1   NATALIE L. BRIDGEMAN, State Bar No. 223717
    Law Offices of Natalie L. Bridgeman, Esq.
2   131 Steuart Street, Suite 400
    San Francisco, CA 94105
3   Telephone: (415) 979-0150
    Facsimile: (415) 520-0140
4   Email: natalie@ihrlaw.com

5   JONATHAN M. FREIMAN (*pro hac vice pending*)
    HOPE R. METCALF (*pro hac vice pending*)
6   National Litigation Project
    Lowenstein International Human Rights Clinic
7   Yale Law School
    P.O. Box 208215
8   New Haven, CT 06520-8215
9   Telephone: (203) 498-4584
    Facsimile: (203) 782-2889
10  Email: jonathan.freiman@yale.edu

11  Attorneys for Jose Padilla and Estela Lebron, Plaintiffs

12

ORIGINAL
FILED

JAN  4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

13              UNITED STATES DISTRICT COURT
14              NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION

15
16  Jose Padilla and Estela Lebron,          CV 08          CASE NO.:      0035

17              Plaintiffs,                  )
                                             )   COMPLAINT
18       v.                                  )
                                             )
19  John Yoo,                                )
                                             )
20              Defendant.                   )
                                             )
21  _____  )

22

23

24

25

26

27

28

COMPLAINT

# INTRODUCTION

1.      Plaintiff Jose Padilla is a United States citizen who was imprisoned as an "enemy combatant" in a military brig, without charge and without ability to defend himself or challenge his conditions of confinement for three years and eight months.  Throughout those years, Mr. Padilla suffered gross physical and psychological abuse at the hands of federal officials as part of a systematic program of abusive interrogation intended to break down Mr. Padilla's humanity and his will to live.  For nearly two years, Mr. Padilla was held in complete isolation and denied all access to the court system, legal counsel and his family.  He was subjected to mistreatment including but not limited to extreme and prolonged sleep and sensory deprivation designed to inflict severe mental pain and suffering; exposure to extreme temperatures; interrogation under threat of torture, deportation and even death; denial of access to necessary medical and psychiatric care; and interference with his ability to practice his religion.  In the year and a half that Mr. Padilla remained in the Brig after he was granted limited access to legal counsel, much of this severe abuse continued.

2.      Mr. Padilla's detention, conditions of confinement, and program of interrogation were unlawful and  violated, inter alia: his rights to procedural and substantive due process; his right to be free from cruel or unusual punishment and treatment that shocks the conscience and/or violates United States laws and regulations; his right freely to exercise his religion; his right to access information; his right to association with family members and friends; his right of access to legal counsel; his right of access to court; his right against compelled self-incrimination; his right against arbitrary and unconstitutional seizure and detention; and his right to be free from governmental conspiracies intended to deprive him of his rights, privileges and immunities under the law.

3.      The grave violations suffered by Padilla were not isolated occurrences by rogue lower-level officials; to the contrary, Defendant John Yoo, along with other senior officials, deliberately removed Mr. Padilla from due process protections traditionally available to U.S. citizens detained by their government and barred all access to the outside world, including access to counsel.  On information and belief, Defendant Yoo and other senior officials then personally

1  formulated and/or approved and/or failed to act upon actual or constructive knowledge of, a

2  systematic program of illegal detention and interrogation, which was specifically designed to

3  inflict, and did inflict, severe physical and mental pain and suffering on Mr. Padilla for the

4  purpose of extracting information from him and/or punishing him without due process of law, and

5  which proximately caused the harms to Mr. Padilla alleged herein.  Defendant Yoo personally

6  provided numerous legal memoranda that purported to provide to senior government officials a

7  legal basis to implement an extreme and unprecedented interrogation and detention program –

8  even though such tactics are unprecedented in U.S. history and clearly contrary to the U.S.

9  Constitution and the law of war.

10       4.       Mr. Padilla suffered and continues to suffer severe mental and physical harm as a

11  result of the forty-four months of military detention and interrogation that he endured, detention

12  and interrogation for which Defendant Yoo personally purported to provide a legal blank check.

13       5.       Ms. Lebron was also injured by the conduct of the Defendant, which caused her to

14  be deprived of the virtually all contact with her son, Mr. Padilla, for the duration of his illegal

15  detention and interrogation, in violation of her constitutional rights to familial association and

16  communication.

17       6.       Plaintiffs Padilla and Lebron assert this complaint against Defendant John Yoo in

18  his individual capacity.  Plaintiffs seek monetary damages and declaratory relief.

19                          **JURISDICTION**

20       7.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question

21  jurisdiction) and directly under the Constitution.

22       8.       Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e).

23                     **INTRADISTRICT ASSIGNMENT**

24       9.       Defendant Yoo resides in Alameda County.  Per Civil Local Rule ("L.R.") 3-2(c)-

25  (d) and 3-5(b), this civil action may be assigned to either the San Francisco or Oakland Divisions

26  of the Northern District of California.

27

28

**PARTIES**

10.    Mr. Padilla is an American citizen.  From on or about June 9, 2002, until on or about January 5, 2006 (the "Relevant Time Period"), Mr. Padilla was detained as an "enemy combatant" at the Naval Consolidated Brig at the Naval Weapons Station in Charleston, South Carolina (hereinafter "Brig"). On January 5, 2006, Mr. Padilla was transferred from the Brig to a federal detention center in Miami, Florida, where he stood trial before Hon. Marcia G. Cook of the U.S. District Court for the Southern District of Florida on criminal charges unrelated to the allegations that had been used to justify his military detention without charge.  On August 16, 2007, the jury returned a verdict of guilty; the judgment is currently subject to appeal.

11.    Ms. Lebron is an American citizen and the mother of Mr. Padilla.  For the Relevant Time Period, Ms. Lebron was denied virtually all contact with her son, Mr. Padilla.

**Defendant John Yoo**

12.    During part of the Relevant Period, from 2001 through May 2003, Defendant John Yoo was Deputy Assistant Attorney General in the Office of Legal Counsel.  Upon information and belief, Defendant Yoo is a citizen of the United States and a resident of California, where he maintains his primary residence.  He is sued in his individual capacity.

**FACTUAL ALLEGATIONS**

13.    On or about May 8, 2002, Mr. Padilla was arrested in Chicago O'Hare International Airport, pursuant to a material witness warrant issued by the U.S. District Court for the Southern District of New York.  He was transported to New York where he was held in custody in a federal detention facility.  He was assigned court-appointed counsel, and a motion to vacate the material witness warrant was filed.

14.    Mr. Padilla is not an enemy combatant and the basis for his designation as such has never been reviewed by an independent tribunal.

15.    Nonetheless, as Counsel to the President Alberto Gonzales explained to the American Bar Association in a speech given on February 24, 2004, attached hereto as Exhibit A, Attorney General John Ashcroft personally considered and then recommended that Mr. Padilla be

-4-

COMPLAINT

militarily detained as an "enemy combatant," without access to counsel, courts, or family, and without due process of law.

16.    In making this recommendation, Attorney General Ashcroft relied upon a legal opinion from the Office of Legal Counsel (OLC). As Defendant Yoo explains in his own book, *War by Other Means,* he was personally responsible for preparing the OLC opinion and personally recommended that Mr. Padilla be militarily detained as an "enemy combatant," without access to counsel, courts, or family, and without due process of law.

17.    Based upon Defendant Yoo's legal opinion and Ashcroft's recommendation, President George W. Bush issued an order dated June 9, 2002, attached hereto as Exhibit B, declaring Mr. Padilla an "enemy combatant" and directing Secretary of Defense Donald Rumsfeld to take Mr. Padilla into military custody.

18.    Although Mr. Padilla is not an "enemy combatant," Mr. Padilla was held in military custody at the Brig for three and a half years (from June 9, 2002, until January 5, 2006) with neither criminal charge nor fact-finding by any independent tribunal to review the basis for his detention.

19.    There was no statutory or constitutional authority for the military seizure and detention of Mr. Padilla.

20.    During his military detention in the Brig, Mr. Padilla was intentionally subjected to a systematic program of illegal interrogation and conditions of confinement that Defendant Yoo justified through legal opinions purporting to permit illegal conduct. The legal opinions prepared by Defendant Yoo (collectively, "the Torture Memos") included, but were not limited to:

    a. A memorandum dated January 9, 2002 from Defendant Yoo to Department of Defense General Counsel Haynes on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees* (attached hereto as Exhibit C);

    b. A memorandum dated January 22, 2002 to Alberto Gonzales, Counsel to the President, on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees,* signed by Assistant Attorney General Bybee but, upon information and belief, created by Defendant Yoo (attached hereto as Exhibit D);

-5-

c.  A memorandum dated February 26, 2002 to Department of Defense General Counsel Haynes on *Potential Legal Constraints Applicable to Interrogations of Persons Captured by U.S. Armed Forces in Afghanistan*, signed by Assistant Attorney General Bybee but, upon information and belief, created by Defendant Yoo (attached hereto as Exhibit E); and

d.  A memorandum dated August 1, 2002 to Counsel to the President Gonzales on *Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A*, signed by Assistant Attorney General Bybee but, upon information and belief, created by Defendant Yoo (attached hereto as Exhibit F).

21.    The program of illegal interrogation applied to Mr. Padilla and authorized by the Torture Memos included conscience-shocking interrogation techniques and conditions of confinement, detailed below, intended to destroy Mr. Padilla's ordinary emotional and cognitive functioning in order to extract from him potentially self-incriminating information. Some of these techniques and conditions were included in the "JFCOM-approved plan" for an unidentified individual detained at the Brig which was referred to by Vice Admiral Church in his May 11, 2004 "Brief to the Secretary of Defense on Treatment of Enemy Combatants Detained at Naval Station Guantanamo Bay, Cuba, and Naval Consolidated Brig, Charleston," attached hereto as Exhibit G.

22.    The conscience-shocking interrogation techniques and conditions of confinement detailed below were not only intended to extract information from Mr. Padilla, but also to punish him. Mr. Padilla was detained long after U.S. Deputy Attorney General James Comey announced in a press conference that the government had uncovered most of what Mr. Padilla was thought to know and also well after Deputy Secretary of Defense Wolfowitz had characterized the activities in which Mr. Padilla allegedly had engaged as mere "loose talk."

23.    Mr. Padilla was kept alone in a unit that, despite consisting of 10 to 20 cells, never accommodated more than three detainees and was otherwise unoccupied for much of the period of Mr. Padilla's detention.

24.    Mr. Padilla's cell was electronically monitored twenty-four hours a day, eliminating the need for a guard to patrol his unit and further increasing his isolation.

-6-

1    25.    From June 9, 2002 until March 4, 2004, Mr. Padilla was deliberately denied all

2    contact with persons outside the military brig, including his family and his lawyers.  During this

3    period, Mr. Padilla's only human contact was with interrogators during interrogation sessions, or

4    with guards when they delivered his meals through a slot in his cell door, or escorted him to the

5    shower or the concrete cage in which he was intermittently permitted to exercise.

6    26.    For ten months after the President, relying on Defendant Yoo's legal opinion,

7    ordered Mr. Padilla detained by the military, the government denied Ms. Lebron any information

8    about her son.  After almost a year of agonizing uncertainty, a Pentagon official finally brought

9    Ms. Lebron a very brief greeting card that Mr. Padilla had been permitted to write to let her know

10   that he was alive.

11   27.    Beginning on March 4, 2004, while a habeas petition filed on his behalf was

12   pending in the U.S. Supreme Court, Mr. Padilla was finally permitted contact with his attorneys.

13   Even then, he was allowed only sporadic contact with his attorneys and only under very restrictive

14   conditions.  His isolation and other conditions of confinement remained largely unchanged by the

15   introduction of this limited access to counsel.

16   28.    In the nearly two year period between March 4, 2004, and January 5, 2006, Mr.

17   Padilla was permitted to receive only two telephone calls from his mother.  Mr. Padilla was never

18   permitted to initiate telephone calls to his mother or to any other member of his family.

19   29.    Mr. Padilla's cell measured only 9 feet by 7 feet, and contained only a bed, sink

20   and toilet and a small window.

21   30.    The windows in Mr. Padilla's tiny cell were blacked out in order to deprive Mr.

22   Padilla of any sunlight or view of the outdoors or even of the inside of the Brig, thereby deepening

23   his sensory deprivation and disorientation.

24   31.    On rare occasions when Mr. Padilla was removed from his cell - once to visit the

25   dentist, for example - his eyes and ears were covered to continue the sensory deprivation as

26   illustrated in the photographs entered as exhibits in Mr. Padilla's criminal trial and attached hereto

27   as Exhibit H.  There was no security or other legitimate penological reason for these constraints, as

28   Mr. Padilla was a docile prisoner who did not violate prison disciplinary rules.

-7-

COMPLAINT

32.    For the bulk of his captivity, Mr. Padilla was denied either a clock or a watch and, deprived of any natural light, he could not tell day from night, and did not know the day of the week or the season, or the direction of Mecca.

33.    To deepen his disorientation, Mr. Padilla was further denied access to any form of information about the outside world, including radio, television, and newspapers from the time of his imprisonment without charge in the military brig until summer 2004, at which time he was permitted very limited access to such materials.

34.    When Mr. Padilla was first detained, he was permitted access to a Qur'an. Shortly thereafter, however, Mr. Padilla's access to religious texts was revoked until March 2004, when Mr. Padilla's counsel provided him with a new copy of the Qur'an.

35.    By depriving Mr. Padilla of any method of ascertaining the time of day, the season of the year, or the direction of Mecca, and by removing his copy of the Qur'an, Brig officials and/or other government agents deliberately interfered with and substantially burdened Mr. Padilla's ability to pray, keep holidays, study religious texts, and otherwise observe the strictures of his faith.

36.    Upon information and belief, the express request of a representative of the International Committee of the Red Cross that Mr. Padilla be given access to a time-piece with which he could ascertain the time for prayer was denied by Brig officials and/or other government agents.

37.    There was no legitimate or compelling penological or other governmental interest for the substantial burden on Mr. Padilla's exercise of his religion described above.

38.    Despite the existence of a library on the Brig, other than the Qur'an, which was briefly provided but quickly taken back, Mr. Padilla was substantially denied reading material from the time of his imprisonment without charge in the military brig until March 2004.

39.    Brig Technical Director Sandy Seymour indicated to Mr. Padilla's habeas counsel that, based on his long experience in corrections, he was concerned about the long-term effect on Mr. Padilla of the extreme and prolonged isolation and sensory deprivation to which Mr. Padilla was being subjected.

40.     Brig Technical Director Seymour's concerns about the potential for harm from isolation and sensory deprivation are supported by a substantial body of clinical literature and expert opinion which holds that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning, and that even a few days of solitary confinement predictably causes brain patterns to become measurably abnormal.

41.     One of the recorded effects of severe isolation and deprivation of environmental stimuli is that individuals become hypersensitive to, and tend to find intensely disturbing, any external stimuli to which they are exposed.

42.     Mr. Padilla was periodically subjected to absolute light or darkness for periods in excess of twenty-four hours.

43.     Until the tail end of his captivity, Mr. Padilla's bed consisted of a cold steel slab with no mattress, pillow, or blanket.

44.     Mr. Padilla was regularly subjected to loud noises at all hours of the night, caused by Brig personnel and/or other government agents banging on the walls and bars of Mr. Padilla's cell or opening and shutting the doors to the empty cells in the wing.

45.     Mr. Padilla was also subjected to extreme and deliberate variations in the temperature of his cell.

46.     Mr. Padilla was denied sufficient exercise and recreation.   Mr. Padilla was permitted to exercise only intermittently and then only in a concrete "cage" and often at night.

47.     Mr. Padilla was denied the most basic comforts and subjected to arbitrary changes in his conditions of confinement.  He was forbidden to shower for weeks at a time but would be subjected to forced grooming at the hands of the interrogators.  Similarly, at varying points of the detention, he was given some comforts, such as a pillow or sheet, only to have them taken away arbitrarily.

48.     Mr. Padilla was kept shackled and manacled, or forced to sit or stand in markedly uncomfortable and painful (or "stress") positions for hours at a time.

49.     Mr. Padilla was forced to endure the introduction into his cell of noxious fumes that caused pain and discomfort to his eyes and nose.

-9-

COMPLAINT

50.    In addition to the conditions of extreme isolation and sensory deprivation in which Mr. Padilla was confined, upon information and belief, during lengthy interrogation sessions government interrogators intentionally subjected Mr. Padilla to the following forms of abuse, intended to cause Mr. Padilla severe mental pain or suffering, overbear his will, and extract from him potentially self-incriminating information:

    a.  Lying to Mr. Padilla about his location and the identity of his interrogators;

    b.  Threatening to subject Mr. Padilla to physical abuse that would result in severe physical pain and suffering, or death, including threats to cut Mr. Padilla with a knife and pour alcohol into the wounds;

    c.  Threatening to kill Mr. Padilla immediately;

    d.  Threatening to transfer Mr. Padilla to a location outside the United States, to a foreign country or the U.S. Naval Base at Guantanamo, where they told him he would be subjected to far worse treatment, including severe physical and mental pain and suffering; and

    e.  Administering to Mr. Padilla, against his will, chemicals that Mr. Padilla believed to be psychotropic drugs.

51.    Each of these interrogation techniques and conditions of confinement individually, and all of them in conjunction with each other, were calculated to and actually did intensify Mr. Padilla's sense of profound isolation and disorientation, deprive Mr. Padilla of sleep, and cause Mr. Padilla severe physical pain and profound disruption of his senses and personality, all well beyond the physical and mental discomfort that normally accompanies incarceration.

52.    During the Relevant Period, Defendant Yoo played a central role in providing the purported legal justifications for interrogation policies directed at suspected "enemy combatants," including the justifications for many or all of the conditions and techniques to which Mr. Padilla was subjected.

53.    During the Relevant Period, Defendant Yoo prepared the Torture Memos. He knew that the Torture Memos would be transmitted to senior government officials, including officials at the White House and Department of Defense, and would be relied upon by military and

intelligence officials in formulating and implementing programs of confinement and interrogation for suspected "enemy combatants."

54.    By means of the Torture Memos, Defendant Yoo purported to provide legal justifications for unprecedented and illegal detention and interrogation techniques, including: program to detain suspected "enemy combatants" summarily, indefinitely and without charge; to deny detainees access to counsel, or review by an independent tribunal; and to subject them to unlawful conditions of confinement and interrogation techniques.  The Torture Memos further advised government officials who, in fact, authorized and/or carried out the torture of "enemy combatant" detainees, that even if such techniques were indeed illegal, they could nevertheless escape liability by claiming the defenses of necessity or self-defense – putative justifications that former Assistant Attorney General Jack Goldsmith has described as "get-out-of-jail-free" cards.

55.    The Torture Memos were used in the creation of Department of Defense policies regarding the detention and interrogation of "enemy combatant" detainees, including Mr. Padilla.

56.    Declassified documents including a Department of Defense Action Memo dated November 27, 2002 ("Action Memo"), attached hereto as Exhibit I, and a Memorandum for the Commander, U.S. Southern Command dated April 16, 2003 and signed by Secretary of Defense Rumsfeld, attached hereto as Exhibit J, demonstrate that senior government officials, upon information and belief, relying upon the Torture Memos, approved for use on suspected "enemy combatants" the following interrogation techniques, many of which were also applied to Mr. Padilla during his detention at the Brig:

    a.  Stress positions for up to 4 hours

    b.  Use of isolation facilities for 30 days or more

    c.  Deprivation of light and auditory stimuli

    d.  Hooding

    e.  20-hour interrogations

    f.  Removal of all comfort items, including religious items

    g.  Removal of clothing

    h.  Forced grooming

-11-

i. Using individual phobias to induce stress

j. Switching the detainee from hot meals to cold MREs ("Meal, Ready to Eat")[1]

k. Altering the environment by adjusting the temperature

l. Altering the environment by introducing an unpleasant smell

m. Adjusting the sleeping times of the detainee, for example by reversing sleep cycles from night to day

57.    The threats listed in ¶ 50(a)-(d) are variations on a technique described in the Action Memo, Ex. D, as "[t]he use of scenarios designed to convince the detainee that death or severely painful consequences are imminent for him or his family."

58.    The  interrogation techniques listed in ¶56 are elaborated upon in publicly-available, declassified government reports.  They were recommended for approval in the April 4, 2003 Working Group Report on Detainee Interrogations in the Global War on Terrorism ("2003 Working Group Report"), which is attached in relevant part hereto as Exhibit K.

59.    The 2003 Working Group Report was created at the direction of Secretary of Defense Rumsfeld.  Upon information and belief, in authoring the 2003 Report, the Working Group was advised by the Department of Justice and expressly instructed to rely upon the Torture Memos authored by Defendant Yoo.  In fact, sections of the March 6 draft of the Working Group Report pertaining to the interpretation of the Torture Statute, 18 U.S.C. §§ 2340-2340A, and the availability of the defenses of necessity and self-defense were copied verbatim from the August 1, 2002 OLC Memo on *Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A*, created, upon information and belief, by Defendant Yoo.

60.    Upon information and belief, the interrogation techniques formulated and approved by senior government officials including Defendant Yoo were based on methods used to train U.S. special forces to "Survive, Evade, Resist, and Escape," otherwise known as "SERE" methods. SERE methods were initially developed during the Cold War to defend U.S. troops against torture

---

[1]An MRE is a self-contained operational ration pack usually heated by a flameless ration heating device that is packed into each meal bag.

COMPLAINT

1    and interrogation methods that the Soviet Union's intelligence agency, the KGB, used on captured

2    Americans.  Upon information and belief, U.S. intelligence and military officials used the SERE

3    methods for half a century only for defensive training purposes, never as an offensive weapon

4    against suspected enemy agents.  To the contrary, the United States regularly condemned those

5    nations employing such torture and interrogation methods.

6        61.    Upon information and belief, professional interrogation experts including Colonel

7    Steve Kleinman, the former head of the air force's strategic interrogation program, and Dr.

8    Michael Gelles, the navy's top forensic psychologist, were alarmed by the adoption of these

9    techniques for interrogation purposes because it is widely understood by experts that these

10   methods, which U.S. troops were being trained to resist, were developed by enemy nations to

11   brainwash U.S. forces for propaganda purposes, not to extract accurate intelligence information,

12   and that the techniques can cause severe injury.

13       62.    Upon information and belief, the attempts of these experts to raise alarms about the

14   ineffectiveness of such techniques for obtaining accurate intelligence were thwarted or ignored by

15   senior government officials, including Defendant Yoo.

16       63.    Upon information and belief, the interrogation techniques originally approved for

17   use on suspected "enemy combatants" by senior defense and government officials, including

18   Defendant Yoo:  (a) were expressly authorized for use on Mr. Padilla; or (b)  were applied to Mr.

19   Padilla in reliance on official memoranda authored by Defendant Yoo and approving harsh

20   interrogation techniques, as well as a deliberate unwritten understanding fostered by the

21   promulgation of memoranda including those authored by Defendant Yoo that senior government

22   officials wanted intelligence results fast and that use of harsh techniques was acceptable for that

23   purpose.

24       64.    From June 9, 2002 until March 4, 2004, senior government officials purposely and

25   systematically deprived Mr. Padilla of all access to legal counsel and all access to the courts.

26       65.    Defendant Yoo and other senior government officials intentionally denied Mr.

27   Padilla access to counsel, inter alia, because, as explained by Vice Admiral Lowell E. Jacoby in

28   his January 9, 2003, Declaration to the United States District Court for the Southern District of

1    New York ("Jacoby Declaration"), attached hereto as Exhibit L, they believed that anything that

2    could give Mr. Padilla hope "that his ultimate release may be obtained through an adversarial civil

3    litigation process" would destroy the complete psychological dependency on his interrogators they

4    intended to create in order to extract from Mr. Padilla potentially self-incriminating information.

5    66.    Mr. Padilla was allowed contact with his attorneys only after the habeas corpus

6    petition filed by his counsel reached the U.S. Supreme Court, at which point the government

7    argued that Mr. Padilla's demand for access to counsel was moot.

8    67.    The government announced the change in policy to allow Mr. Padilla limited

9    access to counsel on February 11, 2004.  However, counsel was not allowed to meet with Mr.

10    Padilla until March 4, 2004.

11    68.    Even after March 4, 2004, Brig officials and other government agents continued

12    deliberately to interfere with Mr. Padilla's communications with counsel and to intimidate Mr.

13    Padilla from speaking freely with his attorneys.

14    69.    Mr. Padilla was only permitted to meet his attorneys in a confined room, with his

15    ankles cuffed and locked onto a metal handle on the floor.

16    70.    Certain legal professionals employed by the government were assigned to the so-

17    called "Privilege Team."  This group reviewed all communication that Mr. Padilla received from

18    his attorneys prior to his receiving them and further asserted the power to review all notes taken by

19    his attorneys.

20    71.    Upon information and belief, some government agents also listened to and recorded

21    Mr. Padilla's conversations with his attorneys.

22    72.    Mr. Padilla's counsel were forced to sign Access Procedures that severely restricted

23    their discussions with Mr. Padilla while he was in the Brig.  The Access Procedures stated that the

24    "Privilege Team" would terminate any discussions between counsel and Mr. Padilla that involved

25    "conveying information concerning the internal operations of the Brig" or "information

26    concerning intelligence sources and methods."  Because of this, counsel were essentially barred

27    from discussing with Mr. Padilla how he had been treated during his months of incommunicado

28

-14-

COMPLAINT

1    interrogation, as well as the ongoing operations of the Brig including the details of his conditions

2    of confinement.

3        73.    The Access Procedures also stated that they did not reflect any determination or

4    acknowledgment of an attorney-client relationship between counsel and Mr. Padilla, leading

5    counsel reasonably to fear that Mr. Padilla's communications with them were monitored and

6    might not be legally protected.   In a Rider that they insisted be attached to the Access Procedures,

7    counsel objected to the Access Procedures and stated that they felt themselves ethically precluded

8    from discussing any potentially privileged topic with Mr. Padilla while the procedures were in

9    place.

10        74.    Upon information and belief, Brig officials and other government agents interfered

11    with Mr. Padilla's access to counsel by telling Mr. Padilla that his attorneys were not trustworthy

12    and actually were government officials.

13        75.    Upon information and belief, Brig officials and other government agents further

14    interfered with Mr. Padilla's access to counsel by threatening Mr. Padilla with unpleasant

15    consequences if he revealed the true conditions of confinement to his counsel.   Mr. Padilla,

16    terrified of retaliation by the government, refused to discuss his treatment with his counsel in any

17    detail during the Relevant Period.

18        76.    In addition to the direct interference with Mr. Padilla's access to counsel detailed

19    above, Mr. Padilla's access to counsel was indirectly hampered by the abusive conditions of

20    confinement and interrogation imposed upon him, which rendered Mr. Padilla incapable of

21    communicating to his attorneys all of the information necessary to effective legal representation of

22    Mr. Padilla's interests.

23        77.    The denial of access to counsel and the courts, and detention without due process of

24    law for what the government asserted could be forever, caused Mr. Padilla mental pain and

25    suffering beyond that inflicted by the isolation and sensory deprivation to which he was subjected.

26        78.  `  As a consequence of the interference with access to counsel detailed above, at no

27    point did Mr. Padilla's counsel fully understand the extent of the abusive interrogations and

28    conditions of confinement to which Mr. Padilla was being subjected.   Furthermore, upon

-15-

COMPLAINT

1    questioning by Mr. Padilla's counsel, government officials within the Department of Defense

2    chain of command, including Capt. A.G. Kaufman of Joint Forces Command, Brig Technical

3    Director Sandy Seymour, and Assistant to the Solicitor General David P. Salmons gave numerous

4    assurances that Mr. Padilla was being held in humane conditions.

5    79.    Nonetheless, Mr. Padilla's attorneys were concerned by what they could ascertain

6    of Mr. Padilla's conditions of confinement, in particular, his severe isolation from other human

7    beings and deprivation of stimuli.    Mr. Padilla's counsel also noticed signs of psychological

8    distress in Mr. Padilla, including involuntary twitching and self-inflicted scratch wounds.

9    80.    On several occasions, Mr. Padilla's counsel brought  concerns about Mr. Padilla's

10    health to the attention of officials in the chain of command governing Mr. Padilla's detention,

11    including Capt. A.G. Kaufman of Joint Forces Command, Brig Technical Director Sandy

12    Seymour, and Assistant to the Solicitor General David P. Salmons, who assured them that these

13    concerns would be passed throughout the chain of command.    Upon information and belief, the

14    concerns about Mr. Padilla's health expressed by his counsel were in fact communicated to other

15    Brig personnel and senior government officials.

16    81.    In addition to counsel's communications regarding Mr. Padilla's well-being, brig

17    personnel, including Brig Technical Director Sandy Seymour, observed Mr. Padilla weeping in his

18    cell on multiple occasions.

19    82.    Mr. Padilla made repeated requests for access to medical care for serious and

20    potentially life-threatening ailments, including chest pain and difficulty breathing, as well as for

21    treatment of the chronic, extreme pain caused by being forced to endure stress positions.    These

22    requests were either denied or met with grossly inadequate responses, upon information and belief,

23    as part of the systematic program of abuse designed and approved by senior government officials,

24    including Defendant Yoo, to break Mr. Padilla's will and extract from him self-incriminating

25    information.

26    83.    On May 11, 2004, Vice Admiral Church expressly noted in his briefing to the

27    Secretary of Defense and his staff that some unauthorized interrogation techniques were being

28    employed against suspected "enemy combatant" detainees at the Brig.    *See* Ex. G at 9. Vice

COMPLAINT

Admiral Church's slides also noted that one enemy combatant detainee on the Brig had had his Qu'ran, mattress, and pillow removed as part of a JFCOM-approved interrogation plan, and that the severe isolation experienced by detainees in the Brig could be legally problematic.

84.    Mr. Padilla was never given any explanation for the abusive treatment and severe conditions of confinement to which he was subjected. Upon information and belief, the measures described above were not imposed on Mr. Padilla for prison disciplinary or other legitimate prison administrative goals. Mr. Padilla was a model prisoner who was never even accused of violating Brig rules; indeed, he was described by Brig officials as being so passive as to be "like a piece of furniture."

85.    The systematic program to punish Mr. Padilla, to subject him to severe mental and physical pain, and to destroy his ordinary emotional and cognitive functioning was a success and proximately caused Mr. Padilla to suffer marked harm to his mental well-being.

86.    In addition to the harm caused to Mr. Padilla by his detention and interrogation, Mr. Padilla continues to suffer deprivation of liberty, public stigmatization, serious ongoing psychological harm, and other collateral effects from the unlawful "enemy combatant" designation, including the threat that he will once again be militarily detained in the Brig and subjected there to unconstitutional conditions of confinement and unconstitutional interrogations.

87.    The threat of re-detention is not a figment of Mr. Padilla's imagination. On or about November 23, 2005 – shortly after the criminal indictment against Mr. Padilla was made public – Deputy Solicitor General Gregory Garre informed Mr. Padilla's counsel, Jonathan Freiman, that it was the government's position that the "enemy combatant" designation had not been rescinded and that the government could therefore militarily redetain Mr. Padilla at any time based on his alleged past acts.

88.    The threat of redetention has also chilled Mr. Padilla's exercise of his right to counsel by preventing him from fully communicating the details of his mistreatment.

89.    Plaintiffs seek to vindicate their constitutional rights and ensure that neither Mr. Padilla nor any other person is treated this way in the future

90.    Plaintiffs seek monetary and declaratory relief.

-17-

COMPLAINT

91.     Plaintiffs have no administrative remedies or other effective means of enforcing their rights other than seeking relief from the Court.

## PERSONAL PARTICIPATION OF DEFENDANT

92.     As described herein, Defendant Yoo acted under color of law and in violation of Plaintiffs' clearly established constitutional, statutory, and common law rights. The allegations of the preceding paragraphs of this complaint are all incorporated by reference into this section as if fully set forth herein.

93.     During the Relevant Period, Defendant Yoo was Deputy Assistant Attorney General in the Office of Legal Counsel of the Department of Justice. As revealed by Jack Goldsmith, former Assistant Attorney General for OLC, Defendant Yoo was a key member of a small, secretive group of executive officials who exerted tremendous influence over anti-terrorism policy and who were known as the "War Council."

94.     Upon information and belief, Defendant Yoo had substantial influence over government policies regarding the detention and interrogation of suspected "enemy combatants." Goldsmith's predecessor, Assistant Attorney General Jay Bybee, "largely delegated OLC's war-on-terrorism responsibilities to Yoo," as Goldsmith has revealed.

95.     Defendant Yoo, through the Torture Memos, personally provided essential legal approval for the policy of militarily detaining and interrogating without access to counsel, courts, or family, and without due process of law, U.S. citizens suspected of being "enemy combatants," and that legal approval proximately and foreseeably caused Mr. Padilla's illegal detention and the other violations alleged herein.

96.     Upon information and belief, Defendant Yoo was personally involved in formulating the recommendation to President George W. Bush that Mr. Padilla be detained without charge as an "enemy combatant." The actions of Defendant Yoo proximately and foreseeably caused Mr. Padilla to be seized from the civilian criminal system and transferred to military detention.

97.     Upon information and belief, Defendant Yoo personally participated in and/or approved the decision militarily to detain Mr. Padilla with the intention of subjecting Mr. Padilla

-18-

1    to conditions of confinement designed to coerce from him potentially self-incriminating evidence,

2    to shield the illegal detention and interrogation from judicial review, and to deprive Mr. Padilla of

3    due process of law, proximately and foreseeably causing harm to Mr. Padilla and Ms. Lebron.

4          98.    Defendant Yoo authored the legal opinion recommending that Mr. Padilla could be

5    taken into custody as a military combatant.  Defendant Yoo himself has publicly asserted that

6    Attorney General Ashcroft relied on this opinion in recommending Mr. Padilla's seizure out of the

7    civilian justice system and detention without charge in a military prison.

8          99.    Upon information and belief, Defendant Yoo also personally participated in

9    formulating and/or approving the program of detention, interrogation, and conditions of

10   confinement that proximately and foreseeably caused the harms to Mr. Padilla and Ms. Lebron

11   alleged herein.

12        100.    Upon information and belief, Defendant Yoo personally authored legal opinions

13   purporting to provide essential legal approval for the use of extreme interrogation tactics against

14   suspected "enemy combatant" detainees and/or concluding that the executive branch had nearly

15   unlimited authority in the interrogation of suspected "enemy combatant" detainees, opinions that

16   proximately and foreseeably harmed Plaintiffs.

17        101.    Upon information and belief, Defendant Yoo's legal opinions served as the basis

18   for the list of interrogation tactics authorized by the Department of Defense for use on suspected

19   "enemy combatant" detainees, including Mr. Padilla. Department of Defense General Counsel

20   Haynes directed the 2003 Working Group on Detainee Interrogations to consider as binding legal

21   authority one of the Torture Memos, upon information and belief authored by Defendant Yoo,

22   which authorized the use of such techniques.

23        102.    Upon information and belief, upon the basis of the Torture Memo prepared by

24   Defendant Yoo, Department of Defense General Counsel Haynes recommended that the Secretary

25   of Defense approve methods of interrogation including:

26           a.   Stress positions for up to 4 hours

27           b.   Use of isolation facilities for 30 days or more

28           c.   Deprivation of light and auditory stimuli

-19-

COMPLAINT

1    d. Hooding

2    e. 20-hour interrogations

3    f. Removal of all comfort items, including religious items

4    g. Removal of clothing

5    h. Forced grooming

6    i. Using individual phobias to induce stress

7   103. Alternatively, upon information and belief, Defendant Yoo had actual or

8 constructive knowledge of the violations alleged herein and failed to take steps to stop those

9 violations despite a substantial and foreseeable risk of harm to Mr. Padilla and Ms. Lebron.

10 Defendant Yoo's deliberate indifference to the perpetration of these violations proximately and

11 foreseeably caused the harms to Plaintiffs alleged herein.

12   104. Alternatively, upon information and belief, Defendant Yoo's formulation and/or

13 approval of, or deliberate indifference to, the use of harsh interrogation techniques for suspected

14 "enemy combatants" foreseeably and proximately caused lower-ranking government officials to

15 subject Mr. Padilla to the abuses detailed herein by creating a climate in which lower-ranking

16 government agents felt pressure to extract information quickly and understood that use of harsh

17 interrogation techniques was acceptable to top-level officials for that purpose.

18   105. The Torture Memos drafted by Defendant Yoo were, as former Assistant Attorney

19 General and the subsequent head of OLC Jack Goldsmith put it in his book *The Terror*

20 *Presidency*, "deeply flawed: sloppily reasoned, overbroad, and incautious in asserting

21 extraordinary constitutional authorities on behalf of the President." They purported to issue a

22 provide essential legal approval for conduct that reasonable government officials – and especially

23 government lawyers – knew or should have known violated clearly established constitutional and

24 statutory rights.

25            **CLAIMS**

26   106. Mr. Padilla incorporates by reference each and every allegation contained in the

27 preceding paragraphs as if set forth fully herein.

28

COMPLAINT

107.    By the allegations incorporated above, Defendant Yoo proximately and foreseeably injured Mr. Padilla by violating numerous clearly established constitutional and statutory rights including, but not limited to, the following:

a. **Denial of Access to Counsel.**  Acting under color of law and his authority as a federal officer, Defendant Yoo violated Mr. Padilla's right of access to legal counsel protected by the First, Fifth, and Sixth Amendments to the U.S. Constitution.

b. **Denial of Access to Court.**  Acting under color of law and his authority as a federal officer, Defendant Yoo violated Mr. Padilla's right of access to court protected by the First and Fifth Amendments to the U.S. Constitution, Article III of the U.S. Constitution, and the Habeas Suspension Clause of the U.S. Constitution.

c. **Unconstitutional Conditions of Confinement.**  Acting under color of law and his authority as a federal officer, Defendant Yoo subjected Mr. Padilla to illegal conditions of confinement and treatment that shocks the conscience in violation of Mr. Padilla's Fifth Amendment rights to procedural and substantive due process, as well as his Eighth Amendment right to be free of cruel and unusual punishment, including torture, outrages on personal dignity, and humiliating and degrading treatment.

d. **Unconstitutional Interrogations.**  Acting under color of law and his authority as a federal officer, Defendant Yoo subjected Mr. Padilla to coercive and involuntary illegal interrogations, both directly and through unlawful conditions of confinement designed to aid the interrogation, all in violation of Mr. Padilla's Fifth Amendment rights to procedural due process, freedom from treatment that shocks the conscience, and freedom from self-incrimination, as well as his Eighth Amendment right to be free from cruel and unusual punishment, including torture, outrages on personal dignity, and humiliating and degrading treatment.

e. **Denial of Freedom of Religion.**  Acting under color of law and his authority as a federal officer, Defendant Yoo violated Mr. Padilla's right to the free exercise of

-21-

COMPLAINT

1    religion guaranteed under the First Amendment to the U.S. Constitution, as well as

2    the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.

3    f.    **Denial of the Right to Information.**  Acting under color of law and his authority as

4    federal officer, Defendant Yoo violated Mr. Padilla's right to information guaranteed

5    under the First Amendment to the U.S. Constitution.

6    g.    **Denial of the Right to Association.**  Acting under color of law and his authority as

7    a federal officer, Defendant Yoo violated Mr. Padilla's right to association with

8    family and others guaranteed under the First Amendment to the U.S. Constitution.

9    h.    **Unconstitutional Military Detention.**  Acting under color of law and his authority

10    as a federal officer, Defendant Yoo violated Mr. Padilla's right to be free from

11    military detention guaranteed by the Fourth Amendment to the U.S. Constitution, the

12    Due Process Clause of the Fifth Amendment to the U.S. Constitution, the Habeas

13    Suspension and Treason Clauses of the U.S. Constitution, and Article III of the U.S.

14    Constitution.

15    i.    **Denial of Due Process.**  Acting under color of law and his authority as a federal

16    officer, Defendant Yoo violated Mr. Padilla's Fifth Amendment right not to be

17    detained or subjected to the collateral effects of designation as an "enemy

18    combatant" without due process of law.

19    108.    By the allegations incorporated above, Defendant Yoo, acting under color of law

20    and his authority as a federal officer, also proximately and foreseeably injured Ms. Lebron by

21    unlawfully denying her virtually all contact with her son in violation of her clearly established

22    rights to association and communication under the First and Fifth Amendments of the U.S.

23    Constitution.

24    **PRAYER FOR RELIEF**

25    109.    Plaintiffs therefore respectfully request that the Court enter a judgment for all relief

26    to which they are legally entitled under the facts of this case, including but not limited to the

27    following:

28

COMPLAINT

1      a.   A judgment declaring that the acts alleged herein are unlawful and violate the

2           Constitution and laws of the United States;

3      b.   Damages in the amount of one dollar;

4      c.   Attorneys' fees and costs; and

5      d.   All other appropriate relief as the Court may determine to be just and proper.

6   Respectfully submitted,

7

8                                        JONATHAN M. FREIMAN (*pro hac vice pending*)
                                         HOPE R. METCALF (*pro hac vice pending*)
9                                        National Litigation Project
                                         Lowenstein International Human Rights Clinic
10                                       Yale Law School
                                         P.O. Box 208215
11                                       New Haven, CT 06520-8215
                                         Telephone: (203) 498-4584
12                                       Facsimile: (203) 782-2889
                                         Email: jonathan.freiman@yale.edu
13

14

15  Dated:  January 4, 2008             By: _____
                                         NATALIE L. BRIDGEMAN, State Bar No. 223717
16                                       Law Offices of Natalie L. Bridgeman, Esq.
                                         131 Steuart Street, Suite 400
17                                       San Francisco, CA 94105
                                         Telephone:  (415) 979-0150
18                                       Facsimile:  (415) 520-0140
                                         Email: natalie@ihrlaw.com
19
                                         Attorneys for Plaintiffs
20

21

22

23

24

25

26

27

28

COMPLAINT