# EXHIBIT C

**PART 1**



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Deputy Assistant Attorney General          *Washington, D.C. 20530*

January 9, 2002

## MEMORANDUM FOR WILLIAM J. HAYNES II
## GENERAL COUNSEL, DEPARTMENT OF DEFENSE

DRAFT

FROM:  John Yoo
       Deputy Assistant Attorney General

       Robert J. Delahunty
       Special Counsel

RE:    *Application of Treaties and Laws to al Qaeda and Taliban Detainees*

You have asked for our Office's views concerning the effect of international treaties and federal laws on the treatment of individuals detained by the U.S. Armed Forces during the conflict in Afghanistan. In particular, you have asked whether the laws of armed conflict apply to the conditions of detention and the procedures for trial of members of al Qaeda and the Taliban militia. We conclude that these treaties do not protect members of the al Qaeda organization, which as a non-State actor cannot be a party to the international agreements governing war. We further conclude that that these treaties do not apply to the Taliban militia. This memorandum expresses no view as to whether the President should decide, as a matter of policy, that the U.S. Armed Forces should adhere to the standards of conduct in those treaties with respect to the treatment of prisoners.

We believe it most useful to structure the analysis of these questions by focusing on the War Crimes Act, 18 U.S.C. § 2441 (Supp. III 1997) ("WCA"). The WCA directly incorporates several provisions of international treaties governing the laws of war into the federal criminal code. Part I of this memorandum describes the WCA and the most relevant treaties that it incorporates: the four 1949 Geneva Conventions, which generally regulate the treatment of non-combatants, such as prisoners of war ("POWs"), the injured and sick, and civilians.[1]

Part II examines whether al Qaeda detainees can claim the protections of these agreements. Al Qaeda is merely a violent political movement or organization and not a nation-state. As a result, it is ineligible to be a signatory to any treaty. Because of the novel nature of

---

[1] The four Geneva Conventions for the Protection of Victims of War, dated August 12, 1949, were ratified by the United States on July 14, 1955. These are the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, 6 U.S.T. 3115 ("Geneva Convention I"); the Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, 6 U.S.T. 3219 ("Geneva Convention II"); the Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3517 ("Geneva Convention III"); and the Convention Relative to the Protection of Civilian Persons in Time of War, 6 U.S.T. 3317 ("Geneva Convention IV").

this conflict, moreover, we do not believe that al Qaeda would be included in non-international forms of armed conflict to which some provisions of the Geneva Conventions might apply. Therefore, neither the Geneva Conventions nor the WCA regulate the detention of al Qaeda prisoners captured during the Afghanistan conflict.

Part III discusses whether the same treaty provisions, as incorporated through the WCA, apply to the treatment of captured members of the Taliban militia. We believe that the Geneva Conventions do not apply for several reasons. First, the Taliban was not a government and Afghanistan was not – even prior to the beginning of the present conflict – a functioning State during the period in which they engaged in hostilities against the United States and its allies. Afghanistan's status as a failed state is ground alone to find that members of the Taliban militia are not entitled to enemy POW status under the Geneva Conventions. Further, it is clear that the President has the constitutional authority to suspend our treaties with Afghanistan pending the restoration of a legitimate government capable of performing Afghanistan's treaty obligations. Second, it appears from the public evidence that the Taliban militia may have been so intertwined with al Qaeda as to be functionally indistinguishable from it. To the extent that the Taliban militia was more akin to a non-governmental organization that used military force to pursue its religious and political ideology than a functioning government, its members would be on the same legal footing as al Qaeda.

In Part IV, we address the question whether any customary international law of armed conflict might apply to the al Qaeda or Taliban militia members detained during the course of the Afghanistan conflict. We conclude that customary international law, whatever its source and content, does not bind the President, or restrict the actions of the United States military, because it does not constitute federal law recognized under the Supremacy Clause of the Constitution. The President, however, has the constitutional authority as Commander in Chief to interpret and apply the customary or common laws of war in such a way that they would extend to the conduct of members of both al Qaeda and the Taliban, and also to the conduct of the U.S. Armed Forces towards members of those groups taken as prisoners in Afghanistan.

## I. Background and Overview of the War Crimes Act and the Geneva Conventions

It is our understanding that your Department is considering two basic plans regarding the treatment of members of al Qaeda and the Taliban militia detained during the Afghanistan conflict. First, the Defense Department intends to make available a facility at the U.S. Navy base at Guantanamo Bay, Cuba, for the long-term detention of these individuals, who have come under our control either through capture by our military or transfer from our allies in Afghanistan. We have discussed in a separate memorandum the federal jurisdiction issues that might arise concerning Guantanamo Bay.[2]  Second, your Department is developing procedures to implement the President's Military Order of November 13, 2001, which establishes military

---

[2] *See* Memorandum for William J. Haynes II, General Counsel, Department of Defense, from: Patrick F. Philbin, Deputy Assistant Attorney General, and John Yoo, Deputy Assistant Attorney General, *Re: Possible Habeas Jurisdiction over Aliens Held in Guantanamo Bay, Cuba* (Dec. 28, 2001).

2

commissions for the trial of violations of the laws of war committed by non-U.S. citizens.[3] The question has arisen whether the Geneva Conventions, or other relevant international treaties or federal laws, regulate these proposed policies.

We believe that the WCA provides a useful starting point for our analysis of the application of the Geneva Conventions to the treatment of detainees captured in the Afghanistan theater of operations.[4] Section 2441 of Title 18 renders certain acts punishable as "war crimes." The statute's definition of that term incorporates, by reference, certain treaties or treaty provisions relating to the laws of war, including the Geneva Conventions.

### A.  Section 2441: An Overview

Section 2441 reads in full as follows:

*War crimes*

(a) Offense.–Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.

(b) Circumstances.–The circumstances referred to in subsection (a) are that the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States (as defined in section 101 of the Immigration and Nationality Act).

(c) Definition.–As used in this section the term "war crime" means any conduct–

(1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;

(2) prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;

(3) which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non-international armed conflict; or

---

[3] *See generally* Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

[4] The rule of lenity requires that the WCA be read so as to ensure that prospective defendants have adequate notice of the nature of the acts that the statute condemns. *See, e.g., Castillo v. United States*, 530 U.S. 120, 131 (2000). In those cases in which the application of a treaty incorporated by the WCA is unclear, therefore, the rule of lenity requires that the interpretative issue be resolved in the defendant's favor.

(4) of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.

18 U.S.C. § 2441.

Section 2441 lists four categories of war crimes. First, it criminalizes "grave breaches" of the Geneva Conventions, which are defined by treaty and will be discussed below. Second, it makes illegal conduct prohibited by articles 23, 25, 27 and 28 of the Annex to the Hague Convention IV. Third, it criminalizes violations of what is known as "common" Article 3, which is an identical provision common to all four of the Geneva Conventions. Fourth, it criminalizes conduct prohibited by certain other laws of war treaties, once the United States joins them. A House Report states that the original legislation "carries out the international obligations of the United States under the Geneva Conventions of 1949 to provide criminal penalties for certain war crimes." H.R. Rep. No. 104-698 at 1 (1996), reprinted in 1996 U.S.C.C.A.N. 2166, 2166. Each of those four conventions includes a clause relating to legislative implementation and to criminal punishment.[5]

In enacting section 2441, Congress also sought to fill certain perceived gaps in the coverage of federal criminal law. The main gaps were thought to be of two kinds: subject matter jurisdiction and personal jurisdiction. First, Congress found that "[t]here are major gaps in the prosecutability of individuals under federal criminal law for war crimes committed against Americans." H.R. Rep. No. 104-698 at 6, reprinted in 1996 U.S.C.C.A.N. at 2171. For example, "the simple killing of a[n American] prisoner of war" was not covered by any existing Federal statute. Id. at 5, reprinted in 1996 U.S.C.C.A.N. at 2170.[6] Second, Congress found that "[t]he ability to court martial members of our armed services who commit war crimes ends when they leave military service. [Section 2441] would allow for prosecution even after discharge." Id. at

---

[5] That common clause reads as follows:

> The [signatory Nations] undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention. . . . Each [signatory nation] shall be under the obligation to search for persons alleged to have committed, or to have ordered to be committed, such grave breaches, and shall bring such persons, regardless of their nationality, before its own courts . . . . It may also, if it prefers, . . . hand such persons over for trial to another [signatory nation], provided such [nation] has made out a prima facie case.

Geneva Convention I, art. 49; Geneva Convention II, art. 50; Geneva Convention III, art. 129; Geneva Convention IV, art. 146.

[6] In projecting our criminal law extraterritorially in order to protect victims who are United States nationals, Congress was apparently relying on the international law principle of passive personality. The passive personality principle "asserts that a state may apply law – particularly criminal law – to an act committed outside its territory by a person not its national where the victim of the act was its national." United States v. Rezaq, 134 F.3d 1121, 1133 (D.C. Cir.), cert. denied, 525 U.S. 834 (1998). The principle marks recognition of the fact that "each nation has a legitimate interest that its nationals and permanent inhabitants not be maimed or disabled from self-support," or otherwise injured. Lauritzen v. Larsen, 345 U.S. 571, 586 (1953); see also Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 309 (1970).

4

7, *reprinted in* 1996 U.S.C.C.A.N. at 2172.[7]  Congress considered it important to fill this gap, not only in the interest of the victims of war crimes, but also of the accused. "The Americans prosecuted would have available all the procedural protections of the American justice system. These might be lacking if the United States extradited the individuals to their victims' home countries for prosecution." *Id.*[8]  Accordingly, Section 2441 criminalizes forms of conduct in which a U.S. national or a member of the Armed Forces may be either a victim or a perpetrator.

### B. *Grave Breaches of the Geneva Conventions*

The Geneva Conventions were approved by a diplomatic conference on August 12, 1949, and remain the agreements to which more States have become parties than any other concerning the laws of war.  Convention I deals with the treatment of wounded and sick in armed forces in the field; Convention II addresses treatment of the wounded, sick, and shipwrecked in armed forces at sea; Convention III regulates treatment of POWs; Convention IV addresses the treatment of citizens.  While the Hague Convention IV establishes the rules of conduct against the enemy, the Geneva Conventions set the rules for the treatment of the victims of war.

The Geneva Conventions, like treaties generally, structure legal relationships between Nation States, not between Nation States and private, subnational groups or organizations.[9]  All four Conventions share the same Article 2, known as "common Article 2." It states:

> In addition to the provisions which shall be implemented in peacetime, the present Convention shall apply to all cases of declared war or of any other armed conflict *which may arise between two or more of the High Contracting Parties,* even if the state of war is not recognized by one of them.

> The Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance.

> Although one of the Powers in conflict may not be a party to the present Convention, the Powers who are parties thereto shall remain bound by it in their mutual relations. They shall furthermore be bound by the Convention in relation to the said Power, if the latter accepts and applies the provisions thereof.

---

[7] In *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955), the Supreme Court had held that a former serviceman could not constitutionally be tried before a court martial under the Uniform Code for Military Justice (the "UCMJ") for crimes he was alleged to have committed while in the armed services.

[8] The principle of nationality in international law recognizes that (as Congress did here) a State may criminalize acts performed extraterritorially by its own nationals.  *See, e.g., Skiriotes v. Florida*, 313 U.S. 69, 73 (1941); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 282 (1952).

[9] *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253 (1984) ("A treaty is in the nature of a contract between nations."); *The Head Money Cases*, 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact between independent nations."); *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 167 (3d Cir. 1997) ("[T]reaties are agreements between nations."); *Vienna Convention on the Law of Treaties*, May 23, 1969, art. 2, § 1(a), 1155 U.N.T.S. 331, 333 ("'[T]reaty' means an international agreement concluded between States in written form and governed by international law. . . .") (the "Vienna Convention"); *see generally Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422 (1964) ("The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another.").

(Emphasis added).

As incorporated by § 2441(c)(1), the four Geneva Conventions similarly define "grave breaches." Geneva Convention III on POWs defines a grave breach as:

> wilful killing, torture or inhuman treatment, including biological experiments, wilfully causing great suffering or serious injury to body or health, compelling a prisoner of war to serve in the forces of the hostile Power, or wilfully depriving a prisoner of war of the rights of fair and regular trial prescribed in this Convention.

Geneva Convention III, art. 130. As mentioned before, the Geneva Conventions require the High Contracting Parties to enact penal legislation to punish anyone who commits or orders a grave breach. *See, e.g., id.* art. 129. Further, each State party has the obligation to search for and bring to justice (either before its courts or by delivering a suspect to another State party) anyone who commits a grave breach. No State party is permitted to absolve itself or any other nation of liability for committing a grave breach.

Thus, the WCA does not criminalize all breaches of the Geneva Conventions. Failure to follow some of the regulations regarding the treatment of POWs, such as difficulty in meeting all of the conditions set forth for POW camp conditions, does not constitute a grave breach within the meaning of Geneva Convention III, art. 130. Only by causing great suffering or serious bodily injury to POWs, killing or torturing them, depriving them of access to a fair trial, or forcing them to serve in the Armed Forces, could the United States actually commit a grave breach. Similarly, unintentional, isolated collateral damage on civilian targets would not constitute a grave breach within the meaning of Geneva Convention IV, art. 147. Article 147 requires that for a grave breach to have occurred, destruction of property must have been done "wantonly" and without military justification, while the killing or injury of civilians must have been "wilful."

### D. Common Article 3 of the Geneva Conventions

Section 2441(c)(3) also defines as a war crime conduct that "constitutes a violation of common Article 3" of the Geneva Conventions. Article 3 is a unique provision that governs the conduct of signatories to the Conventions in a particular kind of conflict that is *not* one between High Contracting Parties to the Conventions. Thus, common Article 3 may require the United States, as a High Contracting Party, to follow certain rules even if other parties to the conflict are not parties to the Conventions. On the other hand, Article 3 requires state parties to follow only certain minimum standards of treatment toward prisoners, civilians, or the sick and wounded, rather than the Conventions as a whole.

Common Article 3 reads in relevant part as follows:

> In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

6

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, color, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for. . . .

The application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

Common article 3 complements common Article 2. Article 2 applies to cases of declared war or of any other armed conflict that may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.[10] Common Article 3, however, covers "armed conflict not of an international character" – a war that does not involve cross-border attacks – that occurs within the territory of one of the High Contracting Parties. There is substantial reason to think that this language refers specifically to a condition of civil war, or a large-scale armed conflict between a State and an armed movement within its own territory.

To begin with, Article 3's text strongly supports the interpretation that it applies to large-scale conflicts between a State and an insurgent group. First, the language at the end of Article 3 states that "[t]he application of the preceding provisions shall not affect the legal status of the Parties to the conflict." This provision was designed to ensure that a Party that observed Article 3 during a civil war would not be understood to have granted the "recognition of the insurgents as an adverse party." Frits Kalshoven, *Constraints on the Waging of War* 59 (1987). Second, Article 3 is in terms limited to "armed conflict . . . occurring *in the territory of one of the High Contracting Parties*" (emphasis added). This limitation makes perfect sense if the Article

---

[10] Article 2's reference to a state of war "not recognized" by a belligerent was apparently intended to refer to conflicts such as the 1937 war between China and Japan. Both sides denied that a state of war existed. *See* Joyce A. C. Gutteridge, *The Geneva Conventions of 1949*, 26 Brit. Y.B. Int'l L. 294, 298-99 (1949).

applies to civil wars, which are fought primarily or solely within the territory of a single state. The limitation makes little sense, however, as applied to a conflict between a State and a transnational terrorist group, which may operate from different territorial bases, some of which might be located in States that are parties to the Conventions and some of which might not be. In such a case, the Conventions would apply to a single armed conflict in some scenes of action but not in others – which seems inexplicable.

This interpretation is supported by commentators. One well-known commentary states that "a non-international armed conflict is distinct from an international armed conflict because of the legal status of the entities opposing each other: the parties to the conflict are not sovereign States, but the government of a single State in conflict with one or more armed factions within its territory."[11] A legal scholar writing in the same year in which the Conventions were prepared stated that "a conflict not of an international character occurring in the territory of one of the High Contracting Parties . . . must normally mean a civil war."[12]

Analysis of the background to the adoption of the Geneva Conventions in 1949 confirms our understanding of common Article 3. It appears that the drafters of the Conventions had in mind only the two forms of armed conflict that were regarded as matters of general *international* concern at the time: armed conflict between Nation States (subject to Article 2), and large-scale civil war within a Nation State (subject to Article 3). To understand the context in which the Geneva Conventions were drafted, it will be helpful to identify three distinct phases in the development of the laws of war.

First, the traditional law of war was based on a stark dichotomy between "belligerency" and "insurgency." The category of "belligerency" applied to armed conflicts between sovereign States (unless there was recognition of belligerency in a civil war), while the category of "insurgency" applied to armed violence breaking out within the territory of a sovereign State.[13] Correspondingly, international law treated the two classes of conflict in different ways. Inter-state wars were regulated by a body of international legal rules governing both the conduct of hostilities and the protection of noncombatants. By contrast, there were very few international rules governing civil unrest, for States preferred to regard internal strife as rebellion, mutiny and treason coming within the purview of national criminal law, which precluded any possible intrusion by other States.[14] This was a "clearly sovereignty-oriented" phase of international law.[15]

---

[11] Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, at ¶ 4339 (Yves Sandoz et al. eds., 1987)

[12] Gutteridge, *supra* n.10, at 300.

[13] See Joseph H. Beale, Jr., *The Recognition of Cuban Belligerency*, 9 Harv. L. Rev. 406, 406 n.1 (1896).

[14] See *The Prosecutor v. Dusko Tadic (Jurisdiction of the Tribunal)*, (Appeals Chamber of the International Criminal Tribunal for the Former Yugoslavia 1995) (the "ICTY"), 105 I.L.R. 453, 504-05 (E. Lauterpacht and C.J. Greenwood eds., 1997).

[15] *Id.* at 505; *see also* Gerald Irving Draper, *Reflections on Law and Armed Conflicts* 107 (1998) ("Before 1949, in the absence of recognized belligerency accorded to the elements opposed to the government of a State, the law of war . . . had no application to internal armed conflicts. . . . International law had little or nothing to say as to how the armed rebellion was crushed by the government concerned, for such matters fell within the domestic jurisdiction of States. Such conflicts were often waged with great lack of restraint and cruelty. Such conduct was a domestic matter.").

8

The second phase began as early as the Spanish Civil War (1936-39) and extended through the time of the drafting of the Geneva Conventions until relatively recently. During this period, State practice began to apply certain general principles of humanitarian law beyond the traditional field of State-to-State conflict to "those internal conflicts that constituted large-scale civil wars."[16] In addition to the Spanish Civil War, events in 1947 during the Civil War between the Communists and the Nationalist régime in China illustrated this new tendency.[17] Common Article 3, which was prepared during this second phase, was apparently addressed to armed conflicts akin to the Chinese and Spanish civil wars. As one commentator has described it, Article 3 was designed to restrain governments "in the handling of armed violence directed against them for the express purpose of secession or at securing a change in the government of a State," but even after the adoption of the Conventions it remained "uncertain whether [Article 3] applied to full-scale civil war."[18]

The third phase represents a more complete break than the second with the traditional "State-sovereignty-oriented approach" of international law. This approach gives central place to individual human rights. As a consequence, it blurs the distinction between international and internal armed conflicts, and even that between civil wars and other forms of internal armed conflict. This approach is well illustrated by the ICTY's decision in *Tadic*, which appears to take the view that common Article 3 applies to non-international armed conflicts of *any* description, and is not limited to civil wars between a State and an insurgent group. In this conception, common Article 3 is not just a complement to common Article 2; rather, it is a catch-all that establishes standards for any and all armed conflicts not included in common Article 2.[19]

---

[16] *Tadic*, 105 I.L.R. at 507. Indeed, the events of the Spanish Civil War, in which "both the republican Government [of Spain] and third States refused to recognize the [Nationalist] insurgents as belligerents," *id.* at 507, may be reflected in common Article 3's reference to "the legal status of the Parties to the conflict."

[17] *See id.* at 508.

[18] *See* Draper, *Reflections on Law and Armed Conflicts, supra*, at 108.

[19] An interpretation of common Article 3 that would apply it to all forms of non-international armed conflict accords better with some recent approaches to international humanitarian law. For example, the *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, supra*, after first stating in the text that Article 3 applies when "the government of a single State [is] in conflict with one or more armed factions within its territory," thereafter suggests, in a footnote, that an armed conflict not of an international character "may also exist in which armed factions fight against each other without intervention by the armed forces of the established government." *Id.* ¶ 4339 at n.2. A still broader interpretation appears to be supported by the language of the decision of the International Court of Justice (the "ICJ") in *Nicaragua v. United States* – which, it should be made clear, the United States refused to acknowledge by withdrawing from the compulsory jurisdiction of the ICJ:

> Article 3 which is common to all four Geneva Conventions of 12 August 1949 defines certain rules to be applied in *the armed conflicts of a non-international character*. There is no doubt that, in the event of international armed conflicts, these rules also constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the Court in 1949 called "elementary considerations of humanity."

*Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States)*, (International Court of Justice 1986), 76 I.L.R. 1, 448, ¶ 218 (E. Lauterpacht and C.J. Greenwood eds., 1988) (emphasis added). The ICJ's language is probably best read to suggest that all "armed conflicts" are either international or non-international, and that if they are non-international, they are governed by common Article 3. If that is the correct understanding of the quoted language, however, it should be noted that the result was merely stated as a conclusion, without taking account either of the precise language of Article 3 or of the background to its adoption. Moreover, while it was true

Nonetheless, despite this recent trend, we think that such an interpretation of common Article 3 fails to take into account, not only the language of the provision, but also its historical context. First, as we have described above, such a reading is inconsistent with the text of Article 3 itself, which applies only to "armed conflict not of an international character occurring in the territory of one of the High Contacting Parties." In conjunction with common Article 2, the text of Article 3 simply does not reach international conflicts where one of the parties is not a Nation State. If we were to read the Geneva Conventions as applying to all forms of armed conflict, we would expect the High Contracting Parties to have used broader language, which they easily could have done. To interpret common Article 3 by expanding its scope well beyond the meaning borne by the text is effectively to amend the Geneva Conventions without the approval of the State Parties to the agreements.

Second, as we have discussed, Article 3 was prepared during a period in which the traditional, State-centered view of international law was still dominant and was only just beginning to give way to a human-rights-based approach. Giving due weight to the State practice and doctrinal understanding of the time, it seems to us overwhelmingly likely that an armed conflict between a Nation State and a transnational terrorist organization, or between a Nation State and a failed State harboring and supporting a transnational terrorist organization, could not have been within the contemplation of the drafters of common Article 3. These would have been simply unforeseen and, therefore, not provided for. Indeed, it seems to have been uncertain even a decade after the Conventions were signed whether common Article 3 applied to armed conflicts that were neither international in character nor civil wars but anti-colonialist wars of independence such as those in Algeria and Kenya. *See* Gerald Irving Draper, *The Red Cross Conventions* 15 (1957). Further, it is telling that in order to address this unforeseen circumstance, the State Parties to the Geneva Conventions did not attempt to distort the terms of common Article 3 to apply it to cases that did not fit within its terms. Instead, they drafted two new protocols (neither of which the United States has ratified) to adapt the Conventions to the conditions of contemporary hostilities.[20] Accordingly, common Article 3 is best understood not to apply to such armed conflicts.

Third, it appears that in enacting the WCA, Congress did not understand the scope of Article 3 to extend beyond civil wars to all other types of internal armed conflict. As discussed in our review of the legislative history, when extending the WCA to cover violations of common Article 3, the House apparently understood that it was codifying treaty provisions that "forbid atrocities occurring in both civil wars and wars between nations."[21] If Congress had embraced a much broader view of common Article 3, and hence of 18 U.S.C. § 2441, we would expect both

that one of the conflicts to which the ICJ was addressing itself — "[t]he conflict between the *contras'* forces and those of the Government of Nicaragua" — "was an armed conflict which is 'not of an international character,'" *id.* at 448, ¶ 219, that conflict was recognizably a civil war between a State and an insurgent group, not a conflict between or among violent factions in a territory in which the State had collapsed. Thus there is substantial reason to question the logic and scope of the ICJ's interpretation of common Article 3.

[20] See, e.g., Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, 1125 U.N.T.S. 4; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977, 1125 U.N.T.S. 610.

[21] 143 Cong. Rec. H5865-66 (daily ed. July 28, 1997) (remarks of Rep. Jenkins).

10

the statutory text and the legislative history to have included some type of clear statement of congressional intent. The WCA regulates the manner in which the U.S. Armed Forces may conduct military operations against the enemy; as such, it potentially comes into conflict with the President's Commander in Chief power under Article II of the Constitution. As we have advised others earlier in this conflict, the Commander in Chief power gives the President the plenary authority in determining how best to deploy troops in the field.[22] Any congressional effort to restrict presidential authority by subjecting the conduct of the U.S. Armed Forces to a broad construction of the Geneva Convention, one that is not clearly borne by its text, would represent a possible infringement on presidential discretion to direct the military. We believe that Congress must state explicitly its intention to take the constitutionally dubious step of restricting the President's plenary power over military operations (including the treatment of prisoners), and that, unless Congress clearly demonstrates such an intent, the WCA must be read to avoid such constitutional problems.[23] As Congress has not signaled such a clear intention in this case, we conclude that common Article 3 should not be read to include all forms of non-international armed conflict.

## II. *Application of WCA and Associated Treaties to al Qaeda*

It is clear from the foregoing that members of the al Qaeda terrorist organization do not receive the protections of the laws of war. Therefore, neither their detention nor their trial by the U.S. Armed Forces is subject to the Geneva Conventions (or the WCA). Three reasons, examined in detail below, support this conclusion. First, al Qaeda's status as a non-State actor renders it ineligible to claim the protections of the Geneva Conventions. Second, the nature of the conflict precludes application of common Article 3 of the Geneva Conventions. Third, al Qaeda members fail to satisfy the eligibility requirements for treatment as POWs under Geneva Convention III.

*Al Qaeda's status as a non-State actor renders it ineligible to claim the protections of the treaties specified by the WCA.* Al Qaeda is not a State. It is a non-governmental terrorist organization composed of members from many nations, with ongoing operations in dozens of nations. Its members seem united in following a radical brand of Islam that seeks to attack Americans throughout the world. Non-governmental organizations cannot be parties to any of the international agreements here governing the laws of war. Al Qaeda is not eligible to sign the Geneva Conventions – and even if it were eligible, it has not done so. Common Article 2, which triggers the Geneva Convention provisions regulating detention conditions and procedures for trial of POWs, is limited only to cases of declared war or armed conflict "between two or more of the High Contracting Parties." Al Qaeda is not a High Contracting Party. As a result, the U.S. military's treatment of al Qaeda members is not governed by the bulk of the Geneva Conventions, specifically those provisions concerning POWs. Conduct towards captured

---

[22] Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sept. 25, 2001).

[23] *Cf. Public Citizen v. Department of Justice*, 491 U.S. 440, 466 (1989) (construing Federal Advisory Committee Act to avoid encroachment on presidential power); *Ashwander v. TVA*, 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring) (stating rule of avoidance); *Association of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 906-11 (D.C. Cir. 1993) (same).

members of al Qaeda, therefore, also cannot constitute a violation of 18 U.S.C. § 2441(c)(1) or § 2441(c)(2).[24]

*Second, the nature of the conflict precludes application of common Article 3 of the Geneva Conventions.* Al Qaeda is not covered by common Article 3, because the current conflict is not covered by the Geneva Conventions. As discussed in Part I, the text of Article 3, when read in harmony with common Article 2, shows that the Geneva Conventions were intended to cover either: a) traditional wars between Nation States (Article 2), or non-international civil wars (Article 3). Our conflict with al Qaeda does not fit into either category. The current conflict is not an international war between Nation States, but rather a conflict between a Nation State and a non-governmental organization. At the same time, the current conflict is not a civil war under Article 3, because it is a conflict of "an international character," rather than an internal armed conflict between parties contending for control over a government or territory. Therefore, the military's treatment of al Qaeda members captured in that conflict is

---

[24] Some difference in the language of the WCA might be thought to throw some doubt on the exact manner in which the statute incorporates these treaty norms. It might be argued, for example, with respect to the Hague Convention IV, that the WCA does not simply incorporate the terms of the treaty itself, with all of their limitations on application, but instead criminalizes the conduct described by that Convention. The argument starts from the fact that there is a textual difference in the way that the WCA references treaty provisions. Section 2441(c)(2) defines as a war crime conduct "prohibited" by the relevant sections of the Hague Convention IV. By contrast, § 2441 (c)(1) makes a war crime any conduct that constitutes a "grave breach" of the Geneva Conventions, and § 2441(c)(3) prohibits conduct "which constitutes a violation" of common Article 3 of the Geneva Convention. It might be argued that this difference indicates that § 2441(c)(2) does not *incorporate* the treaty into federal law; rather, it prohibits the conduct *described* by the treaty. Section 2441(c)(3) prohibits conduct "which constitutes a *violation* of common Article 3" (emphasis added), and that can only be conduct which is a treaty violation. Likewise, § 2441(c)(1) only criminalizes conduct that is a "grave breach" of the Geneva Conventions – which, again, must be a treaty violation. In other words, § 2441(c)(2) might be read to apply even when the Hague Convention IV, by its own terms, would not. On this interpretation, an act could violate § 2441(c)(2), whether or not the Hague Convention IV applied to the specific situation at issue.

We do not think that this interpretation is tenable. To begin with, § 2441(c)(2) makes clear that to be a war crime, conduct must be "*prohibited*" by the Hague Convention IV (emphasis added). Use of the word "prohibited," rather than phrases such as "referred to" or "described," indicates that the treaty must, by its own operation, proscribe the conduct at issue. If the Hague Convention IV does not itself apply to a certain conflict, then it cannot itself proscribe any conduct undertaken as part of that conflict. Thus, the most natural reading of the statutory language is that an individual must violate the Hague Convention IV in order to violate Section 2441(c)(2). Had Congress intended broadly to criminalize the types of conduct proscribed by the relevant Hague Convention IV provisions as such, rather than as treaty violations, it could have done so more clearly. Furthermore, the basic purpose of § 2441 was to implement, by appropriate legislation, the United States' treaty obligations. That purpose would be accomplished by criminalizing acts that were also violations of certain key provisions of the Annex to Hague Convention IV. It would not be served by criminalizing acts *of the kind* condemned by those provisions, whether or not they were treaty violations.

Nothing in the legislative history supports the opposite result. To the contrary, the legislative history suggests an entirely different explanation for the minor variations in language between §§ 2441(c)(1) and 2441(c)(2). As originally enacted, the WCA criminalized violations of the Geneva Conventions. *See* Pub. L. No. 104-192, § 2(a), 110 Stat. 2104, § 2401 (1996). In signing the original legislation, President Clinton urged that it be expanded to include other serious war crimes involving violation of the Hague Conventions IV and the Amended Protocol II. *See* 2 Pub. Papers of William J. Clinton 1323 (1996). The Expanded War Crimes Act of 1997, introduced as H.R. 1348 in the 105th Congress, was designed to meet these requests. Thus, § 2441(c)(2) was added as an amendment at a later time, and was not drafted at the same time and in the same process as § 2441(c)(1).

12

not limited either by common Article 3 of the Geneva Conventions or 18 U.S.C. § 2441(c)(3), the provision of the WCA incorporating that article.[23]

*Third, al Qaeda members fail to satisfy the eligibility requirements for treatment as POWs under Geneva Convention III.* It might be argued that, even though it is not a State party to the Geneva Convention, al Qaeda could be covered by some protections in Geneva Convention III on the treatment of POWs. Article 4(A)(2) of the Geneva Convention III defines prisoners of war as including not only captured members of the armed forces of a High Contracting Party, but also irregular forces such as "[m]embers of other militias and members of other volunteer corps, including those of organized resistance movements." Geneva Convention III, art. 4. Article 4(A)(3) also includes as POWs "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." *Id.* art. 4(A)(3). It might be claimed that the broad terms of these provisions could be stretched to cover al Qaeda.

This view would be mistaken. Article 4 does not expand the application of the Convention beyond the circumstances expressly addressed in common Articles 2 and 3. Unless there is a conflict subject to Article 2 or 3 (the Convention's jurisdictional provisions), Article 4 simply does not apply. As we have argued with respect to Article 3, and shall further argue with respect to Article 2, the conflict in Afghanistan does not fall within either Articles 2 or 3. As a result, Article 4 has no application. In other words, Article 4 cannot be read as an alternative, and far more expansive, statement of the application of the Convention. It merely specifies, where there is a conflict covered by the Convention, who must be accorded POW status.

Even if Article 4, however, were considered somehow to be jurisdictional as well as substantive, captured members of al Qaeda still would not receive the protections accorded to POWs. Article 4(A)(2), for example, further requires that the militia or volunteers fulfill the conditions first established by the Hague Convention IV of 1907 for those who would receive the protections of the laws of war. Hague Convention IV declares that the "laws, rights and duties of war" only apply to armies, militia, and volunteer corps when they fulfill four conditions: command by responsible individuals, wearing insignia, carrying arms openly, and obeying the laws of war. Hague Convention IV, Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277. Al Qaeda members have clearly demonstrated that they will not follow these basic requirements of lawful warfare. They have attacked purely civilian targets of no military value; they refused to wear uniform or insignia or carry arms openly, but instead hijacked civilian airliners, took hostages, and killed them; they have deliberately targeted and killed thousands of civilians; and they themselves do not obey the laws of war concerning the protection of the lives of civilians or the means of legitimate combat. Thus, Article 4(A)(3) is

---

[23] This understanding is supported by the WCA's legislative history. When extending the WCA to cover violations of common Article 3, the House apparently understood that it was codifying treaty provisions that "forbid atrocities occurring in both civil wars and wars between nations." 143 Cong. Rec. H5865-66 (remarks of Rep. Jenkins). The Senate also understood that "[t]he inclusion of common article 3 of the Geneva Conventions . . . expressly allows the United States to prosecute war crimes perpetrated in noninternational conflicts, such as Bosnia and Rwanda." 143 Cong. Rec. S7544, S7589 (daily ed. July 16, 1997) (remarks of Sen. Leahy). In referring to Bosnia and Rwanda, both civil wars of a non-international character, Senator Leahy appears to have understood common Article 3 as covering only civil wars as well. Thus, Congress apparently believed that the WCA would apply only to traditional international wars between States, or purely internal civil wars.

inapt because al Qaeda do not qualify as "regular armed forces," and its members do not qualify for protection as lawful combatants under the laws of war.

### III. *Application of the Geneva Conventions to the Taliban Militia*

Whether the Geneva Conventions apply to the detention and trial of members of the Taliban militia presents a more difficult legal question. Afghanistan has been a party to all four the Geneva Conventions since September 1956. Some might argue that this requires application of the Geneva Conventions to the present conflict with respect to the Taliban militia, which would then trigger the WCA. This argument depends, however, on the assumptions that during the period in which the Taliban militia was ascendant in Afghanistan, the Taliban was the *de facto* government of that nation, that Afghanistan continued to have the essential attributes of statehood, and that Afghanistan continued in good standing as a party to the treaties that its previous governments had signed.

We think that all of these assumptions are disputable, and indeed false. The weight of informed opinion strongly supports the conclusion that, for the period in question, Afghanistan was a "failed State" whose territory had been largely overrun and held by violence by a militia or faction rather than by a government. Accordingly, Afghanistan was without the attributes of statehood necessary to continue as a party to the Geneva Conventions, and the Taliban militia, like al Qaeda, is therefore not entitled to the protections of the Geneva Conventions. Furthermore, there appears to be substantial evidence that the Taliban was so dominated by al Qaeda and so complicit in its actions and purposes that the Taliban militia cannot stand on a higher footing under the Geneva Conventions.

#### A. Constitutional Authority

It is clear that, under the Constitution, the Executive has the plenary authority to determine that Afghanistan ceased at relevant times to be an operating State and therefore that members of the Taliban militia were and are not protected by the Geneva Conventions.[26] As an initial matter, Article II makes clear that the President is vested with all of the federal executive power, that he "shall be Commander in Chief," that he shall appoint, with the advice and consent

---

[26] This is *not* to maintain that Afghanistan ceased to be a State party to the Geneva Conventions merely because it underwent a change of government in 1996, after the military successes of Taliban. The general rule of international law is that treaty relations survive a change of government. *See, e.g.,* 2 Marjorie M. Whiteman, *Digest of International Law* 771-73 (1963); J.L. Brierly, *The Law of Nations* 144-45 (6th ed. 1963); Eleanor C. McDowell, *Contemporary Practice of the United States Relating to International Law,* 71 Am. J. Int'l L. 337 (1977). However, although "[u]nder international law, a change in government alone generally does not alter a state's obligations to honor its treaty commitments . . . [a] different and more difficult question arises . . . when the state itself dissolves." Yoo, *supra* n.17, at 904. Furthermore, we are *not* suggesting that the United States' nonrecognition of the Taliban as the government of Afghanistan in and of itself deprived Afghanistan of party status under the Geneva Conventions. The general rule is that treaties may still be observed even as to State parties, the current governments of which have been unrecognized. *See New York Chinese TV Programs v. U.S. Enterprises,* 954 F.2d 847 (2d Cir.), *cert. denied,* 506 U.S. 827 (1992); *see also Restatement (Third) of the Foreign Relations Law of the United States* at § 202 cmts. a, b; Egon Schwelb, *The Nuclear Test Ban Treaty and International Law,* 58 Am. J. Int'l L. 642, 655 (1964) (quoting statements of President Kennedy and Secretary of State Rusk that participation in a multilateral treaty does not affect recognition status).

of the Senate, and receive, ambassadors, and that he "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties." U.S. Const., art. II, § 2, cl. 2. Congress possesses its own specific foreign affairs powers, primarily those of declaring war, raising and funding the military, and regulating international commerce. While Article II, § 1 of the Constitution grants the President an undefined executive power, Article I, § 1 limits Congress to "[a]ll legislative Powers herein granted" in the rest of Article I.

From the very beginnings of the Republic, this constitutional arrangement has been understood to grant the President plenary control over the conduct of foreign relations. As Secretary of State Thomas Jefferson observed during the first Washington Administration: "The constitution has divided the powers of government into three branches [and] . . . has declared that 'the executive powers shall be vested in the President,' submitting only special articles of it to a negative by the senate."[27] Due to this structure, Jefferson continued, "[t]he transaction of business with foreign nations is Executive altogether. It belongs then to the head of that department, except as to such portions of it as are specially submitted to the Senate. Exceptions are to be construed strictly."[28] In defending President Washington's authority to issue The Neutrality Proclamation, Alexander Hamilton came to the same interpretation of the President's foreign affairs powers. According to Hamilton, Article II "ought . . . to be considered as intended . . . to specify and regulate the principal articles implied in the definition of Executive Power; leaving the rest to flow from the general grant of that power."[29] As future Chief Justice John Marshall famously declared a few years later, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations. . . . The [executive] department . . . is entrusted with the whole foreign intercourse of the nation . . . ."[30] Given the agreement of Jefferson, Hamilton, and Marshall, it has not been difficult for the executive branch consistently to assert the President's plenary authority in foreign affairs ever since.

On the few occasions where it has addressed the question, the Supreme Court has lent its approval to the executive branch's broad powers in the field of foreign affairs. Responsibility for the conduct of foreign affairs and for protecting the national security are, as the Supreme Court has observed, "'central Presidential domains.'"[31] The President's constitutional primacy flows from both his unique position in the constitutional structure, and from the specific grants of authority in Article II that make the President both the Chief Executive of the nation and the Commander in Chief.[32] Due to the President's constitutionally superior position, the Supreme Court has consistently "recognized 'the generally accepted view that foreign policy [is] the province and responsibility of the Executive.'"[33] This foreign affairs power is independent of Congress: it is "the very delicate, plenary and exclusive power of the President as sole organ of

---

[27] Thomas Jefferson, *Opinion on the Powers of the Senate Respecting Diplomatic Appointments* (1790), *reprinted in* 16 *The Papers of Thomas Jefferson* 378 (Julian P. Boyd ed., 1961).

[28] *Id.* at 379.

[29] Alexander Hamilton, Pacificus No. 1 (1793), *reprinted in* 15 *The Papers of Alexander Hamilton* 33, 39 (Harold C. Syrett et al. eds., 1969).

[30] 10 Annals of Cong. 613-14 (1800).

[31] *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982).

[32] *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982).

[33] *Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)).

the federal government in the field of international relations – a power which does not require as a basis for its exercise an act of Congress."[34]

Part of the President's plenary power over the conduct of the Nation's foreign relations is the interpretation of treaties and of international law. Interpretation of international law includes the determination whether a territory has the necessary political structure to qualify as a Nation State for purposes of treaty implementation. In *Clark v. Allen*, 331 U.S. 503 (1947), for example, the Supreme Court considered whether a 1923 treaty with Germany continued to exist after the defeat, occupation and partition of Germany by the victorious World War II Allies. The Court rejected the argument that the treaty "must be held to have failed to survive the [Second World War], since Germany, as a result of its defeat and the occupation by the Allies, has ceased to exist as an independent national or international community."[35] Instead, the Court held that "the question whether a state is in a position to perform its treaty obligations is essentially a political question. *Terlinden v. Ames*, 184 U.S. 270, 288 [(1902)]. We find no evidence that the political departments have considered the collapse and surrender of Germany as putting an end to such provisions of the treaty as survived the outbreak of the war or the obligations of either party in respect to them."[36]

Thus, *Clark* demonstrates the Supreme Court's sanction for the Executive's constitutional authority to decide the "political question" whether Germany had ceased to exist as a Nation State and, if so, whether the 1923 treaty with Germany had become inoperative. Equally here, the executive branch should conclude that Afghanistan was not "in a position to perform its treaty obligations" because it lacked, at least throughout the Taliban's ascendancy, all the elements of statehood. If the Executive made such a determination, the Geneva Conventions would be inoperative as to Afghanistan until it was in a position to perform its Convention duties. The federal courts would not review such political questions, but instead would defer to the decision of the Executive.

### B. *Status as a Failed State*

There are ample grounds that demonstrate that Afghanistan was a failed State. Indeed, the findings of the State and Defense Departments, of foreign leaders, and of expert opinion overwhelmingly support such a conclusion.

International law recognizes many situations in which there may be a territory that has no "State." A variety of situations can answer to this description.[37] Of chief relevance here is the

---

[34] United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936).

[35] *Id.* at 514.

[36] *Id.; see also id.* at 508-09 (President might have "formulated a national policy quite inconsistent with the enforcement" of the treaty).

[37] It is entirely possible in international law for a territory (even a populated one) to be without any State. In the *Western Sahara Case*, Advisory Opinion, 1975 I.C.J. 12 (Advisory Opinion May 22, 1975), the General Assembly requested the ICJ to decide the question whether the Western Sahara at the time of Spanish colonization was a territory belonging to no one. The question would have had no meaning unless there could be Stateless territory without a State. See D.J. Harris, *Cases and Materials on International Law* 113 (1991). The Transkei, a "homeland" created for the Xhosa people by the Republic of South Africa in 1976, was also a territory not internationally recognized as a State. See *id.* at 110-11.

category of the "failed State." The case of Somalia in 1992, at the time of the United States' intervention, provides a clear example of this category.

A "failed State" is generally characterized by the collapse or near-collapse of State authority. Such collapse is characterized by the inability of central authorities to maintain government institutions, ensure law and order or engage in normal dealings with other governments, and by the prevalence of violence that destabilizes civil society and the economy. The Executive can readily find that at the outset of this conflict, when the country was largely in the hands of the Taliban militia, there was no functioning central government in Afghanistan that was capable of providing the most basic services to the Afghan population, of suppressing endemic internal violence, or of maintaining normal relations with other governments. Afghanistan, consequently, was without the status of a State for purposes of treaty law, and the Taliban militia could not have qualified as the *de facto* government of Afghanistan. Rather, the Taliban militia would have had the status only of a violent faction or movement contending with other factions for control of that country.

We want to make clear that this Office does not have access to all of the facts related to the activities of the Taliban militia and al Qaeda in Afghanistan. Nonetheless, the available facts in the public record support our conclusion that Afghanistan was a failed state – including facts that pre-existed the military reversals suffered by the Taliban militia and the formation of the new transitional government pursuant to the Bonn agreement. Indeed, the departments best positioned to make such a determination appear to have reached that conclusion some time ago. Secretary of Defense Donald Rumsfeld, for example, declared at a November 2, 2001 press conference that the "Taliban is not a government. The government of Afghanistan does not exist today. The Taliban never was a government as such. It was a force in the country that is not substantially weakened – in many cases cloistered away from the people."[38]

The State Department has taken the same view. Near the start of the conflict, the Bureau of South Asian Affairs found that "[t]here is no functioning central government [in Afghanistan]. The country is divided among fighting factions. . . . The Taliban [is] a radical Islamic movement [that] occupies about 90% of the country."[39]

Prominent authorities and experts on Afghan affairs agree that Afghanistan was a failed State. As one leading scholar of international law has written, "[t]he most dramatic examples of the decline in state authority can be found in countries where government and civil order have virtually disappeared. Recent examples are Liberia, Somalia, and Afghanistan. The term 'failed states' has come to be used for these cases and others like them."[40] Lakhdar Brahimi, the United Nations mediator in Afghanistan and a former Algerian Foreign Minister, described Afghanistan

---

[38] *Secretary Rumsfeld Media Availability en Route to Moscow* (Nov. 2, 2001), available at http://www.yale.edu/lawweb/avalon/sept_11/dod_brief64.htm (visited Nov. 8, 2001).

[39] *Background Note* (October, 2001), available at http://www.state.gov/r/pa/bgn/index.cfm?docid=5380 (visited Oct. 25, 2001), prepared by the Bureau of South Asian Affairs. *See also* Reuters AlertNet - Afghanistan, *Country Profiles* ("There are no state-constituted armed forces. It is not possible to show how ground forces' equipment has been divided among the different factions."), available at http://www.alertnet.org/thefacts/countryprofiles/152478?version=1 (visited Nov. 1, 2001).

[40] Oscar Schachter, *The Decline of the Nation-State and Its Implications for International Law*, 36 Colum. J. Transnat'l L. 7, 18 (1997).

under the Taliban as a "failed state which looks like an infected wound."[41] Tony Blair, the Prime Minister of Great Britain, on a visit to that country this month, declared that "Afghanistan has been a failed state for too long and the whole world has paid the price."[42]

Traditional legal analysis also makes clear that Afghanistan was a failed State during the period of the Taliban militia's existence. A State has failed when centralized governmental authority has almost completely collapsed, no central authorities are capable of maintaining government institutions or ensuring law and order, and violence has destabilized civil society and the economy.[43] A failed State will not satisfy some or all of the three traditional tests for "statehood" under international law:

   i) Does the entity have a defined territory and population?

   ii) Are the territory/population under the control of its own government?

   iii) Does the entity engage in or have the capacity to engage in formal relations with other States?[44]

In another version of the traditional formulation, the State Department has identified four tests for "statehood":

   i) Does the entity have effective control over a clearly defined territory and population?

   ii) Is there an organized governmental administration of the territory?

---

[41] Ahmed Rashid, Taliban: Militant Islam, Oil & Fundamentalism in Central Asia 207 (2001).

[42] Philip Webster, *Blair's mission to Kabul*, in *The Times of London* (Jan. 8, 2002), 2002 WL 4171996.

[43] "States in which institutions and law and order have totally or partially collapsed under the pressure and amidst the confusion of erupting violence, yet which subsist as a ghostly presence on the world map, are now commonly referred to as 'failed States' or '*États sans gouvernement*.'" Daniel Thurer, *The failed State and International Law*, International Review of the Red Cross No. 836 (Dec. 31, 1999), available at http://www.icrc.org/eng/review (visited Oct. 22, 2001). Somewhat different tests have been used for determining whether a State has "failed." First, the most salient characteristic of a "failed State" seems to be the disappearance of a "central government." Yoram Dinstein, *The Thirteenth Waldemar A. Solf Lecture in International Law*, 166 MIL L. Rev. 93, 103 (2000); *see also id.* ("All that remains is a multiplicity of groups of irregular combatants fighting each other."). Closely related to this test, but perhaps somewhat broader, is the definition of a "failed State" as "a situation where the government is unable to discharge basic governmental functions with respect to its populace and its territory. Consequently, laws are not made, cases are not decided, order is not preserved and societal cohesion deteriorates. Basic services such as medical care, education, infrastructure maintenance, tax collection and other functions and services rendered by central governing authorities cease to exist or exist only in limited areas." Ruth Gordon, *Growing Constitutions*, 1 U. Pa. J. Const. L. 528, 533-34 (1999). Professor Thurer distinguishes three elements (respectively, territorial, political and functional) said to characterize a "failed State": 1) failed States undergo an "implosion rather than an explosion of the structures of power and authority, the disintegration and destructuring of States rather than their dismemberment;" 2) they experience "the total or near total breakdown of structures guaranteeing law and order;" and 3) there are marked by "the absence of bodies capable, on the one hand, of representing the State at the international level and, on the other, of being influenced by the outside world." Thurer, *supra*.

[44] *See Restatement (Third) of the Foreign Relations Law of the United States*, at § 201; *see also* 1933 Montevideo Convention on Rights and Duties of States, art. I, 49 Stat. 3097, 28 Am. J. Int'l L. Supp. 75 (1934).

iii) Does the entity have the capacity to act effectively to conduct foreign relations and to fulfill international obligations?

iv) Has the international community recognized the entity?[45]

Based on these factors, we conclude that Afghanistan under the Taliban militia was in a condition of "statelessness," and therefore was not a High Contracting Party to the Geneva Conventions for at least that period of time. The condition of having an organized governmental administration was plainly not met. Indeed, there are good reasons to doubt whether *any* of the conditions was met.

First, even before the outset of the conflict with the United States, the Taliban militia did not have effective control over a clearly defined territory and population. Even before the United States air strikes began, at least ten percent of the country, and the population within those areas, was governed by the Northern Alliance. A large part of the Afghan population in recent years has consisted of refugees: as of June, 2001, there were an estimated 2,000,000 Afghan refugees in Pakistan, and as of December, 2000, an estimated 1,500,000 were in Iran.[46] These figures demonstrate that a significant segment of the Afghan population was never under the control of the Taliban militia. It is unclear how strong was the hold of the Taliban militia before the conflict, in light of the rapid military successes of the Northern Alliance in just a few weeks.

Indeed, the facts appear to show that Afghanistan appears to have been divided between different tribal and warring factions, rather than by any central state as such. As we have noted, the State Department has found that Afghanistan was not under the control of a central government, but was instead divided among different warlords and ethnic groups. The Taliban militia in essence represented only an ethnically Pashtun movement, a "tribal militia,"[47] that did not command the allegiance of other major ethnic groups in Afghanistan and that was apparently unable to suppress endemic violence in the country. As a prominent writer on the Taliban militia wrote well before the current conflict began, "[e]ven if [the Taliban] were to conquer the north, it would not bring stability, only continuing guerrilla war by the non-Pashtuns, but this time from bases in Central Asia and Iran which would further destabilize the region."[48]

Second, again even before the United States air strikes and the successes of the Northern Alliance, an organized governmental administration did not exist in Afghanistan. One expert on the Taliban concluded that the country had

> ceased to exist as a viable state and when a state fails civil society is destroyed . . . . The entire Afghan population has been displaced, not once but many times over. The physical destruction of Kabul has turned it into the Dresden of the late twentieth century. . . . There is no semblance of an infrastructure that can sustain

---

[45] Eleanor C. McDowell, Contemporary Practice of the United States Relating to International Law, 71 Am. J. Int'l L. 337 (1977).

[46] See CNN.com, In-Depth Specials, War Against Terror, available at http://www.cnn.com/SPECIALS/2001/trade.center/refugee.map.html (visited Nov. 1, 2001). Other estimates are lower but still extremely large numbers. See, e.g., Goodson, supra, at 149 (estimating 1.2 million Afghans living in Pakistan).

[47] Goodson, supra, at 115.

[48] Rashid, supra, at 213.

society — even at the lowest common denominator of poverty. . . . The economy is a black hole that is sucking in its neighbours with illicit trade and the smuggling of drugs and weapons, undermining them in the process. . . . Complex relationships of power and authority built up over centuries have broken down completely. No single group or leader has the legitimacy to reunite the country. Rather than a national identity or kinship-tribal-based identities, territorial regional identities have become paramount. . . . [T]he Taliban refuse to define the Afghan state they want to constitute and rule over, largely because they have no idea what they want. The lack of a central authority, state organizations, a methodology for command and control and mechanisms which can reflect some level of popular participation . . . make it impossible for many Afghans to accept the Taliban or for the outside world to recognize a Taliban government. . . . No warlord faction has ever felt itself responsible for the civilian population, but the Taliban are incapable of carrying out even the minimum of developmental work because they believe that Islam will take care of everyone.[49]

Another expert reached similar conclusions:

Afghanistan today has become a violent society, bereft of political institutions that function correctly and an economy that functions at all. When this is coupled with the destruction of population and the physical infrastructure. . ., it becomes clear that Afghanistan is a country on the edge of collapse, or at least profound transformation. . . . With the Taliban, there are few meaningful governmental structures and little that actually functions.[50]

The State Department also came to such conclusions. In testimony early in October 2001 before the Senate Foreign Relations Committee's Subcommittee on Near East and South Asian Affairs, Assistant Secretary of State for South Asian Affairs Christina Rocca explained that:

[t]wenty-two years of conflict have steadily devastated [Afghanistan], destroyed its physical and political infrastructure, shattered its institutions, and wrecked its socio-economic fabric. . . . The Taliban have shown no desire to provide even the most rudimentary health, education, and other social services expected of any government. Instead, they have chosen to devote their resources to waging war on the Afghan people, and exporting instability to their neighbors.[51]

Rather than performing normal government functions, the Taliban militia exhibited the characteristics of a criminal gang. The United Nations Security Council found that the Taliban militia extracted massive profits from illegal drug trafficking in Afghanistan and subsidized terrorism from those revenues.[52]

---

[49] *Id.* at 207-08, 212-13.

[50] Goodson, *supra*, at 103-04; 115.

[51] United States Department of State, International Information Programs, *Rocca Blames Taliban for Humanitarian Disaster in Afghanistan* (Oct. 10, 2001), available at http://www.usinfo.state.gov/ regional/nea/sasia/afghan/text/1010roca.htm (visited Oct. 19, 2001).

[52] *See* U.N. Security Council Resolution 1333 (2000), available at http://www.yale.edu/lawweb/avalon/ sept_11/unsecres_1333.htm (finding that "the Taliban benefits directly from the cultivation of illicit opium by