# EXHIBIT C

**PART 2**

Third, the Taliban militia was unable to conduct normal foreign relations or to fulfill its international legal obligations. Indeed, the public record shows that the Taliban militia had become so subject to the domination and control of al Qaeda that it could not pursue independent policies with respect to the outside world.[53] Publicly known facts demonstrate that the Taliban was unwilling and perhaps unable to obey its international obligations and to conduct normal diplomatic relations. Thus, the Taliban has consistently refused to comply with United Nations Security Council Resolutions 1333 (2000) and 1267 (1999), which called on it to surrender Osama bin Laden to justice and to take other actions to abate terrorism based in Afghanistan.[54] Those resolutions also called on all States to deny permission for aircraft to take off or to land if they were owned or operated by or for the Taliban, and to freeze funds and other resources owned or controlled by the Taliban. The Taliban also reportedly refused or was unable to extradite bin Laden at the request of Saudi Arabia in September, 1998, despite close relations between the Saudi government and itself. As a result, the Saudi government expelled the Afghan *chargé d'affaires*.[55] The Taliban's continuing role in sheltering and supporting those believed to be responsible for the terrorist attacks of September 11, 2001 placed it in clear breach of international law, which required it to prevent the use of its territory as a launching pad for attacks against another Nation.[56]

---

imposing a tax on its production and indirectly benefits from the processing and trafficking of such opium, and these substantial resources strengthen the Taliban's capacity to harbor terrorists"). The United States Government has amassed substantial evidence that Taliban has condoned and profited from narco-trafficking on a massive scale, with disastrous effects on neighboring countries. *See The Taliban, Terrorism, and Drug Trade: Hearing Before the Subcomm. on Criminal Justice, Drug Policy and Human Resources of the House Comm. on Government Reform*, 107th Cong. (2001) (testimony of William Bach, Director, Office of Asia, Africa, Europe, NIS Programs, Bureau of International Narcotics and Law Enforcement Affairs, Department of State; testimony of Asa Hutchinson, Administrator, Drug Enforcement Administration, U.S. Department of Justice). "The heroin explosion emanating from Afghanistan is now affecting the politics and economies of the entire region. It is crippling societies, distorting the economies of already fragile states and creating a new narco-elite which is at odds with the ever increasing poverty of the population." Rashid, *supra*, at 123; *see also* Goodson, *supra*, at 101-03; Peter Tomsen, *Untying the Afghan Knot*, 25 WTR Fletcher F. World Aff. 17, 18 (2001) ("Afghanistan is now the world's largest producer of opium."). Iran is estimated to have as many as three million drug addicts, largely as a result of Taliban's involvement in the drug trade. Rashid, *supra*, at 122, 203.

[53] *See, e.g.*, "2 U.S. Targets Bound by Fate," *The Washington Post* at A22 (Nov. 14, 2001) ("According to Thomas Gouttierre, an Afghan expert at the University of Nebraska and a former UN adviser, the so-called Afghan Arabs surrounding bin Laden were much more educated and articulate than the often illiterate Taliban and succeeded in convincing them that they were at the head of a world-wide Islamic renaissance. 'Al Qaeda ended up hijacking a large part of the Taliban movement,' he said, noting that [Taliban supreme religious leader Mohammed] Omar and bin Laden were 'very, very tight' by 1998."); "Bin Laden Paid Cash For Taliban," *The Washington Post* at A1 (Nov. 30, 2001) (reporting claims by former Taliban official of al Qaeda's corruption of Taliban officials).

[54] U.N. Security Council Resolution 1333 "strongly condemn[ed]" the Taliban for the "sheltering and training of terrorists and [the] planning of terrorist acts," and "deplor[ed] the fact that the Taliban continues to provide a safe haven to Usama bin Laden and to allow him and others associated with him to operate a network of terrorist training camps from Taliban-controlled territory and to use Afghanistan as a base from which to sponsor international terrorist operations." U.N. Security Council Resolution 1214, ¶ 13 (1998) enjoined the Taliban to stop providing a sanctuary and training for terrorists. U.N. Security Council Resolution 1267, ¶ 2 (1999), stated that the Taliban's failure to comply with the Council's 1998 demand constituted a threat to the peace. *See* Sean D. Murphy, *Efforts to Obtain Custody of Osama Bin Laden*, 94 Am. J. Int'l L. 366 (2000).

[55] *See* Yossef Bodansky, *Bin Laden: The Man Who Declared War on America* 301-02 (2001).

[56] *See* Robert F. Turner, *International Law and the Use of Force in Response to the World Trade Center and Pentagon Attacks*, available at http://jurist.law.pitt.edu/forum/new/34.htm (visited Oct. 25, 2001) ("If (as has been claimed by the US and UK governments) bin Laden masterminded the attacks on New York and Washington,

Fourth, the Taliban militia was not recognized as the legitimate government of Afghanistan by the United States or by any member of the international community except Pakistan. Neither the United States nor the United Nations ever recognized that the Taliban militia were a government. The only two other States that had maintained diplomatic relations with it before the current conflict began (Saudi Arabia and the United Arab Emirates) soon severed them.[57] Even Pakistan had withdrawn its recognition before the end of hostilities between the United States and the Taliban forces. This *universal* refusal to recognize the Taliban militia as a government demonstrates that other nations and the United Nations concur in our judgment that the Taliban militia was no government and that Afghanistan had ceased to operate as a Nation State.

Based on the foregoing, we conclude that the evidence supports the conclusion that Afghanistan, when largely controlled by the Taliban, failed some, and perhaps all, of the ordinary tests of statehood. Nor do we think that the military successes of the United States and the Northern Alliance change that outcome. Afghanistan *was* stateless for the relevant period of the conflict, even if after the Bonn Agreement it becomes a State recognized by the United Nations, the United States, and most other nations.[58] If Afghanistan was in a condition of statelessness during the time of the conflict, the Taliban militia could not have been considered a government that was also a High Contracting Party to the Geneva Conventions.

The conclusion that members of the Taliban militia are not entitled to the protections accorded to POWs under the Geneva Conventions receives further support from other arguments. As we have already suggested, there is substantial evidence that the Taliban and al Qaeda were so closely intertwined that the Taliban cannot be regarded as an independent actor, and therefore cannot stand on a higher footing under the Geneva Conventions than al Qaeda. Mullah Mohammed Omar, the spiritual leader of the Taliban, appears to have been particularly susceptible to the more sophisticated leadership of al Qaeda, who "introduced him to the world

---

Afghanistan is in breach of its state responsibility to take reasonable measures to prevent its territory from being used to launch attacks against other states. The United States and its allies thus have a legal right to violate Afghanistan's territorial integrity to destroy bin Laden and related terrorist targets. If the Taliban elects to join forces with bin Laden, it, too, becomes a lawful target"); *see also* W. Michael Reisman, *International Legal Responses to Terrorism*, 22 Hous. J. Int'l L. 3, 40-42, 51-54 (1999).

[57] *See* "A Look at the Taliban," Sept. 30, 2001, available at http://www.usatoday.com/news/world/2001/thetaliban.htm (visited Oct. 19, 2001). Indeed, Pakistan had been the only country in the world that maintained an embassy in Kabul; the overwhelming majority of States and the United Nations recognized exiled President Burhanuddin Rabbani and his government as the country's legal authorities. *See* "Taliban tactics move to hostage ploy," Aug. 8, 2001, available at http://www.janes.com/regional_news/asia_pacific/news/jid/jid010808_1_n.shtml (visited Oct. 19, 2001).

[58] We do not think that the military successes of the United States and the Northern Alliance necessarily meant that Afghanistan's statehood was restored before the Bonn agreement, if only because the international community, including the United States, did not regard the Northern Alliance as constituting the government of Afghanistan. United Nations Security Council Resolution 1378, ¶ 1 (2001), available at http://www.yale.edu/lawweb/avalon/sept_11/unsecres_1378.htm (visited Nov. 19, 2001), expressed "strong support for the efforts of the Afghan people to establish a new and transitional administration leading to the formation of a government" (emphasis added); *see also* id. ¶ 3 (affirming that the United Nations should play a central role in supporting Afghan efforts to establish a "new and transitional administration leading to the formation of a new government"). The plain implication of this Resolution, which reflects the views of the United States, is that Afghanistan after Taliban did not have a government at that time.

of Islamic radicalism, global jihad and hatred of the United States," who exercised great religious and ideological influence over him, and who furnished him with personal favors such as a bomb-proof house in Kandahar.[59]  In particular, Omar, who was born into poverty and was virtually uneducated, seems to have worked closely with Osama bin Laden, who shared with Omar a vision of an international Islamic revolution.[60]

Al Qaeda also provided substantial material assistance to the Taliban militia.  It made large sums available to Taliban leaders, and supplied them with "a steady stream of guerrilla fighters to assist the Taliban in their continuing battles with the Northern Alliance."[61]  Because the Taliban was not equipped to maintain control over Afghanistan in the face of armed opposition from other factions, the Taliban became increasingly dependent on the money, weapons, recruits, and well-trained soldiers provided to it by al Qaeda.  Al Qaeda in turn depended on the Taliban to provide it with bases for training camps and a refuge from the United States.  Over the course of his dealings with it, bin Laden "pumped tens of millions of dollars into the Taliban, provided it with his most elite Arab fighting forces, and integrated his Qaeda network into key portfolios within the Taliban government. . . . [T]he two [movements] had long since melded together as one, through money, combat, and a shared radical interpretation of Islam."[62]  Further, both because al Qaeda was capable of mustering more formidable military forces than the Taliban at any given point, and because failure to protect bin Laden would have cost the Taliban the support of radical Islamists, it may well have been impossible for the Taliban to surrender bin Laden as directed by the United Nations, even if it had been willing to do.[63]  In any event, by continuing to harbor bin Laden and al Qaeda and to assist them in material ways, the Taliban became complicit in its terrorist acts.  Taking all these facts into account, together with other non-public information that may be available to the Executive, we think it fair to characterize the Taliban militia as functionally intertwined with al Qaeda, and therefore on the same footing as al Qaeda under the Geneva Conventions.

### C. Implications Under the Geneva Conventions

Whether based on the view that Afghanistan was a failed State or on the view that Taliban was functionally indistinguishable from al Qaeda, the view that Afghanistan had ceased to be a party to the Geneva Conventions has two immediate ramifications.  First, common Article 2 – and thus most of the substance of the Geneva Conventions – would not apply to the members of the Taliban militia, because that provision only applies to international wars between two State Parties to the Conventions.  Second, even common Article 3's basic standards would not apply.  This would be so, not only because the current conflict is not a non-international conflict subject to Article 3, but also because common Article 3 concerns only a non-international conflict that occurs "in the territory *of one of the High Contracting Parties*"

---

[59] Murray Campbell, *Enigmatic Taliban cleric a poor leader*, The Globe and Mail, at A11 (Dec. 1, 2001).

[60] Indeed, there are press reports (which have also been denied) that a daughter of bin Laden married Omar, and a daughter of Omar married bin Laden.

[61] Michael Dobbs and Vernon Loeb, *supra* note 53.

[62] Michael Kranish and Indira A.R. Lakshmanan, *Partners in 'Jihad': Bin Laden Ties to Taliban: How Odd Alliances Marked Bin Laden's Path*, in The Boston Globe (Oct. 28, 2001), 2001 WL 3958881.  This article contains especially detailed information about the close linkages between the two movements and their leaders.

[63] Peter McGrath and Gretel Kovach, *Bin Laden's Imprint; an expert on the radical leader says targeting the Saudi dissident won't eliminate his threat*, in Newsweek (Sept. 14, 2001), 2001 WL 24138958.

23

(emphasis added). If Afghanistan was not a High Contracting Party during the time of the conflict, then a non-international conflict within its territory does not fall within the terms of Article 3.

We have considered the argument that, even if our conclusions held during the period when Afghanistan was largely under the Taliban's control (and thus in a condition of statelessness), they have ceased to hold in light of the Bonn Agreement. Afghanistan now has an internationally recognized government, and on that basis it might be argued that it has resumed its status as a High Contracting Party under the Geneva Conventions. It could then be argued that the protections of those Conventions – including the protections for prisoners of war – *now* clothe the Taliban militia, even if they did not during the Taliban's ascendancy.

This reasoning would be mistaken. First, even if Afghanistan now has a recognized government, it does not *necessarily* follow that its status as a party to the Conventions has been completely restored. Afghanistan still may not be in a position to fulfill its Convention responsibilities, and thus should not yet be accorded party status under the Conventions.[64] Thus, even though Germany had some form of government when the Supreme Court decided *Clark v. Allen* in 1947, the Court declared that whether Germany was "in a position to perform its treaty obligations"[65] was a political question, meaning that it remained open for the President to decide whether the treaty with Germany was in effect. We expect that the courts would properly recognize that it rests solely within the President's constitutional authority to determine whether Afghanistan has yet returned to the status of a state party to the Conventions.

Second, the jurisdictional provisions of the Conventions (common Articles 2 and 3) still remain inapplicable to the conflict between the United States and the Taliban militia. This is the case even assuming that, with the substantial cessation of that conflict, the status of Afghanistan as a party to the Conventions has been restored. Article 2 states that the Convention shall apply to all cases of declared war or other armed conflict between the High Contracting Parties. But there was no war or armed conflict between the United States and *Afghanistan* during the period before the Bonn Agreement if Afghanistan was stateless at that time. Nor, of course, is there a state of war or armed conflict between the United States and Afghanistan *now*. Likewise, Article 3 states that certain basic standards shall apply in the case of "an armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." The most natural reading of this provision is that the conflict must have occurred in the territory of a State that was a High Contracting Party *at the time of the conflict*. So understood, Article 3 would not apply to the conflict with the Taliban.[66] Because the jurisdictional provisions remain inapplicable even if Afghanistan's status as a Convention party has been restored, Taliban prisoners remain outside the protections of the Conventions. As a result, they do not, for example, fall under the definition of "prisoners of war" in Geneva Convention III, art. 4.

[64] As one expert on Afghanistan has recently noted, "Afghanistan hasn't really had a credible central government since 1973, when the king was ousted.... They have been out of practice at seeing themselves as having a central authority of some kind." Kevin Whitelaw et al., *A Hunt in the Hills*, in *U.S. News & World Report* (Dec. 17, 2001), 2001 WL 30366330 (quoting Thomas Goutierre of the University of Nebraska-Omaha).

[65] 331 U.S. at 514

[66] In addition, as we have noted, Article 3 is and was inapplicable because the conflict in Afghanistan is and was of an international character.

Furthermore, even apart from the question whether Afghanistan was or remains a failed state, there are specific reasons why Geneva Convention III, relating to POWs, would not apply to captured Taliban militia. First, Article 4 of Geneva Convention III enumerates particular categories of persons who are entitled to POW status. In our judgment, Taliban captives do not fall within any of these categories, including that of Article 4(A)(3), "Members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." As we have discussed, the United Nations and almost all members of the world community, including the United States, refused to recognize the Taliban militia as the government of Afghanistan. Of the handful of States that did recognize it, all but Pakistan withdrew their recognition soon after the start of the conflict, and Pakistan later followed suit. Thus, the Taliban cannot even be considered "a government or authority" at all for purposes of this provision, since no other state in the world viewed the Taliban militia as qualifying as one. According the Taliban militia the status of the armed forces of a government, even when no other country in the world considered it as such, would be tantamount to allowing any political or violent movement to simply declare itself to be a government. Enjoyment of the rights and duties of a sovereign state should not be so easily accorded as by self-identification.

Second, even if a political group or movement could be considered to be "a government or authority" within the meaning of Article 4(A)(3), that group or movement would have to demonstrate that it considered itself bound by Geneva Convention III in order to be in a position to claim the Convention's benefits. Your Department, however, informs us that the Taliban militia failed to confirm its acceptance of the Geneva Conventions, did not fulfill its obligations, and it did not act consistently with the most fundamental obligations of the laws of war, such as the prohibition on using civilians to shield military forces.

Third, even if the Taliban considered themselves to be a party to Geneva Convention III, or even if they had stated publicly that they would comply with that Convention's provisions and in fact did so, Taliban captives would still have to meet other requirements of Article 4, to be entitled to POW status. For example, Article 4(A)(3) only covers "[m]embers of *regular armed forces*" (emphasis added). The Taliban militia, it seems, cannot be so characterized. To be sure, Article 4(A)(2) accords POW status to persons who are not in regular armed forces — *i.e.*, "[m]embers of other militias and members of other voluntary corps, including those of organized resistance movements." Nevertheless, Article 4 makes clear that these combatants are only afforded POW status if they meet certain conditions, including "that of being commanded by a person responsible for his subordinates," "that of having a fixed distinctive sign recognizable at a distance," and "that of conducting their operations in accordance with the laws and customs of war." Your Department advises us that the Taliban militia's command structure probably did not meet the first of these requirements; that the evidence strongly indicates that the requirement of a distinctive uniform was not met; and that the requirement of conducting operations in accordance with the law and customs of armed conflict was not met. Accordingly, we think that Taliban captives do not qualify for POW status either as members of regular armed forces or as combatants of other kinds covered by the Convention.[67]

### D. Historical Application of the Geneva Conventions

---

[67] We refrain from discussing more specific facts here due to the sensitive operational nature of such information.

We conclude by addressing a point of considerable significance. To say that the specific provisions of the Geneva and Hague Conventions do not apply in the current conflict with the Taliban militia *as a legal requirement* is by no means to say that the principles of the law of armed conflict cannot be applied *as a matter of U.S. Government policy*. The President as Commander in Chief can determine as a matter of his judgment for the efficient prosecution of the military campaign that the policy of the United States will be to enforce customary standards of the law of war against the Taliban and to punish any transgressions against those standards. Thus, for example, even though Geneva Convention III may not apply, the United States may deem it a violation of the laws and usages of war for Taliban troops to torture any American prisoners whom they may happen to seize. The U.S. military thus could prosecute Taliban militiamen for war crimes for engaging in such conduct.[68] A decision to apply the principles of the Geneva Conventions or of others laws of war as a matter of policy, not law, would be fully consistent with the past practice of the United States.

United States practice in post-1949 conflicts reveals several instances in which our military forces have applied the Geneva Conventions as a matter of policy, without acknowledging any legal obligation to do so. These cases include the Wars in Korea and Vietnam and the interventions in Panama and Somalia.

*Korea.* The Korean War broke out on June 25, 1950, before any of the major State parties to the conflict (including the United States) had ratified the Geneva Conventions. Nonetheless, General Douglas MacArthur, the United Nations Commander in Korea, said that his forces would comply with the principles of the Geneva Conventions, including those relating to POWs. MacArthur stated: "My present instructions are to abide by the humanitarian principles of the 1949 Geneva Conventions, particularly common Article three. In addition, I have directed the forces under my command to abide by the detailed provisions of the prisoner-of-war convention, since I have the means at my disposal to assure compliance with this convention by all concerned and have fully accredited the ICRC delegates accordingly."[69]

*Viet Nam.* The United States through the State Department took the position that the Geneva Convention III "indisputably applies to the armed conflict in Viet Nam," and therefore that "American military personnel captured in the course of that armed conflict are entitled to be treated as prisoners of war."[70] We understand from the Defense Department that our military forces, as a matter of policy, decided at some point in the conflict to accord POW treatment (but not necessarily POW status) to Viet Cong members, despite the fact that they often did *not* meet the criteria for that status (set forth in Geneva Convention III, art. 4), *e.g.*, by not wearing uniforms or any other fixed distinctive signs visible at a distance.

---

[68] The President could, of course, also determine that it will be the policy of the United States to require its own troops to adhere to standards of conduct recognized under customary international law, and could prosecute offenders for violations. As explained above, the President is not *bound* to follow these standards by law, but may direct the armed forces to adhere to them as a matter of policy.

[69] Quoted in Joseph P. Bialke, United Nations Peace Operations: Applicable Norms and the Application of the Law of Armed Conflict, 50 A.F.L. Rev. 1, 63 n.235 (2001).

[70] *Entitlement of American Military Personnel Held by North Viet-Nam to Treatment as Prisoners of War Under the Geneva Convention of 1949 Relative to the Treatment of Prisoners of War*, July 13, 1966, *reprinted in* John Norton Moore, *Law and the Indo-China War* 635, 639 (1972).

*Panama.* The United States' intervention in Panama on December 20, 1989 came at the request and invitation of Panama's legitimately elected President, Guillermo Endara.[71] The United States had never recognized General Manuel Noriega, the commander of the Panamanian Defense Force, as Panama's legitimate ruler. Thus, in the view of the executive branch, the conflict was between the Government of Panama assisted by the United States on the one side and insurgent forces loyal to General Noriega on the other. It was not an international armed conflict between the United States and Panama, another State. Accordingly, it was not, in the executive's judgment, an international armed conflict governed by common Article 2 of the Geneva Conventions.[72] Nonetheless, we understand that, as a matter of policy, all persons captured or detained by the United States in the intervention – including civilians and members of paramilitary forces as well as members of the Panamanian Defense Force – were *treated* consistently with the Geneva Convention III, until their precise status under that Convention was determined.     A 1990 letter to the Attorney General from the Legal Adviser to the State Department said that "[i]t should be emphasized that the decision to extend basic prisoner of war protections to such persons was based on strong policy considerations, and was not necessarily based on any conclusion that the United States was obligated to do so as a matter of law."[73]

*Interventions in Somalia, Haiti and Bosnia.* There was considerable factual uncertainty whether the United Nations Operation in Somalia in late 1992 and early 1993 rose to the level of an "armed conflict" that could be subject to common Article 3 of the Geneva Conventions, particularly after the United Nations Task Force abandoned its previously neutral role and took military action against a Somali warlord, General Aideed. Similar questions have arisen in other peace operations, including those in Haiti and Bosnia. It appears that the U.S. military has decided, as a matter of policy, to conduct operations in such circumstances as if the Geneva Conventions applied, regardless of whether there is any legal requirement to do so. The U.S.

---

[71] *See United States v. Noriega*, 117 F.3d 1206, 1211 (11th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998).
[72] *See* Jan E. Aldykiewicz and Geoffrey S. Corn, *Authority to Court-Martial Non-U.S. Military Personnel for Serious Violations of International Humanitarian Law Committed During Internal Armed Conflict*, 167 Mil. L. Rev. 74, 77 n.6 (2001). In *United States v. Noriega*, 808 F. Supp. 791, 794 (S.D. Fla. 1992), the district court held that the United States' intervention in Panama in late 1989 was an international armed conflict under (common) Article 2 of the Geneva Convention III, and that General Noriega was entitled to POW status. To the extent that the holding assumed that the courts are free to determine whether a conflict is between the United States and another "State" regardless of the President's view whether the other party is a "State" or not, we disagree with it. By assuming the right to determine that the United States was engaged in an armed conflict with *Panama* – rather than with insurgent forces in rebellion against the recognized and legitimate Government of Panama – the district court impermissibly usurped the recognition power, a constitutional authority reserved to the President. The power to determine whether a foreign government is to be accorded recognition, and the related power to determine whether a condition of statelessness exists in a particular country, are exclusively executive. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 212 (1962) ("[R]ecognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing.' . . . Similarly, recognition of belligerency abroad is an executive responsibility. . . .") (citation omitted); *Kennett v. Chambers*, 55 U.S. (14 How.) 38, 50-51 (1852) ("[T]he question whether [the Republic of] Texas [while in rebellion against Mexico] had or had not at that time become an independent state, was a question for that department of our government exclusively which is charged with our foreign relations. And until the period when that department recognized it as an independent state, the judicial tribunals . . . were bound to consider . . . Texas as a part of the Mexican territory."); *Mingtai Fire & Marine Ins. Co. v. United Parcel Service*, 177 F.3d 1142, 1145 (9th Cir.) ("[T]he Supreme Court has repeatedly held that the Constitution commits to the Executive branch alone the authority to recognize, and to withdraw recognition from, foreign regimes."), *cert. denied*, 528 U.S. 951 (1999).
[73] Letter for the Hon. Richard L. Thornburgh, Attorney General, from Abraham D. Sofaer, Legal Adviser, State Department at 2 (Jan. 31, 1990).

Army Operational Law Handbook, after noting that "[i]n peace operations, such as those in Somalia, Haiti, and Bosnia, the question frequently arises whether the [law of war] legally applies," states that it is "the position of the US, UN and NATO that their forces will apply the 'principles and spirit' of the [law of war] in these operations."[74]

## E. Suspension of The Geneva Conventions as to Afghanistan

Even if Afghanistan under the Taliban were not deemed to have been a failed State, the President could still regard the Geneva Conventions as temporarily suspended during the current military action. As a constitutional matter, the President has the power to consider performance of some or all of the obligations of the United States under the Conventions suspended. Such a decision could be based on the finding that Afghanistan lacked the capacity to fulfill its treaty obligations or (if supported by the facts) on the finding that Afghanistan was in material breach of its obligations.

As the Nation's representative in foreign affairs, the President has a variety of constitutional powers with respect to treaties, including the powers to suspend them, withhold performance of them, contravene them or terminate them. The treaty power is fundamentally an executive power established in Article II of the Constitution, and therefore power over treaty matters after advice and consent by the Senate are within the President's plenary authority. We have recently treated these questions in detail, and rely upon that advice here.[75]

The courts have often acknowledged the President's constitutional powers with respect to treaties. Thus, it has long been accepted that the President may determine whether a treaty has lapsed because a foreign State has gained or lost its independence, or because it has undergone other changes in sovereignty.[76] Nonperformance of a particular treaty obligation may, in the President's judgment, justify withholding performance of one of the United States' treaty obligations, or contravening the treaty.[77] Further, the President may regard a treaty as suspended for several reasons. For example, he may determine that "the conditions essential to [the treaty's] continued effectiveness no longer pertain."[78] The President may also determine that a

---

[74] Quoted in Bialke, supra, at 56.

[75] See Memorandum for John Bellinger, III, Senior Associate Counsel and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty (Nov. 15, 2001); see also Memorandum for William Howard Taft, IV, Legal Adviser, Department of State, from John Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, Re: President's Constitutional Authority to Withdraw Treaties from the Senate (Aug. 24, 2001).

[76] See Kennett, 55 U.S. at 47-48, 51; Terlinden, 184 U.S. at 288; Saroop, 109 F.3d at 171 (collecting cases). Alexander Hamilton argued in 1793 that the revolution in France had triggered the power (indeed, the duty) of the President to determine whether the pre-existing treaty of alliance with the King of France remained in effect. The President's constitutional powers, he said, "include[] that of judging, in the case of a Revolution of Government in a foreign Country, whether the new rulers are competent organs of the National Will and ought to be recognised or not: And where a treaty antecedently exists between the UStates and such nation that right involves the power of giving operation or not to such treaty." Alexander Hamilton, Pacificus No. 1 (1793), reprinted in 15 The Papers of Alexander Hamilton 33, 41 (Harold C. Syrett et al. eds, 1969).

[77] See Taylor v. Morton, 23 F. Cas. 784, 787 (C.C.D. Mass. 1855) (No. 13,799) (Curtis, Circuit Justice), aff'd, 67 U.S. (2 Black) 481 (1862).

[78] See International Load Line Convention, 40 Op. Att'y Gen. 119,124 (1941). Changed conditions have provided a basis on which Presidents have suspended treaties in the past. For example, in 1939, President Franklin Roosevelt

material breach of a treaty by a foreign government has rendered a treaty not merely voidable but void, as to that government.[79]

The President could justifiably exercise his constitutional authority over treaties by regarding the Geneva Conventions as suspended in relation to Afghanistan. The basis for such a determination would be a finding that under the Taliban militia, Afghanistan committed grave violations of international law and maintained close relationships with international terrorist organizations such as al Qaeda, which have attacked wholly civilian targets by surprise attack. As a result, Afghanistan under the Taliban could be held to have violated basic humanitarian duties under the Geneva Conventions and other norms of international law. Nonperformance of such basic duties could be taken to have demonstrated that Afghanistan could not be trusted to perform its commitments under the Conventions during the current conflict.[80] After the conflict, the President determine that relations under the Geneva Conventions with Afghanistan had been restored, once an Afghan government that was willing and able to execute the country's treaty obligations was securely established. Furthermore, if evidence of other material breaches of the Conventions by Afghanistan existed, that evidence could also furnish a basis for the President to decide to suspend performance of the United States' Convention obligations. A decision to regard the Geneva Conventions as suspended would not, of course, constitute a "denunciation" of the Conventions, for which procedures are prescribed in the Conventions.[81] The President need not regard the Conventions as suspended in their entirety, but only in part.[82]

---

suspended the operation of the London Naval Treaty of 1936. "The war in Europe had caused several contracting parties to suspend the treaty, for the obvious reason that it was impossible to limit naval armaments. The notice of termination was therefore grounded on changed circumstances." David Gray Adler, *The Constitution and the Termination of Treaties*, 187 (1986).

[79] See, e.g., *Charlton v. Kelly*, 229 U.S. 447, 473 (1913); *Escobedo v. United States*, 623 F.2d 1098, 1106 (5th Cir.), cert. denied, 449 U.S. 1036 (1980).

[80] It is possible for the President to suspend a multilateral treaty as to one but not all of the parties to the treaty. In 1986, the United States suspended the performance of its obligations under the Security Treaty (ANZUS Pact), T.I.A.S. 2493, 3 U.S.T. 3420, entered into force April 29, 1952, as to New Zealand but not as to Australia. See Marian Nash (Leich), 1 *Cumulative Digest of United States Practice in International Law 1981-1988*, at 1279-81.

[81] See, e.g., Geneva Convention III, art. 142. The suspension of a treaty is distinct from the denunciation or termination of one. Suspension is generally a milder measure than termination, often being partial, temporary, or contingent upon circumstances that can be altered by the actions of the parties to the treaty. Moreover, at least in the United States, suspension of a treaty can be reversed by unilateral executive action, whereas termination, which annuls a treaty, and which is therefore more disruptive of international relationships, would require Senate consent to a new treaty in order to be undone. See Oliver J. Lissitzyn, *Treaties and Changed Circumstances (Rebus Sic Stantibus)*, 61 Am. J. Int'l L. 895, 916 (1967) ("It is difficult to see how a right of suspension would present greater dangers than a right of termination.").

[82] In general, the partial suspension of the provisions of a treaty (as distinct from both termination and complete suspension) is recognized as permissible under international law. Article 60 of the Vienna Convention explicitly permits the suspension of a treaty "in whole or in part." "[U]nder both treaty law and non-forcible reprisal law as a basis for responsive suspension it is clear that suspension may be only partial and need not suspend or terminate an agreement as a whole, in contrast, for example, for treaty withdrawal clauses." John Norton Moore, *Enhancing Compliance With International Law: A Neglected Remedy*, 39 Va. J. Int'l L. 881, 932 (1999). Although suspension of particular treaty provisions is recognized both in State practice and international law, we are not aware of any precedent for suspending a treaty as to *same*, but not *others*, of the persons otherwise protected by a treaty. Thus, we can see no basis for suggesting that the President might suspend the Geneva Conventions as to the Taliban *leadership*, but not as to its rank and file members. However, the President could achieve the same outcome by suspending the Conventions, ordering the U.S. military to follow them purely as a matter of policy, and excepting the Taliban leadership from the coverage of this policy.

29

Although the United States has never, to our knowledge, suspended any provision of the Geneva Conventions, it is significant that on at least two occasions since 1949 – the Korean War and the Persian Gulf War – its practice has deviated from the clear requirements of Article 118 of Geneva Convention III. That Article prescribes the mandatory repatriation of POWs after the cessation of a covered conflict.[83] Although on both occasions the POWs themselves sought to avoid repatriation, Geneva Convention III provides that a POW may "in no circumstances" renounce in part or in entirety" the right to repatriation. Moreover, the negotiating history of the Convention reveals that a proposal to make POW repatriation voluntary was considered and rejected, in large part on the ground that it would work to the detriment of the POWs.[84] Consequently, withholding of repatriation, even with the consent of the POWs, represented a deviation from the Convention's strict norms.

*Korea.* The Korean War broke out on June 25, 1950, before any of the major State parties to the conflict (including the United States) had ratified the Geneva Conventions. Nonetheless, the principle of repatriation of POWs had long been rooted in treaty and customary international law, including Article 20 of the Annex to Hague Convention IV, which states that "[a]fter the conclusion of peace, the repatriation of prisoners of war shall be carried out as quickly as possible."[85] Large numbers of Chinese and North Korean POWs held by the United Nations did not wish to be repatriated, however, and special provisions for them (and for a small number of United Nations POWs in Communist hands) were made under the Armistice of July 27, 1953. "To supervise the repatriation, the armistice created a Neutral Nations Repatriation Commission, composed of representatives from Sweden, Switzerland, Poland, Czechoslovakia, and India. Within sixty days of signing the Armistice, prisoners who desired repatriation were to be directly repatriated in groups to the side to which they belonged at the time of their capture. Those prisoners not so repatriated were to be released to the Neutral Nations Repatriation Commission . . . for further disposition."[86] Altogether approximately 23,000 POWs refused repatriation. The majority (not quite 22,000) eventually went to Taiwan.[87]

*The Persian Gulf War.* At the cessation of hostilities in the Persian Gulf War, some 13,418 Iraqi POWs held by Allied forces were unwilling to be repatriated for fear of suffering punishment from their government for having surrendered.   Notwithstanding the repatriation mandate of Geneva Convention III, the United States and its Allies executed an agreement with

---

[83] Article 118 states in relevant part:

Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities.

In the absence of stipulations to the above effect in any agreement concluded between the Parties to the conflict with a view to the cessation of hostilities, or failing any such agreement, each of the Detaining Powers shall itself establish and execute without delay a plan of repatriation in conformity the principle laid down in the foregoing paragraph.

[84] *See* Howard S. Levie, *The Korean Armistice Agreement and Its Aftermath*, 41 Naval L. Rev. 115, 125-27 (1993).

[85] *See generally* 3 Charles Cheney Hyde, *International Law Chiefly as Interpreted and Applied by the United States,* ¶ 674 at 1858-59 (2d ed. 1945).

[86] David M. Morriss, *From War to Peace: A Study of Cease-Fire Agreements and the Evolving Role of the United Nations,* 36 Va. J. Int'l L. 801, 883 (1996).

[87] *Id.* at 885.

Iraq providing for only voluntary repatriation through a program administered by the International Committee of the Red Cross.[88]

### F. Suspension Under International Law

Although the United States may determine either that Afghanistan was a failed State that could not be considered a party to the Geneva Conventions, or that the Geneva Conventions should otherwise be regarded as suspended under the present circumstances, there remains the distinct question whether such determinations would be valid as a matter of international law. We emphasize that the resolution of that question, however, has no bearing on domestic constitutional issues, or on the application of the WCA. Rather, these issues are worth consideration as a means of justifying the actions of the United States in the world of international politics. While a close question, we believe that the better view is that, in certain circumstances, countries can suspend the Geneva Conventions consistently with international law.

International law has long recognized that the material breach of a treaty can be grounds for the party injured by the breach to terminate or withdraw from the treaty.[89] Under customary international law, the general rule is that breach of a multilateral treaty by a State Party justifies the suspension of that treaty with regard to that State. "A material breach of a multilateral treaty by one of the parties entitles . . . [a] party specially affected by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part in the relations between itself and the defaulting State."[91] Assuming that Afghanistan could have been found to be in material breach for having violated "a provision essential to the accomplishment of the object or purpose of the [Geneva Conventions]," suspension of the Conventions would have been justified.[92]

We note, however, that these general rules authorizing suspension "do not apply to provisions relating to the protection of the human person contained in treaties of a humanitarian character, in particular to provisions prohibiting any form of reprisals against persons protected by such treaties."[93] Although the United States is not a party to the Vienna Convention, some

---

[88] See id. at 931 & n.633.

[89] In general, of course, a decision by a State not to discharge its treaty obligations, even when effective as a matter of domestic law, does not necessarily relieve it of possible international liability for non-performance. See generally Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 160 (1934).

[90] See Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) Notwithstanding Security Council Resolution 276, 1971 I.C.J. 16, 47 ¶ 98 (Advisory Opinion June 21, 1971) (holding it to be a "general principle of law that a right of termination on account of breach must be presumed to exist in respect of all treaties, except as regards provisions relating to the protection of the human person contained in treaties of a humanitarian character. ... The silence of a treaty as to the existence of such a right cannot be interpreted as implying the exclusion of a right which has its source outside of the treaty, in general international law[.]").

[91] Vienna Convention on Treaties art. 60(2)(b).

[92] Id. art. 60(3).

[93] Id. art. 60(5). The Vienna Convention seems to prohibit or restrict the suspension of humanitarian treaties if the sole ground for suspension is material breach. It does not squarely address the case in which suspension is based, not on particular breaches by a party, but by the party's disappearance as a State or on its incapacity to perform its treaty obligations.

lower courts have said that the Convention embodies the customary international law, and the State Department has at various times taken the same view.[94] The Geneva Conventions must be regarded as "treaties of a humanitarian character," many of whose provisions "are for the protection of the human person."[95] Arguably, therefore, a determination by the United States that the Geneva Conventions were inoperative as to Afghanistan or a decision to regard them as suspended, might put the United States in breach of customary international law.[?]

In addition, the Geneva Conventions could themselves be read to preclude suspension. Common Article 1 pledges the High Contracting Parties "to respect and to ensure respect for the present Convention *in all circumstances*" (emphasis added). Some commentators argue that this provision should be read to bar any State party from refusing to enforce their provisions, no matter the conduct of its adversaries. In other words, the duty of performance is absolute and does not depend upon reciprocal performance by other State parties.[96] Under this approach, the substantive terms of the Geneva Conventions could never be suspended, and thus any violation would always be illegal under international law.

This understanding of the Vienna and Geneva Conventions cannot be correct. There is no textual provision in the Geneva Conventions that clearly prohibits temporary suspension. The drafters included a provision that appears to preclude State parties from agreeing to absolve each other of violations.[97] They also included careful procedures for the termination of the agreements by individual State parties, including a provision that requires delay of a termination of a treaty, if that termination were to occur during a conflict, until the end of the conflict.[98] Yet, at the same time, the drafters of the Conventions did not address suspension at all, even though it has been a possible option since at least the eighteenth century.[99] Applying the canon of interpretation *expressio unius est exclusio alterius*, that the inclusion of one thing implies the exclusion of the other, we should presume that the State parties did not intend to preclude suspension. Indeed, if the drafters and ratifiers of the Geneva Conventions believed the treaties could not be suspended, while allowing for withdrawal and denunciation, they could have said so explicitly and easily in the text.

The text of the Conventions also makes it implausible to claim that *all* obligations imposed by the Geneva Conventions are absolute and that non-performance is *never* excusable. To begin with, the Conventions themselves distinguish "grave" breaches from others. They further provide that "[n]o High Contracting Party shall be allowed to absolve itself . . . of any liability incurred by itself . . . in respect of [grave] breaches."[100] If all of the obligations imposed

---

[94] *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 433 (2d Cir.), *cert. denied*, 122 S. Ct. 206 (2001); Moore, *supra*, at 891-92 (quoting 1971 statement by Secretary of State William P. Rogers and 1986 testimony by Deputy Legal Adviser Mary V. Mochary).

[95] *See* Sir Ian Sinclair, *The Vienna Convention on the Law of Treaties* 191 (2d ed. 1984) (explaining intent and scope of reference to "humanitarian" treaties). Indeed, when the drafters of the Vienna Convention added paragraph 5 to article 60, the Geneva Conventions were specifically mentioned as coming within it. *See* Harris, *supra* n.19, at 797.

[96] *See, e.g.*, Draper, *The Red Cross Conventions, supra*, at 8; *see also Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States)*, 76 I.L.R. at 448, ¶ 220.

[97] *See, e.g.*, Geneva Convention III, art. 131.

[98] *See, e.g.*, *id.*, art. 142.

[99] *See* Sinclair, *supra*, at 192.

[100] Geneva Convention IV, art. 148.

32

by the Conventions were absolute and unqualified, it would deny them the ability to punish "grave" breaches from others, or to provide explicitly that no party could absolve itself from liability for grave breaches. Furthermore, although specific provisions of the Conventions rule out "reprisals" of particular kinds,[101] they do not rule out reprisals as such. Thus, Article 13 of Geneva Convention III, while defining certain misconduct with respect to prisoners of war as constituting a "serious breach" of the Convention, also states categorically that "[m]easures of reprisal *against prisoners of war* are prohibited." (emphasis added). Similarly, Article 60(5) of the Vienna Convention on Treaties states that the usual rules permitting treaty suspension in some instances "do not apply to provisions relating to the protection of the human person contained in treaties of a humanitarian character, in particular to provisions prohibiting any form of reprisals *against persons protected by such treaties*" (emphasis added). That provision seems to be an implicit prohibition only of a particular class of reprisals, not of all reprisals. Accordingly, it appears to be permissible, as a matter both of treaty law and of customary international law, to suspend performance of Geneva Convention obligations on a temporary basis. It also appears permissible to engage in reprisals in response to material breaches by an enemy, provided that the reprisals do not give rise to "grave" breaches or to reprisals against protected persons.

Finally, a blanket non-suspension rule makes little sense as a matter of international law and politics. If there were such a rule, international law would leave an injured party effectively remediless if its adversaries committed material breaches of the Geneva Conventions. Apart from its unfairness, that result would reward and encourage non-compliance with the Conventions. True, the Conventions appear to contemplate that enforcement will be promoted by voluntary action of the parties.[102] Furthermore, the Conventions provide for intervention by "the International Committee of the Red Cross or any other impartial humanitarian organization . . . subject to the consent of the Parties to the conflict concerned."[103] But the effectiveness of these provisions depends on the good will of the very party assumed to be committing material breaches, or on its sensitivity to international opinion. Likewise, the provision authorizing an impartial investigation of alleged violations also hinges on the willingness of a breaching party to permit the investigation and to abide by its result. Other conceivable remedies, such as the imposition of an embargo by the United Nations on the breaching party, may also be inefficacious in particular circumstances. If, for example, Afghanistan were bound by Geneva Convention III to provide certain treatment to United States prisoners of war but in fact materially breached such duties, a United Nations embargo might have little effect on its behavior. Finally, offenders undoubtedly face a risk of trial and punishment before national or international courts after the conflict is over. Yet that form of relief presupposes that the

---

[101] U.S. Army, *The Law of Land Warfare, Field Manual No. 27-10*, (July 18, 1956), (the "FM 27-10"), defines "reprisals" as "acts of retaliation in the form of conduct which would otherwise be unlawful, resorted to by one belligerent against enemy personnel or property for acts of warfare committed by the other belligerent in violation of the law of war, for the purpose of enforcing future compliance with the recognized rules of civilized warfare. For example, the employment by a belligerent of a weapon the use of which is normally precluded by the law of war would constitute a lawful reprisal for intentional mistreatment of prisoners of war held by the enemy." *Id.*, ch. 8, ¶ 497(a). In general, international law disfavors and discourages reprisals. *See id.* ¶ 497(d). ("Reprisals are never adopted merely for revenge, but only as an unavoidable last resort to induce the enemy to desist from unlawful practices.") They are permitted, however, in certain specific circumstances.

[102] *See, e.g.,* the Geneva Convention III, art. 8; Geneva Convention IV, art. 9.

[103] Geneva Convention III, art. 9; Geneva Convention IV, art. 10.

33

offenders will be subject to capture at the end of the conflict – which may well depend on whether or not they have been defeated. Reliance on post-conflict trials, as well as being uncertain, defers relief for the duration of the conflict. Without a power to suspend, therefore, parties to the Geneva Conventions would only be left with these meager tools to remedy widespread violation of the Conventions by others.

Thus, even if one were to believe that international law set out fixed and binding rules concerning the power of suspension, the United States could make convincing arguments under the Geneva Conventions itself, the Vienna Convention on Treaties, and customary international law in favor of suspending the Geneva Conventions as applied to the Taliban militia in the current war in Afghanistan.

## IV. The Customary International Laws of War

So far, this memorandum has addressed the issue whether the Geneva Conventions and the WCA, apply to the detention and trial of al Qaeda and Taliban militia members taken prisoner in Afghanistan. Having concluded that these laws do not apply, we turn to your question concerning the effect, if any, of customary international law. Some may take the view that even if the Geneva Conventions, by their terms, do not govern the conflict in Afghanistan, the substance of these agreements has received such universal approval that it has risen to the status of customary international law. Regardless of its substance, however, customary international law cannot bind the executive branch under the Constitution because it is not federal law. This is a view that this Office has expressed before,[104] and is one consistent with the views of the federal courts,[105] and with executive branch arguments in the courts.[106] As a result, any customary international law of armed conflict in no way binds, as a legal matter, the President or the U.S. Armed Forces concerning the detention or trial of members of al Qaeda and the Taliban.

### A. Is Customary International Law Federal Law?

Under the view promoted by many international law academics, any presidential violation of customary international law is presumptively unconstitutional.[107] These scholars argue that customary international law is federal law, and that the President's Article II duty under the Take Care Clause requires him to execute customary international law as well as statutes lawfully enacted under the Constitution. A President may not violate customary international law, therefore, just as he cannot violate a statute, unless he believes it to be unconstitutional. Relying upon cases such as The Paquete Habana, 175 U.S. 677, 700 (1900), in

[104] See Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities, 13 Op. O.L.C. 163 (1989),

[105] See, e.g., United States v. Alvarez-Machain, 504 U.S. 655 (1992).

[106] See, e.g., Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 935-36 (D.C. Cir. 1988); Garcia-Mir v. Meese, 788 F.2d 1446, 1453-55 (11th Cir.), cert. denied, 479 U.S. 889 (1986).

[107] See, e.g., Michael J. Glennon, Raising the Paquete Habana: Is Violation of Customary International Law by the Executive Unconstitutional?, 80 NW. U. L. REV. 321, 325 (1985); Louis Henkin, International Law As Law in the United States, 82 MICH. L. REV. 1555, 1567 (1984); Jules Lobel, The Limits of Constitutional Power: Conflicts Between Foreign Policy and International Law, 71 VA. L. REV. 1071, 1179 (1985); see also Jonathan R. Charney, Agora: May the President Violate Customary International Law?, 80 AM. J. INT'L L. 913 (1986).

which the Supreme Court observed that "international law is part of our law" and claims that the federal judiciary has the authority to invalidate executive action that runs counter to customary international law.[108]

This view of customary international law is seriously mistaken. The Constitution nowhere brackets presidential or federal power within the confines of international law. When the Supremacy Clause discusses the sources of federal law, it enumerates only "this Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States." U.S. Const. art. VI. International law is nowhere mentioned in the Constitution as an independent source of federal law or as a constraint on the political branches of government. Indeed, if it were, there would have been no need to grant to Congress the power to "define and punish . . . Offenses against the Law of Nations."[109] It is also clear that the original understanding of the Framers was that "Laws of the United States" did *not* include the law of nations, as international law was called in the late eighteenth century. In explaining the jurisdiction of the Article III courts to cases arising "under the Constitution and the Laws of the United States," for example, Alexander Hamilton did not include the law of nations as a source of jurisdiction.[110] Rather, Hamilton pointed out, claims involving the laws of nations would arise either in diversity cases or maritime cases,[111] which by definition do not involve "the Laws of the United States." Little evidence exists that those who attended the Philadelphia Convention in the summer of 1787 or the state ratifying conventions believed that federal law would have included customary international law, but rather that the law of nations was part of a general common law that was not true federal law.[112]

Indeed, allowing customary international law to rise to the level of federal law would create severe distortions in the structure of the Constitution. Incorporation of customary international law directly into federal law would bypass the delicate procedures established by the Constitution [illegible] Treaties [illegible] art. VI.

[108] Recently, the status of customary international law within the federal legal system has been the subject of sustained debate with legal academia. The legitimacy of incorporating customary international law as federal law has been subjected in these exchanges to crippling doubts. See Curtis A. Bradley & Jack L. Goldsmith, Customary International Law As Federal Common Law: A Critique of the Modern Position, 110 Harv. L. Rev. 815, 817 (1997); see also Phillip R. Trimble, A Revisionist View of Customary International Law, 33 UCLA L. Rev. 665, 672-673 (1986); Arthur M. Weisburd, The Executive Branch and International Law, 41 Vand. L. Rev. 1205, 1269 (1988). These claims have not gone unchallenged. Harold H. Koh, Is International Law Really State Law?, 111 Harv. L. Rev. 1824, 1827 (1998); Gerald L. Neuman, Sense and Nonsense About Customary International Law: A Response to Professors Bradley and Goldsmith, 66 Fordham L. Rev. 371, 371 (1997); Beth Stephens, The Law of Our Land: Customary International Law As Federal Law After Erie, 66 Fordham L. Rev. 393, 396-97 (1997). Bradley and Goldsmith have responded to their critics several times. See Curtis A. Bradley & Jack L. Goldsmith, Federal Courts and the Incorporation of International Law, 111 Harv. L. Rev. 2260 (1998); Curtis A. Bradley & Jack L. Goldsmith, The Current Illegitimacy of International Human Rights Litigation, 66 Fordham L. Rev. 319, 330 (1997).
[109] U.S. Const. art. I, § 8.
[110] The Federalist No. 80, at 447-49 (Alexander Hamilton) (Clinton Rossiter ed., 1999).
[111] Id. at 444-46.
[112] See, e.g., Stewart Jay, The Status of the Law of Nations in Early American Law, 42 Vand. L. Rev. 819, 830-37 (1989); Bradford R. Clark, Federal Common Law: A Structural Reinterpretation, 144 U. Pa. L. Rev. 1245, 1306-12 (1996); Curtis A. Bradley & Jack L. Goldsmith, The Current Illegitimacy of International Human Rights Litigation, 66 Fordham L. Rev. 319, 333-36 (1997).

the Constitution for amending the Constitution or for enacting legislation. Because customary international law is not approved by two-thirds of Congress and three-quarters of the state legislatures, it has not been passed by both houses of Congress and signed by the President, nor is it made by the President with the advice and consent of two-thirds of the Senate. In other words, customary international law has not undergone the difficult hurdles that stand before enactment of constitutional amendments, statutes, or treaties. As such, it can have no legal effect on the government or on American citizens because it is not law.[114] Even the inclusion of treaties in the Supremacy Clause does not render treaties automatically self-executing in federal court, not to mention self-executing against the executive branch.[115] If even treaties that have undergone presidential signature and senatorial advice and consent can have no binding legal effect in the United States, then it certainly must be the case that a source of rules that never undergoes any process established by our Constitution cannot be law.[116]

It is well accepted that the political branches have ample authority to override customary international law within their respective spheres of authority. This has been recognized by the Supreme Court since the earliest days of the Republic. In *The Schooner Exchange v. McFaddon*,[7] for example, Chief Justice Marshall applied customary international law to the seizure of a French warship only because the United States government had not chosen a different rule.

> It seems then to the Court, to be a principle of public [international] law, that national ships of war, entering the port of a friendly power, open for their ordinary reception, are to be considered as exempted by the consent of that power from its jurisdiction. Without doubt, the sovereign of the place is capable of destroying this implication. He may claim and exercise jurisdiction, either by employing force, or by subjecting such vessels to the ordinary tribunals.[117]

In *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814), Chief Justice Marshall again stated that customary international law "is a guide which the sovereign follows or abandons at his will. The rule, like other precepts of morality, of humanity, and even of wisdom, is addressed to the judgment of the sovereign; and although it cannot be disregarded by him without obloquy, yet it may be disregarded."[118] In twenty-first century words, overriding customary international law may prove to be a bad idea, or be subject to criticism, but there is no doubt that the government has the power to do it.

---

[113] *Cf. INS v. Chadha*, 462 U.S. 919 (1983) (invalidating legislative veto for failure to undergo bicameralism and presentment as required by Article I, Section 8 for all legislation).

[114] In fact, allowing customary international law to bear the force of federal law would create significant problems under the Appointments Clause and the non-delegation doctrine, as it would be law made completely outside the American legal system through a process of international practice, rather than either the legislature or officers of the United States authorized to do so.

[115] *See, e.g., Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829).

[116] *See* John C. Yoo, Globalism and the Constitution: Treaties, Non-Self-Execution, and the Original Understanding, 99 Colum. L. Rev. 1955 (1999) (non-self-execution of treaties justified by the original understanding); John C. Yoo, Treaties and Public Lawmaking: A Textual and Structural Defense of Non-Self-Execution, 99 Colum. L. Rev. 2218 (1999) (demonstrating that constitutional text and structure require implementation of treaty obligations by federal statute).

[117] 11 U.S. (7 Cranch) 116, 145-46 (1812) (emphasis added).

[118] *Id.* at 128.

Indeed, proponents of the notion that customary international law have little support in either history or Supreme Court case law. It is true that in some contexts, mostly involving maritime, insurance, and commercial law, the federal courts in the nineteenth century looked to customary international law as a guide.[119]. Upon closer examination of these cases, however, it is clear that customary international law had the status only of the general federal common law that was applied in federal diversity cases under *Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842). As such, it was not considered true federal law under the Supremacy Clause, and did not support Article III "arising under" jurisdiction; it did not pre-empt inconsistent state law, and it did not bind the executive branch. Indeed, even during this period, the Supreme Court acknowledged that the laws of war did not qualify as true federal law and could not therefore serve as the basis for federal subject matter jurisdiction. In *New York Life Ins. Co. v. Hendren*, 92 U.S. 286, for example, the Supreme Court declared that it had no jurisdiction to review cases involving general laws of war, as recognized by the law of nations applicable to this case, "because such laws do not involve the constitution, laws, treaties, or executive proclamations of the United States.[120] The spurious nature of this type of law led the Supreme Court in the famous case of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), to eliminate general federal common law.[121]

Even the case most relied upon by proponents of customary international law's status as federal law, *The Paquete Habana*, itself acknowledges that customary international law is subject to override by the action of the political branches. *The Paquete Habana* involved the question whether U.S. armed vessels in wartime could capture certain fishing vessels belonging to enemy nationals and sell them as prize. In that case, the Court applied an international law rule, and did indeed say that "international law is part of our law."[121] But Justice Gray then continued, *"where there is no treaty and no controlling executive or legislative act or judicial decision,* resort must be had to the customs and usages of civilized nations." In other words, while it was willing to apply customary international law as general federal common law (this was the era of *Swift v. Tyson*), the Court also readily acknowledged that the political branches and even the federal judiciary could override it at any time. No Supreme Court decision in modern times has challenged that view.[122] Thus, under clear Supreme Court precedent, any

---

[119] See, e.g., Oliver Am. Trading Co. v. Mexico, 264 U.S. 440, 442-43 (1924); Huntington v. Attrill, 146 U.S. 657, 683 (1892); New York Life Ins. Co. v. Hendren, 92 U.S. 286, 286-87 (1875).
[120] 92 U.S. 286, 286-87.
[121] *Id.* at 700.
[122] Two lines of cases are often cited for the proposition that the Supreme Court has found customary international law to be federal law. The first, which derives from Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1804). The "Charming Betsy" rule, as it is sometimes known, is a rule of construction that a statute should be construed when possible so as not to conflict with international law. This rule, however, does not apply international law of its own force, but instead can be seen as measure of judicial restraint that violating international law is a decision for the political branches to make, and that if they wish to do so, they should state clearly their intentions. The second, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, applied the "act of state" doctrine, which generally precludes courts from examining the validity of the decisions of foreign governments taken on their own soil, as federal common law to a suit over expropriations by the Cuban government. As with Charming Betsy, however, the Court developed this rule as one of judicial self-restraint to preserve the flexibility of the political branches to decide how to conduct foreign policy.
Some supporters of customary international law as federal law rely on a third line of cases, beginning with Filártiga v. Peña-Irala, 630 F.2d 876 (2d Cir. 1980). In Filártiga, the Second Circuit read the federal Alien Tort Statute, 28 U.S.C. §1350 (1994), to allow a tort suit in federal court against the former official of a foreign government for violating norms of international human rights law, namely torture. Incorporation of customary international law via the Alien Tort Statute, while accepted by several circuit courts, has never received the blessings of the Supreme

presidential decision in the current conflict concerning the detention of Taliban militia prisoners would constitute a "controlling" executive act that would immediately and completely override any customary international law norms.

Constitutional text and Supreme Court decisions aside, allowing the federal courts to rely upon international law to restrict the President's discretion to conduct war would raise deep structural problems. First, if customary international law is indeed federal law, then it must receive all of the benefits of the Supremacy Clause. Therefore, customary international law would not only bind the President, but it also would pre-empt state law and even supersede inconsistent federal statutes and treaties that were enacted before the rule of customary international law came into being. This has never happened. Indeed, giving customary international law this power not only runs counter to the Supreme Court cases described above, but would have the effect of importing a body of law to restrain the three branches of American government that never underwent any approval by our democratic political process. If customary international law does not have these effects, as the constitutional text, practice and the most sensible readings of the Constitution indicate, then it cannot be true federal law under the Supremacy Clause. As non-federal law, then, customary international law cannot bind the President or the executive branch, in any legally meaningful way, in its conduct of the war in Afghanistan.

Second, relying upon customary international law here would undermine the President's control over foreign relations and his Commander in Chief authority. As we have noted, the President under the Constitution is given plenary authority over the conduct of the Nation's foreign relations and over the use of the military. Importing customary international law notions concerning armed conflict would represent a direct infringement on the President's discretion as the Commander in Chief and Chief Executive to determine how best to conduct the Nation's military affairs. Presidents and courts have agreed that the President enjoys the fullest discretion permitted by the Constitution in commanding troops in the field.[123] It is difficult to see what legal authority under our constitutional system would permit customary international law to restrict the exercise of the President's plenary power in this area, which is granted to him directly by the Constitution. Further, reading customary international law to be federal law would improperly inhibit the President's role as the representative of the Nation in its foreign affairs.[124] Customary law is not static; it evolves through a dynamic process of State custom and practice. "States necessarily must have the authority to contravene international norms, however, for it is

---

Court and has been sharply criticized by some circuits, see, e.g., Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 808-10 (D.C. Cir. 1984) (Bork, J., concurring), cert. denied, 470 U.S. 1003 (1985), as well as by academics, see Curtis A. Bradley & Jack L. Goldsmith, The Current Illegitimacy of International Human Rights Litigation, 66 Fordham L. Rev. 319, 330 (1997).

[123] See Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them (Sept. 25, 2001) (reviewing authorities).

[124] "When articulating principles of international law in its relations with other states, the Executive branch speaks not only as an interpreter of generally accepted and traditional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns." Sabbatino, 376 U.S. at 432-33. See also Rappenecker v. United States, 509 F.Supp. 1024, 1029 (N.D. Cal. 1980) ("Under the doctrine of separation of powers, the making of those determinations [under international law] is entrusted to the President."); International Load line Convention, 40 Op. Att'y Gen. at 123-24 (President "speak[s] for the nation" in making determination under international law).

the process of changing state practice that allows customary international law. As we observed in 1989, "[i]f the United States is to participate in the evolution of international law, the Executive must have the power to act inconsistently with international law where necessary."[126]   The power to override or ignore customary international law, even the law applying to armed conflict, is "an integral part of the President's foreign affairs power."[127]

Third, if customary international law is truly federal law, it presumably must be enforceable by the federal courts. Allowing international law to interfere with the President's war power in this way, however, would expand the federal judiciary's authority into areas where it has little competence, where the Constitution does not textually call for its intervention, and where it risks defiance by the political branches. Indeed, treating customary international law as federal law would require the judiciary to intervene into the most deeply political questions, those concerning war. This the federal courts have said they will not do, most notably during the Kosovo conflict.[128]   Again, the practice of the branches demonstrates that they do not consider customary international law to be federal law. This position makes sense even at the level of democratic theory, because conceiving of international law as a restraint on warmaking would allow norms of questionable democratic origin to constrain actions validly taken under the U.S. Constitution by popularly accountable national representatives.

Based on these considerations of constitutional text, structure, and history, we conclude that any customary rules of international law that apply to armed conflicts do not bind the President or the U.S. Armed Forces in their conduct of the war in Afghanistan. International law, where

## B. Do the Customary Laws of War Apply to al Qaeda or the Taliban Militia?

Although customary international law does not bind the President, the President may still use his constitutional warmaking authority to subject members of al Qaeda or the Taliban militia to the laws of war. While this result may seem at first glance to be counter-intuitive, it is a product of the President's Commander in Chief and Chief Executive powers to prosecute the war effectively.

The President has the legal and constitutional authority to subject both al Qaeda and Taliban to the laws of war, and to try their members before military courts or commissions instituted under Title 10 of the United States Code, if he so chooses. Section 818 of title 10 provides in part that "[g]eneral courts-martial . . . have jurisdiction to try any person who by the law of war is subject to trial by a military tribunal and may adjudge any punishment permitted by the law of war" (except for capital punishment in certain cases). Section 821 allows for the trial "offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals." We have described the jurisdiction and usage of military tribunals for you in a separate memorandum. We do not believe that these courts would lose jurisdiction to try members of al Qaeda or the Taliban militia for violations of the laws of

---

[125] 13 Op. O.L.C. at 170.

[126] Id.

[127] Id. at 171.

[128] See, e.g., Campbell v. Clinton, 203 F.3d 19, 40 (D.C. Cir.), cert. denied, 531 U.S. 815 (2000).

39

war, even though we have concluded that the laws of war have no binding effect
~ on the President.

This is so because the extension of the common laws of war to the present conflict is, in
essence, a *military* measure that the President can order as Commander in Chief. As the
Supreme Court has recognized, "an important incident to the conduct of war is the adoption of
measures by the military command not only to repel and defeat the enemy, but to seize and
subject to disciplinary measures those enemies who in their attempt to thwart or impede our
military effort have violated the law of war."[129]  In another case, the Court, concluding that, in the
absence of attempts by Congress to limit the President's power, "the President, as Commander in
Chief of the Army and Navy of the United States, he may, in time of war, establish and prescribe
the jurisdiction and procedure of military commissions, and of tribunals in the nature of such
commissions, in territory occupied by Armed Forces of the United States."[130]  Thus, pursuant to
his Commander in Chief authority, the President could impose the laws of war on members of al
Qaeda and the Taliban militia as part of the measures necessary to prosecute the war
successfully.

Moreover, the President's general authority over the conduct of foreign relations entails
the specific power to express the views of the United States both on the content of international
law generally and on the application of international law to specific facts. "When articulating
principles of international law in its relations with other states, the Executive Branch speaks not
only as an interpreter of generally accepted and traditional rules, as would the courts, but also as
an advocate of standards it believes desirable for the community of nations and protective of
national concerns."[131]  Thus, the President can properly find the unprecedented conflict between
the United States and transnational terrorist organizations a "war" for the purposes of the
customary or common laws of war. Certainly, given the scale of hostilities both in the United
States and Afghanistan since the September 11 attacks on the World Trade Center and the
Pentagon, the scale of the military, diplomatic and financial commitments by the United States
and its allies to counter the terrorist threats, and the expected duration of the conflict, it would be
entirely reasonable for the President to find that a condition of "war" existed for purposes of
triggering application of the common laws of war. He could also reasonably find that al Qaeda,
the Taliban militia, and other related entities that are engaged in conflict with the United States
were subject to the duties imposed by those laws.  Even if members of these groups and
organizations were considered to be merely "private" actors, they could nonetheless be held
subject to the laws of war.[132]

In addition, Congress has delegated to the President sweeping authority with respect to
the present conflict, and especially with regard to those organizations and individuals implicated

---

[129] *See Ex parte Quirin*, 317 U.S. 1, 28-29 (1942); *cf. Hirota v. Mac Arthur*, 338 U.S. 197, 208 (1948) (Douglas, J., concurring) (Agreement with Allies to establish international tribunals to try accused war criminals who were enemy officials or armed service members was "a part of the prosecution of the war. It is a furtherance of the hostilities directed to a dilution of enemy power and involving retribution for wrongs done.").

[130] *Madsen v. Kinsella*, 343 U.S. 341, 348 (1952).

[131] *Sabbatino*, 376 U.S. at 432-33.

[132] *See Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir.) ("The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II . . . and remains today an important aspect of international law."), *cert. denied*, 518 U.S. 1005 (1996).

in the terrorist attacks of September 11, 2001. In the wake of those incidents, Congress passed Pub. L. No. 107-40, 115 Stat. 224 (2001). Congress found that "on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens," and that "such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad," and that "such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States." Section 2 of the statute authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Read together with the President's constitutional authorities as Commander in Chief and as interpreter of international law, this authorization allows the President to subject members of al Qaeda, the Taliban militia, and other affiliated groups to trial and punishment for violations of the common laws of war, if the President determines that it would further the conduct of military operations or contribute to the defense and security of the United States and its citizens.

### C. May a U.S. Servicemember be Tried for Violations of the Laws of War?

You have also asked whether the laws of war, as incorporated by reference in title 10, also apply to United States military personnel engaged in armed conflict with al Qaeda or with the Taliban militia. Even though the customary laws of war do not bind the President as federal law, the President may wish to extend some or all of such laws to the conduct of United States military operations in this conflict, or to the treatment of members of al Qaeda or the Taliban captured in the conflict. It is within his constitutional authority as Commander in Chief to do so. The common laws of war can be viewed as rules governing the conduct of military personnel in time of combat, and the President has undoubted authority to promulgate such rules and to provide for their enforcement.[133] The Army's Manual on the Law of Land Warfare, which represents the Army's interpretation of the customary international law governing armed conflict, can be expanded, altered, or overridden at any time by presidential act, as the Manual itself recognizes.[134] This makes clear that the source of authority for the application of the customary

---

[133] The President has broad authority under the Commander in Chief Clause to take action to superintend the military that overlaps with Congress's power to create the armed forces and to make rules for their regulation. tSee Loving v. United States, 517 U.S. 748, 772 (1996) ("The President's duties as Commander in Chief . . . require him to take responsible and continuing action to superintend the military, including courts-martial."); United States v. Eliason, 41 U.S. (16 Pet.) 291, 301 (1842) ("The power of the executive to establish rules and regulations for the government of the army, is undoubted."). The executive branch has long asserted that the President has "the unquestioned power to establish rules for the government of the army" in the absence of legislation, Power of the President to Create a Militia Bureau in the War Department, 10 Op. Att'y Gen. 11, 14 (1861). Indeed, at an early date, Attorney General Wirt concluded that regulations issued by the President on his independent authority remained in force even after Congress repealed the statute giving them legislative sanction "in all cases where they do not conflict with positive legislation." Brevet Pay of General Macomb, 1 Op. Att'y Gen. 547, 549 (1822). These independent powers of the President as commander in chief have frequently been exercised in administering justice in cases involving members of the Armed Forces: "[i]ndeed, until 1830, courts-martial were convened solely on [the President's] authority as Commander-in-Chief." Congressional Research Service, The Constitution of the United States of America: Analysis and Interpretation 479 (1987).

[134] FM 27-10, ch. 1, ¶ 7(c).

laws of war to the armed forces arises directly from the Commander in Chief power.

Moreover, the President has authority to limit or qualify the application of such laws could exempt, for example, certain operations from their coverage, or apply some, but not all of the common laws of war to this conflict. This, too, is an aspect of the President's Commander in Chief authority. In narrowing the scope of the substantive prohibitions that apply in a particular conflict, the President may effectively determine the jurisdiction of military courts and commissions. He could thus preclude the trials of United States military personnel on specific charges of violations of the common laws of war.

Finally, a presidential determination concerning the application of the substantive prohibitions of the laws of war to the Afghanistan conflict would not preclude the normal system of military justice from applying to members of the U.S. Armed Services. Members of the Armed Services would still be subject to trial by courts martial for any violations of the Uniform Code of Military Justice (the "UCMJ"). Indeed, if the President were to issue an order listing certain common laws of war for the military to follow, failure to obey that order would constitute an offense under the UCMJ.[135] Thus, although the President is not constitutionally bound by the customary laws of war, he can still choose to require the U.S. Armed Forces to obey them through the UCMJ.

Thus, our view that the customary international laws of armed conflict do not bind the President does not, in any way, compel the conclusion that members of the U.S. Armed Forces who commit acts that might be considered war crimes would be free from military justice.

### Conclusion

For the foregoing reasons, we conclude that neither the federal War Crimes Act nor the Geneva Conventions would apply to the detention conditions in Guantanamo Bay, Cuba, or to trial by military commission of al Qaeda or Taliban prisoners. We also conclude that customary international law has no binding legal effect on either the President or the military because it is not federal law, as recognized by the Constitution. Nonetheless, we also believe that the President, as Commander in Chief, has the constitutional authority to impose the customary laws of war on both the al Qaeda and Taliban groups and the U.S. Armed Forces.

Please let us know if we can provide further assistance.

---

[135] 10 U.S.C. § 892 (2000).