# EXHIBIT D



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

January 22, 2002

### Memorandum for Alberto R. Gonzales
### Counsel to the President,
### and William J. Haynes II
### General Counsel of the Department of Defense

*Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees*

You have asked for our Office's views concerning the effect of international treaties and federal laws on the treatment of individuals detained by the U.S. Armed Forces during the conflict in Afghanistan. In particular, you have asked whether certain treaties forming part of the laws of armed conflict apply to the conditions of detention and the procedures for trial of members of al Qaeda and the Taliban militia. We conclude that these treaties do not protect members of the al Qaeda organization, which as a non-State actor cannot be a party to the international agreements governing war. We further conclude that that President has sufficient grounds to find that these treaties do not protect members of the Taliban militia. This memorandum expresses no view as to whether the President should decide, as a matter of policy, that the U.S. Armed Forces should adhere to the standards of conduct in those treaties with respect to the treatment of prisoners.

We believe it most useful to structure the analysis of these questions by focusing on the War Crimes Act, 18 U.S.C. § 2441 (Supp. III 1997) ("WCA"). The WCA directly incorporates several provisions of international treaties governing the laws of war into the federal criminal code. Part I of this memorandum describes the WCA and the most relevant treaty that it incorporates: the Geneva Convention Relative to the Treatment of Prisoners of War ("Geneva III").[1]

Parts II and III of this memorandum discuss why other deviations from the text of Geneva III would not present either a violation of the treaty or of the WCA. Part II explains that al Qaeda detainees cannot claim the protections of Geneva III because the treaty does not apply to them. Al Qaeda is merely a violent political movement or organization and not a nation-State. As a result, it cannot be a state party to any treaty. Because of the novel nature of this conflict, moreover, a conflict with al Qaeda is not properly included in non-international forms of armed

---

[1] The four Geneva Conventions for the Protection of Victims of War, dated August 12, 1949, were ratified by the United States on July 14, 1955. These are the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, 6 U.S.T. 3115 ("Geneva Convention I"); the Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, 6 U.S.T. 3219 ("Geneva Convention II"); the Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3517 ("Geneva Convention III"); and the Convention Relative to the Protection of Civilian Persons in Time of War, 6 U.S.T. 3317 ("Geneva Convention IV").

conflict to which some provisions of the Geneva Conventions might apply. Therefore, neither the Geneva Conventions nor the WCA regulate the detention of al Qaeda prisoners captured during the Afghanistan conflict.

Part III discusses why the President may decide that Geneva III, as a whole, does not protect members of the Taliban militia in the current situation. The President has the constitutional authority to temporarily suspend our treaty obligations to Afghanistan under the Geneva Conventions. Although he may exercise this aspect of the treaty power at his discretion, we outline several grounds upon which he could justify that action here. In particular, he may determine that Afghanistan was not a functioning State, and therefore that the Taliban militia was not a government, during the period in which the Taliban was engaged in hostilities against the United States and its allies. Afghanistan's status as a failed State is sufficient ground alone for the President to suspend Geneva III, and thus to deprive members of the Taliban militia of POW status. The President's constitutional power to suspend performance of our treaty obligations with respect to Afghanistan is not restricted by international law. It encompasses the power to suspend some treaties but not others, or some but not all obligations under a particular treaty. Should the President make such a determination, then Geneva III would not apply to Taliban prisoners and any failure to meet that treaty's requirements would not violate either our treaty obligations or the WCA.

Part IV examines justifications for any departures from Geneva III requirements should the President decline to suspend our treaty obligations toward Afghanistan. It explains that certain deviations from the text of Geneva III may be permissible, as a matter of domestic law, if they fall within certain justifications or legal exceptions, such as those for self-defense or infeasibility. Further, Part IV discusses the President's authority to find, even if Geneva III were to apply, that Taliban members do not qualify as POWs as defined by the treaty.

In Part V, we address the question whether, in the absence of any Geneva III obligations, customary international law requires, as a matter of federal law, that the President provide certain standards of treatment for al Qaeda or Taliban prisoners. We conclude that customary international law, as a matter of domestic law, does not bind the President, or restrict the actions of the United States military, because it does not constitute either federal law made in pursuance of the Constitution or a treaty recognized under the Supremacy Clause.

I. *Background and Overview of the War Crimes Act and the Geneva Conventions*

It is our understanding that your Department is considering two basic plans regarding the treatment of members of al Qaeda and the Taliban militia detained during the Afghanistan conflict. First, the Defense Department intends to make available a facility at the U.S. Navy base at Guantanamo Bay, Cuba ("GTMO"), for the long-term detention of these individuals, who have come under our control either through capture by our military or transfer from our allies in Afghanistan. At the present moment, your Department has confined these individuals in temporary facilities, pending the construction of a more permanent camp at GTMO. While it is conceivable that some might argue that these facilities are not fully in keeping with the terms of Geneva III, we understand that they meet minimal humanitarian requirements consistent with the need to prevent violence and for force protection. We understand that GTMO authorities are

providing these individuals with regular food and medical care, and that basic hygiene and sanitary standards are being maintained. You have further informed us that your plans for a longer-term facility at GTMO are still under development.[2]

Second, your Department is developing procedures to implement the President's Military Order of November 13, 2001, which establishes military commissions for the trial of violations of the laws of war committed by non-U.S. citizens.[3] The question has arisen whether Geneva III would restrict the proposed rules, or even require that only courts-martial be used to try members of al Qaeda or the Taliban militia for war crimes.

We believe that the WCA provides a useful starting point for our analysis of the application of the Geneva Conventions to the treatment of detainees captured in the Afghanistan theater of operations.[4] Section 2441 of title 18 renders certain acts punishable as "war crimes." The statute's definition of that term incorporates, by reference, certain treaties or treaty provisions relating to the laws of war, including the Geneva Conventions.

### A. Section 2441: An Overview

Section 2441 of Title 18 lists four categories of war crimes. First, it criminalizes "grave breaches" of the Geneva Conventions, which are defined by treaty and will be discussed below. Second, it makes illegal conduct prohibited by articles 23, 25, 27 and 28 of the Annex to the Hague Convention IV Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277 ("Hague Convention IV"). Third, it criminalizes violations of what is known as "common article 3," which is a provision common to all four of the Geneva Conventions. Fourth, it criminalizes conduct prohibited by certain other laws of war treaties, once the United States joins them. A House Report states that the original legislation "carries out the international obligations of the United States under the Geneva Conventions of 1949 to provide criminal penalties for certain war crimes." H.R. Rep. No. 104-698, at 1 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2166, 2166. Each of those four conventions includes a clause relating to legislative implementation and to criminal punishment.[5]

---

[2] We have discussed in a separate memorandum the federal jurisdiction issues that might arise concerning Guantanamo Bay. *See* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Patrick F. Philbin, Deputy Assistant Attorney General and John Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Possible Habeas Jurisdiction over Aliens Held in Guantanamo Bay, Cuba* (Dec. 28, 2001).

[3] *See generally* Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

[4] The rule of lenity requires that the WCA be read so as to ensure that prospective defendants have adequate notice of the nature of the acts that the statute condemns. *See, e.g., Castillo v. United States*, 530 U.S. 120, 131 (2000). In those cases in which the application of a treaty incorporated by the WCA is unclear, therefore, the rule of lenity requires that the interpretive issue be resolved in the defendant's favor.

[5] That common clause reads as follows:

> The [signatory Nations] undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention. . . . Each [signatory nation] shall be under the obligation to search for persons alleged to have committed, or to have ordered to be committed, such grave breaches, and shall bring such persons, regardless of their nationality, before its own courts. . . . It may also, if it prefers, . . . hand such persons over for trial to another [signatory nation], provided such [nation] has made out a *prima facie* case.

In enacting section 2441, Congress sought to fill certain perceived gaps in the coverage of federal criminal law. The main gaps were thought to be of two kinds: subject matter jurisdiction and personal jurisdiction. First, Congress found that "[t]here are major gaps in the prosecutability of individuals under federal criminal law for war crimes committed against Americans."[6] For example, "the simple killing of a[n American] prisoner of war" was not covered by any existing Federal statute.[7] Second, Congress found that "[t]he ability to court martial members of our armed services who commit war crimes ends when they leave military service. [Section 2441] would allow for prosecution even after discharge."[8] Congress considered it important to fill this gap, not only in the interest of the victims of war crimes, but also of the accused. "The Americans prosecuted would have available all the procedural protections of the American justice system. These might be lacking if the United States extradited the individuals to their victims' home countries for prosecution."[9] Accordingly, section 2441 criminalizes forms of conduct in which a U.S. national or a member of the Armed Forces may be either a victim or a perpetrator.

## B. *Grave Breaches of the Geneva Conventions*

The Geneva Conventions of 1949 remain the agreements to which more States have become parties than any other concerning the laws of war. Convention I deals with the treatment of wounded and sick in armed forces in the field; Convention II addresses treatment of the wounded, sick, and shipwrecked in armed forces at sea; Convention III regulates treatment of POWs; Convention IV addresses the treatment of citizens.

The Geneva Conventions, like treaties generally, structure legal relationships between nation-States, not between nation-States and private, transnational or subnational groups or organizations.[10] Article 2, which is common to all four Geneva Conventions, makes the

---

Geneva Convention I, art. 49; Geneva Convention II, art. 50; Geneva Convention III, art. 129; Geneva Convention IV, art. 146.

[6] H.R. Rep. No. 104-698, at 6, *reprinted in* 1996 U.S.C.C.A.N. at 2171.

[7] *Id.* at 5, *reprinted in* 1996 U.S.C.C.A.N. at 2170. In projecting our criminal law extraterritorially in order to protect victims who are United States nationals, Congress was apparently relying on the international law principle of passive personality. The passive personality principle "'asserts that a state may apply law – particularly criminal law – to an act committed outside its territory by a person not its national where the victim of the act was its national.'" *United States v. Rezaq*, 134 F.3d 1121, 1133 (D.C. Cir.), *cert. denied*, 525 U.S. 834 (1998). The principle marks recognition of the fact that "each nation has a legitimate interest that its nationals and permanent inhabitants not be maimed or disabled from self-support," or otherwise injured. *Lauritzen v. Larsen*, 345 U.S. 571, 586 (1953); *see also Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970).

[8] H.R. Rep. No. 104-698, at 7, *reprinted in* 1996 U.S.C.C.A.N. at 2172. In *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955), the Supreme Court had held that a former serviceman could not constitutionally be tried before a court martial under the Uniform Code for Military Justice (the "UCMJ") for crimes he was alleged to have committed while in the armed services. The WCA cured this problem.

[9] H.R. Rep. No. 104-698, at 7, *reprinted in* 1996 U.S.C.C.A.N. at 2172. The principle of nationality in international law recognizes that (as Congress did here) a State may criminalize acts performed extraterritorially by its own nationals. *See, e.g., Skiriotes v. Florida*, 313 U.S. 69, 73 (1941); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 282 (1952).

[10] *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253 (1984) ("A treaty is in the nature of a contract between nations."); *The Head Money Cases*, 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact

application of the Conventions to relations between state parties clear. It states that: "the present Convention shall apply to all cases of declared war or of any other armed conflict *which may arise between two or more of the High Contracting Parties*, even if the state of war is not recognized by one of them."[11] Similarly, it states that "[t]he Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance."

As noted above, Section 2441(c)(1) criminalizes "grave breaches" of the Convention. Each of the four Geneva Conventions has a similar definition of "grave breaches." Geneva Convention III defines a grave breach as:

> wilful killing, torture or inhuman treatment, including biological experiments, wilfully causing great suffering or serious injury to body or health, compelling a prisoner of war to serve in the forces of the hostile Power, or wilfully depriving a prisoner of war of the rights of fair and regular trial prescribed in this Convention.

Geneva Convention III, art. 130. As mentioned before, the Geneva Conventions require the High Contracting Parties to enact penal legislation to punish anyone who commits or orders a grave breach. *See, e.g., id.* art. 129. Further, each State party has the obligation to search for and bring to justice (either before its courts or by delivering a suspect to another State party) anyone who commits a grave breach. No State party is permitted to absolve itself or any other nation of liability for committing a grave breach.

Given the specific definition of "grave breaches," it bears noting that not all breaches of the Geneva Conventions are criminalized under Section 2441. Failure to follow some of the regulations regarding the treatment of POWs, such as difficulty in meeting all of the conditions set forth for POW camp conditions, does not constitute a grave breach within the meaning of Geneva Convention III, art. 130. Only by causing great suffering or serious bodily injury to POWs, killing or torturing them, depriving them of access to a fair trial, or forcing them to serve in the Armed Forces, could the United States actually commit a grave breach.

### C. *Common Article 3 of the Geneva Conventions*

Section 2441(c)(3) also defines as a war crime conduct that "constitutes a violation of common article 3" of the Geneva Conventions. Article 3 is a unique provision that governs the conduct of signatories to the Conventions in a particular kind of conflict that is *not* one between High Contracting Parties to the Conventions. Thus, common article 3 may require the United States, as a High Contracting Party, to follow certain rules even if other parties to the conflict are not parties to the Conventions. On the other hand, article 3 requires State parties to follow only certain minimum standards of treatment toward prisoners, civilians, or the sick and wounded – standards that are much less onerous and less detailed than those spelled out in the Conventions as a whole.[12]

---

between independent nations."); *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 167 (3d Cir. 1997) ("[T]reaties are agreements between nations.")

[11] Geneva III art. 2 (emphasis added).

[12] Common Article 3 reads in relevant part as follows:

Common article 3 complements common article 2. Article 2 applies to cases of declared war or of any other armed conflict that may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.[13] Common article 3, however, covers "armed conflict not of an international character" -- a war that does not involve cross-border attacks -- that occurs within the territory of one of the High Contracting Parties.

Common article 3's text provides substantial reason to think that it refers specifically to a condition of civil war, or a large-scale armed conflict between a State and an armed movement within its own territory. First, the text of the provision refers specifically to an armed conflict that a) is not of an international character, and b) occurs in the territory of a state party to the Convention. It does not sweep in all armed conflicts, nor does it address a gap left by common article 2 for international armed conflicts that involve non-state entities (such as an international terrorist organization) as parties to the conflict. Further, common article 3 addresses only non-international conflicts that occur within the territory of a single state party, again, like a civil war. This provision would not reach an armed conflict in which one of the parties operated from multiple bases in several different states. Also, the language at the end of article 3 states that "[t]he application of the preceding provisions shall not affect the legal status of the Parties to the conflict." This provision was designed to ensure that a state party that observed article 3 during a civil war would not be understood to have granted the "recognition of the insurgents as an adverse party."[14]

This interpretation is supported by commentators. One well-known commentary states that "a non-international armed conflict is distinct from an international armed conflict because of the legal status of the entities opposing each other: the parties to the conflict are not sovereign States, but the government of a single State in conflict with one or more armed factions within its territory."[15] A legal scholar writing in the same year in which the Conventions were prepared

---

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, color, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for. . . .

The application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

[13] Article 2's reference to a state of war "not recognized" by a belligerent was apparently intended to refer to conflicts such as the 1937 war between China and Japan. Both sides denied that a state of war existed. *See* Joyce A. C. Gutteridge, *The Geneva Conventions of 1949*, 26 Brit. Y.B. Int'l L. 294, 298-99 (1949).

[14] Frits Kalshoven, *Constraints on the Waging of War* 59 (1987).

[15] *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949*, at ¶ 4339 (Yves Sandoz et al. eds., 1987)

stated that "a conflict not of an international character occurring in the territory of one of the High Contracting Parties . . . must normally mean a civil war."[16]

Analysis of the background to the adoption of the Geneva Conventions in 1949 confirms our understanding of common article 3. It appears that the drafters of the Conventions had in mind only the two forms of armed conflict that were regarded as matters of general *international* concern at the time: armed conflict between nation-States (subject to article 2), and large-scale civil war within a nation-State (subject to article 3). To understand the context in which the Geneva Conventions were drafted, it will be helpful to identify three distinct phases in the development of the laws of war.

First, the traditional laws of war were based on a stark dichotomy between "belligerency" and "insurgency." The category of "belligerency" applied to armed conflicts between sovereign States (unless there was recognition of belligerency in a civil war), while the category of "insurgency" applied to armed violence breaking out within the territory of a sovereign State.[17] International law treated the two classes of conflict in different ways. Inter-state wars were regulated by a body of international legal rules governing both the conduct of hostilities and the protection of noncombatants. By contrast, there were very few international rules governing armed conflict within a state, for states preferred to regard internal strife as rebellion, mutiny and treason coming within the purview of national criminal law, which precluded any possible intrusion by other States.[18] This was a "clearly sovereignty-oriented" phase of international law.[19]

The second phase began as early as the Spanish Civil War (1936-39) and extended through the time of the drafting of the Geneva Conventions until relatively recently. During this period, State practice began to apply certain general principles of humanitarian law beyond the traditional field of State-to-State conflict to "those internal conflicts that constituted large-scale civil wars."[20] In addition to the Spanish Civil War, events in 1947 during the civil war between the Communists and the Nationalist regime in China illustrated this new tendency.[21] Common article 3, which was prepared during this second phase, was apparently addressed to armed conflicts akin to the Chinese and Spanish civil wars. As one commentator has described it, article 3 was designed to restrain governments "in the handling of armed violence directed against them for the express purpose of secession or at securing a change in the government of a

---

[16] Gutteridge, *supra*, at 300.

[17] *See* Joseph H. Beale, Jr., *The Recognition of Cuban Belligerency,* 9 Harv. L. Rev. 406, 406 n.1 (1896).

[18] *See The Prosecutor v. Dusko Tadic (Jurisdiction of the Tribunal)* (Appeals Chamber of the International Criminal Tribunal for the Former Yugoslavia 1995) ("*Tadic*"), 105 I.L.R. 453, 504-05 (E. Lauterpacht & C.J. Greenwood eds., 1997).

[19] *Id.* at 505; *see also* Gerald Irving Draper, *Reflections on Law and Armed Conflicts* 107 (1998) ("Before 1949, in the absence of recognized belligerency accorded to the elements opposed to the government of a State, the law of war . . . had no application to internal armed conflicts. . . . International law had little or nothing to say as to how the armed rebellion was crushed by the government concerned, for such matters fell within the domestic jurisdiction of States. Such conflicts were often waged with great lack of restraint and cruelty. Such conduct was a domestic matter.").

[20] *Tadic*, 105 I.L.R. at 507. Indeed, the events of the Spanish Civil War, in which "both the republican Government [of Spain] and third States refused to recognize the [Nationalist] insurgents as belligerents," *id.* at 507, may be reflected in common Article 3's reference to "the legal status of the Parties to the conflict."

[21] *See id.* at 508.

State," but even after the adoption of the Conventions it remained "uncertain whether [Article 3] applied to full-scale civil war."[22]

The third phase represents a more complete break than the second with the traditional "State-sovereignty-oriented approach" of international law. This approach gives central place to individual human rights. As a consequence, it blurs the distinction between international and internal armed conflicts. This approach is well illustrated by the decision of the International Criminal Tribunal for the Former Yugoslavia in *Prosecutor v. Tadic*, which appears to take the view that common article 3 applies to all armed conflicts of *any* description other than those between state parties, and is not limited to internal conflicts between a State and an insurgent group. In this conception, common article 3 is not just a complement to common article 2; rather, it is a catch-all that establishes standards for any and all armed conflicts not included in common article 2.[23]

Such an interpretation of common article 3, however, ignores the text and the context in which it was ratified by the United States. If the state parties had intended the Conventions to apply to all forms of armed conflict, they could have used broader, clearer language. To interpret common article 3 by expanding its scope well beyond the meaning borne by its text is effectively to amend the Geneva Conventions without the approval of the State parties to the agreements. Further, as we have discussed, article 3 was ratified during a period in which the traditional, State-centered view of international law was still dominant and was only just beginning to give way to a human-rights-based approach. Giving due weight to the state practice and doctrinal understanding of the time, the idea of an armed conflict between a nation-State and a transnational terrorist organization (or between a nation-State and a failed State harboring and supporting a transnational terrorist organization) could not have been within the contemplation of the drafters of common article 3. Conflicts of these kinds would have been unforeseen and were not provided for in the Conventions. Further, it is telling that in order to address this unforeseen circumstance, the State parties to the Geneva Conventions did not attempt to distort the terms of

---

[22] *See* Draper, *Reflections on Law and Armed Conflicts, supra,* at 108.

[23] Some international law authorities seem to suggest that common Article 3 is better read as applying to all forms of non-international armed conflict. The *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, supra,* after first stating that Article 3 applies when "the government of a single State [is] in conflict with one or more armed factions within its territory," suggests, in a footnote, that an armed conflict not of an international character "may also exist in which armed factions fight against each other without intervention by the armed forces of the established government." *Id.* ¶ 4339 at n.2. A still broader interpretation appears to be supported by the language of the decision of the International Court of Justice (the "ICJ") in *Nicaragua v. United States* – which the United States refused to acknowledge by withdrawing from the compulsory jurisdiction of the ICJ. *Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States),* (International Court of Justice 1986), 76 I.L.R. 1, 448, ¶ 218 (E. Lauterpacht & C.J. Greenwood eds., 1988). The ICJ's decision is probably best read to suggest that all "armed conflicts" are either international or non-international, and that if they are non-international, they are governed by common Article 3. If that is the correct understanding, however, the result was merely stated as a conclusion, without taking account either of the precise language of Article 3 or of the background to its adoption. Moreover, while it was true that one of the conflicts to which the ICJ was addressing itself – "[t]he conflict between the *contras'* forces and those of the Government of Nicaragua" – "was an armed conflict which is 'not of an international character,'" *id.* at 448, ¶ 219, that conflict was recognizably a civil war between a State and an insurgent group, not a conflict between or among violent factions in a territory in which the State had collapsed. Thus there is substantial reason to question the logic and scope of the ICJ's interpretation of common Article 3, which, in any event, is not binding as a matter of domestic law on the United States.

8

common article 3 to apply it to cases that did not fit within its terms. Instead, they drafted two new protocols to adapt the Conventions to the conditions of contemporary hostilities.[24] The United States has not ratified these protocols, and hence cannot be held to the reading of the Geneva Conventions they promote. Thus, the WCA's prohibition on violations of common article 3 would apply only to internal conflicts between a state party and an insurgent group, rather than to all forms of armed conflict not covered by common article 2.

## II. *Application of WCA and Associated Treaties to al Qaeda*

We conclude that Geneva III does not apply to the al Qaeda terrorist organization. Therefore, neither the detention nor trial of al Qaeda fighters is subject to Geneva III (or the WCA). Three reasons, examined in detail below, support this conclusion. First, al Qaeda is not a State and thus cannot receive the benefits of a State party to the Conventions. Second, al Qaeda members fail to satisfy the eligibility requirements for treatment as POWs under Geneva Convention III. Third, the nature of the conflict precludes application of common article 3 of the Geneva Conventions.

*Geneva III does not apply to a non-State actor such as the al Qaeda terrorist organization.* Al Qaeda is not a State. It is a non-governmental terrorist organization composed of members from many nations, with ongoing operations in dozens of nations. Non-governmental organizations cannot be parties to any of the international agreements here governing the laws of war. Common article 2, which triggers the Geneva Convention provisions regulating detention conditions and procedures for trial of POWs, is limited to cases of declared war or armed conflict "between two or more of the High Contracting Parties." Al Qaeda is not a High Contracting Party. As a result, the U.S. military's treatment of al Qaeda members is not governed by the bulk of the Geneva Conventions, specifically those provisions concerning POWs. Conduct towards captured members of al Qaeda, therefore, also cannot constitute a violation of 18 U.S.C. § 2441(c)(1).

*Second, al Qaeda members fail to satisfy the eligibility requirements for treatment as POWs under Geneva Convention III.* It might be argued that, even though it is not a State party to the Geneva Conventions, al Qaeda could be covered by some protections in Geneva Convention III. Article 4(A)(2) of Geneva III defines prisoners of war as including not only captured members of the armed forces of a High Contracting Party, but also irregular forces such as "[m]embers of other militias and members of other volunteer corps, including those of organized resistance movements." Article 4(A)(3) also includes as POWs "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." *Id.* art. 4(A)(3). It might be claimed that the broad terms of these provisions could be stretched to cover al Qaeda.

This view would be mistaken. Article 4 does not expand the application of the Convention beyond the circumstances expressly addressed in common articles 2 and 3. Unless

---

[24] *See* Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, 1125 U.N.T.S. 4; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977, 1125 U.N.T.S. 610.

there is a conflict subject to article 2, article 4 simply does not apply. If the conflict is one to which article 3 applies, then article 4 has no role because article 3 does not trigger application of the rest of the provisions of Geneva III. Rather, article 3 provides an alternative set of standards that requires only minimal humanitarian protections. As we have explained, the conflict with al Qaeda does not fall within article 2. As a result, article 4 has no application. In other words, article 4 cannot be read as an alternative, and a far more expansive, statement of the application of the Convention. It merely specifies, where there is a conflict covered by article 2 of the Convention, who must be accorded POW status.

Even if article 4, however, were considered somehow to be jurisdictional as well as substantive, captured members of al Qaeda still would not receive the protections accorded to POWs. First, al Qaeda is not the "armed forces," volunteer forces, or militia of a state party that is a party to the conflict, as defined in article 4(A)(1). Second, they cannot qualify as volunteer force, militia, or organized resistance force under article 4(A)(2). That article requires that militia or volunteers fulfill four conditions: command by responsible individuals, wearing insignia, carrying arms openly, and obeying the laws of war. Al Qaeda members have clearly demonstrated that they will not follow these basic requirements of lawful warfare. They have attacked purely civilian targets of no military value; they refused to wear uniform or insignia or carry arms openly, but instead hijacked civilian airliners, took hostages, and killed them; and they themselves do not obey the laws of war concerning the protection of the lives of civilians or the means of legitimate combat. As these requirements also apply to any regular armed force under other treaties governing the laws of armed conflict,[25] al Qaeda members would not qualify under article 4(A)(3) either, which provides POW status to captured individuals who are members of a "regular armed force" that professes allegiance to a government or authority not recognized by the detaining power. Members of al Qaeda, therefore, would not qualify for POW treatment under article 4, even if it were somehow thought that they were participating in a conflict covered by common article 2 or if article 4 itself were thought to be jurisdictional in nature.

*Third, the nature of the conflict precludes application of common article 3 of the Geneva Conventions.* As discussed in Part I, the text of common article 3, when read in harmony with common article 2, shows that the Geneva Conventions were intended to cover either: a) traditional wars between state parties to the Conventions (article 2), b) or non-international civil wars (article 3). Our conflict with al Qaeda does not fit into either category. It is not an international war between nation-States because al Qaeda is not a State. Nor is this conflict a civil war under article 3, because it *is* a conflict of "an international character." Al Qaeda operates in many countries and carried out a massive international attack on the United States on September 11, 2001. Therefore, the military's treatment of al Qaeda members is not limited either by common article 3 or 18 U.S.C. § 2441(c)(3).

### III. *Application of the Geneva Conventions to the Taliban Militia*

Whether the Geneva Conventions apply to the detention and trial of members of the Taliban militia presents a more difficult legal question. Afghanistan has been a party to all four Geneva Conventions since September 1956. Some might argue that this requires application of the

---

[25] Hague Convention IV, Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277.

Geneva Conventions to the present conflict with respect to the Taliban militia, which would then trigger the WCA. Nonetheless, we conclude that the President has more than ample grounds to find that our treaty obligations under Geneva III toward Afghanistan were suspended during the period of the conflict. Under Article II of the Constitution, the President has the unilateral power to suspend whole treaties or parts of them at his discretion. In this part, we describe the President's constitutional power and discuss the grounds upon which he can justify the exercise of that power.

There are several grounds which might the President could exercise that authority here. First, the weight of informed opinion indicates that, for the period in question, Afghanistan was a "failed State" whose territory had been largely held by a violent militia or faction rather than by a government. As a failed state, Afghanistan did not have an operating government nor was it capable of fulfilling its international obligations. Therefore, the United States could decide to partially suspend any obligations that the United States might have under Geneva III towards the Taliban militia. Second, there appears to be developing evidence that the Taliban leadership had become closely intertwined with, if not utterly dependent upon, al Qaeda. This would have rendered the Taliban more akin to a terrorist organization that used force not to administer a government, but for terrorist purposes. The President could decide that no treaty obligations were owed to such a force.

### A. Constitutional Authority

Article II of the Constitution makes clear that the President is vested with all of the federal executive power, that he "shall be Commander in Chief," that he shall appoint, with the advice and consent of the Senate, and receive, ambassadors, and that he "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties." U.S. Const. art. II, § 2, cl. 2. Congress possesses its own specific foreign affairs powers, primarily those of declaring war, raising and funding the military, and regulating international commerce. While Article II, section 1 of the Constitution grants the President an undefined executive power, Article I, section 1 limits Congress to "[a]ll legislative Powers herein granted" in the rest of Article I.

From the very beginnings of the Republic, this constitutional arrangement has been understood to grant the President plenary control over the conduct of foreign relations. As Secretary of State Thomas Jefferson observed during the first Washington administration: "The constitution has divided the powers of government into three branches [and] . . . has declared that 'the executive powers shall be vested in the President,' submitting only special articles of it to a negative by the senate."[26] Due to this structure, Jefferson continued, "[t]he transaction of business with foreign nations is Executive altogether. It belongs then to the head of that department, _except_ as to such portions of it as are specially submitted to the Senate. _Exceptions are to be construed strictly._"[27] In defending President Washington's authority to issue the Neutrality Proclamation, Alexander Hamilton came to the same interpretation of the President's foreign affairs powers. According to Hamilton, Article II "ought . . . to be considered as intended . . . to specify and regulate the principal articles implied in the definition of Executive

---

[26] Thomas Jefferson, _Opinion on the Powers of the Senate Respecting Diplomatic Appointments_ (1790), _reprinted in_ 16 _The Papers of Thomas Jefferson_ 378 (Julian P. Boyd ed., 1961).

[27] _Id._ at 379.

Power; leaving the rest to flow from the general grant of that power."[28]  As future Chief Justice John Marshall famously declared a few years later, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations. . . . The [executive] department . . . is entrusted with the whole foreign intercourse of the nation. . . ."[29]

On the few occasions where it has addressed the question, the Supreme Court has lent its approval to the executive branch's broad powers in the field of foreign affairs.  Responsibility for the conduct of foreign affairs and for protecting the national security are, as the Supreme Court has observed, "'central Presidential domains."[30]  The President's constitutional primacy flows from both his unique position in the constitutional structure and from the specific grants of authority in Article II making the President the Chief Executive of the Nation and the Commander in Chief.[31]  Due to the President's constitutionally superior position, the Supreme Court has consistently "recognized 'the generally accepted view that foreign policy [is] the province and responsibility of the Executive.'"[32]  This foreign affairs power is independent of Congress: it is "the very delicate, plenary and exclusive power of the President as sole organ of the federal government in the field of international relations – a power which does not require as a basis for its exercise an act of Congress."[33]

In light of these principles, any unenumerated executive power, especially one relating to foreign affairs, must be construed as within the control of the President.  Although the Constitution does not specifically mention the power to suspend or terminate treaties, these authorities have been understood by the courts and long executive branch practice as belonging solely to the President.  The treaty power is fundamentally an executive power established in Article II of the Constitution, and power over treaty matters post-ratification are within the President's plenary authority.  As Alexander Hamilton declared during the controversy over the Neutrality Proclamation, "though treaties can only be made by the President and Senate, their activity may be continued or suspended by the President alone."[34]  Commentators also have supported this view.  According to the drafters of the *Restatement (Third) of the Foreign Relations Law of the United States*, the President has the power either "to suspend or terminate an [international] agreement in accordance with its terms," or "to make the determination that would justify the United States in terminating or suspending an agreement because of its violation by another party or because of supervening events, and to proceed to terminate or suspend the agreement on behalf of the United States."[35]  Indeed, the President's power to terminate treaties, which has been accepted by practice and considered opinion of the three branches,[36] must include the lesser power of temporarily suspending them.  We have discussed these questions in detail in recent opinions, and we follow their analysis here.[37]

---

[28] Alexander Hamilton, *Pacificus* No. 1 (1793), *reprinted in* 15 *The Papers of Alexander Hamilton* 33, 39 (Harold C. Syrett et al. eds., 1969).

[29] 10 Annals of Cong. 613-14 (1800).

[30] *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982).

[31] *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982).

[32] *Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)).

[33] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

[34] Hamilton, *Pacificus* No. 1, *supra*, at 42.

[35] *Restatement (Third) of the Foreign Relations Law of the United States* § 339 (1987).

[36] *See, e.g.*, Memorandum for Alberto R. Gonzales, Counsel to the President, from: Jay S. Bybee, Assistant Attorney General, *Re: Authority of the President to Denounce the ABM Treaty* (Dec. 14, 2001); *Goldwater v. Carter*, 617

12

The courts have often acknowledged the President's constitutional powers with respect to treaties. Thus, it has long been accepted that the President may determine whether a treaty has lapsed because a foreign State has gained or lost its independence, or because it has undergone other changes in sovereignty.[38] Nonperformance of a particular treaty obligation may, in the President's judgment, justify a decision to suspend or terminate the treaty.[39] While Presidents have unrestricted discretion, as a matter of domestic law, in suspending treaties, they can base the exercise of this discretion on several grounds. For example, the President may determine that "the conditions essential to [the treaty's] continued effectiveness no longer pertain."[40] He can decide to suspend treaty obligations because of a fundamental change in circumstances, as the United States did in 1941 in response to hostilities in Europe.[41] The President may also determine that a material breach of a treaty by a foreign government has rendered a treaty not in effect as to that government.[42]

Exercising this constitutional authority, the President can decide to suspend temporarily our obligations under Geneva III toward Afghanistan. Other Presidents have partially suspended treaties, and have suspended the obligations of multilateral agreements with regard to one of the state parties.[43] The President could also determine that relations under the Geneva Conventions

F.2d 697, 706-07 (D.C. Cir.) (en banc), *vacated and remanded with instructions to dismiss,* 444 U.S. 996 (1979); Senate Comm. on Foreign Relations, 106th Cong., *Treaties and Other International Agreements: The Role of the United States Senate* 201 (Comm. Print 2001) (prepared by Congressional Research Service, Library of Congress) (footnotes omitted)

[37] *See* Memorandum for John Bellinger, III, Senior Associate Counsel and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* (Nov. 15, 2001); *see also* Memorandum for William Howard Taft, IV, Legal Adviser, Department of State, from John Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: President's Constitutional Authority to Withdraw Treaties from the Senate* (Aug. 24, 2001).

[38] *See Kennett v. Chambers,* 55 U.S. 38, 47-48, 51 (1852); *Terlinden v. Ames,* 184 U.S. 270, 288 (1902); *Saroop v. Garcia,* 109 F.3d 165, 171 (3d. Cir. 1997) (collecting cases). Alexander Hamilton argued in 1793 that the revolution in France had triggered the power (indeed, the duty) of the President to determine whether the pre-existing treaty of alliance with the King of France remained in effect. The President's constitutional powers, he said, "include[] that of judging, in the case of a Revolution of Government in a foreign Country, whether the new rulers are competent organs of the National Will and ought to be recognised or not: And where a treaty antecedently exists between the UStates and such nation that right involves the power of giving operation or not to such treaty." Alexander Hamilton, *Pacificus No.* 1 (1793), *reprinted in* 15 *The Papers of Alexander Hamilton* 33, 41 (Harold C. Syrett et al. eds 1969).

[39] *See Taylor v. Morton,* 23 F. Cas. 784, 787 (C.C.D. Mass. 1855) (No. 13,799) (Curtis, Circuit Justice), *aff'd,* 67 U.S. (2 Black) 481 (1862).

[40] *See International Load Line Convention,* 40 Op. Att'y Gen. 119,124 (1941). Changed conditions have provided a basis on which Presidents have suspended treaties in the past. For example, in 1939, President Franklin Roosevelt suspended the operation of the London Naval Treaty of 1936. "The war in Europe had caused several contracting parties to suspend the treaty, for the obvious reason that it was impossible to limit naval armaments. The notice of termination was therefore grounded on changed circumstances." David Gray Adler, *The Constitution and the Termination of Treaties* 187 (1986).

[41] *International Load Line Convention,* 40 Op. Att'y Gen. at 123.

[42] *See, e.g., Charlton v. Kelly,* 229 U.S. 447, 473 (1913); *Escobedo v. United States,* 623 F.2d 1098, 1106 (5th Cir.), *cert. denied,* 449 U.S. 1036 (1980).

[43] In 1986, the United States suspended the performance of its obligations under the Security Treaty (ANZUS Pact), T.I.A.S. 2493, 3 U.S.T. 3420, *entered into force* April 29, 1952, as to New Zealand but not as to Australia. *See* Marian Nash (Leich), 1 *Cumulative Digest of United States Practice in International Law 1981-1988,* at 1279-81.

with Afghanistan should be restored once an Afghan government that is willing and able to execute the country's treaty obligations is securely established.[44]  A decision to regard the Geneva Conventions as suspended would not constitute a "denunciation" of the Conventions, for which procedures are prescribed in the Conventions.[45]  The President need not regard the Conventions as suspended in their entirety, but only in part.[46]

Among the grounds upon which a President may justify his power to suspend treaties is the collapse of a treaty partner, in other words the development of a failed state that could not fulfill its international obligations and was not under the control of any government. This has been implicitly recognized by the Supreme Court. In *Clark v. Allen*, 331 U.S. 503 (1947), the Supreme Court considered whether a 1923 treaty with Germany continued to exist after the defeat, occupation and partition of Germany by the victorious World War II Allies. The Court rejected the argument that the treaty "must be held to have failed to survive the [Second World War], since Germany, as a result of its defeat and the occupation by the Allies, has ceased to exist as an independent national or international community."[47]  Instead, the Court held that "the question whether a state is in a position to perform its treaty obligations is essentially a political question. *Terlinden v. Ames*, 184 U.S. 270, 288 [(1902)]. We find no evidence that the political departments have considered the collapse and surrender of Germany as putting an end to such provisions of the treaty as survived the outbreak of the war or the obligations of either party in respect to them."[48]  In *Clark*, the Court also made clear that the President could consider whether Germany was able to perform its international obligations in deciding whether to suspend our treaty relationship with her.

---

Thus, suspension of the Geneva Conventions as to Afghanistan would not affect the United States' relationships under the Conventions with other state parties.

[44] On June 20, 1876, for example, President Grant informed Congress that he was suspending the extradition clause of the 1842 "Webster-Ashburton Treaty" with Great Britain, Convention as to Boundaries, Suppression of Slave Trade and Extradition, Aug. 9, 1842, U.S.-Gr. Brit., Art 10, 8 Stat. 572, 579. Grant advised Congress that the release of two fugitives whose extradition was sought by the United States amounted to the abrogation or annulment of the extradition clause, and that the executive branch in response would take no action to surrender fugitives sought by the British Government unless Congress signified that it do so. The clause remained suspended until it was reactivated by the British Government's resumed performance.

[45] *See, e.g.,* Geneva Convention III, art. 142. The suspension of a treaty is distinct from the denunciation or termination of one. Suspension is generally a milder measure than termination, often being partial, temporary, or contingent upon circumstances that can be altered by the actions of the parties to the treaty. Moreover, at least in the United States, suspension of a treaty can be reversed by unilateral executive action, whereas termination, which annuls a treaty, and which is therefore more disruptive of international relationships, would require Senate consent to a new treaty to be undone.

[46] In general, the partial suspension of the provisions of a treaty (as distinct from both termination and complete suspension) is recognized as permissible under international law. Article 60 of the Vienna Convention on treaties explicitly permits the suspension of a treaty "in whole or in part." "[U]nder both treaty law and non-forcible reprisal law as a basis for responsive suspension it is clear that suspension may be only partial and need not suspend or terminate an agreement as a whole, in contrast, for example, with treaty withdrawal clauses." John Norton Moore, *Enhancing Compliance With International Law: A Neglected Remedy,* 39 Va. J. Int'l L. 881, 932 (1999). It should be noted, however, that the United States is not a party to the Vienna Convention on treaties, although it has treated its rules as customary international law. This issue is explored in greater detail, *infra* Part III.C.

[47] 331 U.S. at 514.

[48] *Id.; see also id.* at 508-09 (President might have "formulated a national policy quite inconsistent with the enforcement" of the treaty).

14

*Clark* demonstrates the Supreme Court's sanction for the President's constitutional authority to decide the "political question" whether our treaty with Germany was suspended because Germany was not in a position to perform its international obligations. Equally here, the executive branch could conclude that Afghanistan was not "in a position to perform its treaty obligations" because it lacked, at least throughout the Taliban's ascendancy, a functioning central government and other essential attributes of statehood. Based on such facts, the President would have the ground to decide that the Nation's Geneva III obligations were suspended as to Afghanistan. The President could further decide that these obligations are suspended until Afghanistan became a functioning state that is in a position to perform its Convention duties. The federal courts would not review such political questions, but instead would defer to the decision of the President.

### B. *Status as a Failed State*

There are ample grounds for the President to determine that Afghanistan was a failed State, and on that basis to suspend performance of our Geneva III obligations towards it.[49] Indeed, the findings of the State and Defense Departments, of foreign leaders, and of expert opinion support the conclusion that Afghanistan under the Taliban was without a functioning central government. The collapse of functioning political institutions in Afghanistan is a valid justification for the exercise of the President's authority to suspend our treaty obligations towards that country.

Such a determination would amount to finding that Afghanistan was a "failed state." A "failed State" is generally characterized by the collapse or near-collapse of State authority. Such a collapse is marked by the inability of central authorities to maintain government institutions, ensure law and order or engage in normal dealings with other governments, and by the prevalence of violence that destabilizes civil society and the economy.

An initial approach to the question whether Afghanistan was a failed state is to examine some of the traditional indicia of statehood.[50] A State has failed when centralized governmental authority has almost completely collapsed, no central authorities are capable of maintaining government institutions or ensuring law and order, and violence has destabilized civil society and

---

[49] We should not be understood to be saying that the President's basis for suspending the Geneva Conventions as to Afghanistan is merely the fact that Afghanistan underwent a change of government in 1996, after the military successes of Taliban. The general rule of international law is that treaty relations survive a change of government. *See, e.g.*, 2 Marjorie M. Whiteman, *Digest of International Law* 771-73 (1963); J.L. Brierly, *The Law of Nations* 144-45 (6th ed. 1963); Eleanor C. McDowell, *Contemporary Practice of the United States Relating to International Law*, 71 Am. J. Int'l L. 337 (1977). The general rule is that treaties may still be observed even as to State parties, the current governments of which have been unrecognized. *See New York Chinese TV Programs v. U.E. Enterprises*, 954 F.2d 847 (2d Cir. 1992); *see also Restatement (Third) of the Foreign Relations Law of the United States* § 202 cmts. a, b (1987).

[50] It would be mistaken to argue that the concept of a failed State is not legal in nature, and thus cannot be taken into account in determining whether to suspend our Geneva III obligations toward Afghanistan. Legal scholars as well as political scientists have employed the concept for some time. Moreover, even if taken only as a category of political science, the term "failed State" encapsulates a description of structural conditions within a country such as Afghanistan) that are directly relevant to considering whether that country has lapsed for *legal* purposes into a condition of statelessness.

the economy.[51]  Borrowing from the *Restatement (Third) of U.S. Foreign Relations Law,* we may conclude that a state has "failed" if it cannot satisfy some or all of the three traditional tests for "statehood" under international law: i) whether the entity has a defined territory and population; ii) whether the territory/population is under the control of its own government; and iii) whether the entity engages in, or has the capacity to engage in formal relations with other States.[52]  The State Department has restated this formulation by elaborating a four-part test for statehood: i) whether the entity have effective control over a clearly defined territory and population; ii) whether an organized governmental administration of the territory exists; iii) whether the entity has the capacity to act effectively to conduct foreign relations and to fulfill international obligations; iv) whether the international community recognizes the entity.[53]

We want to make clear that this Office does not have access to all of the facts related to the activities of the Taliban militia and al Qaeda in Afghanistan.  Nonetheless, the available facts in the public record would support the conclusion that Afghanistan was a failed State – including facts that pre-existed the military reversals suffered by the Taliban militia and the formation of the new transitional government pursuant to the Bonn Agreement.  Indeed, there are good reasons to doubt whether *any* of the conditions were met.

First, even before the outset of the conflict with the United States, the Taliban militia did not have effective control over a clearly defined territory and population.  It is unclear whether the Taliban militia ever fully controlled most of the territory of Afghanistan.  At the time that the United States air strikes began, at least ten percent of the country, and the population within those areas, was governed by the Northern Alliance.  Indeed, the facts suggest that Afghanistan was divided between different tribal and warring factions, rather than controlled by any central State.  The Taliban militia in essence represented only an ethnically Pashtun movement, a "tribal

---

[51] "States in which institutions and law and order have totally or partially collapsed under the pressure and amidst the confusion of erupting violence, yet which subsist as a ghostly presence on the world map, are now commonly referred to as 'failed States' or '*États sans gouvernement*.'"  Daniel Thurer, *The Failed State and International Law,* International Review of the Red Cross No. 836 (Dec. 31, 1999), available at http://www.icrc.org/eng/review (visited Jan. 10, 2002).  Somewhat different tests have been used for determining whether a State has "failed."  First, the most salient characteristic of a "failed State" seems to be the disappearance of a "central government."  Yoram Dinstein, *The Thirteenth Waldemar A. Solf Lecture in International Law,* 166 Mil. L. Rev. 93, 103 (2000); *see also id.* ("All that remains is a multiplicity of groups of irregular combatants fighting each other.").  Closely related to this test, but perhaps somewhat broader, is the definition of a "failed State" as "a situation where the government is unable to discharge basic governmental functions with respect to its populace and its territory.  Consequently, laws are not made, cases are not decided, order is not preserved and societal cohesion deteriorates.  Basic services such as medical care, education, infrastructure maintenance, tax collection and other functions and services rendered by central governing authorities cease to exist or exist only in limited areas."  Ruth Gordon, *Growing Constitutions,* 1 U. Pa. J. Const. L. 528, 533-34 (1999).  Professor Thurer distinguishes three elements (respectively, territorial, political and functional) said to characterize a "failed State": 1) failed States undergo an "implosion rather than an explosion of the structures of power and authority, the disintegration and destructuring of States rather than their dismemberment;" 2) they experience "the total or near total breakdown of structures guaranteeing law and order;" and 3) there are marked by "the absence of bodies capable, on the one hand, of representing the State at the international level and, on the other, of being influenced by the outside world."

[52] *See Restatement (Third) of the Foreign Relations Law of the United States* § 201; *see also* 1933 Montevideo Convention on Rights and Duties of States, art. 1, 49 Stat. 3097, 28 Am. J. Int'l L. Supp. 75 (1934).

[53] Eleanor C. McDowell, *Contemporary Practice of the United States Relating to International Law,* 71 Am. J. Int'l L. 337 (1977).

militia,"[54] that did not command the allegiance of other major ethnic groups in Afghanistan and that was apparently unable to suppress endemic violence in the country. As a prominent writer on the Taliban militia wrote well before the current conflict began, "[e]ven if [the Taliban] were to conquer the north, it would not bring stability, only continuing guerrilla war by the non-Pashtuns, but this time from bases in Central Asia and Iran which would further destabilize the region."[55]

Second, again even before the United States air strikes and the successes of the Northern Alliance, an organized governmental administration did not exist in Afghanistan. One noted expert on the Taliban has concluded that the country had

> ceased to exist as a viable state . . . . The entire Afghan population has been displaced, not once but many times over. The physical destruction of Kabul has turned it into the Dresden of the late twentieth century. . . . There is no semblance of an infrastructure that can sustain society -- even at the lowest common denominator of poverty. . . . The economy is a black hole that is sucking in its neighbors with illicit trade and the smuggling of drugs and weapons, undermining them in the process. . . . Complex relationships of power and authority built up over centuries have broken down completely. No single group or leader has the legitimacy to reunite the country. Rather than a national identity or kinship-tribal-based identities, territorial regional identities have become paramount. . . . [T]he Taliban refuse to define the Afghan state they want to constitute and rule over, largely because they have no idea what they want. The lack of a central authority, state organizations, a methodology for command and control and mechanisms which can reflect some level of popular participation . . . make it impossible for many Afghans to accept the Taliban or for the outside world to recognize a Taliban government. . . . No warlord faction has ever felt itself responsible for the civilian population, but the Taliban are incapable of carrying out even the minimum of developmental work because they believe that Islam will take care of everyone.[56]

Another expert had reached similar conclusions before the outbreak of the conflict:

> Afghanistan today has become a violent society, bereft of political institutions that function correctly and an economy that functions at all. When this is coupled with the destruction of population and the physical infrastructure . . ., it becomes clear that Afghanistan is a country on the edge of collapse, or at least profound transformation. . . . With the Taliban, there are few meaningful governmental structures and little that actually functions.[57]

---

[54] Larry P. Goodson, *Afghanistan's Endless War: State Failure, Regional Politics, and the Rise of the Taliban* 46, 115 (2001).

[55] Ahmed Rashid, *Taliban: Militant Islam, Oil & Fundamentalism in Central Asia* 213 (2001).

[56] *Id.* at 207-08, 212-13.

[57] Goodson, *supra*, at 103-04; 115.

The State Department has come to similar conclusions. In testimony early in October 2001 before the Senate Foreign Relations Committee's Subcommittee on Near East and South Asian Affairs, Assistant Secretary of State for South Asian Affairs Christina Rocca explained that:

> [t]wenty-two years of conflict have steadily devastated [Afghanistan], destroyed its physical and political infrastructure, shattered its institutions, and wrecked its socio-economic fabric. . . . The Taliban have shown no desire to provide even the most rudimentary health, education, and other social services expected of any government. Instead, they have chosen to devote their resources to waging war on the Afghan people, and exporting instability to their neighbors.[58]

Rather than performing normal government functions, the Taliban militia exhibited the characteristics of a criminal gang. The United Nations Security Council found that the Taliban militia extracted massive profits from illegal drug trafficking in Afghanistan and subsidized terrorism from those revenues.[59]

Third, the Taliban militia was unable to conduct normal foreign relations or to fulfill its international legal obligations. Publicly known facts suggest that the Taliban was unable to obey its international obligations and to conduct normal diplomatic relations. Thus, the Taliban militia consistently refused to comply with United Nations Security Council Resolutions 1333 (2000) and 1267 (1999), which called on it to surrender Osama bin Laden to justice and to take other actions to abate terrorism based in Afghanistan.[60] Those resolutions also called on all States to deny permission for aircraft to take off or to land if they were owned or operated by or for the Taliban, and to freeze funds and other resources owned or controlled by the Taliban. Reportedly, the Taliban militia also may have been unable to extradite bin Laden at the request of Saudi Arabia in September, 1998, despite its close relations with the Saudi government. As a

---

[58] United States Department of State, International Information Programs, *Rocca Blames Taliban for Humanitarian Disaster in Afghanistan* (Oct. 10, 2001), *available at* http://www.usinfo.state.gov/regional/nea/sasia/afghan/text2001/1010roca.htm (visited Jan. 10, 2001).

[59] *See* U.N. Security Council Resolution 1333 (2000), *available at* http://www.un.org/Docs/scres/2000/res1333e.pdf (finding that "the Taliban benefits directly from the cultivation of illicit opium by imposing a tax on its production and indirectly benefits from the processing and trafficking of such opium, and . . . these substantial resources strengthen the Taliban's capacity to harbor terrorists"). The United States Government has amassed substantial evidence that the Taliban has condoned and profited from narco-trafficking on a massive scale, with disastrous effects on neighboring countries. *See The Taliban, Terrorism, and Drug Trade: Hearing Before the Subcomm. on Criminal Justice, Drug Policy and Human Resources of the House Comm. on Government Reform*, 107th Cong. (2001) (testimony of William Bach, Director, Office of Asia, Africa, Europe, NIS Programs, Bureau of International Narcotics and Law Enforcement Affairs, Department of State; testimony of Asa Hutchinson, Administrator, Drug Enforcement Administration, U.S. Department of Justice).

[60] U.N. Security Council Resolution 1333 "strongly condemn[ed]" the Taliban for the "sheltering and training of terrorists and [the] planning of terrorist acts," and "deplor[ed] the fact that the Taliban continues to provide a safe haven to Usama bin Laden and to allow him and others associated with him to operate a network of terrorist training camps from Taliban-controlled territory and to use Afghanistan as a base from which to sponsor international terrorist operations." U.N. Security Council Resolution 1214, ¶ 13 (1998) enjoined the Taliban to stop providing a sanctuary and training for terrorists. U.N. Security Council Resolution 1267, ¶ 2 (1999), stated that the Taliban's failure to comply with the Council's 1998 demand constituted a threat to the peace. *See* Sean D. Murphy, *Efforts to Obtain Custody of Osama Bin Laden*, 94 Am. J. Int'l L. 366 (2000).

result, the Saudi government expelled the Afghan *chargé d'affaires*.[61] The Taliban's continuing role in sheltering and supporting those believed to be responsible for the terrorist attacks of September 11, 2001 placed it in clear breach of international law, which required it to prevent the use of its territory as a launching pad for attacks against other nations.[62]

It has been suggested by government officials and independent press reports that the Taliban militia had become so subject to the domination and control of al Qaeda that it could not pursue independent policies with respect to the outside world.[63] Former Ambassador Robert Oakley described the relationship as "very close. The Taliban and bin Laden, particularly Mullah Omar, go way, way back . . . [Bin Laden] has helped the Taliban with material support since they began their movement in Afghanistan."[64] Richard Haass, Director of the State Department's Office of the Policy Planning Staff, has noted that the Taliban "have accepted substantial financial support from and proved themselves subservient to" al Qaeda.[65] Al Qaeda apparently supplied the Taliban regime with money, materiel, and personnel to help it gain the upper hand in its ongoing battles with the Northern Alliance.[66] Because al Qaeda was capable of mustering more formidable military forces than the Taliban at any given point, and because failure to protect bin Laden would have cost the Taliban the support of radical Islamists, it may well have been impossible for the Taliban to surrender bin Laden as directed by the United Nations, even if it had been willing to do so. While a policy decision to violate international law

---

[61] *See* Yossef Bodansky, *Bin Laden: The Man Who Declared War on America* 301-02 (2001).

[62] *See* Robert F. Turner, *International Law and the Use of Force in Response to the World Trade Center and Pentagon Attacks, available at* http://jurist.law.pitt.edu/forum/forumnew34.htm (visited Jan. 10, 2002) ("If (as has been claimed by the US and UK governments) bin Laden masterminded the attacks on New York and Washington, Afghanistan is in breach of its state responsibility to take reasonable measures to prevent its territory from being used to launch attacks against other states. The United States and its allies thus have a legal right to violate Afghanistan's territorial integrity to destroy bin Laden and related terrorist targets. If the Taliban elects to join forces with bin Laden, it, too, becomes a lawful target."); *see also* W. Michael Reisman, *International Legal Responses to Terrorism*, 22 Hous. J. Int'l L. 3, 40-42, 51-54 (1999).

[63] *See, e.g.*, Michael Dobbs & Vernon Loeb, *2 U.S. Targets Bound by Fate*, Wash. Post, Nov. 14, 2001 at A22 ("According to Thomas Gouttierre, an Afghan expert at the University of Nebraska and a former UN adviser, the so-called Afghan Arabs surrounding bin Laden were much more educated and articulate than the often illiterate Taliban and succeeded in convincing them that they were at the head of a world-wide Islamic renaissance. 'Al Qaeda ended up hijacking a large part of the Taliban movement,' he said, noting that [Taliban supreme religious leader Mohammed] Omar and bin Laden were 'very, very tight' by 1998."); Peter Baker, *Defector Says Bin Laden Had Cash, Taliban In His Pocket*, Wash. Post, Nov. 30, 2001 at A1 (reporting claims by former Taliban official of al Qaeda's corruption of Taliban officials).

[64] *Online News Hour: The Taliban* (Sept. 15, 2001), *available at* http://www.pbs.org/newshour/bb/terrorism/july-dec01/taliban_9-15.html (visited Jan. 15, 2002).

[65] *The Bush Administration's Response to September 11th – and Beyond*, Remarks to the Council of Foreign Relations (Oct. 15, 2001), *available at* http://www.yale.edu/lawweb/avalon/sept_11/haass_001.htm (visited Jan. 15, 2002).

[66] The so-called "55th Brigade," a military force consisting primarily of Arabs under Syrian and Saudi commanders, was based outside of Kabul and was trained, maintained and paid for by al Qaeda. It "provided crucial support to Taliban forces during offensives against the Northern Alliance over the past five years." Michael Jansen, *US focused initially on bin Laden Mercenaries*, The Irish Times on the Web (Oct. 30, 2001), *available at* http://www.ireland.coewspaper/world/2001/1030/wor6.htm (visited Jan. 15, 2002). According to some reports, these al Qaeda fighters were the most aggressive and ideologically committed forces available to the Taliban leadership, and were used to control other Taliban units. *See also* Michael Kranish & Indira A.R. Lakshmanan, *Partners in 'Jihad': Bin Laden Ties to Taliban*, Boston Globe, Oct. 28, 2001, at A1. This article contains especially detailed information about the close linkages between the two movements and their leaders.

would not be grounds to deny statehood, if al Qaeda – a non-governmental terrorist organization – possessed such power within Afghanistan to prevent its alleged rulers from taking action against it as ordered by the U.N., this would indicate that the Taliban militia did not exercise sufficient governmental control within the territory to fulfill its international obligations.

The Taliban militia's failure to carry out its international obligations became even further apparent during the conflict itself. During the United States' campaign in Afghanistan, Secretary Rumsfeld noted that the Taliban "are using mosques for ammunition storage areas. They are using mosques for command and control and meeting places. They are putting tanks and artillery pieces in close proximity to hospitals, schools, and residential areas."[67] In a series of "Fact Sheets" issued during the campaign, the State Department described in detail many of the atrocities committed by the Taliban and al Qaeda before and during the United States' military operations. These included massacres of both prisoners and civilians. For example, the State Department reported that in August, 2000, the Taliban had "executed POWs in the streets of Herat as a lesson to the local population."[68] The State Department also reported on November 2, 2001 that "[t]he Taliban have put the Afghan civilian population in grave danger by deliberately hiding their soldiers and equipment in civilian areas, including in mosques."[69] According to State, the Taliban "massacred hundreds of Afghan civilians, including women and children, in Yakaoloang, Mazar-I-Sharif, Bamiyan, Qezelabad, and other towns."[70] For example, the State Department noted, a report by the United Nations Secretary General regarding the July, 1999, massacre in the Shomaili Plains stated that "[t]he Taliban forces, who allegedly carried out these acts, essentially treated the civilian population with hostility and made no distinction between combatants and non-combatants."[71] All of this evidence goes to prove that the Taliban militia regularly refused to follow the laws of armed conflict, which, besides independently providing grounds for a presidential suspension of Geneva III, also demonstrate that Afghanistan had become a failed state and was under the control not of a government but of a violent terrorist group.

Fourth, the Taliban militia was not recognized as the legitimate government of Afghanistan by the United States or by any member of the international community except Pakistan. Neither the United States nor the United Nations ever recognized that the Taliban militia was a government. The only two other States that had maintained diplomatic relations with it before the current conflict began (Saudi Arabia and the United Arab Emirates) soon

---

[67] *Transcript: Rumsfeld Says Taliban Functioning As Military Force Only, supra.*

[68] *Fact Sheet on Al Qaeda and Taliban Atrocities* (released Nov. 22, 2001 by Coalition Information Center), *available at* http://www.usinfo.state.gov/topical/pol/terror/01112301.htm (visited Jan. 15, 2002). The source cited for this particular report was the Defense Department.

[69] *Fact Sheet: Taliban Actions Imperil Afghan Civilians* (Nov. 2, 2001), *available at* http://wwww.usinfo.state.gov/topical/pol/terror/01110203.htm (visited Jan. 15, 2002). Further, the State Department publicized reports from *The Washington Post* that the Taliban was using entire villages as human shields to protect their stockpiles of ammunition and weapons, that they were relocating the police ministry in Kandahar to mosques, that they had taken over NGO relief organization buildings, and that they were discovered transporting tanks and mortar shells in the guise of humanitarian relief. *Fact Sheet: The Taliban's Betrayal of the Afghan People* (Nov. 6, 2001), *available at* http://www.usinfo.state.gov/topical/pol/terror/01110608.htm (visited Jan. 15, 2002).

[70] *Id.*

[71] *Id.* (quoting report; no citation given).

severed them.[72]  Even Pakistan had withdrawn its recognition before the end of hostilities between the United States and the Taliban forces. This *universal* refusal to recognize the Taliban militia as a government demonstrates that other nations and the United Nations concurred in a judgment that the Taliban militia was no government and that Afghanistan had ceased to operate as a nation-State.

Indeed, the cabinet departments of the U.S. Government best positioned to determine whether Afghanistan constituted a failed state appear to have reached that conclusion some time ago. Secretary of Defense Donald Rumsfeld, for example, declared at a November 2, 2001 press conference that the "Taliban is not a government. The government of Afghanistan does not exist today. The Taliban never was a government as such. It was a force in the country that is not substantially weakened – in many cases cloistered away from the people."[73]  Secretary Rumsfeld has made substantially the same remarks on several other occasions. On October 29, 2001, he described the Taliban as "an illegitimate, un-elected group of terrorists."[74]  And on November 4, 2001, he stated at a press conference with the Foreign Minister of Pakistan that "Taliban is not really functioning as a government as such. There is really not a government to speak of in Afghanistan today."[75]  On November 11, 2001, the Secretary emphasized the extent to which Afghanistan had fallen under the control of al Qaeda: "for all practical purposes, the al Qaeda has taken over the country."[76]  Secretary Rumsfeld's final statement indicates his belief that no real government functioned in Afghanistan, but rather that groups of armed, violent militants had come into control.

In the recent past, the State Department took the same view. Near the start of the conflict, the Bureau of South Asian Affairs found that "[t]here is no functioning central government [in Afghanistan]. The country is divided among fighting factions. . . . The Taliban [is] a radical Islamic movement [that] occupies about 90% of the country."[77]  Undersecretary of State Paula J. Dobriansky said on October 29, 2001, that "young Afghans cannot remember a time when their country really worked. There was a time – a little over 20 years ago – when Afghanistan was a functioning state, a member of the world community. . . . Unfortunately it is

---

[72] *See A Look at the Taliban*, USA Today, Sept. 30, 2001, *available at* http://www.usatoday.com/news/world/2001/thetaliban.htm (visited Jan. 10, 2002). Indeed, Pakistan had been the only country in the world that maintained an embassy in Kabul; the overwhelming majority of States and the United Nations recognized exiled President Burhanuddin Rabbani and his government as the country's legal authorities. *See Taliban tactics move to hostage ploy*, Aug. 8, 2001, available at http://www.janes.com/regional_news/asia_pacific/news/jid/jid010808_1_n.shtml (visited Oct. 19, 2001).

[73] Secretary Rumsfeld Media Availability en Route to Moscow (Nov. 2, 2001), *available at* http://www.yale.edu/lawweb/avalon/sept_11/dod_brief64.htm (visited Jan. 15, 2002).

[74] *Rumsfeld Says Taliban to Blame for Casualties* (Oct. 29, 2001), *available at* http://www.usinfo.state.gov/topical/pol/terror/01102905.htm (visited Jan. 15, 2002).

[75] *Transcript: Rumsfeld Says Taliban Functioning As Military Force Only* (Nov. 4, 2001), *available at* http:www.usinfo.state.gov/topical/pol/terror/0110403.htm (visited Jan. 15, 2002).

[76] *Rumsfeld on Afghanistan Developments on "Fox News Sunday,"* (Nov. 12, 2001), *available at* http://www.usinfo.state.gov/topical/pol/terror/0111204.htm (visited Jan. 15, 2002).

[77] *Background Note* (October, 2001), *available at* http://www.state.gov/r/pa/bgn/index.cfm?docid=5380 (visited Jan. 10, 2002), prepared by the Bureau of South Asian Affairs. *See also* Reuters AlertNet - Afghanistan, *Country Profiles* ("There are no state-constituted armed forces. It is not possible to show how ground forces' equipment has been divided among the different factions."), *available at* http://www.alertnet.org/thefacts/countryprofiles/152478?version=1 (visited Jan. 15, 2002).

now difficult to remember that functioning Afghanistan."[78]  As recently as December 12, 2001, the State Department's Office of International Information Programs, drawing on Coalition Information Center materials and media reports, stated that *both* the Taliban and al Qaeda "are terrorist organizations," and characterized the Taliban's leader, Mullah Omar, as "a terrorist."[79]

Some international officials concur with the views of our Government. Lakhdar Brahimi, for example, the United Nations mediator in Afghanistan and a former Algerian Foreign Minister, described Afghanistan under the Taliban as a "failed state which looks like an infected wound."[80]  Tony Blair, the Prime Minister of Great Britain, on a visit to that country this month, declared that "Afghanistan has been a failed state for too long and the whole world has paid the price."[81]

Based on the foregoing, it is apparent that the publicly-available evidence would support the conclusion that Afghanistan, when largely controlled by the Taliban militia, failed some, and perhaps all, of the ordinary tests of statehood. Nor do we think that the military successes of the United States and the Northern Alliance change that outcome. Afghanistan *was* effectively stateless for the relevant period of the conflict, even if after the Bonn Agreement it became a State recognized by the United Nations, the United States, and most other nations.[82]  The President can readily find that at the outset of this conflict, when the country was largely in the hands of the Taliban militia, there was no functioning central government in Afghanistan that was capable of providing the most basic services to the Afghan population, of suppressing endemic internal violence, or of maintaining normal relations with other governments.  In other words, the Taliban militia would not even qualify as the *de facto* government of Afghanistan. Rather, it would have the status only of a violent faction or movement contending with other factions for control of Afghanistan's territory, rather than the regular armed forces of an existing state.  This would provide sufficient ground for the President to exercise his constitutional power to suspend our Geneva III obligations toward Afghanistan.

### C. Suspension Under International Law

Although the President may determine that Afghanistan was a failed State as a matter of domestic law, there remains the distinct question whether suspension would be valid as a matter

---

[78] Paula J. Dobransky, *Afghanistan: Not Always a Battlefield* (Oct. 29, 2001), *available at* http://www.usinfo.state.gov/topical/pol/terror/01102908.htm (visited Jan. 15, 2002).
[79] *The End of the Taliban Reign of Terror in Afghanistan* (Dec. 12, 2001), *available at* http://www.usinfo.state.gov/topical/pol/terror/01121206.htm (visited Jan. 15, 2002).
[80] Rashid, *supra*, at 207.
[81] Philip Webster, *Blair's mission to Kabul,* The Times of London, Jan. 8, 2002, *available at* 2002 WL 4171996.
[82] We do not think that the military successes of the United States and the Northern Alliance necessarily meant that Afghanistan's statehood was restored before the Bonn agreement, if only because the international community, including the United States, did not regard the Northern Alliance as constituting the government of Afghanistan. United Nations Security Council Resolution 1378, ¶ 1 (2001), *available at* http://www.yale.edu/lawweb/ avalon/sept__11/unsecres__1378.htm (visited Nov. 19, 2001), expressed "strong support for the efforts of the Afghan people to establish a new and transitional administration leading to the formation of a government" (emphasis added); *see also id.* ¶ 3 (affirming that the United Nations should play a central role in supporting Afghan efforts to establish a "new and transitional administration leading to the formation of a new government"). The plain implication of this Resolution, which reflects the views of the United States, is that Afghanistan after the Taliban did not have a government at that time.

of international law.[83]  We emphasize that the resolution of that question, however, *has no bearing* on domestic constitutional issues, or on the application of the WCA.  Rather, these issues are worth consideration as a means of justifying the actions of the United States in the world of international politics.  While a close question, we believe that the better view is that, in certain circumstances, countries can suspend the Geneva Conventions consistently with international law.

International law has long recognized that the material breach of a treaty can be grounds for the party injured by the breach to terminate or withdraw from the treaty.[84]  Under customary international law, the general rule is that breach of a multilateral treaty by a State party justifies the suspension of that treaty with regard to that State.  "A material breach of a multilateral treaty by one of the parties entitles . . . [a] party specially affected by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part in the relations between itself and the defaulting State."[85]  If Afghanistan could be found in material breach for violating "a provision essential to the accomplishment of the object or purpose of the [Geneva Conventions]," suspension of the Conventions would have been justified.[86]

We note, however, that these general rules authorizing suspension "do not apply to provisions relating to the protection of the human person contained in treaties of a humanitarian character, in particular to provisions prohibiting any form of reprisals against persons protected by such treaties."[87]  Although the United States is not a party to the Vienna Convention, some lower courts have said that the Convention embodies the customary international law of treaties, and the State Department has at various times taken the same view.[88]  The Geneva Conventions must be regarded as "treaties of a humanitarian character," many of whose provisions "relat[e] to the protection of the human person."[89]  Arguably, therefore, a decision by the United States to suspend Geneva III with regard to Afghanistan might put the United States in breach of customary international law.

---

[83] In general, of course, a decision by a State not to discharge its treaty obligations, even when effective as a matter of domestic law, does not necessarily relieve it of possible international liability for non-performance. *See generally Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 160 (1934).

[84] *See Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) Notwithstanding Security Council Resolution 276*, 1971 I.C.J. 16, 47, ¶ 98 (Advisory Opinion June 21, 1971) (holding it to be a "general principle of law that a right of termination on account of breach must be presumed to exist in respect of all treaties, except as regards provisions relating to the protection of the human person contained in treaties of a humanitarian character. . . . The silence of a treaty as to the existence of such a right cannot be interpreted as implying the exclusion of a right which has its source outside of the treaty, in general international law[.]").

[85] Vienna Convention on Treaties, art. 60(2)(b).

[86] *Id.* art. 60(3).

[87] *Id.* art. 60(5).  The Vienna Convention seems to prohibit or restrict the suspension of humanitarian treaties if the sole ground for suspension is material breach.  It does not squarely address the case in which suspension is based, not on particular breaches by a party, but by the party's disappearance as a State or on its incapacity to perform its treaty obligations.

[88] *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 433 (2d Cir.), *cert. denied*, 122 S. Ct. 206 (2001); Moore, *supra*, at 891-92 (quoting 1971 statement by Secretary of State William P. Rogers and 1986 testimony by Deputy Legal Adviser Mary V. Mochary).

[89] *See* Sir Ian Sinclair, *The Vienna Convention on the Law of Treaties* 191 (2d ed. 1984) (explaining intent and scope of reference to "humanitarian" treaties).  Indeed, when the drafters of the Vienna Convention added paragraph 5 to article 60, the Geneva Conventions were specifically mentioned as coming within it. *See* Harris, *supra*, at 797.

In addition, the Geneva Conventions could themselves be read to preclude suspension. Common article 1 pledges the High Contracting Parties "to respect and to ensure respect for the present Convention *in all circumstances*" (emphasis added). Some commentators argue that this provision should be read to bar any State party from refusing to enforce their provisions, no matter the conduct of its adversaries. In other words, the duty of performance is absolute and does not depend upon reciprocal performance by other State parties.[90] Under this approach, the substantive terms of the Geneva Conventions could never be suspended, and thus any violation would always be illegal under international law.

This understanding of the Vienna and Geneva Conventions cannot be correct. There is no textual provision in the Geneva Conventions that clearly prohibits temporary suspension. The drafters included a provision that precludes State parties from agreeing to absolve each other of violations.[91] They also included careful procedures for the termination of the agreements by individual State parties, including a provision that requires delay of a termination of a treaty, if that termination were to occur during a conflict, until the end of the conflict.[92] Yet, at the same time, the drafters of the Conventions did not address suspension at all, even though it has been a possible option since at least the eighteenth century.[93] Indeed, if the drafters and ratifiers of the Geneva Conventions believed the treaties could not be suspended, while allowing for withdrawal and denunciation, they could have said so explicitly and easily in the text.

A blanket non-suspension rule makes little sense as a matter of international law and politics. If there were such a rule, international law would leave an injured party effectively remediless if its adversaries committed material breaches of the Geneva Conventions. Apart from its unfairness, that result would reward and encourage non-compliance with the Conventions. True, the Conventions appear to contemplate that enforcement will be promoted by voluntary action of the parties.[94] Furthermore, the Conventions provide for intervention by "the International Committee of the Red Cross or any other impartial humanitarian organization . . . subject to the consent of the Parties to the conflict concerned."[95] But the effectiveness of these provisions depends on the good will of the very party assumed to be committing material breaches, or on its sensitivity to international opinion. Likewise, the provision authorizing an impartial investigation of alleged violations also hinges on the willingness of a breaching party to permit the investigation and to abide by its result. Other conceivable remedies, such as the imposition of an embargo by the United Nations on the breaching party, may also be inefficacious in particular circumstances. If, for example, Afghanistan were bound by Geneva Convention III to provide certain treatment to United States prisoners of war but in fact materially breached such duties, a United Nations embargo might have little effect on its behavior. Finally, offenders undoubtedly face a risk of trial and punishment before national or international courts after the conflict is over. Yet that form of relief presupposes that the offenders will be subject to capture at the end of the conflict – which may well depend on

---

[90] *See, e.g.,* Draper, *The Red Cross Conventions, supra,* at 8; *see also Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States),* 76 I.L.R. at 448, ¶ 220.

[91] *See, e.g.,* Geneva Convention III, art. 131.

[92] *See, e.g., id.,* art. 142.

[93] *See* Sinclair, *supra,* at 192.

[94] *See, e.g.,* the Geneva Convention III, art. 8; Geneva Convention IV, art. 9.

[95] Geneva Convention III, art. 9; Geneva Convention IV, art. 10.

whether or not they have been defeated. Reliance on post-conflict trials, as well as being uncertain, defers relief for the duration of the conflict. Without a power to suspend, therefore, parties to the Geneva Conventions would only be left with these meager tools to remedy widespread violation of the Conventions by others.

Thus, even if one were to believe that international law set out fixed and binding rules concerning the power of suspension, the United States could make convincing arguments under the Geneva Conventions itself, the Vienna Convention on Treaties, and customary international law in favor of suspending the Geneva Conventions as applied to the Taliban militia in the current war in Afghanistan.

### D. Application of the Geneva Conventions As a Matter of Policy

We conclude this Part by addressing a matter of considerable significance for policymakers. To say that the President may suspend specific provisions of the Geneva Conventions *as a legal requirement* is by no means to say that the principles of the laws of armed conflict cannot be applied *as a matter of U.S. Government policy*. There are two aspects to such policy decisions, one involving the protections of the laws of armed conflict and the other involving liabilities under those laws.

First, the President may determine that for reasons of diplomacy or in order to encourage other States to comply with the principles of the Geneva Conventions or other laws of armed conflict, it serves the interests of the United States to *treat* al Qaeda or Taliban detainees (or some class of them) as if they were prisoners of war, even though they do not have any legal entitlement to that *status*. We express no opinion on the merits of such a policy decision.

Second, the President as Commander in Chief can determine as a matter of his judgment for the efficient prosecution of the military campaign that the policy of the United States will be to enforce customary standards of the law of war against the Taliban and to punish any transgressions against those standards. Thus, for example, even though Geneva Convention III does not apply as a matter of law, the United States may deem it a violation of the laws and usages of war for Taliban troops to torture any American prisoners whom they may happen to seize. The U.S. military thus could prosecute Taliban militiamen for war crimes for engaging in such conduct.[96]

A decision to apply the principles of the Geneva Conventions or others laws of war as a matter of policy, not law, would be fully consistent with the past practice of the United States. United States practice in post-1949 conflicts reveals several instances in which our military forces have applied Geneva III as a matter of policy, without acknowledging any legal obligation to do so. These cases include the wars in Korea and Vietnam and the interventions in Panama and Somalia.

---

[96] The President could, of course, also determine that it will be the policy of the United States to require its own troops to adhere to standards of conduct recognized under customary international law, and could prosecute offenders for violations. As explained below, the President is not *bound* to follow these standards by law, but may direct the armed forces to adhere to them as a matter of policy.

*Korea*. The Korean War broke out on June 25, 1950, before any of the major State parties to the conflict (including the United States) had ratified the Geneva Conventions. Nonetheless, General Douglas MacArthur, the United Nations Commander in Korea, declared that his forces would act consistently with the principles of the Geneva Conventions, including those relating to POWs. General MacArthur stated: "My present instructions are to abide by the humanitarian principles of the 1949 Geneva Conventions, particularly common article 3. In addition, I have directed the forces under my command to abide by the detailed provisions of the prisoner-of-war convention, since I have the means at my disposal to assure compliance with this convention by all concerned and have fully accredited the ICRC delegates accordingly."[97]

It should be noted, however, that deciding to follow Geneva III as a matter of policy would allow the United States to deviate from certain provisions it did not believe were appropriate to the current conflict. In Korea, for example, the United States did not fulfill the requirement that it repatriate all POWs at the end of the conflict. Pursuant to the armistice agreement, thousands of Chinese and North Korean POWs who did not wish to be repatriated were examined by an international commission, and many eventually ended up in Taiwan.[98]

*Viet Nam*. The United States through the State Department took the position that the Geneva Convention III "indisputably applies to the armed conflict in Viet Nam," and therefore that "American military personnel captured in the course of that armed conflict are entitled to be treated as prisoners of war."[99] We understand from the Defense Department that our military forces, as a matter of policy, decided at some point in the conflict to accord POW treatment (but not necessarily POW status) to Viet Cong members, despite the fact that they often did *not* meet the criteria for that status (set forth in Geneva Convention III, art. 4), *e.g.*, by not wearing uniforms or any other fixed distinctive signs visible at a distance.

*Panama*. The United States' intervention in Panama on December 20, 1989 came at the request and invitation of Panama's legitimately elected President, Guillermo Endara.[100] The United States had never recognized General Mañuel Noriega, the commander of the Panamanian Defense Force, as Panama's legitimate ruler. Thus, in the view of the executive branch, the conflict was between the Government of Panama assisted by the United States on the one side and insurgent forces loyal to General Noriega on the other. It was not an international armed conflict between the United States and Panama, another State. Accordingly, it was not, in the executive's judgment, an international armed conflict governed by common article 2 of the Geneva Conventions.[101] Nonetheless, we understand that, as a matter of policy, all persons

---

[97] *Quoted in* Joseph P. Bialke, *United Nations Peace Operations: Applicable Norms and the Application of the Law of Armed Conflict*, 50 A.F.L. Rev. 1, 63 n.235 (2001).

[98] David M. Morriss, *From War to Peace: A Study of Cease-Fire Agreements and the Evolving Role of the United Nations*, 36 Va. J. Int'l L. 801, 883-85 (1996).

[99] *Entitlement of American Military Personnel Held by North Viet-Nam to Treatment as Prisoners of War Under the Geneva Convention of 1949 Relative to the Treatment of Prisoners of War*, July 13, 1966, *reprinted in* John Norton Moore, *Law and the Indo-China War* 635, 639 (1972).

[100] *See United States v. Noriega*, 117 F.3d 1206, 1211 (11ᵗʰ Cir. 1997).

[101] *See* Jan E. Aldykiewicz and Geoffrey S. Corn, *Authority to Court-Martial Non-U.S. Military Personnel for Serious Violations of International Humanitarian Law Committed During Internal Armed Conflict*, 167 Mil. L. Rev. 74, 77 n.6 (2001). In *United States v. Noriega*, 808 F. Supp. 791, 794 (S.D. Fla. 1992), the district court held that the United States' intervention in Panama in late 1989 was an international armed conflict under (common) Article 2 of the Geneva Convention III, and that General Noriega was entitled to POW status. To the extent that the holding

captured or detained by the United States in the intervention – including civilians and members of paramilitary forces as well as members of the Panamanian Defense Force – were *treated* consistently with the Geneva Convention III, until their precise status under that Convention was determined.    A 1990 letter to the Attorney General from the Legal Adviser to the State Department said that "[i]t should be emphasized that the decision to extend basic prisoner of war protections to such persons was based on strong policy considerations, and was not necessarily based on any conclusion that the United States was obligated to do so as a matter of law."[102]

   *Interventions in Somalia, Haiti and Bosnia.*  There was considerable factual uncertainty whether the United Nations Operation in Somalia in late 1992 and early 1993 rose to the level of an "armed conflict" that could be subject to common article 3 of the Geneva Conventions, particularly after the United Nations Task Force abandoned its previously neutral role and took military action against a Somali warlord, General Aideed.  Similar questions have arisen in other peace operations, including those in Haiti and Bosnia.  It appears that the U.S. military has decided, as a matter of policy, to conduct operations in such circumstances as if the Geneva Conventions applied, regardless of whether there is any legal requirement to do so. The U.S. Army Operational Law Handbook, after noting that "[i]n peace operations, such as those in Somalia, Haiti, and Bosnia, the question frequently arises whether the [laws of war] legally applies," states that it is "the position of the US, UN and NATO that their forces will apply the 'principles and spirit' of the [law of war] in these operations."[103]

   It might be argued, however, that the United States has conceded that Geneva III applied, as a matter of law, in every conflict since World War II.  The facts, as supplied by our research and by the Defense Department, demonstrate otherwise.  Although the United States at times has declared in different wars that the United States would accord Geneva Convention III treatment to enemy prisoners, there are several examples where the United States clearly decided not to comply with Geneva III as a matter of law.  Further, such a position confuses situations in which the United States said it would act *consistently* with the Geneva Conventions with those in which we admitted that enemy prisoners would receive POW status as a matter of law.  Our conduct in

---

assumed that the courts are free to determine whether a conflict is between the United States and another "State" regardless of the President's view whether the other party is a "State" or not, we disagree with it. By assuming the right to determine that the United States was engaged in an armed conflict with *Panama* – rather than with insurgent forces in rebellion against the recognized and legitimate Government of Panama -- the district court impermissibly usurped the recognition power, a constitutional authority reserved to the President.  The power to determine whether a foreign government is to be accorded recognition, and the related power to determine whether a condition of statelessness exists in a particular country, are exclusively executive. *See, e.g., Baker v. Carr,* 369 U.S. 186, 212 (1962) ("[R]ecognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing.' . . . Similarly, recognition of belligerency abroad is an executive responsibility. . . .") (citation omitted); *Kennett v. Chambers,* 55 U.S. (14 How.) 38, 50-51 (1852) ("[T]he question whether [the Republic of] Texas [while in rebellion against Mexico] had or had not at that time become an independent state, was a question for that department of our government exclusively which is charged with our foreign relations. And until the period when that department recognized it as an independent state, the judicial tribunals . . . were bound to consider . . . Texas as a part of the Mexican territory."); *Mingtai Fire & Marine Ins. Co. v. United Parcel Service,* 177 F.3d 1142, 1145 (9th Cir.) ("[T]he Supreme Court has repeatedly held that the Constitution commits to the Executive branch alone the authority to recognize, and to withdraw recognition from, foreign regimes."), *cert. denied,* 528 U.S. 951 (1999).
[102] Letter for the Hon. Richard L. Thornburgh, Attorney General, from Abraham D. Sofaer, Legal Adviser, State Department at 2 (Jan. 31, 1990).
[103] *Quoted in* Bialke, *supra,* at 56.

Panama provides an important example. There, the United States never conceded that the forces of Manuel Noriega qualified as POWs under the Geneva Convention, but did provide for them as a policy matter as if they were POWs.

### IV. *Detention Conditions Under Geneva III*

Even if the President decided not to suspend our Geneva III obligations toward Afghanistan, two reasons would justify some deviations from the requirements of Geneva III. This would be the case even if Taliban members legally were entitled to POW status. First, certain deviations concerning treatment can be justified on basic grounds of legal excuse concerning self-defense and feasibility. Second, the President could choose to find that none of the Taliban prisoners qualify as POWs under article 4 of Geneva III, which generally defines the types of armed forces that may be considered POWs once captured. In the latter instance, Geneva III would apply and the Afghanistan conflict would fall within common article 2's jurisdiction. The President, however, would be interpreting the treaty in light of the facts on the ground to find that the Taliban militia categorically failed the test for POWs within Geneva III's terms. We should be clear that we have no information that the conditions of treatment for Taliban prisoners currently violate Geneva III standards, but it is possible that some may argue that our GTMO facilities do not fully comply with all of the treaty's provisions.

### A. *Justified Deviations from Geneva Convention Requirements*

We should make clear that as we understand the facts, the detainees currently are being treated in a manner consistent with common article 3 of Geneva III. This means that they are housed in basic humane conditions, are not being physically mistreated, and are receiving adequate medical care. They have not yet been tried or punished by any U.S. court system. As a result, the current detention conditions in GTMO do not violate common article 3, nor do they present a grave breach of Geneva III as defined in article 130. For purposes of domestic law, therefore, the GTMO conditions do not constitute a violation of the WCA, which criminalizes only violations of common article 3 or grave breaches of the Conventions.

That said, some very well may argue that detention conditions currently depart from Geneva III requirements. Nonetheless, not all of these deviations from Geneva III would amount to an outright violation of the treaty's requirements. Instead, some departures from the text can be justified by some basic doctrines of legal excuse. We believe that some deviations would not amount to a treaty violation, because they would be justified by the need for force protection. Nations have the right to take reasonable steps for the protection of the armed forces guarding prisoners. At the national level, no treaty can override a nation's inherent right to self-defense. Indeed, the United Nations Charter recognizes this fundamental principle. Article 51 of the U.N. Charter provides that "[n]othing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations." As we have discussed in other opinions relating to the war on terrorism, the September 11 attacks on the Pentagon and the World Trade Center have triggered the United States' right to defend itself.[104] Our national right to self-defense must encompass the lesser

---

[104] Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* at 22-33 (Nov.

included right to defend our own forces from prisoners who pose a threat to their lives and safety, just as the Nation has the authority to take measures in the field to protect the U.S. armed forces. Any Geneva III obligations, therefore, may be legally adjusted to take into account the needs of force protection.

The right to national self-defense is further augmented by the individual right to self-defense as a justification for modifications to Geneva III based on the need for force protection. Under domestic law, self-defense serves as a legal defense even to the taking of a human life. "[S]elf defense is . . . embodied in our jurisprudence as a consideration totally eliminating any criminal taint . . . . It is difficult to the point of impossibility to imagine a right in any state to abolish self defense altogether . . . ."[105]  As the U.S. Court of Appeals for the District of Columbia Circuit has observed, "[m]ore than two centuries ago, Blackstone, best known of the expositors of the English common law, taught that 'all homicide is malicious, and of course, amounts to murder, unless . . . excused on the account of accident or self-preservation . . . .' Self-defense, as a doctrine legally exonerating the taking of human life, is as viable now as it was in Blackstone's time . . . ."[106]  Both the Supreme Court and this Office have opined that the use of force by law enforcement or the military is constitutional, even if it results in the loss of life, if necessary to protect the lives and safety of officers or innocent third parties.[107]  Thus, as a matter of domestic law, the United States armed forces can modify their Geneva III obligations to take into account the needs of military necessity to protect their individual members.

Other deviations from Geneva III, which do not involve force protection, may still be justified as a domestic legal matter on the ground that immediate compliance is infeasible. Certain conditions, we have been informed, are only temporary until the Defense Department can construct permanent facilities that will be in compliance with Geneva. We believe that no treaty breach would exist under such circumstances. The State Department has informed us that state practice under the Convention allows nations a period of reasonable time to satisfy their affirmative obligations for treatment of POWs, particularly during the early stages of a conflict.[108]  An analogy can be drawn here to a similar legal doctrine in administrative law. For

6, 2001); Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority for Use of Military Force to Combat Terrorist Activities Within the United States* at 2-3 (Oct. 17, 2001).

[105] *Griffin v. Martin*, 785 F.2d 1172, 1186-87 & n.37 (4th Cir. 1986), *aff'd by an equally divided court*, 795 F.2d 22 (4th Cir. 1986) (en banc), *cert. denied*, 480 U.S. 919 (1987).

[106] *United States v. Peterson*, 483 F.2d 1222, 1228-29 (D.C. Cir.) (footnote omitted), *cert denied*, 414 U.S. 1007 (1973).

[107] *See Tennessee v. Garner*, 471 U.S. 1, 7, 11 (1985) (Fourth Amendment "seizure" caused by use of force subject to reasonableness analysis); Memorandum to Files, from Robert Delahunty, Special Counsel, Office of Legal Counsel, *Re: Use of Deadly Force Against Civil Aircraft Threatening to Attack 1996 Summer Olympic Games* (Aug. 19, 1996); *United States Assistance to Countries that Shoot Down Civil Aircraft Involved in Drug Trafficking*, 18 Op. O.L.C. 148, 164 (1994) ("[A] USG officer or employee may use deadly force against civil aircraft without violating [a criminal statute] if he or she reasonably believes that the aircraft poses a threat of serious physical harm . . . to another person.").

[108] During the India-Pakistan conflicts between 1965 and 1971, prisoners were able to correspond with their families, but there were "some difficulties in getting lists of all military prisoners" — "[e]specially at the beginning of the conflict." Allan Rosas, *The Legal Status of Prisoners of War* at 186 (1976). Similarly, during the 1967 War in the Middle East, Israeli authorities delayed access to Arab prisoners on the grounds that "all facilities would be granted as soon as the prisoners were transferred to the camp at Atlith . . . In the meantime, delegates had the

example, it is a well-established principle that, where a statutory mandate fails to specify a particular deadline for agency action, a federal agency's duty to comply with that mandate is lawfully discharged, as long as it is satisfied within a reasonable time. The Administrative Procedure Act expressly provides that a "reviewing court shall . . . compel agency action unlawfully withheld or *unreasonably* delayed." 5 U.S.C. § 706 (emphasis added). Courts have recognized accordingly that a federal agency has a reasonable time to discharge its obligations.[109] Thus, "if an agency has no concrete deadline establishing a date by which it must act, . . . a court must compel only action that is delayed unreasonably. . . . [W]hen an agency is required to act--either by organic statute or by the APA--within an expeditious, prompt, or reasonable time, § 706 leaves in the courts the discretion to decide whether agency delay is unreasonable."[110]

Here, Geneva III contains no strict deadlines for compliance. Indeed, it would be illogical to require immediate compliance, particularly if a nation were suddenly attacked and had no warning that POW facilities would be needed. Further, it might not be immediately practicable, given the conditions in the field where POWs would first be detained, to provide conditions that fully comply with Geneva III. Given that Geneva III has no mandated timetable, the armed forces have a reasonable time to satisfy their obligations of treatment with regard to POWs and are not guilty of breach when it is infeasible to achieve immediate compliance.

### B. Status of Taliban Prisoners Under Article 4

Even if the President declines to suspend our obligations under Geneva III toward Afghanistan, it is possible that Taliban detainees still might not receive the legal status of POWs. Geneva III provides that once a conflict falls within common article 2, combatants must fall within one of several categories in order to receive POW status. Article 4(A)(1)-(3) sets out the three categories relevant here: i) members of the armed forces of a party to the conflict, along with accompanying militia and volunteer forces; ii) members of militia or volunteer corps who are commanded by an individual responsible to his subordinates, who have a distinctive sign recognizable from a distance, who carry arms openly, and who obey the laws of war; and iii) members of regular armed forces who profess allegiance to a government or authority that is not recognized by the detaining power. Should "any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy," article 5 of Geneva III requires that these individuals "enjoy the protections of" the Convention until a tribunal has determined their status. As we understand it, as a matter of practice prisoners are presumed to have article 4 POW status until a tribunal determines otherwise.

Although these provisions seem to contemplate a case-by-case determination of an individual detainee's status, the President could determine categorically that all Taliban prisoners fall outside article 4. Under Article II of the Constitution, the President possesses the power to

---

opportunity to see some of the prisoners at the transit camp at El Quantara and Kusseima." *Id.* at 203 (citation omitted). Although Israel was technically obliged under the Convention to provide access to Arab POWs, immediate compliance with that obligation was infeasible.

[109] *Sierra Club v. Thomas*, 828 F.2d 783, 794 (D.C. Cir. 1987).

[110] *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).

interpret treaties on behalf of the Nation.[111] He could interpret Geneva III, in light of the known facts concerning the operation of Taliban forces during the Afghanistan conflict, to find that all of the Taliban forces do not fall within the legal definition of prisoners of war as defined by article 4. A presidential determination of this nature would eliminate any legal "doubt" as to the prisoners' status, as a matter of domestic law, and would therefore obviate the need for article 5 tribunals.

We do not have, however, the facts available to advise your Department or the White House whether the President would have the grounds to apply the law to the facts in this categorical manner. Some of the facts which would be important to such a decision include: whether Taliban units followed a recognizable, hierarchical command-and-control structure, whether they wore distinctive uniforms, whether they operated in the open with their weapons visible, the tactics and strategies with which they conducted hostilities, and whether they obeyed the laws of war. If your Department were to conclude that the Afghanistan conflict demonstrated that the conduct of the Taliban militia had always violated these requirements, you would be justified in advising the President to determine that all Taliban prisoners are not POWs under article 4.

It is important to recognize that if the President were to pursue this line of reasoning, the executive branch would have to find that the Afghanistan conflict qualifies as an international war between two state parties to the Conventions. Article 4 is not a jurisdictional provision, but is instead only applied once a conflict has fallen within the definition of an international conflict covered by common article 2 of the Conventions. At this point in time, we cannot predict what consequences this acceptance of jurisdiction would have for future stages in the war on terrorism.

Nonetheless, if the President were to make such a determination, the WCA still would not impose any liability. As will be recalled, the WCA criminalizes either grave breaches of the Geneva Conventions or violations of common article 3. If members of the Taliban militia do not qualify as POWs under article 4, even though the conflict falls within common article 2's jurisdictional provisions, then their treatment cannot constitute a grave breach under Geneva III. Article 130 of Geneva III states that a grave breach occurs only when certain acts are committed against "persons . . . protected by the Convention." If the President were to find that Taliban prisoners did not constitute POWs under article 4, they would no longer be persons protected by the Convention. Thus, their treatment could not give rise to a grave breach under article 130, nor constitute a violation of the WCA.

Further, if the President were to find that all Taliban prisoners did not enjoy the status of POWs under article 4, they would not be legally entitled to the standards of treatment in common article 3. As the Afghanistan war is international in nature, involving as it does the use of force by state parties – the United States and Great Britain – which are outside of Afghanistan, common article 3 by its very terms would not apply. Common article 3, as we have explained earlier, does not serve as a catch-all provision that applies to all armed conflicts, but rather as a

---

[111] Memorandum for John Bellinger, III, Senior Associate Counsel and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* (Nov. 15, 2001).

specific complement to common article 2. Further, in reaching the article 4 analysis, the United States would be accepting that Geneva Convention jurisdiction existed over the conflict pursuant to common article 2. Common article 3 by its text would not apply, and therefore any violation of its terms would not constitute a violation of the WCA.

## V. *Customary International Law*

Thus far, this memorandum has addressed the issue whether the Geneva Conventions, and the WCA, apply to the detention and trial of al Qaeda and Taliban militia members taken prisoner in Afghanistan. Having concluded that these laws do not apply, we turn to the effect, if any, of customary international law. Some may take the view that even if the Geneva Conventions, by their terms, do not govern the treatment of al Qaeda and Taliban prisoners, the substance of these agreements has received such universal approval that it has risen to the status of customary international law. Customary international law, however cannot bind the executive branch under the Constitution because it is not federal law. This is a view that this Office has expressed before,[112] and is one consistent with the views of the federal courts,[113] and with executive branch positions before the courts.[114] Although we are not currently aware whether any detention conditions currently would violate customary international law, it should be clear that customary international law would not bind the President.

### A. *Is Customary International Law Federal Law?*

Under the view promoted by many international law academics, any presidential violation of customary international law is presumptively unconstitutional.[115] These scholars argue that customary international law is federal law, and that the President's Article II duty under the Take Care Clause requires him to execute customary international law as well as statutes lawfully enacted under the Constitution. A President may not violate customary international law, therefore, just as he cannot violate a statute, unless he believes it to be unconstitutional. Relying upon cases such as *The Paquete Habana*, 175 U.S. 677, 700 (1900), in which the Supreme Court observed that "international law is part of our law," this position often claims that the federal judiciary has the authority to invalidate executive action that runs counter to customary international law.[116]

---

[112] See *Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. 163 (1989).

[113] See, e.g., *United States v. Alvarez-Machain*, 504 U.S. 655 (1992).

[114] See *id.* at 669-70; *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935-36 (D.C. Cir. 1988); *Garcia-Mir v. Meese*, 788 F.2d 1446, 1453-55 (11th Cir.), *cert. denied*, 479 U.S. 889 (1986).

[115] See, e.g., Michael J. Glennon, *Raising the* Paquete Habana: *Is Violation of Customary International Law by the Executive Unconstitutional?*, 80 Nw. U. L. Rev. 321, 325 (1985); Louis Henkin, *International Law As Law in the United States*, 82 Mich. L. Rev. 1555, 1567 (1984); Jules Lobel, *The Limits of Constitutional Power: Conflicts Between Foreign Policy and International Law*, 71 Va. L. Rev. 1071, 1179 (1985); *see also* Jonathan R. Charney, *Agora: May the President Violate Customary International Law?*, 80 Am. J. Int'l L. 913 (1986).

[116] Recently, the status of customary international law within the federal legal system has been the subject of sustained debate with legal academia. The legitimacy of incorporating customary international law as federal law has been subjected in these exchanges to crippling doubts. See Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law As Federal Common Law: A Critique of the Modern Position*, 110 Harv. L. Rev. 815, 817 (1997); *see also* Phillip R. Trimble, *A Revisionist View of Customary International Law*, 33 UCLA L. Rev. 665, 672-673 (1986); Arthur M. Weisburd, *The Executive Branch and International Law*, 41 Vand. L. Rev. 1205, 1269

This view of customary international law is seriously mistaken. The constitutional text nowhere brackets presidential or federal power within the confines of customary international law. When the Supremacy Clause discusses the sources of federal law, it enumerates only "this Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States." U.S. Const. art. VI. Customary international law is nowhere mentioned in the Constitution as an independent source of federal law or as a constraint on the political branches of government. Indeed, if it were, there would have been no need to grant to Congress the power to "define and punish . . . Offenses against the Law of Nations."[117] It is also clear that the original understanding of the Framers was that "Laws of the United States" did *not* include the law of nations, as international law was called in the late eighteenth century. In explaining the jurisdiction of the Article III courts to cases arising "under the Constitution and the Laws of the United States," for example, Alexander Hamilton did not include the laws of nations as a source of jurisdiction.[118] Rather, Hamilton pointed out, claims involving the laws of nations would arise either in diversity cases or maritime cases,[119] which by definition do not involve "the Laws of the United States." Little evidence exists that those who attended the Philadelphia Convention in the summer of 1787 or the State ratifying conventions believed that federal law would have included customary international law, but rather that the laws of nations was part of a general common law that was not true federal law.[120]

Indeed, allowing customary international law to rise to the level of federal law would create severe distortions in the structure of the Constitution. Incorporation of customary international law directly into federal law would bypass the delicate procedures established by the Constitution for amending the Constitution or for enacting legislation.[121] Customary international law is not approved by two-thirds of Congress and three-quarters of the State legislatures, it has not been passed by both houses of Congress and signed by the President, nor is it made by the President with the advice and consent of two-thirds of the Senate. In other words, customary international law has not undergone the difficult hurdles that stand before enactment of constitutional amendments, statutes, or treaties. As such, it can have no legal effect

---

(1988). These claims have not gone unchallenged. *See* Harold H. Koh, *Is International Law Really State Law?*, 111 Harv. L. Rev. 1824, 1827 (1998); Gerald L. Neuman, *Sense and Nonsense About Customary International Law: A Response to Professors Bradley and Goldsmith*, 66 Fordham L. Rev. 371, 371 (1997); Beth Stephens, *The Law of Our Land: Customary International Law As Federal Law After Erie*, 66 Fordham L. Rev. 393, 396-97 (1997). Bradley and Goldsmith have responded to their critics several times. *See* Curtis A. Bradley & Jack L. Goldsmith, *Federal Courts and the Incorporation of International Law*, 111 Harv. L. Rev. 2260 (1998); Curtis A. Bradley & Jack L. Goldsmith, *The Current Illegitimacy of International Human Rights Litigation*, 66 Fordham L. Rev. 319, 330 (1997).

[117] U.S. Const. art. I, § 8, cl. 10.

[118] *The Federalist No. 80*, at 447-49 (Alexander Hamilton) (Clinton Rossiter ed., 1999).

[119] *Id.* at 444-46.

[120] *See, e.g.*, Stewart Jay, *The Status of the Law of Nations in Early American Law*, 42 Vand. L. Rev. 819, 830-37 (1989); Bradford R. Clark, *Federal Common Law: A Structural Reinterpretation*, 144 U. Pa. L. Rev. 1245, 1306-12 (1996); Curtis A. Bradley & Jack L. Goldsmith, *The Current Illegitimacy of International Human Rights Litigation*, 66 Fordham L. Rev. 319, 333-36 (1997).

[121] *Cf. INS v. Chadha*, 462 U.S. 919 (1983) (invalidating legislative veto for failure to undergo bicameralism and presentment as required by Article I, Section 8 for all legislation).

on the government or on American citizens because it is not law.[122]   Even the inclusion of treaties in the Supremacy Clause does not render treaties automatically self-executing in federal court, not to mention self-executing against the executive branch.[123]  If even treaties that have undergone presidential signature and senatorial advice and consent can have no binding legal effect in the United States, then it certainly must be the case that a source of rules that never undergoes any process established by our Constitution cannot be law.

It is well accepted that the political branches have ample authority to override customary international law within their respective spheres of authority.  This has been recognized by the Supreme Court since the earliest days of the Republic.  In *The Schooner Exchange v. McFaddon*, for example, Chief Justice Marshall applied customary international law to the seizure of a French warship only because the United States government had not chosen a different rule.

> It seems then to the Court, to be a principle of public [international] law, that national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction.  Without doubt, the sovereign of the place is capable of destroying this implication.  He may claim and exercise jurisdiction, either by employing force, or by subjecting such vessels to the ordinary tribunals.[124]

In *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814), Chief Justice Marshall again stated that customary international law "is a guide which the sovereign follows or abandons at his will.  The rule, like other precepts of morality, of humanity, and even of wisdom, is addressed to the judgment of the sovereign; and although it cannot be disregarded by him without obloquy, yet it may be disregarded."[125]  In other words, overriding customary international law may prove to be a bad idea, or be subject to criticism, but there is no doubt that the government has the power to do it.

Indeed, proponents of the notion that customary international law is federal law can find little support in either history or Supreme Court case law.  It is true that in some contexts, mostly involving maritime, insurance, and commercial law, the federal courts in the nineteenth century looked to customary international law as a guide.[126]  Upon closer examination of these cases, however, it is clear that customary international law had the status only of the general federal common law that was applied in federal diversity cases under *Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842).  As such, it was not considered true federal law under the Supremacy Clause; it did not support Article III "arising under" jurisdiction; it did not pre-empt inconsistent state law; and it did not bind the executive branch.  Indeed, even during this period, the Supreme Court acknowledged that the laws of war did not qualify as true federal law and could not therefore

---

[122] In fact, allowing customary international law to bear the force of federal law would create significant problems under the Appointments Clause and the non-delegation doctrine, as it would be law made completely outside the American legal system through a process of international practice, rather than either the legislature or officers of the United States authorized to do so.

[123] *See, e.g., Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829).

[124] 11 U.S. (7 Cranch) 116, 145-46 (1812).

[125] *Id.* at 128.

[126] *See, e.g., Oliver Am. Trading Co. v. Mexico*, 264 U.S. 440, 442-43 (1924); *Huntington v. Attrill*, 146 U.S. 657, 683 (1892); *New York Life Ins. Co. v. Hendren*, 92 U.S. 286, 286-87 (1875).

serve as the basis for federal subject matter jurisdiction. In *New York Life Ins. Co. v. Hendren*, 92 U.S. 286, for example, the Supreme Court declared that it had no jurisdiction to review "the general laws of war, as recognized by the law of nations applicable to this case," because such laws do not involve the Constitution, laws, treaties, or Executive proclamations of the United States.[127] The spurious nature of this type of law led the Supreme Court in the famous case of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), to eliminate general federal common law.

Even the case most relied upon by proponents of customary international law's status as federal law, *The Paquete Habana*, itself acknowledges that customary international law is subject to override by the action of the political branches. *The Paquete Habana* involved the question whether U.S. armed vessels in wartime could capture certain fishing vessels belonging to enemy nationals and sell them as prize. In that case, the Court applied an international law rule, and did indeed say that "international law is part of our law."[128] But Justice Gray then continued, "*where there is no treaty and no controlling executive or legislative act or judicial decision*, resort must be had to the customs and usages of civilized nations." *Id.* (emphasis added). In other words, while it was willing to apply customary international law as general federal common law (this was the era of *Swift v. Tyson*), the Court also readily acknowledged that the political branches and even the federal judiciary could override it at any time. No Supreme Court decision in modern times has challenged that view.[129] Thus, under clear Supreme Court precedent, any presidential decision in the current conflict concerning the detention and trial of al Qaeda or Taliban militia prisoners would constitute a "controlling" Executive act that would immediately and completely override any customary international law norms.

Constitutional text and Supreme Court decisions aside, allowing the federal courts to rely upon international law to restrict the President's discretion to conduct war would raise deep structural problems. First, if customary international law is indeed federal law, then it must

---

[127] 92 U.S. 286, 286-87.

[128] 175 U.S. at 700.

[129] Two lines of cases are often cited for the proposition that the Supreme Court has found customary international law to be federal law. The first derives from *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804). The "*Charming Betsy*" rule, as it is sometimes known, is a rule of construction that a statute should be construed when possible so as not to conflict with international law. This rule, however, does not apply international law of its own force, but instead can be seen as measure of judicial restraint: that violating international law is a decision for the political branches to make, and that if they wish to do so, they should state clearly their intentions. The second, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, applied the "act of state" doctrine, which generally precludes courts from examining the validity of the decisions of foreign governments taken on their own soil, as federal common law to a suit over expropriations by the Cuban government. As with *Charming Betsy*, however, the Court developed this rule as one of judicial self-restraint to preserve the flexibility of the political branches to decide how to conduct foreign policy.

Some supporters of customary international law as federal law rely on a third line of cases, beginning with *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980). In *Filártiga*, the Second Circuit read the federal Alien Tort Statute, 28 U.S.C. §1350 (1994), to allow a tort suit in federal court against the former official of a foreign government for violating norms of international human rights law, namely torture. Incorporation of customary international law via the Alien Tort Statute, while accepted by several circuit courts, has never received the blessings of the Supreme Court and has been sharply criticized by some circuits, *see, e.g., Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 808-10 (D.C. Cir. 1984) (Bork, J., concurring), *cert. denied*, 470 U.S. 1003 (1985), as well as by academics, see Curtis A. Bradley & Jack L. Goldsmith, *The Current Illegitimacy of International Human Rights Litigation*, 66 Fordham L. Rev. 319, 330 (1997).

receive all of the benefits of the Supremacy Clause. Therefore, customary international law would not only bind the President, but it also would pre-empt state law and even supersede inconsistent federal statutes and treaties that were enacted before the rule of customary international law came into being. This has never happened. Indeed, giving customary international law this power not only runs counter to the Supreme Court cases described above, but would have the effect of importing a body of law to restrain the three branches of American government that never underwent any approval by our democratic political process. If customary international law does not have these effects, as the constitutional text, practice and most sensible readings of the Constitution indicate, then it cannot be true federal law under the Supremacy Clause. As non-federal law, then, customary international law cannot bind the President or the executive branch, in any legally meaningful way, in its conduct of the war in Afghanistan.

Second, relying upon customary international law here would undermine the President's control over foreign relations and his Commander in Chief authority. As we have noted, the President under the Constitution is given plenary authority over the conduct of the Nation's foreign relations and over the use of the military. Importing customary international law notions concerning armed conflict would represent a direct infringement on the President's discretion as the Commander in Chief and Chief Executive to determine how best to conduct the Nation's military affairs. Presidents and courts have agreed that the President enjoys the fullest discretion permitted by the Constitution in commanding troops in the field.[130] It is difficult to see what legal authority under our constitutional system would permit customary international law to restrict the exercise of the President's plenary power in this area, which is granted to him directly by the Constitution. Further, reading customary international law to be federal law would improperly inhibit the President's role as the representative of the Nation in its foreign affairs.[131] Customary law is not static; it evolves through a dynamic process of State custom and practice. "States necessarily must have the authority to contravene international norms, however, for it is the process of changing state practice that allows customary international law to evolve."[132] As we observed in 1989, "[i]f the United States is to participate in the evolution of international law, the Executive must have the power to act inconsistently with international law where necessary."[133] The power to override or ignore customary international law, even the law applying to armed conflict, is "an integral part of the President's foreign affairs power."[134]

Third, if customary international law is truly federal law, it presumably must be enforceable by the federal courts. Allowing international law to interfere with the President's

---

[130] *See* Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sept. 25, 2001) (reviewing authorities).
[131] "When articulating principles of international law in its relations with other states, the Executive branch speaks not only as an interpreter of generally accepted and traditional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns." *Sabbatino*, 376 U.S. at 432-33. *See also Rappenecker v. United States*, 509 F.Supp. 1024, 1029 (N.D. Cal. 1980) ("Under the doctrine of separation of powers, the making of those determinations [under international law] is entrusted to the President."); *International Load line Convention*, 40 Op. Att'y Gen. at 123-24 (President "speak[s] for the nation" in making determination under international law).
[132] 13 Op. O.L.C. at 170.
[133] *Id.*
[134] *Id.* at 171.

war power in this way, however, would expand the federal judiciary's authority into areas where it has little competence, where the Constitution does not textually call for its intervention, and where it risks defiance by the political branches. Indeed, treating customary international law as federal law would require the judiciary to intervene into the most deeply of political questions, those concerning war. This the federal courts have said they will not do, most recently during the Kosovo conflict.[135]  Again, the practice of the branches demonstrates that they do not consider customary international law to be federal law. This position makes sense even at the level of democratic theory, because conceiving of international law as a restraint on warmaking would allow norms of questionable democratic origin to constrain actions validly taken under the U.S. Constitution by popularly accountable national representatives.

Based on these considerations of constitutional text, structure, and history, we conclude that customary international law does not bind the President or the U.S. Armed Forces in their decisions concerning the detention conditions of al Qaeda and Taliban prisoners.

### Conclusion

For the foregoing reasons, we conclude that neither the federal War Crimes Act nor the Geneva Conventions would apply to the detention conditions of al Qaeda prisoners. We also conclude that the President has the plenary constitutional power to suspend our treaty obligations toward Afghanistan during the period of the conflict. He may exercise that discretion on the basis that Afghanistan was a failed state. Even if he chose not to, he could interpret Geneva III to find that members of the Taliban militia failed to qualify as POWs under the terms of the treaty. We also conclude that customary international law has no binding legal effect on either the President or the military because it is not federal law, as recognized by the Constitution.

We should make clear that in reaching a decision to suspend our treaty obligations or to construe Geneva III to conclude that members of the Taliban militia are not POWs, the President need not make any specific finding. Rather, he need only authorize or approve policies that would be consistent with the understanding that al Qaeda and Taliban prisoners are not POWs under Geneva III.

Please let us know if we can provide further assistance.

Jay S. Bybee
Assistant Attorney General

---

[135] *See, e.g., Campbell v. Clinton,* 203 F.3d 19, 40 (D.C. Cir.), *cert. denied,* 531 U.S. 815 (2000).