# EXHIBIT E



Office of the Assistant Attorney General

Washington, D.C. 20530

February 26, 2002

**MEMORANDUM FOR WILLIAM J. HAYNES, II**
**GENERAL COUNSEL, DEPARTMENT OF DEFENSE**

*Re: Potential Legal Constraints Applicable to Interrogations of Persons Captured by U.S. Armed Forces in Afghanistan*

You have asked a series of questions concerning legal constraints that may potentially apply to interrogation of persons captured in Afghanistan. Several of the issues you have raised relate to the applicability of the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), to interrogations that may be conducted for various purposes (and by various personnel) ranging from obtaining intelligence for military operations and force protection to investigating crimes with a view to bringing subsequent prosecutions. As explained below, the Self-Incrimination Clause of the Fifth Amendment, as interpreted by the Supreme Court in *Miranda*, provides a trial right in a criminal prosecution before U.S. courts and governs the admissibility of statements made by the defendant in a custodial interrogation. The issue of the applicability of *Miranda* and restrictions it may place on conduct in interrogations, therefore, is best addressed in the context of the subsequent use that is made of statements obtained in custodial interrogation.

As we explain below, the Self-Incrimination Clause (and hence *Miranda)* does not apply in the context of a trial by military commission for violations of the laws of war. Accordingly, military commissions may admit statements made by a defendant in a custodial interrogation conducted without *Miranda* warnings. Therefore, to the extent that the only trial-related use of statements obtained in an interrogation will be before a military commission, there is no need to provide *Miranda* warnings.

As we understand it, the inquiry cannot end there because decisions have not yet been made concerning whether individuals being interrogated will be prosecuted and if so in what forum charges will be brought. The possibility still exists that some detainees may be prosecuted on criminal charges in Article III courts. Thus, you have asked how Article III courts may treat statements obtained in various scenarios without *Miranda* warnings and whether *Miranda* warnings should be given as a prudential matter to preserve the possibility of using statements in a criminal trial. Although unwarned statements made in the course of custodial interrogation by law enforcement officers are generally presumed to be compelled under *Miranda*, thereby rendering them inadmissible in criminal prosecutions before domestic courts, *Miranda* does not provide an iron-clad rule governing the voluntariness of all custodial statements. *Miranda* was designed to provide a constitutional rule of conduct to regulate the practices of law enforcement, and where its deterrent rationale does not apply, the Supreme Court has not extended it. Many of the interrogations in question here, which will be conducted for purposes of obtaining information for military operations

and intelligence purposes, do not come within the rationale of *Miranda*. In addition, one of the specific exceptions to *Miranda* that the Supreme Court has crafted should extend, by a close analogy, to some of the interrogations contemplated here. We divide our discussion to address four categories of statements the United States may wish to admit into evidence in a subsequent criminal prosecution: (1) statements arising out of interrogation conducted by military and intelligence personnel to develop military operations and intelligence information; (2) statements obtained for criminal law enforcement purposes, whether by FBI interrogators or military personnel; (3) statements obtained in the course of a war crimes investigation by members of the criminal investigative services of one of the U.S. Armed Forces; and (4) statements obtained where the objectives of the questioning may be mixed, and the interrogation thus may not fall squarely into only one of the first three categories.

We conclude that the first category of statements is likely to be admissible in an Article III trial even if the statements are obtained without *Miranda* warnings. Statements from the second category are likely to be inadmissible if they arise from unwarned interrogation. There is a substantial risk that courts will apply *Miranda* to the third category as well. Finally, in the fourth category – where the objectives of the questioning may be mixed – results may be highly fact-dependent, but we believe that the subjective motivations of interrogators in pursuing particular questions should not alter the conclusion that an interrogation conducted for obtaining military and intelligence information should not require *Miranda* warnings.

We also explain that, even after statements are obtained in an unwarned custodial interrogation governed by *Miranda*, any subsequent, *Mirandized* confessions would be admissible in an Article III court, at least so long as any prior, unwarned interrogation did not involve coercion, or where there was an adequate break in events between any coercion and the subsequent, properly *Mirandized* interrogation.

Finally, in response to your other inquiries, we explain that the Sixth Amendment right to counsel does not apply prior to the initiation of adversary judicial criminal proceedings, and thus is not likely to apply to persons seized in Afghanistan and held overseas. In addition, the Citizens Protection Act, 28 U.S.C. § 530B (Supp. IV 1998), commonly known as the McDade Act – which places restrictions on government attorneys' conduct with respect to interrogations – does not apply to Defense Department lawyers.

## I. The Self-Incrimination Clause Provides a Trial Right.

As the Supreme Court has explained, the Self-Incrimination Clause of the Fifth Amendment, on which the *Miranda* decision is premised, is a "trial right of criminal defendants." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990). The clause provides that "[n]o person . . . shall be compelled *in any criminal case* to be a witness against himself." U.S. Const. amend. V (emphasis added). "The Amendment has its roots in the Framers' belief that a system of justice in which the focus is on the extraction of proof of guilt from the defendant himself is often an adjunct to tyranny and may lead to the conviction of innocent persons. Thus, a violation of the constitutional guarantee

occurs when one is 'compelled' by governmental coercion to bear witness against oneself in the criminal process." *Duckworth v. Eagan*, 492 U.S. 195, 209 (1989) (O'Connor, J., concurring).

The protection of the Self-Incrimination Clause is not limited, however, to statements compelled during the course of a court proceeding. Rather, it extends to prior statements subsequently introduced into evidence at a court proceeding. Beginning with *Bram v. United States*, 168 U.S. 532 (1897), the Supreme Court has held that the Clause bars the introduction in federal cases of involuntary confessions made during certain forms of custodial interrogation. *See also Withrow v. Williams*, 507 U.S. 680, 688 (1993). In *Miranda*, the Court held that the privilege against self-incrimination prohibits the admission into evidence of statements given by a suspect to the police during custodial interrogation unless a prior warning has been given advising the defendant of his rights. *See* 384 U.S. 436 (1966); *see also Illinois v. Perkins*, 496 U.S. 292, 296 (1990); *Duckworth*, 492 U.S. at 201 (in *Miranda*, "the Court established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation"). The Court in *Miranda* "presumed that interrogation in certain custodial circumstances is inherently coercive and . . . that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forego those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984) (footnote omitted). In the years since first announcing the *Miranda* presumption, the Supreme Court has "frequently reaffirmed the central principle established by that case: if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated [in *Miranda*], his responses cannot be introduced into evidence to establish his guilt." *Berkemer v. McCarthy*, 468 U.S. 420, 429 (1984).

It bears repeating that the *Miranda* presumption is premised on the "*trial right* of criminal defendants" provided by the Self-Incrimination Clause. *Verdugo-Urquidez*, 494 U.S. at 264 (emphasis added). The "sole concern" of that Clause, the Supreme Court has explained, is "insur[ing] that the testimony cannot lead to the infliction of criminal penalties on the witness." *Kastigar v. United States*, 406 U.S. 441, 453 (1972). Thus, "[a]lthough conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs *only at trial*." *Verdugo-Urquidez*, 494 U.S. at 264 (emphasis added).[1] Thus, neither the Self-Incrimination Clause nor *Miranda* established a free-floating code of conduct regulating the manner in which agents of the federal government may conduct interrogations in any and all circumstances. In other words, neither the Self-Incrimination Clause nor *Miranda* prohibits an unwarned custodial interrogation as a constitutional violation *in itself*. Accordingly, it confuses analysis somewhat to speak in terms of an FBI or military interrogator "violating" *Miranda* or the Fifth Amendment simply by conducting an unwarned custodial interrogation. Whether or not *Miranda* applies to a given circumstance or requires warnings can only be assessed in view of the use the government makes of statements

---

[1] *See also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("Even if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding."); *United States v. Yunis*, 859 F.2d 953, 970 (D.C. Cir. 1988) (Mikva, J., concurring specially) ("[T]he focus of the fifth amendment protection continues to be the *use* of compelled, self-incriminatory evidence against the defendant at trial.").

obtained in the interrogation. If the government never uses the statement in a criminal prosecution where the Self-Incrimination Clause applies, no question of a *Miranda* "violation" can ever arise. *See Quarles*, 467 U.S. at 686 (Marshall, J., dissenting) ("[T]he police are free to interrogate suspects without advising them of their constitutional rights. . . . All the Fifth Amendment forbids is the introduction of coerced statements at trial.").

In addition, in addressing the scope of proper application of the *Miranda* warnings, it is critical to bear in mind that the Supreme Court has made clear – both in *Miranda* and in subsequent decisions – that the purpose of the *Miranda* rule is to provide a rule of conduct for law enforcement officers to prevent practices that might lead to defendants making involuntary statements. As the Court put it in *Miranda*, its goal was to set out "concrete constitutional guidelines for law enforcement agencies and courts to follow." 384 U.S. at 442. The Court has not treated *Miranda* as establishing an immutable rule that *any* statement made in any unwarned, custodial interrogation is necessarily involuntary under the Fifth Amendment and cannot be admitted at trial. Rather, in circumstances where the purpose of regulating the conduct of law enforcement officers would not be served, or is outweighed by other considerations, the Court has consistently declined to require that the *Miranda* procedures be followed in order for a custodial statement to be deemed admissible. For example, in *New York v. Quarles*, the Court held that when the police arrest a suspect under circumstances presenting an imminent danger to the public safety, they may, without informing him of his *Miranda* rights, ask questions necessary to elicit information that would neutralize the threat. The Court concluded that in such circumstances, the need to ensure public safety outweighed any benefit that might be gained from the ordinary rule of requiring *Miranda* warnings. 467 U.S. at 657. Similarly, in *Harris v. New York*, 401 U.S. 222 (1971), the Court sanctioned the use of statements obtained without *Miranda* warnings for purposes of impeaching a defendant upon cross-examination. Again, the Court explained that the goal of shaping the conduct of law enforcement officers did not require extending *Miranda* to exclude the use of unwarned statements for purposes of cross examination: "Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Id.* at 225.

As explained in more detail below, moreover, the Court's decisions limiting *Miranda* to circumstances where the purposes of *Miranda*'s judicially crafted code of conduct would be served have not been undermined by the recent pronouncement that *Miranda* states a constitutional requirement. *See Dickerson v. United States*, 530 U.S. 428 (2000). The *Dickerson* Court did not suggest that *Miranda* warnings are an absolute prerequisite for any custodial statement to be voluntary under the Fifth Amendment and that any statement obtained without the warnings is necessarily inadmissible. Rather, *Dickerson* expressly endorsed past decisions such as *Quarles* and *Harris* that made exceptions to the requirements of *Miranda* warnings and explained that they simply "illustrate the principle . . . that no constitutional rule is immutable." *Id.* at 441.

**II. Trials by Military Commissions.**

The Self-Incrimination Clause does not apply to trials by military commissions for violations

of the laws of war. The Clause is limited by its terms to "any criminal case," U.S. Const., amend. V, and the Supreme Court has long understood the rights guaranteed by the amendment to be limited to the scope they had at common law in criminal prosecutions at the time of the founding. *See, e.g., Ex parte Quirin*, 317 U.S. 1, 39-40 (1942); *Ex parte Wilson*, 114 U.S. 417, 423 (1885) ("The Fifth Amendment, declaring in what cases a grand jury should be necessary, . . . in effect, affirm[ed] the rule of the common law upon the same subject."). In *Quirin*, the Court concluded that a trial by military commission for violations of the laws of war was not a criminal prosecution that required a grand jury indictment at common law and thus expressly held that the Fifth Amendment's requirement of indictment by grand jury does not apply to military commissions. *See Quirin*, 317 U.S. at 40. *See also Application of Yamashita*, 327 U.S. 1 (1946). Under the same reasoning, the Self-Incrimination Clause also does not constrain the evidence that military commissions may receive. Trials by military commissions are not "criminal case[s]" within the terms of the Amendment. Rather, they are entirely creatures of the President's authority as Commander in Chief under Article II and are part and parcel of the conduct of a military campaign.[2] As a result, they are not constrained by the strictures placed on "criminal case[s]" by the Self-Incrimination Clause (or other provisions in the Bill of Rights). As the *Quirin* Court stated broadly (albeit in *dicta*), "the Fifth and Sixth Amendments did not restrict whatever authority was conferred by the Constitution to try offenses against the law of war by military commission." 317 U.S. at 45. *Cf. Miller v. United States*, 78 U.S. (11 Wall.) 268, 305 (1870) ("the war powers of the government . . . are not affected by the restrictions imposed by the fifth and sixth amendments").

Accordingly, incriminating statements may be admitted in proceedings before military commissions even if the interrogating officers do not abide by the requirements of *Miranda*. *Cf. United States v. Bin Laden*, 132 F. Supp. 2d 168, 181, 182 n.10 (S.D.N.Y. 2001) (distinguishing, for purposes of application of the Fifth Amendment, "proceeding[s]" against "'subject[s] of a foreign state at war with the United States'" and "operated pursuant to a temporary military commission specially constituted under the authority of the Joint Chiefs of Staff" from criminal trials before Article III courts (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950))); *id.* at 189 ("*Miranda* only prevents an unwarned or involuntary statement from being used as evidence in a domestic criminal trial").[3]

Moreover, with respect to trials of foreign nationals conducted outside U.S. territory, our conclusion is additionally supported by the well-established fact that the Fifth Amendment does not

---

[2] *See* Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

[3] *Cf. also* Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials Under Control Council Law No. 10*, at 59 (William S. Hein & Co., Inc. 1997) (1949) (although "interrogations . . . were carried out in a thoroughly humane fashion, and no objectionable means were used to elicit information from those who were questioned," "[t]hey were not carried out in the manner of 'pre-trial interrogations' as known to American courts, and it would never have occurred to the interrogators, for example, to warn the individual being questioned that anything he said 'might be used against him.'").

confer rights upon aliens outside the sovereign territory of the United States. *See Verdugo-Urquidez*, 494 U.S. at 269 ("we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States"); *Johnson v. Eisentrager*, 339 U.S. 763, 783 (1950) (finding "no authority whatever for holding that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses"); *cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens . . . ."). Accordingly, U.S. military tribunals convened abroad are not required to grant aliens rights under the Self-Incrimination Clause.

**III. Criminal Trials Before Article III Courts.**

Although the Self-Incrimination Clause of the Fifth Amendment does not confer rights upon aliens *outside* the sovereign territory of the United States, no issue of extraterritoriality would be involved if aliens were brought *into* the United States for trial in an Article III court. As the Supreme Court has explained, "[t]he privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants." *Verdugo-Urquidez*, 494 U.S. at 264. Any violation of the right would occur at the trial conducted here in the United States when statements made by the accused were offered into evidence.

The Supreme Court has never squarely held that the Self-Incrimination Clause applies in the criminal trial of an alien whose only connections to the United States consist of an attack on the country followed by his arrest overseas and transportation to the United States to stand trial. The United States, moreover, has recently argued in at least one case that the Self-Incrimination Clause does not apply in such a trial. *See Bin Laden*, 132 F. Supp. 2d at 181 & n.8.[4]

As a matter of original interpretation of the Fifth Amendment, there may be sound reasons for concluding that the Self-Incrimination Clause does not apply to a trial of an alien whose only connections to this country consist of the commission of a federal crime (perhaps taking place entirely abroad) and involuntary transportation to this country to stand trial. The Clause states: "nor shall any person . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In extending this right to "any person," the Framers may have intended to encompass only a limited class of "person[s]" who could claim the protections of the Constitution. Some support for this interpretation can be found in the analysis the Supreme Court has applied in holding that the Fifth Amendment does not apply extraterritorially. In *Johnson v. Eisentrager*, the Court

---

[4] It appears that in other cases involving similar fact patterns the United States has not contested the application of the Fifth and Sixth Amendments. *See, e.g., Yunis*, 859 F.2d at 957 ("The parties have stipulated that Yunis, despite his alien status, can claim the protection of the fifth amendment to the American Constitution for interrogation that occurred outside the territory of the United States."). *Cf. also United States v. Yousef*, 925 F. Supp. 1063 (S.D.N.Y. 1996) (denying motion to suppress statement made on airplane from Pakistan to United States, because defendant had validly waived *Miranda* rights); *United States v. Noriega*, 746 F. Supp. 1506, 1529-32 (S.D. Fla. 1990) (rejecting motion to dismiss indictment on grounds that American invasion of Panama violated Due Process Clause, because alleged violations of rights involved only third parties and not Noriega himself).

made clear that the terms of the amendment cannot be read literally to confer rights on "any person" – a reading that would include aliens overseas who had no connection whatsoever to the United States. As Justice Kennedy summarized in *Verdugo-Urquidez*, "the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." 494 U.S. at 275 (Kennedy, J., concurring). In describing the limitations on the class of "person[s]" to whom the Fifth Amendment extends, the Court explained that the alien "has been accorded a generous and ascending scale of rights as he increases his identity with our society." *Eisentrager*, 339 U.S. at 770. Arguably, an alien whose only connection with the United States is an attack upon the country (or its citizens) followed by his arrest overseas and transportation to the United States to stand trial has not established any sort of connection with the country that warrants allowing him the protections of the Fifth Amendment.

Nevertheless, whatever the merits of such an interpretation as an original matter, we understand that your inquiry concerns the likely treatment of the Self-Incrimination Clause given the current state of the Supreme Court's jurisprudence. Approaching the question on that basis, we believe that the Supreme Court's analysis in prior decisions points to the conclusion that the Self-Incrimination Clause would likely be applied in a criminal trial of an alien in the United States even if the alien had no previous connection to this country. That is because the Court's decisions generally reflect a view that any criminal prosecution within the territorial boundaries of the United States is constrained by the requirements of the Fifth Amendment. Even in *Eisentrager*, for example, the Court's analysis centered repeatedly on the absence of the aliens in question from the territorial jurisdiction of the United States. *See* 339 U.S. at 769-78; *id.* at 771 ("[I]n extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the *alien's presence within the territorial jurisdiction* that gave the Judiciary power to act.") (emphasis added).

More importantly, in *Wong Wing v. United States*, 163 U.S. 228 (1896), the Court long ago concluded that the Fifth Amendment rights to grand jury indictment and due process applied to aliens subject to criminal punishment within the United States, *see id.* at 238. The Court's textual analysis of the Amendment focused on its broad terms guaranteeing that no "person" should be subject to certain treatments and concluded that it should have broad application covering all persons. Thus, the Court first noted that the Fourteenth Amendment's Due Process and Equal Protection Clauses, like the Fifth Amendment, speak in terms of rights guaranteed to "any person." *See id.* The Court explained that "[t]hese provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or nationality." *Id.* It concluded that "[a]pplying this reasoning to the fifth and sixth amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guarantied by those amendments." *Id.*

On its face, the analysis in *Wong Wing* was not limited to aliens who had established particular connections with this country. To the contrary, the Court framed its reasoning in terms applicable to aliens who had established no ties to the country because they had never effected a

lawful entry into the United States. It thus contrasted Congress's power to "forbid aliens or classes of aliens from" entering the country with its power to subject "such aliens to infamous punishment at hard labor," which could be done only through "a judicial trial to establish the guilt of the accused." *Id.* at 237. Similarly, in one of the decisions marking the most restrictive view of the extraterritorial application of the Constitution – denying its application even to citizens abroad – the Court has stated in *dicta* that the constitutional guarantees in the Fifth and Sixth Amendments "apply only to citizens and others within the United States, *or who are brought there for trial for alleged offenses committed elsewhere.*" *Ross v. McIntyre*, 140 U.S. 453, 464 (1891) (emphasis added). Taking a similar territorial approach, the Court has held that the Fifth Amendment's Due Process Clause applies to aliens even if their "presence in this country is unlawful, involuntary, or transitory." *Matthews v. Diaz*, 426 U.S. 67, 77 (1976).[5]

To be sure, in *Verdugo-Urquidez* the Court stated that *Wong Wing* addressed "resident aliens" and thus the decision cannot avail "an alien who has had no previous significant voluntary connection with the United States." 494 U.S. at 271. *See also id.* ("These cases, however [including *Wong Wing*], establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."). Despite that characterization, however, as noted above the analysis in *Wong Wing* did not distinguish between resident aliens and other aliens, and in subsequent cases since *Verdugo-Urquidez* the Court has described the decision in broader terms – terms consistent with the view that the Self-Incrimination Clause would apply to criminal trials of any aliens in the United States. *See Zadvydas v. Davis*, 121 S. Ct. 2491, 2501 (*Wong Wing* held that "all persons within the territory of the United States are entitled to the protection" of the Fifth Amendment, noting that decisions limiting application of constitutional rights to aliens "rested upon a basic territorial distinction"); *see also id.* at 2506 (Scalia, J., joined by Thomas, J., dissenting) (suggesting that *Wong Wing* draws no distinction between "aliens arrested and detained at the border" before entry and those already within the country).

The analysis in *Verdugo-Urquidez* itself, moreover, on balance tends to suggest that the present Court would be inclined to reach the same conclusion. *Verdugo-Urquidez* involved the application of the Fourth Amendment to searches and seizures conducted by U.S. law enforcement personnel on an alien's property outside the United States. In approaching that issue, the Court framed its entire analysis by first distinguishing the Fifth Amendment and explaining that the Fourth Amendment "operates in a different manner than the Fifth Amendment, which is not at issue in this case." 494 U.S. at 264. The Fifth Amendment, the Court emphasized, provides a "fundamental trial

---

[5] It bears mention that in the immigration context the Court has developed a doctrine known as the "entry fiction" under which an alien who is detained at the border, even though physically present within the boundaries of the United States, is deemed legally not to have entered the United States. As a result, the alien does not possess constitutional protections that would attach upon entry. *See, e.g., Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953). It might be argued that an alien whose only presence in the country consists of his transportation here for trial similarly should be treated legally as lacking any presence sufficient to confer rights. Given the analysis outlined in text, we cannot predict that such an argument is likely to prevail. The one circuit court that has addressed the issue has rejected such an approach. *See United States v. Henry*, 604 F.2d 908, 914 (5th Cir. 1979).

right," rather than directly regulating the conduct of police prior to trial. *Id.* In addition, the Court based its analysis largely on the particular terms of the Fourth Amendment, which limit the right it describes to "the people." *Id.* The Court emphasized that this limitation "contrasts with the words 'person' and 'accused' used in the Fifth and Sixth Amendments regulating procedure in criminal cases," thus suggesting that the procedure in criminal cases (within the United States) would be the same for all persons. *Id.* at 265-66. *See also id.* at 265 (the Fourth Amendment "*by contrast with the Fifth and Sixth Amendments*, extends its reach only to 'the people'") (emphasis added); *id.* at 269 (noting that the Fifth Amendment "speaks in the relatively universal term of 'person'"). Justice Kennedy, moreover, who provided the fifth vote for the majority, also wrote separately and noted that, where the "United States is prosecuting a foreign national in a court established under Article III, . . . all of the trial proceedings are governed by the Constitution." *Id.* at 278 (Kennedy, J., concurring). Given the Court's explicit acknowledgment of the textual differences between the Fourth Amendment and the Fifth Amendment, we think that *Verdugo-Urquidez* does not provide strong support for the claim that the Fifth Amendment does not apply to the trial in the United States of an alien who has no previous connections with this country.

Finally, it bears noting that the Court has consistently described the Self-Incrimination Clause as a fundamental trial right that is critical for protecting the integrity of the trial process. At times the Court has suggested that the Clause plays a critical role in ensuring the reliability of confessions and thus protects the truth-finding function of a trial. *See, e.g., Application of Gault*, 387 U.S. 1, 47 (1967) ("The privilege against self-incrimination is, of course, related to the question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not the mere fruits of fear or coercion, but are reliable expressions of the truth."); *Malloy v. Hogan*, 378 U.S. 1, 7-8 (1964) ("[T]he American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay. Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth.") (citation omitted). At other points the Court has stressed that the privilege is critical "to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution 'shoulder the entire load.'" *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 415 (1966); *see also id.* at 416 ("[T]he Fifth Amendment's privilege against self-incrimination is not an adjunct to the ascertainment of truth."). Under either rationale, the protection provided by the Clause is treated as critical for the integrity of the trial process itself. It thus seems likely that the Court would conclude that it applies in any criminal case, regardless of the status of the defendant as an alien.

Lower courts that have addressed the issue (albeit only in *dicta* in some cases) have concluded that the Self-Incrimination Clause does apply to trials of aliens, even if they have not established any connection with this country.[6]

---

[6] *See United States v. Henry*, 604 F.2d 908, 914 (5th Cir. 1979) (stating in *dicta* that "an alien who is within the territorial jurisdiction of this country, whether it be at the border or in the interior . . . is entitled to those protections guaranteed by the Fifth Amendment in criminal proceedings which would include the *Miranda* warning") (citation

The conclusion that the Self-Incrimination Clause will likely apply in any future trial, however, does not in itself answer the question how the decision in *Miranda* will apply. Under *Miranda*, evidence developed from custodial interrogation is not inflexibly presumed to be compelled, and thereby rendered inadmissible, simply because interrogators have neglected to provide the warnings outlined in *Miranda*. Not all custodial interrogation is subject to *Miranda*'s requirements. We address below four kinds of statements that the United States might wish to admit into evidence in an Article III trial: (1) statements arising out of interrogations intended to develop military operations and intelligence information; (2) statements obtained for criminal law enforcement purposes, whether by FBI interrogators or military personnel; (3) statements obtained in the course of a war crimes investigation by members of the criminal investigative services of one of the U.S. Armed Forces; and (4) statements obtained in an interrogation that may have mixed objectives and does not fall purely into only one of the previous categories. We conclude that the first category of evidence is likely to be admissible in an Article III trial even if *Miranda* warnings are not given. The second category of evidence is likely to be inadmissible unless the interrogators comply with *Miranda*. There is a substantial risk that courts will apply *Miranda* to the third category as well. Finally, for interrogations in the fourth category, results will likely turn on a highly fact-dependent inquiry.

**A. Questioning by military and intelligence personnel for military operations and intelligence information.**

We conclude that statements obtained in the course of interrogation by military and intelligence personnel for purposes of gathering intelligence and military operations information need not satisfy *Miranda* standards in order to be admitted at an Article III criminal trial. Our conclusion is based on two separate, independent grounds. First, although *Miranda* establishes a presumption that statements made during unwarned custodial interrogation are involuntary, and thus inadmissible at trial under the Self-Incrimination Clause, *Miranda* and its progeny make clear that this presumption of involuntariness is not immutable or universally applicable. In particular, the Court has treated *Miranda* as a rule designed to guide the conduct of officials in law enforcement agencies and has repeatedly limited the reach of *Miranda*'s warning requirements based on the need for regulating the conduct of law enforcement officers. The fundamental objective of regulating that conduct has no application whatsoever in the context of interrogations of battlefield detainees for purposes of obtaining intelligence and military operations information. Under the reasoning that the Supreme Court has used to define the limits of *Miranda*, we conclude that interrogators engaged in such questioning need not give *Miranda* warnings to ensure that voluntary statements will be admissible in a later criminal trial. Second, we conclude that the established public-safety exception to *Miranda* should extend by analogy to interrogations of battlefield detainees for purposes of gathering intelligence and military operations information.

---

omitted); *Jean v. Nelson*, 727 F.2d 957, 972-73 & n.22 (11th Cir. 1984) (*dicta*); *Bin Laden*, 132 F. Supp. 2d at 183 ("Fifth Amendment . . . protections seemingly apply with equal vigor to all defendants facing criminal prosecution at the hands of the United States, and without apparent regard to citizenship or community connection").

1. ***Miranda's* deterrence rationale does not apply.**

As previously explained, the Supreme Court crafted the requirements of *Miranda* as a means for implementing the protections of the Self-Incrimination Clause. In *Miranda*, the Court held that, because the environment in a custodial police interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," 384 U.S. at 467, confessions made during the course of such custodial interrogation are presumptively involuntary and, unless certain warnings are given to defuse the coerciveness of the environment, must be excluded at trial under the Self-Incrimination Clause. *See generally Dickerson v. United States*, 530 U.S. 428 (2000). If *Miranda* stated an immutable presumption concerning the voluntariness of custodial statements, it might well mean that in *any* custodial interrogation – even an interrogation of a battlefield detainee undertaken to obtain information for military operations – *Miranda* warnings would have to be given for any statements to be admissible at a later trial. Interrogation in the custody of the armed forces after capture on the battlefield might be considered at least as inherently coercive a scenario as questioning in custody at a police station. And if *Miranda* provided an absolute rule concerning the voluntariness of statements in such a custodial interrogation, it might be read to mean that statements obtained in a military interrogation could not be used in a subsequent criminal trial if the requisite warnings had not been given.

The Supreme Court, however, has never taken such an approach to *Miranda*. To the contrary, the Court has emphasized that the presumption crafted in *Miranda* and the warnings outlined there were intended to establish guidelines for the conduct of law enforcement officers pursuing criminal investigations. Although the purpose of the guidelines was to ensure the voluntariness of any statements obtained from custodial interrogations, the standards of conduct were not intended to set down an inflexible rule for evaluating voluntariness under the Fifth Amendment. The focus of *Miranda*, in other words, is not establishing a universally applicable (and constitutionally mandated) standard for measuring the voluntariness of statements made in any custodial situation. Rather, it is designed to provide rules of conduct specifically for the guidance of U.S. law enforcement officials – or, as the Court put it, "concrete constitutional guidelines for law enforcement agencies and courts to follow." *Miranda*, 384 U.S. at 442.[7] *See also Dickerson*, 530 U.S. at 434-35 (quoting same language from *Miranda*). Thus, the Supreme Court has repeatedly emphasized that the requirements of *Miranda* are designed to regulate the conduct of custodial interrogations arising out of criminal law enforcement investigations. The *Miranda* Court focused its concern on "police" interrogation and practices, and in later cases the Court has emphasized that the rationale behind *Miranda* is providing a "deterrent effect on proscribed police conduct." *Harris*, 401 U.S. at 225. Similarly, in *Thompson v. Keohane*, 516 U.S. 99 (1995), the Court described *Miranda* in terms of the requirements it imposed on "law enforcement officers." *Id.* at 107. *See also Quarles*, 467 U.S. at 656 ("The *Miranda* decision was based in large part on this Court's view that

[7] To the extent the Court has referred to *Miranda* as providing "concrete constitutional guidelines" for *courts* to follow, it seems clear that what is meant is guidelines for courts to follow in their role of deterring improper conduct by law enforcement through exclusion of evidence.

the warnings which it required police to give to suspects in custody would reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation . . . ."); *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices"); *Fare v. Michael C.*, 442 U.S. 707, 718 (1979) ("*Miranda*'s holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation . . . ."). When the Court has applied *Miranda* to interrogation by government officials other than law enforcement agents, it has done so based upon some finding of a nexus between the interrogation in question and criminal law enforcement. *See, e.g., Mathis v. United States*, 391 U.S. 1, 4 (1968) (applying *Miranda* to interview conducted by Internal Revenue Service agents with person in state custody largely upon basis that "tax investigations frequently lead to criminal prosecutions"); *Estelle v. Smith*, 451 U.S. 454, 466-69 (1981) (applying *Miranda* to court-ordered psychiatric examinations of criminal defendants); *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279-80 (9th Cir. 1983) (applying *Miranda* to INS questioning of criminal suspect); *United States v. Gupta*, 183 F.3d 615, 617-18 (7th Cir. 1999) ("*Miranda* . . . is a mismatch for the immigration process, at least at the outset. . . . Much more difficult is the question when . . . the criminal investigation is far enough advanced [to trigger *Miranda*]."); *see also* 2 Wayne R. LaFave et al., Criminal Procedure § 6.10(c), at 622 (2d ed. 1999) ("[T]he courts have generally held that government agents not primarily charged with enforcement of the criminal law are under no obligation to comply with *Miranda*.").

Where the rationale of shaping the conduct of law enforcement officers does not apply or is outweighed by other considerations, the Court has consistently concluded that *Miranda*'s requirements do not apply and that statements obtained during custodial interrogation without *Miranda* warnings may still be introduced into evidence consistent with the Fifth Amendment's prohibition on compelled testimony. Thus, in *New York v. Quarles*, the Court concluded that where police need to obtain information critical for ensuring public safety, they need not provide *Miranda* warnings before initiating custodial questioning. 467 U.S. at 657-58. And in *Harris v. New York*, the Court concluded that *Miranda*'s purpose of providing a deterrent to regulate police conduct would be served sufficiently if un-*Mirandized* statements were excluded solely from the prosecution's case in chief, but were permitted for impeachment purposes on cross-examination. *See Harris*, 401 U.S. at 225 ("Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief."). As the *Harris* Court explained, the benefits in terms of guiding conduct that would be derived from precluding the use of an unwarned statement upon cross-examination were too speculative and attenuated to outweigh the clear benefits that admitting the statements would provide in aiding "the jury in assessing [the defendant's] credibility." *Id.* The Court has thus demonstrated that the deterrent rationale behind *Miranda* limits the range of situations in which the case will be applied.

Similarly, drawing on the Supreme Court's analysis in *Miranda* and its progeny, lower courts have identified other situations where *Miranda*'s goal of shaping police conduct has no application and where *Miranda*'s warning requirements therefore do not apply. For example, federal courts have

repeatedly admitted unwarned custodial statements obtained by foreign police officers.[8] If *Miranda* provided an immutable rule that an unwarned statement made in custodial interrogation is necessarily involuntary, such statements would be absolutely barred from use at trial under the Self-Incrimination Clause, regardless of whether they were obtained by foreign police or anyone else. Such statements are admitted into evidence, however, because the rationale behind *Miranda* – shaping police conduct – does not apply to foreign police. Foreign police, of course, are not subject to the requirements of the federal Constitution,[9] and there is thus no basis for attempting to force them to comply with *Miranda*'s guidelines. Moreover, excluding statements obtained by foreign police without *Miranda* warnings would have no *practical* deterrent effect, because ensuring admissibility of evidence in U.S. courts is not a relevant incentive for police in another nation. As one court of appeals has explained,

> the United States Constitution cannot compel such specific, affirmative action by foreign sovereigns, so the policy of deterring so-called 'third degree' police tactics, which underlies the *Miranda* exclusionary rule, is inapposite to this case. Here the statements were not coerced, as revealed by testimony at the original trial which we have scrutinized. The evidence was therefore admissible.

*Kilday v. United States*, 481 F.2d 655 (5th Cir. 1973) (citations omitted).[10]

---

[8] *See, e.g., United States v. Nagelberg*, 434 F.2d 585, 587 n. 1 (2nd Cir. 1970) ("The *Miranda* rule has no application . . . where the arrest and interrogation were by Canadian officers interested in Canadian narcotic and immigration offenses under their investigation. There is no showing that the statement was coerced or taken in violation of the laws of Canada. There is no claim of 'rubbing pepper in the eyes,' or other shocking conduct. The presence of an American officer should not destroy the usefulness of evidence legally obtained on the ground that methods of interrogation of another country, at least equally civilized, may vary from ours."); *United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971) ("so long as the trustworthiness of the confession satisfies legal standards, the fact that the defendant was not given *Miranda* warnings before questioning by foreign police will not, by itself, render his confession inadmissible"); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980) ("statements obtained by foreign officers conducting interrogations in their own nations have been held admissible despite a failure to give *Miranda* warnings to the accused," at least where the conduct does not "shock[] the conscience of the American court," American officials did not "participate[] in the foreign search or interrogation," and the foreign agents were not "acting as agents for their American counterparts"); *United States v. Covington*, 783 F.2d 1052, 1056 (9th Cir. 1985) ("the exclusionary rule is not applicable to interrogations performed by foreign police officers acting in their own country"); *United States v. Khan*, 993 F.2d 1368, 1376 n.7 (9th Cir. 1993) ("Statements given to police officers of a foreign country are not excludable because *Miranda* warnings are not given.") (citation omitted).

[9] *See Neely v. Henkel*, 180 U.S. 109, 122-23 (1901) ("[T]he provisions of the Federal Constitution relating to the writ of habeas corpus, bills of attainder, ex post facto laws, trial by jury for crimes, and generally to the fundamental guaranties of life, liberty, and property embodied in that instrument . . . have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country. . . . When an American citizen commits a crime in a foreign country he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people.").

[10] Another court of appeals has similarly concluded that, "[w]hen the interrogation is by the authorities of a foreign jurisdiction, the exclusionary rule has little or no effect upon the conduct of foreign police." *Chavarria*, 443 F.2d at 905. Put simply, "applying the *Miranda* rule to foreign police officers will not affect their conduct, and therefore

The Supreme Court's recent declaration that *Miranda* is a "constitutional decision," *Dickerson*, 530 U.S. at 438, does not alter the above analysis. It might be argued that after *Dickerson*, *Miranda* must be understood as a "constitutional rule" establishing a fixed test for determining whether statements are "compelled" for purposes of the Fifth Amendment. *Cf. id.* at 455-56 (Scalia, J., dissenting) (suggesting that this must be the implication of the Court's decision). That gloss on *Dickerson* might be used to cast doubt on the exceptions to *Miranda* noted above based on the theory that the exceptions are rooted in the mistaken idea that *Miranda* sets a prophylactic rule that is not constitutionally required. In *Quarles*, for example, the Court based its analysis in part on the statement that "[t]he prophylactic *Miranda* warnings therefore are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" 467 U.S. at 654.[11] Now that the Court has made clear that *Miranda* is a constitutional requirement in its own right, the argument would go, practical considerations such as deterrence cannot limit the application of *Miranda*'s rules.

That approach, however, distorts *Dickerson*. In establishing *Miranda* as a constitutional rule, *Dickerson* merely held that the body of law established by *Miranda* and its progeny set constitutional requirements determined by the Court that could not be disturbed by an act of Congress.[12] Nowhere did the *Dickerson* Court suggest that it was radically reforming the rationale behind *Miranda* and later cases to make *Miranda* an inflexible constitutional determination that *all* unwarned custodial statements are necessarily "compelled" testimony under the Fifth Amendment. Instead, the Court treated *Miranda*, as the language from the original decision itself suggests, as "constitutional guidelines for law enforcement agencies" crafted by the Court. 384 U.S. at 442. Because they were defined by the Court as constitutional requirements, Congress could not modify them, but in the Court's view, that did not mean that *courts* could not define limits on *Miranda* based on the same balancing of interests outlined in the cases above (and employed by courts in other constitutional

---

we decline to so extend the scope of that decision." *Commonwealth v. Wallace*, 248 N.E.2d 246, 248 (Mass. 1969). *See also United States v. Welch*, 455 F.2d 211, 212 (2d Cir. 1972) ("[S]ince the *Miranda* requirements were primarily designed to prevent United States police officers from relying upon improper interrogation techniques and as the requirements have little, if any, deterrent effect upon foreign police officers, the *Miranda* warnings should not serve as the *sine qua non* of admissibility."); *Yousef*, 925 F. Supp. at 1076 ("[T]he purpose of the rule that any statement taken in violation of *Miranda* is inadmissible is to prevent and deter United States law enforcement personnel from taking involuntary statements that are the result of unduly coercive custodial circumstances.").

[11] Similarly, at least some courts tied the exception for foreign police interrogations to the concept that *Miranda* is a "prophylactic" rule. One court, for example, explained that, because "[w]e have generally held that *prophylactic constitutional rules* designed to deter police misconduct do not apply to foreign police behavior," the "*Miranda* rules [have been held] inapplicable to Mexican police interrogations," just as the "Fourth Amendment exclusionary rule does not apply to illegal searches conducted by Mexican authorities acting without substantial involvement by American officials." *United States v. Wolf*, 813 F.2d 970, 972 n.3 (9th Cir. 1987) (citations omitted, emphasis added).

[12] Two years after *Miranda* was decided, Congress enacted a provision now codified at 18 U.S.C. § 3501 (1994). By purporting to eliminate the warnings requirements of *Miranda* and restore voluntariness as the "touchstone of admissibility," section 3501 was intended to override *Miranda*. *Dickerson*, 530 U.S. at 436. *Dickerson* held that Congress could not override *Miranda*. *See id.* at 432 ("We hold that *Miranda*, being a constitutional decision of this Court, may not be in effect overruled by an Act of Congress[.]").

contexts). In keeping with that understanding, the Court never cast doubt on the various limitations and exceptions to *Miranda* already embedded in the Court's jurisprudence. To the contrary, *Dickerson* explicitly embraced the Court's existing decisions. Addressing the decisions in *Quarles* and *Harris* specifically, the Court stated that they "illustrate the principle – not that *Miranda* is not a constitutional rule – but that no constitutional rule is immutable." 530 U.S. at 441. The Court concluded that "the sort of modifications represented by these cases are *as much a normal part of constitutional law* as the original decision," *id.* (emphasis added), and held that *Miranda* "*and its progeny in this Court*" continue to "govern the admissibility of statements made during custodial interrogation in both state and federal courts" *id.* at 432 (emphasis added). Thus, as one court of appeals has observed, "the *Dickerson* majority expressly incorporated existing decisions, like *Quarles*, into the 'constitutional' right to a *Miranda* warning it elucidated in *Dickerson*." *United States v. Talley*, 275 F.3d 560, 564-65 (6th Cir. 2001).

There is certainly nothing in *Dickerson* that expands *Miranda* to require warnings in all forms of custodial interrogation. In fact, the *Dickerson* Court repeatedly recognized that the core function of *Miranda* was to address "the advent of modern custodial *police* interrogation," which "brought with it an increased concern about confessions obtained by coercion." 530 U.S. at 434-35 (emphasis added). *See also id.* at 443 ("*Miranda* has become embedded in *routine police practice*") (emphasis added); *id.* (discussing the "impact of the *Miranda* rule on *legitimate law enforcement*") (emphasis added). Nowhere in the opinion did the Court indicate any inclination to depart from past practice and unhinge the scope of *Miranda* from the rationale of regulating U.S. law enforcement officers that has guided the Court in the past.

The same logic that has underpinned the exceptions to *Miranda* outlined above demonstrates that *Miranda* warnings have no application in interrogations conducted by military and intelligence officers for purposes of gathering intelligence and military operations information from a battlefield detainee. Nothing in the Court's explanation of *Miranda* and its progeny applies to, or even addresses, the interrogation of enemy prisoners in a military theater of operations for the purpose of obtaining military and intelligence information. Applying *Miranda's* requirements in this context would do nothing to advance the goal that the Supreme Court has repeatedly treated as a guiding factor in determining the scope of *Miranda* – namely, regulating the conduct of law enforcement officials in criminal investigations. Indeed, where an interrogation is conducted for obtaining military operations and intelligence information, *Miranda*'s concerns for regulating questioning in the law enforcement context are irrelevant. The goal in such a scenario is not to carefully balance the rights of a criminal defendant under our constitutional system against the needs of law enforcement, but rather to ensure that our troops and intelligence officers can extract as much useful information as possible for protecting our troops and securing our military objectives. The Court's stated concerns for providing "constitutional guidelines for law enforcement agencies and courts," in other words, are a mismatch for this context. *Miranda*, 384 U.S. at 442.

The conclusion that the purposes of *Miranda* would not be served by applying the decision to interrogations conducted for military operations and intelligence information is bolstered by the fact that restrictions imposed by the Fourth, Fifth, and Sixth Amendments generally do not apply to

the actions of our armed forces in an armed conflict. This Office recently opined that the Fourth Amendment does not apply to United States military actions, both within the United States and abroad, taken to combat terrorists in the wake of the September 11 attacks. *See* Memorandum for Alberto R. Gonzales, Counsel to the President & William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General & Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority for Use of Military Force To Combat Terrorist Activities Within the United States* at 22-34 (Oct. 23, 2001). As we explained, in reversing a lower court decision to apply the Fourth Amendment extraterritorially to non-U.S. citizens, the Supreme Court pointed out the untenable consequences of applying the Fourth Amendment to United States military operations abroad. *See Verdugo-Urquidez*, 494 U.S. at 273-74. Such a rule would result in applying the Fourth Amendment "also to other foreign policy operations which might result in 'searches or seizures'" – a result that "would have significant and deleterious consequences for the United States in conducting activities beyond its boundaries." *Id.* at 273. The Court explained:

> The United States frequently employs Armed Forces outside this country–over 200 times in our history–for the protection of American citizens or national security. . . . Application of the Fourth Amendment to those circumstances could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest . . . [and] plunge [the political branches] into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad.

*Id.* at 273-74 (citations omitted). The Court further noted that in 1798 during the Quasi War with France Congress authorized President Adams to order the seizure of French vessels on the high seas, and "it was never suggested that the Fourth Amendment restrained the authority of Congress or of United States agents to conduct operations such as this." *Id.* at 268. Thus, within the first decade after the Constitution's ratification, the Fourth Amendment was understood not to restrict military operations against the Nation's enemies.

Likewise, the Just Compensation Clause of the Fifth Amendment does not attach to actions taken as a matter of military necessity by United States Armed Forces in the field, even when those actions entail the destruction of property owned by United States citizens (and, indeed, even when the destruction occurs within the territory of the United States). The general rule is that "the government cannot be charged for injuries to, or destruction of, private property caused by military operations of armies in the field." *United States v. Pacific R.R.*, 120 U.S. 227, 239 (1887).

We believe that, as in the above cases, "significant and deleterious consequences," *Verdugo-Urquidez*, 494 U.S. at 273, would result from applying *Miranda* to the interrogation of a prisoner who was apparently a member of a transnational terrorist group, who was captured while engaged in military operations against the United States and its allies, and who was being questioned for the purpose of gathering intelligence of military value to the United States in the conflict. Interrogation of enemy prisoners is a practical necessity for waging war effectively. Prisoners are always interrogated for information concerning their unit, enemy troop positions and strength, and

other information that may be relevant to military operations in the area, to force protection, and (particularly in this conflict) to broader national security and intelligence objectives. Such interrogation serves the specifically military and intelligence objectives of the armed forces in the field of combat and the interests of national security. It is not, and is not intended to be, a part of the law enforcement apparatus of the United States. Subjecting the conduct of all such interrogations to the standards outlined in *Miranda* based on the possibility that some statements from an interrogation might later be used in a criminal trial would make no sense.

To be sure, there is a distinction between applying the Fourth Amendment and other constitutional constraints to the conduct of military operations and "applying" *Miranda* to military interrogations. The Fourth Amendment, if applicable, would impose mandatory requirements on the conduct of the armed forces in the field. It would directly regulate the ways in which operations could be conducted and failures to comply would, in themselves, be violations of the Constitution. If *Miranda* applied, however, an unwarned custodial interrogation would not *in itself*, constitute any constitutional violation.[13] Thus, in one sense, "applying" *Miranda* would not *prohibit* the government from conducting interrogations as it chooses; rather, it would simply put the government to the choice of following *Miranda* or forgoing the use of any statements in later criminal trials.

But that distinction does not make a difference for the analysis here. The entire purpose behind *Miranda* as a constitutional rule is to put constraints on conduct. Where the rationale for developing those constraints does not apply, the correct result under *Miranda* and its progeny is that *Miranda* itself does not apply. And for many of the same reasons that it makes no sense to have the Fourth Amendment constrain the conduct of military operations, it also makes no sense to have the constitutionally based rules for interrogations in *Miranda* apply.

**2. Statements obtained during interrogations undertaken to obtain military or intelligence information should be admissible under the public safety exception to *Miranda*.**

Even if the broader rationale for rejecting the application of *Miranda* outlined above were not accepted, we believe that statements obtained in the course of interrogation for purposes of gathering intelligence and military operations information would be admissible at trial in an Article III court under an exception to *Miranda* closely analogous to, and based upon the same rationale as, the "'public safety' exception" announced by the Supreme Court in *New York v. Quarles*, 467 U.S. 649 (1984).

In *Quarles*, the police had chased a rape suspect – who was reportedly armed – into a

---

[13] *See, e.g., Calif. Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039, 1046-47 (9th Cir. 2000) ("a bare violation of *Miranda* is not enough to sustain a claim under § 1983," although "a failure to comply with *Miranda* can be viewed as an aggravation of other coercive tactics"); *Cooper v. Dupnik*, 963 F.2d 1220, 1243-44 (9th Cir. 1992) ("Our holding . . . does not create a Fifth Amendment cause of action under § 1983 for conduct that merely violates *Miranda* safeguards without also trespassing on the actual Constitutional right against self-incrimination that those safeguards are designed to protect. ").

supermarket, where they arrested him, frisked him, and discovered an empty shoulder holster. A police officer asked the suspect, "Where is the gun?" *Id.* at 674. The suspect, gesturing toward a stack of soap cartons, replied, "The gun is over there." *Id.* The Court held that "on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved." *Id.* at 655-56. The Court explained that in such a situation, the "need for answers to questions in a situation posing a threat to the public safety outweighs the need" for the "[p]rocedural safeguards" imposed by *Miranda*. *Id.* at 657. As the Court made clear in *Quarles*, the exception applies to "questions necessary to secure [police officers'] own safety or the safety of the public." *Id.* at 659. *See, e.g., United States v. DeSantis*, 870 F.2d 536, 539 (9th Cir. 1989) ("The 'public safety' exception . . . was intended to protect the police, as well as the public, from danger."); *United States v. Mobley*, 40 F.3d 688, 693 (4th Cir. 1994) (*Quarles* applies to "such circumstances posing an objective danger to the public or police"); *United States v. Khalil*, 214 F.3d 111, 121 (2d Cir. 2000) (*Quarles* applies to statements about construction and stability of bombs seized during raid on defendant's apartment the night before).

We conclude that, where the interrogation of an enemy combatant captured in an area of military operations is at issue, the same reasoning applied in *Quarles* should apply to provide an exception from *Miranda* for questioning directed at eliciting information relevant to military operations and intelligence. If the police are permitted to bypass *Miranda* warnings in order to "secure their own safety or the safety of the public," 467 U.S. at 659, surely the exigencies of combat justify a similar exception for the interrogations contemplated here. As we understand it, interrogation of prisoners seized in battle is undertaken as a matter of course to determine information such as what units of the enemy forces are operating in the area, their position, strength, supply status, etc., as well as information of broader use for intelligence concerning enemy plans and capabilities for launching strikes against U.S. positions. In the context of an armed conflict, it seems readily apparent that *all* such information relates directly to the safety and protection of American troops, who are constantly exposed to the dangers of combat. In addition, in this conflict, given the demonstrated ability of the enemy to attack military and civilian targets around the globe, including within the United States (and given the repeated vows to continue such attacks), interrogations for intelligence and national security purposes may additionally develop information critical for thwarting further imminent loss of American lives far from the immediate scene of battle in Afghanistan. Thus, as in *Quarles*, the lives and safety of both the questioners and others will be directly at stake.

**B. Interrogations for criminal law enforcement purposes.**

By contrast, we believe that statements obtained through interrogations conducted abroad for criminal law enforcement purposes – whether by FBI interrogators or military personnel – are

unlikely to be admitted in an Article III criminal trial if *Miranda* requirements are not met.[14]

As outlined above, we believe that the Supreme Court would almost certainly conclude that the Self-Incrimination Clause applies to trials in Article III courts of aliens, even where an alien's only connection to this country is that he has been brought here to be tried. That in itself, however, does not automatically dictate that law enforcement officers interrogating aliens abroad to prepare for such prosecutions must be bound by the *Miranda* regime. There are sound arguments that the *Miranda* system of warnings, while a useful system for controlling the conduct of law enforcement officials operating in the United States, imposes an unwieldy burden in the vastly varying situations law enforcement officers must face while operating abroad. As some courts have noted, for example, when a suspect is in the custody of a foreign police force, some of the *Miranda* rights that are normally described to a suspect may not actually be available because they conflict with the law and procedures of the nation that has custody of the suspect. *See, e.g., Bin Laden*, 132 F. Supp. 2d at 188 ("foreign law may . . . ban all manner of defense counsel from even entering the foreign stationhouse, and such law necessarily trumps American procedure"); *United States v. Dopf*, 434 F.2d 205, 207 (5th Cir. 1970) (*Miranda* satisfied where FBI agent told defendants held by Mexican officials that, because he had no jurisdiction in Mexico, "he could not furnish them with a lawyer in Mexico but [that he could] contact the American Consul on their behalf"). Even where, as here, the suspects are held by the United States government abroad, other factors may make the burdens of *Miranda* outweigh any benefits that *Miranda* may provide in deterring misconduct in run-of-the-mill prosecutions. In particular, it seems likely that when a battlefield detainee is being interrogated for military and intelligence information – a process that may extend over many days or weeks – the provision of *Miranda* warnings by *other* U.S. personnel who may wish to question the same detainee during the same time period for purposes of building a criminal case will make the detainee less likely to provide information vital to the objectives of military and intelligence questioning. In such a scenario, there is a sound argument that the disadvantages that will result from providing *Miranda* warnings (in terms of lost information of military and intelligence value) outweigh any benefits to be gained from applying *Miranda* as a device for regulating police conduct.

It is difficult to predict with any accuracy how the Court would receive such arguments concerning why *Miranda* should not be extended here. Nevertheless, we believe that the weight of authority suggests that courts would require *Miranda* warnings in interrogations conducted by U.S. personnel abroad for law enforcement purposes. Several courts of appeal have already held that when U.S. law enforcement officers interrogate a suspect abroad or direct the questioning carried out by foreign police who are acting essentially as their agents, *Miranda* warnings must be given for any statements to be admissible at trial in the United States. *See Cranford v. Rodriguez*, 512 F.2d 860, 863 (10th Cir. 1975); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980). Similarly, earlier this year the Southern District of New York concluded that in prosecutions stemming from

---

[14] Whether an interrogation is conducted for criminal law enforcement purposes should not be evaluated based on the subjective motivations of the interrogators. Rather, it should be determined objectively based on the nature of the questions. If the questions are directed at eliciting information that is designed to build a case for a criminal prosecution, we believe that most courts would conclude that *Miranda*'s warning requirements apply.

the al Qaeda bombings of U.S. embassies in Africa, "*Miranda* must apply to *any* portion of an overseas interrogation that is, *in fact or form*, conducted by U.S. law enforcement." *Bin Laden*, 132 F. Supp. 2d at 187 (emphasis added). The court justified its holding by relying in large part on cases holding that "the lack of *Miranda* warnings will still lead to suppression if U.S. law enforcement themselves actively participated in the questioning, or if U.S. personnel, despite asking no questions directly, used the foreign officials as their interrogational agents in order to circumvent the requirements of *Miranda*." *Id.* (citations omitted). The same principle could be applied to any interrogation conducted by U.S. personnel for law enforcement purposes – even if conducted by the military. Thus, we believe that there is a substantial risk that an Article III court would regard any attempt by military officers to engage in unwarned interrogation for the sole purpose of either developing criminal charges or facilitating a criminal prosecution as an attempt to "circumvent the requirements of *Miranda*." *Id.*

That said, it may not be necessary under these circumstances to apply the full panoply of warnings and rights that would ordinarily be required under *Miranda*. Under normal conditions, *Miranda* requires that a suspect be warned not only that he has a right to remain silent and that his statements will be used against him, but also that he has a right to have counsel present and to have counsel appointed if necessary. By contrast, courts have found that, at least where an individual is in the custody of officials of another country, whose practices may limit access to counsel, there may be practical limitations on the right to counsel. In other words, the right to counsel as it would be applied in the United States applies only "if the particular overseas context actually presents *no* obvious hurdle to the implementation of an accused's right to the assistance and presence of counsel." *Bin Laden*, 132 F. Supp. 2d at 188. Even then, only "due care" is required to avoid "foreclos[ing] an opportunity" to be represented by counsel "that in fact exists" – that is to say, only the opportunity to obtain counsel subject to the limits of applicable foreign law. *Id.* *See also Cranford*, 512 F.2d at 863 (FBI agents satisfied *Miranda* by advising suspect held abroad that he had right to consult U.S. consul in Mexico rather than lawyer); *Dopf*, 434 F.2d at 206-7 (same).[15]

---

[15] In *Bin Laden*, which involved suspects in the custody of foreign officials, the court suggested that the following advice of rights could constitutionally be given to aliens interrogated by U.S. law enforcement officials:

> Under U.S. law, you have the right to talk to a lawyer to get advice before we ask you any questions and you can have a lawyer with you during questioning. Were we in the United States, if you could not afford a lawyer, one would be appointed for you, if you wished, before any questioning.
>
> Because you are not in our custody and we are not in the United States, we cannot ensure that you will be permitted access to a lawyer, or have one appointed for you, before or during any questioning.
>
> However, if you want a lawyer, we will ask the foreign authorities to permit access to a lawyer or to appoint one for you. If the foreign authorities agree, then you can talk to that lawyer to get advice before we ask you any questions and you can have that lawyer with you during questioning.
>
> If you want a lawyer, but the foreign authorities do not permit access at this time to a lawyer or will not now appoint one for you, then you still have the right not to speak to us at any time without a lawyer present.

It is not clear whether analogous considerations would apply when the individual is in the custody of U.S. Armed Forces overseas. There may be strong arguments that providing a detainee appointed counsel while he is held by the armed forces is not a practical alternative (perhaps for reasons of security of the detention facility) and would unduly interfere with the military's own ongoing questioning of the subject for military and intelligence information. We could pursue further the extent to which modifications to the traditional *Miranda* warnings might be justified in this context if you so request.

**C. Interrogations by investigative services of one of the U.S. Armed Forces investigating war crimes.**

We understand that members of the criminal investigative services of the individual branches of the U.S. Armed Forces may wish to interrogate persons in order to investigate the possible commission of war crimes for subsequent prosecution before military commissions. As noted in Part II of this memorandum, *Miranda* does not bar the admission of evidence in a proceeding before a military commission. We understand, however, that even if the armed forces begin interrogating an individual with a view to a military commission trial, the possibility remains that the individual will later be transferred to civilian custody for purposes of criminal prosecution before an Article III court in the United States. The question will then be whether *Miranda* bars any unwarned statements obtained by the military investigators.

Based on the analysis above, we believe that war crimes investigations by military personnel preparing for a possible trial by military commission are not the kind of law enforcement investigations that *Miranda* was intended to regulate. Although such investigations are, in some sense, "criminal" in nature, their primary purpose is the execution of the President's wartime power as Commander in Chief "to seize and subject to disciplinary measures those enemies who, in their attempt to thwart or impede our military effort, have violated the law of war," and not his authority as the nation's chief law enforcement officer. *Application of Yamashita*, 327 U.S. 1, 11 (1946).[16] After all, "[t]he trial and punishment of enemy combatants who have committed violations of the law of war is . . . a *part of the conduct of war* operating as a preventive measure against such violations." *Id.* (emphasis added). *Miranda*'s guiding rationale based on regulating the conduct of law enforcement agencies does not properly apply in such a case. Thus, unwarned statements obtained by military investigators in that context should be admissible in a later trial in federal court.

---

132 F. Supp. 2d at 188 n.16.

[16] This distinction is not a novel one. We recently opined that the Posse Comitatus Act, 18 U.S.C. § 1385 (1994), which generally prohibits the domestic use of the Armed Forces for law enforcement purposes absent constitutional or statutory authority to do so, does not forbid the use of military force for the military purpose of preventing and deterring terrorism within the United States. *See* Memorandum for Alberto R. Gonzales, Counsel to the President & William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General & Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority for Use of Military Force To Combat Terrorist Activities Within the United States* at 15-20 (Oct. 23, 2001).

Nevertheless, we caution that no courts have addressed this issue, the matter is not at all free from doubt, and there is a very substantial risk that a court would reach the opposite conclusion and decide that *Miranda*'s requirements do properly apply. A court could conclude that, while interrogations of battlefield detainees for intelligence and information related to operations are one matter (and outside the ambit of *Miranda*), a different matter is presented when there is a switch to any form of criminal investigation -- even if the only intended objective at the time of the questioning is developing a case for a military commission trial. There is always the possibility that the investigation will lead to trial in an Article III court. Indeed, it might be argued that this possibility is enhanced here because the only person charged so far in relation to the attacks of September 11 has been charged in federal court (even though the attacks appear to involve several violations of the laws of war), and, in any event, some war crimes can also be prosecuted as violations of federal criminal law, *see* 18 U.S.C. § 2441 (Supp. III 1997).

Further support for applying *Miranda* to custodial interrogations by war crimes investigators might be drawn from Supreme Court decisions involving interrogation by government officials other than police officers. In *Mathis v. United States*, 391 U.S. 1 (1968), the Court extended the requirement of *Miranda* warnings to an interview conducted by an IRS agent with a person in custody on the ground that, even though the IRS had not yet begun any criminal investigation, "tax investigations frequently lead to criminal prosecutions," *id.* at 4. *See also id.* ("[A]s the investigating revenue agent was compelled to admit, there was always the possibility during his investigation that his work would end up in a criminal prosecution."); *cf. id.* at 7 (White, J., dissenting) (suggesting that the majority's statement may be "a hint that any in-custody questioning by an employee of the Government must be preceded by warnings if it is within the immensely broad area of investigations which 'frequently lead' to criminal inquiries"). Similarly, in *Estelle v. Smith*, 451 U.S. 454 (1981), the Court applied *Miranda* to statements made during a court-ordered psychiatric examination when the prosecution later attempted to use those statements against the defendant during the penalty phase of a criminal trial. The fact that the defendant "was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney" was "immaterial." *Id.* at 467. Once the psychiatrist "went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, *his role changed* and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.* (emphasis added).[17] Thus, a court might exclude statements made

[17] *See also United States v. D.F.*, 63 F.3d 671, 682-83 (7th Cir. 1995) (Under *Mathis*, "it is not the particular job title that determines whether the government employee's questioning implicates the Fifth Amendment, but whether the prosecution of the defendant being questioned is among the purposes, definite or contingent, for which the information is elicited. . . . [A]lthough a government employee need not be a law enforcement official for his questioning to implicate the strictures of the Fifth Amendment, his questioning must be of a nature that reasonably contemplates the possibility of criminal prosecution.") (footnotes omitted); *Battie v. Estelle*, 655 F.2d 692, 699 (5th Cir. 1981) ("[T]he particular office that the official who performs the custodial interrogation represents is inconsequential because *Miranda* was not concerned with the division of responsibility between the various state investigatory agencies but was concerned with official custodial interrogations of an accused and the use of statements obtained from an accused without an attorney in such circumstances to prove the State's case against the accused.").

during custodial interrogation by war crimes investigators unless the *Miranda* requirements are satisfied, on the grounds that such interrogation bears a similarly close nexus to law enforcement.

While we do not believe that this analysis would be correct, it undeniably presents a substantial risk. Accordingly, if a decision has not yet been made concerning where an individual will be prosecuted and if it is deemed essential to ensure that any statements obtained by military investigators may be used in a subsequent trial in an Article III court, we believe that it would be prudent to provide *Miranda* warnings.

**D. Interrogations with Mixed or Dual Purposes.**

In some cases there may be claims that a given interrogation does not fall neatly into only one of the categories outlined above, or claims that the lines between categories have been blurred because there were different motives behind the questioning. It is possible, for example, that military interrogators primarily seeking information relevant to operations and intelligence may have some interest in determining whether a detainee was engaged in conduct chargeable as a crime or a war crime. As explained below, for the most part we believe that the subjective motives of the interrogator should not alter analysis, which should be guided instead by an objective assessment of the nature of the questioning.

First, and most importantly, under the reasoning outlined above, we have concluded that *Miranda* should not apply at all to military and intelligence officers' questioning conducted for obtaining military and intelligence information because officers acting in this capacity are not the intended objects of *Miranda's* rules of conduct. Their subjective motivations in asking any particular questions should not alter this analysis. Nor should the analysis be affected even if it turns out after the fact that an objective assessment of certain particular questions demonstrates that the information sought was relevant solely to establishing the role of the detainee in a past criminal act. Such factors should not matter as long as overall, the primary objective of the questioning is military operations and intelligence information and the interrogators are in good faith pursuing their role in developing such information. Their particular motivations for asking certain questions or the exact nature of the information sought in particular questions should not serve as a basis for later claiming that *Miranda* warnings should have been supplied in such an interrogation.[18]

Second, we explained above that an extension of the public-safety exception should apply by analogy to interrogations for military and intelligence information, and the Supreme Court has directly addressed the question of dual motives behind questioning in the context of that exception. The Court made clear that the "availability of [the public-safety] exception does not depend upon the motivation of the individual officers involved." 467 U.S. at 656. *See also id.* ("[T]he

[18] Of course, a different issue would be raised if it appeared that military and intelligence officers had taken it on themselves to develop a criminal investigation in order to exploit the absence of *Miranda* warnings in their interrogations or were merely acting as the proxies for law enforcement by asking questions at the direction of, for example, FBI agents. Determining where the line would be drawn requiring *Miranda* in such cases would likely depend on a highly fact-intensive inquiry into the particular circumstances.

application of the exception which we recognize today should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer."). "Whatever the motivation" of those conducting the questioning, the Court concluded that the exception should apply if there were an objective basis for concluding that the questions were "reasonably prompted by a concern for the public safety." *Id.* In other words, where there is objectively "a situation posing a threat to the public safety," *id.* at 657, questions reasonably aimed at eliminating that threat can be asked without *Miranda* warnings. The Court thus drew a distinction between "questions necessary to secure [police officers'] own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 659.

We conclude that, to the extent the public-safety exception is extended by analogy to military and intelligence questioning, the same analysis of dual motives should apply. Thus, as long as there was an objectively reasonable basis to believe that the information sought by military and intelligence officers would reduce the dangers to the lives and safety of American military personnel, allied forces or others, we believe it would not matter if the questioners were also partially motivated by a law-enforcement concern.[19] Questions in the sort of interrogation we have described above seem reasonably related to the former purpose and are certainly not directed solely at the latter.

Finally, a similar dual motive analysis might be applied to argue that when law enforcement personnel – such as FBI agents – are questioning a detainee, it is only when they ask questions solely for law-enforcement purposes that *Miranda* is required. Where questions objectively can be said to be related to securing public safety, the *Quarles* exception should apply. Stated thus generally, we think this is a correct statement of the law, but we nevertheless caution that it likely does not provide a very useful guide for conduct. As we understand the factual situation, detainees will likely be seized by the military and initially interrogated for operational and intelligence information. Much of this information will be most critical for securing safety within the theater and addressing military threats. The detainee may later be questioned by law enforcement personnel (and others acting at the direction of law enforcement). We think there is a substantial risk in this context that courts will view the change in personnel conducting the interrogations as a proxy for a change in the focus of the questioning and conclude that all such interrogations are for law enforcement purposes. Thus, even if some questions are reasonably related to "public safety" (as broadly conceived in this context), it may be more difficult to establish that the public-safety exception applies. In addition, to receive the benefit of the public-safety exception, it seems likely that law enforcement interrogators would have to ask questions related to public safety first before *Mirandizing* the detainee and proceeding with further questioning. We think it unlikely that a court would take the

---

[19] The Court's holdings in "dual motive" cases under the Fourth Amendment also tend to support our conclusion in this context. As a general matter, the Fourth Amendment case law does not require that a search or seizure have only a single purpose so long as it is otherwise legitimate. Thus, the police may engage in (objectively justified) traffic stops even if their underlying motive may be to investigate other violations as to which no probable cause or even articulable suspicion exists. *See Whren v. United States*, 517 U.S. 806 (1996); *see also United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983) (otherwise valid warrantless boarding of vessel by customs officials not invalidated by facts that state police officer accompanied customs officials and officers were following tip that vessel might be carrying marijuana).

record of a broad-ranging interview, much of which was conducted plainly for the purpose of eliciting incriminating evidence, and parse out those questions and answers that are related to public safety to admit them into evidence. The Supreme Court's analysis in *Quarles* suggested that the exception was designed to permit officers to ask questions immediately as reasonably needed to address safety matters and then to *Mirandize* a suspect before further questioning. It seems likely that courts will attempt to adhere to that pattern. Because of these concerns, we think the most prudent approach would be to provide *Miranda* warnings at the outset when the interrogation is being conducted by law enforcement officers building a criminal case.[20]

## IV. Subsequent *Mirandizing* after failure to warn.

For purposes of determining whether *Miranda* warnings should be applied in the more doubtful scenarios considered above, it may be important to understand that if *Miranda* warnings are not given in an interview where it is later determined they were required, the result will *not* be that all statements subsequently made by the individual in later interviews will be inadmissible as "fruit of the poisonous tree." To the contrary, as a general matter, a subsequent, properly *Mirandized* statement may be used against an individual even if that individual has previously given an unwarned statement during questioning when *Miranda* warnings should have been provided.

The Supreme Court has held that a second, *Mirandized* statement is admissible so long as the earlier statement, although inadmissible itself under *Miranda*, was nevertheless voluntarily made. Where the first statement was involuntarily made, the second, *Mirandized* statement can still be admitted, but only where there has been an adequate break in events between the two statements to ensure that the later one is voluntary. In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Court explained:

> [T]here is no warrant for presuming coercive effect [in a second, *Mirandized* confession] where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.... [A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Id.* at 318. Thus, where the first statement was voluntary (even if unwarned), the Court refused to require the "break in the stream of events" that would have been required had the first statement been coerced. *Id.* at 310; *see also id.* at 318 (declining to require "a passage of time or break in events before a second, fully warned statement can be deemed voluntary"); *cf. Miranda*, 384 U.S. at 496

---

[20] Of course, there may be some specialized branches of law enforcement agencies (such as a counter-terrorism unit in the FBI) whose mission is instead to expose and thwart pending terrorist attacks. Their questioning, therefore, may be much more similar to questioning conducted for intelligence and national security objectives, and should be treated the same. Thus, an objective assessment of the type of information being sought in the questioning remains the critical touchstone for assessing the application of *Miranda*. We note simply that questioning by personnel traditionally associated with law enforcement will likely serve as a rough proxy for most courts in concluding that the questioning was for law-enforcement purposes.

("A different case would be presented if an accused [who had previously given an involuntary confession] were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them.").

*Elstad*, moreover, has not been undermined by *Dickerson* and the determination that *Miranda* is a constitutional rule. Although the *Elstad* opinion relied in part on the view that *Miranda* was not a constitutional ruling, *see, e.g.*, 470 U.S. at 308, that rationale was not essential to its holding. As the Court noted, "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion." *Elstad*, 470 U.S. at 307. Whether the presumption arises out of the Constitution or by judicial creation, it is that compulsion that triggers the Self-Incrimination Clause in the first place. Once warnings are given, however, the presumption of coercion evaporates. In the Court's words,

> a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'

*Id.* at 310-11 (citation omitted). Indeed, to rule otherwise would

> effectively immunize[] a suspect who responds to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver of the privilege of remaining silent. This immunity comes at a high cost to legitimate law enforcement activity, while adding little desirable protection to the individual's interest in not being *compelled* to testify against himself. When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder.

*Id.* at 312 (citations omitted).

Nothing in this logic depends upon whether the presumption arose out of the Fifth Amendment itself or by judicial creation.[21] The touchstone of both the Self-Incrimination Clause and *Miranda* is compulsion, and as *Elstad* makes clear, there is no basis for presuming compulsion once an individual has been given *Miranda* warnings. Nothing in *Dickerson* alters that result. Rather, the *Dickerson* Court expressly noted that *Elstad* was consistent with its approach to treating

---

[21] *See also id.* at 308 ("[T]he absence of any coercion or improper tactics undercuts the twin rationales--trustworthiness and deterrence [of constitutional violations]--for a broader rule. Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities."); *id.* at 308-9 ("A living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. . . . The living witness is an individual human personality whose attributes of will, perception, memory and *volition* interact to determine what testimony he will give.") (quotations omitted); *id.* at 314 ("A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.").

*Miranda* as a constitutional decision and explained that *Elstad* "simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." 530 U.S. at 441. The Court thus made plain that the result in *Elstad* did not depend on the theory that *Miranda* was a "nonconstitutional decision." *Id.* Instead, it rested on other differences between an unlawful search and unwarned interrogations, foremost among them being the fact (emphasized in *Elstad*) that, while an unlawful search may lead inexorably to the discovery of pieces of evidence such that they are the products of the unlawful act, in the context of interviews with a suspect who has "attributes of will, perception, memory and *volition*," *Elstad*, 470 U.S. at 309, there can be an intervening act of will when the suspect has been warned of his rights and yet consents to continue making statements to his interrogators.

The courts of appeals that have addressed the issue have agreed that the result in *Elstad* survives the decision in *Dickerson*. *See United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) ("We cannot agree with the defendant's reading of *Dickerson* because the Supreme Court appeared to anticipate and reject it. . . . We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued."); *United States v. Orso*, 266 F.3d 1030, 1034 n.3 (9th Cir. 2001) ("The distinction was originally premised on the fact that a *Miranda* violation was not a violation of the Constitution, whereas a Fourth Amendment violation was. . . . Nonetheless, *Dickerson* seems to signal that the distinction set forth in *Elstad* continues unabated.").

## VI. The Sixth Amendment Right to Counsel Does Not Apply Prior to the Initiation of Adversary Judicial Criminal Proceedings.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Unless access to counsel must be provided in order to safeguard an independent constitutional right (such as the Fifth Amendment's protection against coerced confession), it is generally necessary that adversary proceedings be formally initiated before a particular phase of a prosecution can be said to "involve[] critical confrontations of the accused by the prosecution" such as to trigger application of the Sixth Amendment. *United States v. Wade*, 388 U.S. 218, 224 (1967). "'The Sixth Amendment right [to counsel] . . . does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)).

## VII. The McDade Act Does Not Apply to Defense Department Interrogators.

The McDade Act, 28 U.S.C. § 530B (Supp. IV 1998), reads as follows:

§ 530B. <u>*Ethical standards for attorneys for the Government*</u>

(a) An attorney for the Government shall be subject to State laws and rules, and

> local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.
>
> (b) The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.
>
> (c) As used in this section, the term "attorney for the Government" includes any attorney described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations and also includes any independent counsel, or employee of such a counsel, appointed under chapter 40.

Among the "State laws and rules" incorporated by this provision are likely to be state analogues to the American Bar Association's ("ABA") Model Rule of Professional Conduct 4.2 (2001). Rule 4.2 reads as follows:

> Rule 4.2 "Communication with Person Represented by Counsel"
>
> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Assuming that a state bar rule similar to Rule 4.2 is among the "State laws and rules" incorporated by section 530B, you have asked specifically whether lawyers on the Judge Advocate Generals' staffs in the Department of Defense are barred from questioning persons detained in Afghanistan or transferred to the custody of the Department of Defense who are represented by counsel. In particular, you have asked whether Defense Department lawyers could question John Walker (Lindh) without the consent of an attorney, Mr. James Brosnahan, claiming to represent him.[22]

Even assuming that a rule similar in substance to Rule 4.2 is incorporated by section 530B, it would not preclude questioning of Mr. Walker by military lawyers even without Mr. Brosnahan's

[22] On December 4, 2001, Mr. James J. Brosnahan wrote to you, stating "I have been retained by the parents of John Walker Lindh to represent him in any matters that might arise." Letter for William J. Haynes, II, General Counsel, Department of Defense, from James J. Brosnahan, Morrison & Forester, LLP at 1 (Dec. 4, 2001). In that letter, Mr. Brosnahan also stated, "I would ask that no further interrogation of my client occur until I have the opportunity to speak with him. As an American citizen, he has the right to counsel and, under all applicable legal authorities, I ask for the right to speak with my client as soon as possible." *Id.*

consent for at least two reasons.[23]

*First*, section 530B does not apply to Department of Defense lawyers. Section 530B by its terms applies only to the conduct of an "attorney for the Government." And subsection 530B(c) expressly defines the term "attorney for the Government" to mean (in addition to an independent counsel and his employees under chapter 40) "any attorney described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations." That regulation provides a definition of "government attorney" that largely limits the term to Department of Justice lawyers and does not include lawyers of the Department of Defense.[24] In addition, subsection 530B(b) directs the Attorney General to "make and amend rules of the Department of Justice to assure compliance with this section." That implementing mechanism – relying on rules for the Department of Justice – reinforces the conclusion that the provision applies solely to lawyers in that Department.

Second, Rule 4.2 would permit a covered Government attorney to communicate with a represented party even absent the party's counsel's consent if the Government attorney is "authorized

---

[23] We note that Rule 4.2 applies only if Mr. Walker is in fact "represented by another lawyer in the matter." In his letter, Mr. Brosnahan stated that he was retained by Mr. Walker's parents to represent their son. We understand, however, that at the time the letter was written Mr. Brosnahan had never spoken with Mr. Walker. This case thus bears a striking resemblance to *Moran v. Burbine*, 475 U.S. 412 (1986). There, the suspect's sister had attempted to retain a lawyer to represent him, but the suspect waived his *Miranda* rights and confessed before learning of his sister's efforts. The Court found no violation of either *Miranda* or the Sixth Amendment. *See id.* at 425 ("Nor are we prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him."). The Court additionally noted "the Rhode Island Supreme Court's finding that, as a matter of state law, no attorney-client relationship existed between respondent and [the counsel obtained by his sister]." *Id.* at 429 n.3 (citing *State v. Burbine*, 451 A.2d 22, 29 (R.I. 1982)). *See also State v. Cline*, 405 A.2d 1192, 1199 (R.I. 1979) ("Generally, the relationship of attorney and client arises by reason of agreement between the parties. . . . Obviously, such a relationship could not exist between persons who had never met and who in all probability were unaware of each other's existence prior to the meeting in the Providence police station."); *cf. United States v. Weinstein*, 511 F.2d 622, 628 (2d Cir. 1975) ("[I]n a criminal proceeding any action taken by the court at the behest of a representative appointed without the defendant's knowledge or consent could not bind the fugitive defendant. . . . [T]he attorney moving on his behalf must at least have been authorized by the defendant to act as his counsel in the case.").

[24] *See* 28 C.F.R. § 77.2(a) (2001) ("The phrase *attorney for the government* means the Attorney General; the Deputy Attorney General; the Solicitor General; the Assistant Attorneys General for, and any attorney employed in, the Antitrust Division, Civil Division, Civil Rights Division, Criminal Division, Environment and Natural Resources Division, and Tax Division; the Chief Counsel for the DEA and any attorney employed in that office; the General Counsel of the FBI and any attorney employed in that office or in the (Office of General Counsel) of the FBI; any attorney employed in, or head of, any other legal office in a Department of Justice agency; any United States Attorney; any Assistant United States Attorney; any Special Assistant to the Attorney General or Special Attorney duly appointed pursuant to 28 U.S.C. 515; any Special Assistant United States Attorney duly appointed pursuant to 28 U.S.C. 543 who is authorized to conduct criminal or civil law enforcement investigations or proceedings on behalf of the United States; and any other attorney employed by the Department of Justice who is authorized to conduct criminal or civil law enforcement proceedings on behalf of the United States. The phrase *attorney for the government* also includes any independent counsel, or employee of such counsel, appointed under chapter 40 of title 28, United States Code. The phrase *attorney for the government* does not include attorneys employed as investigators or other law enforcement agents by the Department of Justice who are not authorized to represent the United States in criminal or civil law enforcement litigation or to supervise such proceedings.").

by law to do so." We believe that an Executive Order by the President permitting Government attorneys to communicate with persons held by the armed forces in the current conflict – even if those persons are represented by counsel – would constitute, in the circumstances of this case, legal authorization within the meaning of such a rule. To assume otherwise would be to read a State ethics rule in a manner that significantly trammeled the President's authority as Commander in Chief to take necessary and appropriate measures to acquire information about enemy forces. Such a construction of state law should be avoided since state law cannot stand as an impermissible burden on the exercise of the President's constitutional authority with respect to military and foreign affairs. *See United States v. Pink*, 315 U.S. 203 (1942).

Finally, we note that even if the Government did in fact violate Rule 4.2 by having military lawyers interrogate represented persons (including Mr. Walker) without consent of counsel, it would not follow that the evidence obtained in that questioning would be inadmissible at trial. The Eleventh Circuit has held that neither section 530B nor the State ethics rules it incorporates requires the suppression in a federal proceeding of evidence obtained through a violation of such rules. "[A] state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible. Federal law, not state law, determines the admissibility of evidence in federal court." *United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir.), *cert. denied*, 528 U.S. 889 (1999). Moreover, the court held, section 530B did not require suppression of evidence obtained in violation of such State laws and rules: Congress did not "intend by that enactment to turn over to state supreme courts in every state – and state legislatures, too, assuming they can also enact codes of professional conduct for attorneys – the authority to decide that otherwise admissible evidence cannot be used in federal court." *Id.* at 1125; *accord Stern v. United States District Court for the District of Mass.*, 214 F.3d 4, 20 (1st Cir. 2000).

Please let us know if we can be of further assistance.

Jay S. Bybee
Assistant Attorney General