# EXHIBIT F



U.S. Department of Justice

Office of Legal Counsel

| | |
|---|---|
| Office of the Assistant Attorney General | *Washington, D.C. 20530* |

August 1, 2002

Memorandum for Alberto R. Gonzales
Counsel to the President

Re: *Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340–2340A*

You have asked for our Office's views regarding the standards of conduct under the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment as implemented by Sections 2340–2340A of title 18 of the United States Code. As we understand it, this question has arisen in the context of the conduct of interrogations outside of the United States. We conclude below that Section 2340A proscribes acts inflicting, and that are specifically intended to inflict, severe pain or suffering, whether mental or physical. Those acts must be of an extreme nature to rise to the level of torture within the meaning of Section 2340A and the Convention. We further conclude that certain acts may be cruel, inhuman, or degrading, but still not produce pain and suffering of the requisite intensity to fall within Section 2340A's proscription against torture. We conclude by examining possible defenses that would negate any claim that certain interrogation methods violate the statute.

In Part I, we examine the criminal statute's text and history. We conclude that for an act to constitute torture as defined in Section 2340, it must inflict pain that is difficult to endure. Physical pain amounting to torture must be equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death. For purely mental pain or suffering to amount to torture under Section 2340, it must result in significant psychological harm of significant duration, e.g., lasting for months or even years. We conclude that the mental harm also must result from one of the predicate acts listed in the statute, namely: threats of imminent death; threats of infliction of the kind of pain that would amount to physical torture; infliction of such physical pain as a means of psychological torture; use of drugs or other procedures designed to deeply disrupt the senses, or fundamentally alter an individual's personality; or threatening to do any of these things to a third party. The legislative history simply reveals that Congress intended for the statute's definition to track the Convention's definition of torture and the reservations, understandings, and declarations that the United States submitted with its ratification. We conclude that the statute, taken as a whole, makes plain that it prohibits only extreme acts.

In Part II, we examine the text, ratification history, and negotiating history of the Torture Convention. We conclude that the treaty's text prohibits only the most extreme

acts by reserving criminal penalties solely for torture and declining to require such penalties for "cruel, inhuman, or degrading treatment or punishment." This confirms our view that the criminal statute penalizes only the most egregious conduct. Executive branch interpretations and representations to the Senate at the time of ratification further confirm that the treaty was intended to reach only the most extreme conduct.

In Part III, we analyze the jurisprudence of the Torture Victims Protection Act, 28 U.S.C. § 1350 note (2000), which provides civil remedies for torture victims, to predict the standards that courts might follow in determining what actions reach the threshold of torture in the criminal context. We conclude from these cases that courts are likely to take a totality-of-the-circumstances approach, and will look to an entire course of conduct, to determine whether certain acts will violate Section 2340A. Moreover, these cases demonstrate that most often torture involves cruel and extreme physical pain. In Part IV, we examine international decisions regarding the use of sensory deprivation techniques. These cases make clear that while many of these techniques may amount to cruel, inhuman or degrading treatment, they do not produce pain or suffering of the necessary intensity to meet the definition of torture. From these decisions, we conclude that there is a wide range of such techniques that will not rise to the level of torture.

In Part V, we discuss whether Section 2340A may be unconstitutional if applied to interrogations undertaken of enemy combatants pursuant to the President's Commander-in-Chief powers. We find that in the circumstances of the current war against al Qaeda and its allies, prosecution under Section 2340A may be barred because enforcement of the statute would represent an unconstitutional infringement of the President's authority to conduct war. In Part VI, we discuss defenses to an allegation that an interrogation method might violate the statute. We conclude that, under the current circumstances, necessity or self-defense may justify interrogation methods that might violate Section 2340A.

## I.    18 U.S.C. §§ 2340–2340A

Section 2340A makes it a criminal offense for any person "outside the United States [to] commit[] or attempt[] to commit torture."[1]  Section 2340 defines the act of torture as an:

---

[1] If convicted of torture, a defendant faces a fine or up to twenty years' imprisonment or both. If, however, the act resulted in the victim's death, a defendant may be sentenced to life imprisonment or to death. *See* 18 U.S.C.A. § 2340A(a). Whether death results from the act also affects the applicable statute of limitations. Where death does not result, the statute of limitations is eight years; if death results, there is no statute of limitations. *See* 18 U.S.C.A. § 3286(b) (West Supp. 2002); *id.* § 2332b(g)(5)(B) (West Supp. 2002). Section 2340A as originally enacted did not provide for the death penalty as a punishment. *See* Omnibus Crime Bill, Pub. L. No.103-322, Title VI, Section 60020, 108 Stat. 1979 (1994) (amending section 2340A to provide for the death penalty); H. R. Conf. Rep. No. 103-711, at 388 (1994) (noting that the act added the death penalty as a penalty for torture).

Most recently, the USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), amended section 2340A to expressly codify the offense of conspiracy to commit torture. Congress enacted this amendment as part of a broader effort to ensure that individuals engaged in the planning of terrorist activities could be prosecuted irrespective of where the activities took place. *See* H. R. Rep. No. 107-236, at 70 (2001)

act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control.

18 U.S.C.A. § 2340(1); *see id.* § 2340A. Thus, to convict a defendant of torture, the prosecution must establish that: (1) the torture occurred outside the United States; (2) the defendant acted under the color of law; (3) the victim was within the defendant's custody or physical control; (4) the defendant specifically intended to cause severe physical or mental pain or suffering; and (5) that the act inflicted severe physical or mental pain or suffering. *See also* S. Exec. Rep. No. 101-30, at 6 (1990) ("For an act to be 'torture,' it must . . . cause severe pain and suffering, and be intended to cause severe pain and suffering."). You have asked us to address only the elements of specific intent and the infliction of severe pain or suffering. As such, we have not addressed the elements of "outside the United States," "color of law," and "custody or control."[2] At your request, we would be happy to address these elements in a separate memorandum.

A.     **"Specifically Intended"**

To violate Section 2340A, the statute requires that severe pain and suffering must be inflicted with specific intent. *See* 18 U.S.C. § 2340(1). In order for a defendant to have acted with specific intent, he must expressly intend to achieve the forbidden act. *See United States v. Carter*, 530 U.S. 255, 269 (2000); Black's Law Dictionary at 814 (7th ed. 1999) (defining specific intent as "[t]he intent to accomplish the precise criminal act that one is later charged with"). For example, in *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994), the statute at issue was construed to require that the defendant act with the "specific intent to commit the crime." (Internal quotation marks and citation omitted). As a result, the defendant had to act with the express "purpose to disobey the law" in order for the *mens rea* element to be satisfied. *Ibid.* (internal quotation marks and citation omitted)

Here, because Section 2340 requires that a defendant act with the specific intent to inflict severe pain, the infliction of such pain must be the defendant's precise objective. If the statute had required only general intent, it would be sufficient to establish guilt by showing that the defendant "possessed knowledge with respect to the *actus reus* of the crime." *Carter*, 530 U.S. at 268. If the defendant acted knowing that severe pain or

---

(discussing the addition of "conspiracy" as a separate offense for a variety of "Federal terrorism offense[s]").

[2]     We note, however, that 18 U.S.C. § 2340(3) supplies a definition of the term "United States." It defines it as "all areas under the jurisdiction of the United States including any of the places described in" 18 U.S.C. §§ 5 and 7, and in 49 U.S.C. § 46501(2). Section 5 provides that United States "includes all places and waters, continental or insular, subject to the jurisdiction of the United States." By including the definition set out in Section 7, the term "United States" as used in Section 2340(3) includes the "special maritime and territorial jurisdiction of the United States." Moreover, the incorporation by reference to Section 46501(2) extends the definition of the "United States" to "special aircraft jurisdiction of the United States."

suffering was reasonably likely to result from his actions, but no more, he would have acted only with general intent. *See id.* at 269; Black's Law Dictionary 813 (7th ed. 1999) (explaining that general intent "usu[ally] takes the form of recklessness (involving actual awareness of a risk and the culpable taking of that risk) or negligence (involving blameworthy inadvertence)"). The Supreme Court has used the following example to illustrate the difference between these two mental states:

> [A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

*Carter*, 530 U.S. at 268 (citing 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.5, at 315 (1986)).

As a theoretical matter, therefore, knowledge alone that a particular result is certain to occur does not constitute specific intent. As the Supreme Court explained in the context of murder, "the . . . common law of homicide distinguishes . . . between a person who knows that another person will be killed as a result of his conduct and a person who acts with the specific purpose of taking another's life[.]" *United States v. Bailey*, 444 U.S. 394, 405 (1980). "Put differently, the law distinguishes actions taken 'because of' a given end from actions taken 'in spite of their unintended but foreseen consequences." *Vacco v. Quill*, 521 U.S. 793, 802–03 (1997). Thus, even if the defendant knows that severe pain will result from his actions, if causing such harm is not his objective, he lacks the requisite specific intent even though the defendant did not act in good faith. Instead, a defendant is guilty of torture only if he acts with the express purpose of inflicting severe pain or suffering on a person within his custody or physical control. While as a theoretical matter such knowledge does not constitute specific intent, juries are permitted to infer from the factual circumstances that such intent is present. *See, e.g., United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001); *United States v. Karro*, 257 F.3d 112, 118 (2d Cir. 2001); *United States v. Wood*, 207 F.3d 1222, 1232 (10th Cir. 2000); *Henderson v. United States*, 202 F.2d 400, 403 (6th Cir.1953). Therefore, when a defendant knows that his actions will produce the prohibited result, a jury will in all likelihood conclude that the defendant acted with specific intent.

Further, a showing that an individual acted with a good faith belief that his conduct would not produce the result that the law prohibits negates specific intent. *See, e.g., South Atl. Lmtd. Ptrshp. of Tenn. v. Reise*, 218 F.3d 518, 531 (4th Cir. 2002). Where a defendant acts in good faith, he acts with an honest belief that he has not engaged in the proscribed conduct. *See Cheek v. United States*, 498 U.S. 192, 202 (1991); *United States v. Mancuso*, 42 F.3d 836, 837 (4th Cir. 1994). For example, in the context of mail fraud, if an individual honestly believes that the material transmitted is truthful, he has not acted with the required intent to deceive or mislead. *See, e.g., United States v. Sayakhom*, 186

4

F.3d 928, 939–40 (9th Cir. 1999). A good faith belief need not be a reasonable one. *See Cheek*, 498 U.S. at 202.

Although a defendant theoretically could hold an unreasonable belief that his acts would not constitute the actions prohibited by the statute, even though they would as a certainty produce the prohibited effects, as a matter of practice in the federal criminal justice system it is highly unlikely that a jury would acquit in such a situation. Where a defendant holds an unreasonable belief, he will confront the problem of proving to the jury that he actually held that belief. As the Supreme Court noted in *Cheek*, "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury . . . will find that the Government has carried its burden of proving" intent. *Id.* at 203–04. As we explained above, a jury will be permitted to infer that the defendant held the requisite specific intent.   As a matter of proof, therefore, a good faith defense will prove more compelling when a reasonable basis exists for the defendant's belief.

**B.    "Severe Pain or Suffering"**

The key statutory phrase in the definition of torture is the statement that acts amount to torture if they cause "severe physical or mental pain or suffering."  In examining the meaning of a statute, its text must be the starting point. *See INS v. Phinpathya*, 464 U.S. 183, 189 (1984) ("This Court has noted on numerous occasions that in all cases involving statutory construction, our starting point must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used.") (internal quotations and citations omitted). Section 2340 makes plain that the infliction of pain or suffering per se, whether it is physical or mental, is insufficient to amount to torture.   Instead, the text provides that pain or suffering must be "severe."   The statute does not, however, define the term "severe."  "In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The dictionary defines "severe" as "[u]nsparing in exaction, punishment, or censure" or "[I]nflicting discomfort or pain hard to endure; sharp; afflictive; distressing; violent; extreme; as *severe* pain, anguish, torture." Webster's New International Dictionary 2295 (2d ed. 1935); *see* American Heritage Dictionary of the English Language 1653 (3d ed. 1992) ("extremely violent or grievous:   *severe* pain") (emphasis in original); IX The Oxford English Dictionary 572 (1978) ("Of pain, suffering, loss, or the like:  Grievous, extreme" and "of circumstances . . .: hard to sustain or endure"). Thus, the adjective "severe" conveys that the pain or suffering must be of such a high level of intensity that the pain is difficult for the subject to endure.

Congress's use of the phrase "severe pain" elsewhere in the United States Code can shed more light on its meaning. *See, e.g., West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991) ("[W]e construe [a statutory term] to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law."). Significantly, the phrase "severe pain" appears in statutes defining an emergency medical condition for the purpose of providing health benefits. *See, e.g.*, 8 U.S.C. § 1369 (2000); 42 U.S.C § 1395w-22 (2000); *id.* § 1395x (2000); *id.* §

5

1395dd (2000); *id.* § 1396b (2000); *id.* § 1396u-2 (2000). These statutes define an emergency condition as one "manifesting itself by acute symptoms of sufficient severity (including *severe pain*) such that a prudent lay person, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in—placing the health of the individual . . . (i) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." *Id.* § 1395w-22(d)(3)(B) (emphasis added). Although these statutes address a substantially different subject from Section 2340, they are nonetheless helpful for understanding what constitutes severe physical pain. They treat severe pain as an indicator of ailments that are likely to result in permanent and serious physical damage in the absence of immediate medical treatment. Such damage must rise to the level of death, organ failure, or the permanent impairment of a significant body function. These statutes suggest that "severe pain," as used in Section 2340, must rise to a similarly high level—the level that would ordinarily be associated with a sufficiently serious physical condition or injury such as death, organ failure, or serious impairment of body functions—in order to constitute torture.[3]

## C.    "Severe mental pain or suffering"

Section 2340 gives further guidance as to the meaning of "severe mental pain or suffering," as distinguished from severe physical pain and suffering. The statute defines "severe mental pain or suffering" as:

the prolonged mental harm caused by or resulting from—
(A) the intentional infliction or threatened infliction of severe physical pain or suffering;
(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
(C) the threat of imminent death; or

---

[3] One might argue that because the statute uses "or" rather than "and" in the phrase "pain or suffering" that "severe physical suffering" is a concept distinct from "severe physical pain." We believe the better view of the statutory text is, however, that they are not distinct concepts. The statute does not define "severe mental pain" and "severe mental suffering" separately. Instead, it gives the phrase "severe mental pain or suffering" a single definition. Because "pain or suffering" is single concept for the purposes of "severe mental pain or suffering," it should likewise be read as a single concept for the purposes of severe physical pain or suffering. Moreover, dictionaries define the words "pain" and "suffering" in terms of each other. *Compare, e.g.,* Webster's Third New International Dictionary 2284 (1993) (defining suffering as "the endurance of . . . pain" or "a pain endured"); Webster's Third New International Dictionary 2284 (1986) (same); XVII The Oxford English Dictionary 125 (2d ed. 1989) (defining suffering as "the bearing or undergoing of pain"); *with, e.g.,* Random House Webster's Unabridged Dictionary 1394 (2d ed. 1999) (defining "pain" as "physical suffering"); The American Heritage Dictionary of the English Language 942 (College ed. 1976) (defining pain as "suffering or distress"). Further, even if we were to read the infliction of severe physical suffering as distinct from severe physical pain, it is difficult to conceive of such suffering that would not involve severe physical pain. Accordingly, we conclude that "pain or suffering" is a single concept within the definition of Section 2340.

(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

18 U.S.C. § 2340(2). In order to prove "severe mental pain or suffering," the statute requires proof of "prolonged mental harm" that was caused by or resulted from one of four enumerated acts. We consider each of these elements.

### 1. "Prolonged Mental Harm"

As an initial matter, Section 2340(2) requires that the severe mental pain must be evidenced by "prolonged mental harm." To prolong is to "lengthen in time" or to "extend the duration of, to draw out." Webster's Third New International Dictionary 1815 (1988); Webster's New International Dictionary 1980 (2d ed. 1935). Accordingly, "prolong" adds a temporal dimension to the harm to the individual, namely, that the harm must be one that is endured over some period of time. Put another way, the acts giving rise to the harm must cause some lasting, though not necessarily permanent, damage. For example, the mental strain experienced by an individual during a lengthy and intense interrogation—such as one that state or local police might conduct upon a criminal suspect—would not violate Section 2340(2). On the other hand, the development of a mental disorder such as posttraumatic stress disorder, which can last months or even years, or even chronic depression, which also can last for a considerable period of time if untreated, might satisfy the prolonged harm requirement. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 426, 439–45 (4th ed. 1994) ("DSM-IV"). *See also* Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 509 (1997) (noting that posttraumatic stress disorder is frequently found in torture victims); *cf.* Sana Loue, *Immigration Law and Health* § 10:46 (2001) (recommending evaluating for post-traumatic stress disorder immigrant-client who has experienced torture).[4] By contrast to "severe pain," the phrase "prolonged mental harm" appears nowhere else in the U.S. Code nor does it appear in relevant medical literature or international human rights reports.

---

[4] The DSM-IV explains that posttraumatic disorder ("PTSD") is brought on by exposure to traumatic events, such as serious physical injury or witnessing the deaths of others and during those events the individual felt "intense fear" or "horror." *Id.* at 424. Those suffering from this disorder reexperience the trauma through, *inter alia*, "recurrent and intrusive distressing recollections of the event," "recurrent distressing dreams of the event," or "intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event." *Id.* at 428. Additionally, a person with PTSD "[p]ersistent[ly]" avoids stimuli associated with the trauma, including avoiding conversations about the trauma, places that stimulate recollections about the trauma; and they experience a numbing of general responsiveness, such as a "restricted range of affect (e.g., unable to have loving feelings)," and "the feeling of detachment or estrangement from others." *Ibid.* Finally, an individual with PTSD has "[p]ersistent symptoms of increased arousal," as evidenced by "irritability or outbursts of anger," "hypervigilance," "exaggerated startle response," and difficulty sleeping or concentrating. *Ibid.*

7

Not only must the mental harm be prolonged to amount to severe mental pain and suffering, but also it must be caused by or result from one of the acts listed in the statute. In the absence of a catchall provision, the most natural reading of the predicate acts listed in Section 2340(2)(A)–(D) is that Congress intended it to be exhaustive. In other words, other acts not included within Section 2340(2)'s enumeration are not within the statutory prohibition. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusio alterius.*"); Norman Singer, 2A Sutherland on Statutory Construction § 47.23 (6th ed. 2000) ("[W]here a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions.") (footnotes omitted). We conclude that torture within the meaning of the statute requires the specific intent to cause prolonged mental harm by one of the acts listed in Section 2340(2).

A defendant must specifically intend to cause prolonged mental harm for the defendant to have committed torture. It could be argued that a defendant needs to have specific intent only to commit the predicate acts that give rise to prolonged mental harm. Under that view, so long as the defendant specifically intended to, for example, threaten a victim with imminent death, he would have had sufficient *mens rea* for a conviction. According to this view, it would be further necessary for a conviction to show only that the victim factually suffered prolonged mental harm, rather than that the defendant intended to cause it. We believe that this approach is contrary to the text of the statute. The statute requires that the defendant specifically intend to inflict severe mental pain or suffering. Because the statute requires this mental state with respect to the infliction of severe mental pain, and because it expressly defines severe mental pain in terms of prolonged mental harm, that mental state must be present with respect to prolonged mental harm. To read the statute otherwise would read the phrase "the prolonged mental harm caused by or resulting from" out of the definition of "severe mental pain or suffering."

A defendant could negate a showing of specific intent to cause severe mental pain or suffering by showing that he had acted in good faith that his conduct would not amount to the acts prohibited by the statute. Thus, if a defendant has a good faith belief that his actions will not result in prolonged mental harm, he lacks the mental state necessary for his actions to constitute torture. A defendant could show that he acted in good faith by taking such steps as surveying professional literature, consulting with experts, or reviewing evidence gained from past experience. *See, e.g., Ratlzlaf,* 510 U.S. at 142 n.10 (noting that where the statute required that the defendant act with the specific intent to violate the law, the specific intent element "might be negated by, e.g., proof that defendant relied in good faith on advice of counsel.") (citations omitted). All of these steps would show that he has drawn on the relevant body of knowledge concerning the result proscribed that the statute, namely prolonged mental harm. Because the presence of good faith would negate the specific intent element of torture, it is a complete defense to such a charge. *See, e.g., United States v. Wall,* 130 F.3d 739, 746 (6th Cir. 1997); *United States v. Casperson,* 773 F.2d 216, 222–23 (8th Cir.1985).

8

2.    *Harm Caused By Or Resulting From Predicate Acts*

Section 2340(2) sets forth four basic categories of predicate acts. First in the list is the "intentional infliction or threatened infliction of severe physical pain or suffering." This might at first appear superfluous because the statute already provides that the infliction of severe physical pain or suffering can amount to torture. This provision, however, actually captures the infliction of physical pain or suffering when the defendant inflicts physical pain or suffering with general intent rather than the specific intent that is required where severe physical pain or suffering alone is the basis for the charge. Hence, this subsection reaches the infliction of severe physical pain or suffering when it is but the means of causing prolonged mental harm. Or put another way, a defendant has committed torture when he intentionally inflicts severe physical pain or suffering with the specific intent of causing prolonged mental harm. As for the acts themselves, acts that cause "severe physical pain or suffering" can satisfy this provision.

Additionally, the threat of inflicting such pain is a predicate act under the statute. A threat may be implicit or explicit. *See, e.g., United States v. Sachdev*, 279 F.3d 25, 29 (1st Cir. 2002). In criminal law, courts generally determine whether an individual's words or actions constitute a threat by examining whether a reasonable person in the same circumstances would conclude that a threat had been made. *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969) (holding that whether a statement constituted a threat against the president's life had to be determined in light of all the surrounding circumstances); *Sachdev*, 279 F.3d at 29 ("a reasonable person in defendant's position would perceive there to be a threat, explicit, or implicit, of physical injury"); *United States v. Khorrami*, 895 F.2d 1186, 1190 (7th Cir. 1990) (to establish that a threat was made, the statement must be made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon [another individual]") (citation and internal quotation marks omitted); *United States v. Peterson*, 483 F.2d 1222, 1230 (D.C. Cir. 1973) (perception of threat of imminent harm necessary to establish self-defense had to be "objectively reasonable in light of the surrounding circumstances"). Based on this common approach, we believe that the existence of a threat of severe pain or suffering should be assessed from the standpoint of a reasonable person in the same circumstances.

Second, Section 2340(2)(B) provides that prolonged mental harm, constituting torture, can be caused by "the administration or application or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality." The statute provides no further definition of what constitutes a mind-altering substance. The phrase "mind-altering substances" is found nowhere else in the U.S. Code nor is it found in dictionaries. It is, however, a commonly used synonym for drugs. *See, e.g., United States v. Kingsley*, 241 F.3d 828, 834 (6th Cir.) (referring to controlled substances as "mind-altering substance[s]") *cert. denied*, 122 S. Ct. 137 (2001); *Hogue v. Johnson*, 131 F.3d 466, 501 (5th Cir. 1997) (referring to drugs and alcohol as "mind-altering substance[s]"), *cert. denied*, 523 U.S. 1014 (1998). In addition, the phrase appears in a number of state statutes, and the context

9

in which it appears confirms this understanding of the phrase. *See, e.g.,* Cal. Penal Code § 3500(c) (West Supp. 2000) ("Psychotropic drugs also include mind-altering . . . drugs . . . ."); Minn. Stat. Ann. § 260B.201(b) (West Supp. 2002) ("'chemical dependency treatment'" define as programs designed to "reduc[e] the risk of the use of alcohol, drugs, or other mind-altering substances").

This subparagraph, however, does not preclude any and all use of drugs. Instead, it prohibits the use of drugs that "disrupt profoundly the senses or the personality." To be sure, one could argue that this phrase applies only to "other procedures," not the application of mind-altering substances. We reject this interpretation because the terms of Section 2340(2) expressly indicate that the qualifying phrase applies to both "other procedures" *and* the "application of mind-altering substances." The word "other" modifies "procedures calculated to disrupt profoundly the senses." As an adjective, "other" indicates that the term or phrase it modifies is the remainder of several things. *See* Webster's Third New International Dictionary 1598 (1986) (defining "other" as "the one that remains of two or more") Webster's Ninth New Collegiate Dictionary 835 (1985) (defining "other" as "being the one (as of two or more) remaining or not included"). Or put another way, "other" signals that the words to which it attaches are of the same kind, type, or class as the more specific item previously listed. Moreover, where statutes couple words or phrases together, it "denotes an intention that they should be understood in the same general sense." Norman Singer, 2A Sutherland on Statutory Construction § 47:16 (6th ed. 2000); *see also Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Thus, the pairing of mind-altering substances with procedures calculated to disrupt profoundly the senses or personality and the use of "other" to modify "procedures" shows that the use of such substances must also cause a profound disruption of the senses or personality.

For drugs or procedures to rise to the level of "disrupt[ing] profoundly the senses or personality," they must produce an extreme effect. And by requiring that they be "calculated" to produce such an effect, the statute requires for liability the defendant has consciously designed the acts to produce such an effect.28 U.S.C. § 2340(2)(B). The word "disrupt" is defined as "to break asunder; to part forcibly; rend," imbuing the verb with a connotation of violence. Webster's New International Dictionary 753 (2d ed. 1935); *see* Webster's Third New International Dictionary 656 (1986) (defining disrupt as "to break apart: Rupture" or "destroy the unity or wholeness of"); IV The Oxford English Dictionary 832 (1989) (defining disrupt as "[t]o break or burst asunder; to break in pieces; to separate forcibly"). Moreover, disruption of the senses or personality alone is insufficient to fall within the scope of this subsection; instead, that disruption must be profound. The word "profound" has a number of meanings, all of which convey a significant depth. Webster's New International Dictionary 1977 (2d ed. 1935) defines profound as: "Of very great depth; extending far below the surface or top; unfathomable[;] . . . [c]oming from, reaching to, or situated at a depth or more than ordinary depth; not superficial; deep-seated; chiefly with reference to the body; as a *profound* sigh, wound, or pain[;] . . . [c]haracterized by intensity, as of feeling or quality; deeply felt or realized; as, *profound* respect, fear, or melancholy; hence, encompassing;

thoroughgoing; complete; as, *profound* sleep, silence, or ignorance." *See* Webster's Third New International Dictionary 1812 (1986) ("having very great depth: extending far below the surface . . . not superficial"). Random House Webster's Unabridged Dictionary 1545 (2d ed. 1999) also defines profound as "originating in or penetrating to the depths of one's being" or "pervasive or intense; thorough; complete" or "extending, situated, or originating far down, or far beneath the surface." By requiring that the procedures and the drugs create a *profound* disruption, the statute requires more than that the acts "forcibly separate" or "rend" the senses or personality. Those acts must penetrate. to the core of an individual's ability to perceive the world around him, substantially interfering with his cognitive abilities, or fundamentally alter his personality.

The phrase "disrupt profoundly the senses or personality" is not used in mental health literature nor is it derived from elsewhere in U.S. law. Nonetheless, we think the following examples would constitute a profound disruption of the senses or personality. Such an effect might be seen in a drug-induced dementia. In such a state, the individual suffers from significant memory impairment, such as the inability to retain any new information or recall information about things previously of interest to the individual. *See* DSM-IV at 134.[5] This impairment is accompanied by one or more of the following: deterioration of language function, e.g., repeating sounds or words over and over again; impaired ability to execute simple motor activities, e.g., inability to dress or wave goodbye; "[in]ability to recognize [and identify] objects such as chairs or pencils" despite normal visual functioning; or "[d]isturbances in executive level functioning," i.e., serious impairment of abstract thinking. *Id.* at 134–35. Similarly, we think that the onset of "brief psychotic disorder" would satisfy this standard. *See id.* at 302–03. In this disorder, the individual suffers psychotic symptoms, including among other things, delusions, hallucinations, or even a catatonic state. This can last for one day or even one month. *See id.* We likewise think that the onset of obsessive-compulsive disorder behaviors would rise to this level. Obsessions are intrusive thoughts unrelated to reality. They are not simple worries, but are repeated doubts or even "aggressive or horrific impulses." *See id.* at 418. The DSM-IV further explains that compulsions include "repetitive behaviors (e.g., hand washing, ordering, checking)" and that "[b]y definition, [they] are either clearly excessive or are not connected in a realistic way with what they are designed to neutralize or prevent." *See id.* Such compulsions or obsessions must be "time-consuming." *See id.* at 419. Moreover, we think that pushing someone to the brink of suicide, particularly where the person comes from a culture with strong taboos against suicide, and it is evidenced by acts of self-mutilation, would be a sufficient disruption of the personality to constitute a "profound disruption." These examples, of course, are in no way intended to be exhaustive list. Instead, they are merely intended to

---

[5] Published by the American Psychiatric Association, and written as a collaboration of over a thousand psychiatrists, the DSM-IV is commonly used in U.S. courts as a source of information regarding mental health issues and is likely to be used in trial should charges be brought that allege this predicate act. *See, e.g., Atkins v. Virginia,* 122 S. Ct. 2242, 2245 n.3 (2002); *Kansas v. Crane,* 122 S. Ct. 867, 871 (2002); *Kansas v. Hendricks,* 521 U.S. 346, 359–60 (1997); *McClean v. Merrifield,* No. 00-CV-0120E(SC), 2002 WL 1477607 at *2 n.7 (W.D.N.Y. June 28, 2002); *Peeples v. Coastal Office Prods.,* 203 F. Supp. 2d. 432, 439 (D. Md. 2002); *Lassiegne v. Taco Bell Corp.,* 202 F. Supp. 2d 512, 519 (E.D. La. 2002).

illustrate the sort of mental health effects that we believe would accompany an action severe enough to amount to one that "disrupt[s] profoundly the senses or the personality."

The third predicate act listed in Section 2340(2) is threatening a prisoner with "imminent death." 18 U.S.C. § 2340(2)(C). The plain text makes clear that a threat of death alone is insufficient; the threat must indicate that death is "imminent." The "threat of imminent death" is found in the common law as an element of the defense of duress. *See Bailey*, 444 U.S. at 409. "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette v. United States*, 342 U.S. 246, 263 (1952). Common law cases and legislation generally define imminence as requiring that the threat be almost immediately forthcoming. 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.7, at 655 (1986). By contrast, threats referring vaguely to things that might happen in the future do not satisfy this immediacy requirement. *See United States v. Fiore*, 178 F.3d 917, 923 (7th Cir. 1999). Such a threat fails to satisfy this requirement not because it is too remote in time but because there is a lack of certainty that it will occur. Indeed, timing is an indicator of certainty that the harm *will* befall the defendant. Thus, a vague threat that someday the prisoner *might* be killed would not suffice. Instead, subjecting a prisoner to mock executions or playing Russian roulette with him would have sufficient immediacy to constitute a threat of imminent death. Additionally, as discussed earlier, we believe that the existence of a threat must be assessed from the perspective of a reasonable person in the same circumstances.

Fourth, if the official threatens to do anything previously described to a third party, or commits such an act against a third party, that threat or action can serve as the necessary predicate for prolonged mental harm. *See* 18 U.S.C. § 2340(2)(D). The statute does not require any relationship between the prisoner and the third party.

### 3.    *Legislative History*

The legislative history of Sections 2340–2340A is scant. Neither the definition of torture nor these sections as a whole sparked any debate. Congress criminalized this conduct to fulfill U.S. obligations under the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), adopted Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85 (entered into force June 26, 1987), which requires signatories to "ensure that all acts of torture are offenses under its criminal law." CAT art. 4. These sections appeared only in the Senate version of the Foreign Affairs Authorization Act, and the conference bill adopted them without amendment. *See* H. R. Conf. Rep. No. 103-482, at 229 (1994). The only light that the legislative history sheds reinforces what is already obvious from the texts of Section 2340 and CAT: Congress intended Section 2340's definition of torture to track the definition set forth in CAT, as elucidated by the United States' reservations, understandings, and declarations

submitted as part of its ratification. *See* S. Rep. No. 103-107, at 58 (1993) ("The definition of torture emanates directly from article 1 of the Convention."); *id.* at 58–59 ("The definition for 'severe mental pain and suffering' incorporates the understanding made by the Senate concerning this term.").

### 4.    Summary

Section 2340's definition of torture must be read as a sum of these component parts. *See Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–35 (1989) (reading two provisions together to determine statute's meaning); *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 405 (1988) (looking to "the language and design of the statute as a whole" to ascertain a statute's meaning). Each component of the definition emphasizes that torture is not the mere infliction of pain or suffering on another, but is instead a step well removed. The victim must experience intense pain or suffering of the kind that is equivalent to the pain that would be associated with serious physical injury so severe that death, organ failure, or permanent damage resulting in a loss of significant body function will likely result. If that pain or suffering is psychological, that suffering must result from one of the acts set forth in the statute. In addition, these acts must cause long-term mental harm. Indeed, this view of the criminal act of torture is consistent with the term's common meaning. Torture is generally understood to involve "intense pain" or "excruciating pain," or put another way, "extreme anguish of body or mind." Black's Law Dictionary at 1498 (7th Ed. 1999); Random House Webster's Unabridged Dictionary 1999 (1999); Webster's New International Dictionary 2674 (2d ed. 1935). In short, reading the definition of torture as a whole, it is plain that the term encompasses only extreme acts.[6]

---

[6] Torture is a term also found in state law. Some states expressly proscribe "murder by torture." *See, e.g.,* Idaho Code § 18-4001 (Michie 1997); N.C. Gen. Stat. Ann. § 14-17 (1999) ; *see also* Me. Rev. Stat. Ann. tit. 17-A, § 152-A (West Supp. 2001) (aggravated attempted murder is "[t]he attempted murder . . . accompanied by torture, sexual assault or other extreme cruelty inflicted upon the victim"). Other states have made torture an aggravating factor supporting imposition of the death penalty. *See, e.g.,* Ark. Code Ann. § 5-4-604(8)(B); Del. Code Ann. tit. 11, § 4209(e)(1)(*l*) (1995); Ga. Code Ann. § 17-10-30(b)(7) (1997); ; 720 Ill. Comp. Stat. Ann. 5/9-1(b)(14) (West Supp. 2002); Mass. Ann. Laws ch. 279, § 69(a) (Law. Co-op. 1992); Mo. Ann. Stat. § 565.032(2)(7) (West 1999); Nev. Rev. Stat. Ann. 200-033(8) (Michie 2001); N.J. Stat. Ann. § 2C:11-3 (West Supp. 2002) (same); Tenn. Code Ann. § 39-13-204(i)(5) (Supp. 2001); *see also* Alaska Stat. § 12.55.125(a)(3) (2000) (term of 99 years' imprisonment mandatory where defendant subjected victim to "substantial physical torture"). *All of these laws support the conclusion that torture is generally an extreme act far beyond the infliction of pain or suffering alone.*

California law is illustrative on this point. The California Penal Code not only makes torture itself an offense, see Cal. Penal Code § 206 (West Supp. 2002), it also prohibits murder by torture, see Cal. Penal Code § 189 (West Supp. 2002), and provides that torture is an aggravating circumstance supporting the imposition of the death penalty, see Cal. Penal Code § 190.2 (West Supp. 2002). California's definitions of torture demonstrate that the term is reserved for especially cruel acts inflicting serious injury. Designed to "fill[] a gap in existing law dealing with extremely violent and callous criminal conduct[,]" *People v. Hale*, 88 Cal. Rptr. 2d 904, 913 (1999) (internal quotation marks and citation omitted), Section 206 defines the offense of torture as:

[e]very person who, with the intent to cause *cruel* or *extreme* pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily

## II.     U.N. Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment.

Because Congress enacted the criminal prohibition against torture to implement CAT, we also examine the treaty's text and history to develop a fuller understanding of the context of Sections 2340–2340A.  As with the statute, we begin our analysis with the treaty's text.  *See Eastern Airlines Inc. v. Floyd*, 499 U.S. 530, 534–35 (1991) ("When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used.) (quotation marks and citations omitted).  CAT defines torture as:

> any act by which *severe* pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Article 1(1) (emphasis added).  Unlike Section 2340, this definition includes a list of purposes for which such pain and suffering is inflicted.  The prefatory phrase "such purposes as" makes clear that this list is, however, illustrative rather than exhaustive. Accordingly, severe pain or suffering need not be inflicted for those specific purposes to constitute torture; instead, the perpetrator must simply have a purpose of the same kind.

---

injury . . . upon the person of another, is guilty of torture.  The crime of torture does not require any proof that the victim suffered pain.

(Emphasis added).  With respect to sections 190.2 and 189, neither of which are statutorily defined, California courts have recognized that torture generally means an "[a]ct or process of inflicting severe pain, esp[ecially] as a punishment to extort confession, or in revenge. . . . Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death." *People v. Barrera*, 18 Cal. Rptr. 2d 395, 399 (Ct. App. 1993) (quotation marks and citation omitted).  Further, "'murder by torture was and is considered among the most reprehensible types of murder because of the calculated nature of the acts causing death." *Id.* at 403 (quoting *People v. Wiley*, 133 Cal. Rptr. 135, 138 (1976) (in bank)).  The definition of murder by torture special circumstance, proscribed under Cal. Penal Code § 190.2, likewise shows an attempt to reach the most heinous acts imposing pain beyond that which a victim suffers through death alone.  To establish murder by torture special circumstance, the "intent to kill, intent to torture, and infliction of an extremely painful act upon a living victim" must be present. *People v. Bemore*, 94 Cal. Rptr. 2d 840, 861 (2000).  The intent to torture is characterized by a "'sadistic intent to cause the victim to suffer pain in addition to the pain of death.'" *Id.* at 862 (quoting *People v. Davenport*, 221 Cal. Rptr. 794, 875 (1985)).  Like the Torture Victims Protection Act and the Convention Against Torture, discussed *infra* at Parts II and III, each of these California prohibitions against torture require an evil intent—such as cruelty, revenge or even sadism.  Section 2340 does not require this additional intent, but as discussed *supra* pp. 2–3, requires that the individual specifically intended to cause severe pain or suffering. Furthermore, unlike Section 2340, neither section 189 nor section 206 appear to require proof of actual pain to establish torture.

14

More importantly, like Section 2340, the pain and suffering must be severe to reach the threshold of torture. Thus, the text of CAT reinforces our reading of Section 2340 that torture must be an extreme act.[7]

CAT also distinguishes between torture and other acts of cruel, inhuman, or degrading treatment or punishment.[8] Article 16 of CAT requires state parties to "undertake to prevent . . . other acts of cruel, inhuman or degrading treatment or punishment *which do not amount to torture* as defined in article 1." (Emphasis added). CAT thus establishes a category of acts that are not to be committed and that states must endeavor to prevent, but that states need not criminalize, leaving those acts without the stigma of criminal penalties. CAT reserves criminal penalties and the stigma attached to those penalties for torture alone. In so doing, CAT makes clear that torture is at the farthest end of impermissible actions, and that it is distinct and separate from the lower level of "cruel, inhuman, or degrading treatment or punishment." This approach is in keeping with CAT's predecessor, the U.N. Declaration on the Protection from Torture. That declaration defines torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." Declaration on Protection from Torture, UN Res. 3452, Art. 1(2) (Dec. 9, 1975).

---

[7] To be sure, the text of the treaty requires that an individual act "intentionally." This language might be read to require only general intent for violations of the Torture Convention. We believe, however, that the better interpretation is that that the use of the phrase "intentionally" also created a specific intent-type standard. In that event, the Bush administration's understanding represents only an explanation of how the United States intended to implement the vague language of the Torture Convention. If, however, the Convention established a general intent standard, then the Bush understanding represents a modification of the obligation undertaken by the United States.

[8] Common article 3 of Geneva Convention on prisoners of war, Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3517 ("Geneva Convention III") contains somewhat similar language. Article 3(1)(a) prohibits "violence to life and person, in particular murder of all kinds, mutilation, *cruel treatment and torture.*" (Emphasis added). Article 3(1)(c) additionally prohibits "outrages upon personal dignity, in particular, humiliating and degrading treatment." Subsection (c) must forbid more conduct than that already covered in subsection (a) otherwise subsection (c) would be superfluous. Common article 3 does not, however, define either of the phrases "outrages upon personal dignity" or "humiliating and degrading treatment." International criminal tribunals, such as those respecting Rwanda and former Yugoslavia have used common article 3 to try individuals for committing inhuman acts lacking any military necessity whatsoever. Based on our review of the case law, however, these tribunals have not yet articulated the full scope of conduct prohibited by common article 3. Memorandum for John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, from James C. Ho, Attorney-Advisor, Office of Legal Counsel, *Re: Possible Interpretations of Common Article 3 of the 1949 Geneva Convention Relative to the Treatment of Prisoners of War* (Feb. 1, 2002).

We note that Section 2340A and CAT protect any individual from torture. By contrast, the standards of conduct established by common article 3 of Convention III, do not apply to "an armed conflict between a nation-state and a transnational terrorist organization." Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* at 8 (Jan. 22, 2002).

15

A.    **Ratification History**

Executive branch interpretation of CAT further supports our conclusion that the treaty, and thus Section 2340A, prohibits only the most extreme forms of physical or mental harm. As we have previously noted, the "division of treaty-making responsibility between the Senate and the President is essentially the reverse of the division of law-making authority, with the President being the draftsman of the treaty and the Senate holding the authority to grant or deny approval." *Relevance of Senate Ratification History to Treaty Interpretation*, 11 Op. O.L.C. 28, 31 (Apr. 9, 1987) ("Sofaer Memorandum"). Treaties are negotiated by the President in his capacity as the "sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Moreover, the President is responsible for the day-to-day interpretation of a treaty and retains the power to unilaterally terminate a treaty. *See Goldwater v. Carter*, 617 F.2d 697, 707–08 (D.C. Cir.) (en banc) *vacated and remanded with instructions to dismiss on other grounds*, 444 U.S. 996 (1979). The Executive's interpretation is to be accorded the greatest weight in ascertaining a treaty's intent and meaning. *See, e.g., United States v. Stuart*, 489 U.S. 353, 369 (1989) ("'the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight'") (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982)); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the department of government particularly charged with their negotiation and enforcement is given great weight."); *Charlton v. Kelly*, 229 U.S. 447, 468 (1913) ("A construction of a treaty by the political departments of the government, while not conclusive upon a court . . . , is nevertheless of much weight.").

A review of the Executive branch's interpretation and understanding of CAT reveals that Congress codified the view that torture included only the most extreme forms of physical or mental harm. When it submitted the Convention to the Senate, the Reagan administration took the position that CAT reached only the most heinous acts. The Reagan administration included the following understanding:

> The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.

S. Treaty Doc. No. 100-20, at 4–5. Focusing on the treaty's requirement of "severity," the Reagan administration concluded, "The extreme nature of torture is further emphasized in [this] requirement." S. Treaty Doc. No. 100-20, at 3 (1988); S. Exec. Rep. 101-30, at 13 (1990). The Reagan administration also determined that CAT's definition of torture fell in line with "United States and international usage, [where it] is usually reserved for extreme deliberate and unusually cruel practices, for example, sustained systematic beatings, application of electric currents to sensitive parts of the body and tying up or hanging in positions that cause extreme pain." S. Exec. Rep. No. 101-30, at

16

14 (1990). In interpreting CAT's definition of torture as reaching only such extreme acts, the Reagan administration underscored the distinction between torture and other cruel, inhuman, or degrading treatment or punishment. In particular, the administration declared that article 1's definition of torture ought to be construed in light of article 16. *See* S. Treaty Doc. No. 100-20, at 3. Based on this distinction, the administration concluded that: "'Torture' is thus to be distinguished from lesser forms of cruel, inhuman, or degrading treatment or punishment, which are to be deplored and prevented, but are not so universally and categorically condemned as to warrant the severe legal consequences that the Convention provides in case of torture." S. Treaty Doc. 100-20, at 3. Moreover, this distinction was "adopted in order to emphasize that torture is at the extreme end of cruel, inhuman and degrading treatment or punishment." S. Treaty Doc. No. 100-20, at 3. Given the extreme nature of torture, the administration concluded that "rough treatment as generally falls into the category of 'police brutality,' while deplorable, does not amount to 'torture.'" S. Treaty Doc. No. 100-20, at 4.

Although the Reagan administration relied on CAT's distinction between torture and "cruel, inhuman, or degrading treatment or punishment," it viewed the phrase "cruel, inhuman, or degrading treatment or punishment" as vague and lacking in a universally accepted meaning. Of even greater concern to the Reagan administration was that because of its vagueness this phrase could be construed to bar acts not prohibited by the U.S. Constitution. The administration pointed to *Case of X v. Federal Republic of Germany* as the basis for this concern. In that case, the European Court of Human Rights determined that the prison officials' refusal to recognize a prisoner's sex change might constitute degrading treatment. *See* S. Treaty Doc. No. 100-20, at 15 (citing European Commission on Human Rights, *Dec. on Adm.*, Dec. 15, 1977, *Case of X v. Federal Republic of Germany* (No. 6694/74), 11 Dec. & Rep. 16)). As a result of this concern, the Administration added the following understanding:

> The United States understands the term, 'cruel, inhuman or degrading treatment or punishment,' as used in Article 16 of the Convention, to mean the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States."

S. Treaty Doc. No. 100-20, at 15–16. Treatment or punishment must therefore rise to the level of action that U.S. courts have found to be in violation of the U.S. Constitution in order to constitute cruel, inhuman, or degrading treatment or punishment. That which fails to rise to this level must fail, *a fortiori*, to constitute torture under Section 2340.[9]

---

[9] The vagueness of "cruel, inhuman and degrading treatment" enables the term to have a far-ranging reach. Article 3 of the European Convention on Human Rights similarly prohibits such treatment. The European Court of Human Rights has construed this phrase broadly, even assessing whether such treatment has occurred from the subjective stand point of the victim. *See* Memorandum from James C. Ho, Attorney-Advisor to John C. Yoo, Deputy Assistant Attorney General, *Re: Possible Interpretations of Common Article 3 of the 1949 Geneva Convention Relative to the Treatment of Prisoners of War* (Feb. 1, 2002) (finding that European Court of Human Right's construction of inhuman or degrading treatment "is broad enough to arguably forbid even standard U.S. law enforcement interrogation techniques, which endeavor to break down a detainee's 'moral resistance' to answering questions.").

The Senate did not give its advice and consent to the Convention until the first Bush administration. Although using less vigorous rhetoric, the Bush administration joined the Reagan administration in interpreting torture as only reaching extreme acts. To ensure that the Convention's reach remained limited, the Bush administration submitted the following understanding:

> The United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental pain caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

S. Exec. Rep. No. 101-30, at 36. This understanding accomplished two things. First, it ensured that the term "intentionally" would be understood as requiring specific intent. Second, it added form and substance to the otherwise amorphous concept of *mental* pain or suffering. In so doing, this understanding ensured that mental torture would rise to a severity seen in the context of physical torture. The Senate ratified CAT with this understanding, and as is obvious from the text, Congress codified this understanding almost verbatim in the criminal statute.

To be sure, it might be thought significant that the Bush administration's language differs from the Reagan administration understanding. The Bush administration said that it had altered the CAT understanding in response to criticism that the Reagan administration's original formulation had raised the bar for the level of pain necessary for the act or acts to constitute torture. *See* Convention Against Torture: Hearing Before the Senate Comm. On Foreign Relations, 101st Cong. 9–10 (1990) ("1990 Hearing") (prepared statement of Hon. Abraham D. Sofaer, Legal Adviser, Department of State). While it is true that there are rhetorical differences between the understandings, both administrations consistently emphasize the extraordinary or extreme acts required to constitute torture. As we have seen, the Bush understanding as codified in Section 2340 reaches only extreme acts. The Reagan understanding, like the Bush understanding, ensured that "intentionally" would be understood as a specific intent requirement.

---

Moreover, despite the Reagan and Bush administrations' efforts to limit the reach of the cruel, inhuman and degrading treatment language, it appears to still have a rather limitless reach. *See id.* (describing how the Eighth Amendment ban on "cruel and unusual punishment" has been used by courts to, *inter alia,* "engage in detailed regulation of prison conductions, including the exact size cells, exercise, and recreational activities, quality of food, access to cable television, internet, and law libraries.")

Though the Reagan administration required that the "act be deliberate and calculated" *and* that it be inflicted with specific intent, in operation there is little difference between requiring specific intent alone and requiring that the act be deliberate and calculated. The Reagan understanding's also made express what is obvious from the plain text of CAT: torture is an extreme form of cruel and inhuman treatment. The Reagan administration's understanding that the pain be "excruciating and agonizing" is in substance not different from the Bush administration's proposal that the pain must be severe.

The Bush understanding simply took a rather abstract concept—excruciating and agonizing mental pain—and gave it a more concrete form.     Executive branch representations made to the Senate support our view that there was little difference between these two understandings and that the further definition of mental pain or suffering merely sought remove the vagueness created by concept of "agonizing and excruciating" mental pain. *See* 1990 Hearing, at 10 (prepared statement of Hon. Abraham D. Sofaer, Legal Adviser, Department of State) ("no higher standard was intended" by the Reagan administration understanding than was present in the Convention or the Bush understanding); *id.* at 13–14 (statement of Mark Richard, Deputy Assistant Attorney General, Criminal Division, Department of Justice) ("In an effort to overcome this unacceptable element of vagueness [in the term "mental pain"], we have proposed an understanding which defines severe mental pain constituting torture with sufficient specificity . . . to protect innocent persons and meet constitutional due process requirements.")     Accordingly, we believe that the two definitions submitted by the Reagan and Bush administrations had the same purpose in terms of articulating a legal standard, namely, ensuring that the prohibition against torture reaches only the most extreme acts. Ultimately, whether the Reagan standard would have been even higher is a purely academic question because the Bush understanding clearly established a very high standard.

Executive branch representations made to the Senate confirm that the Bush administration maintained the view that torture encompassed only the most extreme acts. Although the ratification record, i.e., testimony, hearings, and the like, is generally not accorded great weight in interpreting treaties, authoritative statements made by representatives of the Executive Branch are accorded the most interpretive value. *See* Sofaer Memorandum, at 35–36. Hence, the testimony of the executive branch witnesses defining torture, in addition to the reservations, understandings and declarations that were submitted to the Senate by the Executive branch, should carry the highest interpretive value of any of the statements in the ratification record. At the Senate hearing on CAT, Mark Richard, Deputy Assistant Attorney General, Criminal Division, Department of Justice, offered extensive testimony as to the meaning of torture. Echoing the analysis submitted by the Reagan administration, he testified that "[t]orture is understood to be that barbaric cruelty which lies at the top of the pyramid of human rights misconduct." 1990 Hearing, at 16 (prepared statement of Mark Richard). He further explained, "As applied to physical torture, there appears to be some degree of consensus that the concept involves conduct, the mere mention of which sends chills down one's spine[.]" *Id.* Richard gave the following examples of conduct satisfying this standard: "the needle under the fingernail, the application of electrical shock to the genital area, the piercing of

eyeballs, etc." *Id.* In short, repeating virtually verbatim the terms used in the Reagan understanding, Richard explained that under the Bush administration's submissions with the treaty "the essence of torture" is treatment that inflicts " "excruciating and agonizing physical pain." *Id.* (emphasis added).

As to mental torture, Richard testified that "no international consensus had emerged [as to] what degree of mental suffering is required to constitute torture[,]" but that it was nonetheless clear that severe mental pain or suffering "does not encompass the normal legal compulsions which are properly a part of the criminal justice system[:] interrogation, incarceration, prosecution, compelled testimony against a friend, etc,— notwithstanding the fact that they may have the incidental effect of producing mental strain." *Id.* at 17. According to Richard, CAT was intended to "condemn as torture intentional acts such as those designed to damage and destroy the human personality." *Id.* at 14. This description of mental suffering emphasizes the requirement that any mental harm be of significant duration and lends further support for our conclusion that mind-altering substances must have a profoundly disruptive effect to serve as a predicate act.

Apart from statements from Executive branch officials, the rest of a ratification record is of little weight in interpreting a treaty. *See generally* Sofaer Memorandum. Nonetheless, the Senate understanding of the definition of torture largely echoes the administrations' views. The Senate Foreign Relations Committee Report on CAT opined: "[f]or an act to be 'torture' it must be an *extreme* form of cruel and inhuman treatment, cause *severe* pain and suffering and be *intended to cause severe* pain and suffering." S. Exec. Rep. No. 101-30, at 6 (emphasis added). Moreover, like both the Reagan and Bush administrations, the Senate drew upon the distinction between torture and cruel, inhuman or degrading treatment or punishment in reaching its view that torture was extreme.[10] Finally, the Senate concurred with the administrations' concern that "cruel, inhuman, or degrading treatment or punishment" could be construed to establish a new standard above and beyond that which the Constitution mandates and supported the inclusion of the reservation establishing the Constitution as the baseline for determining whether conduct amounted to cruel, inhuman, degrading treatment or punishment. *See* 136 Cong. Rec. 36,192 (1990); S. Exec. Rep. 101-30, at 39.

**B.    Negotiating History**

CAT's negotiating history also indicates that its definition of torture supports our reading of Section 2340. The state parties endeavored to craft a definition of torture that reflected the term's gravity. During the negotiations, state parties offered various formulations of the definition of torture to the working group, which then proposed a

[10] Hearing testimony, though the least weighty evidence of meaning of all of the ratification record, is not to the contrary. Other examples of torture mentioned in testimony similarly reflect acts resulting in intense pain: the "gouging out of childrens' [sic] eyes, the torture death by molten rubber, the use of electric shocks," cigarette burns, hanging by hands or feet. 1990 Hearing at 45 (Statement of Winston Nagan, Chairman, Board of Directors, Amnesty International USA); *id.* at 79 (Statement of David Weissbrodt, Professor of Law, University of Minnesota, on behalf of the Center for Victims of Torture, the Minnesota Lawyers International Human Rights Committee).

definition based on those formulations. Almost all of these suggested definitions illustrate the consensus that torture is an extreme act designed to cause agonizing pain. For example, the United States proposed that torture be defined as "includ[ing] any act by which extremely severe pain or suffering . . . is deliberately and maliciously inflicted on a person." J. Herman Burgers & Hans Danelius, *The United Nations Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel Inhuman and Degrading Treatment or Punishment* 41 (1988) ("CAT Handbook"). The United Kingdom suggested an even more restrictive definition, i.e., that torture be defined as the "*systematic and intentional* infliction of *extreme* pain or suffering rather than *intentional* infliction of *severe* pain or suffering." *Id.* at 45 (emphasis in original). Ultimately, in choosing the phrase "severe pain," the parties concluded that this phrase "sufficient[ly] . . . convey[ed] the idea that only acts of a certain gravity shall . . . constitute torture." *Id.* at 117.

In crafting such a definition, the state parties also were acutely aware of the distinction they drew between torture and cruel, inhuman, or degrading treatment or punishment. The state parties considered and rejected a proposal that would have defined torture merely as cruel, inhuman or degrading treatment or punishment. *See id.* at 42. Mirroring the Declaration on Protection From Torture, which expressly defined torture as an "aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment," some state parties proposed that in addition to the definition of torture set out in paragraph 2 of article 1, a paragraph defining torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment" should be included. *See id.* at 41; *see also* S. Treaty Doc. No. 100-20, at 2 (the U.N. Declaration on Protection from Torture (1975) served as "a point of departure for the drafting of [CAT]"). In the end, the parties concluded that the addition of such a paragraph was superfluous because Article 16 "impl[ies] that torture is the gravest form of such treatment or punishment." *CAT Handbook* at 80; *see* S. Exec. Rep. No. 101-30, at 13 ("The negotiating history indicates that [the phrase 'which do not amount to torture'] was adopted in order to emphasize that torture is at the extreme end of cruel, inhuman and degrading treatment or punishment and that Article 1 should be construed with this in mind.").

Additionally, the parties could not reach a consensus about the meaning of "cruel, inhuman, or degrading treatment or punishment." *See CAT Handbook* at 47. Without a consensus, the parties viewed the term as simply "'too vague to be included in a convention which was to form the basis for criminal legislation in the Contracting States.'" *Id.* This view evinced by the parties reaffirms the interpretation of CAT as purposely reserving criminal penalties for torture alone.

CAT's negotiating history offers more than just support for the view that pain or suffering must be extreme to amount to torture. First, the negotiating history suggests that the harm sustained from the acts of torture need not be permanent. In fact, "the United States considered that it might be useful to develop the negotiating history which indicates that although conduct resulting in permanent impairment of physical or mental faculties is indicative of torture, it is not an essential element of the offence." *Id.* at 44.

Second, the state parties to CAT rejected a proposal to include in CAT's definition of torture the use of truth drugs, where no physical harm or mental suffering was apparent. This rejection at least suggests that such drugs were not viewed as amounting to torture per se. *See id.* at 42.

## C.    Summary

The text of CAT confirms our conclusion that Section 2340A was intended to proscribe only the most egregious conduct. CAT not only defines torture as involving severe pain and suffering, but also it makes clear that such pain and suffering is at the extreme end of the spectrum of acts by reserving criminal penalties solely for torture. Executive interpretations confirm our view that the treaty (and hence the statute) prohibits only the worst forms of cruel, inhuman, or degrading treatment or punishment. The ratification history further substantiates this interpretation. Even the negotiating history displays a recognition that torture is a step far-removed from other cruel, inhuman or degrading treatment or punishment. In sum, CAT's text, ratification history and negotiating history all confirm that Section 2340A reaches only the most heinous acts.

## III.    U.S. Judicial Interpretation

There are no reported cases of prosecutions under Section 2340A. *See* Beth Stephens, *Corporate Liability: Enforcing Human Rights Through Domestic Litigation*, 24 Hastings Int'l & Comp. L. Rev. 401, 408 & n.29 (2001); Beth Van Schaack, *In Defense of Civil Redress: The Domestic Enforcement of Human Rights Norms in the Context of the Proposed Hague Judgments Convention*, 42 Harv. Int'l L. J. 141, 148–49 (2001); Curtis A. Bradley, *Universal Jurisdiction and U.S. Law*, 2001 U. Chi. Legal F. 323, 327–28. Nonetheless, we are not without guidance as to how United States courts would approach the question of what conduct constitutes torture. Civil suits filed under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note (2000), which supplies a tort remedy for victims of torture, provide insight into what acts U.S. courts would conclude constitute torture under the criminal statute.

The TVPA contains a definition similar in some key respects to the one set forth in Section 2340. Moreover, as with Section 2340, Congress intended for the TVPA's definition of torture to follow closely the definition found in CAT. *See Xuncax v. Gramajo*, 886 F. Supp. 162, 176 n.12 (D. Mass 1995) (noting that the definition of torture in the TVPA tracks the definitions in Section 2340 and CAT).[11] The TVPA defines torture as:

---

[11] *See also* 137 Cong. Rec. 34,785 (statement of Rep. Mazzoli) ("Torture is defined in accordance with the definition contained in [CAT]"); *see also* Torture Victims Portection Act: Hearing and Markup on H.R. 1417 Before the Subcomm. On Human Rights and International Organizations of the House Comm. on Foreign Affairs, 100th Cong. 38 (1988) (Prepared Statement of the Association of the Bar of the City of New York, Committee on International Human Rights) ("This language essentially tracks the definition of 'torture' adopted in the Torture Convention.").

(1). . . any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from–
(A) the intentional infliction or threatened infliction of severe physical pain or suffering;
(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
(C) the threat of imminent death; or
(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note § 3(b). This definition differs from Section 2340's definition in two respects. First, the TVPA definition contains an illustrative list of purposes for which such pain may have been inflicted. *See id.* Second, the TVPA includes the phrase "arising only from or inherent in, or incidental to lawful sanctions"; by contrast, Section 2340 refers only to pain or suffering "incidental to lawful sanctions." *Id.* Because the purpose of our analysis here is to ascertain acts that would cross the threshold of producing "severe physical or mental pain or suffering," the list of illustrative purposes for which it is inflicted, generally would not affect this analysis.[12] Similarly, to the extent that the absence of the phrase "arising only from or inherent in" from Section 2340 might affect the question of whether pain or suffering was part of lawful sanctions and thus not torture, the circumstances with which we are concerned here are solely that of interrogations, not the imposition of punishment subsequent to judgment. These differences between the TVPA and Section 2340 are therefore not sufficiently significant to undermine the usefulness of TVPA cases here.[13]

---

[12] This list of purposes is illustrative only. Nevertheless, demonstrating that a defendant harbored any of these purposes "may prove valuable in assisting in the establishment of intent at trial." Matthew Lippman, *The Development and Drafting of the United Nations Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment,* 17 B.C. Int'l & Comp. L. Rev. 275, 314 (1994).

[13] The TVPA also requires that an individual act "intentionally." As we noted with respect to the text of CAT, see *supra* n. 7, this language might be construed as requiring general intent. It is not clear that this is so. We need not resolve that question, however, because we review the TVPA cases solely to address the acts that would satisfy the threshold of inflicting "severe physical or mental pain or suffering."

23

In suits brought under the TVPA, courts have not engaged in any lengthy analysis of what acts constitute torture. In part, this is due to the nature of the acts alleged. Almost all of the cases involve physical torture, some of which is of an especially cruel and even sadistic nature. Nonetheless, courts appear to look at the entire course of conduct rather than any one act, making it somewhat akin to a totality-of-the-circumstances analysis. Because of this approach, it is difficult to take a specific act out of context and conclude that the act in isolation would constitute torture. Certain acts do, however, consistently reappear in these cases or are of such a barbaric nature, that it is likely a court would find that allegations of such treatment would constitute torture: (1) severe beatings using instruments such as iron barks, truncheons, and clubs; (2) threats of imminent death, such as mock executions; (3) threats of removing extremities; (4) burning, especially burning with cigarettes; (5) electric shocks to genitalia or threats to do so; (6) rape or sexual assault, or injury to an individual's sexual organs, or threatening to do any of these sorts of acts; and (7) forcing the prisoner to watch the torture of others. Given the highly contextual nature of whether a set of acts constitutes torture, we have set forth in the attached appendix the circumstances in which courts have determined that the plaintiff has suffered torture, which include the cases from which these seven acts are drawn. While we cannot say with certainty that acts falling short of these seven would *not* constitute torture under Section 2340, we believe that interrogation techniques would have to be similar to these in their extreme nature and in the type of harm caused to violate the law.

Despite the limited analysis engaged in by courts, a recent district court opinion provides some assistance in predicting how future courts might address this issue. In *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, (N.D. Ga. 2002), the plaintiffs, Bosnian Muslims, sued a Bosnian Serb, Nikola Vuckovic, for, among other things, torture and cruel and inhumane treatment. The court described in vivid detail the treatment the plaintiffs endured. Specifically, the plaintiffs experienced the following:

Vuckovic repeatedly beat Kemal Mehinovic with a variety of blunt objects and boots, intentionally delivering blows to areas he knew to already be badly injured, including Mehinovic's genitals. *Id.* at 1333–34. On some occasions he was tied up and hung against windows during beatings. *Id.* Mehinovic, was subjected to the game of "Russian roulette" *See id.* Vuckovic, along with other guards, also forced Mehinovic to run in a circle while the guards swung wooden planks at him. *Id.*

Like Mehinovic, Muhamed Bicic was beaten repeatedly with blunt objects, to the point of loss of consciousness. *See Id* at 1335. He witnessed the severe beatings of other prisoners, including his own brother. "On one occasion, Vuckovic ordered Bicic to get on all fours while another soldier stood or rode on his back and beat him with a baton—a game the soldiers called 'horse.'" *Id.* Bicic, like Mehinovic, was subjected to the game of Russian roulette. Additionally, Vuckovic and the other guards forcibly extracted a number of Bicic's teeth. *Id.* at 1336.

Safet Hadzialijagic was subjected to daily beatings with "metal pipes, bats, sticks, and weapons." *Id.* at 1337. He was also subjected to Russian roulette *See id.* at 1336–37.

Hadzialijagic also frequently saw other prisoners being beaten or heard their screams as they were beaten. Like Bicic, he was subjected to the teeth extraction incident. On one occasion, Vuckovic rode Hadzialijagic like a horse, simultaneously hitting him in the head and body with a knife handle. During this time, other soldiers kicked and hit him. He fell down during this episode and was forced to get up and continue carrying Vuckovic. *See id.* "Vuckovic and the other soldiers [then] tied Hadzialijagic with a rope, hung him upside down, and beat him. When they noticed that Hadzialijagic was losing consciousness, they dunked his head in a bowl used as a toilet." *Id.* Vuckovic then forced Hadzialijagic to lick the blood off of Vuckovic's boots and kicked Hadzialijagic as he tried to do so. Vuckovic then used his knife to carve a semi-circle in Hadzialijagic's forehead. Hadzialijagic went into cardiac arrest just after this incident and was saved by one of the other plaintiffs. *See id.*

Hasan Subasic was brutally beaten and witnessed the beatings of other prisoners, including the beating and death of one of his fellow prisoners and the beating of Hadzialijagic in which he was tied upside down and beaten. *See id.* at 1338–39. *Id.* at 1338. Subasic also was subjected to the teeth pulling incident. Vuckovic personally beat Subasic two times, punching him and kicking him with his military boots. In one of these beatings, "Subasic had been forced into a kneeling position when Vuckovic kicked him in the stomach." *Id.*

The district court concluded that the plaintiffs suffered both physical and mental torture at the hands of Vuckovic.[16] With respect to physical torture, the court broadly outlined with respect to each plaintiff the acts in which Vuckovic had been at least complicit and that it found rose to the level of torture. Regarding Mehinovic, the court determined that Vuckovic's beatings of Mehinovic in which he kicked and delivered other blows to Mehinovic's face, genitals, and others body parts, constituted torture. The court noted that these beatings left Mehinovic disfigured, may have broken ribs, almost caused Mehinovic to lose consciousness, and rendered him unable to eat for a period of time. As to Bicic, the court found that Bicic had suffered severe physical pain and suffering as a result of Vuckovic's repeated beatings of him in which Vuckovic used various instruments to inflict blows, the "horse" game, and the teeth pulling incident. *See id.* at 1346. In finding that Vuckovic inflicted severe physical pain on Hadzialijagic, the court unsurprisingly focused on the beating in which Vuckovic tied Hadzialijagic upside down and beat him. *See id.* The court pointed out that in this incident, Vuckovic almost killed Hadzialijagic. *See id.* The court further concluded that Subasic experienced severe physical pain and thus was tortured based on the beating in which Vuckovic kicked Subasic in the stomach. *See id.*

---

[16] The court also found that a number of acts perpetrated against the plaintiffs constituted cruel, inhuman, or degrading treatment but not torture. In its analysis, the court appeared to fold into cruel, inhuman, or degrading treatment two distinct categories. First, cruel, inhuman, or degrading treatment includes acts that "do not rise to the level of 'torture.'" *Id.* at 1348. Second, cruel, inhuman, or degrading treatment includes acts that "do not have the same purposes as 'torture.'" *Id.* By including this latter set of treatment as cruel, inhuman or degrading, the court appeared to take the view that acts that would otherwise constitute torture fall outside that definition because of the absence of the particular purposes listed in the TVPA and the treaty. Regardless of the relevance of this concept to the TVPA or CAT, the purposes listed in the TVPA are not an element of torture for purposes of sections 2340–2340A.

The court also found that the plaintiffs had suffered severe mental pain. In reaching this conclusion, the court relied on the plaintiffs' testimony that they feared they would be killed during beatings by Vuckovic or during the "game" of Russian roulette. Although the court did not specify the predicate acts that caused the prolonged mental harm, it is plain that both the threat of severe physical pain and the threat of imminent death were present and persistent. The court also found that the plaintiffs established the existence of prolonged mental harm as each plaintiff "*continues* to suffer long-term psychological harm as a result of [their] ordeals." *Id.* (emphasis added). In concluding that the plaintiffs had demonstrated the necessary "prolonged mental harm," the court's description of that harm as ongoing and "long-term" confirms that, to satisfy the prolonged mental harm requirement, the harm must be of a substantial duration.

The court did not, however, delve into the nature of psychological harm in reaching its conclusion. Nonetheless, the symptoms that the plaintiffs suffered and continue to suffer are worth noting as illustrative of what might in future cases be held to constitute mental harm. Mehinovic had "anxiety, flashbacks, and nightmares and has difficulty sleeping." *Id.* at 1334. Similarly, Bicic, "suffers from anxiety, sleeps very little, and has frequent nightmares" and experiences frustration at not being able to work due to the physical and mental pain he suffers. *Id.* at 1336. Hadzialijagic experienced nightmares, at times required medication to help him sleep, suffered from depression, and had become reclusive as a result of his ordeal. *See id.* at 1337–38. Subasic, like the others, had nightmares and flashbacks, but also suffered from nervousness, irritability, and experienced difficulty trusting people. The combined effect of these symptoms impaired Subasic's ability to work. *See id.* at 1340. Each of these plaintiffs suffered from mental harm that destroyed his ability to function normally, on a daily basis, and would continue to do so into the future.

In general, several guiding principles can be drawn from this case. First, this case illustrates that a single incident can constitute torture. The above recitation of the case's facts shows that Subasic was clearly subjected to torture in a number of instances, e.g., the teeth pulling incident, which the court finds to constitute torture in discussing Bicic. The court nevertheless found that the beating in which Vuckovic delivered a blow to Subasic's stomach while he was on his knees sufficed to establish that Subasic had been tortured. Indeed, the court stated that this incident "caus[ed] Subasic to suffer severe pain." *Id.* at 1346. The court's focus on this incident, despite the obvious context of a course of torturous conduct, suggests that a course of conduct is unnecessary to establish that an individual engaged in torture. It bears noting, however, that there are no decisions that have found an example of torture on facts that show the action was isolated, rather than part of a systematic course of conduct. Moreover, we believe that had this been an isolated instance, the court's conclusion that this act constituted torture would have been in error, because this single blow does not reach the requisite level of severity.

Second, the case demonstrates that courts may be willing to find that a wide range of physical pain can rise to the necessary level of "severe pain or suffering." At one end of the spectrum is what the court calls the "nightmarish beating" in which Vuckovic hung

Hadzialijagic upside down and beat him, culminating in Hadzialijagic going into cardiac arrest and narrowly escaping death. *Id.* It takes little analysis or insight to conclude that this incident constitutes torture. At the other end of the spectrum, is the court's determination that a beating in which "Vuckovic hit plaintiff Subasic and kicked him in the stomach with his military boots while Subasic was forced into a kneeling position[]" constituted torture. *Id.* To be sure, this beating caused Subasic substantial pain. But that pain pales in comparison to the other acts described in this case. Again, to the extent the opinion can be read to endorse the view that this single act and the attendant pain, considered in isolation, rose to the level of "severe pain or suffering," we would disagree with such a view based on our interpretation of the criminal statute.

The district court did not attempt to delineate the meaning of torture. It engaged in no statutory analysis. Instead, the court merely recited the definition and described the acts that it concluded constituted torture. This approach is representative of the approach most often taken in TVPA cases. The adoption of such an approach suggests that torture generally is of such an extreme nature—namely, the nature of acts are so shocking and obviously incredibly painful—that courts will more likely examine the totality of the circumstances, rather than engage in a careful parsing of the statute. A broad view of this case, and of the TVPA cases more generally, shows that only acts of an extreme nature have been redressed under the TVPA's civil remedy for torture. We note, however, that *Mehinovic* presents, with the exception of the single blow to Subasic, facts that are well over the line of what constitutes torture. While there are cases that fall far short of torture, see *infra* app., there are no cases that analyze what the lowest boundary of what constitutes torture. Nonetheless, while this case and the other TVPA cases generally do not approach that boundary, they are in keeping with the general notion that the term "torture" is reserved for acts of the most extreme nature.

### IV.    International Decisions

International decisions can prove of some value in assessing what conduct might rise to the level of severe mental pain or suffering. Although decisions by foreign or international bodies are in no way binding authority upon the United States, they provide guidance about how other nations will likely react to our interpretation of the CAT and Section 2340. As this Part will discuss, other Western nations have generally used a high standard in determining whether interrogation techniques violate the international prohibition on torture. In fact, these decisions have found various aggressive interrogation methods to, at worst, constitute cruel, inhuman, and degrading treatment, but not torture. These decisions only reinforce our view that there is a clear distinction between the two standards and that only extreme conduct, resulting in pain that is of an intensity often accompanying serious physical injury, will violate the latter.

### A.    European Court of Human Rights

An analogue to CAT's provisions can be found in the European Convention on Human Rights and Fundamental Freedoms (the "European Convention"). This convention prohibits torture, though it offers no definition of it. It also prohibits cruel,

inhuman, or degrading treatment or punishment.  By barring both types of acts, the European Convention implicitly distinguishes between them and further suggests that torture is a grave act beyond cruel, inhuman, or degrading treatment or punishment. Thus, while neither the European Convention nor the European Court of Human Rights decisions interpreting that convention would be authority for the interpretation of Sections 2340–2340A, the European Convention decisions concerning torture nonetheless provide a useful barometer of the international view of what actions amount to torture.

The leading European Court of Human Rights case explicating the differences between torture and cruel, inhuman, or degrading treatment or punishment is *Ireland v. the United Kingdom* (1978).[15]  In that case, the European Court of Human Rights examined interrogation techniques somewhat more sophisticated than the rather rudimentary and frequently obviously cruel acts described in the TVPA cases.  Careful attention to this case is worthwhile not just because it examines methods not used in the TVPA cases, but also because the Reagan administration relied on this case in reaching the conclusion that the term torture is reserved in international usage for "extreme, deliberate, and unusually cruel practices."  S. Treaty Doc. 100-20, at 4.

The methods at issue in *Ireland* were:

(1) Wall Standing.  The prisoner stands spread eagle against the wall, with fingers high above his head, and feet back so that he is standing on his toes such that his all of his weight falls on his fingers.
(2) Hooding.  A black or navy hood is placed over the prisoner's head and kept there except during the interrogation.
(3) Subjection to Noise.  Pending interrogation, the prisoner is kept in a room with a loud and continuous hissing noise.
(4) Sleep Deprivation.  Prisoners are deprived of sleep pending interrogation.
(5) Deprivation of Food and Drink.  Prisoners receive a reduced diet during detention and pending interrogation.

---

[15]  According to one commentator, the Inter-American Court of Human Rights has also followed this decision. *See* Julie Lantrip, *Torture and Cruel, Inhuman and Degrading Treatment in the Jurisprudence of the Inter-American Court of Human Rights*, 5 ILSA J. Int'l & Comp. L. 551, 560–61 (1999). The Inter-American Convention to Prevent and Punish Torture, however, defines torture much differently than it is defined in CAT or U.S. law. *See* Inter-American Convention to Prevent and Punish Torture, opened for signature Dec. 9, 1985, art. 2, OAS T.S. No. 67 (entered into force Feb. 28, 1987 but the United States has never signed or ratified it). It defines torture as "any act intentionally performed whereby physical or mental pain or suffering is inflicted on a person for purposes of criminal investigation, as a means of intimidation, as personal punishment, as a preventive measure, as a penalty or for any other purpose. Torture shall also be understood to be the use of methods upon a person intended to obliterate the personality of the victim or to diminish his physical or mental capacities, even if they do not cause physical pain or mental anguish." Art. 2. While the Inter-American Convention to Prevent and Punish Torture does not require signatories to criminalize cruel, inhuman, or degrading treatment or punishment, the textual differences in the definition of torture are so great that it would be difficult to draw from that jurisprudence anything more than the general trend of its agreement with the *Ireland* decision.

The European Court of Human Rights concluded that these techniques used in combination, and applied for hours at a time, were inhuman and degrading but did not amount to torture. In analyzing whether these methods constituted torture, the court treated them as part of a single program. *See Ireland.* ¶ 104. The court found that this program caused "if not actual bodily injury, at least intense physical and mental suffering to the person subjected thereto and also led to acute psychiatric disturbances during the interrogation." *Id.* ¶ 167. Thus, this program "fell into the category of inhuman treatment[.]" *Id.* The court further found that "[t]he techniques were also degrading since they were such as to arouse in their victims feeling of fear, anguish and inferiority capable of humiliating and debasing them and possible [sic] breaking their physical or moral resistance." *Id.* Yet, the court ultimately concluded:

> Although the five techniques, as applied in combination, undoubtedly amounted to inhuman and degrading treatment, although their object was the extraction of confession, the naming of others and/or information and although they were used systematically, they did not occasion suffering of the particular *intensity* and *cruelty* implied by the word torture . . .

*Id.* (emphasis added). Thus, even though the court had concluded that the techniques produce "intense physical and mental suffering" and "acute psychiatric disturbances," they were not sufficient intensity or cruelty to amount to torture.

The court reached this conclusion based on the distinction the European Convention drew between torture and cruel, inhuman, or degrading treatment or punishment. The court reasoned that by expressly distinguishing between these two categories of treatment, the European Convention sought to "attach a special stigma to deliberate inhuman treatment causing very serious and cruel suffering." *Id.* ¶ 167. According to the court, "this distinction derives principally from a difference in the intensity of the suffering inflicted." *Id.* The court further noted that this distinction paralleled the one drawn in the U.N. Declaration on the Protection From Torture, which specifically defines torture as "'an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.'" *Id.* (quoting U.N. Declaration on the Protection From Torture).

The court relied on this same "intensity/cruelty" distinction to conclude that some physical maltreatment fails to amount to torture. For example, four detainees were severely beaten and forced to stand spread eagle up against a wall. *See id.* ¶ 110. Other detainees were forced to stand spread eagle while an interrogator kicked them "continuously on the inside of the legs." *Id.* ¶ 111. Those detainees were beaten, some receiving injuries that were "substantial" and, others received "massive" injuries. *See id.* Another detainee was "subjected to . . . 'comparatively trivial' beatings" that resulted in a perforation of the detainee's eardrum and some "minor bruising." *Id.* ¶ 115. The court concluded that none of these situations "attain[ed] the particular level [of severity] inherent in the notion of torture." *Id.* ¶ 174.

29

**B.      Israeli Supreme Court**

The European Court of Human Rights is not the only other court to consider whether such a program of interrogation techniques was permissible.  In *Public Committee Against Torture in Israel v. Israel*, 38 I.L.M. 1471 (1999), the Supreme Court of Israel reviewed a challenge brought against the General Security Service ("GSS") for its use of five techniques.  At issue in *Public Committee Against Torture In Israel* were: (1) shaking, (2) the Shabach, (3) the Frog Crouch, (4) the excessive tightening of handcuffs, and (5) sleep deprivation.  "Shaking" is "the forceful shaking of the suspect's upper torso, back and forth, repeatedly, in a manner which causes the neck and head to dangle and vacillate rapidly."  *Id.* ¶ 9. The "Shabach" is actually a combination of methods wherein the detainee

> is seated on a small and low chair, whose seat is tilted forward, towards the ground. One hand is tied behind the suspect, and placed inside the gap between the chair's seat and back support. His second hand is tied behind the chair, against its back support.  The suspect's head is covered by an opaque sack, falling down to his shoulders.  Powerfully loud music is played in the room.

*Id.* ¶ 10.

The "frog crouch" consists of "consecutive, periodical crouches on the tips of one's toes, each lasting for five minute intervals." *Id.* ¶ 11.  The excessive tightening of handcuffs simply referred to the use handcuffs that were too small for the suspects' wrists.  *See id.* ¶ 12.  Sleep deprivation occurred when the Shabach was used during "intense non-stop interrogations."[16] *Id.* ¶ 13.

While the Israeli Supreme Court concluded that these acts amounted to cruel, and inhuman treatment, the court did not expressly find that they amounted to torture.  To be sure, such a conclusion was unnecessary because even if the acts amounted only to cruel and inhuman treatment the GSS lacked authority to use the five methods.  Nonetheless, the decision is still best read as indicating that the acts at issue did not constitute torture. The court's descriptions of and conclusions about each method indicate that the court viewed them as merely cruel, inhuman or degrading but not of the sufficient severity to reach the threshold of torture.   While its descriptions discuss necessity, dignity, degradation, and pain, the court carefully avoided describing any of these acts as having the severity of pain or suffering indicative of torture.  *See id.* at ¶¶ 24–29.  Indeed, in assessing the *Shabach* as a whole, the court even relied upon the European Court of Human Right's *Ireland* decision for supportand it did not evince disagreement with that decision's conclusion that the acts considered therein did not constitute torture.  *See id.* ¶ 30.

---

[16] The court did, however, distinguish between this sleep deprivation and that which occurred as part of routine interrogation, noting that some degree of interference with the suspect's regular sleep habits was to be expected. *Public Committee Against Torture in Israel* ¶ 23.

Moreover, the Israeli Supreme Court concluded that in certain circumstances GSS officers could assert a necessity defense. [17]   CAT, however, expressly provides that "[n]o exceptional circumstance whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency may be invoked as a justification of torture." Art. 2(2).   Had the court been of the view that the GSS methods constituted torture, the Court could not permit this affirmative defense under CAT. Accordingly, the court's decision is best read as concluding that these methods amounted to cruel and inhuman treatment, but not torture.

In sum, both the European Court on Human Rights and the Israeli Supreme Court have recognized a wide array of acts that constitute cruel, inhuman, or degrading treatment or punishment, but do not amount to torture. Thus, they appear to permit, under international law, an aggressive interpretation as to what amounts to torture, leaving that label to be applied only where extreme circumstances exist.

## V.    The President's Commander-in-Chief Power

Even if an interrogation method arguably were to violate Section 2340A, the statute would be unconstitutional if it impermissibly encroached on the President's constitutional power to conduct a military campaign. As Commander-in-Chief, the President has the constitutional authority to order interrogations of enemy combatants to gain intelligence information concerning the military plans of the enemy. The demands of the Commander-in-Chief power are especially pronounced in the middle of a war in which the nation has already suffered a direct attack. In such a case, the information gained from interrogations may prevent future attacks by foreign enemies. Any effort to apply Section 2340A in a manner that interferes with the President's direction of such core war matters as the detention and interrogation of enemy combatants thus would be unconstitutional.

### A.    The War with Al Qaeda

At the outset, we should make clear the nature of the threat presently posed to the nation. While your request for legal advice is not specifically limited to the current circumstances, we think it is useful to discuss this question in the context of the current war against the al Qaeda terrorist network. The situation in which these issues arise is unprecedented in recent American history. Four coordinated terrorist attacks, using hijacked commercial airliners as guided missiles, took place in rapid succession on the

---

[17] In permitting a necessity defense, the court drew upon the ticking time bomb hypothetical proffered by the GSS as a basis for asserting a necessity defense. In that hypothetical, the GSS has arrested a suspect, who holds information about the location of a bomb and the time at which it is set to explode. The suspect is the only source of this information, and without that information the bomb will surely explode, killing many people. Under those circumstances, the court agreed that the necessity defense's requirement of imminence, which the court construed as the "imminent nature of the act rather than that of danger," would be satisfied. *Id.* ¶ 34. It further agreed "that in appropriate circumstances" this defense would be available to GSS investigators. *Id.* ¶ 35.

morning of September 11, 2001.  These attacks were aimed at critical government buildings in the Nation's capital and landmark buildings in its financial center.  These events reach a different scale of destructiveness than earlier terrorist episodes, such as the destruction of the Murrah Building in Oklahoma City in 1994.  They caused thousands of deaths.  Air traffic and communications within the United States were disrupted; national stock exchanges were shut for several days; and damage from the attack has been estimated to run into the tens of billions of dollars.  Moreover, these attacks are part of a violent campaign against the United States that is believed to include an unsuccessful attempt to destroy an airliner in December 2001; a suicide bombing attack in Yemen on the *U.S.S. Cole* in 2000; the bombings of the United States Embassies in Kenya and in Tanzania in 1998; a truck bomb attack on a U.S. military housing complex in Saudi Arabia in 1996; an unsuccessful attempt to destroy the World Trade Center in 1993; and the ambush of U.S. servicemen in Somalia in 1993.  The United States and its overseas personnel and installations have been attacked as a result of Usama Bin Laden's call for a "jihad against the U.S. government, because the U.S. government is unjust, criminal and tyrannical."[18]

In response, the Government has engaged in a broad effort at home and abroad to counter terrorism.  Pursuant to his authorities as Commander-in-Chief, the President in October, 2001, ordered the Armed Forces to attack al Qaeda personnel and assets in Afghanistan, and the Taliban militia that harbored them.  That military campaign appears to be nearing its close with the retreat of al Qaeda and Taliban forces from their strongholds and the installation of a friendly provisional government in Afghanistan.  Congress has provided its support for the use of forces against those linked to the September 11 attacks, and has recognized the President's constitutional power to use force to prevent and deter future attacks both within and outside the United States.  S. J. Res. 23, Pub. L. No. 107-40, 115 Stat. 224 (2001).  We have reviewed the President's constitutional power to use force abroad in response to the September 11 attacks in a separate memorandum.  *See* Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sept. 25, 2001) ("September 11 War Powers Memorandum").  We have also discussed the President's constitutional authority to deploy the armed forces domestically to protect against foreign terrorist attack in a separate memorandum.  *See* Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority for Use of Military Force to Combat Terrorist Activities Within the United States* at 2–3 (Oct. 17, 2001).  The Justice Department and the FBI have launched a sweeping investigation in response to the September 11 attacks, and last fall Congress enacted legislation to expand the Justice Department's powers of surveillance against terrorists.  *See* The USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001).  This spring, the President proposed the creation of a new cabinet

---

[18] *See Osama Bin Laden v. The U.S.: Edicts and Statements*, CNN Interview with Osama bin Laden, March 1997, *available at* http://www.pbs.org/wgbh/pages/frontline/shows/binladen/who/edicts.html.

department for homeland security to implement a coordinated domestic program against terrorism.

Despite these efforts, numerous upper echelon leaders of al Qaeda and the Taliban, with access to active terrorist cells and other resources, remain at large. It has been reported that the al Qaeda fighters are already drawing on a fresh flow of cash to rebuild their forces. *See* Paul Haven, *U.S.: al-Qaida Trying to Regroup*, Associated Press, Mar. 20, 2002. As the Director of the Central Intelligence Agency has recently testified before Congress, "Al-Qa'ida and other terrorist groups will continue to plan to attack this country and its interests abroad. Their modus operandi is to have multiple attack plans in the works simultaneously, and to have al-Qa'ida cells in place to conduct them." Testimony of George J. Tenet, Director of Central Intelligence, Before the Senate Armed Services Committee at 2 (Mar. 19, 2002). Nor is the threat contained to Afghanistan. "Operations against US targets could be launched by al-Qa'ida cells already in place in major cities in Europe and the Middle East. Al-Qa'ida can also exploit its presence or connections to other groups in such countries as Somalia, Yemen, Indonesia, and the Philippines." *Id.* at 3. It appears that al Qaeda continues to enjoy information and resources that allow it to organize and direct active hostile forces against this country, both domestically and abroad.

Al Qaeda continues to plan further attacks, such as destroying American civilian airliners and killing American troops, which have fortunately been prevented. It is clear that bin Laden and his organization have conducted several violent attacks on the United States and its nationals, and that they seek to continue to do so. Thus, the capture and interrogation of such individuals is clearly imperative to our national security and defense. Interrogation of captured al Qaeda operatives may provide information concerning the nature of al Qaeda plans and the identities of its personnel, which may prove invaluable in preventing further direct attacks on the United States and its citizens. Given the massive destruction and loss of life caused by the September 11 attacks, it is reasonable to believe that information gained from al Qaeda personnel could prevent attacks of a similar (if not greater) magnitude from occurring in the United States. The case of Jose Padilla, a.k.a. Abdullah Al Mujahir, illustrates the importance of such information. Padilla allegedly had journeyed to Afghanistan and Pakistan, met with senior al Qaeda leaders, and hatched a plot to construct and detonate a radioactive dispersal device in the United States. After allegedly receiving training in wiring explosives and with a substantial amount of currency in his position, Padilla attempted in May, 2002, to enter the United States to further his scheme. Interrogation of captured al Qaeda operatives allegedly allowed U.S. intelligence and law enforcement agencies to track Padilla and to detain him upon his entry into the United States.

## B.    Interpretation to Avoid Constitutional Problems

As the Supreme Court has recognized, and as we will explain further below, the President enjoys complete discretion in the exercise of his Commander-in-Chief authority and in conducting operations against hostile forces. Because both "[t]he executive power and the command of. the military and naval forces is vested in the President," the

33

Supreme Court has unanimously stated that it is *"the President alone* [] who is constitutionally invested with the *entire charge of hostile operations." Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (emphasis added). That authority is at its height in the middle of a war.

In light of the President's complete authority over the conduct of war, without a clear statement otherwise, we will not read a criminal statute as infringing on the President's ultimate authority in these areas. We have long recognized, and the Supreme Court has established a canon of statutory construction that statutes are to be construed in a manner that avoids constitutional difficulties so long as a reasonable alternative construction is available. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499–501, 504 (1979)) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe [a] statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). This canon of construction applies especially where an act of Congress could be read to encroach upon powers constitutionally committed to a coordinate branch of government. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 800–1 (1992) (citation omitted) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the [Administrative Procedure Act]. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 465–67 (1989) (construing Federal Advisory Committee Act not to apply to advice given by American Bar Association to the President on judicial nominations, to avoid potential constitutional question regarding encroachment on Presidential power to appoint judges).

In the area of foreign affairs, and war powers in particular, the avoidance canon has special force. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 232–33 (1986) (construing federal statutes to avoid curtailment of traditional presidential prerogatives in foreign affairs). We do not lightly assume that Congress has acted to interfere with the President's constitutionally superior position as Chief Executive and Commander in Chief in the area of military operations. *See Egan*, 484 U.S. at 529 (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)). *See also Agee*, 453 U.S. at 291 (deference to Executive Branch is "especially" appropriate "in the area . . . of . . . national security").

In order to respect the President's inherent constitutional authority to manage a military campaign against al Qaeda and its allies, Section 2340A must be construed as not applying to interrogations undertaken pursuant to his Commander-in-Chief authority. As our Office has consistently held during this Administration and previous Administrations, Congress lacks authority under Article I to set the terms and conditions under which the President may exercise his authority as Commander in Chief to control

34

the conduct of operations during a war. *See, e.g.*, Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* (Apr. 8, 2002); Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sep. 25, 2001) ("Flanigan Memorandum"); Memorandum for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Defense Authorization Act* (Sep. 15, 1995). As we discuss below, the President's power to detain and interrogate enemy combatants arises out of his constitutional authority as Commander in Chief. A construction of Section 2340A that applied the provision to regulate the President's authority as Commander-in-Chief to determine the interrogation and treatment of enemy combatants would raise serious constitutional questions. Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield. Accordingly, we would construe Section 2340A to avoid this constitutional difficulty, and conclude that it does not apply to the President's detention and interrogation of enemy combatants pursuant to his Commander-in-Chief authority.

This approach is consistent with previous decisions of our Office involving the application of federal criminal law. For example, we have previously construed the congressional contempt statute not to apply to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. In a published 1984 opinion, we concluded that

> if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.

*Prosecution for Contempt of Congress of an Executive Branch Offical Who Has Asserted A Claim of Executive Privilege*, 8 Op. O.L.C. 101, 134 (May 30, 1984). Likewise, we believe that, if executive officials were subject to prosecution for conducting interrogations when they were carrying out the President's Commander-in-Chief powers, "it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." These constitutional principles preclude an application of Section 2340A to punish officials for aiding the President in exercising his exclusive constitutional authorities. *Id.*

## C.    The Commander-in-Chief Power

It could be argued that Congress enacted 18 U.S.C. § 2340A with full knowledge and consideration of the President's Commander-in-Chief power, and that Congress intended to restrict his discretion in the interrogation of enemy combatants. Even were we to accept this argument, however, we conclude that the Department of Justice could not could not enforce Section 2340A against federal officials acting pursuant to the President's constitutional authority to wage a military campaign.

Indeed, in a different context, we have concluded that both courts and prosecutors should reject prosecutions that apply federal criminal laws to activity that is authorized pursuant to one of the President's constitutional powers. This Office, for example, has previously concluded that Congress could not constitutionally extend the congressional contempt statute to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. We opined that "courts ... would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution." 8 Op. O.L.C. at 141. Further, we concluded that the Department of Justice could not bring a criminal prosecution against a defendant who had acted pursuant to an exercise of the President's constitutional power. "The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual." *Id.* Although Congress may define federal crimes that the President, through the Take Care Clause, should prosecute, Congress cannot compel the President to prosecute outcomes taken pursuant to the President's own constitutional authority. If Congress could do so, it could control the President's authority through the manipulation of federal criminal law.

We have even greater concerns with respect to prosecutions arising out of the exercise of the President's express authority as Commander in Chief than we do with prosecutions arising out of the assertion of executive privilege. In a series of opinions examining various legal questions arising after September 11, we have explained the scope of the President's Commander-in-Chief power.[19] We briefly summarize the findings of those opinions here. The President's constitutional power to protect the security of the United States and the lives and safety of its people must be understood in light of the Founders' intention to create a federal government "cloathed with all the powers requisite to the complete execution of its trust." *The Federalist* No. 23, at 147 (Alexander Hamilton) (Jacob E. Cooke ed. 1961). Foremost among the objectives committed to that trust by the Constitution is the security of the nation. As Hamilton explained in arguing for the Constitution's adoption, because "the circumstances which may affect the public safety" are not "reducible within certain determinate limits,"

---

[19] *See, e.g.,* September 11 War Powers Memorandum; Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

> it must be admitted, as a necessary consequence, that there can be no limitation of that authority, which is to provide for the defence and protection of the community, in any matter essential to its efficacy.

*Id.* at 147–48. Within the limits that the Constitution itself imposes, the scope and distribution of the powers to protect national security must be construed to authorize the most efficacious defense of the nation and its interests in accordance "with the realistic purposes of the entire instrument." *Lichter v. United States*, 334 U.S. 742, 782 (1948).

The text, structure and history of the Constitution establish that the Founders entrusted the President with the primary responsibility, and therefore the power, to ensure the security of the United States in situations of grave and unforeseen emergencies. The decision to deploy military force in the defense of United States interests is expressly placed under Presidential authority by the Vesting Clause, U.S. Const. Art. I, § 1, cl. 1, and by the Commander-in-Chief Clause, *id.*, § 2, cl. 1.[20] This Office has long understood the Commander-in-Chief Clause in particular as an affirmative grant of authority to the President. *See. e.g.*, Memorandum for Charles W. Colson, Special Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* (May 22, 1970) ("Rehnquist Memorandum"). The Framers understood the Clause as investing the President with the fullest range of power understood at the time of the ratification of the Constitution as belonging to the military commander. In addition, the structure of the Constitution demonstrates that any power traditionally understood as pertaining to the executive—which includes the conduct of warfare and the defense of the nation—unless expressly assigned in the Constitution to Congress, is vested in the President. Article II, Section 1 makes this clear by stating that the "executive Power shall be vested in a President of the United States of America." That sweeping grant vests in the President an unenumerated "executive power" and contrasts with the specific enumeration of the powers—those "herein"—granted to Congress in Article I. The implications of constitutional text and structure are confirmed by the practical consideration that national security decisions require the unity in purpose and energy in action that characterize the Presidency rather than Congress.[21]

---

[20] *See Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (President has authority to deploy United States armed forces "abroad or to any particular region"); *Fleming v. Page*, 50 U.S. (9 How.) 603, 614–15 (1850) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual") *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and concurring in judgment) (The "inherent powers" of the Commander in Chief "are clearly extensive."); *Maul v. United States*, 274 U.S. 501, 515-16 (1927) (Brandeis & Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any waters in order to perform any duty of the service"); *Commonwealth of Massachusetts v. Laird*, 451 F.2d 26, 32 (1st Cir. 1971) (the President has "power as Commander-in-Chief to station forces abroad"); *Ex parte Vallandigham*, 28 F.Cas. 874, 922 (C.C.S.D. Ohio 1863) (No. 16,816) (in acting "under this power where there is no express legislative declaration, the president is guided solely by his own judgment and discretion"); *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 6 (Dec. 4, 1992) (Barr, Attorney General).

[21] Judicial decisions since the beginning of the Republic confirm the President's constitutional power and duty to repel military action against the United States and to take measures to prevent the recurrence of an attack. As Justice Joseph Story said long ago, "[i]t may be fit and proper for the government, in the

As the Supreme Court has recognized, the Commander-in-Chief power and the President's obligation to protect the nation imply the ancillary powers necessary to their successful exercise. "The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And, of course, the grant of war power includes all that is necessary and proper for carrying those powers into execution." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). In wartime, it is for the President alone to decide what methods to use to best prevail against the enemy. *See, e.g.*, Rehnquist Memorandum; Flanigan Memorandum at 3. The President's complete discretion in exercising the Commander-in-Chief power has been recognized by the courts. In the *Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862), for example, the Court explained that whether the President "in fulfilling his duties as Commander in Chief" had appropriately responded to the rebellion of the southern states was a question "to be *decided by him*" and which the Court could not question, but must leave to "the political department of the Government to which this power was entrusted."

One of the core functions of the Commander in Chief is that of capturing, detaining, and interrogating members of the enemy. *See, e.g.*, Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Power as Commander in Chief to Transfer Captured Terrorists to the Control and Custody of Foreign Nations* at 3 (March 13, 2002) ("the Commander-in-Chief Clause constitutes an independent grant of substantive authority to engage in the detention and transfer of prisoners captured in armed conflicts"). It is well settled that the President may seize and detain enemy combatants, at least for the duration of the conflict, and the laws of war make clear that prisoners may be interrogated for information concerning the enemy, its strength, and its plans.[22] Numerous Presidents have ordered the capture, detention, and questioning of

---

exercise of the high discretion confided to the executive, for great public purposes, to act on a sudden emergency, or to prevent an irreparable mischief, by summary measures, which are not found in the text of the laws." *The Apollon*, 22 U.S. (9 Wheat.) 362, 366–67 (1824). If the President is confronted with an unforeseen attack on the territory and people of the United States, or other immediate, dangerous threat to American interests and security, it is his constitutional responsibility to respond to that threat with whatever means are necessary. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority."); *United States v. Smith*, 27 F. Cas. 1192, 1229-30 (C.C.D.N.Y. 1806) (No. 16,342) (Paterson, Circuit Justice) (regardless of statutory authorization, it is "the duty . . . of the executive magistrate . . . to repel an invading foe"); *see also* 3 Story, *Commentaries* § 1485 ("[t]he command and application of the public force . . . to maintain peace, and to resist foreign invasion" are executive powers).

[22] The practice of capturing and detaining enemy combatants is as old as war itself. *See* Allan Rosas, The Legal Status of Prisoners of War 44–45 (1976). In modern conflicts, the practice of detaining enemy combatants and hostile civilians generally has been designed to balance the humanitarian purpose of sparing lives with the military necessity of defeating the enemy on the battlefield. *Id.* at 59–80. While Article 17 of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3517, places restrictions on interrogation of enemy combatants, members of al Qaeda and the Taliban militia are not legally entitled to the status of prisoners of war as defined in the Convention. *See* Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* (Jan. 22, 2002).

enemy combatants during virtually every major conflict in the Nation's history, including recent conflicts such as the Gulf, Vietnam, and Korean wars. Recognizing this authority, Congress has never attempted to restrict or interfere with the President's authority on this score. *Id.*

Any effort by Congress to regulate the interrogation of battlefield combatants would violate the Constitution's sole vesting of the Commander-in-Chief authority in the President. There can be little doubt that intelligence operations, such as the detention and interrogation of enemy combatants and leaders, are both necessary and proper for the effective conduct of a military campaign. Indeed, such operations may be of more importance in a war with an international terrorist organization than one with the conventional armed forces of a nation-state, due to the former's emphasis on secret operations and surprise attacks against civilians. It may be the case that only successful interrogations can provide the information necessary to prevent the success of covert terrorist attacks upon the United States and its citizens. Congress can no more interfere with the President's conduct of the interrogation of enemy combatants than it can dictate strategic or tactical decisions on the battlefield. Just as statutes that order the President to conduct warfare in a certain manner or for specific goals would be unconstitutional, so too are laws that seek to prevent the President from gaining the intelligence he believes necessary to prevent attacks upon the United States.

## VI.    Defenses

In the foregoing parts of this memorandum, we have demonstrated that the ban on torture in Section 2340A is limited to only the most extreme forms of physical and mental harm. We have also demonstrated that Section 2340A, as applied to interrogations of enemy combatants ordered by the President pursuant to his Commander-in-Chief power would be unconstitutional. Even if an interrogation method, however, might arguably cross the line drawn in Section 2340, and application of the statute was not held to be an unconstitutional infringement of the President's Commander-in-Chief authority, we believe that under the current circumstances certain justification defenses might be available that would potentially eliminate criminal liability. Standard criminal law defenses of necessity and self-defense could justify interrogation methods needed to elicit information to prevent a direct and imminent threat to the United States and its citizens.

## A.    Necessity

We believe that a defense of necessity could be raised, under the current circumstances, to an allegation of a Section 2340A violation. Often referred to as the "choice of evils" defense, necessity has been defined as follows:

> Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:

(a) the harm or evil sought to be avoided by such conduct is greater than
that sought to be prevented by the law defining the offense charged; and
(b) neither the Code nor other law defining the offense provides
exceptions or defenses dealing with the specific situation involved; and
(c) a legislative purpose to exclude the justification claimed does not
otherwise plainly appear.

Model Penal Code § 3.02. *See also* Wayne R. LaFave & Austin W. Scott, 1 Substantive
Criminal Law § 5.4 at 627 (1986 & 2002 supp.) ("LaFave & Scott"). Although there is
no federal statute that generally establishes necessity or other justifications as defenses to
federal criminal laws, the Supreme Court has recognized the defense. *See United States
v. Bailey*, 444 U.S. 394, 410 (1980) (relying on LaFave & Scott and Model Penal Code
definitions of necessity defense).

The necessity defense may prove especially relevant in the current circumstances.
As it has been described in the case law and literature, the purpose behind necessity is
one of public policy. According to LaFave and Scott, "the law ought to promote the
achievement of higher values at the expense of lesser values, and sometimes the greater
good for society will be accomplished by violating the literal language of the criminal
law." LaFave & Scott, at 629. In particular, the necessity defense can justify the
intentional killing of one person to save two others because "it is better that two lives be
saved and one lost than that two be lost and one saved." *Id.* Or, put in the language of a
choice of evils, "the evil involved in violating the terms of the criminal law ( . . . even
taking another's life) may be less than that which would result from literal compliance
with the law ( . . . two lives lost)." *Id.*

Additional elements of the necessity defense are worth noting here. First, the
defense is not limited to certain types of harms. Therefore, the harm inflicted by
necessity may include intentional homicide, so long as the harm avoided is greater (i.e.,
preventing more deaths). *Id.* at 634. Second, it must actually be the defendant's
intention to avoid the greater harm; intending to commit murder and then learning only
later that the death had the fortuitous result of saving other lives will not support a
necessity defense. *Id.* at 635. Third, if the defendant reasonably believed that the lesser
harm was necessary, even if, unknown to him, it was not, he may still avail himself of the
defense. As LaFave and Scott explain, "if A kills B reasonably believing it to be
necessary to save C and D, he is not guilty of murder even though, unknown to A, C and
D could have been rescued without the necessity of killing B." *Id.* Fourth, it is for the
court, and not the defendant to judge whether the harm avoided outweighed the harm
done. *Id.* at 636. Fifth, the defendant cannot rely upon the necessity defense if a third
alternative is open and known to him that will cause less harm.

It appears to us that under the current circumstances the necessity defense could
be successfully maintained in response to an allegation of a Section 2340A violation. On
September 11, 2001, al Qaeda launched a surprise covert attack on civilian targets in the
United States that led to the deaths of thousands and losses in the billions of dollars.
According to public and governmental reports, al Qaeda has other sleeper cells within the

United States that may be planning similar attacks. Indeed, al Qaeda plans apparently include efforts to develop and deploy chemical, biological and nuclear weapons of mass destruction. Under these circumstances, a detainee may possess information that could enable the United States to prevent attacks that potentially could equal or surpass the September 11 attacks in their magnitude. Clearly, any harm that might occur during an interrogation would pale to insignificance compared to the harm avoided by preventing such an attack, which could take hundreds or thousands of lives.

Under this calculus, two factors will help indicate when the necessity defense could appropriately be invoked. First, the more certain that government officials are that a particular individual has information needed to prevent an attack, the more necessary interrogation will be. Second, the more likely it appears to be that a terrorist attack is likely to occur, and the greater the amount of damage expected from such an attack, the more that an interrogation to get information would become necessary. Of course, the strength of the necessity defense depends on the circumstances that prevail, and the knowledge of the government actors involved, when the interrogation is conducted. While every interrogation that might violate Section 2340A does not trigger a necessity defense, we can say that certain circumstances could support such a defense.

Legal authorities identify an important exception to the necessity defense. The defense is available "only in situations wherein the legislature has not itself, in its criminal statute, made a determination of values." *Id.* at 629. Thus, if Congress explicitly has made clear that violation of a statute cannot be outweighed by the harm avoided, courts cannot recognize the necessity defense. LaFave and Israel provide as an example an abortion statute that made clear that abortions even to save the life of the mother would still be a crime; in such cases the necessity defense would be unavailable. *Id.* at 630. Here, however, Congress has not explicitly made a determination of values vis-à-vis torture. In fact, Congress explicitly removed efforts to remove torture from the weighing of values permitted by the necessity defense.[23]

---

[23] In the CAT, torture is defined as the intentional infliction of severe pain or suffering "for such purpose[] as obtaining from him or a third person information or a confession." CAT art. 1.1. One could argue that such a definition represented an attempt to to indicate that the good of of obtaining information—no matter what the circumstances—could not justify an act of torture. In other words, necessity would not be a defense. In enacting Section 2340, however, Congress removed the purpose element in the definition of torture, evidencing an intention to remove any fixing of values by statute. By leaving Section 2340 silent as to the harm done by torture in comparison to other harms, Congress allowed the necessity defense to apply when appropriate.

Further, the CAT contains an additional provision that "no exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." CAT art. 2.2. Aware of this provision of the treaty, and of the definition of the necessity defense that allows the legislature to provide for an exception to the defense, see Model Penal Code § 3.02(b), Congress did not incorporate CAT article 2.2 into Section 2340. Given that Congress omitted CAT's effort to bar a necessity or wartime defense, we read Section 2340 as permitting the defense.

**B.    Self-Defense**

Even if a court were to find that a violation of Section 2340A was not justified by necessity, a defendant could still appropriately raise a claim of self-defense. The right to self-defense, even when it involves deadly force, is deeply embedded in our law, both as to individuals and as to the nation as a whole. As the Court of Appeals for the D.C. Circuit has explained:

> More than two centuries ago, Blackstone, best known of the expositors of the English common law, taught that "all homicide is malicious, and of course amounts to murder, unless . . . excused on the account of accident or self-preservation. . . ." Self-defense, as a doctrine legally exonerating the taking of human life, is as viable now as it was in Blackstone's time.

*United States v. Peterson*, 483 F.2d 1222, 1228–29 (D.C. Cir. 1973). Self-defense is a common-law defense to federal criminal law offenses, and nothing in the text, structure or history of Section 2340A precludes its application to a charge of torture. In the absence of any textual provision to the contrary, we assume self-defense can be an appropriate defense to an allegation of torture.

The doctrine of self-defense permits the use of force to prevent harm to another person. As LaFave and Scott explain, "one is justified in using reasonable force in defense of another person, even a stranger, when he reasonably believes that the other is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger." *Id.* at 663–64. Ultimately, even deadly force is permissible, but "only when the attack of the adversary upon the other person reasonably appears to the defender to be a deadly attack." *Id.* at 664. As with our discussion of necessity, we will review the significant elements of this defense.[24] According to LaFave and Scott, the elements of the defense of others are the same as those that apply to individual self-defense.

First, self-defense requires that the use of force be *necessary* to avoid the danger of unlawful bodily harm. *Id.* at 649. A defender may justifiably use deadly force if he reasonably believes that the other person is about to inflict unlawful death or serious bodily harm upon another, and that it is necessary to use such force to prevent it. *Id.* at 652. Looked at from the opposite perspective, the defender may not use force when the force would be as equally effective at a later time and the defender suffers no harm or risk by waiting. *See* Paul H. Robinson, 2 Criminal Law Defenses § 131(c) at 77 (1984). If, however, other options permit the defender to retreat safely from a confrontation without having to resort to deadly force, the use of force may not be necessary in the first place. La Fave and Scott at 659–60.

---

[24] Early cases had suggested that in order to be eligible for defense of another, one should have some personal relationship with the one in need of protection. That view has been discarded. LaFave & Scott at 664.

Second, self-defense requires that the defendant's belief in the necessity of using force be reasonable. If a defendant honestly but unreasonably believed force was necessary, he will not be able to make out a successful claim of self-defense. *Id.* at 654. Conversely, if a defendant reasonably believed an attack was to occur, but the facts subsequently showed no attack was threatened, he may still raise self-defense. As LaFave and Scott explain, "one may be justified in shooting to death an adversary who, having threatened to kill him, reaches for his pocket as if for a gun, though it later appears that he had no gun and that he was only reaching for his handkerchief." *Id.* Some authorities, such as the Model Penal Code, even eliminate the reasonability element, and require only that the defender honestly believed—regardless of its unreasonableness—that the use of force was necessary.

Third, many legal authorities include the requirement that a defender must reasonably believe that the unlawful violence is "imminent" before he can use force in his defense. It would be a mistake, however, to equate imminence necessarily with timing—that an attack is immediately about to occur. Rather, as the Model Penal Code explains, what is essential is that , the defensive *response* must be "immediately necessary." Model Penal Code § 3.04(1). Indeed, imminence may be merely another way of expressing the requirement of necessity. Robinson at 78. LaFave and Scott, for example, believe that the imminence requirement makes sense as part of a necessity defense because if an attack is not immediately upon the defender, the defender has other options available to avoid the attack that do not involve the use of force. LaFave and Scott at 656. If, however, the fact of the attack becomes certain and no other options remain, the use of force may be justified. To use a well-known hypothetical, if A were to kidnap and confine B, and then tell B he would kill B one week later, B would be justified in using force in self-defense, even if the opportunity arose before the week had passed. *Id.* at 656; *see also* Robinson at § 131(c)(1) at 78. In this hypothetical, while the attack itself is not imminent, B's use of force becomes immediately necessary whenever he has an opportunity to save himself from A.

Fourth, the amount of force should be proportional to the threat. As LaFave and Scott explain, "the amount of force which [the defender] may justifiably use must be reasonably related to the threatened harm which he seeks to avoid." LaFave and Scott at 651. Thus, one may not use deadly force in response to a threat that does not rise to death or serious bodily harm. If such harm may result, however, deadly force is appropriate. As the Model Penal Code § 3.04(2)(b) states, "[t]he use of deadly force is not justifiable . . . unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat."

Under the current circumstances, we believe that a defendant accused of violating Section 2340A could have, in certain circumstances, grounds to properly claim the defense of another. The threat of an impending terrorist attack threatens the lives of hundreds if not thousands of American citizens. Whether such a defense will be upheld depends on the specific context within which the interrogation decision is made. If an attack appears increasingly likely, but our intelligence services and armed forces cannot prevent it without the information from the interrogation of a specific individual, then the

43

more likely it will appear that the conduct in question will be seen as necessary. If intelligence and other information support the conclusion that an attack is increasingly certain, then the necessity for the interrogation will be reasonable. The increasing certainty of an attack will also satisfy the imminence requirement. Finally, the fact that previous al Qaeda attacks have had as their aim the deaths of American citizens, and that evidence of other plots have had a similar goal in mind, would justify proportionality of interrogation methods designed to elicit information to prevent such deaths.

To be sure, this situation is different from the usual self-defense justification, and, indeed, it overlaps with elements of the necessity defense. Self-defense as usually discussed involves using force against an individual who is about to conduct the attack. In the current circumstances, however, an enemy combatant in detention does not himself present a threat of harm. He is not actually carrying out the attack; rather, he has participated in the planning and preparation for the attack, or merely has knowledge of the attack through his membership in the terrorist organization. Nonetheless, leading scholarly commentators believe that interrogation of such individuals using methods that might violate Section 2340A would be justified under the doctrine of self-defense, because the combatant by aiding and promoting the terrorist plot "has culpably caused the situation where someone might get hurt. If hurting him is the only means to prevent the death or injury of others put at risk by his actions, such torture should be permissible, and on the same basis that self-defense is permissible." Michael S. Moore, *Torture and the Balance of Evils*, 23 Israel L. Rev. 280, 323 (1989) (symposium on Israel's Landau Commission Report).[25] Thus, some commentators believe that by helping to create the threat of loss of life, terrorists become culpable for the threat even though they do not actually carry out the attack itself. They may be hurt in an interrogation because they are part of the mechanism that has set the attack in motion, *id.* at 323, just as is someone who feeds ammunition or targeting information to an attacker. Under the present circumstances, therefore, even though a detained enemy combatant may not be the exact attacker—he is not planting the bomb, or piloting a hijacked plane to kill civilians—he still may be harmed in self-defense if he has knowledge of future attacks because he has assisted in their planning and execution.

Further, we believe that a claim by an individual of the defense of another would be further supported by the fact that, in this case, the nation itself is under attack and has the right to self-defense. This fact can bolster and support an individual claim of self-defense in a prosecution, according to the teaching of the Supreme Court in *In re Neagle*, 135 U.S. 1 (1890). In that case, the State of California arrested and held deputy U.S. Marshal Neagle for shooting and killing the assailant of Supreme Court Justice Field. In granting the writ of habeas corpus for Neagle's release, the Supreme Court did not rely alone upon the marshal's right to defend another or his right to self-defense. Rather, the Court found that Neagle, as an agent of the United States and of the executive branch, was justified in the killing because, in protecting Justice Field, he was acting pursuant to

---

[25] Moore distinguishes that case from one in which a person has information that could stop a terrorist attack, but who does not take a hand in the terrorist activity itself, such as an innocent person who learns of the attack from her spouse. Moore, 23 Israel L. Rev. at 324. Such individuals, Moore finds, would not be subject to the use of force in self-defense, although they might be under the doctrine of necessity.

the executive branch's inherent constitutional authority to protect the United States government. *Id.* at 67 ("We cannot doubt the power of the president to take measures for the protection of a judge of one of the courts of the United States who, while in the discharge of the duties of his office, is threatened with a personal attack which may probably result in his death."). That authority derives, according to the Court, from the President's power under Article II to take care that the laws are faithfully executed. In other words, Neagle as a federal officer not only could raise self-defense or defense of another, but also could defend his actions on the ground that he was implementing the Executive Branch's authority to protect the United States government.

If the right to defend the national government can be raised as a defense in an individual prosecution, as *Neagle* suggests, then a government defendant, acting in his official capacity, should be able to argue that any conduct that arguably violated Section 2340A was undertaken pursuant to more than just individual self-defense or defense of another. In addition, the defendant could claim that he was fulfilling the Executive Branch's authority to protect the federal government, and the nation, from attack. The September 11 attacks have already triggered that authority, as recognized both under domestic and international law. Following the example of *In re Neagle*, we conclude that a government defendant may also argue that his conduct of an interrogation, if properly authorized, is justified on the basis of protecting the nation from attack.

There can be little doubt that the nation's right to self-defense has been triggered under our law. The Constitution announces that one of its purposes is "to provide for the common defense." U.S. Const., Preamble. Article I, § 8 declares that Congress is to exercise its powers to "provide for the common Defence." *See also* 2 Pub. Papers of Ronald Reagan 920, 921 (1988-89) (right of self-defense recognized by Article 51 of the U.N. Charter). The President has a particular responsibility and power to take steps to defend the nation and its people. *In re Neagle*, 135 U.S. at 64. *See also* U.S. Const., art. IV, § 4 ("The United States shall . . . protect [each of the States] against Invasion") . As Commander-in-Chief and Chief Executive, he may use the armed forces to protect the nation and its people. *See, e.g., United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990). And he may employ secret agents to aid in his work as Commander-in-Chief. *Totten v. United States*, 92 U.S. 105, 106 (1876). As the Supreme Court observed in *The Prize Cases*, 67 U.S. (2 Black) 635 (1862), in response to an armed attack on the United States "the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority." *Id.* at 668. The September 11 events were a direct attack on the United States, and as we have explained above, the President has authorized the use of military force with the support of Congress.[26]

---

[26] While the President's constitutional determination alone is sufficient to justify the nation's resort to self-defense, it also bears noting that the right to self-defense is further recognized under international law. Article 51 of the U.N. Charter declares that "[n]othing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations until the Security Council has taken the measures necessary to maintain international peace and security." The attacks of September 11, 2001 clearly constitute an armed attack against the United States, and indeed were the latest in a long history of al Qaeda sponsored attacks against the United States. This conclusion was acknowledged by the United Nations Security Council on September 28, 2001, when it unanimously adopted Resolution 1373 explicitly "reaffirming the inherent right of individual and collective self-defence

As we have made clear in other opinions involving the war against al Qaeda, the nation's right to self-defense has been triggered by the events of September 11. If a government defendant were to harm an enemy combatant during an interrogation in a manner that might arguably violate Section 2340A, he would be doing so in order to prevent further attacks on the United States by the al Qaeda terrorist network. In that case, we believe that he could argue that his actions were justified by the executive branch's constitutional authority to protect the nation from attack. This national and international version of the right to self-defense could supplement and bolster the government defendant's individual right.

### Conclusion

For the foregoing reasons, we conclude that torture as defined in and proscribed by Sections 2340–2340A, covers only extreme acts. Severe pain is generally of the kind difficult for the victim to endure. Where the pain is physical, it must be of an intensity akin to that which accompanies serious physical injury such as death or organ failure. Severe mental pain requires suffering not just at the moment of infliction but it also requires lasting psychological harm, such as seen in mental disorders like posttraumatic stress disorder. Additionally, such severe mental pain can arise only from the predicate acts listed in Section 2340. Because the acts inflicting torture are extreme, there is significant range of acts that though they might constitute cruel, inhuman, or degrading treatment or punishment fail to rise to the level of torture.

Further, we conclude that under the circumstances of the current war against al Qaeda and its allies, application of Section 2340A to interrogations undertaken pursuant to the President's Commander-in-Chief powers may be unconstitutional. Finally, even if an interrogation method might violate Section 2340A, necessity or self-defense could provide justifications that would eliminate any criminal liability.

Please let us know if we can be of further assistance.

Jay S. Bybee
Assistant Attorney General

---

as recognized by the charter of the United Nations." This right of self-defense is a right to effective self-defense. In other words, the victim state has the right to use force against the aggressor who has initiated an "armed attack" until the threat has abated. The United States, through its military and intelligence personnel, has a right recognized by Article 51 to continue using force until such time as the threat posed by al Qaeda and other terrorist groups connected to the September 11th attacks is completely ended." Other treaties re-affirm the right of the United States to use force in its self-defense. See, e.g., Inter-American Treaty of Reciprocal Assistance, art. 3, Sept. 2, 1947, T.I.A.S. No. 1838, 21 U.N.T.S. 77 (Rio Treaty); North Atlantic Treaty, art. 5, Apr. 4, 1949, 63 Stat. 2241, 34 U.N.T.S. 243.

APPENDIX

Cases in which U.S. courts have concluded the defendant tortured the plaintiff:

- Plaintiff was beaten and shot by government troops while protesting the destruction of her property. *See Wiwa v. Royal Dutch Petroleum*, 2002 WL 319887 at *7 (S.D.N.Y. Feb. 28, 2002).

- Plaintiff was removed from ship, interrogated, and held incommunicado for months. Representatives of defendant threatened her with death if she attempted to move from quarters where she was held. She was forcibly separated from her husband and unable to learn of his welfare or whereabouts. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 180 F. Supp. 2d 78, 88 (D.D.C. 2001) (Rule 12(b)(6) motion).

- Plaintiff was held captive for five days in a small cell that had no lights, no window, no water, and no toilet. During the remainder of his captivity, he was frequently denied food and water and given only limited access to the toilet. He was held at gunpoint, with his captors threatening to kill him if he did not confess to espionage. His captors threatened to cut off his fingers, pull out his fingernails, and shock his testicles. *See Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 22–23, 25 (D.D.C. 2001) (default judgment).

- Plaintiff was imprisoned for 205 days. He was confined in a car park that had been converted into a prison. His cell had no water or toilet and had only a steel cot for a bed. He was convicted of illegal entry into Iraq and transferred to another facility, where he was placed in a cell infested with vermin. He shared a single toilet with 200 other prisoners. While imprisoned he had a heart attack but was denied adequate medical attention and medication. *See Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 22–23 (D.D.C. 2001) (default judgment).

- Plaintiff was imprisoned for 126 days. At one point, a guard attempted to execute him, but another guard intervened. A truck transporting the plaintiff ran over pedestrian at full speed without stopping. He heard other prisoners being beaten and he feared being beaten. He had serious medical conditions that were not promptly or adequately treated. He was not given sufficient food or water. *See Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 22–23 (D.D.C. 2001) (default judgment).

- Allegations that guards beat, clubbed, and kicked the plaintiff and that the plaintiff was interrogated and subjected to physical and verbal abuse sufficiently stated a claim for torture so as to survive Rule 12(b)(6) motion. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 110 F. Supp. 2d 10 (D.D.C. 2000).

- Plaintiffs alleged that they were blindfolded, interrogated and subjected to physical, mental, and verbal abuse while they were held captive. Furthermore,

47

one plaintiff was held eleven days without food, water, or bed. Another plaintiff was held for four days without food, water, or a bed, and was also stripped naked, blindfolded, and threatened with electrocution of his testicles. The other two remaining plaintiffs alleged that they were not provided adequate or proper medical care for conditions that were life threatening. The court concluded that these allegations sufficiently stated a claim for torture and denied defendants Rule 12(b)(6) motion. *See Daliberti v. Republic v. Iraq*, 97 F. Supp. 2d 38, 45 (D.D.C. 2000) (finding that these allegations were "more than enough to meet the definition of torture in the [TVPA]").

- Plaintiff's kidnappers pistol-whipped him until he lost consciousness. They then stripped him and gave him only a robe to wear and left him bleeding, dizzy, and in severe pain. He was then imprisoned for 1,908 days. During his imprisonment, his captors sought to force a confession from him by playing Russian Roulette with him and threatening him with castration. He was randomly beaten and forced to watch the beatings of others. Additionally, he was confined in a rodent and scorpion infested cell. He was bound in chains almost the entire time of his confinement. One night during the winter, his captors chained him to an upper floor balcony, leaving him exposed to the elements. Consequently, he developed frostbite on his hands and feet. He was also subjected to a surgical procedure for an unidentified abdominal problem. *See Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998).

- Plaintiff was kidnapped at gunpoint. He was beaten for several days after his kidnapping. He was subjected to daily torture and threats of death. He was kept in solitary confinement for two years. During that time, he was blindfolded and chained to the wall in a six-foot by six-foot room infested with rodents. He was shackled in a stooped position for 44 months and he developed eye infections as a result of the blindfolds. Additionally, his captors did the following: forced him to kneel on spikes, administered electric shocks to his hands; battered his feet with iron bars and struck him in the kidneys with a rifle; struck him on the side of his head with a hand grenade, breaking his nose and jaw; placed boiling tea kettles on his shoulders; and they laced his food with arsenic. *See Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C.1998).

- Plaintiff was pistol-whipped, bound and gagged, held captive in darkness or blindfold for 18 months. He was kept chained at either his ankles or wrists, wearing nothing but his undershorts and a t-shirt. As for his meals, his captors gave him pita bread and dry cheese for breakfast, rice with dehydrated soup for lunch, and a piece of bread for dinner. Sometimes the guards would spit into his food. He was regularly beaten and incessantly interrogated; he overheard the deaths and beatings of other prisoners. *See Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, (D.D.C.1998).

- Plaintiff spent eight years in solitary or near solitary confinement. He was threatened with death, blindfolded and beaten while handcuffed and fettered. He

48

was denied sleep and repeatedly threatened him with death. At one point, while he was shackled to a cot, the guards placed a towel over his nose and mouth and then poured water down his nostrils. They did this for six hours. During this incident, the guards threatened him with death and electric shock. Afterwards, they left him shackled to his cot for six days. For the next seven months, he was imprisoned in a hot, unlit cell that measured 2.5 square meters. During this seven-month period, he was shackled to his cot—at first by all his limbs and later by one hand or one foot. He remained shackled in this manner except for the briefest moments, such as when his captors permitted him to use the bathroom. The handcuffs cut into his flesh. *See Hilao v. Estate of Marcos*, 103 F.3d 789, 790 (9th Cir. 1996). The court did not, however, appear to consider the solitary confinement per se to constitute torture. *See id.* at 795 (stating that to the extent that [the plaintiff's] years in solitary confinement do not constitute torture, they clearly meet the definition of prolonged arbitrary detention.").

- High-ranking military officers interrogated the plaintiff and subjected him to mock executions. He was also threatened with death. *See Hilao v. Estate of Marcos*, 103 F.3d 789, 795 (9th Cir. 1996).

- Plaintiff, a nun, received anonymous threats warning her to leave Guatemala. Later, two men with a gun kidnapped her. They blindfolded her and locked her in an unlit room for hours. The guards interrogated her and regardless of the answers she gave to their questions, they burned her with cigarettes. The guards then showed her surveillance photographs of herself. They blindfolded her again, stripped her, and raped her repeatedly. *See Xuncax v. Gramajo*, 886 F. Supp. 162, 176 (1995).

- Plaintiffs were beaten with truncheons, boots, and guns and threatened with death. Nightsticks were used to beat their backs, kidneys, and the soles of their feet. The soldiers pulled and squeezed their testicles. When they fainted from the pain, the soldiers revived them by singeing their nose hair with a cigarette lighter. They were interrogated as they were beaten with iron barks, rifle butts, helmets, and fists. One plaintiff was placed in the "djak" position, *i.e.*, with hands and feet bound and suspended from a pole. Medical treatment was withheld for one week and then was sporadic and inadequate. *See Paul v. Avril*, 901 F. Supp. 330, 332 (S.D. Fla. 1994).

- Alien subjected to sustained beatings for the month following his first arrest. After his second arrest, suffered severe beatings and was burned with cigarettes over the course of an eight-day period. *Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001) (deportation case).

- Decedent was attacked with knifes and sticks, and repeatedly hit in the head with the butt of a gun as he remained trapped in his truck by his attackers. The attackers then doused the vehicle with gasoline. Although he managed to get out

49

of the truck, he nonetheless burned to death. *Tachiona v. Mugabe*, No. 00 Civ. 6666VMJCF, 2002 WL 1424598 at *1 (S.D.N.Y. July 1, 2002).

- Decedent was attacked by spear, stick, and stone wielding supporters of defendant. He was carried off by the attackers and "was found dead the next day, naked and lying in the middle of the road[.]" From the physical injuries, it was determined that the had been severely beaten. According to his death certificate, he died from "massive brain injury from trauma; [] assault; and [] laceration of the right lung." *Tachiona v. Mugabe*, No. 00 Civ. 6666VMJCF, 2002 WL 1424598 at *2 (S.D.N.Y. July 1, 2002).

- Decedent was abducted, along with five others. He and the others were severely beaten and he was forced to drink diesel oil. He was then summarily executed. *Tachiona v. Mugabe*, No. 00 Civ. 6666VMJCF, 2002 WL 1424598 at *4 (S.D.N.Y. July 1, 2002).

- Forced sterilization constitutes torture. *Bi Zhu Lin v. Ashcroft*, 183 F. Supp. 2d 551 (D. Conn. 2002) (noting determination by immigration judge that such conduct constitutes torture).

There are two cases in which U.S. courts have rejected torture claims on the ground that the alleged conduct did not rise to the level of torture. In *Faulder v. Johnson*, 99 F. Supp. 2d 774 (S.D. Tex. 1999), the district court rejected a death row inmate's claim that psychological trauma resulting from repeated stays of his execution and his 22-year-wait for that execution was torture under CAT. The court rejected this contention because of the United States' express death penalty reservation to CAT. *See id.* In *Eastman Kodak v. Kavlin*, 978 F. Supp. 1078, 1093 (S.D. Fla. 1997), the plaintiff was held for eight days in a filthy cell with drug dealers and an AIDS patient. He received no food, no blanket and no protection from other inmates. Prisoners murdered one another in front of the plaintiff. *Id.* The court flatly rejected the plaintiff's claim that this constituted torture.