1  NATALIE L. BRIDGEMAN, State Bar No. 223717
   Law Offices of Natalie L. Bridgeman, Esq.
2  131 Steuart Street, Suite 400
   San Francisco, CA 94105
3  Telephone:  (415) 979-0150
   Facsimile:  (415) 520-0140
4  Email: natalie@ihrlaw.com

5  JONATHAN M. FREIMAN (*pro hac vice*)
   HOPE R. METCALF (*pro hac vice*)
6  127 Wall Street
   New Haven, CT 06520-8215
7  Telephone: (203) 498-4584
   Facsimile: (203) 782-2889
8  Email: jonathan.freiman@yale.edu

9

10 Attorneys for Jose Padilla and Estela Lebron, Plaintiffs

11

12              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
13               SAN FRANCISCO DIVISION

14 Jose Padilla and Estela Lebron,        )   **CASE NO.:**  3:08-cv-00035-JSW_____
                                          )
15          Plaintiffs,                    )
                                          )
16      v.                                 )   **FIRST AMENDED COMPLAINT**
                                          )
17 John Yoo,                               )
                                          )
18          Defendant.                     )
                                          )
19                                         )
                                          )
20 _____)

21

22

23

24

25

26

27

28

-1-

FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.    Plaintiff Jose Padilla is a United States citizen who was imprisoned in a military brig in Charleston, South Carolina, without charge, and without ability to defend himself or to challenge his conditions of confinement.  During his military detention, which lasted three years and eight months, Mr. Padilla suffered gross physical and psychological abuse upon the orders of high-ranking government officials as part of a systematic program of abusive interrogation mirroring the abuses committed at Guantanamo Bay, including but not limited to: extreme isolation; interrogation under threat of torture, deportation, and even death; prolonged sleep adjustment and sensory deprivation; exposure to extreme temperatures and noxious odors; denial of access to necessary medical and psychiatric care; substantial interference with his ability to practice his religion; and almost two years without any access to family, counsel or the courts.

2.    Plaintiff Estela Lebron, Mr. Padilla's mother, was deprived of virtually all contact with him, in violation of her constitutional rights to familial association and communication.  Ms. Lebron was injured by the continued denial of her right to association with her son during his prolonged, unlawful military detention.

3.    Defendant John Yoo, a resident of this district, is one of several current and former government officials who abused their high positions to cause the unlawful military detention and interrogation of Mr. Padilla.  Defendant set in motion Mr. Padilla's illegal interrogation and detention, both by formulating unlawful policies for the designation, detention, and interrogation of suspected "enemy combatants" and by issuing legal memoranda designed to evade all legal constraints on those policies and to immunize those who implemented them.  In so doing, he abdicated his ethical duties as a government attorney and abandoned his office's tradition of objectivity.

4.    As a proximate and foreseeable result of Defendant's abuse of his authority, Mr. Padilla was labeled an "enemy combatant" and illegally detained for three years and eight months without criminal charge under conscience-shocking conditions at the Naval Brig at Charleston, South Carolina, where he endured physical and psychological abuse intended to break his spirit.

5.     Mr. Padilla's designation as an enemy combatant, military detention, conditions of confinement, and program of interrogation were unlawful and violated, *inter alia*: his rights to procedural and substantive due process; his right not to be subjected to cruel or unusual punishment or treatment that shocks the conscience or otherwise violates United States laws and regulations; his right freely to exercise his religion; his right to access information; his right to association with family members and friends; his right of access to legal counsel; his right of access to court; his right against compelled self-incrimination; and his right against arbitrary and unconstitutional seizure and military detention.

6.     Mr. Padilla suffered and continues to suffer severe mental and physical harm as a result of the forty-four months of unlawful military detention and interrogation for which Defendant Yoo personally purported to provide a legal blank check, as well as ongoing deprivation of liberty, stigmatization, and psychological trauma from the "enemy combatant" designation, which remains in effect, and upon the basis of which the government has reserved the right to re-detain Mr. Padilla at any time.

7.     Plaintiffs Padilla and Lebron assert this complaint against Defendant in his individual capacity, seeking declaratory relief and $1.00 in monetary damages.

**JURISDICTION**

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 42 U.S.C. § 2000bb (Religious Freedom Restoration Act), and directly under the Constitution as interpreted by *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e).

**INTRADISTRICT ASSIGNMENT**

10.     Defendant Yoo resides in Alameda County. Per Civil Local Rule ("L.R.") 3-2(c)-(d) and 3-5(b), this civil action may be assigned to either the San Francisco or Oakland Divisions of the Northern District of California.

**PARTIES**

11.     Mr. Padilla is an American citizen. From on or about June 9, 2002, until on or about January 5, 2006 (the "Relevant Time Period"), Mr. Padilla was detained as an "enemy

-3-

combatant" at the Naval Consolidated Brig at the Naval Weapons Station in Charleston, South Carolina ("Brig"). On January 5, 2006, Mr. Padilla was transferred from the Brig to a federal detention center in Miami, Florida, where he stood trial before Hon. Marcia G. Cooke of the U.S. District Court for the Southern District of Florida on criminal charges unrelated to the allegations that had been used to justify his military detention without charge. On August 16, 2007, the jury returned a verdict of guilty; the judgment is currently subject to appeal.

12.    Ms. Lebron is an American citizen and the mother of Mr. Padilla. For the Relevant Period, Ms. Lebron was denied virtually all contact with her son, Mr. Padilla.

13.    During part of the Relevant Period, from 2001 through May 2003, Defendant John Yoo was Deputy Assistant Attorney General in the Office of Legal Counsel. Upon information and belief, Defendant Yoo is a citizen of the United States and a resident of California, where he maintains his primary residence. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

**Defendant Devised Illegal Interrogation and Detention Policies and Issued Memoranda Intended to Justify Those Policies and Immunize Those Who Implemented Them.**

14.    From 2001 to 2003, Defendant was Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) of the Department of Justice.

15.    As he has publicly acknowledged in his book "War By Other Means," Defendant stepped beyond his role as a lawyer to participate directly in developing policy in the war on terrorism. He shaped government policy in his role as key member of a small, secretive, and highly-influential group of senior administration officials known as the "War Council," which met regularly "to develop policy in the war on terrorism."

16.    Defendant further acted outside the scope of his employment at OLC by taking instructions directly from White House Counsel Alberto Gonzales ("Gonzales") and providing Gonzales with verbal and written advice without first consulting Attorney General Ashcroft.

17.    The OLC assists the Attorney General in providing the President with legal guidance necessary to ensure that the Executive complies with our Constitution and laws. OLC

has a long and powerful tradition of providing the Executive with fair appraisals of applicable law, even when that appraisal may constrain the President's policy choices.

18.    According to former Assistant Attorney General and OLC head Jack Goldsmith ("Goldsmith"), after September 11, 2001, Goldsmith's predecessor as head of OLC, then-Assistant Attorney General Jay Bybee ("Bybee"), "largely delegated OLC's war-on-terrorism responsibilities to Yoo."

19.    In his role as the *de facto* head of war-on-terrorism legal issues, Defendant wrote and promulgated a series of memoranda (the "Memos"). The Memos included but were not limited to:

a.    A memorandum dated October 23, 2001 from Defendant to Gonzales and Department of Defense General Counsel Haynes ("Haynes") regarding *Authority for Use of Military Force to Combat Terrorist Activities Within the United States*, which concluded, *inter alia*, that "the Fourth Amendment had no application to domestic military operations," and "restrictions outlined in the Fifth Amendment simply do not address actions the Executive takes in conducting a military campaign against the nation's enemies." Though the memorandum involves the use of military force within the United States, the Executive has so far refused to release the memorandum to the American public;

b.    A memorandum dated December 21, 2001 from Defendant to Haynes regarding *Possible Criminal Charges Against American Citizen Who Was a Member of the Al Qaeda Terrorist Organization or the Taliban Militia.* The Executive has so far refused to release the memorandum to the public;

c.    A draft memorandum dated January 9, 2002 from Defendant to Haynes on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees* (attached as Exhibit A);

d.    A memorandum dated January 22, 2002 to Gonzales on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees*, signed by Bybee but drafted by Defendant Yoo (attached as Exhibit B);

FIRST AMENDED COMPLAINT

1     e.     A memorandum dated February 26, 2002 to Haynes on *Potential Legal Constraints*

2  *Applicable to Interrogations of Persons Captured by U.S. Armed Forces in Afghanistan,* signed by

3  Bybee but, upon information and belief, created by Defendant (attached as Exhibit C);

4     f.     Upon information and belief, an OLC memorandum drafted in or about May 2002

5  regarding access to counsel and legal mail by detainees held at the naval brigs in Norfolk and

6  Charleston;

7     g.     A memorandum dated June 27, 2002 from Defendant to Assistant Attorney General

8  Bryant of the Office of Legislative Affairs regarding *The Applicability of 18 U.S.C. Sec. 4001(a)*

9  *to Military Detention of United States Citizens*.  The Executive has so far refused to release the

10  memorandum to the public;

11     h.     A memorandum dated August 1, 2002 to Gonzales on *Standards of Conduct for*

12  *Interrogation under 18 U.S.C. §§ 2340-2340A,* signed by Bybee but created by Defendant, and

13  concluding, *inter alia*, that an interrogation technique must cause damage that rises "to the level of

14  death, organ failure, or the permanent impairment of a significant body function," in order to be

15  considered torture (attached as Exhibit D);

16     i.     Upon information and belief, a second memorandum produced during August 2002

17  addressing the legality of particular interrogation techniques that the CIA wished to employ.  The

18  Executive has so far refused to release the memorandum to the public;

19     j.     An opinion dated March 14, 2003, from Defendant to Haynes, on *Military*

20  *Interrogation of Alien Unlawful Combatants Held Outside the United States,* extending authority

21  to use harsh interrogation techniques against high-level prisoners held at Guantanamo Bay

22  ("Guantanamo") and other facilities under DOD control, and approving the use of mind-altering

23  drugs during interrogations (attached as Exhibit E).

24     20.     Upon information and belief, Defendant also reviewed and approved a November

25  27, 2002 memorandum by Haynes, attached as Exhibit F ("Haynes Memo"), which recommended

26  that Secretary of Defense Rumsfeld ("Rumsfeld") approve for use by the military a range of

27  aggressive interrogation techniques not permitted by the military interrogation field manual.

28

21.    The Memos advised *inter alia* that there were no legal constraints — either domestic or international — on the Executive's policies with respect to the detention and interrogation of suspected terrorists.  According to Defendant, neither the Fourth nor Fifth Amendments placed any limitations on the President's power to capture, interrogate or detain terrorism suspects, inside the United States or outside it.  Likewise, the memoranda instructed that the Geneva Conventions were inapplicable to detention and interrogation of terrorism suspects.

22.    The Memos did not provide the fair and impartial evaluation of the law required by OLC tradition and the ethical obligation of an attorney to provide the client with an exposition of the law adequate to make an informed decision.  Rather, as former CIA director James Woolsey, Defense Policy Board member Professor Ruth Wedgwood, and former Assistant Attorney General Goldsmith have variously observed, the Memos are "deeply flawed: sloppily reasoned, overbroad, and incautious," "rest on cursory and one-sided legal arguments," "lack the tenor of detachment and caution that usually characterizes OLC work," and patently "bend and twist to avoid any legal restrictions."  Goldsmith has further observed that "[i]n their redundant and one-sided effort to eliminate any hurdles posed by the torture law, and in their analysis of defenses and other ways to avoid prosecution for Executive violation of federal laws, the opinions could be interpreted as if they were designed to confer immunity for bad acts."  According to Alberto Mora, then-General Counsel to the Navy, Yoo's memo on interrogation techniques was "fundamentally in error."  Mora went on explain that "[b]ecause [the memo] identifies no boundaries to action – more it alleges there are none – it is virtually useless as guidance as now drafted and dangerous in that it might give a false sense of comfort."  *See* Alberto J. Mora, *Memorandum for Inspector General, Department of the Navy*, July 7, 2004 ("Mora Memo"), attached hereto as Exhibit G.

23.    Upon information and belief, Defendant did not in the Memos attempt to provide fair legal analysis to guide the Executive's decision-making, but instead intentionally used the

-7-

FIRST AMENDED COMPLAINT

Memos to evade well-established legal constraints and to justify illegal policy choices that he knew had already been made – sometimes by virtue of his own participation in the War Council.

24.    Alternatively, upon information and belief, Defendant was deliberately indifferent to the fact that the policies outlined in the Memos were plainly illegal and carried a substantial risk of serious harm to Mr. Padilla and other detainees who would be subjected to those policies.

25.    The Memos intentionally were not circulated to other government agencies with relevant expertise, such as the State Department but, as Goldsmith concluded, "were deliberately withheld from other agencies in order to control the outcome and minimize resistance."

26.    Defendant's determination to provide legal justification for pre-formulated policies was so extreme that then-Attorney General Ashcroft (Ashcroft) nicknamed Defendant "Dr. Yes," and OLC chief Goldsmith was warned that his opinion on a legal question related to Iraqi insurgents would be unwelcome in the White House because "[t]hey've never been told 'no.'"

27.    Upon information and belief, Defendant's January 2002 memo, stating that suspected members of the Taliban and al-Qaeda were not eligible for the most basic Geneva Convention protections against inhuman and degrading treatment, was designed to justify the Executive's already concluded policy decision to employ unlawfully harsh interrogation tactics.

28.    Following a July 2002 War Council session in which Defendant and fellow War Council members "discussed in great detail how to legally justify" "pressure techniques proposed by the CIA," including waterboarding, mock burial, and open-handed slapping of suspects, Defendant wrote his August 1, 2002 memo, which stated that acts of interrogation would not constitute torture unless they caused pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death."

29.    Upon information and belief, the August 1, 2002 memo was designed to remove legal restraints on interrogators so as to justify the Executive's already concluded policy decision.

30.    By issuing legal memoranda intended to justify policy choices, or acting in deliberate indifference to the illegality of those policies and the substantial risk of serious harm caused by them, Defendant violated OLC practice and well-established OLC precedent prohibiting the Department of Justice from issuing a legal opinion where a conclusion has been "already

-8-

reached and about which the official presenting the question merely desires [a] confirmatory opinion." *Jurisdiction of the Attorney General-Certain Cases in which the Attorney General will not Render an Opinion*, 38 Op. Atty. Gen. 149 (1933); *see also Opinion of the Hon. Charles H. Aldrich,* 20 Op. Atty. Gen. 440 (1898) (refusing to issue an opinion where a decision had been made).

31.    Upon information and belief, Defendant also crafted the August 1, 2002 and March 14, 2003 memoranda with the specific intent of immunizing government officials from criminal liability for participating in practices that Defendant Yoo knew to be unlawful.

32.    In addition to redefining torture, Defendant's August 2002 memo further encouraged aggressive interrogation by stating that even if extreme interrogation methods were eventually deemed to constitute war crimes or torture under federal criminal statutes, officials interrogating prisoners could nevertheless escape criminal liability by claiming the common law defenses of necessity or self-defense.

33.    Similarly, Defendant's March 2003 memo on interrogation of enemy combatants states that Defendant had received assurances from the Criminal Division of the Justice Department that prosecutions would not be brought against interrogators, reinforcing the point that even federal officials who committed war crimes or torture under federal criminal statutes would escape responsibility for their crimes.

34.    Defendant persisted in justifying abusive interrogation techniques despite warnings from senior attorneys in the Pentagon, FBI, and Navy that those techniques were unlawful:

a.    Upon information and belief, senior Pentagon legal counsel told Defendant that government agents could be criminally prosecuted if they used techniques that Defendant planned to approve;

b.    On November 27, 2002, an FBI special agent sent a memorandum to FBI legal counsel, attached as Exhibit H, stating that the eighteen techniques recommended for implementation by Defendant and Haynes were unlawful under the U.S. Constitution and could violate the U.S. Torture Statute, exposing agents who used them to criminal liability;

FIRST AMENDED COMPLAINT

c.     In December 2002, then-General Counsel to the Navy, Alberto Mora also told Haynes that the techniques recommended in the Haynes Memo, upon information and belief reviewed and approved by Defendant, were unlawful and that the authorization of those techniques was causing detainees at Guantanamo to be subjected to abusive, degrading, and illegal interrogations; and

d.     In February 2003, Mora also met directly with Defendant and told him that the legal analysis in a draft of the March 2003 Memo on interrogation techniques was deeply flawed and dangerous.

**Defendant Personally Participated in Mr. Padilla's Unlawful Military Detention.**

35.     On or about May 8, 2002, Mr. Padilla was arrested in Chicago O'Hare International Airport, pursuant to a material witness warrant issued by the U.S. District Court for the Southern District of New York. He was transported to New York where he was held in custody in a federal detention facility. He was assigned court-appointed counsel, and a motion to vacate the material witness warrant was filed.

36.     As Defendant relates in his book "War By Other Means," Defendant and others developed an extra-judicial, *ex parte* assessment of enemy combatant status followed by indefinite military detention, without notice or opportunity for a hearing of any sort, and it completely precluded judicial review of the designation.

37.     Defendant knew or was deliberately indifferent to the fact that this procedure for designating a U.S. citizen as an enemy combatant violated U.S. law.

38.     According to Defendant's book, Defendant personally "reviewed the material on Padilla to determine whether he could qualify, legally, as an enemy combatant, and issued an opinion to that effect."

39.     As described by Gonzales in a February 24, 2004 speech to the American Bar Association, attached as Exhibit I, and as stated in Defendant's book, Ashcroft relied on Defendant's opinion in recommending to the President that Mr. Padilla be taken into military custody.

-10-

FIRST AMENDED COMPLAINT

40.    Based on Defendant's legal opinion and Ashcroft's recommendation, President George W. Bush issued an order dated June 9, 2002, attached as Exhibit J, declaring Mr. Padilla an "enemy combatant," directing Rumsfeld to take Mr. Padilla into military custody, and stating that these actions were "consistent with U.S. law and the laws of war."

41.    On June 27, 2002, Defendant prepared a memorandum for Assistant Attorney General Bryant of the Office of Legislative Affairs regarding *The Applicability of 18 U.S.C. Sec. 4001(a) to Military Detention of United States Citizens*. Though the memorandum involves the military detention of U.S. citizens, the Executive has so far refused to release it to the public.

42.    In his book, Defendant states that he had the security clearance to, and in fact did, "read the intelligence reports" on Mr. Padilla before purporting to provide legal authority for Mr. Padilla's designation and detention as an enemy combatant. Accordingly, Defendant knew or was deliberately indifferent to the constitutional inadequacy of a significant portion of the evidence upon which he based his recommendation that Mr. Padilla be deprived of his liberty, namely the uncorroborated statements of two confidential sources detained and interrogated outside of the United States, at least one of whom had been questioned while under treatment with various kinds of medication. *See* Declaration of Michael J. Mobbs, Special Advisor to the Under Secretary of Defense for Policy, August 27, 2002, attached as Exhibit K.

43.    Mr. Padilla is not an "enemy combatant" and the factual basis for his designation as such has never been reviewed by any court.

44.    Nevertheless, as a proximate and foreseeable result of Defendant's actions, Mr. Padilla was declared an "enemy combatant" and held in military custody at the Brig for over three and a half years (from June 9, 2002, until January 5, 2006).

**Defendant's Actions Proximately and Foreseeably Caused Mr. Padilla to Suffer Abusive and Unlawful Interrogations and Conditions of Confinement.**

45.    During his detention in the Brig, Mr. Padilla was subjected to a systematic program of unlawful interrogation methods and conditions of confinement, which proximately and foreseeably caused Mr. Padilla to suffer extreme isolation, sensory deprivation, severe physical

pain, sleep deprivation, and profound disruption of his senses and personality, all well beyond the physical and mental discomfort that normally accompanies incarceration.

46.    Upon information and belief, the policies that Defendant participated in developing, including through his participation on the War Council, proximately and foreseeably led to the abuses suffered by Mr. Padilla.

47.    Upon information and belief, the Memos – and the Haynes Memo that Defendant approved – proximately and foreseeably gave interrogators and custodians a green light for abusive interrogation and detention, thereby setting in motion the abuses suffered by Mr. Padilla.

48.    On December 2, 2002, upon information and belief having been assured that the Department of Justice, through Defendant, had approved the Haynes Memo, Secretary Rumsfeld accepted the Haynes Memo and authorized the use of the following interrogation techniques:

    a) Yelling;

    b) Deception;

    c) Stress positions for up to four hours;

    d) Falsified documents and reports;

    e) Use of isolation facilities for renewable periods of up to 30 days;

    f) Interrogation in an environment other than the standard interrogation room;

    g) Deprivation of light and auditory stimuli;

    h) Hooding;

    i) 20-hour interrogations;

    j) Removal of all comfort items, including religious items;

    k) Removal of clothing;

    l) Forced grooming;

    m) Using individual phobias to induce stress;

    n) Dietary manipulation;

o) Environmental manipulation, including by adjusting the temperature or introducing an unpleasant smell;

p) Sleep adjustment, including by reversing sleep cycles from night to day; and

q) Grabbing, poking in the chest, and pushing.

49.    Upon information and belief, Rumsfeld rescinded this authorization when Haynes was informed that the techniques violated U.S. and international law and military tradition.

50.    After rescinding the December 2, 2002, authorization, Rumsfeld convened a Working Group on Detainee Interrogations in the Global War on Terrorism (Working Group), which on April 1, 2003 produced a report, attached as Exhibit L, recommending that all techniques previously approved be re-approved for use on detainees outside of the United States. On April 16, 2003, Rumsfeld issued a memorandum to the Commander of the U.S. Southern Command, attached as Exhibit M, authorizing for use at Guantanamo the techniques recommended by the Working Group.

51.    The Working Group relied heavily upon the Memos, and sections of the March 6, 2003 draft of the Working Group Report, attached as Exhibit N, pertaining to the interpretation of the Torture Statute and the availability of the defenses of necessity and self-defense, were copied verbatim from Defendant's August 1, 2002 OLC Memo on *Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A*.

52.    The December 2002 and April 2003 authorizations proximately and foreseeably caused aggressive interrogation techniques to spread to detainee operations in other areas, as numerous government reports have documented.

53.    Defendant, on information and belief, intended or was deliberately indifferent to the fact that Mr. Padilla would be subjected to the illegal policies Defendant set in motion and to the substantial risk that Mr. Padilla would suffer severe harm as a result. Defendant personally recommended Mr. Padilla's unlawful military detention as a suspected enemy combatant and then wrote opinions to justify the use of unlawful interrogation methods against persons suspected of being enemy combatants. It was foreseeable that the illegal interrogation policies would be

FIRST AMENDED COMPLAINT

1  applied to Mr. Padilla, who was under the effective control of the U.S. Southern Command — the

2  same military authority that controlled Guantanamo — and was one of only two suspected enemy

3  combatants held at the Brig.

4          54.    In fact, Brig officials were ordered to treat suspected enemy combatants detained at

5  the Brig — including Mr. Padilla — in the exact same manner that suspected enemy combatants

6  were treated at Guantanamo.

7          55.    During Mr. Padilla's detention, government officials subjected him to many of the

8  interrogation techniques and conditions of confinement employed against detainees at

9  Guantanamo, including:

10         a.    Extreme and prolonged isolation;

11         b.    Deprivation of light;

12         c.    Exposure to prolonged periods of artificial light;

13         d.    Extreme variations in temperature;

14         e.    Sleep adjustment;

15         f.    Threats to subject him to physical abuse resulting in severe physical pain and

16               suffering, or death, including threats to cut him with a knife and pour alcohol into

17               the wounds;

18         g.    Threats to kill him immediately;

19         h.    Threats to transfer him to a location outside the United States, to a foreign country

20               or Guantanamo, where he was told he would be subjected to far worse treatment,

21               including severe physical and mental pain and suffering; and

22         i.    Against his will, administering to him or making him believe that he was being

23               administered psychotropic drugs;

24         j.    Shackling and manacling for hours at a time;

25         k.    Forcing him into markedly uncomfortable and painful (or "stress") positions;

26         l.    Requiring him to wear earphones and black-out goggles during movement to, from,

27               and within the Brig;

28         m.    Introduction into his cell of noxious fumes that caused pain to eyes and nose;

-14-

FIRST AMENDED COMPLAINT

n.    Lying to him about his location and the identity of his interrogators;

o.    Loud noises at all hours of the night, caused by government agents banging on the walls and bars of his cell or opening and shutting the doors to nearby empty cells;

p.    Withholding of any mattress, pillow, sheet or blanket, leaving him with nothing to sleep or rest on except a cold steel slab;

q.    Extreme and deliberate variations in the temperature of his cell;

r.    Forced grooming;

s.    Sudden and unexplained suspension of showers;

t.    Sudden and unexplained removal of religious items; and

u.    Constant surveillance, including during use of toilet facilities and shower.

56.    From June 9, 2002 until March 4, 2004, government officials also denied Mr. Padilla all contact with persons outside the military brig, including his family and legal counsel.

57.    For the first nearly two years of confinement, Mr. Padilla's only human contact was with interrogators during interrogation sessions, or with guards when they delivered his meals through a slot in his cell door or escorted him to the shower or the concrete cage in which he was intermittently permitted to exercise.

58.    For ten months after Mr. Padilla's transfer to military detention military, the government also denied Ms. Lebron any information about her son.  After almost a year of agonizing uncertainty, a Pentagon official finally brought Ms. Lebron a very brief greeting card that her son had been permitted to write to let her know that he was alive.

59.    Beginning on March 4, 2004, while a habeas petition filed on his behalf was pending in the U.S. Supreme Court, Mr. Padilla was finally permitted contact with his attorneys. However, that contact was sporadic, subjected to severe restrictions including recording of conversations and review by government officials of all legal correspondence.

60.    Upon information and belief, the restrictions imposed on Mr. Padilla's access to counsel were authorized by an OLC memorandum written by Defendant in or about May 2002.

61.    Mr. Padilla's extreme isolation and harsh conditions of confinement remained largely unchanged by the limited access to counsel granted in March 2004.

62.    In the nearly two-year period between March 4, 2004, and January 5, 2006, Mr. Padilla was permitted to receive only three twenty-minute telephone calls and one visit from his mother; during these interactions, Mr. Padilla was forbidden to discuss the interrogations to which he was being subjected.

63.    In tandem with severe isolation, government officials subjected Mr. Padilla to sensory deprivation far exceeding the ordinary levels attendant upon incarceration, causing him to suffer profound disorientation and psychological distress.

64.    Mr. Padilla was periodically subjected to absolute light or darkness for periods in excess of twenty-four hours.

65.    For most of his detention, the interior and exterior windows of Mr. Padilla's cell were intentionally blacked out. On the rare occasions when Mr. Padilla was removed from his cell -- once to visit the dentist, for example -- his eyes and ears were covered, deepening the sensory deprivation, as illustrated in the photographs attached as Exhibit O.

66.    Deepening his disorientation, Mr. Padilla was further denied access to any form of information about the outside world, including radio, television, and newspapers from the time of his imprisonment without charge in the military brig until summer 2004, at which time he was permitted very limited access to such materials.

67.    For most of his confinement, Government officials denied Mr. Padilla sufficient exercise and recreation. Mr. Padilla was permitted to exercise only intermittently and then only in a concrete "cage" and often at night.

68.    Despite the fact that officials knew that Mr. Padilla was a practicing Muslim, for the bulk of his captivity, Mr. Padilla was denied either a clock or a watch and, deprived of any natural light, he could not tell day from night, and did not know the day of the week or the season, or the direction of Mecca. Upon information and belief, the express request of a representative of the International Committee of the Red Cross that Mr. Padilla be given access to a time-piece with

-16-

which he could ascertain the time for prayer was denied by Brig officials and/or other government agents.

69.     When Mr. Padilla was first detained, he was permitted access to a Koran. Shortly thereafter, however, Mr. Padilla's access to religious texts was revoked until March 2004, when Mr. Padilla's counsel provided him with a new copy of the Koran.

70.     By depriving Mr. Padilla of any method of ascertaining the time of day, the season of the year, or the direction of Mecca, and by removing his copy of the Koran, Defendants substantially burdened Mr. Padilla's ability to pray, keep holidays, study religious texts, and otherwise observe the strictures of his faith.

71.     Mr. Padilla made repeated requests for access to medical care for serious and potentially life-threatening ailments, including chest pain and difficulty breathing, as well as for treatment of the chronic, extreme pain caused by being forced to endure stress positions. These requests were either denied or met with grossly inadequate responses.

72.     Mr. Padilla's conditions of confinement and interrogation techniques described above were calculated to, and did, subject Mr. Padilla to extreme psychiatric stress which a reasonable person would understand to necessitate the provision of psychiatric care. Counsel and Brig staff reported signs of psychological distress in Mr. Padilla up the chain of command and requested remedial measures. These requests were either denied or met with grossly inadequate responses.

73.     In May 2004, on orders from Secretary Rumsfeld, Vice Admiral Church conducted a review of detainee conditions at the Brig and reported his findings in a slideshow attached as Exhibit P (Church Slides). The Church Slides confirm the use at the Brig of interrogation techniques including removal of Koran, mattress, pillow, and warm meals, noting, *inter alia*, that: "[One] detainee has Koran removed from cell as part of JFCOM-approved interrogation plan. Muslim chaplain not available"; "One detainee . . has mattress removed as part of JFCOM-

approved interrogation plan"; 'One detainee . . . not authorized ICRC visits due to interrogation plans in progress"; and 'One detainee in Charleston has Koran, mattress, and pillow removed and is fed cold MREs as part of interrogation plan approved by JFCOM. (SECDEF Memo of 16 Apr 03 addresses GTMO only)".

74.     The Church Slides also noted "potential issues" with "unauthorized interrogation techniques" at the Brig, and provided "amplification" on this issue.  The Executive has not yet released to the public the part of the Church Slides providing this "amplification."

75.     The application to Mr. Padilla of the methods of interrogation and conditions of confinement detailed above was a foreseeable result of Defendant's intentional or deliberately indifferent conduct and proximately and foreseeably caused Mr. Padilla severe mental and physical pain.

76.     In addition to the harm caused to Mr. Padilla by his detention and interrogation, Mr. Padilla continues to suffer deprivation of liberty, public stigmatization, serious ongoing psychological harm, and other collateral effects from the unlawful "enemy combatant" designation, including the threat that he will once again be militarily detained in the Brig and subjected there to unconstitutional interrogations and conditions of confinement.

77.     The threat of re-detention is not a figment of Mr. Padilla's imagination. On or about November 23, 2005 – shortly after the criminal indictment against Mr. Padilla was made public – Deputy Solicitor General Gregory Garre informed Mr. Padilla's counsel, Jonathan Freiman, that it was the government's position that the "enemy combatant" designation had not been rescinded and that the government could therefore militarily detain Mr. Padilla at any time based on his alleged past acts.

78.     Plaintiffs seek to vindicate their constitutional rights and to ensure that neither Mr. Padilla nor any other person is treated this way in the future.

79.     Plaintiffs seek monetary and declaratory relief.

80.     Plaintiffs have no administrative remedies or other effective means of enforcing their rights other than seeking relief from the Court.

1

## CLAIMS

2      81.    Mr. Padilla incorporates by reference each and every allegation contained in the

3  preceding paragraphs as if set forth fully herein.

4      82.    By the allegations incorporated above, Defendant proximately and foreseeably

5  injured Mr. Padilla by violating numerous clearly established constitutional and statutory rights

6  including, but not limited to, the following:

7      a.    **Denial of Access to Counsel.**  Acting under color of law and his authority as a

8  federal officer, Defendant caused Mr. Padilla to be deprived of his right of access to legal counsel

9  protected by the First, Fifth, and Sixth Amendments to the U.S. Constitution.

10      b.    **Denial of Access to Court.**  Acting under color of law and his authority as a

11  federal officer, Defendant caused Mr. Padilla to be deprived of his right of access to court

12  protected by the First and Fifth Amendments to the U.S. Constitution, Article III of the U.S.

13  Constitution, and the Habeas Suspension Clause of the U.S. Constitution.

14      c.    **Unconstitutional Conditions of Confinement.**  Acting under color of law and his

15  authority as a federal officer, Defendant caused Mr. Padilla to be subjected to illegal conditions of

16  confinement and treatment that shocks the conscience in violation of Mr. Padilla's Fifth

17  Amendment rights to procedural and substantive due process, as well as his Eighth Amendment

18  right to be free of cruel and unusual punishment, including torture, outrages on personal dignity,

19  and humiliating and degrading treatment.

20      d.    **Unconstitutional Interrogations.**  Acting under color of law and his authority as a

21  federal officer, Defendant caused Mr. Padilla to be subjected to coercive and involuntary illegal

22  interrogations, both directly and through unlawful conditions of confinement designed to aid the

23  interrogations, all in violation of Mr. Padilla's Fifth Amendment rights to procedural due process,

24  freedom from treatment that shocks the conscience, and freedom from self-incrimination, as well

25  as his Eighth Amendment right to be free from cruel and unusual punishment, including torture,

26  outrages on personal dignity, and humiliating and degrading treatment.

27      e.    **Denial of Freedom of Religion.**  Acting under color of law and his authority as a

28  federal officer, Defendant caused Mr. Padilla to be deprived of his right to the free exercise of

-19-

FIRST AMENDED COMPLAINT

religion guaranteed under the First Amendment to the U.S. Constitution, as well as the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.

f.    **Denial of the Right to Information.**  Acting under color of law and his authority as federal officer, Defendant caused Mr. Padilla to be deprived of his right to information guaranteed under the First Amendment to the U.S. Constitution.

g.    **Denial of the Right to Association.**  Acting under color of law and his authority as a federal officer, Defendant caused Mr. Padilla to be deprived of his right to association with family and others guaranteed under the First Amendment to the U.S. Constitution.

h.    **Unconstitutional Military Detention.**  Acting under color of law and his authority as a federal officer, Defendant violated Mr. Padilla's right to be free from military detention guaranteed by the Fourth Amendment to the U.S. Constitution, the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the Habeas Suspension and Treason Clauses of the U.S. Constitution, and Article III of the U.S. Constitution.

i.    **Denial of the Right to Be Free from Unreasonable Seizures.**  Acting under color of law and his authority as a federal officer, Defendant violated Mr. Padilla's right to be free from unreasonable seizures guaranteed by the Fourth Amendment to the U.S. Constitution.

j.    **Denial of Due Process.**  Acting under color of law and his authority as a federal officer, Defendant violated Mr. Padilla's Fifth Amendment right not to be detained or subjected to the collateral effects of designation as an "enemy combatant" without due process of law.

83.    By the allegations incorporated above, Defendant, acting under color of law and his authority as a federal officer, also proximately and foreseeably injured Ms. Lebron by causing her to be denied of virtually all contact with her son in violation of her clearly established rights to association and communication under the First and Fifth Amendments of the U.S. Constitution.

**PRAYER FOR RELIEF**

84.    Plaintiffs therefore respectfully request that the Court enter a judgment for all relief to which they are legally entitled under the facts of this case, including but not limited to the following:

a.  A judgment declaring that the acts alleged herein are unlawful and violate the Constitution and laws of the United States;

b.  Damages in the amount of one dollar;

c.  Attorneys' fees and costs; and

d.  All other appropriate relief as the Court may determine to be just and proper.

Respectfully submitted,

/s/ Jonathan Freiman

JONATHAN M. FREIMAN (*pro hac vice*)
HOPE R. METCALF (*pro hac vice*)
127 Wall Street
New Haven, CT 06520-8215
Telephone: (203) 498-4584
Facsimile: (203) 782-2889
Email: jonathan.freiman@yale.edu

NATALIE L. BRIDGEMAN, State Bar No. 223717
Law Offices of Natalie L. Bridgeman, Esq.
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone:  (415) 979-0150
Facsimile:  (415) 520-0140
Email: natalie@ihrlaw.com

Attorneys for Plaintiffs

Dated:  June 2, 2008

-21-