# Exhibit A



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Deputy Assistant Attorney General                    *Washington, D.C. 20530*

January 9, 2002

**MEMORANDUM FOR WILLIAM J. HAYNES II
GENERAL COUNSEL, DEPARTMENT OF DEFENSE**

DRAFT

**FROM:** John Yoo
Deputy Assistant Attorney General

Robert J. Delahunty
Special Counsel

**RE:**   *Application of Treaties and Laws to al Qaeda and Taliban Detainees*

You have asked for our Office's views concerning the effect of international treaties and federal laws on the treatment of individuals detained by the U.S. Armed Forces during the conflict in Afghanistan. In particular, you have asked whether the laws of armed conflict apply to the conditions of detention and the procedures for trial of members of al Qaeda and the Taliban militia. We conclude that these treaties do not protect members of the al Qaeda organization, which as a non-State actor cannot be a party to the international agreements governing war. We further conclude that that these treaties do not apply to the Taliban militia. This memorandum expresses no view as to whether the President should decide, as a matter of policy, that the U.S. Armed Forces should adhere to the standards of conduct in those treaties with respect to the treatment of prisoners.

We believe it most useful to structure the analysis of these questions by focusing on the War Crimes Act, 18 U.S.C. § 2441 (Supp. III 1997) ("WCA"). The WCA directly incorporates several provisions of international treaties governing the laws of war into the federal criminal code. Part I of this memorandum describes the WCA and the most relevant treaties that it incorporates: the four 1949 Geneva Conventions, which generally regulate the treatment of non-combatants, such as prisoners of war ("POWs"), the injured and sick, and civilians.[1]

Part II examines whether al Qaeda detainees can claim the protections of these agreements. Al Qaeda is merely a violent political movement or organization and not a nation-state. As a result, it is ineligible to be a signatory to any treaty. Because of the novel nature of

---

[1] The four Geneva Conventions for the Protection of Victims of War, dated August 12, 1949, were ratified by the United States on July 14, 1955. These are the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, 6 U.S.T. 3115 ("Geneva Convention I"); the Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, 6 U.S.T. 3219 ("Geneva Convention II"); the Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3517 ("Geneva Convention III"); and the Convention Relative to the Protection of Civilian Persons in Time of War, 6 U.S.T. 3317 ("Geneva Convention IV").

this conflict, moreover, we do not believe that al Qaeda would be included in non-international forms of armed conflict to which some provisions of the Geneva Conventions might apply. Therefore, neither the Geneva Conventions nor the WCA regulate the detention of al Qaeda prisoners captured during the Afghanistan conflict.

Part III discusses whether the same treaty provisions, as incorporated through the WCA, apply to the treatment of captured members of the Taliban militia. We believe that the Geneva Conventions do not apply for several reasons. First, the Taliban was not a government and Afghanistan was not – even prior to the beginning of the present conflict – a functioning State during the period in which they engaged in hostilities against the United States and its allies. Afghanistan's status as a failed state is ground alone to find that members of the Taliban militia are not entitled to enemy POW status under the Geneva Conventions. Further, it is clear that the President has the constitutional authority to suspend our treaties with Afghanistan pending the restoration of a legitimate government capable of performing Afghanistan's treaty obligations. Second, it appears from the public evidence that the Taliban militia may have been so intertwined with al Qaeda as to be functionally indistinguishable from it. To the extent that the Taliban militia was more akin to a non-governmental organization that used military force to pursue its religious and political ideology than a functioning government, its members would be on the same legal footing as al Qaeda.

In Part IV, we address the question whether any customary international law of armed conflict might apply to the al Qaeda or Taliban militia members detained during the course of the Afghanistan conflict. We conclude that customary international law, whatever its source and content, does not bind the President, or restrict the actions of the United States military, because it does not constitute federal law recognized under the Supremacy Clause of the Constitution. The President, however, has the constitutional authority as Commander in Chief to interpret and apply the customary or common laws of war in such a way that they would extend to the conduct of members of both al Qaeda and the Taliban, and also to the conduct of the U.S. Armed Forces towards members of those groups taken as prisoners in Afghanistan.

*I. Background and Overview of the War Crimes Act and the Geneva Conventions*

It is our understanding that your Department is considering two basic plans regarding the treatment of members of al Qaeda and the Taliban militia detained during the Afghanistan conflict. First, the Defense Department intends to make available a facility at the U.S. Navy base at Guantanamo Bay, Cuba, for the long-term detention of these individuals, who have come under our control either through capture by our military or transfer from our allies in Afghanistan. We have discussed in a separate memorandum the federal jurisdiction issues that might arise concerning Guantanamo Bay.[2]  Second, your Department is developing procedures to implement the President's Military Order of November 13, 2001, which establishes military

---

[2] *See* Memorandum for William J. Haynes II, General Counsel, Department of Defense, from: Patrick F. Philbin, Deputy Assistant Attorney General, and John Yoo, Deputy Assistant Attorney General, *Re: Possible Habeas Jurisdiction over Aliens Held in Guantanamo Bay, Cuba* (Dec. 28, 2001).

2

commissions for the trial of violations of the laws of war committed by non-U.S. citizens.[3]  The question has arisen whether the Geneva Conventions, or other relevant international treaties or federal laws, regulate these proposed policies.

We believe that the WCA provides a useful starting point for our analysis of the application of the Geneva Conventions to the treatment of detainees captured in the Afghanistan theater of operations.[4]  Section 2441 of Title 18 renders certain acts punishable as "war crimes." The statute's definition of that term incorporates, by reference, certain treaties or treaty provisions relating to the laws of war, including the Geneva Conventions.

### A.  Section 2441:  An Overview

Section 2441 reads in full as follows:

*War crimes*

(a) Offense.–Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.

(b) Circumstances.–The circumstances referred to in subsection (a) are that the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States (as defined in section 101 of the Immigration and Nationality Act).

(c) Definition.–As used in this section the term "war crime" means any conduct–

(1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;

(2) prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;

(3) which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non-international armed conflict; or

---

[3] *See generally* Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re:  Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

[4] The rule of lenity requires that the WCA be read so as to ensure that prospective defendants have adequate notice of the nature of the acts that the statute condemns. *See, e.g., Castillo v. United States*, 530 U.S. 120, 131 (2000). In those cases in which the application of a treaty incorporated by the WCA is unclear, therefore, the rule of lenity requires that the interpretative issue be resolved in the defendant's favor.

3

(4) of a person who, in relation to an armed conflict and contrary to the
provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines,
Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol
II as amended on 3 May 1996), when the United States is a party to such Protocol,
willfully kills or causes serious injury to civilians.

18 U.S.C. § 2441.

Section 2441 lists four categories of war crimes. First, it criminalizes "grave breaches"
of the Geneva Conventions, which are defined by treaty and will be discussed below. Second, it
makes illegal conduct prohibited by articles 23, 25, 27 and 28 of the Annex to the Hague
Convention IV. Third, it criminalizes violations of what is known as "common" Article 3, which
is an identical provision common to all four of the Geneva Conventions. Fourth, it criminalizes
conduct prohibited by certain other laws of war treaties, once the United States joins them. A
House Report states that the original legislation "carries out the international obligations of the
United States under the Geneva Conventions of 1949 to provide criminal penalties for certain
war crimes." H.R. Rep. No. 104-698 at 1 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2166, 2166.
Each of those four conventions includes a clause relating to legislative implementation and to
criminal punishment.[5]

In enacting section 2441, Congress also sought to fill certain perceived gaps in the
coverage of federal criminal law. The main gaps were thought to be of two kinds: subject matter
jurisdiction and personal jurisdiction. First, Congress found that "[t]here are major gaps in the
prosecutability of individuals under federal criminal law for war crimes committed against
Americans." H.R. Rep. No. 104-698 at 6, *reprinted in* 1996 U.S.C.C.A.N. at 2171. For example,
"the simple killing of a[n American] prisoner of war" was not covered by any existing Federal
statute. *Id.* at 5, *reprinted in* 1996 U.S.C.C.A.N. at 2170.[6] Second, Congress found that "[t]he
ability to court martial members of our armed services who commit war crimes ends when they
leave military service. [Section 2441] would allow for prosecution even after discharge." *Id.* at

---

[5] That common clause reads as follows:

> The [signatory Nations] undertake to enact any legislation necessary to provide effective penal sanctions
> for persons committing, or ordering to be committed, any of the grave breaches of the present Convention. .
> . . Each [signatory nation] shall be under the obligation to search for persons alleged to have committed,
> or to have ordered to be committed, such grave breaches, and shall bring such persons, regardless of their
> nationality, before its own courts. . . . It may also, if it prefers, . . . hand such persons over for trial to
> another [signatory nation], provided such [nation] has made out a *prima facie* case.

Geneva Convention I, art. 49; Geneva Convention II, art. 50; Geneva Convention III, art. 129; Geneva Convention
IV, art. 146.

[6] In projecting our criminal law extraterritorially in order to protect victims who are United States nationals,
Congress was apparently relying on the international law principle of passive personality. The passive personality
principle "asserts that a state may apply law – particularly criminal law – to an act committed outside its territory by
a person not its national where the victim of the act was its national." *United States v. Rezaq*, 134 F.3d 1121, 1133
(D.C. Cir.), *cert. denied*, 525 U.S. 834 (1998). The principle marks recognition of the fact that "each nation has a
legitimate interest that its nationals and permanent inhabitants not be maimed or disabled from self-support," or
otherwise injured. *Lauritzen v. Larsen*, 345 U.S. 571, 586 (1953); *see also Hellenic Lines Ltd. v. Rhoditis*, 398 U.S.
306, 309 (1970).

4

7, *reprinted in* 1996 U.S.C.C.A.N. at 2172.[7]  Congress considered it important to fill this gap, not only in the interest of the victims of war crimes, but also of the accused. "The Americans prosecuted would have available all the procedural protections of the American justice system. These might be lacking if the United States extradited the individuals to their victims' home countries for prosecution." *Id.*[8]  Accordingly, Section 2441 criminalizes forms of conduct in which a U.S. national or a member of the Armed Forces may be either a victim or a perpetrator.

### B. *Grave Breaches of the Geneva Conventions*

The Geneva Conventions were approved by a diplomatic conference on August 12, 1949, and remain the agreements to which more States have become parties than any other concerning the laws of war.  Convention I deals with the treatment of wounded and sick in armed forces in the field; Convention II addresses treatment of the wounded, sick, and shipwrecked in armed forces at sea; Convention III regulates treatment of POWs; Convention IV addresses the treatment of citizens.  While the Hague Convention IV establishes the rules of conduct against the enemy, the Geneva Conventions set the rules for the treatment of the victims of war.

The Geneva Conventions, like treaties generally, structure legal relationships between Nation States, not between Nation States and private, subnational groups or organizations.[9]  All four Conventions share the same Article 2, known as "common Article 2." It states:

> In addition to the provisions which shall be implemented in peacetime, the present Convention shall apply to all cases of declared war or of any other armed conflict *which may arise between two or more of the High Contracting Parties*, even if the state of war is not recognized by one of them.

> The Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance.

> Although one of the Powers in conflict may not be a party to the present Convention, the Powers who are parties thereto shall remain bound by it in their mutual relations.  They shall furthermore be bound by the Convention in relation to the said Power, if the latter accepts and applies the provisions thereof.

---

[7] In *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955), the Supreme Court had held that a former serviceman could not constitutionally be tried before a court martial under the Uniform Code for Military Justice (the "UCMJ") for crimes he was alleged to have committed while in the armed services.

[8] The principle of nationality in international law recognizes that (as Congress did here) a State may criminalize acts performed extraterritorially by its own nationals. *See, e.g., Skiriotes v. Florida*, 313 U.S. 69, 73 (1941); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 282 (1952).

[9] *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 253 (1984) ("A treaty is in the nature of a contract between nations."); *The Head Money Cases*, 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact between independent nations."); *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 167 (3d Cir. 1997) ("[T]reaties are agreements between nations."); *Vienna Convention on the Law of Treaties*, May 23, 1969, art. 2, § 1(a), 1155 U.N.T.S. 331, 333 ("'[T]reaty' means an international agreement concluded between States in written form and governed by international law. . . .") (the "Vienna Convention"); *see generally Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422 (1964) ("The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another.").

5

(Emphasis added).

As incorporated by § 2441(c)(1), the four Geneva Conventions similarly define "grave breaches." Geneva Convention III on POWs defines a grave breach as:

> wilful killing, torture or inhuman treatment, including biological experiments, wilfully causing great suffering or serious injury to body or health, compelling a prisoner of war to serve in the forces of the hostile Power, or wilfully depriving a prisoner of war of the rights of fair and regular trial prescribed in this Convention.

Geneva Convention III, art. 130. As mentioned before, the Geneva Conventions require the High Contracting Parties to enact penal legislation to punish anyone who commits or orders a grave breach. *See, e.g., id.* art. 129. Further, each State party has the obligation to search for and bring to justice (either before its courts or by delivering a suspect to another State party) anyone who commits a grave breach. No State party is permitted to absolve itself or any other nation of liability for committing a grave breach.

Thus, the WCA does not criminalize all breaches of the Geneva Conventions. Failure to follow some of the regulations regarding the treatment of POWs, such as difficulty in meeting all of the conditions set forth for POW camp conditions, does not constitute a grave breach within the meaning of Geneva Convention III, art. 130. Only by causing great suffering or serious bodily injury to POWs, killing or torturing them, depriving them of access to a fair trial, or forcing them to serve in the Armed Forces, could the United States actually commit a grave breach. Similarly, unintentional, isolated collateral damage on civilian targets would not constitute a grave breach within the meaning of Geneva Convention IV, art. 147. Article 147 requires that for a grave breach to have occurred, destruction of property must have been done "wantonly" and without military justification, while the killing or injury of civilians must have been "wilful."

### D. Common Article 3 of the Geneva Conventions

Section 2441(c)(3) also defines as a war crime conduct that "constitutes a violation of common Article 3" of the Geneva Conventions. Article 3 is a unique provision that governs the conduct of signatories to the Conventions in a particular kind of conflict that is *not* one between High Contracting Parties to the Conventions. Thus, common Article 3 may require the United States, as a High Contracting Party, to follow certain rules even if other parties to the conflict are not parties to the Conventions. On the other hand, Article 3 requires state parties to follow only certain minimum standards of treatment toward prisoners, civilians, or the sick and wounded, rather than the Conventions as a whole.

Common Article 3 reads in relevant part as follows:

> In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, color, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for. . . .

The application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

Common article 3 complements common Article 2. Article 2 applies to cases of declared war or of any other armed conflict that may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.[10] Common Article 3, however, covers "armed conflict not of an international character" – a war that does not involve cross-border attacks – that occurs within the territory of one of the High Contracting Parties. There is substantial reason to think that this language refers specifically to a condition of civil war, or a large-scale armed conflict between a State and an armed movement within its own territory.

To begin with, Article 3's text strongly supports the interpretation that it applies to large-scale conflicts between a State and an insurgent group. First, the language at the end of Article 3 states that "[t]he application of the preceding provisions shall not affect the legal status of the Parties to the conflict." This provision was designed to ensure that a Party that observed Article 3 during a civil war would not be understood to have granted the "recognition of the insurgents as an adverse party." Frits Kalshoven, *Constraints on the Waging of War* 59 (1987). Second, Article 3 is in terms limited to "armed conflict . . . occurring *in the territory of one of the High Contracting Parties*" (emphasis added). This limitation makes perfect sense if the Article

---

[10] Article 2's reference to a state of war "not recognized" by a belligerent was apparently intended to refer to conflicts such as the 1937 war between China and Japan. Both sides denied that a state of war existed. *See* Joyce A. C. Gutteridge, *The Geneva Conventions of 1949*, 26 Brit. Y.B. Int'l L. 294, 298-99 (1949).

7

applies to civil wars, which are fought primarily or solely within the territory of a single state. The limitation makes little sense, however, as applied to a conflict between a State and a transnational terrorist group, which may operate from different territorial bases, some of which might be located in States that are parties to the Conventions and some of which might not be. In such a case, the Conventions would apply to a single armed conflict in some scenes of action but not in others – which seems inexplicable.

This interpretation is supported by commentators. One well-known commentary states that "a non-international armed conflict is distinct from an international armed conflict because of the legal status of the entities opposing each other: the parties to the conflict are not sovereign States, but the government of a single State in conflict with one or more armed factions within its territory."[11] A legal scholar writing in the same year in which the Conventions were prepared stated that "a conflict not of an international character occurring in the territory of one of the High Contracting Parties . . . must normally mean a civil war."[12]

Analysis of the background to the adoption of the Geneva Conventions in 1949 confirms our understanding of common Article 3. It appears that the drafters of the Conventions had in mind only the two forms of armed conflict that were regarded as matters of general *international* concern at the time: armed conflict between Nation States (subject to Article 2), and large-scale civil war within a Nation State (subject to Article 3). To understand the context in which the Geneva Conventions were drafted, it will be helpful to identify three distinct phases in the development of the laws of war.

First, the traditional law of war was based on a stark dichotomy between "belligerency" and "insurgency." The category of "belligerency" applied to armed conflicts between sovereign States (unless there was recognition of belligerency in a civil war), while the category of "insurgency" applied to armed violence breaking out within the territory of a sovereign State.[13] Correspondingly, international law treated the two classes of conflict in different ways. Inter-state wars were regulated by a body of international legal rules governing both the conduct of hostilities and the protection of noncombatants. By contrast, there were very few international rules governing civil unrest, for States preferred to regard internal strife as rebellion, mutiny and treason coming within the purview of national criminal law, which precluded any possible intrusion by other States.[14] This was a "clearly sovereignty-oriented" phase of international law.[15]

---

[11] Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, at ¶ 4339 (Yves Sandoz et al. eds., 1987)

[12] Gutteridge, *supra* n.10, at 300.

[13] *See* Joseph H. Beale, Jr., *The Recognition of Cuban Belligerency*, 9 Harv. L. Rev. 406, 406 n.1 (1896).

[14] *See The Prosecutor v. Dusko Tadic (Jurisdiction of the Tribunal)*, (Appeals Chamber of the International Criminal Tribunal for the Former Yugoslavia 1995) (the "ICTY"), 105 I.L.R. 453, 504-05 (E. Lauterpacht and C.J. Greenwood eds., 1997).

[15] *Id.* at 505; *see also* Gerald Irving Draper, *Reflections on Law and Armed Conflicts* 107 (1998) ("Before 1949, in the absence of recognized belligerency accorded to the elements opposed to the government of a State, the law of war . . . had no application to internal armed conflicts. . . . International law had little or nothing to say as to how the armed rebellion was crushed by the government concerned, for such matters fell within the domestic jurisdiction of States. Such conflicts were often waged with great lack of restraint and cruelty. Such conduct was a domestic matter.").

8

The second phase began as early as the Spanish Civil War (1936-39) and extended through the time of the drafting of the Geneva Conventions until relatively recently. During this period, State practice began to apply certain general principles of humanitarian law beyond the traditional field of State-to-State conflict to "those internal conflicts that constituted large-scale civil wars."[16] In addition to the Spanish Civil War, events in 1947 during the Civil War between the Communists and the Nationalist régime in China illustrated this new tendency.[17] Common Article 3, which was prepared during this second phase, was apparently addressed to armed conflicts akin to the Chinese and Spanish civil wars. As one commentator has described it, Article 3 was designed to restrain governments "in the handling of armed violence directed against them for the express purpose of secession or at securing a change in the government of a State," but even after the adoption of the Conventions it remained "uncertain whether [Article 3] applied to full-scale civil war."[18]

The third phase represents a more complete break than the second with the traditional "State-sovereignty-oriented approach" of international law. This approach gives central place to individual human rights. As a consequence, it blurs the distinction between international and internal armed conflicts, and even that between civil wars and other forms of internal armed conflict. This approach is well illustrated by the ICTY's decision in *Tadic*, which appears to take the view that common Article 3 applies to non-international armed conflicts of *any* description, and is not limited to civil wars between a State and an insurgent group. In this conception, common Article 3 is not just a complement to common Article 2; rather, it is a catch-all that establishes standards for any and all armed conflicts not included in common Article 2.[19]

---

[16] *Tadic*, 105 I.L.R. at 507. Indeed, the events of the Spanish Civil War, in which "both the republican Government [of Spain] and third States refused to recognize the [Nationalist] insurgents as belligerents," *id.* at 507, may be reflected in common Article 3's reference to "the legal status of the Parties to the conflict."

[17] *See id.* at 508.

[18] *See* Draper, *Reflections on Law and Armed Conflicts, supra,* at 108.

[19] An interpretation of common Article 3 that would apply it to all forms of non-international armed conflict accords better with some recent approaches to international humanitarian law. For example, the *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, supra,* after first stating in the text that Article 3 applies when "the government of a single State [is] in conflict with one or more armed factions within its territory," thereafter suggests, in a footnote, that an armed conflict not of an international character "may also exist in which armed factions fight against each other without intervention by the armed forces of the established government." *Id.* ¶ 4339 at n.2. A still broader interpretation appears to be supported by the language of the decision of the International Court of Justice (the "ICJ") in *Nicaragua v. United States* – which, it should be made clear, the United States refused to acknowledge by withdrawing from the compulsory jurisdiction of the ICJ:

> Article 3 which is common to all four Geneva Conventions of 12 August 1949 defines certain rules to be applied *in the armed conflicts of a non-international character.* There is no doubt that, in the event of international armed conflicts, these rules also constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the Court in 1949 called "elementary considerations of humanity."

*Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States),* (International Court of Justice 1986), 76 I.L.R. 1, 448, ¶ 218 (E. Lauterpacht and C.J. Greenwood eds., 1988) (emphasis added). The ICJ's language is probably best read to suggest that all "armed conflicts" are either international or non-international, and that if they are non-international, they are governed by common Article 3. If that is the correct understanding of the quoted language, however, it should be noted that the result was merely stated as a conclusion, without taking account either of the precise language of Article 3 or of the background to its adoption. Moreover, while it was true

9

Nonetheless, despite this recent trend, we think that such an interpretation of common Article 3 fails to take into account, not only the language of the provision, but also its historical context. First, as we have described above, such a reading is inconsistent with the text of Article 3 itself, which applies only to "armed conflict not of an international character occurring in the territory of one of the High Contacting Parties." In conjunction with common Article 2, the text of Article 3 simply does not reach international conflicts where one of the parties is not a Nation State. If we were to read the Geneva Conventions as applying to all forms of armed conflict, we would expect the High Contracting Parties to have used broader language, which they easily could have done. To interpret common Article 3 by expanding its scope well beyond the meaning borne by the text is effectively to amend the Geneva Conventions without the approval of the State Parties to the agreements.

Second, as we have discussed, Article 3 was prepared during a period in which the traditional, State-centered view of international law was still dominant and was only just beginning to give way to a human-rights-based approach. Giving due weight to the State practice and doctrinal understanding of the time, it seems to us overwhelmingly likely that an armed conflict between a Nation State and a transnational terrorist organization, or between a Nation State and a failed State harboring and supporting a transnational terrorist organization, could not have been within the contemplation of the drafters of common Article 3. These would have been simply unforeseen and, therefore, not provided for. Indeed, it seems to have been uncertain even a decade after the Conventions were signed whether common Article 3 applied to armed conflicts that were neither international in character nor civil wars but anti-colonialist wars of independence such as those in Algeria and Kenya. *See* Gerald Irving Draper, *The Red Cross Conventions* 15 (1957). Further, it is telling that in order to address this unforeseen circumstance, the State Parties to the Geneva Conventions did not attempt to distort the terms of common Article 3 to apply it to cases that did not fit within its terms. Instead, they drafted two new protocols (neither of which the United States has ratified) to adapt the Conventions to the conditions of contemporary hostilities.[20] Accordingly, common Article 3 is best understood not to apply to such armed conflicts.

Third, it appears that in enacting the WCA, Congress did not understand the scope of Article 3 to extend beyond civil wars to all other types of internal armed conflict. As discussed in our review of the legislative history, when extending the WCA to cover violations of common Article 3, the House apparently understood that it was codifying treaty provisions that "forbid atrocities occurring in both civil wars and wars between nations."[21] If Congress had embraced a much broader view of common Article 3, and hence of 18 U.S.C. § 2441, we would expect both

---

that one of the conflicts to which the ICJ was addressing itself – "[t]he conflict between the *contras*' forces and those of the Government of Nicaragua" – "was an armed conflict which is 'not of an international character,'" *id.* at 448, ¶ 219, that conflict was recognizably a civil war between a State and an insurgent group, not a conflict between or among violent factions in a territory in which the State had collapsed. Thus there is substantial reason to question the logic and scope of the ICJ's interpretation of common Article 3.

[20] See, e.g., Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, 1125 U.N.T.S. 4; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977, 1125 U.N.T.S. 610.

[21] 143 Cong. Rec. H5865-66 (daily ed. July 28, 1997) (remarks of Rep. Jenkins).

10

the statutory text and the legislative history to have included some type of clear statement of congressional intent. The WCA regulates the manner in which the U.S. Armed Forces may conduct military operations against the enemy; as such, it potentially comes into conflict with the President's Commander in Chief power under Article II of the Constitution. As we have advised others earlier in this conflict, the Commander in Chief power gives the President the plenary authority in determining how best to deploy troops in the field.[22] Any congressional effort to restrict presidential authority by subjecting the conduct of the U.S. Armed Forces to a broad construction of the Geneva Convention, one that is not clearly borne by its text, would represent a possible infringement on presidential discretion to direct the military. We believe that Congress must state explicitly its intention to take the constitutionally dubious step of restricting the President's plenary power over military operations (including the treatment of prisoners), and that, unless Congress clearly demonstrates such an intent, the WCA must be read to avoid such constitutional problems.[23] As Congress has not signaled such a clear intention in this case, we conclude that common Article 3 should not be read to include all forms of non-international armed conflict.

## II. *Application of WCA and Associated Treaties to al Qaeda*

It is clear from the foregoing that members of the al Qaeda terrorist organization do not receive the protections of the laws of war. Therefore, neither their detention nor their trial by the U.S. Armed Forces is subject to the Geneva Conventions (or the WCA). Three reasons, examined in detail below, support this conclusion. First, al Qaeda's status as a non-State actor renders it ineligible to claim the protections of the Geneva Conventions. Second, the nature of the conflict precludes application of common Article 3 of the Geneva Conventions. Third, al Qaeda members fail to satisfy the eligibility requirements for treatment as POWs under Geneva Convention III.

*Al Qaeda's status as a non-State actor renders it ineligible to claim the protections of the treaties specified by the WCA.* Al Qaeda is not a State. It is a non-governmental terrorist organization composed of members from many nations, with ongoing operations in dozens of nations. Its members seem united in following a radical brand of Islam that seeks to attack Americans throughout the world. Non-governmental organizations cannot be parties to any of the international agreements here governing the laws of war. Al Qaeda is not eligible to sign the Geneva Conventions – and even if it were eligible, it has not done so. Common Article 2, which triggers the Geneva Convention provisions regulating detention conditions and procedures for trial of POWs, is limited only to cases of declared war or armed conflict "between two or more of the High Contracting Parties." Al Qaeda is not a High Contracting Party. As a result, the U.S. military's treatment of al Qaeda members is not governed by the bulk of the Geneva Conventions, specifically those provisions concerning POWs. Conduct towards captured

---

[22] Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sept. 25, 2001).

[23] *Cf. Public Citizen v. Department of Justice*, 491 U.S. 440, 466 (1989) (construing Federal Advisory Committee Act to avoid encroachment on presidential power); *Ashwander v. TVA*, 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring) (stating rule of avoidance); *Association of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 906-11 (D.C. Cir. 1993) (same).

11

members of al Qaeda, therefore, also cannot constitute a violation of 18 U.S.C. § 2441(c)(1) or § 2441(c)(2).[24]

*Second, the nature of the conflict precludes application of common Article 3 of the Geneva Conventions.* Al Qaeda is not covered by common Article 3, because the current conflict is not covered by the Geneva Conventions. As discussed in Part I, the text of Article 3, when read in harmony with common Article 2, shows that the Geneva Conventions were intended to cover either: a) traditional wars between Nation States (Article 2), or non-international civil wars (Article 3). Our conflict with al Qaeda does not fit into either category. The current conflict is not an international war between Nation States, but rather a conflict between a Nation State and a non-governmental organization. At the same time, the current conflict is not a civil war under Article 3, because it *is* a conflict of "an international character," rather than an internal armed conflict between parties contending for control over a government or territory. Therefore, the military's treatment of al Qaeda members captured in that conflict is

---

[24] Some difference in the language of the WCA might be thought to throw some doubt on the exact manner in which the statute incorporates these treaty norms. It might be argued, for example, with respect to the Hague Convention IV, that the WCA does not simply incorporate the terms of the treaty itself, with all of their limitations on application, but instead criminalizes the conduct described by that Convention. The argument starts from the fact that there is a textual difference in the way that the WCA references treaty provisions. Section 2441(c)(2) defines as a war crime conduct "prohibited" by the relevant sections of the Hague Convention IV. By contrast, § 2441 (c)(1) makes a war crime any conduct that constitutes a "grave breach" of the Geneva Conventions, and § 2441(c)(3) prohibits conduct "which constitutes a violation" of common Article 3 of the Geneva Convention. It might be argued that this difference indicates that § 2441(c)(2) does not *incorporate* the treaty into federal law; rather, it prohibits the conduct *described by* the treaty. Section 2441(c)(3) prohibits conduct "which constitutes a *violation* of common Article 3" (emphasis added), and that can only be conduct which is a treaty violation. Likewise, § 2441(c)(1) only criminalizes conduct that is a "grave breach" of the Geneva Conventions – which, again, must be a treaty violation. In other words, § 2441(c)(2) might be read to apply even when the Hague Convention IV, by its own terms, would not. On this interpretation, an act could violate § 2441(c)(2), whether or not the Hague Convention IV applied to the specific situation at issue.

We do not think that this interpretation is tenable. To begin with, § 2441(c)(2) makes clear that to be a war crime, conduct must be "*prohibited*" by the Hague Convention IV (emphasis added). Use of the word "prohibited," rather than phrases such as "referred to" or "described," indicates that the treaty must, by its own operation, proscribe the conduct at issue. If the Hague Convention IV does not itself apply to a certain conflict, then it cannot itself proscribe any conduct undertaken as part of that conflict. Thus, the most natural reading of the statutory language is that an individual must violate the Hague Convention IV in order to violate Section 2441(c)(2). Had Congress intended broadly to criminalize the types of conduct proscribed by the relevant Hague Convention IV provisions as such, rather than as treaty violations, it could have done so more clearly. Furthermore, the basic purpose of § 2441 was to implement, by appropriate legislation, the United States' treaty obligations. That purpose would be accomplished by criminalizing acts that were also violations of certain key provisions of the Annex to Hague Convention IV. It would not be served by criminalizing acts *of the kind* condemned by those provisions, whether or not they were treaty violations.

Nothing in the legislative history supports the opposite result. To the contrary, the legislative history suggests an entirely different explanation for the minor variations in language between §§ 2441(c)(1) and 2441(c)(2). As originally enacted, the WCA criminalized violations of the Geneva Conventions. *See* Pub. L. No. 104-192, § 2(a), 110 Stat. 2104, § 2401 (1996). In signing the original legislation, President Clinton urged that it be expanded to include other serious war crimes involving violation of the Hague Conventions IV and the Amended Protocol II. *See* 2 Pub. Papers of William J. Clinton 1323 (1996). The Expanded War Crimes Act of 1997, introduced as H.R. 1348 in the 105th Congress, was designed to meet these requests. Thus, § 2441(c)(2) was added as an amendment at a later time, and was not drafted at the same time and in the same process as § 2441(c)(1).

12

not limited either by common Article 3 of the Geneva Conventions or 18 U.S.C. § 2441(c)(3), the provision of the WCA incorporating that article.[25]

   *Third, al Qaeda members fail to satisfy the eligibility requirements for treatment as POWs under Geneva Convention III.* It might be argued that, even though it is not a State party to the Geneva Convention, al Qaeda could be covered by some protections in Geneva Convention III on the treatment of POWs. Article 4(A)(2) of the Geneva Convention III defines prisoners of war as including not only captured members of the armed forces of a High Contracting Party, but also irregular forces such as "[m]embers of other militias and members of other volunteer corps, including those of organized resistance movements." Geneva Convention III, art. 4. Article 4(A)(3) also includes as POWs "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." *Id.* art. 4(A)(3). It might be claimed that the broad terms of these provisions could be stretched to cover al Qaeda.

   This view would be mistaken. Article 4 does not expand the application of the Convention beyond the circumstances expressly addressed in common Articles 2 and 3. Unless there is a conflict subject to Article 2 or 3 (the Convention's jurisdictional provisions), Article 4 simply does not apply. As we have argued with respect to Article 3, and shall further argue with respect to Article 2, the conflict in Afghanistan does not fall within either Articles 2 or 3. As a result, Article 4 has no application. In other words, Article 4 cannot be read as an alternative, and far more expansive, statement of the application of the Convention. It merely specifies, where there is a conflict covered by the Convention, who must be accorded POW status.

   Even if Article 4, however, were considered somehow to be jurisdictional as well as substantive, captured members of al Qaeda still would not receive the protections accorded to POWs. Article 4(A)(2), for example, further requires that the militia or volunteers fulfill the conditions first established by the Hague Convention IV of 1907 for those who would receive the protections of the laws of war. Hague Convention IV declares that the "laws, rights and duties of war" only apply to armies, militia, and volunteer corps when they fulfill four conditions: command by responsible individuals, wearing insignia, carrying arms openly, and obeying the laws of war. Hague Convention IV, Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277. Al Qaeda members have clearly demonstrated that they will not follow these basic requirements of lawful warfare. They have attacked purely civilian targets of no military value; they refused to wear uniform or insignia or carry arms openly, but instead hijacked civilian airliners, took hostages, and killed them; they have deliberately targeted and killed thousands of civilians; and they themselves do not obey the laws of war concerning the protection of the lives of civilians or the means of legitimate combat. Thus, Article 4(A)(3) is

---

[25] This understanding is supported by the WCA's legislative history. When extending the WCA to cover violations of common Article 3, the House apparently understood that it was codifying treaty provisions that "forbid atrocities occurring in both civil wars and wars between nations." 143 Cong. Rec. H5865-66 (remarks of Rep. Jenkins). The Senate also understood that "[t]he inclusion of common article 3 of the Geneva Conventions . . . expressly allows the United States to prosecute war crimes perpetrated in noninternational conflicts, such as Bosnia and Rwanda." 143 Cong. Rec. S7544, S7589 (daily ed. July 16, 1997) (remarks of Sen. Leahy). In referring to Bosnia and Rwanda, both civil wars of a non-international character, Senator Leahy appears to have understood common Article 3 as covering only civil wars as well. Thus, Congress apparently believed that the WCA would apply only to traditional international wars between States, or purely internal civil wars.

inapt because al Qaeda do not qualify as "regular armed forces," and its members do not qualify for protection as lawful combatants under the laws of war.

### III. *Application of the Geneva Conventions to the Taliban Militia*

Whether the Geneva Conventions apply to the detention and trial of members of the Taliban militia presents a more difficult legal question. Afghanistan has been a party to all four the Geneva Conventions since September 1956. Some might argue that this requires application of the Geneva Conventions to the present conflict with respect to the Taliban militia, which would then trigger the WCA. This argument depends, however, on the assumptions that during the period in which the Taliban militia was ascendant in Afghanistan, the Taliban was the *de facto* government of that nation, that Afghanistan continued to have the essential attributes of statehood, and that Afghanistan continued in good standing as a party to the treaties that its previous governments had signed.

We think that all of these assumptions are disputable, and indeed false. The weight of informed opinion strongly supports the conclusion that, for the period in question, Afghanistan was a "failed State" whose territory had been largely overrun and held by violence by a militia or faction rather than by a government. Accordingly, Afghanistan was without the attributes of statehood necessary to continue as a party to the Geneva Conventions, and the Taliban militia, like al Qaeda, is therefore not entitled to the protections of the Geneva Conventions. Furthermore, there appears to be substantial evidence that the Taliban was so dominated by al Qaeda and so complicit in its actions and purposes that the Taliban leadership cannot be distinguished from al Qaeda, and accordingly that the Taliban militia cannot stand on a higher footing under the Geneva Conventions.

### A. *Constitutional Authority*

It is clear that, under the Constitution, the Executive has the plenary authority to determine that Afghanistan ceased at relevant times to be an operating State and therefore that members of the Taliban militia were and are not protected by the Geneva Conventions.[26] As an initial matter, Article II makes clear that the President is vested with all of the federal executive power, that he "shall be Commander in Chief," that he shall appoint, with the advice and consent

---

[26] This is *not* to maintain that Afghanistan ceased to be a State party to the Geneva Conventions merely because it underwent a change of government in 1996, after the military successes of Taliban. The general rule of international law is that treaty relations survive a change of government. *See, e.g.*, 2 Marjorie M. Whiteman, *Digest of International Law* 771-73 (1963); J.L. Brierly, *The Law of Nations* 144-45 (6th ed. 1963); Eleanor C. McDowell, *Contemporary Practice of the United States Relating to International Law*, 71 Am. J. Int'l L. 337 (1977). However, although "[u]nder international law, a change in government alone generally does not affect a state's obligations to honor its treaty commitments . . . [a] different and more difficult question arises . . . when the state itself dissolves." Yoo, *supra* n.17, at 904. Furthermore, we are *not* suggesting that the United States' nonrecognition of the Taliban as the government of Afghanistan in and of itself deprived Afghanistan of party status under the Geneva Conventions. The general rule is that treaties may still be observed even as to State parties, the current governments of which have been unrecognized. *See New York Chinese TV Programs v. U.E. Enterprises*, 954 F.2d 847 (2d Cir.), *cert. denied*, 506 U.S. 827 (1992); *see also Restatement (Third) of the Foreign Relations Law of the United States* at § 202 cmts. a, b; Egon Schwelb, *The Nuclear Test Ban Treaty and International Law*, 58 Am. J. Int'l L. 642, 655 (1964) (quoting statements of President Kennedy and Secretary of State Rusk that participation in a multilateral treaty does not affect recognition status).

14

of the Senate, and receive ambassadors, and that he "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties." U.S. Const., art. II, § 2, cl. 2. Congress possesses its own specific foreign affairs powers, primarily those of declaring war, raising and funding the military, and regulating international commerce. While Article II, § 1 of the Constitution grants the President an undefined executive power, Article I, § 1 limits Congress to "[a]ll legislative Powers herein granted" in the rest of Article I.

From the very beginnings of the Republic, this constitutional arrangement has been understood to grant the President plenary control over the conduct of foreign relations. As Secretary of State Thomas Jefferson observed during the first Washington Administration: "The constitution has divided the powers of government into three branches [and] . . . has declared that 'the executive powers shall be vested in the President,' submitting only special articles of it to a negative by the senate."[27] Due to this structure, Jefferson continued, "[t]he transaction of business with foreign nations is Executive altogether. It belongs then to the head of that department, *except* as to such portions of it as are specially submitted to the Senate. *Exceptions* are to be construed strictly."[28] In defending President Washington's authority to issue the Neutrality Proclamation, Alexander Hamilton came to the same interpretation of the President's foreign affairs powers. According to Hamilton, Article II "ought . . . to be considered as intended . . . to specify and regulate the principal articles implied in the definition of Executive Power; leaving the rest to flow from the general grant of that power."[29] As future Chief Justice John Marshall famously declared a few years later, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations. . . . The [executive] department . . . is entrusted with the whole foreign intercourse of the nation. . . ."[30] Given the agreement of Jefferson, Hamilton, and Marshall, it has not been difficult for the executive branch consistently to assert the President's plenary authority in foreign affairs ever since.

On the few occasions where it has addressed the question, the Supreme Court has lent its approval to the executive branch's broad powers in the field of foreign affairs. Responsibility for the conduct of foreign affairs and for protecting the national security are, as the Supreme Court has observed, "'central' Presidential domains."[31] The President's constitutional primacy flows from both his unique position in the constitutional structure, and from the specific grants of authority in Article II that make the President both the Chief Executive of the nation and the Commander in Chief.[32] Due to the President's constitutionally superior position, the Supreme Court has consistently "recognized 'the generally accepted view that foreign policy [is] the province and responsibility of the Executive.'"[33] This foreign affairs power is independent of Congress: it is "the very delicate, plenary and exclusive power of the President as sole organ of

[27] Thomas Jefferson, *Opinion on the Powers of the Senate Respecting Diplomatic Appointments* (1790), *reprinted in* 16 *The Papers of Thomas Jefferson* 378 (Julian P. Boyd ed., 1961).

[28] *Id.* at 379.

[29] Alexander Hamilton, Pacificus No. 1 (1793), *reprinted in* 15 *The Papers of Alexander Hamilton* 33, 39 (Harold C. Syrett et al. eds., 1969).

[30] 10 Annals of Cong. 613-14 (1800).

[31] *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982).

[32] *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982).

[33] *Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)).

the federal government in the field of international relations – a power which does not require as
a basis for its exercise an act of Congress."[34]

Part of the President's plenary power over the conduct of the Nation's foreign relations is
the interpretation of treaties and of international law. Interpretation of international law includes
the determination whether a territory has the necessary political structure to qualify as a Nation
State for purposes of treaty implementation. In *Clark v. Allen*, 331 U.S. 503 (1947), for
example, the Supreme Court considered whether a 1923 treaty with Germany continued to exist
after the defeat, occupation and partition of Germany by the victorious World War II Allies. The
Court rejected the argument that the treaty "must be held to have failed to survive the [Second
World War], since Germany, as a result of its defeat and the occupation by the Allies, has ceased
to exist as an independent national or international community."[35] Instead, the Court held that
"the question whether a state is in a position to perform its treaty obligations is essentially a
political question. *Terlinden v. Ames*, 184 U.S. 270, 288 [(1902)]. We find no evidence that the
political departments have considered the collapse and surrender of Germany as putting an end to
such provisions of the treaty as survived the outbreak of the war or the obligations of either party
in respect to them."[36]

Thus, *Clark* demonstrates the Supreme Court's sanction for the Executive's constitutional
authority to decide the "political question" whether Germany had ceased to exist as a Nation
State and, if so, whether the 1923 treaty with Germany had become inoperative. Equally here,
the executive branch should conclude that Afghanistan was not "in a position to perform its
treaty obligations" because it lacked, at least throughout the Taliban's ascendancy, all the
elements of statehood. If the Executive made such a determination, the Geneva Conventions
would be inoperative as to Afghanistan until it was in a position to perform its Convention
duties. The federal courts would not review such political questions, but instead would defer to
the decision of the Executive.

### B. Status as a Failed State

There are ample grounds that demonstrate that Afghanistan was a failed State. Indeed,
the findings of the State and Defense Departments, of foreign leaders, and of expert opinion
overwhelmingly support such a conclusion.

International law recognizes many situations in which there may be a territory that has no
"State." A variety of situations can answer to this description.[37] Of chief relevance here is the

---

[34] United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936).

[35] *Id.* at 514.

[36] *Id.; see also id.* at 508-09 (President might have "formulated a national policy quite inconsistent with the enforcement" of the treaty).

[37] It is entirely possible in international law for a territory (even a populated one) to be without any State. In the *Western Sahara Case*, Advisory Opinion, 1975 I.C.J. 12 (Advisory Opinion May 22, 1975), the General Assembly requested the ICJ to decide the question whether the Western Sahara at the time of Spanish colonization was a territory belonging to no one. The question would have had no meaning unless there could be Stateless territory without a State. *See* D.J. Harris, *Cases and Materials on International Law* 113 (1991). The Transkei, a "homeland" created for the Xhosa people by the Republic of South Africa in 1976, was also a territory not internationally recognized as a State. *See id.* at 110-11.

16

category of the "failed State." The case of Somalia in 1992, at the time of the United States' intervention, provides a clear example of this category.

A "failed State" is generally characterized by the collapse or near-collapse of State authority. Such collapse is characterized by the inability of central authorities to maintain government institutions, ensure law and order or engage in normal dealings with other governments, and by the prevalence of violence that destabilizes civil society and the economy. The Executive can readily find that at the outset of this conflict, when the country was largely in the hands of the Taliban militia, there was no functioning central government in Afghanistan that was capable of providing the most basic services to the Afghan population, of suppressing endemic internal violence, or of maintaining normal relations with other governments. Afghanistan, consequently, was without the status of a State for purposes of treaty law, and the Taliban militia could not have qualified as the *de facto* government of Afghanistan. Rather, the Taliban militia would have had the status only of a violent faction or movement contending with other factions for control of that country.

We want to make clear that this Office does not have access to all of the facts related to the activities of the Taliban militia and al Qaeda in Afghanistan. Nonetheless, the available facts in the public record support our conclusion that Afghanistan was a failed state – including facts that pre-existed the military reversals suffered by the Taliban militia and the formation of the new transitional government pursuant to the Bonn agreement. Indeed, the departments best positioned to make such a determination appear to have reached that conclusion some time ago. Secretary of Defense Donald Rumsfeld, for example, declared at a November 2, 2001 press conference that the "Taliban is not a government. The government of Afghanistan does not exist today. The Taliban never was a government as such. It was a force in the country that is not substantially weakened – in many cases cloistered away from the people."[38]

The State Department has taken the same view. Near the start of the conflict, the Bureau of South Asian Affairs found that "[t]here is no functioning central government [in Afghanistan]. The country is divided among fighting factions. . . . The Taliban [is] a radical Islamic movement [that] occupies about 90% of the country."[39]

Prominent authorities and experts on Afghan affairs agree that Afghanistan was a failed State. As one leading scholar of international law has written, "[t]he most dramatic examples of the decline in state authority can be found in countries where government and civil order have virtually disappeared. Recent examples are Liberia, Somalia, and Afghanistan. The term 'failed states' has come to be used for these cases and others like them."[40] Lakhdar Brahimi, the United Nations mediator in Afghanistan and a former Algerian Foreign Minister, described Afghanistan

---

[38] *Secretary Rumsfeld Media Availability en Route to Moscow* (Nov. 2, 2001), available at http://www.yale.edu/lawweb/avalon/sept.11/dod_brief64.htm (visited Nov. 8, 2001).
[39] *Background Note* (October, 2001), available at http://www.state.gov/r/pa/bgn/index.cfm?docid=5380 (visited Oct. 25, 2001), prepared by the Bureau of South Asian Affairs. *See also* Reuters AlertNet - Afghanistan, *Country Profiles* ("There are no state-constituted armed forces. It is not possible to show how ground forces' equipment has been divided among the different factions."), available at http://www.alertnet.org/thefacts/countryprofiles/152478?version=1 (visited Nov. 1, 2001).
[40] Oscar Schachter, *The Decline of the Nation-State and Its Implications for International Law*, 36 Colum. J. Transnat'l L. 7, 18 (1997).

under the Taliban as a "failed state which looks like an infected wound."[41] Tony Blair, the Prime Minister of Great Britain, on a visit to that country this month, declared that "Afghanistan has been a failed state for too long and the whole world has paid the price."[42]

Traditional legal analysis also makes clear that Afghanistan was a failed State during the period of the Taliban militia's existence. A State has failed when centralized governmental authority has almost completely collapsed, no central authorities are capable of maintaining government institutions or ensuring law and order, and violence has destabilized civil society and the economy.[43] A failed State will not satisfy some or all of the three traditional tests for "statehood" under international law:

i) Does the entity have a defined territory and population?

ii) Are the territory/population under the control of its own government?

iii) Does the entity engage in or have the capacity to engage in formal relations with other States?[44]

In another version of the traditional formulation, the State Department has identified four tests for "statehood":

i) Does the entity have effective control over a clearly defined territory and population?

ii) Is there an organized governmental administration of the territory?

---

[41] Ahmed Rashid, Taliban: Militant Islam, Oil & Fundamentalism in Central Asia 207 (2001).

[42] Philip Webster, *Blair's mission to Kabul*, in The Times of London (Jan. 8, 2002), 2002 WL 4171996.

[43] "States in which institutions and law and order have totally or partially collapsed under the pressure and amidst the confusion of erupting violence, yet which subsist as a ghostly presence on the world map, are now commonly referred to as 'failed States' or '*États sans gouvernement*.'" Daniel Thürer, *The failed State and International Law*, International Review of the Red Cross No. 836 (Dec. 31, 1999), available at http://www.icrc.org/eng/review (visited Oct. 22, 2001). Somewhat different tests have been used for determining whether a State has "failed." First, the most salient characteristic of a "failed State" seems to be the disappearance of a "central government." Yoram Dinstein, *The Thirteenth Waldemar A. Solf Lecture in International Law*, 166 Mil. L. Rev. 93, 103 (2000); *see also id.* ("All that remains is a multiplicity of groups of irregular combatants fighting each other."). Closely related to this test, but perhaps somewhat broader, is the definition of a "failed State" as "a situation where the government is unable to discharge basic governmental functions with respect to its populace and its territory. Consequently, laws are not made, cases are not decided, order is not preserved and societal cohesion deteriorates. Basic services such as medical care, education, infrastructure maintenance, tax collection and other functions and services rendered by central governing authorities cease to exist or exist only in limited areas." Ruth Gordon, *Growing Constitutions*, 1 U. Pa. J. Const. L. 528, 533-34 (1999). Professor Thürer distinguishes three elements (respectively, territorial, political and functional) said to characterize a "failed State": 1) failed States undergo an "implosion rather than an explosion of the structures of power and authority, the disintegration and destructuring of States rather than their dismemberment;" 2) they experience "the total or near total breakdown of structures guaranteeing law and order;" and 3) there are marked by "the absence of bodies capable, on the one hand, of representing the State at the international level and, on the other, of being influenced by the outside world." Thürer, *supra*.

[44] *See Restatement (Third) of the Foreign Relations Law of the United States*, at § 201; *see also* 1933 Montevideo Convention on Rights and Duties of States, art. I, 49 Stat. 3097, 28 Am. J. Int'l L. Supp. 75 (1934).

18

iii) Does the entity have the capacity to act effectively to conduct foreign relations and to fulfill international obligations?

iv) Has the international community recognized the entity?[45]

Based on these factors, we conclude that Afghanistan under the Taliban militia was in a condition of "statelessness," and therefore was not a High Contracting Party to the Geneva Conventions for at least that period of time. The condition of having an organized governmental administration was plainly not met. Indeed, there are good reasons to doubt whether *any* of the conditions was met.

First, even before the outset of the conflict with the United States, the Taliban militia did not have effective control over a clearly defined territory and population. Even before the United States air strikes began, at least ten percent of the country, and the population within those areas, was governed by the Northern Alliance. A large part of the Afghan population in recent years has consisted of refugees: as of June, 2001, there were an estimated 2,000,000 Afghan refugees in Pakistan, and as of December, 2000, an estimated 1,500,000 were in Iran.[46] These figures demonstrate that a significant segment of the Afghan population was never under the control of the Taliban militia. It is unclear how strong was the hold of the Taliban militia before the conflict, in light of the rapid military successes of the Northern Alliance in just a few weeks.

Indeed, the facts appear to show that Afghanistan appears to have been divided between different tribal and warring factions, rather than by any central state as such. As we have noted, the State Department has found that Afghanistan was not under the control of a central government, but was instead divided among different warlords and ethnic groups. The Taliban militia in essence represented only an ethnically Pashtun movement, a "tribal militia,"[47] that did not command the allegiance of other major ethnic groups in Afghanistan and that was apparently unable to suppress endemic violence in the country. As a prominent writer on the Taliban militia wrote well before the current conflict began, "[e]ven if [the Taliban] were to conquer the north, it would not bring stability, only continuing guerrilla war by the non-Pashtuns, but this time from bases in Central Asia and Iran which would further destabilize the region."[48]

Second, again even before the United States air strikes and the successes of the Northern Alliance, an organized governmental administration did not exist in Afghanistan. One expert on the Taliban concluded that the country had

> ceased to exist as a viable state and when a state fails civil society is destroyed. . . . . The entire Afghan population has been displaced, not once but many times over. The physical destruction of Kabul has turned it into the Dresden of the late twentieth century. . . . There is no semblance of an infrastructure that can sustain

---

[45] Eleanor C. McDowell, Contemporary Practice of the United States Relating to International Law, 71 Am. J. Int'l L. 337 (1977).

[46] See CNN.com. /In-Depth Specials, *War Against Terror*, available at http://www.cnn.com/SPECIALS/2001/trade.center/refugee.map.html (visited Nov. 1, 2001). Other estimates are lower but still extremely large numbers. See, e.g., Goodson, *supra*, at 149 (estimating 1.2 million Afghans living in Pakistan).

[47] Goodson, *supra*, at 115.

[48] Rashid, *supra*, at 213.

19

society — even at the lowest common denominator of poverty. . . . The economy is a black hole that is sucking in its neighbours with illicit trade and the smuggling of drugs and weapons, undermining them in the process. . . . Complex relationships of power and authority built up over centuries have broken down completely. No single group or leader has the legitimacy to reunite the country. Rather than a national identity or kinship-tribal-based identities, territorial regional identities have become paramount. . . . [T]he Taliban refuse to define the Afghan state they want to constitute and take over, largely because they have no idea what they want. The lack of a central authority, state organizations, a methodology for command and control and mechanisms which can reflect some level of popular participation . . . make it impossible for many Afghans to accept the Taliban or for the outside world to recognize a Taliban government. . . . No warlord faction has ever felt itself responsible for the civilian population, but the Taliban are incapable of carrying out even the minimum of developmental work because they believe that Islam will take care of everyone.[49]

Another expert reached similar conclusions:

Afghanistan today has become a violent society, bereft of political institutions that function correctly and an economy that functions at all. When this is coupled with the destruction of population and the physical infrastructure. . ., it becomes clear that Afghanistan is a country on the edge of collapse, or at least profound transformation. . . . With the Taliban, there are few meaningful governmental structures and little that actually functions.[50]

The State Department also came to such conclusions. In testimony early in October 2001 before the Senate Foreign Relations Committee's Subcommittee on Near East and South Asian Affairs, Assistant Secretary of State for South Asian Affairs Christina Rocca explained that:

[t]wenty-two years of conflict have steadily devastated [Afghanistan], destroyed its physical and political infrastructure, shattered its institutions, and wrecked its socio-economic fabric. . . . The Taliban have shown no desire to provide even the most rudimentary health, education, and other social services expected of any government. Instead, they have chosen to devote their resources to waging war on the Afghan people, and exporting instability to their neighbors.[51]

Rather than performing normal government functions, the Taliban militia exhibited the characteristics of a criminal gang. The United Nations Security Council found that the Taliban militia extracted massive profits from illegal drug trafficking in Afghanistan and subsidized terrorism from those revenues.[52]

---

[49] *Id.* at 207-08, 212-13.

[50] Goodson, *supra*, at 103-04; 115.

[51] United States Department of State, International Information Programs, *Rocca Blames Taliban for Humanitarian Disaster in Afghanistan* (Oct. 10, 2001), available at http://www.usinfo.state.gov/regional/nea/sasia/afghan/text/1010roca.htm (visited Oct. 19, 2001).

[52] *See* U.N. Security Council Resolution 1333 (2000), available at http://www.yale.edu/lawweb/avalon/sept_11/unsecres_1333.htm (finding that "the Taliban benefits directly from the cultivation of illicit opium by

Third, the Taliban militia was unable to conduct normal foreign relations or to fulfill its international legal obligations. Indeed, the public record shows that the Taliban militia had become so subject to the domination and control of al Qaeda that it could not pursue independent policies with respect to the outside world.[53] Publicly known facts demonstrate that the Taliban was unwilling and perhaps unable to obey its international obligations and to conduct normal diplomatic relations. Thus, the Taliban has consistently refused to comply with United Nations Security Council Resolutions 1333 (2000) and 1267 (1999), which called on it to surrender Osama bin Laden to justice and to take other actions to abate terrorism based in Afghanistan.[54] Those resolutions also called on all States to deny permission for aircraft to take off or to land if they were owned or operated by or for the Taliban, and to freeze funds and other resources owned or controlled by the Taliban. The Taliban also reportedly refused or was unable to extradite bin Laden at the request of Saudi Arabia in September, 1998, despite close relations between the Saudi government and itself. As a result, the Saudi government expelled the Afghan *chargé d'affaires*.[55] The Taliban's continuing role in sheltering and supporting those believed to be responsible for the terrorist attacks of September 11, 2001 placed it in clear breach of international law, which required it to prevent the use of its territory as a launching pad for attacks against another Nation.[56]

---

imposing a tax on its production and indirectly benefits from the processing and trafficking of such opium, and these substantial resources strengthen the Taliban's capacity to harbor terrorists"). The United States Government has amassed substantial evidence that Taliban has condoned and profited from narco-trafficking on a massive scale, with disastrous effects on neighboring countries. *See The Taliban, Terrorism, and Drug Trade*: Hearing Before the Subcomm. on Criminal Justice, Drug Policy and Human Resources of the House Comm. on Government Reform, 107[th] Cong. (2001) (testimony of William Bach, Director, Office of Asia, Africa, Europe, NIS Programs, Bureau of International Narcotics and Law Enforcement Affairs, Department of State; testimony of Asa Hutchinson, Administrator, Drug Enforcement Administration, U.S. Department of Justice). "The heroin explosion emanating from Afghanistan is now affecting the politics and economies of the entire region. It is crippling societies, distorting the economics of already fragile states and creating a new narco-elite which is at odds with the ever increasing poverty of the population." Rashid, *supra*, at 123; *see also* Goodson, *supra*, at 101-03; Peter Tomsen, *Untying the Afghan Knot*, 25 WTR Fletcher F. World Aff. 17, 18 (2001) ("Afghanistan is now the world's largest producer of opium."). Iran is estimated to have as many as three million drug addicts, largely as a result of Taliban's involvement in the drug trade. Rashid, *supra*, at 122, 203.

[53] *See, e.g.*, "2 U.S. Targets Bound by Fate," *The Washington Post* at A22 (Nov. 14, 2001) ("According to Thomas Gouttierre, an Afghan expert at the University of Nebraska and a former UN adviser, the so-called Afghan Arabs surrounding bin Laden were much more educated and articulate than the often illiterate Taliban and succeeded in convincing them that they were at the head of a world-wide Islamic renaissance. 'Al Qaeda ended up hijacking a large part of the Taliban movement,' he said, noting that [Taliban supreme religious leader Mohammed] Omar and bin Laden were 'very, very tight' by 1998."); "Bin Laden Paid Cash For Taliban," *The Washington Post* at A1 (Nov. 30, 2001) (reporting claims by former Taliban official of al Qaeda's corruption of Taliban officials).

[54] U.N. Security Council Resolution 1333 "strongly condemn[ed]" the Taliban for the "sheltering and training of terrorists and [the] planning of terrorist acts," and "deplor[ed] the fact that the Taliban continues to provide a safe haven to Usama bin Laden and to allow him and others associated with him to operate a network of terrorist training camps from Taliban-controlled territory and to use Afghanistan as a base from which to sponsor international terrorist operations." U.N. Security Council Resolution 1214, ¶ 13 (1998) enjoined the Taliban to stop providing a sanctuary and training for terrorists. U.N. Security Council Resolution 1267, ¶ 2 (1999), stated that the Taliban's failure to comply with the Council's 1998 demand constituted a threat to the peace. *See* Sean D. Murphy, *Efforts to Obtain Custody of Osama Bin Laden*, 94 Am. J. Int'l L. 366 (2000).

[55] *See* Yossef Bodansky, *Bin Laden: The Man Who Declared War on America* 301-02 (2001).

[56] *See* Robert F. Turner, *International Law and the Use of Force in Response to the World Trade Center and Pentagon Attacks*, available at http://jurist.law.pitt.edu/forumnew/34.htm (visited Oct. 25, 2001) ("If (as has been claimed by the US and UK governments) bin Laden masterminded the attacks on New York and Washington,

Fourth, the Taliban militia was not recognized as the legitimate government of Afghanistan by the United States or by any member of the international community except Pakistan. Neither the United States nor the United Nations ever recognized that the Taliban militia were a government. The only two other States that had maintained diplomatic relations with it before the current conflict began (Saudi Arabia and the United Arab Emirates) soon severed them.[57] Even Pakistan had withdrawn its recognition before the end of hostilities between the United States and the Taliban forces. This *universal* refusal to recognize the Taliban militia as a government demonstrates that other nations and the United Nations concur in our judgment that the Taliban militia was no government and that Afghanistan had ceased to operate as a Nation State.

Based on the foregoing, we conclude that the evidence supports the conclusion that Afghanistan, when largely controlled by the Taliban, failed some, and perhaps all, of the ordinary tests of statehood. Nor do we think that the military successes of the United States and the Northern Alliance change that outcome. Afghanistan *was* stateless for the relevant period of the conflict, even if after the Bonn Agreement it becomes a State recognized by the United Nations, the United States, and most other nations.[58] If Afghanistan was in a condition of statelessness during the time of the conflict, the Taliban militia could not have been considered a government that was also a High Contracting Party to the Geneva Conventions.

The conclusion that members of the Taliban militia are not entitled to the protections accorded to POWs under the Geneva Conventions receives further support from other arguments. As we have already suggested, there is substantial evidence that the Taliban and al Qaeda were so closely intertwined that the Taliban cannot be regarded as an independent actor, and therefore cannot stand on a higher footing under the Geneva Conventions than al Qaeda. Mullah Mohammed Omar, the spiritual leader of the Taliban, appears to have been particularly susceptible to the more sophisticated leadership of al Qaeda, who "introduced him to the world

---

Afghanistan is in breach of its state responsibility to take reasonable measures to prevent its territory from being used to launch attacks against other states. The United States and its allies thus have a legal right to violate Afghanistan's territorial integrity to destroy bin Laden and related terrorist targets. If the Taliban elects to join forces with bin Laden, it, too, becomes a lawful target."); *see also* W. Michael Reisman, *International Legal Responses to Terrorism,* 22 Hous. J. Int'l L. 3, 40-42, 51-54 (1999).

[57] *See* "A Look at the Taliban," Sept. 30, 2001, available at http://www.usatoday.com/news/world/2001/thetaliban.htm (visited Oct. 19, 2001). Indeed, Pakistan had been the only country in the world that maintained an embassy in Kabul; the overwhelming majority of States and the United Nations recognized exiled President Burhanuddin Rabbani and his government as the country's legal authorities. *See* "Taliban tactics move to hostage ploy," Aug. 8, 2001, available at http://www.janes.com/regional_news/asia_pacific/news/jid/jid010808_1_n.shtml (visited Oct. 19, 2001).

[58] We do not think that the military successes of the United States and the Northern Alliance necessarily mean that Afghanistan's statehood was restored before the Bonn agreement, if only because the international community, including the United States, did not regard the Northern Alliance as constituting the government of Afghanistan. United Nations Security Council Resolution 1378, ¶ 1 (2001), available at http://www.yale.edu/lawweb/avalon/sept_11/unsecres_1378.htm (visited Nov. 19, 2001), expressed "strong support for the efforts of the Afghan people to establish a new and transitional administration leading to the formation of a 'government'" (emphasis added); see also id. ¶ 3 (affirming that the United Nations should play a central role in supporting Afghan efforts to establish a "new and transitional administration leading to the formation of a new government"). The plain implication of this Resolution, which reflects the views of the United States, is that Afghanistan after Taliban did not have a government at that time.

of Islamic radicalism, global jihad and hatred of the United States," who exercised great religious and ideological influence over him, and who furnished him with personal favors such as a bomb-proof house in Kandahar.[59] In particular, Omar, who was born into poverty and was virtually uneducated, seems to have worked closely with Osama bin Laden, who shared with Omar a vision of an international Islamic revolution.[60]

Al Qaeda also provided substantial material assistance to the Taliban militia. It made large sums available to Taliban leaders, and supplied them with "a steady stream of guerrilla fighters to assist the Taliban in their continuing battles with the Northern Alliance."[61] Because the Taliban was not equipped to maintain control over Afghanistan in the face of armed opposition from other factions, the Taliban became increasingly dependent on the money, weapons, recruits, and well-trained soldiers provided to it by al Qaeda. Al Qaeda in turn depended on the Taliban to provide it with bases for training camps and a refuge from the United States. Over the course of his dealings with it, bin Laden "pumped tens of millions of dollars into the Taliban, provided it with his most elite Arab fighting forces, and integrated his Qaeda network into key portfolios within the Taliban government. . . . [T]he two [movements] had long since melded together as one, through money, combat, and a shared radical interpretation of Islam."[62] Further, both because al Qaeda was capable of mustering more formidable military forces than the Taliban at any given point, and because failure to protect bin Laden would have cost the Taliban the support of radical Islamists, it may well have been impossible for the Taliban to surrender bin Laden as directed by the United Nations, even if it had been willing to do.[63] In any event, by continuing to harbor bin Laden and al Qaeda and to assist them in material ways, the Taliban became complicit in its terrorist acts. Taking all these facts into account, together with other non-public information that may be available to the Executive, we think it fair to characterize the Taliban militia as functionally intertwined with al Qaeda, and therefore on the same footing as al Qaeda under the Geneva Conventions.

### C. Implications Under the Geneva Conventions

Whether based on the view that Afghanistan was a failed State or on the view that Taliban was functionally indistinguishable from al Qaeda, the view that Afghanistan had ceased to be a party to the Geneva Conventions has two immediate ramifications. First, common Article 2 – and thus most of the substance of the Geneva Conventions – would not apply to the members of the Taliban militia, because that provision only applies to international wars between two State Parties to the Conventions. Second, even common Article 3's basic standards would not apply. This would be so, not only because the current conflict is not a non-international conflict subject to Article 3, but also because common Article 3 concerns only a non-international conflict that occurs "in the territory *of one of the High Contracting Parties*"

[59] Murray Campbell, *Enigmatic Taliban cleric a poor leader*, The Globe and Mail, at A11 (Dec. 1, 2001).
[60] Indeed, there are press reports (which have also been denied) that a daughter of bin Laden married Omar, and a daughter of Omar married bin Laden.
[61] Michael Dobbs and Vernon Loeb, *supra* note 53.
[62] Michael Kranish and Indira A.R. Lakshmanan, *Partners in 'Jihad': Bin Laden Ties to Taliban: How Odd Alliances Marked Bin Laden's Path*, in *The Boston Globe* (Oct. 28, 2001), 2001 WL 3958881. This article contains especially detailed information about the close linkages between the two movements and their leaders.
[63] Peter McGrath and Gretel Kovach, *Bin Laden's Imprint; an expert on the radical leader says targeting the Saudi dissident won't eliminate his threat*, in Newsweek (Sept. 14, 2001), 2001 WL 24138958.

(emphasis added).    If Afghanistan was not a High Contracting Party during the time of the conflict, then a non-international conflict within its territory does not fall within the terms of Article 3.

We have considered the argument that, even if our conclusions held during the period when Afghanistan was largely under the Taliban's control (and thus in a condition of statelessness), they have ceased to hold in light of the Bonn Agreement. Afghanistan now has an internationally recognized government, and on that basis it might be argued that it has resumed its status as a High Contracting Party under the Geneva Conventions. It could then be argued that the protections of those Conventions – including the protections for prisoners of war – *now* clothe the Taliban militia, even if they did not during the Taliban's ascendancy.

This reasoning would be mistaken. First, even if Afghanistan now has a recognized government, it does not *necessarily* follow that its status as a party to the Conventions has been completely restored. Afghanistan still may not be in a position to fulfill its Convention responsibilities, and thus should not yet be accorded party status under the Conventions.[64] Thus, even though Germany had some form of government when the Supreme Court decided *Clark v. Allen* in 1947, the Court declared that whether Germany was "in a position to perform its treaty obligations"[65] was a political question, meaning that it remained open for the President to decide whether the treaty with Germany was in effect. We expect that the courts would properly recognize that it rests solely within the President's constitutional authority to determine whether Afghanistan has yet returned to the status of a state party to the Conventions.

Second, the jurisdictional provisions of the Conventions (common Articles 2 and 3) still remain inapplicable to the conflict between the United States and the Taliban militia. This is the case even assuming that, with the substantial cessation of that conflict, the status of Afghanistan as a party to the Conventions has been restored. Article 2 states that the Convention shall apply to all cases of declared war or other armed conflict between the High Contracting Parties. But there was no war or armed conflict between the United States and *Afghanistan* during the period before the Bonn Agreement if Afghanistan was stateless at that time. Nor, of course, is there a state of war or armed conflict between the United States and Afghanistan *now*. Likewise, Article 3 states that certain basic standards shall apply in the case of "an armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." The most natural reading of this provision is that the conflict must have occurred in the territory of a State that was a High Contracting Party *at the time of the conflict*. So understood, Article 3 would not apply to the conflict with the Taliban.[66] Because the jurisdictional provisions remain inapplicable even if Afghanistan's status as a Convention party has been restored, Taliban prisoners remain outside the protections of the Conventions. As a result, they do not, for example, fall under the definition of "prisoners of war" in Geneva Convention III, art. 4.

---

[64] As one expert on Afghanistan has recently noted, "Afghanistan hasn't really had a credible central government since 1973, when the king was ousted. . . . They have been out of practice at seeing themselves as having a central authority of some kind." Kevin Whitelaw et al., *A Hunt in the Hills*, in *U.S. News & World Report* (Dec. 17, 2001), 2001 WL 30366330 (quoting Thomas Goutierre of the University of Nebraska-Omaha).

[65] 331 U.S. at 514

[66] In addition, as we have noted, Article 3 is and was inapplicable because the conflict in Afghanistan is and was of an international character.

24

Furthermore, even apart from the question whether Afghanistan was or remains a failed state, there are specific reasons why Geneva Convention III, relating to POWs, would not apply to captured Taliban militia. First, Article 4 of Geneva Convention III enumerates particular categories of persons who are entitled to POW status. In our judgment, Taliban captives do not fall within any of these categories, including that of Article 4(A)(3), "Members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." As we have discussed, the United Nations and almost all members of the world community, including the United States, refused to recognize the Taliban militia as the government of Afghanistan. Of the handful of States that did recognize it, all but Pakistan withdrew their recognition soon after the start of the conflict, and Pakistan later followed suit. Thus, the Taliban cannot even be considered "a government or authority" at all for purposes of this provision, since no other state in the world viewed the Taliban militia as qualifying as one. According the Taliban militia the status of the armed forces of a government, even when no other country in the world considered it as such, would be tantamount to allowing any political or violent movement to simply declare itself to be a government. Enjoyment of the rights and duties of a sovereign state should not be so easily accorded as by self-identification.

Second, even if a political group or movement could be considered to be "a government or authority" within the meaning of Article 4(A)(3), that group or movement would have to demonstrate that it considered itself bound by Geneva Convention III in order to be in a position to claim the Convention's benefits. Your Department, however, informs us that the Taliban militia failed to confirm its acceptance of the Geneva Conventions, did not fulfill its obligations, and it did not act consistently with the most fundamental obligations of the laws of war, such as the prohibition on using civilians to shield military forces.

Third, even if the Taliban considered themselves to be a party to Geneva Convention III, or even if they had stated publicly that they would comply with that Convention's provisions and in fact did so, Taliban captives would still have to meet other requirements of Article 4 to be entitled to POW status. For example, Article 4(A)(3) only covers "[m]embers of *regular armed forces*" (emphasis added). The Taliban militia, it seems, cannot be so characterized. To be sure, Article 4(A)(2) accords POW status to persons who are not in regular armed forces—*i.e.*, "[m]embers of other militias and members of other voluntary corps, including those of organized resistance movements." Nevertheless, Article 4 makes clear that these combatants are only afforded POW status if they meet certain conditions, including "that of being commanded by a person responsible for his subordinates," "that of having a fixed distinctive sign recognizable at a distance," and "that of conducting their operations in accordance with the laws and customs of war." Your Department advises us that the Taliban militia's command structure probably did not meet the first of these requirements; that the evidence strongly indicates that the requirement of a distinctive uniform was not met; and that the requirement of conducting operations in accordance with the law and customs of armed conflict was not met. Accordingly, we think that Taliban captives do not qualify for POW status either as members of regular armed forces or as combatants of other kinds covered by the Convention.[67]

### D. *Historical Application of the Geneva Conventions*

---

[67] We refrain from discussing more specific facts here due to the sensitive operational nature of such information.

We conclude by addressing a point of considerable significance. To say that the specific provisions of the Geneva and Hague Conventions do not apply in the current conflict with the Taliban militia *as a legal requirement* is by no means to say that the principles of the law of armed conflict cannot be applied *as a matter of U.S. Government policy.* The President as Commander in Chief can determine as a matter of his judgment for the efficient prosecution of the military campaign that the policy of the United States will be to enforce customary standards of the law of war against the Taliban and to punish any transgressions against those standards. Thus, for example, even though Geneva Convention III may not apply, the United States may deem it a violation of the laws and usages of war for Taliban troops to torture any American prisoners whom they may happen to seize. The U.S. military thus could prosecute Taliban militiamen for war crimes for engaging in such conduct.[68] A decision to apply the principles of the Geneva Conventions or of others laws of war as a matter of policy, not law, would be fully consistent with the past practice of the United States.

United States practice in post-1949 conflicts reveals several instances in which our military forces have applied the Geneva Conventions as a matter of policy, without acknowledging any legal obligation to do so. These cases include the Wars in Korea and Vietnam and the interventions in Panama and Somalia.

*Korea.* The Korean War broke out on June 25, 1950, before any of the major State parties to the conflict (including the United States) had ratified the Geneva Conventions. Nonetheless, General Douglas MacArthur, the United Nations Commander in Korea, said that his forces would comply with the principles of the Geneva Conventions, including those relating to POWs. MacArthur stated: "My present instructions are to abide by the humanitarian principles of the 1949 Geneva Conventions, particularly common Article three. In addition, I have directed the forces under my command to abide by the detailed provisions of the prisoner-of-war convention, since I have the means at my disposal to assure compliance with this convention by all concerned and have fully accredited the ICRC delegates accordingly."[69]

*Viet Nam.* The United States through the State Department took the position that the Geneva Convention III "indisputably applies to the armed conflict in Viet Nam," and therefore that "American military personnel captured in the course of that armed conflict are entitled to be treated as prisoners of war."[70] We understand from the Defense Department that our military forces, as a matter of policy, decided at some point in the conflict to accord POW treatment (but not necessarily POW status) to Viet Cong members, despite the fact that they often did *not* meet the criteria for that status (set forth in Geneva Convention III, art. 4), *e.g.*, by not wearing uniforms or any other fixed distinctive signs visible at a distance.

---

[68] The President could, of course, also determine that it will be the policy of the United States to require its own troops to adhere to standards of conduct recognized under customary international law, and could prosecute offenders for violations. As explained above, the President is not *bound* to follow these standards by law, but may direct the armed forces to adhere to them as a matter of policy.

[69] Quoted in Joseph P. Bialke, *United Nations Peace Operations: Applicable Norms and the Application of the Law of Armed Conflict,* 50 A.F.L. Rev. 1, 63 n.235 (2001).

[70] *Entitlement of American Military Personnel Held by North Viet-Nam to Treatment as Prisoners of War Under the Geneva Convention of 1949 Relative to the Treatment of Prisoners of War,* July 13, 1966, *reprinted in* John Norton Moore, *Law and the Indo-China War* 635, 639 (1972).

*Panama*. The United States' intervention in Panama on December 20, 1989 came at the request and invitation of Panama's legitimately elected President, Guillermo Endara.[71] The United States had never recognized General Manuel Noriega, the commander of the Panamanian Defense Force, as Panama's legitimate ruler. Thus, in the view of the executive branch, the conflict was between the Government of Panama assisted by the United States on the one side and insurgent forces loyal to General Noriega on the other. It was not an international armed conflict between the United States and Panama, another State. Accordingly, it was not, in the executive's judgment, an international armed conflict governed by common Article 2 of the Geneva Conventions.[72] Nonetheless, we understand that, as a matter of policy, all persons captured or detained by the United States in the intervention – including civilians and members of paramilitary forces as well as members of the Panamanian Defense Force – were *treated* consistently with the Geneva Convention III, until their precise status under that Convention was determined. A 1990 letter to the Attorney General from the Legal Adviser to the State Department said that "[i]t should be emphasized that the decision to extend basic prisoner of war protections to such persons was based on strong policy considerations, and was not necessarily based on any conclusion that the United States was obligated to do so as a matter of law."[73]

*Interventions in Somalia, Haiti and Bosnia*. There was considerable factual uncertainty whether the United Nations Operation in Somalia in late 1992 and early 1993 rose to the level of an "armed conflict" that could be subject to common Article 3 of the Geneva Conventions, particularly after the United Nations Task Force abandoned its previously neutral role and took military action against a Somali warlord, General Aideed. Similar questions have arisen in other peace operations, including those in Haiti and Bosnia. It appears that the U.S. military has decided, as a matter of policy, to conduct operations in such circumstances as if the Geneva Conventions applied, regardless of whether there is any legal requirement to do so. The U.S.

---

[71] *See United States v. Noriega*, 117 F.3d 1206, 1211 (11th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998).

[72] *See* Jan E. Aldykiewicz and Geoffrey S. Corn, *Authority to Court-Martial Non-U.S. Military Personnel for Serious Violations of International Humanitarian Law Committed During Internal Armed Conflict*, 167 Mil. L. Rev. 74, 77 n.6 (2001). In *United States v. Noriega*, 808 F. Supp. 791, 794 (S.D. Fla. 1992), the district court held that the United States' intervention in Panama in late 1989 was an international armed conflict under (common) Article 2 of the Geneva Convention III, and that General Noriega was entitled to POW status. To the extent that the holding assumed that the courts are free to determine whether a conflict is between the United States and another "State" regardless of the President's view whether the other party is a "State" or not, we disagree with it. By assuming the right to determine that the United States was engaged in an armed conflict with *Panama* – rather than with insurgent forces in rebellion against the recognized and legitimate Government of Panama – the district court impermissibly usurped the recognition power, a constitutional authority reserved to the President. The power to determine whether a foreign government is to be accorded recognition, and the related power to determine whether a condition of statelessness exists in a particular country, are exclusively executive. *See, e.g., Baker v. Carr*, 369 U.S. 186, 212 (1962) ("[R]ecognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing.' . . . Similarly, recognition of belligerency abroad is an executive responsibility. . . .") (citation omitted); *Kennett v. Chambers*, 55 U.S. (14 How.) 38, 50-51 (1852) ("[T]he question whether [the Republic of] Texas [while in rebellion against Mexico] had or had not at that time become an independent state, was a question for that department of our government exclusively which is charged with our foreign relations. And until the period when that department recognized it as an independent state, the judicial tribunals . . . were bound to consider . . . Texas as a part of the Mexican territory."); *Mingtai Fire & Marine Ins. Co. v. United Parcel Service*, 177 F.3d 1142, 1145 (9th Cir.) ("[T]he Supreme Court has repeatedly held that the Constitution commits to the Executive branch alone the authority to recognize, and to withdraw recognition from, foreign regimes."), *cert. denied*, 528 U.S. 951 (1999).

[73] Letter for the Hon. Richard L. Thornburgh, Attorney General, from Abraham D. Sofaer, Legal Adviser, State Department at 2 (Jan. 31, 1990).

Army Operational Law Handbook, after noting that "[i]n peace operations, such as those in Somalia, Haiti, and Bosnia, the question frequently arises whether the [law of war] legally applies," states that it is "the position of the US, UN and NATO that their forces will apply the 'principles and spirit' of the [law of war] in these operations."[74]

### E. Suspension of The Geneva Conventions as to Afghanistan

Even if Afghanistan under the Taliban were not deemed to have been a failed State, the President could still regard the Geneva Conventions as temporarily suspended during the current military action. As a constitutional matter, the President has the power to consider performance of some or all of the obligations of the United States under the Conventions suspended. Such a decision could be based on the finding that Afghanistan lacked the capacity to fulfill its treaty obligations or (if supported by the facts) on the finding that Afghanistan was in material breach of its obligations.

As the Nation's representative in foreign affairs, the President has a variety of constitutional powers with respect to treaties, including the powers to suspend them, withhold performance of them, contravene them or terminate them. The treaty power is fundamentally an executive power established in Article II of the Constitution, and therefore power over treaty matters after advice and consent by the Senate are within the President's plenary authority. We have recently treated these questions in detail, and rely upon that advice here.[75]

The courts have often acknowledged the President's constitutional powers with respect to treaties. Thus, it has long been accepted that the President may determine whether a treaty has lapsed because a foreign State has gained or lost its independence, or because it has undergone other changes in sovereignty.[76] Nonperformance of a particular treaty obligation may, in the President's judgment, justify withholding performance of one of the United States' treaty obligations, or contravening the treaty.[77] Further, the President may regard a treaty as suspended for several reasons. For example, he may determine that "the conditions essential to [the treaty's] continued effectiveness no longer pertain."[78] The President may also determine that a

---

[74] Quoted in Bialke, supra, at 56.

[75] See Memorandum for John Bellinger, III, Senior Associate Counsel and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty (Nov. 15, 2001); see also Memorandum for William Howard Taft, IV, Legal Adviser, Department of State, from John Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, Re: President's Constitutional Authority to Withdraw Treaties from the Senate (Aug. 24, 2001).

[76] See Kennett, 55 U.S. at 47-48, 51; Terlinden, 184 U.S. at 288; Saroop, 109 F.3d at 171 (collecting cases). Alexander Hamilton argued in 1793 that the revolution in France had triggered the power (indeed, the duty) of the President to determine whether the pre-existing treaty of alliance with the King of France remained in effect. The President's constitutional powers, he said, "include[] that of judging, in the case of a Revolution of Government in a foreign Country, whether the new rulers are competent organs of the National Will and ought to be recognised or not: And where a treaty antecedently exists between the UStates and such nation that right involves the power of giving operation or not to such treaty." Alexander Hamilton, Pacificus No. 1 (1793), reprinted in 15 The Papers of Alexander Hamilton 33, 41 (Harold C. Syrett et al. eds, 1969).

[77] See Taylor v. Morton, 23 F. Cas. 784, 787 (C.C.D. Mass. 1855) (No. 13,799) (Curtis, Circuit Justice), aff'd, 67 U.S. (2 Black) 481 (1862).

[78] See International Load Line Convention, 40 Op. Att'y Gen. 119,124 (1941). Changed conditions have provided a basis on which Presidents have suspended treaties in the past. For example, in 1939, President Franklin Roosevelt

material breach of a treaty by a foreign government has rendered a treaty not merely voidable, but void, as to that government.[79]

The President could justifiably exercise his constitutional authority over treaties by regarding the Geneva Conventions as suspended in relation to Afghanistan. The basis for such a determination would be a finding that under the Taliban militia, Afghanistan committed grave violations of international law and maintained close relationships with international terrorist organizations such as al Qaeda, which have attacked wholly civilian targets by surprise attack. As a result, Afghanistan under the Taliban could be held to have violated basic humanitarian duties under the Geneva Conventions and other norms of international law. Nonperformance of such basic duties could be taken to have demonstrated that Afghanistan could not be trusted to perform its commitments under the Conventions during the current conflict.[80] After the conflict, the President determine that relations under the Geneva Conventions with Afghanistan had been restored, once an Afghan government that was willing and able to execute the country's treaty obligations was securely established. Furthermore, if evidence of other material breaches of the Conventions by Afghanistan existed, that evidence could also furnish a basis for the President to decide to suspend performance of the United States' Convention obligations. A decision to regard the Geneva Conventions as suspended would not, of course, constitute a "denunciation" of the Conventions, for which procedures are prescribed in the Conventions.[81] The President need not regard the Conventions as suspended in their entirety, but only in part.[82]

voidable.

---

suspended the operation of the London Naval Treaty of 1936. "The war in Europe had caused several contracting parties to suspend the treaty, for the obvious reason that it was impossible to limit naval armaments. The notice of termination was therefore grounded on changed circumstances." David Gray Adler, *The Constitution and the Termination of Treaties*, 187 (1986).

[79] *See, e.g., Charlton v. Kelly*, 229 U.S. 447, 473 (1913); *Escobedo v. United States*, 623 F.2d 1098, 1106 (5th Cir.), cert. denied, 449 U.S. 1036 (1980).

[80] It is possible for the President to suspend a multilateral treaty as to one but not all of the parties to the treaty. In 1986, the United States suspended the performance of its obligations under the Security Treaty (ANZUS Pact), T.I.A.S. 2493, 3 U.S.T. 3420, entered into force April 29, 1952, as to New Zealand but not as to Australia. *See* Marian Nash (Leich), 1 *Cumulative Digest of United States Practice in International Law 1981-1988*, at 1279-81.

[81] *See, e.g.,* Geneva Convention III, art. 142. The suspension of a treaty is distinct from the denunciation or termination of one. Suspension is generally a milder measure than termination, often being partial, temporary, or contingent upon circumstances that can be altered by the actions of the parties to the treaty. Moreover, at least in the United States, suspension of a treaty can be reversed by unilateral executive action, whereas termination, which annuls a treaty, and which is therefore more disruptive of international relationships, would require Senate consent to a new treaty in order to be undone. *See* Oliver J. Lissitzyn, *Treaties and Changed Circumstances (Rebus Sic Stantibus)*, 61 Am. J. Int'l L. 895, 916 (1967) ("It is difficult to see how a right of suspension would present greater dangers than a right of termination.").

[82] In general, the partial suspension of the provisions of a treaty (as distinct from both termination and complete suspension) is recognized as permissible under international law. Article 60 of the Vienna Convention explicitly permits the suspension of a treaty "in whole or in part." "[U]nder both treaty law and non-forcible reprisal law as a basis for responsive suspension it is clear that suspension may be only partial and need not suspend or terminate an agreement as a whole, in contrast, for example, with treaty withdrawal clauses." John Norton Moore, *Enhancing Compliance With International Law: A Neglected Remedy*, 39 Va. J. Int'l L. 881, 932 (1999). Although suspension of particular treaty provisions is recognized both in State practice and international law, we are not aware of any precedent for suspending a treaty as to *some*, but not *others*, of the persons otherwise protected by it. Thus, we can see no basis for suggesting that the President might suspend the Geneva Conventions as to the Taliban *leadership*, but not as to its rank and file members. However, the President could achieve the same outcome by suspending the Conventions, ordering the U.S. military to follow them purely as a matter of policy, and excepting the Taliban leadership from the coverage of this policy.

Although the United States has never, to our knowledge, suspended any provision of the Geneva Conventions, it is significant that on at least two occasions since 1949 – the Korean War and the Persian Gulf War – its practice has deviated from the clear requirements of Article 118 of Geneva Convention III. That Article prescribes the mandatory repatriation of POWs after the cessation of a covered conflict.[83] Although on both occasions the POWs themselves sought to avoid repatriation, Geneva Convention III provides that a POW may "in no circumstances renounce in part or in entirety" the right to repatriation. Moreover, the negotiating history of the Convention reveals that a proposal to make POW repatriation voluntary was considered and rejected, in large part on the ground that it would work to the detriment of the POWs.[84] Consequently, withholding of repatriation, even with the consent of the POWs, represented a deviation from the Convention's strict norms.

_Korea_. The Korean War broke out on June 25, 1950, before any of the major State parties to the conflict (including the United States) had ratified the Geneva Conventions. Nonetheless, the principle of repatriation of POWs had long been rooted in treaty and customary international law, including Article 20 of the Annex to Hague Convention IV, which states that "[a]fter the conclusion of peace, the repatriation of prisoners of war shall be carried out as quickly as possible."[85] Large numbers of Chinese and North Korean POWs held by the United Nations did not wish to be repatriated, however, and special provisions for them (and for a small number of United Nations POWs in Communist hands) were made under the Armistice of July 27, 1953. "To supervise the repatriation, the armistice created a Neutral Nations Repatriation Commission, composed of representatives from Sweden, Switzerland, Poland, Czechoslovakia, and India. Within sixty days of signing the Armistice, prisoners who desired repatriation were to be directly repatriated in groups to the side to which they belonged at the time of their capture. Those prisoners not so repatriated were to be released to the Neutral Nations Repatriation Commission . . . for further disposition."[86] Altogether approximately 23,000 POWs refused repatriation. The majority (not quite 22,000) eventually went to Taiwan.[87]

_The Persian Gulf War_. At the cessation of hostilities in the Persian Gulf War, some 13,418 Iraqi POWs held by Allied forces were unwilling to be repatriated for fear of suffering punishment from their government for having surrendered. Notwithstanding the repatriation mandate of Geneva Convention III, the United States and its Allies executed an agreement with

---

[83] Article 118 states in relevant part:

Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities.

In the absence of stipulations to the above effect in any agreement concluded between the Parties to the conflict with a view to the cessation of hostilities, or failing any such agreement, each of the Detaining Powers shall itself establish and execute without delay a plan of repatriation in conformity the principle laid down in the foregoing paragraph.

[84] _See_ Howard S. Levie, _The Korean Armistice Agreement and Its Aftermath_, 41 Naval L. Rev. 115, 125-27(1993).

[85] _See generally_ 3 Charles Cheney Hyde, _International Law Chiefly as Interpreted and Applied by the United States_, ¶ 674 at 1858-59 (2d ed. 1945).

[86] David M. Morriss, _From War to Peace: A Study of Cease-Fire Agreements and the Evolving Role of the United Nations_, 36 Va. J. Int'l L. 801, 883 (1996).

[87] _Id._ at 885.

Iraq providing for only voluntary repatriation through a program administered by the International Committee of the Red Cross.[88]

## F. Suspension Under International Law

Although the United States may determine either that Afghanistan was a failed State that could not be considered a party to the Geneva Conventions, or that the Geneva Conventions should otherwise be regarded as suspended under the present circumstances, there remains the distinct question whether such determinations would be valid as a matter of international law. We emphasize that the resolution of that question, however, *has no bearing* on domestic constitutional issues, or on the application of the WCA. Rather, these issues are worth consideration as a means of justifying the actions of the United States in the world of international politics. While a close question, we believe that the better view is that, in certain circumstances, countries can suspend the Geneva Conventions consistently with international law.

International law has long recognized that the material breach of a treaty can be grounds for the party injured by the breach to terminate or withdraw from the treaty.[90] Under customary international law, the general rule is that breach of a multilateral treaty by a State Party justifies the suspension of that treaty with regard to that State. "A material breach of a multilateral treaty by one of the parties entitles . . . [a] party specially affected by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part in the relations between itself and the defaulting State."[91] Assuming that Afghanistan could have been found to be in material breach for having violated "a provision essential to the accomplishment of the object or purpose of the [Geneva Conventions]," suspension of the Conventions would have been justified.[92]

We note, however, that these general rules authorizing suspension "do not apply to provisions relating to the protection of the human person contained in treaties of a humanitarian character, in particular to provisions prohibiting any form of reprisals against persons protected by such treaties."[93] Although the United States is not a party to the Vienna Convention, some

---

[88] *See id* .at 931 & n.633.

[89] In general, of course, a decision by a State not to discharge its treaty obligations, even when effective as a matter of domestic law, does not necessarily relieve it of possible international liability for non-performance. *See generally Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 160 (1934).

[90] *See Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) Notwithstanding Security Council Resolution 276,* 1971 I.C.J. 16, 47 ¶ 98 (Advisory Opinion June 21, 1971) (holding it to be a "general principle of law that a right of termination on account of breach must be presumed to exist in respect of all treaties, except as regards provisions relating to the protection of the human person contained in treaties of a humanitarian character. . . . The silence of a treaty as to the existence of such a right cannot be interpreted as implying the exclusion of a right which has its source outside of the treaty, in general international law[.]").

[91] Vienna Convention on Treaties art. 60(2)(b).

[92] *Id.* art. 60(3).

[93] *Id.* art. 60(5). The Vienna Convention seems to prohibit or restrict the suspension of humanitarian treaties if the sole ground for suspension is material breach. It does not squarely address the case in which suspension is based, not on particular breaches by a party, but by the party's disappearance as a State or on its incapacity to perform its treaty obligations.

lower courts have said that the Convention embodies the customary international law, and the State Department has at various times taken the same view.[94] The Geneva Conventions must be regarded as "treaties of a humanitarian character," many of whose provisions relate to the protection of the human person."[95] Arguably, therefore, a determination by the United States that the Geneva Conventions were inoperative as to Afghanistan or a decision to regard them as suspended, might put the United States in breach of customary international law.

In addition, the Geneva Conventions could themselves be read to preclude suspension. Common Article 1 pledges the High Contracting Parties "to respect and to ensure respect for the present Convention *in all circumstances*" (emphasis added). Some commentators argue that this provision should be read to bar any State party from refusing to enforce their provisions, no matter the conduct of its adversaries. In other words, the duty of performance is absolute and does not depend upon reciprocal performance by other State parties.[96] Under this approach, the substantive terms of the Geneva Conventions could never be suspended, and thus any violation would always be illegal under international law.

This understanding of the Vienna and Geneva Conventions cannot be correct. There is no textual provision in the Geneva Conventions that clearly prohibits temporary suspension. The drafters included a provision that appears to preclude State parties from agreeing to absolve each other of violations.[97] They also included careful procedures for the termination of the agreements by individual State parties, including a provision that requires delay of a termination of a treaty, if that termination were to occur during a conflict, until the end of the conflict.[98] Yet, at the same time, the drafters of the Conventions did not address suspension at all, even though it has been a possible option since at least the eighteenth century.[99] Applying the canon of interpretation *expressio unius est exclusio alterius*, that the inclusion of one thing implies the exclusion of the other, we should presume that the State parties did not intend to preclude suspension. Indeed, if the drafters and ratifiers of the Geneva Conventions believed the treaties could not be suspended, while allowing for withdrawal and denunciation, they could have said so explicitly and easily in the text.

The text of the Conventions also makes it implausible to claim that *all* obligations imposed by the Geneva Conventions are absolute and that non-performance is *never* excusable. To begin with, the Conventions themselves distinguish "grave" breaches from others. They further provide that "[n]o High Contracting Party shall be allowed to absolve itself . . . of any liability incurred by itself . . . in respect of [grave] breaches."[100] If all of the obligations imposed

---

[94] *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 433 (2d Cir.), *cert. denied*, 122 S. Ct. 206 (2001); Moore, *supra*, at 891-92 (quoting 1971 statement by Secretary of State William P. Rogers and 1986 testimony by Deputy Legal Adviser Mary V. Mochary).

[95] *See* Sir Ian Sinclair, *The Vienna Convention on the Law of Treaties* 191 (2d ed. 1984) (explaining intent and scope of reference to "humanitarian" treaties). Indeed, when the drafters of the Vienna Convention added paragraph 5 to article 60, the Geneva Conventions were specifically mentioned as coming within it. *See* Harris, *supra* n.19, at 797.

[96] *See, e.g.*, Draper, *The Red Cross Conventions*, *supra*, at 8; *see also Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States)*, 76 I.L.R. at 448, ¶ 220.

[97] *See, e.g.*, Geneva Convention III, art. 131.

[98] *See, e.g.*, *id.*, art. 142.

[99] *See* Sinclair, *supra*, at 192.

[100] Geneva Convention IV, art. 148.

32

by the Conventions were absolute and unqualified, it would serve that end to infer an absolute "grave" breaches from others, or to provide explicitly that no party could absolve itself from liability for grave breaches. Furthermore, although specific provisions of the Conventions rule out "reprisals" of particular kinds,[101] they do not rule out reprisals as such. Thus, Article 13 of Geneva Convention III, while defining certain misconduct with respect to prisoners of war as constituting a "serious breach" of the Convention, also states categorically that "[m]easures of reprisal *against prisoners of war* are prohibited." (emphasis added). Similarly, Article 60(5) of the Vienna Convention on Treaties states that the usual rules permitting treaty suspension in some instances "do not apply to provisions relating to the protection of the human person contained in treaties of a humanitarian character, in particular to provisions prohibiting any form of reprisals *against persons protected by such treaties*" (emphasis added). That provision seems to be an implicit prohibition only of a particular class of reprisals, not of all reprisals. Accordingly, it appears to be permissible, as a matter both of treaty law and of customary international law, to suspend performance of Geneva Convention obligations on a temporary basis. It also appears permissible to engage in reprisals in response to material breaches by an enemy, provided that the reprisals do not give rise to "grave" breaches or to reprisals against protected persons.

Finally, a blanket non-suspension rule makes little sense as a matter of international law and politics. If there were such a rule, international law would leave an injured party effectively remediless if its adversaries committed material breaches of the Geneva Conventions. Apart from its unfairness, that result would reward and encourage non-compliance with the Conventions. True, the Conventions appear to contemplate that enforcement will be promoted by voluntary action of the parties.[102] Furthermore, the Conventions provide for intervention by "the International Committee of the Red Cross or any other impartial humanitarian organization . . . subject to the consent of the Parties to the conflict concerned."[103] But the effectiveness of these provisions depends on the good will of the very party assumed to be committing material breaches, or on its sensitivity to international opinion. Likewise, the provision authorizing an impartial investigation of alleged violations also hinges on the willingness of a breaching party to permit the investigation and to abide by its result. Other conceivable remedies, such as the imposition of an embargo by the United Nations on the breaching party, may also be inefficacious in particular circumstances. If, for example, Afghanistan were bound by Geneva Convention III to provide certain treatment to United States prisoners of war but in fact materially breached such duties, a United Nations embargo might have little effect on its behavior. Finally, offenders undoubtedly face a risk of trial and punishment before national or international courts after the conflict is over. Yet that form of relief presupposes that the

---

[101] U.S. Army, *The Law of Land Warfare, Field Manual No. 27-10* (July 18, 1956), (the "FM 27-10"), defines "reprisals" as "acts of retaliation in the form of conduct which would otherwise be unlawful, resorted to by one belligerent against enemy personnel or property for acts of warfare committed by the other belligerent in violation of the law of war, for the purpose of enforcing future compliance with the recognized rules of civilized warfare. For example, the employment by a belligerent of a weapon the use of which is normally precluded by the law of war would constitute a lawful reprisal for intentional mistreatment of prisoners of war held by the enemy." *Id.*, ch. 8, ¶ 497(a). In general, international law disfavors and discourages reprisals. *See id.* ¶ 497(d). ("Reprisals are never adopted merely for revenge, but only as an unavoidable last resort to induce the enemy to desist from unlawful practices.") They are permitted, however, in certain specific circumstances.

[102] *See, e.g.*, the Geneva Convention III, art. 8; Geneva Convention IV, art. 9.

[103] Geneva Convention III, art. 9; Geneva Convention IV, art. 10.

offenders will be subject to capture at the end of the conflict — which may well depend on whether or not they have been defeated. Reliance on post-conflict trials, as well as being uncertain, defers relief for the duration of the conflict. Without a power to suspend, therefore, parties to the Geneva Conventions would only be left with these meager tools to remedy widespread violation of the Conventions by others.

Thus, even if one were to believe that international law set out fixed and binding rules concerning the power of suspension, the United States could make convincing arguments under the Geneva Conventions itself, the Vienna Convention on Treaties, and customary international law in favor of suspending the Geneva Conventions as applied to the Taliban militia in the current war in Afghanistan.

## IV. The Customary International Laws of War

So far, this memorandum has addressed the issue whether the Geneva Conventions, and the WCA, apply to the detention and trial of al Qaeda and Taliban militia members taken prisoner in Afghanistan. Having concluded that these laws do not apply, we turn to your question concerning the effect, if any, of customary international law. Some may take the view that even if the Geneva Conventions, by their terms, do not govern the conflict in Afghanistan, the substance of these agreements has received such universal approval that it has risen to the status of customary international law. Regardless of its substance, however, customary international law cannot bind the executive branch under the Constitution because it is not federal law. This is a view that this Office has expressed before,[104] and is one consistent with the views of the federal courts,[105] and with executive branch arguments in the courts.[106] As a result, any customary international law of armed conflict in no way binds, as a legal matter, the President or the U.S. Armed Forces concerning the detention or trial of members of al Qaeda and the Taliban.

## A. Is Customary International Law Federal Law?

Under the view promoted by many international law academics, any presidential violation of customary international law is presumptively unconstitutional.[107] These scholars argue that customary international law is federal law, and that the President's Article II duty under the Take Care Clause requires him to execute customary international law as well as statutes lawfully enacted under the Constitution. A President may not violate customary international law, therefore, just as he cannot violate a statute, unless he believes it to be unconstitutional. Relying upon cases such as *The Paquete Habana*, 175 U.S. 677, 700 (1900), in

---

[104] See *Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. 163 (1989).

[105] See, e.g., *United States v. Alvarez-Machain*, 504 U.S. 655 (1992).

[106] See, id. at 669-70; *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935-36 (D.C. Cir. 1988); *Garcia-Mir v. Meese*, 788 F.2d 1446, 1453-55 (11th Cir.), cert. denied, 479 U.S. 889 (1986).

[107] See, e.g., Michael J. Glennon, Raising the Paquete Habana: Is Violation of Customary International Law by the Executive Unconstitutional?, 80 NW. U. L. REV. 321, 325 (1985); Louis Henkin, International Law As Law in the United States, 82 MICH. L. REV. 1555, 1567 (1984); Jules Lobel, The Limits of Constitutional Power: Conflicts Between Foreign Policy and International Law, 71 VA. L. REV. 1071, 1179 (1985); see also Jonathan R. Charney, Agora: May the President Violate Customary International Law?, 80 AM. J. INT'L L. 913 (1986).

which the Supreme Court observed that "international law is part of our law." This position also claims that the federal judiciary has the authority to invalidate executive action that runs counter to customary international law.[108]

This view of customary international law is seriously mistaken. The constitutional text nowhere brackets presidential or federal power within the confines of international law. When the Supremacy Clause discusses the sources of federal law, it enumerates only "this Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States." U.S. Const. art. VI. International law is nowhere mentioned in the Constitution as an independent source of federal law or as a constraint on the political branches of government. Indeed, if it were, there would have been no need to grant to Congress the power to "define and punish . . . Offenses against the Law of Nations."[109] It is also clear that the original understanding of the Framers was that "Laws of the United States" did *not* include the law of nations, as international law was called in the late eighteenth century. In explaining the jurisdiction of the Article III courts to cases arising "under the Constitution and the Laws of the United States," for example, Alexander Hamilton did not include the law of nations as a source of jurisdiction.[110] Rather, Hamilton pointed out, claims involving the laws of nations would arise either in diversity cases or maritime cases,[111] which by definition do not involve "the Laws of the United States." Little evidence exists that those who attended the Philadelphia Convention in the summer of 1787 or the state ratifying conventions believed that federal law would have included customary international law, but rather that the law of nations was part of a general common law that was not true federal law.[112]

Indeed, allowing customary international law to rise to the level of federal law would create severe distortions in the structure of the Constitution. Incorporation of customary international law directly into federal law would bypass the delicate procedures established by

---

[108] Recently, the status of customary international law within the federal legal system has been the subject of sustained debate with legal academia. The legitimacy of incorporating customary international law as federal law has been subjected in these exchanges to crippling doubts. See Curtis A. Bradley & Jack L. Goldsmith, Customary International Law As Federal Position: A Critique of the Modern Position, 110 Harv. L. Rev. 815, 817 (1997); see also Phillip R. Trimble, A Revisionist View of Customary International Law, 33 UCLA L. Rev. 665, 672-673 (1986); Arthur M. Weisburd, The Executive Branch and International Law, 41 Vand. L. Rev. 1205, 1269 (1988). These claims have not gone unchallenged. Harold H. Koh, Is International Law Really State Law?, 111 Harv. L. Rev. 1824, 1827 (1998); Gerald L. Neuman, Sense and Nonsense About Customary International Law: A Response to Professors Bradley and Goldsmith, 66 Fordham L. Rev. 371, 371 (1997); Beth Stephens, The Law of Our Land: Customary International Law As Federal Law After Erie, 66 Fordham L. Rev. 393, 396-97 (1997). Bradley and Goldsmith have responded to their critics several times. See Curtis A. Bradley & Jack L. Goldsmith, Federal Courts and the Incorporation of International Law, 111 Harv. L. Rev. 2260 (1998); Curtis A. Bradley & Jack L. Goldsmith, The Current Illegitimacy of International Human Rights Litigation, 66 Fordham L. Rev. 319, 330 (1997).

[109] U.S. Const. art. I, § 8.

[110] The Federalist No. 80, at 447-49 (Alexander Hamilton) (Clinton Rossiter ed., 1999).

[111] Id. at 444-46.

[112] See, e.g., Stewart Jay, The Status of the Law of Nations in Early American Law, 42 Vand. L. Rev. 819, 830-37 (1989); Bradford R. Clark, Federal Common Law: A Structural Reinterpretation, 144 U. Pa. L. Rev. 1245, 1306-12 (1996); Curtis A. Bradley & Jack L. Goldsmith, The Current Illegitimacy of International Human Rights Litigation, 66 Fordham L. Rev. 319, 333-36 (1997).

the Constitution for amending the Constitution or for enacting legislation, then a rule of international law is not approved by two-thirds of Congress and three-quarters of the state legislatures, it has not been passed by both houses of Congress and signed by the President, nor is it made by the President with the advice and consent of two-thirds of the Senate. In other words, customary international law has not undergone the difficult hurdles that stand before enactment of constitutional amendments, statutes, or treaties. As such, it can have no legal effect on the government or on American citizens because it is not law.[114] Even the inclusion of treaties in the Supremacy Clause does not render treaties automatically self-executing in federal court, not to mention self-executing against the executive branch.[115] If even treaties that have undergone presidential signature and senatorial advice and consent can have no binding legal effect in the United States, then it certainly must be the case that a source of rules that never undergoes any process established by our Constitution cannot be law.[116]

It is well accepted that the political branches have ample authority to override customary international law within their respective spheres of authority. This has been recognized by the Supreme Court since the earliest days of the Republic. In *The Schooner Exchange v. McFaddon*,7 for example, Chief Justice Marshall applied customary international law to the seizure of a French warship only because the United States government had not chosen a different rule.

> It seems then to the Court, to be a principle of public [international] law, that national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction. Without doubt, the sovereign of the place is capable of destroying this implication. He may claim and exercise jurisdiction, either by employing force, or by subjecting such vessels to the ordinary tribunals.[117]

In *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814), Chief Justice Marshall again stated that customary international law "is a guide which the sovereign follows or abandons at his will. The rule, like other precepts of morality, of humanity, and even of wisdom, is addressed to the judgment of the sovereign; and although it cannot be disregarded by him without obloquy, yet it may be disregarded."[118] In twenty-first century words, overriding customary international law may prove to be a bad idea, or be subject to criticism, but there is no doubt that the government has the power to do it.

---

[113] *Cf. INS v. Chadha*, 462 U.S. 919 (1983) (invalidating legislative veto for failure to undergo bicameralism and presentment as required by Article I, Section 8 for all legislation).

[114] In fact, allowing customary international law to bear the force of federal law would create significant problems under the Appointments Clause and the non-delegation doctrine, as it would be law made completely outside the American legal system through a process of international practice, rather than either the legislature or officers of the United States authorized to do so.

[115] *See, e.g., Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829).

[116] See John C. Yoo, Globalism and the Constitution: Treaties, Non-Self-Execution, and the Original Understanding, 99 Colum. L. Rev. 1955 (1999) (non-self-execution of treaties justified by the original understanding); John C. Yoo, Treaties and Public Lawmaking: A Textual and Structural Defense of Non-Self-Execution, 99 Colum. L. Rev. 2218 (1999) (demonstrating that constitutional text and structure require implementation of treaty obligations by federal statute).

[117] 11 U.S. (7 Cranch) 116, 145-46 (1812) (emphasis added).

[118] *Id.* at 128.

36

Indeed, proponents of the notion that customary international law have little support in either history or Supreme Court case law. It is true that in some contexts mostly involving maritime, insurance, and commercial law, the federal courts in the nineteenth century looked to customary international law as a guide.[119] Upon closer examination of these cases, however, it is clear that customary international law had the status only of the general federal common law that was applied in federal diversity cases under *Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842). As such, it was not considered true federal law under the Supremacy Clause; it did not support Article III "arising under" jurisdiction; it did not pre-empt inconsistent state law; and it did not bind the executive branch. Indeed, even during this period the Supreme Court acknowledged that the laws of war did not qualify as true federal law and could not therefore serve as the basis for federal subject matter jurisdiction. In *New York Life Ins. Co. v. Hendren*, 92 U.S. 286, for example, the Supreme Court declared that it had no jurisdiction to review the general laws of war, as recognized by the law of nations applicable to this case, because such laws do not involve the constitution, laws, treaties, or executive proclamations of the United States.[120] The spurious nature of this type of law led the Supreme Court in the famous case of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), to eliminate general federal common law.

Even the case most relied upon by proponents of customary international law's status as federal law, *The Paquete Habana*, itself acknowledges that customary international law is subject to override by the action of the political branches. *The Paquete Habana* involved the question whether U.S. armed vessels in wartime could capture certain fishing vessels belonging to enemy nationals and sell them as prize. In that case, the Court applied an international law rule, and did indeed say that "international law is part of our law."[121] But Justice Gray then continued, "*where there is no treaty and no controlling executive or legislative act or judicial decision*, resort must be had to the customs and usages of civilized nations." In other words, while it was willing to apply customary international law as general federal common law (this was the era of *Swift v. Tyson*), the Court also readily acknowledged that the political branches and even the federal judiciary could override it at any time. No Supreme Court decision in modern times has challenged that view.[122] Thus, under clear Supreme Court precedent, any

---

[119] See, e.g., Oliver Am. Trading Co. v. Mexico, 264 U.S. 440, 442-43 (1924); Huntington v. Attrill, 146 U.S. 657, 683 (1892); New York Life Ins. Co. v. Hendren, 92 U.S. 286, 286-87 (1875).

[120] 92 U.S. 286, 286-87.

[121] *Id.* at 700.

[122] Two lines of cases are often cited for the proposition that the Supreme Court has found customary international law to be federal law. The first, which derives from Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1804). The "Charming Betsy" rule, as it is sometimes known, is a rule of construction that a statute should be construed when possible so as not to conflict with international law. This rule, however, does not apply international law of its own force, but instead can be seen as measure of judicial restraint: that violating international law is a decision for the political branches to make, and that if they wish to do so, they should state clearly their intentions. The second, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, applied the "act of state" doctrine, which generally precludes courts from examining the validity of the decisions of foreign governments taken on their own soil, as federal common law to a suit over expropriations by the Cuban government. As with Charming Betsy, however, the Court developed this rule as one of judicial self-restraint to preserve the flexibility of the political branches to decide how to conduct foreign policy.

Some supporters of customary international law rely on a third line of cases, beginning with Filártiga v. Peña-Irala, 630 F.2d 876 (2d Cir. 1980). In Filártiga, the Second Circuit read the federal Alien Tort Statute, 28 U.S.C. §1350 (1994), to allow a tort suit in federal court against the former official of a foreign government for violating norms of international human rights law, namely torture. Incorporation of customary international law via the Alien Tort Statute, while accepted by several circuit courts, has never received the blessings of the Supreme

presidential decision in the current conflict concerning the detention of al Qaeda and Taliban militia prisoners would constitute a "controlling" executive act that would immediately and completely override any customary international law norms.

Constitutional text and Supreme Court decisions aside, allowing the federal courts to rely upon international law to restrict the President's discretion to conduct war would raise deep structural problems. First, if customary international law is indeed federal law, then it must receive all of the benefits of the Supremacy Clause. Therefore, customary international law would not only bind the President, but it also would pre-empt state law and even supersede inconsistent federal statutes and treaties that were enacted before the rule of customary international law came into being. This has never happened. Indeed, giving customary international law this power not only runs counter to the Supreme Court cases described above, but would have the effect of importing a body of law to restrain the three branches of American government that never underwent any approval by our democratic political process. If customary international law does not have these effects, then as the constitutional text, practice and most sensible readings of the Constitution indicate, then it cannot be true federal law under the Supremacy Clause. As non-federal law, then, customary international law cannot bind the President or the executive branch, in any legally meaningful way, in its conduct of the war in Afghanistan.

Second, relying upon customary international law here would undermine the President's control over foreign relations and his Commander in Chief authority. As we have noted, the President under the Constitution is given plenary authority over the conduct of the Nation's foreign relations and over the use of the military. Importing customary international law notions concerning armed conflict would represent a direct infringement on the President's discretion as the Commander in Chief and Chief Executive to determine how best to conduct the Nation's military affairs. Presidents and courts have agreed that the President enjoys the fullest discretion permitted by the Constitution in commanding troops in the field.[123] It is difficult to see what legal authority under our constitutional system would permit customary international law to restrict the exercise of the President's plenary power in this area, which is granted to him directly by the Constitution. Further, reading customary international law to be federal law would improperly inhibit the President's role as the representative of the Nation in its foreign affairs.[124] Customary law is not static; it evolves through a dynamic process of State custom and practice. "States necessarily must have the authority to contravene international norms, however, for it is

___

Court and has been sharply criticized by some circuits, see, e.g., Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 808-10 (D.C. Cir.1984) (Bork, J., concurring), cert. denied, 470 U.S. 1003 (1985), as well as by academics, see Curtis A. Bradley & Jack L. Goldsmith, The Current Illegitimacy of International Human Rights Litigation, 66 Fordham L. Rev. 319, 330 (1997).

[123] See Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them (Sept. 25, 2001) (reviewing authorities).

[124] "When articulating principles of international law in its relations with other states, the Executive branch speaks not only as an interpreter of generally accepted and traditional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns." Sabbatino, 376 U.S. at 432-33. See also Rappenecker v. United States, 509 F.Supp. 1024, 1029 (N.D. Cal. 1980) ("Under the doctrine of separation of powers, the making of those determinations [under international law] is entrusted to the President."); International Load line Convention, 40 Op. Att'y Gen. at 123-24 (President "speak[s] for the nation" in making determination under international law).

the process of changing state practice that allows customary internation... ...
we observed in 1989, "[i]f the United States is to participate in the evolution of international law
the Executive must have the power to act inconsistently with international law where
necessary."[126]   The power to override or ignore customary international law, even the law
applying to armed conflict, is "an integral part of the President's foreign affairs power."[127]

Third, if customary international law is truly federal law, it presumably must be
enforceable by the federal courts.  Allowing international law to interfere with the President's
war power in this way, however, would expand the federal judiciary's authority into areas where
it has little competence, where the Constitution does not textually call for its intervention, and
where it risks defiance by the political branches.  Indeed, treating customary international law as
federal law would require the judiciary to intervene into the most deeply of political questions,
those concerning war.  This the federal courts have said they will not do, most notably during the
Kosovo conflict.[128]   Again, the practice of the branches demonstrates that they do not consider
customary international law to be federal law.  This position makes sense even at the level of
democratic theory, because conceiving of international law as a restraint on warmaking would
allow norms of questionable democratic origin to constrain actions validly taken under the U.S.
Constitution by popularly accountable national representatives.

Based on these considerations of constitutional text, structure, and history, we conclude
that any customary rules of international law that apply to armed conflicts do not bind the
President or the U.S. Armed Forces in their conduct of the war in Afghanistan.

### B. Do the Customary Laws of War Apply to al Qaeda or the Taliban Militia?

Although customary international law does not bind the President, the President may still
use his constitutional warmaking authority to subject members of al Qaeda or the Taliban militia
to the laws of war.  While this result may seem at first glance to be counter-intuitive, it is a
product of the President's Commander in Chief and Chief Executive powers to prosecute the war
effectively.

The President has the legal and constitutional authority to subject both al Qaeda and
Taliban to the laws of war, and to try their members before military courts or commissions
instituted under Title 10 of the United States Code, if he so chooses.  Section 818 of title 10
provides in part that "[g]eneral courts-martial . . . have jurisdiction to try any person who by the
law of war is subject to trial by a military tribunal and may adjudge any punishment permitted by
the law of war" (except for capital punishment in certain cases).  Section 821 allows for the trial
"offenders or offenses that by statute or by the law of war may be tried by military commissions,
provost courts, or other military tribunals."  We have described the jurisdiction and usage of
military tribunals for you in a separate memorandum.  We do not believe that these courts would
lose jurisdiction to try members of al Qaeda or the Taliban militia for violations of the laws of

---

[125] 13 Op. O.L.C. at 170.
[126] Id.
[127] Id. at 171.
[128] See, e.g., Campbell v. Clinton, 203 F.3d 19, 40 (D.C. Cir.), cert. denied, 531 U.S. 815 (2000).

39

war, even though we have concluded that the laws of war have no binding effect as such – on the President.

This is so because the extension of the common laws of war to the present conflict is, in essence, a *military* measure that the President can order as Commander in Chief. As the Supreme Court has recognized, "an important incident to the conduct of war is the adoption of measures by the military command not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war."[129] In another case, the Court concluded that "[i]n the absence of attempts by Congress to limit the President's power, it appears that[,] as Commander in Chief of the Army and Navy of the United States, he may, in time of war, establish and prescribe the jurisdiction and procedure of military commissions, and of tribunals in the nature of such commissions, in territory occupied by Armed Forces of the United States."[130] Thus, pursuant to his Commander in Chief authority, the President could impose the laws of war on members of al Qaeda and the Taliban militia as part of the measures necessary to prosecute the war successfully.

Moreover, the President's general authority over the conduct of foreign relations entails the specific power to express the views of the United States both on the content of international law generally and on the application of international law to specific facts. "When articulating principles of international law in its relations with other states, the Executive Branch speaks not only as an interpreter of generally accepted and traditional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns."[131] Thus, the President can properly find the unprecedented conflict between the United States and transnational terrorist organizations a "war" for the purposes of the customary or common laws of war. Certainly, given the extent of hostilities both in the United States and Afghanistan since the September 11 attacks on the World Trade Center and the Pentagon, the scale of the military, diplomatic and financial commitments by the United States and its allies to counter the terrorist threats, and the expected duration of the conflict, it would be entirely reasonable for the President to find that a condition of "war" existed for purposes of triggering application of the common laws of war. He could also reasonably find that al Qaeda, the Taliban militia, and other related entities that are engaged in conflict with the United States were subject to the duties imposed by those laws. Even if members of these groups and organizations were considered to be merely "private" actors, they could nonetheless be held subject to the laws of war.[132]

In addition, Congress has delegated to the President sweeping authority with respect to the present conflict, and especially with regard to those organizations and individuals implicated

---

[129] See Ex parte Quirin, 317 U.S. 1, 28-29 (1942); cf. Hirota v. Mac Arthur, 338 U.S. 197, 208 (1948) (Douglas, J., concurring) (Agreement with Allies to establish international tribunals to try accused war criminals who were enemy officials or armed service members was "a part of the prosecution of the war. It is a furtherance of the hostilities directed to a dilution of enemy power and involving retribution for wrongs done.").

[130] Madsen v. Kinsella, 343 U.S. 341, 348 (1952).

[131] Sabbatino, 376 U.S. at 432-33.

[132] See Kadic v. Karadzic, 70 F.3d 232, 243 (2d Cir.) ("The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II . . . and remains today an important aspect of international law."), cert. denied, 518 U.S. 1005 (1996).

40

in the terrorist attacks of September 11, 2001. In the wake of those incidents, Congress enacted Pub. L. No. 107-40, 115 Stat. 224 (2001). Congress found that "on September . . . treacherous violence were committed against the United States and its citizens," and that "such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad," and that "such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States." Section 2 of the statute authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Read together with the President's constitutional authorities as Commander in Chief and as interpreter of international law, this authorization allows the President to subject members of al Qaeda, the Taliban militia, and other affiliated groups to trial and punishment for violations of the common laws of war, if the President determines that it would further the conduct of military operations or contribute to the defense and security of the United States and its citizens.

### C. May a U.S. Servicemember be Tried for Violations of the Laws of War?

You have also asked whether the laws of war, as incorporated by reference in title 10, also apply to United States military personnel engaged in armed conflict with al Qaeda or with the Taliban militia. Even though the customary laws of war do not bind the President as federal law, the President may wish to extend some or all of such laws to the conduct of United States military operations in this conflict, or to the treatment of members of al Qaeda or the Taliban captured in the conflict. It is within his constitutional authority as Commander in Chief to do so. The common laws of war can be viewed as rules governing the conduct of military personnel in time of combat, and the President has undoubted authority to promulgate such rules and to provide for their enforcement.[133] The Army's Manual on the Law of Land Warfare, which represents the Army's interpretation of the customary international law governing armed conflict, can be expanded, altered, or overridden at any time by presidential act, as the Manual itself recognizes.[134] This makes clear that the source of authority for the application of the customary

---

[133] The President has broad authority under the Commander in Chief Clause to take action to superintend the military that overlaps with Congress's power to create the armed forces and to make rules for their regulation. See Loving v. United States, 517 U.S. 748, 772 (1996) ("The President's duties as Commander in Chief . . . require him to take responsible and continuing action to superintend the military, including courts-martial."); United States v. Eliason, 41 U.S. (16 Pet.) 291, 301 (1842) ("The power of the executive to establish rules and regulations for the government of the army, is undoubted."). The executive branch has long asserted that the President has "the unquestioned power to establish rules for the government of the army" in the absence of legislation, Power of the President to Create a Militia Bureau in the War Department, 10 Op. Att'y Gen. 11, 14 (1861). Indeed, at an early date, Attorney General Wirt concluded that regulations issued by the President on his independent authority remained in force even after Congress repealed the statute giving them legislative sanction "in all cases where they do not conflict with positive legislation." Brevet Pay of General Macomb, 1 Op. Att'y Gen. 547, 549 (1822). These independent powers of the President as commander in chief have frequently been exercised in administering justice in cases involving members of the Armed Forces: "[i]ndeed, until 1830, courts-martial were convened solely on [the President's] authority as Commander-in-Chief." Congressional Research Service, The Constitution of the United States of America: Analysis and Interpretation 479 (1987).

[134] FM 27-10, ch. 1, ¶ 7(c).

laws of war to the armed forces arises directly from the President's Commander in Chief power.

Moreover, the President has authority to limit or qualify the application of such rules. He could exempt, for example, certain operations from their coverage, or apply some, but not all, of the common laws of war to this conflict. This, too, is an aspect of the President's Commander in Chief authority. In narrowing the scope of the substantive prohibitions that apply in a particular conflict, the President may effectively determine the jurisdiction of military courts and commissions. He could thus preclude the trials of United States military personnel on specific charges of violations of the common laws of war.

Finally, a presidential determination concerning the application of the substantive prohibitions of the laws of war to the Afghanistan conflict would not preclude the normal system of military justice from applying to members of the U.S. Armed Services. Members of the Armed Services would still be subject to trial by courts martial for any violations of the Uniform Code of Military Justice (the "UCMJ"). Indeed, if the President were to issue an order, listing certain common laws of war for the military to follow, failure to obey that order would constitute an offense under the UCMJ.[135] Thus, although the President is not constitutionally bound by the customary laws of war, he can still choose to require the U.S. Armed Forces to obey them through the UCMJ.

Thus, our view that the customary international laws of armed conflict do not bind the President does not, in any way, compel the conclusion that members of the U.S. Armed Forces who commit acts that might be considered war crimes would be free from military justice.

### Conclusion

For the foregoing reasons, we conclude that neither the federal War Crimes Act nor the Geneva Conventions would apply to the detention conditions in Guantanamo Bay, Cuba, or to trial by military commission of al Qaeda or Taliban prisoners. We also conclude that customary international law has no binding legal effect on either the President or the military because it is not federal law, as recognized by the Constitution. Nonetheless, we also believe that the President, as Commander in Chief, has the constitutional authority to impose the customary laws of war on both the al Qaeda and Taliban groups and the U.S. Armed Forces.

Please let us know if we can provide further assistance.

---

[135] 10 U.S.C. § 892 (2000).

42