# Exhibit E, Part 1



U.S. Department of Justice

Office of Legal Counsel

Office of the Deputy Assistant Attorney General  Washington, D.C. 20530

March 14, 2003

### Memorandum for William J. Haynes II,
### General Counsel of the Department of Defense

*Re: Military Interrogation of Alien Unlawful Combatants Held Outside the United States*

You have asked our Office to examine the legal standards governing military interrogations of alien unlawful combatants held outside the United States. You have requested that we examine both domestic and international law that might be applicable to the conduct of those interrogations.[1]

In Part I, we conclude that the Fifth and Eighth Amendments, as interpreted by the Supreme Court, do not extend to alien enemy combatants held abroad. In Part II, we examine federal criminal law. We explain that several canons of construction apply here. Those canons of construction indicate that federal criminal laws of general applicability do not apply to properly-authorized interrogations of enemy combatants, undertaken by military personnel in the course of an armed conflict. Such criminal statutes, if they were misconstrued to apply to the interrogation of enemy combatants, would conflict with the Constitution's grant of the Commander in Chief power solely to the President.

Although we do not believe that these laws would apply to authorized military interrogations, we outline the various federal crimes that apply in the special maritime and territorial jurisdiction of the United States: assault, 18 U.S.C. § 113 (2000); maiming, 18 U.S.C. § 114 (2000); and interstate stalking, 18 U.S.C. § 2261A (2000). In Part II.C., we address relevant criminal prohibitions that apply to conduct outside the jurisdiction of the United States: war crimes, 18 U.S.C. § 2441 (2000); and torture, 18 U.S.C. § 2340A (2000 & West Supp. 2002).

In Part III, we examine the international law applicable to the conduct of interrogations. First, we examine the U.N. Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Apr. 18, 1988, 1465 U.N.T.S. 113 ("CAT") and conclude that U.S. reservations, understandings, and declarations ensure that our international obligations mirror the standards of 18 U.S.C. § 2340A. Second, we address the U.S. obligation under CAT to undertake to prevent the commission of "cruel, inhuman, or degrading treatment or punishment." We conclude that based on its reservation, the United States' obligation extends only to conduct

---

[1] By delimiting the legal boundaries applicable to interrogations, we of course do not express or imply any views concerning whether and when legally-permissible means of interrogation should be employed. That is a policy judgment for those conducting and directing the interrogations.

UNCLASSIFIED         ~~SECRET/NOFORN~~

Declassify under authority of Executive Order 1958
By Acting General Counsel, Department of Defense
By Daniel J. Dell'Orto
31 March 2008

that is "cruel and unusual" within the meaning of the Eighth Amendment or otherwise "shocks the conscience" under the Due Process Clauses of the Fifth and Fourteenth Amendments.

Third, we examine the applicability of customary international law. We conclude that as an expression of state practice, customary international law cannot impose a standard that differs from U.S. obligations under CAT, a recent multilateral treaty on the same subject. In any event, our previous opinions make clear that customary international law is not federal law and that the President is free to override it at his discretion.

In Part IV, we discuss defenses to an allegation that an interrogation method might violate any of the various criminal prohibitions discussed in Part II. We believe that necessity or self-defense could provide defenses to a prosecution.

## I.   U.S. Constitution

Two fundamental constitutional issues arise in regard to the conduct of interrogations of al Qaeda and Taliban detainees. First, we discuss the constitutional foundations of the President's power, as Commander in Chief and Chief Executive, to conduct military operations during the current armed conflict. We explain that detaining and interrogating enemy combatants is an important element of the President's authority to successfully prosecute war. Second, we address whether restraints imposed by the Bill of Rights govern the interrogation of alien enemy combatants during armed conflict. Two constitutional provisions that might be thought to extend to interrogations—the Fifth and Eighth Amendments—do not apply here. The Fifth Amendment provides in relevant part that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const., amend V.[2] The Eighth Amendment bars the "inflict[ion]" of "cruel and unusual punishments." U.S. Const., amend. VIII. These provisions, however, do not regulate the interrogation of alien enemy combatants outside the United States during an international armed conflict. This is clear as a matter of the text and purpose of the Amendments, as they have been interpreted by the federal courts.[3]

### A.   The President's Commander-in-Chief Authority

We begin by discussing the factual and legal context within which this question arises. The September 11, 2001 terrorist attacks marked a state of international armed conflict between the United States and the al Qaeda terrorist organization. Pursuant to his Commander-in-Chief power, as supported by an act of Congress, the President has ordered the Armed Forces to carry out military operations against al Qaeda, which includes the power both to kill and to capture

---

[2] The Fifth Amendment further provides that "No person shall be held to answer for a capital crime, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[,]" that no person "shall . . . be subject for the same offense to be twice put in jeopardy," "nor shall be compelled in any criminal case to be a witness against himself," "nor shall private property be taken for public use, without just compensation." These provisions are plainly inapplicable to the conduct of interrogations.

[3] As we explain in Part III, U.S. obligations under international law are limited to the prevention of conduct that would constitute cruel, unusual or inhuman treatment prohibited by the Fifth, Eighth, and Fourteenth Amendments. See id. The applicable standards under the Fifth, Fourteenth, and Eighth Amendments are thus useful to understanding U.S. obligations under international law, which we discuss in Part III.

members of the enemy. Interrogation arises as a necessary and legitimate element of the detention of al Qaeda and Taliban members during an armed conflict.

### 1. The War with al Qaeda

The situation in which these issues arise is unprecedented in recent American history. Four coordinated terrorist attacks, using hijacked commercial airliners as guided missiles, took place in rapid succession on the morning of September 11, 2001. These attacks were aimed at critical government buildings in the Nation's capital and landmark buildings in its financial center, and achieved an unprecedented level of destruction. They caused thousands of deaths. Air traffic and communications within the United States were disrupted; national stock exchanges were shut for several days; and damage from the attack has been estimated to run into the tens of billions of dollars. Government leaders were dispersed to ensure continuity of government operations. These attacks are part of a violent campaign by the al Qaeda terrorist organization against the United States that is believed to include an unsuccessful attempt to destroy an airliner in December 2001; a suicide bombing attack in Yemen on the *U.S.S. Cole* in 2000; the bombings of the United States Embassies in Kenya and in Tanzania in 1998; a truck bomb attack on a U.S. military housing complex in Saudi Arabia in 1996; an unsuccessful attempt to destroy the World Trade Center in 1993; and the ambush of U.S. servicemen in Somalia in 1993.

The September 11, 2001 attacks triggered the Nation's right under domestic and international law to use force in self-defense.[4] In response, the Government has engaged in a broad effort at home and abroad to counter terrorism. Pursuant to his authorities as Commander in Chief, the President in October, 2001, ordered the Armed Forces to attack al Qaeda personnel and assets in Afghanistan, and the Taliban militia that harbored them. Although the breadth of that campaign has lessened, it is still ongoing. Congress has provided its support for the use of forces against those linked to the September 11 attacks, and has recognized the President's constitutional power to use force to prevent and deter future attacks both within and outside the United States. S. J. Res. 23, Pub. L. No. 107-40, 115 Stat. 224 (2001). The Justice Department and the FBI have launched a sweeping investigation in response to the September 11 attacks, and Congress enacted legislation to expand the Justice Department's powers of surveillance against terrorists. *See* The USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001). Last year, Congress enacted the President's proposed new cabinet department for homeland security in

---

[4] Article 51 of the U.N. Charter declares that "[n]othing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations until the Security Council has taken the measures necessary to maintain international peace and security." The attacks of September 11, 2001 clearly constitute an armed attack against the United States, and indeed were the latest in a long history of al Qaeda sponsored attacks against the United States. This United Nations Security Council recognized this on September 28, 2001, when it unanimously adopted Resolution 1373 explicitly "reaffirming the inherent right of individual and collective self-defence as recognized by the charter of the United Nations." This right of self-defense is a right to effective self-defense. In other words, the victim state has the right to use force against the aggressor who has initiated an "armed attack" until the threat has abated. The United States, through its military and intelligence personnel, has a right recognized by Article 51 to continue using force until such time as the threat posed by al Qaeda and other terrorist groups connected to the September 11th attacks is completely ended." Other treaties re-affirm the right of the United States to use force in its self-defense. *See, e.g.*, Inter-American Treaty of Reciprocal Assistance, art. 3, Sept. 2, 1947, T.I.A.S. No. 1838, 21 U.N.T.S. 77 (Rio Treaty); North Atlantic Treaty, art. 5, Apr. 4, 1949, 63 Stat. 2241, 34 U.N.T.S. 243.

order to implement a coordinated domestic program against terrorism. The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

Leaders of al Qaeda and the Taliban, with access to active terrorist cells and other resources, remain at large. It has been reported that they have regrouped and are communicating with their members. *See, e.g.*, Cam Simpson, *Al Qaeda Reorganized, German Official Says, Minister Fears Reprisals if USA attacks Iraq*, Star-Ledger, Jan. 26, 2003, at 18. In his recent testimony to the Senate Select Committee on Intelligence on February 11, 2003, the Director of the Central Intelligence Agency, testified that another al Qaeda attack was anticipated as early as mid-February. *See* Rowan Scarborough & Jerry Seper, *Bin Laden Tape Vows Al Qaeda Will Aid Iraq; Says U.S. Bombing Nearly Killed Him*, Wash. Times, Feb. 12, 2003, at A1. It appears that al Qaeda continues to enjoy information and resources that allow it to organize and direct active hostile forces against this country, both domestically and abroad.

Given the ongoing threat of al Qaeda attacks, the capture and interrogation of al Qaeda operatives is imperative to our national security and defense. Because of the asymmetric nature of terrorist operations, information is perhaps the most critical weapon for defeating al Qaeda. Al Qaeda is not a nation-state, and has no single country or geographic area as its base of operations. It has no fixed, large-scale military or civilian infrastructure. It deploys personnel, material, and finances covertly and attacks without warning using unconventional weapons and methods. As the September 11, 2001 attacks and subsequent events demonstrate, it seeks to launch terror attacks against purely civilian targets within the United States, and seeks to acquire weapons of mass destruction for such attacks. Because of the secret nature of al Qaeda's operations, obtaining advance information about the identity of al Qaeda operatives and their plans may prove to be the only way to prevent direct attacks on the United States. Interrogation of captured al Qaeda operatives could provide that information; indeed, in many cases interrogation may be the only method to obtain it. Given the massive destruction and loss of life caused by the September 11 attacks, it is reasonable to believe that information gained from al Qaeda personnel could prevent attacks of a similar (if not greater) magnitude from occurring in the United States.

2.   **Commander-in-Chief Authority**

In a series of opinions examining various legal questions arising after September 11, we have explained the scope of the President's Commander-in-Chief power.[5] In those opinions, we explained that the text, structure and history of the Constitution establish that the Founders entrusted the President with the primary responsibility, and therefore the power, to protect the security of the United States. The decision to deploy military force in the defense of U. S. interests is expressly placed under Presidential authority by the Vesting Clause, U.S. Const. art. I, § 1, cl. 1, and by the Commander-in-Chief Clause, *id.*, § 2, cl. 1.[6] The Framers understood the

---

[5] *See, e.g.*, Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them* (Sept. 25, 2001) ("*Flanigan Memorandum*"); Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

[6] *See Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (President has authority to deploy United States armed forces "abroad or to any particular region"); *Fleming v. Page*, 50 U.S. (9 How.) 603, 614-15 (1850) ("As

**UNCLASSIFIED**          ~~SECRET/NOFORN~~

Commander-in-Chief Clause to grant the President the fullest range of power recognized at the time of the ratification as belonging to the military commander. In addition, the structure of the Constitution demonstrates that any power traditionally understood as pertaining to the executive—which includes the conduct of warfare and the defense of the nation—unless expressly assigned to Congress, is vested in the President. Article II, Section 1 makes this clear by stating that the "executive Power shall be vested in a President of the United States of America." That sweeping grant vests in the President the "executive power" and contrasts with the specific enumeration of the powers—those "herein"—granted to Congress in Article I. Our reading of the constitutional text and structure are confirmed by historical practice, in which Presidents have ordered the use of military force more than 100 times without congressional authorization, and by the functional consideration that national security decisions require a unity in purpose and energy that characterizes the Presidency alone.[7]

As the Supreme Court has recognized, the Commander-in-Chief power and the President's obligation to protect the nation imply the ancillary powers necessary to their successful exercise. "The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And, of course, the grant of war power includes all that is necessary and proper for carrying those powers into execution." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). In wartime, it is for the President alone to decide what methods to use to best prevail against the enemy. *See, e.g., Flanigan Memorandum* at 3; Memorandum for Charles W. Colson, Special Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* (May 22, 1970).[8] The President's

---

commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual"); *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and concurring in judgment) (The "inherent powers" of the Commander in Chief "are clearly extensive."); *Maul v. United States*, 274 U.S. 501, 515–16 (1927) (Brandeis & Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any waters in order to perform any duty of the service"); *Commonwealth of Massachusetts v. Laird*, 451 F.2d 26, 32 (1st Cir. 1971) (the President has "power as Commander-in-Chief to station forces abroad"); *Ex parte Vallandigham*, 28 F.Cas. 874, 922 (C.C.S.D. Ohio 1863) (No. 16,816) (in acting "under this power where there is no express legislative declaration, the president is guided solely by his own judgment and discretion"); *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 6 (1992).

[7] Judicial decisions since the beginning of the Republic confirm the President's constitutional power and duty to repel military action against the United States and to take measures to prevent the recurrence of an attack. As Justice Joseph Story said long ago, "[i]t may be fit and proper for the government, in the exercise of the high discretion confided to the executive, for great public purposes, to act on a sudden emergency, or to prevent an irreparable mischief, by summary measures, which are not found in the text of the laws." *The Apollon*, 22 U.S. (9 Wheat.) 362, 366–67 (1824). If the President is confronted with an unforeseen attack on the territory and people of the United States, or other immediate, dangerous threat to American interests and security, it is his constitutional responsibility to respond to that threat with whatever means are necessary. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority."); *United States v. Smith*, 27 F. Cas. 1192, 1229–30 (C.C.D.N.Y. 1806) (No. 16,342) (Paterson, Circuit Justice) (regardless of statutory authorization, it is "the duty . . . of the executive magistrate . . . to repel an invading foe"); *see also* 3 Story, *Commentaries* § 1485 ("[t]he command and application of the public force . . . to maintain peace, and to resist foreign invasion" are executive powers).

[8] *See also* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Legal Constraints to Boarding and Searching Foreign Vessels on the High Seas* at 3 (June 13, 2002) ("*High Seas Memorandum*") ("[T]he Commander-in-Chief and

complete discretion in exercising the Commander-in-Chief power has been recognized by the courts. In the *Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862), for example, the Court explained that whether the President "in fulfilling his duties as Commander in Chief" had appropriately responded to the rebellion of the southern states was a question "to be decided *by him*" and which the Court could not question, but must leave to "the political department of the Government to which this power was entrusted." *See also Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (by virtue of the Commander-in-Chief Clause, it is "the President alone[] who is constitutionally invested with the entire charge of hostile operations.").

One of the core functions of the Commander in Chief is that of capturing, detaining, and interrogating members of the enemy. *See, e.g.*, Memorandum for William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Power as Commander in Chief to Transfer Captured Terrorists to the Control and Custody of Foreign Nations* at 3 (Mar. 13, 2002) ("*Transfers Memorandum*") ("the Commander-in-Chief Clause constitutes an independent grant of substantive authority to engage in the detention and transfer of prisoners captured in armed conflicts"). It is well settled that the President may seize and detain enemy combatants, at least for the duration of the conflict, and the laws of war make clear that prisoners may be interrogated for information concerning the enemy, its strength, and its plans.[9] Numerous Presidents have ordered the capture, detention, and questioning of enemy combatants during virtually every major conflict in the Nation's history, including recent conflicts such as the Gulf, Vietnam, and Korean wars. Recognizing this authority, Congress has never attempted to restrict or interfere with the President's authority on this score. *Id.*

C.   Fifth Amendment Due Process Clause

We conclude below that the Fifth Amendment Due Process Clause is inapplicable to the conduct of interrogations of alien enemy combatants held outside the United States for two independent reasons. First, the Fifth Amendment Due Process Clause does not apply to the President's conduct of a war. Second, even if the Fifth Amendment applied to the conduct of war, the Fifth Amendment does not apply extraterritorially to aliens who have no connection to the United States. We address each of these reasons in turn.

First, the Fifth Amendment was not designed to restrict the unique war powers of the President as Commander in Chief. As long ago as 1865, Attorney General Speed explained the unquestioned rule that, as Commander in Chief, the President waging a war may authorize

---

Vesting Clauses grant the President the authority not just to set broad military strategy, but also to decide all operational and tactical plans."); Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C. § 4001(a) to Military Detention of United States Citizens* at 2 (June 27, 2002) (The Constitution "vests full control of the military operations of the United States in the President.").

[9] Although Article 17 of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3517, places restrictions on interrogation of enemy combatants, members of al Qaeda and the Taliban militia are not legally entitled to the status of prisoners of war under the Convention. *See generally* Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes, II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* (Jan. 22, 2002) ("*Treaties and Laws Memorandum*").

soldiers to engage in combat that could not be authorized as a part of the President's role in enforcing the laws. The strictures that bind the Executive in its role as a magistrate enforcing the civil laws have no place in constraining the President in waging war:

> Soldiers regularly in the service have the license of the government to deprive men, the active enemies of the government, of their liberty and lives; their commission so to act is as perfect and legal as that of a judge to adjudicate . . . . *Wars never have been and never can be conducted upon the principle that an army is but a posse comitatis of a civil magistrate.*

*Military Commissions*, 11 Op. Att'y Gen. 297, 301–02 (1865) (emphasis added); *see also The Modoc Indian Prisoners*, 14 Op. Att'y Gen. 249, 252 (1873) ("it cannot be pretended that a United States soldier is guilty of murder if he kills a public enemy in battle, which would be the case if the municipal law was in force and applicable to an act committed under such circumstances"). As Attorney General Speed concluded, the Due Process Clause has no application to the conduct of a military campaign:

> That portion of the Constitution which declares that 'no person shall be deprived of his life, liberty, or property without due process of law,' has such direct reference to, and connection with, trials for crime or criminal prosecutions that comment upon it would seem to be unnecessary. Trials for offences against the laws of war are not embraced or intended to be embraced in those provisions. . . . The argument that flings around offenders against the laws of war these guarantees of the Constitution would convict all the soldiers of our army of murder; no prisoners could be taken and held; the army could not move. The absurd consequences that would of necessity flow from such an argument show that it cannot be the true construction—it cannot be what was intended by the framers of the instrument. One of the prime motives for the Union and a federal government was to confer the powers of war. If any provisions of the Constitution are so in conflict with the power to carry on war as to destroy and make it valueless, then the instrument, instead of being a great and wise one, is a miserable failure, a felo de se.

11 Op. Att'y Gen. at 313–14.

Moreover, the Supreme Court's reasoning in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), addressing the extra-territorial application of the Fourth Amendment is equally instructive as to why the Fifth Amendment cannot be construed to apply to the President's conduct of a war:

> The United States frequently employs Armed Forces outside this country—over 200 times in our history—for the protection of American citizens or national security. . . . Application of the Fourth Amendment to those circumstances could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest. Were respondent to prevail, aliens with no attachment to this country might well bring actions for damages to remedy

claimed violations of the Fourth Amendment in foreign countries or in international waters. . . . [T]he Court of Appeals' global view of [the Fourth Amendment's] applicability would plunge [the political branches] into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad.

*Id.* at 273–74 (citations omitted).[10] If each time the President captured and detained enemy aliens outside the United States, those aliens could bring suit challenging the deprivation of their liberty, such a result would interfere with and undermine the President's capacity to protect the Nation and to respond to the exigencies of war.[11]

The Supreme Court has repeatedly refused to apply the Due Process Clause or even the Just Compensation Clause to executive and congressional actions taken in the direct prosecution of a war effort against enemies of the Nation. It has long been settled that nothing in the Fifth Amendment governs wartime actions to detain or deport alien enemies and to confiscate enemy property. As the Court has broadly stated in *United States v. Salerno*, 481 U.S. 739, 748 (1987), "in times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous" without violating the Due Process Clause. *See also Ludecke v. Watkins*, 335 U.S. 160, 171 (1948). Similarly, as the Supreme Court has explained with respect to enemy property, "[b]y exertion of the war power, and untrammeled by the due process or just compensation clause," Congress may "enact[] laws directing seizure, use, and disposition of property in this country belonging to subjects of the enemy." *Cummings v. Deutsche Bank Und Discontogesellschaft*, 300 U.S. 115, 120 (1937). These authorities of the federal government during armed conflict were recognized early in the Nation's history. Chief Justice Marshall concluded for the Court in 1814 that "war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found." *Brown v. United States*, 12 U.S. (8 Cranch) 110, 122 (1814). *See also Eisentrager*, 339 U.S. at 775 ("The resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a 'declared war' exists."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 587 (1952). As the Court explained in *United States v. Chemical Found., Inc.*, 272 U.S. 1, 11 (1926), Congress is "untrammeled and free to authorize the seizure, use or appropriation of [enemy] properties without any compensation. . . . There is no constitutional prohibition against confiscation of enemy properties." *See also White v. Mechs. Sec. Corp.*, 269 U.S. 283, 301 (1925) (Holmes, J.) (when U.S. seizes property from an enemy it may "do with it what it liked").

---

[10] Indeed, drawing in part on the reasoning of *Verdugo-Urquidez*, as well as the Supreme Court's treatment of the destruction of property for the purposes of military necessity, our Office recently concluded that the Fourth Amendment had no application to *domestic* military operations. *See* Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, *Re: Authority for Use of Military Force to Combat Terrorist Activities Within the United States* at 25 (Oct. 23, 2001).

[11] Our analysis here should not be confused with a theory that the Constitution somehow does not "apply" during wartime. The Supreme Court squarely rejected such a proposition long ago in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 119–20 (1866), and at least that part of the *Milligan* decision is still good law. *See, e.g., Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 88 (1921) ("[T]he mere existence of a state of war could not suspend or change the operation upon the power of Congress of the guaranties and limitations of the Fifth and Sixth Amendments . . . ."). Instead, we conclude that the restrictions outlined in the Fifth Amendment simply do not address actions the Executive takes in conducting a military campaign against the Nation's enemies.

The Supreme Court has also stated a general rule that, notwithstanding the compensation requirement for government takings of property under the Fifth Amendment, "the government cannot be charged for injuries to, or destruction of, private property caused by military operations of armies in the field." *United States v. Pacific R.R.*, 120 U.S. 227, 239 (1887). For "[t]he terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war. This Court has long recognized that in wartime many losses must be attributed solely to the fortunes of war, and not to the sovereign." *United States v. Caltex, Inc. (Philippines)*, 344 U.S. 149, 155–56 (1952). *See also Herrera v. United States*, 222 U.S. 558 (1912); *Juragua Iron Co. v. United States*, 212 U.S. 297 (1909); *Ford v. Surget*, 97 U.S. 594 (1878). These cases and the untenable consequences for the President's conduct of a war that would result from the application of the Due Process Clause demonstrate its inapplicability during wartime—whether to the conduct of interrogations or the detention of enemy aliens.

Second, even if the Fifth Amendment applied to enemy combatants in wartime, it is clear that that the Fifth Amendment does not operate outside the United States to regulate the Executive's conduct toward aliens. The Supreme Court has squarely held that the Fifth Amendment provides no rights to non-citizens who have no established connection to the country and who are held outside sovereign United States territory. *See Verdugo-Urquidez*, 494 U.S. at 269 ("[W]e have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."). *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections[, such as the Fifth Amendment,] available to persons inside the United States are unavailable to aliens outside of our geographic borders.") (citing *Verdugo-Urquidez*, 494 U.S. at 269; and *Eisentrager*, 339 U.S. at 784). As the Supreme Court explained in *Eisentrager*, construing the Fifth Amendment to apply to aliens who are outside the United States and have no connection to the United States:

> would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments. Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view.

339 U.S. at 784. *See also Harbury v. Deutch*, 233 F.3d 596, 603–04 (D.C. Cir. 2000), *rev'd on other grounds, Christopher v. Harbury*, 122 S. Ct. 2179 (2002); *Rasul v. Bush*, 215 F. Supp. 2d 55, 72 n.16 (D.D.C. 2002) ("The Supreme Court in *Eisentrager, Verdugo-Urquidez*, and *Zadvydas*, and the District of Columbia Circuit in *Harbury*, have all held that there is no extraterritorial application of the Fifth Amendment to aliens."). Indeed, in *Harbury v. Deutch*, the D.C. Circuit expressly considered a claim that various U.S. officials had participated in the torture of a non-U.S. citizen outside the sovereign territory of the United States during peacetime. *See* 233 F.3d at 604–05. The D.C. Circuit rejected the contention that the Due

Process clause applied extraterritorially to a person in such circumstances. The court found *Verdugo-Urquidez* to be controlling on the question, and determined that the Supreme Court's rejection of the extraterritorial application the Fifth Amendment precluded any claim by an alien held outside the United States even when the conduct at issue had not occurred in wartime. *See id.* at 604 (finding that "the Supreme Court's extended and approving citation of *Eisentrager* [in *Verdugo-Urquidez*] suggests that its conclusions regarding the extraterritorial application of the Fifth Amendment are not . . . . limited" to wartime). We therefore believe that it is clear that the Fifth Amendment does not apply to alien enemy combatants held overseas.

### D.   Eighth Amendment

A second constitutional provision that might be thought relevant to interrogations is the Eighth Amendment. The Eighth Amendment, however, applies solely to those persons upon whom criminal sanctions have been imposed. As the Supreme Court has explained, the Cruel and Unusual Punishments Clause "was designed to protect those convicted of crimes." *Ingraham v. Wright*, 430 U.S. 651, 664 (1977). As a result, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Id.* at 671 n.40. The Eighth Amendment thus has no application to those individuals who have not been punished as part of a criminal proceeding, irrespective of the fact that they have been detained by the government. *See Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) (holding that condition of confinement claims brought by pretrial detainee must be considered under the Fifth Amendment, not the Eighth Amendment). The Eighth Amendment therefore cannot extend to the detention of wartime detainees, who have been captured pursuant to the President's power as Commander in Chief. *See Transfers Memorandum* at 2 (concluding that "the President has since the Founding era exercised exclusive and virtually unfettered control over the disposition of enemy soldiers and agents captured in time of war"). *See also Hamdi v. Rumsfeld*, 316 F.3d 450, 463 (4th Cir. 2003) (the President's powers as Commander in Chief "include the authority to detain those captured in armed struggle").

The detention of enemy combatants can in no sense be deemed "punishment" for purposes of the Eighth Amendment. Unlike imprisonment pursuant to a criminal sanction, the detention of enemy combatants involves no sentence judicially imposed or legislatively required and those detained will be released at the end of the conflict. Indeed, it has long been established that "'[c]aptivity [in wartime] is neither a punishment nor an act of vengeance,' but 'merely a temporary detention which is devoid of all penal character.'" William Winthrop, *Military Law and Precedents* 788 (2d ed. 1920) (quoting British War Office, *Manual of Military Law* (1882)). Moreover, "[t]he object of capture is to prevent the captured individual from serving the enemy." *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946). *See also Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950); Marco Sassoli & Antoine A. Bouvier, *How Does Law Protect in War? Cases Documents and Teaching Materials on Contemporary Practice in International Humanitarian Law* 125 (1999) (the purpose of detaining enemy combatants "is not to punish them, but . . . to hinder their direct participation in hostilities"). Detention also serves another vital military objective—i.e., obtaining intelligence from captured combatants to aid in the prosecution of the war. Accordingly, the Eighth Amendment has no application here.

**UNCLASSIFIED**

## II. Federal Criminal Law

### A. Canons of Construction

We discuss below several canons of construction that indicate that ordinary federal criminal statutes do not apply to the properly-authorized interrogation of enemy combatants by the United States Armed Forces during an armed conflict.[12] These canons include the avoidance of constitutional difficulties, inapplicability of general criminal statutes to the conduct of the military during war, inapplicability of general statutes to the sovereign, and the specific governs the general. The Criminal Division concurs in our conclusion that these canons of construction preclude the application of the assault, maiming, interstate stalking, and torture statutes to the military during the conduct of a war.

#### 1. Interpretation to Avoid Constitutional Problems

As the Supreme Court has recognized, and as we will explain further below, the President enjoys complete discretion in the exercise of his Commander-in-Chief authority in conducting operations against hostile forces. Because both "[t]he executive power and the command of the military and naval forces is vested in the President," the Supreme Court has unanimously stated that it is *"the President alone* [] who is constitutionally invested with the *entire charge of hostile operations."* Hamilton v. Dillin, 88 U.S. (21 Wall.) 73, 87 (1874) (emphasis added).

In light of the President's complete authority over the conduct of war, in the absence of a clear statement from Congress otherwise, we will not read a criminal statute as infringing on the President's ultimate authority in these areas. We presume that Congress does not seek to provoke a constitutional confrontation with an equal, coordinate branch of government unless it has unambiguously indicated its intent to do so. The Supreme Court has recognized, and this Office has similarly adopted, a canon of statutory construction that statutes are to be construed in a manner that avoids constitutional difficulties so long as a reasonable alternative construction is available. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499–501, 504 (1979)) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe [a] statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). *Cf. United States Assistance to Countries That Shoot Down Civil Aircraft Involved in Drug Trafficking*, 18 Op. O.L.C. 148, 149 (July 14, 1994) (*"Shoot Down Opinion"*) (requiring "careful examination of each individual [criminal] statute" before concluding that generally applicable statute applied to the conduct of U.S. government officials). This canon of construction applies especially where an act of Congress could be read to encroach upon powers constitutionally committed to a coordinate branch of government. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (citation omitted) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the [Administrative Procedure Act]. We would require an express statement by

---

[12] One exception to this general statement is the War Crimes Statute, 18 U.S.C. § 2441, which expressly applies to the military's conduct of war. This statute does not apply to the interrogations in the current conflict for the reasons we explain *infra* Part II.C.1.

Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 465–67 (1989) (construing Federal Advisory Committee Act not to apply to advice given by American Bar Association to the President on judicial nominations, to avoid potential constitutional question regarding encroachment on Presidential power to appoint judges).

In the area of foreign affairs and war powers in particular, the avoidance canon has special force. In contrast to the domestic realm, foreign affairs and war clearly place the President in the dominant constitutional position due to his authority as Commander in Chief and Chief Executive and his plenary control over diplomatic relations. There can be little doubt that the conduct of war is a matter that is fundamentally executive in nature, the power over which the Framers vested in a unitary executive. "The direction of war implies the direction of the common strength," Alexander Hamilton observed, "and the power of directing and employing the common strength forms a usual and essential part in the definition of the executive authority." *The Federalist No. 74*, at 415. Thus, earlier in this current armed conflict against the al Qaeda terrorist network, we concluded that "[t]he power of the President is at its zenith under the Constitution when the President is directing military operations of the armed forces." *Flanigan Memorandum* at 3. Correspondingly, during war Congress plays a reduced role in the war effort and the courts generally defer to executive decisions concerning the conduct of hostilities. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862).

Construing generally-applicable statutes so as not to apply to the conduct of military operations against the enemy during an armed conflict respects the Constitution's basic allocation of wartime authority. As our Office recently explained in rejecting the application of 18 U.S.C. § 2280, which prohibits the seizure of vessels, to conduct during the current war:

> we have previously concluded that the President's authority in the areas of foreign relations and national security is very broad, and that in the absence of a clear statement in the text or context of a statutory prohibition to suggest that it was Congress's intent to circumscribe this authority, we do not believe that a statute should be interpreted to impose such a restriction on the President's constitutional powers.

*High Seas Memorandum* at 8 n.5. Federal courts similarly have agreed that federal statutes should not be read to interfere with the Executive Branch's control over foreign affairs unless Congress specifically and clearly seeks to do so. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 232–33 (1986) (construing federal statutes to avoid curtailment of traditional presidential prerogatives in foreign affairs). Courts will not lightly assume that Congress has acted to interfere with the President's constitutionally superior position as Chief Executive and Commander in Chief in the area of military operations. *See Egan*, 484 U.S. at 529 (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)). *See also Agee*, 453 U.S. at 291 (deference to executive branch is "especially" appropriate "in the area . . . of . . . national security").

In order to respect the President's inherent constitutional authority to direct a military campaign against al Qaeda and its allies, general criminal laws must be construed as not applying to interrogations undertaken pursuant to his Commander-in-Chief authority. Congress cannot interfere with the President's exercise of his authority as Commander in Chief to control the conduct of operations during a war. *See, e.g.*, Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* (Apr. 8, 2002); *Flanigan Memorandum* at 6; Memorandum for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Defense Authorization Act* (Sept. 15, 1995). As we have discussed above, the President's power to detain and interrogate enemy combatants arises out of his constitutional authority as Commander in Chief. Any construction of criminal laws that regulated the President's authority as Commander in Chief to determine the interrogation and treatment of enemy combatants would raise serious constitutional questions whether Congress had intruded on the President's constitutional authority. Moreover, we do not believe that Congress enacted general criminal provisions such as the prohibitions against assault, maiming, interstate stalking, and torture pursuant to any express authority that would allow it to infringe on the President's constitutional control over the operation of the Armed Forces in wartime. In our view, Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield. In fact, the general applicability of these statutes belies any argument that these statutes apply to persons under the direction of the President in the conduct of war.[13]

To avoid this constitutional difficulty, therefore, we will construe potentially applicable criminal laws, reviewed in more detail below, not to apply to the President's detention and interrogation of enemy combatants pursuant to his Commander-in-Chief authority. We believe that this approach fully respects Congress's authority. First, we will not read a statute to create constitutional problems because we assume that Congress fully respects the limits of its own constitutional authority and would not knowingly seek to upset the separation of powers. Second, we will not infer a congressional attempt to spark a constitutional confrontation with the executive branch in wartime unless Congress clearly and specifically seeks to do so.

---

[13] It might be thought that Congress could enact legislation that regulated the conduct of interrogations under its authority to "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. The question whether Congress could use this power to regulate military commissions was identified and reserved by the Supreme Court. *Ex Parte Quirin*, 317 U.S. 1, 29 (1942). Our Office has determined that Congress cannot exercise its authority to make rules for the Armed Forces to regulate military commissions. Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* at 7 (Apr. 8, 2002). If military commissions are considered an integral part of the conduct of military operations, , then the conduct of interrogations of enemy combatants during wartime must be as much a core element of the President's power to successfully prosecute war. Any effort by Congress to use its power to make rules for the armed forces would thus be just as unconstitutional as such rules would be with regard to military commissions.

**UNCLASSIFIED**

### 2. Application of Laws of General Applicability to the Conduct of the Military During War

Not only do we construe statutes to avoid intruding upon the President's power as Commander in Chief, but we also apply a more specific and related canon to the conduct of war. As this Office has previously opined, unless "Congress by a clear and unequivocal statement declares otherwise" a criminal statute should not be construed to apply to the properly authorized acts of the military during armed conflict. *Shoot Down Opinion*, 18 Op. O.L.C. at 164. *See* Memorandum for Alan Kreczko, Legal Adviser to the National Security Council, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 47 U.S.C. § 502 to Certain Broadcast Activities* at 3 (Oct. 15, 1993) ("In the absence of a clear statement of [the] intent [to apply the statute to military personnel acting under the President as Commander in Chief], we do not believe that a statutory provision of this generality should be interpreted so to restrict the President's constitutional powers."); *Application of the Neutrality Act to Official Government Activities*, 8 Op. O.L.C. 58, 81 (1984) (concluding that in absence of a express statement, the Neutrality Act does not apply to U.S. "Government officials acting within the course and scope of their official duties," in light of the legislative history and historical practice that demonstrated a contrary intent). For many years, our Office has also applied this canon in several highly classified contexts that cannot be discussed in this memorandum.

This canon of construction is rooted in the absurdities that the application of such laws to the conduct of the military during a war would create. If those laws were construed to apply to the properly-authorized conduct of military personnel, the most essential tasks necessary to the conduct of war would become subject to prosecution. A soldier who shot an enemy combatant on the battlefield could become liable under the criminal laws for assault or murder; a pilot who bombed a military target in a city could be prosecuted for murder or destruction of property; a sailor who detained a suspected terrorist on the high seas might be subject to prosecution for kidnapping. As we noted in the *Shoot Down Opinion*, the application of such laws to the military during wartime "could [also] mean in some circumstances that military personnel would not be able to engage in reasonable self-defense without subjecting themselves to the risk of criminal prosecution." *Id.* at 164. The mere potential for prosecution could impair the military's completion of its duties during a war as military officials became concerned about their liability under the criminal laws. Such results are so ridiculous as to be untenable and must be rejected to allow the President and the Armed Forces to successfully conduct a war.

This canon of construction, of course, establishes only a presumption. While the federal criminal statutes of general applicability reviewed below do not overcome that presumption, in some cases it has been done. For example, it is clear that the War Crimes Statute, 18 U.S.C. § 2441, which we address below, is intended to apply to the conduct of the U.S. military. It expressly provides that the statute applies where the perpetrator of the crime "is a member of the Armed Forces of the United States" and the conduct it prohibits is conduct that occurs during war. *Id.* § 2441(b). That presumption has not, however, been overcome with respect to the assault, maiming, interstate stalking, or the torture statutes. We will not infer an intention by Congress to interfere with the conduct of military operations in an armed conflict without a clear statement otherwise.

### 3. Generally Applicable Statutes Are Not Construed to Apply to the Sovereign

It is also a canon of construction that laws of general applicability are not read to apply to the sovereign. In *United States v. Nardone*, 302 U.S. 379 (1937), the Supreme Court explained its application: (1) where it "would deprive the sovereign of a recognized or established prerogative title or interest," *id.* at 383; or (2) "where a reading which would include such officers would work obvious absurdity[,]" *id.* at 384. As the Court explained, "[a] classical instance" of the deprivation of a recognized or established prerogative title or interest "is the exemption of the state from the operation of general statutes of limitation." *Id.* at 383.

Here, the application of these statutes to the conduct of interrogations of unlawful combatants would deprive the sovereign of a recognized prerogative. Historically, nations have been free to treat unlawful combatants as they wish, and in the United States this power has been vested in the President through the Commander-in-Chief Clause. As one commentator has explained, unlawful belligerents are "more often than not treated as war or national criminals liable to be treated *at will by the captor. There are almost no regulatory safeguards with respect to them and the captor owes no obligation towards them.*" R.C. Hingorani, *Prisoners of War* 18 (1982) (emphasis added). See Ingrid Detter, *The Law of War* 148 (2d ed. 2000) ("Unlawful combatants . . . enjoy no protection under international law); William Winthrop, *Military Law and Precedents* 784 (2d ed. 1920) (unlawful belligerents are "[n]ot . . . within the protection of the laws of war"); A. Berriedale Keith, 2 *Wheaton's Elements of International Law* 716 (6th ed. 1929) ("irregular bands of marauders are . . . not entitled to the protection of the mitigated usages of war as practised by civilized nations"); L. Oppenheim, 2 *International Law*, § 254, at 454 (6th ed. 1944) ("Private individuals who take up arms and commit hostilities against the enemy do not enjoy the privileges of armed forces, and the enemy has, according to a customary rule of International Law, the right to treat such individuals as war criminals.").[14] The United States Supreme Court has recognized the important distinction between lawful and unlawful combatants. As the Supreme Court unanimously stated 60 years ago, "[b]y universal agreement and practice the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations *and also between those who are lawful and unlawful combatants.*" *Ex parte Quirin*, 317 U.S. 1, 30–31 (1942) (emphasis added).

---

[14] *See also* Alberico Gentili, 2 *De Iure Belli Libri Tres* 22 (1612) (John C. Rolfe translation 1933) ("malefactors do not enjoy the privileges of a law to which they are foes"); E. de Vattel, 3 *The Law of Nations or the Principles of Natural Law* 318 (1758) (Charles G. Fenwick translation 1916) ("The troops alone carry on the war and the rest of the people remain at peace. . . . [I]f the peasantry commit of their own accord any acts of hostility, the enemy treats them without mercy, and hangs them as he would robbers or brigands."); Sir Robert Phillimore, 3 *Commentaries Upon International Law* 164 (2d ed. 1873) (listing "[b]ands of marauders, acting without the authority of the Sovereign or the order of the military commander," "[d]eserters," and "[s]pies" as examples of unlawful belligerents who "have no claim to the treatment of prisoners of War"); Sir G. Sherston Baker, 1 *Halleck's International Law* 614–17 (4th ed. 1908) (noting distinction between lawful and unlawful belligerency and concluding unlawful combatants are "not entitled to the mitigated rules of modern warfare"); Pasquale Fiore, *International Law Codified*, § 1459, at 548 (1918) ("Any act of hostility, any armed violence against the person or property of the hostile sovereign or state and of its citizens, even though legitimate under the laws of war, shall be deemed unlawful and punishable according to 'common' law, if committed by one who is not properly a belligerent."); *id.* § 1475, at 552 ("Armed bands committing hostile acts in time of war by engaging in operations on their own account and without authorization of the Government and, when necessary, concealing their identity as combatants, cannot invoke the application of the laws of war nor be recognized as belligerents.").

Under traditional practice as expressed in the customary laws of war, the treatment of unlawful belligerents is left to the sovereign's discretion. As one commentator has stated, the treatment of "unprivileged belligerents . . . [is] left to the discretion of the belligerent threatened by their activities." Julius Stone, *Legal Controls of International Conflict* 549 (1954). Under our Constitution, the sovereign right of the United States on the treatment of enemy combatants is reserved to the President as Commander-in-Chief. In light of the long history of discretion given to each nation to determine its treatment of unlawful combatants, to construe these statutes to regulate the conduct of the United States toward such combatants would interfere with a well-established prerogative of the sovereign. While the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. 3364 ("GPW"), imposes restrictions on the interrogations of prisoners of war, it does not provide prisoner of war status to those who are unlawful combatants. *See Treaties and Laws Memorandum* at 8–9. Those restrictions therefore would not apply to the interrogations of unlawful belligerents such as al Qaeda or Taliban members.

The second exception recognized by the Supreme Court arises where the application of general laws to a government official would create absurd results, such as effectively preventing the official from carrying out his duties. In *Nardone*, the Supreme Court pointed to "the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm" as examples of such absurd results. *Nardone*, 302 U.S. at 384. *See also United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486–87 (1868) (holding that statute punishing obstruction of mail did not apply to an officer's temporary detention of mail caused by his arrest of the carrier for murder). In those situations and others, such as undercover investigations of narcotics trafficking, the government officer's conduct would constitute a literal violation of the law. And while "[g]overnment law enforcement efforts frequently require the literal violation of facially applicable statutes[,] . . . courts have construed prohibitory laws as inapplicable when a public official is engaged in the performance of a necessary public duty." Memorandum for Maurice C. Inman, Jr., General Counsel, Immigration and Naturalization Service, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Visa Fraud Investigation* at 2 (Nov. 20, 1984). Indeed, to construe such statutes otherwise would undermine almost all undercover investigative efforts. *See also id.* For the reasons we explain above, the application of these general laws to the conduct of the military during the course of a war would create untenable results.

Like the canon of construction against the application of general criminal statutes to the conduct of the military during war, this canon of construction is not absolute. The rule excluding the sovereign is only one of construction. It may be overcome where the legislative history or obvious policies of the statue demonstrate that the sovereign and its officers should be included. With respect to assault, maiming, or interstate stalking, no such history or obvious legislative policy indicates an intention to regulate lawful military activities in an armed conflict. Although the torture statute, as we explain below, applies to persons acting under color of law, the legislative history indicates no intent to apply this to the conduct of military personnel. Indeed, as we explained in discussing the prerogative of the sovereign, it is well established that the sovereign retains the discretion to treat unlawful combatants as it sees fit.