# Exhibit E, Part 2

SECRET/NOFORN

4.    **Specific Governs the General**

The canon of construction that specific statutes govern general statutes also counsels that generally applicable criminal statutes should not apply to the military's conduct of interrogations in the prosecution of a war. Where a specific statute or statutory scheme has been enacted, it and not a more general enactment will govern. *See, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445 (1987). Here, the UCMJ provides a detailed regulatory regime for the conduct of military personnel apart from the federal criminal code. Congress enacted the UCMJ pursuant to its constitutional authority "[t]o make Rules for the government and Regulation of the land and naval Forces." U.S. Const. art. I, sec. 8, cl. 14. As the specific code of conduct, the UCMJ governs the conduct of the military during a war, not the general federal criminal laws.

The Military Extraterritorial Jurisdiction Act makes clear that it is the UCMJ—not the criminal code—that governs the conduct of the members of the Armed Forces. As explained above, 18 U.S.C. § 3261(d) ensures that the military punishes and disciplines its members. To be sure, section 3261(a)(1) provides that members of the Armed Forces may be punished for conduct that would constitute a felony if committed in the special maritime and territorial jurisdiction. But section 3261(d) precludes the prosecution of such persons in an Article III court, with only two exceptions: (1) where an individual is no longer a member of the Armed Forces, though he was a member at the time of the offense the individual; and (2) where the member committed the offense with someone who was not a member of the Armed Forces.

It could be argued that Congress specifically enacted section 3261 to extend special maritime and territorial jurisdiction crimes to the members of the Armed Forces and those accompanying or employed by them. Such a contention would, however, be incorrect. Nothing in that provision, or its legislative history suggests an intention to impose general criminal liability on the military for properly-authorized acts undertaken in the prosecution of a war. Rather, the legislative history reveals a desire to ensure that when persons accompanying or employed by the Armed Forces, acting solely in their personal capacity, commits a felony, they can be punished for those crimes.[15] We therefore believe that this canon of construction, as with the others outlined above, supports our conclusion that the statutes outlined in this opinion, with the exception of the war crimes statute, do not govern the properly authorized interrogation of enemy combatants during an armed conflict.

5.    **Application of the Canons of Construction**

The assault, maiming, interstate stalking, and torture statutes discussed below are generally applicable criminal prohibitions, applying on their faces to "whoever" engages in the

---

[15] Congress enacted the Military Extraterritorial Jurisdiction Act of 2000 to fill a jurisdictional gap. In a series of cases, the Supreme Court held that the Constitution barred the military from trying civilians accompanying the military in military courts during peacetime. *See, e.g., Reid v. Covert,* 354 U.S. 1 (1957). Because of these decisions, and the frequent failure of other nations to prosecute such individuals, persons employed by or accompanying the Armed Forces outside the United States often escaped prosecution for crimes committed on bases or against other U.S. nationals. *See* Military Extraterritorial Jurisdiction Act of 2000, H. Rep. No. 106-778(I), at 10–11 (July 20, 2000). *See also* H. R. Rep. No. 106-1048, at 120 (2001); *United States v. Gatlin,* 216 F.3d 207, 209 (2d Cir. 2000). Though this gap was long recognized, see *Gatlin,* 216 F.3d at 208–09, it was not until 2000 that Congress closed it.

        SECRET/NOFORN

conduct they proscribe. 18 U.S.C. § 113; *id.* § 114; *id.* § 2261A; *id.* § 2340A. Each of the canons outlined above counsels against the application of these statutes to the conduct of the military during war. As we explained above, the application of these statutes to the President's conduct of the war would potentially infringe upon his power as Commander in Chief. Furthermore, the conduct at issue here—interrogations—is a core element of the military's ability to prosecute a war. As a general matter, we do not construe generally applicable criminal statutes to reach the conduct of the military during a war. Moreover, the application of these statutes to the conduct of the military during war would touch upon a prerogative of the sovereign, namely its discretion regarding the treatment of unlawful belligerents.[16] Congress has not provided a clear statement with respect to any of these statutes that would suggest that these canons of construction do not apply. Additionally, as we explained above, the UCMJ provides a specific statutory scheme that governs the conduct of the military and as the more specific enactment it governs here.

To be sure, section 2340 applies to individuals who are acting "under color of law." 18 U.S.C. § 2340(1). As such, it applies to governmental actors and it could be argued that Congress enacted it with the intention of restricting the ability of the Armed Forces to interrogate enemy combatants during an armed conflict. We believe that these canons of construction nevertheless counsel against the application of this statute to the conduct of the military during the prosecution of a war. As we explained above, applying this statute to the President's conduct of the war would raise grave separation of powers concerns. Such a construction is unnecessary to give effect to the criminal prohibition. Though we believe that the statute would not apply to the conduct of the military during the prosecution of a war, it would reach the conduct of other governmental actors in peacetime. We further note that where Congress intends to apply statutes to the conduct of our military it has done so far more clearly than by requiring the individuals act "under color of law." For example, the War Crimes Statute, 18 U.S.C. § 2441 applies to the conduct "any member of the Armed Forces of the United States." 18 U.S.C. § 2441(b). Moreover, here, it is the UCMJ, a specific statutory scheme, that governs the conduct of the Armed Forces rather than this general statute.

## 6.    Commander-in-Chief Authority

Even if these statutes were misconstrued to apply to persons acting at the direction of the President during the conduct of war, the Department of Justice could not enforce this law or any of the other criminal statutes applicable to the special maritime and territorial jurisdiction against federal officials acting pursuant to the President's constitutional authority to direct a war. Even if an interrogation method arguably were to violate a criminal statute, the Justice Department could not bring a prosecution because the statute would be unconstitutional as applied in this context. This approach is consistent with previous decisions of our Office involving the application of federal criminal law. For example, we have previously construed the congressional contempt statute not to apply to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. In a published 1984 opinion, we concluded:

---

[16] We emphasize that this opinion concerns the application of these statutes solely to the President's conduct of a war. We express no opinion as to their applicability outside of this context.

SECRET/NOFORN

> [I]f executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.

*Prosecution for Contempt of Congress of an Executive Branch Offical Who Has Asserted A Claim of Executive Privilege,* 8 Op. O.L.C. 101, 134 (1984). *Cf. Shoot Down Memorandum* at 163–64. And should the statute not be construed in this manner, our Office concluded that the Department of Justice could not enforce the statute against federal officials who properly execute the President's constitutional authority. "The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual." 8 Op. O.L.C. at 141. We opined that "courts . . . would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution." *Id.*

We have even greater concerns with respect to prosecutions arising out of the exercise of the President's express authority as Commander in Chief than we do with prosecutions arising out of the assertion of executive privilege. Any effort by Congress to regulate the interrogation of enemy combatants would violate the Constitution's sole vesting of the Commander-in-Chief authority in the President. There can be little doubt that intelligence operations, such as the detention and interrogation of enemy combatants and leaders, are both necessary and proper for the effective conduct of a military campaign. Indeed, such operations may be of more importance in a war with an international terrorist organization than one with the conventional armed forces of a nation-state, due to the former's emphasis on covert operations and surprise attacks against civilians. It may be the case that only successful interrogations can provide the information necessary to prevent future attacks upon the United States and its citizens. Congress can no more interfere with the President's conduct of the interrogation of enemy combatants than it can dictate strategic or tactical decisions on the battlefield. Just as statutes that order the President to conduct warfare in a certain manner or for specific goals would be unconstitutional, so too are laws that would prevent the President from gaining the intelligence he believes necessary to prevent attacks upon the United States.

## B.    Special Maritime and Territorial Jurisdiction of the United States

### 1.    Jurisdiction

Before turning to the specific federal criminal statutes that may be relevant to the conduct of interrogations, we must examine whether these statutes apply. Federal criminal statutes generally do not apply within the special maritime and territorial jurisdiction of the United States. *See United States v. Bowman,* 260 U.S. 94, 98 (1922). As noted above, this opinion addresses solely those alien enemy combatants held outside the United States. The application of federal criminal laws to the conduct of interrogations overseas is determined by the complex

SECRET//NOFORN

interaction of 18 U.S.C.A. § 7 (2000 & West Supp. 2002) and 18 U.S.C. § 3261 (2000), which is part of the Military Extraterritorial Jurisdiction Act of 2000, Pub. L. No. 106-523, 114 Stat. 2488 (2001). Section 7 defines the term "special maritime and territorial jurisdiction," which we conclude includes permanent U.S. military bases outside the United States, like the U.S. Naval Station, Guantanamo Bay ("GTMO"). Section 3261 defines military extraterritorial jurisdiction. We conclude that all persons who are neither members of the Armed Forces nor persons accompanying or employed by the Armed Forces are subject to the special maritime and territorial jurisdiction of the United States when they are in locations that Section 7 defines as part of that jurisdiction. Members of the Armed Forces and persons accompanying or employed by them, however, are subject to a slightly different rule. Members of the Armed Forces are subject to military discipline under the UCMJ anyplace outside the United States for conduct that would constitute a felony if committed within the special maritime and territorial jurisdiction of the United States. Those accompanying or employed by the Armed Forces can be prosecuted in an Article III court for their conduct outside the United States that would constitute a felony offense if committed within the special maritime and territorial jurisdiction of the United States. Finally, members of the Armed Forces and those accompanying or employed by the military are punishable for misdemeanor offenses in an Article III court when they commit such offenses within the special maritime and territorial jurisdiction of the United States.

As a general matter, GTMO and other U.S. military bases outside the United States fall within the special maritime and territorial jurisdiction of the United States.[17] Section 7(9) of Title 18 of the U.S. Code provides, in relevant part, that the special maritime and territorial jurisdiction of the United States includes:

> offenses committed by or against a national of the United States . . . on the premises of United States . . . military . . . missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership.

18 U.S.C.A. § 7(9)(A). [18]   By its terms, this section applies to GTMO and other U.S. military bases in foreign states, although no court has interpreted the scope of section 7(9)'s reach. [19]

---

[17] The United States occupies GTMO under a lease entered into with the Cuban Government in 1903. Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 16–23, 1903, U.S.-Cuba, art. III, T.S. No. 418, 6 Bevans 1113. In 1934, the United States and Cuba entered into a new treaty that explicitly reaffirmed the continuing validity of the 1903 Lease of Lands Agreement. *See* Relations With Cuba, May 29, 1934, U.S.-Cuba, T.S. No. 866, 6 Bevans 1161.

[18] The USA PATRIOT Act, Pub. L. No. 107-56, § 804, 115 Stat. 272, 377 (2001) amended the special maritime jurisdiction statute to include subsection 9. Congress added this section to resolve a circuit split on the reach of section 7(3), which provides that the special maritime and territorial jurisdiction of the United States includes "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7(3). There was some question as to whether section 7(3) reached lands outside of United States territory. *Compare United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000) (section 7(3) applies only to land acquired within U.S. territorial borders) *with United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973) (section 7(3) covers American Embassy in Equatorial Guinea). *See* Provide Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001, H.R. Rep. No. 107-236, pt. 1, at 74 (2001) (noting the circuit split and that "[t]his [sub]section would

---

          SECRET//NOFORN

Section 7(9) further provides that it "does not apply with respect to an offense committed by a person described in" 18 U.S.C. § 3261(a). Persons described in section 3261(a) are those "employed by or accompanying the Armed Forces outside the United States" or "member[s] of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice)," who engage in "conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States[.]" *Id.* The interaction of section 7(9) and section 3261(a) in effect differentiates between three classes of persons: (1) all persons who are neither members of the Armed Forces nor persons accompanying or employed by the Armed Forces; (2) members of the Armed Forces subject to the UCMJ; (3) those persons employed by or accompanying the Armed Forces.

First, those persons who are neither members of the Armed Forces nor are employed by or accompanying the Armed Forces are subject to prosecution for violations of federal criminal law when they are at a location that is included within the special maritime and territorial jurisdiction. Conversely, when the acts in question are committed outside of the special maritime and territorial jurisdiction, these individuals are not subject to those federal criminal laws. So, for example, a federal, non-military officer who is conducting interrogations in a foreign location, one that is not on a permanent U.S. military base or diplomatic establishment, would not be subject to the federal criminal laws applicable in the special maritime and territorial jurisdiction.

The rules that apply to the second and third classes of persons are more complicated. Section 7(9), in conjunction with 18 U.S.C. § 3261, provides that members of the Armed Forces subject to the UCMJ are not within the special maritime and territorial jurisdiction when they, while outside the United States, engage in conduct that would constitute a felony if committed within the special maritime and territorial jurisdiction. Section 3261(a) exempts such persons, however, only if their conduct constitutes a felony. If they were to commit a misdemeanor offense while stationed at GTMO, they would fall outside section 3261(a)'s exception and would be subject to the special maritime and territorial jurisdiction. *See* 18 U.S.C. § 3261(a).[20]

Section 7(9), in conjunction with 18 U.S.C. § 3261, likewise provides that those persons employed by or accompanying members of the Armed Forces subject to the UCMJ are not within the special maritime and territorial jurisdiction of the United States when they, while outside the United States, engage in conduct that would constitute a felony if committed within the special maritime and territorial jurisdiction.[21] And, like members of the Armed Forces, if

make it clear that embassies and embassy housing of the United States in foreign states are included in the special maritime and territorial jurisdiction of the United States.").
[19] We express no opinion as to the full scope of the meaning of subsection (9)'s phrase "military . . . missions or entities in foreign states." We simply note that it is clear that permanent U.S. military bases such as the one at GTMO fall within subsection (9).
[20] Under 18 U.S.C. § 3559(a), any offense for which the maximum sentence is more than one year is defined as a felony. Offenses for which the maximum sentence is one year or less are classified as misdemeanors. *See* 18 U.S.C. § 3559(a) (2000).
[21] The term "accompanying the Armed Forces outside the United States" is further defined by statute. Section 3267 defines "accompanying the Armed Forces outside the United States" as:

SECRET/NOFORN

such persons commit a misdemeanor offense while in an area that falls within the special maritime and territorial jurisdiction, they are within the special maritime and territorial jurisdiction.

Although these two classes of persons are not within the special maritime and territorial jurisdiction when they engage in conduct that would constitute a felony if engaged in within the special maritime and territorial jurisdiction, they are in fact punishable for such conduct when they are outside the United States—whether they are in an area that is otherwise part of the special maritime and territorial jurisdiction or elsewhere outside the United States, such as in a foreign state. Section 3261(a) provides that when such persons are outside the United States and they engage in conduct that would be a felony if committed in the special maritime and territorial jurisdiction, those persons "shall be punished as provided for that offense." 18 U.S.C. § 3261(a). Section 3261(a) therefore gives extraterritorial effect to the criminal prohibitions applicable to the special maritime and territorial jurisdiction of the United States. Thus, with respect to interrogations, members of the Armed Forces and those employed by or accompanying the Armed Forces will be subject to the felony criminal prohibitions that apply in the special maritime and territorial jurisdiction irrespective of whether the interrogations occur at, for example, a U.S. military base or at the military facilities of a foreign state.

Although members of the Armed Forces are to be punished for conduct that would constitute a felony if committed in the special maritime and territorial jurisdiction, they can only be prosecuted under the UCMJ for that conduct. Section 3261 prohibits the prosecution of members of the Armed Forces under the laws applicable to the special maritime and territorial jurisdiction. For persons who are members of the Armed Forces subject to the UCMJ, section 3261(d) provides that "no prosecution may be commenced against" them "under section

---

    (A)      A dependent of—
            (i)        a member of the Armed Forces;
            (ii)      a civilian employee of the Department of Defense (including a nonappropriated fund instrumentality of the Department); or
            (iii)     a Department of Defense contractor (including a subcontractor at any tier) or an employee of a Department of Defense contractor (including a subcontractor at any tier);
    (B)      residing with such member, civilian employee, contractor, or contractor employee outside the United States; and
    (C)      not a national of or ordinarily resident in the host nation.

18 U.S.C. § 3267 (2000).

     Likewise, the statute also defines "employed by the Armed forces." Section 3267(1) provides that this term includes those persons:

    (A) employed as a civilian employee of the Department of Defense (including a nonappropriated fund instrumentality of the Department), as a Department of Defense contractor (including a subcontractor at any tier), or as an employee of a Department of Defense contractor (including a subcontractor at any tier);
    (B) present or residing outside the United States in connection with such employment; and
    (C) not a national of or ordinarily resident in the host nation.

*Id.*

**UNCLASSIFIED**

3261(a)." 18 U.S.C. § 3261(d).[22]    Section 3261(d) is subject to two exceptions.  First, the bar on prosecutions applies only so long as the member continues to be subject to the UCMJ.  *See* 18 U.S.C. § 3261(d)(1).    Second, if "an indictment or information charges that the member committed the offense with one or more other defendants, at least one of whom is not subject" to the UCMJ, the bar does not apply.  18 U.S.C. § 3261(d)(2).  In limited circumstances, namely in time of war, persons employed by or accompanying the Armed Forces are subject to the UCMJ.  *See* 10 U.S.C. § 802 (a)(11) (2000) (providing that "persons serving with, employed by, or accompanying the armed forces outside the United States" are subject to the UCMJ); *Reid v. Covert*, 354 U.S. 1 (1957).[23]  If the indictment charged that such persons committed the offense in wartime with members of the Armed Forces subject to the UCMJ, this bar on prosecution would not be removed for the member.  The indictment would, for example, have to charge that the member of the Armed Forces committed the offense with, for example, a government official not subject to the UCMJ (and not physically accompanying the Armed Forces in the field) to survive.

## 2.    Criminal Statutes Applicable in the Special Maritime and Territorial Jurisdiction of the United States

Because the interaction of 18 U.S.C. § 7 and 18 U.S.C. § 3261(a) renders the criminal statutes that apply in special maritime and territorial jurisdiction applicable to the conduct of members of the Armed Forces, and those accompanying or employed by the Armed Forces, we have examined below the criminal statutes that could conceivably cover interrogation conduct.  Specifically, we have addressed: assault, 18 U.S.C. § 113; maiming, 18 U.S.C. § 114; and interstate stalking, 18 U.S.C. § 2261A.  Of course, as we explained above, various canons of construction preclude the application of these laws to authorized military interrogations of alien enemy combatants during wartime.

---

[22]  Section 3261 ensures that the military can prosecute its members under the UCMJ.  Section 3261(c) makes clear that neither section 3261(d)'s bar nor any other portion of the statute precludes proceeding against persons covered by section 3261(a) in a military commission.  It provides that "[n]othing in this chapter may be construed to deprive a court-martial, military commission, provost court, or other military tribunal of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by a court-martial, military commission, provost court, or other military tribunal."  18 U.S.C. § 3261(d).

[23]  Although in construing 10 U.S.C. § 802(a)(10), which provides that persons subject to the UCMJ includes "[i]n time of war, persons serving with or accompanying an armed force in the field," we opined that "in time of war" meant both declared and undeclared wars, we found that due to ambiguity in the case law we could not predict whether the Court of Military Appeals or the Supreme Court would agree with our reading of the phrase.  *See* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General, *Re: Possible Criminal Charges Against American Citizen Who Was a Member of the Al Qaeda Terrorist Organization or the Taliban Militia* at 18 (Dec. 21, 2001).

Additionally, we note that with respect to meaning of the term "employed by or accompanying the Armed Forces," we have construed those terms to have essentially the same meaning as that which 18 U.S.C. § 3267 provides.  Specifically, we have opined that "the phrase 'employed by or accompanying' is a well understood reference to civilian employees of the military establishment and to the dependents of military personnel."  Memorandum for Fred M. Vinson, Jr., Assistant Attorney General, Criminal Division from Frank M. Wozencraft, Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 11244, A Bill To Amend Title 18 of the United States Code to Give United States District Courts Jurisdiction of Certain Offenses Committed by Americans Outside The United States, and for Other Purposes* (Aug. 23, 1967).  It is, however, unclear whether the meaning of "employed by the armed forces" for purposes of the UCMJ extends to Department of Defense contractors as does section 3267.

SECRET/NOFORN

### a.    Assault

Section 113 of Title 18 proscribes assault within the special maritime and territorial jurisdiction of the United States.[24]  Although section 113 does not define assault, courts have construed the term "assault" in accordance with its common law meaning.  *See, e.g., United States v. Estrada-Fernandez*, 150 F.3d 491, 494 n.1 (5th Cir. 1998); *United States v. Juvenile-Male*, 930 F.2d 727, 728 (9th Cir. 1991).  At common law, an assault is an attempted battery or an act that puts another person in reasonable apprehension of bodily harm.  *See, e.g., United States v. Bayes*, 210 F.3d 64, 68 (1st Cir. 2000).  Section 113, as we explain below, sweeps more broadly than the common law definition of simple assault and sweeps within its ambit acts that would at common law constitute battery.  We analyze below each form of assault section 113 proscribes.

First, we begin with the least serious form of assault:  simple assault, which section 113(a)(5) proscribes.[25]  This form of assault includes attempted battery.  *See, e.g., United States v. Dupree*, 544 F.2d 1050 (9th Cir. 1976).[26]  Courts have employed various formulations of what constitutes an attempted battery.  By the far most common formulation is that attempted battery is "a willful attempt to inflict injury upon the person of another."  *United States v. Fallen*, 256

---

[24]  18 U.S.C. § 113 provides in full:

(a) Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

    (1) Assault with intent to commit murder, by imprisonment for not more than twenty years.

    (2) Assault with intent to commit any felony, except murder or a felony under chapter 109A, by a fine under this title or imprisonment for not more than ten years, or both.

    (3) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by a fine under this title or imprisonment for not more than ten years, or both.

    (4) Assault by striking, beating, or wounding, by a fine under this title or imprisonment for not more than six months, or both.

    (5) Simple assault, by a fine under this title or imprisonment for not more than six months, or both, or if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both.

    (6) Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both.

    (7) Assault resulting in substantial bodily injury to an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 5 years, or both.

(b) As used in this subsection—

    (1) the term "substantial bodily injury" means bodily injury which involves—
        (A) a temporary but substantial disfigurement; or
        (B) a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty; and
    (2) the term "serious bodily injury" has the meaning given that term in section 1365 of this title.

[25]  Simple assault carries a penalty of not more than six months' imprisonment, a fine, or both.  If, however, the victim under age 16, the defendant faces a penalty of up to one year's imprisonment, a fine, or both.  *See* 18 U.S.C. § 113(a)(5).

[26]  As the Seventh Circuit has explained, this latter type of assault is drawn from tort law.  *See United States v. Bell*, 505 F.2d 539, 540–41 (7th Cir. 1974).  *See also* LaFave at 746 (same).

      SECRET/NOFORN

SECRET/NOFORN

F.3d 1082, 1088 (11th Cir. 2001), *cert. denied*, 534 U.S. 1170 (2002). *See United States v. McCulligan*, 256 F.3d 97, 102–03 (3d Cir. 2001) (same); *Juvenile Male*, 930 at 728 (same). An assault at common law does not require actual physical contact. If the defendant does make such contact, it does not preclude a charge of simple assault. *See Dupree*, 544 F.2d at 1052 ("[A]n assault is an attempted battery and proof of a battery will support conviction of assault"); *Cf. Bayes*, 210 F.3d at 69 ("in a prosecution for simple assault . . . , it is sufficient to show that the defendant deliberately touched another in a patently offensive manner without justification or excuse"). The attempted battery form of assault is, like all other forms of attempt, a specific intent crime. *See* Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* § 7.16, at 312 (1986) ("LaFave & Scott"). Thus, the defendant must have specifically intended to commit a battery—i.e., he must have specifically intended to "to cause physical injury to the victim." *See id.* Some courts construe that physical injury to extend to offensive touchings. An offensive touching can be anything from attempting to spit on someone to trying to touch someone's buttocks. *See Bayes*, 210 F.3d at 69; *United States v. Frizzi*, 491 F.2d 1231, 1232 (1st Cir. 1974). *See also United States v. Whitefeather*, 275 F.3d 741, 743 (8th Cir. 2002) (urinating on victim was an offensive touching). And as one of the leading commentators explains, "[a]n attempt to commit any crime requires that the attempting party come pretty close to committing it." Wayne R. LaFave, *Criminal Law*, § 7.16, at 745 (3d ed. 2000) ("LaFave"). In the context of interrogations, if, for example, an interrogator attempted to slap the detainee, such an act would constitute simple assault. On the other hand, changing the detainee's environment such as by altering the lighting or temperature would not constitute simple assault.

Simple assault also includes the placement of another in reasonable apprehension of immediate bodily harm. To convict a defendant of this type of assault, the prosecution must establish that: (1) the defendant intended to cause apprehension of immediate bodily harm; (2) the victim actually experienced such apprehension; and (3) the defendant engaged in some conduct that reasonably arouses such apprehension. *See, e.g., United States v. Skeet*, 665 F.2d 983, 986–87 (9th Cir. 1982) (defendant's actions must actually cause victim apprehension); *United States v. Sampson*, No. 00-50689, 2002 WL 1478552, at *2 (9th Cir. July 10, 2002) (where defendant's firing of a gun failed to frighten police officer because he had not heard the gun fire or seen the defendant fire the gun the defendant had not committed simple assault); LaFave, § 7.16, at 747.[27] In interrogating a detainee, if interrogators were to, for example, show a detainee a device for electrically shocking him and to threaten to use it should he refuse to divulge information, such an action would constitute this type of assault. In so doing, the interrogator would have intended to cause apprehension of immediate bodily harm, it would have been reasonable for the detainee to experience such apprehension, and more than likely he would have experienced such apprehension.

Second, section 113(a)(4) proscribes assault by "striking, beating, or wounding."[28] This crime requires only general intent. *See, e.g., United States v. Felix*, 996 F.2d 203, 207 (8th Cir.

---

[27] Some courts have labeled this requirement of reasonable apprehension as the requirement that the defendant had the "present apparent ability" to inflict harm. *See Fallen*, 256 F.3d at 1088 (defendant's "repeated assertion that he had a gun and was willing to use it" sufficed to establish that the defendant had the "present apparent ability" to harm victim). Under either formulation, the inquiry is still one that looks to whether the circumstances would have caused a reasonable person to think that the defendant would harm her.

[28] This form of assault carries a penalty of up to six months' imprisonment, a fine, or both. 18 U.S.C. § 113(a)(4).

UNCLASSIFIED        SECRET/NOFORN

SECRET/NOFORN

1993) (general intent crime). Courts have construed this section to preclude essentially what at common law would have been simple battery. *See, e.g., United States v. Chavez*, 204 F.3d 1305, 1317 (11th Cir. 2000); *United States v. Duran*, 127 F.3d 911, 915 (10th Cir. 1997). By contrast to the simple assault section 113(a)(5) proscribes, this subsection requires that a defendant make physical contact with the victim. *See Estrada-Fernandez*, 150 F.3d at 494; *United States v. Johnson*, 637 F.2d 1224, 1242 n.26 (9th Cir. 1980). Notably, however, assault by striking, beating, or wounding "requires no particular degree of severity in the injury" to the victim. *Felix*, 996 F.2d at 207. *See Chavez*, 204 F.3d at 1317 (same). Because this section requires physical contact, interrogation methods that do not involve physical contact will not run afoul of this section.

Before turning to the remaining types of assault that section 113 proscribes, it bears noting that both simple assault and assault by striking, beating or wounding are punishable by a maximum sentence of six months' imprisonment, a fine, or both. *See* 18 U.S.C. § 113(a)(5); *id.* § 113(a)(4).[29] Because the maximum sentence for each of these crimes is less than a year, charges brought against a member of the Armed Forces subject to the UCMJ or those employed by or accompanying the Armed Forces for either of these crimes would not bring that member within the scope of 18 U.S.C. § 3261(a). As a result, a member of the Armed Forces engaging in such conduct at a military base, such as GTMO, would be within the special maritime and territorial jurisdiction of the United States and could be prosecuted for this offense in an Article III court, subject, of course, to any defenses or any protections stemming from the exercise of the President's constitutional authority. If, however, members of the Armed Forces were engaging in such conduct on a foreign state's military base, they would not be covered by 3261(a) nor would they be within the special maritime and territorial jurisdiction. The remaining types of assault prohibited under section 113(a) addressed below would, however, bring a member of the Armed Forces or someone employed by or accompanying the Armed Forces squarely within section 3261(a).

Section 113 proscribes assault resulting in "serious bodily injury" and assault resulting in "substantial bodily injury to an individual who has not attained the age of 16 years." 18 U.S.C. § 113(a)(6); *id.* § 113(a)(7). These crimes are general intent crimes. *See, e.g., United States v. Belgard*, 894 F.2d 1092, 1095 n.1 (9th Cir. 1990); *Felix*, 996 F.2d at 207. To establish assault resulting in serious bodily injury, the prosecution must prove that the defendant "assault[ed] the victim and that the assault happen[ed] to result" in the necessary level of injury. *United States v. Davis*, 237 F.3d 942, 944 (8th Cir. 2001). "Serious bodily injury" is defined as "bodily injury which involves . . . a substantial risk of death; . . . extreme physical pain; . . . protracted and obvious disfigurement; or . . . protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365(g)(3) (2000); *see id.* § 113(b)(2) ("[T]he term 'serious bodily injury' has the meaning given that term in section 1365 of this title.").[30] By contrast, section 113(b)(1) defines "substantial bodily injury" as "bodily injury which involves . .

---

[29] If, however, an individual were charged with the simple assault of a person "who has not attained the age of 16 years," that individual would face a maximum sentence of up to one year in prison. This charge still would not bring a member of the Armed Forces or those accompanying or employed by the Armed Forces within section 3261(a)'s coverage because the conduct must constitute an offense punishable by more than a year in prison.

[30] 18 U.S.C. § 1365(g)(4) further defines "bodily injury" to mean: (1) "a cut, abrasion, bruise, burn, or disfigurement"; (2) "physical pain"; (3) "illness"; (4) "impairment of the function of a bodily member, organ, or mental faculty"; (5) "or any other injury to the body no matter how temporary."

SECRET/NOFORN

. a temporary or substantial disfigurement; or . . . a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty." *Id.* § 113(b)(1). Thus, an assault resulting in serious bodily injury requires a more severe injury, that in some instances may have a more lasting impact on the victim than that which might be considered "substantial bodily injury."

No court has definitively addressed the minimum thresholds of injury necessary to rise to the level of "substantial bodily injury" or "serious bodily injury," respectively. Nonetheless, reported opinions regarding these crimes offer some idea as to the severity and type of injuries that would be sufficient to establish violations of these subsections. With respect to substantial bodily injury, for example, a defendant was convicted of assault resulting in substantial bodily injury for injuries to the victim that included: fracturing the victim's skull, burning his face, and biting him, which left a human bite mark on the victim's leg. *See United States v. Brown*, 287 F.3d 684, 687 (8th Cir. 2002). And in *In re Murphy*, No. 98-M-168, 1998 WL 1179109 (W.D.N.Y. June 30, 1998), the magistrate concluded that "a loss of consciousness and a two-day stay in the sick room could qualify as allegations of substantial bodily injury." *Id.* at *6. With respect to serious bodily injury, evidence establishing that the victim's cheekbone and eye socket were fractured, and a large laceration created, requiring the victim to undergo reconstructive surgery and leaving her suffering from a permanent disfigurement, established that she had suffered serious bodily injury. *See United States v. Waloke*, 962 F.2d 824, 827 (8th Cir. 1992). With respect to "serious bodily injury," in *United States v. Dennison*, 937 F.2d 559 (10th Cir. 1991), the Tenth Circuit concluded that the infliction of seven lacerations over the victim's neck and chest that required extensive suturing and had produced scarring "involve[ing] a 'substantial risk of . . . protracted and obvious disfigurement.'" *Id.* at 562. And in *United States v. Brown*, 276 F.3d 930 (7th Cir.), *cert. denied*, 123 S. Ct. 126 (2002), the Seventh Circuit concluded that the tearing of a muscle in the victim's calf and leg that required hospitalization and crutches did not constitute protracted loss or impairment of the function of the leg nor did it cause disfigurement within the meaning of section 1365(g). *See id.* at 931–32. Nonetheless, the court concluded that because the victim had suffered from extreme pain for eight days due to the injuries sustained to his leg, he had suffered serious bodily injury. *See id.*

It bears emphasizing that for the purposes of sections 113(a)(6) and 113(a)(7) the concepts of serious bodily injury and substantial bodily injury include injury to an individual's mental faculties. *See, e.g., United States v. Lowe*, 145 F.3d 45, 53 (1st Cir. 1998); 18 U.S.C. § 113(b)(1)(B); *id.* § 1365(g)(3). We have not, however, found any reported cases in which a mental harm absent physical contact constituted assault. For example, in *Lowe*, the only reported case in which mental harm fulfilled the serious bodily injury requirement for the purposes of assault under this section, the defendant kidnapped and raped the victim and this physical brutality caused her mental harm. *See id.* at 48. We note that with the exception of the undefined reference to "mental faculties," all of the injuries described in the statute connote some (and more likely extensive) physical contact with the victim. In defining substantial bodily injury, for example, the statute speaks in terms of disfigurement, or loss of the function of some bodily member or organ. In the case of serious bodily injury, the statute reaches more serious injuries to include those injuries that bear a substantial risk of death, result in extreme physical pain, as well as protracted disfigurement or the impairment of a bodily member or organ. The "impairment" of one's "mental faculty" might be construed in light of the obvious physical

contact required for all other injuries listed in the statute. Moreover, these crimes must be construed consistently with the common law definitions of assault and battery. Simple assault, as we explained above, is a specific intent crime and requires no physical contact. By contrast, battery is a general intent crime and requires physical contact. Courts have construed assault resulting in serious bodily harm to require only general intent, rendering it akin to battery in that regard and thereby suggesting that it too requires actual physical contact. Indeed, the only other general intent crime under section 113 is assault by striking, beating, or wounding. Courts have construed that form of assault to be the equivalent of simple battery, requiring actual physical contact as an element. Thus, given the requisite intent and remainder of the other injuries that constitute serious bodily injury or substantial bodily injury, we believe the better view of these forms of assault is that they require actual physical contact. Indeed, no court has found mental harm in the absence of physical contact sufficient to satisfy the requisite injury. Nonetheless, we cannot conclude with certainty that no court would make such a finding.

In the context of interrogations, we believe that interrogation methods that do not involve physical contact will not support a charge of assault resulting in substantial injury or assault resulting in serious bodily injury or substantial bodily injury. Moreover, even minimal physical contact, such as poking, slapping, or shoving the detainee, is unlikely to produce the injury necessary to establish either one of these types of assault.

Section 113(a)(3) prohibits "assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse." To establish this type of assault, the prosecution must prove that the defendant "(1) assaulted the victim (2) with a dangerous weapon (3) with the intent to do bodily harm." *Estrada-Fernandez*, 150 F.3d at 494. *See also United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990) (to establish assault with a dangerous weapon, the prosecution must establish that the defendant acted with the specific intent to commit bodily harm). It does not, however, require the defendant to make physical contact with the victim. *See Estrada-Fernandez*, 150 F.3d at 494; *United States v. Duran*, 127 F.3d 911 (10th Cir. 1997). It is also therefore not necessary for the victim to have suffered actual bodily injury. *See United States v. Phelps*, 168 F.3d 1048, 1056 (8th Cir. 1999) ("The government is required to present sufficient evidence only that the appellant assaulted the victim with an object capable of inflicting bodily injury, *and not that the victim actually suffered bodily injury* as a result of the assault.") (emphasis added).

Although the statutory text provides that this type of assault must be committed "without just cause or excuse," courts have held that the prosecution is not required to establish the absence of just cause or excuse. Instead, these are affirmative defenses for which the defendant bears the burden. *See United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982); *United States v. Phillippi*, 655 F.2d 792, 793 (7th Cir. 1981); *Hockenberry v. United States*, 422 F.2d 171, 173 (9th Cir. 1970); *United States v. Peters*, 476 F. Supp. 259, 262 (E.D. Wis. 1979). *See also United States v. Jackson*, No. 99-4388, 2000 WL 194284, at *2 (4th Cir. Feb. 18, 2000) (unpublished opinion) (following *Guilbert*).[31]

---

[31]  Although it could be argued that this subsection's express mention of "just cause or excuse" indicate that such defenses are not available with respect to the other types of assault under section 113, we believe that the better view is that these affirmative defenses remain available. As we explain *infra* Part IV, absent a clear statement eliminating such defenses, they remain available.

SECRET//NOFORN

An item need not fall within the classic examples of dangerous weapons—e.g., a knife or a gun—to constitute a "dangerous weapon" for the purposes of section 113(a)(3). Instead, the touchstone for whether an object is a "dangerous weapon" is whether it has been used in a manner likely to cause serious injury. *See Guilbert*, 692 F.2d at 1343; *United States v. LeCompte*, 108 F.3d 948 (8th Cir. 1997); *United States v. Bey*, 667 F.2d 7, 11 (5th Cir. 1982) ("[W]hat constitutes a dangerous weapon depends not on the nature of the object itself but on its capacity, given the manner of its use to endanger life or inflict great bodily harm.") (internal quotation marks and citation omitted). *See also United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Guilbert* with approval). For example, courts have found that a telephone receiver and a broom handle can be, under certain circumstances, "dangerous weapons." *See LeCompte*, 108 F.3d at 952 (telephone receiver); *Estrada-Fernandez*, 150 F.3d 491 (broom or mop handle). For that matter, a speeding car could constitute a dangerous weapon. *See United States v. Gibson*, 896 F.2d 206, 209 n.1 (6th Cir. 1990). At a minimum, however, it requires that a defendant employ some object as a dangerous weapon. Ultimately, whether or not an item constitutes a dangerous weapon is a question of fact for a jury. *See Riggins*, 40 F.3d at 1057; *Phelps*, 168 F.3d at 1055. As the Fourth Circuit has explained, "[t]he test of whether a particular object was used as a dangerous weapon is not so mechanical that it can be readily reduced to a question of law. Rather, it must be left to the jury to determine whether, under the circumstances of each case, the defendant used some instrumentality, [or] object, . . . to cause death or serious injury." *United States v. Sturgis*, 48 F.3d 784, 788 (4th Cir. 1995).[32]

Here, so long as the interrogation method does not involve a dangerous weapon, this type of assault has not been committed. Physical contact would be insufficient to demonstrate this type of assault. Methods of interrogation that involve alterations to the detainee's cell environment would not be problematic under this section, not only because no dangerous weapon would have been used, but also because such alterations are unlikely to involve the necessary intent to inflict bodily injury.

Finally, section 113 prohibits assault with intent to commit murder and assault with the intent to commit any other felony except murder or sexual abuse crimes.[33]  18 U.S.C. § 113(a)(1)–(2). Both of these crimes are specific intent crimes—the former requiring that the individual specifically intend to commit murder and the latter requiring the intent to commit a felony, such as maiming or torture. *See, e.g., United States v. Perez*, 43 F.3d 1131, 1137–38 (7th Cir. 1994). *See also* 18 U.S.C. § 114 (prohibiting maiming within the special maritime jurisdiction); *id.* § 2340A (prohibiting torture outside the United States). Although neither of these crimes requires actual physical contact with the victim, demonstrating the requisite intent may be more difficult to establish absent such contact. Here, as long as the interrogators do not intend to murder the detainee, they will not have run afoul of section 113(a)(1). Moreover, as to

---

[32] We note that one court has construed "dangerous weapon" to include the use of one's body parts. In *Sturgis*, the Fourth Circuit concluded that the defendant's teeth and mouth constituted a dangerous weapon where an HIV positive inmate bit the officer in an effort to infect the officer with HIV and the bites inflicted wounds that bled "profusely." 48 F.3d at 788.

[33] Assault with intent to commit murder carries a maximum penalty of 20 years' imprisonment. *See* 18 U.S.C. § 113(a)(1). Assault with the intent to commit any other felony may be punished by up to 10 years' imprisonment, a fine, or both. *See id.* § 113(a)(2).

section 113(a)(2), the intent to torture appears to be the most relevant. As we will explain *infra* Part II.C.2, to satisfy this intent element, the interrogator would have to intend to cause other severe physical pain or suffering or to cause prolonged mental harm. Absent such intent, the interrogator would not have committed assault with intent to torture. We caution, however, that specific intent, as will be discussed in more detail in Part II.C.2., can be inferred from the factual circumstances. *See also United States v. Hinton*, 31 F.3d 817, 822 (9th Cir. 1994).[34]

###### b.    Maiming

Another criminal statute applicable in the special maritime and territorial jurisdiction is 18 U.S.C. § 114. Section 114 makes it a crime for an individual (1) "with the intent to torture (as defined in section 2340), maim, or disfigure" to (2) "cut[], bite[], or slit[] the nose, ear, or lip, or cut[] out or disable[] the tongue, or put[] out or destroy[] an eye, or cut[] off or disable[] a limb or any member of another person." 18 U.S.C. § 114. It further prohibits individuals from "throw[ing] or pour[ing] upon another person any scalding water, corrosive acid, or caustic substance" with like intent. *Id*.[35]

The offense requires the specific intent to torture, maim or disfigure. *See United States v. Chee*, No. 98-2038, 1999 WL 261017 at *3 (10th Cir. May 3, 1999) (maiming is a specific intent crime) (unpublished opinion); *see also United States v. Salamanca*, 990 F.2d 629, 635 (D.C. Cir. 1993) (where defendant inflicted "enough forceful blows to split open [the victim's] skull, shatter his eye socket, knock out three of his teeth, and break his jaw" requisite specific intent had been established.). Moreover, the defendant's method of maiming must be one of the types the statute specifies—i.e., cutting, biting, slitting, cutting out, disabling, or putting out—and the injury must be to a body part the statute specifies—i.e., the nose, ear, lip, tongue, eye, or limb. *See United States v. Stone*, 472 F.2d 909, 915 (5th Cir. 1973). Similarly, the second set of acts applies to a very narrow band of conduct. It applies only to the throwing or pouring of some sort of scalding, corrosive, or caustic substance. *See id*.

---

[34] Although section 113 appears to encompass a wide range of conduct, particularly simple assault and assault by striking, beating or wounding, we note that there are no reported cases in which section 113 charges have been brought against a federal officer—FBI, DEA, correctional officer or any other federal officer. Certainly, in the course of completing their duties, federal officers will invariably at some point touch or attempt to touch individuals in a way that they would view as offensive, such as during the course of an arrest or in restraining an unruly inmate. Nonetheless, charges are not brought against officers for such conduct. For reasons explained in Part II.A., such actions by officers are not acts that we view as criminal.

[35] Section 114 provides in full:

> Whoever, within the special maritime and territorial jurisdiction of the United States, and with intent to torture (as defined in section 2340), maim, or disfigure, cuts, bites, or slits the nose, ear, or lip, or cuts out or disables the tongue, or puts out or destroys an eye, or cuts off or disables a limb or any member of another person; or
>
> Whoever, within the special maritime and territorial jurisdiction of the United States, and with like intent, throws or pours upon another person, any scalding water, corrosive acid, or caustic substance—
>
> Shall be fined under this title or imprisoned not more than twenty years, or both.

SECRET/NOFORN

Here, so long as the interrogation methods under contemplation do not involve the acts enumerated in section 114, the conduct of those interrogations will not fall within the purview of this statute. Because the statute requires specific intent, i.e., the intent to maim, disfigure or torture, the absence of such intent is a complete defense to a charge of maiming.

### c.    Interstate Stalking

Section 2261A of Title 18 prohibits "[w]hoever . . . travels in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States . . . with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to that person."[36] Thus, there are three elements to a violation of section 2261A: (1) the defendant traveled in interstate or foreign commerce or within the special maritime and territorial jurisdiction; (2) he did so with the intent to injure, harass, intimidate another person; (3) the person he intended to harass or injure was reasonably placed in fear of death or serious bodily injury as a result of that travel. *See United States v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir.), *cert. denied*, 122 S. Ct. 2638 (2002).

To establish the first element, the prosecution need only show that the defendant engaged in interstate travel. Section 2261A also applies to "travel[] . . . *within* the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2261A(1) (emphasis added). *See also* National Defense Authorization Act for Fiscal Year 1997, H. Conf. Rep. No. 104-724, at 793 (1996) (the statute was intended to apply to "any incident of stalking involving interstate

---

[36] Section 2261A provides in full:

Whoever—

(1) travels in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, that person, a member of the immediate family (as defined in section 115) of that person, or the spouse or intimate partner of that person; or

(2) with the intent—

(A) to kill or injure a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States; or
(B) to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to—

(i) that person;
(ii) a member of the immediate family (as defined in section 115) of that person; or
(iii) a spouse or intimate partner of that person,

uses the mail or any facility of interstate or foreign commerce to engage in a course of conduct that places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii),

shall be punished as provided in section 2261(b).

SECRET/NOFORN

movement or which occurs on federal property"). Thus, travel simply *within* the special maritime and territorial jurisdiction satisfies this element. As a result, proof that an individual traveled within a military base in a foreign state would be sufficient to establish this element.

To establish the requisite intent, the prosecution must demonstrate that the defendant undertook the travel with the specific intent to harass, or intimidate another. *See Al-Zubaidy*, 283 F.3d at 809 (the defendant "must have intended to harass or injure [the victim] at the time he crossed the state line"). Thus, for example, a member of the Armed Forces who traveled to a base solely pursuant to his orders to be stationed there, and subsequently came to be involved in the interrogation of operatives, would lack the requisite intent. He would have traveled for the purpose of complying with his orders but not for the purpose of harassment. Nevertheless, because travel within the special maritime and territorial jurisdiction is also covered, the intent to travel within that base for the purpose of intimidating or harassing another person would satisfy the intent element.

In determining whether the third element has been demonstrated, a court will look to the defendant's entire course of conduct. *See id.* This third element is not fulfilled by the mere act of travel itself. *See United States v. Crawford*, No. 00-CR-59-B-S, 2001 WL 185140, at *2 (D. Me. Jan. 26, 2001) ("A plain reading of the statute makes clear that the statute requires the actor to place the victim in reasonable fear, rather than, as Defendant would have it, that his travel place the victim in reasonable fear."). Additionally, serious bodily injury has the same meaning as it does for assault resulting in serious bodily injury. *See* 18 U.S.C. § 2266(6) (for the purposes of section 2261A "[t]he term 'serious bodily injury' has the meaning stated in [18 U.S.C. §] 2119(2)"); *id.* § 2119(2) ("serious bodily injury" is defined in 18 U.S.C. § 1365); *id.* § 113 (section 1365 defines "serious bodily injury" for the purposes of "assault resulting in serious bodily injury"). Thus, an individual must have a reasonable fear of death or a reasonable fear of "bodily injury which involves . . . a substantial risk of death; . . . extreme physical pain . . . protracted and obvious disfigurement; or . . . protracted loss or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 1365(g).[37]

## C.     Criminal Prohibitions Applicable to Conduct Occurring Outside the Jurisdiction of the United States

There are two criminal prohibitions that apply to the conduct of U.S. persons outside the United States: the War Crimes Act, 18 U.S.C. § 2441, and the prohibition against torture, 18 U.S.C. §§ 2340–2340A. We conclude that the War Crimes Act does not apply to the interrogation of al Qaeda and Taliban detainees because, as illegal belligerents, they do not qualify for the legal protections under the Geneva or Hague Conventions that section 2441 enforces. In regard to section 2340, we conclude that the statute, by its terms, does not apply to interrogations conducted within the territorial United States or on permanent military bases outside the territory of the United States. Nonetheless, we identify the relevant substantive

---

[37] The use of such interrogation techniques as alterations in the lighting, e.g., around the clock lighting of the cell, or changes in the detainee's diet, e.g., using something akin to the Nutraloaf used in prisons, could not be said to reasonably cause a detainee to fear for his life or to fear that he will suffer serious bodily injury. It is important, however, to bear in mind that the entire course of the interrogations must be examined to determine whether the person has been reasonably placed in fear of death or serious bodily injury.

SECRET/NOFORN

standards regarding the prohibition on torture should interrogations occur outside that jurisdictional limit.

### 1.    War Crimes

Section 2441 of Title 18 criminalizes the commission of war crimes by U.S. nationals and members of the U.S. Armed Forces.[38] It criminalizes such conduct whether it occurs inside or outside the United States, including conduct within the special maritime and territorial jurisdiction. *See id.* § 2441(a). Subsection (c) of section 2441 defines "war crimes" as (1) grave breaches of any of the Geneva Conventions; (2) conduct prohibited by certain provisions of the Hague Convention IV, Hague Convention IV Respecting the Laws and Customs of War on Land, Oct.18, 1907, 36 Stat. 2277;[39] or (3) conduct that constitutes a violation of common Article 3 of the Geneva Conventions. We have previously concluded that this statute does not apply to conduct toward the members of al Qaeda and the Taliban. *See Treaties and Laws Memorandum* at 8–9. We reached this conclusion because we found al Qaeda to be a non-governmental terrorist organization whose members are not legally entitled to the protections of

---

[38] Section 2441 provides in full:

(a) Offense.—Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.

(b) Circumstances.—The circumstances referred to in subsection (a) are that the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States (as defined in section 101 of the Immigration and Nationality Act).

(c) Definition.—As used in this section the term 'war crime' means any conduct—
 (1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;
 (2) prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;
 (3) which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non- international armed conflict; or
 (4) of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.

[39] With respect to the Hague Convention IV, section 2441(c)(2) criminalizes conduct barred by articles 23, 25, 27, 28, of the Annex to the Hague Convention IV. Under the Hague Convention, the conduct in these articles, like all of the regulations the Annex contains, is prohibited solely as between parties to the Convention. Hague Convention IV, art. 2 ("The provisions contained in the Regulations referred to in Article 1, as well as in the present Convention, do not apply except between Contracting Powers, and then only if all the belligerents are parties to the Convention."). Since Afghanistan is not a party to the Hague Convention IV, no argument could be made that the Convention covers the Taliban. As a non-state, al Qaeda is likewise not a party to the Hague Convention IV. Moreover, Hague Convention IV requires that belligerents meet the same requirements that they must meet in order to receive the protections of GPW, which al Qaeda and the Taliban do not meet. Thus, conduct toward enemy combatants in the current war would not fall within the conduct proscribed by these articles.

**UNCLASSIFIED**        SECRET/NOFORN

GPW. Since its members cannot be considered to be POWs under the Convention, conduct toward members of al Qaeda could not constitute a grave breach of the Geneva Conventions. *See* 18 U.S.C. § 2441(c)(1). We further found that common Article 3 of the Geneva Conventions covers either traditional wars between state parties to the convention or non-international civil wars, but not an international conflict with a non-governmental terrorist organization. As a result, conduct toward members of al Qaeda could not constitute a violation of common Article 3, see *Treaties and Law Memorandum* at 9, and thus could not violate Section 2441(c)(3).

We also concluded that the President had reasonable grounds to find that the Taliban had failed to meet the requirements for POW status under GPW. *See* Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, *Re: Status of Taliban Forces Under Article 4 of the Third Geneva Convention of 1949* at 3 (Feb. 7, 2002). On February 7, 2002, the President determined that these treaties did not protect either the Taliban or al Qaeda. *See* Statement by White House Press Secretary Ari Fleischer, *available at* http://www.us-mission.ch/press2002/0802fleischerdetainees.htm (Feb. 7, 2002).[40]

Thus, section 2441 is inapplicable to conduct toward members of the Taliban or al Qaeda. We further note that the *Treaties and Law Memorandum* is the Justice Department's binding interpretation of the War Crimes Act, and it will preclude any prosecution under it for conduct toward members of the Taliban and al Qaeda. *See* Letter for William H. Taft, IV, Legal Adviser, Department of State, from John C. Yoo, Deputy Assistant Attorney General, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel (Jan. 14, 2002).

2.      18 U.S.C. §§ 2340–2340A

Section 2340A of Title 18 makes it a criminal offense for any person "outside the United States [to] commit[] or attempt[] to commit torture."[41] The statute defines "the United States" as "all areas under the jurisdiction of the United States including any of the places described in" 18 U.S.C. § 5,[42] and 18 U.S.C.A. § 7.[43] 18 U.S.C. § 2340(3).[44] Therefore, to the extent that

---

[40] *See also* Fact Sheet: Status of Detainees at Guantanamo *available at* http://www.whitehouse.gov/news/releases/2002/02/20020207-13.html.

[41] If convicted of torture, a defendant faces a fine or up to twenty years' imprisonment or both. If, however, the act resulted in the victim's death, a defendant may be sentenced to life imprisonment or to death. *See* 18 U.S.C.A. § 2340A(a). Whether death results from the act also affects the applicable statute of limitations. Where death does not result, the statute of limitations is eight years; if death results, there is no statute of limitations. *See* 18 U.S.C.A. § 3286(b) (West Supp. 2002); *id.* § 2332b(g)(5)(B) (West Supp. 2002). Section 2340A as originally enacted did not provide for the death penalty as a punishment. *See* Omnibus Crime Bill, Pub. L. No.103-322, Title VI, Section 60020, 108 Stat. 1979 (1994) (amending section 2340A to provide for the death penalty); H. R. Conf. Rep. No. 103-711, at 388 (1994) (noting that the act added the death penalty as a penalty for torture).

Most recently, the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), amended section 2340A to expressly codify the offense of conspiracy to commit torture. Congress enacted this amendment as part of a broader effort to ensure that individuals engaged in the planning of terrorist activities could be prosecuted irrespective of where the activities took place. *See* H. R. Rep. No. 107-236, at 70 (2001) (discussing the addition of "conspiracy" as a separate offense for a variety of "Federal terrorism offense[s]").

[42] 18 U.S.C. § 5 (2000) provides: "The term 'United States', as used in this title in a territorial sense, includes all places and waters, continental or insular, subject to the jurisdiction of the United States, except the Canal Zone." As we understand it, the persons discussed in this memorandum are not within United States as it is defined in section 5.

**UNCLASSIFIED**           SECRET/NOFORN

SECRET/NOFORN
35

interrogations take place within the special maritime and territorial jurisdiction, such as at a U.S. military base in a foreign state, the interrogations are not subject to sections 2340–2340A. If, however, the interrogations take place outside the special maritime and territorial jurisdiction and are otherwise outside the United States, the torture statute applies. Thus, for example, interrogations conducted at GTMO would not be subject to this prohibition, but interrogations conducted at a non-U.S. base in Afghanistan would be subject to section 2340A.[45]

Moreover, we note that because the statute criminalizes conduct only when it is committed outside the United States—which under section 2340(3) means it must be committed outside the special maritime jurisdiction—the proviso contained in 18 U.S.C.A. § 7(9) excluding those persons covered by 18 U.S.C. § 3261(a) does *not* apply. As discussed above, this proviso excluding members of the Armed Forces, those employed by the Armed Forces or the Department of Defense, and those persons accompanying members of the Armed Forces or their employees applies *only* when their conduct is a felony if committed *within* the special maritime and territorial jurisdiction of the United States. *See id.* Here, the conduct under section 2340A is a felony only when committed outside the special maritime and territorial jurisdiction. Thus, so long as members of the Armed Forces and those accompanying or employed by the Armed Forces are in an area that 18 U.S.C. § 7 defines as part of the special maritime and territorial jurisdiction, they too are within the special maritime and territorial jurisdiction for the purposes

---

[43] 18 U.S.C. § 7, as discussed *supra* Part II.B., defines the special maritime and territorial jurisdiction of the United States.

[44] The statute further includes those places described in 49 U.S.C. § 46501(2) (2000), which sets forth the special aircraft jurisdiction. Under section 46501(2), the special aircraft jurisdiction includes "any of the following aircraft *in flight*":

> (A) a civil aircraft of the United States.
> (B) an aircraft of the armed forces of the United States.
> (C) another aircraft in the United States.
> (D) another aircraft outside the United States—
> > (i) that has its next scheduled destination or last place of departure in the United States, if the aircraft next lands in the United States;
> > (ii) on which an individual commits an offense (as defined in the Convention for the Suppression of Unlawful Seizure of Aircraft) if the aircraft lands in the United States with the individual still on the aircraft; or
> > (iii) against which an individual commits an offense (as defined in subsection (d) or (e) of article I, section I of the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation) if the aircraft lands in the United States with the individual still on the aircraft.
> (E) any other aircraft leased without crew to a lessee whose principal place of business is in the United States or, if the lessee does not have a principal place of business, whose permanent residence is in the United States.

(Emphasis added).

[45] We also note that there are several statutes that would permit the prosecution of individuals who, while not conducting the interrogations themselves, were otherwise involved in the interrogations. Section 2340A(c) expressly criminalizes conspiracy to commit torture. 18 U.S.C. § 2339A makes it an offense to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or carrying out, a violation of section . . . 2340A." *Id.* § 2339A(a). As a general matter, the federal criminal code also provides for accessory liability. *See* 18 U.S.C. § 2 (accessory punishable as principal); 18 U.S.C. § 3 (accessory after the fact).

---

              SECRET/NOFORN

SECRET/NOFORN

36

of the conduct section 2340A criminalizes. Accordingly, they are considered to be within the United States for purposes of that statute. The criminal prohibition against torture therefore would not apply to their conduct of interrogations at U.S. military bases located in a foreign state. If, however, such persons are involved in interrogations outside the special maritime and territorial jurisdiction and outside the United States, they are subject to the prohibition against torture as well as those criminal statutes applicable to the special maritime and territorial jurisdiction.

Section 2340 defines the act of torture as an:

> act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control.

18 U.S.C.A. § 2340(1); *see id.* § 2340A. Thus, to establish the offense of torture, the prosecution must show that: (1) the torture occurred outside the United States; (2) the defendant acted under the color of law; (3) the victim was within the defendant's custody or physical control; (4) the defendant specifically intended to cause severe physical or mental pain or suffering; and (5) that the act inflicted severe physical or mental pain or suffering. *See also* S. Exec. Rep. No. 101-30, at 6 (1990) ("For an act to be 'torture,' it must . . . cause severe pain and suffering, and be intended to cause severe pain and suffering.").[46]

At the outset we note that no prosecutions have been brought under section 2340A. There is therefore no case law interpreting sections 2340–2340A. In light of this paucity of case law, we have discussed at length below the text of the statute, its legislative history, and the judicial interpretation of a closely related statute—the Torture Victims Protection Act—in order to provide guidance as to the meaning of the elements of torture.

a.    **"Specifically Intended"**

To violate section 2340A, the statute requires that severe pain and suffering be inflicted with specific intent. *See* 18 U.S.C. § 2340(1). For a defendant to act with specific intent, he must expressly intend to achieve the forbidden act. *See United States v. Carter*, 530 U.S. 255, 269 (2000); *Black's Law Dictionary* at 814 (7th ed. 1999) (defining specific intent as "[t]he intent to accomplish the precise criminal act that one is later charged with"). For example, in *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994), the statute at issue was construed to require that the defendant act with the "specific intent to commit the crime." (Internal quotation marks and citation omitted). As a result, the defendant had to act with the express "purpose to disobey the law" for the *mens rea* element to be satisfied. *Id.* (internal quotation marks and citation omitted)

Here, because section 2340 requires that a defendant act with the specific intent to inflict severe pain, the infliction of such pain must be the defendant's precise objective. If the statute

---

[46] For the purposes of our analysis, we have assumed that interrogators would be acting under color of law and that the person interrogated would be within the custody or control of those interrogators.

**UNCLASSIFIED**              SECRET/NOFORN

had required only general intent, it would be sufficient to establish guilt by showing that the defendant "possessed knowledge with respect to the *actus reus* of the crime." *Carter*, 530 U.S. at 268. If the defendant acted knowing that severe pain or suffering was reasonably likely to result from his actions, but no more, he would have acted only with general intent. *See id.* at 269; *Black's Law Dictionary* 813 (7th ed. 1999) (explaining that general intent "usu[ally] takes the form of recklessness (involving actual awareness of a risk and the culpable taking of that risk) or negligence (involving blameworthy inadvertence)"). The Supreme Court has used the following example to illustrate the difference between these two mental states:

> [A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

*Carter*, 530 U.S. at 268 (citing 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 3.5, at 315 (1986)).

As a theoretical matter, therefore, knowledge alone that a particular result is certain to occur does not constitute specific intent. As the Supreme Court explained in the context of murder, "the . . . common law of homicide distinguishes . . . between a person who knows that another person will be killed as a result of his conduct and a person who acts with the specific purpose of taking another's life[.]" *United States v. Bailey*, 444 U.S. 394, 405 (1980). "Put differently, the law distinguishes actions taken 'because of' a given end from actions taken 'in spite' of their unintended but foreseen consequences." *Vacco v. Quill*, 521 U.S. 793, 802–03 (1997). Thus, even if the defendant knows that severe pain will result from his actions, if causing such harm is not his objective, he lacks the requisite intent. While as a theoretical matter such knowledge does not constitute specific intent, juries are permitted to infer from the factual circumstances that such intent is present. *See, e.g., United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001); *United States v. Karro*, 257 F.3d 112, 118 (2d Cir. 2001); *United States v. Wood*, 207 F.3d 1222, 1232 (10th Cir. 2000); *Henderson v. United States*, 202 F.2d 400, 403 (6th Cir.1953). Therefore, when a defendant knows that his actions will produce the prohibited result, a jury will in all likelihood conclude that the defendant acted with specific intent.

Further, an individual who acts with a good faith belief that his conduct would not produce the result that the law prohibits would not have the requisite intent. *See, e.g., South Atl. Lmtd. Ptrshp. of Tenn. v. Reise*, 218 F.3d 518, 531 (4th Cir. 2002). Where a defendant acts in good faith, he acts with an honest belief that he has not engaged in the proscribed conduct. *See Cheek v. United States*, 498 U.S. 192, 202 (1991); *United States v. Mancuso*, 42 F.3d 836, 837 (4th Cir. 1994). A good faith belief need not be a reasonable one. *See Cheek*, 498 U.S. at 202.

Although a defendant theoretically could hold an unreasonable belief that his acts would not constitute the actions the statute prohibits, even though they would as a certainty produce the prohibited effects, as a matter of practice it is highly unlikely that a jury would acquit in such a situation. Where a defendant holds an unreasonable belief, he will confront the problem of

SECRET/NOFORN

38

proving to the jury that he actually held that belief. As the Supreme Court noted in *Cheek*, "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury . . . will find that the Government has carried its burden of proving" intent. *Id.* at 203–04. As we explained above, a jury will be permitted to infer that the defendant held the requisite specific intent. As a matter of proof, therefore, a good faith defense will prove more compelling when a reasonable basis exists for the defendant's belief.

> b.      "Severe Pain or Suffering"

The key statutory phrase in the definition of torture is the statement that acts amount to torture if they cause "severe physical or mental pain or suffering." In examining the meaning of a statute, its text must be the starting point. *See INS v. Phinpathya*, 464 U.S. 183, 189 (1984). Section 2340 makes plain that the infliction of pain or suffering per se, whether it is physical or mental, is insufficient to amount to torture. Instead, the pain or suffering must be "severe." The statute does not, however, define the term "severe." "In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The dictionary defines "severe" as "[u]nsparing in exaction, punishment, or censure" or "[I]nflicting discomfort or pain hard to endure; sharp; afflictive; distressing; violent; extreme; as *severe* pain, anguish, torture." *Webster's New International Dictionary* 2295 (2d ed. 1935); *see American Heritage Dictionary of the English Language* 1653 (3d ed. 1992) ("extremely violent or grievous: *severe* pain") (emphasis in original); IX *The Oxford English Dictionary* 572 (1978) ("Of pain, suffering, loss, or the like: Grievous, extreme" and "of circumstances . . .: hard to sustain or endure"). Thus, the adjective "severe" conveys that the pain or suffering must be of such a high level of intensity that the pain is difficult for the subject to endure.

Congress's use of the phrase "severe pain" elsewhere in the U. S. Code can shed more light on its meaning. *See, e.g., West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991) ("[W]e construe [a statutory term] to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law."). Significantly, the phrase "severe pain" appears in statutes defining an emergency medical condition for the purpose of providing health benefits. *See, e.g.,* 8 U.S.C. § 1369 (2000); 42 U.S.C § 1395w-22 (2000); *id.* § 1395x (2000); *id.* § 1395dd (2000); *id.* § 1396b (2000); *id.* § 1396u-2 (2000). These statutes define an emergency condition as one "manifesting itself by acute symptoms of sufficient severity (including *severe pain*) such that a prudent lay person, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in—placing the health of the individual . . . (i) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." *Id.* § 1395w-22(d)(3)(B) (emphasis added). Although these statutes address a substantially different subject from section 2340, they are nonetheless helpful for understanding what constitutes severe physical pain. They treat severe pain as an indicator of ailments that are likely to result in permanent and serious physical damage in the absence of immediate medical treatment. Such damage must rise to the level of death, organ failure, or the permanent impairment of a significant body function. These statutes suggest that to constitute torture "severe pain" must rise to a similarly high level—the level that would ordinarily be associated

SECRET/NOFORN

with a physical condition or injury sufficiently serious that it would result in death, organ failure, or serious impairment of body functions.[47]

### c.     "Severe mental pain or suffering"

Section 2340 gives more express guidance as to the meaning of "severe mental pain or suffering." The statute defines "severe mental pain or suffering" as:

> the prolonged mental harm caused by or resulting from—
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

18 U.S.C. § 2340(2). To prove "severe mental pain or suffering," the statute requires proof of "prolonged mental harm" that was caused by or resulted from one of four enumerated acts. We consider each of these elements.

### i.     "Prolonged Mental Harm"

As an initial matter, section 2340(2) requires that the severe mental pain must be evidenced by "prolonged mental harm." To prolong is to "lengthen in time" or to "extend the duration of, to draw out." *Webster's Third New International Dictionary* 1815 (1988); *Webster's New International Dictionary* 1980 (2d ed. 1935). Accordingly, "prolong" adds a temporal dimension to the harm to the individual, namely, that the harm must be one that is endured over some period of time. Put another way, the acts giving rise to the harm must cause some lasting, though not necessarily permanent, damage. For example, the mental strain experienced by an

---

[47] One might argue that because the statute uses "or" rather than "and" in the phrase "pain or suffering" that "severe physical suffering" is a concept distinct from "severe physical pain." We believe the better view of the statutory text is, however, that they are not distinct concepts. The statute does not define "severe mental pain" and "severe mental suffering" separately. Instead, it gives the phrase "severe mental pain or suffering" a single definition. Because "pain or suffering" is a single concept for the purposes of "severe mental pain or suffering," it should likewise be read as a single concept for the purposes of "severe physical pain or suffering." Moreover, dictionaries define the words "pain" and "suffering" in terms of each other. *Compare, e.g., Webster's Third New International Dictionary* 2284 (1993) (defining suffering as "the endurance of . . . pain" or "a pain endured"); *Webster's Third New International Dictionary* 2284 (1986) (same); XVII *The Oxford English Dictionary* 125 (2d ed. 1989) (defining suffering as "the bearing or undergoing of pain"); *with, e.g., Random House Webster's Unabridged Dictionary* 1394 (2d ed. 1999) (defining "pain" as "physical suffering"); *The American Heritage Dictionary of the English Language* 942 (College ed. 1976) (defining pain as "suffering or distress"). Further, even if we were to read the infliction of severe physical suffering as distinct from severe physical pain, it is difficult to conceive of such suffering that would not involve severe physical pain. Accordingly, we conclude that "pain or suffering" is a single concept in section 2340.

individual during lengthy and intense questioning by law enforcement would not violate section 2340(2). On the other hand, the development of a mental disorder such as posttraumatic stress disorder, which can last months or even years, or even chronic depression, which also can last for a considerable period of time if untreated, might satisfy the prolonged harm requirement. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 426, 439–45 (4th ed. 1994) ("DSM-IV"). *See also* Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 509 (1997) (noting that posttraumatic stress disorder is frequently found in torture victims); *cf.* Sana Loue, *Immigration Law and Health* § 10:46 (2001) (recommending evaluating for post-traumatic stress disorder immigrant-client who has experienced torture).[48] By contrast to "severe pain," the phrase "prolonged mental harm" appears nowhere else in the U.S. Code nor does it appear in relevant medical literature or international human rights reports.

Not only must the mental harm be prolonged to amount to severe mental pain and suffering, but also it must be caused by or result from one of the acts listed in the statute. In the absence of a catchall provision, the most natural reading of the predicate acts listed in section 2340(2)(A)–(D) is that Congress intended it to be exhaustive. In other words, other acts not included within section 2340(2)'s enumeration are not within the statutory prohibition. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusio alterius.*"); Norman Singer, 2A *Sutherland on Statutory Construction* § 47.23 (6th ed. 2000) ("[W]here a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions.") (footnotes omitted). We conclude that torture within the meaning of the statute requires the specific intent to cause prolonged mental harm by one of the acts listed in section 2340(2).

A defendant must specifically intend to cause prolonged mental harm for the defendant to have committed torture. It could be argued that a defendant needs to have specific intent only to commit the predicate acts that give rise to prolonged mental harm. Under that view, so long as the defendant specifically intended to, for example, threaten a victim with imminent death, he would have had sufficient *mens rea* for a conviction. According to this view, it would be necessary for a conviction to show only that the victim suffered prolonged mental harm, rather than that the defendant intended to cause it. We believe that this approach is contrary to the text of the statute. The statute requires that the defendant specifically intend to inflict severe mental pain or suffering. Because the statute requires this mental state with respect to the infliction of severe mental pain, and because it expressly defines severe mental pain in terms of prolonged

---

[48] The DSM-IV explains that posttraumatic disorder ("PTSD") is brought on by exposure to traumatic events, such as serious physical injury or witnessing the deaths of others and during those events the individual felt "intense fear" or "horror." *Id.* at 424. Those suffering from this disorder reexperience the trauma through, *inter alia*, "recurrent and intrusive distressing recollections of the event," "recurrent distressing dreams of the event," or "intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event." *Id.* at 428. Additionally, a person with PTSD "[p]ersistent[ly]" avoids stimuli associated with the trauma, including avoiding conversations about the trauma, places that stimulate recollections about the trauma; and they experience a numbing of general responsiveness, such as a "restricted range of affect (e.g., unable to have loving feelings)," and "the feeling of detachment or estrangement from others." *Id.* Finally, an individual with PTSD has "[p]ersistent symptoms of increased arousal," as evidenced by "irritability or outbursts of anger," "hypervigilance," "exaggerated startle response," and difficulty sleeping or concentrating. *Id.*

mental harm, that mental state must be present with respect to prolonged mental harm. To read the statute otherwise would read the phrase "the prolonged mental harm caused by or resulting from" out of the definition of "severe mental pain or suffering."

A defendant could negate a showing of specific intent to cause severe mental pain or suffering by showing that he had acted in good faith that his conduct would not amount to the acts prohibited by the statute. Thus, if a defendant has a good faith belief that his actions will not result in prolonged mental harm, he lacks the mental state necessary for his actions to constitute torture. A defendant could show that he acted in good faith by taking such steps as surveying professional literature, consulting with experts, or reviewing evidence gained from past experience. *See, e.g., Ratzlaf*, 510 U.S. at 142 n.10 (noting that where the statute required that the defendant act with the specific intent to violate the law, the specific intent element "might be negated by, e.g., proof that defendant relied in good faith on advice of counsel.") (citations omitted). All of these steps would show that he has drawn on the relevant body of knowledge concerning the result proscribed by the statute, namely prolonged mental harm. Because the presence of good faith would negate the specific intent element of torture, it is a complete defense to such a charge. *See, e.g., United States v. Wall*, 130 F.3d 739, 746 (6th Cir. 1997); *United States v. Casperson*, 773 F.2d 216, 222–23 (8th Cir.1985).

## ii. Harm Caused By Or Resulting From Predicate Acts

Section 2340(2) sets forth four basic categories of predicate acts. First on the list is the "intentional infliction or threatened infliction of severe physical pain or suffering." This provision might at first appear superfluous because the statute already provides that the infliction of severe physical pain or suffering can amount to torture. This provision, however, actually captures the infliction of physical pain or suffering when the defendant inflicts physical pain or suffering with general intent rather than the specific intent that is required where severe physical pain or suffering alone is the basis for the charge. Hence, this subsection reaches the infliction of severe physical pain or suffering when it is but the means of causing prolonged mental harm. Or put another way, a defendant has committed torture when he intentionally inflicts severe physical pain or suffering with the specific intent of causing prolonged mental harm. As for the acts themselves, acts that cause "severe physical pain or suffering" can satisfy this provision.

Additionally, the threat of inflicting such pain is a predicate act under the statute. A threat may be implicit or explicit. *See, e.g., United States v. Sachdev*, 279 F.3d 25, 29 (1st Cir. 2002). In criminal law, courts generally determine whether an individual's words or actions constitute a threat by examining whether a reasonable person in the same circumstances would conclude that a threat had been made. *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969) (holding that whether a statement constituted a threat against the president's life had to be determined in light of all the surrounding circumstances); *Sachdev*, 279 F.3d at 29 ("a reasonable person in defendant's position would perceive there to be a threat, explicit, or implicit, of physical injury"); *United States v. Khorrami*, 895 F.2d 1186, 1190 (7th Cir. 1990) (to establish that a threat was made, the statement must be made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon [another individual]") (citation and internal quotation marks omitted); *United*

*States v. Peterson*, 483 F.2d 1222, 1230 (D.C. Cir. 1973) (perception of threat of imminent harm necessary to establish self-defense had to be "objectively reasonable in light of the surrounding circumstances"). Based on this common approach, we believe that the existence of a threat of severe pain or suffering should be assessed from the standpoint of a reasonable person in the same circumstances.

Second, section 2340(2)(B) provides that prolonged mental harm, constituting torture, can be caused by "the administration or application or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality." The statute provides no further definition of what constitutes a mind-altering substance. The phrase "mind-altering substances" is found nowhere else in the U.S. Code nor is it found in dictionaries. It is, however, a commonly used synonym for drugs. *See, e.g., United States v. Kingsley*, 241 F.3d 828, 834 (6th Cir.) (referring to controlled substances as "mind-altering substance[s]") *cert. denied*, 122 S. Ct. 137 (2001); *Hogue v. Johnson*, 131 F.3d 466, 501 (5th Cir. 1997) (referring to drugs and alcohol as "mind-altering substance[s]"), *cert. denied*, 523 U.S. 1014 (1998). In addition, the phrase appears in a number of state statutes, and the context in which it appears confirms this understanding of the phrase. *See, e.g.*, Cal. Penal Code § 3500(c) (West Supp. 2000) ("Psychotropic drugs also include mind-altering . . . drugs . . . ."); Minn. Stat. Ann. § 260B.201(b) (West Supp. 2002) ("'chemical dependency treatment'" define as programs designed to "reduc[e] the risk of the use of alcohol, drugs, or other mind-altering substances").

This subparagraph, however, does not preclude any and all use of drugs. Instead, it prohibits the use of drugs that "disrupt profoundly the senses or the personality." To be sure, one could argue that this phrase applies only to "other procedures," not the application of mind-altering substances. We reject this interpretation because the terms of section 2340(2) indicate that the qualifying phrase applies to both "other procedures" *and* the "application of mind-altering substances." The word "other" modifies "procedures calculated to disrupt profoundly the senses." As an adjective, "other" indicates that the term or phrase it modifies is the remainder of several things. *See Webster's Third New International Dictionary* 1598 (1986) (defining "other" as "the one that remains of two or more") *Webster's Ninth New Collegiate Dictionary* 835 (1985) (defining "other" as "being the one (as of two or more) remaining or not included"). Or put another way, "other" signals that the words to which it attaches are of the same kind, type, or class as the more specific item previously listed. Moreover, where statutes couple words or phrases together, it "denotes an intention that they should be understood in the same general sense." Norman Singer, 2A *Sutherland on Statutory Construction* § 47:16 (6th ed. 2000); *see also Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Thus, the pairing of mind-altering substances with procedures calculated to disrupt profoundly the senses or personality and the use of "other" to modify "procedures" shows that the use of such substances must also cause a profound disruption of the senses or personality.

For drugs or procedures to rise to the level of "disrupt[ing] profoundly the senses or personality," they must produce an extreme effect. And by requiring that they be "calculated" to produce such an effect, the statute requires that the defendant has consciously designed the acts to produce such an effect. 28 U.S.C. § 2340(2)(B). The word "disrupt" is defined as "to break

asunder; to part forcibly; rend," imbuing the verb with a connotation of violence. *Webster's New International Dictionary* 753 (2d ed. 1935); *see Webster's Third New International Dictionary* 656 (1986) (defining disrupt as "to break apart: Rupture" or "destroy the unity or wholeness of"); IV *The Oxford English Dictionary* 832 (1989) (defining disrupt as "[t]o break or burst asunder; to break in pieces; to separate forcibly"). Moreover, disruption of the senses or personality alone is insufficient to fall within the scope of this subsection; instead, that disruption must be profound. The word "profound" has a number of meanings, all of which convey a significant depth. *Webster's New International Dictionary* 1977 (2d ed. 1935) defines profound as: "Of very great depth; extending far below the surface or top; unfathomable[;] . . . [c]oming from, reaching to, or situated at a depth or more than ordinary depth; not superficial; deep-seated; chiefly with reference to the body; as a *profound* sigh, wound, or pain[;] . . . [c]haracterized by intensity, as of feeling or quality; deeply felt or realized; as, *profound* respect, fear, or melancholy; hence, encompassing; thoroughgoing; complete; as, *profound* sleep, silence, or ignorance." *See Webster's Third New International Dictionary* 1812 (1986) ("having very great depth: extending far below the surface . . . not superficial"). *Random House Webster's Unabridged Dictionary* 1545 (2d ed. 1999) also defines profound as "originating in or penetrating to the depths of one's being" or "pervasive or intense; thorough; complete" or "extending, situated, or originating far down, or far beneath the surface." By requiring that the procedures and the drugs create a *profound* disruption, the statute requires more than that the acts "forcibly separate" or "rend" the senses or personality. Those acts must penetrate to the core of an individual's ability to perceive the world around him, substantially interfering with his cognitive abilities, or fundamentally alter his personality.

The phrase "disrupt profoundly the senses or personality" is not used in mental health literature nor is it derived from elsewhere in U.S. law. Nonetheless, we think the following examples would constitute a profound disruption of the senses or personality. Such an effect might be seen in a drug-induced dementia. In such a state, the individual suffers from significant memory impairment, such as the inability to retain any new information or recall information about things previously of interest to the individual. *See DSM-IV* at 134.[49] This impairment is accompanied by one or more of the following: deterioration of language function, e.g., repeating sounds or words over and over again; impaired ability to execute simple motor activities, e.g., inability to dress or wave goodbye; "[in]ability to recognize [and identify] objects such as chairs or pencils" despite normal visual functioning; or "[d]isturbances in executive level functioning," i.e., serious impairment of abstract thinking. *Id.* at 134–35. Similarly, we think that the onset of "brief psychotic disorder" would satisfy this standard. *See id.* at 302–03. In this disorder, the individual suffers psychotic symptoms, including among other things, delusions, hallucinations, or even a catatonic state. This can last for one day or even one month. *See id.* We likewise think that the onset of obsessive-compulsive disorder behaviors would rise to this level. Obsessions are intrusive thoughts unrelated to reality. They are not simple worries, but are

---

[49] Published by the American Psychiatric Association, and written as a collaboration of over a thousand psychiatrists, the DSM-IV is commonly used in U.S. courts as a source of information regarding mental health issues and is likely to be used in trial should charges be brought that allege this predicate act. *See, e.g., Atkins v. Virginia*, 122 S. Ct. 2242, 2245 n.3 (2002); *Kansas v. Crane*, 534 U.S. 407, 413–14 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 359–60 (1997); *McClean v. Merrifield*, No. 00-CV-0120E(SC), 2002 WL 1477607, at *2 n.7 (W.D.N.Y. June 28, 2002); *Peeples v. Coastal Office Prods.*, 203 F. Supp. 2d. 432, 439 (D. Md. 2002); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 519 (E.D. La. 2002).

SECRET/NOFORN

repeated doubts or even "aggressive or horrific impulses." *See id.* at 418. The DSM-IV further explains that compulsions include "repetitive behaviors (e.g., hand washing, ordering, checking)" and that "[b]y definition, [they] are either clearly excessive or are not connected in a realistic way with what they are designed to neutralize or prevent." *See id.* Such compulsions or obsessions must be "time-consuming." *See id.* at 419. Moreover, we think that pushing someone to the brink of suicide, particularly where the person comes from a culture with strong taboos against suicide, and it is evidenced by acts of self-mutilation, would be a sufficient disruption of the personality to constitute a "profound disruption." These examples, of course, are in no way intended to be exhaustive list. Instead, they are merely intended to illustrate the sort of mental health effects that we believe would accompany an action severe enough to amount to one that "disrupt[s] profoundly the senses or the personality."

The third predicate act listed in section 2340(2) is threatening a prisoner with "imminent death." 18 U.S.C. § 2340(2)(C). The plain text makes clear that a threat of death alone is insufficient; the threat must indicate that death is "imminent." The "threat of imminent death" is found in the common law as an element of the defense of duress. *See Bailey*, 444 U.S. at 409. "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette v. United States*, 342 U.S. 246, 263 (1952). Common law cases and legislation generally define imminence as requiring that the threat be almost immediately forthcoming. 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 5.7, at 655 (1986). By contrast, threats referring vaguely to things that might happen in the future do not satisfy this immediacy requirement. *See United States v. Fiore*, 178 F.3d 917, 923 (7th Cir. 1999). Such a threat fails to satisfy this requirement not because it is too remote in time but because there is a lack of certainty that it will occur. Indeed, timing is an indicator of certainty that the harm *will* befall the defendant. Thus, a vague threat that someday the prisoner *might* be killed would not suffice. Instead, subjecting a prisoner to mock executions or playing Russian roulette with him would have sufficient immediacy to constitute a threat of imminent death. Additionally, as discussed earlier, we believe that the existence of a threat must be assessed from the perspective of a reasonable person in the same circumstances.

Fourth, if the official threatens to do anything previously described to a third party, or commits such an act against a third party, that threat or action can serve as the necessary predicate for prolonged mental harm. *See* 18 U.S.C. § 2340(2)(D). The statute does not require any relationship between the prisoner and the third party.

### d.    Summary

Section 2340's definition of torture must be read as a sum of these component parts. *See Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–35 (1989) (reading two provisions together to determine statute's meaning); *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 405 (1988) (looking to "the language and design of the statute as a whole" to ascertain a statute's meaning). Each component of the definition emphasizes that torture is not the mere

SECRET/NOFORN

infliction of pain or suffering on another, but is instead a step well removed. The victim must experience intense pain or suffering of the kind that is equivalent to the pain that would be associated with serious physical injury so severe that death, organ failure, or permanent damage resulting in a loss of significant body function will likely result. If that pain or suffering is psychological, that suffering must result from one of the acts set forth in the statute. In addition, these acts must cause long-term mental harm. Indeed, this view of the criminal act of torture is consistent with the term's common meaning. Torture is generally understood to involve "intense pain" or "excruciating pain," or put another way, "extreme anguish of body or mind." *Black's Law Dictionary* 1498 (7th Ed. 1999); *Random House Webster's Unabridged Dictionary* 1999 (1999); *Webster's New International Dictionary* 2674 (2d ed. 1935). In short, reading the definition of torture as a whole, it is plain that the term encompasses only extreme acts.

> e.      **Legislative History**

The legislative history of sections 2340–2340A is scant. Neither the definition of torture nor these sections as a whole sparked any debate. Congress criminalized this conduct to fulfill U.S. obligations under CAT, which requires signatories to "ensure that all acts of torture are offenses under its criminal law." CAT art. 4. Sections 2340–2340A appeared only in the Senate version of the Foreign Affairs Authorization Act, and the conference bill adopted them without amendment. *See* H. R. Conf. Rep. No. 103-482, at 229 (1994). The only light that the legislative history sheds reinforces what is obvious from the texts of section 2340 and CAT: Congress intended Section 2340's definition of torture to track the definition set forth in CAT, as elucidated by the United States' reservations, understandings, and declarations submitted as part of its ratification. *See* S. Rep. No. 103-107, at 58 (1993) ("The definition of torture emanates directly from article 1 of the Convention."); *id.* at 58–59 ("The definition for 'severe mental pain and suffering' incorporates the understanding made by the Senate concerning this term.").

> f.      **U.S. Judicial Interpretation**

As previously noted, there are no reported cases of prosecutions under section 2340A. *See* Beth Stephens, *Corporate Liability: Enforcing Human Rights Through Domestic Litigation*, 24 Hastings Int'l & Comp. L. Rev. 401, 408 & n.29 (2001); Beth Van Schaack, *In Defense of Civil Redress: The Domestic Enforcement of Human Rights Norms in the Context of the Proposed Hague Judgments Convention*, 42 Harv. Int'l L.J. 141, 148–49 (2001); Curtis A. Bradley, *Universal Jurisdiction and U.S. Law*, 2001 U. Chi. Legal F. 323, 327–28. Nonetheless, we are not without guidance as to how United States courts would approach the question of what conduct constitutes torture. Civil suits filed under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note (2000), which supplies a tort remedy for victims of torture, provide insight into what acts U.S. courts would conclude constitute torture under the criminal statute.

The TVPA contains a definition similar in some key respects to the one set forth in section 2340. Moreover, as with section 2340, Congress intended for the TVPA's definition of torture to follow closely the definition found in CAT. *See Xuncax v. Gramajo*, 886 F. Supp. 162,

UNCLASSIFIED

176 n.12 (D. Mass 1995) (noting that the definition of torture in the TVPA tracks the definitions in section 2340 and CAT).[50]  The TVPA defines torture as:

> (1). . . any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from–
>   (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>   (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>   (C) the threat of imminent death; or
>   (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note § 3(b).  This definition differs from section 2340's definition in two respects.  First, the TVPA definition contains an illustrative list of purposes for which such pain may have been inflicted.  *See id.*  Second, the TVPA includes the phrase "arising only from or inherent in, or incidental to lawful sanctions"; by contrast, section 2340 refers only to pain or suffering "incidental to lawful sanctions."  *Id.*  Because the purpose of our analysis here is to ascertain acts that would cross the threshold of producing "severe physical or mental pain or suffering," the list of illustrative purposes for which it is inflicted generally would not affect this analysis.[51]  Similarly, to the extent that the absence of the phrase "arising only from or inherent in" from section 2340 might affect the question of whether pain or suffering was part of lawful sanctions and thus not torture, the circumstances with which we are concerned here are solely that of interrogations, not the imposition of punishment subsequent to judgment.  These

---

[50] *See also* 137 Cong. Rec. 34,785 (1991) (statement of Rep. Mazzoli) ("Torture is defined in accordance with the definition contained in [CAT]"); *see also Torture Victims Protection Act: Hearing and Markup on H.R. 1417 Before the Subcomm. On Human Rights and International Organizations of the House Comm. on Foreign Affairs,* 100th Cong. 38 (1988) (Prepared Statement of the Association of the Bar of the City of New York, Committee on International Human Rights) ("This language essentially tracks the definition of 'torture' adopted in the Torture Convention.").

[51] While this list of purposes is illustrative only, demonstrating that a defendant harbored any of these purposes "may prove valuable in assisting in the establishment of intent at trial."  Matthew Lippman, *The Development and Drafting of the United Nations Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment,* 17 B.C. Int'l & Comp. L. Rev. 275, 314 (1994).

SECRET/NOFORN
47

differences between the TVPA and section 2340 are therefore not sufficiently significant to undermine the usefulness of TVPA cases here.[52]

In suits brought under the TVPA, courts have not engaged in any lengthy analysis of what acts constitute torture. In part, the absence of such analysis is due to the nature of the acts alleged. Almost all of the cases involve physical torture, some of which is of an especially cruel and even sadistic nature. Nonetheless, courts appear to look at the entire course of conduct rather than any one act, making it somewhat akin to a totality-of-the-circumstances analysis. Because of this approach, it is difficult to take a specific act out of context and conclude that the act in isolation would constitute torture. Certain acts do, however, consistently reappear in these cases or are of such a barbaric nature, that it is likely a court would find that allegations of such treatment would constitute torture: (1) severe beatings using instruments such as iron barks, truncheons, and clubs; (2) threats of imminent death, such as mock executions; (3) threats of removing extremities; (4) burning, especially burning with cigarettes; (5) electric shocks to genitalia or threats to do so; (6) rape or sexual assault, or injury to an individual's sexual organs, or threatening to do any of these sorts of acts; and (7) forcing the prisoner to watch the torture of others. While we cannot say with certainty that acts falling short of these seven would *not* constitute torture under Section 2340, we believe that interrogation techniques would have to be similar to these acts in their extreme nature and in the type of harm caused to violate the law.

### III.    International Law

In this Part, we examine CAT. Additionally, we examine the applicability of customary international law to the conduct of interrogations. At the outset, it is important to emphasize that the President can suspend or terminate any treaty or provision of a treaty. *See generally* Memorandum for John Bellinger, III, Senior Associate Counsel to the President and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* (Nov. 15, 2001); Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, *Re: Authority of the President to Denounce the ABM Treaty* (Dec. 14, 2001). Any presidential decision to order interrogation methods that are inconsistent with CAT would amount to a suspension or termination of those treaty provisions. Moreover, as U.S. declarations during CAT's ratification make clear, the Convention is non-self-executing and therefore places no legal obligations under domestic law on the Executive Branch, nor can it create any cause of action in federal court. Letter for Alberto R. Gonzales, Counsel to the President from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, 1 (July 22, 2002). Similarly, customary international law lacks domestic legal effect, and in any event can be overridden by the President at his discretion.

---

[52] The TVPA also requires that an individual act "intentionally." As we noted with respect to the text of CAT, this language might be construed as requiring general intent. It is not clear that this is so. We need not resolve that question, however, because we review the TVPA cases solely to address the acts that would satisfy the threshold of inflicting "severe physical or mental pain or suffering."

SECRET/NOFORN