# Exhibit E, Part 3

SECRET/NOFORN
47

differences between the TVPA and section 2340 are therefore not sufficiently significant to undermine the usefulness of TVPA cases here.[52]

In suits brought under the TVPA, courts have not engaged in any lengthy analysis of what acts constitute torture. In part, the absence of such analysis is due to the nature of the acts alleged. Almost all of the cases involve physical torture, some of which is of an especially cruel and even sadistic nature. Nonetheless, courts appear to look at the entire course of conduct rather than any one act, making it somewhat akin to a totality-of-the-circumstances analysis. Because of this approach, it is difficult to take a specific act out of context and conclude that the act in isolation would constitute torture. Certain acts do, however, consistently reappear in these cases or are of such a barbaric nature, that it is likely a court would find that allegations of such treatment would constitute torture: (1) severe beatings using instruments such as iron barks, truncheons, and clubs; (2) threats of imminent death, such as mock executions; (3) threats of removing extremities; (4) burning, especially burning with cigarettes; (5) electric shocks to genitalia or threats to do so; (6) rape or sexual assault, or injury to an individual's sexual organs, or threatening to do any of these sorts of acts; and (7) forcing the prisoner to watch the torture of others. While we cannot say with certainty that acts falling short of these seven would *not* constitute torture under Section 2340, we believe that interrogation techniques would have to be similar to these acts in their extreme nature and in the type of harm caused to violate the law.

### III.    International Law

In this Part, we examine CAT. Additionally, we examine the applicability of customary international law to the conduct of interrogations. At the outset, it is important to emphasize that the President can suspend or terminate any treaty or provision of a treaty. *See generally* Memorandum for John Bellinger, III, Senior Associate Counsel to the President and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* (Nov. 15, 2001); Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, *Re: Authority of the President to Denounce the ABM Treaty* (Dec. 14, 2001). Any presidential decision to order interrogation methods that are inconsistent with CAT would amount to a suspension or termination of those treaty provisions. Moreover, as U.S. declarations during CAT's ratification make clear, the Convention is non-self-executing and therefore places no legal obligations under domestic law on the Executive Branch, nor can it create any cause of action in federal court. Letter for Alberto R. Gonzales, Counsel to the President from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, 1 (July 22, 2002). Similarly, customary international law lacks domestic legal effect, and in any event can be overridden by the President at his discretion.

---

[52] The TVPA also requires that an individual act "intentionally." As we noted with respect to the text of CAT, this language might be construed as requiring general intent. It is not clear that this is so. We need not resolve that question, however, because we review the TVPA cases solely to address the acts that would satisfy the threshold of inflicting "severe physical or mental pain or suffering."

    SECRET/NOFORN

A.    **U.N. Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment ("CAT").**

The most relevant international convention here is CAT.[53]   The treaty's text and negotiating history establish that the definition of torture is limited only to the most egregious conduct.  Further, because the United States' instrument of ratification defined torture in exactly the same manner as in 18 U.S.C. §§ 2340–2340A, the United States' treaty obligation is no different than the standard set by federal criminal law.  With respect to CAT's provision concerning cruel, inhuman, or degrading treatment or punishment, the United States' instrument of ratification defined that term as the cruel, unusual and inhuman treatment prohibited by the Eighth, Fifth, and Fourteenth Amendments.  We review the substantive standards established by those Amendments in order to fully identify the scope of the United States' CAT obligations.

1.    **CAT's Text**

We begin our analysis with the treaty's text.  *See Eastern Airlines Inc. v. Floyd*, 499 U.S. 530, 534–35 (1991) ("When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used.)  (quotation marks and citations omitted).  CAT defines torture as:

> any act by which *severe* pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or

---

[53]  You have also asked whether U.S. interrogation of al Qaeda and Taliban detainees could lead to liability and potential prosecution before the International Criminal Court ("ICC").  The ICC cannot take action against the United States for its conduct of interrogations for two reasons.  First, under international law a state cannot be bound by treaties to which it has not consented.  Although President Clinton signed the Rome Statute, which establishes the ICC, the United States has withdrawn its signature from that agreement and has not submitted it to the Senate for advice and consent—effectively terminating it.  *See* Letter for Kofi Annan, U.N. Secretary General, from John R. Bolton, Under Secretary of State for Arms Control and International Security (May 6, 2002) (notifying the U.N. of U.S. intention not to be a party to the treaty); Rome Statute of the International Criminal Court, 37 I.L.M. 999, U.N. Doc. A/Conf.183/9 (1998).  The United States cannot, therefore, be bound by the provisions of the ICC treaty nor can U.S. nationals be subject to ICC prosecution.  Second, even if the ICC could in some way act upon the United States and its citizens, interrogation of an al Qaeda or Taliban operative could not constitute a crime under the Rome Statute.  The Rome Statute makes torture a crime subject to the ICC's jurisdiction in only two contexts.  Under article 7 of the Rome Statute, torture may fall under the ICC's jurisdiction as a crime against humanity if it is committed as "part of a widespread and systematic attack directed against any civilian population."  Here, however, the interrogation of al Qaeda or Taliban operatives is part of an international armed conflict against a terrorist organization, not an attack on a civilian population.  Indeed, our conflict with al Qaeda does not directly involve any distinct civilian population.  Rather, al Qaeda solely constitutes a group of illegal belligerents who are dispersed around the world into cells, rather than being associated with the civilian population of a nation-state.  Under article 8 of the Rome Statute, torture can fall within the ICC's jurisdiction as a war crime.  To constitute a war crime, torture must be committed against "persons or property protected under the provisions of the relevant Geneva Conventions."  Rome Statute, art. 8.  As we have explained, neither members of the al Qaeda terrorist network nor Taliban soldiers are entitled to the legal status of prisoners of war under the GPW.  *See Treaties and Laws Memorandum* at 8 (Jan. 22, 2002); *see also United States v. Lindh*, 212 F.2d 541, 556–57 (E.D. Va. 2002).  Interrogation of al Qaeda or Taliban members, therefore cannot constitute a war crime because article 8 of the Rome Statute applies only to those protected by the Geneva Conventions.

SECRET/NOFORN

> a third person, or for any reason based on discrimination of any
> kind, when such pain or suffering is inflicted by or at the
> instigation of or with the consent or acquiescence of a public
> official or other person acting in an official capacity.

Article 1(1). Unlike section 2340, this definition includes a list of purposes for which pain and suffering cannot be inflicted. The prefatory phrase "such purposes as" makes clear that this list is illustrative rather than exhaustive. Severe pain or suffering need not be inflicted for those specific purposes to constitute torture. Instead, the perpetrator must simply have a purpose of the same kind. More importantly, as under section 2340, the pain and suffering must be severe to reach the threshold of torture. As with section 2340, the text of CAT makes clear that torture must be an extreme act.

CAT also distinguishes between torture and other acts of cruel, inhuman, or degrading treatment or punishment.[54] Article 16 of CAT requires state parties to "undertake to prevent . . . other acts of cruel, inhuman or degrading treatment or punishment *which do not amount to torture* as defined in article 1." (Emphasis added). CAT thus establishes a category of acts that states should endeavor to prevent but need not criminalize. CAT reserves for torture alone the criminal penalties and the stigma attached to those penalties. In so doing, CAT makes clear that torture is at the farthest end of impermissible actions, and that it is distinct and separate from the lower level of "cruel, inhuman, or degrading treatment or punishment." This approach is in keeping with the earlier, but non-binding, U.N. Declaration on the Protection from Torture, which defines torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." Declaration on Protection from Torture, UN Res. 3452, Art. 1(2) (Dec. 9, 1975).

2.    **Ratification History**

Executive branch interpretation of CAT further supports our conclusion that the treaty prohibits only the most extreme forms of physical or mental harm. As we have previously noted, the "division of treaty-making responsibility between the Senate and the President is essentially the reverse of the division of law-making authority, with the President being the draftsman of the treaty and the Senate holding the authority to grant or deny approval." *Relevance of Senate Ratification History to Treaty Interpretation*, 11 Op. O.L.C. 28, 31 (1987) ("*Sofaer*

---

[54] Common article 3 of GPW contains somewhat similar language. Article 3(1)(a) prohibits "violence to life and person, in particular murder of all kinds, mutilation, *cruel treatment and torture*." (Emphasis added). Article 3(1)(c) additionally prohibits "outrages upon personal dignity, in particular, humiliating and degrading treatment." Subsection (c) must forbid more conduct than that already covered in subsection (a) otherwise subsection (c) would be superfluous. Common article 3 does not, however, define either of the phrases "outrages upon personal dignity" or "humiliating and degrading treatment." International criminal tribunals, such as those respecting Rwanda and former Yugoslavia have used common article 3 to try individuals for committing inhuman acts lacking any military necessity whatsoever. These tribunals, however, have not yet articulated the full scope of conduct prohibited by common article 3. Memorandum for John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, from James C. Ho, Attorney-Advisor, Office of Legal Counsel, *Re: Possible Interpretations of Common Article 3 of the 1949 Geneva Convention Relative to the Treatment of Prisoners of War* (Feb. 1, 2002). We note that section 2340A and CAT protect any individual from torture. By contrast, the standards of conduct established by common article 3 do not apply to "an armed conflict between a nation-state and a transnational terrorist organization." *Treaties and Laws Memorandum* at 8.

**UNCLASSIFIED**          <del>SECRET/NOFORN</del>

Memorandum"). In his capacity as the "sole organ of the federal government in the field of international relations," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), the President alone decides whether to initiate treaty discussions and he alone controls the course and substance of negotiations. The President conducts the day-to-day interpretation of a treaty and may terminate a treaty unilaterally. *See Goldwater v. Carter*, 617 F.2d 697, 707–08 (D.C. Cir.) (en banc), *vacated and remanded with instructions to dismiss on other grounds*, 444 U.S. 996 (1979). Courts accord the Executive Branch's interpretation the greatest weight in ascertaining a treaty's intent and meaning. *See, e.g., United States v. Stuart*, 489 U.S. 353, 369 (1989) ("'the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight'") (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982)); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the department of government particularly charged with their negotiation and enforcement is given great weight."); *Charlton v. Kelly*, 229 U.S. 447, 468 (1913) ("A construction of a treaty by the political departments of the government, while not conclusive upon a court . . . , is nevertheless of much weight.").

A review of the Executive branch's interpretation and understanding of CAT reveals that the United States understood that torture included only the most extreme forms of physical or mental harm. When it submitted the Convention to the Senate, the Reagan administration took the position that CAT reached only the most heinous acts. The Reagan administration included the following understanding:

> The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.

S. Treaty Doc. No. 100-20, at 4–5. Focusing on the treaty's requirement of "severity," the Reagan administration concluded, "[t]he extreme nature of torture is further emphasized in [this] requirement." S. Treaty Doc. No. 100-20, at 3 (1988); S. Exec. Rep. No. 101-30, at 13 (1990). The Reagan administration determined that CAT's definition of torture was consistent with "United States and international usage, [where it] is usually reserved for extreme deliberate and unusually cruel practices, for example, sustained systematic beatings, application of electric currents to sensitive parts of the body and tying up or hanging in positions that cause extreme pain." S. Exec. Rep. No. 101-30, at 14 (1990).

Further, the Reagan administration clarified the distinction between torture and lesser forms of cruel, inhuman, or degrading treatment or punishment. In particular, the administration declared that article 1's definition of torture ought to be construed in light of article 16. *See* S. Treaty Doc. No. 100-20, at 3. "'Torture' is thus to be distinguished from lesser forms of cruel, inhuman, or degrading treatment or punishment, which are to be deplored and prevented, but are not so universally and categorically condemned as to warrant the severe legal consequences that the Convention provides in case of torture." *Id.* at 3. This distinction was "adopted in order to emphasize that torture is at the extreme end of cruel, inhuman and degrading treatment or

punishment." *Id.* at 3. Given this definition, "rough treatment as generally falls into the category of 'police brutality,' while deplorable, does not amount to 'torture.'" *Id.* at 4.

Although the Reagan administration relied on CAT's distinction between torture and "cruel, inhuman, or degrading treatment or punishment," it viewed the phrase "cruel, inhuman, or degrading treatment or punishment" as vague and lacking in a universally accepted meaning. The vagueness of this phrase could even be construed to bar acts not prohibited by the U.S. Constitution. The Administration pointed to *Case of X v. Federal Republic of Germany* as the basis for this concern. In that case, the European Court of Human Rights determined that the prison officials' refusal to recognize a prisoner's sex change might constitute degrading treatment. *See* S. Treaty Doc. No. 100-20, at 15 (citing European Commission on Human Rights, *Dec. on Adm.*, Dec. 15, 1977, *Case of X v. Federal Republic of Germany* (No. 6694/74), 11 Dec. & Rep. 16)). As a result of this concern, the Administration added the following understanding to its proposed instrument of ratification:

> The United States understands the term, 'cruel, inhuman or degrading treatment or punishment,' as used in Article 16 of the Convention, to mean the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States."

S. Treaty Doc. No. 100-20, at 15–16. Under this understanding, treatment or punishment must rise to the level of action that U.S. courts have found to be in violation of the U.S. Constitution in order to constitute cruel, inhuman, or degrading treatment or punishment. That which fails to rise to this level must fail, *a fortiori*, to constitute torture under section 2340 or CAT.

The Senate consented to the Convention during the first Bush administration. The Bush administration agreed with the Reagan administration's cruel, inhuman, and degrading treatment or punishment understanding and upgraded it from an understanding to a reservation. The Senate consented to the reservation in consenting to CAT. Although using less vigorous rhetoric, the Bush administration joined the Reagan administration in interpreting torture as reaching only extreme acts. To ensure that the Convention's reach remained limited, the Bush administration submitted the following understanding:

> The United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental pain caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

S. Exec. Rep. No. 101-30, at 36. This understanding accomplished two things. First, it ensured that the term "intentionally" would be understood as requiring specific intent. Second, it defined the amorphous concept of *mental* pain or suffering. In so doing, this understanding ensured that mental torture would rise to a severity seen in the context of physical torture. The Senate ratified CAT with this understanding, and Congress codified it in 18 U.S.C. § 2340.

To be sure, the Bush administration's language differs from the Reagan administration understanding. The Bush administration said that it had altered the CAT understanding in response to criticism that the Reagan administration's original formulation had raised the bar for the level of pain necessary to constitute torture. *See Convention Against Torture: Hearing Before the Senate Comm. on Foreign Relations*, 101st Cong. 9–10 (1990) ("*1990 Hearing*") (prepared statement of Hon. Abraham D. Sofaer, Legal Adviser, Department of State). While it is true that there are rhetorical differences, both administrations consistently emphasized the extreme acts required to constitute torture. As we have seen, the Bush understanding as codified in section 2340 reaches only extreme acts. The Reagan understanding, like the Bush understanding, declared that "intentionally" would be understood to require specific intent. Though the Reagan administration required that the "act be deliberate and calculated" *and* that it be inflicted with specific intent, in operation there is little difference between requiring specific intent alone and requiring that the act be deliberate and calculated. The Reagan administration's understanding also made express what is obvious from the plain text of CAT: torture is an extreme form of cruel and inhuman treatment. The Reagan administration's understanding that the pain be "excruciating and agonizing" does not substantively deviate from the Bush administration's view.

The Bush understanding simply took an amorphous concept—excruciating and agonizing mental pain—and gave it a more concrete form. Executive branch representations made to the Senate support our view that there was little difference between these two understandings. *See 1990 Hearing*, at 10 (prepared statement of Hon. Abraham D. Sofaer, Legal Adviser, Department of State) ("no higher standard was intended" by the Reagan administration understanding than was present in the Convention or the Bush understanding); *id.* at 13–14 (statement of Mark Richard, Deputy Assistant Attorney General, Criminal Division, Department of Justice) ("In an effort to overcome this unacceptable element of vagueness [in the term "mental pain"], we have proposed an understanding which defines severe mental pain constituting torture with sufficient specificity . . . to protect innocent persons and meet constitutional due process requirements.") Accordingly, we believe that the two definitions submitted by the Reagan and Bush administrations had the same purpose in terms of articulating a legal standard, namely, ensuring that the prohibition against torture reaches only the most extreme acts.

Executive branch representations made to the Senate confirm that the Bush administration maintained the view that torture encompassed only the most extreme acts. Although the ratification record, such as committee hearings, floor statements, and testimony, is generally not accorded great weight in interpreting treaties, authoritative statements made by representatives of the Executive Branch are accorded the most interpretive value. *See Sofaer Memorandum* at 35–36. Hence, the testimony of the executive branch witnesses defining torture, in addition to the reservations, understandings and declarations that were submitted to the Senate by the Executive branch, should carry the highest interpretive value of any of the statements in

the ratification record. At the Senate hearing on CAT, Mark Richard, Deputy Assistant Attorney General, Criminal Division, Department of Justice, offered extensive testimony as to the meaning of torture. Echoing the analysis submitted by the Reagan administration, he testified that "[t]orture is understood to be that barbaric cruelty which lies at the top of the pyramid of human rights misconduct." *1990 Hearing* at 16 (prepared statement of Mark Richard). He further explained, "As applied to physical torture, there appears to be some degree of consensus that the concept involves conduct, the mere mention of which sends chills down one's spine[.]" *Id.* Richard gave the following examples of conduct satisfying this standard: "the needle under the fingernail, the application of electrical shock to the genital area, the piercing of eyeballs, etc." *Id.* In short, repeating virtually verbatim the terms used in the Reagan understanding, Richard explained that under the Bush administration's submissions with the treaty "the essence of torture" is treatment that inflicts "excruciating and agonizing physical pain." *Id.* (emphasis added).

As to mental torture, Richard testified that "no international consensus had emerged [as to] what degree of mental suffering is required to constitute torture[,]" but that it was nonetheless clear that severe mental pain or suffering "does not encompass the normal legal compulsions which are properly a part of the criminal justice system[:] interrogation, incarceration, prosecution, compelled testimony against a friend, etc,—notwithstanding the fact that they may have the incidental effect of producing mental strain." *Id.* at 17. According to Richard, CAT was intended to "condemn as torture intentional acts such as those designed to damage and destroy the human personality." *Id.* at 14. This description of mental suffering emphasizes the requirement that any mental harm be of significant duration and supports our conclusion that mind-altering substances must have a profoundly disruptive effect to serve as a predicate act.

Apart from statements from Executive branch officials, the rest of a ratification record is of little weight in interpreting a treaty. *See generally Sofaer Memorandum.* Nonetheless, the Senate understanding of the definition of torture largely echoes the administrations' views. The Senate Foreign Relations Committee Report on CAT opined: "[f]or an act to be 'torture' it must be an *extreme* form of cruel and inhuman treatment, cause *severe* pain and suffering and be *intended to cause severe* pain and suffering." S. Exec. Rep. No. 101-30, at 6 (emphasis added). Moreover, like both the Reagan and Bush administrations, the Senate drew upon the distinction between torture and cruel, inhuman or degrading treatment or punishment in reaching its view that torture was extreme.[55] Finally, concurring with the administration's concern that "cruel, inhuman, or degrading treatment or punishment" could be construed to go beyond constitutional standards, the Senate supported the inclusion of the reservation establishing the Constitution as the baseline for determining whether conduct amounted to cruel, inhuman, degrading treatment or punishment. *See* 136 Cong. Rec. 36,192 (1990); S. Exec. Rep. No. 101-30, at 39.

---

[55] Hearing testimony, though the least weighty evidence of meaning of all of the ratification record, is not to the contrary. Other examples of torture mentioned in testimony similarly reflect acts resulting in intense pain: the "gouging out of childrens' [sic] eyes, the torture death by molten rubber, the use of electric shocks," cigarette burns, hanging by hands or feet. *1990 Hearing* at 45 (Statement of Winston Nagan, Chairman, Board of Directors, Amnesty International USA); *id.* at 79 (Statement of David Weissbrodt, Professor of Law, University of Minnesota, on behalf of the Center for Victims of Torture, the Minnesota Lawyers International Human Rights Committee).

### 3.    Negotiating History

CAT's negotiating history also supports interpreting torture to include only the extreme acts defined in section 2340. The state parties endeavored to craft a definition that reflected the term's gravity. During the negotiations, state parties offered various formulations to the working group, which then proposed a definition. Almost all of these suggested definitions illustrate the consensus that torture is an extreme act designed to cause agonizing pain. For example, the United States proposed that torture be defined as "includ[ing] any act by which extremely severe pain or suffering . . . is deliberately and maliciously inflicted on a person." J. Herman Burgers & Hans Danelius, *The United Nations Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel Inhuman and Degrading Treatment or Punishment* 41 (1988) ("*CAT Handbook*"). The United Kingdom suggested that torture be defined even more narrowly as the "*systematic and intentional* infliction of *extreme* pain or suffering rather than *intentional* infliction of *severe* pain or suffering." *Id.* at 45 (emphasis in original). Ultimately, in choosing the phrase "severe pain," the parties concluded that this phrase "sufficient[ly] . . . convey[ed] the idea that only acts of a certain gravity shall . . . constitute torture." *Id.* at 117.

State parties were acutely aware of the distinction they drew between torture and cruel, inhuman, or degrading treatment or punishment. The state parties considered and rejected a proposal that would have defined torture merely as cruel, inhuman or degrading treatment or punishment. *See id.* at 42. Mirroring the U.N. Declaration on Protection From Torture, some state parties proposed the inclusion of a paragraph defining torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." *See id.* at 41; *see also* S. Treaty Doc. No. 100-20, at 2 (the U.N. Declaration on Protection from Torture (1975) served as "a point of departure for the drafting of [CAT]"). In the end, the parties concluded that the proposal was superfluous because Article 16 "impl[ies] that torture is the gravest form of such treatment or punishment." *CAT Handbook* at 80; *see* S. Exec. Rep. No. 101-30, at 13 ("The negotiating history indicates that [the phrase 'which do not amount to torture'] was adopted in order to emphasize that torture is at the extreme end of cruel, inhuman and degrading treatment or punishment and that Article 1 should be construed with this in mind.").

Additionally, the parties could not reach a consensus about the meaning of "cruel, inhuman, or degrading treatment or punishment." *See CAT Handbook* at 47. Without a consensus, the parties viewed the term as simply "'too vague to be included in a convention which was to form the basis for criminal legislation in the Contracting States.'" *Id.* This view reaffirms the interpretation of CAT as purposely reserving criminal penalties for torture alone.[56]

---

[56] CAT's negotiating history offers more than just support for the view that pain or suffering must be extreme to amount to torture. First, the negotiating history suggests that the harm sustained from the acts of torture need not be permanent. In fact, "the United States considered that it might be useful to develop the negotiating history which indicates that although conduct resulting in permanent impairment of physical or mental faculties is indicative of torture, it is not an essential element of the offence." *CAT Handbook* at 44. Second, the state parties to CAT rejected a proposal to include in CAT's definition of torture the use of truth drugs, where no physical harm or mental suffering was apparent. This rejection at least suggests that such drugs were not viewed as amounting to torture per se. *See id.* at 42.

4.    U.S. Obligations Under CAT

a.    Torture

Despite the apparent differences in language between the Convention and 18 U.S.C. § 2340, the U.S. obligations under both are identical. As discussed above, the first Bush administration proposed an understanding of torture that is identical to the definition of that term found in section 2340. S. Exec. Rep. No. 101-30, at 36. The Senate approved CAT based on this understanding, and the United States included the understanding in its instrument of ratification.[57] As we explained above, the understanding codified at section 2340 accomplished two things. First, it made crystal clear that torture requires specific intent. Second, it added form and substance to the otherwise amorphous concept of *mental* pain or suffering. Because the understanding was included in the instrument of ratification, it defines the United States' obligation under CAT.

It is one of the basic principles of international law that a nation cannot be bound to a treaty without its consent. *See* Advisory Opinion on Reservations to the Convention on Genocide, 1951 I.C.J. 15, 21 (May 28, 1951) ("Genocide Convention Advisory Opinion"). *See also* 1 *Restatement (Third) of the Foreign Relations Law of the United States* pt. I, introductory note at 18 (1987) ("*Restatement (Third)*") ("Modern international law is rooted in acceptance by states which constitute the system."); Anthony Aust, *Modern Treaty Law and Practice* 75 (2000) (a state can only be bound by a treaty to which it has consented to be bound). In other words, the United States is only bound by those obligations of the Torture Convention to which it knowingly agreed. The United States cannot be governed either by provisions of the Convention from which it withheld its consent, or by interpretations of the Convention with which it disagreed, just as it could not be governed by the Convention itself if it had refused to sign it.

This does not mean that in signing the Torture Convention, the United States bound itself to every single provision. Rather, under international law, a reservation made when ratifying a treaty validly alters or modifies the treaty obligation. Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331, 8 I.L.M. 679 (entered into force Jan. 27, 1980); *Restatement (Third)* at § 313.[58] The right to enter reservations applies to multilateral agreements just as to the

---

[57] *See* http://www.un.org/Depts/Treaty/final/ts2/newfiles/part_boo/iv_boo/iv_9.html.

[58] A reservation is generally understood to be a unilateral statement that modifies a state party's obligations under a treaty. The ratifying party deposits this statement with its instrument of ratification. *See, e.g.,* Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Genocide Convention* at 1 n.1 (Jan. 20, 1984). By contrast, an understanding is defined as a statement that merely clarifies or interprets a State party's legal obligations under the treaty. Such a statement does not alter the party's obligations as a matter of international law. How a party characterizes a statement it deposits at ratification is not, however, dispositive of whether it is reservation or understanding. *See* Letter for Hon. Frank Church, Chairman, Ad Hoc Subcommittee on the Genocide Convention, Committee on Foreign Relations, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel at 2–3 (May 8, 1970). Instead, whether a statement is a reservation or understanding depends on the statement's substance. *See* Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Genocide Convention*, at 2 n.4 (June 1, 1982). Here, although under domestic law, the Bush administration's definition of torture was categorized as an "understanding," it was deposited with the instrument of ratification as a condition of the United States' ratification, and so under international law we consider it to be a reservation if it indeed modifies CAT's standard. *See Restatement (Third)*, at § 313 cmt. g. Under either characterization, the section 2340 standard governs.

SECRET/NOFORN

more familiar context of bilateral agreements. *Restatement (Third)* at § 313. Under international law, therefore, the United States is bound only by the text of CAT as modified by the Bush administration's understanding.[59] As is obvious from its text, and as discussed at length above, Congress codified the understanding almost verbatim when it enacted section 2340. The United States' obligation under CAT is thus identical to the standard set by section 2340. Conduct that does not violate the latter does not violate the former. So long as the interrogation methods do not violate section 2340, they also do not violate our international obligations under CAT.

To be sure, the Vienna Convention on Treaties recognizes several exceptions to the power to make reservations. None of them, however, apply here. First, a reservation is valid and effective unless it purports to defeat the "object and purpose" of the treaty. Vienna Convention, art. 19.[60] International law provides little guidance regarding the meaning of the "object and purpose" test. *See* Curtis A. Bradley & Jack L. Goldsmith, *Treaties, Human Rights, and Conditional Consent*, 149 U. Penn. L. Rev. 399, 432–33 (2000) (explaining that "[n]either the Vienna Convention nor the [Genocide Convention Advisory Opinion] provides much guidance regarding the 'object and purpose' test" and that "there has been no subsequent judicial analysis of the test under either the Vienna Convention or customary international law, and no binding official determination that a reservation has ever violated the test."). Nonetheless, it is clear that here the United States did not defeat the object and purpose of the Convention. In fact, it enacted section 2340 to expand the prohibition on torture in its domestic criminal law. The United States could only have defeated the object and purpose of the Convention if it had *narrowed* the existing prohibitions on torture under its domestic law. Rather than defeat the object of CAT, the United States accepted its terms and attempted, through the Bush administration's understanding, to make clear the scope and meaning of the treaty's obligations.

Second, a treaty reservation will not be valid if the treaty itself prohibits states from taking reservations. CAT nowhere prohibits state parties from entering reservations. Two provisions of the Convention—the competence of the Committee Against Torture in Article 28, and the mandatory jurisdiction of the International Court of Justice in Article 30—specifically note that nations may take reservations from their terms. The Convention, however, contains no provision that explicitly attempts to preclude states from exercising their basic right under international law to enter reservations to other provisions. Other treaties are quite clear when they attempt to prohibit any reservations. Without such a provision, we do not believe that CAT precludes reservations.

---

[59] Further, if we are correct in our suggestion that CAT itself creates a heightened intent standard, then the understanding the Bush Administration attached is less a modification of the Convention's obligations and more of an explanation of how the United States would implement its somewhat ambiguous terms.

[60] The United States is not a party to the Vienna Convention on Treaties. Nonetheless, as we have previously explained, "some lower courts have said that the Convention embodies the customary international law of treaties," and the State Department has at various times taken the same view. *See* Letter for John Bellinger, III, Senior Associate Counsel to the President and Legal Advisor to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, at 1 (Nov.15, 2001). *See also* Memorandum for John H. Shenefield, Associate Attorney General, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: *The Application of Sections 212(a)(27) and 212(a)(29) of the Immigration and Nationality Act of 1952 to Persons Within the Scope of the United Nations Headquarters Agreement and the Convention on the Privileges and Immunities of the United Nations* 22 (Oct. 20, 1980) (noting that the Vienna Convention is "generally accepted as the universal guide for the interpretation of treaties").

**UNCLASSIFIED**         SECRET/NOFORN

Third, in regard to multilateral agreements, a treaty reservation may not be valid if other parties object in a timely manner. Vienna Convention, art. 20. If another state does not object within a certain period of time, it is deemed to have acquiesced in the reservation. If another nation objects, then the provision of the treaty to which the reservation applies is not in force between the two nations, unless the objecting nation opposes entry into force of the treaty as whole between the two nations. *Id.* art. 21(3). *See also Genocide Convention Advisory Opinion*, 1951 I.C.J. 15, 26 (May 28, 1951) (an objection "will only affect the relationship between the State making the reservation and the objecting State"). Here, no nation objected to the United States' further definition of torture.[61] Even if any nation had properly objected, that would mean only that there would be no provision prohibiting torture in effect between the United States and the objecting nation—effectively mooting the question whether an interrogation method violates the Torture Convention.

We conclude that the Bush administration's understanding created a valid and effective reservation to CAT. Even if it were otherwise, there is no international court that could take issue with the United States' interpretation of the Convention. In an additional reservation, the United States refused to accept the jurisdiction of the ICJ to adjudicate cases under the Convention. Although CAT creates a committee to monitor compliance, it can only conduct studies and has no enforcement powers.

Some may argue that permitting the assertion of justification defenses under domestic law, such as necessity or self-defense, would place the United States in violation of its international obligations. Such an argument would point to article 2(2) of CAT, which provides that "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." We do not believe, however, that a treaty may eliminate the United States' right, under international law, to use necessary measures for its self-defense. The right of national self-defense is well established under international law. As we have explained elsewhere, it is a right that is inherent in international law and in the international system. *See Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, Re: Authority of the President under Domestic and International Law to Use Force Against Iraq* at 30 (Oct. 23, 2002) ("*Iraq Memorandum*"). And, as we explained above, Article 51 of the U.N. Charter recognizes and reaffirms this inherent right:

> Nothing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations, until the Security Council has taken the measures necessary to maintain international peace and security.

---

[61] Three nations commented. Finland and Sweden asserted that the understanding did not alter U.S. obligations under CAT. While the Netherlands noted that the understanding "appear[ed] to narrow" article 1's definition of torture, it too asserted that this understanding did not alter U.S. obligations under CAT. Comments such as these have no effect under international law. Moreover, even if these comments could be termed objections, they were in fact untimely and thus are invalid. An objection to a reservation must be raised within twelve months of the notification of the reservation or by the date on which the objecting party consented to be bound, whichever is later. *See Restatement (Third)*, at § 313 cmt. e. None of these countries entered their comments within that time frame.

U.N. Charter art. 51; *see also* North Atlantic Treaty, Apr. 4, 1949, art. 5, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246 (agreeing that if an armed attack occurs against one of the parties, the others will exercise the right of individual or collective self-defense recognized by article 51); Inter-American Treaty of Reciprocal Assistance, Sept. 2, 1947, art. 3, 62 Stat. 1681, 1700, 21 U.N.T.S. 77, 93 (Rio Treaty) (same).

Although recognized by these agreements, the United States has long held the view that the right to self-defense is broader in scope, and could not be limited by these treaty provisions. Our Office has observed, for example, that Article 51 merely reaffirms a right that already existed independent of the Charter. As this Office explained forty years ago:

> The concept of self-defense in international law of course justifies more than activity designed merely to resist an armed attack which is already in progress. Under international law every state has, in the words of Elihu Root, "the right . . . to protect itself by preventing a condition of affairs in which it will be too late to protect itself."

Memorandum for the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Legality under International Law of Remedial Action Against Use of Cuba as a Missile Base by the Soviet Union* at 2 (Aug. 30, 1962); *cf. Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29 (1827) ("the [domestic] power to provide for repelling invasions includes the power to provide against the attempt and danger of invasion"). We have opined that "it is likely that under international law no treaty could prevent a nation from taking steps to defend itself." *High Seas Memorandum* at 10. As Secretary of State Frank Kellogg explained, "The right of self-defense . . . is inherent in every sovereign state and implicit in every treaty. Every nation is free at all times and regardless of treaty provisions to defend its territory from attack or invasion and it alone is competent to decide whether circumstances require recourse to war in self-defense." *Id.* (internal quotation marks and citation omitted). Indeed, the United States has consistently defended the doctrine of anticipatory self-defense, even though the text of Article 51 of the United Nations Charter itself seems to permit the use of force only after an armed attack has occurred. We believe that Article 51 is only expressive of one element of the broader right to self-defense, and that it could not derogate from a nation's right to use force to prevent an imminent attack.

Thus, if interrogation methods were inconsistent with the United States' obligations under CAT, but were justified by necessity or self-defense, we would view these actions still as consistent ultimately with international law. Although these actions might violate CAT, they would still be in service of the more fundamental principle of self-defense that cannot be extinguished by CAT or any other treaty. Further, if the President ordered that conduct, such an order would amount to a suspension or termination of the Convention. In so doing, the President's order and the resulting conduct would not be a violation of international law because the United States would no longer be bound by the treaty.

The right to self-defense, of course, cannot be invoked in any and all circumstances. As this Office has recently explained, the use of force must meet two requirements to be legitimate.

*See Iraq Memorandum* at 33. First, "the use of force must be necessary because the threat is imminent and thus pursuing peaceful alternatives is not an option." *Id.* "Second, the response must be proportionate to the threat[.]" *Id.* We further explained that to determine whether a threat is sufficiently imminent to make the use of force necessary, "[f]actors to be considered include: the probability of an attack; the likelihood that this probability will increase, and therefore the need to take advantage of a window of opportunity; whether diplomatic alternatives are practical; and the magnitude of the harm that could result from the threat." *Id.* at 44.

### b.    Cruel, Inhuman, or Degrading Treatment or Punishment

CAT provides that "[e]ach State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture." Art. 16.[62]  CAT does not require state parties to criminalize such conduct, nor does CAT (in contrast to the prohibition against torture) preclude its justification by exigent circumstances.  Thus, the United States is within its international law obligations even if it uses interrogation methods that might constitute cruel, inhuman, or degrading treatment or punishment, so long as their use is justified by self-defense or necessity.

In its instrument of ratification to the Torture Convention, the United States expressly defined the term "cruel, inhuman, or degrading treatment or punishment" for purposes of Article 16 of the Convention.  The reservation limited "cruel and unusual or inhumane treatment or punishment" to the conduct prohibited under the Fifth, Fourteenth and Eighth Amendments. This reservation cannot be said to defeat CAT's object and purpose.  As with the U.S. definition of torture, it does not expand the right to engage in cruel, inhuman, or degrading treatment. Rather, the reservation merely reaffirmed the United States' consistent interpretation of this ambiguous term.[63]  While several countries commented on this reservation, those objections, if valid, mean simply that Article 16 is not in force between the United States and the objecting states.[64]  As to the remaining countries, this reservation is a binding obligation.

The U.S. reservation is important in light of the lack of international consensus regarding the meaning of cruel, inhuman or degrading treatment. *See, e.g., Forti v. Suarez-Mason,* 694 F.

---

[62] Article 16, like the other first 15 articles in the treaty, is non-self executing.  The United States took a reservation to this section, as with the other first fifteen articles, that this section was non-self executing.  As explained in text, therefore they not only "are not federal law cognizable in federal court, they also place no obligations on the Executive Branch." Letter for Alberto R. Gonzales, Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, at 1 (July 22, 2002). *See also Buell v. Mitchell,* 274 F.3d 337, 372 (6th Cir. 2001) ("Courts in the United States are bound to give effect to international law and to international agreements, except that a non-self-executing agreement will not be given effect as law in the absence of necessary authority.") (internal quotation marks and citation omitted).

[63] The United States took the same reservation with respect to a provision in the International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171, that prohibited cruel, inhuman, or degrading treatment or punishment.

[64] Three countries objected to this reservation.  Finland and the Netherlands objected to this reservation on the ground that it was incompatible with the object and purpose of the treaty.  Additionally, these two countries, along with Sweden objected to this reservation because of its reference to national law, which these countries found to fail to clearly define U.S. treaty obligations.  A fourth country, Germany, merely commented that this reservation d[id] not touch upon the obligations of the United States of America as State Party to the Convention." These objections and comments, as noted earlier, were untimely and thus invalid.

Supp. 707, 711–12 (N.D. Cal. 1988) (sustaining earlier dismissal of cruel, inhuman, or degrading treatment or punishment because the court concluded that there was insufficient consensus defining the prohibited conduct). *Cf. Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J. concurring in the denial of cert.) (noting that international courts were not in agreement as to whether a lengthy delay between sentencing and execution constituted "cruel inhuman or degrading treatment or punishment" and that every court of appeals to have addressed such a claim had rejected it). Indeed, the drafters of CAT expressly recognized the absence of any consensus as to what kind of treatment or punishment rose to the level of "cruel, inhuman, or degrading treatment or punishment." As noted above, it is precisely because this term had no coherent meaning under international law that the drafters chose not to require the criminalization of such conduct. *See CAT Handbook* at 47. *Compare* CAT, art. 4 ("Each State Party shall ensure that all acts of torture are offences under its criminal law.") *with id.* art. 16 ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, human, or degrading treatment or punishment which do not amount to torture . . . ."). Given the wide-ranging nature of international decisions regarding this phrase, some international decisions might give the phrase almost limitless application. For example, in *Iwanczuk v. Poland* (Eur. Ct. H.R. 2001), the European Court of Human Rights concluded that a strip search, undertaken because a prisoner had once been found with a knife, as well as certain humiliating remarks the guards allegedly made about the prisoner's body (which the government disputed), "amounted to degrading treatment . . . ." *Id.* at ¶ 59. In reaching that conclusion, the court reasoned, "[I]t is sufficient if the victim is humiliated in his or her own eyes." *Id.* at ¶ 51 (citations omitted). And in *Ireland v. United Kingdom* (Eur. Ct. H.R. 1977), a decision discussed in more detail below, the court concluded that actions that "arouse . . . feelings of fear, anguish and inferiority capable of humiliating and debasing [the prisoners] and possibly breaking their physical or moral resistance" constitutes degrading treatment. *Id.* at ¶ 167. Under these decisions anything that *a detainee* finds humiliating or offensive, or anything geared toward reducing that person's moral or physical resistance to cooperating could constitute degrading treatment or punishment. These opinions would reach conduct far below the standard articulated in the U.S. reservation and would produce precisely the expansive and limitless results that the United States sought to avoid. Ultimately, as explained above, the United States is bound only by the treaty obligations to which it has consented. We explain below the substantive standards that this reservation to the definition of cruel, inhuman, and degrading treatment or punishment establishes. We address first the Eighth Amendment and then the standard established by the Fifth and Fourteenth Amendments.[65]

i.    **Eighth Amendment**

Under the Supreme Court's "cruel and unusual punishment" jurisprudence, there are two lines of analysis that might be relevant to the conduct of interrogations: (1) when prison officials use excessive force; and (2) when prisoners challenge their conditions of confinement. As a general matter, the excessive force analysis often arises in situations in which an inmate has attacked another inmate or a guard. Under this analysis, "a prisoner alleging excessive force must demonstrate that the defendant acted 'maliciously and sadistically'" for the very purpose of causing harm. *Porter v. Nussle*, 534 U.S. 516, 528 (2002) (quoting *Hudson v. McMillian*, 503

---

[65] As we explained in Part I, neither the Fifth Amendment nor the Eighth Amendment apply of their own force to the interrogations of alien enemy combatants held abroad.

U.S. 1, 7 (1992)).  Actions taken in "good-faith . . . to maintain or restore discipline" do not constitute excessive force.  *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) ("[W]e think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.") (internal quotation marks and citation omitted).  To determine whether an official has met this standard, factors such as "the need for the application of force, the relationship between the need and the amount of force that was used, [] the extent of injury inflicted[,]" are to be considered as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.* at 321 (internal quotation marks and citation omitted).  Put another way, the actions must be necessary and proportional in light of the danger that reasonably appears to be posed.  Moreover, the Supreme Court has emphasized that deference must be accorded to the decisions of prison officials "taken in response to an actual confrontation with riotous inmates" as well as "to prophylactic or preventative measures intended to reduce the incidence of these or any other breaches of prison discipline." *Id.* at 322.

This standard appears to be most potentially applicable to interrogation techniques that may involve varying degrees of force.  As is clear from above, the excessive force analysis turns on whether the official acted in good faith or maliciously and sadistically for the very purpose of causing harm.  For good faith to be found, the use of force should, among other things, be necessary.  Here, depending upon the precise factual circumstances, such techniques may be necessary to ensure the protection of the government's interest here—national security.  As the Supreme Court recognized in *Haig v. Agee*, 435 U.S. 280 (1981), "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Id.* at 307 (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).  In the typical excessive force case, the protection of other inmates and officers or the maintenance of order are valid government interests that may necessitate the use of force.  If prison administration or the protection of one person can be deemed to be valid governmental interests necessitating the use of force, then the interest of the United States here—obtaining intelligence vital to the protection of thousands of American citizens—can be no less valid.

To be sure, no court has encountered the precise circumstances here.  Nonetheless, Eighth Amendment cases most often concern instances in which the inmate is a threat to safety, and here force would be used to prevent a threat to the safety of the United States that went beyond a single inmate or a single prison.  We believe it is beyond question that there can be no more compelling government interest than that which is presented here.  Just as prison officials are given deference in their response to rioting inmates or prison discipline, so too must the Executive be given discretion in its decisions to respond to the grave threat to national security posed by the current conflict.  Whether the use of more aggressive techniques that involve force is permissible will depend on the information that relevant officials have regarding the nature of the threat and the likelihood that the particular detainee has information relevant to that threat.

Whether the interrogators have acted in good faith would turn in part on the injury inflicted.  For example, if the technique caused minimal or minor pain, it is less likely to be problematic under this standard.  The use of force must also be proportional, i.e., there should

also be some relationship between the technique used and the necessity of its use. So, if officials had credible threat information that a U.S. city was to be the target of a large-scale terrorist attack a month from now and the detainee was in a position to have information that could lead to the thwarting of that attack, physical contact such as shoving or slapping the detainee clearly would not be disproportionate to the threat posed. In such an instance, those conducting the interrogations would have acted in good faith rather than maliciously and sadistically for the very purpose of causing harm.

We also note that the excessive force analysis might also apply to the use of threats. Some courts have held that threats can state an excessive force claim. For example, in *Chandler v. District of Columbia Dept. of Corrections*, 145 F.3d 1355 (D.C. Cir. 1998), the D.C. Circuit found that a correctional officer's threat to the inmate had put him in "imminent fear of his life because she was in a position to carry it out." *Id.* at 1361. The court concluded that "[d]epending upon the gravity of the fear, the credibility of the threat, and on [the inmate's] psychological condition, the threat itself could have caused more than *de minimis* harm and therefore could have been sufficient to state a claim of excessive use of force." *Id.* at 1361. *See also Northington v. Jackson*, 973 F.2d 1518 (10th Cir. 1992) (holding that allegation that officer put a gun to the inmate's head and threatened to kill him stated an excessive force claim). *But see Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff's idle threat to hang prisoner did not state a claim for an Eighth Amendment violation); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (allegations that defendants threatened inmate with physical harm, where plaintiff also alleged the defendants had beaten him, did not state an Eighth Amendment claim).

The conditions of confinement cases provide a useful analogue to interrogation techniques that alter the conditions of a detainee's cell and surrounding environment. The conditions of confinement analysis often arises in claims concerning the use of administrative segregation and conditions attendant that segregation. In those cases, a condition of confinement is not "cruel and unusual" unless it (1) is "sufficiently serious" to implicate constitutional protection, *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and (2) reflects "deliberate indifference" to the prisoner's health or safety, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The failure to demonstrate either one of these components is fatal to the claim. The first element is objective, and inquires whether the challenged condition is cruel and unusual. The second, so-called "subjective" element requires an examination of the actor's intent and inquires whether the challenged condition is imposed as a punishment. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) ("The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify.").

The Supreme Court has noted that "[n]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346 (1981) (internal quotations marks and citation omitted). *See also Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (stating that the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency"). Despite

this broad language, in recent years the Supreme Court clearly has sought to limit the reach of the Eighth Amendment in the prison context and certain guidelines emerge from these cases.

As to the objective element, the Court has established that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347). It is not enough for a prisoner to show that he has been subjected to conditions that are merely "restrictive and even harsh," as such conditions are simply "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347. *See also id.* at 349 ("the Constitution does not mandate comfortable prisons"). Rather, a prisoner must show that he has suffered a "serious deprivation of basic human needs," *id.* at 347, such as "essential food, medical care, or sanitation," *id.* at 348. *See also Wilson*, 501 U.S. at 304 (requiring "the deprivation of a single, identifiable human need such as food, warmth, or exercise"). "The Amendment also imposes [the duty on officials to] provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (internal quotation marks and citations omitted). The Court has also articulated an alternative test inquiring whether an inmate was exposed to "a substantial risk of serious harm." *Id.* at 837. *See also DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) ("In order to satisfy the [objective] requirement, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.") (internal quotation marks and citation omitted).

In these recent cases, the Court has made clear that the conditions of confinement are not to be assessed under a totality-of-the-circumstances approach. In *Wilson v. Seiter*, 501 US. 294 (1991), the Supreme Court expressly rejected the contention that "each condition must be considered as part of the overall conditions challenged." *Id.* at 304 (internal quotation marks and citation omitted). Instead, the Court concluded that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Id.* As the Court further explained, "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

To show deliberate indifference under the subjective element of the conditions of confinement test, a prisoner must show that " the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. This standard requires greater culpability than mere negligence. *See id.* at 835; *Wilson*, 501 U.S. at 305 ("mere negligence would satisfy neither [the *Whitley* standard of malicious and sadistic infliction'] nor the more lenient deliberate indifference standard") (internal quotation marks omitted). Deliberate indifference is, however, "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Moreover, the Court has emphasized that there need not be direct evidence of such intent. Instead, the "existence of this subjective state of mind [may be

SECRET/NOFORN

inferred] from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 122 S. Ct. 2508, 2514 (2002).

One of its most recent opinions on conditions of confinement—*Hope v. Pelzer*, 122 S. Ct. 2508 (2002)—illustrates the Court's focus on the necessity of the actions undertaken in response to a disturbance in determining the officer's subjective state of mind.[66] In *Hope*, following an "exchange of vulgar remarks" between the inmate Hope and an officer, the two got into a "wrestling match." *Id.* at 2512. Additional officers intervened and restrained Hope. *See id.* These officers then took Hope back to the prison. Once there, they required him to take off his shirt and then attached him to the hitching post, where he remained in the sun for the next seven hours. *See id.* at 2512–13. During this time, Hope received no bathroom breaks. He was given water only once or twice and at least one guard taunted him about being thirsty. *See id.* at 2513. The Supreme Court concluded that the facts Hope alleged stated an "obvious" Eighth Amendment violation. *Id.* at 2514. The obviousness of this violation stemmed from the utter lack of necessity of the guard's actions. The Court emphasized that "[a]ny safety concerns" arising from the scuffle between Hope and the officer "had long since abated by the time [Hope] was handcuffed to the hitching post" and that there was a "clear lack of an emergency situation." *Id.* As a result, the Court found that "[t]his punitive treatment amount[ed] to [the] gratuitous infliction of 'wanton and unnecessary' pain that our precedent clearly prohibits." *Id.* at 2515. Thus, the necessity of the governmental action bears upon both the conditions of confinement analysis as well as the excessive force analysis.

Here, interrogation methods that do not deprive enemy combatants of basic human needs would not meet the objective element of the conditions of confinement test. For example, a deprivation of a basic human need would include denial of adequate shelter, such as subjecting a detainee to the cold without adequate protection. *See Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). A brief stay in solitary confinement alone is insufficient to state a deprivation. *See, e.g., Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997) ("A brief stay in disciplinary segregation[, here 15 days,] is, figuratively, a kind of slap on the wrist that does not lead to a cognizable Eighth Amendment claim."). Such things as insulting or verbally ridiculing detainees would not constitute the deprivation of a basic human need. *See Somers v. Thurman*, 109 F.3d 614, 624 (9th Cir. 1997) ("To hold that gawking, pointing, and joking [about nude prisoners] violates the prohibition against cruel and unusual punishment would trivialize the objective component of the Eighth Amendment test and render it absurd."). Additionally, the clothing of a detainee could also be taken away for a period of time without necessarily depriving him of a basic human need that satisfies this objective test. *See, e.g., Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995). While the objective element would not permit the deprivation of food altogether, alterations in a detainee's diet could be made that would not rise to the level of a denial of life's necessities. As the Ninth Circuit has explained, "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LaMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).

---

[66] Although the officers' actions in *Hope* were undertaken in response to a scuffle between an inmate and a guard, the case is more properly thought of as a conditions of confinement case rather than as an "excessive force" case. By examining the officers' actions under the "deliberate indifference standard" the Court analyzed it as a conditions of confinement case. As explained in text, the deliberate indifference standard is inapplicable to claims of excessive force.

Even if an interrogation method amounted to a deprivation of life's necessities under the objective test, the subjective component would still need to be satisfied, i.e., the interrogators would have to act with deliberate indifference to the detainee's health or safety. We believe that if an interrogator acts with the honest belief that the interrogation methods used on a particular detainee do not present a serious risk to the detainee's health or safety, he will not have acted with deliberate indifference. An honest belief might be demonstrated by due diligence as to the effects of a particular interrogation technique combined with an assessment of the prisoner's psychological health.

Finally, the interrogation methods cannot be unnecessary or wanton. As we explained regarding the excessive force analysis, the government interest here is of the highest magnitude. In the typical conditions of confinement case, the protection of other inmates or officers, the protection of the inmate alleged to have suffered the cruel and unusual punishment, or even the maintenance of order in the prison, provide valid government interests that may justify various deprivations. *See, e.g., Anderson v. Nosser*, 438 F.2d 183, 193 (5th Cir. 1971) ("protect[ing] inmates] from self-inflicted injury, [] protect[ing] the general prison population and personnel from violate acts on his part, [and] prevent[ing] [] escape" are all legitimate penological interests that would permit the imposition of solitary confinement); *McMahon v. Beard*, 583 F.2d 172, 175 (5th Cir. 1978) (prevention of inmate suicide is a legitimate interest). As with excessive force, no court has encountered the precise circumstances here under conditions of confinement jurisprudence. Nonetheless, we believe it is beyond question that there can be no more compelling government interest than that which is presented here and depending upon the precise factual circumstances of an interrogation, e.g., where there was credible information that the enemy combatant had information that could avert a threat, deprivations that may be caused would not be wanton or unnecessary.

### ii.    Fifth and Fourteenth Amendments

Under the Due Process clauses of the Fifth and Fourteenth Amendments,[67] substantive due process protects an individual from "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Under substantive due process "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846 (internal quotation marks and citation omitted). That conduct must "shock[] the conscience." *See generally id.; Rochin v. California*, 342 U.S. 165 (1952).[68] Unlike government actions subjected

---

[67] The substantive due process standard discussed in this section applies to both the Fourteenth and Fifth Amendment Due Process Clauses.

[68] In the seminal case of *Rochin v. California*, 342 U.S. 165 (1952), the police had some information that the defendant was selling drugs. Three officers went to and entered the defendant's home without a warrant and forced open the door to the defendant's bedroom. Upon the opening door, the officers saw two pills and asked the defendant about them. The defendant promptly put them in his mouth. The officers "jumped upon him and attempted to extract the capsules." *Id.* at 166. The police tried to pull the pills out of his mouth but despite considerable struggle the defendant swallowed them. The police then took the defendant to a hospital, where a doctor forced an ermetic solution into the defendant's stomach by sticking a tube down his throat and into his stomach, which caused the defendant to vomit up the pills. The pills did in fact contain morphine. *See id.* The

to scrutiny under procedural due process, which are constitutionally permissible so long as the government affords adequate processes, government actions that "shock the conscience" are prohibited irrespective of the procedures that the government may employ in undertaking those actions. *See generally Rochin v. California*, 342 U.S. 165 (1952). The Supreme Court has limited the use of the nebulous standards of substantive due process and sought to steer constitutional claims to more specific amendments. *See, e.g., Graham v. Connor*, 490 U.S. 386, 393–95 (1989) (holding that damages claim for injuries sustained when officers used physical force during a stop should be analyzed under the Fourth Amendment rather than substantive due process); *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (holding that substantive due process provides no greater protection to prisoner shot during a prison riot than does the Eighth Amendment). *See also Matta-Ballesteros v. Henman*, 896 F.2d 255, 261 (7th Cir. 1990) (declining to analyze claim under the "shock-the-conscience" standard because Fourth Amendment provided that court with an explicit textual constitutional protection under which to analyze the plaintiff's claim of excessive force). As the Court explained in *Albright v. Oliver*, 510 U.S. 266 (1994), "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* at 273 (plurality opinion of Rehnquist, C.J.). *See also County of Sacramento*, 523 U.S. at 843 ("[s]ubstantive due process analysis is therefore inappropriate" if the claim is covered by a specific Amendment). Thus, although substantive due process offers another line of analysis, it does not provide any protection greater than that which the Eighth Amendment provides. *See Whitley*, 475 U.S. at 327.

To shock the conscience, the conduct at issue must involve more than mere negligence by the executive official. *See County of Sacramento*, 523 U.S. at 849. *See also Daniels v. Williams*, 474 U.S. 327 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property.") (collecting cases). Instead, "[i]t is . . . behavior on the other end of the culpability spectrum that would most probably support a substantive due process claim: conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento*, 523 U.S. at 849. In some circumstances, however, recklessness or gross negligence may suffice. *See id.* The requisite level of culpability is ultimately "not . . . subject to mechanical application in unfamiliar territory." *Id.* at 850. As the Supreme Court has explained: "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* As a general matter, deliberate indifference would be an appropriate standard where there is a real possibility for actual deliberation. In other circumstances, however, where quick decisions must be made (such as responding to a prison riot), a heightened level of culpability is more appropriate. *See id.* at 851–52.

The shock-the-conscience standard appears to be an evolving one. The Court's most recent opinion regarding this standard emphasized that the conscience shocked was the

Court found that the actions of the police officers "shocked the conscience" and therefore violated Rochin's due process rights. *Id.* at 170.

SECRET/NOFORN

"*contemporary* conscience." *Id.* at 847 n.8 (emphasis added). The Court explained that while a judgment of what shocks the conscience "may be informed by a history of liberty protection, [] it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them." *Id.* Despite the evolving nature of the standard, it is objective rather than subjective. The Supreme Court has cautioned that although "the gloss has . . . not been fixed" as to what substantive due process is, judges "may not draw on [their] merely personal and private notions and disregard the limits that bind judges in their judicial function. . . . [T]hese limits are derived from considerations that are fused in the whole nature of our judicial process." 342 U.S. at 170. *See United States v. Lovasco*, 431 U.S. 783 (1973) (reaffirming that the test is objective rather than subjective). As the Court further explained, the conduct at issue must "do more than offend some fastidious squeamishness or private sentimentalism" to violate due process. *Rochin*, 342 U.S. at 172.

Additionally, *Ingraham v. Wright*, 430 U.S. 651 (1977), clarified that under substantive due process, "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* at 674. And as the Fourth Circuit has noted, it is a "principle" "inherent in the Eighth [Amendment] and [substantive due process]" that "[n]ot . . . every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights")." *Riley v. Dorton*, 115 F.3d 1159, 1167 (4th Cir. 1997) (quoting *Hudson*, 503 U.S. at 9). Instead, "the [shock-the-conscience] . . . inquiry . . . [ is] whether the force applied caused injury so severe, and was so disproportionate to the need presented and so inspired by malice or sadism . . . that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). Examples of physical brutality that "shock the conscience" include: the rape of a plaintiff by a uniformed officer, see *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997); a police officer striking the plaintiff in retaliation for the plaintiff photographing the police officer, see *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. 1981); police officer shooting a fleeing suspect's legs without any probable cause other than the suspect's running and failure to stop, see *Aldridge v. Mullins*, 377 F. Supp. 850 (M.D. Tenn. 1972) *aff'd*, 474 F.2d 1189 (6th Cir. 1973). Moreover, beating or sufficiently threatening someone during the course of an interrogation can constitute conscience-shocking behavior. *See Gray v. Spillman*, 925 F.2d 90, 91 (4th Cir. 1991) (plaintiff was beaten and threatened with further beating if he did not confess). By contrast, for example, actions such as verbal insults and an angry slap of "medium force" did not constitute behavior that "shocked the conscience." *See Riley*, 115 F.3d at 1168 n.4 (4th Cir. 1997) (finding claims that such behavior shocked the conscience "meritless").

Physical brutality is not the only conduct that may meet the shock-the-conscience standard. In *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), the Ninth Circuit held that certain psychologically-coercive interrogation techniques could constitute a violation of substantive due process. The interrogators techniques were "designed to instill stress, hopelessness, and fear, and to break [the suspect's] resistance." *Id.* at 1229. The officers planned to ignore any request for a lawyer and to ignore the suspect's right to remain silent, with the express purpose that any statements he might offer would help keep him from testifying in his own defense. *See id.* at 1249. It was this express purpose that the court found to be the "aggravating factor" that led it to conclude that the conduct of the police "shocked the

SECRET/NOFORN

conscience." *Id.* at 1249. The court reasoned that while "[i]t is a legitimate purpose of police investigation to gather evidence and muster information that will surround a guilty defendant and make it difficult if not impossible for him to escape justice[,]" "when the methods chosen to gather such evidence and information are deliberately unlawful and flout the Constitution, the legitimacy is lost." *Id.* at 1250. In *Wilkins v. May*, 872 F.2d 190 (7th Cir. 1989), the Seventh Circuit found that severe mental distress inflicted on a suspect could be a basis for a substantive due process claim. *See id.* at 195. *See also Rhodes v. Robinson*, 612 F.2d 766, 771 (3d Cir. 1979) (claim of emotional harm could be the basis of a substantive due process claim). The *Wilkins* court found that under certain circumstances interrogating a suspect with gun at his head could violate those rights. *See* 872 F.2d at 195. Whether it would rise to the level of a violation depended upon whether the plaintiff was able to show "misconduct that a reasonable person would find so beyond the norm of proper police procedure as to shock the conscience, and that it is calculated to induce not merely momentary fear or anxiety, but severe mental suffering, in the plaintiff." *Id.* On the other hand, we note that merely deceiving the suspect does not shock the conscience, see, e.g., *United States v. Byram*, 145 F.3d 405 (1st Cir. 1998) (assuring defendant he was not in danger of prosecution did not shock the conscience), nor does the use of sympathy or friends as intermediaries, see, e.g., *United States v. Simtob*, 901 F.2d 799, 809 (9th Cir. 1990).

Although the substantive due process case law is not pellucid, several principles emerge. First, whether conduct is conscience-shocking turns in part on whether it is without any justification, i.e., it is "inspired by malice or sadism." *Webb*, 828 F.2d at 1158. Although enemy combatants may not pose a threat to others in the classic sense seen in substantive due process cases, the detainees here may be able to prevent great physical injury to countless others through their knowledge of future attacks. By contrast, if the interrogation methods were undertaken solely to produce severe mental suffering, they might shock the conscience. Second, the official must have acted with more than mere negligence. Because, generally speaking, there will be time for deliberation as to the methods of interrogation that will be employed, it is likely that the culpability requirement here is deliberate indifference. *See County of Sacramento*, 523 U.S. at 851–52. Thus, an official must know of a serious risk to the health or safety of a detainee and he must act in conscious disregard for that risk in order to violate due process standards. Third, this standard permits some physical contact. Employing a shove or slap as part of an interrogation would not run afoul of this standard. Fourth, the detainee must sustain some sort of injury as a result of the conduct, e.g., physical injury or severe mental distress.

## 5.    International Decisions on the Conduct of Interrogations

Although decisions by foreign or international bodies are in no way binding authority upon the United States, they provide guidance about how other nations will likely react to our interpretation of the CAT and Section 2340. As this Part will discuss, other Western nations have generally used a high standard in determining whether interrogation techniques violate the international prohibition on torture. In fact, these decisions have found various aggressive interrogation methods to, at worst, constitute cruel, inhuman, and degrading treatment, but not torture. These decisions only reinforce our view that there is a clear distinction between the two standards and that only extreme conduct, resulting in pain that is of an intensity often accompanying serious physical injury, will violate the latter.

### a.    European Court of Human Rights

An analogue to CAT's provisions can be found in the European Convention on Human Rights and Fundamental Freedoms (the "European Convention"). This convention prohibits torture, though it offers no definition of it. It also prohibits cruel, inhuman, or degrading treatment or punishment, again without definition. By barring both types of acts, the European Convention implicitly distinguishes between them and further suggests that torture is a grave act beyond cruel, inhuman, or degrading treatment or punishment.

The leading European Court of Human Rights case explicating the differences between torture and cruel, inhuman, or degrading treatment or punishment is *Ireland v. the United Kingdom* (1978).[69] In that case, the European Court of Human Rights examined interrogation techniques somewhat more sophisticated than the rather rudimentary and frequently obviously cruel acts described in the TVPA cases. Careful attention to this case is worthwhile not just because the case examines methods not used in the TVPA cases, but also because the Reagan administration relied on this case in reaching the conclusion that the term torture is reserved in international usage for "extreme, deliberate, and unusually cruel practices." S. Treaty Doc. No. 100-20, at 4.

The methods at issue in *Ireland* were:

(1) Wall Standing. The prisoner stands spread eagle against the wall, with fingers high above his head, and feet back so that he is standing on his toes such that his all of his weight falls on his fingers.
(2) Hooding. A black or navy hood is placed over the prisoner's head and kept there except during the interrogation.
(3) Subjection to Noise. Pending interrogation, the prisoner is kept in a room with a loud and continuous hissing noise.
(4) Sleep Deprivation. Prisoners are deprived of sleep pending interrogation.
(5) Deprivation of Food and Drink. Prisoners receive a reduced diet during detention and pending interrogation.

The European Court of Human Rights concluded that these techniques used in combination, and applied for hours at a time, were inhuman and degrading but did not amount to torture. In analyzing whether these methods constituted torture, the court treated them as part of a single program. *See Ireland.* ¶ 104. The court found that this program caused "if not actual bodily injury, at least intense physical and mental suffering to the person subjected thereto and also led to acute psychiatric disturbances during the interrogation." *Id.* ¶ 167. Thus, this program "fell into the category of inhuman treatment[.]" *Id.* The court further found that "[t]he techniques were also degrading since they were such as to arouse in their victims feeling of fear,

---

[69] According to one commentator, the Inter-American Court of Human Rights has also followed this decision. *See* Julie Lantrip, *Torture and Cruel, Inhuman and Degrading Treatment in the Jurisprudence of the Inter-American Court of Human Rights*, 5 ILSA J. Int'l & Comp. L. 551, 560–61 (1999). The Inter-American Convention to Prevent and Punish Torture, however, defines torture much differently from CAT or U.S. law and, as such, any cases under that treaty are not relevant here. *See* Inter-American Convention to Prevent and Punish Torture, *opened for signature* Dec. 9, 1985, art. 2, OAS T.S. No. 67, 25 I.L.M. 419 (1985) (entered into force Feb. 28, 1987 but the United States has never signed or ratified it).

SECRET/NOFORN

70

anguish and inferiority capable of humiliating and debasing them and possible [sic] breaking their physical or moral resistance." *Id.* Yet, the court ultimately concluded:

> Although the five techniques, as applied in combination, undoubtedly amounted to inhuman and degrading treatment, although their object was the extraction of confession, the naming of others and/or information and although they were used systematically, they did not occasion suffering of the particular *intensity* and *cruelty* implied by the word torture . . . .

*Id.* (emphasis added). Thus, even though the court had concluded that the techniques produce "intense physical and mental suffering" and "acute psychiatric disturbances," they were not of sufficient intensity and cruelty to amount to torture.

The court reached this conclusion based on the distinction the European Convention drew between torture and cruel, inhuman, or degrading treatment or punishment. The court reasoned that by expressly distinguishing between these two categories of treatment, the European Convention sought to "attach a special stigma to deliberate inhuman treatment causing very serious and cruel suffering." *Id.* ¶ 167. According to the court, "this distinction derives principally from a difference in the intensity of the suffering inflicted." *Id.* The court further noted that this distinction paralleled the one drawn in the U.N. Declaration on the Protection From Torture, which specifically defines torture as "'an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.'" *Id.* (quoting U.N. Declaration on the Protection From Torture).

The court relied on this same "intensity/cruelty" distinction to conclude that some physical maltreatment fails to amount to torture. For example, four detainees were severely beaten and forced to stand spread eagle up against a wall. *See id.* ¶ 110. Other detainees were forced to stand spread eagle while an interrogator kicked them "continuously on the inside of the legs." *Id.* ¶ 111. Those detainees were beaten, some receiving injuries that were "substantial" and, others received "massive" injuries. *See id.* Another detainee was "subjected to . . . 'comparatively trivial' beatings" that resulted in a perforation of the detainee's eardrum and some "minor bruising." *Id.* ¶ 115. The court concluded that none of these situations "attain[ed] the particular level [of severity] inherent in the notion of torture." *Id.* ¶ 174.

### b.   Israeli Supreme Court

The European Court of Human Rights is not the only other court to consider whether such a program of interrogation techniques was permissible. In *Public Committee Against Torture in Israel v. Israel*, 38 I.L.M. 1471 (1999), the Supreme Court of Israel reviewed a challenge brought against the General Security Service ("GSS") for its use of five techniques. At issue in *Public Committee Against Torture In Israel* were: (1) shaking, (2) the Shabach, (3) the Frog Crouch, (4) the excessive tightening of handcuffs, and (5) sleep deprivation. "Shaking" is "the forceful shaking of the suspect's upper torso, back and forth, repeatedly, in a manner which causes the neck and head to dangle and vacillate rapidly." *Id.* ¶ 9. The "Shabach" is actually a combination of methods wherein the detainee

is seated on a small and low chair, whose seat is tilted forward, towards the ground. One hand is tied behind the suspect, and placed inside the gap between the chair's seat and back support. His second hand is tied behind the chair, against its back support. The suspect's head is covered by an opaque sack, falling down to his shoulders. Powerfully loud music is played in the room.

*Id.* ¶ 10.

The "frog crouch" consists of "consecutive, periodical crouches on the tips of one's toes, each lasting for five minute intervals." *Id.* ¶ 11. The excessive tightening of handcuffs simply referred to the use handcuffs that were too small for the suspects' wrists. *See id.* ¶ 12. Sleep deprivation occurred when the Shabach was used during "intense non-stop interrogations."[70] *Id.* ¶ 13.

While the Israeli Supreme Court concluded that these acts amounted to cruel, and inhuman treatment, the court did not expressly find that they amounted to torture. To be sure, such a conclusion was unnecessary because even if the acts amounted only to cruel and inhuman treatment the GSS lacked authority to use the five methods. Nonetheless, the decision is still best read as indicating that the acts at issue did not constitute torture. The court's descriptions of and conclusions about each method indicate that the court viewed them as merely cruel, inhuman or degrading but not of the sufficient severity to reach the threshold of torture. While its descriptions discuss necessity, dignity, degradation, and pain, the court carefully avoided describing any of these acts as having the severity of pain or suffering indicative of torture. *See id.* at ¶¶ 24–29. Indeed, in assessing the *Shabach* as a whole, the court even relied upon the European Court of Human Right's *Ireland* decision for support and it did not evince disagreement with that decision's conclusion that the acts considered therein did not constitute torture. *See id.* ¶ 30.

In sum, both the European Court on Human Rights and the Israeli Supreme Court have recognized a wide array of acts that constitute cruel, inhuman, or degrading treatment or punishment, but do not amount to torture. Thus, they appear to permit, under international law, an aggressive interpretation as to what amounts to torture, leaving that label to be applied only where extreme circumstances exist.

## B.    Customary International Law

CAT constitutes the United States' primary international obligation on the issue of torture. Some, however, might argue that the United States is subject to a second set of obligations created by customary international law. Customary international law and treaties are often described as the two primary forms of international law. Unlike treaties, however, customary international law is unwritten, arises from the practice of nations, and must be followed out of a sense of legal obligation. While it may be the case that customary international

---

[70]   The court did, however, distinguish between this sleep deprivation and that which occurred as part of routine interrogation, noting that some degree of interference with the suspect's regular sleep habits was to be expected. *Public Committee Against Torture in Israel* ¶ 23.

SECRET/NOFORN

72

law prohibits torture, we believe that it cannot impose a substantive obligation that would vary from that which CAT creates. As a broad, recent multilateral agreement, CAT *is* the very state practice allegedly represented by customary international law, and thus customary international law could not functionally be any different from CAT.

As our Office has previously explained, customary international law "evolves through a dynamic process of state custom and practice." *Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. 163, 170 (1989). As one authority has described it, customary international law can be defined as a "general and consistent practice of states followed by them from a sense of legal obligation." *Restatement (Third)*, at § 102(2). The best evidence of customary international law is proof of state practice. *Id.* § 103 cmt. a; *see also Iraq Memorandum* at 23. Authorities observe that multilateral treaties are important evidence of state practice. *See Restatement (Third)*, pt. III introductory note at 144–45 ("Multilateral treaties are increasing used also to codify and develop customary international law. . . ."); *Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. U.S.)*, 1986 I.C.J. 14 (June 27) (relying on multilateral treaties as evidence of customary international law).

First, this must be the case because CAT, like other treaties, is the written expression of an agreement among signatories that willingly are bound by its terms. It provides a carefully crafted definition of the obligation regarding torture that nations, including the United States, have agreed to obey. By contrast, customary international law has no written definition, and the sources from which it can be drawn, such as the opinion of scholars, non-binding declarations by various meetings and assemblies, diplomatic notes and domestic judicial decisions, do not yield a defined and universal definition of the prohibited conduct. It is also unclear how universal and uniform state practice must be in order to crystallize into a norm of customary international law. Indeed, scholars will even argue that a norm has entered into customary international law, such as the prohibition on torture, while admitting that many states practice torture on their own citizens. *See, e.g., Filartiga v. Pena-Irala*, 630 F.2d 876, 882 (2d Cir. 1980); B. Simma & P. Alston, *The Sources of Human Rights Law: Custom, Jus Cogens, and General Principles*, 12 Australian Y. B. Int'l L. 82, 90–93 (1992). International law itself provides no guide for determining when the almost 200 nations in the world follow the same state practice sufficiently to create a new norm of customary international law. Even under the ambiguous methodology of international law, it is difficult to see how this form of law, which is never enacted through any accountable process nor accepted by any written form of consent, could supercede the obligations recently established through a carefully negotiated and written multilateral treaty on the identical subject.

Second, even if there is a uniform and universal state practice concerning torture sufficient to raise it to the level of customary international law, we believe it analytically incoherent to establish a norm of customary international law that differs from a recent, broadly accepted, multilateral agreement on the same exact issue. CAT provides substantive content to the prohibition on torture and cruel, inhuman, or degrading treatment or punishment. CAT is a multilateral agreement, ultimately joined by 132 state parties, to establish a definition of torture. In this context, we cannot see evidence of customary international law that could be a more compelling or conclusive definition of state practice. *See Restatement (Third)*, at § 102 cmt. i.

SECRET/NOFORN

("[i]nternational agreements constitute practice of states and as such can contribute to the growth of customary international law"). Indeed, any effort to draw forth a norm of customary international law at odds with the Torture Convention would ignore the most basic evidence of state practice—that of broad agreement to a written text—in favor of more speculative, ambiguous, and diverse definitions of dubious legitimacy.

Thus, it is CAT's substantive obligations as defined by our reservations, understandings, and declarations that govern the United States' international law obligations on torture. CAT not only governs U.S. obligations with respect to torture but it also does so with respect to cruel, inhuman, or degrading treatment or punishment. Thus, even if customary international law prohibits cruel, inhuman, or degrading treatment or punishment, CAT and the reservations, understandings, and declarations that the United States has taken with respect to the scope of that term's reach are definitive of United States' obligations. Customary international law cannot override carefully defined U.S. obligations through multilateral treaties on the exact same subject.

Finally, even if customary international law on torture created a different standard than that which the Torture Convention creates, and even if such a standard were somehow considered binding under international law, it could not bind the President as a matter of domestic law. We have previously concluded that customary international law is not federal law. *See Treaties and Laws Memorandum* at 32–33. This has been the longstanding view of this Office and of the Department of Justice. *See Authority of the Federal Bureau of Investigation to Override International in Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. at 168–171. The constitutional text provides no support for the notion that customary international law is part of federal law. *See id.* at 33. Indeed, because customary international has not undergone the processes the Constitution requires for "the enactment of constitutional amendments, statutes, or treaties," it is not law and "can have no legal effect on the government or on American citizens." *Treaties and Laws Memorandum* at 33–34. As we explained, to elevate customary international law to federal law would "raise deep structural problems" by "import[ing] a body of law to restrain the three branches of American government that never underwent any approval by our democratic political process." *Id.* at 36. Further, treating customary international law as federal law would directly invade "the President's discretion as the Commander in Chief and Chief Executive to determine how best to conduct the Nation's military affairs." *Id.* at 36. Thus, we concluded that "customary international law does not bind the President or the U.S. Armed Forces in their decisions concerning the detention conditions of al Qaeda and Taliban prisoners." *Id.* at 37. That conclusion is no less true there than here. Customary international law cannot interfere, as a matter of domestic law, with the President and the U.S. Armed Forces as they carry out their constitutional duties to successfully prosecute war against an enemy that has conducted a direct attack on the United States.

Even if one were to accept the notion that customary international law has some standing within our domestic legal system, the President may decide to override customary international law at his discretion. "It is well accepted that the political branches have ample authority to override customary international law within their respective spheres of authority." *Id.* at 34 (discussing *The Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116 (1812) and *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814)); *The Paquete Habana*, 175 U.S. 677 (1900). Our

Office has made clear its agreement with these Supreme Court cases that the President can unilaterally order the violation of customary international law. 13 Op. O.L.C. at 170. Indeed, there is a strong argument under international law that nations must have the ability to violate customary international law. Because the very essence of customary international law is that it evolves through state custom and practice, "'[s]tates necessarily must have the authority to contravene international norms.'" *Id.* at 36 (quoting *Authority of the Federal Bureau of Investigation to Override International Law in Extraterritorial Law Enforcement Activities*, 13 Op. OL.C. at 170). Otherwise, custom itself could not change. Thus, if the President were to order interrogation methods that were inconsistent with some notion of customary international law, he would have the authority to override the latter as a matter of domestic law, and he could also argue that as a matter of international law such conduct was needed to shape a new norm to address international terrorism.

## IV.    Defenses

Even if an interrogation method might arguably cross the line drawn in one of the criminal statutes described above, and application of the statute was not held to be an unconstitutional infringement of the President's Commander-in-Chief authority, we believe that under the current circumstances certain justification defenses might be available. Standard criminal law defenses of necessity and self-defense could justify interrogation methods needed to elicit information to prevent a direct and imminent threat to the United States and its citizens. The availability of these defenses would depend upon the precise factual circumstances surrounding a particular interrogation.

### A.    Necessity

We believe that a defense of necessity might be raised in certain circumstances. Often referred to as the "choice of evils" defense, necessity has been defined as follows:

> Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:
>
> > (a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
> > (b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
> > (c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

Model Penal Code § 3.02. *See also* LaFave & Scott, § 5.4 at 627. Although there is no federal statute that generally establishes necessity or other justifications as defenses to federal criminal laws, the Supreme Court has recognized the defense. *See United States v. Bailey*, 444 U.S. 394, 410 (1980) (relying on LaFave & Scott and Model Penal Code definitions of necessity defense).

The necessity defense might prove especially relevant in the current conflict. As it has been described in the case law and literature, the purpose behind necessity is one of public

~~SECRET/NOFORN~~

policy. According to LaFave and Scott, "the law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law." LaFave & Scott, at 629. In particular, the necessity defense can justify the intentional killing of one person to save two others because "it is better that two lives be saved and one lost than that two be lost and one saved." *Id.* Or, put in the language of a choice of evils, "the evil involved in violating the terms of the criminal law (. . . even taking another's life) may be less than that which would result from literal compliance with the law ( . . . two lives lost)." *Id.*

Additional elements of the necessity defense are worth noting here. First, the defense is not limited to certain types of harms. Therefore, the harm inflicted by necessity may include intentional homicide, so long as the harm avoided is greater (i.e., preventing more deaths). *Id.* at 634. Second, it must actually be the defendant's intention to avoid the greater harm; intending to commit murder and then learning only later that the death had the fortuitous result of saving other lives will not support a necessity defense. *Id.* at 635. Third, if the defendant reasonably believed that the lesser harm was necessary, even if, unknown to him, it was not, he may still avail himself of the defense. As LaFave and Scott explain, "if A kills B reasonably believing it to be necessary to save C and D, he is not guilty of murder even though, unknown to A, C and D could have been rescued without the necessity of killing B." *Id.* Fourth, it is for the court, and not the defendant to judge whether the harm avoided outweighed the harm done. *Id.* at 636. Fifth, the defendant cannot rely upon the necessity defense if a third alternative is open and known to him that will cause less harm.

It appears to us that the necessity defense could be successfully maintained in response to an allegation of a violation of a criminal statute. Al Qaeda's September 11, 2001 attack led to the deaths of thousands and losses in the billions of dollars. According to public and governmental reports, al Qaeda has other sleeper cells within the United States that may be planning similar attacks. Indeed, we understand that al Qaeda seeks to develop and deploy chemical, biological and nuclear weapons of mass destruction. Under these circumstances, a particular detainee may possess information that could enable the United States to prevent imminent attacks that could equal or surpass the September 11 attacks in their magnitude. Clearly, any harm that might occur during an interrogation would pale to insignificance compared to the harm avoided by preventing such an attack, which could take hundreds or thousands of lives.

Under this calculus, two factors will help indicate when the necessity defense could appropriately be invoked. First, the more certain that government officials are that a particular individual has information needed to prevent an attack, the more necessary interrogation will be. Second, the more likely it appears to be that a terrorist attack is likely to occur, and the greater the amount of damage expected from such an attack, the more that an interrogation to get information would become necessary. Of course, the strength of the necessity defense depends on the particular circumstances, and the knowledge of the government actors involved, when the interrogation is conducted. While every interrogation that might violate a criminal prohibition does not trigger a necessity defense, we can say that certain circumstances could support such a defense.

**UNCLASSIFIED**    ~~SECRET/NOFORN~~

We note that legal authorities identify an important exception to the necessity defense. The defense is available "only in situations wherein the legislature has not itself, in its criminal statute, made a determination of values." *Id.* at 629. Thus, if Congress explicitly has made clear that violation of a statute cannot be outweighed by the harm avoided, courts cannot recognize the necessity defense. LaFave and Israel provide as an example an abortion statute that made clear that abortions even to save the life of the mother would still be a crime; in such cases the necessity defense would be unavailable. *Id.* at 630. Here, however, Congress has not explicitly made a determination of values vis-à-vis torture. It has not made any such determination with respect to the federal criminal statutes applicable in the special maritime and territorial jurisdiction.

In fact, in enacting the torture statute to implement CAT, Congress declined to adopt language from the treaty's definition of torture that arguably seeks to prohibit the weighing of values. As discussed above CAT defines torture as the intentional infliction of severe pain or suffering "for such purpose[] as obtaining from him or a third person information or a confession." CAT art. 1.1. It could be argued that this definition means that the good of obtaining information—no matter what the circumstances—cannot justify an act of torture. In other words, necessity would not be a defense. In enacting section 2340, however, Congress removed the purpose element in the definition of torture, defining torture in terms of conduct rather than by reference to the purpose for which it was carried out. By leaving section 2340 silent as to the harm done by torture in comparison to other harms, Congress allowed the necessity defense to go forward when appropriate.

Further, CAT contains an additional provision that "no exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." CAT art. 2.2. Given that Congress enacted 18 U.S.C. §§ 2340–2340A in light of CAT, Congress presumably was aware of this provision of the treaty, and of the definition of the necessity defense that allows the legislature to provide for an exception to the defense, see Model Penal Code § 3.02(b), yet Congress did not incorporate CAT article 2.2 into section 2340. Nor did Congress amend any of the generally applicable criminal statutes to eliminate this defense in cases of torture. Given that Congress omitted CAT's effort to bar a necessity or wartime defense, we read section 2340 and the federal criminal statutes applicable to the special maritime and territorial jurisdiction as permitting the defense.

Additionally, criminal statutes are to be "strictly construed in favor of the defendant." LaFave, at § 2.2(d). As noted above, sections 2340–2340A do not expressly preclude the common law defenses of necessity nor as we explain below do they preclude the defense of self-defense. To find the necessity defense barred based on art. 2, which is not part of our domestic law because it is non-self-executing, would be a gross breach of this fundamental tenet. Indeed, such a conclusion would not only raise the specter that section 2340A is unconstitutionally vague, in violation of a defendant's Fifth Amendment right to due process, but invoking this article to preclude either self-defense or necessity defenses could also raise ex post facto-like concerns that may implicate a defendant's Fifth Amendment right to due process. *See Rogers v. Tennessee*, 532 U.S. 451, 462 (2001) ("[W]e conclude that a judicial alteration of a common law doctrine of criminal law violates the principle of fair

warning, and hence must not be given retroactive effect, only where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.") (internal quotation marks and citations omitted). *Cf.* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed").

B.    Self-Defense

Even if a court were to find that necessity did not justify the violation of a criminal statute, a defendant could still appropriately raise a claim of self-defense. The right to self-defense, even when it involves deadly force, is deeply embedded in our law, both as to individuals and as to the nation as a whole. As the Court of Appeals for the D.C. Circuit has explained:

> More than two centuries ago, Blackstone, best known of the expositors of the English common law, taught that "all homicide is malicious, and of course amounts to murder, unless . . . excused on the account of accident or self-preservation. . . ." Self-defense, as a doctrine legally exonerating the taking of human life, is as viable now as it was in Blackstone's time.

*United States v. Peterson*, 483 F.2d 1222, 1228–29 (D.C. Cir. 1973). Self-defense is a common-law defense to federal criminal offenses, and nothing in the text, structure or history of section 2340A precludes its application to a charge of torture. Similarly, in light of Congress's failure to eliminate this defense for defendants accused of torture but charged with one of the offenses applicable to the special maritime and territorial jurisdiction, we believe that nothing precludes the assertion of this defense. In the absence of any textual provision to the contrary, we assume self-defense can be an appropriate defense to an allegation of torture, irrespective of the offense charged.

The doctrine of self-defense permits the use of force to prevent harm to another person. As LaFave and Scott explain, "one is justified in using reasonable force in defense of another person, even a stranger, when he reasonably believes that the other is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger." *Id.* at 663–64. Ultimately, even deadly force is permissible, but "only when the attack of the adversary upon the other person reasonably appears to the defender to be a deadly attack." *Id.* at 664. As with our discussion of necessity, we will review the significant elements of this defense.[71] According to LaFave and Scott, the elements of the defense of others are the same as those that apply to individual self-defense.

First, self-defense requires that the use of force be *necessary* to avoid the danger of unlawful bodily harm. *Id.* at 649. A defender may justifiably use deadly force if he reasonably believes that the other person is about to inflict unlawful death or serious bodily harm upon another, and that it is necessary to use such force to prevent it. *Id.* at 652. Looked at from the opposite perspective, the defender may not use force when the force would be as equally effective at a later time and the defender suffers no harm or risk by waiting. *See* Paul H.

---

[71] Early cases had suggested that in order to be eligible for defense of another, one should have some personal relationship with the one in need of protection. That view has been discarded. LaFave & Scott at 664.

Robinson, 2 *Criminal Law Defenses* § 131(c) at 77 (1984). If, however, other options permit the defender to retreat safely from a confrontation without having to resort to deadly force, the use of force may not be necessary in the first place. La Fave & Scott at 659–60.

Second, self-defense requires that the defendant's belief in the necessity of using force be reasonable. If a defendant honestly but unreasonably believed force was necessary, he will not be able to make out a successful claim of self-defense. *Id.* at 654. Conversely, if a defendant reasonably believed an attack was to occur, but the facts subsequently showed no attack was threatened, he may still raise self-defense. As LaFave and Scott explain, "one may be justified in shooting to death an adversary who, having threatened to kill him, reaches for his pocket as if for a gun, though it later appears that he had no gun and that he was only reaching for his handkerchief." *Id.* Some authorities, such as the Model Penal Code, even eliminate the reasonability element, and require only that the defender honestly believed—regardless of its unreasonableness—that the use of force was necessary.

Third, many legal authorities include the requirement that a defender must reasonably believe that the unlawful violence is "imminent" before he can use force in his defense. It would be a mistake, however, to equate imminence necessarily with timing—that an attack is immediately about to occur. Rather, as the Model Penal Code explains, what is essential is that, the defensive *response* must be "immediately necessary." Model Penal Code § 3.04(1). Indeed, imminence may be merely another way of expressing the requirement of necessity. Robinson at 78. LaFave and Scott, for example, believe that the imminence requirement makes sense as part of a necessity defense because if an attack is not immediately upon the defender, the defender has other options available to avoid the attack that do not involve the use of force. LaFave & Scott at 656. If, however, the fact of the attack becomes certain and no other options remain, the use of force may be justified. To use a well-known hypothetical, if A were to kidnap and confine B, and then tell B he would kill B one week later, B would be justified in using force in self-defense, even if the opportunity arose before the week had passed. *Id.* at 656; *see also* Robinson at § 131(c)(1) at 78. In this hypothetical, while the attack itself is not imminent, B's use of force becomes immediately necessary whenever he has an opportunity to save himself from A.

Fourth, the amount of force should be proportional to the threat. As LaFave and Scott explain, "the amount of force which [the defender] may justifiably use must be reasonably related to the threatened harm which he seeks to avoid." LaFave & Scott at 651. Thus, one may not use deadly force in response to a threat that does not rise to death or serious bodily harm. If such harm may result, however, deadly force is appropriate. As the Model Penal Code § 3.04(2)(b) states, "[t]he use of deadly force is not justifiable . . . unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat."

In the current conflict, we believe that a defendant accused of violating the criminal prohibitions described above might, in certain circumstances, have grounds to properly claim the defense of another. The threat of an impending terrorist attack threatens the lives of hundreds if not thousands of American citizens. Whether such a defense will be upheld depends on the specific context within which the interrogation decision is made. If an attack appears increasingly certain, but our intelligence services and armed forces cannot prevent it without the information from the interrogation of a specific individual, then the more likely it will appear

that the conduct in question will be seen as necessary. The increasing certainty of an attack will also satisfy the imminence requirement. Finally, the fact that previous al Qaeda attacks have had as their aim the deaths of American citizens, and that evidence of other plots have had a similar goal in mind, would justify proportionality of interrogation methods designed to elicit information to prevent such deaths.

To be sure, this situation is different from the usual self-defense justification, and, indeed, it overlaps with elements of the necessity defense. Self-defense as usually discussed involves using force against an individual who is about to conduct the attack. In the current circumstances, however, an enemy combatant in detention does not himself present a threat of harm. He is not actually carrying out the attack; rather, he has participated in the planning and preparation for the attack, or merely has knowledge of the attack through his membership in the terrorist organization. Nonetheless, some leading scholarly commentators believe that interrogation of such individuals using methods that might violate section 2340A would be justified under the doctrine of self-defense, because the combatant by aiding and promoting the terrorist plot "has culpably caused the situation where someone might get hurt. If hurting him is the only means to prevent the death or injury of others put at risk by his actions, such torture should be permissible, and on the same basis that self-defense is permissible." Michael S. Moore, *Torture and the Balance of Evils*, 23 Israel L. Rev. 280, 323 (1989) (symposium on Israel's Landau Commission Report).[72] *See also* Alan M. Dershowitz, *Is It Necessary to Apply "Physical Pressure" to Terrorists—and to Lie About It?*, 23 Israel L. Rev. 192, 199–200 (1989). Thus, some commentators believe that by helping to create the threat of loss of life, terrorists become culpable for the threat even though they do not actually carry out the attack itself. If necessary, they may be hurt in an interrogation because they are part of the mechanism that has set the attack in motion, Moore, at 323, just as is someone who feeds ammunition or targeting information to an attacker. Under the present circumstances, therefore, even though a detained enemy combatant may not be the exact attacker—he is not planting the bomb, or piloting a hijacked plane to kill civilians—he still may be harmed in self-defense if he has knowledge of future attacks because he has assisted in their planning and execution.

In addition, we believe that a claim by an individual of the defense of another would be further supported by the fact that, in this case, the nation itself is under attack and has the right to self-defense. As *In re Neagle*, 135 U.S. 1 (1890) suggests, a federal official who has used force in self-defense may also draw upon the national right to self-defense to strengthen his claim of justification. In that case, the State of California arrested and held deputy U.S. Marshal Neagle for shooting and killing the assailant of Supreme Court Justice Field. In granting the writ of habeas corpus for Neagle's release, the Supreme Court did not rely alone upon the marshal's right to defend another or his right to self-defense. Rather, the Court found that Neagle, as an agent of the United States and of the executive branch, was justified in the killing because, in protecting Justice Field, he was acting pursuant to the executive branch's inherent constitutional authority to protect the United States government. *Id.* at 67 ("We cannot doubt the power of the president to take measures for the protection of a judge of one of the courts of the United States

---

[72] Moore distinguishes that case from one in which a person has information that could stop a terrorist attack, but who does not take a hand in the terrorist activity itself, such as an innocent person who learns of the attack from her spouse. Moore, 23 Israel L. Rev. at 324. Such individuals, Moore finds, would not be subject to the use of force in self-defense, although they might be under the doctrine of necessity.

who, while in the discharge of the duties of his office, is threatened with a personal attack which may probably result in his death."). That authority derives, according to the Court, from the President's power under Article II to take care that the laws are faithfully executed. In other words, Neagle as a federal officer not only could raise self-defense or defense of another, but also could defend his actions on the ground that he was implementing the Executive Branch's authority to protect the United States government.

If the right to defend the national government can be raised as a defense in an individual prosecution, as *Neagle* suggests, then a government defendant, acting in his official capacity, should be able to argue that any conduct that arguably violated a criminal prohibition was undertaken pursuant to more than just individual self-defense or defense of another. In addition, the defendant could claim that he was fulfilling the Executive Branch's authority to protect the federal government and the nation from attack after the events of September 11, which triggered the nation's right to self-defense. Following the example of *In re Neagle*, a government defendant may also argue that his conduct of an interrogation, if properly authorized, is justified on the basis of protecting the nation from attack. In order to make the fullest use of this defense, the defendant would want to show that his conduct was specifically ordered by national command authorities that have the authority to decide to use force in national self-defense.

There can be little doubt that the nation's right to self-defense has been triggered under our law. The Constitution announces that one of its purposes is "to provide for the common defense." U.S. Const., Preamble. Article I, § 8 declares that Congress is to exercise its powers to "provide for the common Defence." *See also* 2 Pub. Papers of Ronald Reagan 920, 921 (1988-89) (right of self-defense recognized by Article 51 of the U.N. Charter); *supra* Part III.A.4.a. The President has a particular responsibility and power to take steps to defend the nation and its people. *In re Neagle*, 135 U.S. at 64. *See also* U.S. Const. art. IV, § 4 ("The United States shall . . . protect [each of the States] against Invasion"). As Commander –in Chief and Chief Executive, he may use the armed forces to protect the nation and its people. *See, e.g., United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990). And he may employ secret agents to aid in his work as Commander-in-Chief. *Totten v. United States*, 92 U.S. 105, 106 (1876). As the Supreme Court observed in *The Prize Cases*, 67 U.S. (2 Black) 635 (1862), in response to an armed attack on the United States "the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority." *Id.* at 668. The September 11 events were a direct attack on the United States that triggered its right to use force under domestic and international law in self-defense, and as we have explained above, the President has authorized the use of military force with the support of Congress.

As we have made clear in other opinions involving the war against al Qaeda, the Nation's right to self-defense has been triggered by the events of September 11. If a government defendant were to harm an enemy combatant during an interrogation in a manner that might arguably violate a criminal prohibition, he would be doing so in order to prevent further attacks on the United States by the al Qaeda terrorist network. In that case, we believe that he could argue that the executive branch's constitutional authority to protect the nation from attack justified his actions. This national and international version of the right to self-defense could supplement and bolster the government defendant's individual right.

## Conclusion

For the foregoing reasons, we conclude that the Fifth and Eighth Amendments do not extend to alien enemy combatants held abroad. Moreover, we conclude that different canons of construction indicate that generally applicable criminal laws do not apply to the military interrogation of alien unlawful combatants held abroad. Were it otherwise, the application of these statutes to the interrogation of enemy combatants undertaken by military personnel would conflict with the President's Commander-in-Chief power.

We further conclude that CAT defines U.S. international law obligations with respect to torture and other cruel, inhuman, or degrading treatment or punishment. The standard of conduct regarding torture is the same as that which is found in the torture statute, 18 U.S.C. §§ 2340–2340A. Moreover, the scope of U.S. obligations under CAT regarding cruel, inhuman, or degrading treatment or punishment is limited to conduct prohibited by the Eighth, Fifth and Fourteenth Amendments. Customary international law does not supply any additional standards.

Finally, even if the criminal prohibitions outlined above applied, and an interrogation method might violate those prohibitions, necessity or self-defense could provide justifications for any criminal liability.

Please let us know if we can be of further assistance

John C. Yoo
Deputy Assistant Attorney General