# Exhibit F

# UNCLASSIFIED



**GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE**
1600 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1600

2002 DEC -2 AM 11: 03

OFFICE OF THE
SECRETARY OF DEFENSE

**ACTION MEMO**

November 27, 2002 (1:00 PM)

DEPSEC _____

**FOR:** SECRETARY OF DEFENSE

**FROM:** William J. Haynes II, General Counsel

**SUBJECT:** Counter-Resistance Techniques

- The Commander of USSOUTHCOM has forwarded a request by the Commander of Joint Task Force 170 (now JTF GTMO) for approval of counter-resistance techniques to aid in the interrogation of detainees at Guantanamo Bay (Tab A).

- The request contains three categories of counter-resistance techniques, with the first category the least aggressive and the third category the most aggressive (Tab B).

- I have discussed this with the Deputy, Doug Feith and General Myers. I believe that all join in my recommendation that, as a matter of policy, you authorize the Commander of USSOUTHCOM to employ, in his discretion, only Categories I and II and the fourth technique listed in Category III ("Use of mild, non-injurious physical contact such as grabbing, poking in the chest with the finger, and light pushing").

- While all Category III techniques may be legally available, we believe that, as a matter of policy, a blanket approval of Category III techniques is not warranted at this time. Our Armed Forces are trained to a standard of interrogation that reflects a tradition of restraint.

**RECOMMENDATION:** That SECDEF approve the USSOUTHCOM Commander's use of those counter-resistance techniques listed in Categories I and II and the fourth technique listed in Category III during the interrogation of detainees at Guantanamo Bay.

SECDEF DECISION

Approved ✓ / Disapproved _____ Other _____

Attachments
As stated

cc: CJCS, USD(P)

*However, I stand for 8-10 hours a day. Why is standing limited to 4 hours?*

D.R.  DEC 0 2 2002

Declassified Under Authority of Executive Order 12958
By Executive Secretary, Office of the Secretary of Defense
William P. Marriott, CAPT, USN
June 18, 2004

UNCLASSIFIED

X04030-02

DEPARTMENT OF DEFENSE
UNITED STATES SOUTHERN COMMAND
OFFICE OF THE COMMANDER
3511 NW 91ST AVENUE
MIAMI, FL 33172-1217

REPLY TO
ATTENTION OF

SCCDR

25 October 2002

MEMORANDUM FOR Chairman of the Joint Chiefs of Staff, Washington, DC 20318-9999

SUBJECT: Counter-Resistance Techniques

1. The activities of Joint Task Force 170 have yielded critical intelligence support for forces in combat, combatant commanders, and other intelligence/law enforcement entities prosecuting the War on Terrorism. However, despite our best efforts, some detainees have tenaciously resisted our current interrogation methods. Our respective staffs, the Office of the Secretary of Defense, and Joint Task Force 170 have been trying to identify counter-resistant techniques that we can lawfully employ.

2. I am forwarding Joint Task Force 170's proposed counter-resistance techniques. I believe the first two categories of techniques are legal and humane. I am uncertain whether all the techniques in the third category are legal under US law, given the absence of judicial interpretation of the US torture statute. I am particularly troubled by the use of implied or expressed threats of death of the detainee or his family. However, I desire to have as many options as possible at my disposal and therefore request that Department of Defense and Department of Justice lawyers review the third category of techniques.

3. As part of any review of Joint Task Force 170's proposed strategy, I welcome any suggested interrogation methods that others may propose. I believe we should provide our interrogators with as many legally permissible tools as possible.

4. Although I am cognizant of the important policy ramifications of some of these proposed techniques, I firmly believe that we must quickly provide Joint Task Force 170 counter-resistance techniques to maximize the value of our intelligence collection mission.

James T. Hill
General, US Army
Commander

Encls

1. JTF 170 CDR Memo
dtd 11 October, 2002
2. JTF 170 SJA Memo
dtd 11 October, 2002
3. JTF 170 J-2 Memo
dtd 11 October, 2002

Declassify Under the Authority of Executive Order 12958
By Executive Secretary, Office of the Secretary of Defense
By William P. Marriott, CAPT, USN
June 21, 2004

UNCLASSIFIED
SECRET/NOFORN




**DEPARTMENT OF DEFENSE**
**JOINT TASK FORCE 170**
**GUANTANAMO BAY, CUBA**
**APO AE 09860**

JTF 170-CG                                                                                   11 October 2002

MEMORANDUM FOR Commander, United States Southern Command, 3511 NW 91st Avenue, Miami, Florida 33172-1217

SUBJECT: Counter-Resistance Strategies

1. Request that you approve the interrogation techniques delineated in the enclosed Counter-Resistance Strategies memorandum. I have reviewed this memorandum and the legal review provided to me by the JTF-170 Staff Judge Advocate and concur with the legal analysis provided.

2. I am fully aware of the techniques currently employed to gain valuable intelligence in support of the Global War on Terrorism. Although these techniques have resulted in significant exploitable intelligence, the same methods have become less effective over time. I believe the methods and techniques delineated in the accompanying J-2 memorandum will enhance our efforts to extract additional information. Based on the analysis provided by the JTF-170 SJA, I have concluded that these techniques do not violate U.S. or international laws.

3. My point of contact for this issue is LTC Jerald Phifer at DSN 660-3476.

MICHAEL E. DUNLAVEY
Major General, USA
Commanding

2 Encls
1. JTF 170-J2 Memo,
   11 Oct 02
2. JTF 170-SJA Memo,
   11 Oct 02




DEPARTMENT OF DEFENSE
JOINT TASK FORCE 170
GUANTANAMO BAY, CUBA
APO AE 09360

JTF 170-SJA                                                11 October 2002

MEMORANDUM FOR Commander, Joint Task Force 170

SUBJ: Legal Review of Aggressive Interrogation Techniques

1. I have reviewed the memorandum on Counter-Resistance Strategies, dated 11 Oct 02, and agree that the proposed strategies do not violate applicable federal law. Attached is a more detailed legal analysis that addresses the proposal.

2. I recommend that interrogators be properly trained in the use of the approved methods of interrogation, and that interrogations involving category II and III methods undergo a legal review prior to their commencement.

3. This matter is forwarded to you for your recommendation and action.

2 Encls
1. JTF 170-J2 Memo,
   11 Oct 02
2. JTF 170-SJA Memo,
   11 Oct 02

DIANE E. BEAVER
LTC, USA
Staff Judge Advocate

~~SECRET//NOFORN~~




**DEPARTMENT OF DEFENSE
JOINT TASK FORCE 170
GUANTANAMO BAY, CUBA
APO AE 09860**

JTF 170-SJA

11 October 2002

MEMORANDUM FOR Commander, Joint Task Force 170

SUBJECT: Legal Brief on Proposed Counter-Resistance Strategies

1. (S//NF) ISSUE: To ensure the security of the United States and its Allies, more aggressive interrogation techniques than the ones presently used, such as the methods proposed in the attached recommendation, may be required in order to obtain information from detainees that are resisting interrogation efforts and are suspected of having significant information essential to national security. This legal brief references the recommendations outlined in the JTF-170-J2 memorandum, dated 11 October 2002.

2. (S//NF) FACTS: The detainees currently held at Guantanamo Bay, Cuba (GTMO), are not protected by the Geneva Conventions (GC). Nonetheless, DoD interrogators trained to apply the Geneva Conventions have been using commonly approved methods of interrogation such as rapport building through the direct approach, rewards, the multiple interrogator approach, and the use of deception. However, because detainees have been able to communicate among themselves and debrief each other about their respective interrogations, their interrogation resistance strategies have become more sophisticated. Compounding this problem is the fact that there is no established clear policy for interrogation limits and operations at GTMO, and many interrogators have felt in the past that they could not do anything that could be considered "controversial." In accordance with President Bush's 7 February 2002 directive, the detainees are not Enemy Prisoners of War (EPW). They must be treated humanely and, subject to military necessity, in accordance with the principles of GC.

3. (S//NF) DISCUSSION: The Office of the Secretary of Defense (OSD) has not adopted specific guidelines regarding interrogation techniques for detainee operations at GTMO. While the procedures outlined in Army FM 34-52 Intelligence Interrogation (28 September 1992), are utilized, they are constrained by, and conform to the GC and applicable international law, and therefore are not binding. Since the detainees are not EPWs, the Geneva Conventions limitations that ordinarily would govern captured enemy personnel interrogations are not binding on U.S. personnel conducting detainee interrogations at GTMO. Consequently, in the absence of specific binding guidance, and in accordance with the President's directive to treat the detainees humanely, we must look to applicable international and domestic law in order to determine the legality of the more aggressive interrogation techniques recommended in the J2 proposal.

a. (U) International Law: Although no international body of law directly applies, the more notable international treaties and relevant law are listed below.

Declassify Under the Authority of Executive Order 12958
By Executive Secretary, Office of the Secretary of Defense
By William P. Marriott, CAPT, USN
June 21, 2004

UNCLASSIFIED

~~SECRET//NOFORN~~

SECRET/NOFORN

JTF170-SJA
SUBJECT: Legal Brief on Proposed Counter-Resistance Strategies

(1) (U) In November of 1994, the United States ratified The Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment. However, the United States took a reservation to Article 16, which defined cruel, inhumane and degrading treatment or punishment, by instead deferring to the current standard articulated in the 8th Amendment to the United States Constitution. Therefore, the United States is only prohibited from committing those acts that would otherwise be prohibited under the United States Constitutional Amendment against cruel and unusual punishment. The United States ratified the treaty with the understanding that the convention would not be self-executing, that is, that it would not create a private cause of action in U.S. Courts. This convention is the principal U.N. treaty regarding torture and other cruel, inhumane, or degrading treatment.

(2) (U) The International Covenant on Civil and Political Rights (ICCPR), ratified by the United States in 1992, prohibits inhumane treatment in Article 7, and arbitrary arrest and detention in Article 9. The United States ratified it on the condition that it would not be self-executing, and it took a reservation to Article 7 that we would only be bound to the extent that the United States Constitution prohibits cruel and unusual punishment.

(3) (U) The American Convention on Human Rights forbids inhumane treatment, arbitrary imprisonment, and requires the state to promptly inform detainees of the charges against them, to review their pretrial confinement, and to conduct a trial within a reasonable time. The United States signed the convention on 1 June 1977, but never ratified it.

(4) (U) The Rome Statute established the International Criminal Court and criminalized inhumane treatment, unlawful deportation, and imprisonment. The United States not only failed to ratify the Rome Statute, but also later withdrew from it.

(5) (U) The United Nations' Universal Declaration of Human Rights, prohibits inhumane or degrading punishment, arbitrary arrest, detention, or exile. Although international declarations may provide evidence of customary international law (which is considered binding on all nations even without a treaty), they are not enforceable by themselves.

(6) (U) There is some European case law stemming from the European Court of Human Rights on the issue of torture. The Court ruled on allegations of torture and other forms of inhumane treatment by the British in the Northern Ireland conflict. The British authorities developed practices of interrogation such as forcing detainees to stand for long hours, placing black hoods over their heads, holding the detainees prior to interrogation in a room with continuing loud noise, and depriving them of sleep, food, and water. The European Court concluded that these acts did not rise to the level of torture as defined in the Convention Against Torture, because torture was defined as an aggravated form of cruel, inhuman, or degrading treatment or punishment. However, the Court did find that these techniques constituted cruel, inhumane, and degrading treatment. Nonetheless, and as previously mentioned, not only is the United States not a part of the European Human Rights Court, but as previously stated, it only ratified the definition of cruel, inhuman, and degrading treatment consistent with the U.S. Constitution. See also Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322 (N.D. Geor. 2002); Committee Against Torture v. Israel, Supreme Court of Israel, 6 Sep 99, 7 BHRC 31; Ireland v. UK (1978), 2 EHRR 25.

JTF170-SJA
SUBJECT: Legal Brief on Proposed Counter-Resistance Strategies

b. (U) Domestic Law: Although the detainee interrogations are not occurring in the continental United States, U.S. personnel conducting said interrogations are still bound by applicable Federal Law, specifically, the Eighth Amendment of the United States Constitution, 18 U.S.C. § 2340, and for military interrogators, the Uniform Code of Military Justice (UCMJ).

(1) (U) The Eighth Amendment of the United States Constitution provides that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. There is a lack of Eighth Amendment case law relating in the context of interrogations, as most of the Eighth Amendment litigation in federal court involves either the death penalty, or 42 U.S.C. § 1983 actions from inmates based on prison conditions. The Eighth Amendment applies as to whether or not torture or inhumane treatment has occurred under the federal torture statute.[1]

(a) (U) A principal case in the confinement context that is instructive regarding Eighth Amendment analysis (which is relevant because the United States adopted the Convention Against Torture, Cruel, Inhumane and Degrading Treatment, it did so deferring to the Eighth Amendment of the United States Constitution) and conditions of confinement if a U.S. court were to examine the issue is Hudson v. McMillian, 503 U.S. 1 (1992). The issue in Hudson stemmed from a 42 U.S.C. § 1983 action alleging that a prison inmate suffered minor bruises, facial swelling, loosened teeth, and a cracked dental plate resulting from a beating by prison guards while he was cuffed and shackled. In this case the Court held that there was no governmental interest in beating an inmate in such a manner. The Court further ruled that the use of excessive physical force against a prisoner might constitute cruel and unusual punishment, even though the inmate does not suffer serious injury.

(b) (U) In Hudson, the Court relied on Whitley v. Albers, 475 U.S. 312 (1986), as the seminal case that establishes whether a constitutional violation has occurred. The Court stated that the extent of the injury suffered by an inmate is only one of the factors to be considered, but that there is no significant injury requirement in order to establish an Eighth Amendment violation, and that the absence of serious injury is relevant to, but does not end, the Eighth Amendment inquiry. The Court based its decision on the "...settled rule that the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Whitley at 319, quoting Ingraham v. Wright, 430 U.S. 651, 670 (1977). The Hudson Court then held that in the excessive force or conditions of confinement context, the Eighth Amendment violation test delineated by the Supreme Court in Hudson is that when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated, whether or not significant injury is evident. The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, but the question of whether the measure taken inflicted unnecessary and wanton pain and suffering, ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very (emphasis added) purpose of causing harm. If so, the Eighth Amendment claim will prevail.

---

[1] Notwithstanding the argument that U.S. personnel are bound by the Constitution, the detainees confined at GTMO have no jurisdictional standing to bring a section 1983 action alleging an Eighth Amendment violation in U.S. Federal Court.

~~SECRET/NOFORN~~

JTF170-SJA
SUBJECT: Legal Brief on Proposed Counter-Resistance Strategies

(c) (U) At the District Court level, the typical conditions-of-confinement claims involve a disturbance of the inmate's physical comfort, such as sleep deprivation or loud noise. The Eighth Circuit ruled in Singh v. Holcomb, 1992 U.S. App. LEXIS 24790, that an allegation by an inmate that he was constantly deprived of sleep which resulted in emotional distress, loss of memory, headaches, and poor concentration, did not show either the extreme deprivation level, or the officials' culpable state of mind required to fulfill the objective component of an Eighth Amendment conditions-of-confinement claim.

(d) (U) In another sleep deprivation case alleging an Eighth Amendment violation, the Eighth Circuit established a totality of the circumstances test, and stated that if a particular condition of detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. In Ferguson v. Cape Girardeau County, 88 F.3d 647 (8th Cir. 1996), the complainant was confined to a 5-1/2 by 5-1/2 foot cell without a toilet or sink, and was forced to sleep on a mat on the floor under bright lights that were on twenty-four hours a day. His Eighth Amendment claim was not successful because he was able to sleep at some point, and because he was kept under those conditions due to a concern for his health, as well as the perceived danger that he presented. This totality of the circumstances test has also been adopted by the Ninth Circuit. In Green v. CSO Strack, 1995 U.S. App. LEXIS 14451, the Court held that threats of bodily injury are insufficient to state a claim under the Eighth Amendment, and that sleep deprivation did not rise to a constitutional violation where the prisoner failed to present evidence that he either lost sleep or was otherwise harmed.

(e) (U) Ultimately, an Eighth Amendment analysis is based primarily on whether the government had a good faith legitimate governmental interest, and did not act maliciously and sadistically for the very purpose of causing harm.

(2) (U) The torture statute (18 U.S.C. § 2340) is the United States' codification of the signed and ratified provisions of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursuant to subsection 2340B, does not create any substantive or procedural rights enforceable by law by any party in any civil proceeding.

(a) (U) The statute provides that "whoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life."

(b) (U) Torture is defined as "an act committed by a person acting under color of law _specifically intended_ (emphasis added) to inflict severe physical or mental pain or suffering (other than pain or suffering incident to lawful sanctions) upon another person within his custody or physical control." The statute defines "severe mental pain or suffering" as "the _prolonged mental harm caused by or resulting_ (emphasis added) from the intentional infliction or threatened infliction of severe physical pain or suffering; or the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses of the personality; or the threat of imminent death; or the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality."

JTF170-SJA
SUBJECT: Legal Brief on Proposed Counter-Resistance Strategies

(c) (U) Case law in the context of the federal torture statute and interrogations is also lacking, as the majority of the case law involving torture relates to either the illegality of brutal tactics used by the police to obtain confessions (in which the Court simply states that these confessions will be deemed as involuntary for the purposes of admissibility and due process, but does not actually address torture or the Eighth Amendment), or the Alien Torts Claim Act, in which federal courts have defined that certain uses of force (such as kidnapping, beating and raping of a nun with the consent or acquiescence of a public official. See Ortiz v. Gramajo, 886 F.Supp. 162 (D. Mass. 1995)) constituted torture. However, no case law on point within the context of 18 USC 2340.

(3) (U) Finally, U.S. military personnel are subject to the Uniform Code of Military Justice. The punitive articles that could potentially be violated depending on the circumstances and results of an interrogation are: Article 93 (cruelty and maltreatment), Article 118 (murder), Article 119 (manslaughter), Article 124 (maiming), Article 128 (assault), Article 134 (communicating a threat, and negligent homicide), and the inchoate offenses of attempt (Article 80), conspiracy (Article 81), accessory after the fact (Article 78), and solicitation (Article 82). Article 128 is the article most likely to be violated because a simple assault can be consummated by an unlawful demonstration of violence which creates in the mind of another a reasonable apprehension of receiving immediate bodily harm, and a specific intent to actually inflict bodily harm is not required.

4. (S/NF) ANALYSIS: The counter-resistance techniques proposed in the JTF-170-J2 memorandum are lawful because they do not violate the Eighth Amendment to the United States Constitution or the federal torture statute as explained below. An international law analysis is not required for the current proposal because the Geneva Conventions do not apply to these detainees since they are not EPWs.

(a) (S/NF) Based on the Supreme Court framework utilized to assess whether a public official has violated the Eighth Amendment, so long as the force used could plausibly have been thought necessary in a particular situation to achieve a legitimate governmental objective, and it was applied in a good faith effort and not maliciously or sadistically for the very purpose of causing harm, the proposed techniques are likely to pass constitutional muster. The federal torture statute will not be violated so long as any of the proposed strategies are not specifically intended to cause severe physical pain or suffering or prolonged mental harm. Assuming that severe physical pain is not inflicted, absent any evidence that any of these strategies will in fact cause prolonged and long lasting mental harm, the proposed methods will not violate the statute.

(b) (S/NF) Regarding the Uniform Code of Military Justice, the proposal to grab, poke in the chest, push lightly, and place a wet towel or hood over the detainee's head would constitute a per se violation of Article 128 (Assault). Threatening a detainee with death may also constitute a violation of Article 128, or also Article 134 (communicating a threat). It would be advisable to have permission or immunity in advance from the convening authority, for military members utilizing these methods.

(c) (S/NF) Specifically, with regard to Category I techniques, the use of mild and fear related approaches such as yelling at the detainee is not illegal because in order to communicate a threat, there must also exist an intent to injure. Yelling at the detainee is legal so long as the yelling is not done with the intent to cause severe physical damage or prolonged mental harm. Techniques of deception such as multiple interrogator techniques, and deception regarding interrogator identity are all permissible methods of interrogation, since there is no legal requirement to be truthful while conducting an interrogation.

JTF170-SJA
SUBJECT: Legal Brief on Proposed Counter-Resistance Strategies

(d) (S/NF) With regard to Category II methods, the use of stress positions such as the proposed standing for four hours, the use of isolation for up to thirty days, and interrogating the detainee in an environment other than the standard interrogation booth are all legally permissible so long as no severe physical pain is inflicted and prolonged mental harm intended, and because there is a legitimate governmental objective in obtaining the information necessary that the high value detainees on which these methods would be utilized possess, for the protection of the national security of the United States, its citizens, and allies. Furthermore, these methods would not be utilized for the "very malicious and sadistic purpose of causing harm," and absent medical evidence to the contrary, there is no evidence that prolonged mental harm would result from the use of these strategies. The use of falsified documents is legally permissible because interrogators may use deception to achieve their purpose.

(e) (S/NF) The deprivation of light and auditory stimuli, the placement of a hood over the detainee's head during transportation and questioning, and the use of 20 hour interrogations are all legally permissible so long as there is an important governmental objective, and it is not done for the purpose of causing harm or with the intent to cause prolonged mental suffering. There is no legal requirement that detainees must receive four hours of sleep per night, but if a U.S. Court ever had to rule on this procedure, in order to pass Eighth Amendment scrutiny, and as a cautionary measure, they should receive some amount of sleep so that no severe physical or mental harm will result. Removal of comfort items is permissible because there is no legal requirement to provide comfort items. The requirement is to provide adequate food, water, shelter, and medical care. The issue of removing published religious items or materials would be relevant if these were United States citizens with a First Amendment right. Such is not the case with the detainees. Forced grooming and removal of clothing are not illegal, so long as it is not done to punish or cause harm, as there is a legitimate governmental objective to obtain information, maintain health standards in the camp and protect both the detainees and the guards. There is no illegality in removing hot meals because there is no specific requirement to provide hot meals, only adequate food. The use of the detainee's phobias is equally permissible.

(f) (S/NF) With respect to the Category III advanced counter-resistance strategies, the use of scenarios designed to convince the detainee that death or severely painful consequences are imminent is not illegal for the same aforementioned reasons that there is a compelling governmental interest and it is not done intentionally to cause prolonged harm. However, caution should be utilized with this technique because the torture statute specifically mentions making death threats as an example of inflicting mental pain and suffering. Exposure to cold weather or water is permissible with appropriate medical monitoring. The use of a wet towel to induce the misperception of suffocation would also be permissible if not done with the specific intent to cause prolonged mental harm, and absent medical evidence that it would. Caution should be exercised with this method, as foreign courts have already advised about the potential mental harm that this method may cause. The use of physical contact with the detainee, such as pushing and poking will technically constitute an assault under Article 128, UCMJ.

SECRET//NOFORN

JTF170-SJA
SUBJECT: Legal Brief on Proposed Counter-Resistance Strategies

5. (U) RECOMMENDATION: I recommend that the proposed methods of interrogation be approved, and that the interrogators be properly trained in the use of the approved methods of interrogation. Since the law requires examination of all facts under a totality of circumstances test, I further recommend that all proposed interrogations involving category II and III methods must undergo a legal, medical, behavioral science, and intelligence review prior to their commencement.

6. (U) POC: Captain Michael Borden, x3536.

DIANE E. BEAVER
LTC, USA
Staff Judge Advocate

 

DEPARTMENT OF DEFENSE
JOINT TASK FORCE 170
GUANTANAMO BAY, CUBA
APO AE 09860

JTF-J2                                                11 October 2002

MEMORANDUM FOR Commander, Joint Task Force 170

SUBJECT: Request for Approval of Counter-Resistance Strategies

1. (S/NF) PROBLEM: The current guidelines for interrogation procedures at GTMO limit the ability of interrogators to counter advanced resistance.

2. (S/NF) Request approval for use of the following interrogation plan.

   a. Category I techniques. During the initial category of interrogation the detainee should be provided a chair and the environment should be generally comfortable. The format of the interrogation is the direct approach. The use of rewards like cookies or cigarettes may be helpful. If the detainee is determined by the interrogator to be uncooperative, the interrogator may use the following techniques.

      (1) Yelling at the detainee (not directly in his ear or to the level that it would cause physical pain or hearing problems)

      (2) Techniques of deception:

         (a) Multiple interrogator techniques.

         (b) Interrogator identity. The interviewer may identify himself as a citizen of a foreign nation or as an interrogator from a country with a reputation for harsh treatment of detainees.

   b. Category II techniques. With the permission of the OIC, Interrogation Section, the interrogator may use the following techniques.

      (1) The use of stress positions (like standing), for a maximum of four hours.

      (2) The use of falsified documents or reports.

      (3) Use of the isolation facility for up to 30 days. Request must be made to through the OIC, Interrogation Section, to the Director, Joint Interrogation Group (JIG). Extensions beyond the initial 30 days must be approved by the Commanding General. For selected



Declassify Under the Authority of Executive Order 12958
By Executive Secretary, Office of the Secretary of Defense
By William P. Marriott, CAPT, USN
June 21, 2004

JTF 170-J2
SUBJECT: Request for Approval of Counter-Resistance Strategies

detainees, the OIC, Interrogation Section, will approve all contacts with the detainee, to include medical visits of a non-emergent nature.

(4) Interrogating the detainee in an environment other than the standard interrogation booth.

(5) Deprivation of light and auditory stimuli.

(6) The detainee may also have a hood placed over his head during transportation and questioning. The hood should not restrict breathing in any way and the detainee should be under direct observation when hooded.

(7) The use of 20-hour interrogations.

(8) Removal of all comfort items (including religious items).

(9) Switching the detainee from hot rations to MREs.

(10) Removal of clothing.

(11) Forced grooming (shaving of facial hair etc...)

(12) Using detainees individual phobias (such as fear of dogs) to induce stress.

c. Category III techniques. Techniques in this category may be used only by submitting a request through the Director, JIG, for approval by the Commanding General with appropriate legal review and information to Commander, USSOUTHCOM. These techniques are required for a very small percentage of the most uncooperative detainees (less than 3%). The following techniques and other aversive techniques, such as those used in U.S. military interrogation resistance training or by other U.S. government agencies, may be utilized in a carefully coordinated manner to help interrogate exceptionally resistant detainees. Any of these techniques that require more than light grabbing, poking, or pushing, will be administered only by individuals specifically trained in their safe application.

(1) The use of scenarios designed to convince the detainee that death or severely painful consequences are imminent for him and/or his family.

(2) Exposure to cold weather or water (with appropriate medical monitoring).

(3) Use of a wet towel and dripping water to induce the misperception of suffocation.

JTF 170-J2
SUBJECT: Request for Approval of Counter-Resistance Strategies

    (4) Use of mild, non-injurious physical contact such as grabbing, poking in the chest with the finger, and light pushing.

3. (U) The POC for this memorandum is the undersigned at x3476.

JERALD PHIFER
LTC, USA
Director, J2