# Exhibit G



**DEPARTMENT OF THE NAVY**
GENERAL COUNSEL OF THE NAVY
1000 NAVY PENTAGON
WASHINGTON, D.C. 20350-1000

JUL _ 7 2004

SECRET — Unclassified upon removal of attachments

MEMORANDUM FOR INSPECTOR GENERAL, DEPARTMENT OF THE NAVY

Subj:   STATEMENT FOR THE RECORD:  OFFICE OF GENERAL COUNSEL
        INVOLVEMENT IN INTERROGATION ISSUES

Ref:    (a) NAVIG Memo 5021 Ser 00/017 of 18 Jun 04

        This responds to your request at reference (a) for a
statement that chronicles any involvement by the Department of
the Navy Office of the General Counsel (OGC) or me personally
in the development of the "interrogation rules of engagement"
(IROE) for Operation Enduring Freedom and Operation Iraqi
Freedom.  The following narrative adopts a slightly broader
focus.  It seeks to describe any such knowledge or involvement
as OGC or I had on any aspect of the interrogation techniques
used or contemplated following September 11, 2001, including
participation in legal analysis or discussions of such issues.
In the end, it is largely an account of my personal actions or
knowledge.  Unless otherwise indicated, the use below of the
term "OGC" includes my personal knowledge or activity as well
as that of other OGC attorneys or personnel.

        Before discussing the specifics of this involvement, four
key factors or events warrant mention by way of background:

        First, as a general rule, OGC has not had any official
responsibility for or involvement in detainee interrogation
practices, procedures, or doctrines, including IROE.  Because
the Department of the Navy (DON) does not have and has not had
assigned responsibilities for detainee interrogation matters,
OGC was neither consulted nor informed of such issues.  Apart
from the incidental events recounted here, the one exception
to this occurred on January 17, 2003, when the General Counsel
of the Air Force, acting pursuant to SECDEF and DOD GC
direction, requested that OGC participate in an inter-Service
Detainee Interrogation Working Group.  When the Working Group
ceased its work in late March 2003, OGC official involvement
in detainee interrogation issues also stopped.

        Second, my duties as General Counsel of the Navy include
serving as the Reporting Senior within the DON Secretariat for

the Naval Criminal Investigative Service (NCIS). These duties extend beyond the function of providing legal counsel and include general oversight responsibility over NCIS operations, policies, and budget. As a component under the operational control of other commands, NCIS has had some worldwide involvement on issues of detainee custody, treatment, and criminal interrogations and, specifically, those involving the Guantanamo detainees. As a result, I gained a measure of insight into detainee treatment and interrogation practices commensurate with NCIS's scope and degree of involvement.

Third, in December 2002, I received a report of detainee abuse occurring at Guantanamo Naval Base, Cuba, and complaints about interrogation guidelines pertaining to those detainees. Because the Guantanamo detainee interrogations, as noted above, were not the responsibility of the DON, I had no official oversight responsibilities in the matter. These alleged abuses were not being inflicted by Navy or Marine Corps personnel or pursuant to DON authorities or actions. OGC attorneys were not involved. Nonetheless, I chose to inquire further into the allegations. This narrative largely involves my response to the allegations that interrogation abuses were occurring at Guantanamo.

Fourth, in the following narrative a number of meetings and conversations are recounted, but this account is by necessity somewhat incomplete. While I have attempted to identify all individuals who participated, this was not always possible. Also, the narrative does not attempt to document the numerous meetings or conversations on the issues that I held with DON staff and colleagues as the events unfolded, in particular with my two Deputy General Counsel, Tom Kranz and William Molzahn; my Executive and Military Assistants, CAPT Charlotte Wise and LtCol Rick Schieke; the Judge Advocate General, RADM Michael Lohr; the Staff Judge Advocate to the Commandant, BGen Kevin Sandkuhler; the Counsel to the Commandant, Peter Murphy; and many senior OGC attorneys.

With this background, the following constitutes a chronological narrative of the significant events pertaining to detainee interrogations in which OGC or I participated or of which I had knowledge.

17 Dec 02

In a late afternoon meeting, NCIS Director David Brant informed me that NCIS agents attached to JTF-160, the criminal investigation task force in Guantanamo, Cuba, had learned that

2

some detainees confined in Guantanamo[1] were being subjected to physical abuse and degrading treatment. This treatment — which the NCIS agents had not participated in or witnessed — was allegedly being inflicted by personnel attached to JTF-170, the intelligence task force, and was rumored to have been authorized, at least in part, at a "high level" in Washington, although NCIS had not seen the text of this authority. The NCIS agents at Guantanamo and civilian and military personnel from other services were upset at this mistreatment and regarded such treatment as unlawful and in violation of American values. Director Brant emphasized that NCIS would not engage in abusive treatment even if ordered to and did not wish to be even indirectly associated with a facility that engaged in such practices.

Director Brant asked me if I wished to learn more. Disturbed, I responded that I felt I had to. We agreed to meet again the following day. That evening, I emailed RADM Michael Lohr, the Navy JAG, and invited him to attend the next morning's meeting with NCIS.

18 Dec 02

I met with Director Brant and NCIS Chief Psychologist Dr. Michael Gelles. Dr. Gelles had advised JTF-160 in interrogation techniques and had spent time at the detention facility. Also present were OGC Deputy General Counsel William Molzahn, RADM Michael Lohr, and my Executive Assistant, CAPT Charlotte Wise.

Dr. Gelles described conditions in Guantanamo and stated that guards and interrogators with JTF-170, who were under pressure to produce results, had begun using abusive techniques with some of the detainees. These techniques included physical contact, degrading treatment (including dressing detainees in female underwear, among other techniques), the use of "stress" positions, and coercive psychological procedures. The military interrogators believed that such techniques were not only useful, but were necessary to obtain the desired information. NCIS agents were not involved in the application of these techniques or witnesses to them, but had learned of them through discussions with

---

[1]  Guantanamo Naval Base is operated by the Navy. However, tenant operations reporting through different chains of commands — such as JTF-160 and JTF-170 — or different agencies do not provide operational reports to the base commander. Thus, such information would not necessarily filter up to OGC or the DON Secretariat.

personnel who had been involved and through access to computer databases where interrogation logs were kept. Dr. Gelles showed me extracts of detainee interrogation logs[2] evidencing some of this detainee mistreatment. (Att 1)

These techniques, Dr. Gelles explained, would violate the interrogation guidelines taught to military and law enforcement personnel and he believed they were generally violative of U.S. law if applied to U.S. persons. In addition, there was great danger, he said, that any force utilized to extract information would continue to escalate. If a person being forced to stand for hours decided to lie down, it probably would take force to get him to stand up again and stay standing. In contrast to the civilian law enforcement personnel present at Guantanamo, who were trained in interrogation techniques and limits and had years of professional experience in such practices, the military interrogators were typically young and had little or no training or experience in interrogations. Once the initial barrier against the use of improper force had been breached, a phenomenon known as "force drift" would almost certainly begin to come into play. This term describes the observed tendency among interrogators who rely on force. If some force is good, these people come to believe, then the application of more force must be better. Thus, the level of force applied against an uncooperative witness tends to escalate such that, if left unchecked, force levels, to include torture, could be reached. Dr. Gelles was concerned that this phenomenon might manifest itself at Guantanamo.

Director Brant reiterated his previous statements that he and the NCIS personnel at Guantanamo viewed any such abusive practices as repugnant. They would not engage in them even if ordered and NCIS would have to consider whether they could even remain co-located in Guantanamo if the practices were to continue. Moreover, this discontent was not limited to NCIS; law enforcement and military personnel from other services were also increasingly disturbed by the practice.

Director Brant also repeated that NCIS had been informed that the coercive interrogation techniques did not represent simply rogue activity limited to undisciplined interrogators or even practices sanctioned only by the local command, but had been reportedly authorized at a "high level" in

---

[2] My recollection is that I was shown extracts of these interrogation logs on this date. However, OGC documents indicate that these log extracts were emailed to me on January 13, 2003.

4

Washington. NCIS, however, had no further information on this.

The general mood in the room was dismay. I was of the opinion that the interrogation activities described would be unlawful and unworthy of the military services, an opinion that the others shared. I commended NCIS for their values and their decision to bring this to my attention. I also committed that I would try to find out more about the situation in Guantanamo, in particular whether any such interrogation techniques had received higher-level authorization.

19 Dec 02

Knowing that the Department of the Army had Executive Agent responsibility for Guantanamo detainee operations, I called Steven Morello, the Army General Counsel, and told him that I had heard of alleged interrogation abuses in Guantanamo. Mr. Morello responded that he had information on the issue and invited me to visit with him and his deputy, Tom Taylor, to discuss it further.

In the Army OGC offices, Mr. Morello and Mr. Taylor provided me with a copy of a composite document (Att 2) capped by an Action Memo from DOD General Counsel William Haynes to the Secretary of Defense entitled "Counter-Resistance Techniques." The memo, which I had not seen before,[3] evidenced that on December 2, 2002, Secretary Rumsfeld had approved the use of certain identified interrogation techniques at Guantanamo, including (with some restrictions) the use of stress positions, hooding, isolation, "deprivation of light and auditory stimuli," and use of "detainee-individual phobias (such as fear of dogs) to induce stress." This composite document (further referred to as the "December 2nd Memo") showed that the request for the authority to employ the techniques had originated with an October 11, 2002, memorandum from MG Michael Dunlavey, the Commander of JTF-170, to the Commander, SOUTHCOM, and had proceeded up the chain of command through the Joint Staff until reaching the Secretary. The Dunlavey memo was accompanied by a legal brief signed by

---

[3] Later, we would determine that this memo had been circulated by the Joint Staff to the OPNAV Staff, where it had been reviewed by a Navy captain who, on November 2, 2002, had concurred in the memo with caveats, including the need for a more detailed interagency legal and policy review. (Att 3) The memo was apparently not circulated further within the DON and had never reached my office or RADM Lohr's.

LTC Diane Beaver, the SJA to JTF-170, generally finding that application of the interrogation techniques complied with law.

Mr. Morello and Mr. Taylor demonstrated great concern with the decision to authorize the interrogation techniques. Mr. Morello said that "they had tried to stop it," without success, and had been advised not to question the settled decision further.

Upon returning to my office, I reviewed the Secretary's December 2nd Memo and the Beaver Legal Brief more closely. The brief held, in summary, that torture was prohibited but cruel, inhuman, or degrading treatment could be inflicted on the Guantanamo detainees with near impunity because, at least in that location, no law prohibited such action, no court would be vested with jurisdiction to entertain a complaint on such allegations, and various defenses (such as good motive or necessity) would shield any U.S. official accused of the unlawful behavior. I regarded the memo as a wholly inadequate analysis of the law and a poor treatment of this difficult and highly sensitive issue. As for the December 2nd Memo, I concluded that it was fatally grounded on these serious failures of legal analysis. As described in the memo and supporting documentation, the interrogation techniques approved by the Secretary should not have been authorized because some (but not all) of them, whether applied singly or in combination, could produce effects reaching the level of torture, a degree of mistreatment not otherwise proscribed by the memo because it did not articulate any bright-line standard for prohibited detainee treatment, a necessary element in any such document. Furthermore, even if the techniques as applied did not reach the level of torture, they almost certainly would constitute "cruel, inhuman, or degrading treatment," another class of unlawful treatment.

In my view, the alleged detainee abuse, coupled with the fact that the Secretary of Defense's memo had authorized at least aspects of it, could — and almost certainly would — have severe ramifications unless the policy was quickly reversed. Any such mistreatment would be unlawful and contrary to the President's directive to treat the detainees "humanely." In addition, the consequences of such practices were almost incalculably harmful to U.S. foreign, military, and legal policies. Because the American public would not tolerate such abuse, I felt the political fallout was likely to be severe.

6

I provided RADM Lohr with a copy of the December 2nd Memo and requested that Navy JAG prepare a legal analysis of the issues. I also decided to brief Secretary of the Navy Gordon England and take my objections to DOD GC Haynes as quickly as possible.

Later that day, RADM Lohr wrote via email that he had brought the allegations of abuse to the attention of the Vice Chief of Naval Operations, ADM William Fallon. (Att 4)

20 Dec 02

At 1015, in a very short meeting, I briefed Navy Secretary Gordon England on the NCIS report of detainee abuse, on the December 2nd Memo authorizing the interrogation techniques, and on my legal views and policy concerns. I told him I was planning to see DOD GC Haynes that afternoon to convey my concerns and objections. Secretary England authorized me to go forward, advising me to use my judgment.[4]

That afternoon I met with Mr. Haynes in his office. I informed him that NCIS had advised me that interrogation abuses were taking place in Guantanamo, that the NCIS agents considered any such abuses to be unlawful and contrary to American values, and that discontent over these practices were reportedly spreading among the personnel on the base. Producing the December 2nd Memo, I expressed surprise that the Secretary had been allowed to sign it. In my view, some of the authorized interrogation techniques could rise to the level of torture, although the intent surely had not been to do so. Mr. Haynes disagreed that the techniques authorized constituted torture. I urged him to think about the techniques more closely. What did "deprivation of light and auditory stimuli" mean? Could a detainee be locked in a completely dark cell? And for how long? A month? Longer? What precisely did the authority to exploit phobias permit? Could a detainee be held in a coffin? Could phobias be applied until madness set in? Not only could individual techniques applied singly constitute torture, I said, but also the application of combinations of them must surely be recognized as potentially capable of reaching the level of torture. Also, the memo's fundamental problem was that it was

---

[4] At this time, Secretary England's nomination to serve as Deputy Secretary of the Department of Homeland Security had been announced, and he was transitioning out of the DON. He would ultimately transfer out of the Department on January 23, 2003. This would be my only conversation with him on the issue until months later, well after his return as Navy Secretary.

completely unbounded — it failed to establish a clear boundary for prohibited treatment. That boundary, I felt, had to be at that point where cruel and unusual punishment or treatment began. Turning to the Beaver Legal Brief, I characterized it as an incompetent product of legal analysis, and I urged him not to rely on it.

I also drew Mr. Haynes's attention to the Secretary's hand-written comment on the bottom of the memo, which suggested that detainees subjected to forced standing (which was limited to four hours) could be made to stand longer since he usually stood for longer periods during his work day.[5] Although, having some sense of the Secretary's verbal style, I was confident the comment was intended to be jocular, defense attorneys for the detainees were sure to interpret it otherwise. Unless withdrawn rapidly, the memo was sure to be discovered and used at trial in the military commissions. The Secretary's signature on the memo ensured that he would be called as a witness. I told Mr. Haynes he could be sure that, at the end of what would be a long interrogation, the defense attorney would then refer the Secretary to the notation and ask whether it was not intended as a coded message, a written nod-and-a-wink to interrogators to the effect that they should not feel bound by the limits set in the memo, but consider themselves authorized to do what was necessary to obtain the necessary information. The memos, and the practices they authorized, threatened the entire military commission process.

Mr. Haynes listened attentively throughout. He promised to consider carefully what I had said.

I had entered the meeting believing that the December 2nd Memo was almost certainly not reflective of conscious policy but the product of oversight — a combination of too much work and too little time for careful legal analysis or measured consideration. I left confident that Mr. Haynes, upon reflecting on the abuses in Guantanamo and the flaws in the December 2nd Memo and underlying legal analysis, would seek to correct these mistakes by obtaining the quick suspension of the authority to apply the interrogation techniques.

21 Dec 02 — 3 Jan 03

On these dates I left for and returned from Miami on a family Christmas vacation. During this time, I learned via

---

[5] The notation reads: "However, I stand for 8 - 10 hours a day. Why is standing limited to 4 hours?"

emails from RADM Lohr that he had brought the allegations of abuse to VADM Kevin Green, the Deputy Chief of Naval Operations for Plans, Policy, and Operations, and COL Manny Supervielle, SOUTHCOM SJA. I returned to the office on Friday, January 3, 2003.

> 6 Jan 03

NCIS Director Brant informed me that the detainee mistreatment in Guantanamo was continuing and that he had not heard that the December 2nd Memo had been suspended or revoked. This came as an unpleasant surprise since I had been confident that the abusive activities would have been quickly ended once I brought them to the attention of higher levels within DOD. I began to wonder whether the adoption of the coercive interrogation techniques might not have been the product of simple oversight, as I had thought, but perhaps a policy consciously adopted — albeit through mistaken analysis — and enjoying at least some support within the Pentagon bureaucracy. To get them curbed I would have to develop a constituency within the Pentagon to do so.

I met with Under Secretary of the Navy Susan Livingstone and informed her, for the first time, of the evidence of abuse in Guantanamo, my legal and policy views, and my various meetings and conversations on the matter. I recommended an NCIS brief, which she accepted. That afternoon, Director Brant and other NCIS agents briefed her along the same lines of the brief they provided me on December 18th. I attended the brief. This would be the first of almost daily conversations or meetings that I had with Under Secretary Livingstone on this issue. Her views and mine coincided, and she provided great support during this entire period.

On this and the following day, I reviewed the product of research that had been begun almost immediately following the news of the detainee abuse, in particular a memorandum of law prepared under RADM Lohr's direction by Navy JAG attorneys. (Att 5) In addition, I reviewed a letter (Att 6) dated December 26, 2002, from Kenneth Roth, the Executive Director of Human Rights Watch, a prominent human rights organization, to President Bush. The letter, which contained legal analysis I considered largely accurate, had been cited in a Washington Post article published on the same date.[6] (Att 7) Both the letter and the article were confirmation that the accounts of

---

[6] D. Priest, B. Gellman, "U.S. Decries Abuse but Defends Interrogations," Washington Post, p. A1 (Dec. 26, 2002).

prisoner abuse had begun to leak out, as they were bound to
do.

### 8 Jan 03

I met in my office with Jaymie Durnan, a Special
Assistant to Secretary Rumsfeld and Deputy Secretary Paul
Wolfowitz. Showing him the December 2nd Memo, I informed Mr.
Durnan about the alleged prisoner abuse at Guantanamo, the
repugnance that NCIS and other U.S. officials at the base felt
about the practice, and my view that the mistreatment was
illegal and contrary to American values. In addition to their
unlawfulness, the abusive practices — once they became known
to the American public and military — would have severe
policy repercussions: the public and military would both
repudiate them; public support for the War on Terror would
diminish; there would be ensuing international condemnation;
and, as a result, the United States would find it more
difficult not only to expand the current coalition, but even
to maintain the one that existed. The full political
consequences were incalculable but certain to be severe. I
also informed Mr. Durnan of my December 20th conversation with
Mr. Haynes and my surprise to learn, following my return from
vacation, that the interrogation authorities had not been
suspended in the intervening time. I told him I would be
seeing Mr. Haynes again the following day and asked for his
help in reversing the policy.

Mr. Durnan expressed serious concern over the matter and
promised to look into it at his level. He asked for a copy of
the December 2nd Memo, which I had delivered to him later that
same day (Att 8) along, I believe, with the Navy JAG legal
memo. He also asked that I keep him informed of my
conversation with Mr. Haynes.

### 9 Jan 03

I met with Mr. Haynes in his office again that afternoon.
He was accompanied by an Air Force major whose name I cannot
recall. I told him that I had been surprised to learn upon my
return from vacation that the detainee abuses appeared to be
continuing and that, from all appearances, the interrogation
techniques authorized by the December 2nd Memo were still in
place. I also provided him a draft copy of the Navy JAG legal
memo.

Mr. Haynes did not explain what had happened during the
interval, but said that some U.S. officials believed the

techniques were necessary to obtain information from the few Guantanamo detainees who, it was thought, were involved in the 9/11 attacks and had knowledge of other al Qaeda operations planned against the United States. I acknowledged the ethical issues were difficult. I was not sure what my position would be in the classic "ticking bomb" scenario where the terrorist being interrogated had knowledge of, say, an imminent nuclear weapon attack against a U.S. city. If I were the interrogator involved, I would probably apply the torture myself, although I would do so with full knowledge of potentially severe personal consequences. But I did not feel this was the factual situation we faced in Guantanamo, and even if I were willing to do this as an individual and assume the personal consequences, by the same token I did not consider it appropriate for us to advocate for or cause the laws and values of our nation to be changed to render the activity lawful. Also, the threats against the United States came from many directions and had many different potential consequences. Does the threat by one common criminal against the life of one citizen justify torture or lesser mistreatment? If not, how many lives must the threat jeopardize? Where does one set the threshold, if at all? In any event, this was not for us to decide in the Pentagon; these were issues for national debate.

My recollection is that I raised the following additional points with Mr. Haynes:

- The December 26th Washington Post article recounting allegations of prisoner mistreatment at Guantanamo and elsewhere demonstrated that the discontent of those in the military opposed to the practice was leaking to the media, as was inevitable.

- Even if one wanted to authorize the U.S. military to conduct coercive interrogations, as was the case in Guantanamo, how could one do so without profoundly altering its core values and character? Societal education and military training inculcated in our soldiers American values adverse to mistreatment. Would we now have the military abandon these values altogether? Or would we create detachments of special guards and interrogators, who would be trained and kept separate from the other soldiers, to administer these practices?

- The belief held by some that Guantanamo's special jurisdictional situation would preclude a U.S. court

finding jurisdiction to review events occurring there was questionable at best. The coercive interrogations in Guantanamo were not committed by rogue elements of the military acting without authority, a situation that may support a finding of lack of jurisdiction. In this situation, the authority and direction to engage in the practice issued from and was under review by the highest DOD authorities, including the Secretary of Defense. What precluded a federal district court from finding jurisdiction along the entire length of the chain of command?

- The British Government had applied virtually the same interrogation techniques against Irish Republican Army detainees in the '70s. Following an exhaustive investigation in which the testimony of hundreds of witnesses was taken, the European Commission of Human Rights found the interrogation techniques to constitute torture. In *Ireland v. United Kingdom*,[7] a later law suit brought by the victims of the interrogation techniques, the European Court of Human Rights in a split decision held that the techniques did not rise to the level of torture, but did amount to "cruel, inhuman, and degrading" treatment, a practice that was equally in violation of European law and international human rights standards. The court awarded damages. Ultimately, the then-Prime Minister, standing in the well of Parliament, admitted that the government had used the techniques, forswore their further use, and announced further investigations and remedial training. This case was directly applicable to our situation for two reasons. First, because of the similarity between U.S. and U.K. jurisprudence, the case helped establish that the interrogation techniques authorized in the December 2nd Memo constituted, at a minimum, cruel, inhuman, and degrading treatment. Further, depending on circumstances, the same treatment may constitute torture — treatment that may discomfit a prizefighter may be regarded as torture by a grandmother. Second, at present, British Prime Minister Tony Blair had lost significant electoral

---

[7] *Republic of Ireland v. United Kingdom,* (Series A, No. 25) European Court of Human Rights (1979-80), 2 EHRR 25 (Jan. 18, 1978).

support and was under heavy political pressure
because of his staunch support for the United States
in the War on Terror and Operation Iraqi Freedom.
What would be the impact on Blair's political
standing upon the disclosure that his partner, the
United States, was engaged in practices that were
unlawful under British and European law?  Could the
British Government be precluded from continuing to
cooperate with us on aspects of the War on Terror
because doing so would abet illegal activity?
Besides Blair, what impact would our actions have
with respect to the willingness of other European
leaders, all of whom are subject to the same law, to
participate with us in the War on Terror?

- A central element of American foreign policy for
decades had been our support for human rights.  By
authorizing and practicing cruel, inhuman, and
degrading treatment, we were now engaged in the same
sort of practices that we routinely condemned.  Had
we jettisoned our human rights policies?  If not,
could we continue to espouse them given our
inconsistent behavior?

Mr. Haynes said little during our meeting.  Frustrated by
not having made much apparent headway, I told him that the
interrogation policies could threaten Secretary Rumsfeld's
tenure and could even damage the Presidency.  "Protect your
client," I urged Mr. Haynes.

After the meeting, I reported back to Mr. Durnan by
email.  (Att 9)  Two sentences summarized my view of the
meeting.  Speaking of Mr. Haynes, I wrote:  "He listened — as
he always does — closely and intently to my arguments and
promised to get back to me, but didn't say when.  I've got no
inkling what impact, if any, I made."

10 Jan 03

I met in my office with CAPT Jane Dalton, JAGC, USN, the
Legal Adviser to the Chairman of the Joint Chiefs of Staff,
who had called for the meeting at Mr. Haynes's request.  I
reviewed the December 2nd Memo with her, making many of the
same points that I had made in my previous conversations with
Mr. Haynes, Mr. Durnan, and others.

Also as a result of action by Mr. Haynes, I presented my
views and objections at an afternoon meeting attended by the

other service General Counsel and the senior Judge Advocates General. My arguments were similar to those discussed above. I reported both meetings in a brief email to Mr. Durnan. (Att 10)

I regarded Mr. Haynes's initiative to schedule the above two meetings as a positive development and a sign that he not only took my arguments seriously, but that he possibly agreed with some or many of them. Later that afternoon, he called to say that Secretary Rumsfeld was briefed that day on my concerns. Mr. Haynes suggested that modifications to the interrogation policy were in the offing and could come as early as next week. I reported this to Mr. Durnan in an email. (Att 11)

13 Jan 03

In separate meetings, I met alone with Air Force General Counsel Mary Walker, Army General Counsel Steve Morello, and DOD Deputy General Counsel Dan Dell'Orto. The arguments I raised were roughly the same ones I had made to Mr. Haynes in our earlier conversations.

14 Jan 03

I met with VADM Kevin Green and gave him a full account of my concerns and objections, as well as of my meetings and conversations on the issues.

15 Jan 03

Uncertain whether there would be any change to the interrogation policy and dissatisfied at what I viewed as the slow pace of the discussions, I prepared a draft memorandum addressed to Mr. Haynes and CAPT Dalton (Att 12) providing my views on the JTF-170[8] October 11, 2002, request (contained as part of the December 2nd Memo) requesting authority to engage in the counter-resistance interrogation techniques. My memo: (a) stated that the majority of the proposed category II and all of the category III techniques were violative of domestic and international legal norms in that they constituted, at a minimum, cruel and unusual treatment and, at worst, torture; (b) rejected the legal analysis and recommendations of the Beaver Legal Brief; and (c) "strongly non-concurred" with the adoption of the violative interrogation techniques. The memo further cautioned that even "the misperception that the U.S.

---

[8] After a name change, it was now designated JTF GTMO.

Government authorizes or condones detention or interrogation practices that do not comply with our domestic and international legal obligations . . . probably will cause significant harm to our national legal, political, military and diplomatic interests."

I delivered the memo in draft form to Mr. Haynes's office in the morning. In a telephone call, I told Mr. Haynes that I was increasingly uncomfortable as time passed because I had not put down in writing my views on the interrogation issues. I said I would be signing out the memo late that afternoon unless I heard definitively that use of the interrogation techniques had been or was being suspended. We agreed to meet later that day.

In the later meeting, which Mr. Dell'Orto attended, Mr. Haynes returned the draft memo to me. He asked whether I was not aware about how he felt about the issues or the impact of my actions. I responded that I did not and, with respect to his own views, I had no idea whether he agreed totally with my arguments, disagreed totally with them, or held an intermediate view. Mr. Haynes then said that Secretary Rumsfeld would be suspending the authority to apply the techniques that same day. I said I was delighted and would thus not be signing out my memo. Later in the day and after our meeting, Mr. Haynes called to confirm that Secretary Rumsfeld had suspended the techniques. I reported the news widely, including to the Under Secretary (Att 13) and VADM Green (Att 14).

    17 Jan 03

    Secretary Rumsfeld, through General Counsel Haynes, established a Working Group headed by Air Force General Counsel Mary Walker to develop recommendations by January 29 on detainee interrogations. (Att 15) The sub-issues associated with the tasking were divided among the services. Navy OGC was assigned the task to develop a paper on the applicability of the 5th, 8th, and 14th Amendments to detainee interrogations. Early in this process, the Working Group was advised that the Office of Legal Counsel (OLC) in the Department of Justice would be developing a comprehensive legal memorandum that was to serve as definitive guidance on

the issues addressed by it.[9]  I appointed LtCol Rick Schieke to serve as the OGC representative to the Working Group.[10]

I met with NCIS Chief Psychologist Dr. Michael Gelles and senior NCIS Special Agent Mark Fallon.  In the meeting, I mentioned my concern that simple opposition to the use of the coercive interrogation techniques may not be sufficient to prevail in the impending bureaucratic reexamination of which procedures to authorize.  We couldn't fight something with nothing; was there anything in the scientific or academic literature that would support the use of non-coercive interrogation techniques?  Dr. Gelles replied that there was. Most behavioral experts working in the field, he said, viewed torture and other less coercive interrogation tactics not only as illegal, but also as ineffective.  The weight of expert opinion held that the most effective interrogation techniques to employ against individuals with the psychological profile of the al Qaeda or Taliban detainees were "relationship-based," that is, they relied on the mutual trust achieved in the course of developing a non-coercive relationship to break down the detainee's resistance to interrogation.  Coercive interrogations, said Dr. Gelles, were counter-productive to the implementation of relationship-based strategies.

At my direction, Dr. Gelles began the preparation of two memos, the first to be a summary of the thesis intended to be injected as quickly as possible into the Working Group and inter-agency deliberations, and the second a comprehensive discussion of the subject.  This actually would lead to the preparation of three memoranda, which are identified below on the dates they were circulated.

18 Jan - 29 Jan 03

This was the principal period for the Working Group activities.  Sometime during this period, OLC delivered its draft legal memo on interrogation techniques (the "OLC Memo") to Air Force GC Walker, the chairperson of the Group. Although the lengthy memo covered many issues and did so with

---

[9] By 28 C.F.R. § 0.25, the Attorney General delegated to the Office of Legal Counsel the authority to render opinions on questions of law when requested by the President or heads of executive departments pursuant to 28 U.S.C § 511-512.
[10] The Working Group process generated a large volume of paper through the course of numerous meetings.  I did not participate in the daily work of the group.  Because its activities were well documented and a large number of participants were involved, the following narrative will focus only on the principal points of my own involvement in the process.

seeming sophistication, I regarded it as profoundly in error in at least two central elements. First, the memo explicitly held that the application of cruel, inhuman, and degrading treatment to the Guantanamo detainees was authorized with few restrictions or conditions. This, I felt, was a clearly erroneous conclusion that was at variance with applicable law, both domestic and international, and trends in constitutional jurisprudence, particularly those dealing with the 8th Amendment protections against cruel and unusual punishment and 14th Amendment substantive due process protections that prohibited conduct "shocking to the conscience." And second, the memo espoused an extreme and virtually unlimited theory of the extent of the President's commander-in-chief authority. A key underpinning to the notion that cruel treatment could be applied to the detainees, the OLC formulation of the commander-in-chief authority was wrongly articulated because it failed to apply the *Youngstown Steel* test to the Guantanamo circumstances. If applied, the test would have yielded a conclusion that the commander-in-chief authority was probably greatly attenuated in the non-battlefield Guantanamo setting. In summary, the OLC memo proved a vastly more sophisticated version of the Beaver Legal Brief, but it was a much more dangerous document because the statutory requirement that OLC opinions are binding provided much more weight to its virtually equivalent conclusions.

Soon upon receipt of the OLC Memo, the Working Group leadership began to apply its guidance to shape the content of its report. As illustrated below, contributions from the members of the Working Group, including OGC, began to be rejected if they did not conform to the OLC guidance.

30 Jan 03

In an email chain initiated by Ms. Walker, she objected to an effort by the OGC representative, which I had directed, to insert 8th Amendment analysis into the Working Group report. In my reply I sought to alert her to the mistakes in the OLC Memo's legal analysis and to its unreliability as guidance. I wrote: "The OLC draft paper is fundamentally in error: it spots some of the legal trees, but misses the constitutional forest. Because it identifies no boundaries to action — more, it alleges there are none — it is virtually useless as guidance as now drafted and dangerous in that it might give some a false sense of comfort."[11]  Ms. Walker's response

---

[11] Ultimately, the Justice Department would apparently come to the same conclusion. In late June 2004, in the aftermath of the Abu Ghraib scandal

dismissed my warning: "I disagree and moreover I believe DOD GC disagrees." (Three emails at Att 16)

Even before this date, it became evident to me and my OGC colleagues[12] that the Working Group report being assembled would contain profound mistakes in its legal analysis, in large measure because of its reliance on the flawed OLC Memo. In addition, the speed of the Working Group process and the division of responsibility among the various Services made it difficult to prepare detailed comments or objections to those sections not assigned to OGC. My intent at this stage was to review the final draft report when it was circulated for clearance but, based on the unacceptable legal analysis contained in the early draft versions that were likely to be retained in the final version, I anticipated that I would non-concur with detailed comments.

4 Feb 03

Under a cover memo entitled "Proposed Alternative Approach to Interrogations," I circulated a January 31, 2003, NCIS memo entitled "An Alternative Approach to the Interrogation of Detainees at Guantanamo Bay, Cuba." This was the first of the three NCIS memos described above in the narrative entry above for 17 Jan 03. (Att 17)

Mr. Haynes convened a meeting of the Working Group principals. I believe that it was at this meeting that Mr. Haynes asked the group's opinion whether a matrix of interrogation techniques (Att 18), which used a green/yellow/red light system to indicate whether the individual technique was in conformity with U.S. law, was

---

— and the separate scandal generated by the offensive reasoning in the OLC Memo and another OLC brief — the Justice Department announced that it was withdrawing the OLC Memo. See, e.g., T. Lacy and J. Biskupic, "Interrogation Memo to be Replaced," *USA Today*, p. A02 (June 23, 2004).
[12] The DON legal leadership was united in its view that the OLC Memo was rife with mistaken legal analysis. RADM Lohr, Mr. Murphy, and BGEN Sandkuhler all shared this view. For that matter, the senior leadership among DON civilian and military attorneys shared a common view of virtually all the legal and policy issues throughout the debate on detainee interrogation. Unfortunately, because this narrative is mainly a personal account, it tends to mask the role these individuals — including OGC Deputy General Counsel Kranz and Molzahn, Marine Corps Counsel Murphy, and NCIS Director Brant — played in the effort to correct the mistaken interrogation policies. For example, RADM Lohr and BGEN Sandkuhler were instrumental in both the legal analysis of the interrogation issue and the advocacy effort, not only within the Navy and Marine Corps but also among the other military services, to ensure that the interrogation techniques conformed to law.

correct and approved by the individuals in the room.  I
indicated that it was my belief that the matrix conformed to
law, and I believe that everyone else in the meeting also
indicated the same view.

 6 Feb 03

   OGC Deputy General Counsel Bill Molzahn and I met in my
office with OLC Deputy Director John Yoo.  The principal
author of the OLC Memo, Mr. Yoo glibly defended the provisions
of his memo, but it was a defense of provisions that I
regarded as erroneous.  Asked whether the President could
order the application of torture, Mr. Yoo responded, "Yes."
When I questioned this, he stated that his job was to state
what the law was, and also stated that my contrary view
represented an expression of legal policy that perhaps the
administration may wish to discuss and adopt, but was not the
law.  I asked:  "Where can I have that discussion?"  His
response:  "I don't know.  Maybe here in the Pentagon?"

   I circulated a second version of the January 31st NCIS
interrogation memo described above in the narrative entry for
4 Feb 03.  This memo, the second of three memos described
above in the narrative entry of 17 December 03, differed from
the first only in that it contained an 11-page classified
attachment that addressed the issue in much greater detail.
(Att 19)

 10 Feb 03

   At some point in February, and most probably on this
date, I met with Mr. Haynes at his request and Mr. Dell'Orto
to discuss the Working Group report.  I informed them that the
draft report was not a quality product.  It was the product of
a flawed working group process and deeply flawed OLC Memo.  I
believe I urged him to keep the report in draft form and not
finalize it.  I do recall suggesting that he should take the
report, thank the Working Group leadership for its efforts,
and then stick the report in a drawer and "never let it see
the light of day again."

 26 Feb 03

   Under a cover memo entitled "Proposed Interrogation
Strategy," I circulated the third NCIS memo addressing
recommended interrogation techniques.  This classified paper
constituted an academic treatment of the issue.  (Att 20)

19

**2 Mar 03**

This is the date of the last Working Group report in OGC files. This draft was as unacceptable as prior drafts.

**8 Mar 03**

Mr. Haynes convened a meeting of the service General Counsel and the JAGs to discuss the Working Group process. During the course of this Saturday morning meeting, Secretary Rumsfeld entered the room. He thanked us for our work and stressed how important the issues were. He emphasized the need to ensure that the Group's recommendations were consistent with U.S. law and values.

**27 Jun 03**

I read in the Washington Post[13] (Att 21) that Mr. Haynes had written a letter to Sen. Patrick Leahy declaring that it was the policy of the Department of Defense, in essence, never to apply torture or inflict cruel, inhuman, or degrading treatment on its prisoners or detainees. I regarded the letter (Att 22), which was dated June 25, 2003, as the perfect expression of the legal obligations binding DOD and the happy culmination of the long debates in the Pentagon as to what the DOD detainee treatment policy should be. I wrote an email to Mr. Haynes (Att 23) expressing my pleasure on his letter and stating that I was proud to be on his team.

I should note that neither I, OGC, nor — to my knowledge — anyone else in the DON ever received a completed version of the Working Group report. It was never circulated for clearance. Over time, I would come to assume that the report had never been finalized.[14]

**Epilogue**

The issue of detainee interrogation has three principal components: (1) the legal analysis that creates a boundary limiting interrogation tactics and techniques; (2) the

---

[13] P. Slevin, "U.S. Pledges to Avoid Torture," *Washington Post*, p. A11 (June 27, 2003).

[14] I learned otherwise only on May 12, 2004, when I called Air Force Deputy General Counsel Dan Ramos to advise him that I had heard references to the report in televised congressional hearings on the Abu Ghraib scandal. Mr. Ramos informed that it in fact had been signed out and briefed to SOUTHCOM Commander GEN Hill and JTF GTMO Commander MGEN Miller in March or April 2003.

policies adopted following the identification of the legal limits; and (3) the actual effects on the detainees. This is how I viewed each of these areas — law, policy, and detainee treatment — in the Guantanamo context in the period after the events described above.

Law. To my knowledge, the two principal DOD documents that address the legal aspects of detainee interrogation are DOD GC Haynes's June 25, 2003, letter to Sen. Leahy, which I view as the definitive and appropriate statement on the legal boundaries to detainee interrogation and treatment, and the Working Group Report. Because I viewed the Report as inconsistent with the Haynes Letter, I would be concerned to the extent that the legal analysis in the Report is still regarded as valid.[15] However, since the Department of Justice has publicly announced that they have withdrawn the OLC Memo,[16] I would regard — and I should assume DOD would also regard — the Working Group Report that so heavily relied on the OLC Memo as no longer serving as any kind of appropriate guidance on the issues.

Policy. To my knowledge, all interrogation techniques authorized for use in Guantanamo after January 15, 2003, fell well within the boundaries authorized by law. Certainly the interrogation matrix discussed at pages 18-19 above also fell within appropriate boundaries.

Detainee Treatment. NCIS advised me, following Secretary Rumsfeld's January 15, 2003, suspension of the interrogation authorities contained in the December 2nd Memo, that the reports of detainee abuses at Guantanamo had ceased. At no subsequent time, up to and including the present, did NCIS or any other person or organization forward to me any report of further detainee abuse. Because of NCIS's demonstrated integrity and ability to detect detainee abuse at Guantanamo, I felt a high degree of confidence that the prisoner abuses at Guantanamo had indeed stopped after January 15, 2003.

Alberto J. Mora

---

[15] Apparently, it was also used as the legal analysis informing the Secretary of Defense's April 2003 renewed guidance memo to JTF GTMO on interrogation techniques (of which I was also not aware until May 2004).
[16] See, footnote 11 above.

21

Attachments:

1.  JTF-Gitmo Interrogation Logs/Notes (S)
2.  DOD GC Action Memo of 27 Nov 02 w/SECDEF note of 2 Dec 02 and/supporting docs (S)
3.  OPNAV memo N3/N5L NPM 466-02 of 4 Nov 02 to J-5
4.  RADM Lohr e-mail to Alberto Mora of 19 Dec 02 (U)
5.  JAG Memo of Law of 16 Jan 03 (S)
6.  Human Rights Watch ltr of 26 Dec 02 (U)
7.  Washington Post article "U.S. Decries Abuse but Defends Interrogations" 26 Dec 02 (U)
8.  Alberto Mora e-mail of 9 Jan 03 8:29 to Jaymie Durnan (U)
9.  Alberto Mora e-mail of 9 Jan 03 4:15 to Jaymie Durnan (U)
10. Alberto Mora e-mail of 10 Jan 03 1:19 to Jaymie Durnan (U)
11. Alberto Mora e-mail of 10 Jan 03 4:53 to Jaymie Durnan (U)
12. U.S. Navy General Counsel Counter-Resistance Techniques draft memo (S)
13. Alberto Mora e-mail of 17 Jan 03 to Susan Livingstone (U)
14. Alberto Mora e-mail of 17 Jan 03 to VADM Green (U)
15. Mary Walker memo to Detainee Interrogation Working Group, dtd 17 Jan 03 (S)
16. E-mails (3) between Alberto Mora and Mary Walker of 29-30 Jan 03 (U)
17. Alberto Mora memo re Proposed Alternative Approach to Interrogations, dtd 4 Feb 03 (S)
18. Matrix of Detainee Interrogation Techniques (S)
19. Alberto Mora memo re Proposed Alternative Approach to Interrogations dtd, 6 Feb 03 (S)
20. Alberto Mora memo re Proposed Interrogation Strategy, dtd 26 Feb 03 (S)
21. Washington Post article "U.S. Pledges to Avoid Torture" 27 Jun 03 (U)
22. Mr. Haynes ltr to Sen. Leahy of 25 Jun 03 (U)
23. Alberto Mora e-mail of 27 Jun 03 to Mr. Haynes (U)