# Exhibit L, Part 2

SECRET/NOFORN UNCLASSIFIED

## IV.    Considerations Affecting Policy

### A.    Historical Role of U.S. Armed Forces

### 1.    Background

(U)  The basic principles of interrogation doctrine, procedures, and techniques applicable to Army intelligence interrogations from June 1945 through May 1987 were contained in Field Manual (FM) 30-15, Examination of Personnel and Documents.  FM 30-15 set forth Army doctrine pertaining to the basic principles of intelligence interrogations and established the procedures and techniques applicable to Army intelligence interrogations of non-U.S. personnel.  The other Services report that they too apply the provisions of this Field Manual.

### 2.    Interrogation Historical Overview

(U)  FM 30-15 stated that the principles and techniques of interrogation discussed within the manual are to be used within the constraints established by humanitarian international law and the Uniform Code of Military Justice ("UCMJ").  The fundamental principle underlying Army doctrine concerning intelligence interrogations between 1945 and the issuance of current doctrine in 1987 (FM 34-52), is that the commander may utilize all available resources and lawful means in the accomplishment of his mission and for the protection and security of his unit.  However, a strong caveat to this principle noted, "treaty commitments and policy of the United States, international agreements, international law, and the UCMJ require the conduct of military to conform with the law of war."  FM 30-15 also recognized that Army intelligence interrogations must conform to the "specific prohibitions, limitations, and restrictions established by the Geneva Conventions of 12 August 1949 for the handling and treatment of personnel captured or detained by military forces" (citing FM 27-10, The Law of Land Warfare).

(U)  FM 30-15 also stated that "violations of the customary and treaty law applicable to the conduct of war normally constitute a concurrent violation of the Uniform Code of Military Justice and will be prosecuted under that code."  The manual advised Army personnel that it was "the direct responsibility of the Commander to insure that the law of war is respected in the conduct of warfare by forces in his command."  Thus, the intelligence interrogation techniques outlined in FM 30-15 were based upon conduct sanctioned under international law and domestic U.S. law and as constrained within the UCMJ.

(U)  Historically, the intelligence staff officer (G2/S2) was the primary Army staff officer responsible for all intelligence functions within the command structure.  This responsibility included interrogation of enemy prisoners of war (EPW), civilian internees, and other captured or detained persons.  In conducting interrogations, the intelligence staff officer was responsible for insuring that these activities were executed in accordance with international and domestic U.S. law, United States Government policy, and the applicable regulations and field manuals regarding the treatment and handling of EPWs,

SECRET/NOFORN UNCLASSIFIED    51



SECRET//NOFORN

civilian internees, and other captured or detained persons. In the maintenance of interrogation collection, the intelligence staff officer was required to provide guidance and training to interrogators, assign collection requirements, promulgate regulations, directives, and field manuals regarding intelligence interrogation, and insure that interrogators were trained in international and domestic U.S. law and the applicable Army publications.

(U) FM 30-15 stated that intelligence interrogations are an art involving the questioning and examination of a source in order to obtain the maximum amount of usable information. Interrogations are of many types, such as the interview, a debriefing, and an elicitation. However, the FM made clear that the principles of objective, initiative, accuracy, prohibitions against the use of force, and security apply to all types of interrogations. The manual indicated that the goal is to collect usable and reliable information, in a lawful manner, promptly, while meeting the intelligence requirements of the command.

(U) FM 30-15 emphasized a prohibition on the use of force during interrogations. This prohibition included the actual use of force, mental torture, threats, and exposure to inhumane treatment of any kind. Interrogation doctrine, procedures, and techniques concerning the use of force are based upon prohibitions in international and domestic U.S. law. FM 30-15 stated that experience revealed that the use of force was unnecessary to gain cooperation and was a poor interrogation technique, given that its use produced unreliable information, damaged future interrogations, and induced those being interrogated to offer information viewed as expected in order to prevent the use of force. However, FM 30-15 stated that the prohibition on the use of force, mental or physical, must not be confused with the use of psychological tools and deception techniques designed to induce a source into providing intelligence information.

(U) The Center for Military History has been requested to conduct a search of government databases, to include the Investigative Records Repository, for documentation concerning the historical participation of the U.S. Armed Forces in interrogations and any archival materials related to interrogation techniques. As of the writing of this analysis, no reply has been received.

3.    **Current Doctrine**

(U) In May 1987, the basic principles of current doctrine, procedures, and techniques applicable to Army intelligence interrogations were promulgated in Field Manual (FM) 34-52, Intelligence Interrogation. FM 34-52 provides general guidance for commanders, staff officers, and other personnel in the use of interrogation elements in Army intelligence units. It also outlines procedures for handling sources of interrogations, the exploitation and processing of documents, and the reporting of intelligence gained through interrogation. Finally, FM 34-52 covers directing and supervising interrogation operations, conflict scenarios, and their impact on interrogation operations, to include peacetime interrogation operations.

SECRET//NOFORN

(U) Army interrogation doctrine today, and since 1945, places particular emphasis on the humane handling of captured personnel. Interrogators receive specific instruction by Army Judge Advocates on the requirements of international and domestic US law, to include constraints established by the Uniform Code of Military Justice (e.g. assault, cruelty and maltreatment, and communicating a threat).

(U) FM 34-52 adopted the principles and framework for conducting intelligence interrogations as stated in FM 30-15. FM 34-52 maintained the established Army doctrine that intelligence interrogations involved the art of questioning and examining a source in order to obtain the maximum amount of useable information. FM 34-52 also reiterated Army doctrine that the principles of objective, initiative, accuracy, prohibition on the use of force, and security apply to all types of interrogations. The goal of intelligence interrogation under current doctrine is the same, the collection of usable and reliable information promptly and in a lawful manner, while meeting the intelligence requirements of the command.

(U) FM 34-52 and the curriculum at U.S. Army Intelligence Center, Fort Huachuca, continue to emphasize a prohibition on the use of force. As stated in its predecessor, FM 34-52 defines the use of force to include actual force, mental torture, threats, and exposure to inhumane treatment of any kind. The underlying basis for this prohibition is the proscriptions contained in international and domestic U.S. law. Current Army intelligence interrogation doctrine continues to view the use of force as unnecessary to gain the cooperation of captured personnel. Army interrogation experts view the use of force as an inferior technique that yields information of questionable quality. The primary concerns, in addition to the effect on information quality, are the adverse effect on future interrogations and the behavioral change on those being interrogated (offering particular information to avoid the use of force). However, the Army's doctrinal prohibition on the use of force does not proscribe legitimate psychological tools and deception techniques.

(U) FM 34-52 outlines procedures and approach techniques for conducting Army interrogations. While the approach techniques are varied, there are three common purposes: establish and maintain control over the source and the interrogation, establish and maintain rapport between the interrogator and the source, and manipulate the source's emotions and weaknesses to gain willing cooperation. Approved techniques include: Direct, Incentive; Emotional (Love & Hate); Increased Fear Up (Harsh & Mild); Decreased Fear Down; Pride and Ego (Up & Down); Futility Technique; We Know All; Establish Your Identity; Repetition; File and Dossier; and Mutt and Jeff (Friend & Foe). These techniques are discussed at greater length in Section V, *infra*.

**B.    Presidential and Secretary of Defense Directives**

(U) The President's Military Order that addresses the detention, treatment, and trial of certain non-citizens in the war against terrorism,[58] provides, *inter alia*, that any

---

[58] (U) *Military Order - Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism*, President of the United States, November 13, 2001.


SECRET//NOFORN
Final Report Dated April 4, 2003

UNCLASSIFIED//FORN

individual subject to the order be "treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or any similar criteria; afforded adequate food, drinking water, shelter, clothing, and medical treatment; and allowed the free exercise of religion consistent with the requirements of the detention."

(U//NF) A Department of Defense memorandum[59] to the Chairman of the Joint Chiefs of Staff, with instructions to forward it to the Combatant Commanders, stated that "the United States has determined that Al Qaida and Taliban individuals under the control of the Department of Defense are not entitled to prisoner of war status for the purposes of the Geneva Conventions of 1949." The memorandum further directed that "[t]he Combatant Commanders shall in detaining Al Qaida and Taliban individuals under the control of the Department of Defense treat them humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of the Geneva Conventions of 1949."

(U) The President has directed that "[a]s a matter of policy, the United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva."[60]

## C.    DOD-Specific Policy Considerations

(U) (The information in this section was derived from guidance provided by the Office of the Assistant Secretary of Defense (Special Operations and Low-Intensity Conflict)).

(U//NF) The first priority of any detainee interrogation is to obtain intelligence on imminent or planned terrorist attacks against the United States and its citizens or interests. A clearly related priority is to obtain intelligence to enable the United States to conduct the ongoing war on terrorism effectively. Detainee interrogations have proven instrumental to United States efforts to uncover terrorist cells and thwart planned attacks.

(U//NF) The Secretary of the Army (DoD lead for criminal investigations) will continue to assess, concurrently, the value of information on detainee activities for prosecution considerations. See *War Crimes and Related Investigations Within the US Central Command Area of Operations*, Secretary of Defense, January 19, 2002.

---

[59] (S//NF) Department of Defense Memorandum – Status of Taliban and Al Qaida, Secretary of Defense, January 19, 2002.
[60] (C) White House Memorandum – Humane Treatment of al Qaida and Taliban Detainees, President of the United States, February 7, 2002.

SECRET/NOFORN

(S/NF) In the event of a request to shift the priority of interrogations from intelligence gathering to prosecution considerations, the following factors, among others, should be considered before such a request is approved:

- the nature of the impending threat to national security and to individuals;
- the imminence of the threat;
- the ability of the detainee to provide useful information to eliminate the threat; and
- potential benefit derived from an effective interrogation compared to the potential benefit from a better opportunity for effective prosecution.

(S/NF) For routine interrogations, standard U.S. Armed Forces doctrine will be utilized.

(S/NF) For interrogations involving exceptional techniques[61] approved by the Secretary of Defense, standard doctrine may be used as well as the specifically authorized exceptional techniques. However, such interrogations may be applied only in limited, designated settings approved by SECDEF or his designee, staffed by personnel specifically trained in their use and subject to a command/decision authority at a level specifically designated by the SECDEF for this purpose.

(S/NF) Choice of interrogation techniques involves a risk benefit analysis in each case, bounded by the limits of DOD policy and U.S. law. When assessing whether to use exceptional interrogations interrogations, consideration should be given to the possible adverse effects on U.S. Armed Forces culture and self-image, which at times in the past may have suffered due to perceived law of war violations. DOD policy, reflected in the DOD Law of War Program implemented in 1979 and in subsequent directives, greatly restored the culture and self-image of U.S. Armed Forces by establishing high benchmarks of compliance with the principles and spirit of the law of war, and thereby humane treatment of all persons in U.S. Armed Forces' custody.[62] In addition, consideration should be given to whether implementation of such exceptional techniques is likely to result in adverse effects on DOD personnel who become POWs, including possible perceptions by other nations that the United States is lowering standards related to the treatment of prisoners, generally.

(S/NF) All interrogation techniques should be implemented deliberately following a documented strategy designed to gain the willing cooperation of the detainee using the least intrusive interrogation techniques and methods.

---

[61] (S/NF) In this context, an "exceptional" technique is one that is more aggressive than routine techniques and is designated an exceptional technique by the SECDEF, requiring special procedures and levels of approval for use.
[62] See DODD 5100.77 DoD Law of War Program, para 5.3.1 (9 Dec 98, canceling DODD 5100.77 of 10 Jul 79); DODD 2310.1 DoD Program for EPOW and Other Detainees, para 3.1 (18 Aug 94); CJCSI 5819.01B Implementation of the DoD LOW Program, para 4a (25 Mar 02).



UNCLASSIFIED/NOFORN

Final Report Dated April 4, 2003

SE**UNCLASSIFIED**RN

*u*
(S//NF) All interrogations involving exceptional methods approved by the appropriate authority must be applied in the context of a comprehensive plan for their use, singly or in combination with other techniques. At a minimum, the plan should include:

- Appropriate approval authority;
- Supervisory requirements to insure appropriate application of methods;
- Specifics on the application of technique(s) including appropriate duration, intervals between applications and events that would require termination of the technique; and
- Requirements for the presence or availability (as appropriate) of qualified medical personnel.

*u*
(S//NF)    Implementation of approved exceptional techniques must be approved at the command authority level specified for the particular method.

## D.    Potential Effects on Prosecutions

*u*
(S//NF) Although the primary purpose of detainee interrogations is obtaining intelligence on imminent or planned terrorist attacks against the United States and its citizens or interests, the United States may later decide to prosecute detainees. This section will discuss whether evidence obtained in interrogations will be admissible in either military commissions or U.S. court proceedings.

*u*
(S//NF) The stated objective of detainee interrogations is to obtain information of intelligence value. Information obtained as a result of interrogations may later be used in criminal prosecutions. Depending on the techniques employed, the admissibility of any information may depend on the forum considering the evidence. In addition, the admissibility of an admission or confession necessarily will be fact-specific, in that the exact techniques used with a specific detainee will determine whether the information will be admissible. Although the goal of intelligence interrogation is to produce a willingly cooperative and compliant subject, a successful interrogation nevertheless may produce a statement that might be argued to be involuntary for purposes of criminal proceedings.

(U) Prosecution by the United States is possible in a military commission, court-martial, or in an Article III court.

*u*
(S//NF)  The standard of admissibility for military commissions is simply whether the evidence has probative value to a reasonable person. *(Military Commissions Order No 1, para 6(D)(1))*. Although this is a fairly low threshold, many of the techniques may place a burden on the prosecution's ability to convince commission members that the evidence meets even that lower standard. As the interrogation methods increase in intensity, the likelihood that the information will be deemed coerced and involuntary and thus held inadmissible increases. Although voluntariness of the confession is not a specific threshold question on admissibility, it can reasonably be expected that the



SECRET/NOFORN
UNCLASSIFIED

defense will raise voluntariness, challenging the probative value of the information and hence, its admissibility. If the statement is admitted, voluntariness will undoubtedly be a factor considered by the members in determining the weight to be given the information.

U
(S/NF) Any trials taking place in either U.S. federal courts or by courts-martial will be conducted pursuant to statutory and constitutional standards and limitations. To be admissible, statements made during interrogation must be determined to be voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The judge must first determine whether the statements were the product of free will, i.e., the defendant's will was not overborne by the interrogators. *Mincey v. Arizona*, 437 U.S. 385 (1978) (the defendant's will was simply overborne and due process of law requires that statements obtained as these were cannot be used in any way against the defendant at his trial). This issue can also be raised before the trier of fact. If the actions taken to secure a statement constitute torture, the statement would be inadmissible. *Brown v. Mississippi*, 297 U.S. 278 (1936) (confessions procured by means "revolting to the sense of justice" could not be used to secure a conviction). It should be noted that conduct does not need to rise to the level of "torture" or "cruel, inhuman and degrading treatment or punishment" for it to cause a statement to be considered involuntary, and therefore inadmissible. As such, the more aggressive the interrogation technique used, the greater the likelihood it could adversely affect the admissibility of any acquired statements or confessions.

(U) Mechanism for Challenge. The defense can be expected to challenge detainee statements through a motion to suppress the detainee statement or to challenge the entire proceeding through a motion to dismiss for egregious prosecutorial misconduct.

U
(S/NF) Other Considerations. One of the Department of Defense's stated objectives is to use the detainees' statements in support of ongoing and future prosecutions. The method of obtaining these statements and its effect on voluntariness may also affect the usability of these statements against other accused in any criminal forum. Statements produced where the will of the detainee has been overborne will in all likelihood be viewed as inherently suspect and of questionable value.

U
(S/NF) Consideration must be given to the public's reaction to methods of interrogation that may affect the military commission process. The more coercive the method, the greater the likelihood that the method will be met with significant domestic and international resistance. This in turn may lower international and domestic acceptance of the military commission process as a whole. In addition, the military commission will be faced with balancing the stated objective of open proceedings with the need not to publicize interrogation techniques. Consequently, having these techniques become public or substantially closing the proceedings in order to protect the techniques from disclosure could be counterproductive and could undermine confidence in the outcome. Finally, the timing of the prosecutions must be considered. Revelation of the techniques presumably will reduce their effectiveness against current and future detainees.



SECRET/NOFORN ~~UNCLASSIFIED~~

UNCLASSIFIED WHEN SEPARATED FROM ATTACHMENT

E.    International Considerations That May Affect Policy Determinations

(U) This section provides a discussion of international law that, although not binding on the United States, could be cited to by other countries to support the proposition that the interrogation techniques used by the U.S. contravene international legal standards. The purpose of providing this international law discussion is to inform the Department of Defense's policy considerations when deciding if, when and how to employ the interrogation techniques against unlawful combatants held outside the United States.

1.    Geneva Conventions

(S/NF) *U* To the extent that other nation states do not concede the U.S. position that the Geneva Conventions do not apply to the detainees, there are several provisions of the Third Geneva Convention that may be relevant considerations regarding interrogation techniques.[63] Article 13 requires that POWs must at all times be treated humanely, and that any unlawful act or omission by the detaining power that causes death or seriously endangers the health of a POW will be regarded as a serious breach of the Convention. In addition, POWs must be protected against acts of violence or intimidation. Under Article 14 of the Convention, POWs are entitled to respect for their person and their honor. Article 17 prohibits physical or mental torture and any other form of coercion of POWs in order to secure information. POWs who refuse to answer may not be threatened, insulted, or exposed to unpleasant or disadvantageous treatment. Article 130 provides that torture or inhuman treatment, or willfully causing great suffering or serious injury to body or health of a POW are considered "grave breaches" of the Convention. Article 129 of the Convention requires Parties to search for, extradite or prosecute those persons alleged to have committed, or have ordered to be committed, grave breaches.

(S/NF) *U* These articles of the Third Geneva Convention may provide an opportunity for other States Parties to allege that they consider the United States to be in violation of the Convention through its treatment of detainees. To the extent any such treatment could be considered by them to be torture or inhuman treatment, such acts could be considered "grave breaches" and punishable as war crimes.

(S/NF) *U* In addition, even if they argue that the Taliban and al Qaida detainees are not entitled to POW status, they may consider that the guarantees contained in Article 75 of the First Additional Protocol to the Geneva Conventions are measures by which the United States' actions could be evaluated. See, *infra*, this Section, paragraph 3. Additional arguments may be made by other nations that the protections of the Geneva Conventions are comprehensive and apply to unlawful combatants.[64]

---

[63] (U) Geneva Convention Relative to the Treatment of Prisoners of War, opened for signature Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.

[64] (U) For example, other countries may argue as follows: The central theme of the Geneva Conventions is humanity. With regard to persons affected by armed conflict, Pictet's *Commentary* states: "In short, all the particular cases we have just been considering confirm a general principle which is embodied in all four Geneva Conventions of 1949. Every person in enemy hands must have some status under international

SECRET//NOFORN
UNCLASSIFIED

## 2.    Convention Against Torture

(S/NF) Article 7 of the Torture Convention requires that a State Party either extradite or prosecute a person found within its territory who has been alleged to have committed acts of torture.[65] As discussed, *supra*, the United States implemented this provision in Chapter 113C of Title 18, United States Code, which provides for federal criminal jurisdiction over an extraterritorial act or attempted act of torture, if the alleged offender is present in the United States, regardless of the nationality of the victim or the alleged offender. All States Parties to the Convention are required to establish this same jurisdiction in their countries. Accordingly, governments could potentially assert jurisdiction over U.S. personnel found in their territory, and attempt to prosecute them for conduct they consider to be violations of the Torture Convention.

## 3.    Customary International Law/Views of Other Nations

(U) "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation."[66]

(U) The United States' primary obligation concerning torture and other related practices derives from the Convention Against Torture and Other Cruel, Inhuman, and Degrading Treatment and Punishment. Although not consistent with U.S. views, some international commentators maintain that various human rights conventions and declarations (including the Geneva Conventions) represent "customary international law" binding on the United States.[67]

(U) Although not binding on the United States, the following international human rights instruments may inform the views of other nations as they assess the actions of the United States relative to detainees.

law; he is either a prisoner of war, and as such covered by the Third Convention, a civilian covered by the Fourth Convention, or again, a member of the medical personnel of the armed forces who is covered by the First Convention. There is no intermediate status; nobody in enemy hands can be outside the law." Pictet, Commentary to the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War (GC IV), Article 4, Paragraph 4, ICRC, Geneva, 1958. Other nations may disagree with the U.S. government view that GC IV is not applicable to those individuals detained in the war on terrorism and argue that GC IV protects those persons who have engaged in hostile or belligerent conduct but who are not entitled to treatment as prisoners of war. GC IV, Article 4; *see generally* Army Field Manual 27-10, *The Laws of Land Warfare* (1956), paragraphs 246-248. In fact, Pictet's *Commentary* on Article 4, paragraph 4 of GC IV states: "if, for some reason, prisoner of war status – to take one example – were denied to them [persons who find themselves in the hands of a party to the conflict], they would become protected persons under the present Convention." Further GC IV, Article 32 specifically prohibits the torture, corporal punishment, or physical suffering of protected persons. Accordingly, the United States may face the argument from other nations that the President may not place these detainees in an intermediate status, outside the law, and then arguably subject them to torture.

[65] (U) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, entered into force for the United States on Nov. 20, 1994, 1465 U.N.T.S. 85.

[66] (U) The Restatement (Third) of the Foreign Relations Law of the U.S, § 102(2).

[67] (U) See, e.g., McDougal, Lasswell, and Chen, Human Rights and World Public Order (1980).



SUNCLASSIFIEDORN

(U)  One of the first major international declarations on human rights protections was the 1948 Universal Declaration of Human Rights (adopted Dec. 10, 1948, G.A. Res. 217A (III), U.N. Doc. A/810). This Declaration, which is not itself binding or enforceable against the United States, states at Article 5 that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." Although there is a specific definition for "torture" in the subsequent 1994 Convention Against Torture, there is no commonly accepted definition in the international community of the terms "cruel, inhuman, and degrading punishment or treatment."

(U)  The American Convention on Human Rights[68] was signed by the United States in 1977 but the United States never ratified it. It states in Article 5 that "no one shall be subjected to torture or to cruel, inhuman or degrading punishment or treatment," and that "all persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person."

(U)  In 1975, the U. N. General Assembly adopted the Declaration on Protection of All Persons from Being Subjected to Torture and other Cruel, Inhumane or Degrading Punishment (G.A. Res 34/52, U.N. Doc. A/10034).  As with previous U. N. declarations, the Declaration itself is not binding on nations. This Declaration provides (Article 2) that the proscribed activities are "an offense to human dignity and shall be condemned as a denial of the purposes of the Charter of the United Nations and as a violation of the human rights and fundamental freedoms proclaimed in the Universal Declaration of Human Rights."

(U)  Article 75 of the First Additional Protocol to the Geneva Conventions, to which the U. S. is not a party, prohibits physical and mental torture, outrages upon personal dignity (in particular humiliating and degrading treatment), or threats to commit any of the foregoing against detainees "who do not benefit from more favorable treatment under the [Geneva] Conventions."[69]  (The First Additional Protocol does not define any of these terms.)  According to International Committee of the Red Cross (ICRC) Commentaries, where the status of a prisoner of war or of a protected person is denied to an individual, the protection of Article 75 must be provided to them at a minimum.[70]

(U)  The Geneva Convention Relative to the Protection of Civilian Persons in Time of War provides, *inter alia*, that persons protected by the Civilians Convention are those who, at a given moment and in any manner whatsoever, find themselves in the hands of a Party to the conflict that is a country of which they are not nationals.[71]  Such persons are at all times to be treated humanely and protected against all acts of violence

---

[68]  (U)  1144 U.N.T.S. 123 (Nov. 22, 1969).

[69]  (U)  Protocal Additional to the Geneva Convention of 12 August 1949, and relating to the Protection of Victims of International Armed Conflict (Protocol I), June 8, 1977, 1125 U.N.T.S. 3.

[70]  (U)  Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, ICRC, at 863-65 (1987).

[71]  (U)  Geneva Convention Relative to the Protection of Civilian Persons in Time of War, opened for signature Aug. 12, 1949, 6 U.S.T. 3365, 75 U.N.T.S 287, see Articles 4 and 27.



Final Report Dated April 4, 2003

SECRET UNCLASSIFIED ORN

or threats thereof. The Department of Justice has determined that this Convention applies only to civilians but does not apply to unlawful combatants.[72]

4.    **International Criminal Court**

U
(S/NF) The Rome Statute of the International Criminal Court (ICC),[73] which the U. S. has made clear it opposes and to which it has no intention of becoming a party, contains provisions prohibiting the infliction of severe physical or mental pain or suffering (including for such purposes as obtaining information). These violations are considered by the signatories to be war crimes of torture and of inhuman treatment (Article 8) and crimes against humanity (Article 7). The affected persons must be protected under one or more of the Geneva Conventions in order for the prohibition to be applicable. Other governments could take a position contrary to the U.S. position on this point. For those State Parties to the ICC that take the position that the ICC grants universal jurisdiction to detain individuals suspected of committing prohibited acts, if these countries obtain control over U.S. personnel, they may view it as within their jurisdiction to surrender such personnel to the ICC. In an effort to preclude this possibility, the United States is currently negotiating "Article 98" agreements with as many countries as possible to provide for protection of U.S. personnel from surrender to the ICC.[74]

U
(S/NF) States with whom the United States has not concluded Article 98 agreements, and that perceive certain interrogation techniques to constitute torture or inhuman treatment, may attempt to use the Rome Statute to prosecute individuals found in their territory responsible for such interrogations.[75] In such cases, the U.S. Government will reject as illegitimate any attempt by the ICC, or a state on its behalf, to assert the jurisdiction of the Rome Statute over U.S. nationals without the prior express consent of the United States.

## V.    Techniques

(U) The purpose of all interviews and interrogations is to get the most information from a detainee with the least intrusive method, always applied in a humane and lawful manner with sufficient oversight by trained investigators or interrogators.

---

[72] (U) Other nations, which, unlike the United States, have accepted Article 75, may argue that since the Taliban and al-Qaida detainees are not entitled to POW status under the Geneva Conventions, Article 75 should be applicable as customary international law, notwithstanding their status as unlawful combatants.

[73] (U) Rome Statute of the International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 183/9 (1998).

[74] (U) Parties to the Rome Statute are obligated to surrender individuals at the request of the ICC for prosecution, unless such surrender would be inconsistent with the requested state's obligations "under an international agreement pursuant to which the consent of the sending state is required to surrender a person of that state to the ICC." (Rome Statute, Article 98 (2)). While the U.S. is not a party to the Rome Statute, Article 98 agreements would provide an exception to an ICC party's general obligation to surrender persons.

[75] (U) Article 25(3) of the Rome Statute provides individual criminal responsibility for a person who, *inter alia,* "orders, solicits, or induces" or otherwise facilitates through aiding, abetting, or assisting in the commission of a crime.

SECRET UNCLASSIFIED ORN    61

SUNCLASSIFIEDORN

Operating instructions must be developed based on command policies to insure uniform, careful, and safe application of any interrogations of detainees.

(S/NF) Interrogations must always be planned, deliberate actions that take into account numerous, often interlocking factors such as a detainee's current and past performance in both detention and interrogation, a detainee's emotional and physical strengths and weaknesses, an assessment of possible approaches that may work on a certain detainee in an effort to gain the trust of the detainee, strengths and weaknesses of interrogators, and augmentation by other personnel for a certain detainee based on other factors.

(S/NF) Interrogation approaches are designed to manipulate the detainee's emotions and weaknesses to gain his willing cooperation. Interrogation operations are never conducted in a vacuum; they are conducted in close cooperation with the units detaining the individuals. The policies established by the detaining units that pertain to searching, silencing, and segregating also play a role in the interrogation of a detainee. Detainee interrogation involves developing a plan tailored to an individual and approved by senior interrogators. Strict adherence to policies/standard operating procedures governing the administration of interrogation techniques and oversight is essential.

(S/NF) Listed below are interrogation techniques all believed to be effective but with varying degrees of utility. Techniques 1-19, 22-26 and 30, applied singly, are purely verbal and/or involve no physical contact that could produce pain or harm and no threat of pain or harm. It is important that interrogators be provided reasonable latitude to vary techniques depending on the detainee's culture, strengths, weaknesses, environment, extent of training in resistance techniques as well as the urgency of obtaining information that the detainee is known to have. Each of the techniques requested or suggested for possible use for detainees by USSOUTHCOM and USCENTCOM is included. Some descriptions include certain limiting parameters; these have been judged appropriate by senior interrogators as to effectiveness.

(S/NF) *While techniques are considered individually within this analysis, it must be understood that in practice, techniques are usually used in combination; the cumulative effect of all techniques to be employed* must *be considered before any decisions are made regarding approval for particular situations.* The title of a particular technique is not always fully descriptive of a particular technique. With respect to the employment of any techniques involving physical contact, stress or that could produce physical pain or harm, a detailed explanation of that technique must be provided to the decision authority prior to any decision.

Note: Techniques 1-17 are further explained in Field Manual 34-52.

1. (S/NF) Direct: Asking straightforward questions.



SECRET/NOFORN
UNCLASSIFIED

2. (S/NF) *u* Incentive/Removal of Incentive: Providing a reward or removing a privilege, above and beyond those that are required by the Geneva Convention, from detainees, (Privileges above and beyond POW-required privileges).

3. (S/NF) *u* Emotional Love: Playing on the love a detainee has for an individual or group.

4. (S/NF) *u* Emotional Hate: Playing on the hatred a detainee has for an individual or group.

5. (S/NF) *u* Fear Up Harsh: Significantly increasing the fear level in a detainee.

6. (S/NF) *u* Fear Up Mild: Moderately increasing the fear level in a detainee.

7. (S/NF) *u* Reduced Fear: Reducing the fear level in a detainee.

8. (S/NF) *u* Pride and Ego Up: Boosting the ego of a detainee.

9. (S/NF) *u* Pride and Ego Down: Attacking or insulting the ego of a detainee, not beyond the limits that would apply to a POW.

10. (S/NF) *u* Futility: Invoking the feeling of futility of a detainee.

11. (S/NF) *u* We Know All: Convincing the detainee that the interrogator knows the answer to questions he asks the detainee.

12. (S/NF) *u* Establish Your Identity: Convincing the detainee that the interrogator has mistaken the detainee for someone else.

13. (S/NF) *u* Repetition Approach: Continuously repeating the same question to the detainee within interrogation periods of normal duration.

14. (S/NF) *u* File and Dossier: Convincing detainee that the interrogator has a damning and inaccurate file, which must be fixed.

15. (S/NF) *u* Mutt and Jeff: A team consisting of a friendly and harsh interrogator. The harsh interrogator might employ the Pride and Ego Down technique.

16. (S/NF) *u* Rapid Fire: Questioning in rapid succession without allowing detainee to answer.

17. (S/NF) *u* Silence: Staring at the detainee to encourage discomfort.

18. (S/NF) *u* Change of Scenery Up: Removing the detainee from the standard interrogation setting (generally to a location more pleasant, but no worse).



SE<del>CRET//NOFO</del>RN
UNCLASSIFIED

19. (S/NF) **Change of Scenery Down:** Removing the detainee from the standard interrogation setting and placing him in a setting that may be less comfortable; would not constitute a substantial change in environmental quality.

20. (S/NF) **Hooding:** This technique is questioning the detainee with a blindfold in place. For interrogation purposes, the blindfold is not on other than during interrogation.

21. (S/NF) **Mild Physical Contact:** Lightly touching a detainee or lightly poking the detainee in a completely non-injurious manner. This also includes softly grabbing of shoulders to get the detainee's attention or to comfort the detainee.

22. (S/NF) **Dietary Manipulation:** Changing the diet of a detainee; no intended deprivation of food or water; no adverse medical or cultural effect and without intent to deprive subject of food or water, e.g., hot rations to MREs.

23. (S/NF) **Environmental Manipulation:** Altering the environment to create moderate discomfort (e.g., adjusting temperature or introducing an unpleasant smell). Conditions would not be such that they would injure the detainee. Detainee would be accompanied by interrogator at all times.

24. (S/NF) **Sleep Adjustment:** Adjusting the sleeping times of the detainee (e.g., reversing sleep cycles from night to day.) This technique is NOT sleep deprivation.

25. (S/NF) **False Flag:** Convincing the detainee that individuals from a country other than the United States are interrogating him.

26. (S/NF) **Threat of Transfer:** Threatening to transfer the subject to a 3rd country that subject is likely to fear would subject him to torture or death. (The threat would not be acted upon nor would the threat include any information beyond the naming of the receiving country.)

(S/NF) The following list includes additional techniques that are considered effective by interrogators, some of which have been requested by USCENTCOM and USSOUTHCOM. They are more aggressive counter-resistance techniques that may be appropriate for detainees who are extremely resistant to the above techniques, and who the interrogators strongly believe have vital information. All of the following techniques indicate the need for technique-specialized training and written procedures to insure the safety of all persons, along with appropriate, specified levels of approval and notification for each technique.

27. (S/NF) **Isolation:** Isolating the detainee from other detainees while still complying with basic standards of treatment.

28. (S/NF) **Use of Prolonged Interrogations:** The continued use of a series of approaches that extend over a long period of time (e.g., 20 hours per day per interrogation).


Final Report Dated April 4, 2003

SH**UNCLASSIFIED**RN

**U**
29. (S/NF) **Forced Grooming:** Forcing a detainee to shave hair or beard. (Force applied with intention to avoid injury. Would not use force that would cause serious injury.)

**U**
30. (S/NF) **Prolonged Standing:** Lengthy standing in a "normal" position (non-stress). This has been successful, but should never make the detainee exhausted to the point of weakness or collapse. Not enforced by physical restraints. Not to exceed four hours in a 24-hour period.

**U**
31. (S/NF) **Sleep Deprivation:** Keeping the detainee awake for an extended period of time. (Allowing individual to rest briefly and then awakening him, repeatedly.) Not to exceed 4 days in succession.

**U**
32. (S/NF) **Physical Training:** Requiring detainees to exercise (perform ordinary physical exercises actions) (e.g., running, jumping jacks); not to exceed 15 minutes in a two-hour period; not more than two cycles, per 24-hour periods) Assists in generating compliance and fatiguing the detainees. No enforced compliance.

**U**
33. (S/NF) **Face slap/ Stomach slap:** A quick glancing slap to the fleshy part of the cheek or stomach. These techniques are used strictly as shock measures and do not cause pain or injury. They are only effective if used once or twice together. After the second time on a detainee, it will lose the shock effect. Limited to two slaps per application; no more than two applications per interrogation.

**U**
34. (S/NF) **Removal of Clothing:** Potential removal of all clothing; removal to be done by military police if not agreed to by the subject. Creating a feeling of helplessness and dependence. This technique must be monitored to ensure the environmental conditions are such that this technique does not injure the detainee.

**U**
35. (S/NF) **Increasing Anxiety by Use of Aversions:** Introducing factors that of themselves create anxiety but do not create terror or mental trauma (e.g., simple presence of dog without directly threatening action). This technique requires the commander to develop specific and detailed safeguards to insure detainee's safety.

## VI.    Evaluation of Useful Techniques

**U**
(S/NF) The working group considered each of the techniques enumerated in Section V, *supra*, in light of the legal, historical, policy and operational considerations discussed in this paper. In the course of that examination it became apparent that any decision whether to authorize a technique is essentially a risk benefit analysis that generally takes into account the expected utility of the technique, the likelihood that any technique will be in violation of domestic or international law, and various policy considerations. Generally, the legal analysis that was applied is that understood to comport with the views of the Department of Justice. Although the United States, as a practical matter, may be the arbiter of international law in deciding its application to our national activities, the views of other nations are relevant in considering their reactions,



SH**UNCLASSIFIED**RN

UNCLASSIFIED//NOFORN

potential effects on our captured personnel in future conflicts, and possible liability to prosecution in other countries and international forums for interrogators, supervisors and commanders involved in interrogation processes and decisions.

(S/NF) The Conclusions section of this analysis, *infra*, summarizes salient conclusions that were applied to our analysis of individual techniques. As it suggests, the lawfulness and the effectiveness of individual techniques will, in practice, depend on the specific facts. The lawfulness will depend in significant part on procedural protections that demonstrate a legitimate purpose and that there was no *intent* to inflict significant mental or physical pain – and, in fact, avoid that. Because of this, the assessment of each technique presumed that the safeguards and procedures described in the "DOD-Specific Policy Considerations" section of this paper would be in place. The importance of this is underscored by the fact that, in practice, techniques are usually applied in combination, and as the legal analysis of this paper indicates, the significance and effect on an individual detainee of the specific combination of techniques employed, and their manner of application will determine the lawfulness of any particular interrogation.

(S/NF) In addition, the lawfulness of the application of any particular technique, or combination of techniques, may depend on the practical necessity for imposition of the more exceptional techniques. As the analysis explains, legal justification for action that could otherwise be unlawful (e.g., relying upon national necessity and self-defense) depends in large part on whether the specific circumstances would justify the imposition of more aggressive techniques. Interrogation of an individual known to have facts essential to prevent an immediate threat of catastrophic harm to large populations may support use of "exceptional" techniques, particularly when milder techniques have been unavailing. But this is a determination that will always be case-specific. Consequently, use of each technique should be a decision level appropriate to the gravity of the particular case (both for the nation and for the detainee).

(S/NF) The chart at Attachment 3 reflects the result of the risk/ benefit assessment for each technique considered, "scored" for each technique, relevant considerations and given an overall recommendation. In addition, it notes specific techniques that, based on this evaluation, should be considered "exceptional techniques" (marked with an "E") subject to particular limitations described in the "DOD-Specific Policy Considerations" section (generally, not routinely available to interrogators, use limited to specifically designated locations and specifically trained interrogators, special safeguards, and appropriately senior employment decision levels specified). For each "exceptional" technique, a recommendation for employment decision level is indicated as well.



SEUNCLASSIFIEDORN

## VII. Conclusions Relevant to Interrogation of Unlawful Combatants Under DOD Control Outside the United States

(S/NF) As a result of the foregoing analysis of legal, policy, historical, and operational considerations, the following general conclusions can be drawn relevant to interrogation of unlawful combatants captured in the war on terrorism under DOD control outside the United States:

(S/NF) Under the Third Geneva Convention, U.S. forces are required to treat captured personnel as POWs until an official determination is made as to their status. Once a determination has been made that captured personnel are unlawful combatants, as is currently the case with captured Taliban and Al Qaida operatives, they do not have a right to the protections of the Third Geneva Convention.

(U) Customary international law does not provide legally-enforceable restrictions on the interrogation of unlawful combatants under DOD control outside the United States.

(U) The United States Constitution does not protect those individuals who are not United States citizens and who are outside the sovereign territory of the United States.

(S/NF) Under the Torture Convention, no person may be subjected to torture. Torture is defined as an act specifically *intended* to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to *prolonged* mental harm caused by or resulting from (1) the *intentional* infliction or *threatened infliction of severe physical pain or suffering*; (2) the administration or application, or threatened application, of mind altering substances or other procedures *calculated* to disrupt profoundly the senses or personality; (3) the threat of imminent death; or (4) the threat that another person will *imminently* be subjected to death, severe physical pain or suffering, or the administration or application, or threatened application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

(S/NF) Under the Torture Convention, no person may be subjected to cruel, inhuman or degrading treatment. The United States has defined its obligations under the Torture Convention as conduct prohibited by the 5th, 8th, and 14th Amendments to the Constitution of the United States. These terms, as defined by U.S. courts, could be understood to mean: to inflict pain or harm without a legitimate purpose; to inflict pain or injury for malicious or sadistic reasons; to deny the minimal civilized measures of life's necessities and such denial reflects a deliberate indifference to health and safety; and to apply force and cause injury so severe and so disproportionate to the legitimate government interest being served that it amounts to a brutal and inhumane abuse of official power literally shocking the conscience.

(U) For actions outside the United States and the special maritime and territorial jurisdiction of the United States, 18 U.S.C. § 2340 applies. For actions occurring within the United States and the special maritime and territorial jurisdiction of the United States, various Federal statutes would apply.



SEUNCLASSIFIEDORN

SECRET//NOFORN

**U**
(S/NF)  The President has directed, pursuant to his Military Order dated November 13, 2001, that the U.S. Armed Forces treat detainees humanely and that the detainees be afforded adequate food, drinking water, shelter, clothing and medical treatment.

**U**
(S/NF)  Pursuant to the Confidential Presidential Determination, dated February 7, 2002, the U.S Armed Forces are to treat detainees in a manner consistent with the *principles* of Geneva, to the extent *appropriate* and consistent with *military necessity*.

(U)  Under Article 10 of the Torture Convention, the United States is obligated to ensure that law enforcement and military personnel involved in interrogations are educated and informed regarding the prohibition against torture, and under Article 11, systematic reviews of interrogation rules, methods, and practices are also required.

(U)  Members of the U.S. Armed Forces are, at all times and all places, subject to prosecution under the UCMJ for, among other offenses, acts which constitute assault, assault consummated by a battery, assault with the intent to inflict grievous bodily harm, manslaughter, unpremeditated murder, and maltreatment of those subject to their orders. Under certain circumstances, civilians accompanying the Armed Forces may be subject to the UCMJ.

(U)  Civilian employees and employees of DOD contractors may be subject to prosecution under the Federal Criminal Code for, among other offenses, acts which constitute assault (in various degrees), maiming, manslaughter, and murder.

**U**
(S/NF)  Defenses relating to Commander-in-Chief authority, necessity and self-defense or defense of others may be available to individuals whose actions would otherwise constitute these crimes, and the extent of availability of those defenses will be fact-specific. Certain relevant offenses require specific intent to inflict particular degrees of harm or pain, which could be refuted by evidence to the contrary (e.g., procedural safeguards). Where the Commander-in-Chief authority is being relied upon, a Presidential written directive would serve to memorialize this authority.

**U**
(S/NF)  The lawfulness and appropriateness of the use of many of the interrogation techniques we examined can only be determined by reference to specific details of their application, such as appropriateness and safety for the particular detainee, adequacy of supervision, specifics of the application including their duration, intervals between applications, combination with other techniques, and safeguards to avoid harm (including termination criteria and the presence or availability of qualified medical personnel.)  (We have recommended appropriate guidance and protections.)

**U**
(S/NF)  Other nations, including major partner nations, may consider use of techniques more aggressive than those appropriate for POWs violative of international law or their own domestic law, potentially making U.S. personnel involved in the use of such techniques subject to prosecution for perceived human rights violations in other



SECRET//NOFORN    UNCLASSIFIED

nations or to being surrendered to international fora, such as the ICC; this has the potential to impact future operations and overseas travel of such personnel.

(S/NF) Some nations may assert that the U.S. use of techniques more aggressive than those appropriate for POWs justifies similar treatment for captured U.S. personnel.

(S/NF) Should information regarding the use of more aggressive interrogation techniques than have been used traditionally by U.S. forces become public, it is likely to be exaggerated or distorted in the U.S. and international media accounts, and may produce an adverse effect on support for the war on terrorism.

(S/NF) The more aggressive the interrogation technique used, the greater the likelihood that it will affect adversely the admissibility of any acquired statements or confessions in prosecutions against the person interrogated, including in military commissions (to a lesser extent than in other U.S. courts).

(S/NF) Carefully drawn procedures intended to prevent unlawful levels of pain or harm not only serve to avoid unlawful results but should provide evidence helpful to demonstrate that the specific intent required for certain offenses did not exist.

(S/NF) General use of exceptional techniques (generally, having substantially greater risk than those currently, routinely used by U.S. Armed Forces interrogators), even though lawful, may create uncertainty among interrogators regarding the appropriate limits of interrogations. They should therefore be employed with careful procedures and only when fully justified.

(S/NF) Participation by U.S. military personnel in interrogations which use techniques that are more aggressive than those appropriate for POWs would constitute a significant departure from traditional U.S. military norms and could have an adverse impact on the cultural self-image of U.S. military forces.[76]

(S/NF) The use of exceptional interrogation techniques should be limited to specified strategic interrogation facilities; when there is a good basis to believe that the detainee possesses critical intelligence; when the detainee is medically and operationally evaluated as suitable (considering all techniques in combination); when interrogators are specifically trained for the technique(s); a specific interrogation plan (including reasonable safeguards, limits on duration, intervals between applications, termination criteria and the presence or availability of qualified medical personnel); when there is appropriate supervision; and, after obtaining appropriate specified senior approval level for use with any specific detainee (after considering the foregoing and receiving legal advice).

---

[76] Those techniques considered in this review that raise this concern are relatively few in number and generally indicated by yellow or red (or green with a significant footnote) under major partner views in Attachment 3.

SECRET//NOFORN    UNCLASSIFIED    69

SECRET/NOFORN
UNCLASSIFIED

## VIII. Recommendations

(U)  We recommend:

(S/NF)  1.  The working group recommends that techniques 1-26 on the attached chart be approved for use with unlawful combatants outside the United States, subject to the general limitations set forth in this Legal and Policy Analysis; and that techniques 27-35 be approved for use with unlawful combatants outside the United States subject to the general limitations as well as the specific limitations regarding "exceptional" techniques as follows:  conducted at strategic interrogation facilities; where there is a good basis to believe that the detainee possesses critical intelligence; the detainee is medically and operationally evaluated as suitable (considering all techniques to be used in combination); interrogators are specifically trained for the technique(s); a specific interrogation plan (including reasonable safeguards, limits on duration, intervals between applications, termination criteria and the presence or availability of qualified medical personnel) is developed; appropriate supervision is provided; and, appropriate specified senior level approval is given for use with any specific detainee (after considering the foregoing and receiving legal advice).

(S/NF)  2.  SECDEF approve the strategic interrogation facilities that are authorized to use the "exceptional techniques" (such facilities at this time include Guantanamo, Cuba; additional strategic interrogation facilities will be approved on a case-by-case basis).

(S/NF)  3.  As the Commander-in-Chief authority is vested in the President, we recommend that any exercise of that authority by DOD personnel be confirmed in writing through Presidential directive or other document.

(S/NF)  4.  That DOD policy directives and implementing guidance be amended as necessary to reflect the determinations in paragraph one and subsequent determinations concerning additional possible techniques.

(S/NF)  5.  That commanders and supervisors, and their legal advisers, involved with the decisions related to employment of "exceptional techniques" receive specialized training regarding the legal and policy considerations relevant to interrogations that make use of such techniques.

(S/NF)  6.  That OASD (PA) prepare a press plan to anticipate and address potential public inquiries and  misunderstandings regarding appropriate interrogation techniques.

(S/NF)  7.  That a procedure be established for requesting approval of additional interrogation techniques similar to that for requesting "supplementals" for ROEs; the process should require the requestor to describe the technique in detail, justify its utility, describe the potential effects on subjects, known hazards and proposed safeguards, provide a legal analysis, and recommend an appropriate decision level regarding use on specific subjects.  This procedure should ensure that SECDEF is the approval authority for the addition of any technique that could be considered equivalent in degree to any of the "exceptional techniques" addressed in this report (in the chart numbers 27-35, labeled with an "E"), and that he establish the specific decision level required for application of such techniques.

SECRET/NOFORN
UNCLASSIFIED

Final Report Dated April 4, 2003

SECRET//NOFORN
UNCLASSIFIED

(S/NF) 8. DOD establish specific understandings with other agencies using DOD detailed interrogators regarding the permissible scope of the DOD interrogator's activities.

Classified by: Secretary Rumsfeld
Reason: 1.5(C)
Declassify on: 10 years

UNCLASSIFIED

# War on Terrorism
## Detainee Interrogation Working Group
## Summary of Analysis and Recommendations
## Pertaining to Unlawful Combatants Outside of the U.S.[1]

| Legend |
|---|
| ● Red |
| ○ Yellow |
| ○ Green |

| Proposed Interrogation Techniques [2] (see attached description/limitations) | Utility — Contribution to Intelligence Collection (Useful) | Law IAW U.S. Interpretation | | |
|---|---|---|---|---|
| | | Torture Convention [Torture] | Torture Convention [Cruel, Inhuman Degrading] | U.S. Domestic Law |
| 1. Direct | High | ◍ | ◍ | ◍ |
| 2. Incentive or Removal | High | ◍ | ◍ | ◍ |
| 3. Emotional Love | High | ◍ | ◍ | ◍ |
| 4. Emotional Hate | High | ◍ | ◍ | ◍ |
| 5. Fear Up Harsh | High | ◍ | ◍ | ◍ |
| 6. Fear Up Mild | High | ◍ | ◍ | ◍ |
| 7. Reduced Fear | High | ◍ | | ◍ |
| 8. Pride and ego up | High | ◍ | ◍ | ◍ |
| 9. Pride and ego down | High | ◍ | ◍ | ◍ |
| 10. Futility | High | ◍ | ◍ | ◍ |
| 11. We Know All | High | ◍ | ◍ | ◍ |
| 12. Establish Your Identity | High | ◍ | ◍ | ◍ |

Note: Green denotes no significant constraint on use raised by the respective area of consideration listed at top of each column, assuming adequate procedural safeguards.
Yellow indicates area of consideration does not preclude use but there are problematic aspects that cannot be eliminated by procedural safeguards (see footnote).
Red indicates major issue in area of consideration that cannot be eliminated.

UNCLASSIFIED

UNCLASSIFIED

**War on Terrorism**
**Detainee Interrogation Working Group**
**Summary of Analysis and Recommendations**
**Pertaining to Unlawful Combatants Outside of the U.S.[1]**

| Legend |
|--------|
| ● Red |
| ○ Yellow |
| ▨ Green |

| Proposed Interrogation Techniques [2] (see attached description/limitations) | Policy | | | | | | | Recommendation |
|---|---|---|---|---|---|---|---|---|
| | Consistency with Historical U.S. Forces Interrogation Role | Consistency with Prior U.S. Public Statements | Consistency with Major Partner Nation Views | Effect on Captured U.S. Forces | Potential Adverse Effect for Participants/Supervisors/COC | Potential Effect on Detainee Prosecutions | Other | Re Unlawful Combatants |
| 1. Direct | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 2. Incentive or Removal | Green | Green | Yellow [3] | Green | Green | Red [4] | Yellow | Green |
| 3. Emotional Love | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 4. Emotional Hate | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 5. Fear Up Harsh | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 6. Fear Up Mild | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 7. Reduced Fear | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 8. Pride and ego up | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 9. Pride and ego down | Green | Green | Yellow [5] | Green | Green | Green | Yellow | Green |
| 10. Futility | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 11. We Know All | Green | Green | Green | Green | Green | Green | Yellow | Green |
| 12. Establish Your Identity | Green | Green | Green | Green | Green | Green | Yellow | Green |

Note:  Green denotes no significant constraint on use raised by the respective area of consideration listed at top of each column, assuming adequate procedural safeguards. Yellow indicates area of consideration does not preclude use but there are problematic aspects that cannot be eliminated by procedural safeguards (see footnote). Red indicates major issue in area of consideration that cannot be eliminated.

UNCLASSIFIED

UNCLASSIFIED

| Proposed Interrogation Techniques 2 (see attached descriptions/limitations) | Utility: Contribution to Intelligence Collection (Useful) | Law IAW U.S. Interpretation | | U.S. Domestic Law |
|---|---|---|---|---|
| | | Torture Convention [Torture] | Torture Convention [Cruel, Inhuman Degrading] | |
| 13. Repetition Approach | Low | ◑ | ◑ | ◑ |
| 14. File and Dossier | High | ◑ | ◑ | ◑ |
| 15. Mutt and Jeff | High | ◑ | ◑ | ◑ |
| 16. Rapid Fire | High | ◑ | ◑ | ◑ |
| 17. Silence | Medium | ◑ | ◑ | ◑ |
| 18. Change of Scenery Up | High | ◑ | ◑ | ◑ |
| 19. Change of Scenery Down | High | ◑ | ◑ | ◑ |
| 20. Hooding | High | ◑ | ◑ | ◑ |
| 21. Mild Physical Contact | High | ◑ | ◑ | ◑ |
| 22. Dietary Manipulation | High | ◑ | ◑ | ◑ |
| 23. Environmental manipulation | High | ◑ | ◑ | ◑ |
| 24. Sleep Adjustment | High | ◑ | ◑ | ◑ |
| 25. False Flag | High | ◑ | ◑ | ◑ |

Legend:
- ● Red
- ○ Yellow
- ○ Green



Note: Green denotes no significant constraint on use raised by the respective area of consideration listed at top of each column, assuming adequate procedural safeguards. Yellow indicates area of consideration does not preclude use but there are problematic aspects that cannot be eliminated by procedural safeguards (see footnote). Red indicates major issue in area of consideration that cannot be eliminated.

UNCLASSIFIED

UNCLASSIFIED

Legend: ● Red  ○ Yellow  ◍ Green

| Proposed Interrogation Techniques 2 (see attached descriptions/limitations) | Policy | | | | | | | Recommendation |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Consistency with Historical U.S. Forces Interrogation Role | Consistency with Prior U.S. Public Statements | Consistency with Major Partner Nation Views | Effect on Captured U.S. Forces | Potential Adverse Effect for Participants/Supervisors/COC | Potential Effect on Detainee Prosecutions | Other | Re Unlawful Combatants |
| 13. Repetition Approach | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 14. File and Dossier | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 15. Mutt and Jeff | ◍ | ◍ | ○ [6] | ◍ | ◍ | ◍ | ○ | ◍ |
| 16. Rapid Fire | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 17. Silence | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 18. Change of Scenery Up | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 19. Change of Scenery Down | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 20. Hooding | ◍ | ◍ | ◍ | ◍ [7] | ◍ | ◍ | ○ | ◍ |
| 21. Mild Physical Contact | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 22. Dietary Manipulation | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 23. Environmental Manipulation | ◍ | ◍ | ◍ [8] | ◍ | ◍ | ◍ [9] | ○ | ◍ |
| 24. Sleep Adjustment | ◍ | ◍ | ◍ | ◍ | ◍ | ◍ | ○ | ◍ |
| 25. False Flag | ◍ | ◍ | | ◍ | ◍ | | ○ | ● |

Note:  Green denotes no significant constraint on use raised by the respective area of consideration listed at top of each column, assuming adequate procedural safeguards.
Yellow indicates area of consideration does not preclude use but there are problematic aspects that cannot be eliminated by procedural safeguards (see footnote).
Red indicates major issue in area of consideration that cannot be eliminated.

UNCLASSIFIED

UNCLASSIFIED

| Legend |
|--------|
| ● Red |
| ○ Yellow |
| ○ Green |

| Proposed Interrogation Techniques [2] (see attached description/limitations) | Utility — Contribution to Intelligence Collection (Useful) | Law IAW U.S. Interpretation — Torture Convention [Torture] | Torture Convention [Cruel, Inhuman Degrading] | U.S. Domestic Law |
|---|---|---|---|---|
| 26. Threaten to transfer to a 3rd country | Medium | Yellow | Yellow | Yellow |
| 27. Isolation | High | Yellow [11] | Yellow [12] | Yellow [13] |
| 28. Use of Prolonged interrogations | High [17] | Yellow | Yellow | Yellow |
| 29. Forced Grooming | High | Yellow | Red [19] | Green [20] |
| 30. Prolonged Standing | High | Yellow | Yellow | Yellow |
| 31. Sleep Deprivation | High | Yellow | Yellow | Yellow |
| 32. Physical Training | High | Red | Red | Yellow |
| 33. Face or Stomach Slap | High | Red | Red | Yellow |
| 34. Removal of Clothing | High | Yellow | Green [34] | Green [35] |
| 35. Increasing Anxiety by Use of Aversions | High | Yellow | Green [38] | Green [39] |

Note: Green denotes no significant constraint on use raised by the respective area of consideration listed at top of each column, assuming adequate procedural safeguards. Yellow indicates area of consideration does not preclude use but there are problematic aspects that cannot be eliminated by procedural safeguards (see footnote). Red indicates major issue in area of consideration that cannot be eliminated.

UNCLASSIFIED

**Legend:**
- ● Red
- ○ Yellow
- ◍ Green

| Proposed Interrogation Techniques [2] (see attached description/limitations) | Policy | | | | | | | Recommendation |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Consistency with Historical U.S. Forces Interrogation Role | Consistency with Prior U.S. Public Statements | Consistency with Major Partner Nation Views | Effect on Captured U.S. Forces | Potential Adverse Effect for Participants/ Supervisors/COC | Potential Effect on Detainee Prosecutions | Other | Re Unlawful Combatants |
| 26. Threaten to transfer to a 3rd country | Green | Green | Green | Green | Green | Green [10] | Yellow | Green |
| 27. Isolation | Green [14] | Green | Yellow [15] | Green | Green | Green [16] | Yellow | Green — E (Cbt.C) |
| 28. Use of Prolonged interrogations | Green | Green | Green | Green | Green | Yellow [18] | Yellow | Green — E (GO/FO) |
| 29. Forced Grooming | Yellow [21] | Green | Yellow [22] | Green | Green | Yellow | Yellow | Green — E (GO/FO) |
| 30. Prolonged Standing | Green | Green | Green | Green | Green | Green [23] | Green | Green — E (GO/FO) |
| 31. Sleep Deprivation | Green | Green | Yellow [24] | Yellow | Yellow | Yellow [25] | Yellow [26] | Green — E (Cbt.C) |
| 32. Physical Training | Green | Green | Green | Green | Green | Yellow [27] | Yellow | Green — E (GO/FO) |
| 33. Face or Stomach Slap | Yellow [28] | Green | Green [29] | Yellow [30] | Yellow [31] | Yellow [32] | Yellow [33] | Green — E (GO/FO) |
| 34. Removal of Clothing | Green | Green | Yellow | Green [36] | Green | Yellow | Yellow [37] | Yellow — E (Cbt.C) |
| 35. Increasing Anxiety by Use of Aversions | Green | Green | Yellow | Green [40] | Green | Yellow [41] | Yellow | Yellow — E (Cbt.C) |

Note: Green denotes no significant constraint on use raised by the respective area of consideration listed at top of each column, assuming adequate procedural safeguards. Yellow indicates area of consideration does not preclude use but there are problematic aspects that cannot be eliminated by procedural safeguards (see footnote). Red indicates major issue in area of consideration that cannot be eliminated.

UNCLASSIFIED

# General Comments on Techniques Chart

"E" denotes recommendation that technique be considered "exceptional" and subject to the following limitations: (i) limited to use only at strategic interrogation facilities; (ii) there is a good basis to believe that the detainee possesses critical intelligence; (iii) the detainee is medically and operationally evaluated as suitable (considering all techniques to be used in combination); (iv) interrogators are specifically trained for the technique(s); (v) a specific interrogation plan (including reasonable safeguards, limits on duration, intervals between applications, termination criteria and the presence or availability of qualified medical personnel) has been developed; (vi) there is appropriate supervision; and, (vii) there is appropriate specified senior approval for use with any specific detainee (after considering the foregoing and receiving legal advice).

"(Cbt.C)" denotes recommendation that approval level for use of technique for a specific detainee be no lower than the Combatant Commander.

"(GO/FO)" denotes recommendation that approval level for use of technique for a specific detainee be no lower than a General Officer or Flag Officer.

The title of a particular technique is not always fully descriptive of a particular technique. With respect to the employment of any techniques involving physical contact or stress or that could produce physical pain or harm, a detailed explanation of that technique must be provided to the decision authority prior to any decision.

**Recommendation: The working group recommends that techniques 1-26 be approved for use with unlawful combatants outside the U.S. subject to the general limitations set forth in the Legal and Policy Analysis; and that techniques 27-35 be approved for use with unlawful combatants outside the U.S. subject to the general limitations as well as the specific limitations regarding "exceptional" techniques set forth above and in the Legal and Policy Analysis. If additional techniques are requested for use in the future, sufficient information regarding the technique must be provided to the appropriate command authority so that a legal/policy analysis can be conducted and recommendations for use made.**

Note: Green denotes no significant constraint on use raised by the respective area of consideration listed at top of each column, assuming adequate procedural safeguards. Yellow indicates area of consideration does not preclude use but there are problematic aspects that cannot be eliminated by procedural safeguards (see footnote). Red indicates major issue in area of consideration that cannot be eliminated.



UNCLASSIFIED

UNCLASSIFIED
## Footnotes

1.  These recommendations assume that procedures and safeguards substantially similar to those set forth in the "Policy" Section of the Legal and Policy Analysis are followed.  **The analysis relates to each individual technique; use of techniques in combination could significantly affect the legality and wisdom of their application.**

2.  Techniques 1-19, 22-26, 30 and 35, applied singly, are purely verbal and/or involve no physical contact that could produce pain or harm; no threat of pain or harm.

3.  *As a matter of policy, for countries that assert that POW protections should apply to detainees*:  Other nations may consider that provision and retention of religious items (e.g., the Koran) are protected under international law (see, Geneva III, Article 34).

4.  May affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

5.  *For countries that assert that POW protections apply to detainees*:  Article 17 of Geneva III provides, "Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to any unpleasant or disadvantageous treatment of any kind."

6.  *As a matter of policy, for countries that assert that POW protections should apply to detainees*:  Would be inconsistent with Geneva III, Article 13 which provides that POWs must be protected against acts of intimidation.

7.  *As a matter of policy, for countries that assert that POW protections should apply to detainees*:  Possible that other nations would disregard "mild" aspect and use as justification for abuse of U.S. POWs.

8.  International case law suggests that technique might in some circumstances be viewed by other countries as inhumane.

9.  May affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

10. May significantly affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

UNCLASSIFIED

UNCLASSIFIED

## Footnotes (cont'd)

11. The use of isolation as an interrogation technique requires detailed implementation instructions, including specific guidelines regarding the length of isolation, medical and psychological review, and approval for extensions of the length of isolation by the appropriate level in the chain of command.

12. To avoid implementation that could transgress, the use of isolation as an interrogation technique requires detailed implementation instructions, including specific guidelines regarding the length of isolation, medical and psychological review, and approval for extensions of the length of isolation by the appropriate level in the chain of command.

13. To avoid implementation that could transgress, the use of isolation as an interrogation technique requires detailed implementation instructions, including specific guidelines regarding the length of isolation, medical and psychological review, and approval for extensions of the length of isolation by the appropriate level in the chain of command.

14. Not known to have been generally used for interrogation purposes for longer than 30 days.

15. As a matter of policy, for countries that assert that POW protections should apply to detainees: Would be inconsistent with the requirements of Geneva III, Article 13 which provides that POWs must be protected against acts of intimidation; Article 14 which provides that POWs are entitled to respect for their person; Article 34 which prohibits coercion (see commentary to paragraph 4), and Article 126 which ensures access and basic standards of treatment.

16. May affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

17. Utility is "high" for the first four to five days, "medium" for the following four to six days, and "low" thereafter.

18. May significantly affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

19. Where there are religious or cultural sensitivities, this technique could raise issue of "degrading" if not applied in accordance with general limitations.

20. At practical level, may raise issues whether excessive force was used.

UNCLASSIFIED

UNCLASSIFIED

## Footnotes (cont'd)

21. This technique has not been used historically by U.S. forces. As such, no color code was assigned.

22. This technique could be viewed by major partner nations as degrading in some circumstances.

23. May affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

24. As a matter of policy, for consideration of other nations' views, the Committee against Torture, established under Article 17 of the Convention Against Torture (CAT), has interpreted "sleep deprivation for prolonged periods" to be a violation of both Article 16 of the CAT as cruel, inhuman, or degrading treatment as well as constituting torture under Article 1 of the CAT. Concluding Observations of the Committee against Torture, U.N. Doc. A/52/44, paragraphs 253-260. See also, Judgment on the Interrogation Methods Applied by the GSS, Nos HC 5100/94, HC 4054/95, HC 5188/96, HC 7563/97, HC 7628/97, HC 1043/99 (Sup Ct of Israel, sitting as the High Court of Justice, Sep 6, 1999). Finally, the European Court of Human Rights (ECHR) has held that sleep deprivation, in conjunction with four other problematic techniques (wall standing, hooding, subjection to noise, and deprivation of food and drink), did constitute "inhuman and degrading treatment". Ireland v. United Kingdom, 25 Eur. Ct. H.R. (Ser. A) (1978).

25. May significantly affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

26. Knowledge of this technique may have a significant adverse effect on public opinion.

27. May affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

28. Technique used historically until the Vietnam war, however not officially sanctioned.

29. As a matter of policy, for consideration of other nations' views, the Committee against Torture has generally denounced the use of "moderate physical pressure" as a permissible interrogation technique. See also, Tyrer v. United Kingdom, 26 Eur. Ct. H.R. (Ser. A) (1978) (spanking of student with 3 lashes of a birch rod violated European Convention on Human Rights). See also, Article 5 of the American Convention on Human Rights prohibits not only "torture" and "cruel, inhuman or degrading punishment or treatment" but it also provides that: "Every person has the right to have his physical, mental, and moral integrity respected."

UNCLASSIFIED

UNCLASSIFIED

## Footnotes

30. As a matter of policy, other nations could interpret this as condoning assault on the detainee and encourage the use against U.S. POWs.

31. Potential to be subject to charge of assault in international jurisdictions.

32. May significantly affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

33. Knowledge of this technique may have significant adverse effect on public opinion.

34. Depending on application of technique, could be construed as degrading.

35. At practical level, may raise issues whether excessive force was used as force may be required to remove clothing.

36. Other nations may use as excuse to apply to U.S. POWs.

37. Knowledge of this technique may have a significant adverse effect on public opinion.

38. Legal exposure would be dependant on specific technique employed. Depending on technique used and subject response, potential exists that technique could be viewed as violating 5th/8th/14th Amendment standards, and therefore violate U.S. interpretation of Torture Convention.

39. Legal exposure would be dependant on specific technique employed. Depending on technique used and subject response, potential exists that technique could be viewed as violating 5th/8th/14th Amendment standards, and therefore violate U.S. interpretation of Torture Convention.

40. Could provide basis for other nations to justify use of more aggravated mental techniques on U.S. POWs.

41. May significantly affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions).

UNCLASSIFIED

UNCLASSIFIED

# Description of Interrogation Techniques

1. **Direct:** Asking straightforward questions.

2. **Incentive/Removal of Incentive:** Providing a reward or removing a privilege, above and beyond those that are required by the Geneva Convention, from detainees.

3. **Emotional Love:** Playing on the love a detainee has for an individual or group.

4. **Emotional Hate:** Playing on the hatred a detainee has for an individual or group.

5. **Fear Up Harsh:** Significantly increasing the fear level in a detainee.

6. **Fear Up Mild:** Moderately increasing the fear level in a detainee.

7. **Reduced Fear:** Reducing the fear level in a detainee.

8. **Pride and Ego Up:** Boosting the ego of a detainee.

9. **Pride and Ego Down:** Attacking or insulting the ego of a detainee, not beyond the limits that would apply to a POW.

10. **Futility:** Invoking the feeling of futility of a detainee.

11. **We Know All:** Convincing the detainee that the interrogator knows the answer to questions he asks the detainee.

12. **Establish Your Identity:** Convincing the detainee that the interrogator has mistaken the detainee for someone else.

13. **Repetition Approach:** Continuously repeating the same question to the detainee within interrogation periods of normal duration.

14. **File and Dossier:** Convincing detainee that the interrogator has a damning and inaccurate file, which must be fixed.

15. **Mutt and Jeff:** A team consisting of a friendly and harsh interrogator. The harsh interrogator might employ the Pride and Ego Down technique.

UNCLASSIFIED

UNCLASSIFIED

## Description of Interrogation Techniques (cont'd)

16.  **Rapid Fire**: Questioning in rapid succession without allowing detainee to answer.

17.  **Silence**: Staring at the detainee to encourage discomfort.

18.  **Change of Scenery Up**: Removing the detainee from the standard interrogation setting (generally to a location more pleasant, but no worse).

19.  **Change of Scenery Down**: Removing the detainee from the standard interrogation setting and placing him in a setting that may be less comfortable; would not constitute a substantial change in environmental quality.

20.  **Hooding**: This technique is questioning the detainee with a blindfold in place. For interrogation purposes, the blindfold is not on other than during interrogation.

21.  **Mild Physical Contact**: Lightly touching a detainee or lightly poking the detainee in a completely non-injurious manner. This also includes softly grabbing of shoulders to get the detainee's attention or to comfort the detainee.

22.  **Dietary Manipulation**: Changing the diet of a detainee; no intended deprivation of food or water; no adverse medical or cultural effect and without intent to deprive subject of food or water, e.g., hot rations to MREs.

23.  **Environmental Manipulation**: Altering the environment to create moderate discomfort (e.g., adjusting temperature or introducing an unpleasant smell). Conditions would not be such that they would injure the detainee. Detainee would be accompanied by interrogator at all times.

24.  **Sleep Adjustment**: Adjusting the sleeping times of the detainee (e.g., reversing sleep cycles from night to day.) This technique is NOT sleep deprivation.

25.  **False Flag**: Convincing the detainee that individuals from a country other than the United States are interrogating him.

26.  **Threat of Transfer**: Threatening to transfer the subject to a 3rd country that subject is likely to fear would subject him to torture or death. (The threat would not be acted upon, nor would the threat include any information beyond the naming of the receiving country.)

UNCLASSIFIED

## Description of Interrogation Techniques (cont'd)

27.    **Isolation:** Isolating the detainee from other detainees while still complying with basic standards of treatment.

28.    **Use of Prolonged Interrogations:** The continued use of a series of approaches that extend over a long period of time (e.g., 20 hours per day per interrogation).

29.    **Forced Grooming:** Forcing a detainee to shave hair or beard. (Force applied with intention to avoid injury. Would not use force that would cause serious injury.)

30.    **Prolonged Standing:** Lengthy standing in a "normal" position (non-stress). This has been successful, but should never make the detainee exhausted to the point of weakness or collapse. Not enforced by physical restraints. Not to exceed four hours in a 24-hour period.

31.    **Sleep Deprivation:** Keeping the detainee awake for an extended period of time. (Allowing individual to rest briefly and then awakening him, repeatedly.) Not to exceed 4 days in succession.

32.    **Physical Training:** Requiring detainees to exercise (perform ordinary physical exercises actions) (e.g., running, jumping jacks); not to exceed 15 minutes in a two hour period; not more than two cycles per 24 hour period. Assists in generating compliance and fatiguing the detainees. No enforced compliance.

33.    **Face slap/ Stomach slap:** A quick glancing slap to the fleshy part of the cheek or stomach. These techniques are used strictly as shock measures and do not cause pain or injury. They are only effective if used once or twice together. After the second time on a detainee, it will lose the shock effect. Limited to two slaps per application; no more than two applications per interrogation.

34.    **Removal of Clothing:** Potential removal of all clothing; removal to be done by military police if not agreed to by the subject. Creating a feeling of helplessness and dependence. This technique must be monitored to ensure the environmental conditions are such that this technique does not injure the detainee.

35.    **Increasing Anxiety by Use of Aversions:** Introducing factors that of themselves create anxiety but do not create terror or mental trauma (e.g., simple presence of dog without directly threatening action). This technique requires the commander to develop specific and detailed safeguards to insure detainee's safety.


UNCLASSIFIED