# Exhibit N

DRAFT

# Working Group Report
## on
## Detainee Interrogations in the Global War on Terrorism:
## Assessment of Legal, Historical, Policy, and Operational Considerations

## 6 March 2003

Classified by: Secretary Rumsfeld
Reason: 1.5(C)
Declassify on: 10 years



## II. International Law

(U) The following discussion addresses the requirements of international law, as it pertains to the Armed Forces of the United States, as interpreted by the United States. As will be apparent in other sections of this analysis, other nations and international bodies may take a more restrictive view, which may affect our policy analysis and thus is considered elsewhere.

### A. The Geneva Conventions

(U) The laws of war contain obligations relevant to the issue of interrogation techniques and methods. It should be noted, however, that it is the position of the U.S. Government that none of the provisions of the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949 (Third Geneva Convention) apply to al Qaida detainees because, *inter alia*, al Qaida is not a High Contracting Party to the Convention.[1] As to the Taliban, the U.S. position is that the provisions of Geneva apply to our present conflict with the Taliban, but that Taliban detainees do not qualify as prisoners of war under Article 4 of the Geneva Convention.[2] The Department of Justice has opined that the Geneva Convention Relative to the Protection of Civilian Personnel in time of War (Fourth Geneva Convention) does not apply to unlawful combatants.

### B. The 1994 Convention Against Torture

(U) The United States' primary obligation concerning torture and related practices derives from the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (commonly referred to as "the Torture Convention"). The United States ratified the Convention in 1994, but did so with a variety of Reservations and Understandings.

(U) Article 1 of the Convention defines the term "torture" for purpose of the treaty.[3] The United States conditioned its ratification of the treaty on an understanding that:

> ...in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or



---

[3] (U) Article I provides: "For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."

suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.[4]

(U) Article 2 of the Convention requires the Parties to "take effective legislative, administrative, judicial and other measures to prevent acts of torture in any territory under its jurisdiction". The U. S. Government believed existing state and federal criminal law was adequate to fulfill this obligation, and did not enact implementing legislation. Article 2 also provides that acts of torture cannot be justified on the grounds of exigent circumstances, such as a state of war or public emergency, or on orders from a superior officer or public authority.[5] The United States did not have an Understanding or Reservation relating to this provision.

(U) Article 3 of the Convention contains an obligation not to expel, return, or extradite a person to another state where there are "substantial grounds" for believing that the person would be in danger of being subjected to torture. The U. S. understanding relating to this article is that it only applies "if it is more likely than not" that the person would be tortured.

(U) Under Article 5, the Parties are obligated to establish jurisdiction over acts of torture when committed in any territory under its jurisdiction or on board a ship or aircraft registered in that state, or by its nationals wherever committed. The "special maritime and territorial jurisdiction of the United States" under 18 U.S.C. § 7 satisfies the U. S. obligation to establish jurisdiction over torture committed in territory under U.S. jurisdiction or on board a U.S. registered ship or aircraft. However, the additional requirement of Article 5 concerning jurisdiction over acts of torture by U.S. nationals "wherever committed" needed legislative implementation. Chapter 113C of Title 18 of the U.S. Code provides federal criminal jurisdiction over an extraterritorial act or attempted act of torture if the offender is a U.S. national. The statute defines "torture" consistent with the U.S. Understanding on Article 1 of the Torture Convention.

(U) The United States is obligated under Article 10 of the Convention to ensure that law enforcement and military personnel involved in interrogations are educated and informed regarding the prohibition against torture. Under Article 11, systematic reviews of interrogation rules, methods, and practices are also required.

---

[4] (U) 18 U.S.C. § 2340 tracks this language. For a further discussion of the U.S. understandings and reservations, see the Initial Report of the U.S. to the U.N. Committee Against Torture, dated October 15, 1999.

[5] (U) But see discussion to the contrary at the Domestic Law section on the necessity defense.

(U) In addition to torture, the Convention prohibits cruel, inhuman and degrading treatment or punishment within territories under a Party's jurisdiction (Art 16). Primarily because the meaning of the term "degrading treatment" was vague and ambiguous, the United States imposed a Reservation on this article to the effect that it considers itself bound only to the extent that such treatment or punishment means the cruel, unusual and inhumane treatment or punishment prohibited by the 5th, 8th, and 14th Amendments to the U.S. Constitution (see discussion *infra*, in the Domestic Law section).

(U) In sum, the obligations under the Torture Convention apply to the interrogation of unlawful combatant detainees, but the Torture Convention prohibits torture only as defined in the U.S. Understanding, and prohibits "cruel, inhuman, and degrading treatment and punishment" only to the extent of the U.S. Reservation relating to the U.S. Constitution.

(U) An additional treaty to which the United States is a party is the International Covenant on Political and Civil Rights, ratified by the United States in 1992. Article 7 of this treaty provides that "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." The United States' ratification of the Covenant was subject to a Reservation that "the United States considers itself bound by Article 7 only to the extent that cruel, inhuman, or degrading treatment or punishment means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States." Under this treaty, a "Human Rights Committee" may, with the consent of the Party in question, consider allegations that such Party is not fulfilling its obligations under the Covenant. The United States has maintained consistently that the Covenant does not apply outside the United States or its special maritime and territorial jurisdiction, and that it does not apply to operations of the military during an international armed conflict.

## C.   Customary International Law

(U) The Department of Justice has concluded that customary international law cannot bind the Executive Branch under the Constitution, because it is not federal law.[6] In particular, the Department of Justice has opined that "under clear Supreme Court precedent, any presidential decision in the current conflict concerning the detention and trial of al-Qaida or Taliban militia prisoners would constitute a "controlling" Executive act that would immediately and completely override any customary international law".[7]

---

[6] (U) Memorandum dated January 22, 2002, *Re: Application of Treaties and Laws to al-Qaida and Taliban Detainees* at 32.

[7] (U) Memorandum dated January 22, 2002, *Re: Application of Treaties and Laws to al-Qaida and Taliban Detainees* at 35.

### III. Domestic Law

### A. Federal Criminal Law

### 1. Torture Statute

(U) 18 U.S.C. § 2340 defines as torture any *"act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain...."* The intent required is the intent to inflict severe physical or mental pain. 18 U.S.C. § 2340A requires that the offense occur "outside the United States". Jurisdiction over the offense extends to any national of the United States or any alleged offender present in the United States, and could, therefore, reach military members, civilian employees of the United States, or contractor employees.[8] The "United States" is defined to include all areas under the jurisdiction of the United States, including the special maritime and territorial jurisdiction (SMTJ) of the United States. SMTJ is a statutory creation[9] that extends the criminal jurisdiction of the United States for designated crimes to defined areas.[10] The effect is to grant federal court criminal jurisdiction for the specifically identified crimes.

(U) Guantanamo Bay Naval Station (GTMO) is included within the definition of the special maritime and territorial jurisdiction of the United States, and accordingly, is within the United States for purposes of § 2340. Thus, the Torture Statute does not apply to the conduct of U.S. personnel at GTMO. That GTMO is within the SMTJ of the United States is manifested by the prosecution of civilian dependents and employees living in GTMO in Federal District Courts based on SMTJ jurisdiction and Department of Justice opinion[11] and the clear intention of Congress as reflected in the 2001 amendment to the SMTJ. The USA Patriot Act (2001) amended § 7 to add subsection 9, which provides:

"With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act –

---

[8] (U) Section 2340A provides, *"Whoever outside the United States commits or attempts to commit torture shall be fined or imprisoned..."* (emphasis added).

[9] (U) 18 USC § 7, "Special maritime and territorial jurisdiction of the United States" includes any lands under the exclusive or concurrent jurisdiction of the United States.

[10] (U) Several paragraphs of 18 USC §7 are relevant to the issue at hand. Paragraph 7(3) provides: [SMTJ includes:] "Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place...." Paragraph 7(7) provides: [SMTJ includes:] "Any place outside the jurisdiction of any nation to an offense by or against a national of the United States." Similarly, paragraphs 7(1) and 7(5) extend SMTJ jurisdiction to, "the high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular state, and any vessel belonging in whole or in part to the United States..." and to "any aircraft belonging in whole or in part to the United States ... while such aircraft is in flight over the high seas, or over any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State".

[11] (U) 6 Op.OLC 236 (1982). The issue was the status of GTMO for purposes of a statute banning slot-machines on "any land where the United States government exercises exclusive or concurrent jurisdiction".

(A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of maintaining those missions or entities, irrespective of ownership; and

(B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.

(U) Any person who commits an enumerated offense in a location that is considered within the special maritime and territorial jurisdiction is subject to the jurisdiction of the United States.

(U) For the purposes of this discussion, it is assumed that an interrogation done for official purposes is under "color of law" and that detainees are in DOD's custody or control.

(U) Although Section 2340 does not apply to interrogations at GTMO, it would apply to U.S. operations outside U.S. jurisdiction, such as Afghanistan. The following analysis is relevant to such activities.

(U) To convict a defendant of torture, the prosecution must establish that: (1) the torture occurred outside the United States; (2) the defendant acted under color of law; (3) the victim was within the defendant's custody or physical control; (4) the defendant specifically intended to cause severe physical or mental pain or suffering; and (5) that the act inflicted severe physical or mental pain or suffering. See also S. Exec. Rep. No. 101-30, at 6 (1990). ("For an act to be 'torture,' it must...cause severe pain and suffering, and be intended to cause severe pain and suffering.")

a. "Specifically Intended"

(U) To violate Section 2340A, the statute requires that severe pain and suffering must be inflicted with specific intent. See 18 U.S.C. § 2340(1). In order for a defendant to have acted with specific intent, he must have expressly intended to achieve the forbidden act. See United States v. Carter, 530 U.S. 255, 269 (2000); Black's Law Dictionary at 814 (7th ed. 1999) (defining specific intent as "[t]he intent to accomplish the precise criminal act that one is later charged with"). For example, in Ratzlaf v. United States, 510 U.S. 135, 141 (1994), the statute at issue was construed to require that the defendant act with the "specific intent to commit the crime". (Internal quotation marks and citation omitted). As a result, the defendant had to act with the express "purpose to disobey the law" in order for the mens rea element to be satisfied. Ibid. (Internal quotation marks and citation omitted.)

(U) Here, because Section 2340 requires that a defendant act with the specific intent to inflict severe pain, the infliction of such pain must be the defendant's precise objective. If the statute had required only general intent, it would be sufficient to establish guilt by showing that the defendant "possessed knowledge with respect to the *actus reus* of the crime." *Carter,* 530 U.S. at 268. If the defendant acted knowing that severe pain or suffering was reasonably likely to result from his actions, but no more, he would have acted only with general intent. *See id* at 269; Black's Law Dictionary: 813 (7th ed. 1999) (explaining that general intent "usu[ally] takes the form of recklessness (involving actual awareness of a risk and the culpable taking of that risk) or negligence (involving blameworthy inadvertence)"). The Supreme Court has used the following example to illustrate the difference between these two mental states:

> [A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

*Carter,* 530 U.S. at 268 (citing 1 W. Lafave & A. Scott, Substantive Criminal Law § 3.5, at 315 (1986).

(U) As a theoretical matter, therefore, knowledge alone that a particular result is certain to occur does not constitute specific intent. As the Supreme Court explained in the context of murder, "the...common law of homicide distinguishes...between a person who knows that another person will be killed as a result of his conduct and a person who acts with the specific purpose of taking another's life[.]" *United States v. Bailey,* 444 U.S. 394, 405 (1980). "Put differently, the law distinguishes actions taken 'because of' a given end from actions taken 'in spite' of their unintended but foreseen consequences." *Vacco v. Quill,* 521 U.S. 793, 802-03 (1997). Thus, even if the defendant knows that severe pain will result from his actions, if causing such harm is not his objective, he lacks the requisite specific intent even though the defendant did not act in good faith. Instead, a defendant is guilty of torture only if he acts with the express purpose of inflicting severe pain or suffering on a person within his custody or physical control. While as a theoretical matter such knowledge does not constitute specific intent, juries are permitted to infer from the factual circumstances that such intent is present. *See, e.g., United States v. Godwin,* 272 F.3d 659, 666 (4th Cir. 2001); *United States v. Karro,* 257 F.3d 112, 118 (2d Cir. 2001); *United States v. Wood,* 207 F.3d 1222, 1232 (10th Cir. 2000); *Henderson v. United States,* 202 F.2d 400, 403 (6th Cir. 1953). Therefore, when a defendant knows that his actions will produce the prohibited result, a jury will in all likelihood conclude that the defendant acted with specific intent.

(U) Further, a showing that an individual acted with a good faith belief that his conduct would not produce the result that the law prohibits negates specific intent. *See, e.g., South Atl. Lmtd. Ptrshp. of Tenn v. Reise,* 218 F.3d 518, 531 (4th Cir. 2002). Where

a defendant acts in good faith, he acts with an honest belief that he has not engaged in the proscribed conduct. *See Cheek v. United States*, 498 U.S. 192, 202 (1991); *United States v. Mancuso*, 42 F.3d 836, 837 (4th Cir. 1994). For example, in the context of mail fraud, if an individual honestly believes that the material transmitted is truthful, he has not acted with the required intent to deceive or mislead. *See, e.g., United States v. Sayakhom*, 186 F.3d 928, 939-40 (9th Cir. 1999). A good faith belief need not be a reasonable one. *See Cheek*, 498 U.S. at 202.

(U) Although a defendant theoretically could hold an unreasonable belief that his acts would not constitute the actions prohibited by the statute, even though they would as a certainty produce the prohibited effects, as a matter of practice in the federal criminal justice system, it is highly unlikely that a jury would acquit in such a situation. Where a defendant holds an unreasonable belief, he will confront the problem of proving to the jury that he actually held that belief. As the Supreme Court noted in *Cheek*, "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury...will find that the Government has carried its burden of proving knowledge". *Id* at 203-04. As explained above, a jury will be permitted to infer that the defendant held the requisite specific intent. As a matter of proof, therefore, a good faith defense will prove more compelling when a reasonable basis exists for the defendant's belief.

### b. "Severe Pain or Suffering"

(U) The key statutory phrase in the definition of torture is the statement that acts amount to torture if they cause "severe physical or mental pain or suffering". In examining the meaning of a statute, its text must be the starting point. *See INS* v. *Phinpathya*, 464 U.S. 183, 189 (1984) ("This Court has noted on numerous occasions that in all cases involving statutory construction, our starting point must be the language employed by Congress...and we assume that the legislative purpose is expressed by the ordinary meaning of the words used.") (internal quotations and citations omitted). Section 2340 makes plain that the infliction of pain or suffering per se, whether it is physical or mental, is insufficient to amount to torture. Instead, the text provides that pain or suffering must be "severe." The statute does not, however, define the term "severe". "In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The dictionary defines "severe" as "[u]nsparing in exaction, punishment, or censure" or "[i]nflicting discomfort or pain hard to endure; sharp; afflictive; distressing; violent; extreme; as *severe* pain, anguish, torture". Webster's New International Dictionary 2295 (2d ed. 1935); *see* American Heritage Dictionary of the English Language 1653 (3d ed. 1992) ("extremely violent or grievous: *severe* pain") (emphasis in original); IX The Oxford English Diction"4TY 572 (1978) ("Of pain, suffering, loss, or the like: Grievous, extreme" and "of circumstances... hard to sustain or endure"). Thus, the adjective "severe" conveys that the pain or suffering must be of such a high level of intensity that the pain is difficult for the subject to endure.

c.     "Severe mental pain or suffering"

(U) Section 2340 gives further guidance as to the meaning of "severe mental pain or suffering," as distinguished from severe physical pain and suffering. The statute defines "severe mental pain or suffering" as:

> the prolonged mental harm caused by or resulting from—
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

18 U.S.C. § 2340(2). In order to prove "severe mental pain or suffering", the statute requires proof of "prolonged mental harm" that was caused by or resulted from one of four enumerated acts. We consider each of these elements.

i.     "Prolonged Mental Harm"

(U) As an initial matter, Section 2340(2) requires that the severe mental pain must be evidenced by "prolonged mental harm". To prolong is to "lengthen in time" or to "extend the duration of, to draw out". Webster's Third New International Dictionary 1815 (1988); Webster's New International Dictionary 1980 (2d ed. 1935). Accordingly, "prolong" adds a temporal dimension to the harm to the individual, namely, that the harm must be one that is endured over some period of time. Put another way, the acts giving rise to the harm must cause some lasting, though not necessarily permanent, damage. For example, the mental strain experienced by an individual during a lengthy and intense interrogation, such as one that state or local police might conduct upon a criminal suspect, would not violate Section 2340(2). On the other hand, the development of a mental disorder such as posttraumatic stress disorder, which can last months or even years, or even chronic depression, which also can last for a considerable period of time if untreated, might satisfy the prolonged harm requirement. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 426, 439-45 (4th ed. 1994) ("DSM-IV"). *See also* Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement,* 23 N.Y.U. Rev. L. & Soc. Change 477,509 (1997) (noting that posttraumatic stress disorder is frequently found in torture victims); *cf* Sana Loue, *Immigration Law and Health* § 10:46 (2001) (recommending evaluating for post-traumatic stress disorder immigrant-client

who has experienced torture).[12] By contrast to "severe pain" the phrase "prolonged mental harm" appears nowhere else in the U.S. Code nor does it appear in relevant medical literature or international human rights reports.

(U) Not only must the mental harm be prolonged to amount to severe mental pain and suffering, but also it must be caused by or result from one of the acts listed in the statute. In the absence of a catchall provision, the most natural reading of the predicate acts listed in Section 2340(2)(A)(D) is that Congress intended the list to be exhaustive. In other words, other acts not included within Section 2340(2)'s enumeration are not within the statutory prohibition. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993) (" *Expressio unius est exclusio alterius* "); Norman Singer, 2A Sutherland on Statutory Construction § 47.23 (6th ed. 2000) ("[W]here a form of conduct the manner of its performance and operation, and the persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions.") (footnotes omitted). We conclude that torture within the meaning of the statute requires the specific intent to cause prolonged mental harm by one of the acts listed in Section 2340(2).

(U) A defendant must specifically intend to cause prolonged mental harm for the defendant to have committed torture. It could be argued that a defendant needs to have specific intent only to commit the predicate acts that give rise to prolonged mental harm. Under that view, so long as the defendant specifically intended to, for example, threaten a victim with imminent death, he would have had sufficient *mens rea* for a conviction. According to this view, it would be further necessary for a conviction to show only that the victim factually suffered prolonged mental harm, rather than that the defendant intended to cause it. We believe that this approach is contrary to the text of the statute. The statute requires that the defendant specifically intend to inflict severe mental pain or suffering. Because the statute requires this mental state with respect to the infliction of severe mental pain and because it expressly defines severe mental pain in terms of prolonged mental harm, that mental state must be present with respect to prolonged mental harm. To read the statute otherwise would read the phrase "prolonged mental harm caused by or resulting from" out of the definition of "severe mental pain or suffering".

(U) A defendant could negate a showing of specific intent to cause severe mental pain or suffering by showing that he had acted in good faith that his conduct would not

[12] The DSM-IV explains that posttraumatic disorder ("PTSD") is brought on by exposure to traumatic events, such as serious physical injury or witnessing the deaths of others and during those events the individual felt "intense fear" or "horror." *Id* at 424. Those suffering from this disorder re-experience the trauma through, *inter alia,* "recurrent and intrusive distressing recollections of the event", "recurrent distressing dreams of the event", or "intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event." *Id.* at 428. Additionally, a person with PTSD "[p]ersistent[ly]" avoids stimuli associated with the trauma, including avoiding conversations about the trauma, places that stimulate recollections about the trauma, and they experience a numbing of general responsiveness, such as a "restricted range of affect (e.g., unable to have loving feelings)", and "the feeling of detachment or estrangement from others." *Ibid.* Finally, an individual with PTSD has "[p]ersistent symptoms of increased arousal," as evidenced by "irritability or outbursts of anger", "hypervigilance", "exaggerated startle response", and difficulty sleeping or concentrating. *Ibid.*

amount to the acts prohibited by the statute. Thus, if a defendant has a good faith belief that his actions will not result in prolonged mental harm, he lacks the mental state necessary for his actions to constitute torture. A defendant could show that he acted in good faith by taking such steps as surveying professional literature, consulting with experts, or reviewing evidence gained from past experience. *See, e.g., Ratlzlaf,* 510 *U.S.* at 142 n.10 (noting that where the statute required that the defendant act with the specific intent to violate the law, the specific intent element "might be negated by, e.g., proof that defendant relied in good faith on advice of counsel.") (citations omitted). All of these steps would show that he has drawn on the relevant body of knowledge concerning the result proscribed by the statute, namely prolonged mental harm. Because the presence of good faith would negate the specific intent element of torture, good faith may be a complete defense to such a charge. *See, e.g., United States* v. *Wall,* 130 F.3d 739, 746 (6th Cir. 1997); *United States* v. *Casperson,* 773 F.2d 216,222-23 (8th Cir.1985).

## ii. *Harm Caused By Or Resulting From Predicate Acts*

(U) Section 2340(2) sets forth four basic categories of predicate acts. The first category is the "intentional infliction or threatened infliction of severe physical pain or suffering". This might at first appear superfluous because the statute already provides that the infliction of severe physical pain or suffering can amount to torture. This provision, however, actually captures the infliction of physical pain or suffering when the defendant inflicts physical pain or suffering with general intent rather than the specific intent that is required where severe physical pain or suffering alone is the basis for the charge. Hence, this subsection reaches the infliction of severe physical pain or suffering when it is only the means of causing prolonged mental harm. Or put another way, a defendant has committed torture when he intentionally inflicts severe physical pain or suffering with the specific intent of causing prolonged mental harm. As for the acts themselves, acts that cause "severe physical pain or suffering" can satisfy this provision.

(U) Additionally, the threat of inflicting such pain is a predicate act under the statute. A threat may be implicit or explicit. *See, e.g., United States* v. *Sachdev,* 279 F.3d 25, 29 (1st Cir. 2002). In criminal law, courts generally determine whether an individual's words or actions constitute a threat by examining whether a reasonable person in the same circumstances would conclude that a threat had been made. *See,* e.g., *Watts* v. *United States,* 394 *U.S.* 70S, 708 (1969) (holding that whether a statement constituted a threat against the president's life had to be determined in light of all the surrounding circumstances); *Sachdev,* 279 F.3d at 29 ("a reasonable person in defendant's position would perceive there to be a threat, explicit or implicit, of physical injury"); *United States v. Khorrami,* 895 F.2d 1186, 1190 (7th Cir. 1990) (to establish that a threat was made, the statement must be made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon [another individual]") (citation and internal quotation marks omitted); *United States v. Peterson,* 483 F.2d 1222, 1230 (D.C. Cir. 1973) (perception of threat of imminent harm necessary to establish self-defense had to be "objectively reasonable in light of the surrounding circumstances"). Based on this common approach,

we believe that the existence of a threat of severe pain or suffering should be assessed from the standpoint of a reasonable person in the same circumstances.

(U) Second, Section 2340(2)(B) provides that prolonged mental harm, constituting torture, can be caused by "the administration or application or threatened administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality". The statute provides no further definition of what constitutes a mind-altering substance. The phrase "mind-altering substances" is found nowhere else in the U.S. Code, nor is it found in dictionaries. It is, however, a commonly use synonym for drugs. *See, e.g., United States v. Kingsley,* 241 F.3d 828, 834 (6th Cir.) (referring to controlled substances as "mind-altering substance[s]") *cert. denied,* 122 S. Ct. 137 (2001); *Hogue v. Johnson,* 131 F. 3rd 466, 501 (5th Cir. 1997) (referring to drugs and alcohol as "mind altering substance[s]"), *cert. denied,* 523 U.S. 1014 (1998). In addition, the phrase appears in a number of state statutes, and the context in which it appears confirms this understanding of the phrase. *See, e.g.,* Cal. Penal Code § 3500 (c) (West Supp. 2000) ("Psychotropic drugs also include mind-altering... drugs..."); Minn. Stat. Ann. § 260B.201(b) (West Supp. 2002) ("'chemical dependency treatment'" define as programs designed to "reduc[e] the risk of the use of alcohol, drugs, or other mind-altering substances").

(U) This subparagraph, section 2340(2)(B), however, does not preclude any and all use of drugs. Instead, it prohibits the use of drugs that "disrupt profoundly the senses or the personality". To be sure, one could argue that this phrase applies only to "other procedures", not the application of mind-altering substances. We reject this interpretation because the terms of Section 2340(2) expressly indicate that the qualifying phrase applies to both "other procedures" *and* the "application of mind-altering substances". The word "other" modifies "procedures calculated to disrupt profoundly the senses". As an adjective, "other" indicates that the term or phase it modifies is the remainder of several things. *See* Webster's Third New International Dictionary 1598 (1986) (defining "other" as "being the one (as of two or more) remaining or not included"). Or put another way, "other" signals that the words to which it attaches are of the same kind, type, or class as the more specific item previously listed. Moreover, where a statute couple words or phrases together, it "denotes an intention that they should be understood in the same general sense." Norman Singer, 2A Sutherland on Statutory Construction § 47:16 (6th ed. 2000); *see also Beecham v. United States,* 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Thus, the pairing of mind-altering substances with procedures calculated to disrupt profoundly the sense or personality and the use of "other" to modify "procedures" shows that the use of such substances must also cause a profound disruption of the senses or personality.

(U) For drugs or procedures to rise to the level of "disrupt[ing] profoundly the sense or personality", they must produce an extreme effect. And by requiring that they be "calculated" to produce such an effect, the statute requires that the defendant has consciously designed the acts to produce such an effect. 28 U.S.C. § 2340(2)(B). The word "disrupt" is defined as "to break asunder; to part forcibly; rend," imbuing the verb

with a connotation of violence. Webster's New International Dictionary 753 (2d ed. 1935); *see* Webster's Third New International Dictionary 656 (1986) (defining disrupt as "to break apart: Rupture" or "destroy the unity or wholeness of"); IV the Oxford English Dictionary 832 (1989) (defining disrupt as "[t]o break or burst asunder; to break in pieces; to separate forcibly"). Moreover, disruption of the senses or personality alone is insufficient to fall within the scope of this subsection; instead, that disruption must be profound. The word "profound" has a number of meanings, all of which convey a significant depth. Webster's New International Dictionary 1977 (2d ed. 1935 defines profound as: "Of very great depth; extending far below the surface or top; unfathomable [;]...[c]oming from, reaching to, or situated at a depth or more than ordinary depth; not superficial; deep-seated; chiefly with reference to the body; as a *profound* sigh, wounded, or pain[;] . . .[c]haracterized by intensity, as of feeling or quality; deeply felt or realized; as, *profound* respect, fear, or melancholy; hence, encompassing; thoroughgoing; complete; as, *profound* sleep, silence, or ignorance." *See* Webster's Third New International Dictionary 1812 (1986) ("having very great depth: extending far below the surface. . .not superficial"). Random House Webster's Unabridged Dictionary 1545 (2d ed. 1999) also defines profound as "originating in or penetrating to the depths of one's being" or "pervasive or intense; thorough; complete" or "extending, situated, or originating far down, or far beneath the surface." By requiring that the procedures and the drugs create a *profound* disruption, the statute requires more than the acts "forcibility separate" or "rend" the senses or personality. Those acts must penetrate to the core of an individual's ability to perceive the world around him, substantially interfering with his cognitive abilities, or fundamentally alter his personality.

(U) The phrase "disrupt profoundly the senses or personality" is not used in mental health literature nor is it derived from elsewhere in U.S. law. Nonetheless, we think the following examples would constitute a profound disruption of the senses or personality. Such an effect might be seen in a drug-induced dementia. In such a state, the individual suffers from significant memory impairment, such as the inability to retain any new information or recall information about things previously of interest to the individual. *See* DSM-IV at 134.[13] This impairment is accompanied by one or more of the following: deterioration of language function, e.g., repeating sounds or words over and over again; impaired ability to execute simple motor activities, e.g., inability to dress or wave goodbye; "[in]ability to recognize [and identify] objects such as chairs or pencils" despite normal visual functioning; or "[d]isturbances in executive level functioning", i.e., serious impairment of abstract thinking. *Id.* At 134-35. Similarly, we think that the onset of "brief psychotic disorder" would satisfy this standard. *See id.* at 302-03. In this disorder, the individual suffers psychotic symptoms, including among other things, delusions, hallucinations, or even a catatonic state. This can last for one day

---

[13] (U)    Published by the American Psychiatric Association, and written as a collaboration of over a thousand psychiatrists, the DSM-IV is commonly used in U.S. courts as a source of information regarding mental health issues and is likely to be used in trial should charges be brought that allege this predicate act. *See, e.g., Atkins v. Virginia*, 122 S. Ct. 2242, 2245 n. 3 (2002); *Kansas v. Crane*, 122 S. Ct. 867, 871 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 359-60 (1997); *McClean v. Merrifield*, No. 00-CV-0120E(SC), 2002 WL 1477607 at *2 n.7 (W.D.N.Y. June 28, 2002); *Peeples v. Coastal Office Prods.*, 203 F. Supp 2d 432, 439 (D. Md 2002); *Lasslegne v. Taco Bell Corp.*, 202 F. Supp 2d 512, 519 (E.D. La. 2002).

or even one month. *See id.* We likewise think that the onset of obsessive-compulsive disorder behaviors would rise to this level. Obsessions are intrusive thoughts unrelated to reality. They are not simple worries, but are repeated doubts or even "aggressive or horrific impulses." *See id.* at 418. The DSM-IV further explains that compulsions include "repetitive behaviors (e.g., hand washing, ordering, checking)" and that "[b]y definition, [they] are either clearly excessive or are not connected in a realistic way with what they are designed to neutralize or prevent". *See id.* Such compulsions or obsessions must be "time-consuming". *See id* at 419. Moreover, we think that pushing someone to the brink of suicide (which could be evidenced by acts of self-mutilation), would be a sufficient disruption of the personality to constitute a "profound disruption". These examples, of course, are in no way intended to be an exhaustive list. Instead, they are merely intended to illustrate the sort of mental health effects that we believe would accompany an action severe enough to amount to one that "disrupt[s] profoundly the sense or the personality".

(U) The third predicate act listed in Section 2340(2) is threatening an individual with "imminent death". 18 U.S.C. § 2340(2)(C). The plain text makes clear that a threat of death alone is insufficient; the threat must indicate that death is "imminent". The "threat of imminent death" is found in the common law as an element of the defense of duress. *See Bailey*, 444 U.S. at 409. "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette v. United States*, 342 U.S. 246, 263 (1952). Common law cases and legislation generally define "imminence" as requiring that the threat be almost immediately forthcoming. 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.7, at 655 (1986). By contrast, threats referring vaguely to things that might happen in the future do not satisfy this immediacy requirement. *See United States v. Fiore*, 178 F. 3rd 917, 923 (7th Cir. 1999). Such a threat fails to satisfy this requirement not because it is too remote in time but because there is a lack of certainty that it will occur. Indeed, timing is an indicator of certainty that the harm will befall the defendant. Thus, a vague threat that someday the prisoner *might* be killed would not suffice. Instead, subjecting a prisoner to mock executions or playing Russian roulette with him would have sufficient immediacy to constitute a threat of imminent death. Additionally, as discussed earlier, we believe that the existence of a threat must be assessed from the perspective of a reasonable person in the same circumstances.

(U) Fourth, if the official threatens to do anything previously described to a third party, or commits such an act against a third party, that threat or action can serve as the necessary predicate for prolonged mental harm. *See* 18 U.S.C. § 2340(2)(D). The statute does not require any relationship between the prisoner and the third party.

## 2. Other Federal Crimes that Could Relate to Interrogation Techniques

(U) Through the SMTJ, the following federal crimes are generally applicable to actions by military or civilian personnel: murder (18 U.S.C. § 1111), manslaughter (18 U.S.C. § 1112), assault (18 U.S.C. § 113), maiming (18 U.S.C. § 114), kidnapping (18 U.S.C. § 1201). These, as well as war crimes (18 U.S.C. § 2441)[14] and conspiracy (18 U.S.C. § 371), are discussed below.

### a. Assaults within maritime and territorial jurisdiction, 18 U.S.C. § 113

(U) 18 U.S.C. § 113 proscribes assault within the special maritime and territorial jurisdiction. Although section 113 does not define assault, courts have construed the term "assault" in accordance with that term's common law meaning. *See, e.g., United States v. Estrada-Fernandez,* 150 F.3d 491, 494 n.1 (5th Cir. 1998); *United States v. Juvenile-Male,* 930 F.2d 727, 728 (9th Cir. 1991). At common law an assault is an attempted battery or an act that puts another person in reasonable apprehension of bodily harm. *See e.g., United States v. Bayes,* 210 F.3d 64, 68 (1st Cir. 2000). Section 113 reaches more than simple assault, sweeping within its ambit acts that would at common law constitute battery.

(U) 18 U.S.C. § 113 proscribes several specific forms of assault. Certain variations require specific intent, to wit: assault with intent to commit murder (imprisonment for not more than twenty years); assault with intent to commit any felony (except murder and certain sexual abuse offenses)(fine and/or imprisonment for not more than ten years); assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse (fine and/imprisonment for not more than ten years, or both). Other defined crimes require only general intent, to wit: assault by striking, beating, or wounding (fine and/or imprisonment for not more than six months); simple assault (fine and/or imprisonment for not more than six months), or if the victim of the assault is an individual who has not attained the age of 16 years (fine and/or imprisonment for not more than 1 year); assault resulting in serious bodily injury (fine and/or imprisonment for not more than ten years); assault resulting in substantial bodily injury to an individual who has not attained the age of 16 years (fine and/or imprisonment for not more than 5 years). "Substantial bodily injury" means bodily injury which involves (A) a temporary but substantial disfigurement; or (B) a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty "Serious bodily injury" means bodily injury which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty. "Bodily injury" means (A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of

---

[14] (U)  18 U.S.C. § 2441 criminalizes the commission of war crimes by U.S. nationals and members of the U.S. Armed Forces. Subsection (c) defines war crimes as (1) grave breaches of any of the Geneva Conventions; (2) conduct prohibited by the Hague Convention IV, Respecting the Law and Customs of War on Land, signed 18 October 1907; or (3) conduct that constitutes a violation of common Article 3 of the Geneva Conventions. The Department of Justice has opined that this statute does not apply to conduct toward al-Qaida or Taliban operatives because the President has determined that they are not entitled to the protections of Geneva and the Hague Regulations.

the function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary.

## b.   Maiming, 18 U.S.C. § 114

(U) Whoever with the intent to torture (as defined in section 2340), maims, or disfigures, cuts, bites, or slits the nose, ear, or lip, or cuts out or disables the tongue, or puts out or destroys an eye, or cuts off or disables a limb or any member of another person; or whoever, and with like intent, throws or pours upon another person, any scalding water, corrosive acid, or caustic substance shall be fined and/or imprisoned not more than twenty years. This is a specific intent crime.

## c.   Murder, 18 U.S.C. § 1111

(U) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree. If within the SMTJ, whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life; whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life. Murder is a specific intent crime.

## d.   Manslaughter, 18 U.S.C. § 1112

(U) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:   (A) voluntary, upon a sudden quarrel or heat of passion and (B) involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

(U) If within the SMTJ whoever is guilty of voluntary manslaughter, shall be fined and/or imprisoned not more than ten years; whoever is guilty of involuntary manslaughter, shall be fined and/or imprisoned not more than six years. Manslaughter is a general intent crime. A death resulting from the exceptional interrogation techniques may subject the interrogator to a charge of manslaughter, most likely of the involuntary sort.

## e.   Interstate Stalking, 18 U.S.C. § 2261A

(U) 18 U.S.C. § 2261A provides that "[w]hoever...travels...within the special maritime and territorial jurisdiction of the United States...with the intent to kill, injure, harass, or intimidate another person, and in the course of or as a result of, such travel

places that person in reasonable fear of the death of, or serious bodily injury of that person." Thus there are three elements to a violation of 2261A: (1) defendant traveled in interstate commerce; (2) he did so with the intent to injure, harass, intimidate another person; (3) the person he intended to harass or injure was reasonably placed in fear of death or serious bodily injury as a result of that travel. *See United States v. Al-Zubaidy,* 283 F.3d 804, 808 (6th Cir. 2002).

(U) The travel itself must have been undertaken with the specific intent to harass or intimidate another. Or put another way, at the time of the travel itself, the defendant must have engaged in that travel for the precise purpose of harassing another person. *See Al-Zubaidy,* 283 F.3d at 809 (the defendant "must have intended to harass or injure [the victim] at the time he crossed the state line").

(U) The third element is not fulfilled by the mere act of travel itself. *See United States v. Crawford,* No. 00-CR-59-B-S, 2001 WL 185140 (D. Me. Jan. 26, 2001) ("A plain reading of the statute makes clear that the statute requires the actor to place the victim in reasonable fear, rather than, as Defendant would have it, that his travel place the victim in reasonable fear.").

(U) It is unlikely that this statute's purpose is aimed at interrogations.

## f.   Conspiracy, 18 U.S.C. § 2 and 18 U.S.C. § 371[15]

(U) Conspiracy to commit crime is a separate offense from crime that is the object of the conspiracy.[16] Therefore, where someone is charged with conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.[17]

(U) As the Supreme Court most recently stated, "the essence of a conspiracy is 'an agreement to commit an unlawful act.'" *United States* v. *Jimenez Recio,* —S.Ct. -, 2003 WL 139612 at *-- (Jan. 12, 2003) (quoting *Iannelli* v. *United States,* 420 U.S. 770, 777 (1975). Moreover, "[t]hat agreement is a 'distinct evil,' which 'may exist and be punished

---

[15] (U)  18 U.S.C. § 2.  Principals
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
18 U.S.C. § 371.  Conspiracy to commit offense or to defraud United States
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.
[16] (U)  *United States* v *Rabinowich,* 238 US 78, 59, 35 S.Ct 682, L Ed 1211 (1915).
[17] (U)  *United States v. Cangiano,* 491 F.2d 906 (2nd Cir. 1974), cert denied 419 U.S. 904 (1974).

whether or not the substantive crime ensues.", *Id* at * (quoting *Salinas* v. *United States*, 522 U.S. 52, 65 (1997).

## 3. Legal doctrines under the Federal Criminal Law that could render specific conduct, otherwise criminal, *not* unlawful

(U) Generally, the following discussion identifies legal doctrines and defenses applicable to the interrogation of unlawful combatants, and the decision process related to them. In practice, their efficacy as to any person or circumstance will be fact-dependent.

### a. Commander-in-Chief Authority

(U) As the Supreme Court has recognized, and as we will explain further below, the President enjoys complete discretion in the exercise of his Commander-in-Chief authority including in conducting operations against hostile forces. Because both "[t]he executive power and the command of the military and naval forces is vested in the President," the Supreme Court has unanimously stated that it is *"the President alone* who is constitutionally invested with the *entire charge of hostile operations." Hamilton v. Dillin,* 88 U.S. (21 Wall.) 73, 87 (1874) (emphasis added).

(U) In light of the President's complete authority over the conduct of war, without a clear statement otherwise, criminal statutes are not read as infringing on the President's ultimate authority in these areas. The Supreme Court has established a canon of statutory construction that statutes are to be construed in a manner that avoids constitutional difficulties so long as a reasonable alternative construction is available. *See, e.g., Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 499-501, 504 (1979)) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe [a] statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") This canon of construction applies especially where an act of Congress could be read to encroach upon powers constitutionally committed to a coordinate branch of government. *See, e.g., Franklin* v. *Massachusetts,* 505 U.S. 788, 800-1 (1992) (citation omitted) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the [Administrative Procedure Act]. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."); *Public Citizen V. United States Dep't of Justice,* 491 U.S. 440, 465-67 (1989) (construing Federal Advisory Committee Act not to apply to advice given by American Bar Association to the President on judicial nominations, to avoid potential constitutional question regarding encroachment on Presidential power to appoint judges).

(U) In the area of foreign affairs, and war powers in particular, the avoidance canon has special force. *See, e.g., Dept of Navy v. Egan,* 484 U.S. 518, 530 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been

reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Japan Whaling Ass 'n* v. *American Cetacean Socy,* 478 U.S. 221, 232-33 (1986) (construing federal statutes to avoid curtailment of traditional presidential prerogatives in foreign affairs). It should not be lightly assumed that Congress has acted to interfere with the President's constitutionally superior position as Chief Executive and Commander-in-Chief in the area of military operations. *See Egan,* 484 U.S. at 529 (quoting *Haig* v. *Agee,* 1453 U.S. 280, 293-94 (1981). *See also Agee,* 453 U.S. at 291 (deference to Executive Branch is "especially" appropriate "in the area of national security").

(U) In order to respect the President's inherent constitutional authority to manage a military campaign, 18 U.S.C. § 2340A (the prohibition against torture) must be construed as inapplicable to interrogations undertaken pursuant to his Commander-in-Chief authority. Congress lacks authority under Article I to set the terms and conditions under which the President may exercise his authority as Commander-in-Chief to control the conduct of operations during a war. The President's power to detain and interrogate enemy combatants arises out of his constitutional authority as Commander-in-Chief. A construction of Section 2340A that applied the provision to regulate the President's authority as Commander-in-Chief to determine the interrogation and treatment of enemy combatants would raise serious constitutional questions. Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield. Accordingly, we would construe Section 2340A to avoid this constitutional difficulty, and conclude that it does not apply to the President's detention and interrogation of enemy combatants pursuant to his Commander-in-Chief authority.

(U) This approach is consistent with previous decisions of the DOJ involving the application of federal criminal law. For example, DOJ has previously construed the congressional contempt statute as inapplicable to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. In a 1984 opinion, DOJ concluded that

> if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted A Claim of Executive Privilege,* 8:Op O.L.C. 101, 134 (May 30,1984). Likewise, if executive officials were subject to prosecution for conducting interrogations when they were carrying out the President's Commander-in-Chief powers, "it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." These constitutional principles preclude an application of Section 2340A to

punish officials for aiding the President in exercising his exclusive constitutional authorities. *Id.*

(U) It could be argued that Congress enacted 18 U.S.C. § 2340A with full knowledge and consideration of the President's Commander-in-Chief power, and that Congress intended to restrict his discretion; however, the Department of Justice could not enforce Section 2340A against federal officials acting pursuant to the President's constitutional authority to wage a military campaign. Indeed, in a different context, DOJ has concluded that both courts and prosecutors should reject prosecutions that apply federal criminal laws to activity that is authorized pursuant to one of the President's constitutional powers. DOJ, for example, has previously concluded that Congress could not constitutionally extend the congressional contempt statute to executive branch officials who refuse to comply with congressional subpoenas because of an assertion of executive privilege. They opined that "courts...would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution." 8 Op. O.L.C. at 141. Further, DOJ concluded that it could not bring a criminal prosecution against a defendant who had acted pursuant to an exercise of the President's constitutional power. "The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual." *Id.* Although Congress may define federal crimes that the President, through the Take Care Clause, should prosecute, Congress cannot compel the President to prosecute outcomes taken pursuant to the President's own constitutional authority. If Congress could do so, it could control the President's authority through the manipulation of federal criminal law.

(U) There are even greater concerns with respect to prosecutions arising out of the exercise of the President's express authority as Commander-in-Chief than with prosecutions arising out of the assertion of executive privilege. In a series of opinions examining various legal questions arising after September 11, 2001, DOJ explained the scope of the President's Commander-in-Chief power. We briefly summarize the findings of those opinions here. The President's constitutional power to protect the security of the United States and the lives and safety of its people must be understood in light of the Founders' intention to create a federal government "cloathed with all the powers requisite to the complete execution of Its trust." *The Federalist* No. 23, at 147 (Alexander Hamilton) (Jacob E. Cooke ed. 1961). Foremost among the objectives committed to that trust by the Constitution is the security of the nation. As Hamilton explained in arguing for the Constitution's adoption, because "the circumstances which may affect the public safety" are not reducible within certain determinate limits,

> it must be admitted, as necessary consequence, that there can be no limitation of that authority, which is to provide for the defense and protection of the community, in any matter essential to its efficacy.

*Id.* at 147-48. Within the limits that the Constitution itself imposes, the scope and distribution of the powers to protect national security must be construed to authorize the

most efficacious defense of the nation and its interests in accordance "with the realistic purposes of the entire instrument." *Lichter v. United States*, 334 U.S. 742, 782 (1948).

(U) The text, structure, and history of the Constitution establish that the Founders entrusted the President with the primary responsibility, and therefore the power, to ensure the security of United States in situations of grave and unforeseen emergencies. The decision to deploy military force in the defense of United States interests is expressly placed under Presidential Authority by the Vesting Clause, U.S. Const. Art. I, § 1, cl. 1, and by the Commander-in-Chief Clause, *id.*, § 2, cl. 1.[18] DOJ has long understood the Commander-in-Chief Clause in particular as an affirmative grant of authority to the President. The Framers understood the Clause as investing the President with the fullest range of power understood at the time of the ratification of the Constitution as belonging to the military commander. In addition, the Structure of the Constitution demonstrates that any power traditionally understood as pertaining to the executive which includes the conduct of warfare and the defense of the nation unless expressly assigned in the Constitution to Congress, is vested in the President. Article II, Section 1 makes this clear by stating that the "executive Power shall be vested in a President of the United States of America." That sweeping grant vests in the President an unenumerated "executive power" and contrasts with the specific enumeration of the powers-those "herein" granted to Congress in Article I. The implications of constitutional text and structure are confirmed by the practical consideration that national security decisions require the unity in purpose and energy in action that characterize the Presidency rather than Congress.[19]

---

[18] (U) *See Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (President has authority to deploy United States armed forces "abroad or to any particular region"); *Fleming v. Page*, 50 U.S. (9 How) 603, 614-15 (1950) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual") *Loving v. United States*, 517 U.S. 748, 776 (1996) (Scalia, J., concurring in part and concurring in judgment) (The inherent powers of the Commander-in-Chief "are clearly extensive."); *Maul v. United States*, 274 U.S. 501, 515-16 (1927) (Brandeis & Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any water in order to perform any duty of the service"); *Commonwealth Massachusetts v. Laird*, 451 F.2d 26, 32 (1st Cir. 1971) (the President has "power as Commander-in-Chief to station forces abroad"); *Ex parte Vallandigham*, 28 F.Cas. 874, 922 (C.C.S.D. Ohio (1863) (No. 16,816) (in acting "under this power where there is no express legislative declaration, the president is guided solely by his own judgment [and] discretion"); *Authority to Use United States Military Forces in Somalia, 16 Op. O.L.C. 6, 6 (Dec. 4, 1992) (Barr, Attorney General)*.

[19] (U) Judicial decisions since the beginning of the Republic confirm the President's constitutional power and duty to repel military action against the United States and to take measures to prevent the recurrence of an attack. As Justice Joseph Story said long ago, "[I]t may be fit and proper for the government, in the exercise of the high discretion confided to the executive, for great public purposes, to act on a sudden emergency, or to prevent an irreparable mischief, by summary measures, which are not found in the text of the laws." *The Apollon*, 22 U.S. (9 Wheat) 362, 366-67 (1824). If the President is confronted with an unforeseen attack on the territory and people of the United States, or other immediate dangerous threat to American interests and security, it is his constitutional responsibility to respond to that threat with whatever means are necessary. *See e.g., The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862) ("If a war be made by invasion or a foreign nation, the President is not only authorized but bound to resist force by force...without waiting for any special legislative authority."); *United States v. Smith*, 27 F.Cas; 1192,1229-30 (C.C.D.N.Y, 1.–06) (No. 16,342) (Paterson, Circuit Justice) (regardless of statutory authorization, it is "the duty ...of the executive magistrate ...to repel an invading foe") *see also 3* Story, *Commentaries* § 1485 ("[t]he command and application of the public force...to maintain peace, and to resist foreign invasion" are executive powers).

(U) As the Supreme Court has recognized, the Commander-in-Chief power and the President's obligation to protect the nation imply the ancillary powers necessary to their successful exercise. "The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And of course, the grant of war power includes all that is necessary and proper for carrying those powers into execution." *Johnson* v. *Eisentrager*, 339 U.S. 763, 788 (1950). In wartime, it is for the President alone to decide what methods to use to best prevail against the enemy. The President's complete discretion in exercising the Commander-in-Chief power has been recognized by the courts. In the *Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862), for example, the Court explained that whether the President, "in fulfilling his duties as Commander in Chief", had appropriately responded to the rebellion of the southern states was a question "to be *decided by him*" and which the Court could not question, but must leave to "the political department of the Government to which this power was entrusted".

(U) One of the core functions of the Commander in Chief is that of capturing, detaining, and interrogating members of the enemy. It is well settled that the President may seize and detain enemy combatants, at least for the duration of the conflict, and the laws of war make clear that prisoners may be interrogated for information concerning the enemy, its strength, and its plans. Numerous Presidents have ordered the capture, detention, and questioning of enemy combatants during virtually every major conflict in the Nation's history, including recent conflicts in Korea, Vietnam, and the Persian Gulf. Recognizing this authority, Congress has never attempted to restrict or interfere with the President's authority on this score.

(U) Any effort by Congress to regulate the interrogation of unlawful combatants would violate the Constitution's sole vesting of the Commander-in-Chief authority in the President. There can be little doubt that intelligence operations, such as the detention and interrogation of enemy combatants and leaders, are both necessary and proper for the effective conduct of a military campaign. Indeed, such operations may be of more importance in a war with an international terrorist organization than one with the conventional armed forces of a nation-state, due to the former's emphasis on secret operations and surprise attacks against civilians. It may be the case that only successful interrogations can provide the information necessary to prevent the success of covert terrorist attacks upon the United States and its citizens. Congress can no more interfere with the President's conduct of the interrogation of enemy combatants than it can dictate strategy or tactical decisions on the battlefield. Just as statutes that order the President to conduct warfare in a certain manner or for specific goals would be unconstitutional, so too are laws that seek to prevent the President from gaining the intelligence he believes necessary to prevent attacks upon the United States.

(U) As this authority is inherent in the President, exercise of it by subordinates would be best if it can be shown to have been derived from the President's authority through Presidential directive or other writing.[20]

---

[20] (U) We note that this view is consistent with that of the Department of Justice.

## b. Necessity

(U) The defense of necessity could be raised, under the current circumstances, to an allegation of a violation of a criminal statute. Often referred to as the "choice of evils" defense, necessity has been defined as follows:

> Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:
>
> (a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
>
> (b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
>
> (c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

Model Penal Code § 3.02. *See also* Wayne R. LaFave & Austin W. Scott, 1 Substantive Criminal Law § 5.4 at 627 *(1986 & 2002 supp.)* ("LaFave & Scott"). Although there is no federal statute that generally establishes necessity or other justifications as defenses to federal criminal laws, the Supreme Court has recognized the defense. *See United States v. Bailey*, 444 U.S. 394, 410 (1980) (relying on LaFave & Scott and Model Penal Code definitions of necessity defense).

(U) The necessity defense may prove especially relevant in the current circumstances. As it has been described in the case law and literature, the purpose behind necessity is one of public policy. According to LaFave & Scott, "the law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law." LaFave & Scott, at 629. In particular, the necessity defense can justify the intentional killing of one person to save two others because "it is better that two lives be saved and one lost than that two be lost and one saved." *Id.* Or, put in the language of a choice of evils, "the evil involved in violating the terms of the criminal law (...even taking another's life) may be less than that which would result from literal compliance with the law (...two lives lost)". *Id.*

(U) Additional elements of the necessity defense are worth noting here. First, the defense is not limited to certain types of harms. Therefore, the harm inflicted by necessity may include intentional homicide, so long as the harm avoided is greater (i.e., preventing more deaths) *Id.* at 634. Second, it must actually be the defendant's intention to avoid the greater harm; intending to commit murder and then learning only later that the death had the fortuitous result of saving other lives will not support a necessity defense. *Id.* at 635. Third, if the defendant reasonably believes that the lesser harm as necessary, even if, unknown to him, it was not, he may still avail himself of the defense. As LaFave and Scott explain, "if A kills B reasonably believing it to be necessary to save C and D, he is not guilty of murder even though, unknown to A, C and D could have been

rescued without the necessity of killing B." *Id.* Fourth, it is for the court, and not the defendant to judge whether the harm avoided outweighed the harm done. *Id.* at 636. Fifth, the defendant cannot rely upon the necessity defense if a third alternative that will cause less harm is open and known to him.



(U) Legal authorities identify an important exception to the necessity defense. The defense is available "only in situations wherein the legislature has not itself, in its criminal statute, made a determination of values." *Id* at 629. Thus, if Congress explicitly has made clear that violation of a statute cannot be outweighed by the harm avoided, courts cannot recognize the necessity defense. LaFave and Israel provide as an example an abortion statute that made clear that abortions even to save the life of the mother would still be a crime; in such cases the necessity defense would be unavailable. *Id.* at 630. Here, however, Congress has not explicitly made a determination of values vis-a-vis torture. In fact, Congress explicitly removed efforts to remove torture from the weighing of values permitted by the necessity defense.[21]

---

[21] In the CAT, torture is defined as the intentional infliction of severe pain or suffering "for such purposes as obtaining from him or a third person information or a confession." CAT art 1.1. One could argue that such a definition represented an attempt to indicate that the good of obtaining information—no matter what the circumstances—could not justify an act of torture. In other words, necessity would not be a defense. In enacting Section 2340, however, Congress removed the purpose element in the definition of torture, evidencing an intention to remove any fixing of values by statute. By leaving Section 2340 silent as to the

### c.    Self-Defense

(U) Even if a court were to find that necessity did not justify the violation of a criminal statute, a defendant could still appropriately raise a claim of self-defense. The right to self-defense, even when it involves deadly force, is deeply embedded in our law, both as to individuals and as to the nation as a whole. As the Court of Appeals for the D.C. Circuit has explained:

> More than two centuries ago, Blackstone, best known of the expositors of the English common law taught that "all homicide is malicious, and of course amounts to murder, unless...excused on the account of accident or self-preservation". Self-defense, as a doctrine legally exonerating the taking of human life, is as viable now as it was in Blackstone's time.

*United States* v. *Peterson*, 483 F.2d 1222, 1228-29 (D.C. Cir. 1973). Self-defense is a common-law defense to federal criminal law offenses, and nothing in the text, structure or history of Section 2340A precludes its application to a charge of torture. In the absence of any textual provision to the contrary, we assume self-defense can be an appropriate defense to an allegation of torture.

(U) The doctrine of self-defense permits the use of force to prevent harm to another person. As LaFave and Scott explain, one is justified in using reasonable force in defense of another person, even a stranger, when he reasonably believes that the other is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger." *Id.* at 663-64. Ultimately, even deadly force is permissible, but "only when the attack of the adversary upon the other person reasonably appears to the defender to be a deadly attack." *Id.* at 664. As with our discussion of necessity, we will review the significant elements of this defense.[22] According to LaFave and Scott, the elements of the defense of others are the same as those that apply to individual self-defense.

---

harm done by torture in comparison to other harms, Congress allowed the necessity defense to apply when appropriate.

Further, the CAT contains an additional provision that "no exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture," CAT art. 2.2. Aware of this provision of the treaty and of the definition of the necessity defense that allows the legislature to provide for an exception to the defense, See Model Penal Code § 3.02(b), Congress did not incorporate CAT article 2.2 into Section 2-4. Given that Congress omitted CAT's effort to bar a necessity or wartime defense, Section 2340 could be read as permitting the defense.

[22] (U) Early cases had suggested that in order to be eligible for defense of another, one should have some personal relationship with the one in need of protection. That view has been discarded. LaFave & Scott at 664.

27

(U) First, self-defense requires that the use of force be *necessary* to avoid the danger of unlawful bodily harm. *Id.* at 649. A defender may justifiably use deadly force if he reasonably believes that the other person is about to inflict unlawful death or serious bodily harm upon another, and that it is necessary to use such force to prevent it. *Id.* at 652. Looked at from the opposite perspective, the defender may not use force when the force would be as equally effective at a later time and the defender suffers no harm or risk by waiting. *See* Paul H.Robinson, 2 Criminal Law Defenses § 131(c) at 77 (1984). If, however, other options permit the defender to retreat safely from confrontation without having to resort to deadly force, the use of force may not be necessary in the first place. LaFave and Scott, at 659-60.

(U) Second, self-defense requires that the defendant's belief in the necessity of using force be reasonable. If a defendant honestly but unreasonably believed force was necessary, he will not be able to make out a successful claim of self-defense. *Id.* at 654. Conversely, if a defendant reasonably believed an attack was to occur, but the facts subsequently showed no attack was threatened, he may still raise self-defense. As LaFave and Scott explain, "one may be justified in shooting to death an adversary who, having threatened to kill him, reaches for his pocket as if for a gun, though it later appears that he had no gun and that he was only reaching for his handkerchief." *Id.* Some authorities such as the Model Penal Code, even eliminate the reasonability element, and require only that the defender honestly believed regardless of its reasonableness--that the use of force was necessary.

(U) Third, many legal authorities include the requirement that a defender must reasonably believe that the unlawful violence is "imminent" before he can use force in his defense. It would be a mistake, however, to equate imminence necessarily with timing-- that an attack is immediately about to occur. Rather, as the Model Penal Code explains, what is essential is that the defensive *response* must be "immediately necessary." Model Penal Code § 3.04(1). Indeed, imminence must be merely another way of expressing the requirement of necessity. Robinson at 78. LaFave and Scott, for example, believe that the imminence requirement makes sense as part of a necessity defense because if an attack is not immediately upon the defender, the defender may have other options available to avoid the attack that do not involve the use of force. LaFave and Scott at 656. If, however, the fact of the attack becomes certain and no other options remain the use of force may be justified. To use a well-known hypothetical, if A were to kidnap and confine B, and then tell B he would kill B one week later, B would be justified in using force in self-defense, even if the opportunity arose before the week had passed. *Id.* at 656; *see also* Robinson at § 131(c)(1) at 78. In this hypothetical, while the attack itself is not imminent, B's use of force becomes immediately necessary whenever he has an opportunity to save himself from A.

(U) Fourth, the amount of force should be proportional to the threat. As LaFave and Scott explain, "the amount of force which [the defender] may justifiably use must be reasonably related to the threatened harm which he seeks to avoid." LaFave and Scott at 651. Thus, one may not use deadly force in response to a threat that does not rise to death or serious bodily harm. If such harm may result however, deadly force is appropriate.

above, the President has authorized the use of military force with the support of Congress.[24]

(U) As DOJ has made clear in opinions involving the war on al Qaida, the nation's right to self-defense has been triggered by the events of September 11. If a government defendant were to harm an enemy combatant during an interrogation in a manner that might arguably violate criminal prohibition, he would be doing so in order to prevent further attacks on the United States by the al Qaida terrorist network. In that case, DOJ believes that he could argue that the executive branch's constitutional authority to protect the nation from attack justified his actions. This national and international version of the right to self-defense could supplement and bolster the government defendant's individual right.

### d.    Law Enforcement Actions

(U) Use of force in military law enforcement is authorized for (1) self-defense and defense of others against a hostile person when in imminent danger of death or serious bodily harm *by the hostile person*; (2) to prevent the actual theft or sabotage of assets vital to national security; (3) to prevent the actual theft or sabotage of resources that are inherently dangerous to others; (4) to prevent the commission of a serious crime that involves imminent danger of death or serious bodily harm; (5) to prevent the destruction of vital public utilities or similar critical infrastructure; (6) for apprehension; and (7) to prevent escape. (DODD 5210.56, 1 Nov 2001). These justifications contemplate the use of force against a person who has committed, is committing, or is about to commit, a serious offense. This recognized concept that force used for such purposes is not unlawful could be argued to apply, at least by analogy, to the use of force against a detainee to extract intelligence to prevent a serious and imminent terrorist incident. However, we are unaware of any authority for the proposition. For an analogous discussion pertaining to the pending commission of a serious crime, see the "necessity" and "self-defense" discussions, *supra*.

---

[24] (U) While the President's constitutional determination alone is sufficient to justify the nation's resort to self-defense, it also bears noting that the right to self-defense is further recognized under international law. Article 51 of the U.N. Charter declares that "[n]othing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations until the Security Council has taken the measures necessary to maintain international peace and security". The attacks of September 11, 2001, clearly constitute an armed attack against the United States, and indeed were the latest in a long history of al Qaida sponsored attacks against the United States. This conclusion was acknowledged by he United Nations Security Council on September 29, 2001, when it unanimously adopted Resolution 1373 explicitly "reaffirming the inherent right of individual and collective defense as recognized by the charter of the United Nations. This right of self-defense is a right to effective self-defense. In other words, the victim state has the right to use force against the aggressor who has initiated an "armed attack" until the threat has abated. The United States, through its military and intelligence personnel, has a right recognized by Article 51 to continue using force until such time as the threat posed by al Qaida and other terrorist groups connected to the September 11th attack is completely ended." Other treaties re-affirm the right of the United States to use force in its self-defense. See, e.g., Inter-American Treaty of Reciprocal Assistance, art. 3, Sept. 2, 1947, T.I.A.S. No. 1838, 21 U.N.T.S. 77 (Rio Treaty); North Atlantic Treaty, art. 5, Apr. 4, 1949, 3 Stat. 2241, 34 U.N.T.S. 243.

### e. Superior Orders

(U) Under both international law and U.S. law, an order to commit an obviously criminal act, such as the wanton killing of a noncombatant or the torture of a prisoner, is an *unlawful* order and will not relieve a subordinate of his responsibility to comply with the law of armed conflict.[25] Only if the individual did not know of the unlawfulness of an order, and he could not reasonably be expected under the circumstances to recognize the order as unlawful, will the defense of obedience of a superior order protect a subordinate from the consequences of violation of the law of armed conflict.[26]

(U) Under international law, the fact that a war crime is committed pursuant to the orders of a military or civilian superior does not by itself relieve the subordinate committing it from criminal responsibility under international law.[27] It may, however, be considered in mitigation of punishment.[28]

(U) For instance, the Charter of the International Military Tribunal at Nuremberg, art. 8, stated:

> The fact that the Defendant acted pursuant to order of his Government or of a superior shall not free him from responsibility, but may be considered in mitigation of punishment if the Tribunal determines that justice so requires.[29]

(U) Similarly, the Statute for the International Tribunal for Yugoslavia, and the Statute for the International Criminal Tribunal for Rwanda provide (in articles 7(4) & 6(4), respectively) provide:

> The fact that an accused person acted pursuant to an order of a Government or of a superior shall not relieve him of criminal responsibility, but may be considered in anticipation of punishment if the Tribunal determines that justice so requires.

(U) As to the general attitude taken by military tribunals toward the plea of superior orders, the following statement is representative:

> It cannot be questioned that acts done in time of war under the military authority of an enemy cannot involve any criminal liability on the part of officers or soldiers if the acts are not prohibited by the conventional or customary rules of war. Implicit obedience to orders of superior officers

---

[25] (U) *See* Section 6.1.4, Annotated Supplement to the Commander's Handbook on the Law of Naval Operations (NWP 1-14M 1997)

[26] *Id*

[27] Conversely, the International Criminal Court reflects the traditional view. Article 33 of the Rome Statute, recognizes the defense of superior orders: "1. The fact that a crime within the jurisdiction of the Court has been committed by a person pursuant to an order of a Government or of a superior, whether military or civilian, shall not relieve that person of criminal responsibility unless: (a) The person was under a legal obligation to obey orders of the Government or superior in question; (b) The person did not know that the order was unlawful; and (c) The order was not manifestly unlawful. 2. For the purposes of this article, orders to commit genocide or crimes against humanity are manifestly unlawful."

[28] *Id.*, at §6.2.5.5.1.

[29] *See* U.S. Naval War College, International Law Documents, at 1944-45, 255 (1946).

is almost indispensable to every military system. But this implies obedience to lawful orders only. If the act done pursuant to a superior's orders be murder, the production of the order will not make it any less so. It may mitigate but it cannot justify the crime. We are of the view, however, that if the illegality of the order was not known to the inferior, and he could not reasonably have been expected to know of its illegality, no wrongful intent necessary to the commission of a crime exists and the interior [*sic*] will be protected. But the general rule is the members of the armed forces are bound to obey only the lawful orders of their commanding officers and they cannot escape criminal liability by obeying a command which violates international law and outrages fundamental concepts of justice.

*The Hostage Case (United States v. Wilhelm List et al.)*, 11 TWC 1236.

(U) The International Military Tribunal at Nuremberg declared in its judgment that the test of responsibility for superior orders "is not the existence of the order, but whether moral choice was in fact possible."[30]

(U) Domestically, the UCMJ discusses the defense of superior order in The Manual Courts-Martial, which provides in R.C.M. 916(d), MCM 2002:

> It is a defense to any offense that the accused was acting pursuant to orders unless the accused knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful. An act performed pursuant to a lawful order is justified. An act performed pursuant to an unlawful order is excused unless the accused knew it to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful.

*Inference of lawfulness.* An order requiring the performance of a military duty or act may be inferred to be lawful and it is disobeyed at the peril of the subordinate.[31]

(U) In sum, the defense of superior orders will generally be available for U.S. Armed Forces personnel engaged in exceptional interrogations except where the conduct goes so far as to be patently unlawful.

---

[30] (U) 1 Trial of Major War Criminals before the International Military Tribunal, Nuremberg 14 November 1945-1 October 1946, at 224 (1947), *excerpted in* U.S. Naval War College, International Law Documents, 1946-1947, at 260 (1948).

[31] (U) This inference does not apply to a patently illegal order, such as one that directs the commission of a crime. (Article 90, UCMJ).

SECRET/NOFORN

or color of law, *of any foreign nation* - (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extra-judicial killing shall, in a civil action, be liable for damages ...." (emphasis added)[38] It thus appears that the TVPA does not apply to the conduct of U.S. agents acting under the color of law.

C.    **Applicability of the United States Constitution**

1.    **Applicability of the Constitution to Aliens Outside the United States**

(U) Nonresident enemy aliens do not enjoy constitutional rights outside the sovereign territory of the United States.[39] The courts have held that unlawful combatants do not gain constitutional rights upon transfer to GTMO as unlawful combatants merely because the U.S. exercises extensive dominion and control over GTMO.[40] Moreover, because the courts have rejected the concept of "de facto sovereignty," constitutional rights apply to aliens only on sovereign U.S. territory. (See discussion under "Jurisdiction of Federal Courts", *infra*.)

(U) Although U.S. constitutional rights do not apply to aliens at GTMO, the U.S. criminal laws do apply to acts committed there by virtue of GTMO's status as within the special maritime and territorial jurisdiction.

2.    **The Constitution Defining U.S. Obligations Under International Law**

(U) In the course of taking reservations to the Convention Against Torture and Other Cruel, and Inhuman or Degrading Treatment or Punishment, the United States determined that the Convention's prohibitions against cruel, inhuman or degrading treatment or punishment applied only to the extent that such conduct was prohibited by the Fifth, Eighth and Fourteenth Amendments to our Constitution.[41] Consequently, analysis of these amendments is significant in determining the extent to which the United States is bound by the Convention. It should be clear, however, that aliens held at GTMO do not have constitutional rights under the 5th Amendment's Due Process clause

---

[38] (U) The definition of torture used in PL 102-256 is: "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to lawful sanctions) whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." This is similar, but broader, than the definition in the Torture Statute. The definition of mental pain and suffering is the same as in the Torture Statute.

[39] (U) *Eisentrager* at 764.

[40] (U) *Al Odah v. United States*, (D.D.C., 2002).

[41] (U) Articles of ratification, 21 Oct 1994: "I. The Senate's advice and consent is subject to the following reservations: (1) That the United States considers itself bound by the obligation under article 16 to prevent 'cruel, inhuman, or degrading treatment or punishment', only insofar as the term 'cruel, inhuman, or degrading treatment or punishment' means the cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States." Available at the UN documents site: http://193.194.138.190/html/menu3/treaty12_asp.htm.

SECRET/NOFORN

03/06/2003 9:44 AM

## SECRET/NOFORN

or the 8th Amendment. See, *Johnson v. Eisenberger*, 339 U.S. 763 (1950) and *Verdugo-Urquidez*, 494 U.S. 259 (1990).

a.    **Eighth Amendment**

(U) "An examination of the history of the Amendment and the decisions of this [Supreme] Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes."[42] The import of this holding is that, assuming a detainee could establish standing to challenge his treatment, the claim would not lie under the 8th Amendment. Accordingly, it does not appear detainees could successfully pursue a claim regarding their pre-conviction treatment under the Eight Amendment.

(U) The standards of the Eighth Amendment are relevant, however, due to the U.S. Reservation to the Torture Convention's definition of cruel, inhuman, and degrading treatment. Under "cruel and unusual punishment" jurisprudence, there are two lines of analysis: (1) conditions of confinement, and (2) excessive force. As a general matter, the excessive force analysis applies to the official use of physical force, often in situations in which an inmate has attacked another inmate or a guard whereas the conditions of confinement analysis applies to such things as administrative segregation. Under the excessive force analysis, "a prisoner alleging excessive force must demonstrate that the defendant acted 'maliciously and sadistically to cause harm.'" *Porter v. Nussle*, 534 U.S. 516, 528 (2002) (quoting *Hudson v. McMillan*, 503 U.S.1, at 7). Excessive force requires the unnecessary and wanton infliction of pain. *Whitney v. Albers*, 475 U.S. 312, 319 (1986).

(U) A condition of confinement is not "cruel and unusual" unless it (1) is "sufficiently serious" to implicate constitutional protection, *id.* at 347, and (2) reflects "deliberate indifference" to the prisoner's health or safety, *Farmer v. Brennan* 511 U.S. 825, 834 (1994). The first element is objective, and inquires whether the challenged condition is cruel and unusual. The second, so-called "subjective" element requires examination of the actor's intent and inquires whether the challenged condition is imposed as punishment. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) ("The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify.").

(U) The Supreme Court has noted that "[n]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 146 (citation omitted). *See also Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (stating that the Eighth Amendment embodies

---

[42] (U) *Ingraham v. Wright*, 430 U.S. 651, 664 (1977). In *Ingraham*, a case about corporal punishment in a public junior high school, the Court analyzed the claim under the 14th amendment's Due Process clause, concluding that the conduct did not violate the 14th amendment, even though it involved up to 10 whacks with a wooden paddle.

SECRET/NOFORN

"broad and idealistic concepts of dignity, civilized standards, humanity, and decency"). Nevertheless, certain guidelines emerge from the Supreme Court's jurisprudence.

(U) The Court has established that "only those deprivations denying 'the minimal civilized measures of life's necessities' sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298, *quoting Rhodes*, 452 U.S. at 347. It is not enough *for* a prisoner to show that he has been subjected to conditions that are merely "restrictive and even harsh," as such conditions are simply "part of the penalty that criminal offenders pay *for* their offenses against society." *Rhodes*, 452 U.S. at 347. *See also Wilson* at 349 ("the Constitution does not mandate comfortable prisons"). Rather, a prisoner must show that he has suffered a "serious deprivation of basic human needs," *id.* at 347, such as "essential food, medical care, or sanitation," *Id.* at 348. *See also Wilson*, 501 U.S. at 304 (requiring "the deprivation of a single, identifiable human need such as food, warmth, or exercise"). "The Amendment also imposes [the duty on officials to] provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (citations omitted). The Court has also articulated an alternative test inquiring whether an inmate was exposed to "a substantial risk or serious harm." *Id* at 837. *See also DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) ("In order to satisfy the [objective] requirement, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.").

(U) The various conditions of confinement are not to be assessed under a totality of the circumstances approach. In *Wilson* v. *Seiter*, 501 U.S. 294 (1991), the Supreme Court expressly rejected the contention that "each condition must be considered as part of the overall conditions challenged." *Id.* at 304 (internal quotation marks and citation omitted). Instead the Court concluded that "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise--for example, a low cell temperature at night combined with a failure to issue blankets." *Id.* at 304. As the Court further explained, "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

(U) To demonstrate deliberate indifference, a prisoner must demonstrate "that the official was subjectively aware of that risk". *Farmer* v. *Brennan* 511 U.S. 125 (1994). As the Supreme Court further explained:

We hold... that a prison official cannot be found liable under the Eighth Amendment for denying any inmate humane conditions of confinement unless the official knows of and regards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists and he must also draw the inference.

*Farmer* v. *Brennan* 511 U.S. 825, 837 (1994). This standard requires greater culpability than mere negligence. *See Farmer* v. *Brennan*, 511 U.S. 825, 837 (1994); *Wilson v. Seiter*, 501 U.S. 294, 302 (1991) ("mere negligence would satisfy neither [the *Whitley* standard of malicious and sadistic infliction] nor the more lenient deliberate indifference standard") (internal quotation marks omitted).

(U) The second line of cases considers the use of force against prisoners. The situation often arises in cases addressing the use of force while quelling prison disturbances. In cases involving the excessive use of force the central question is whether the force was applied with good intentions in an attempt to restore order or maliciously and sadistically with the purpose of causing harm.[43] Malicious and sadistic use of force always violates contemporary standards of decency and would constitute cruel and unusual punishment.[44] The courts apply a subjective test when examining intent of the official. In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."[45] Great deference is given to the prison official in the carrying out of his duties.[46]

(U) One of the Supreme Court's most recent opinions on conditions of confinement – *Hope v. Pelzer*, 122 S.Ct. 2508 (2002) – illustrates the Court's focus on the necessity of the actions undertaken in response to a disturbance in determining the officer's subjective state of mind.[47] In *Hope*, following an "exchange of vulgar remarks" between the inmate Hope and an officer, the two got into a "wrestling match". *Id* at 2512. Additional officers intervened and restrained Hope. See *id*. These officers then took Hope back to prison. Once there, they required him to take off his shirt and then attached him to the hitching post, where he remained in the sun for the next seven hours. See *id*. at 2512-13. During this time, Hope received no bathroom breaks. He was given water only once or twice and at least one guard taunted him about being thirsty. See *id*. at 2513. The Supreme Court concluded that the facts Hope alleged stated an "obvious" Eighth Amendment violation. *Id* at 2514. The obviousness of this violation stemmed from the utter lack of necessity for the actions the guards undertook. The Court emphasized that "any safety concerns" arising from the scuffle between Hope and the officer "had long since abated by the time [Hope] was attached to the hitching post" and that there was a "clear lack of an emergency situation". *Id*. As a result, the Court found

---

[43] (U) *Whitley v. Albers*, 475 U.S. (1986)

[44] (U) *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)

[45] (U) *Whitley* at 321.

[46] (U) *Whitley v. Albers*, 475 U.S. (1986).

[47] (U) Although the officers' actions in *Hope* were undertaken in response to a scuffle between an inmate and a guard, the case is more properly thought of a "conditions of confinement" case rather than an "excessive force" case. By examining the officers' actions through the "deliberate indifference standard" the Court analyzed it as a "conditions of confinement" case. The deliberate indifference standard is inapplicable to claims of excessive force.

SECRET/NOFORN

that "[t]his punitive treatment amount[ed] to [the] gratuitous infliction of 'wanton and unnecessary' pain that our precedent clearly prohibits." *Id.* at 2515. Thus, the necessity of the governmental action bears upon both the conditions of confinement analysis as well as the excessive force analysis.

(U) The government interest here is of the highest magnitude. The typical prison case, the protection of other inmates or officers, the protection of the inmate alleged to have suffered the cruel and unusual punishment, or even the maintenance of order in the prison provide valid government interests for various deprivations. *See .e.g.,Anderson v. Nosser,* 438 F.2d 183, 193 (5th Cir. 1971) ("protect[ing] inmates from self-inflicted injury, protect[ing] the general prison population and personnel from violate acts on his part, prevent[ing] escape" are all legitimate penological interests that would permit the imposition of solitary confinement); *McMahon* v. *Beard,* 583 F.2d 172, 175 (5th Cir. 1978) (prevention if inmate suicide is a legitimate interest). If the protection of one person or even prison administration can be deemed to be valid governmental interests in such cases frequently permitted deprivations, it follows *a fortiori* that the interest of the United States here--obtaining intelligence vital to the protection of untold thousands of American citizens--can be no less valid. To be sure, no court has encountered the precise circumstances hereunder Eighth Amendment jurisprudence. Nonetheless, it can be forcefully argued that there can be no more compelling government interest than that which is presented here. *See Hope v. Pelzer,* 122 S. Ct. 2508 (2002) ("The unnecessary and wanton infliction of pain ...constitutes cruel and unusual punishment forbidden by the Eighth Amendment. We have said that among unnecessary and wanton inflictions of pain are those that are totally without penological justification.")

b.    **Fifth Amendment and Fourteenth Amendment**[48]

(U) "It is now the settled doctrine ... that the Due Process Clause embodies a system of rights based on moral principles so deeply imbedded in the traditions and feelings of our people as to be deemed fundamental to a civilized society as conceived by our whole history. Due Process is that which comports with the deepest notions of what is fair and right and just."[49] Due process is violated if a practice or rule "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental".[50]

(U) Standing by itself, the phrase "due process" would seem to refer solely and simply to procedure, to process in court, and therefore to be so limited that "due process of law" would be what the legislative branch enacted it to be. But that is not the interpretation which has been placed on the term. "It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process 'due process of law'

---

[48] (U) Because the Due Process considerations under the 5th and 14th amendments are the same for our purposes, this analysis considers them together.
[49] (U) *Solesbee v. Balkcom,* 339 U.S. 9, 16 (1950) (Justice Frankfurter dissenting).
[50] (U) *Snyder v. Massachusetts,* 291 U.S. 97, 105 (1934).

by its mere will."[51] With this viewpoint, the Supreme Court has carved out a role for the courts to judge the legislative and executive acts for their effect on the rights of the people.

(U) All persons within the territory of the United States are entitled to the protections of due process, including corporations, aliens, and presumptively citizens seeking readmission to the United States. It is effective in the District of Columbia and in territories which are part of the United States, but does not apply of its own force to unincorporated territories. But, it does not reach enemy alien belligerents engaged in hostilities against the United States and/or tried by military tribunals outside the territorial jurisdiction of the United States.[52] The *Eisentrager* doctrine works to prevent access by enemy belligerents, captured and held abroad, to U.S. courts. Further, in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court held that aliens outside the United States did not have Fourth Amendment rights against the U.S. government. Indeed, in that case, the Court observed that extension of constitutional rights to aliens outside of the United States would interfere with the military operations against the nation's enemies.

(U) Even if a Court were to find mistakenly that unlawful combatants at GTMO did have constitutional rights, it is unlikely that due process would pose any standards beyond those required by the Eighth Amendment. In 1972 the Supreme Court held that "[f]ederal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' which include prisoners..."[53] The Supreme Court's review of state criminal justice systems under the due process clause has never been subject to precise statement of metes and bounds. In each case the Court asks whether the challenged practice or policy violates "a fundamental principle of liberty and justice which inheres in the very idea of a free government and is the inalienable right of a citizen of such government".[54] The Court has generally treated challenges to prison conditions as a whole under the cruel and unusual punishments clause of the Eighth Amendment, rather than the Fifth Amendment's Due Process Clause, and challenges to particular incidents and practices under the due process clause as well as under more specific provisions, such as the First Amendment speech and religion clauses.[55]

---

[51] (U) *Murray's Lessee v. Hoboken Land and Improvement Co.* 59 U.S. (18 How.) 272, 276 (1856).

[52] (U) *Johnson v. Eisentrager*, 339 U.S. 763 (1950); *In re Yamashita*, 327 U.S. 1 (1946). Justices Rutledge and Murphy in the latter case argued that the due process clause applies to every human being, including enemy belligerents.

[53] (U) *Cruz v. Beto*, 405 U.S. 319, 321 (1972)

[54] (U) *Twining v. New Jersey*, 211 U.S. 78, 106 (1908)

[55] (U) By way of example, the courts have recognized several rights of prisoners. Prisoners have a right to be free of racial segregation in prisons, except for the necessities of prison security and discipline. *Lee v. Washington*, 390 U.S. 333 (1968). They have the right to petition for redress of grievances, which includes access to the courts for purposes of presenting their complaints, *Ex parte Hull*, 312 U.S. 546 (1941); *White v. Ragen*, 324 U.S. 760 (1945). Prisoners must have reasonable access to a law library or to persons trained in the law. *Younger v. Gilmore*, 404 U.S. 15 (1971); *Bounds v. Smith*, 430 U.S. 817 (1978) and to bring actions in federal courts to recover for damages wrongfully done them by prison administrators. *Haines v. Kerner*, 404 U.S. 519 (1972); *Preiser v. Rodriguez*, 411 U.S. 475 (1973). And they have a right, circumscribed by legitimate prison administration considerations, to fair and regular treatment during their incarceration.

SECRET/NOFORN

(U) On the other hand, some conduct is so egregious that there is no justification. In *Rochin v. California*, the Supreme Court found that the State's actions in unlawfully entering the defendant's room, grappling with him to prevent him from swallowing the evidence, and then transporting him to the hospital to have his stomach pumped "shocked the conscience." The Court said of the police methods "they are methods too close to the rack and the screw to permit of constitutional differentiation". [61] Even though *Rochin* is about evidence seizure, the rationale for judicial intervention is the infringement of due process. Explaining the importance of due process the Court said "involuntary verbal confessions...are inadmissible under the Due Process Clause even [if true]... Coerced confessions offend the community's sense of fair play and decency. So here, to sanction the brutal conduct ...would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society."[62] Only interrogation techniques that "shock the conscience" would not be analyzed under the standard due process balancing test.

(U) The Fifth Amendment standards are also relevant due to the U.S. Reservations to the Torture Convention's definition of cruel, inhuman, and degrading treatment.

(U) Under the Fifth Amendment right to Due Process, substantive due process protects an individual from "the exercise of power without any reasonable justification in the service of any legitimate governmental objective." *County of Sacremento v. Lewis*, 523 U.S. 833, 846 (1998). Under substantive due process "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id* at 846 (internal quotation marks omitted). That conduct must "shock the conscience." *See generally id; Rochin v. California*, 342 U.S. 165 (1952).[63] By contrast to deprivations in procedural due process, which can occur so long as the government affords adequate processes, government actions that "shock the conscience" are prohibited irrespective of the procedures the government may employ in undertaking those actions. *See generally Rochin v. California*, 342 U.S. 164 (1952).

(U) To shock the conscience, the conduct at issue must involve more than mere negligence. *See County of Sacramento*, 523 U.S. at 849. *See also Daniel v. Williams*, 474 U.S. 327 (1986) ("Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property.") (collecting cases). Instead, "[I]t is...behavior on the other end of the culpability spectrum that would most probably support a substantive due process claim:

---

[61] (U) *Rochin v. California*, 342 U.S. 165, 172 (1952).

[62] (U) Id. at 174.

[63] (U) In the seminal case of *Rochin v California*, 342 U.S. 165 (1952), the police had some information that the defendant was selling drugs. Three officers went to and entered the defendant's home without a warrant and forced open the door to defendant's bedroom. Upon opening the door, the officers saw two pills and asked the defendant about them. The defendant promptly put them in his mouth. The officers "jumped upon him and attempted to extract the capsules." 342 U.S. at 166. The police tried to pull the pills out of his mouth but despite considerable struggle the defendant swallowed them. The police then took the defendant to a hospital where a doctor forced an emetic solution into the defendant's stomach by sticking a tube down his throat and into his stomach, which cause the defendant to vomit up the pills. The pills did in fact contain morphine. *See id.* The Court found that the actions of the police officers "shocked the conscience" and therefore violated Rochin's due process rights. *Id* at 170.

SECRET/NOFORN

conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* In some circumstances, however, recklessness or gross negligence may suffice. *See id.* The requisite level of culpability is ultimately "not subject to mechanical application in unfamiliar territory." *Id.* at 850. As the Court explained: "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* Nonetheless, the Court opined that as a general matter such a standard would be appropriate where there is a real possibility for actual deliberation as opposed to those circumstances, such as responding to a prison riot, where quick decisions must be made and a heightened level of culpability is thus more appropriate. *See id.* at 851-52

(U) This standard appears to be an evolving one as the Court's most recent opinion regarding this standard emphasized that the conscience shocked was the "contemporary conscience." *County of Sacramento*, 523 U.S. at 847 n.8 (emphasis added). The court explained that while a judgment of what shocks the conscience "may be informed by a history of liberty protection, [] it necessarily reflects a traditional understanding of executive behavior, of contemporary practice, and of the standards of blame generally applied to them." *Id.* Despite the evolving nature of the standard, the standard is objective rather than subjective. The *Rochin* Court cautioned that although "the gloss has ... has not been fixed" as to what substantive due process is, judges "may not drawn on 'their' merely personal and private notions and disregard the limits that bind judges in their judicial function... [T]hese limits are derived from considerations that are fused in the whole nature of our judicial process." *Id.* At 170. *United States v. Lovasco*, 431 U.S. 783 (1973) (reaffirming that the test is objective rather than subjective). As the Court explained, the conduct issue must "do more than offend some fastidious squeamishness or private sentimentalism' in order to violate due process. *Rochin*, 342 U.S. 165, 172.

(U) The Supreme Court also clarified in *Ingraham v. Wright*, 430 U.S. 651 (1977), that under substantive due process, "[t]there is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* at 674. And as Fourth Circuit has noted, it is a "principle...inherent in the Eighth and the Fourteenth Amendments" that "[n]ot ...every malevolent touch by a prison guard gives rise to a federal cause of action". *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights")." *Riley v. Dorton*, 115 F.3d 1159, 1167 (4th Cir. 1997) (quoting *Hudson*, 503 U.S. at 9). Instead, the [shock-the-conscience]... inquiry....[is] whether the force applied caused injury so severe, and was so inspired by malice or sadism...that it amounted to a brutal and inhumane abuse of official power literally socking to the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). Examples of physical brutality that "shock the conscience" include: rape of plaintiff by uniformed officer, see *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997); police officer struck plaintiff in retaliation for photographing police officer, see *Shillinford v. Holmes*, 634 F.2d 263 (5th Cir. 1981); police officer shot a fleeing suspect's legs without any

## SECRET/NOFORN

probable cause other than the suspect's running and failing to stop, see *Aldridge v. Mullins*, 377 F. Supp. 850 (M.D. Tenn. 1972) aff'd, 474 1189 (6th Cir. 1973). Moreover, beating or sufficiently threatening someone during the course of an interrogation can constitute conscience-shocking behavior. See *Gray v. Spillman*, 925 F.2d 90, 91 (4th Cir. 1991) (plaintiff was beaten and threatened with further beating if he did not confess). By contrast, for example, actions such as verbal insults and an angry slap of "medium force" did not constitute behavior that "shocked the conscience." See *Riley v. Dorton*, 115 F.3d 1159, 1168 n.4 (4th Cir. 1997) (finding claims that such behavior shocked the conscience "meritless"). We note, however, that courts have distinguished between the use of force in interrogations and the use of force in the prison or arrest settings. The Fifth Circuit has held that "the use of physical violence against a person who is in the presence of the police for custodial interrogation, who poses no threat to others, and who does not otherwise initiate action which would indicate to a reasonably prudent police officer that the use of force is justified, is a constitutional violation." *Ware v. Reed*, 709 F.2d 345, 351 (5TH Cir. 1983).

(U) Physical brutality is not the only conduct that may meet the shock-the-conscience standard. In *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), the Ninth Circuit held that certain psychologically-coercive interrogation techniques could constitute a violation of substantive due process. The interrogators techniques were "designed to instill stress, hopelessness, and fear, and to break [the suspect's] resistance." *Id.* at 1229. The officers planned to ignore any request for a lawyer and to ignore the suspect's right to remain silent, with the express purpose that any statements he might offer would help keep him from testifying in his own defense. See *id.* at 1249. It was this express purpose that the court found to be the "aggravating factor" leading to its conclusion that the conduct of the police "shocked the conscience." *Id.* at 1249. The court reasoned that while "it is a legitimate purpose of police investigation to gather evidence and muster information that will surround a guilty defendant and make it difficult if not impossible for him to escape justice [,]" when the methods chosen to gather evidence and information are deliberately unlawful and flout the Constitution, the legitimacy is lost." *Id.* at 1250. In *Wilkins v. May*, 872 F.2d 190 (7th Cir. 1989), the Seventh Circuit found that severe mental distress inflicted on a suspect could be a basis for a substantive due process claim. See *id.* at 195. See also *Rhodes v. Robinson*, 612 F.2d 766, 771 (3d Cir. 1979) (claim of emotional harm could be the basis of a substantive due process claim). The *Wilkins* court found that under certain circumstances interrogating a suspect with gun at his head could violate those rights. See 872 F.2d at 195. Whether it would rise to the level of violation depended upon whether the plaintiff was able to show: "misconduct that a reasonable person would find so beyond the norm of proper police procedure as to shock the conscience, and that it is, calculated to induce not merely momentary fear or anxiety, but severe mental suffering, in the plaintiff." *Id.* On the other hand, we note that merely deceiving the suspect does not shock the conscience, see, e.g., *United States v. Byram*, 145 F.3d 405 (1st Cir. 1998) (assuring defendant he was not in danger of prosecution did not shock the conscience) nor does the use of sympathy or friends as intermediaries, see, e.g., *United States v. Simtob*, 901 F.2d 799, 809 (9th Cir. 1990).

SECRET/NOFORN

### D.    Jurisdiction of Federal Courts

### 1.    Jurisdiction to Consider Constitutional Claims

(U)  The federal habeas statute provides that courts may only grant the writ "within their respective jurisdictions". This has been interpreted to limit a court's subject matter jurisdiction over habeas cases to those in which a custodian lies within the jurisdiction. For U.S. citizens, habeas jurisdiction lies regardless of where the detention occurs. The habeas action must be brought in the district in which a custodian resides or, if all custodians are outside the United States, in the District of Columbia. For aliens, there is no habeas jurisdiction outside the sovereign territory of the United States.[64]

(U)  As construed by the courts, habeas jurisdiction is coterminous with the reach of constitutional rights, although that result is a matter of statutory construction. Congress has the power to extend habeas jurisdiction beyond the reach of constitutional rights but may not place greater restrictions on it.

(U)  In *Johnson v. Eisentrager*, the Supreme Court ruled that enemy aliens, captured on the field of battle abroad by the U.S. Armed Forces, tried abroad for war crimes, and incarcerated abroad do not have access to the U.S. courts[65] over a habeas petition filed by German nationals seized by U.S. soldiers in China. *Eisentrager* considered habeas corpus petitions by German soldiers captured during WWII in China supporting the Japanese, convicted by Military Commission sitting in China, and incarcerated in Germany and concluded that United States courts lacked jurisdiction.[66]

(U)  Recently, unlawful combatants detained at Guantanamo Bay, Cuba (GTMO) have sought review in U.S. district court through the writ of habeas corpus, 28 U.S.C. § 2241.[67]

---

[64] (U) *Johnson v. Eisentrager*, 339 U.S. 763 (1950).

[65] (U) *Jason v. Eisentrager*, 339 U.S. 763, 777 (1950). "We are here confronted with a decision whose basic premise is that these prisoners are entitled, as a constitutional right, to sue in some court of the United States for a writ of habeas corpus. To support that assumption we must hold that a prisoner of our military authorities is constitutionally entitled to the writ, even though he be (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States." With those words, the Supreme Court held that: "a nonresident enemy alien has no access to our courts in wartime." Currently, the D.C. Circuit is considering the appeal of several detainees at GTMO in which action the District Court denied their writ of habeas corpus challenging their detention. *Al Odah et al. v. United States*, Nos. 02-5251, 02-5284, and 02-5288 (D.C. Circ. 2002).

[66] (U) For a fuller discussion of Habeas Corpus law as it applies to Naval Base, Guantanamo Bay, *see* memorandum, LCDR F. Greg Bowman of 29 Jan 02, subj: CRIMINAL JURISDICTION AND ITS EFFECTS OF AVAILABILITY OF THE WRIT OF HABEAS CORPUS AT U.S. NAVAL BASE, GUANTANAMO BAY, CUBA (on file).

[67] (U) *Coalition of Clergy v. Bush*, 189 F. Supp. 2d 1036 (C.D. Cal.), affirmed in part and vacated in part. 310 F.3d 1153 (9th Cir. 2002); *Rasul v. Bush*, 215 F.2d 55 (D.D.C. 2002).

(U) Two courts have examined, and rejected, petitioners' claims that U.S. exclusive jurisdiction over GTMO results in a form of "de facto sovereignty" and, therefore, vests habeas jurisdiction in the federal courts.

## 2.    Other Bases for Federal Jurisdiction

(U) In addition, one group of GTMO detainees has challenged conditions of confinement through the Alien Tort Claims Act (ATCA) and the Administrative Procedures Act (APA). The courts have declined to exercise jurisdiction on those theories in each case to date.[68] Petitioners in *Al Odah* attempted to circumvent the territorial limitations of habeas by bringing their action under the APA and ATCA. The district court found that, although petitioners did not seek release from custody, their suit challenging conditions of confinement was, nonetheless, required to be brought under habeas.

(U) The court also held, in the alternative, that it lacked jurisdiction even if petitioners were not barred by the exclusive nature of habeas actions. The ATCA provides the "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 18 U.S.C. § 1350. The ATCA, although it provides federal jurisdiction over private suits, does not waive sovereign immunity for a suit against the United States. The courts have held that the APA's waiver of sovereign immunity for nonmonetary damages can theoretically be used to maintain an ATCA action against the United States. The *Al Odah* Court, however, found that the APA's exemption for "military authority exercised in the field in time of war or in occupied territory" precluded the ATCA.

## 3.    The Military Extraterritorial Jurisdiction Act

(U) The Military Extraterritorial Jurisdiction Act (MEJA), 18 U.S.C. § 3261 *et seq*, extends Federal criminal jurisdiction for serious Federal offenses committed outside the United States to civilian persons accompanying the Armed Forces (e.g., civilian employees and contractor employees), and to members of the Armed Forces who committed a criminal act while subject to the UCMJ but who are no longer are subject to the UCMJ or who committed the offense with a defendant not subject to the UCMJ. The standard is that if the conduct by the individual would "constitute an offense punishable by imprisonment for more than one year *if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States*." (emphasis added). In the absence of implementing regulations, the practical effect of MEJA is uncertain; however, MEJA remains Federal law.

## E.    The Uniform Code of Military Justice

(U) The Uniform Code of Military Justice (UCMJ) applies to United States Forces on active duty, at all times and in all places throughout the world. Members of the

---

[68] (U) The ACTA and APA theories, rejected in the District Court for D.C., are awaiting review in the D.C. Circuit at this time in the *Rasul* and *Al Odah* cases.

## SECRET/NOFORN

Reserve component and retired regular officers can, under certain circumstances, also be subject to the UCMJ, as can civilians accompanying the Armed Forces in time of war under certain circumstances.[69]

### 1.    Offenses

(U) A number of UCMJ provisions potentially apply to service members involved in the interrogation and supervision of the interrogation of detainees. Most significant are the following:[70]

### a.    Cruelty, Oppression or Maltreatment, Art 93

(U) The elements of the offense are that the alleged victim was subject to the orders of the accused and that the accused was cruel toward, oppressed, or maltreated the victim. The cruelty, etc. need not be physical. Subject to the orders of, includes persons, subject to the UCMJ or not, who are by some reason of some duty are required to obey the lawful orders of the accused, even if not in the direct chain of command of the accused. "Cruel", "oppressed", and "maltreated" refer to unwarranted, harmful, abusive, rough or other unjustifiable treatment that, under all the circumstances, results in physical or mental pain or suffering and is unwarranted, unjustified and unnecessary for any lawful purpose. It is measured by an objective standard. MCM IV-25; MJB, Section 3-17-1.

### b.    Reckless Endangerment, Art 134

(U) The elements of the offense are that the accused engaged in wrongful conduct that was reckless or wanton and that the conduct was likely to produce death or grievous bodily harm. "[L]ikely to produce" means the natural or probable consequences of particular conduct. "[G]rievous bodily harm" includes injuries comparable to fractured or dislocated bones, serious damage to internal organs. MCM IV-119; MJB, Section 3-100A-1.

### c.    Assault, Art 128

(U) This article encompasses the following offenses:

*(U) Simple assault* — The elements are that the accused attempted or offered to do bodily harm to an individual and that such attempt or offer was done with unlawful force and violence. An act of force or violence is unlawful if done without legal justification or excuse and without the consent of the victim. The use of threatening words accompanied by a menacing act or gesture may constitute an assault. MCM IV-81; MJB, Section 3-54-1.

---

[69] (U)   Article 2 UCMJ; Rules for Courts-Martial, Rule 202, and Discussion.

[70] (U) The following are extracted from the Department of the Army Pamphlet 27-9, Military Judges' Benchbook (MJB), which summarizes the requirements of the Manual For Courts-Martial (MCM) and case law applicable to trials by courts martial.

SECRET/NOFORN

as well as statutes and treaties that have become the law of the land may create duties for purposes of this article.

**h.    Maiming, Art 124**

(U) The elements of this offense are that the accused intentionally inflicted an injury on a person, and whether intended or not, that the injury seriously disfigured the person's body, destroyed or disabled an organ or member, or seriously diminished the person's physical vigor.  MCM IV-77; MJB, Section 3-50-1.

**2.    Affirmative Defenses under the UCMJ (R.C.M. 916)**

(U) In order for any use of force to be lawful, it must either be justified under the circumstances or an accepted affirmative defense is present to excuse the otherwise unlawful conduct.  No case law was found that defines at what point force or violence becomes either lawful or unlawful during war.  Each case is by its nature, dependent upon the factual circumstances surrounding the incident.

(U) Applying accepted rules for the law of armed conflict, the use of force is only authorized when there is a military purpose and the force used is no greater than necessary to achieve the objective.  The existence of war does not in and of itself justify all forms of assault.  For instance, in *United States v. Calley*, 22 U.S.C.M.A. 534, 48 C.M.R.19 (1973), the court recognized that "while it is lawful to kill an enemy in the heat and exercise of war, to kill such an enemy after he has laid down his arms . . . is murder." Further, the fact that the law of war has been violated pursuant to an order of a superior authority, whether military or civil, does not deprive the act in question of its character of a war crime, nor does it constitute a defense in the trial of an accused individual, unless he did not know and could not reasonably have been expected to know that the act ordered was unlawful.  In all cases where the order is held not to constitute a defense to an allegation of war crime, the fact that the individual was acting pursuant to orders may be considered in mitigation of punishment.  The thrust of these holdings is that even in war, limits to the use and extent of force apply.

a.    **Self-Defense**

(U) For the right of self-defense to exist, the accused must have had a reasonable apprehension that death or grievous bodily harm was about to be inflicted on himself. The test is whether, under the same facts and circumstances, an ordinary prudent adult person faced with the same situation would have believed that there were grounds to fear immediate death or serious bodily harm (an objective test) and the person must have actually believed that the amount of force used was required to protect against death or serious bodily harm (a subjective test). Grievous bodily harm means serious bodily injury. It does not mean minor injuries such as a black eye or a bloody nose, but does mean fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs, or other serious bodily injuries. MJB, Section 5-2. (See also the discussion of "Self-Defense" under the discussion of Federal law, *supra*.)

b.    **Defense of Another**

(U) For this defense, the accused must have had a reasonable belief that harm was about to be inflicted and that the accused actually believed that force was necessary to protect that person. The accused must actually believe that the amount of force used was necessary to protect against the degree of harm threatened. MJB, Section 5-3-1.

c.    **Accident**

(U) This defense arises when an accused is doing a lawful act in a lawful manner, free of any negligence, and unforeseeable or unintentional death or bodily harm occurs. MJB, Section 5-4.

d.    **Mistake of Fact**

(U) If ignorance or mistake of a fact concerns an element of an offense involving specific intent, the ignorance or mistake need only exist in the mind of the accused, i.e., if the circumstances of an event were as the accused believed, there would be no offense. For crimes not involving specific intent, the ignorance or mistake must be both honest (actual) and reasonable. The majority of the crimes discussed above do not require specific intent. For instance, in the case of violations of general orders, knowledge is presumed. Most of the "mistakes" would likely be mistakes of law in that the accused would not believe that the conduct was unlawful. While mistakes of law are generally not a defense, unawareness of a law may be a defense to show the absence of a criminal state of mind when actual knowledge is not necessary to establish the offense. MJB, Section 5-11.

e.    **Coercion or duress**

(U) It is a defense to any offense except killing an innocent person that the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately

SECRET/NOFORN

necessary to achieve the objective. The existence of war does not in and of itself justify all forms of assault. For instance, in *US v. Calley*, the court recognized that "while it is lawful to kill an enemy "in the heat and exercise of war, to kill such an enemy after he has laid down his arms . . . is murder." Further, the fact that the law of war has been violated pursuant to an order of a superior authority, whether military or civil, does not deprive the act in question of its character of a war crime, nor does it constitute a defense in the trial of an accused individual, unless he did not know and could not reasonably have been expected to know that the act ordered was unlawful. In all cases where the order is held not to constitute a defense to an allegation of war crime, the fact that the individual was acting pursuant to orders may be considered in mitigation of punishment." The thrust of these holdings is that even in war, limits to the use and extent of force apply.

g.    **Necessity**

(U) Another common law affirmative defense is one of necessity. This defense is recognized by a number of states and is applicable when: 1) the harm must be committed under the pressure of physical or natural force, rather than human force; 2) the harm sought to be avoided is greater than (or at least equal to) that harm sought to be prevented by the law defining the offense charged; 3) the actor reasonably believes at the moment that his act is necessary and is designed to avoid the greater harm; 4) the actor must be without fault in bringing about the situation; and 5) the harm threatened must be imminent, leaving no alternative by which to avoid the greater harm.

(U) However, military courts have treated the necessity defense with disfavor, and in fact, some have refused to accept necessity as a permissible defense (the MCM does not list necessity as an affirmative defense under RCM 916). "The problem with the necessity defense is that it involves a weighing of evil inflicted against evil avoided and is, thereby, difficult to legislate." The courts also have been reluctant to embrace the defense due to a "fear that private moral codes will be substituted for legislative determination, resulting in a necessity exception that swallows the rule of law." *United States v. Rankins*, 34 MJ 326 (CMA 1992).

(U) The effect of these cases is that the MCM recognizes that an accused may commit an illegal act in order to avoid the serious injury or death of the accused or an innocent person. However, military law limits this defense only when there is an imminent and continuing harm that requires immediate action to prevent. Once the immediacy is gone, the defense will no longer apply. Ostensibly, the use of force to acquire information from an unlawful combatant, absent immediate and compelling circumstances, will not meet the elements established by the MCM and case law. (But see the necessity defense in the discussion of Federal law, *supra*.)

SECRET/NOFORN

3.    **Legal doctrines could render specific conduct, otherwise criminal, *not* unlawful**

See discussion of Commander-in-Chief Authority, *supra*.

## IV.   Considerations Affecting Policy

### A.   Historical Role of U.S. Armed Forces

#### 1.   Background

(U)  The basic principles of interrogation doctrine, procedures, and techniques applicable to Army intelligence interrogations from June 1945 through May 1987 were contained in Field Manual (FM) 30-15, Examination of Personnel and Documents.  FM 30-15 set forth Army doctrine pertaining to the basic principles of intelligence interrogations and established the procedures and techniques applicable to Army intelligence interrogations of non-U.S. personnel.  The other Services report that they too apply the provisions of this Field Manual.

#### 2.   Interrogation Historical Overview

(U)  FM 30-15 stated that the principles and techniques of interrogation discussed within the manual are to be used within the constraints established by humanitarian international law and the Uniform Code of Military Justice ("UCMJ").  The fundamental principle underlying Army doctrine concerning intelligence interrogations between 1945 and the issuance of current doctrine in 1987 (FM 34-52), is that the commander may utilize all available resources and lawful means in the accomplishment of his mission and for the protection and security of his unit.  However, a strong caveat to this principle noted, "treaty commitments and policy of the United States, international agreements, international law, and the UCMJ require the conduct of military to conform with the law of war."  FM 30-15 also recognized that Army intelligence interrogations must conform to the "specific prohibitions, limitations, and restrictions established by the Geneva Conventions of 12 August 1949 for the handling and treatment of personnel captured or detained by military forces" (citing FM 27-10, The Law of Land Warfare).

(U)  FM 30-15 also stated that "violations of the customary and treaty law applicable to the conduct of war normally constitute a concurrent violation of the Uniform Code of Military Justice and will be prosecuted under that code."  The manual advised Army personnel that it was "the direct responsibility of the Commander to insure that the law of war is respected in the conduct of warfare by forces in his command."  Thus, the intelligence interrogation techniques outlined in FM 30-15 were based upon conduct sanctioned under international law and domestic U.S. law and as constrained within the UCMJ.

(U)  Historically, the intelligence staff officer (G2/S2) was the primary Army staff officer responsible for all intelligence functions within the command structure.  This responsibility included interrogation of enemy prisoners of war (EPW), civilian internees, and other captured or detained persons.  In conducting interrogations, the intelligence staff officer was responsible for insuring that these activities were executed in accordance with international and domestic U.S. law, United States Government policy, and the applicable regulations and field manuals regarding the treatment and handling of EPWs,

SECRET/NOFORN

civilian internees, and other captured or detained persons. In the maintenance of interrogation collection, the intelligence staff officer was required to provide guidance and training to interrogators, assign collection requirements, promulgate regulations, directives, and field manuals regarding intelligence interrogation, and insure that interrogators were trained in international and domestic U.S. law and the applicable Army publications.

(U) FM 30-15 stated that intelligence interrogations are an art involving the questioning and examination of a source in order to obtain the maximum amount of usable information. Interrogations are of many types, such as the interview, a debriefing, and an elicitation. However, the FM made clear that the principles of objective, initiative, accuracy, prohibitions against the use of force, and security apply to all types of interrogations. The manual indicated that the goal is to collect usable and reliable information, in a lawful manner, promptly, while meeting the intelligence requirements of the command.

(U) FM 30-15 emphasized a prohibition on the use of force during interrogations. This prohibition included the actual use of force, mental torture, threats, and exposure to inhumane treatment of any kind. Interrogation doctrine, procedures, and techniques concerning the use of force are based upon prohibitions in international and domestic U.S. law. FM 30-15 stated that experience revealed that the use of force was unnecessary to gain cooperation and was a poor interrogation technique, given that its use produced unreliable information, damaged future interrogations, and induced those being interrogated to offer information viewed as expected in order to prevent the use of force. However, FM 30-15 stated that the prohibition on the use of force, mental or physical, must not be confused with the use of psychological tools and deception techniques designed to induce a source into providing intelligence information.

(U) The Center for Military History has been requested to conduct a search of government databases, to include the Investigative Records Repository, for documentation concerning the historical participation of the U.S. Armed Forces in interrogations and any archival materials related to interrogation techniques. As of the writing of this analysis, no reply has been received.

3.   **Current Doctrine**

(U) In May 1987, the basic principles of current doctrine, procedures, and techniques applicable to Army intelligence interrogations were promulgated in Field Manual (FM) 34-52, Intelligence Interrogation. FM 34-52 provides general guidance for commanders, staff officers, and other personnel in the use of interrogation elements in Army intelligence units. It also outlines procedures for handling sources of interrogations, the exploitation and processing of documents, and the reporting of intelligence gained through interrogation. Finally, FM 34-52 covers directing and supervising interrogation operations, conflict scenarios, and their impact on interrogation operations, to include peacetime interrogation operations.

SECRET/NOFORN

SECRET/NOFORN

(U) Army interrogation doctrine today, and since 1945, places particular emphasis on the humane handling of captured personnel. Interrogators receive specific instruction by Army Judge Advocates on the requirements of international and domestic US law, to include constraints established by the Uniform Code of Military Justice (e.g. assault, cruelty and maltreatment, and communicating a threat).

(U) FM 34-52 adopted the principles and framework for conducting intelligence interrogations as stated in FM 30-15. FM 34-52 maintained the established Army doctrine that intelligence interrogations involved the art of questioning and examining a source in order to obtain the maximum amount of useable information. FM 34-52 also reiterated Army doctrine that the principles of objective, initiative, accuracy, prohibition on the use of force, and security apply to all types of interrogations. The goal of intelligence interrogation under current doctrine is the same, the collection of usable and reliable information promptly and in a lawful manner, while meeting the intelligence requirements of the command.

(U) FM 34-52 and the curriculum at U.S. Army Intelligence Center, Fort Huachuca, continue to emphasize a prohibition on the use of force. As stated in its predecessor, FM 34-52 defines the use of force to include actual force, mental torture, threats, and exposure to inhumane treatment of any kind. The underlying basis for this prohibition is the proscriptions contained in international and domestic U.S. law. Current Army intelligence interrogation doctrine continues to view the use of force as unnecessary to gain the cooperation of captured personnel. Army interrogation experts view the use of force as an inferior technique that yields information of questionable quality. The primary concerns, in addition to the effect on information quality, are the adverse effect on future interrogations and the behavioral change on those being interrogated (offering particular information to avoid the use of force). However, the Army's doctrinal prohibition on the use of force does not proscribe legitimate psychological tools and deception techniques.

(U) FM 34-52 outlines procedures and approach techniques for conducting Army interrogations. While the approach techniques are varied, there are three common purposes: establish and maintain control over the source and the interrogation, establish and maintain rapport between the interrogator and the source, and manipulate the source's emotions and weaknesses to gain willing cooperation. Approved techniques include: Direct; Incentive; Emotional (Love & Hate); Increased Fear Up (Harsh & Mild); Decreased Fear Down; Pride and Ego (Up & Down); Futility Technique; We Know All; Establish Your Identity; Repetition; File and Dossier; and Mutt and Jeff (Friend & Foe). These techniques are discussed at greater length in Section V, *infra*.

## B.    Presidential and Secretary of Defense Directives

(U) The President's Military Order that addresses the detention, treatment, and trial of certain non-citizens in the war against terrorism,[71] provides, *inter alia*, that any

---

[71] (U) *Military Order - Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism*, President of the United States, November 13, 2001.