1  GREGORY G. KATSAS
   Assistant Attorney General
2  C. FREDERICK BECKNER III
   Deputy Assistant Attorney General
3  TIMOTHY P. GARREN
   Director, Torts Branch
4  MARY HAMPTON MASON
   Senior Trial Counsel
5  GLENN S. GREENE
   SARAH WHITMAN
6  Trial Attorneys
7  Torts Branch, Civil Division
   United States Department of Justice
8  P.O. Box 7146
   Ben Franklin Station
9  Washington, D.C. 20044
   Telephone:(202) 616-4143
10 Facsimile: (202) 616-4314
11 glenn.greene@usdoj.gov

12 Attorneys for Defendant John Yoo

13             UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
14             SAN FRANCISCO DIVISION

15 JOSE PADILLA AND ESTELA LEBRON,        )    CASE NO.: 3:08-cv-00035 JSW
                                          )
16         PLAINTIFFS,                     )
                                          )
17         v.                             )    **DEFENDANT JOHN YOO'S**
                                          )    **MOTION TO DISMISS**
18 JOHN YOO,                              )
                                          )    **DATE: DECEMBER 5, 2008**
19         DEFENDANT.                      )    **TIME: 9:00AM**
                                          )
20 _____)

21      PLEASE TAKE NOTICE that on December 5, 2008, at 9:00AM, or as soon thereafter as

22 counsel may be heard, Defendant John Yoo will present his motion to dismiss pursuant to Fed.

23 R. Civ. P. 12(b)(6) before the Honorable Jeffrey S. White, United States District Court Judge for

24 the Northern District of California.

25

26

27

28
                                          Defendant John Yoo's Motion to Dismiss
                                          3:08-cv-00035 JSW

1    Defendant Yoo's motion to dismiss seeks dismissal of all of the claims asserted in the

2  First Amended Complaint filed by Plaintiffs Jose Padilla and Estela Lebron.

3

4  Dated: August 1, 2008

5                                        Respectfully submitted,

6                                        GREGORY G. KATSAS
                                         Assistant Attorney General
7
                                         C. FREDERICK BECKNER III
8                                        Deputy Assistant Attorney General

9                                        TIMOTHY P. GARREN
                                         Director Torts Branch
10                                       Civil Division

11                                       MARY HAMPTON MASON
                                         Senior Trial Counsel
12
                                          /S/
13                                       GLENN S. GREENE
                                         SARAH WHITMAN
14                                       Trial Attorneys
                                         United States Department of Justice
15                                       Torts Branch, Civil Division
                                         P.O. Box 7146
16                                       Ben Franklin Station
                                         Washington, DC 20044
17                                       Telephone:  (202) 616-4143
                                         Facsimile:   (202) 616-4314
18                                       E-mail: glenn.greene@usdoj.gov
                                         *Attorneys for Defendant John Yoo*
19

20

21

22

23

24

25

26

27
                                         Defendant John Yoo's Motion to Dismiss
28                                       3:08-cv-00035 JSW

GREGORY G. KATSAS
Assistant Attorney General
C. FREDERICK BECKNER III
Deputy Assistant Attorney General
TIMOTHY P. GARREN
Director, Torts Branch
MARY HAMPTON MASON
Senior Trial Counsel
GLENN S. GREENE
SARAH WHITMAN
Trial Attorneys
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146
Ben Franklin Station
Washington, D.C. 20044
Telephone:(202) 616-4143
Facsimile: (202) 616-4314
glenn.greene@usdoj.gov

Attorneys for Defendant John Yoo

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| JOSE PADILLA AND ESTELA LEBRON,    ) | CASE NO.: 3: 08–cv-00035 JSW |
| ) | |
| PLAINTIFFS,    ) | **BRIEF IN SUPPORT OF** |
| ) | **DEFENDANT JOHN YOO'S** |
| v.    ) | **MOTION TO DISMISS** |
| ) | |
| JOHN YOO,    ) | **DATE: DECEMBER 5, 2008** |
| ) | **TIME: 9:00AM** |
| DEFENDANT.    ) | |
| ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS. . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF MUST BE DISMISSED. . . . . . . 6

II.     PLAINTIFFS' CONSTITUTIONAL CLAIMS FOR DAMAGES MUST BE
        DISMISSED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Special Factors Counseling Hesitation Foreclose The Creation Of A *Bivens*
                Remedy For Any Of The Constitutional Harms Alleged By Plaintiffs. . . . . . . . . . 10

        B.      Defendant Yoo Is Entitled To Qualified Immunity For All Of The Plaintiffs'
                *Bivens* Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                1.      Plaintiffs have failed to establish that Defendant Yoo personally
                        participated in any violation of Plaintiffs' constitutional rights. . . . . . . . . 27

                2.      Plaintiffs have not alleged a violation of any constitutional rights. . . . . . 34

                        a.      The Fourth Circuit's rejection of Padilla's petition
                                for a writ of habeas corpus precludes most of Plaintiffs'
                                constitutional claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                        b.      Padilla has not stated a violation of the
                                right of access to courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

                        c.      Padilla has not stated a violation of any rights under the Eighth
                                Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

                        d.      Padilla has not stated a violation of the Fifth Amendment right
                                against self-incrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

                3.      Plaintiffs fail to allege a violation of any clearly established right. . . . . . 42

III.    PADILLA HAS NOT STATED A CLAIM UNDER THE RELIGIOUS FREEDOM
        RESTORATION ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        A.      Padilla Has Failed To Establish That Defendant Yoo Is Personally Responsible
                For Any Violation Of RFRA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.     RFRA Does Not Create A Cause Of Action Against Defendant Yoo In His Individual Capacity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.     Even If A Cause Of Action Is Allowed, Defendant Yoo Is Entitled To Qualified Immunity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

1

# <u>TABLE OF AUTHORITIES</u>

2

## CASES

3  *Adams v. Johnson,*
        355 F.3d 1179 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
4

   *Aguilera v. Baca,*
5        510 F.3d 1161 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

6  *Aldabe v. Aldabe,*
        616 F.2d 1089 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
7

   *Anderson v. Creighton,*
8        483 U.S. 635 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 42

9  *Arar v. Ashcroft,*
        No. 06-4216, 2008 WL 2574470 (2d Cir. June 30, 2008). . . . . . . . . . . . . .  16, 17, 21, 23
10

   *Barren v. Harrington,*
11       152 F.3d 1193 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

12 *Bell Atlantic Corporation v. Twombly,*
        127 S. Ct. 1955 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 27, 33, 34
13

   *Benson v. Allphin,*
14       786 F.2d 268 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

15 *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,*
        403 U.S. 388 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim
16

   *Borucki v. Ryan,*
17       827 F.2d 836 (1st Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43, 49

18 *Branch v. Tunnell,*
        14 F.3d 449 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
19

   *Bruns v. Nat'l Credit Union Admin.,*
20       122 F.3d 1251 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

21 *Burns v. Reed,*
        500 U.S. 478 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
22

   *Bush v. Lucas,*
23       462 U.S. 367 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 20

24 *Campbell v. Allied Van Lines Inc.,*
        410 F.3d 618 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45
25

   *Carlson v. Green,*
26       446 U.S. 14 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

27

28

*Chappell v. Wallace,*
    462 U.S. 296 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 20

*Chavez v. Martinez,*
    538 U.S. 760 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Christopher v. Harbury,*
    536 U.S. 403 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Chuman v. Wright,*
    76 F.3d 292 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 26, 28, 34

*Circuit City Stores, Inc. v. Adams,*
    532 U.S. 105 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 9

*Correctional Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 24, 26

*County of Riverside v. McLaughlin,*
    500 U.S. 44 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Crawford-El v. Britton,*
    523 U.S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Davis v. Passman,*
    442 U.S. 228 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Department of Navy v. Egan,*
    484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*DiMeglio v. Haines,*
    45 F.3d 790 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 49

*El-Shifa Pharmaceutical Indus. v. United States,*
    378 F.3d 1346 (Fed. Cl. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Employment Division, Department of Human Resources v. Smith,*
    494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25, 34

*In re Estate of Covington,*
    450 F.3d 917 (9th Cir.  2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Falcetta v. Chapman,*
    231 Fed.Appx. 363 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*FDIC v. Meyer,*
    510 U.S. 471 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Feit v. Ward,*
    886 F.2d 848 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Fisher v. United States,*
    425 U.S. 391 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 41

*Frank v. Relin,*
    1 F.3d 1317 (2nd Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Galen v. County of Los Angeles,*
    477 F.3d 652 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hafer v. Melo,*
    502 U.S. 21 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Halperin v. Kissinger,*
    807 F.2d 180 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hamdi v. Rumsfeld,*
    542 U.S. 507. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Hanft v. Padilla,*
    546 U.S. 1084 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hartmann v. Stone,*
    68 F.3d 973 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Heck v. Humphrey,*
    512 U.S. 477 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Ingraham v. Wright,*
    430 U.S. 651 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Iraq and Afghanistan Detainees Litigation,*
    479 F. Supp. 2d 85 (D.D.C. 2007), *appeal docketed sub nom.,*
    *Ali v. Rumsfeld,* No. 07-5178 (D.C. Cir. May 31, 2007). . . . . . . . . . . . . . . . . . . . . . passim

*Jama v. INS,*
    343 F. Supp. 2d 338 (D.N.J. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*James v. United States,*
    127 S. Ct. 1586 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Japan Whaling Ass'n v. American Cetacean Society,*
    478 U.S. 221 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

*Kentucky v. Graham,*
    473 U.S. 159 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*Kirby v. City of Elizabeth, North Carolina,*
    388 F.3d 440 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006). . . . . . . . . . . . . . . . .   7

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

*Lane v. Pea,*
    518 U.S. 187 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

*Larsen v. United States Navy,*
    346 F. Supp. 2d 122 (D.D.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

*Leer v. Murphy,*
    844 F.2d 628 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Lepp v. Gonzales,*
    No. C-05-0566 VRW, 2005 WL 1867723 (N.D. Cal. Aug. 2, 2005), *aff'd sub nom.*,
    *Harris v. Mukasey*, No. 05-16695, 2008 WL 194924 (9th Cir. Jan. 22, 2008). . . . . . . .   48

*Malley v. Briggs,*
    475 U.S. 335 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Medina v. City and County of Denver,*
    960 F.2d 1493 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43, 49

*Micklus v. Carlson,*
    632 F.2d 227 (3d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

*Nebraska Beef, Ltd. v. Greening,*
    398 F.3d 1080 (8th Cir. 2005), *cert. denied*, 547 U.S. 1110 (2006). . . . . . . . . . . . . . .   11

*Nelsen v. King County,*
    895 F.2d 1248 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*North Dakota v. United States,*
    495 U.S. 423 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Omar v. Casterline,*
    414 F. Supp. 2d 582 (W.D. La. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

*Padilla, et al. v. Rumsfeld, et al.,*
    No. 2:07-cv-410-HFF-RSC (D.S.C.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Padilla ex rel. Newman v. Bush,*
    233 F. Supp. 2d 564 (S.D.N.Y. 2002), *remanded, Padilla v. Rumsfeld,*
    352 F.3d 695 (2d Cir. 2003), *reversed sub nom., Rumsfeld v. Padilla,*
    542 U.S. 426 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38, 40

*Padilla v. Hanft,*
    No. 04-2221-HFF-RSC (D.S.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Padilla v. Hanft ("Padilla I"),*
    389 F. Supp. 2d 678 (D.S.C. 2005), *rev'd,* 423 F.3d 386
    (4th Cir. 2005), *cert. denied,* 547 U.S. 1062 (2006). . . . . . . . . . . . . . . . . . . . . . . passim

*Padilla v. Hanft ("Padilla II"),*
    423 F.3d 386 (4th Cir. 2005), *cert. denied,* 547 U.S. 1062 (2006). . . . . . . . . . . . passim

*Padilla v. Rumsfeld,*
    542 U.S. at 430.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Phillips v. Hust,*
    477 F.3d 1070 (9th Cir. 2007), *petition for cert. filed,* 76 U.S.L.W. 3393
    (Dec. 13, 2007) (No. 07-897).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Morrison v. Olson,*
    487 U.S. 654 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 31

*Prins v. Coughlin,*
    76 F.3d 504 (2d Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ex parte Quirin,*
    317 U.S. 1 (1942).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Robbins v. Oklahoma,*
    519 F.3d 1242 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

*Saucier,*
    533 U.S. 194, 201 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 42

*Schneider v. Kissinger,*
    310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd on other grounds,* 412 F.3d 190
    (D.C. Cir. 2005), *cert. denied,* 547 U.S. 1069 (2006). . . . . . . . . . . . . . . . . . . . . . 15

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Sherbert v. Verner,*
    374 U.S. 398 (1963).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Sissoko v. Rocha,*
    509 F.3d 947 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20

*Spagnola v. Mathis,*
    859 F.2d 223 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Stafford v. Briggs,*
    444 U.S. 527 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Steel Company v. Citizens for a Better Environment,*
    523 U.S. 83 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Sterling v. Tenet,*
    416 F.3d 338 (4th Cir. 2005), *cert. denied,* 546 U.S. 1093 (2006). . . . . . . . . . . . . . . . 16

*Synagogue v. U.S.,*
    482 F.3d 1058 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Terrell v. Brewer,*
    935 F.2d 1015 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Townsend v. Columbia Operations,*
    667 F.2d 844 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Trevino v. Gates,*
    99 F.3d 911 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Antoine,*
    318 F.3d 919 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Grisel,*
    488 F.3d 844 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Sioux,*
    362 F.3d 1241 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Stanley,*
    483 U.S. 669 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,*
    537 U.S. 371 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Wilkie v. Robbins,*
    127 S. Ct. 2588 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wilson v. Libby*,
  498 F. Supp. 2d 74 (D.D.C. 2007)..................................... 16

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)................................................ 50

*Withrow v. Williams*,
  507 U.S. 680 (1993)................................................ 41

*Wolfe v. Strankman*,
  392 F.3d 358 (9th Cir. 2004)...................................... 5, 7

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000)...................................... 45

*Youngstown Sheet & Tube Co.*,
  343 U.S. 579 (1952)................................................ 13

## U.S. CONSTITUTION

U.S. Const. Art. I, § 8 ............................................... 12

U.S. Const. Art. III, § 2, cl. 1 ....................................... 8

## STATUTES

10 U.S.C. § 801 *et seq*... ............................................ 21

18 U.S.C. § 371. ...................................................... 3

18 U.S.C. § 956. ...................................................... 3

18 U.S.C. § 2339A..................................................... 3

18 U.S.C. §§2340-2340A................................................ 32

28 U.S.C. § 1391(e)................................................ 47, 48

28 U.S.C. §2241...................................................... 21

28 U.S.C. § 2679. .................................................... 23

42 U.S.C. §2000dd.................................................... 21

Detainee Treatment Act, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (2006). ........... 21

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006))........... 21

Authorization for Use of Military Force Joint Resolution,
    Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Reagan Act, Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (2004)
    (codified at 10 U.S.C. § 801, stat. note §§ 1091-92). . . . . . . . . . . . . . . . . . . . . . .  21

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* . . . . . . . . . . . . . . . . . . . . *passim*

## CODE OF FEDERAL REGULATIONS

28 C.F.R. § 0.25(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

## OTHER

C. Wright & A. Miller, Federal Practice and Procedure § 1216. . . . . . . . . . . . . . . . . . . . . . .  27

Black's Law Dictionary (8th ed. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1

## POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

2

### INTRODUCTION

3       Plaintiffs Jose Padilla and Estela Lebron seek to hold John Yoo, a former Deputy

4   Assistant Attorney General in the Office of Legal Counsel ("OLC") at the United States

5   Department of Justice,[1] personally liable for the decision made by the President of the United

6   States to designate Padilla, a convicted terrorist, as an enemy combatant.  The President's

7   decision, when challenged by Padilla through a petition for a writ of habeas corpus, was

8   recognized by the United States Court of Appeals for the Fourth Circuit as being "unquestionably

9   authorized . . . as a fundamental incident to the President's prosecution of the war against al

10  Qaeda in Afghanistan."  *Padilla v. Hanft*, 423 F.3d 386, 392 (4th Cir. 2005), *cert. denied*, 547

11  U.S. 1062 (2006).  Plaintiffs also seek to hold Defendant Yoo personally responsible for

12  Padilla's military detention as a result of the enemy combatant designation and the treatment he

13  allegedly received.  Plaintiffs do not allege any facts demonstrating that Yoo made the decision

14  to designate Padilla as an enemy combatant, or that he had any direct personal involvement in, or

15  control over Padilla's military detention or treatment.  Nor do Plaintiffs allege that Yoo had any

16  supervisory or other responsibility for anyone who had direct personal involvement in Padilla's

17  designation as an enemy combatant, or his military detention or treatment.  Yet in Plaintiffs'

18  view, Yoo can nonetheless be held personally responsible for their claimed injuries because Yoo

19  purportedly created legal memoranda that contained legal analyses which in turn were allegedly

20  relied upon by senior government and military officials who actually made and implemented the

21  decisions that governed Padilla's designation, military detention, and treatment.  To countenance

22  such a claim would not only constitute an unprecedented intrusion into the President's authority

23  in the areas of war-making, national security and foreign policy, it could jeopardize the ability of

24  the President and other Executive Branch officials to obtain candid legal advice on constitutional

25  ────────────────

26      [1] John Yoo is currently a professor of law at the University of California at Berkeley
    School of Law, a position he returned to after leaving government service.

27

28                              1

1 matters of utmost national importance and sensitivity.

2 **BACKGROUND**

3    In the Authorization for Use of Military Force Joint Resolution ("AUMF") of September

4 18, 2001, Congress specifically authorized the President to

5    use all necessary and appropriate force against those nations, organizations, or
persons he determines planned, authorized, committed, or aided the terrorist
6    attacks that occurred on September 11, 2001, or harbored such organizations or
persons, in order to prevent any future acts of international terrorism against the
7    United States by such nations, organizations or persons.

8 Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001).  On June 9, 2002, explicitly relying upon the

9 AUMF, the President directed the Secretary of Defense to detain Jose Padilla in military custody

10 as an enemy combatant.  The basis for Padilla's detention, as stated by the President, was that:

11    (1)    Jose Padilla, who is under the control of the Department of Justice and who is a
U.S. citizen, is, and at the time he entered the United States in May 2002 was, an
12    enemy combatant;

13    (2)    Mr. Padilla is closely associated with al Qaeda, an international terrorist
organization with which the United States is at war;
14
15    (3)    Mr. Padilla engaged in conduct that constituted hostile and war-like acts,
including conduct in preparation for acts of international terrorism that had the
aim to cause injury to or adverse effects on the United States;
16
17    (4)    Mr. Padilla possesses intelligence, including intelligence about personnel and
activities of al Qaeda, that, if communicated to the U.S., would aid U.S. efforts to
prevent attacks by al Qaeda on the United States or its armed forces, other
18    governmental personnel, or citizens;

19    (5)    Mr. Padilla represents a continuing, present and grave danger to the national
security of the United States, and detention of Mr. Padilla is necessary to prevent
20    him from aiding al Qaeda in its efforts to attack the United States or its armed
forces, other governmental personnel, or citizens;
21
22    (6)    it is in the interest of the United States that the Secretary of Defense detain Mr.
Padilla as an enemy combatant; and

23    (7)    it is [ ] consistent with U.S. law and the laws of war for the Secretary of Defense
to detain Mr. Padilla as enemy combatant.
24
25 *See* Letter from President George W. Bush to the Secretary of Defense (June 9, 2002) ("June 9,

26 2002 Bush Letter"), *reprinted in Padilla v. Hanft* ("*Padilla II*"), 423 F.3d 386, 389 (4th Cir.

27

28    2

1  2005), *cert. denied*, 547 U.S. 1062 (2006).

2        On July 2, 2004, Padilla filed a petition for a writ of habeas corpus in the United States

3  District Court for the District of South Carolina in which he raised many of the same

4  constitutional arguments that are being asserted in this matter.  *See Padilla v. Hanft* ("*Padilla I*"),

5  389 F. Supp. 2d 678, 682  (D.S.C. 2005), *rev'd*, *Padilla II*, 423 F.3d 386 (4th Cir. 2005), *cert.*

6  *denied*, 547 U.S. 1062 (2006).  The Fourth Circuit rejected Padilla's petition and declared that

7  his military detention as an enemy combatant by the President was "unquestionably authorized

8  by the AUMF as a fundamental incident to the President's prosecution of the war against al

9  Qaeda in Afghanistan."  *Padilla II*, 423 F.3d at 392.

10        On January 5, 2006, Padilla was transferred from military custody to a federal detention

11  center in Miami, Florida, to face federal criminal charges related to his terrorist activities.  First

12  Amended Complaint ("Complaint" or "Compl.") ¶ 11.  On August 16, 2007, Padilla was

13  convicted of three federal criminal offenses: conspiracy to kill, kidnap, maim, or injure persons

14  in a foreign country, *see* 18 U.S.C. § 956; providing material support to terrorists, *see* 18 U.S.C.

15  § 2339A; and conspiracy to provide material support to terrorists, *see* 18 U.S.C. § 371.  *See*

16  *generally* Criminal Docket for Case #: 0:04-cr-60001-MGC, *United States of America v. Adham*

17  *Amin Hassoun, Kifah Wael Jayyousi, and Jose Padilla*, at Number 1193 - Verdict.  On January

18  22, 2008, Padilla was sentenced to a term of imprisonment of 17 years and 4 months.  *See id.* at

19  Number 1333 - Judgment.  Padilla has appealed his conviction.

20        In February 2007, Plaintiffs Padilla and Lebron filed a civil suit in the United States

21  District Court for the District of South Carolina seeking to hold current and former government

22  officials personally liable for Padilla's designation as an enemy combatant, his subsequent

23  military detention, and his treatment during that detention.  *See Padilla, et al. v. Rumsfeld, et al.*,

24  No. 2:07-cv-410-HFF-RSC (D.S.C.).  Plaintiffs in the South Carolina lawsuit raise substantially

25

26

27

28                                                   3

1  the same claims as this lawsuit.[2]

2       In this case, Plaintiffs sue a single defendant – former OLC Deputy Assistant Attorney

3  General John Yoo.  He is sued in his individual capacity.  Plaintiffs' claims against Defendant

4  Yoo are based upon his alleged role in Padilla's designation as an enemy combatant, and his

5  military detention and treatment.  Padilla alleges that these actions violated numerous

6  constitutional provisions that he claims apply to his situation, specifically:

7   | Claim a. | The right of access to legal counsel under the First, Fifth, and Sixth Amendments; |

8

9   | Claim b. | The right of access to courts under the First and Fifth Amendments; |

    | Claim c. | The right not to be subjected to conditions of confinement and treatment that violate the rights to procedural and substantive due process under the Fifth Amendment, and the right to be free of cruel and unusual punishment under the Eighth Amendment; |
10

11

12  | Claim d. | The right to be free from coercive and involuntary custodial interrogation pursuant to procedural and substantive due process under the Fifth Amendment, the Fifth Amendment privilege against self-incrimination, and the right to be free of cruel and unusual punishment under the Eighth Amendment; |

13

14

15  | Claims e.-g. | The right to free exercise of religion under the First Amendment (e); and the rights to information (f), and to association with family and others (g) under the First Amendment; |

16

17  | Claim h. | The right not to be subject to military detention under the Fourth and Fifth Amendments; |

18

19  ————————————

20      [2]  The defendants in the District of South Carolina matter are: Donald H. Rumsfeld, former Secretary of Defense; John Ashcroft, former Attorney General; Robert M. Gates,

21  Secretary of Defense; Paul Wolfowitz, former Deputy Secretary of Defense; Vice Admiral Lowell E. Jacoby, former Director, Defense Intelligence Agency; Michael H. Mobbs, Special

22  Advisor to the Undersecretary of Defense for Policy; William Haynes, former General Counsel, Department of Defense; Naval Captain Catherine T. Hanft; retired Naval Commander Melanie

23  A. Marr; Naval Commander Stephanie L. Wright; Chief Petty Officer Mack Keen; Sandy Seymour, Technical Director, Consolidated Brig; and Dr. Craig Noble.  Also included as

24  defendants are 50 John Does.  With the exception of a request for injunctive relief against Padilla's potential re-detention as an enemy combatant and an Administrative Procedures Act

25  claim against Secretary of Defense Gates, the claims asserted in the District of South Carolina

26  case are identical to those asserted in this case.

27

28                                    4

Claim i.    The right to be free from unreasonable seizures under the Fourth Amendment; and

Claim j.    The right not to be subjected to the "collateral effects" of designation as an "enemy combatant" without due process of law under the Fifth Amendment.

*See* Compl. ¶¶ 82.a.-j. Padilla claims further that his detention and treatment as an enemy combatant violated the Habeas Suspension and Treason Clauses of the U.S. Constitution, *id.* ¶¶ 82.b. & h., as well as the Religious Freedom Restoration Act, *see id.* ¶¶ 82.e.

Plaintiff Estela Lebron alleges that she was "denied of virtually all contact with her son [Plaintiff Padilla]" for the duration of his detention as an enemy combatant. *See id.* ¶ 83. She alleges that Padilla's detention violated her rights to association and communication under the First and Fifth Amendments. *See id.*

## SUMMARY OF ARGUMENT

Plaintiffs' claims against Defendant Yoo fail as a matter of law. First, Plaintiffs' claim for declaratory relief fails because Yoo, in his individual capacity, is not a party from whom declaratory relief can be sought or obtained. *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004). Moreover, Plaintiffs lack standing to obtain such relief. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

Second, Plaintiffs' constitutional claims for damages should be dismissed because there are special factors counseling hesitation that preclude the Court from creating a damages remedy for an enemy combatant against a federal official alleged to be responsible for his designation, detention, and treatment as an enemy combatant. *Wilkie v. Robbins*, 127 S. Ct. 2588, 2597-98 (2007). Hesitation in implying a right of action is especially appropriate here, where Plaintiffs sue over alleged legal advice given to the President and other Executive Branch officials on matters involving war powers, national security, and foreign policy. No court has ever recognized such a novel cause of action and to do so here would be contrary to Supreme Court precedent and would threaten the President's ability to obtain candid legal counsel from

Defendant John Yoo's Motion to Dismiss
3:08-cv-00035 JSW

1    traditional sources within the Executive Branch.  At the same time, the proposed cause of action

2    would raise the very type of practical line-drawing difficulties that led the Supreme Court in

3    *Wilkie v. Robbins*, 127 S. Ct. 2588 (2007), to preclude the creation of a *Bivens* remedy.

4          In the alternative, even if creating a non-statutory constitutional tort remedy were

5    permissible under these extraordinary and sensitive circumstances, Defendant Yoo is entitled to

6    qualified immunity as a matter of law.  The Complaint fails to allege facts sufficient to establish,

7    as it must, that Defendant Yoo was personally responsible for any of the particular claimed

8    constitutional violations to which Plaintiff Padilla was allegedly subjected.  *Chuman v. Wright*,

9    76 F.3d 292, 294-95 (9th Cir. 1996); *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955,

10   1969 (2007).  Moreover, Plaintiffs fail to allege the violation of any clearly established

11   constitutional rights for the constitutional claims that question Padilla's designation and

12   detention as an enemy combatant, including his being held in isolation and incommunicado (*see*

13   Compl. ¶¶ 82.a-j.).  To the extent that Plaintiffs assert claims related to Padilla's alleged

14   interrogation and conditions of confinement during his detention as an enemy combatant that are

15   premised on Padilla being interrogated in isolation, without access to counsel, family, or outside

16   information (*see id.* ¶¶ 82.c.-e.) , Plaintiffs fail to allege the violation of any clearly established

17   constitutional rights for those claims as well.  *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005).

18         Finally, Padilla's claim under the Religious Freedom Restoration Act ("RFRA") fails

19   because Padilla has not alleged any actions by Defendant Yoo that substantially burdened the

20   exercise of Padilla's religion; RFRA does not provide for a cause of action against Defendant

21   Yoo in his individual capacity; and to the extent that Padilla has stated a claim under RFRA,

22   Defendant Yoo is entitled to qualified immunity.

23                              **ARGUMENT**

24   **I.    PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF MUST BE DISMISSED.**

25         Plaintiffs seek equitable relief from Defendant Yoo in his individual capacity in the form

26   of a judgment "declaring that the acts alleged [in the Complaint] are unlawful and violate the

27

28                              6

Defendant John Yoo's Motion to Dismiss
3:08-cv-00035 JSW

Constitution and laws of the United States." *See id.* ¶ 84.a. This request for equitable relief fails as a matter of law because Defendant Yoo, a former federal employee sued in his individual capacity, *see id.* ¶ 7, is not a party from whom such declaratory relief can be sought or obtained. Moreover, Plaintiffs lack standing to obtain such relief.

**1.** Every court of appeals to address the issue of whether a plaintiff alleging the violation of federal rights can sue a government official in an individual capacity for equitable relief, including the Court of Appeals for the Ninth Circuit, has concluded that there is no basis for such a suit. *See Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004) ("[T]he declaratory and injunctive relief Wolfe seeks is only available in an official capacity suit.").[3] These cases recognize that the government is the real party in interest in a suit for non-monetary relief and that a government employee's personal interest in the litigation does not extend beyond whether or not the employee is required to pay damages out of his or her own pocket.[4]

In light of the real party-in-interest distinction between individual and official capacity suits, an individual capacity claim for equitable relief is not legally viable because it names "improper defendants." *Feit*, 886 F.2d at 858. Only by acting as a government official (not as an individual), can a defendant employee comply with a court decree by altering government policy or practice. A defendant employee who stands before the court in his or her capacity as an individual has no such ability. *See Wolfe*, 392 F.3d at 360 n.2. Therefore the equitable relief

---

[3] *See, e.g.*, *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) ("[T]he equitable relief Feit requests – a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future – can be obtained only from the defendants in their official capacities, not as private individuals."); *Kirby v. City of Elizabeth, North Carolina*, 388 F.3d 440, 452 n.10 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Frank v. Relin*, 1 F.3d 1317, 1327 (2nd Cir. 1993).

[4] Although an injunction or declaratory judgment may affect how the employee performs his or her official duties in the future, a public servant has no legally cognizable *personal* interest in performing official duties in one fashion versus another. This is especially true for a former federal employee such as Defendant Yoo, whom Plaintiffs do not allege will be performing such duties in the future.

1    Plaintiffs seek here "can be obtained only from the defendant[] in [his] official capacit[y], not as

2    [a] private individual[]." *Feit*, 886 F.2d at 858 (citation omitted).[5]  Plaintiffs clearly and

3    deliberately sued Defendant Yoo in his individual capacity after he left government office.

4    Plaintiffs' claims are thus "properly dismissed" because their "attempt to obtain declaratory . . .

5    relief from the defendant[] in [his] personal capacit[y] fails to state a claim upon which relief

6    may be granted." *Id.*

7        **2.**  In addition to seeking equitable relief from an improper defendant, Plaintiffs also lack

8    standing to pursue their equitable relief claim.  An Article III court only has jurisdiction over a

9    "case or controversy."  U.S. Const. Art. III, § 2, cl. 1.  As the Supreme Court observed in *City of*

10   *Los Angeles v. Lyons*, "[a]bstract injury is not enough.  The plaintiff must show that he 'has

11   sustained or is immediately in danger of sustaining some direct injury' as the result of the

12   challenged official conduct and the injury or threat of injury must be both 'real and immediate,'

13   not 'conjectural' or 'hypothetical.'" 461 U.S. 95, 101-02 (1983) (citations omitted); *see also*

14   *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (noting that threatened injury must be "certainly

15   impending" to constitute an injury-in-fact sufficient to satisfy Article III standing requirements).

16   Past injury alone is insufficient to provide a plaintiff with standing to seek declaratory or

17   injunctive relief because declaratory or injunctive relief cannot redress past injury.  *See Lyons*,

18   461 U.S. at 103-04 (finding that plaintiff lacked standing to seek injunction against Los Angeles

19   police officers' use of "chokeholds" because he failed to show that he was likely to suffer future

20   injury from the use of the "chokeholds" by police officers); *Steel Company v. Citizens for a*

21   *Better Environment*, 523 U.S. 83, 109 (1998) (finding that plaintiff lacked standing to obtain

22   equitable relief against a company for its alleged past violations of federal law).

23       This Court lacks subject matter jurisdiction over Plaintiffs' claims for equitable relief

24   because Plaintiffs have failed to allege a threat of injury that is "real and immediate," and not

25   ————————————

26       [5]  Defendant Yoo could not be sued in his official capacity because as a former federal
     employee, he no longer has any official duties to carry out.

27

28                                    8

1  "conjectural" or "hypothetical." *See Lyons*, 461 U.S. at 101-02. All of Plaintiffs' claims,

2  including those for equitable relief, are premised upon Padilla's *past* detention as an enemy

3  combatant. *See* Compl. ¶¶ 1-6. On January 5, 2006, Padilla was transferred from military

4  custody to the custody of the U.S. Justice Department for trial on a variety of terrorism-related

5  offenses. *See Hanft v. Padilla*, 546 U.S. 1084 (2006); Compl. ¶ 11. Padilla was subsequently

6  convicted of three federal criminal offenses. On January 22, 2008, Padilla was sentenced to a

7  term of imprisonment of 17 years and 4 months and has been committed to the custody of the

8  U.S. Bureau of Prisons. *See* Criminal Docket for Case #: 0:04-cr-60001-MGC, *United States of*

9  *America v. Adham Amin Hassoun, Kifah Wael Jayyousi, and Jose Padilla*, at Number 1333-

10  Judgment. There is thus no reason to believe that Padilla is likely to soon be re-transferred to

11  military custody to be re-detained as an enemy combatant and/or subjected to coercive

12  interrogation techniques or unconstitutional conditions of confinement stemming from that

13  designation.[6] *See Steel Company*, 523 U.S. at 109. Plaintiffs lack standing to seek equitable

14  relief against such "conjectural" or "hypothetical" scenarios. *See Lyons*, 461 U.S. at 101-02.[7]

15

16      [6] The sole evidence cited as support for Padilla's fear of redetention as an enemy
combatant is an alleged statement by a Deputy Solicitor General to Padilla's counsel that the

17  government "could" redetain Padilla in military custody at any time based on Padilla's past acts.
*See* Compl. ¶ 77. However, this statement was purportedly made on November 23, 2005, *see id.*,

18  while Padilla was still in military custody. Plaintiffs allege no statement or action of any kind
made after Padilla was transferred to the custody of the U.S. Department of Justice for criminal

19  prosecution that indicates a "real and immediate" threat to return Padilla to military detention.

20  Indeed, Padilla has since been convicted and sentenced to a term of imprisonment.

21      [7] Federal courts of appeals, including the Ninth Circuit, have consistently applied the
standing requirements set forth in *Lyons* to reject claims by prisoners, pretrial detainees, and

22  immigration detainees seeking equitable relief to challenge the conditions of their confinement

23  following their release from custody or even after a transfer to a different facility. *See Nelsen v.*
*King County*, 895 F.2d 1248, 1249-54 (9th Cir. 1990) (rejecting the argument that the allegation

24  that plaintiffs' alcoholism made it very likely that they would re-offend and be treated in the
same facility constituted a sufficient threat of future injury to support standing for equitable relief

25  claims challenging sanitary conditions in a treatment facility from which plaintiffs had been

26  released); *see also Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("[I]t is settled in this

(continued...)

27

28      9

1   **II.     PLAINTIFFS' CONSTITUTIONAL CLAIMS FOR DAMAGES MUST BE
          DISMISSED.**

2          Plaintiffs' constitutional claims for damages against Defendant Yoo should be dismissed

3   for two alternative reasons.  First, there are special factors counseling hesitation that preclude the

4   Court from creating the non-statutory damages remedy Plaintiffs seek in this extraordinary and

5   sensitive context.  Alternatively, even if it were appropriate for the Court to create a non-

6   statutory damages remedy in this context, Defendant Yoo is entitled to qualified immunity as a

7   matter of law on all of Plaintiffs' claims.

8          **A.     Special Factors Counseling Hesitation Foreclose The Creation Of A *Bivens*
                 Remedy For Any Of The Constitutional Harms Alleged By Plaintiffs.**

9

10         Plaintiffs seek damages from Defendant Yoo for alleged constitutional infirmities in

11  Padilla's designation, detention, and treatment as an enemy combatant.  The "special factors"

12  doctrine developed by the Supreme Court in *Bivens v. Six Unknown Named Agents of the Fed.*

13  *Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny precludes an individual damages

14  remedy for this unprecedented claim.

15         A judicially-created damages remedy for constitutional violations "is not an automatic

16  entitlement."  *Wilkie v. Robbins*, 127 S. Ct. 2588, 2597 (2007); *Sissoko v. Rocha*, 509 F.3d 947,

17  949 (9th Cir. 2007); *see also Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) ("[O]ur

18  precedent makes clear that the right to sue as established by *Bivens* is qualified and is not

19  absolute.").  In *Bivens*, the Supreme Court held that the victim of an alleged Fourth Amendment

20  violation could bring suit to recover damages in the absence of a statutory cause of action only

21  where there were "no special factors counseling hesitation in the absence of affirmative action by

22  Congress."  403 U.S. at 396.  Subsequently, the Court has countenanced an expansion of *Bivens*

23  on just two occasions, and in both instances specifically determined that there were no such

24

25         [7](...continued)

26  Circuit that a transfer from a prison facility moots an action for injunctive relief against the
    transferring facility.").

27

28                                    10

1    "special factors."  *See Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14

2    (1980).  The Supreme Court has "in most instances . . . found a *Bivens* remedy unjustified,"

3    *Wilkie*, 127 S. Ct. at 2597-98, and accordingly, in the nearly three decades since *Carlson*, the

4    Court has "consistently refused to extend *Bivens* liability to any new context or new category of

5    defendants," *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).[8]  As a result,

6    "recognizing such a claim is clearly disfavored."  *See In re Iraq and Afghanistan Detainees*

7    *Litigation*, 479 F. Supp. 2d 85, 93-94 (D.D.C. 2007), *appeal docketed sub nom.*, *Ali v. Rumsfeld*,

8    No. 07-5178 (D.C. Cir. May 31, 2007); *accord Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080,

9    1084 (8th Cir. 2005) (recognizing "presumption against judicial recognition of direct actions for

10   violations of the Constitution by federal officers or employees") (quoting *McIntosh v. Turner*,

11   861 F.2d 524, 526 (8th Cir. 1988)), *cert. denied*, 547 U.S. 1110 (2006).  Moreover, the Court has

12   determined that a wide range of factors may make it inappropriate for federal courts to create a

13   *Bivens* remedy in a particular context, even where the plaintiff has no alternative statutory

14   remedy available.  *See Wilkie*, 127 S. Ct. at 2598 ("even in the absence of an alternative [existing

15   process for protecting a constitutionally recognized interest], a *Bivens* remedy is a subject of

16   judgment"); *id.* at 2604-05 (holding that the "serious difficulty of devising a workable cause of

17   action" was a special factor that precluded the creation of a *Bivens* claim).

18         Plaintiffs seek an unprecedented extension of *Bivens* into a new, previously unrecognized,

19   and highly sensitive context – one that would allow a damages action seeking recovery from the

20

21         [8]  *See, e.g.*, *Malesko*, 534 U.S. at 70-72 (refusing to recognize a *Bivens* remedy against
22   private companies performing governmental functions under contract with the United States
     because doing so would not serve the public policy purposes of the remedy); *FDIC v. Meyer*, 510
23   U.S. 471, 486 (1994) (refusing to allow a *Bivens* claim against a federal agency because of its
     potential impact on federal fiscal policy); *Schweiker v. Chilicky*, 487 U.S. 412, 425-29 (1988)
24   (rejecting a *Bivens* remedy for the denial of Social Security benefits because a statutory
     procedure already existed to challenge adverse eligibility determinations); *Bush v. Lucas*, 462
25   U.S. 367, 389-90 (1983) (refusing to recognize a *Bivens* remedy for the alleged violation of First
     Amendment rights arising out of federal personnel decisions for fear that the claim might
26   interfere with a statutory scheme regulating the federal workplace).

27

28                                    11

1  personal assets of a former Department of Justice attorney for legal analyses and advice he

2  allegedly provided to the President, other Executive Branch officials, and/or members of the

3  United States military related to wartime actions in identifying, capturing, designating, detaining,

4  and interrogating an enemy combatant. No court has ever recognized a *Bivens* remedy in this

5  context, and this Court should decline Plaintiffs' invitation to do so here. The *Bivens* remedy

6  Plaintiffs seek would impinge upon the Executive Branch's authority to conduct war and foreign

7  policy, and to protect the nation from terrorist attack. It would also present serious practical

8  difficulties to devise a workable *Bivens* cause of action that challenges the advisory functions of

9  an Executive Branch attorney without compromising the ability of the President and other

10  Executive Branch officials to obtain candid advice on matters of national importance.[9]

11  Permitting Plaintiffs' claims to proceed in the face of these concerns would violate bedrock

12  separation-of-powers principles and constitute a sharp departure from the Supreme Court's well-

13  settled reluctance to extend *Bivens* liability to new contexts.

14      **1.** The Constitution explicitly delegates authority over decisions related to the conduct of

15  war to the Legislative and Executive branches. *See* U.S. Const. Art. I, § 8 (Legislative Branch);

16  Art. II, § 2 (Executive Branch). For this reason, the Supreme Court has repeatedly recognized

17  that courts should refrain from interfering in the core functions of the political branches,

18  especially during wartime. *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) (plurality

19  opinion) ("We accord the greatest respect and consideration to the judgments of military

20  authorities in matters relating to the actual prosecution of a war, and recognize that the scope of

21  that discretion necessarily is wide."); *id.* at 531 ("Without doubt, our Constitution recognizes that

22  core strategic matters of warmaking belong in the hands of those who are best positioned and

23  most politically accountable for making them."); *North Dakota v. United States*, 495 U.S. 423,

24

25      [9] Indeed, if the legal issues the Executive Branch faces were simple and straightforward, there would be no need for OLC to – as Plaintiffs allege – "provid[e] the President with legal

26  guidance necessary to ensure that the Executive complies with our Constitution and laws." Compl. ¶ 17.

27

28                                                12

1  443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we

2  properly defer to the judgment of those who must lead our Armed Forces in battle.").[10]  In

3  keeping with this deference, the Supreme Court has refused, on the basis of the special factors

4  doctrine, to create a *Bivens* action against military officials *or civilians* for claims arising incident

5  to military service.  *United States v. Stanley*, 483 U.S. 669, 681-83 (1987).[11]

6          The decision to designate, detain, and interrogate Padilla as an enemy combatant was a

7  military decision made pursuant to the AUMF's explicit grant of authority to the President from

8  Congress.  *See* June 9, 2002 Bush Letter.  Padilla's designation and detention were deemed

9  "necessary to prevent [Padilla] from aiding al Qaeda in its efforts to attack the United States or

10  its armed forces, other governmental personnel, or citizens."  *Id.*  The power to identify, detain,

11  and question individuals like Padilla who have aligned themselves with declared enemies of the

12  United States and have taken up arms against this country is essential to the exercise of

13  constitutionally and congressionally delegated war powers.  Therefore, deference to the

14  President's decision in that regard is especially warranted.  *See Youngstown Sheet & Tube Co.*,

15  343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an

16

17          [10]  *See also Department of Navy v. Egan*, 484 U.S. 518, 530 (1988) (noting the reluctance
of the courts "to intrude upon the authority of the Executive in military and national security

18  affairs).

19          [11]  In *Stanley*, the Court considered the creation of a *Bivens* remedy that would allow a
former serviceman to sue military officers and civilians to recover damages he sustained as a

20  result of his involuntary participation in an Army medical experiment.  *Stanley*, 483 U.S. at 671-

21  73.  The Court found that "congressionally uninvited intrusion into military affairs by the
judiciary" is a special factor precluding creation of a *Bivens* remedy.  *Id.* at 683.  *Stanley* was an

22  extension of *Chappell v. Wallace*, 462 U.S. 296 (1983), in which the Court also found
separation-of-powers to be a special factor counseling hesitation that prevented the creation of a

23  *Bivens* remedy that would allow enlisted military personnel to sue their superior officers.  The

24  Court reasoned in *Chappell* that since "Congress, the constitutionally authorized source of
authority over the military system of justice, ha[d] not provided a damage remedy for claims by

25  military personnel that constitutional rights have been violated by superior officers . . .[a]ny

26  action to provide a judicial response by way of such a remedy would be plainly inconsistent with
Congress' authority in this field."  462 U.S. at 304.

27

28                                          13

1  express or implied authorization of Congress, his authority is at its maximum, for it includes all

2  that he possesses in his own right plus all that Congress can delegate.").

3       The potential disruption to the coordinate branches of government caused by recognizing

4  a cause of action for damages by an enemy combatant against his captors in a time of war is far

5  greater than that found sufficient to preclude a *Bivens* action in either *Stanley* or *Chappell*.  This

6  is true regardless of who along the chain of decision-making the enemy combatant chooses to

7  sue.  In this case, Plaintiffs have sued a former Justice Department attorney for legal analyses

8  allegedly provided by OLC and the Attorney General to the President as well as senior military

9  and civilian officials on matters related to the conduct of the war on terrorism, *see infra* § II.B.1.

10 The Supreme Court has recognized that "the greatest respect and consideration" is to be accorded

11 to "the judgments of military authorities in matters relating to the actual prosecution of a war,"

12 and that the scope of the discretion exercised by these authorities "necessarily is wide."  *Hamdi*,

13 542 U.S. at 535 (plurality opinion).  It follows, therefore, that courts should take great care when

14 asked to create a cause of action that would intrude upon the judgment and discretion of military

15 authorities by targeting the government attorneys to whom those authorities go for candid legal

16 analyses or advice in matters related to the prosecution of war.

17      The potential interference is of particular concern as it relates to legal advice on military

18 matters sought and obtained from OLC, which is responsible among other matters for "rendering

19 informal opinions and legal advice to the various agencies of the Government; and assisting the

20 Attorney General in the performance of his functions as legal adviser to the President . . ."  28

21 C.F.R. § 0.25(a).  Indeed, the head of OLC is commonly recognized as "a post that has

22 traditionally had responsibility for providing legal advice to the President. . . ."  *See Morrison v.*

23 *Olson*, 487 U.S. 654, 700 (1988) (Scalia, J., dissenting).  Recognizing the *Bivens* remedy

24 Plaintiffs seek here against Defendant Yoo would inappropriately interfere with the ability of the

25 President and other Executive Branch officials to receive candid legal analyses and advice from

26 individual OLC attorneys who may in turn temper those analyses or advice out of fear of personal

27

28                                     14

1    liability.  *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982) (recognizing that the purpose of

2    qualified immunity is to shield government officials from "undue interference with their duties

3    and from potentially disabling threats of liability").  This would directly affect the ability of these

4    officials to exercise the judgment and discretion which courts have accorded them with respect to

5    the prosecution of war.  *Hamdi*, 542 U.S. at 535.

6        **2.**  Not only would recognizing a *Bivens* remedy here impermissibly intrude on

7    Presidential and Congressional primacy in matters of war, it would also impinge on the national

8    security prerogative of the coordinate branches.  Even in times of peace, federal courts have

9    broadly deferred to the Executive Branch on national security matters.  *See, e.g.*, *Egan*, 484 U.S.

10   at 530 ("courts traditionally have been reluctant to intrude upon the authority of the Executive in

11   . . . national security affairs."); *Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C. Cir. 1986) (noting

12   that the "harm produced" by the assertion of damages actions against federal officials "is

13   particularly severe in the national security field, since 'no governmental interest is more

14   compelling'") (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)); *Schneider v. Kissinger*, 310 F.

15   Supp. 2d 251, 270 n.27 (D.D.C. 2004) (dismissing claims for equitable relief because they

16   concerned "foreign and national security policy directives of the President"), *aff'd on other*

17   *grounds*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006).  There are obvious

18   and significant national security concerns inherent in subjecting a former government attorney to

19   personal liability for decisions made by the President, current and former members of the

20   President's Cabinet, and military and civilian officials regarding the designation, detention and

21   interrogation of an enemy combatant whom the President expressly concluded "represents a

22   continuing, present and grave danger to the national security of the United States," *see* June 9,

23   2002 Bush Letter.  The prospect of prolonged litigation and personal liability might unduly

24   influence decisions concerning the designation, detention and interrogation of enemy combatants

25   like Padilla, or the release of such enemies from military custody, which in turn could adversely

26   impact the fundamental security of the Nation, enhancing the risks to our military in the field and

27

28                                    15                  Defendant John Yoo's Motion to Dismiss
                                                          3:08-cv-00035 JSW

1  our citizens at home.

2      Adjudication of the claims pressed by Plaintiffs in this case would necessarily require an

3  examination of the manner in which the government identifies, captures, designates, detains, and

4  interrogates enemy combatants.  *See In re Iraq*, 479 F. Supp. 2d at 105 ("The discovery process

5  alone risks aiding our enemies by affording them a mechanism to obtain what information they

6  could about military affairs and disrupt command missions by wresting officials from the

7  battlefield to answer compelled deposition and other discovery inquiries about the military's

8  interrogation and detention policies, practices, and procedures.").  Litigating these extremely

9  sensitive matters itself raises serious national security concerns, and is a policy judgment that

10  should be left to Congress.  *See Arar v. Ashcroft*, No. 06-4216, 2008 WL 2574470, at *20 (2d

11  Cir. June 30, 2008) (refusing to infer *Bivens* remedy for alien whose claim "involve[d] the

12  intersection of removal decisions and national security" because "consideration [of the claim]

13  raises questions entrusted principally to other branches of government"); *Wilson v. Libby*, 498 F.

14  Supp. 2d 74, 83-96 (D.D.C. 2007) (refusing to create a *Bivens* remedy for the alleged retaliatory

15  disclosure of the covert status of a CIA operative because of separation-of-powers and

16  justiciability concerns), *appeal argued*, No. 07-5257 (D.C. Cir. May 9, 2008); *cf. Sterling v.

17  Tenet*, 416 F.3d 338, 348 (4th Cir. 2005) (noting that even established methods for the protection

18  of sensitive information, "whatever they might be, still entail considerable risk" of revealing the

19  information they are invoked to protect), *cert. denied*, 546 U.S. 1093 (2006); *El-Shifa

20  Pharmaceutical Indus. v. United States,* 378 F.3d 1346, 1365 (Fed. Cl. 2004) (dismissing a

21  takings claim as non-justiciable because it would require the court to second-guess the

22  Executive's evaluation of military intelligence).

23      **3.**  Recognizing the *Bivens* remedy sought by Plaintiffs would also impermissibly intrude

24  upon the primacy of the Executive Branch in matters of foreign policy, including whether, where

25  and when the United States chooses to capture enemy combatants.  Certainly, foreign

26  governments have an interest in the manner in which associates of Al Qaeda or any other foreign

27

28                                    16

1    terrorist organization are identified, detained, and interrogated by the United States.  For different

2    legal consequences to attach when the United States arrests and detains an enemy combatant on

3    domestic rather than foreign soil would necessarily impact the Executive's decision-making in

4    that regard, would lead to increased foreign operations, and, in turn, impact foreign relations.

5    That is especially true in regard to persons involved in international terrorism occurring abroad

6    and aimed at undermining foreign governments that thereby have a keen and legitimate interest

7    in the proceedings.  As the D.C. Circuit explained in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202,

8    209 (D.C. Cir. 1985), "the special needs of foreign affairs must stay our hand in the creation of

9    damage remedies against military and foreign policy officials . . . The foreign affairs implications

10   of suits such as this cannot be ignored . . .".  *See also id.* at 205-09 (refusing to recognize a

11   *Bivens* remedy for alleged constitutional violations resulting from a plan by former President

12   Reagan and members of the National Security Council to overthrow the government of

13   Nicaragua); *Arar*, 2008 WL 2574470, at *19-20 (citing the fact that litigation of the plaintiff's

14   claim "would interfere with the management of our country's relations with foreign powers and

15   affect our government's ability to ensure national security" as a factor weighing against the

16   recognition of a *Bivens* action); *cf. Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S.

17   221, 230 (1986) ("[C]ourts are fundamentally underequipped to formulate national policies or

18   develop standards for matters not legal in nature.") (quoting *United States ex rel. Joseph v.*

19   *Cannon*, 642 F.2d 1373, 1379 (1981) (footnote omitted)).  Even apart from national security

20   concerns, federal courts have traditionally deferred to the Executive Branch on foreign policy

21   matters.[12]  Courts have approached foreign affairs with caution even when Congress has passed a

22

---

23        [12]  *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n. 21 (2004) (recognizing
24   "policy of case-specific deference to the political branches" in foreign affairs and "strong
     argument that federal courts should give serious weight to the Executive Branch's view of the
25   case's impact on foreign policy"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990)
     (highlighting "significant and deleterious consequences" that the creation of a damages action
26   would have on "foreign policy operations"); *United States v. Curtiss-Wright Export Corp.*, 299

                                                                              (continued...)

27

28                                      17                    Defendant John Yoo's Motion to Dismiss
                                                              3:08-cv-00035 JSW

1    statute contemplating some form of judicial involvement.  *See*, *e.g.*, *Sosa*, 542 U.S. at 727-28.

2    The rationale for this deference in general is particularly acute where a suit involves a request to

3    create a non-statutory private cause of action that implicates foreign policy concerns.

4        **4.**    Beyond the concerns outlined above, recognizing a private right of action for damages

5    against government officers would have at least two very specific consequences in this context.

6    First, the potential chilling effect of a damages remedy would threaten the President's ability to

7    obtain needed counsel and guidance on matters of great importance and sensitivity to the Nation

8    and thereby interfere with critical decision-making at the highest levels of the government.

9    Second, such a cause of action would give our enemies a means of interfering with ongoing

10   military operations.  *Bivens* actions brought by designated enemy combatants such as Padilla

11   could hamper military operations by "bring[ing] aid and comfort to the enemy . . . diminish[ing]

12   the prestige of our commanders," as well as those upon whom the commanders rely for advice,

13   by "allow[ing] the very enemies [they are fighting] ... to call [them] to account in [their] own

14   civil courts," thereby diverting the time and attention of those officials from the "military

15   offensive" to the "legal defensive."  *Johnson v. Eisentrager*, 339 U.S. 763, 778-79 (1950).

16   Indeed, "[i]t would be difficult to devise more effective fettering" of executive branch officials,

17   *see id.*, than to allow an enemy combatant to trade a battlefield in Afghanistan for a battlefield in

18   the U.S. legal system where the primary weapon of choice is a personal liability damages action

19   directed at the federal officials deemed responsible for his designation, detention, and

20   interrogation.  *See Stanley*, 483 U.S. at 683 ("Even putting aside the risk of erroneous judicial

21   conclusions (which would becloud military decisionmaking), the mere process of arriving at

22   correct conclusions would disrupt the military regime."); *see also Sanchez-Espinoza*, 770 F.2d at

23

24         [12](...continued)

25   U.S. 304, 320 (1936) (recognizing that "congressional legislation which is to be made effective
     through negotiation and inquiry within the international field must often accord to the President a

26   degree of discretion and freedom from statutory restriction which would not be admissible were
     domestic affairs alone involved").

27

28                                    18

209 ("[T]he danger of foreign citizens using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that [courts] must leave to Congress the judgment whether a damage remedy should exist.").  The District Court for the District of Columbia succinctly and accurately identified this concern in *In re Iraq*, a case in which a group of alien detainees in Iraq and Afghanistan brought suit on *Bivens* theories against military *and civilian* personnel who were responsible for their alleged detention and treatment while confined. Finding that "considerations of institutional competence" precluded creation of the *Bivens* remedy sought by the detainees, that court stated

> There is no getting around the fact that authorizing monetary damages remedies against military officials engaged in an active war would invite enemies to use our own federal courts to obstruct the Armed Forces' ability to act decisively and without hesitation in defense of our liberty and national interests, a prospect the Supreme Court found intolerable in *Eisentrager*.

*In re Iraq*, 479 F. Supp. 2d at 105-06 (quoting *Sanchez-Espinoza*, 770 F.2d at 208-09).[13]  These considerations apply with no less force when contemplating a novel damages remedy against government attorneys who advise the President, Executive Branch officials, and/or military officers with respect to sensitive national security issues.

Moreover, implying a damages remedy here would create a paradoxical result: U.S. soldiers fighting al Qaeda abroad are barred from bringing *Bivens* actions against military and civilian officials for injuries arising out of their military service, *see Stanley*, 483 U.S. at 682-83,

---

[13]  While the courts in *Sanchez-Espinoza* and *In re Iraq* dealt in particular with the danger of foreigners using the courts to obstruct foreign policy, the nationality of a potential plaintiff does not control the special factors analysis in these circumstances.  United States citizens, no less than foreigners, might use litigation against federal officers in their individual capacity rather than the political process to oppose foreign policy initiatives to which those citizens object.  And a United States citizen who joins forces with al Qaeda may pose an even greater threat to this country than a non-citizen.  *See Hamdi*, 542 U.S. at 519 (plurality opinion) ("There is no bar to this Nation's holding one of its own citizens as an enemy combatant . . . A citizen, no less than an alien, can be part of or supporting forces hostile to the United States or coalition partners and engaged in an armed conflict against the United States.") (citations and internal quotations omitted).  There is no question, in light of Padilla's conviction for three federal criminal offenses involving terrorism, that Padilla posed a great threat to the United States.

1  while al Qaeda associates such as Padilla who find their way to U.S. soil would be able to sue

2  those military and civilian officials for their alleged injuries during this war.  Again, a principal

3  reason no damages remedy should be created is because of the impact an implied judicial remedy

4  would have on military decision-making – an impact far greater if a suit is allowed by al Qaeda

5  associates than if such a remedy were given to U.S. military personnel.  It would be anomalous,

6  to say the least, to provide an implied constitutional tort remedy to an identified enemy of the

7  United States, who was found to represent a "continuing, present and grave danger to the national

8  security of the United States" and whose detention was found to be "necessary to prevent him

9  from aiding al Qaeda in its efforts to attack the United States or its armed forces, other

10  governmental personnel, or citizens," *see* June 9, 2002 Bush Letter, when that remedy has been

11  expressly denied to the military officers who are engaged in the fight against al Qaeda.  *See*

12  *Eisentrager*, 339 U.S. at 783 (rejecting an interpretation of the Fifth Amendment that would put

13  "enemy aliens in unlawful hostile action against [the United States] . . . in a more protected

14  position than our own soldiers" and stating that "[i]t would be a paradox indeed if what the

15  Amendment denied to Americans it guaranteed to enemies."); *In re Iraq*, 479 F. Supp. 2d at 106

16  n.22 ("The Court agrees with the defendants that creating a *Bivens* remedy for these plaintiffs

17  would result in an absurdity whereby remedies for constitutional violations that are denied our

18  service men and women by the decisions in *Stanley* and *Chappell* would be available to the very

19  enemies against whom those men and women risk their lives to defend our country's

20  sovereignty.").  This Court should decline Plaintiffs' request to confer a cause of action "on all

21  the world except Americans engaged in defending it."  *Eisentrager*, 339 U.S. at 784.

22        Given the potential impact of creating a damages action for enemy combatants to use

23  against federal officials alleged to be responsible for their designation, detention, and treatment

24  as enemy combatants, Congress, not the Judiciary, is the appropriate branch to create any

25  damages action in this context.  *Stanley*, 483 U.S. at 683; *Bush*, 462 U.S. at 380; *cf. Sosa*, 542

26  U.S. at 727-28.  Congress, however, has not created any such damages remedy.  In fact, with

27

28                                          Defendant John Yoo's Motion to Dismiss
                        20                  3:08-cv-00035 JSW

1   respect to the issue of the interrogation and treatment of military detainees, "Congress has [ ]

2   issued legislation addressing detainee treatment without creating a private cause of action for

3   detainees injured by military officials." *In re Iraq*, 479 F. Supp. 2d at 107 n.23 (citing Detainee

4   Treatment Act, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (2006) (codified at 42 U.S.C. §

5   2000dd), and Reagan Act, Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (2004) (codified at 10

6   U.S.C. § 801, stat. note §§ 1091-92)).[14]   As the court explained in *In re Iraq*, the absence of any

7   provision for damages actions in this legislation is "some indication that Congress' inaction in

8   this regard has not been inadvertent."  479 F. Supp. 2d at 107 n.23.  The fact that Congress has

9   chosen not to include such a remedy in the legislation at issue makes it inappropriate for courts to

10  create one.  *See Chilicky*, 487 U.S. at 423; *Spagnola v. Mathis*, 859 F.2d 223, 229 (D.C. Cir.

11  1988) ("After *Chilicky*, it is quite clear that if Congress has 'not inadvertently' omitted damages

12  against officials in the statute at issue, the courts must abstain from supplementing Congress'

13  otherwise comprehensive statutory relief scheme with *Bivens* remedies . . .).[15]

14      **5.**  Even if it was possible to divorce this case from its military, national security, and

15

---

16  [14]   In addition, neither the Military Commissions Act of 2006 (Pub. L. No. 109-366, 120
17  Stat. 2600 (2006)) nor the Uniform Code of Military Justice (10 U.S.C. § 801 *et seq.*), both of
    which address the treatment of detainees, provides for a private right of action for damages.

18  [15]   *Cf. Stanley*, 483 U.S. at 683 ("[I]t is irrelevant to a special factors analysis whether the
19  laws currently on the books afford Stanley . . . an adequate federal remedy for his injuries")
    (internal quotation marks omitted); *Arar*, 2008 WL 2574470, at *9, 21 (finding that special
20  factors prevented a plaintiff from pursuing *Bivens* remedy for alleged constitutional violations
    that occurred during the plaintiff's immigration proceedings even if it was assumed that the
21  plaintiff had no other remedy under immigration law or that the defendants intentionally
    prevented the plaintiff from pursuing other available remedies).  Moreover, among the wide
22  range of factors that may be considered by the Court in determining whether a *Bivens* remedy is
    inappropriate here, *see Wilkie*, 127 S. Ct. at 2598, is the fact that Padilla *had* a congressionally-
23  created habeas corpus remedy to challenge the fact of his military detention, *see* 28 U.S.C. §
24  2241.  Padilla has already exercised that remedy and has had judicial review in the form of a
    habeas petition of most if not all of the constitutional challenges he raises in this matter.  *See*
25  *infra* § II.B.2.a-.b.  It would be especially inappropriate, given the concerns raised herein, to
26  recognize some sort of implied further review in the form of a damages claim against an
    individual federal employee.

27

28                          21

1   foreign relations underpinnings – which it is not – government attorneys provide legal advice and

2   analysis to the President, as well as members of the military, on a wide spectrum of issues over

3   which the attorneys have no policy-making or decision-making authority whatsoever.  In *Wilkie*,

4   the Supreme Court recognized that the "serious difficulty of devising a workable cause of action"

5   for a particular *Bivens* claim is a special factor that precludes courts from creating a *Bivens*

6   remedy.  *Wilkie*, 127 S. Ct. at 2604-05.  The plaintiff in *Wilkie* sought a *Bivens* remedy against

7   federal officials for actions the plaintiff claimed went "too far" in the pursuit of an otherwise

8   legitimate governmental interest.  *Id.* at 2601-02.  The Supreme Court recognized that there were

9   "line-drawing difficulties" inherent in claims alleging that government actions in pursuit of a

10  legitimate purpose went "too far" because a standard of liability premised upon the determination

11  of whether particular actions were "too much" was an unreliable guide to conduct.  *Id.*  Such

12  concerns are a compelling basis to reject Plaintiffs' proposed *Bivens* claims in this case.

13      The crux of Plaintiffs' *Bivens* claims here is that an Executive Branch attorney went "too

14  far" in offering legal counsel and thus "stepped beyond his role as a lawyer" to effectively

15  become a participant in policymaking on issues related to the war on terrorism by rendering what

16  Plaintiffs consider to be flawed legal advice.  *See, e.g., id.* ¶¶ 3, 15, 22-23, 27, 29-30.  As the

17  Supreme Court observed in *Wilkie*, however, "as soon as [Plaintiffs'] claim is framed this way,

18  the line-drawing difficulties it creates are immediately apparent," 127 S. Ct. at 2601.  What

19  Plaintiffs ask of this Court is to determine where the line should be drawn that marks the

20  boundary between where a "fair" legal analysis ends and an "unfair" legal analysis begins.  *See*

21  Compl. ¶ 23.  But a judicial standard to identify this line "would be endlessly knotty to work

22  out," *see Wilkie*, 127 S. Ct. at 2604.  This is made apparent by Plaintiffs' reliance on select and

23  subjective opinions of current and former government officials who believe that Yoo went "too

24  far" in his analyses.[16]  To the extent that the grievances these individuals purport to have with

25

26      [16]  *See* Compl. ¶ 22 (offering opinions that characterize memoranda attributed to Yoo as

(continued...)

27

28                              22

1   Yoo's analyses and professional judgment read like allegations in a suit for legal malpractice,

2   that does not give rise to a claim against an individual federal employee under federal or

3   constitutional law.  *See, e.g., Falcetta v. Chapman*, 231 Fed.Appx. 363 (5th Cir. 2007).  Indeed,

4   Congress barred such common law tort claims against federal employees in the Westfall Act, *see*

5   28 U.S.C. § 2679, making a claim against the United States under the Federal Tort Claims Act

6   the exclusive remedy for professional negligence by federal officials.  On the other hand, to the

7   extent that Plaintiffs ask this Court to recognize some sort of extra constitutional remedy against

8   Executive Branch attorneys who are allegedly overly zealous or "incautious," *see* Compl. ¶ 22, in

9   pressing legal arguments in pursuit of a governmental interest, that would raise precisely the kind

10  of line-drawing concerns outlined in *Wilkie* and "would invite an onslaught of *Bivens* actions."

11  *See Wilkie*, 127 S. Ct. at 2604.

12          Such *Bivens* actions, moreover, would present practical problems of both proof and

13  discovery.  *Wilkie*, 127 S. Ct. at 2604.  For example, as shown in Exhibit I of the Complaint, the

14  President considers information and recommendations from numerous sources in making his

15  decision to designate a person as an enemy combatant, one of Plaintiffs' core complaints

16  regarding Defendant Yoo.  *See also infra* § II.B.1.  Thus, determining what if any role Yoo's

17  memos may have had in establishing certain practices would involve discovery at the highest

18  levels of the military, Department of Defense, and other Executive agencies.  A suit such as this

19  would require depositions of the President and other high-ranking federal officials involving

20  numerous intelligence matters and be extremely disruptive to the most sensitive functions of

21  government.  *See Arar*, 2008 WL 2574470, at *19-20.  Likewise, Plaintiffs' attenuated theory of

22  causation would require proving: which portions of the OLC memos at issue were drafted or

23  approved by Defendant Yoo; which military officials reviewed these portions of the memos; the

24

25          [16](...continued)

26  "deeply flawed: sloppily reasoned, overbroad, and incautious," "cursory," and "fundamentally in
    error").

27

28                                      23

1    exact role that any legal analyses in these portions of the memos played in decisions made about

2    Padilla's military detention; whether these decisions were appropriately based on Yoo's analyses,

3    including the express limitations placed on those analyses; and whether the underlying legal

4    advice was clearly inappropriate under objective standards.

5         Accordingly, the Court should decline Plaintiffs' request to impose constitutional tort

6    liability on Defendant Yoo for allegedly going "too far" in the legal analysis or advice he

7    provided to Executive Branch officials with respect to the conduct of the war on terrorism.  As

8    the Supreme Court observed in *Wilkie*, "[a]ny damages remedy for actions by Government

9    employees who push too hard for the Government's benefit may come better, if at all, through

10   legislation."  127 S. Ct. 2604-05.  "The caution toward extending *Bivens* remedies into any new

11   context, a caution consistently and repeatedly recognized for three decades, forecloses such an

12   extension here."  *Malesko*, 534 U.S. at 74; *see also id.* at 68 (noting the Supreme Court's

13   "consistent[ ] refus[al] to extend *Bivens* liability to any new context or *category of defendants*")

14   (emphasis added).

15              *              *              *              *              *

16        In sum, Plaintiffs propose a judicially-created remedy that would strike at the core

17   functions of the political branches, impacting the ability of Executive Branch and military

18   officials to seek and obtain candid legal analyses and advice for their use in decision-making,

19   thereby potentially aiding our enemies and making the United States more vulnerable to terrorist

20   attack.  There can be little doubt that accepting Plaintiffs' invitation to create a judicial damages

21   remedy for enemy combatants to use against U.S. officials and their attorney-advisors in their

22   individual capacity for alleged constitutional infirmities in their detention and treatment would be

23   "a general *Bivens* cure . . . worse than the disease."  *Wilkie*, 127 S. Ct. at 2604.  Accordingly, this

24   Court should dismiss all of Plaintiffs' constitutional damages claims as a matter of law.

25        **B.     Defendant Yoo Is Entitled To Qualified Immunity For All Of The Plaintiffs'**
              ***Bivens* Claims.**

26

27

28                                   24

1    Even if the Court does not find that special factors preclude the creation of the *Bivens*

2 remedy that Plaintiffs seek, Plaintiffs' constitutional claims should nonetheless be dismissed

3 because Defendant Yoo is entitled to qualified immunity.

4    Qualified immunity shields government officials who perform discretionary

5 governmental functions from civil liability so long as their conduct does not violate any "clearly

6 established statutory or constitutional rights of which a reasonable person would have known."

7 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "provides ample protection

8 to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*,

9 475 U.S. 335, 341 (1986). Qualified immunity is not merely a defense to liability. It is intended

10 to afford sweeping protection to federal officials from the entirety of the litigation process.

11 Government officials are accorded qualified immunity "to shield them from undue interference

12 with their duties and from potentially disabling threats of liability." *Harlow*, 457 U.S. at 806; *see*

13 *also Burns v. Reed*, 500 U.S. 478 (1991) (recognizing that prosecutors were entitled to qualified

14 immunity for advising police officers that they could interview a suspect under hypnosis).

15 Accordingly, the Supreme Court has repeatedly emphasized that an official's entitlement to

16 qualified immunity must be resolved at the earliest possible stage of the litigation and that

17 "discovery should not be allowed" until it is determined that the plaintiff has properly stated a

18 claim for the violation of a clearly established right. *Harlow*, 457 U.S. at 818-19; *Crawford-El v.*

19 *Britton*, 523 U.S. 574, 598 (1998); *Anderson v. Creighton*, 483 U.S. 635, 647 n.6 (1987).

20    After a defendant asserts entitlement to qualified immunity, the burden shifts to the

21 plaintiff to show that qualified immunity is not appropriate. The Ninth Circuit has recognized

22 that the determination of whether a defendant's actions are shielded by the defense of qualified

23 immunity requires a two-step inquiry:

24    First, "taken in the light most favorable to the party asserting the injury, do the
      facts show the officer's conduct violated a constitutional right?" Second, the court
25    must "ask whether the right was clearly established." "The relevant, dispositive
      inquiry in determining whether a right is clearly established is whether it would be
26    clear to a reasonable officer his conduct was unlawful in the situation he

27

28                                              25

1  confronted."

2  *Phillips v. Hust*, 477 F.3d 1070, 1079 (9th Cir. 2007), *petition for cert. filed*, 76 U.S.L.W. 3393

3  (Dec. 13, 2007) (No. 07-897) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

4  In addition, "[a] plaintiff must allege facts, not simply conclusions, that show that an

5  individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*,

6  152 F.3d 1193, 1194 (9th Cir. 1998). "The purpose of *Bivens* is to deter individual federal

7  officers from committing constitutional violations," thus, federal officers may only be subject to

8  suit for constitutional violations if they are "directly responsible" for them. *Malesko*, 534 U.S. at

9  70-71. Respondeat superior is inapplicable to *Bivens* cases. *Terrell v. Brewer*, 935 F.2d 1015,

10  1018 (9th Cir. 1990). Therefore, in order for Plaintiffs to establish a *Bivens* claim against

11  Defendant Yoo, Plaintiffs must specify the particular acts taken by Yoo that violated the

12  constitutional provisions on which Plaintiffs' claims rest. *See Barren*, 152 F.3d at 1194.

13  Plaintiffs must establish Yoo's "integral participation" in the alleged unconstitutional conduct,

14  *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996), and Plaintiffs must set forth the specific

15  factual basis upon which they claim Yoo is liable, *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th

16  Cir. 1980).

17  All of Plaintiffs' claims against Defendant Yoo fail as a matter of law because Plaintiffs

18  have not alleged facts that establish that Yoo was personally responsible for a violation of

19  Plaintiffs' constitutional rights. Moreover, eight of Plaintiffs' constitutional claims – Claims a-c

20  and f-j (*see* Compl. ¶¶ 82.a-.c, .f-.j) – fail as a matter of law because these claims are explicitly

21  precluded by the Fourth Circuit's prior rejection of Padilla's petition for a writ of habeas corpus.

22  Claims c-e (*see id.* ¶¶ 82.c-.e) are necessarily precluded to the extent they rely on Padilla being

23  held in isolation and incommunicado because these claims are also encompassed within the

24  Fourth Circuit's decision. Claim d (*see id.* ¶ 82.d) also fails to allege a violation of Padilla's

25  rights under the Self-Incrimination Clause of the Fifth Amendment. Claim b (*see id.* ¶ 82.b) fails

26  to allege a violation of Padilla's right of access to courts under the First and Fifth Amendment.

27

28
Defendant John Yoo's Motion to Dismiss
3:08-cv-00035 JSW

1   And Claims c and d (*see id.* ¶ 82.c-.d) fail to allege a violation of any rights under the Eighth

2   Amendment.  To the extent that the above constitutional claims are not precluded by Padilla's

3   failed petition for habeas corpus, the claims fail nonetheless because his constitutional claims

4   were not "clearly established" at the time Padilla was designated and detained as an enemy

5   combatant.

6           **1.     Plaintiffs have failed to establish that Defendant Yoo personally
                      participated in any violation of Plaintiffs' constitutional rights.**

7           In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court clarified

8   the level of specificity necessary for a complaint to survive a motion to dismiss.  The Court

9   stated that

10          a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief"
            requires more than labels and conclusions, and a formulaic recitation of the
11          elements of a cause of action will not do.  Factual allegations must be enough to
            raise a right to relief above the speculative level, on the assumption that all the
12          allegations in the complaint are true (even if doubtful in fact).

13  *Id.* at 1964-65 (internal citations and quotations omitted); *see* 5 C. Wright & A. Miller, Federal

14  Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) ("[T]he pleading must contain

15  something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally

16  cognizable right of action").  Accordingly, the Court found, it is not sufficient for a plaintiff to

17  show merely that his or her claims are "conceivable," the plaintiff must show that the complaint

18  sets forth facts establishing that the claims are actually "plausible."  *Twombly*, 127 S. Ct. at 1974;

19  *see Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (noting that the *Twombly*

20  standard may have greater "bite" in the context of qualified immunity cases).  Under this

21  standard, Plaintiffs have not met the threshold requirement of sufficiently alleging the personal

22  participation of Defendant Yoo in Padilla's designation as an enemy combatant, or his detention

23  or treatment in military confinement.

24          The personal participation inquiry "must be individualized and focus on the duties and

25  responsibilities of each individual defendant whose acts or omissions are alleged to have caused

26

27

28                                      27

1  a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  Thus,

2  Plaintiffs must allege facts that show Defendant Yoo was "integral" to causing any alleged

3  constitutional violation.  *Chuman*, 76 F.3d at 294-95.  The Complaint utterly fails to allege such

4  facts.

5      Plaintiffs' Complaint cites only one instance in which Defendant Yoo allegedly took

6  some direct action that specifically related to Jose Padilla – the allegation that Yoo issued a legal

7  opinion on the question of whether Padilla could "qualify, legally as an enemy combatant."  *See*

8  Compl. ¶ 38.  Plaintiffs allege that former Attorney General John Ashcroft relied on this legal

9  opinion in recommending to the President that Padilla be taken into military custody.  *Id.* ¶ 39.

10  Plaintiffs, however, omit from their allegations facts stated in the materials attached to their

11  Complaint which show that Yoo's role in the path to the designation and detention of Padilla as

12  an enemy combatant was not nearly as direct or integral as Plaintiffs allege.

13      In a speech cited in Plaintiffs' Complaint and attached as Exhibit I, then White House

14  Counsel Alberto Gonzales outlined the steps involved in the designation of a U.S. citizen as an

15  enemy combatant.  *See* Compl. Exh. I.[17]  The decision to designate a person as an enemy

16  combatant is made by the President.  *Id.* at 4.  As Gonzales explained, however, "a thorough -

17  indeed, painstaking - mechanism [is employed] to ensure multiple layers of scrutiny before even

18  proposing any action to the President."  *Id.* at 3.  Information that has been developed on a

19  suspected enemy combatant is first presented to OLC in oral briefings for a tentative

20  determination as to whether the individual meets the legal standard for enemy combatant status.

21  *Id.* at 3-4.  If the initial assessments indicate that an enemy combatant designation is the best

22

23  ────────────────

24  [17]  The Court's consideration of Exhibit I of Plaintiffs' Complaint does not convert this
    motion to dismiss into a motion for summary judgment.  "[A] document is not 'outside' the

25  complaint if the complaint specifically refers to the document and if its authenticity is not
    questioned."  *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (citing *Townsend v. Columbia*

26  *Operations*, 667 F.2d 844, 848-49 (9th Cir. 1982)).  Plaintiffs specifically refer to Exhibit I in
    their Complaint and Defendant Yoo does not question the authenticity of the exhibit.

27

28

1    legally available course to pursue, the Director of the CIA then makes a written assessment of all

2    available CIA intelligence information concerning the individual and transmits a

3    recommendation and request to the Department of Defense recommending that the person be

4    taken into custody as an enemy combatant.  *Id.* at 4.  The Secretary of Defense then makes an

5    independent evaluation, based on information provided by the CIA and information developed

6    within the Department of Defense. *Id.*  The information is embodied in a written assessment

7    concerning the enemy combatant designation.  *Id.*  The Secretary of Defense's assessment is then

8    forwarded to the Attorney General for a formal assessment and recommendation that considers

9    the applicable law enforcement equities.  *Id.*  The Attorney General considers the material

10   received from the Department of Defense along with a memorandum from the Criminal Division

11   that sets out the information available on the individual from law enforcement sources and a

12   formal legal opinion from OLC on whether the individual meets the legal standard to be held as

13   an enemy combatant.  *Id.*  The Attorney General then forwards his legal advice and

14   recommendation, along with the memoranda from the Criminal Division and OLC, back to the

15   Department of Defense.  *Id.*  The Secretary of Defense then transmits a package of information to

16   the President, recommending that the individual be designated as an enemy combatant.  *Id.*  The

17   package contains the following: 1) the independent written assessment and recommendation from

18   the Central Intelligence Agency; 2) the preliminary assessment and recommendation from the

19   Secretary of Defense; 3) intelligence information from the Department of Defense; 4) the

20   Attorney General's legal opinion and recommendation; 5) a factual memorandum from the

21   Criminal Division; and 6) the legal opinion from OLC.  *Id.*  *All* of this information is then

22   reviewed by White House lawyers and then forwarded to the President, along with the

23   recommendation of the Counsel to the President, for review.  *Id.*  If the President concludes that

24   the individual is an enemy combatant, the President signs an order to that effect directing the

25   Secretary of Defense to take the individual into custody.  *Id.*  Thus, in light of this "thorough -

26   indeed, painstaking - mechanism," it is simply not plausible to hold Defendant Yoo personally

27

28                                           29

Defendant John Yoo's Motion to Dismiss
3:08-cv-00035 JSW

1    liable for Padilla's designation and detention as an enemy combatant when: 1) OLC's

2    involvement in this process is so attenuated; 2) the use of its legal analysis on the enemy

3    combatant designation is subject to the judgment and discretion of numerous other independent

4    actors; 3) the underlying intelligence information used to support the designation is provided by

5    others; and 4) the decision to make the designation is ultimately that of the President, who

6    considers analyses and recommendations provided by numerous individuals.

7        With respect to the treatment Padilla received during his detention, Plaintiffs fail to point

8    to any facts that would affirmatively link Defendant Yoo to the constitutional injuries they allege.

9    Plaintiffs do not allege that Yoo, as an attorney in OLC (a component of the Department of

10   Justice), had any direct personal involvement in or control over the military's detention or

11   interrogation of Padilla at a military facility.  Nor do Plaintiffs allege that Yoo had any

12   supervisory or discretionary authority, control, or responsibility for anyone who had direct

13   personal involvement in Padilla's detention or interrogation.[18]  Rather, Plaintiffs attempt to hold

14   Yoo personally liable based upon alleged actions that were part of a chain of events wholly

15   unrelated to Padilla, but which Plaintiffs nonetheless claim "proximately and foreseeably" caused

16   Padilla to suffer unlawful interrogations and conditions of confinement.  *See* Compl. ¶¶ 45-77.

17   This attempt fails.

18       It is significant that none of the materials upon which Plaintiffs primarily rely for this

19   proposition – five memoranda that are attached to the Complaint as Exhibits A-E – recommends

20   that any U.S. official take or refrain from taking any particular course of action towards Jose

21   Padilla or anyone else, let alone directs that any action be taken.  Indeed, the two memos signed

22

23       [18]  To the extent that Plaintiffs suggest in a conclusory manner that Yoo had such

24   authority, discretion, control, and/or responsibility, *see* Compl. ¶ 60, such bare allegations wholly

25   divorced from any pled facts are insufficient under *Twombly*.  *See Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997) (recognizing that "[v]ague and conclusory

26   allegations of official participation in civil rights violations are not sufficient to withstand a

     motion to dismiss").

27

28                                         Defendant John Yoo's Motion to Dismiss

1  by Defendant Yoo explicitly state that they are not expressing any view on the policy decision

2  that the President might make with respect to the legal issues analyzed in the opinions.[19]

3  Moreover, even if Yoo could be held personally responsible for the manner in which senior

4  Executive Branch officials, including the President, chose as a matter of policy to implement his

5  legal analyses, Yoo's responsibility for that use is clearly circumscribed by the limits of the

6  analyses he provided.   The five legal opinions upon which Plaintiffs primarily rely contain legal

7  analyses that relate to subject matters that are not applicable to any aspect of Padilla's

8  interrogation or conditions of confinement.  These memoranda, which Yoo allegedly drafted,[20]

9  were prepared in response to specific inquiries directed to OLC from the Department of Defense

10  and/or the Counsel to the President.  *See* Compl. Exh. A at 2, Exh. B at 2, Exh. C at 2, Exh. D at

11  2, Exh. E at 2.  They offer analyses by OLC of whether and how specific international treaties,

12  U.S. statutes, and/or U.S. constitutional principles apply to the detention and interrogation of

13  persons captured or detained by U.S. Armed Forces *outside the United States*.[21]  As is clear from

14

---

15      [19]  *See* Compl. Exh. E at 1, n.1 ("By delineating the legal boundaries applicable to
16  interrogations, we of course do not express or imply any views concerning whether and when
   legally-permissible means of interrogation should be employed. That is a policy judgment for
17  those conducting and directing the interrogations."); Compl. Exh. A at 1 ("This memorandum
   expresses no view as to whether the President should decide, as a matter of policy, that the U.S.
18  Armed Forces should adhere to the standards of conduct in those treaties with respect to the
   treatment of prisoners.").
19

20      [20]  While Plaintiffs allege "upon information and belief" that all five of the legal
   memoranda they attach to the Complaint were "created" or drafted by Yoo, *see* Compl. ¶ 19,
21  Yoo's name only appears on two of the opinions, on one of which he is listed as a co-author.  *See*
   Compl. Exh. A at 1; Exh. E at 81.  Two opinions are signed by Jay S. Bybee, former Assistant
22  Attorney General in OLC and Yoo's direct supervisor, *see* Compl. Exhs. B and C; one opinion is
23  unsigned and has no identified author, *see* Compl. Exh. D.

24      [21]  *See* Compl. Exhs. A and B (analyzing the question of whether and how international
   treaties, as incorporated by federal laws, and customary international law apply to the conditions
25  of detention and procedures for trial of members of al Qaeda and the Taliban militia who came
26  under U.S. control *in Afghanistan*, either through capture by the military or transfer from allies);

                                                              (continued...)

27

28                                      31

1   the Complaint, however, Padilla is a U.S. citizen and was arrested and detained in the U.S.  *See*

2   Compl. ¶¶ 1, 35.  Padilla's interrogation and the alleged mistreatment that occurred during that

3   interrogation took place entirely on U.S. soil.  *Id*. ¶¶ 1, 45.[22]  In fact, the *only* mention of Padilla

4   in any of these five opinions occurs in the August 1, 2002 opinion, where it is noted that

5   information obtained through interrogations of captured al Qaeda operatives purportedly led to

6   Padilla's arrest in the United States.  *See* Compl. Exh. D at 33.  The August 1 opinion does not in

7   any way discuss the legalities (let alone the appropriateness) of Padilla's arrest, detention, or

8   interrogation.

9        Of the alleged actions by Defendant Yoo which Plaintiffs claim "proximately and

10  foreseeably gave interrogators and custodians a green light for abusive interrogation and

11  detention," *see* Compl. ¶ 47, almost all relate back to the subject matter or analyses provided in

12  the five memoranda described above, none of which was applicable to Padilla.  For instance,

13  Plaintiffs allege that after a July 2002 meeting of the "War Council" (a group that allegedly

14  developed policy in the war on terrorism, *see* Compl. ¶ 15), Yoo wrote a memo that was

15  "designed to remove legal restraints on interrogators" to "justify the Executive's already

16  concluded policy decision" concerning the use of "pressure techniques proposed by the CIA."

17  *See id.* ¶¶ 28-29, 46.  Again, however, the cited memo concerns interrogations that take place

18  *outside* the United States, and thus is not even applicable to Padilla.  *See* Compl. Exh. D.  The

19

20  _____

21      [21](...continued)
    Compl. Exh. C (discussing whether the rule of *Miranda v. Arizona* applies to interrogations of

22  suspected enemy combatants captured *in Afghanistan*); Compl. Exh. D (analyzing 18 U.S.C. §§
    2340-2340A, which makes it a criminal offense for any person *outside* of the United States to

23  commit or attempt to commit torture); Compl. Exh. E (examining the legal standards governing
    military interrogations of *alien* unlawful combatants held *outside* the United States).

24

25      [22]  Moreover, Padilla does not claim the benefit of any of the instruments of international
    law that were the focus of the opinions in Exh. A or B.  Nor can Padilla logically argue that he

26  ever suffered any violation of his Fifth Amendment rights stemming from the opinion addressing
    *Miranda v. Arizona* discussed in Exh. C.  *See infra* §§ II.B.2.d, II.B.3.

27

28                                    Defendant John Yoo's Motion to Dismiss
                        32                          3:08-cv-00035 JSW

1    other memo which Plaintiffs claim was written to justify an "already concluded policy decision

2    to employ unlawfully harsh interrogation tactics," *see* Compl. ¶ 27, similarly concerns persons

3    captured outside of the United States, *see id.* Exh. A.  Plaintiffs allege that a "Working Group"

4    convened by former Secretary of Defense Rumsfeld relied upon memos written by Yoo when it

5    produced a report recommending the approval of particular interrogation techniques.  *See id.* ¶¶

6    50-51.  Plaintiffs' own Complaint, however, recognizes that approval was sought to use these

7    techniques "on detainees outside of the United States," *see id.* ¶ 50; *id.* Exhs. L, N, a category of

8    detainees to which Padilla did not belong.

9         Plaintiffs also attempt to draw a causal link between Defendant Yoo's alleged approval of

10   the "Haynes Memo," a November 2002 memorandum by Department of Defense General

11   Counsel William J. Haynes II, and Padilla's alleged treatment while in detention.  *See* Compl. ¶

12   47.  The Haynes Memo, however, recommended that Secretary Rumsfeld approve certain

13   interrogation techniques to aid in the interrogation of alien detainees at Guantanamo Bay, Cuba.

14   *See* Compl. Exh. F.  It had nothing to do with the interrogation of a U.S. citizen detained in a

15   U.S. naval brig such as Padilla.

16        Plaintiffs offer nothing in their Complaint that bridges the plausibility gap between the

17   level of personal liability that they seek to impose on Defendant Yoo, and a plain reading of the

18   specific legal opinions they cite in their Complaint and on which their claims are primarily based.

19   *See Twombly*, 127 S. Ct. at 1974 (holding that it is not sufficient for a plaintiff to show merely

20   that his or her claims are "conceivable," the plaintiff  must show that the complaint sets forth

21   facts establishing that the claims are actually "plausible").  The gist of Plaintiffs' position is that

22   when Yoo offered legal opinions that expressly concerned the treatment of alien enemy

23   combatants captured and detained outside of the United States, Yoo was really seeking to provide

24   legal justifications for the treatment received by a U.S. citizen captured and detained on U.S. soil.

25   There is no support for such a twisted theory of personal participation under the qualified

26   immunity doctrine.  It is simply not plausible to suggest that Defendant Yoo knew or should have

27

28                                    33

1  known that legal opinions he prepared, which were specifically limited to general legal issues

2  concerning the detention and treatment of persons captured by the U.S. military outside of the

3  United States, would be used to authorize or justify the detention or particular aspects of the

4  treatment of someone arrested and detained in the United States by individuals over whom Yoo

5  had no supervisory control.  This is particularly so where, as shown above, the legal opinions

6  expressly disclaimed advocating any policy or action.  *See* Compl. Exh. E at 1, n.1; Compl. Exh.

7  A at 1.  Under these circumstances, it would defy both law and logic to hold Yoo personally

8  responsible for the eventual use to which these legal analyses – which were unrelated to Jose

9  Padilla – were supposedly put by others over whom Yoo had no authority or control and who

10  exercised independent judgment and discretion in determining whether to designate Padilla as an

11  enemy combatant, and when and by what means to detain and interrogate him.[23]  The Supreme

12  Court has instructed that these are precisely the circumstances under which qualified immunity

13  should apply.  *See Harlow*, 457 U.S. at 806 (stating that government officials require some form

14  of immunity from suit for damages "to shield them from undue interference with their duties and

15  from potentially disabling threats of liability").

16  **2.    Plaintiffs have not alleged a violation of any constitutional rights.**

17

---

18  [23]  Plaintiffs' reliance on general references to legal memoranda that are not attached to
19  the Complaint, *see* Compl. ¶¶ 19.a-.b, .f-.g, .i, 60, is insufficient under *Twombly* to establish
    Defendant Yoo's personal responsibility for any of the alleged unconstitutional conduct.  Simply
20  alleging that Yoo drafted a memorandum that was somehow related to the war on terrorism, as
    Plaintiffs have done, does not remotely show "integral" involvement, *see Chuman*, 76 F.3d at
21  294-95, in the specific constitutional violations Plaintiffs allege.  This is especially true since
    Plaintiffs do not allege that Yoo could have ordered or did order any government official to take
22  any action toward Padilla; that Yoo had either the discretion or authority to propose or select any
    interrogation technique or condition of detention; or that Yoo personally implemented any policy
23  decision with respect to Padilla's designation and detention as an enemy combatant, or his
    interrogation or conditions of confinement.  As shown *supra*, Yoo should not be held personally
24  liable for the use to which general legal analyses he provided were put by others since there were
    numerous intermediaries exercising independent judgment and discretion between any legal
25  assessment that Yoo or OLC may have provided and the ultimate implementation of a particular
    policy decision.
26

27

28                                    34

1    In addition to the fact that Plaintiffs have not sufficiently alleged the personal

2  participation of Defendant Yoo in the alleged violation of any of Plaintiffs' constitutional rights,

3  Plaintiffs' claims fail as a matter of law.

4                a.    The Fourth Circuit's rejection of Padilla's petition for a writ of
                       habeas corpus precludes most of Plaintiffs' constitutional claims.

5          Padilla claims that his designation as an enemy combatant and his subsequent detention

6  as such violated various constitutional rights.  However, the Fourth Circuit's rejection of

7  Padilla's petition for a writ of habeas corpus necessarily included a determination that eight of

8  the constitutional rights claimed by Padilla in this case – Claims a-c and f-j, *see* Compl. ¶¶ 82.a-

9  .c, .f-.j – were not violated by Padilla's designation and detention as an enemy combatant. In

10  addition, to the extent that Padilla's constitutional claims concerning his interrogation and

11  treatment – Claims c-e, *see id.* ¶¶ 82.c-.e – relate to Padilla's being held in isolation and

12  incommunicado, those claims must be dismissed as well because they are necessarily

13  encompassed within the Fourth Circuit's decision.

14         On July 2, 2004, Padilla filed a petition for a writ of habeas corpus in the United States

15  District Court for the District of South Carolina.  *See Padilla I*, 389 F. Supp. 2d 678, 682  (D.

16  S.C. 2005), *rev'd*, *Padilla II*, 423 F.3d 386 (4th Cir. 2005), *cert. denied*, 547 U.S. 1062 (2006).

17  Padilla claimed that his military detention as an enemy combatant without criminal charge

18  violated the Fourth, Fifth and Sixth Amendments.  *Padilla I*, 389 F. Supp. 2d at 692 n.1.

19  Specifically, Padilla alleged that

20
21         •      he was "incarcerated and unlawfully held" at the Consolidated Naval Brig in
                  South Carolina;

22         •      he had not been given "fair notice of the Government's case against him" and
                  had been given "no opportunity to be heard by a neutral decision maker to
23                contest the factual grounds for his imprisonment";

24         •      he was entitled to an evidentiary hearing on the factual allegations underlying his
                  designation as an "enemy combatant;"
25
26         •      he "unquestionably ha[d] the right to access to counsel;" and

27
                                                              Defendant John Yoo's Motion to Dismiss
28                              35                            3:08-cv-00035 JSW

- • his "ongoing interrogation" "throughout two years of incommunicado detention" "violate[d] his rights under the Fifth, Sixth and Eighth Amendments to the U.S. Constitution, including the rights against self-incrimination, the right to counsel, the right not to be subject to cruel or unusual punishment, and substantive and procedural due process."

*See* Petition for Writ of Habeas Corpus *filed in Padilla v. Hanft*, No. 04-2221-HFF-RSC (D. S.C.) ("Petition for Writ of Habeas Corpus") ¶¶ 1, 3, 15, 27-29, 32.  Padilla also sought an order requiring the government to cease all interrogation of him while his petition was pending.  *Id.* at Prayer For Relief No. 4.  The district court granted Padilla's petition, finding that the President did not have the authority to detain Padilla as an enemy combatant.  *Padilla I*, 389 F. Supp. 2d at 688-692.  This decision, however, was reversed by the Fourth Circuit in *Padilla II*.

In *Padilla II*, the Fourth Circuit held that the President possessed authority, pursuant to the AUMF, to designate Padilla as an enemy combatant and to detain him in military custody as such.  423 F.3d at 389.  After finding that Padilla qualified as an enemy combatant under the definitions adopted by the Supreme Court in *Hamdi* and *Ex parte Quirin*, 317 U.S. 1 (1942), the Fourth Circuit declared that "[Padilla's] military detention as an enemy combatant by the President is unquestionably authorized by the AUMF as a fundamental incident to the President's prosecution of the war against al Qaeda in Afghanistan."  *Padilla II*, 423 F.3d at 392.  The Fourth Circuit recognized that the AUMF

provided the President all powers necessary and appropriate to protect American citizens from terrorist acts by those who attacked the United States on September 11, 2001.  As would be expected, and as the Supreme Court has held, those powers include the power to detain identified and committed enemies such as Padilla, who associated with al Qaeda and the Taliban regime, who took up arms against this Nation in its war against these enemies, *and* who entered the United States for the avowed purpose of further prosecuting that war by attacking American citizens and targets on our own soil – a power without which, Congress understood, the President could well be unable to protect American citizens from the very kind of savage attack that occurred four years ago almost to the day.

*Id.* at 397 (emphasis in original).  Although the Fourth Circuit acknowledged that Padilla could not be detained indefinitely, the Court found that his detention had not exceeded the duration authorized by the AUMF because the United States remains engaged in the conflict with al

1  Qaeda in Afghanistan.  *Id.* at 393 n.3 (citing *Hamdi*, 542 U.S. at 520-521).

2  The doctrine of collateral estoppel prevents Padilla from relitigating issues of fact or law

3  that were actually and necessarily decided in prior federal litigation in which Padilla had a full

4  and fair opportunity to litigate the issues.  *Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996).

5  The doctrine applies where: (1) the issue at stake is identical to the one alleged in the prior

6  litigation; (2) the issue was actually litigated in the prior litigation by the party against whom

7  preclusion is asserted; and (3) the determination of the issue in the prior litigation was a critical

8  and necessary part of the judgment in the earlier action.  *Id.*  Under the collateral estoppel

9  doctrine, any claim raised by Padilla in this case that is encompassed by issues of fact or law that

10  were actually litigated and necessarily decided against him in a prior federal proceeding is

11  precluded.[24]

12  There is no question that Padilla has raised, and the Fourth Circuit has rejected, the

13  majority, if not the entirety, of the claims that are the subject of this litigation.  In recognizing

14  that the President had the authority to designate Padilla as an enemy combatant and to detain him

15  in military custody as such, the Fourth Circuit in *Padilla II* decided all of the issues of fact and

16  law raised in Padilla's petition for habeas corpus.  *See Padilla I*, 389 F. Supp. 2d at 679 n.1.  The

17  issues raised in Padilla's petition for habeas corpus and necessarily decided against Padilla by the

18  Fourth Circuit in *Padilla II* encompass Claims a (denial of access to counsel), b (right of access

19  to courts), c (conditions of confinement and treatment), h (military detention), i (unreasonable

20  seizure), and j (due process) of the Complaint, which relate to Padilla's designation and detention

21  as an enemy combatant.  *Compare Padilla I*, 389 F. Supp. 2d at 692 n.1 *and* Petition for Writ of

22

23

24  [24] The Supreme Court has specifically recognized in the criminal context that a prisoner cannot bringing a constitutional tort action that effectively challenges the legality of his criminal conviction without first overturning the conviction on direct appeal or through habeas corpus proceedings.  *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).  The same logic applies in this case to preclude Padilla's constitutional tort challenge to his designation and detention as an enemy combatant, which were upheld in his prior habeas corpus challenge.

25

26

27

28
Defendant John Yoo's Motion to Dismiss
3:08-cv-00035 JSW

1   Habeas Corpus ¶¶ 1, 3, 15, 27-29, 32 *with* Compl. ¶¶ 82.a-.c, .h-j.  Therefore, these claims are

2   precluded by *Padilla II*.  To the extent that Claims c (conditions of confinement and treatment), d

3   (interrogation), and e (free exercise of religion), which relate to Padilla's interrogation, rely upon

4   the alleged coercive effect of his being detained and held incommunicado, these claims are

5   similarly precluded because they were also explicitly raised by Padilla in his habeas petition and

6   necessarily rejected by the Fourth Circuit.  *See* Petition for Writ of Habeas Corpus ¶ 32; Compl.

7   ¶¶ 82.c-.e.

8        Moreover, *Padilla II* also bars those constitutional claims that Padilla did not explicitly

9   raise in his habeas petition but which flow from the determination that he was properly held in

10  isolation and incommunicado.  Padilla specifically alleged in his habeas petition that he was

11  being held "incommunicado."  *See* Petition for Habeas Corpus ¶¶ 14, 19, 32.[25]  However, in

12  denying Padilla's habeas petition, the Fourth Circuit recognized that inherent in the authority to

13  detain a designated enemy combatant such as Padilla for the duration of active hostilities is the

14  ability – and the necessity – of detaining the enemy combatant in isolation with limited if any

15  opportunity to communicate with the outside world.  In this regard, the Fourth Circuit found that

16  the detention of designated enemy combatants serves three equally important purposes: 1)

17  preventing the detainee from returning to the field of battle; 2) facilitating the process of

18  gathering intelligence from the detainee; and 3) "restrict[ing] the detainee's communication with

19  confederates so as to ensure that the detainee does not pose a continuing threat to national

20  security even as he is confined."  *Padilla II*, 423 F.3d at 395.  It is these considerations, the

21  Fourth Circuit found, that make "military detention not only an appropriate, but also the

22  necessary, course of action to be taken in the interest of national security."  *Id*.  Thus *Padilla II* is

23  also dispositive of those constitutional claims asserted by Padilla in Claims f (right to

24  _____

25     [25] *See also Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564, 574 (S.D.N.Y. 2002)
    ("It is not disputed that Padilla is held incommunicado, and specifically that he has not been
26  permitted to consult with Newman or any other counsel"), *remanded*, *Padilla v. Rumsfeld*, 352
    F.3d 695 (2d Cir. 2003), *reversed sub nom.*, *Rumsfeld v. Padilla*, 542 U.S. 426 (2004).

27

28                  38

1  information) and g (right of association), *see* Compl. ¶¶ 82.f-.g, that are based upon his being

2  held incommunicado – *i.e.*, in near or total isolation from his family, *see id.* ¶¶ 1, 45, 56-58, 62;

3  and from outside sources of information such as radio, television, and reading materials, *see id.*

4  ¶¶ 66 – whether or not they were explicitly relied upon by Padilla in his habeas petition.[26]

5                 b.    <u>Padilla has not stated a violation of the right of access to courts.</u>

6         Whether or not the Fourth Circuit's decision is preclusive, an additional reason why

7  Padilla has not stated a violation of the right of access to the courts in Claim b is that Padilla has

8  not identified a legal claim of any sort that he was unable to bring in the past because of any

9  actions by Defendant Yoo.  The Supreme Court has recognized that constitutional claims for

10  denial of the right of access to court generally fall into two categories:

11         In the first are claims that systemic official action frustrates a plaintiff or plaintiff
            class in preparing and filing suits at the present time. . . . The second category
12         covers claims not in aid of a class of suits yet to be litigated, but of specific cases
            that cannot now be tried (or tried with all material evidence), no matter what
13         official action may be in the future.

14  *Christopher v. Harbury*, 536 U.S. 403, 412-14 (2002).  The Court has recognized that the right of

15  access to courts is ancillary to the underlying claim, without which a plaintiff cannot have

16  suffered injury by being shut out of court.  *Id.* at 414-15.  Thus, to state a denial of access to

17  courts claim, a plaintiff must allege both: (1) a nonfrivolous, arguable underlying claim, and (2)

18  official acts frustrating litigation of the claim.  *Id.* at 415.

19         Nowhere in Plaintiffs' Complaint do they identify a claim of any sort that Padilla was

20  unable to bring in the past because of the actions of Defendant Yoo.  The only past claim referred

21  to in the Complaint is a petition for a writ of habeas corpus, *see* Compl. ¶ 59, which Padilla

22

23

24      [26]  *Padilla II* is similarly dispositive of Plaintiff Lebron's First Amendment right of
         association claim, which is premised upon the allegation that Lebron was denied "virtually all
25      contact with her son" during his detention as an enemy combatant.  *See* Compl. ¶ 83.  Moreover,
         it cannot be said, in light of *Padilla II*, that Lebron had a clearly established right to have contact
26      with Padilla during his detention as an enemy combatant.  *See infra* § III.B.3.

27

28                                    39

1    brought in two jurisdictions and ultimately lost, *see Padilla II*, 423 F.3d at 386.[27]  Padilla does

2    not identify any claim that Defendant Yoo's actions prevented or are preventing him from

3    pursuing.[28]

4                        c.    Padilla has not stated a violation of any rights under the Eighth
                               Amendment.

5
       Even if the Fourth Circuit's decision is not preclusive of Padilla's Eighth Amendment

6    claims in Claims c and d, an additional reason why Padilla has not stated a violation of his Eighth

7    Amendment rights is that it is well established that the Eighth Amendment does not apply unless

8    there has been a criminal conviction.  *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)

9    ("[T]he State does not acquire the power to punish with which the Eighth Amendment is

10

11   ─────────────────

12   [27]  To the extent that Padilla alleges he was denied the opportunity to contest the basis for
     his enemy combatant designation, *see* Compl. ¶ 43, he is incorrect.  The reasons Padilla did not

13   obtain a factual hearing on the basis for his designation and detention as an enemy combatant are
     twofold: 1) he filed his initial habeas petition in the wrong jurisdiction; and 2) once he filed in

14   the proper jurisdiction, he made a strategic decision to litigate the factual basis for his
     designation and detention after litigating the question of whether the President had the authority

15   to designate and detain him as an enemy combatant.  In the first habeas proceeding, which was
     brought in the Southern District of New York, the district court recognized the President's

16   authority to detain Padilla as an enemy combatant and was prepared to determine the factual
     sufficiency of that designation.  *See Padilla ex rel. Newman*, 233 F. Supp. 2d at 587-99, 610.

17   However, the district court's decision was reversed by the Supreme Court on the basis that the
     habeas petition was filed in the wrong jurisdiction.  *Padilla v. Rumsfeld*, 542 U.S. at 430.  In his

18   second habeas proceeding in the District of South Carolina, Padilla agreed to have the district
     court first decide, on the basis of a stipulated set of facts, the issue of whether the President had

19   the authority to detain him as an enemy combatant before then addressing the factual basis for his
     designation and detention as an enemy combatant.  *See* Sept. 27, 2004 Scheduling Order in No.

20   2:04-2221-HFF-RSC (D.S.C.).  After the Fourth Circuit denied Padilla's petition for habeas, the
     district court was to decide the validity of the enemy combatant designation.  When Padilla was

21   subsequently indicted on federal criminal charges and removed from the jurisdiction, however,
     the issue became moot.  *See* Nov. 29, 2005 Order in No. 2:04-2221-HFF-RSC (D.S.C.).

22

23

24   [28]  Similarly, Padilla cannot premise his right of access claim on the Habeas Suspension
     Clause, *see* Compl. ¶¶ 82.b, .h, because Padilla has not been denied the opportunity to pursue a

25   writ of habeas corpus.  Moreover, that argument was raised in Padilla's petition for habeas
     corpus, *see* Petition for Writ of Habeas Corpus at ¶ 21, and rejected by the Fourth Circuit, *see*

26   *Padilla II*, 423 F.3d at 386.

27

28                                        40

Defendant John Yoo's Motion to Dismiss
3:08-cv-00035 JSW

1   concerned until after it has secured a formal adjudication of guilt in accordance with due process

2   of law.").  Padilla makes no allegation that any of the mistreatment he was allegedly subjected to

3   occurred in connection with any criminal proceedings against him.  In fact, Padilla specifically

4   alleges that he was held in military custody "without charge," Compl. ¶¶ 1, 11, and the

5   allegations of this suit predate his eventual criminal conviction.

6            d.      Padilla has not stated a violation of the Fifth Amendment right
                     against self-incrimination.

8            Whether or not the Fourth Circuit's decision is preclusive, Padilla's allegation that

9   Defendant Yoo violated his right to be free from "coercive and involuntary custodial

10  interrogation," asserted in Claim d under the Self-Incrimination Clause of the Fifth Amendment,

11  *see* Compl. ¶ 82.d, fails because Padilla does not allege that he made any incriminating

12  statements.  There can be no violation of the right against self-incrimination unless an

13  incriminating statement has been made.  *Fisher v. United States*, 425 U.S. 391, 408 (1976)

14  (stating that the Fifth Amendment privilege "applies only when the accused is compelled to make

15  a Testimonial Communication that is incriminating").  Moreover, the Fifth Amendment right

16  against self-incrimination is a *trial* right.  *Withrow v. Williams*, 507 U.S. 680, 691 (1993).  "Only

17  after a compelled incriminating statement is used in a criminal proceeding has an accused

18  suffered the requisite constitutional injury . . ."  *Aguilera v. Baca*, 510 F.3d 1161, 1173 (9th Cir.

19  2007) (rejecting plaintiffs' Fifth Amendment self-incrimination claim because plaintiffs were

20  never charged with a crime and no incriminating use of their statements was made).[29]  Nowhere

21  does Padilla allege that an incriminating statement he made while held as an enemy combatant

22  was used against him in a trial.

24      [29]  *See also Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (plurality opinion) (finding no
25  violation of the Fifth Amendment's Self-incrimination Clause where the plaintiff's statements
    were never admitted as testimony against him in a criminal case and stating that "The text of the
26  Self-Incrimination Clause simply cannot support the [] view that the mere use of compulsory
    questioning, without more, violates the Constitution."); *id.* at 777-79 (Souter, J., concurring).

28                                          41

1            **3.    Plaintiffs fail to allege a violation of any clearly established right.**

2        In order to show that the rights claimed in their Complaint were clearly established at the

3    time of Plaintiffs' alleged injury, Plaintiffs must show that a reasonable official in Defendant

4    Yoo's position would have understood that his or her individual conduct violated those rights.

5    *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *Saucier*, 533 U.S. at 200-02.

6    The constitutional rights that Plaintiffs assert in this case must have been clearly established in a

7    "particularized, and hence more relevant, sense," at the time of Defendant Yoo's alleged actions.

8    *Anderson*, 483 U.S. at 640.  "[I]n the light of the pre-existing law the unlawfulness" of Yoo's

9    conduct must have been "apparent."  *Id.*  When Plaintiffs' constitutional claims are considered

10   under this demanding standard, it is evident that Plaintiffs have not met their burden.

11       No federal court has afforded an enemy combatant the constitutional protections Plaintiffs

12   seek in this case.  To the contrary, in a recent and closely analogous case, the Supreme Court held

13   that the AUMF authorized the military detention of an American citizen, Yaser Hamdi, who was

14   captured in Afghanistan, designated as an enemy combatant, and subsequently detained in

15   military custody on U.S. soil.  *See Hamdi*, 542 U.S. at 518-22 (plurality opinion).  The Court

16   specifically recognized that "[t]here is no bar to this Nation's holding one of its own citizens as

17   an enemy combatant."  *Id.* at 519.  Moreover, *Padilla II* also addresses Padilla's designation and

18   detention claims and most if not all of his interrogation and treatment claims, and there is no

19   other closely analogous precedent that could clearly establish any claim Plaintiffs assert.  *Hamdi*

20   and *Padilla II* support Defendant Yoo's position that even if Plaintiffs have sufficiently alleged

21   Defendant Yoo's personal participation in Padilla's designation, detention, and/or treatment as an

22   enemy combatant, which they have not, there was no violation of Padilla's clearly established

23   constitutional rights.

24       To the extent that Plaintiffs would argue that their claims fall outside the reach of *Hamdi*

25   because Padilla was captured on U.S. soil while Hamdi was captured on foreign soil, this

26   argument should be rejected.  As the Fourth Circuit concluded in *Padilla II*, the reasoning in

27

28                                   42

1  *Hamdi* does not support a distinction between Padilla's detention and Hamdi's detention based

2  upon where they were captured.  The court observed that while the plurality in *Hamdi* limited its

3  opinion, it did not do so

> in a way that leaves room for argument that the President's power to detain one
> who has associated with the enemy and taken up arms against the United States in
> a foreign combat zone varies depending upon the geographic location where that
> enemy combatant happens to be captured.

6  *Padilla II*, 423 F.3d at 394.

7       Moreover, courts have recognized that only infrequently will the law be "clearly

8  established" for purposes of qualified immunity where the relevant inquiry "requires a

9  particularized balancing that is subtle, difficult to apply, and not yet well-defined."  *DiMeglio v.*

10  *Haines*, 45 F.3d 790, 806 (4th Cir. 1995) (internal quotations and citations omitted).[30]  The

11  determination of whether the rights Padilla asserts in this case were clearly established at the time

12  of Defendant Yoo's alleged actions requires a careful balancing that considers Padilla's rights as

13  an American citizen and the Executive Branch's authority to conduct war, protect national

14  security, and formulate foreign policy.[31]  Such a balance is inherently "subtle" and "difficult to

---

16       [30]  *See, e.g.*, *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)
17  ("In determining whether the law was clearly established, we bear in mind that allegations of
   constitutional violations that require courts to balance competing interests may make it more
18  difficult to find the law clearly established when assessing claims of qualified immunity." )
19  (citations and quotations omitted); *Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir. 1987) ("[W]hen
   the law requires a balancing of competing interests, . . . it may be unfair to charge an official with
20  knowledge of the law in the absence of a previously decided case with clearly analogous facts." )
   (footnote omitted).

22       [31]  *See, e.g.*, *Hamdi*, 542 U.S. at 529-32 (plurality opinion) (recognizing that "striking the
   proper constitutional balance" between the individual liberty interest of a designated enemy
23  combatant and the "weighty and sensitive governmental interests in ensuring that those who have
   in fact fought with the enemy during a war do not return to battle against the United States" is of
24  "great importance to the Nation during this period of ongoing combat"); *cf. County of Riverside*
   *v. McLaughlin*, 500 U.S. 44, 53 (1991) (recognizing, in the context of domestic law enforcement,
25  that the determination of the length of time permitted under the Fourth Amendment that persons
26  arrested without a warrant could remain in police custody without a judicial determination of

(continued...)

1  apply." And the most recent and closely analogous cases in which courts have attempted to

2  define this balance – *Hamdi* and *Padilla II* – both make clear that the rights Padilla claims in this

3  case were not clearly established at the time of Defendant Yoo's alleged actions.

4  **III.    PADILLA HAS NOT STATED A CLAIM UNDER THE RELIGIOUS FREEDOM
        RESTORATION ACT.**

5

6       Padilla alleges that he was denied his right to the free exercise of his religion as protected

   by the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq. See* Compl. ¶
7
   82.e (Claim e). RFRA "suspends generally applicable federal laws that 'substantially burden a
8
   person's exercise of religion' unless the laws are 'the least restrictive means of furthering [a]
9
   compelling governmental interest.'" *United States v. Antoine,* 318 F.3d 919, 920 (9th Cir. 2003)
10
   (quoting 42 U.S.C. § 2000bb-1(a)-(b)). Padilla's purported RFRA claim fails as a matter of law
11
   for three independent and alternative reasons. First, Padilla does not allege Defendant Yoo
12
   personally participated in any acts that substantially burdened Padilla's ability to exercise his
13
   religion. Second, RFRA does not create a cause of action against Defendant Yoo in his
14
   individual capacity. Third, even if such a cause of action is allowed under RFRA, Defendant
15
   Yoo is entitled to qualified immunity.
16

17       **A.    Padilla Has Failed To Establish That Defendant Yoo Is Personally
            Responsible For Any Violation Of RFRA.**

18       All of Plaintiffs' claims against Defendant Yoo, including Padilla's RFRA claim, rest

19  entirely upon Yoo's alleged creation of legal opinions while he worked at the Office of Legal

20  Counsel. As shown *infra* in Part II.B.2, Padilla asserts no plausible basis for holding Yoo

21  responsible for the purported eventual use to which these legal opinions – none of which are

22  alleged to even address any aspect of RFRA, *see* Compl. ¶¶ 19.a-.j – were put by others over

23  whom Yoo exercised no form of control or supervisory responsibility.

24

25       [31](...continued)

26  probable cause required a "'practical compromise' between the rights of individuals and the
    realities of law enforcement") (quoting *Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975)).

27

28                                44

### B.    RFRA Does Not Create A Cause Of Action Against Defendant Yoo In His Individual Capacity.

The threshold inquiry for a RFRA claim is whether the challenged governmental action substantially burdens the exercise of sincerely-held religious beliefs. *Antoine,* 318 F.3d at 920. The burden of proving the existence of a substantial interference with the right of free exercise rests on the religious adherent. *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000). Only if such a substantial burden is proven must the government demonstrate that the compelling interest test is satisfied. *Id.* at 1121 n.3. RFRA provides that "[a] person whose religious exercise has been burdened . . . may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*." 42 U.S.C. § 2000bb-1(c) (emphasis added). This language does not provide for a cause of action against a government employee in his or her individual capacity.

Any interpretation of a statute begins with the text, *Campbell v. Allied Van Lines Inc.*, 410 F.3d 618, 620 (9th Cir. 2005), and the text of RFRA indicates that Congress has authorized suits against government entities, not individual government employees. The phrase "appropriate relief against a government" would be an odd way for Congress to indicate that individual employees must pay money judgments from their personal assets, which is what Padilla seeks from Defendant Yoo here. In common usage, the term "government" means an entity, not an individual person employed by the government. *See* Black's Law Dictionary 715 (8th ed. 2004) (noting that the term "government" "refers collectively to the political organs of a country"). And taken as a whole, the phrase "appropriate relief against a government" would not appear to encompass actions for money damages at all, as sovereign immunity generally prevents money damages from being an "appropriate" form of relief to seek from a government. *See Lane v. Peña*, 518 U.S. 187, 192 (1996).

RFRA's definition of "government," read in proper context, does not change this common sense construction. RFRA defines "government" as "a branch, department, agency,

1    instrumentality, and official (or other person acting under color of law) of the United States, a

2    State, or a subdivision of a State." 42 U.S.C. § 2000bb-2(1). In this definition, only the phrase

3    "official (or other person acting under color of law)" could conceivably implicate a government

4    employee in his or her individual capacity. Careful analysis of this phrase, however, indicates

5    that it does not. A plaintiff may seek judicial relief from a government employee in two different

6    capacities: "official capacity" and "individual capacity." The term "official capacity" denotes a

7    suit nominally against an official, but in reality against the government itself, while "individual

8    capacity" denotes a suit against the officer personally. *See Hafer v. Melo*, 502 U.S. 21, 25

9    (1991); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). RFRA's reference to "official," then, is

10   referring to the prospect of an official-capacity suit – a suit that, consistent with the preceding

11   text, would seek "relief against a government," 42 U.S.C. § 2000bb-1(c).

12        Nor does the residual phrase "other person acting under color of law" authorize individual

13   capacity suits. When, as in this case, a list of specific terms ends with a reference to "other" such

14   items, the Supreme Court and the Ninth Circuit commonly turn to two canons of statutory

15   construction: *noscitur a sociis* and *ejusdem generis*. *See, e.g.*, *Wash. State Dep't of Soc. &*

16   *Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 383-89 (2003) (using canons to

17   limit scope of phrase "other legal process"); *Synagogue v. U.S.*, 482 F.3d 1058, 1062-64 (9th Cir.

18   2007) (using *ejusdem generis* canon to interpret law governing civil forfeiture proceedings).

19   According to the *noscitur a sociis* ("known by its associates") canon, "the meaning of an unclear

20   word or phrase should be determined by the words immediately surrounding it." *United States v.*

21   *Grisel*, 488 F.3d 844, 859 n.8 (9th Cir. 2007) (quoting *James v. United States*, 127 S. Ct. 1586,

22   1605 (2007) (Scalia, J., dissenting)). The closely related *ejusdem generis* ("of the same class")

23   canon provides that where general words follow specific words in a statutory enumeration, the

24   general words are construed to embrace only objects similar in nature to those objects

25   enumerated by the preceding specific words. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105,

26   114-19 (2001) (quotations omitted); *In re Estate of Covington*, 450 F.3d 917, 922-23 (9th Cir.

27

28                                      46

1   2006).

2       As applied to the phrase "branch, department, agency, instrumentality, and official (or

3   other person acting under color of law)," these canons show that the definition of "government"

4   does not include government employees in their individual capacities.  Rather, it simply shows

5   that other persons acting under color of law will be considered the "government" with respect to

6   obtaining appropriate relief.  *Noscitur a sociis* indicates that the term "official" must be read in

7   context with the other terms on the list, all of which refer to government entities, not to

8   individual employees of such entities.  *Ejusdem generis* indicates that "other persons acting

9   under color of law" must be read in light of the specific terms that precede it.  All those specific

10  terms contemplate suits against government entities (either in name or by way of an official

11  capacity suit), not individual employees.

12      This interpretation of "official (or other persons acting under color of law)" finds support

13  in the Supreme Court's prior constructions of similar phrases.  *Cf. United States v. Sioux*, 362

14  F.3d 1241, 1246 (9th Cir. 2004) ("It is an elementary principle of statutory construction that

15  similar language in similar statutes should be interpreted similarly.").  For instance, 28 U.S.C. §

16  1391(e) (2000) provides for expanded venue and nationwide service of process in actions against

17  an "officer or employee" of the United States "acting in his official capacity or under color of

18  legal authority."  In *Stafford v. Briggs*, a *Bivens* action, the Court interpreted the term "officer or

19  employee of the United States or any agency thereof acting in his official capacity or under color

20  of legal authority" to apply only to actions brought against federal employees in their official

21  capacity, not actions against employees in their individual capacity.  444 U.S. 527, 535-36 (1980)

22  (*construing* 28 U.S.C. § 1391(e)); *see also Micklus v. Carlson*, 632 F.2d 227, 240-41 (3d Cir.

23  1980).  The Court reached this result over the plaintiff's argument that the phrase "official

24  capacity *or under color of legal authority*" (emphasis added) was intended to embrace individual

25  capacity suits in addition to official capacity suits.  The Court noted that the phrase "or under

26  color of legal authority" could reasonably be read as describing the character of the defendant at

27

28                                          47

Defendant John Yoo's Motion to Dismiss
3:08-cv-00035 JSW

1    the time of the suit and, so read, limited § 1391(e)'s coverage to actions against a federal official

2    who was, at the time of the events giving rise to the suit, acting in an official way.  *See Stafford*,

3    444 U.S. at 536.

### C.    Even If A Cause Of Action Is Allowed, Defendant Yoo Is Entitled To Qualified Immunity.

6         Even if Padilla has stated a RFRA claim against Defendant Yoo in his individual

      capacity, Defendant Yoo is entitled to qualified immunity for three distinct reasons.  First, as

      explained *supra*, at the time of Yoo's alleged actions, it was not clearly established that RFRA

      allowed for the cause of action Padilla asserts in this case because the Ninth Circuit had not

10    addressed the question of whether a cause of action against individual government employees is

      available under RFRA.[32]

12         Second, it was not clearly established in the Ninth Circuit that a RFRA claim can be

      premised upon an intentionally discriminatory policy or practice, as opposed to a neutral policy

      or practice of general applicability.  Padilla alleges that deliberate actions were taken to interfere

      with and substantially burden his ability to practice his religion.  *See* Compl. ¶¶ 68-70.  It is not

16    clearly established that such allegations state an actionable RFRA violation because courts have

---

17    [32]  In *Lepp v. Gonzales*, No. C-05-0566 VRW, 2005 WL 1867723, at *8 (N.D. Cal. Aug.

18    2, 2005), *aff'd sub nom.*, *Harris v. Mukasey*, No. 05-16695, 2008 WL 194924 (9th Cir. Jan. 22, 2008), Chief Judge Walker adopted the reasoning of *Jama v. INS*, 343 F. Supp. 2d 338 (D.N.J.

19    2004), which held that RFRA allows for individual capacity suits for money damages against

20    federal officers.  *Lepp*, however, was decided in 2005, two years after Defendant Yoo's potential involvement in Padilla's situation, *see* Compl. ¶ 13.  Moreover, the Ninth Circuit has not

21    addressed this issue.  Therefore, although *Lepp* recognizes an individual capacity claim under RFRA, it cannot be said that such a claim was clearly established in the Ninth Circuit at the time

22    of the events alleged in the Complaint.  *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 283-86

23    (1994) (refusing to apply retroactively amendments to Title VII because the amendments could be viewed as both creating a new cause of action and increasing the damages available under a

24    preexisting cause of action).  For the reasons cited above, Defendant Yoo respectfully urges that any suggestion that a cause of action under RFRA exists against individual government

25    employees is in error.  In any event, to the extent that Plaintiffs seek an equitable, non-damages claim under RFRA, such a claim is barred against Defendant Yoo in his individual capacity as he

26    is not a proper party for such a claim.  *See supra* §§ I.A-.B.

27

28                                         48

1  held that RFRA covers only "neutral" laws that are "generally applicable" and which adversely

2  impact religious freedom.  *See Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995) (holding that

3  "if the regulations are not neutral and generally applicable, [the court] need not address the

4  [RFRA]"); *Omar v. Casterline*, 414 F. Supp. 2d 582, 594 (W.D. La. 2006) (finding RFRA did

5  not affect analysis of First Amendment free exercise claim that was not based on any law of

6  neutral applicability); *Larsen v. United States Navy*, 346 F. Supp. 2d 122, 137-38 (D.D.C. 2004)

7  (holding that the plaintiffs' claims were "clearly outside the realm of the RFRA" because the

8  plaintiffs were challenging an "intentionally discriminatory policy" rather than a "neutral law of

9  general applicability").  The Ninth Circuit has not addressed this issue.[33]

10         Third, numerous circuits have recognized that where the existence of a right or the degree

11  of protection it warrants in a particular context is subject to a balancing test, the right can rarely

12  be considered "clearly established" in particular circumstances in the absence of closely

13  analogous factual and legal precedent that would have given a reasonable official fair warning as

14  to how that balance should have been struck in the particular case at hand.  *See*, *e.g.*, *DiMeglio*,

15  45 F.3d at 806 (recognizing that law applicable to constitutional inquiry which required "a

16  particularized balancing that is subtle, difficult to apply, and not yet well-defined" would "only

17  infrequently" be "clearly established" for purposes of qualified immunity); *Benson v. Allphin*,

18  786 F.2d 268, 276 (7th Cir. 1986) (stating that a constitutional rule that "involv[es] the balancing

19  of competing interests" is "so fact dependent that the 'law' can rarely be considered 'clearly

20  established'"); *Medina*, 960 F.2d at 1498; *Borucki*, 827 F.2d at 848.  RFRA was enacted to

21  ensure that after the Supreme Court's decision in *Employment Division, Department of Human*

22  *Resources v. Smith*, 494 U.S. 872 (1990), claims that government action impinged on the free

23  exercise of religion would still be analyzed under the fact-intensive balancing test of *Sherbert v.*

24

25         [33]  Claims for such intentional discrimination would generally be cognizable under the

26  First Amendment.  However, as explained *supra*, special factors preclude the recognition of such

    a *Bivens* claim – which in any event would be barred by qualified immunity – here.

27

28                                          49

1  *Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).  *See* 42 U.S.C. §

2  2000bb(b)(1).  A determination of Padilla's RFRA claims in this setting would require the Court

3  to balance the Executive Branch's authority to conduct war, protect national security, and

4  formulate foreign policy, with the interests set forth in RFRA – the burden imposed upon a

5  particular exercise of religion, the compelling governmental interest that justifies the burden, and

6  the restrictiveness of the means used to further that interest, *see* 42 U.S.C. § 2000bb-1(b)(1)-(2).

7  The most recent and closely analogous cases in which courts have attempted to define the

8  balance between the constitutional rights of an American citizen designated as an enemy

9  combatant and the authority of the Executive Branch in the conduct of war, national security, and

10  foreign policy, make clear that any constitutional claims related to Padilla's designation,

11  detention, and interrogation as an enemy combatant were not clearly established at the time of the

12  Defendant Yoo's actions.  *See Hamdi*, 542 U.S. at 507 (plurality opinion); *Padilla II*, 423 F.3d

13  386 (4th Cir. 2005).  Accordingly, to the extent that Plaintiffs' RFRA claim – which is derived

14  from the First Amendment – is based upon Padilla's designation, detention, or interrogation as an

15  enemy combatant, it cannot be said that Yoo would have been on notice that his alleged conduct

16  violated Padilla's rights under RFRA.

17      For all of these reasons, Defendant Yoo is entitled to qualified immunity from Padilla's

18  RFRA claim.

19                              **<u>CONCLUSION</u>**

20      For the reasons stated above, all of Plaintiffs' claims should be dismissed.

21

22

23

24

25

26

27

28                              Defendant John Yoo's Motion to Dismiss
                                3:08-cv-00035 JSW

1  Dated: August 1, 2008

2                                      Respectfully submitted,

3                                      GREGORY G. KATSAS
                                       Assistant Attorney General
4
                                       C. FREDERICK BECKNER III
5                                      Deputy Assistant Attorney General

6                                      TIMOTHY P. GARREN
                                       Director Torts Branch
7                                      Civil Division

8                                      MARY HAMPTON MASON
                                       Senior Trial Counsel
9
                                       _/S/_____
10                                     GLENN S. GREENE
                                       SARAH WHITMAN
11                                     Trial Attorneys
                                       United States Department of Justice
12                                     Torts Branch, Civil Division
                                       P.O. Box 7146
13                                     Ben Franklin Station
                                       Washington, DC 20044
14                                     Telephone:  (202) 616-4143
                                       Facsimile:   (202) 616-4314
15                                     E-mail: glenn.greene@usdoj.gov
                                       *Attorneys for Defendant John Yoo*
16

17

18

19

20

21

22

23

24

25

26

27
                                                    Defendant John Yoo's Motion to Dismiss
28                                                          3:08-cv-00035 JSW