NATALIE L. BRIDGEMAN, State Bar No. 223717
Law Offices of Natalie L. Bridgeman, Esq.
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone:  (415) 979-0150
Facsimile:  (415) 520-0140
Email: natalie@ihrlaw.com

JONATHAN M. FREIMAN (*pro hac vice*)
HOPE R. METCALF (*pro hac vice*)
127 Wall Street
New Haven, CT 06520-8215
Telephone: (203) 498-4584
Facsimile: (203) 782-2889


Attorneys for Jose Padilla and Estela Lebron, Plaintiffs


## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION


| | |
|---|---|
| Jose Padilla and Estela Lebron, | ) **CASE NO.:** 3:08-cv-00035-JSW |
|     Plaintiffs, | ) |
| | ) |
|   v. | ) **OPPOSITION TO** |
| | ) **MOTION TO DISMISS** |
| John Yoo, | ) |
| | ) |
|     Defendant. | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. iv

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT .............................................................................................................. 7

I.      No threshold issues bar plaintiffs' legitimate claims ....................................... 7

        A.      Collateral estoppel bars none of the claims ......................................... 7

        B.      No "special factors" bar the traditional *Bivens* remedy ..................... 10

                1.      No established special factor applies to plaintiffs' claims ........ 12

                        a.      Congress has not precluded a *Bivens* remedy ............... 12

                        b.      There is no danger of intrusion upon the "unique disciplinary
                                structure of the Military Establishment" ....................... 13

                        c.      There is no "serious difficulty" in defining this traditional cause
                                of action ......................................................................... 14

                2.      None of the novel factors proposed by Yoo justify denial of a *Bivens*
                        remedy ........................................................................................ 17

                        a.      Deference to "war powers" does not bar the claims ...... 17

                        b.      No "national security prerogative" bars the claims ....... 19

                        c.      Plaintiffs' claims will not disrupt military operations ... 22

                        d.      No foreign relations concerns bar the claims ............... 22

II.     Qualified immunity does not shield Yoo from his wrongs .............................. 24

        A.      Plaintiffs have stated claim of constitutional violations ..................... 24

                1.      Yoo personally participated in causing the constitutional violations ........ 24

                        a.      Personal participation in policymaking ......................... 25

                        b.      Personally advising that Padilla qualified for the "enemy
                                combatant" program ...................................................... 26

c.   Personally advising that the Fourth and Fifth Amendments were inapplicable in the U.S. ................................................................. 26

d.   Personally advising that extreme interrogation could occur with impunity ........................................................................................ 26

e.   Personally approving incommunicado detention and denial of access to counsel ............................................................................ 27

2.   Plaintiffs' constitutional rights were violated ........................................... 32

a.   Designation, seizure, and detention *vel non* were unconstitutional ................................................................................ 32

i.   The Fourth Amendment prohibited seizure ...................... 32

ii.   The Fifth Amendment barred military detention of a citizen seized in the U.S. ............................................... 33

iii.   The Fifth Amendment barred continued detention without due process ...................................................................... 33

b.   Padilla's extreme interrogations and punitive treatment shock the conscience .................................................................................... 34

i.   Substantive due process barred coercive interrogation ...... 34

ii.   Substantive due process barred punishment without adjudication of guilt ....................................................... 35

iii.   Substantive due process barred a state-created risk of danger .......................................................................... 37

c.   Padilla's rights of access to courts and counsel were violated ...... 37

d.   Plaintiffs' First Amendment rights to free exercise of religion, to information and to association were violated ........................... 38

3.   The constitutional violations were clearly established ............................. 40

III.   The Religious Freedom Restoration Act claims are properly alleged ............................... 43

A.   Yoo was a "person acting under color of law" ...................................... 44

B.   Yoo is not entitled to qualified immunity for his RFRA violations ...................... 46

IV.   Padilla has standing to seek declaratory relief against Yoo ................................. 47

A.   Yoo may be sued for declaratory relief in his individual capacity ........................ 47

B.     Padilla has standing to seek declaratory relief ........................................................48

CONCLUSION................................................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004) ...................................................................11, 13

*Al-Haramain v. Bush*, 507 F.3d 1190 (9th Cir. 2007) ...............................................................21

*Al-Joudi v. Bush*, 406 F. Supp. 2d 13 (D.D.C. 2005) .......................................................38

*Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) .........................................38

*Anoushiravani v. Fishel*, No. CV 04-212-MO, 2004 WL 1630240 (D. Or. July 19, 2004)[1]...15, 29

*Arar v. Ashcroft*, 532 F.3d 157 (2nd Cir. 2008)...............................................................20, 21, 22

*Arledge v. Hendricks*, 715 So. 2d 135 (La. App. 2d Cir. 1998)....................................16

*Ashcraft v. Tennessee*, 322 U.S. 143 (1944) ...................................................................35

*Bacon v. United States*, 449 F.2d 933 (9th Cir. 1971) ...................................................33

*Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988) .........................................................30

*Beard v. Banks*, 548 U.S. 521 (2006) ............................................................................39

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .............................................24, 25, 27, 31

*Bell v. Wolfish*, 441 U.S. 520 (1979) .............................................................................35, 38

*Bess v. Alameida*, No. CIVS 03-2498 BEB DAD, 2007 WL 2481682 (E.D. Cal. Aug. 29, 2007) ..............................................................................................................................44

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983) ....................................37

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)........................................................................................................................ *passim*

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008) ...............................................................11, 12, 18

*Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004).................................................25

*Brewster v. Board of Education of Lynwood Unified School District*, 149 F.3d 971 (9th Cir. 1998) ....................................................................................................................43

---

[1] All unpublished cases are attached in alphabetical order as Exhibit A.

*Burns v. Reed*, 500 U.S. 478 (1991) .................................................................................40

*Butz v. Economou*, 438 U.S. 478 (1978) ...........................................................................18

*Carlson v. Green*, 446 U.S. 14 (1980) ..........................................................................10, 12

*Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142 (1907).................................37

*Chappell v. Wallace*, 462 U.S. 296 (1983) ...............................................11, 13, 14, 21

*Chavez v. Martinez*, 538 U.S. 760 (2003) .........................................................................35

*Ching v. Lewis*, 895 F.2d 608 (9th Cir. 1990).................................................................37

*Christopher v. Harbury*, 536 U.S. 403 (2002) ................................................................38

*Chuman v. Wright*, 76 F.3d 292 (1996) ...........................................................................25

*City of Canton v. Harris*, 489 U.S. 378 (1989).................................................................36

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...........................................................48

*Clement v. California Department of Corrections*, 364 F.3d 1148 (9th Cir. 2004) ......................39

*Clewis v. Texas*, 386 U.S. 707 (1967).................................................................................35

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), *cert. denied*, 506 U.S. 953 (1992)...........................................................................................................................35

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) ........................................10

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).................................................32

*Darwin v. Connecticut*, 391 U.S. 346 (1968) ..................................................................35

*Davis v. FEC*, 128 S. Ct. 2759 (2008) ..............................................................................49

*Davis v. Passman*, 442 U.S. 228 (1979) .....................................................................10, 12

*Davis v. Sutley*, No. EDCV 07-415-CBM RNB, 2008 WL 1817262 (C.D. Cal. Apr. 17, 2008)...........................................................................................................................43

*Department of Navy v. Egan*, 484 U.S. 518 (1988) .........................................................20

*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) ..............36

*Demaery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) .................................................................49

*DiMeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995) ....................................................................43

*Dible v. City of Chandler*, 515 F.3d 918 (9th Cir. 2008) .........................................................43

*Donovan v. Reinbold*, 433 F.2d 738 (9th Cir. 1970) ...........................................................15, 30

*Ellis v. University of Kansas Medical Center*, 163 F.3d 1186 (10th Cir. 1998) ......................48

*Endsley v. Luna*, No. CV 06-04100 DSF SS, 2008 WL 3890382 (C.D. Cal. May 23, 2008) .........................................................................................................................................43

*Epstein v. Washington Energy Co.*, 83 F.3d 1136 (9th Cir. 1996) .............................................7

*F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312 (9th Cir. 1989) ..................................................47

*Ford v. Reynolds*, 316 F.3d 351 (2d Cir. 2003) ......................................................................47

*Gant v. Wallingford Board of Education*, 69 F.3d 669 (2d Cir. 1995) .....................................28

*Garcia v. United States*, 469 U.S. 70 (1984) ..........................................................................45

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ...................................................................................32

*Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002) .................................................36

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ..........................................................................38

*Government of Guam v. United States*, 179 F.3d 630 (9th Cir. 1999) ......................................45

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) ...................................................31

*Green v. Fischbein Olivieri Rozenholc & Badillo*, 507 N.Y.S.2d 148 (N.Y. App. Div. 1986) ..........................................................................................................................................16

*Guzell v. Hiller*, 223 F.3d 518 (7th Cir. 2000) .......................................................................28

*Hafer v. Melo*, 502 U.S. 21 (1991) .........................................................................................44

*Hall v. American National Red Cross*, 86 F.3d 919 (9th Cir. 1996) ...................................45, 46

*Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002) ...................................................................36

*Halperin v. Kissinger*, 807 F.2d 180 (D.C. Cir. 1986) ...........................................................20

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................... *passim*

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ......................................................10

*Hartman v. Moore*, 547 U.S. 250 (2006) .........................................................16

*Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934) .......................18

*Hope v. Pelzer*, 536 U.S. 730 (2002) ..........................................................36, 40

*Howe v. Smith*, 452 U.S. 473 (1981) ...........................................................33, 44

*Hydrick v. Hunter*, 500 F.3d 978 (9th Cir. 2007) ...........................25, 27, 40, 41, 42, 43

*Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261 (1997)............................................47

*Illinois v. Gates*, 462 U.S. 213 (1983) .........................................................33

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), *cert. granted on other grounds, Ashcroft v. Iqbal*, 128 S. Ct. 2931 (Jun. 16, 2008) ...........................................................19, 28

*In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85 (D.D.C. 2007) ...........13, 22

*Jama v. INS*, 343 F. Supp. 2d 338 (D.N.J. 2004)............................................44, 45

*Johnson v. Avery*, 393 U.S. 483 (1969) ...........................................................38

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)....................................................22

*Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116 (9th Cir. 2008) .......................24, 31

*Keen v. Noble*, No. CVF04564AWIWMWP, 2007 WL 2789561 (E.D. Cal. Sept. 20, 2007), *amended on other grounds by* 2008 WL 268821 (E.D. Cal. Jan. 30, 2008) ...............44

*Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996), *partially amended and reh'g denied*, 135 F.3d 1318 (1998)................................................................................36

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ..........................................8

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006) ......................................37

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) ............................................30

*Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004)..................................25, 27, 30, 43

*Lassiter v. Department Social Service*, 452 U.S. 18 (1981) ........................................38

*Lepp v. Gonzales*, No. C-05-0566 VRW, 2005 WL 1867723 (N.D. Cal. Aug. 2, 2005) .............44

*Lewis v. Casey*, 518 U.S. 343 (1996) ........................................................................................38

*Libas Ltd. v. Carillo*, 329 F.3d 1128 (9th Cir. 2003) ................................................................11

*Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006)................................................................15, 29

*MCI Telcom. Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491 (3d Cir. 2001) ........................48

*Maag v. Wessler*, 960 F.2d 773 (9th Cir. 1991).........................................................................32

*Malley v. Briggs*, 475 U.S. 335 (1986) ......................................................................................25

*Martinez v. City of Oxnard*, 337 F.3d 1091 (9th Cir. 2003), *cert denied*, 542 U.S. 953
(2004).................................................................................................................................34, 35

*Medina v. City of Denver*, 960 F.2d 1493 (10th Cir. 1992)........................................................42

*Ex parte Milligan*, 71 U.S. 2 (1866), *cited with approval in Hamdan v. Rumsfeld*, 548
U.S. 557 (2006).................................................................................................................34, 42

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .............................................2, 3, 10, 12, 17, 19, 20, 23

*Moran v. State of Wash.*, 147 F.3d 839 (9th Cir. 1998)..............................................................43

*Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) ....................................................44

*Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000)..........................37

*Munsell v. Department of Agricultural*, 509 F.3d 572 (D.C. Cir. 2007) ................................11, 12

*Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997) ........................................................................49

*Nebraska Beef, Ltd., v. Greening*, 398 F.3d 1080 (8th Cir. 2005)...................................................11

*Norman-Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260 (9th Cir. 1998) ...............49

*North Dakota v. United States*, 495 U.S. 423 (1990) ................................................................19

*O'Lone v. Shabazz*, 482 U.S. 342 (1987)...................................................................................39

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003)..............................................36

*Overton v. Bazzetta*, 539 U.S. 126 (2003) ...............................................................................39

*Padilla v. Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002) ......................................................5

*Padilla v. Hanft*, 389 F. Supp. 2d 678 (D.S.C. 2005) .......................................................6, 8

*Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005)..............................6, 8, 33, 41, 42, 46

*Padilla v. Hanft*, 432 F.3d 582 (4th Cir. 2005)........................................................6, 7, 8

*Padilla v. Hanft*, 547 U.S. 1062 (2006) ................................................................................7

*Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003) ...........................................................5

*Panoutsopoulos v. Chambliss*, 157 Cal. App. 4th Supp. 297 (Cal. Dist. Ct. App. 2007)..............16

*Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) ................................37

*Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008) ............................35, 36, 41

*Porter v. City of Davis Police Department*, No. CIVS062099 MCE GGHPS, 2007 WL
    4463344 (E.D. Cal. Dec. 17, 2007)..............................................................................48

*Preskar v. United States*, 248 F.R.D. 576 (E.D. Cal. 2008) ...........................................48

*Procunier v. Martinez*, 416 U.S. 396 (1974), *rev'd in part on other grounds, Thornburgh
    v. Abbott*, 490 U.S. 401, 413 (1989) ...................................................................37, 39

*Reid v. Covert*, 354 U.S. 1 (1957).......................................................................................23

*Revere v. Massachusetts General Hospital*, 463 U.S. 239 (1983).................................36

*Rhodes v. Chapman*, 452 U.S. 337 (1981) .......................................................................36

*Rivera v. Hamlet*, No. C03-962 SI (PR), 2003 WL 22846114 (N.D. Cal. Nov. 25, 2003) ...........28

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004) .......................................................6, 41, 42, 47

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985).................................22, 23

*Sanchez v. Elk Grove Unified School District*, No. CIV S-07-0535FCDGGHP, 2007 WL
    1515510 (E.D. Cal. May 22, 2007)...............................................................................48

*Saucier v. Katz*, 533 U.S. 194 (2001) ...............................................................24, 32, 46

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) .............................................................11, 14

*Smith v. Montgomery County*, 573 F. Supp. 604 (D. Md. 1983) .................15, 29, 30, 45

*Soldal v. Cook County*, 506 U.S. 56 (1992)..........................................................32

*Sorrels v. McKee*, 290 F.3d 965 (9th Cir. 2002).................................................43

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)...................................................23

*Sri International v. Matsushita Electric Corp. of America*, 775 F.2d 1107 (Fed. Cir. 1985) ...........................................................................................................8

*Stanley v. United States*, 483 U.S. 669 (1987)............................................11, 13, 14, 20

*Sterling v. Tenet*, 416 F.3d 338 (4th Cir. 2005) ...................................................21

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999)...............44, 45, 46

*Swift v. Lewis*, 901 F.2d 730 (9th Cir. 1990) .......................................................43

*Taylor v. Prosper*, No. CIVS052535GEBGGHP, 2006 WL 3114298 (E.D. Cal. Nov. 1, 2006) ..........................................................................................................48

*Thompson v. Souza*, 111 F.3d 694 (9th Cir. 1997) ................................................36

*Torres v. City of Los Angeles*, 540 F.3d 1031 (9th Cir. Aug. 26, 2008) ...................24, 32

*Turner v. Safley*, 482 U.S. 78 (1987) ...........................................................36, 38, 39, 43

*United States v. Delgadillo-Velasquez*, 856 F.2d 1292 (9th Cir. 1988)........................33

*United States v. Lanier*, 520 U.S. 259 (1997) ......................................................42

*United States v. State of Alaska*, 521 U.S. 1 (1997)...............................................45

*United States v. United States District Court*, 407 U.S. 297 (1972)............................32

*United States v. Reynolds*, 345 U.S. 1 (1953) .....................................................21

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003).............................................29

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)......................................23, 32

*United States v. Wilhem von Leeb, et al.*, in XI Trials of War Criminals Before the Nuremberg Military Tribunals Control Council Law No. 10, 690-95 (U.S. Gov't Printing Office 1950) ..............................................................................16, 31

*Von Colln v. County of Ventura*, 189 F.R.D. 583 (C.D. Cal. 1999) .............................48

*Washington-El v. Diguglielmo*, No. CIV.A. 06-CV-4517, 2008 WL 2954745 (E.D. Pa. July 29, 2008).................................................................................................................39

*Whitcombe v. United States Department of Treasury*, No. C89-334Z, 1989 U.S. Dist. LEXIS 11386 (W.D. Wash. Aug. 29, 1989) ..........................................................48

*White v. Roper*, 901 F.2d 1501 (9th Cir. 1990)..........................................................25, 28

*Wilkie v. Robbins*, 127 S. Ct. 2588 (2007)............................................11, 12, 16, 17

*Wilson v. Grannis*, No. C 07-2018 PJH (PR), 2008 WL 4415268 (N.D. Cal. Sept. 26, 2008) ....................................................................................................................28

*Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) ........................................................20

*Wilson v. Seiter*, 501 U.S. 294 (1991)........................................................................36

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) ....................................................48

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ..................................................................37

*Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) ......................................................37

*Ex parte Young*, 209 U.S. 123 (1908).........................................................................47

*Youngberg v. Romeo*, 457 U.S. 307 (1982) .................................................................35

*Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952).........................................18

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ........................................................33

## STATUTES AND RULES

5 U.S.C. § 552a ...........................................................................................................20

10 U.S.C. §§ 802(a)(9), (13) ........................................................................................13

18 U.S.C. § 4001(a) (1971)...........................................................................................33

18 U.S.C. § 4001(a) (2000) ..........................................................................................18

28 U.S.C. § 1391(e) ......................................................................................................45

33 U.S.C. § 1515...........................................................................................................45

42 U.S.C. § 1983...........................................................................................................44

42 U.S.C. § 2000bb-1 ..............................................................................44, 45, 46, 47

42 U.S.C. § 2000bb-2 ....................................................................................44, 45

42 U.S.C. § 9124 ..................................................................................................45

Fed. R. Civ. P. 8(c) ..............................................................................................8

Fed. R. Civ. P. 10(c) ..........................................................................................28

Fed. R. Civ. P. 11(b)(2) ......................................................................................15

Fed. R. Civ. P. 12(b) ..........................................................................................28

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (codified at 10
    U.S.C. § 948r(c) (2006)) ............................................................................12

National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, §
    1405(e), 119 Stat. 3477 (codified at 10 U.S.C. § 801 note (2006)) ..................................12, 13

Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L.
    108-375, §§1091(a)(1), 118 Stat. 1811 (codified at 10 U.S.C. § 801 note (2005))................13

The Authorization for Use of Military Force Joint Resolution, Pub. L. No. 107-40 § 2(a),
    115 Stat. 224 (2001).....................................................................................33

## OTHER AUTHORITIES

50 Cong. Rec. S2702-05 (2004) .........................................................................28

151 Cong. Rec. S14, 269 (2005)..........................................................................13

H.R Rep. No. 106-219 (1999)..............................................................................45

S. Rep. No. 103-111 (1993) ................................................................................45

Prosser & Keeton on Torts § 44 (5th ed. 1984) ............................................28

4 John Henry Wigmore, *A Treatise on the System of Evidence in Trials at Common Law*
    § 2376 (1905)..............................................................................................21

19 Charles Alan Wright, et al., *Federal Practice and Procedure* § 4445 (2d ed. 2002)................8

*Detainee's Trial in Military System Begins Today*, Wash. Post, July 21, 2008 ...........................49

## INTRODUCTION

1    Jose Padilla is an American citizen who was seized by agents of the U.S. military from a

2    New York jail and secretly transported to a military prison in South Carolina.  Charged with no

3    crime, he was imprisoned for years, unable to talk with lawyers or even his mother. His captors,

4    hidden from the outside world, used the interrogation-driven standard operating procedure

5    initially designed for detainees at Guantanamo Bay, subjecting him to vicious interrogations,

6    chilling sensory deprivation and total isolation. As federal courts began to ask questions about

7    what was happening to Padilla and other detainees, the justification for his detention started

8    shifting, with new stories told at each new litigation posture. But Jose Padilla, utterly alone in a

9    blacked-out room, had no chance to tell his story.

10    Along with his mother, Estela Lebron, Padilla brings this suit against John Yoo, a key

11    architect of the enemy combatant program, without whose transgressions none of this could have

12    happened. Padilla and Lebron assert the most classic of *Bivens* claims: illegal seizure, cruel and

13    inhuman treatment, and unlawful imprisonment. Yoo casts himself, in his motion to dismiss, as a

14    mere lawyer, but he was much more (and much less). He was a member of the War Council, a

15    select group of policymakers that set operational policy regarding the treatment and detention of

16    suspected "enemy combatants." Christened "Dr. Yes" by the Attorney General, Yoo was the

17    "go-to" man on questions like how to justify extreme interrogations, willingly sacrificing his role

18    as an attorney – and the proud traditions of his office – to participate directly in policymaking

19    and to provide legal cover for pre-determined and patently illegal policies.

20    Yoo knew exactly what the natural consequences of his actions would be – because he

21    intended them, because they were obvious, and because he was warned by others. Padilla was the

22    only American citizen seized in the United States and one of only three people interrogated at the

23    Charleston Brig, and Yoo along with the rest of the War Council knew and intended that their

24    policies would be applied to him.  Though Yoo claims not to have been sufficiently involved to

25    deserve liability, he set Padilla's mistreatment in motion.

1      Yoo meant to keep the courts at bay. Warrants were dispensed with, as was judicial

2    approval of probable cause for seizure, to keep courts from assessing the propriety of the

3    military's seizure of Mr. Padilla from a civilian jail cell. However much time might pass, courts

4    would have no role whatsoever in assessing the Executive's factual assertion that Padilla was an

5    enemy of the state. And Padilla would be imprisoned incommunicado, unable to communicate

6    with his lawyers (or anyone else), rendering the courts unable even to know about the brutal

7    methods of interrogation taking place behind the blacked-out windows at the Charleston Brig.

8       It comes as no surprise, then, that Yoo now seeks to keep this Court too at bay. He tries

9    again to draw the shade of "national security" over his part in the shameful abrogation of that

10   most fundamental of American values: freedom from punishment without trial at the whim of an

11   unconstrained Executive. Yoo insists that "war powers," "national security," and "foreign

12   affairs" constitute "special factors" that should make this court "hesitat[e]" – he means forebear

13   – from adjudicating Padilla's classic claims of unlawfulness. But the Supreme Court long ago

14   rejected the argument that efforts to promote national security (even when undertaken by a

15   cabinet-level official) are free from constitutional scrutiny, and Yoo's claim that foreign relations

16   will be disrupted by an American court reviewing an American citizen's challenge to his

17   treatment in an American prison is equally hollow.  Taken together, Yoo's special factors

18   arguments amount to no more than a plea for this Court to look away from what Yoo so long

19   fought to keep dark.

20      There is no reason to look away, and every reason not to. "National security tasks . . . are

21   carried out in secret; open conflict and overt winners and losers are rare. Under such

22   circumstances, it is far more likely that actual abuses will go uncovered than that fancied abuses

23   will give rise to unfounded and burdensome litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 522

24   (1985) (rejecting argument that national security requires dismissal of *Bivens* suit against the

25   Attorney General for wiretaps against suspected terrorists). Yoo argues that liability would chill

26   government officials from providing frank advice, but "[w]here an official could be expected to

27   know that his conduct would violate statutory or constitutional rights, he *should* be made to

1  hesitate." *Id.* at 524 (emphasis in original; quotation marks omitted). The Supreme Court "do[es]
2  not believe that the security of the Republic will be threatened if its Attorney General is given
3  incentives to abide by clearly established law," *id.*, and the same is true of former Deputy
4  Assistant Attorney General Yoo. He knowingly violated clearly established law – freedom's first
5  principles – and his motion to dismiss should be denied.

## STATEMENT OF FACTS

6      Jose Padilla is an American citizen. He is not, and never has been, an enemy combatant.
7  C43. [1] On June 9, 2002, Padilla was detained in a civilian jail in New York as a material witness.
8  C35. Court-appointed counsel moved to vacate the material witness warrant, but two days before
9  the motion could be heard, the Executive, without presenting evidence to any judicial officer,
10  decreed Padilla an "enemy combatant," seized him from the civilian jail, and transported him to
11  the Consolidated Naval Brig in Charleston, South Carolina ("the Brig"). C40.

12      It would be almost two years until anyone beyond the Brig's doors heard from Padilla
13  again.  Though she could not communicate with him, his counsel immediately petitioned for a
14  writ of habeas corpus in the Southern District of New York. In response, the Executive asserted
15  that any American citizen declared an enemy combatant could be imprisoned indefinitely,
16  without charge, and that the court had no authority to evaluate the supposed factual basis for that
17  decision. Nevertheless, Michael H. Mobbs, a mid-level advisor in the Department of Defense,
18  provided a short declaration [hereinafter "Mobbs Declaration" or "Declaration"], which admitted
19  that the government's "sources ha[d] not been completely candid," and that some of their
20  statements "may be part of an effort to mislead or confuse U.S. officials," but purported, on the
21  basis of that unreliable multiple hearsay, to justify Padilla's designation, seizure and indefinite
22  imprisonment. Mobbs Declaration 2, n.1 (attached to First Amended Complaint as Exhibit K).

23      Yoo, a policy-making member of a secretive group known as the War Council, designed
24  the program of incommunicado detention without charge and extreme interrogation. C15, 36.

[1] The letter C refers to the First Amended Complaint; the numbers correspond to particular
paragraphs in the complaint.

1    Once designed, Yoo made its implementation possible by stating that the Fourth and Fifth

2    Amendments do not apply to "military" operations in the United States – which he defines to

3    include the seizure of an unarmed citizen in a civilian setting. C21. And Yoo applied the program

4    to Padilla, stating in writing that he "qualified" as an "enemy." C38. He did all this knowing it

5    was unconstitutional and knowing – or deliberately indifferent to – what would happen to

6    Padilla. C37.

7         Officials detaining Padilla were under orders to follow the standard operating procedures

8    governing Guantanamo Bay. C54. Padilla was placed in solitary confinement in a tiny cell in an

9    otherwise empty wing of the Brig. He was held completely incommunicado, permitted no

10   contact with counsel, courts, or family for almost two years, aside from a single short message to

11   his mother after ten months informing her that he was alive. C56, 58. His only human contact

12   during this period was with interrogators, or with guards delivering food through a slot in the

13   door or standing watch when he was allowed to shower. C57. Night and day dissolved – the

14   windows blackened, artificial light glaring at any hour, with no way of reckoning time – so that

15   he did not know even how to fulfill his religious obligation of five-times daily prayer. C65, 64,

16   55b, 55c, 68, 70. Removal from his cell meant sensory deprivation, with black-out goggles and

17   sound-blocking earphones. C55l, 65. All outside information – papers, radio, television – was

18   prohibited and even his Koran was swiftly confiscated. C66. Padilla was denied a mattress,

19   blanket, sheet, or pillow, and left only a cold, steel slab. C55p. Whatever sleep he could muster

20   was "adjusted" by deliberate banging, constant artificial light, noxious odors, and extreme

21   temperature variations. C55 o, c, m, q.

22         Padilla suffered these conditions as part of a systematic program of extreme

23   interrogation. C1, 4. Interrogators forcibly injected Padilla with substances represented to be

24   truth serum, left him shackled for hours in "stress" positions, and denied him adequate medical

25   care for the severe medical conditions foreseeably resulting from this treatment. C55 i, j, k, 71,

26   72. Yoo facilitated the interrogation regime. He aimed to provide legal cover for extreme

27   interrogation methods then in use at Guantanamo Bay, redefining – and making up fictitious

1   defenses to – torture. C23, 29, 31, 53. Unsurprisingly, the methods spread to other sites that

2   imprisoned alleged enemies of the state, including the Brig – not least because of Yoo's

3   assurance that the Fifth Amendment did not apply to "military" operations in America. C54, 21.

4        During these years of incommunicado detention, counsel litigated the habeas petition

5   without client contact. Though Judge Mukasey held that the Authorization for the Use of

6   Military Force ("AUMF") permitted the detention without charge of citizens as enemy

7   combatants, he rebuffed the Executive's efforts to continue the program, ruling that Padilla had

8   the right to access to counsel and to an opportunity to challenge the factual basis for his military

9   detention. *Padilla v. Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002) [hereinafter *Padilla I*]. The

10  Second Circuit went further, holding that only a clear congressional statement could authorize

11  the detention without charge of an American citizen. *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir.

12  2003) [hereinafter *Padilla II*].

13       The Supreme Court granted certiorari. Days before its merits brief was due (and nearly

14  two years after he was seized), the Executive announced it would permit Padilla limited access to

15  attorneys (in recorded meetings with agents present and cameras on). C59. It also lessened some

16  of the worse conditions, stepping back from sensory deprivation, returning Padilla's Koran,

17  permitting limited access to information and, over the next two years, allowing Padilla three

18  twenty-minute telephone calls and one visit from his mother. C66, 62.

19       The Supreme Court heard argument alongside *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004),

20  which involved the detention of an American citizen seized on a foreign battlefield. The cases

21  were decided the same day. In *Hamdi*, the Court held that the AUMF permitted the military

22  seizure of a citizen found on a foreign battlefield bearing arms for the enemy, but ruled that

23  Hamdi had the right to challenge his detention in proceedings that provided him due process. *Id.*

24  Detention was constitutional only if Hamdi was an actual "enemy combatant," and only for the

25  limited purpose of preventing return to the battlefield. *Id.* at 521-22 & n.1. "Certainly," the Court

26  held, "detention for the purpose of interrogation is not authorized." *Id.* at 521. Two dissenters

27  (Justices Scalia and Stevens) went further, holding that no citizen could be detained without

1    charge absent a congressional suspension of habeas corpus. *Id.* at 554 (Scalia, J., dissenting).

2        The Court dismissed Padilla's habeas petition on other grounds, holding that the petition

3    should have been filed where Padilla was imprisoned, not where he had been seized. *Rumsfeld v.*

4    *Padilla*, 542 U.S. 426, 451 (2004) [hereinafter *Padilla III*]. Four justices believed jurisdiction

5    was proper and addressed the merits. "At stake in this case is nothing less than the essence of a

6    free society," they wrote, concluding that "the protracted, incommunicado detention of American

7    citizens arrested in the United States" was unconstitutional.[2] *Id.* at 465, 464 n.8.

8        Days later, Padilla filed a new habeas petition in South Carolina. The Executive

9    responded, alleging for the first time that Padilla had been in Afghanistan during a U.S. attack on

10    the Taliban, armed with an assault weapon and fleeing. (Before turning to this allegation, the

11    Executive had alleged a "dirty bomb" plot and, when it abandoned that, a gas heat explosion

12    plot.) With the pleadings closed, Padilla moved for summary judgment, arguing that even if the

13    government's factual averments were true, Padilla's seizure and detention were unconstitutional.

14    Like the Second Circuit before it, the district court agreed. *Padilla v. Hanft*, 389 F. Supp. 2d 678

15    (D.S.C. 2005) [hereinafter *Padilla IV*].

16        The Fourth Circuit reversed the grant of summary judgment, concluding that the

17    Executive could constitutionally detain citizens, even if seized in the United States, if they had

18    actually carried arms for hostile forces on a foreign battlefield. It remanded to the district court

19    for a hearing on the factual basis for the designation of Padilla as an enemy combatant. *Padilla v.*

20    *Hanft*, 423 F.3d 386 (4th Cir. 2005) [*Padilla V*]; *Padilla v. Hanft*, 432 F.3d 582, 584 (4th Cir.

21    2005) [hereinafter *Padilla VI*]. Padilla petitioned for certiorari. Judge Luttig has eloquently

22    described what happened next: "A short time after our decision issued on the government's

23    representation that Padilla's military custody was indeed necessary . . . the government

---

[2] Taking the opinions in *Hamdi* and *Padilla* together, it is clear that at least five of the justices considered the military detention of citizens seized in civilian settings in the U.S. to be unconstitutional, regardless of process: the four dissenters in *Padilla* (who alone addressed the merits) and Justice Scalia, who dissenting in *Hamdi* concluded that citizens could never be military detained absent a suspension of habeas corpus.

1  determined that it was no longer necessary . . . Instead, it announced, Padilla would be . . .

2  criminally prosecuted in Florida." *Padilla VI*, 432 F.3d at 584. "The indictment," Judge Luttig

3  noted, "made no mention of the acts upon which the government purported to base its military

4  detention of Padilla." *Id*. Its timing was also suspicious: it "came only two business days before

5  the government's brief in response to Padilla's petition for certiorari was due to be filed in the

6  Supreme Court" and only days before the District Court "pursuant to our remand, was to accept

7  briefing on the question whether Padilla had been properly designated an enemy combatant." *Id*.

8  The Executive's actions with regard to Padilla had "given rise to at least an appearance that the

9  purpose . . . may be to avoid consideration of our decision by the Supreme Court" and that the

10  principles that had been offered to justify Padilla's detention were so disposable that they could

11  "yield to expediency with little or no cost." *Id*. at 585, 587.

12       Padilla was ultimately transferred and "criminally prosecuted in Florida for alleged

13  offenses considerably different from, and less serious than, those acts for which the government

14  had militarily detained Padilla." *Id*. at 584. His convictions of those offenses, involving activities

15  in the 1990s directed at non-U.S. interests abroad, are currently on appeal. C11. Following

16  Padilla's transfer, the Supreme Court denied certiorari. *Padilla v. Hanft*, 547 U.S. 1062 (2006)

17  [hereinafter *Padilla VII*]. No final judgment issued in the District Court, to which the Fourth

18  Circuit had remanded "on the question whether Padilla had been properly designated an enemy

19  combatant." *Padilla VI*, 432 F.3d at 584.

20       The answer to that question is no. C43. Yoo asserts otherwise, of course. But on a motion

21  to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most

22  favorable to Plaintiffs." *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

23  Yoo cannot deny Padilla's innocence any more than he can deny his own guilt.

## ARGUMENT

**I.    No threshold issues bar plaintiffs' legitimate claims.**

    **A.    Collateral estoppel bars none of the claims.**

24       Yoo claims (at 35-37) that the Fourth Circuit "decided all of the issues of fact and law

1   raised in Padilla's petition for habeas corpus." It did not. It merely reversed a grant of summary

2   judgment and remanded to the district court for a factual hearing. *See Padilla V*, 423 F.3d at 390

3   n.1; *Padilla VI*, 432 F.3d at 584; *Padilla IV*, 389 F. Supp. 2d at 679. The Executive explicitly

4   recognized this in its brief opposing certiorari in the Supreme Court and it is unclear why Yoo

5   argues otherwise here.[3]

6        It is too early for Yoo to invoke collateral estoppel, which is an affirmative defense that

7   must be pleaded. Fed. R. Civ. P. 8(c). Yoo has not even answered. When he does, his effort to

8   invoke collateral estoppel will be futile. He will have to prove four things: "(1) there was a full

9   and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated

10  in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the

11  person against whom collateral estoppel is asserted in the present action was a party or in privity

12  with a party in the previous action." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir.

13  2008) (citation omitted). Three cannot be proven.

14       First, *Padilla V*, which merely reversed a grant of summary judgment, was not a "final

15  judgment."[4] (Yoo cites no authority to support the assertion that a reversal of summary judgment

16  somehow counts as a final judgment, and he conveniently omits (at 37) the "final judgment"

17  element from his description of collateral estoppel doctrine.) Second, Yoo does not explain how

18  the facts were "actually litigated." As the Fourth Circuit stated, it was only on remand following

19  that decision that the district court "was to accept briefing on the question whether Padilla had

20  been properly designated an enemy combatant." *Padilla VI*, 432 F.3d at 584. And third, because

---

[3] *See* Brief for Respondent in Opposition 2-3, *Padilla VII*, 432 F.3d 582 (acknowledging that the
Fourth Circuit "issued its mandate so the case could return to the district court, where [Padilla]
can contest the factual basis for his detention as an enemy combatant," and specifically
describing the Fourth Circuit decision as "interlocutory"). This Court can take judicial notice of
that brief.

[4] *See, e.g.*, *Sri Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116-17 (Fed. Cir. 1985);
*see also* 19 Charles Alan Wright et al., *Federal Practice and Procedure* § 4445 (2d ed. 2002)
(collecting cases). Loosely describing (at 35, 37) the Fourth Circuit decision as a "reject[ion]" of
the habeas petition does not transform it into a final judgment.

1    no hearing or briefing took place, it is hard to see how Yoo will meet his burden of proving that

2    Padilla had a "full and fair opportunity" to litigate any of the issues on which he seeks collateral

3    estoppel: Padilla had no opportunity.

4    　　　　Unable to satisfy the most basic elements of collateral estoppel, Yoo aims to bend it to

5    his will. He claims (at 40 n.27) that the Fourth Circuit's reversal of summary judgment should be

6    given preclusive effect because Padilla made the "strategic decision to litigate the factual basis

7    for his designation and detention after litigating the question of whether the President had the

8    authority to designate and detain him as an enemy combatant."[5] He also claims (at 35-36) that

9    collateral estoppel effect should be given not just to the disputed and never-decided factual

10   assertions made by the Executive, but even to disputed and never-decided factual matters not

11   relevant to the motion for summary judgment, such as facts concerning Padilla's interrogations

12   and treatment. Still not done, he asserts (at 38-39) that collateral estoppel effect can be given

13   even to issues never raised in the habeas petition, so long as the claims somehow "flow from" the

14   incommunicado detention. All three assertions boil down to this proposition: if a party moves for

15   summary judgment and loses, then all disputed facts relevant to the motion – or to the entire

16   complaint, or to anything that "flows from" the conditions in the complaint – should be

17   presumed to have been found against him, and collateral estoppel effect should be given to all of

18   those disputed and unresolved facts. He offers no authority for any form of that proposition, and

19   there is none.

20   　　　　The Fourth Circuit did not issue a final judgment, and it considered only a narrow

21   (though important) legal question on a set of facts presumed to be true solely for purposes of

22   summary judgment. That question is irrelevant here, where the relevant averments differ entirely

23   from the set of facts presumed by the Fourth Circuit. Like the Second Circuit decision (reversed

24   on other grounds by the Supreme Court), the Fourth Circuit decision is as persuasive as the

25   strength of its arguments, but no more. It has no preclusive effect and is not binding precedent in

---

[5] Yoo does not explain how, when his program kept Padilla from communicating with his
attorneys, C56-61, they could have litigated facts instead of law. *See also* C55-75.

1   this Court.

## B.   No "special factors" bar the traditional *Bivens* remedy.

2   In *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court held

3   that an individual alleging a Fourth Amendment violation by federal officers could sue those

4   officers directly under the Constitution. *See also Carlson v. Green*, 446 U.S. 14 (1980) (*Bivens*

5   claim for Eight Amendment cruel and unusual punishment violation proper); *Davis v. Passman*,

6   442 U.S. 228 (1979) (*Bivens* claim for Fifth Amendment due process violation proper). *Bivens*

7   has two purposes. As Chief Justice Rehnquist explained in *Correctional Servs. Corp. v. Malesko*,

8   534 U.S. 61 (2001), "*Bivens* from its inception has been based . . . on the deterrence of individual

9   officers who commit unconstitutional acts." *Id.* at 71. The reason for that deterrence is simple:

10   "Where an official could be expected to know that his conduct would violate statutory or

11   constitutional rights, he *should* be made to hesitate." *Mitchell*, 472 U.S. at 524 (emphasis in

12   original; quotation marks omitted) (rejecting argument that national security requires dismissal

13   of *Bivens* suit against Attorney General for illegal wiretaps directed at suspected terrorists); *see*

14   *also Harlow v. Fitzgerald*, 457 U.S. 800, 809 (1982) (rejecting argument that *Bivens* suit against

15   senior White House aides should be dismissed on basis of asserted need for frank advice and

16   reiterating that the "greater power of high officials . . . affords a greater potential for a regime of

17   lawless conduct") (brackets and quotation marks omitted). Its second purpose is to "provide a

18   cause of action for a plaintiff who lack[s] any alternative remedy for harms caused by an

19   individual officer's unconstitutional conduct." *Malesko*, 534 U.S. at 70. Only where "such

20   circumstances are not present" has the Court "consistently rejected invitations to extend *Bivens*."

21   *Id.*[6]

---

[6] Yoo's "extension" argument rests on a misreading of *Malesko*. In observing that it had "consistently refused to extend Bivens liability to any new context or new category of defendants," 534 U.S. at 68, *Malesko* was explaining why *Bivens* liability had not been expanded beyond the traditional context – suits against individual federal officers – to new sorts of entities such as private companies, *id.* at 70-71, and federal agencies, *id.* at 69, or to contexts where Congress had created a clear, alternative remedy, *id.* at 68. *Malesko* preserved traditional claims against individual federal officers, like those presented here. *Id.* at 70-71.

1    Plaintiffs' *Bivens* claims seek to hold an individual federal officer accountable for setting

2    in motion grave deprivations of what the Supreme Court has called "freedom's first principles":

3    the "freedom from arbitrary and unlawful restraint and the personal liberty that is secured by

4    adherence to the separation of powers." *Boumediene v. Bush*, 128 S. Ct. 2229, 2277 (2008).

5    They have no adequate alternative remedy. Yet Yoo describes this action as an attempt to

6    "extend" *Bivens* and urges this Court to create new "special factors counseling hesitation."

7    *Bivens*, 403 U.S. at 396.

8    Even if plaintiffs' claims against a federal officer for causing unlawful imprisonment and

9    physical mistreatment could be described as an extension, a *Bivens* remedy would be available.

10   A court considering claims for an extension of *Bivens* asks first "whether any alternative,

11   existing process for protecting the interest amounts to a convincing reason for the Judicial

12   Branch to refrain from providing a new and freestanding remedy." *Wilkie v. Robbins*, 127 S. Ct.

13   2588, 2598 (2007). If this first step leads to the conclusion that "[i]t would be hard to infer that

14   Congress expected the Judiciary to stay its *Bivens* hand," the court then engages in the common-

15   law process of "weigh[ing] reasons for and against the creation of a new cause of action,"

16   including the consideration of any "special factors counseling hesitation."[7] *Id.* at 2600, 2598.

17   The Supreme Court and Ninth Circuit have together identified only three factors that

18   justify denying a *Bivens* remedy: (1) congressional preclusion, whether expressly by creation of

19   an alternative remedy, *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130-31 (9th Cir. 2003), or

20   implicitly through intentional omission of a damages remedy in an otherwise comprehensive

21   regulatory scheme, *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988); *Adams v. Johnson*, 355

22   F.3d 1179, 1185 (9th Cir. 2004); (2) intrusion on "the unique disciplinary structure of the

23   Military Establishment and Congress' activity in the field" by permitting servicemembers to sue

---

[7] *Wilkie*'s emphasis on common-law balancing repudiates an earlier Eighth Circuit case on which Yoo (at 11) relies – *Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005). *See Munsell v. Dep't of Agric*, 509 F.3d 572, 590-91 (D.C. Cir. 2007) (noting that *Nebraska Beef*'s "presumption against" a *Bivens* remedy in a new context is at odds with *Wilkie* weighing test).

1    for injuries incident to military service, *Stanley v. U.S.,* 483 U.S. 669, 683 (1987); *Chappell v.*

2    *Wallace*, 462 U.S. 296, 304 (1983); and (3) "difficulty in defining a workable cause of action."

3    *Wilkie*, 127 S. Ct. at 2601.[8]  None of these factors applies here.

###### 1.    No established special factor applies to plaintiffs' claims.

###### a.    Congress has not precluded a *Bivens* remedy.

4            Under *Wilkie*, the first step in the *Bivens* analysis is to ask if an existing remedy

5    adequately protects the constitutional interest. *Wilkie*, 127 S. Ct. at 2588, 2598. None does. Like

6    the *Bivens*, *Davis* and *Carlson* plaintiffs, Padilla has no alternative means of redress for the

7    illegal detention and interrogations that Yoo caused him to suffer. Defendant does not seriously

8    suggest otherwise.[9] Instead, he argues (at 20-21) that Congress implicitly precluded a *Bivens*

9    claim by passing legislation that prohibited the abuse of detainees in U.S. custody but did not

10   create a new statutory cause of action. The text and history of the statutes he cites suggest

11   otherwise.

12           The Military Commissions Act of 2006 does not purport to regulate the rights of a U.S.

13   citizen seized and detained in the U.S. Rather, it addresses detainees held outside the United

14   States, and is explicitly applicable only to "alien [i.e., non-citizen] unlawful enemy

15   combatant[s]". Military Commissions Act of 2006, Pub. L. No. 109-366, § 3, 120 Stat. 2600,

16   2602 (codified at 10 U.S.C. § 948r(c) (2006)). Yoo also relies on Section 1405 of the Detainee

17   Treatment Act of 2005 ("DTA"), which the Supreme Court found unconstitutional in

18   *Boumediene*, 128 S. Ct. at 2240. The DTA purported to strip federal courts of jurisdiction to hear

19   challenges to "the detention by the Department of Defense of an alien at Guantanamo Bay,

---

[8] The first two factors were described as "special factors." *Wilkie* found this third factor
sufficient to deny a remedy, but did not describe it as a "special" factor.

[9] Yoo suggests in a footnote (21 n.5) that no *Bivens* remedy exists because Padilla was able to
file a habeas petition. Yet the possibility of injunctive relief – which habeas offers through the
Great Writ – does not foreclose a *Bivens* remedy. *See Mitchell*, 472 U.S. at 523 n.7. Yoo's
footnote also ignores the fact that his own actions deprived Padilla of access to court or counsel,
C59, rendering the promise of the Great Writ hollow.

1   Cuba." National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, §

2   1405(e), 119 Stat. 3136, 3477 (codified at 10 U.S.C. § 801 note (2006)). Congress could have

3   drafted this section to cover a suspected "unlawful enemy combatant" wherever detained, but it

4   did not. Moreover, DTA Section 1402, which prohibits certain extreme interrogation techniques

5   by Defense Department interrogators (though not by CIA interrogators) expressly states that

6   "[n]othing in this section shall be construed to affect the rights under the United States

7   Constitution of any person in the custody . . . of the United States." *Id.* § 1402.

8           The legislative history is similar. *See* 151 Cong. Rec. S14, 269 (2005) (statement of Sen.

9   McCain) (observing that DTA provisions "do not eliminate or diminish any private right of

10  action otherwise available"); *id.* (statement of Sen. Levin) ("I do not believe that the [McCain

11  amendment to the DTA] was intended either to create such a private right of action, or to

12  eliminate – or undercut any private right of action."). In short, these statutes do not constitute a

13  "comprehensive remedial scheme" through which Congress "considered the universe of harms"

14  and provided what it believed to be all "adequate remedies."[10] *Adams v. Johnson*, 355 F.3d

15  1179, 1185 (9th Cir. 2004).

>        **b.**     **There is no danger of intrusion upon the "unique disciplinary**
>                   **structure of the Military Establishment."**

16          In *Stanley,* 483 U.S. 669, and *Chappell,* 462 U.S. 296, the Supreme Court identified the

---

[10] Yoo cites *In re Iraq & Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85 (D.D.C. 2007), but that case found implied preclusion of a *Bivens* remedy only with regard to non-citizen detainees. His invocation of the Uniform Code of Military Justice ("UCMJ") is also unavailing, as the UCMJ regulates only the detention of "[p]risoners of war" and "[l]awful enemy combatants," 10 U.S.C. §§ 802(a)(9),(13) (1956), and Yoo and other federal officers have long maintained that Padilla is neither of these. The Reagan Act is similarly inapposite, as it was enacted specifically in response to, and is concerned with, the abuse of non-citizens detained at Abu Ghraib. *See* Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, §§1091(a)(1), 118 Stat. 1811 (codified at 10 U.S.C. § 801 note (2005)) ("[T]he abuses inflicted upon detainees at the Abu Ghraib prison in Baghdad . . . are inconsistent with the professionalism . . . [of the] United States Armed Forces."); *id.* § 1091(a)(6) ("The Constitution, laws, and treaties of the United States . . . prohibit the torture . . . of foreign prisoners held in custody by the United States"); *id.* § 1093(c)(2)(requiring Secretary of Defense to provide "[g]eneral information on the foreign national detainees in the custody of the Department of Defense . . . .").

1    risk of intrusion upon "the unique disciplinary structure of the Military Establishment and

2    Congress' activity in the field" as a special factor counseling hesitation. *Stanley*, 483 U.S. at 679

3    (citing *Chappell*). This risk arises where a servicemember sue for "injuries that arise out of or are

4    in the course of activity incident to service." *Id.* at 684. Because Padilla is not a servicemember,

5    that prohibition is inapplicable here.

6         Yoo seeks to extend *Stanley* and *Chappell* by arguing (at 19) that if a servicemember

7    cannot sue for his military injuries, then an "enemy combatant" should not be able to sue for

8    unlawful detention and interrogation. But applying this special factor outside the "Military

9    Establishment" for which it was created makes no sense. First, Padilla is not subject to "the

10   unique disciplinary structure" that *Stanley* and *Chappell* protect, so his suit does not disturb it.

11   Second, unlike Padilla, servicemembers have been provided with a "comprehensive internal

12   system of justice to regulate military life," one that "not only permits aggrieved military

13   personnel to raise constitutional challenges in administrative proceedings, it authorizes recovery

14   of significant consequential damages." *Schweiker*, 487 U.S. at 436 (citing *Chappell*, 462 U.S. at

15   302-03). Finally, Yoo's argument rests on factual assertions in his brief (at 20, 19 n.13) that are

16   at odds with the pleadings. Padilla is not an "enemy combatant." C43. Far from demoralizing our

17   troops, holding Yoo accountable for the extraordinary violations that he set in motion would

18   reassure those who risk their lives to preserve our Nation's Constitution and values.

### c.    There is no "serious difficulty" in defining this traditional cause of action.

19        Yoo contends (at 23) that no *Bivens* remedy should be permitted because the claims pose

20   a "serious difficulty of devising a workable cause of action." Yoo pegs this contention to the fact

21   that he was a lawyer, saying (at 22) that this Court would have to "determine where the line

22   should be drawn that marks the boundary between where a 'fair' legal analysis ends and an

23   'unfair' legal analysis begins," a question that he says would "be endlessly knotty to work out."[11]

---

[11] To the extent that Yoo's "line-drawing" argument overlaps with his claim that calling him to account would chill the performance of national security functions, that claim has already been rejected by the Supreme Court and is addressed *infra*, Part I.B.2.b.

1    Contrary to the contention, the allegations are nothing like "a suit for legal malpractice."

2    Plaintiffs do not allege that Yoo was negligent or merely "overly zealous" (at 23) in performing a

3    legitimate function. They assert that Yoo deliberately acted outside the scope of his authority

4    both (a) by acting not as a legal advisor but as a policymaker establishing unlawful detention and

5    interrogation policies and (b) by issuing legal opinions that *intentionally* misrepresented the state

6    of the law in order to shield those very policies and to encourage others to implement those

7    policies without fear of criminal or civil liability. C3, 15, 22, 23, 29, 30, 31, 34, 53.[12]

8    Courts have had no problem drawing lines between legitimate legal work and actions by

9    a lawyer intended to shield or promote illegal ends.[13] Even in cases that (unlike this case) involve

10   no policymaking allegations, courts have repeatedly distinguished between ordinary legal work

11   and legal work intended to further illegal ends. The Ninth Circuit has long held that government

12   attorneys can be sued for constitutional torts on the basis of their legal advice where the lawyer is

13   alleged to have willfully disregarded the law. *See Donovan v. Reinbold*, 433 F.2d 738, 744-45

14   (9th Cir. 1970) (Section 1983 action against city attorneys proper where attorneys allegedly

15   willfully disregarded law and their advice to city resulted in constitutional violations against

16   plaintiff).[14]

17   This is not surprising, as private attorneys face similar liability under the common law,

18   where courts recognize that "while an attorney is privileged to give honest advice, even if

---

[12] The Westfall Act does not apply to claims of *intentional* misconduct like those alleged here.

[13] The federal rules sometimes require courts to distinguish between fair and unfair legal work. *See* Fed. R. Civ. P. 11(b)(2) (requiring courts to determine whether claims or defenses "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law").

[14] *See also Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006) (assistant city attorney can be sued in constitutional tort for legal advice given to city police who relying on advice cause injury); *Anoushiravani v. Fishel*, 2004 WL 1630240, *5 (D. Or. July 19, 2004) (federal homeland security lawyers can be sued in constitutional tort for legal advice given to federal customs officers who rely on advice to cause injury); *Smith v. Montgomery County*, 573 F. Supp. 604, 609 (D. Md. 1983) (county attorney can be sued in constitutional tort for giving legal advice that officials relied on, thereby engaging in illegal strip searches).

1    erroneous, and generally is not responsible for the motives of his clients, admission to the bar

2    does not create a license to act maliciously, fraudulently, or knowingly to tread upon the legal

3    rights of others." *Green v. Fischbein Olivieri Rozenholc & Badillo*, 507 N.Y.S.2d 148, 152-53

4    (N.Y. App. Div. 1986); *see also Panoutsopoulos v. Chambliss*, 68 Cal. Rptr. 3d 647, 654 (Cal.

5    Ct. App. 2007) ("An attorney may be held liable for conspiring with his or her client to commit

6    actual fraud or for the intentional infliction of emotional distress"); *Arledge v. Hendricks*, 715

7    So. 2d 135, 139 (La. Ct. App. 1998) ("Intentionally tortious actions, ostensibly performed for a

8    client's benefit, will not shroud an attorney with immunity") (internal quotation marks and

9    citation omitted); *see generally Hartman v. Moore*, 547 U.S. 250, 258 (2006) ("[W]e certainly

10   are ready to look at the elements of common law torts when we think about elements of actions

11   for constitutional violations.").

12          Attorneys can face even criminal prosecution for intentionally misstating the law, as

13   when they knowingly promote illegal tax shelters or advance the goals of criminal organizations.

14   In fact, federal prosecutors have charged and convicted government lawyers with war crimes on

15   the basis of their legal work.[15] If distinguishing between ordinary legal work and legal work

16   intended to further illegal ends is not too "knotty" for federal prosecutors to convict a

17   government lawyer of a war crime, it is not too "knotty" to determine whether a government

18   lawyer committed a constitutional tort.

19          In addition to failing on its own terms, Yoo's argument about "line-drawing difficulties"

20   rests on a misapplication of *Wilkie*. There the plaintiff alleged that federal agents had retaliated

21   against him for refusing to re-grant an easement through his ranch to the government. It was

22   undisputed that the alleged retaliations aimed to recover the easement, a legitimate purpose.

---

[15] Rudolf Lehmann, Chief of the Legal Department of the High Command of the German (Nazi) Armed Forces, was convicted of war crimes for his role in drafting a series of orders and decrees that permitted illegal acts in occupied territories, including summary execution of enemies caught behind German lines and summary deportation for criminal suspects. *U.S. v. Wilhem von Leeb et al., in XI Trials of War Criminals Before the Nuremberg Military Tribunals Control Council Law No. 10*, 690-95 (U.S. Gov't Printing Office 1950) [hereinafter *Lehmann's Case*].

1    *Wilkie*, 127 S. Ct. at 2601. While in the aggregate the retaliations could be described as "death by

2    a thousand cuts," it was not clear that any of the individual acts were even impermissible. *Id.* at

3    2600-01. These were the features that led the Court to perceive a line-drawing problem. *Id.* at

4    2601 (noting that plaintiff did not object to agents' purpose or means but rather argued that in the

5    aggregate the agents "simply demanded too much and went too far. But as soon as Robbins's

6    claim is framed this way, the line-drawing difficulties it creates are immediately apparent."). By

7    contrast, Padilla contends that Yoo's purpose (legitimating illegal military detention and coercive

8    interrogation) and means (making illegal policies and shielding those policies with intentionally

9    wrong legal memoranda) were illegitimate.[16] Yoo's purpose may (or may not) have been

10   motivated by an intent to protect national security. But that intent gave him no more authority to

11   suspend the Constitution at Padilla's expense than police officers' intent to protect the

12   community from crime gives them authority to conduct unconstitutional searches, as in *Bivens*.

13   Like theirs, his "zeal" transgressed the law and was misplaced. *See Mitchell*, 472 U.S. at 523.

### 2.    None of the novel factors proposed by Yoo justify denial of *Bivens* remedy.

14            Because none of the factors that the Supreme Court or Ninth Circuit have identified over

15   the last thirty-seven years apply here, Yoo asks this Court to invent several new ones. Each

16   rehashes national-security arguments regularly rejected by courts in the last several years, or

17   inappropriately transplants issues from another doctrine that adequately addresses those issues.

#### a.    Deference to "war powers" does not bar the claims.

18            Yoo claims (at 12-13) that because the illegal detention and extreme interrogations were a

19   "military decision," this Court must "refrain from interfering in the core functions of the political

20   branches especially during wartime." That was Yoo's refrain when he held office as well. The

---

[16] *See Hamdi*, 542 U.S. at 521 ("Certainly, we agree that indefinite detention for the purpose of interrogation is not authorized."). Neither is it legitimate for a government attorney sworn to assist the President faithfully to execute the laws to meet secretly with other executive officials and "'discuss[] in great detail how to legally justify' 'pressure techniques proposed by the CIA,' including waterboarding, mock burial, and open-handed slapping of suspects." C28.

1    Supreme Court has consistently rejected it.

2          To be sure, it is an old concern. "Safety from external danger is the most powerful director

3    of national conduct. Even the ardent love of liberty will, after a time, give way to its dictates."

4    The Federalist No. 8, at 33 (Alexander Hamilton). Even those nations "most attached to liberty,"

5    Hamilton warned, would turn in difficult times "to institutions which have a tendency to destroy

6    their civil and political rights. To be more safe, they, at length, become willing to run the risk of

7    being less free." *Id*. To safeguard freedom, the Framers established a constitutional system in

8    which the Judiciary – not the Executive – protects constitutional rights at all times.  Because "a

9    state of war is not a blank check for the President when it comes to the rights of the Nation's

10   citizens," "[i]t does not infringe on the core role of the military for the courts to exercise their

11   own time-honored and constitutionally mandated roles of reviewing and resolving claims like

12   those presented here." *Hamdi*, 542 U.S. at 535. To the contrary, "[w]ithin the Constitution's

13   separation-of-powers structure, few exercises of judicial power are as legitimate or as necessary

14   as the responsibility to hear challenges to the authority of the Executive to imprison a person."

15   *Boumediene,* 128 S. Ct. at 2277.[17]  Put simply, "the war power does not remove constitutional

16   limitations safeguarding essential liberties." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S.

17   398, 426 (1934).

18          "In situations of abuse, an action for damages against the responsible official can be an

19   important means of vindicating constitutional guarantees." *Butz v. Economou*, 438 U.S. 478, 506

20   (1978) ("[A]ll individuals, whatever their position in government, are subject to federal law.").

21   While the need for deterring those whose power tempts them to "destroy . . . civil and political

---

[17] This is true even when the President acts with the full backing of Congress; under such circumstances, challenges are not precluded, only "the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 637 (1952). Here, however, the Executive's actions against Padilla were contrary to the will of Congress, as expressed in the Non-Detention Act, 18 U.S.C. § 4001(a) (2000).  Unlike a battlefield capture, neither the detention without charge of citizens seized in civilian settings in the U.S. nor prolonged extreme interrogation is a "fundamental and accepted incident to waging war" permitted by the Authorization for Use of Military Force ("AUMF").  *See Hamdi*, 542 U.S. at 518, 519-20; *see also infra* Part II.A.2.a.ii.

1    rights" is, if anything, even greater in difficult times, as Hamilton warned, the Federalist No. 8, at

2    33, "[t]he strength of our system of constitutional rights derives from the steadfast protection of

3    those rights in both normal and unusual times." *Iqbal v. Hasty*, 490 F.3d 143, 159 (2d Cir. 2007),

4    *cert. granted on other grounds, Ashcroft v. Iqbal*, 128 S. Ct. 2931 (Jun. 16, 2008) (No. 07-1015).

5    In *Iqbal*, the Second Circuit permitted non-citizens detained on immigration charges after 9/11 to

6    bring *Bivens* claims vindicating "the right not to be subjected to needlessly harsh conditions of

7    confinement, [and] the right to be free from the use of excessive force."  Deference to war

8    powers did not require dismissal there and it does not here, in the case of an American citizen

9    subjected to a longer and more horrific detention.[18]

**b.    No "national security prerogative" bars the claims.**

10           Yoo asserts (at 15-18) that making him subject to the same rules as other federal officers

11   would jeopardize national security by preventing candid advice on national security issues. It

12   would not. In *Mitchell*, 472 U.S. at 523, federal officials – believing that suspected terrorists

13   intended to blow up buildings and kidnap the National Security Advisor – authorized warrantless

14   wiretaps. One wiretap captured conversations involving Forsyth. When Forsyth (like Padilla)

15   was later prosecuted on unrelated charges, he discovered the wiretaps and sued the Attorney

16   General under *Bivens*. The defendant, there as here, claimed that his "actions in furtherance of

17   the national security should be shielded from scrutiny in civil damages actions." *Id.* at 521. Like

18   Yoo, the Attorney General argued that the possibility of personal liability would chill the

---

[18] Yoo's citations (at 12-13) to *Hamdi* and *North Dakota  v. U.S.* (which involved a dispute over
state regulations that increased the price of liquor sold on military bases) miss the point.  The
passages quoted stand for the proposition that deference is due to "those who must lead our
troops in battle," *North Dakota v. U.S.*, 495 U.S. 423, 443 (1990), with respect to "core strategic
matters of warmaking," *Hamdi* 542 U.S. at 535. They provide no support for the notion that
courts may not hear claims of unlawful detention and interrogation of a U.S. citizen thousands of
miles from any battlefield. To the contrary, as *Hamdi* reaffirmed, "[w]hatever power the United
States Constitution envisions for the Executive in its exchanges with other nations or with enemy
organizations in times of conflict, it most assuredly envisions a role for all three branches when
individual liberties are at stake." 542 U.S. 535-37.

1    performance of functions essential to national security. *Id.* Although the Supreme Court

2    recognized the "importance of those activities to the safety of our Nation," *id.* at 523, it refused

3    to create a "blanket immunization of [the] performance of the 'national security function.'" *Id.* at

4    521. The reason was simple: "The danger that high federal officials will disregard constitutional

5    rights in their zeal to protect the national security is sufficiently real to counsel against affording

6    such officials an absolute immunity." *Id.* at 523. Though Yoo puts his "national security

7    prerogative" under the "special factors counseling hesitation" heading, and Mitchell put his

8    under the "absolute immunity" heading, the concerns are the same.

9        The Supreme Court in *Mitchell* recognized the importance of avoiding a legal order in

10   which senior officials would, as Yoo puts it (at 14), "temper [their] analyses or advice out of fear

11   of personal liability." But it also recognized that eliminating constitutional tort suits would lead

12   to too much zeal. Balance is the key, and the Court concluded that qualified immunity achieved

13   that balance:

> [T]he standard of [qualified immunity] . . . will not allow the Attorney General to
> carry out his national security functions wholly free from concern for his personal
> liability; he may on occasion have to pause to consider whether a proposed course
> of action can be squared with the Constitution and laws of the United States. But
> this is precisely the point . . . Where an official could be expected to know that his
> conduct would violate statutory or constitutional rights, he *should* be made to
> hesitate.

14   *Mitchell*, 472 U.S. at 524 (emphasis in original; quotation marks omitted). "This is as true in

15   matters of national security as in other fields of governmental action." *Id.*[19]

---

[19] Yoo's citations are not to the contrary. *Halperin v. Kissinger*, 807 F.2d 180 (D.C. Cir. 1986)
acknowledged an important interest in national security, but held that the assertion of national
security concerns was an insufficient basis for summary judgment; facts sufficient for the
factfinder to make an independent judgment were necessary. *Id.* at 189. *Department of Navy v.
Egan* considered whether deference to executive decisions was appropriate only in the context of
security clearances, and the Court explicitly noted that no one has a right to a security clearance.
484 U.S. 518, 528 (1988). While *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), involved
national security-related issues, it was decided on the fact that Congress set out a comprehensive
remedial scheme for breaches of privacy in the Privacy Act, 5 U.S.C. § 552a, not on deference to
"war powers." And *Arar v. Ashcroft*, 532 F.3d 157 (2nd Cir. 2008), *rehearing en banc set sua
sponte* (Aug 12, 2008), concerned an unadmitted non-citizen's challenge to the decision to his
removal from the United States, and in that unique context found national security and foreign

1    Yoo also argues that a new national security special factor should be created because

2  "[l]itigating these extremely sensitive matters itself raises serious national security concerns" (at

3  16) if senior officials were deposed on "intelligence matters" (at 23). This puts the cart before the

4  horse. This Court has ample tools at its disposal to address discovery matters, including the

5  possible disclosure of government secrets. The state secrets privilege, not *Bivens* "special

6  factors," is the doctrine by which a district court considers allegations that a deposition or

7  particular piece of evidence would reveal information damaging to national security. That

8  doctrine requires the government, not an individual litigant, to assert the privilege after

9  intervening. And it requires that an invocation of the privilege be supported with an affidavit

10  from the head of the relevant government department. *U.S. v. Reynolds*, 345 U.S. 1, 7-8 (1953).

11  The government has not intervened to assert the privilege, and no cabinet-level official has put

12  his name and reputation behind an affidavit swearing that a particular sort of information is

13  secret and that national security would be undermined by its disclosure. Yoo seeks to unburden

14  himself of these and other[20] constraints merely by intoning words like "secret" and "security."

15  That will not do. "Simply saying 'military secret,' 'national security' or 'terrorist threat' or

16  invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the

17  [state secrets] privilege." *Al-Haramain v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007). It is

18  likewise insufficient to support creation of a new special factor that would do the same thing.[21]

---

relations special factors. *Id.* at 183. The panel made no such analysis of special factors with respect to Arar's "domestic detention claims." *Id.* at 184. Finally, *Stanley* and *Chappell* relate only to servicemembers' claims against superior officers. *See supra* Part I.B.1.b.

[20] Executive invocation of the privilege does not end the analysis. "[T]he court itself must determine whether the circumstances are appropriate for the claim of privilege." *Reynolds,* 345 U.S. at 8, 9-10. That is because "[t]he lawful limits of the privilege are extensible beyond any control, if its applicability is left to the determination of the very official whose interest it is to shield his wrongdoing under the privilege." 4 John Henry Wigmore, *A Treatise on the System of Evidence in Trials at Common Law* § 2376, at 3345 (1905).

[21] Yoo's cases do not support his effort to do by "special factors" analysis what he could not do under the states secrets privilege. Indeed, *Sterling v. Tenet,* 416 F.3d 338, 348 (4th Cir. 2005), involved an invocation of the state secrets privilege – not a request to dismiss a case without such an assertion. *Arar* too involved an invocation of the state secrets privilege, by both the

1    Yoo's assertion is also wrong on the facts. The Executive itself has publicized, and

2 permitted to be exposed in public court proceedings, the manner of Padilla's seizure and the role

3 of various executive officers; moreover, the extreme interrogation methods have been exposed

4 through, *inter alia*, declassified government reports, orders and memoranda.[22]

        **c.**       **Plaintiffs' claims will not disrupt military operations.**

5    Yoo also argues (at 18) that a new special factor should be created because lawsuits

6 "interfer[e] with ongoing military operations . . . by diverting the time and attention of . . .

7 officials from the military offensive to the legal defensive." Yoo tries to bootstrap his claims by

8 presuming something the pleadings deny: that Padilla is an enemy. He is not. C43. Unlike

9 Hamdi, Padilla was not captured on a foreign battlefield, carried no arms when seized, and was

10 seized from the civilian justice system. C35, 40. Yoo does not explain how a suit by an American

11 citizen seized, imprisoned and brutally interrogated in the United States would divert military

12 officials. It would not require haling commanders into court from combat operations or require

13 review of battle decisions or decisions made in undercover operations abroad.[23]

        **d.**       **No foreign relations concerns bar the claims.**

14    Yoo invokes foreign relations concerns, but this case involves claims about what

15 American officials did to an American citizen in America. There are no credible foreign relations

---

Acting Attorney General and the Homeland Security Secretary. *Arar*, 532 F.3d at 182-83.

[22] *See* Exhibit A (Haynes memo); Exhibit F (DOD memo, Nov. 27, 2002); Exhibit I (Gonzales speech); Exhibit J (Order designating Padilla an enemy combatant); Exhibit K (Mobbs Declaration); Exhibit M (Rumsfeld memo to Commander U.S. Southern Command, Apr. 16, 2003); Exhibit N (Working Group Report on Detainee Interrogations, Apr. 4, 2003); Exhibit O (Photographs of Padilla's shackles, goggles, earphones); Exhibit P (Church Slides).

[23] Certainly none of the cases cited by Yoo support his disruption theory. *See Johnson v. Eisentrager*, 339 U.S. 763 (1950) (non-citizens captured in China, convicted in China and detained in Germany); *In re Iraq*, 479 F. Supp. 2d 85 (non-citizens captured and detained in Iraq and Afghanistan); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985) (non-citizens abroad allegedly subjected to torts by U.S.-backed paramilitary force); *see also Arar*, 532 F.3d at 181-82 (non-resident non-citizen rendered to Syria, whose claims involved high-level official action from three nations).

1    concern; his own cases make that clear. *Sanchez-Espinoza* involved claims by Nicaraguans about

2    activities that took place in Nicaragua, and the decision was expressly predicated on the fact that

3    the plaintiffs alleged "unconstitutional treatment of foreign subjects causing injury abroad." *Id.*,

4    770 F.2d at 209. *Arar* involved claims by a dual Syrian-Canadian citizen for torts inflicted by

5    Syrian officials in Syria. *Id.*, 532 F.3d at 181-84.  *U.S. v. Verdugo-Urquidez* involved claims by a

6    Mexican for alleged constitutional torts taking place in Mexico, and the Court determined that

7    the Fourth Amendment was not "intended to restrain the actions of the Federal Government

8    against aliens outside of the United States territory." *Id.*, 494 U.S. 259, 266 (1990). *Sosa v.*

9    *Alvarez-Machain* likewise involved claims by a Mexican for alleged torts taking place in

10   Mexico.  *Id.*, 542 U.S. 692, 727 (2004).

11         Unsupported by the cases, Yoo makes one last-ditch effort to imbue Padilla's claims with

12   foreign policy implications, claiming (at 17) that "[f]or different legal consequences to attach

13   when the United States arrests and detains an enemy combatant on domestic rather than foreign

14   soil would necessarily impact the Executive's decision-making in that regard, would lead to

15   increased foreign operations, and, in turn impact foreign relations." Yoo intimates that, if the

16   Executive is bound by the constitution within the U.S., then it will attempt to seize and detain

17   citizens outside the U.S. so it can transgress those constitutional bounds – a situation that he

18   believes would cause tension with nations where the Executive commits such abuses. Yet the

19   Constitution follows citizens abroad. *Reid v. Covert*, 354 U.S. 1, 5-6 (1957). And unlike Yoo, the

20   Executive has not seen fit to warn the federal judiciary that it will ramp up seizures and

21   detentions of Americans abroad if it must abide by the Constitution at home.

22                                    * * *

23         In sum, a *Bivens* remedy is appropriate. The constitutional tort claims are classic claims.

24   Even if they were new, whether to provide a *Bivens* remedy would remain the "subject of

25   judgment." *Wilkie* at 2598. That judgment should be clear here. The brazen constitutional

26   violations that Yoo set in motion were the product of a zeal that Alexander Hamilton recognized

27   as always dangerous, and – as the Supreme Court has stated – those whose positions put them at

1   risk of discharging that zeal "*should* be made to hesitate." *Mitchell*, 472 U.S. at 524 (emphasis in

2   original; quotation marks omitted). Padilla, the victim of that zeal, has no adequate alternative

3   remedy. Set against those values are Yoo's hollow claims of special factors, which amount to no

4   more than another plea for the federal judiciary to avert its eyes from the terrible things that have

5   been done in the Nation's name.

**II.    Qualified immunity does not shield Yoo from his wrongs.**

6         An invocation of qualified immunity on a motion to dismiss requires a two-step analysis

7   under *Saucier v. Katz*, 533 U.S. 194 (2001). "The first question is whether the facts, when taken

8   in the light most favorable to Plaintiffs, show that Defendant['s] conduct violated a constitutional

9   right." *Torres v. City of Los Angeles*, 540 F.3d 1031, 1044 (9th Cir. 2008) (internal citations

10  omitted). If the answer to the first question is yes, the second question is asked: "The second

11  question is whether the constitutional right at issue is 'clearly established.'" *Id.*

**A.    Plaintiffs have stated claim of constitutional violations.**

12        Other than his overreaching collateral estoppel argument, addressed *supra* Part I.A, Yoo

13  offers two arguments against the complaint stating constitutional claims. First, he argues that

14  plaintiffs have not adequately alleged his personal participation in any of the constitutional

15  violations – essentially an allegation of defective pleading of causation. Second, he takes issue

16  with three (but only three) of the constitutional rights allegedly violated: the privilege against

17  self-incrimination, the Eighth Amendment, and access to courts.

18        **1.    Yoo personally participated in causing the constitutional violations.**

19        The plaintiff in a constitutional tort suit, like the plaintiff in any tort action, must plead a

20  causal connection between the defendant and the constitutional injury, sometimes referred to as

21  the defendant's "personal participation." Like any other facts on a motion to dismiss, facts

22  alleging causation are presumed true. *See Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d

23  1116, 1122 (9th Cir. 2008) (post-*Twombly*); *see also id.* at 1122 (notice pleading is "not an

24  onerous burden"); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (plaintiffs need only

1    plead "enough facts to raise a reasonable expectation that discovery will reveal evidence").[24]

2        Liability for constitutional torts is interpreted "against the background of tort liability that

3    makes a man responsible for the natural consequences of his actions," *Malley v. Briggs*, 475 U.S.

4    335, 344 n.7 (1986), and foreseeable "intervening causes . . . will not supersede the defendant's

5    responsibility." *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990). Foreseeability, the

6    keystone of causation, is a fact-heavy inquiry. *Id.* Fact patterns of foreseeability fall into several

7    categories, among them direct participation (e.g., a guard delivering a blow); supervisory

8    responsibility; and "setting in motion a series of acts by others which the actor knows or

9    reasonably should know would cause others to inflict the constitutional injury." *See, e.g.*, *Kwai*

10    *Fun Wong v. U.S.*, 373 F.3d 952, 966 (9th Cir. 2004) (*Bivens* action). Plaintiffs have pled both

11    direct participation and "set in motion" causation.[25] Five examples follow.

### a.    Personal participation in policymaking.

13        As "*de facto* head of war-on terrorism legal issues" and "key member of a small,

14    secretive, and highly-influential group of senior administration officials known as the 'War

15    Council,'" Yoo "participate[d] directly in developing policy in the war on terrorism." C19, 15.

16    His policies included "extra-judicial, ex parte assessment of enemy combatant status followed by

17    indefinite military detention, without notice or opportunity for a hearing of any sort . . .

18    completely preclud[ing] judicial review of the designation." C36. They also included the

19    "decision to employ unlawfully harsh interrogation tactics," and "pressure techniques proposed

20    by the CIA" against individuals designated as "enemy combatants." C27, 28. This policy of

---

[24] Relying on a Tenth Circuit case, Yoo suggests (at 27) without elaboration that "the *Twombly* standard may have greater 'bite' in the context of qualified immunity cases." Whatever this may mean, it is not the law in the Ninth Circuit, which has reiterated after *Twombly* that it will not "eviscerate the notice pleading standard in suits where qualified immunity is at issue." *Hydrick v. Hunter*, 500 F.3d 978, 985 (9th Cir. 2007) (post-*Twombly*).

[25] Yoo repeatedly relies on a misreading of *Chuman v. Wright*, 76 F.3d 292 (1996), that the Ninth Circuit has rejected. *Chuman* holds that it is improper to "allow[] liability to attach to a mere bystander who had no role in the unlawful conduct" but does not require that "that each [defendant] officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (quotation marks omitted).

1   employing harsh interrogation techniques against enemy combatants "proximately and

2   foreseeably led to the abuses suffered by Padilla." C46.

### b.   Personally advising that Padilla qualified for the "enemy combatant" program.

3   Yoo "personally 'reviewed the material on Padilla to determine whether he could qualify,

4   legally, as an enemy combatant," and "issued an opinion to that effect.'" C38. "Ashcroft relied

5   on Defendant's opinion in recommending to the President that Padilla be taken into military

6   custody," C39, and "[b]ased on Defendant's legal opinion and Ashcroft's recommendation,"

7   Padilla was declared an "enemy combatant," seized and delivered to military custody. C40.

### c.   Personally advising that the Fourth and Fifth Amendments were inapplicable in the U.S.

8   Yoo advised executive officials – by way of an October 23, 2001 memorandum entitled

9   *Authority for Use of Military Force to Combat Terrorist Activities Within the United States*, and

10  a June 27, 2002 memo entitled *The Applicability of 18 U.S.C. Sec. 4001(a) to Military Detention*

11  *of United States Citizens* – that military detention of an American citizen seized on U.S. soil was

12  lawful because "'the Fourth Amendment had no application to domestic military operations,' and

13  'restrictions outlined in the Fifth Amendment simply do not address actions the Executive takes

14  in conducting a military campaign against the nation's enemies.'" C19a; *see also* C21.

### d.   Personally advising that extreme interrogation could occur with impunity.

15  In June 2002, the month that Padilla was seized from the civilian justice system, Yoo and

16  the rest of the "War Council" "[d]iscuss[ed] in great detail how to legally justify pressure

17  techniques proposed by the CIA." C28. Shortly thereafter, Yoo advised that "acts of

18  interrogation would not constitute torture unless they caused pain equivalent in intensity to the

19  pain accompanying serious physical injury such as organ failure." *Id*. That Fall, Yoo "reviewed

20  and approved" unprecedented interrogation techniques including "stress positions for up to four

21  hours," "isolation facilities for renewable periods up to 30 days," "deprivation of light and

22  auditory stimuli," "hooding," "sleep adjustment," "environmental manipulation," "forced

1   grooming," and "removal of all comfort items, including religious items." C20, 48. These

2   justifications (most later repudiated by the Executive) repeatedly violated "OLC practice and

3   well-established OLC precedent." C30. Yoo "intentionally used the Memos to evade well-

4   established legal constraints and to justify illegal policy choices that he knew had already been

5   made," C23, provided analyses that "patently bend and twist to avoid any legal restriction," C22,

6   and were intentionally withheld "from other agencies in order to control the outcome and

7   minimize resistance." C25. Yoo acted "with the specific intent of immunizing government

8   officials from criminal liability for participating in practices that he knew to be unlawful," C31,

9   so as "to remove legal restraints on interrogators," C29, and "justify the Executive's already

10  concluded policy decision to employ unlawfully harsh interrogation tactics," C27, in

11  contravention of clear "OLC precedent prohibiting [DOJ] from issuing a legal opinion where a

12  conclusion has already been reached." C30.

> **e.   Personally approving incommunicado detention and denial of access to counsel.**

13         "In his role as the de facto head of war-on-terrorism legal issues, Defendant wrote and

14  promulgated a series of memoranda," C19, including one from "about May 2002 regarding

15  access to counsel and legal mail by detainees held at naval brigs in Norfolk and Charleston,"

16  C19f, which authorized "restrictions imposed on Padilla's access to counsel," C60, thereby

17  making it impossible for courts to know about – much less stop – the abusive interrogations and

18  conditions.

19         Yoo seeks to rebut the sufficiency of these causation allegations in three ways, each of

20  which is inconsistent with binding precedent. **First**, he repeatedly contends (at 28-30) that

21  plaintiffs have not pleaded "direct action," "direct personal involvement" or "supervisory or

22  discretionary authority, control, or responsibility." Yoo is wrong on the law. Causation exists

23  whenever a defendant "sets in motion a series of acts by others which the actor knows or

24  reasonably should know would cause others to inflict the constitutional injury.'" *Kwai Fun*

25  *Wong*, 373 F.3d at 966. Direct participation and supervisory authority are two ways – not the

1    only ways – that a defendant can cause foreseeable constitutional injuries. Yoo is also wrong on

2    the facts; though he ignores it, plaintiffs more than adequately allege direct participation in

3    policymaking. *See, e.g.*, *Hydrick*, 500 F.3d at 988 (post-*Twombly*) (in constitutional challenge to

4    conditions of confinement at state psychiatric hospital, allegations that defendant "played an

5    instrumental role in policymaking" satisfied the "set in motion" standard). *Iqbal*, 490 F.3d at 166

6    (post-*Twombly*) (personal involvement adequately pled by allegations that one defendant

7    "directed that all detainees 'of high interest' be confined in the most restrictive conditions

8    possible," second defendant "approved this policy," and third defendant "along with others,

9    designed the policy.").

10       **Second,** Yoo attempts to evade liability by claiming (at 30) that he was just a middleman

11    in the decision to designate and detain Padilla – receiving information from others, analyzing it

12    and passing it on to still others who made final decisions. In short, he argues that later

13    intervening causes – e.g., the President's order – strip him of responsibility. Yet "intervening

14    causes . . . will not supersede the defendant's responsibility." *White*, 901 F.2d at 1506 (ellipsis in

15    original) (*citing* Prosser & Keeton on Torts § 44, at 303-04 (5th ed. 1984)). And while an

16    abnormal intervening force, unlike a foreseeable one, will break the causal chain, whether a

17    consequence was "foreseeable" or "abnormal" is "to be decided as issues of fact are decided,"

18    i.e., by the factfinder, not on a motion to dismiss. *White*, 901 F.2d at 1506.[26]

---

[26] Yoo presumes (at 28-30, 23) that the complaint admits every assertion in the Gonzales speech merely because a copy of the Congressional Record containing the speech, *see* 50 Cong. Rec. S2702-05 (2004), was attached for the Court's convenience. Yet "[t]he rule that allows the court to look beyond the complaint does not require the court to attribute to a plaintiff everything in a document written by a third party or a defendant." *Rivera v. Hamlet*, 2003 WL 22846114, at *5 (N.D. Cal. 2003). A plaintiff can plead a third party's statement – i.e., admit that someone said something – without admitting the truth of the statement. *Guzell v. Hiller,* 223 F.3d 518, 519 (7th Cir. 2000) (Posner, J.) ("A plaintiff in a libel suit who attached the allegedly libelous article to his complaint would obviously not be vouching for the truth of the libelous assertions in the article."); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir. 1995) ("Both the district court and the defendants assume that Rule 10(c) requires a plaintiff to adopt as true the full contents of any document attached to a complaint or adopted by reference. This is not a proper reading of the rule."); *Wilson v. Grannis*, 2008 WL 4415268, at *2 (N.D. Cal. Sept. 26, 2008). Yoo ignores Federal Rule of Civil Procedure 10(c), instead citing (at 28 n.17) two Rule 12(b)

1        Like other government officials, government lawyers are responsible for the foreseeable

2   consequences of their actions. In *Lippoldt*, 468 F.3d 1204, for example, a protest group sought

3   parade permits, and a deputy chief of police, fearing a risk to public safety, asked the city legal

4   department whether permit denials would be constitutional. *Id.* at 1210. The assistant city

5   attorney researched the law and drafted a letter denying the applications. The chief city attorney

6   revised the letter, the police chief orally approved, and the deputy police chief signed. *Id.* The

7   protesters sued city officials, including the assistant city attorney, asserting that the permit

8   denials violated the First Amendment. Like Yoo, the attorney argued that "the causal connection

9   between [her] conduct and the ultimate denial [was] too tenuous, and too heavily interrupted by

10  the acts and decisions of others," and "subordinate to the causative actors who actually made the

11  decision to deny the parade permits." *Id.* at 1220 (quotation marks omitted). Though the letter

12  had been revised by the chief attorney and approved by the chief of police, the district court after

13  a bench trial rejected the intervening actors theory and found the assistant city attorney liable.

14  The Tenth Circuit affirmed, explaining that the assistant city attorney had discovered in her

15  research that:

> [Defendant] drafted the letter denying the parade permits . . . [S]he researched the law on parade applications and learned that . . . denying the parade permits for the reasons offered by the City was most likely unconstitutional, [yet she] advised [the deputy police chief] to sign the denial letter. We agree with the district court that [the assistant attorney's] conduct was a substantial factor in denying the parade permits and violating plaintiffs' First Amendment rights.

16  *Id.* at 1220. Similarly, in *Anoushiravani*, 2004 WL 1630240, two Department of Homeland

17  Security attorneys advised customs agents that they could constitutionally refuse to release

18  seized property, and a person whose property was so seized and retained sued both the customs

---

cases stating that consideration of the appendix would not convert this motion to a motion for summary judgment. That doctrine allows documents to be "incorporated by reference into a complaint if the plaintiff refers *extensively* to the document or the document *forms the basis* of the plaintiff's claim . . . for example, when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan . . . or when a plaintiff's claim about stock fraud is based on the contents of SEC filings." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (emphasis added). Here, the complaint refers only once to the Gonzales speech. C39.

1    agents and the attorneys. The district court held that the complaint sufficiently alleged the

2    lawyers' personal participation, since the seizures were a foreseeable result of their advice. *Id.* at

3    *5. Likewise, in *Smith*, 573 F. Supp. 604, a county attorney was sued as part of a constitutional

4    challenge to a detention center's strip search policy. Though the attorney asserted insufficient

5    personal participation, the court held that "[g]iving legal advice which serves as the basis for

6    actions which violate the rights of others is sufficient personal involvement to support liability

7    under § 1983." *Id.* at 609.

8           In any event, Yoo's factual assertion that he could not have known how his memoranda

9    would be used is at odds with the pleadings, which allege policymaking plus invention of legal

10   justifications intended to achieve illegal policy ends.[27] To the extent he argues that legal advice

11   cannot cause foreseeable constitutional violations – even where a defendant has *intended* the

12   constitutional violations – he is wrong. Attorneys are liable for intentional facilitation of

13   unlawful conduct. *Supra* Part I.B.1.c.; *see also Donovan*, 433 F.2d at 744-45.

14          "The critical question," as the Ninth Circuit has held, "is whether it was reasonably

15   foreseeable that the actions of the [defendant] . . . would lead to the rights violations alleged."

16   *Kwai Fun Wong*, 373 F.3d at 966. The mere fact "that the intervening third party may exercise

17   independent judgment in determining whether to follow a course of action recommended by the

18   defendant does not make acceptance of the recommendation unforeseeable or relieve the

19   defendant of responsibility."[28] Yoo, a key architect of the program, its legal justifier, and the man

---

[27] Yoo "stepped beyond his role as a lawyer to participate directly in developing policy in the war on terrorism," C15, and abused his position by providing legal advice intended "to evade well-established legal constraints and to justify illegal policy choices that he knew had already been made – sometimes by virtue of his own participation in the War Council." C23. Moreover, Padilla's detention, extreme interrogations and treatment were the intended result of Yoo's advice, which included assurance: (i) that the Fourth and Fifth Amendments do not constrain domestic "military" operations, C21, 23, 53; (ii) that Padilla could be designated and detained as an "enemy combatant," C38; (iii) that interrogators could cause detainees pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or death" without risk of liability, C19h; and (iv) that they could raise affirmative defenses to liability even if they crossed that conscience-shocking line. C32, 33.

[28] *Kerman v. City of N.Y.*, 374 F.3d 93, 126-27 (2d Cir. 2004); *accord Bateson v. Geisse*, 857

1    who personally certified that Padilla qualified for the program, cannot argue that Padilla's

2    seizure, detention and treatment were not the foreseeable results of his actions.[29]

3         Yoo's **third** argument (at 31) is that he cannot be blamed for any extreme interrogations

4    or treatment at the Brig because five of his seven memoranda were directed to Guantanamo. Yet

5    two memoranda applied directly to the U.S., declaring that neither the Fourth nor the Fifth

6    Amendment applied to domestic "military" operations. C19a, 19g, 21.[30] By purporting to strip

7    protections from unreasonable seizure, excessive force, and conscience-shocking interrogations

8    and detention, these memoranda foreseeably caused Padilla's seizure, detention, and submersion

9    in the rights-free world of the Brig.[31] So did the other five memos, which Yoo intended to enable

10   extreme interrogations that interrogators would otherwise refuse to conduct for fear of criminal

11   prosecution. C28-33. Yoo knew these five were being used to justify abuses at Guantanamo,

12   C34c, knew that the same military authority ruled both Guantanamo and the Brig, C53, and knew

13   that Brig officials would treat Brig detainees the same as Guantanamo detainees. C54. Even

14   without the two U.S.-directed memos, it was foreseeable that Brig interrogators would use the

15   abusive techniques, C52-53.[32]

---

F.2d 1300, 1303-04 (9th Cir. 1988) (holding that where local legislature refused to grant permit or timely reconsider its decision, the bank's intervening and independent decision to foreclose property was foreseeable, so local legislators could be liable for the resulting constitutional tort).

[29] The middleman defense has also failed in the criminal context. For example, in the case of Rudolf Lehmann, discussed *supra* note 12, the defendant received directives from senior government officials and translated them into legal form for Field Marshal Keitel, the leader of the German military, to sign and transmit to the military. Lehmann was responsible for the foreseeable consequences of his actions. *See, e.g.*, *Lehmann's Case* at 694 ("We find no provisions in this order where he contributed to its inherent viciousness but he was one of those responsible for its final production in the form in which this criminal order was transmitted to the army and he was criminally responsible for a part of the vicious product.").

[30] Yoo notes these memoranda are not attached to the complaint (at 34 n.23) but, "at the motion to dismiss stage, [plaintiff] need not support his allegations with evidence." *Johnson*, 534 F.3d 1122 (post-*Twombly*).

[31] Yoo cannot disclaim his authorship of the memoranda (at 31 n.20) on a motion to dismiss.

[32] As the Fifth Circuit has put it in an analogous context, "[w]here police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policymakers, the affirmative

### 2.   Plaintiffs' constitutional rights were violated.

1    Aside from his collateral estoppel claim, Yoo challenges plaintiffs' claims with respect to

2    only three constitutional rights: the privilege against self-incrimination, the Eighth Amendment,

3    and access to courts.  Because *Saucier* requires this Court to determine *first* whether the pleaded

4    facts state a claim for a constitutional violation, and only *second* to determine whether the

5    constitutional right at issue was clearly established at the time of the injury, *Torres*, 540 F.3d at

6    1044, plaintiffs describe here all of the alleged constitutional violations, not just the challenged

7    three.[33]

### a.   Designation, seizure, and detention *vel non* were unconstitutional.

#### i.   The Fourth Amendment prohibited seizure

8    The Fourth Amendment broadly protects all Americans on U.S. soil against

9    unreasonable searches and seizures. *Verdugo-Urquidez*, 494 U.S. at 266. The prohibition applies

10   regardless of governmental purpose. *Soldal v. Cook County*, 506 U.S. 56, 69 (1992); *accord*

11   *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991). An invocation of national security is no

12   exception. *U.S. v. U.S. Dist. Ct.*, 407 U.S. 297, 316-17 (1972).

13   No seizure is reasonable under the Fourth Amendment unless there is "fair and reliable

14   determination of probable cause . . . made by a judicial officer either before or promptly after"

15   the seizure. *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975); *see also County of Riverside v.*

16   *McLaughlin*, 500 U.S. 44, 56-57 (1991) (presumption that judicial determination not "prompt"

17   after 48 hours). Here, Padilla was secured in a civilian jail when seized by military agents – so

---

link/moving force requirement is satisfied," and the policymakers are liable for the consequences. *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985).

[33] Plaintiffs' discuss the Self-incrimination Clause, the Cruel and Unusual Punishment Clause, and access to courts in subsections b.i, b.ii., and c of this Part. Because Yoo did not challenge any of the other claims, they are not extensively briefed. If Yoo challenges these claims for the first time in his reply brief, plaintiffs expect to seek permission to file a sur-reply brief.

1    there was no excuse for a warrantless seizure. *Gerstein*, 420 U.S. at 113-14 ("Once the suspect is

2    in custody . . . the reasons that justify dispensing with the magistrate's neutral judgment

3    evaporate."). Nor was there was ever any judicial determination of probable cause after the

4    seizure, let alone a "prompt" determination.

5          Probable cause was also lacking.[34] Even if an American citizen on American soil can be

6    detained without charge as an alleged "enemy combatant," probable cause for that specific

7    allegation must exist. *See Zurcher*, 436 U.S. at 556 n.6. Yet the information upon which the

8    designation was based could not provide probable because it nowhere alleged that Padilla had

9    engaged in armed combat,[35] and was largely based on second hand recitations of admittedly

10    unreliable informant testimony.[36]

           **ii.**      **The Fifth Amendment barred military detention of a**
                      **citizen seized in the U.S.**

11          The Fifth Amendment requires that liberty be deprived only pursuant to positive law: the

12    Constitution grants the Executive no power to detain at will. For citizens, liberty is buttressed

13    further by the Non-Detention Act, 18 U.S.C. § 4001(a) (2000), which unequivocally states that:

14    "No citizen shall be imprisoned or detained by the United States except pursuant to an Act of

15    Congress." *Id.* ; *see Howe v. Smith*, 452 U.S. 473, 479 n.3 (1981) ("§ 4001(a) proscrib[es]

---

[34] Padilla was originally detained on a material witness warrant. *Bacon v. U.S.*, 449 F.2d 933, 943 (9th Cir. 1971). That warrant – which by its nature alleged facts regarding what Padilla had *witnessed* – could not justify the later military seizure. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 n.6 (1978).

[35] *Padilla V* held that a citizen seized in the U.S. may be detained indefinitely if he engaged in armed conflict abroad against the U.S. 423 F.3d at 392. However, the power of military detention recognized in *Hamdi* applies only to citizens seized on a foreign battlefield. *See infra* Part II.A.2.a.ii; *see also supra* note 2 (majority of justices agreed at time of *Hamdi*).

[36] *Illinois v. Gates*, 462 U.S. 213, 241-42 (1983) requires that informant testimony be supported by a "substantial basis" to infer credibility, yet the Mobbs Declaration admits that the informants were not "completely candid" and had provided information that "may be part of an effort to mislead or confuse U.S. officials." Declaration at 2, n.1. *See also U.S. v. Delgadillo-Velasquez*, 856 F.2d 1292, 1297 (9th Cir. 1988) (second-hand tip received from a customs agent who vouched for credibility of informant "was not reliable because the investigating marshal had no means of knowing from whom it came or the past performance of the informant.").

1    detention *of any kind* by the United States, absent a congressional grant of authority to detain")

2    (emphasis in original). The Authorization for Use of Military Force Joint Resolution, Pub. L. No.

3    107-40 § 2(a), 115 Stat. 224 (2001) ("AUMF"), authorizes detention of citizens only under the

4    "narrow circumstances" of a "citizen captured in a *foreign* combat zone." *Hamdi*, 542 U.S. at

5    509, 523 (emphasis original). Unlike a foreign battlefield capture, the seizure of a citizen from a

6    domestic jail has not been authorized by Congress. *See id.* at 518 (AUMF authorizes only

7    "fundamental and accepted . . . incident[s] to war").

8        Moreover, the Constitution limits military jurisdiction over citizens. *Ex parte Milligan*,

9    71 U.S. 2, 121-22 (1866) (notwithstanding Civil War, military has no power over citizens in

10   areas "where the courts are open and their process unobstructed"), *cited with approval in*

11   *Hamdan v. Rumsfeld*, 548 U.S. 557, 596 n.25 (2006).

### iii.     The Fifth Amendment barred continued detention without due process.

12       Even if authority to detain existed, "a citizen-detainee seeking to challenge his

13   classification as an enemy combatant must receive notice of the factual basis for his

14   classification, and a fair opportunity to rebut the Government's factual assertions before a neutral

15   decisionmaker." *Hamdi*, 542 U.S. at 533. Padilla received no process at all. *See Hamdi*, 542 U.S.

16   at 537-38 (finding that unspecified "screening" processes and military interrogations do not

17   provide sufficient process).[37]

### b.     Padilla's extreme interrogations and punitive treatment shock the conscience.

18       The Fifth Amendment protects against "state action that either shocks the conscience . . .

19   or interferes with rights implicit in the concept of ordered liberty." *Martinez v. City of Oxnard*,

20   337 F.3d 1091, 1092 (9th Cir. 2003) (quotations omitted), *cert denied*, 542 U.S. 953 (2004).

### i.     Substantive due process barred coercive interrogation.

21       "A clearly established right, fundamental to ordered liberty, is freedom from coercive

---

[37] The Habeas Suspension Clause also barred detention without due process.

1    police interrogation." *Martinez*, 337 F.3d at 1092.[38] Unlike violations of the privilege against

2    self-incrimination, a violation of the Due Process Clause "is complete with the coercive behavior

3    itself. . . . The actual use or attempted use of that coerced statement in a court of law is not

4    necessary to complete the affront to the Constitution." *Cooper v. Dupnik*, 963 F.2d 1220, 1244-

5    45 (9th Cir. 1992) (en banc), *cert. denied*, 506 U.S. 953 (1992).[39]

6         Padilla was interrogated incommunicado for 21 months without access to counsel;

7    subjected to months of sleep deprivation; denied basic necessities like a mattress or blanket;

8    forced into painful stress positions. C55, 56. The Supreme Court has repeatedly condemned as

9    impermissibly coercive far less shocking conditions. *See, e.g., Ashcraft v. Tennessee*, 322 U.S.

10   143, 152 n.8, 154 (1944) (36 hours of interrogation "inquisition[al]" and "inherently coercive");

11   *Darwin v. Conn.*, 391 U.S. 346 (1968) (48 hours of incommunicado questioning); *Clewis v. Tex.*,

12   386 U.S. 707 (1967) (arrest without probable cause and interrogation for nine days with little

13   sleep).

### ii.   Substantive due process barred punishment without adjudication of guilt.

14        Punishment cannot occur "prior to an adjudication of guilt in accordance with due

15   process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Pierce v. County of Orange*, 526 F.3d

16   1190, 1205 (9th Cir. 2008). Padilla was condemned to nearly four years in the Brig without any

17   adjudication of guilt and was entitled to "more considerate treatment and conditions of

---

[38] Even if Padilla *were* an enemy combatant, which he is not, *see* C43, "indefinite detention for the purpose of interrogation is not authorized." *Hamdi*, 542 U.S. at 521.

[39] *Accord Martinez*, 337 F.3d at 1092. *Chavez v. Martinez*, 538 U.S. 760 (2003) left *Dupnik* intact. *See Chavez*, 538 U.S. at 773 (plurality opinion) ("Our views on the proper scope of the . . . Self-Incrimination Clause do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used at trial; it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern the inquiry in those cases and provide relief in appropriate circumstances."); *id.* at 779 (Souter, concurring); *id.* at 781-82 (Scalia, dissenting) (noting that *Dupnik* survives *Chavez*'s holding). On remand the Ninth Circuit adhered to *Dupnik* and denied the defendant's request for qualified immunity on the due process claim. *Martinez*, 337 F.3d at 1092.

1    confinement than criminals whose conditions of confinement are designed to punish."

2    *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). As someone convicted of no crime, "the

3    guarantees of the Eighth Amendment provide[d] a *minimum standard of care* for determining"

4    his right to be free of punishment. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir.

5    2003) (emphasis in original); *accord Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).[40]

6          Padilla endured not just punishment, but cruel and unusual punishment: prolonged

7    shackling in painful "stress positions," relentless periods of illumination and intentional

8    interference with sleep through loud noise at all hours of the night. C55; *see Hope v. Pelzer*, 536

9    U.S. 730, 738 (2002) (punitive chaining unconstitutional); *Keenan v. Hall*, 83 F.3d 1083, 1090-

10    1091 (9th Cir. 1996), *partially amended and reh'g denied*, 135 F.3d 1318 (9th Cir. 1998) (noise

11    and constant illumination unconstitutional). To further his extreme psychiatric stress, he was

12    impermissibly denied necessary medical care. C71-72; *see City of Canton v. Harris*, 489 U.S.

13    378, 381-82 (1989); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *Gibson v. County of*

14    *Washoe*, 290 F.3d 1175, 1192 (9th Cir. 2002); *see also DeShaney v. Winnebago County Dep't of*

15    *Social Servs.*, 489 U.S. 189, 199-200 (1989).[41]

16          Restrictions on the liberty of an unconvicted detainee that are not justified by a legitimate

17    penological purpose constitute impermissible punishment. *Turner v. Safley,* 482 U.S. 78, 89

18    (1987); *Pierce*, 526 F.3d at 1209 ("punitive interest" not proper for pre-trial detainees); *see also*

19    *Thompson v. Souza*, 111 F.3d 694, 699-700 (9th Cir. 1997). There was no legitimate penological

20    purpose for these conditions – only an effort to intensify the coerciveness of the interrogations.

21    C1, 41, 45, 55, 72.[42]

---

[40] This prohibition clearly applies here because the detention of "enemy combatants" is justified
by "neither revenge, nor punishment, but solely protective custody . . . to prevent the prisoners of
war from further participation in the war." *Hamdi*, 542 U.S. at 518 (quotations omitted).

[41] Even if any one condition did not constitute cruel and unusual punishment, together they do.
*See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 362-63
(1981) (Brennan, J., concurring); *see also* C1, 55, 56, 65, 66, 68, 72.

[42] Because Yoo chose to move to dismiss rather than answer the complaint, there has been no
factual assertion of a legitimate, non-punitive justification.

### iii. Substantive due process barred a state-created risk of danger.

1   Substantive due process likewise prohibits state action that "creates or exposes an

2   individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of*

3   *Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (internal citation and punctuation omitted).

4   Defendant exposed Padilla to the danger of extreme interrogation and treatment: "by formulating

5   unlawful policies for the designation, detention, and interrogation of suspected 'enemy

6   combatants,'" C3; certifying that Padilla "qualified" for military detention as an "enemy

7   combatant"; "issuing legal memoranda designed to evade all legal constraints on those policies

8   and to immunize those who implemented them," C3, 23, 32, 33 (including memoranda advising

9   that neither the Fourth nor the Fifth Amendments constrained domestic military operations such

10  as Padilla's detention, C21); and authoring a memorandum authorizing restriction on access to

11  counsel that prevented Padilla from stopping the unlawful conditions. C19f, 60. Yoo took these

12  actions intentionally or with at least deliberate indifference to their foreseeable consequences for

13  Padilla, C53, 23, 24, and thus, through his affirmative actions, "left [Padilla] in a situation that

14  was more dangerous than the one in which [Defendant] found him." *Munger v. City of Glasgow*

15  *Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000); *see also Penilla v. City of Huntington Park*,

16  115 F.3d 707, 709 (9th Cir. 1997); *Wood v. Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989).[43]

### c. Padilla's rights of access to courts and counsel were violated.

17  Access to courts is "the right conservative of all other rights." *Chambers v. Baltimore &*

18  *Ohio R.R. Co.*, 207 U.S. 142, 148 (1907). Grounded in the Due Process Clause, *Wolff v.*

19  *McDonnell*, 418 U.S. 539, 579 (1974), and the First Amendment right to petition the

20  government, *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983), it encompasses the

---

[43] For the same reasons, Yoo created a state-created risk of danger of military detention *vel non*.

1    right to private and meaningful communication with one's attorney. *Procunier v. Martinez*, 416

2    U.S. 396, 419-20 (1974), *rev'd in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401,

3    413 (1989); *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990). The right is violated not just

4    when a plaintiff is "unable to bring" (at 39) a claim, but when he is "hindered [in] his efforts to

5    pursue a legal claim" or when a "nonfrivolous legal claim ha[s] been frustrated or [is] being

6    impeded." *Lewis v. Casey*, 518 U.S. 343, 351, 353 (1996). For nearly two years, Padilla was

7    detained incommunicado with no access to counsel. C56. (After March 4, 2004, he was

8    permitted extremely restricted access, with attorney-client conversations watched and recorded

9    and review by government officials of all legal correspondence. C59, 61.) The denial of access

10   had no legitimate penological justification. *See Turner,* 482 U.S. at 89. It was simply to keep the

11   courts from discovering what was happening behind closed doors: a strong-arm tactic meant to

12   enable further constitutional violations, including ongoing extreme interrogations. Access to

13   courts is meant as a shield against exactly such abuses. *See Johnson v. Avery*, 393 U.S. 483, 485-

14   86 (1969). Unable to tell his attorneys what was happening to him, or to rebut the Executive's

15   factual assertions, Padilla was hindered from bringing his claims. *Christopher v. Harbury*, 536

16   U.S. 403, 415 (2002); *see also Al Odah v. U.S.*, 346 F. Supp. 2d 1, 8 (D.D.C. 2004); *Al-Joudi v.*

17   *Bush*, 406 F. Supp. 2d 13, 21-22 (D.D.C. 2005).[44]

18          Even a citizen enemy combatant seized on a foreign battlefield "unquestionably has the

19   right to access to counsel." *Hamdi*, 542 U.S. at 539. Access to counsel undergirds both due

20   process and the right to petition the courts. *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963).

21   It extends beyond the Sixth Amendment right to criminal counsel to any case where the "interest

22   in personal freedom" is at stake. *Lassiter v. Dep't Soc. Serv.* 452 U.S. 18, 25 (1981). Denying

23   Padilla *any* access to counsel for nearly two years violated this guarantee.

---

[44] The access to court claim would not have to be dismissed at this juncture even if a doctrine precluded remedies for both that claim and the other claims arising from his unlawful detention and interrogation. That is because the access-to-courts claim would be available in the alternative if any of the other claims were foreclosed. *Harbury*, 536 U.S. at 415-16.

### d.   Plaintiffs' First Amendment rights to free exercise of religion, to information and to association were violated.

1   Detainees "do not forfeit all constitutional protections by reason of their . . . confinement

2   in prison." *Bell*, 441 U.S. at 545. They "clearly retain protections afforded by the First

3   Amendment," *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987), including the "directive that no law

4   shall prohibit the free exercise of religion," *id.*, the "right to receive information while

5   incarcerated," *Clement v. Cal. Dep't of Corrs.*, 364 F.3d 1148, 1151 (9th Cir. 2004), and

6   visitation with family members. *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (declining to

7   hold that the "right to intimate association is altogether terminated by incarceration").

8   Restrictions on these rights of detainees are permissible only when "reasonably related to

9   legitimate penological interests and . . . not an exaggerated response to such objectives." *Beard v.*

10   *Banks*, 548 U.S. 521, 528 (2006) (quotation marks omitted); *see generally Turner*, 482 U.S. at

11   89-91 (requiring "a valid, rational connection between the prison regulation and the legitimate

12   governmental interest put forward to justify it" and considering whether detainees have other

13   ways of exercising the right, how accommodation of the right would affect the prison, and the

14   availability of alternatives) (quotation marks omitted).

15   For nearly two years, Padilla was deprived of all religious rights (no Koran; denial of

16   knowledge of date and time necessary for time-based prayer; denial of knowledge of direction of

17   Mecca), rights to information (no newspapers, books, etc.) and rights to intimate association

18   (detained incommunicado). C56-58, 66-70. These deprivations were inflicted for the *per se*

19   illegitimate purpose of coercive interrogation. The deprivations were nearly total, extremely

20   prolonged, and left plaintiffs no alternate means of vindicating their rights. Accordingly, they

21   failed the *Turner* test. *See Turner*, 482 U.S. at 90.[45]

---

[45] *See also Overton*, 539 U.S. at 135-36 (restrictions on associational rights justified where, *inter alia*, prisoners had other means of exercising associational rights, namely letters and telephone calls, and there were no viable alternatives); *Thornburgh*, 490 U.S. at 418 (prison policy regulating inmates' receipt of subscription publications acceptable where regulations "permit a broad range of publications to be sent, received, and read" by the inmates); *O'Lone*, 482 U.S. at 352 (restrictions on Muslim inmates' ability to participate in Jumu'ah permissible because inmates were "not deprived of all forms of religious exercise, but instead freely observe a

### 3.      The constitutional violations were clearly established.

1    Yoo does not dispute that, in 2002, it was clearly established that military agents could

2    not enter a civilian jail, seize a man from the civilian justice system, transport him to a military

3    prison, detain him there indefinitely without criminal charge or conviction, deprive of him

4    contact with attorneys or family (indeed, anyone but his captors), take from him his ability to

5    fulfill the minimum requirements of his religion, and subject him to a program of extreme

6    interrogations, sensory deprivation and punishment. He contends only that it was not clearly

7    established whether a man lost all these rights as soon as the Executive labeled him an "enemy

8    combatant." In this "particularized, and hence more relevant, sense" (at 42), he explains, the

9    constitutional rights were not clearly established. In other words, he asserts that the very actions

10   for which he is called to account – his creation and justification of the "enemy combatant"

11   designation and program – give him immunity for those actions.[46]

12   Aside from its brazenness, the assertion errs in its assumption that new facts unsettle the

13   law. As the Supreme Court has held, "officials can still be on notice that their conduct violates

14   established law even in novel factual circumstances." *Hope*, 536 U.S. at 741 (holding that clearly

15   established test does not require that facts be "fundamentally similar" or "materially similar" to

16   an earlier decided case).

17   Yoo's assertion of factual novelty rests on his calling Padilla an "enemy combatant" (at

18   42), an assertion at variance with the pleadings. C42, 43. Even if the context were "suspected

---

number of their religious obligations" and could participate in other ceremonies); *Washington-El v. Diguglielmo*, 2008 WL 2954745, *4 (E.D. Pa. 2008) (denial of inmate's right to participate in Ramadan or "to retain a copy of the Koran necessary for prayer" left the inmate no "viable alternate way to practice his religion," in violation of "clearly-established" *Turner* test).

[46] Government attorneys advising interrogators on the legality of interrogation methods are entitled to qualified immunity only if it was not clearly established that the methods they approved were unconstitutional. *Burns v. Reed*, 500 U.S. 478 (1991) (unacceptability of hypnosis was not clearly established, so attorneys endorsing its use were entitled to qualified immunity). But Yoo does not claim the illegality of the extreme methods he approved was unclear; he claims only that it was unclear whether those clearly impermissible methods had become permissible by virtue of his creation of the new category of "enemy combatants."

1    enemy combatant," it would not avail him. The fact that a new type of detainee has come into

2    being does not mean that minimum protections for detainees are not clearly established. In

3    *Hydrick*, 500 F.3d 978, the Ninth Circuit found the law to be clearly established for a new type

4    of detainee, statutorily-defined "sexual violent predators" ("SVP's"). Even though "the law

5    applicable to SVPs is still evolving," it was still true that "the rights afforded [convicted]

6    prisoners set a floor for those that must be afforded SVPs."[47] *Id.* at 989. *Hydrick* held that the

7    rights of this new class of detainees was clearly established "where the SVPs claim a violation of

8    a right that is clearly established *even in the prison context*, and second, where the SVPs claim a

9    violation of a right that is clearly established *for all civilly detained persons*." *Id.* at 990

10   (emphasis added). That it was not clear exactly how far SVP rights went did not matter: "It may

11   not be clear exactly what due process rights are to be afforded SVPs, but surely it is clear that

12   certain actions . . . transgress the boundary." *Id.* at 990 n.8 (internal punctuation omitted). The

13   defendants' arguments in that case echo Yoo's here, but the court rejected them:

> The Defendants could not have been so completely unaware of the standards that
> would apply to their conduct as it related to SVPs. . . . [T]he Plaintiffs' complaint
> alleges practices that would be unconstitutional if directed at any prisoner.
> Accordingly, Defendants cannot escape liability based on a "reasonable but
> mistaken" belief about the constitutionality of their conduct.

14   *Id.* at 1001; *see also id.* ("We do not adhere to the theory that 'every dog is entitled to one

15   bite.'"). The complaint here "alleges practices that would be unconstitutional if directed at any

16   prisoner," *id.*, and this court should likewise conclude that the rights were clearly established.

17          *Hamdi* and *Padilla V* (at 42-43) are not to the contrary. Neither deals with the brutal

18   practices alleged here. In fact, *Hamdi* makes plain that minimum due process standards were

19   clearly established. *See* 542 U.S. at 521 ("Certainly . . . indefinite detention for the purpose of

20   interrogation is not authorized."); *id.* at 531 ("reaffirm[ing] . . . the fundamental nature of a

21   citizen's right to be free from involuntary confinement by his own government without due

22   process of law"); *id.* at 536 (noting that Court had "*long since made clear* that a state of war is

---

[47] The rights of convicted prisoners set the floor for the rights of any detainee. *Pierce*, 526 F.3d
at 1205.

1   not a blank check for the President when it comes to rights of the Nation's citizens") (emphasis

2   added); *id.* (finding that Executive's "position that the courts must forgo any examination of the

3   individual [detainee's] case . . . cannot be mandated by any reasonable view of separation of

4   powers"); *id.* at 518-19 (citing numerous authorities for established proposition that "[c]aptivity

5   in war is neither revenge, nor punishment, but solely protective custody") (internal citations and

6   punctuation omitted); *id.* at 538 ("*Plainly*, the 'process' Hamdi has received is not that to which

7   he is entitled under the Due Process Clause") (emphasis added).[48]

8          Notwithstanding *Hamdi*, Yoo also broadly claims (at 43) that the law was not clearly

9   established because this Court must "balanc[e]" executive power against Padilla's rights. That

10  argument is limited to rights subject to a "balancing test" (at 43) and so does not apply to

11  absolute rights, such as the right against coercive interrogation and the Fourth Amendment

12  requirement of a prompt judicial determination of probable cause for seizure. In any event, it has

13  no application here. As Yoo's own cases recognize, "conduct may be so egregious that a

14  reasonable person would know it to be unconstitutional even though it is judged by a balancing

15  test." *Medina v. City of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). Even where rights

16  involve multifactor balancing "it is clear that certain actions . . . transgress the boundary. Surely

17  it would not require 'law training' or clairvoyance to recognize that these actions, as alleged by

18  Plaintiffs, do not comport with due process," the Fourth Amendment, or the determination of our

19  Founders to impose the rule of law between the citizenry and the ungloved hand of an

20  overzealous Executive. *See Hydrick*, 500 F.3d 990 n.8 (internal punctuation omitted); *see also*

21  *U.S. v. Lanier*, 520 U.S. 259, 271 (1997) ("There has never been a . . . case accusing welfare

---

[48] The finding in *Padilla V*, that the Executive may detain citizens suspected of having carried arms on a foreign battlefield, had nothing to do with the treatment due to those detained. It is also irrelevant here, as Padilla is not an enemy combatant. C43. Even if it were relevant, the decision in 2005 could not have rendered unclear what was clearly established in 2002: that citizens seized in civilian settings in the U.S. cannot be detained without charge on the basis of allegations that they have affiliated with an enemy. *Hamdi*, 542 U.S. at 521-22 (reiterating that *Ex parte Milligan*, 4 Wall. 2 (1866), was premised on the fact that Milligan was seized not on a battlefield but in a civilian setting in Indiana).

1    officials of selling foster children into slavery; it does not follow that if such a case arose, the

2    officials would be immune from damages.") (internal citation and quotation marks omitted).

3          Moreover, the argument is premature. Where they lack a factual basis, the Ninth Circuit

4    regularly rejects qualified immunity defenses as to rights scrutinized under a balancing test. *See*

5    *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (holding that any policy that was "obviously

6    unrelated to any conceivable penological interest" under *Turner* balancing test would not sustain

7    defense of qualified immunity); *Swift v. Lewis*, 901 F.2d 730, 732-33 (9th Cir. 1990) (holding

8    that where prison officials failed to produce "evidence that their policies are based on legitimate

9    penological justifications," no qualified immunity defense under *Turner* balancing test was

10   proper, and remanding for court to reconsider after a "sufficient factual record is developed").[49]

### III.   The Religious Freedom Restoration Act claims are properly alleged.

11         Aside from briefly reiterating his argument that causation is lacking,[50] Yoo argues that

---

[49] Of Yoo's cases, only two find qualified immunity on the basis of a balancing test, both on a factual record at summary judgment. *See DiMeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995); *Medina*, 960 F.2d 1493. The same is true of the cases decided by the Ninth Circuit on this basis (which Yoo fails to cite). *See Dible v. City of Chandler*, 515 F.3d 918, 930 (9th Cir. 2008); *Moran v. State of Wash.*, 147 F.3d 839, 847 (9th Cir. 1998); *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 979-84 (9th Cir. 1998). This is not a coincidence: qualified immunity may not be granted until the court "consider[s] the specific facts of this case to determine whether it presents one of those occasions in which the rights are clearly established." *Brewster*, 149 F.3d at 984; *see also Hydrick*, 500 F.3d at 993 ("The reasonableness of a search or seizure[] is a fact-intensive inquiry that cannot be determined at this stage."); *id.* at 985 (noting that "a motion to dismiss on qualified immunity grounds puts the court in the difficult position of deciding far-reaching constitutional questions on a non-existent factual record," and that therefore the "exercise of that authority is not a wise choice in every case") (internal quotation marks omitted). *Davis v. Sutley*, 2008 WL 1817262, *4 (C.D. Cal. 2008) (noting that "the raising of a qualified immunity defense is generally disfavored [on a motion to dismiss"); *Endsley v. Luna*, 2008 WL 3890382, *7 (C.D. Cal. 2008) (denying qualified immunity at motion to dismiss because "greater development of the record" necessary).

[50] Yoo argues that he did not cause the RFRA violations. That is a factual claim. Dismissal is proper only if the pleadings do not allege that Yoo "[set] in motion a series of acts by others which [Yoo knew] or reasonably should [have known] would cause others to inflict the [RFRA] injury." *Kwai Fun Wong*, 373 F.3d at 966. The same pleadings that allege that Yoo set in motion violations of plaintiffs' First Amendment rights also adequately allege that Yoo set in motion the RFRA violations. *See supra* Part II. A.1.a-e.

1    the RFRA claim should be dismissed for two reasons: RFRA does not authorize suits against

2    former officials who acted under color of law, and he is entitled to qualified immunity.

### A.    Yoo was a "person acting under color of law."

3    RFRA allows a person whose exercise of religion has been "substantially burden[ed]" by

4    "government" to "obtain appropriate relief." 42 U.S.C. § 2000bb-1(a), (c) (2000). It defines

5    "government" to include an "official (or other person acting under color of law) of the United

6    States." *Id.* § 2000bb-2(1). The language tracks that of 42 U.S.C. § 1983: "Congress has used the

7    key phrase—'acting under color of law'—before in other statutes, including 42 U.S.C. § 1983."

8    *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999) (construing RFRA

9    to track § 1983).[51] Courts have consistently interpreted the phrase "person acting under color of

10    law" to mean that Congress intended to establish *individual* liability for civil rights violations.

11    *See, e.g., Morse v. Republican Party of Va.*, 517 U.S. 186, 221 n.34 (1996) (noting it was

12    "natural" for Congress to borrow "person acting under color of law" from § 1983 when drafting

13    42 U.S.C. § 1973(i)(a) (enforcement of voting rights), since both statutes established individual

14    liability for civil rights violations). "When a legislature borrows an already judicially interpreted

15    phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to

16    adopt not merely the old phrase but the judicial construction of that phrase." *Sutton*, 192 F.3d at

17    834-35 (citation omitted). For this reason, the "judicial interpretation of the phrase 'acting under

18    color of law,' as used in 42 U.S.C. § 1983, applies equally in . . . RFRA action[s]." *Id.* at 835.

19    The phrase "person acting under color of [law]" in § 1983 includes officials in their

20    individual capacities. *Hafer v. Melo*, 502 U.S. 21, 31 (1991) ("state officials, sued in their

21    individual capacities, are 'persons' within the meaning of § 1983"). The same is true of RFRA.[52]

---

[51] *See also Bess v. Alameida*, 2007 WL 2481682, at *21 (E.D. Cal. 2007) (recognizing that identical language in the Religious Land Use and Institutionalized Persons Act ["RLUIPA"] "tracks that found in 42 U.S.C. § 1983").

[52] *See, e.g., Keen v. Noble*, 2007 WL 2789561, at *9 (E.D. Cal. 2007) *amended on other grounds by* 2008 WL 268821 (E.D. Cal. 2008); *Lepp v. Gonzales*, 2005 WL 1867723, *8 (N.D. Cal. Aug. 2, 2005); *Jama v. INS*, 343 F. Supp. 2d 338, 371-75 (D.N.J. 2004); *cf. Bess*, 2007 WL 2481682, at *21 (identical language in RLUIPA).

1    Indeed, the Ninth Circuit has on two occasions made clear that RFRA applies even to *private*

2    persons – not just government officials – who act "under color of law." *See Sutton*, 192 F.3d at

3    835-43; *Hall v. Am. Nat'l Red Cross*, 86 F.3d 919, 921-22 (9th Cir. 1996).[53]

4         Yoo invokes two canons of statutory construction, *noscitur a sociis* and *ejusdem generis*,

5    to support his reading of the statute. Neither of these canons applies. They are useful only where

6    a statute is ambiguous.[54] The phrase "person acting under color of law" has a clear and consistent

7    meaning in Title 42. At bottom, Yoo's interpretation of "person acting under color of law"

8    makes the term superfluous. He reads it (at 46-47) to refer only to "officials" – people sued in

9    their official, not individual, capacities. Yet the definition already includes the word "official";

10   the phrase "or *other* person acting under color of law," immediately following "official," clearly

11   indicates more.[55] 42 U.S.C. § 2000bb-2(1) (emphasis added); *see Jama*, 343 F. Supp. 2d at 374;

12   *see generally U.S. v. State of Alaska*, 521 U.S. 1, 59 (1997).

13        Yoo also compares RFRA's phrase "person acting under color of law" (at 47-48) to

14   language in 28 U.S.C. § 1391(e) (2000). While 28 U.S.C. § 1391(e) applies to an "officer or

15   employee" of the U.S. "acting in his official capacity or under color of legal authority," it does

16   not have an additional phrase including an "*other person* acting under color of law." *Id.*

17   (emphasis added). RFRA should be interpreted in light of the similar language of § 1983, not the

---

[53] Contrary to Yoo's suggestion (at 45), RFRA authorizes suits for money damages. *See* S. Rep.
No. 103-111, at 12 (1993) (RFRA "does not expand, contract or alter the ability of a claimant to
obtain relief in a manner consistent with the Supreme Court's free exercise jurisprudence under
the compelling governmental interest test prior to *Smith*"); H.R Rep. No. 106-219, at 29 (1999)
(RFRA creates "a private cause of action for damages"). The text authorizes "appropriate relief,"
42 U.S.C. § 2000bb-1(c), and does not use narrower terms such as "equitable relief" that were
readily available, *e.g.*, 42 U.S.C. § 9124 (civil action for "equitable relief"); 33 U.S.C. § 1515
(same).

[54] *See, e.g., Garcia v. U.S.*, 469 U.S. 70, 74 (1984) (noting that "the rule of *ejusdem generis* . . .
is only an instrumentality for ascertaining the correct meaning of words when there is
uncertainty") (internal quotation marks omitted).

[55] So does the word "or," which separates "official" from "other person acting under color of
law." 42 U.S.C. § 2000bb-2(1). *See Garcia*, 469 U.S. at 75 (statutory terms "are made separate
and distinct from one another by Congress' use of the disjunctive").

1    dissimilar language of 28 U.S.C. § 1391(e). *Government of Guam v. U.S.*, 179 F.3d 630, 638 (9th

2    Cir. 1999).

### B.      Yoo is not entitled to qualified immunity for his RFRA violations.

3          Yoo claims he is entitled to qualified immunity for three reasons. First, he claims (at 48)

4    that "it was not clearly established that RFRA allowed for the cause of action Padilla asserts in

5    this case." Yet the Ninth Circuit had made clear, before Yoo's actions, that RFRA authorizes

6    lawsuits against private persons. *Sutton*, 192 F.3d at 835-43; *Hall*, 86 F.3d at 921-22. In fact,

7    these decisions had gone even farther, showing that private persons who never had any official

8    status could be liable under RFRA. In any event, it is the illegality of the official's *conduct* that

9    must be clearly established, *Saucier*, 533 U.S. at 202—not whether he could have been sued at

10   the time.

11         Second, Yoo argues (at 48) that it was not clearly established that a RFRA claim could be

12   "premised upon an intentionally discriminatory policy or practice, as opposed to a neutral policy

13   or practice of general applicability."[56] To be sure, Yoo acted intentionally. But that does not

14   mean his intention was to discriminate—rather than to enable coercive interrogation or to punish.

15   The complaint contains no allegations of intentional religious discrimination.[57]

16         Third, Yoo argues (at 49-50) again that rights subject to balancing tests are rarely clearly

17   established,[58] and that the RFRA rights here were not clearly established. He argues that recent

18   cases have aimed to balance constitutional rights and Executive power and show that Padilla's

---

[56] Yoo ignores RFRA's key language here: "Government shall not substantially burden a person's exercise of religion *even if* the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). Yoo suggests the phrase "even if" is equivalent to "only if." Nothing in the text or structure of the statute justifies such a departure from the plain meaning of "even if."

[57] It bears mention, too, that Yoo seeks to avoid liability by claiming that he could not have known that intentional violations of religious rights were forbidden. That is a stunning claim. Whether such violations are actionable under RFRA, or directly under the First Amendment, or both, no reasonable official could have doubted that they were forbidden.

[58] As shown *supra* Part II.B.3, he errs in arguing that, on a motion to dismiss, the mere fact that rights are subject to a balancing test means that they are not clearly established.

1   RFRA rights were not clearly established, citing only *Hamdi* and *Padilla V.* Again he

2   overreaches. Neither case concerned RFRA. More important, *Hamdi* "*reaffirmed*" (not created)

3   bedrock principles of due process and rejected the Executive's arguments as inconsistent with

4   "*any reasonable view* of separation of powers." In fact, it rebuked the Executive for actions that

5   it had "*long since made clear*" were unconstitutional. 542 U.S. at 531, 536 (emphasis added).

6   The law was so well established that only adverbs could express the wrongness of the

7   Executive's positions: "*Certainly*, . . . indefinite detention for the purpose of interrogation is not

8   authorized," and "*Plainly*, the 'process' Hamdi has received is not that to which he is entitled

9   under the Due Process Clause." *Id.* at 521, 538 (emphasis added).

10       Moreover, if RFRA is a "balancing test," it is one weighted heavily in favor of religious

11  rights: only a religious restriction that is the least restrictive means of furthering a compelling

12  governmental interest passes muster. 42 U.S.C. § 2000bb-1(b). Whatever broad interest Yoo has

13  in mind (*e.g.*, "conduct war" (at 50)), it is hard to imagine how it was furthered by the total

14  deprivation of a citizen's religious rights – let alone how that deprivation could constitute the

15  "least restrictive means of furthering" that interest. *Id.*

**IV.   Padilla has standing to seek declaratory relief against Yoo.**

**A.   Yoo may be sued for declaratory relief in his individual capacity.**

16       Yoo argues (at 7) that he is not a proper defendant for declaratory judgment because

17  "[e]very court of appeals to address the issue" agrees that declaratory judgment cannot be sought

18  against an official in his individual capacity. Yet a person who has violated the Constitution is

19  "stripped of his official or representative character and is *subjected in his person* to the

20  consequences of his *individual* conduct." *Ex parte Young*, 209 U.S. 123, 159-160 (1908)

21  (emphasis added.) *See also Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 269 (1997) (*Young*

22  creates "the exception this Court has recognized for certain suits seeking declaratory and

23  injunctive relief against state officers in their individual capacities."). At least three circuits have

1  held that an official may be sued for equitable relief in an individual capacity.[59] The Ninth

2  Circuit has stated the same. *F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1314 (9th Cir. 1989)

3  ("For certain constitutional violations, governmental officials may be sued in their individual

4  capacities for monetary damages or injunctive or declaratory relief.").[60]

5          There is no general bar to an official being sued for declaratory relief in his individual

6  capacity. Yoo is no mere placeholder for an official policy, but acted in ways that link him

7  personally and inextricably to the unconstitutional conduct alleged. Equitable individual capacity

8  suits are particularly appropriate where, as here, the defendant is directly and personally linked to

9  the unconstitutional conduct. *See Taylor*, 2006 WL 3114298, at *2 & n.2.

10     **B.     Padilla has standing to seek declaratory relief.**

11         Yoo claims (at 8) that Padilla does not face a real and immediate injury or threat of injury

12  and so lacks standing to sue for declaratory relief under *City of Los Angeles v. Lyons*, 461 U.S.

13  95, 101-02 (1983). *Lyons* rejected an equitable claim by a plaintiff who had been subject to a

14  police chokehold, because nothing about Lyons, or the fact he had been choked, made it more

---

[59] *Ford v. Reynolds*, 316 F.3d 351, 356-57 (2d Cir. 2003) (upholding dismissal of official capacity suit for injunctive relief under Eleventh Amendment immunity but remanding "for consideration of the claims for monetary and declaratory relief against . . . defendants in their individual capacities"); *MCI Telcom. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 506 (3d Cir. 2001) (holding that *Young* creates Eleventh Amendment exception "under which individual state officers can be sued in their individual capacities for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law"); *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1196 (10th Cir. 1998) ("[A] suit for prospective injunctive relief against a state official acting in her official or individual capacity may still be brought in federal court . . .").

[60] *Accord Preskar v. U.S.*, 248 F.R.D. 576, 585 (E.D. Cal. 2008); *Porter v. City of Davis Police Dep't*, 2007 WL 4463344, at *3 (E.D. Cal. Dec. 14, 2007); *Sanchez v. Elk Grove Unified Sch. Dist.*, 2007 WL 1515510, at *5 (E.D. Cal. May 22, 2007); *Taylor v. Prosper*, 2006 WL 3114298, at *2 & n.2 (E.D. Cal. Nov. 1, 2006) (holding that "[a] state official may be sued in her individual capacity for injunctive relief if the official is linked to the alleged misconduct."). One court, following *Trotter*, held that equitable claims may *only* be brought against officials sued in their individual capacities. *See Whitcombe v. U.S. Dep't of Treasury*, 1989 U.S. Dist. LEXIS 11386, 4-5 (W.D. Wash. Aug. 29, 1989). The phrase in the case Yoo cites, *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004) is dicta. Even if it were a holding, it would conflict with *Trotter*, and the earlier panel would prevail. *Von Colln v. County of Ventura*, 189 F.R.D. 583, 589 n.2 (C.D. Cal. 1999).

1    likely that he, as opposed to anyone else in Los Angeles, would be choked in the future. *Id.* at

2    108. Unlike Lyons, Padilla is the only citizen designated an "enemy combatant" by the Executive

3    and seized from the civilian justice system. The designation has not been withdrawn, C77,

4    making the declaratory claim a present-tense (not past-tense) challenge. And while Padilla is

5    currently incarcerated in a civilian jail following unrelated convictions (pending on appeal), that

6    does not render conjectural the threat of re-detention as an enemy combatant. After all, a civilian

7    jail is exactly where he was on June 9, 2002, when this all began.[61] C77.

8         Moreover, the collateral consequences he suffers from the designation are themselves

9    sufficient to provide standing to seek equitable relief. *See Neal v. Shimoda,* 131 F.3d 818 (9th

10   Cir. 1997) (inmates designated as "sex offenders" have standing to maintain request for equitable

11   relief to remove designation). The Ninth Circuit has deemed the threat of lesser social stigma

12   sufficient standing for equitable relief. In *Norman-Bloodsaw v. Lawrence Berkeley Lab.,* 135

13   F.3d 1260 (9th Cir. 1998), a government entity secretly tested employees for pregnancy, birth

14   defects, and sexually transmitted diseases, and the court held that, under *Lyons,* retention of

15   records "constitute[s] a continuing 'irreparable injury' for purposes of equitable relief." *Id.* at

16   1275. That was because the designation of individuals as carriers of STDs or genetic defects

17   represented "an ongoing 'effect' of the allegedly unconstitutional and discriminatory testing." *Id.*

18   So too here, where the "enemy combatant" designation remains in place.[62]

---

[61] After the criminal indictment against Padilla was made public, Deputy Solicitor General
Gregory Garre informed Padilla's counsel that the "enemy combatant" designation had not been
rescinded and that the government could therefore militarily detain Padilla at any time. C77.
That policy has not changed. *See Detainee's Trial in Military System Begins Today,* Wash. Post,
July 21, 2008, at A03 (Justice Department declaring to court that "[t]he government can hold
[alleged enemy combatant] Hamdan all the way up until the end of hostilities," notwithstanding
sentence imposed by military jury). *See generally Davis v. FEC,* 128 S.Ct. 2759, 2770 (2008)
(citing article quoting public statement as evidence that case was not moot).

[62] *See also Demaery v. Arpaio,* 378 F.3d 1020, 1027 (9th Cir. 2004) (pretrial detainee plaintiffs
could maintain claims for equitable relief because there was "reasonable expectancy" that they
would be re-detained even though many had been detained only once).

## CONCLUSION

1        For the reasons set forth above, the motion to dismiss should be DENIED.


Respectfully submitted,


/s/ Jonathan M. Freiman

JONATHAN M. FREIMAN (*pro hac vice*)
HOPE R. METCALF (*pro hac vice*)
127 Wall Street
New Haven, CT 06520-8215
Telephone: (203) 498-4584
Facsimile: (203) 782-2889

NATALIE L. BRIDGEMAN
State Bar No. 223717
Law Offices of Natalie L. Bridgeman, Esq.
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone:  (415) 979-0150
Facsimile:  (415) 520-0140
Email: natalie@ihrlaw.com

Attorneys for Plaintiffs


Dated:  October 17, 2008