# EXHIBIT A



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

Page 1

**c**
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
Morteza ANOUSHIRAVANI, Plaintiff,
v.
Megan FISHEL, in her individual capacity and in her official capacity as an agent of the Portland Office of the United States Customs and Border Protection, et al., Defendants.
**No. CV 04-212-MO.**

July 19, 2004.

Kenneth E. Kaufmann, Thomas H. Nelson, Nelson Lovinger Norling Kaufmann, LLP, Portland, OR, for Plaintiff.
Kelly Alexandre Zusman, United States Attorney's Office, Portland, OR, for Defendants.

OPINION AND ORDER

MOSMAN, J.
*1 In this action, plaintiff Morteza Anoushiravani alleges several United States Customs and Border Protection ("Customs") officials violated his Fifth Amendment rights to due process and just compensation by conditioning release of personal property exempt from import regulations on him signing a hold harmless agreement. The agreement would have released Customs and its officials from all liability arising from the seizure, detention, and release of his property. Plaintiff seeks money damages pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)(*"Bivens"* ), declaratory relief, and injunctive relief.

Before the court is defendants' motion to dismiss each of plaintiffs' claims (Doc. # 10). Defendants specifically assert (1) plaintiff lacks standing and his claims for injunctive relief are moot; (2) the court lacks personal jurisdiction over defendants Stilwell and Goldfarb; (3) plaintiff fails to state a constitutional claim; and (4) the doctrine of qualified immunity protects defendants from suit. The court GRANTS defendants' motion as to (1) plaintiff's claims for injunctive relief; (2) plaintiff's claims for declaratory relief; and (3) plaintiff's claims for money damages against defendant Megan Fishel. The court DENIES defendants' motion as to plaintiff's claims for money damages against defendants Stilwell and Goldfarb.

I. *BACKGROUND*

The facts, as alleged by plaintiff and viewed in the light most favorable to him, are as follows. On October 30, 2003, upon plaintiff's return from Iran via Portland International Airport, Customs officials seized from him items they suspected violated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. pt. 560 (2003). On October 31, 2003, plaintiff contacted the Portland Customs office and requested Customs return his property. On January 14, 2004, defendant Megan Fishel, a Portland Customs official, indicated in a letter to plaintiff that "42 compact discs and four cassette tapes of recorded music, one setar,[FN1] one pipe-flute, and five pairs of shoes" were exempt from the ITR. Ms. Fishel further stated plaintiff would forfeit the exempt property unless he signed a document entitled "U.S. Customs & Border Protection Hold Harmless Release Agreement" ("hold harmless agreement"). On or about January 20, plaintiff spoke with Ms. Fishel and demanded Customs return his property; she demanded that he first sign a hold harmless agreement; he refused.

> FN1. A small, four stringed musical instrument.

On January 27, 2004, plaintiff's attorney called defendant Jennifer Stilwell, a lawyer for Customs,FN2 and informed her he believed Customs was violating plaintiff's constitutional rights by conditioning return of his exempt property on

Not Reported in F.Supp.2d                                                                                         Page 2
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

him signing a hold harmless agreement. Ms. Stilwell and another defendant-Customs lawyer, David Goldfarb, advised the Portland Customs office at times material from their offices in Seattle, Washington. Plaintiff alleges Ms. Stilwell and Mr. Goldfarb (1) advised Ms. Fishel "on the legality of requiring waivers of liability from property owners before returning their exempt property,"[FN3] (2) regularly dispensed "legal advice by telephone and other means to the Portland Customs Office"; and (3) "materially aided" the Portland Customs office's "hold harmless policy" by reviewing and approving the form of the hold harmless agreement.

> FN2. Plaintiff alleges that "defendant Assistant Chief Counsel Jennifer Stilwell is a paralegal for [Customs]." (Complaint ¶ 8). In the court's experience, a paralegal for the government does not carry the title "Assistant Chief Counsel." Defendants, however, clarified that "defendants Goldfarb and Stilwell are agency attorneys...." (Def. Motion in Support at 5).

> FN3. At oral argument, plaintiff's counsel clarified this statement by indicating it is meant to include advice given prior to January 14, 2004.

*2 On January 28, Ms. Fishel notified plaintiff's attorney that after consultation with Customs lawyers, "we are returning [the exempt property] to your client without requiring that your client sign a Hold Harmless Agreement."In conversations initiated by plaintiff's attorney whereby plaintiff threatened to challenge the constitutionality of Customs requiring a hold harmless agreement before releasing exempt property, both Ms. Fishel, on January 28, and Ms. Stilwell, on February 5, told plaintiff's attorney the Portland Custom's office "would continue its policy of requesting that owners sign a hold harmless agreement as a condition of return of their exempt property."

Plaintiff further alleges (1) he "plans to use the Portland International Airport to travel to and from Iran and other international destinations in the near future," (2) "he recently received a request from the Mercy Corps asking him to be available to travel to Iran ... in the near future and upon short notice," and (3) Portland Customs is more likely to seize exempt property from persons of "Persian or Arabian descent" than from persons of other national origin.

## II. DISCUSSION

Plaintiff alleges Customs officials violated his Fifth Amendment rights to due process and just compensation for public takings when they conditioned the return of personal property exempt from the ITR, 31 C.F.R. pt. 560, on him releasing the United States and its officials from all potential liability arising out of the seizure, detention, and release of his property. He brings suit for actual and punitive damages pursuant to *Bivens*, declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2000), and injunctive relief pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702-706 (2000).

Defendants move to dismiss all claims, specifically asserting (1) plaintiff lacks standing and his claim for injunctive relief is moot; (2) the court lacks personal jurisdiction over defendants Stilwell and Goldfarb; (3) plaintiff fails to state a constitutional claim; and (4) the doctrine of qualified immunity protects defendants from suit.

As detailed below, the court dismisses (1) plaintiff's claims for injunctive relief because he lacks standing to bring such claims;[FN4] (2) plaintiff's Fifth Amendment takings claim under *Bivens* without prejudice so he may properly bring suit against the United States in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 (2000), or in this court under 28 U.S.C. § 1346 (2000); (3) plaintiff's Fifth Amendment due process claim under *Bivens* against defendant Megan Fishel because she is entitled to qualified immunity from suit; and (4) plaintiff's claims for declaratory relief pursuant to the court's discretion under 28 U.S.C. § 2201.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN4. Defendant Steve Gilbert, named by plaintiff "in his official capacity as Area Port Director" of the Portland Customs office, is accordingly dismissed from the case.

The court denies defendants' motion to dismiss plaintiff's Fifth Amendment due process claims under *Bivens* against Jennifer Stilwell and David Goldfarb. As to these claims, plaintiff's complaint alleges facts necessary to establish standing to sue, possible constitutional violations, and the court's personal jurisdiction over Stilwell and Goldfarb. The court defers judgment on the qualified immunity of Stilwell and Goldfarb until, and if, defendants raise the issue on summary judgment.

## A. STANDING

**\*3** Plaintiff fails to establish standing to sue defendants for injunctive relief, but alleges facts sufficient to establish standing to sue for money damages and declaratory relief.[FN5] Plaintiff, the party invoking federal jurisdiction, bears the burden of alleging specific facts sufficient to establish standing-"an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Furthermore, he "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), for proposition that "notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief").

FN5. The court's present conclusion on standing is tied to the procedural posture of this motion, and is not intended to indicate how the court would decide the issue on a motion for summary judgment.

To fulfill the constitutional minimum of standing, the plaintiff must demonstrate (1) a legally recognized actual or imminent injury which is concrete and particularized-i.e, affects the plaintiff "in a personal and individualized way"; (2) a causal connection between actions of the defendants and the alleged injury; and (3) a likelihood that a favorable decision by the court will redress the alleged injury. *Defenders of Wildlife,* 504 U.S. at 560 & n. 1.

1. Plaintiff fails to establish standing to sue for injunctive relief.

Plaintiff's complaint fails to allege facts if true that establish he is suffering or imminently will suffer a cognizable injury which injunctive relief would prevent. While plaintiff need only "plead general factual allegations of injury ... to survive a motion to dismiss" for lack of standing, *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1156 (9th Cir.2000) (citing *Defenders of Wildlife,* 504 U.S. at 561), he must allege facts if true that establish a cognizable injury. *See Whitmore v. Arkansas,* 495 U.S. 149, 158-59, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' ") (citations omitted); *United States v. SCRAP,* 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ("pleadings must be something more than an ingenious academic exercise in the conceivable"); *Schmier v. United States Court of Appeals for the Ninth Circuit,* 279 F.3d 817, 823 (9th Cir.2002) (the injury element of standing is the proper basis for a motion to dismiss). Furthermore, plaintiff's " '[p]ast exposure to [allegedly] illegal conduct does not in itself show a present case or controversy regarding injunctive relief....' " *Lyons,* 461 U.S. at 102 (alteration in original) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

Unlike the facts alleged by the plaintiff in *SCRAP*-described by the Court in *Whitmore,* 495 U.S. at 158, as "the most attenuated injury conferring Article III standing" and "the very outer limit of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

law"-no amount of evidence can establish plaintiff's asserted future injury as "certainly impending." *See id.* at 158, 160.In *SCRAP,* "an environmental group challenged the Interstate Commerce Commission's approval of a surcharge on railroad freight rates, claiming that the adverse environmental impact of the ICC's action on the Washington metropolitan area would cause the group's members to suffer" certain harms. *Whitmore,* 495 U.S. at 158-59 (citing *SCRAP,* 412 U.S. at 678). The allegations of the plaintiffs in *SCRAP* withstood the government's motion to dismiss because they "may have been able to show at trial that the string of occurrences alleged would happen immediately." *Whitmore,* 495 U.S. at 159.

*4 Furthermore, like the plaintiffs in *Defenders of Wildlife,* plaintiffs allegations if true would only evidence "some day" intentions and "do not support a finding of the 'actual or imminent' injury" the law requires. *See* 504 U.S. at 564 (citations omitted). In *Defenders of Wildlife,* plaintiffs, seeking to withstand summary judgment, submitted affidavits that stated they intended to travel to certain international locations in the future to attempt to observe certain endangered species allegedly negatively impacted by projects facilitated in part by the U.S. government. *Id.* at 563-64.The Court concluded that the "affiants' profession of an 'inten[t]' to return to places they had visited before ... is simply not enough."*Id.* at 564 (alteration in original). While the Court noted that "imminence is ... a somewhat elastic concept," it stated that the concept "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes-that the injury is *'certainly* impending.'" ' *Id.* at 564 n. 2 (emphasis in original) (quoting *Whitmore,* 495 U.S. at 158).

While plaintiff's allegations do not attempt to stretch the concept of imminence as far as those of the plaintiffs in *Defenders of Wildlife,* his allegations fall beyond the outer limits of "imminence" established by *SCRAP.*Plaintiff alleges (1) he "plans to use the Portland International Airport to

travel to and from Iran and other international destinations in the near future"; (2) "he recently received a request from the Mercy Corps asking him to be available to travel to Iran ... in the near future and upon short notice"; and (3) Portland Customs is more likely to seize exempt property from persons of "Persian or Arabian descent" than from persons of other national origin. (Complaint ¶¶ 27-28). If true, plaintiff's allegations go only to establish (1) he may travel to Iran; (2) he may return to the United States via Portland International Airport; and (3) Customs may seize from him property exempt from the ITR and condition its return on him signing a hold harmless agreement. Plaintiff's allegations fall outside the limits of imminence recognized by the court because the conditional "may" implicit in plaintiff's allegations demonstrates he can prove only that-that he may be injured. To satisfy the requirements of standing, a plaintiff's allegations if true must prove he will in all likelihood be injured.

In sum, plaintiff's complaint fails to allege facts if true that would establish plaintiff is suffering or imminently will suffer a cognizable injury which injunctive relief would prevent. He thus fails to establish standing to sue for such relief.

2. Plaintiff establishes standing to sue for money damages.

Plaintiff demonstrates his standing to sue for money damages under *Bivens* by alleging he suffered a concrete and particularized injury to his constitutional right to due process;[FN6] alleging a causal connection between his injury and the actions of defendants Fishel, Stilwell, and Goldfarb; and praying for actual and punitive damages.

> FN6. The analysis of plaintiff's takings claim is substantively similar. The court's standing analysis focuses, however, on plaintiff's standing to bring his due process claim because as discussed below the court dismisses the takings claim for another

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

reason.

a. Plaintiff alleges a concrete and particularized injury.

**\*5** Pursuant to *Defenders of Wildlife,* 504 U.S. at 560, plaintiff properly alleges a legally recognized actual injury which affects the plaintiff in a personal and individualized way. Defendants assert plaintiff lacks standing to sue for money damages because he "never subjected himself to the alleged 'policy' of using hold harmless agreements."(Def. Reply Memo. at 4). They argue he was not injured because he refused to sign the hold harmless agreement and Customs nevertheless returned his property. (Def. Memo. in Support at 9). In support of their argument, defendants cite *Resnick v. Adams,* 348 F.3d 763, 772 (9th Cir.2003), in which the court found the plaintiff lacked standing to challenge deficiencies in a prison's administration of a special diet program because he failed to participate or even attempt to participate in the program. *Resnick* is inapposite. The injury upon which plaintiff has standing arises from Custom's allegedly unconstitutional act of depriving him of his property from the time he demanded the exempt property without avail, January 20, 2004, until the time Customs reversed its position and released plaintiff's property, January 28, 2004.[FN7] (*See* Complaint ¶¶ 15, 16, 22-24). Thus, his refusal to sign the agreement and the eventual return of his property are irrelevant to the alleged fact that the policy of conditioning release of exempt property on signing a hold harmless agreement temporarily deprived him of property to which he had an unconditional right without due process of law.

> FN7. Alternatively, the period of deprivation may run from January 14, 2004-the date Ms. Fishel issued her opinion regarding the subject property's exempt status-to January 28, 2004.

b. Plaintiff alleges a causal connection between his injury and the actions of defendants Fishel, Stilwell, and Goldfarb.

To establish a causal connection between an alleged injury and the conduct complained of, a plaintiff must allege the injury is " 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Defenders of Wildlife,* 504 U.S. at 560-61 (alterations in original) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

Plaintiff's complaint alleges facts that if true are sufficient to draw a "fairly traceable" causal connection between his injury and the alleged actions of defendants Fishel, Stilwell, and Goldfarb. The line between plaintiff's alleged injury and Fishel's alleged conduct is straightforward. Plaintiff demanded return of the exempt property to which he had an unconditional right and Fishel denied his demand. (*See* Complaint ¶ 22). The causal connection between plaintiff's alleged injury and the alleged conduct of Stilwell and Goldfarb requires more attention. Defendants assert "[p]laintiff has failed to identify *any* involvement in this case by Stilwell or Goldfarb prior to the critical, allegedly unconstitutional acts committed by Fishel on January 14 and 20, 2004."(Def. Reply Memo. at 6) (emphasis in original). Plaintiff, however, alleges Stilwell and Goldfarb advised Fishel "on the legality of requiring waivers of liability from property owners before returning their exempt property."[FN8] (Complaint ¶¶ 7-8). Because on a motion to dismiss plaintiff's "general allegations embrace those specific facts ... necessary to support" his claim, *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), the court infers a causal connection between plaintiff's alleged injury and the alleged advice of Stilwell and Goldfarb to Fishel, the immediate agent of injury.

> FN8. *See supra* note 3.

c. The court can redress plaintiff's alleged injury.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

**\*6** Plaintiff prays for actual and punitive damages against defendants Fishel, Stilwell, and Goldfarb pursuant to *Bivens.*(Complaint at 9). Furthermore, while at this juncture not dispositive, plaintiff may proceed on a denial of procedural due process claim without proving actual damages; nominal damages are appropriate to protect the "absolute" right to procedural due process. *Weinberg v. Whatcom County,* 241 F.3d 746, 752 (9th Cir.2001) (citing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)).

## B. PERSONAL JURISDICTION OVER STIL-WELL AND GOLDFARB.

Defendants assert the court lacks personal jurisdiction over defendants Stilwell and Goldfarb; however, plaintiff's complaint establishes the court's jurisdiction over them, at least at this stage of the proceeding. The normal rules for establishing personal jurisdiction over a defendant apply in a damages action against a federal official in his individual capacity. *Gilbert v. DaGrossa,* 756 F.2d 1455, 1459 (9th Cir.1985). Under those rules, plaintiff carries the burden of establishing the court's personal jurisdiction over defendants, and the court must analyze personal jurisdiction over each defendant separately. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell and Clements Ltd.,* 328 F.3d 1122, 1128-30 (9th Cir.2003). On a motion to dismiss without an evidentiary hearing, the plaintiff " 'need only demonstrate facts that if true would support jurisdiction over defendant." ' *Id.* (quoting *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995)).

The court may exercise personal jurisdiction over a defendant where it comports with the forum state's long-arm statute and due process. *Lee v. City of Los Angeles,* 250 F.3d 668, 692 (9th Cir.2001). Oregon's long-arm statute allows courts to exercise personal jurisdiction "to the outer limits of due process." *State ex rel. Hydraulic Servocontrols Corp. v. Dale,* 294 Or. 381, 657 P.2d 211, 213 n. 2 (Or.1982). To determine whether a court's exercise

of specific personal jurisdiction [FN9] over a defendant comports with the requirements of due process, the Ninth Circuit applies a three part test, as follows:

> FN9. Plaintiff does not allege, nor is there any basis for the court to assert, general personal jurisdiction over defendants Stilwell and Goldfarb.

(1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Harris Rutsky,* 328 F.3d at 1129 (quoting *Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1485 (9th Cir.1993)). Plaintiff establishes the court's personal jurisdiction over defendants Stilwell and Goldfarb by alleging facts if true that meet the requirements of the this three part test.

1. Plaintiff alleges Stilwell and Goldfarb purposefully directed activities toward Oregon and its residents.

**\*7** "Physical contact with the forum state is not a necessary condition" for the court to conclude defendants purposefully directed activities at the forum state. *Id.* at 1130.A defendant purposefully directs activities at the forum state for the purposes of personal jurisdiction if his or her activities comport with the "effects" test, which is as follows: (1) the defendant committed an intentional act; (2) the defendant expressly aimed the act at the forum state;

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

and (3) the act allegedly caused harm which was primarily suffered in the forum and the defendant knew the harm was likely to be suffered in the forum state. *Harris Rutsky,* 328 F.3d at 1131 (citing *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Core-Vent,* 11 F.3d at 1486). Plaintiff alleges Stilwell and Goldfarb advised Fishel "on the legality of requiring waivers of liability from property owners before returning their exempt property."(Complaint ¶¶ 7-8). Defendants contend plaintiff's allegations regarding Stilwell and Goldfarb do not establish the court's jurisdiction over them because plaintiff's "complaint ... is premised entirely upon assumptions regarding legal advice given from their office in Seattle"; that "[t]he mere provision of legal advice does not constitute purposeful availment and the exercise of jurisdiction over [Stilwell and Goldfarb] for such attenuated contacts would not be reasonable."(Def. Memo. in Support at 12).

Defendants' argument relies primarily on *Sher v. Johnson,* 911 F.2d 1357, 1363 (9th Cir.1990), for the proposition that "[o]ut of state legal representation does not establish purposeful availment...." (*See* Def. Memo. in Support at 11). The present action is distinguished from *Sher* on the facts. In *Sher,* the plaintiff, a California resident, brought suit in a federal district court in California against several Florida lawyers for alleged malpractice arising out of the lawyers' representation of plaintiff in a criminal matter in Florida. 911 F.2d at 1360. The plaintiff sought out the lawyers in Florida, and the lawyers directed their activities in the matter giving rise to the malpractice claim exclusively within Florida. *Id.* at 1362.The court determined the lawyers contacts with California did not evidence "the deliberate creation of a 'substantial connection' with California"-the contacts were rather merely " 'random, fortuitous, or attenuated." ' *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 479-80, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). In other words, in relation to the plaintiff, the defendants in *Sher* were "out of state representation"-i.e., Florida lawyers representing a Califor-

nia resident-but within the framework of personal jurisdiction, they purposefully directed their activities only within Florida and thus were appropriately not subject to the jurisdiction of a federal court in California.

Unlike the lawyers in *Sher,* Stilwell and Goldfarb purposefully directed activities at the forum state by advising Fishel, an official at the Portland Customs office, on the legality of requiring a hold harmless agreement before releasing exempt property to persons whose property had been seized at Portland International Airport-persons who are presumably in large part residents of the forum state. Furthermore, the alleged actions of Stilwell and Goldfarb meet the "effects" test for personal jurisdiction because (1) they allegedly "committed an intentional act"-they advised Fishel on the legality of requiring a hold harmless agreement before releasing exempt property; (2) they expressly aimed the act at the forum state-they knew Fishel implemented the policy in Oregon; and (3) the act allegedly caused harm which was suffered in Oregon, and logically, Stilwell and Goldfarb knew the harm would be suffered in Oregon. *See Harris Rutsky,* 328 F.3d at 1131.

2. Plaintiff's claim arises out of the alleged forum-related activities of Stilwell and Goldfarb.

**\*8** The Ninth Circuit uses the "but for" test to determine whether a plaintiff's claim arises out of the forum-related activities of a defendant.*Id.* at 1131-32 (citing *Ballard,* 65 F.3d at 1500). Employing the "but for" test, the court must determine the answer to the following question: but for Stilwell's and Goldfarb's contacts with Oregon, would plaintiff's claims have arisen? *See Ballard,* 65 F.3d at 1500 (setting forth form of question).

Defendant contends that "[b]ecause the only acts alleged against Stilwell and Goldfarb arose after the allegedly unconstitutional actions of Megan Fishel, plaintiff's claimed injury could not have been 'caused' by [them]." (Def. Reply Memo. at 7).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

Page 8

Plaintiff, however, alleges Stilwell and Goldfarb advised Fishel "on the legality of requiring waivers of liability from property owners before returning their exempt property."[FN10](Complaint ¶¶ 7-8). Furthermore, plaintiff connects the "but for" dots, as follows: "[b]ut for defendant[s] Goldfarb['s] and Stilwell's advice, [d]efendant Fishel would not (1) have demanded a [hold harmless agreement] as a condition to the return of exempt property; [or] (2) withhold plaintiff's exempt property when he refused to sign the [agreement]...." (Pl. Response at 18). Reading plaintiff's allegations in the light most favorable to him, the logic of plaintiff's response is sound; thus, he carries his burden on the "but for" test.

FN10. *See supra* note 3.

3. Defendants fail to demonstrate the court's exercise of jurisdiction over Stilwell and Goldfarb would be unreasonable.

If a plaintiff meets its burden on the "purposeful direction" and "but for" prongs of the personal jurisdiction analysis, the burden shifts to the defendant to " 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' '-i.e., to establish that the court's exercise of jurisdiction does not comport with fair play and substantial justice. *Harris Rutsky,* 328 F.3d at 1129, 1132 (quoting *Burger King,* 471 U.S. at 477). Defendants fail to meet this substantial burden. The sum of their argument on reasonableness is, at best, as follows: "[t]he mere provision of legal advice does not constitute purposeful availment and the exercise of jurisdiction over these two defendants for such attenuated contacts would not be reasonable." (Def. Memo. in Support at 12).

In sum, plaintiff establishes the court's jurisdiction over defendants Stilwell and Goldfarb by alleging facts if true that establish they purposefully directed acts at Oregon that gave rise to plaintiffs claims. Furthermore, defendants fail to present a compelling case that the court's exercise of jurisdiction over Stilwell and Goldfarb would be unreasonable.

## C. TAKINGS CLAIM

Plaintiff does not have an implied cause of action under *Bivens* for a Fifth Amendment takings claim because he has an express cause of action for such a claim under the Tucker Act, 28 U.S.C. § 1491. The right to sue federal officials for constitutional torts under *Bivens* "is not absolute." *Adams v. Johnson,* 355 F.3d 1179, 1183 (9th Cir.2004). This rule is consistent with the Court's caution in *Bivens* that an action against government officials will not lie where there are special factors that counsel hesitation in implying non-statutory remedies. *Adams,* 355 F.3d at 1183 (citing *Bivens,* 403 U.S. at 396). A special factor that precludes a *Bivens* claim exists "[w]here Congress has provided *some* mechanism for relief." *Adams,* 355 F.3d at 1183-84 (emphasis in original) (quoting *Berry v. Hollander,* 925 F.2d 311, 313 (9th Cir.1991)).

*9 The Tucker Act, 28 U.S.C. § 1491, provides a statutorily defined mechanism for asserting claims against the United States for just compensation for public takings. *Eastern Enter. v. Aphel,* 524 U.S. 498, 520, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) ("a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute"); *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (in order for a claim to be "cognizable under the Tucker Act," it "must be one for money damages against the United States"); *Weiss v. Lehman,* 642 F.2d 265, 267 (9th Cir.1981).[FN11] Furthermore, 28 U.S.C. § 1346(a)(2) gives federal district courts concurrent jurisdiction over such claims when they do not exceed $10,000. Thus, whether plaintiff could bring a Tucker Act claim in this court depends on the compensation plaintiff alleges he is due. *See Weiss,* 642 F.2d at 267 n. 3.

FN11. The court in *Weiss* eventually allowed a plaintiff's takings claim to proceed under a *Bivens* cause of action because it determined that the Tucker Act-Fifth

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                  Page 9
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

Amendment just compensation claim was less than equally effective as the *Bivens* remedy. The court noted that the *Bivens* remedy provided for trial by jury and served as a greater deterrent to unconstitutional acts by government officers. 642 F.2d at 267-68. The Ninth Circuit, however, decided *Weiss* before the Supreme Court's decisions in *Bush v. Lucas,* 462 U.S. 367, 375-76, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), and *Schweiker v. Chilicky,* 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), ushered in the "special factor" other remedy analysis set forth in the first paragraph of this section.

While the Tucker Act is jurisdictional only, the Takings Clause of the Fifth Amendment provides the substantive right enforceable against the United States for money damages. *Weiss,* 642 F.2d at 267 (citing *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)). In sum, because the Tucker Act, in coordination with the Fifth Amendment, provides an express remedy for plaintiff's takings claim against defendant Fishel, the court does not imply a cause of action for such claims under *Bivens.* Furthermore, because plaintiff failed to allege an amount of compensation due for the alleged taking, the court is unable to sua sponte convert plaintiff's takings claim under *Bivens* into one under the Tucker Act. Accordingly, the court dismisses plaintiff's takings claim without prejudice so he may amend his complaint to state a cause of action under the Tucker Act. If plaintiff alleges he is due compensation greater than $10,000, he should file his Tucker Act claim in the Court of Federal Claims.

**D. DUE PROCESS CLAIM**

Defendants contend the court should dismiss plaintiff's *Bivens* claims for failure to state a claim;

they assert he fails to assert a possible constitutional violation.[FN12] (Def. Memo. in Support at 5-8). Plaintiff, however, alleges facts sufficient to show defendants possibly violated his Fifth Amendment right to due process. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). To properly state a claim under *Bivens,* plaintiff must allege facts necessary to establish a possible constitutional violation arising from defendants' actions under the color of law. *Morgan v. United States,* 323 F.3d 776, 780 (9th Cir.2003).

> FN12. Defendants do not contest they were acting under color of federal law.

The Fifth Amendment prohibits the government from depriving a person of property without due process of law-i.e., "underlying authority and competent procedural protections." *Vance,* 345 F.3d at 1090. Plaintiff alleges he demanded return of exempt property to which he had an unconditional right and Fishel denied his demand. (*See* Complaint ¶ 22). Tying Stilwell and Goldfarb to the deprivation, plaintiff alleges they advised Fishel "on the legality of requiring waivers of liability from property owners before returning their exempt property." (*Id.* ¶¶ 7-8); *see Kwai Fun Wong v. INS,* --- F.3d ----, No. 02-35727, 373 F.3d 952, 2004 WL 1418012, at *10 (9th Cir. June 25, 2004) ("direct, personal participation is not necessary to establish liability for a constitutional violation") (citing *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978)). He alleges this denial temporarily deprived him of his property. (*See* Complaint ¶¶ 23-24). The court infers from the complaint that defendants failed to afford him any procedural protections preceding or subsequent to the alleged deprivation.

**\*10** Defendants do not contend they provided plaintiff with due process before temporarily depriving him of his exempt property; rather, they

Case3:08-cv-00035-JSW   Document27-1   Filed10/17/08   Page11 of 60

Not Reported in F.Supp.2d                                                      Page 10
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

contend their actions and policy comport with the Constitution. They cite a series of cases for the proposition that conditioning return of seized property or dismissal of criminal claims on securing a release agreement is consistent with the Constitution and the public policy that favors settlement of disputes. These cases include *Town of Newton v. Rumery,* 480 U.S. 386, 397-98, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987); *Lynch v. City of Alhambra,* 880 F.2d 1122, 1126-27 (9th Cir.1989); and *Diamond Game Enter. v. Howland,* No. CV-98-1242-ST, 1999 WL 397743, at *7-9 (D.Or. Mar.23, 1999). (Def. Memo in Support at 5-8). To the trained eye, each of these cases is easily distinguished because each depends on the parties settling a bona fide dispute; in each case the government had a right to a person's property or the grounds to prosecute the person for a crime. In this case the government fails to establish it had a right to the property at times material;[FN13] the government had determined the subject property exempt from the ITR and notified plaintiff of its determination. Thus, as alleged, the hold harmless agreement served not as a tool of settlement but as a condition on plaintiff exercising his right to the exempt property. This condition served to temporarily deprive plaintiff of his property without due process of law. Therefore, plaintiff's complaint, taken in the light most favorable to him, states a claim under *Bivens* because defendants' actions square with a possible violation his Fifth Amendment due process rights.

> FN13. At page 2, note 1 of their reply memorandum, defendants note that "[w]hen Megan Fishel decided to return some of the personal items to the plaintiff, she exercised her discretion pursuant to 19 U.S.C. § 1618; however, because [the Office of Foreign Assets Control] was not involved in the decision to return these particular items, there was nothing equivalent to a final, judicial determination that the returned merchandise was exempt."Defendants' statement appears to run contrary to the interplay of § 1618 and

the ITR, 31 C.F.R. pt. 506. As alleged, the subject property is exempt from the regulations pursuant to 31 C.F.R. § 560.201(c) (Information and informational materials) or authorized for importation by 31 C.F.R. § 560.524 (Household goods and personal effects). Thus, the property was not subject to forfeiture. Section 1618 authorizes Customs officials to remit property subject to forfeiture upon existence of certain mitigating factors. Because the property in question was not subject to forfeiture, defendant Fishel could not have been operating under § 1618. This conclusion is not incompatible with the conclusion that Fishel was operating in a discretionary manner within the framework of qualified immunity. *Seeinfra* note 14 and accompanying text.

E. QUALIFIED IMMUNITY

Defendants assert they are entitled to qualified immunity from suit. (Def. Memo. in Support at 5-8). Applying the law to the facts plaintiff alleges yields qualified immunity for defendant Fishel. However, as for defendants Stilwell and Goldfarb, the court determines it imprudent to rule on qualified immunity without additional facts and, thus, reserves judgment on the question. Under the doctrine of qualified immunity, a government official performing a discretionary function is entitled not to stand trial or face the other burdens of litigation if the official's conduct does not violate clearly established statutory or constitutional rights. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[FN14]

> FN14. Plaintiff contends defendant Fishel was acting in a non-discretionary manner when she conditioned the return of plaintiff's property on him signing a hold harmless agreement because, pursuant to the ITR, 31 C.F.R. pt. 506, "defendants did not have discretion to withhold plaintiff's

property after determining it to be exempt."(Pl. Response at 14). As a preliminary matter, the court determines the ITR fail to specify the precise action a official must take when the official determines an item exempt. The ITR thus creates discretionary, as opposed to ministerial, authority. *See Davis v. Scherer,* 468 U.S. 183, 197 n. 14, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Browning v. Vernon,* 44 F.3d 818, 822 n. 5 (9th Cir.1995). In other words, while the exemption provisions of the ITR determine plaintiff's unconditional right to his property, they leave to the Customs official some discretion in how to effectuate return of the property. Defendants' argument regarding the "clearly established" inquiry of the qualified immunity analysis, *seeinfra* Part II.E.1.b, logically encompasses its position on discretion.

Qualified immunity is " 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." ' *Saucier v. Katz,* 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasis in original) (quoting *Mitchell,* 472 U.S. at 526). The Supreme Court has, accordingly, " 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." ' *Id.* at 201.(quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)); *see also Kwai Fun Wong,* 02-35727, 373 F.3d 952, 2004 WL 1418012, at *1 (providing that "government officials are entitled to raise the qualified immunity defense immediately, on a motion to dismiss the complaint, to protect against the burdens of discovery and other pre-trial procedures) (citing *Behrens v. Pelletier,* 516 U.S. 299, 308, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)); *but seeid.*(providing that the somewhat peculiar "confluence of [the] procedural doctrines" of notice pleading and qualified immunity raises concern when courts are "called upon to decide far-reaching constitutional questions on a nonexistent factual re-

cord").

**\*11** A court required to rule on whether a defendant is entitled to qualified immunity faces a two step inquiry. First, the court must determine whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Saucier,* 533 U.S. at 201. The above section on whether plaintiff asserts a constitutional claim, *supra* Part II.D, answers this threshold question in the affirmative.

Second, the court must determine whether the subject constitutional right was clearly established. *Saucier,* 533 U.S. at 201. A right is clearly established if the " 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' *Id.* at 202 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *see also Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (second step is designed to protect "all but the plainly incompetent"). The plaintiff bears the burden of proving the right was clearly established. *Alford v. Haner,* 333 F.3d 972, 977 (9th Cir.2003) (citing *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991)).

The reasonable official standard enunciated by *Saucier* and *Anderson,* similar to the reasonable person standard in a typical tort case, varies depending on the particular official's position. *Seegenerally* Kit Kinports, *Qualified Immunity in Section 1983 Cases: The Unanswered Questions,* 23 Ga. L.Rev. 597, 619-622 (1989) (citing in support of the proposition case law from every circuit including the Ninth Circuit- *Schlegel v. Gebout,* 841 F.2d 937, 945 (9th Cir.1988); *Kraus v. County of Pierce,* 793 F.2d 1105, 1109 (9th Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987); *Shouse v. Ljunggren,* 792 F.2d 902, 906 (9th Cir.1986)); *see also Ramirez v. Butte Silver Bow County,* 298 F.3d 1022, 1027-28 (9th Cir.2002) ( "Law enforcement officers are entitled to qualified immunity if they act reasonably under the circumstances.... What's reasonable for a particular officer

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                              Page 12
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

depends on his role in the search"-differentiating between "lead officers" and "line officers"). For example, "a state attorney general ... can reasonably be expected to know more about current constitutional doctrine than the cop on the beat. Thus, a constitutional right may become clearly established for the state attorney general before it becomes clearly established for local police officers."Kinports, *supra*, at 621.Similarly, in this case, what is clearly established to a reasonable Customs lawyer may vary from what is clearly established to a front line Customs official.

Furthermore, while the "clearly established" standard must be satisfied "in light of the specific context of the case," *Saucier,* 533 U.S. at 201, satisfaction of the standard does not require precedent directly on point, *seeVance,* 345 F.3d at 1094;*see alsoBoyd v. Benton County,* --- F.3d ----,Nos. 02-35776, 02-35777, 2004 WL 1433532, at *6 (9th Cir. June 28, 2004) (a plaintiff's " 'constitutional rights may be clearly established in the absence of a case on all fours prohibiting [the] particular manifestation of unconstitutional conduct [at issue]" ') (alterations in original) (quoting *Deorle v. Rutherford,* 272 F.3d 1272, 1286 (9th Cir.2001)).

1. Fishel entitled to qualified immunity

**\*12** Plaintiff fails to demonstrate a reasonable official in Fishel's position would understand what she did violated plaintiff's constitutional right to due process; therefore, as to defendant Fishel, plaintiff's right to be free from a condition in the form of a hold harmless agreement on the return of exempt property was not clearly established.

a. Plaintiff's contentions

Plaintiff alleges that "Megan Fishel is a Fines, Penalties, and Forfeitures Officer" for the Portland Customs office. (Complaint ¶ 6). The court takes notice that a "Fines, Penalties, and Forfeitures Officer" is a front line Customs official. Accordingly, to determine whether defendant Fishel is entitled to

qualified immunity, the court must determine whether at the time of plaintiff's alleged injury by the actions of defendant Fishel, a reasonable front line Customs official would clearly understand that the actions of defendant Fishel illegally deprived plaintiff of property without due process of law.

Plaintiff contends it is "plain that[ ] where the government has concluded that plaintiff is entitled to possession of his property, it may not withhold that property, conditionally or otherwise."(Pl. Response at 15-16) (citing *Lee v. Thornton,* 538 F.2d 27, 30 (2d Cir.1976); *Lowther v. United States,* 480 F.2d 1031, 1033-34 (10th Cir.1973); *Vance,* 345 F.3d at 1190-94; *DeNieva v. Reyes,* 966 F.2d 480, 485-86 (9th Cir.1992)). In *Lee,* Customs seized appellants' motor vehicles pursuant to various crimes. 538 F.2d at 28. Appellants challenged the constitutionality of the seizures, and the court held that "in failing to provide appellants with an adequate opportunity to contest the detention of their property, the contested statutes as here applied violated appellants' fifth amendment right to due process." *Id.* at 29.*DeNieva* is similar in substance to *Lee* for the present purposes. *See DeNieva,* 966 F.2d at 485-86 (defendant detained plaintiff's passport "for a potentially indefinite period without a hearing"). Unlike *Lee* and *DeNieva,* which speak to the proper procedures for notice and hearing after seizure, the present case revolves around the proper procedure on release of property.

In *Lowther,* "officers of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service [ ("ATF") ] in the process of executing a search warrant seized [certain firearms] from the residence of [the] plaintiff." 480 F.2d at 1032. The government subsequently prosecuted him for possession of the firearms. *Id.* He demanded ATF remit the firearms to him; he was subsequently acquitted on the criminal charges stemming from possession of the firearms. *Id.* ATF denied his request for remission; it had destroyed the firearms. *Id.* at 1032-33.The court determined plaintiff had a valid claim for compensation under the Tucker Act. *Id.* at

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

1035.While *Lowther* and the present case are similar in that the plaintiffs had an unconditional right to their property, *Lowther* differs because it speaks not to a temporary deprivation arising out of conditioning the return of property, but to the effect of destruction of property on the rights of plaintiff and his subsequent remedy.

**\*13** Finally, in *Vance,* the Nevada Department of Prisons ("NDOP") required all inmates, to be eligible for prison employment, to sign a fiscal agreement that authorized prison officials to deduct from the inmate's savings account " 'the cost of any expense incurred by NDOP on [the inmate's] behalf, whether [the inmate] incurred the expense voluntarily or involuntarily." ' 345 F.3d at 1086-87 (alterations in original). The plaintiff-inmates refused to sign the fiscal agreement and the NDOP accordingly released them from prison employment. *Id.* at 1087.The court held the coercive deductions and retaliation sounded of possible constitutional violations. *Id.* at 1091-93.The setting and facts of *Vance* make analogy between it and the present case attenuated at best.

While case law need not be on all fours or even closely analogous to clearly establish a constitutional right, *seeBoyd,* --- F.3d ----,Nos. 02-35776, 02-35777, 2004 WL 1433532, at \*6, the cases cited by plaintiff in support of its position do not clearly put a reasonable front line Customs official on notice that requiring a hold harmless agreement before returning exempt property violates a person's constitutional rights.

b. Defendants' contentions

Defendants cite a series of cases that could shape the reasonable front line Customs official's understanding of what is legal in the subject circumstances. These cases, including *Town of Newton v. Rumery,* 480 U.S. 386, 397-98, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987); *Lynch v. City of Alhambra,* 880 F.2d 1122, 1126-27 (9th Cir.1989); and *Diamond Game Enter. v. Howland,* No. CV-

98-1242-ST, 1999 WL 397743, at \*7-9 (D.Or. Mar.23, 1999), support the proposition that conditioning return of seized property or dismissal of criminal claims on securing a release agreement is consistent with the Constitution and the public policy that favors settlement of disputes. The cases involve resolution of bona fide disputes-ones in which the government has a legitimate claim to one's property or liberty. The present case does not involve such a dispute; the government determined the property exempt, and the plaintiff had an unconditional right to the property.

To the trained eye, this distinction is relatively straightforward; however, to the untrained eye-the "cop on the street" or, in this case, the reasonable front line Customs official-such a distinction starts to blur. The front line customs official should understand, for example, that requiring a hold harmless agreement is legal-i.e, consistent with the cases cited by defendants-when the Customs official exercises discretion under 19 U.S.C. § 1618 and remits or mitigates a fine or forfeiture in regards to property to which Customs has seized. The result of a Customs official determining property is exempt from import regulations can be facially very similar to the result of a Customs official's actions under § 1618-Customs relinquishes control of seized property. To understand a hold harmless agreement is a legal quid pro quo in a § 1618 situation but an unconstitutional condition in an exemption situation goes beyond what is expected from the reasonable front line Customs official.

c. Advice of counsel

**\*14** Furthermore, as alleged by plaintiff, defendant Fishel either sought out or was furnished advice from counsel regarding the legality of requiring a hold harmless agreement before returning exempt property. (Complaint ¶¶ 7-8). While receiving advice from counsel on the legality of a course of action does not demand a conclusion of qualified immunity, *Stevens v. Rose,* 298 F.3d 880, 884 (9th Cir.2002), reasonable reliance on advice of counsel

Not Reported in F.Supp.2d                                                           Page 14
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

factors in favor of a finding of immunity, *Los Angles Police Protective League v. Gates,* 907 F.2d 879, 888 (9th Cir.1990).*See also Vance,* 345 F.3d at 1094 n. 14 (citing same).

In sum, plaintiff fails to show a reasonable front line Customs official would understand that the actions of defendant Fishel illegally deprived plaintiff of property without due process of law. While plaintiff alleges facts to support a possible constitutional violation, the case law, as set forth by plaintiff and defendants, is not so clear that a reasonable front line Customs official should be able to understand its nuances and consistently apply its teachings.

2. The Court defers judgment on qualified immunity for Stilwell and Goldfarb.

Defendants Stilwell and Goldfarb are lawyers for Customs. As such, to determine whether they are entitled to qualified immunity, the court must determine whether a reasonable lawyer in their positions would understand that the alleged advice giving rise to the actions of defendant Fishel illegally deprived plaintiff of property without due process of law. Unlike defendant Fishel, a front line Customs official, defendants Stilwell and Goldfarb are trained in the law, trained in its jargon and sometimes subtle distinctions. Furthermore, as lawyers for a federal law enforcement agency, an agency on the front lines of the inevitable conflict between government action and individual rights, they are expected to be well versed in core due process jurisprudence.

No precedent appears directly on point to put Stilwell and Goldfarb on notice that they could not advise Customs officials to condition release of personal property exempt from import regulations on a person signing a hold harmless agreement. However, when "an [official's] conduct 'is so patently violative of [a] constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional,

closely analogous preexisting case law is not required to show that the law is clearly established." ' *Boyd,* --- F.3d ----,Nos. 02-35776, 02-35777, 2004 WL 1433532, at *6 (quoting *Deorle,* 272 F.3d at 1286). The court thus must determine whether the alleged actions of Stilwell and Goldfarb-advising a front line official that it was legal to require a hold harmless agreement before returning exempt property-were so egregious that a reasonable lawyer for a federal law enforcement agency, without direct or closely analogous case law on point, would have known that such advice would lead to the violation of a person's right to due process.

**\*15** Based on plaintiff's serious allegations, the court is not prepared at this point to grant qualified immunity to Stilwell and Goldfarb. The court, however, views the question of Stilwell's and Goldfarb's qualified immunity as involving lightly treaded legal theories and refuses to contribute "to the development of legal doctrine that has lost its moorings in the empirical world, and that might never need to be determined were the case permitted to proceed, at least to the summary judgment stage."*See Kwai Fun Wong v. INS,* --- F.3d ----, No. 02-35727, 373 F.3d 952, 2004 WL 1418012, at *1 (9th Cir. June 25, 2004). The court, therefore, declines to specifically deny qualified immunity to Stilwell and Goldfarb by applying a more fully developed version of the above-enunciated standard to the skeletal set of alleged facts in plaintiff's complaint. The court accordingly defers judgment on the qualified immunity of Stilwell and Goldfarb until, and if, defendants raise the issue on summary judgment. The court will determine at the Rule 16 conference whether the parties need preliminary discovery narrowly tailored to the issue of Stilwell's and Goldfarb's qualified immunity. *See Crawford-El v. Britton,* 523 U.S. 574, 593 n. 14, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)(*"Harlow* sought to protect officials from the costs of broad reaching discovery, 457 U.S. at 818, and we have since recognized that limited discovery may sometimes be necessary before the district court can resolve a mo-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion for summary judgment based on qualified immunity.").

## F. DECLARATORY JUDGMENT

The court dismisses plaintiff's claims for declaratory relief. Plaintiff's standing to sue for an alleged constitutional violation, as set forth *supra* Part II.A.2, satisfies the jurisdictional prerequisites of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. However, § 2201 provides a court *"may* declare the rights and other legal relations of any interested party seeking such declaration."(emphasis added). This language authorizes, rather than commands, a court to consider a claim for declaratory relief. *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942); *see also Wilton v. Seven Falls Co.,* 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ("In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."); *Government Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1225 n. 5 (9th Cir.1998) (noting that courts, in exercise of their discretion, may consider the "availability and relative convenience of other remedies'") (quoting *American States Ins. Co. v. Kearns,* 15 F.3d 142, 145 (9th Cir.1994) (Garth, J., concurring)). Pursuant to its discretion, the court dismisses plaintiff's claims for declaratory relief because adjudicating such claims would require the court and the parties to engage in unnecessary redundancy. Adjudicating plaintiff's claims for declaratory relief would require the same inquiry and yield the same result on the question of liability as plaintiff's claim for damages-i.e., the court will hold the defendants liable for damages under *Bivens* only if the finder of fact determines they violated plaintiff's constitutional rights.

## III. *CONCLUSION*

*16 The court dismisses (1) plaintiff's claims for injunctive relief because he lacks standing to bring such claims; (2) plaintiff's Fifth Amendment takings claim under *Bivens* without prejudice so he may properly bring suit against the United States in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, or in this court under 28 U.S.C. § 1346; (3) plaintiff's Fifth Amendment due process claim under *Bivens* against defendant Megan Fishel because she is entitled to qualified immunity from suit; and (4) plaintiff's claims for declaratory relief pursuant to its discretion under 28 U.S.C. § 2201.

The court denies defendants' motion to dismiss plaintiff's Fifth Amendment due process claims under *Bivens* against Jennifer Stilwell and David Goldfarb. As to these claims, plaintiff's complaint alleges facts necessary to establish standing to sue, possible constitutional violations, and the court's personal jurisdiction over Stilwell and Goldfarb. The court defers judgment on the qualified immunity of Stilwell and Goldfarb until, and if, defendants raise the issue on summary judgment.

IT IS SO ORDERED.

D.Or.,2004.
Anoushiravani v. Fishel
Not Reported in F.Supp.2d, 2004 WL 1630240 (D.Or.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                                                                    Page 1
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

**H**
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Larry BESS, Jr., Plaintiff,
v.
Edward S. ALAMEIDA, Jr., et al., Defendants.
**No. CIV S-03-2498 GEB DAD P.**

Aug. 29, 2007.

Larry Bess, Jr., Ione, CA, pro se.
April Hiroshima Gatling, Attorney General's Office, Department of Justice, Kevin Trent Snider, Pacific Justice Institute, Sacramento, CA, for Defendants.


*ORDER AND FINDINGS AND RECOMMENDATIONS*

DALE A. DROZD, United States Magistrate Judge.
*1 Plaintiff, a state prisoner confined at Mule Creek State Prison, is proceeding pro se with a civil rights action seeking relief under 42 U.S.C. § 1983. The matter is before the court on defendants' second motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has filed an opposition to the motion.[FN1] Defendants have filed a reply. In addition, the court has granted Pacific Justice Institute leave to file an amicus curiae brief in support of plaintiff. (Order filed June 29, 2007.)

> FN1. Plaintiff's opposition does not comply with Local Rule 56-260. Plaintiff's typed opposition is comprised of a seven-page preliminary statement, a three-page chronology, a nine-page memorandum of points and authorities, extensive documentary evidence, and plaintiff's own declaration. Plaintiff did not reproduce and admit or deny each fact itemized in defendants' statement of undisputed facts. Nor did plaintiff present his own concise statement of disputed facts, as permitted,

or the statement of undisputed facts required for a counter-motion for summary judgment. Nevertheless, in the interests of justice, the court has read and considered plaintiff's opposition.

**PROCEDURAL HISTORY**

On December 1, 2003, plaintiff filed a § 1983 complaint naming as defendants Edward Alameida, Jr., then director of the California Department of Corrections; Mike Knowles, then Warden of Mule Creek State Prison; and Mike Valdez, then Community Resources Manager at Mule Creek State Prison. Plaintiff alleged that these defendants violated inmates' religious freedom by censoring religious mail and creating a substantial burden on inmates' exercise of religious freedom. Plaintiff sought damages and injunctive relief.

Plaintiff's complaint was dismissed as so vague and conclusory that the court could not determine whether the allegations stated a cognizable claim for relief. Plaintiff filed an amended complaint on April 21, 2004. The court determined that the amended pleading stated cognizable claims against defendants Alameida, Knowles, and Valdez. In response to the court's order requiring plaintiff to submit documents for service of process, plaintiff failed to submit a USM-285 form for one defendant, submitted a USM-285 form for an individual not named in the amended complaint, and did not submit true copies of the amended complaint. The court construed plaintiff's submissions as an attempt to further amend his pleading. Accordingly, plaintiff was granted leave to file a second amended complaint.

On July 15, 2004, plaintiff filed his second amended complaint, which is the operative pleading in this action. The court determined that the second amended complaint stated cognizable claims against defendants Alameida, Knowles, and Valdez, as well as Jeanne Woodford, then the director of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                      Page 2
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

California Department of Corrections. Service was effected, and defendants filed an answer on February 28, 2005. The court issued a discovery order on March 4, 2005. Soon after the court directed the parties to file status reports, defendants filed their first motion for summary judgment. Plaintiff filed an opposition. Defendants did not file a reply. The undersigned issued findings and recommendations on February 16, 2006, recommending that defendants' first motion for summary judgment be denied. On March 22, 2006, the assigned district judge adopted those findings and recommendations in full and defendants' motion was denied. Discovery, which had been previously stayed, ensued.

On January 25, 2007, defendants filed their second motion for summary judgment. Plaintiff has filed an opposition. Defendants have filed a reply. Pacific Justice Institute has also filed an amicus curiae brief in support of plaintiff's opposition.

## PLAINTIFF'S CLAIMS

**\*2** In his second amended complaint, plaintiff makes the following allegations. The Mule Creek State Prison ("MCSP") Departmental Operations Manual ("DOM") § 53050, dated February 1, 2002, was introduced by defendant Valdez, the Community Resources Manager. The procedure announced therein was signed by defendant Knowles under the authorization of defendant Alameida, who was the director of the California Department of Corrections ("CDC"). Under the announced procedure, mail room staff returned religious mail to the sender marked "unauthorized," without notice to the inmate and in violation of an institutional memorandum, the departmental operations manual and state regulations. Plaintiff alleges that the challenged procedure placed a substantial burden on inmates' religion and violated the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

Plaintiff contends that the challenged procedure placed religious materials under quarterly package restrictions for no reason other than to restrict religious practices. He asserts that the effect was to place a burden on religious materials that is not placed on secular materials. For example, plaintiff alleges that under this procedure inmates could order any number of nonreligious books once every thirty days but were allowed to order only one religious book once every ninety days. Similarly, plaintiff alleges that under the challenged procedure a religious calendar sent to an inmate was returned to the sender solely because the calendar was religious, although secular calendars are permitted. Finally, and most relevant to this action, plaintiff alleges that Joyce Meyer Ministries sent him a publication titled "Me and My Big Mouth," but prison mail room staff returned it to the sender, marking it "unauthorized." Plaintiff learned of the return only when he received a letter from Joyce Meyer Ministries. Plaintiff also contends that an inmate who wanted to order a religious book was required to obtain approval at three levels while that was not required to obtain secular publications.

Plaintiff states that, although revisions have been made to the challenged procedure in response to his claims, such recognition of the violation of his rights is not sufficient. Plaintiff seeks (1) a broad injunction prohibiting the imposition of severe burdens on the exercise of religious by prisoners at MCSP; (2) an order directing mail room staff not to separate mail into religious mail and regular mail and not to reject religious mail from approved vendors merely because the particular item is not on the approved list; and (3) an order prohibiting the CDC from censoring religious mail. Plaintiff also seeks damages for his pain, suffering, and mental anguish.

Although plaintiff's second amended complaint did not specifically cite the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment, the court found that the pro se pleading appeared to support such claims. (Findings & Recommendations filed Feb. 16, 2006 at 3.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

**\*3** Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c).

Under summary judgment practice, the moving party

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

 *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c))."[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' " *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322."[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id* . In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See   Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See*Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 586 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see   Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita,* 475 U .S. at 587 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments).

**\*4** In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed.R.Civ.P. 56(c). The evidence of the opposing party is to be believed. *See  Anderson,* 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See  Matsushita,* 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

duce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244-45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (citation omitted).

On December 22, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland,* 154 F.3d 952, 957 (9th Cir.1998) (en banc); *Klingele v. Eikenberry,* 849 F.2d 409 (9th Cir.1988).

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND EVIDENCE

Defendants summarize the case as follows: plaintiff, a Catholic, alleges that prison officials' return of a non-denominational, self-help and motivational study guide entitled "Me and My Big Mouth" to its sender violated his rights under the First Amendment, the Religious Land Use and Institutional Persons Act of 2000 ("RLUIPA"), and the Fourteenth Amendment Due Process and Equal Protection Clauses. (Defs.' Mot. for Summ. J. at 6.)

Defendants' statement of undisputed facts is supported by citations to plaintiff's deposition testimony, copies of his medical records, and declarations by M. Valdez, a Community Resources Manager in the Division of Community Partnerships FN2; E. Kanipe, a former litigation coordinator for MCSP; M. Knowles, former Warden at MCSP and current Warden at Kern Valley State Prison FN3; R. Espinoza, Correctional Sergeant at MCSP; T. Kemp, a MCSP mail room employee; S. Barham, Protestant Chaplain at MCSP; E. Alameida FN4 and J. Woodford, former Directors/Under-secretaries/Secretaries of the CDC and CDCR. De-

fendants have also submitted with their reply a declaration by Joe Cocke, the current litigation coordinator at MCSP.

FN2. Attached to the Valdez declaration are (1) copies of online shopping descriptions of "Me and My Big Mouth: Your Answer is Right Under Your Nose-Study Guide"; (2) Joyce Meyer Ministries' description of "Me and My Big Mouth Study Guide"; (3) a copy of the letter to plaintiff from Joyce Meyer Ministries, informing him that the study guide had been returned to them as UNAUTHORIZED; (4) the May 4, 1999 memorandum regarding procedure for purchases of religious artifacts; (5) MCSP DOM Supplement § 53050 May 2000 revision signed by defendant Knowles; (6) images of contraband, including religious claws and pins, sent through mail; (7) copies of "Criminon" self-help publication descriptions; (8) a copy of a notice sent to Mount Zion Bible Book Store, indicating concerns regarding religious packages sent to MCSP and a copy of Mount Zion Bible Church's response, indicating they would comply with the mail procedures; a copy of a notice sent to Kaufer's, indicating concerns regarding religious packages sent to MCSP and copy of Kaufer's response, indicating they would comply with the mail procedures; (9) MCSP DOM Supplement § 53050 May 2002 revision signed by defendant Knowles with copies of forms SP-R.1 and SP-R.2; (10) a copy of the November 19, 2002 memorandum sent to all inmates from defendant Knowles, explaining the MCSP DOM Supplement § 53050 May 2002 revision; (11) a copy of the religious special order tracking log; (12) MCSP DOM Supplement § 53050 May 2003 revision signed by defendant Knowles; and plaintiff's relevant administrative grievances and responses thereto from the ap-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                          Page 5
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

peals office and the inmate appeals branch.

FN3. Attached to the Knowles declaration are (1) copies of online shopping descriptions of "Me and My Big Mouth: Your Answer is Right Under Your Nose-Study Guide"; (2) Joyce Meyer Ministries' description of "Me and My Big Mouth Study Guide"; (3) a copy of the letter to plaintiff from Joyce Meyer Ministries, informing him that the study guide had been returned to them as UNAUTHORIZED; (4) the May 4, 1999 memorandum regarding procedure for purchases of religious artifacts; (5) MCSP DOM Supplement § 53050 May 2000 revision signed by defendant Knowles; (6) images of contraband sent through mail; (7) copies of "Criminon" self-help publication descriptions; (8) MCSP DOM Supplement § 53050 May 2002 revision signed by defendant Knowles with copies of forms SP-R.1 and SP-R.2; (9) a copy of the November 19, 2002 memorandum sent to all inmates from defendant Knowles, explaining the MCSP DOM Supplement § 53050 May 2002 revision; (10) MCSP DOM Supplement § 53050 May 2003 revision signed by defendant Knowles; (11) MCSP DOM Supplement § 51020 April 2004 revision from Scott Kernan (regarding operational supplements).

FN4. Attached to the Alameida declaration are copies of plaintiff's relevant appeals and responses thereto from the appeals office and inmate appeals branch.

The undersigned finds that defendants' evidence establishes the following facts: Starting May 4, 1999, the procedure for inmates who wanted to purchase special religious items and artifacts required an inmate to complete a "Religious Special Purchase Request" and a Trust Withdrawal form and give them to the chapel clerk for their respective religion; the clerk would forward the forms to the chaplain, and

if approved, he would sign them and forward the forms to the community resources manager (CRM) for review; if the CRM approved the forms, he would forward them to Receiving and Release (R & R); R & R would then check the name of the inmate against an approval list provided by the chaplain, according to the inmate's religion, and staff would also check the list of approved vendors; if the request was approved, R & R would sign the forms and forward them to the trust office; the trust office would then process the request through normal institutional Special Purchase procedures.

*5 In 2000-2001, contraband items found their way into the mail at MCSP; for example, someone attempted to mail a packet of religious claw-like items; in addition, someone attempted to mail into the prison tapestry needles; the items were sent into MCSP by way of general mail and were intended for use in conjunction with some religious activity.

The mail room supervisor Villereal contacted defendant Valdez, then the CRM, expressing concern about the volume of religious items, books, packages, and bulk mail flyers that continued to stack up in the mail room and were not being processed in a timely manner. Many of the items were sent unsolicited, while some were mailed because a family member requested that they be sent to the inmate.

Defendant Valdez met with the chaplains and directed them to review and search these items for contraband and asked that they be processed in a timely manner; Villereal continued to express concerns about the volume of packages.

Warden Knowles contacted defendant Valdez and asked him to examine the existing policy and recommend an amended policy to address security and staff concerns; defendant Valdez reviewed general mail regulations and found that MCSP was not in compliance with standard search procedures or acceptance of gift and donations by inmates; in addition, mail room staff, chaplains, and custodial staff were not consistent in screening for contraband.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                            Page 6
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

In 2000-2001, items from mainstream faith groups were scanned and processed without delay, while items considered non-mainstream would be delayed or returned to the vendor or sender; certain items of religious property received were supposed to be documented as property on the inmate's property card. However, this did not always take place, so inmates could deny that items were theirs or claim that items were stolen by staff or other inmates. These issues created a less secure environment and staff required direction and policy in the area of religious services. Defendant Valdez's predecessor had previously sent a memorandum dated October 24, 2001, requiring vendors to understand and acknowledge that no customers were allowed to come into contact with the product before it was shipped to the prison.

The procedure for inmates obtaining special religious items and artifacts was subsequently amended with MCSP DOM Supplement § 53050, May 2002 revision. The change helped ensure consistent security measures and communications in processing and inspection upon receipt of a package at the institution and it clarified and identified a process for participation for all religious correspondence. The May 2002 revision also combined previous fragmented policies into one approval process pursuant to which an inmate's request for special religious purchases marked with SP-R1 (special purchase religious-1) went through the chaplain, then the CRM, and then the institution's R & R staff for approval before the inmate ordered the item. Once approved, the inmate would then complete the SP-R1 Form and send it to the approved vendor with request for the approved item. The vendor would then label the package and place the vendor's stamp on the form before mailing it back to the inmate.

**\*6** A November 19, 2002 memorandum was sent to all inmates at MCSP notifying them of the updated procedures. The memorandum informed inmates that, effective January 1, 2003, religious items, either sent at no charge or purchased from an approved vendor, would be allowed once per quarter,

per inmate; the memorandum was posted throughout the institution and directed to chaplains, associate wardens, captains, and the entire inmate population. Captains employed the assistance of the Men's Advisory Committee to issue copies of the memorandums to each inmate in their housing units as well as posting them in the housing unit.

In late 2002 or early 2003, plaintiff ordered a study guide entitled "Me and My Big Mouth" from Joyce Meyer Ministries.[FN5] Prison mail room officials at MCSP returned the study guide to the sender because plaintiff had not sought prior approval for the publication as required by prison policies and procedures. Joyce Meyer Ministries sent plaintiff a letter, notifying him that his request was not authorized.[FN6]

> FN5. Plaintiff reportedly already possessed the companion book.
>
> FN6. The record does not establish either the date on which plaintiff sent his request for the study guide or the date on which prison officials returned it to the sender. The letter from Joyce Meyer Ministries concerning the return of the study guide is dated February 20, 2003. It appears to the undersigned that the May 2002 revision was in effect when prison mail room staff returned the study guide to Joyce Meyer Ministries.

Under the May 2002 revision, prison officials were to notify an inmate if his package was returned to the sender, stating the reason the package was rejected. Defendant Valdez has attempted unsuccessfully to locate a copy of the notice sent to plaintiff. If plaintiff did not receive a rejection notice, it was an oversight and not pursuant to the policy in effect at the time since the policy was to provide inmates with notice if a package was returned.

During implementation of the May 2002 revision, Sergeant Campbell replaced Villereal as mail room supervisor at MCSP. Defendant Valdez met with

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Sergeant Campbell to discuss the May 2002 revision. In Sergeant Campbell's review of the procedure, she discovered that the mail room staff and R & R staff were not consistent in notifying inmates of package rejections.

Subsequently, the procedure was again amended with MCSP DOM Supplement § 53050, May 2003 revision which provided that special religious purchases would be authorized once per month and could be obtained through approved vendors. Inmates could request these purchases through the special order form SP-1. An inmate had to complete the form and have it processed via the staff chaplain for approval. If approved, the form would then be forwarded to the R & R Sergeant for normal special order processing. Religious items not available through approved vendors could be acquired through the public faith community by seeking approval from the CRM. Such requests were generally approved.

Plaintiff filed an administrative grievance concerning the rejection of "Me and My Big Mouth" and exhausted his appeal through the director's level. Once plaintiff received notice from Joyce Meyer Ministries that his request was not authorized, he could have submitted a request as set forth in the November 19, 2002 memorandum and outlined above. However, plaintiff did not utilize the procedure with respect to the publication at issue here.

*7 Currently, the process for obtaining special religious purchases is based on MCSP DOM, Supplement § 53050, March 2006 revision pursuant to which religious items/artifacts are authorized one per quarter in addition to inmates' personal property allotment. Inmates may obtain such items by using a special order form that the chaplains are authorized to approve. If the request is approved, the form is then sent to the R & R Sergeant who co-signs the form to affirm that the vendor is authorized. The R & R Sergeant then logs the request and returns the original form to the facility chapel. The chapel clerk then logs the request and returns the original form to the inmate. The inmate then may forward the form along with a completed trust withdrawal slip to the trust office for processing. If the request is denied, the decision is presented immediately to the AWCS for review. The denial form is then returned to the inmate within 10 days. Although boxes and packages continue to be processed by R & R, religious and non-religious books are processed through the mail room like any other mail item.

Based on the evidence set forth above, defendants argue that they are entitled to summary judgment as to all of plaintiff's claims because (1) defendants may not be sued in their official capacities; (2) the predicate of the suit (the study guide) is a non-religious publication and thus did not trigger First Amendment or RLUIPA protections; (3) defendant Woodford is not personally liable or subject to retention for purposes of injunctive relief because she has resigned as Secretary of CDCR; (4) defendants Woodford and Alameida are entitled to judgment as administrators or supervisors of others; (5) the challenged policy was rationally related to legitimate penological state interests; (6) no religious interest was burdened, and to the extent it was, compelling governmental interests existed and the procedure employed was the least restrictive means available; (7) the law and facts do not support plaintiff's due process or equal protection claims; (8) defendants are entitled to qualified immunity from suit; and (9) plaintiff's request for injunctive relief has been rendered moot. (Defs.' Mot. for Summ. J. at 6.)

### ANALYSIS

### I. Threshold Issues

### A. Characterization "Me and My Big Mouth"

Defendants argue that they are entitled to summary judgment because "Me and My Big Mouth" is a self-help publication, not a religious publication. Defendants acknowledge that the guide includes Bible verses, but emphasize that it is not a religious

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 8
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

text; rather, it is motivational and self-help in nature. (Defs.' Mot. for Summ. J. at 7.) Defendants note that neither the Catholic priest nor the Protestant chaplain at MCSP referred plaintiff to the guide. Defendants conclude that the court should not allow plaintiff to cloth his non-religious study guide with RLUIPA and First Amendment protections. (*Id.* at 8.)

In opposition, plaintiff argues that defendants are not entitled to summary judgment because "Me and My Big Mouth" is a religious text. It contains chapters entitled "Learning to Speak God's Language" and "Become God's Mouthpiece." Plaintiff contends that any book that aids one in understanding the Bible is a religious text. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 12-13.)

*8 The undersigned finds that the proper characterization of "Me and My Big Mouth" represents "a genuine issue of material fact."Fed.R.Civ.P. 56(c). Although defendants may be correct that "Me and My Big Mouth" is a self-help publication, self-help publications and religious publications are not necessarily mutually exclusive. "Me and My Big Mouth," for example, is written and sold by Joyce Meyer Ministries. In fact, plaintiff sought the publication from that ministry. Although the study guide is also available through secular vendors, such as MSN Shopping or Amazaon.com, the publication is found under Christianity or religious and spirituality categories. Finally, the fact that neither the Catholic priest nor the Protestant chaplain referred plaintiff to the guide is not dispositive of the material issue. The chaplains may not have read the book or been familiar with it. Accordingly, to the extent that defendants' motion for summary judgment is based on the argument that the "Me and My Big Mouth" is a non-religious publication, the motion should be denied.

**B. Mootness of Plaintiff's Request for Injunctive Relief**

Defendants argue that plaintiff's request for injunct-

ive relief is moot because the challenged regulations no longer offend plaintiff's interests. (Defs.' Mot. for Summ. J. at 34-35.) Defendants point to plaintiff's deposition, arguing that he admitted that the procedure for processing requests for religious material has changed and no longer poses a problem requiring injunctive relief. Specifically, defendants rely on the following passages of that deposition:

**Q.** But what's going on right now is fine. You agree with it. Is that correct?

**A.** Yes

**Q.** You like it.

**A.** (Witness nods head.)

**Q.** You like to be able to write, get your book through the mail; is that correct?

**A.** Yes.

(Defs.' Ex. I at 139:15-24.)
**Q.** Now, the Court said that you-in terms of your injunctive relief, and somewhat different than what you just read to me, said that you are seeking a broad injunction prohibiting severe religious burdens on Mule Creek, an order directing Mule Creek staff not to separate mail into religious mail and regular mail, and not to reject religious mail from approved vendors just because a particular item is not on an approved list, and an order prohibiting CDCR from censoring religious mail; is that correct?

**A.** Yes, sir.

**Q.** But, in fact, they are no longer censoring religious mail. In fact, it's coming in. It's being examined, of course. And you don't dispute or argue that's wrong, do you, examining?

**A.** I never did.

**Q.** All right. And, in fact, religious mail can be sought and received now, and there's no burden, no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

interference with the mail; is that correct?

**A.** Exactly. And it should have never been.

(Defs.' Ex. I at 143:5-24.)

In opposition, plaintiff argues that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 18.) Plaintiff contends that defendants have a heavy burden of persuading the court that the challenged conduct is not reasonably expected to start up again. Plaintiff concludes that defendants have not met their burden in this regard and therefore are not entitled to summary judgment. (*Id.* at 19.)

**\*9** "Mootness is like standing, in that if it turns out that resolution of the issue presented cannot really affect the plaintiff's rights, there is, generally speaking, no case or controversy for the courts to adjudicate; no real relief can be awarded." *Smith v. Univ. of Washington Law School,* 233 F.3d 1188, 1193 (9th Cir.2000)."Where the activities sought to be enjoined already have occurred, and the ... courts cannot undo what has already been done, the action is moot, and must be dismissed." *Bernhardt v. County of Los Angeles,* 279 F.3d 862, 871 (9th Cir.2002).*See also Demery v. Arpaio,* 378 F.3d 1020, 1025-26 (9th Cir.2004) ("[A] suit for injunctive relief is normally moot upon the termination of the conduct at issue[.]").*See David v. Giurbino,* 488 F.Supp.2d 1048, 1056 (S.D.Cal.2007).

Here, plaintiff continues to seek injunctive relief as to a prison policy that has since been modified to plaintiff's satisfaction.[FN7] Plaintiff's claim for injunctive relief is therefore moot unless it falls within the exception to the mootness doctrine. The exception applies when "(1) the challenged action was too short in duration to be fully litigated prior to its cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 774, 98

S.Ct. 1407, 55 L.Ed.2d 707 (1978).*See also Dilley v. Gunn,* 64 F.3d 1365, 1368-69 (9th Cir.1995) (prisoner's claim for adequate access to law library was moot upon transfer and did not fall under the two-prong exception to mootness doctrine); *Wiggins v. Rushen* 760 F.2d 1009 (9th Cir.1985) (where prisoner was no longer subjected to prison officials' allegedly unconstitutional activity, the complaint for injunctive relief became moot); *Williams v. Alioto,* 549 F.2d 136, 143 (9th Cir.1977) ( "A mere speculative possibility of repetition is not is not sufficient. There must be a cognizable danger, a reasonable expectation, of recurrence for the repetition branch of the mootness exception to be satisfied."); 1A C.J.S. *Controversies Capable of Repetition Yet Evading Review* § 82 (2007) (cases satisfying the mootness exception include those actions involving issues such as abortion, elections, residency requirements, benefits, and preadjudication detention).

> FN7. In relevant part, the governing policy states: "Religious organizations or publishers that send text material (non bound) pamphlets other than catalogs will be forwarded to the inmates as regular mail.... All religious mail will be processed via normal institutional policies for mail and is subject to search in keeping with CDCR policies."(Defs.' Reply at 3.)

Plaintiff has not demonstrated that his claim falls into the category of cases that satisfy the "capable of repetition, yet evading review" exception. Under the first prong of that exception, a prisoner's claim that prison officials or prison policies burden or deny his right to free exercise of religion is not a claim that will evade review. First Amendment cases that are properly filed are reviewed for cognizable claims and then decided by the federal courts. *Cf., e.g., Dilley,* 64 F.3d at 1369 ("the scores of cases in which we have reviewed claims by inmates that prison officials failed to provide adequate access to prison law libraries demonstrate that these cases do not generally evade review.").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Under the second prong, plaintiff has not demonstrated a reasonable expectation that prison officials will deny him access to his religious mail. In fact, after being denied "Me and My Big Mouth," plaintiff has since successfully availed himself of the current process and obtained other religious publications. (Defs.' Ex. J at 53:4-24.) Plaintiff has also conceded that the current procedures are constitutional. (*Id.* at 81:5-17.)

**\*10** In light of MCSP's new policy, and plaintiff's satisfaction with it, plaintiff's claim for injunctive relief is now moot. Plaintiff has not demonstrated that his claim is "capable of repetition, yet evading review."Accordingly, defendants' motion for summary judgment on plaintiff's claim for injunctive relief should be granted.

### C. Defendants' Involvement in the Deprivation of Plaintiff's Rights

#### 1. Defendant Woodford's Liability

Defendants argue that defendant Woodford is not personally liable, nor is she subject to retention for purposes of injunctive relief because she has resigned as Secretary of CDCR. (Defs.' Mot. for Summ. J. at 9.) Defendant Woodford's declaration states that she was not the Secretary or Undersecretary of the CDCR, nor the Director of the CDC in late 2002 to early 2003. Her declaration further states that she resigned as the Acting Secretary on April 20, 2006. (Woodford Decl. at 2.) Plaintiff does not dispute these facts.

Previously, this court found that plaintiff had sued defendant Woodford because the injunctive relief he sought might require action at the director's level if he prevailed on his claims. Given defendant Woodford's resignation, as well as this court's recommendation that plaintiff's claim for injunctive relief be found moot, the court concludes that defendant Woodford is entitled to summary judgment in her favor on plaintiff's claim for injunctive relief.

#### 2. Supervisory Personnel

Defendants argue that defendants Woodford and Alameida are entitled to judgment in their favor as mere administrators or supervisors of others and not subject to supervisorial liability. Defendants acknowledge that this court previously held that there was a "causal connection between the conduct" of defendants Woodford and Alameida and plaintiff's alleged deprivations. However, defendants emphasize that the evidence now submitted with this motion for summary judgment demonstrates that such a causal connection does not exist. First, defendants contend that neither Woodford nor Alameida committed any affirmative act, participated in another's affirmative act, or failed to perform an act he or she was legally required to perform. In addition, defendants argue that plaintiff now admits that defendant Alameida did not sign the director's level decision that denied plaintiff's administrative grievance against prison officials for rejecting "Me and My Big Mouth." Defendants argue that Alameida had no knowledge of the administrative grievance and that plaintiff's attempt to hold Alameida liable is based solely on his status as CDC Director at the time MCSP staff returned the publication to Joyce Meyer Ministries. (Defs.' Mot. for Summ. J. at 11.) Finally, defendants argue that neither Alameida nor Woodford wrote, read, participated in discussions relative to, or were otherwise involved in the implementation of the challenged policy and procedure at MCSP. (Defs.' Mot. for Summ. J. at 12-13; Defs.' Reply at 4-5.)

**\*11** In his opposition, plaintiff states that defendants Woodford and Alameida are not entitled to summary judgment, arguing that the court has already found sufficient allegations in the pleadings to link all defendants to the alleged deprivation of rights and contending that defendants are not entitled to re-litigate the issue. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 13-14.)

In this court's February 16, 2006 findings and recommendations recommending denial of defendants' first motion for summary judgment, the court

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

found that plaintiff had sued defendant Alameida for authorizing and approving institutional policies that caused plaintiff's alleged constitutional violations and for denying plaintiff's inmate appeal, either personally or through staff acting under his authority, thereby failing to ensure the constitutionality of prison policies. The evidence submitted in connection with the pending motion indicates that defendant Valdez, as the CRM, was responsible for reviewing and recommending updates to policies that facilitate access for all interested inmates to religious programs. The CRM does not have authority to approve or order policy changes. Only the warden possesses such authority. CDCR directors Woodford and Alameida were not involved in any way in changing MCSP policies. Defendants' evidence also establishes that defendant Alameida did not sign, or have any knowledge of, plaintiff's administrative grievance related to "Me and My Big Mouth."

As the court previously explained, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley,* 607 F.2d 858, 862 (9th Cir.1979); *Mosher v. Saalfeld,* 589 F.2d 438, 441 (9th Cir.1978), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2883, 61 L.Ed.2d 311 (1979). Here, plaintiff has failed to tender any evidence in support of his contention that a dispute exists as to a material issue of fact. *See* Fed.R.Civ.P. 56(e). The court finds that plaintiff has failed to present any evidence establishing the involvement of defendants Alameida or Woodford in approving or ordering policy changes or of defendant Alameida's involvement in denying plaintiff's administrative appeal. Accordingly, defendants Woodford and Alameida are entitled to summary judgment in their favor.

## II. Plaintiff's Constitutional and Statutory Claims

Defendants next argue that they are entitled to summary judgment on plaintiff's claims brought pursuant to the First Amendment, RLUIPA and Due Process Equal Protection Clauses.

### A. First Amendment

#### 1. *Parties' Arguments*

Defendants argue that the challenged policy did not violate plaintiff's First Amendment free exercise rights because it was rationally related to legitimate penological state interests. Defendants contend that the threshold question is whether plaintiff's sincerely held religious beliefs mean that without "Me and My Big Mouth," plaintiff was not able to worship or otherwise exercise his religious beliefs? Defendants assert that the answer is no. They argue that plaintiff concedes that he was able to practice his religion notwithstanding prison officials returning his copy of "Me and My Big Mouth" to its sender. In addition, defendants note that this study guide is not a central element of plaintiff's Catholic religion. (Defs.' Mot. for Summ. J. at 13-14.)

**\*12** Defendants also argue that the challenged policy is valid under the principles announced in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In *Turner,* the Supreme Court established guidelines governing constitutional challenges to prison regulations. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. The Supreme Court laid out a four-factor test to determine the reasonableness of a prison regulation: (1) whether there is a valid, rational connection between the regulation and the legitimate and neutral governmental interest used to justify it; (2) whether there are alternative means of exercising the asserted prisoners' right; (3) what impact accommodation of the asserted right will have on correctional staff and other inmates, and on the allocation of prison resources in general; and (4) whether there are obvious, easy alternatives to the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

regulation or policy in question, the absence of which is evidence of the reasonableness of the prison rule. *Turner,* 482 U.S. at 89-91. (Defs.' Mot. for Summ. J. at 15.)

Under the first prong, defendants note that the policy in place before late 2002/ early 2003 was cumbersome, confusing, and presented security and workforce problems. For example, contraband items found their way into the prison. As a result, defendants contend that Warden Knowles asked CRM Valdez to examine the policy and recommend an amendment. The change ensured consistent security measures and communications and clarified the process for religious correspondence. (Defs.' Mot. for Summ. J. at 16.) On November 19, 2002, a memorandum was sent to all inmates, notifying them of the updated procedure. Defendants emphasize that both the Supreme Court and the Ninth Circuit have held that prison security is a legitimate penological interest. Moreover, defendants contend that effective and efficient processing of mail falls squarely into that realm. (Defs.' Mot. for Summ. J. at 17.)

Defendants also argue that the challenged policy was neutral. (*Id.* at 17-18.)The regulation did not ban religious material. It merely ensured that the vendor was one that has been approved and the item was from a legitimate vendor. Defendants contend that a regulation that addresses religious material to the exclusion of non-religious material may nonetheless be deemed neutral in operation. Defendants argue that, in the prison context, regulations applicable to specific types of content due to specific inherent risks or harms are considered content neutral. In defendants' view, there is no question that prison officials promulgated the regulation for the security of the institution, not to suppress expression. Defendants conclude that the challenged regulation was rationally related to its objective of ensuring institutional security in the processing of incoming mail. (*Id.* at 18.)

Under the second prong of the *Turner* test, defendants argue that there were alternative means of ex-

pression that remained open to plaintiff. Defendants note that, once plaintiff was informed that his study guide had been rejected, plaintiff had the opportunity to submit a request as set out in the November 19, 2002 memorandum. Instead, plaintiff chose to file this lawsuit. Defendants contend that the challenged policy did nothing to impinge on plaintiff's practice of his religion and that he was able to pray, attend church and participate in customary practices. In fact, since the rejection of the study guide, plaintiff has availed himself of the available process to obtain other religious publications. (*Id.* at 20.)

**\*13** Under the third prong, defendants note that, allowing plaintiff to receive the package without compliance with the regulation, would have exposed staff and other prisoners to substantial risk of harm associated with the introduction of contraband into prison. The Supreme Court has consistently held that prison administrators should be given wide-ranging deference in the adoption and execution of policies needed to preserve the internal order and discipline of institutional security. (Defs.' Mot. for Summ. J. at 21.)

Finally, under the fourth prong of the *Turner* test, defendants contend that there were no obvious, easy alternatives to the regulation at issue. They argue that prison officials need not eliminate every conceivable alternative method of accommodating plaintiff's constitutional claim. Rather, the burden is on plaintiff to demonstrate that there was an alternative way of fully accommodating the prisoner's rights at a de minimis cost to valid penological interests. If such an alternative exists, the court may consider it as evidence that the challenged regulation does not satisfy the reasonable relationship standard. (Defs.' Mot. for Summ. J. at 21-22.)

In sum, defendants argue that their evidence shows that the challenged religious publications policy was a constitutional prison regulation, serving a legitimate and neutral objective of prison security. They note that excluding contraband is important in maintaining security, order, and discipline. In addi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                  Page 13
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

tion, prison personnel may act more efficiently and effectively in processing thousands of pieces of mail sent to prisoners each year. Defendants conclude by arguing that there is no objective evidence supporting plaintiff's assertion that the study guide was an important component to either Christianity generally or to Catholicism specifically. Accordingly defendants assert that the challenged mail policy passes constitutional muster under *Turner,* even though it is no longer applied. (*Id.* at 22-23.)

In opposition to the motion for summary judgment, plaintiff argues that defendants' policy was not rationally related to legitimate penological interests and that defendants' claims that restricting Christian literature constitutes a rational penological interest is exaggerated. In addition, plaintiff contends, defendants' policy was not neutral in that it applied solely to religious publications. According to plaintiff, such a content-based distinction cannot be viewed as operating in a neutral fashion. Plaintiff concludes that the challenged policy is unconstitutional under the Supreme Court's decision in *Turner.*(Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 14-16.)

## 2. *Discussion*

A prisoner's First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir.1987) (per curiam). In particular, a prisoner's constitutional right to free exercise of religion must be balanced against the state's right to limit First Amendment freedoms in order to attain valid penological objectives such as rehabilitation of prisoners, deterrence of crime, and preservation of institutional security. *Pell,* 417 U.S. at 822-23.

*14 Courts must, of course, accord deference to the decisions of prison administrators. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 126, 97 S.Ct. 2532, 53 L.Ed.2d 629

."Nevertheless, deference does not mean abdication." *Walker v. Sumner,* 917 F.2d 382, 385 (9th Cir.1990).

Prison officials must "put forward" a legitimate governmental interest to justify their regulation, *Turner v. Safley,* 482 U.S. at 89, and must provide *evidence* that the interest proffered is the reason why the regulation was adopted or enforced. *Swift v. Lewis,* 901 F.2d 730, 732 (9th Cir.1990) ( "prison officials must at least produce some evidence that their policies are based on legitimate penological justifications"); *Caldwell v. Miller,* 790 F.2d 589, 598 (7th Cir.1986) ("the governmental interest asserted in support of a restrictive policy must be sufficiently articulated to allow for meaningful review of the regulation and its effect on the inmate's asserted rights"); *Wilson v. Schillinger,* 761 F.2d 921, 925 (3rd Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986). The Constitution requires that "considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit constitutional review." *Caldwell,* 790 F.2d at 599. It is only after prison officials have put forth such evidence that courts defer to the officials' judgment. *Id.* at 600.

*Id.* at 385-86 (parallel citations omitted) (emphasis in original). Summary judgment must be denied where prison officials fail to provide evidence that the interests they have asserted are the actual bases for the regulation or policy under attack. *Id.* at 386 (citing *Swift,* 901 F.2d at 731). Prison officials cannot rely on conclusory assertions to support their policies but must first identify the specific penological interests involved and then make an evidentiary showing that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. *Id.*

Defendants' first purported justification for the challenged regulation is that it was necessary to prevent contraband from entering the prison. Defendants do not contend that the religious literature

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

is in and of itself a security concern. Rather, defendants argue that, before prison officials implemented the challenged policy, many contraband items found their way into the mail at MCSP. Defendants point to two instances involving contraband. In one instance, someone attempted to send religious claw-like items through the mail. In a second instance, someone attempted to mail a packet of tapestry needles into the prison.

However, defendants have failed to offer any evidence that contraband was more likely to be hidden in or disguised as religious mail, thereby justifying the pre-approval process for religious mail but not general mail. *Cf. Morrison v. Hall,* 261 F.3d 896, 902 (9th Cir.2001) ("although defendants have presented some evidence that contraband is sometimes included in bulk rate, third and fourth class mail, the defendants have failed to present any evidence that the risk of contraband in first or second class mail is any lower than the risk of contraband in mail that is sent bulk rate, third or fourth class."); *Prison Legal News v. Cook,* 238 F.3d 1145, 1150 (9th Cir.2001) ("The Department has presented no evidence supporting a rational distinction between the risk of contraband in subscription non-profit organization standard mail and first class or periodicals mail.").

**\*15** Aside from the two instances above, defendants are only able to proffer generalities regarding contraband. For example, T. Kemp's declaration explains that "over the years," he has often found contraband-drugs, publications displaying frontal nudity and laminated religious book markers, which he contends could be used as knives. However, T. Kemp does not specify whether his experience with contraband has been primarily with religious mail or general mail. He also does not specify whether his experience with contraband was any more or less of a problem prior to implementation of the challenged policy. Similarly, S. Barham's declaration states that "over the years" he has learned of instances where people have attempted to use religious materials for the purpose of introducing con-

traband. "Years ago" when he was a correctional officer, he confiscated a Bible that was hollowed out and filled with drugs. (Barham Decl. at 2.) Much like T. Kemp's declaration, Barham's declaration is silent as to when these incidents occurred. Finally, R. Espinoza's declaration notes that "[y]ears ago" a family member sent notes to an inmate hidden in a religious book. The notes were considered contraband because they must be written and mailed through first class mail. Again, R. Espinoza's declaration does not demonstrate that his experience with contraband is relevant because it may have occurred after prison officials adopted the challenged policy. In fact, Espinoza's declaration points to an instance in the first part of 2006, after the challenged policy was implemented, when marijuana had been found in incoming mail. However, he was unable to recall whether the mail was classified as religious mail or regular mail. Espinoza also declares that, in his experience, contraband has been sent to the prison in regular mail and packages as well as in religious mail. (Espinoza Decl. at 3.)

On average, MCSP receives an estimated 3000 to 4500 pieces of mail a day and 1300 pieces of property per month.[FN8] However, aside from the two instances mentioned above, defendants have not otherwise been able to support their claim that institutional security mandated the pre-approval of all religious publications and the complicated and burdensome procedures selected for implementing the pre-approval policy, particularly when all packages are inspected on receipt at the prison. Defendants' security justification does not satisfy the first prong of the *Turner* test, as defendants have not demonstrated a valid, rational connection between their policies and the legitimate governmental interest put forward to justify them.

> FN8. T. Kemp, an MCSP mail room employee, declares that he is responsible for processing mail for one-third of inmates. On average, he processes from 1000 to 1500 pieces of mail each day. He specu-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

lates that other mail room staff process similar amounts. Although those numbers have increased a bit since 2002-2003, Kemp declares that the numbers remain similar. (T. Kemp Decl. at 3.) R. Espinoza, MCSP's R & R supervisor, declares that R & R processes on average an estimated 1300 pieces of property per month. Based on his experience, he estimates that the pieces of property processed in late 2002 or early 2003 was similar to that number.

Defendants' other purported justification for the challenged regulation is that it was necessary to process incoming mail more efficiently and effectively. However, the Ninth Circuit has rejected the efficient use of prison resources as a justification for impinging on prisoners' First Amendment rights. *See Morrison v. Hall,* 261 F.3d 896 (9th Cir.2001); *see also Prison Legal News v. Cook,* 238 F.3d 1145, 1151 (9th Cir.2001).

**\*16** In *Morrison,* an Oregon prisoner had a pre-paid subscription to *Montana Outdoors,* a for-profit subscription magazine, typically mailed bulk rate, third, or fourth class mail. The prison mail room staff returned the magazine to the publisher, inaccurately stating that the address was incorrect. The prisoner challenged the prison regulation, prohibiting prisoners from receiving bulk rate, third, or fourth class mail. In a motion for summary judgment, defendants claimed, *inter alia,* that the regulation facilitated the efficient use of prison personnel and prison resources. *Morrison,* 261 F.3d at 902. The defendants had submitted a declaration by the Deputy Assistant Director of the Oregon Department of Corrections, stating that Oregon prisons received massive volumes of bulk rate, third, and fourth class mail, and approximately one quarter of a staff person's time had been taken each day dealing with unsolicited and non-privileged junk mail. *Id.* at 903.In addition, the declaration emphasized that mail room staff had to spend significant time scanning pages in an effort to prevent contraband from entering the institution. Finally, the declara-

tion stated that, because the catalogues and brochures often contained contraband, and inmates were entitled to a hearing each time contraband was confiscated by mail room staff, a policy prohibiting bulk rate, third, and fourth class mail reduced confiscation hearings. *Id.* at 903.

The Ninth Circuit held that efficient use of staff time does not justify a ban on bulk rate, third, and fourth class mail. *Morrison,* 261 F.3d at 903. The court also found that, despite the Deputy Assistant Director's declaration, "defendants have failed to submit any evidence regarding the quantum of for-profit subscription publications received at Oregon prisons." *Id.* at 903.The court explained that the declaration only contained statistics related to "unsolicited and non-privileged junk mail." *Id.* at 903.

In this case, defendant Valdez describes the volume of religious mail at MCSP as follows:

I was contacted by mail room supervisor Villereal, who expressed concern for the volume of religious items, books, packages, bulk mail flyers that continued to stack up in the mail room and were not being processed into the prison in a timely manner. *Many of these items were being sent to the prison without being sought by the inmate. Some were being sent to inmates because a family member asked that the item be sent. In other instances, they were unsolicited material from religious organizations.*(emphasis added)

I met with the chaplains and directed them to review and search these items for contraband and asked that they be processed into the institution in a timely manner. I personally spent on average one day out of very work week reviewing and searching the non-general mail items being sent to the prison. *These items often included bulk mailed pamphlets and catalogs, and cassette tapes and videos that had not been requested by the inmate.*(emphasis added)

**\*17** Villereal continued to report his concerns about

the volume of religious packages to the central services captain and warden. The volume of these items were simply beyond the resources of myself and the chaplains to keep up with. I would estimate that 1 cubic yard of religious items were being received by MCSP each week.

(Valdez Decl. at 4-5.) As in *Morrison,* defendants here have not submitted any probative evidence that processing *solicited* religious mail, such as "Me and My Big Mouth" has a burdensome impact on MCSP staff. Defendants have therefore failed to demonstrate that processing incoming mail more efficiently and effectively mandated the pre-approval of all religious publications and the complicated and burdensome procedures selected for implementing the pre-approval policy.

Defendants have also failed to show that their objective was neutral. Defendants attempt to claim that the challenged policy was promulgated not to suppress expression, but for neutral purposes, including security of the institution and efficient and effective processing of incoming mail. As discussed above, it is " 'important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, *without regard to the content of the expression.* '" *Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner,* 482 U.S. at 90) (emphasis added). In *Thornburgh,* the regulations at issue did not ban publications because their content was religious, philosophical, political, social, or sexual, or even because their content was unpopular or repugnant, but rather because the publications were detrimental to security.*Id.* at 415.The Supreme Court explained in *Thornburgh* that the prison officials were drawing distinctions between publications "solely on the basis of their potential implications for prison security" and were therefore neutral. *Id.* at 415-16.*See also Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 131 n. 8, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (upholding content distinctions between materials that served a rehabilitative purpose and materials

that posed a threat to the order and security of the institution).

In contrast, the challenged policy at MCSP applied solely to religious publications, distinguishing between religious publications and all other publications. Such a content-based distinction cannot be viewed as operating in a neutral fashion with regard to content, particularly when defendants have not shown that only religious publications have potential implications for prison security and efficiency while other publications do not.

Because the first *Turner* factor " 'constitutes *sine qua non,* '" a court need not reach the remaining three factors if the regulation at issue is not rationally related to a legitimate and neutral governmental objective. *Prison Legal News v. Lehman,* 397 F.3d 692, 699 (9th Cir.2005) (quoting *Walker v. Sumner,* 917 F.2d 382, 385 (9th Cir.1990)). Nonetheless, below the undersigned will briefly address the other *Turner* factors.

**\*18** The second *Turner* factor requires the court to consider whether other avenues remain available for exercising the asserted right. Plaintiff has not demonstrated that other avenues were unavailable to him.

The third *Turner* factor concerns the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources. On this point, defendants argue that "[p]ermitting plaintiff to receive the package without compliance with the regulation would have exposed staff and other prisoners to a substantial risk of harm associated with the introduction of contraband into the prison."(Defs.' Mot. for Summ. J. at 21.) They urge the court to defer to prison administrators in this regard. However, defendants' evidence of contraband entering the prison in religious mail can be fairly characterized as limited at best. They point to only two such instances occurring during the relevant time period. Based on this showing, the court concludes that defendants' stated concern of a "substantial risk of harm" is exagger-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ated. Moreover, defendants' subsequent revisions of their policy governing religious mail suggest that accommodations of the asserted right were in fact possible without any negative effect.

The fourth *Turner* factor assesses whether there was a lack of ready alternatives. Defendants argue that there were no obvious, easy alternatives to the policies at issue. Defendants speculate that plaintiff may suggest as one alternative that each package be searched on receipt. Defendants contend, however, that prison officials are not obligated to pick and choose between security measures or to employ only the most minimal measures available. As the court already determined above, the pre-approval process for the mailing of religious materials appears to be an exaggerated response to defendants' security concerns. Moreover, the present record reflects that a number of easy alternatives were available to prison officials as evidenced by the subsequent revisions to the process. The court therefore concludes that the policy in effect at the time prison staff returned to the sender the copy of "Me and My Big Mouth" addressed to plaintiff were not the least restrictive alternatives available to prison officials.

In sum, defendants have not carried their burden and their motion for summary judgment on plaintiff's First Amendment claim should therefore be denied.

**B. Religious Land Use and Institutionalized Persons Act**

*1. Parties' Arguments*

Defendants first argue that they are entitled to summary judgment because RLUIPA does not allow damages suits against defendants in their individual capacity. (Defs.' Mot. for Summ. J. at 23-24.) Defendants also argue that the challenged regulation did not substantially burden plaintiff's exercise of his religion, and to the extent that it did, the regulation advanced a compelling governmental interest and was the least restrictive means of furthering that compelling interest. (Defs.' Mot. for Summ. J. at 24.)

**\*19** In this regard, defendants argue that plaintiff's exercise of religion was not substantially burdened because the challenged regulation was neither "oppressive to a significantly great extent" nor did it impose a "significantly great restriction or onus upon [religious] exercise."(*Id.*) Defendants argue that the Supreme Court has found a substantial burden only where the state places a substantial pressure on an adherent to modify his behavior and violate his beliefs. Here, defendants contend, the challenged policy did not prevent plaintiff from practicing his religion in the slightest. In this regard, defendants note that plaintiff conceded that the rejection of his copy of "Me and My Big Mouth" was an isolated incident and that he has successfully ordered religious items both prior to and after the isolated incident. Defendants also argue that the challenged policy did not prevent plaintiff from acquiring the study guide in question but only required that he follow the established procedure to ensure that the publication was being sought from a valid vendor and was not reasonably expected to contain contraband. Defendants argue that the policy did not affect plaintiff's ability to practice religion or prevent him from being a practicing Catholic. (*Id.* at 24-25.)

Next, defendants argue that, even assuming the challenged policy constituted a substantial burden, there were compelling state interests at stake and the regulation was the least restrictive means of furthering those interests.(*Id.* at 27.)In this vein, defendants contend that prison officials have a valid interest in preventing contraband from entering the prison and in ensuring the effective and efficient processing of prison mail. Defendants argue that the Supreme Court has recognized that Congress enacted RLUIPA with the expectation that courts would apply the compelling government interest standard with due deference to the experience and expertise of prison administrators in establishing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

necessary regulations and procedures to maintain good order. *Cutter v. Wilkinson,* 544 U.S. at 722-23. According to defendants, the decision of the Court in *Cutter* stands for the proposition that the compelling state interest/least restrictive means test adopted under RLUIPA is equivalent to, and in application should require the same results as, the reasonable relationship to legitimate penological interest standard under *Turner.*(Defs.' Mot. for Summ. J. at 27-28.)

Plaintiff responds that defendants' challenged policy violated RLUIPA. Plaintiff sought material to exercise his faith and required supplemental materials to help him understand the Bible. Defendants' policy, disallowing free religious study materials, substantially burdened plaintiff and prevented him from engaging in conduct both important to him and motivated by sincerely held religious beliefs. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 17.)

### 2. Discussion

As the Ninth Circuit has observed:

**\*20** Section 3 of RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability,"*unless* the government establishes that the burden furthers "a compelling governmental interest," *and* does so by "the least restrictive means."

*Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir.2005) (citing 42 U.S.C. § 2000cc-1(a)(1)(2)) (emphasis in original). For purposes of RLUIPA, "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."42 U.S.C. § 2000cc-5(7)(A). The statute must be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted" by the Act and the Constitution. 42 U.S.C. § 2000cc-3(g).

RLUIPA is "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." *Cutter v. Wilkinson,* 544 U.S. 709, 714, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (holding that RLUIPA "does not, on its face, exceed the limits of permissible government accommodation of religious practices"). In *Cutter,* the Supreme Court noted that Congress enacted RLUIPA after documenting, "in hearings spanning three years, that 'frivolous or arbitrary' barriers impeded institutionalized persons' religious exercise."*Id.* at 2118.The Court found that the Act "alleviates exceptional government-created burdens on private religious exercise" and "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."*Id.* at 2121-22.The Court noted congressional anticipation "that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators.' " *Id.* at 2119.

No federal courts of appeal have ruled on whether RLUIPA allows damages against state officials sued in their individual capacities, and federal district courts are split on the question. *Compare Shidler v. Moore,* 409 F.Supp.2d 1060, 1071 (N.D.Ind.2006) (recognizing RLUIPA claim for damages); *Charles v. Verhagen,* 220 F.Supp.2d 937, 953 (W.D.Wis.2002) (same); and *Guru Nanak Sikh Society of Yuba City v. Sutter,* 326 F.Supp.2d 1128, 1136 (E.D.Cal.2003) ("government" in RLUIPA includes officials, so actions are permitted against them at least in their official capacities"); *with Boles v. Neet* 402 F.Supp.2d 1237, 1241 (D.Colo.2005) (damages are not available under RLUIPA).

RLUIPA's provision authorizing a cause of action states: "A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a govern-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ment."42 U.S.C.A. § 2000cc-2(a). However, the Act defines "government" to include:

**\*21** (i) a State, county, municipality, or other governmental entity created under the authority of a State;

(ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

(iii) any other person acting under color of State law....

42 U.S.C.A. § 2000cc-5(4)(A).

As several courts have recognized in unpublished opinions, if Congress had not added subsection (iii), RLUIPA would only contemplate claims against officials in their official capacity. However, by including language that tracks that found in 42 U.S.C. § 1983, Congress appears to have intended RLUIPA to authorize claims against all persons amenable to suit under § 1983. *See, e.g., Daker v. Ferrero,* No. 1:03-CV-02481-RWS, 2006 WL 346440 at \*9-10 (N.D.Ga. Feb.13, 2006); *Agrawal v. Briley,* No 02-C-6807, 2006 WL 3523750 at \*9-13 (N.D.Ill.Dec.6, 2006) (and cases cited therein); *see also Jama v. U.S. Immigration and Naturalization Serv.,* 343 F.Supp.2d 338, 374 (D.N.J.2004) (interpreting RLUIPA's predecessor statute, RFRA). RLUIPA provides that claimants may obtain "appropriate relief." Although the provision does not expressly state that monetary damages are available, it also does not preclude them. Accordingly, this court concludes that plaintiff may proceed on his RLUIPA claims for monetary damages against defendants in their individual capacities.

As the court explained in its February 16, 2006 findings and recommendations recommending that defendants' first motion for summary judgment be denied, the allegations of plaintiff's complaint and the evidence produced by defendants demonstrate that the institutional policies at issue impeded plaintiff's religious exercise in late 2002 or early

2003. When plaintiff requested "Me and My Big Mouth," MCSP's policy placed a substantial burden on prisoners' ability to obtain and use religious publications in their private religious exercise by (1) severely limiting the permissible sources of religious publications; (2) restricting requests for publications to once per quarter; (3) requiring inmates to obtain the approval of the inmate's chaplain and two prison officials; (4) requiring inmates to complete two different forms; (5) imposing on inmates the task of ensuring that religious organizations and publishers returned one of the required forms with the requested publications; and (6) creating delay in the receipt of publications due to the complexity of the approval process.

Plaintiff has carried his initial burden of coming forward with evidence demonstrating a prima facie claim that the challenged policy constituted a substantial burden on his religious exercise. *See*42 U.S.C. § 2000cc-2(b); *Warsoldier,* 418 F.3d at 994-95. Defendants' evidence, which the undersigned has again found to be insufficient to establish even a rational connection between the challenged policy and a legitimate and neutral governmental interest, fails to establish that the burden imposed on prisoners at MCSP furthered a compelling governmental interest and did so by the least restrictive means. The court is unable to defer to the experience and expertise of MCSP administrators or CDCR directors, as the defendants argue, because there is no evidence on the record that such experience and expertise was brought to bear on the matter of religious publications at MCSP.

**\*22** Defendants have not borne their burden of showing that any substantial burden on plaintiff's exercise of religious beliefs is both in furtherance of a compelling governmental interest and the least restrictive means of furthering that compelling governmental interest. *See*42 U.S.C. § 2000cc-2(b); *Warsoldier,* 418 F.3d at 995. Accordingly, defendants' motion for summary judgment on plaintiff's RLUIPA claim should be denied.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## C. Due Process Clause

### 1. *Parties' Arguments*

Defendants argue that the law and facts do not support plaintiff's due process claim. Relying on the decision in *Sorrels v. McKee,* 290 F.3d 965 (9th Cir.2002), defendants contend that prison officials' negligence in failing to provide plaintiff with notice that they returned "Me and My Big Mouth" to the sender is not actionable as a due process violation under § 1983. (Defs.' Mot. for Summ. J. at 28-29.) In this regard, defendants argue that the procedures then in place required prison officials to notify plaintiff that they had returned the publication to the sender. They contend that prison officials' failure to send plaintiff such a notice was at worst, negligent.(*Id.* at 29.)Plaintiff has not disputed defendants' contentions in this regard.

### 2. *Discussion*

The court is persuaded by defendants' argument on this point. In *Sorrels,* a prisoner brought a § 1983 action against prison officials, claiming that they violated his due process rights when they failed to notify him that they rejected a gift copy of the *Georgetown Law Journal* sent to him by an attorney. 290 F.3d at 968. The Ninth Circuit concluded that prisoners have a Fourteenth Amendment due process liberty interest in receiving notice if prison officials withhold from them incoming mail. *Sorrel,* 290 F.3d at 972.[FN9] The court explained, however, that while the deprivation of such rights caused by conduct engaged in pursuant to established state procedure would be cognizable, "mere negligence on the part of prison officials is not actionable as a due process violation under § 1983."*Id. See also Frost v. Symington,* 197 F.3d 348, 353-54 (9th Cir.1999) (prisoner has due process interest in receiving notice of items being withheld). There, the court concluded that the prison officials' failure to notify Sorrel constituted at most negligence, and therefore did not state a cognizable due process claim under § 1983. *Sorrel,* 290 F.3d at 972-73.

FN9. It should be noted that it was prison officials' failure to provide plaintiff with notice that they rejected the journal that stated the due process claim found to be cognizable, not their actual rejection of the law journal. *Sorrels v. McKee,* 290 F.3d 965, 972 (9th Cir.2002).

The same is true here. The evidence submitted by defendants in support of their motion for summary judgment demonstrates that prison officials' failure to notify plaintiff that they were rejecting "Me and My Big Mouth" was the result of negligence, and not pursuant to established policy. In fact, established policy in effect at the time provided that the same notice procedures applicable with respect to standard mail and package would be followed for religious mail and package rejections. Under that policy, plaintiff should have received a rejection notice. Accordingly, because the failure to provide the required rejection notice was a result of negligence and not pursuant to policy, defendants are entitled to summary judgment in their favor on plaintiff's due process claim.

## D. Equal Protection Clause

### 1. *Parties' Arguments*

**\*23** Defendants argue that the law and facts also do not support plaintiff's equal protection claim. Relying on the decision in *Washington v. Davis,* 426 U.S. 229, 239-40, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), they contend that for plaintiff to prevail on a § 1983 claim based on a violation of the Equal Protection Clause, he must show that defendants intentionally discriminated against him or against a class of inmates which included plaintiff. Defendants acknowledge that prison officials must give inmates who adhere to a minority religion a reasonable opportunity of pursing their faith, but emphasize that prison facilities do not need to provide identical facilities or accommodations to people of different faiths. Defendants first note that plaintiff's religion, Catholicism, is not a minority religion.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(Defs.' Mot. for Summ. J. at 30.) They contend that the challenged regulation applied to all prisoners, not just plaintiff. Defendants argue that plaintiff has presented no evidence that his practice of religion was dealt with any differently than that of other inmates. (*Id.* at 31.)

In opposition, plaintiff argues that he has in fact demonstrated that he was treated differently than similarly situated inmates. Specifically, plaintiff claims that he has shown that secular texts were not restricted in number while religious texts were. Plaintiff also contends that on its face the challenged policy is evidence of an intent to discriminate. (*Id.* at 18.)

2. *Discussion*

Equal protection is relevant with respect to classifications that impermissibly operate to disadvantage a suspect class or improperly interfere with an individual's exercise of a fundamental right. Fourteenth Amendment protections, including equal protection, extend to state prisons. *Walker v. Gomez,* 370 F.3d 969, 974 (9th Cir.2004); *see also Freeman v. Arpaio,* 125 F.3d 732, 737 (9th Cir.1997) ("The Constitution's equal protection guarantee ensures that prison officials cannot discriminate against particular religions."). The Supreme Court has recently limited the holding in *Turner* in the equal protection context. *See Johnson v. California,* 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). In *Johnson,* the Court held that strict scrutiny, and not the reasonableness standard articulated in *Turner,* applies to prison racial classifications. *Johnson,* 543 U.S. at 510. The Court noted "We think this unsurprising, as we have applied *Turner's* reasonable-relationship test *only* to rights that are 'inconsistent with proper incarceration' " *Johnson,* 543 U.S. at 510. In so ruling, however, the Court reaffirmed that *Turner's* reasonable relationship test continues to apply to prisoner claims involving fundamental rights, including claims related to free exercise of religion, free association, due process claims and the right to marry. *Johnson,* 543 U.S. at 510;*see,*

*e.g., Stewart v. Alameida,* 418 F.Supp.2d 1154 (N.D.Cal.2006)(*Turner's* reasonable relationship test continues to apply to First Amendment association claims after *Johnson v. California* ). Here, plaintiff's equal protection claim alleges that prison officials wrongly discriminated against him based on membership with a religious group and/or improperly burdened his fundamental right to free exercise of religion. That claim should be measured against the reasonable relationship standard announced in *Turner.*

**\*24** Applying that standard, the court finds that defendants have not shown that the challenged policy withstands scrutiny under *Turner.*Defendants have failed to demonstrate that the challenged policy was rationally related to legitimate penological state interests. Accordingly, defendants' motion for summary judgment on plaintiff's equal protection claim should be denied.

**III. Immunity**

**A. Official Capacity**

Defendants argue that they are entitled to summary judgment on any of plaintiff's claims against them in their official capacity. They contend that the Eleventh Amendment bars damages actions against state officials based on acts alleged to have been taken in their official capacity. (Defs.' Mot. for Summ. J. at 7.)

Plaintiff argues that he is entitled to seek injunctive relief against them in their official capacity. Plaintiff also argues that he has made clear that he is suing them in their individual capacities too. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 12.)

Defendants arguments are persuasive with respect to this issue. The Eleventh Amendment bars plaintiff's damages claims to the extent that they are based on acts by defendants in their official capacities. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). In *Will,* the Supreme Court held that state officials acting in

their official capacities are not "persons" under § 1983 ." 491 U.S. at 71. The Court reasoned that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will,* 491 U.S. at 71. The Court concluded that such a suit is therefore no different from a suit against the state itself. *Id.*

Accordingly, to the extent that plaintiff seeks monetary damages from defendants in their official capacity, defendants' motion for summary judgment should be granted.FN10

> FN10. The court agrees with plaintiff that, "[w]hen sued for *prospective injunctive relief,* a state official in his official capacity is considered a 'person' for § 1983 purposes."*See Doe v. Lawrence Lovermore National Laboratory,* 131 F.3d 836, 839 (9th Cir.1997) ("a suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity"); *see also Porter v. Jones,* 319 F.3d 483, 491 ("suits against an official for prospective relief are generally cognizable, whereas claims for retrospective relief (such as damages) are not"). However, above this court has already recommended that plaintiff's claim for injunctive relief be found moot.

**B. Qualified Immunity**

Defendants argue that under the holding in *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), they are entitled to qualified immunity on plaintiff's First and Fourteenth Amendment claims as well as his RLUIPA claim. (Defs.' Mot. for Summ. J. at 31; Defs.' Reply at 5-6.) Specifically, defendants contend that plaintiff has not demonstrated a violation of his RLUIPA rights or his rights under the United States Constitution and has made no showing that the defendants knew or should have known that they were violating plaintiff's rights under RLUIPA or the First and

Fourteenth Amendment. Accordingly, defendants conclude that they are entitled to qualified immunity. (Defs.' Mot. for Summ. J. at 33-34.)

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Jeffers v. Gomez,* 267 F.3d 895, 910 (9th Cir.2001) (per curiam) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The threshold question for a court required to rule on a qualified immunity defense is whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendants' conduct violated a statutory or constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If no such right would have been violated even if the plaintiff's allegations were established, "there is no necessity for further inquiries concerning qualified immunity." *Id.*

**\*25** If a violation of a statutory or constitutional right is demonstrated by the plaintiff's allegations, the court's next inquiry is "whether the right was clearly established."*Id.* This inquiry must be undertaken in light of the specific context of the case. *Id.* In deciding whether the plaintiff's rights were clearly established, "[t]he proper inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted'... or whether the state of the law in [the relevant year] gave 'fair warning' to the officials that their conduct was unconstitutional." *Clement v. Gomez,* 298 F.3d 898, 906 (9th Cir.2002) (quoting *Saucier,* 533 U.S. at 202) (citing *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2511, 153 L.Ed.2d 666 (2002)). Summary judgment in favor of defendants based on qualified immunity is appropriate if the law did not put the defendants on notice that their conduct would be unlawful. *Saucier,* 533 U.S. at 202. Because qualified immunity is an affirmative defense, the burden of proof initially lies with the official asserting the defense. *Harlow,* 457 U.S. at 812; *Houghton v. South,* 965 F.2d 1532, 1536

Slip Copy                                                                                                          Page 23
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

(9th Cir.1992); *Benigni v. City of Hemet,* 879 F.2d 473, 479 (9th Cir.1989).

The court determined at screening that the facts alleged by plaintiff in his second amended complaint, taken in the light most favorable to him, state cognizable claims upon which relief may be granted. First, with respect to plaintiff's First Amendment and RLUIPA claims, the facts alleged by plaintiff concerning institutional policies governing religious publications and mail at MCSP show that defendants violated plaintiff's constitutional and statutory rights by imposing severe burdens and restrictions on religious mail and literature. In addition, it was clearly established in 2002 that prison inmates have a right to receive mail and publications not prohibited by reasonable penological interests. *Thornburgh,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Prison Legal News v. Cook,* 238 F.3d 1145 (9th Cir.2001); *Walker v. Sumner,* 917 F.2d 382 (9th Cir.1990). The state of the law in 2002 gave fair warning to defendants that it would be unconstitutional to implement a policy that violated inmates' right to receive religious mail and publications unless the policy was reasonably related to a legitimate and neutral penological interest. Defendants have not shown that the policies they implemented at MCSP in late 2002 and early 2003 were reasonably related to a legitimate and neutral penological interest. Contrary to defendants' argument, it should have been clear to reasonable prison officials in 2002 that their policies were not related to a legitimate and neutral penological interest and would therefore violate inmates' rights.

Second, with respect to plaintiff's Equal Protection claim, the facts alleged by plaintiff concerning institutional policies governing religious publications and mail at MCSP would show that defendants violated plaintiff's equal protection rights by discriminating against him and prisoners who practice a faith and prisoners who do not. Pursuant to established prison policies, prison officials returned "Me and My Big Mouth" to the sender, Joyce Meyer

Ministries, because they considered it a religious text and it had not been pre-approved. Had prison officials deemed it a secular text, plaintiff would have received the publication without having to complete the pre-approval process. It was clearly established in 2002 that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). The state of the law in 2002 gave fair warning to defendants that they could not intentionally treat a group of inmates differently because of their practice of religion, and if they did, they would be violating inmates' equal protection rights. *See Freeman v. Arpaio,* 125 F.3d 732 (9th Cir.1997) ("The Constitution's equal protection guarantee ensures that prison officials cannot discriminate against particular religions.").

**\*26** Accordingly, defendants are not entitled to qualified immunity on plaintiff's RLUIPA claim or his First and Fourteenth Amendment claims. Therefore, their motion for summary judgment on plaintiff's claims for damages should be denied.FN11

> FN11. The court need not address defendants' claim that they are entitled to qualified immunity on plaintiff's due process claim given the court's recommendation that the claim be dismissed.

### OTHER MATTERS

Pursuant to Rule 201(b) of the Federal Rules of Evidence, amicus Pacific Justice Institute has requested that the court take judicial notice of *Jesus Christ Ministries v. California Department of Corrections,* 456 F.Supp.2d 1188 (E.D.Cal.2006). Defendants have requested that the court take judicial notice of its April 16, 2007 order in that same case approving the stipulation for voluntary dismissal of that action. The court will deny both requests as unnecessary.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

### CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Amicus Pacific Justice Institute's request for judicial notice of *Jesus Christ Ministries v. California Department of Corrections,* 456 F.Supp.2d 1188 (E.D.Cal.2006) is denied as unnecessary; and

2. Defendants' request for judicial notice of its April 16, 2007 order in *Jesus Christ Ministries v. California Department of Corrections,* 456 F.Supp.2d 1188 (E.D.Cal.2006) is denied as unnecessary.

IT IS HEREBY RECOMMENDED that defendants' January 25, 2007 motion for summary judgment be granted in part and denied in part as follows:

1. Defendants' motion for summary judgment with respect to plaintiff's request for injunctive relief be granted;

2. Defendants' motion for summary judgment in favor of defendants Woodford and Alameida be granted;

3. Defendants' motion for summary judgment in their favor on plaintiff's Due Process claim be granted;

4. Defendants' motion for summary judgment in their favor on plaintiff's claim for damages against the defendants in their official capacity be granted;

5. Defendants' motion for summary judgment on plaintiff's RLUIPA, First Amendment, and Equal Protection claims be denied; and

6. Defendants' motion for summary judgment based on their affirmative defense of qualified immunity be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fifteen days after being served with these findings and recommendations, any party may file and serve written objections with the court. A document containing objections should be entitled "Objections to Magistrate Judge's Findings and Recommendations."Any reply to objections should be filed and served within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *See Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

E.D.Cal.,2007.
Bess v. Alameida
Slip Copy, 2007 WL 2481682 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
United States District Court,C.D. California.
Clarence DAVIS, Plaintiff,
v.
Carman SUTLEY, Defendant.
**No. EDCV 07-1415-CBM (RNB).**

April 17, 2008.

Clarence Davis, Blythe, CA, pro se.
Mark V. Santa Romana, CAAG-Office of Attorney
General of California, Los Angeles, CA, for Defendant.

ORDER ADOPTING FINDINGS, CONCLU-
SIONS, AND RECOMMENDATIONS OF
UNITED STATES MAGISTRATE JUDGE

CONSUELO B. MARSHALL, District Judge.
**\*1** Pursuant to 28 U.S.C. § 636, the Court has re-
viewed all the records and files herein, and the re-
commendation of the United States Magistrate
Judge. No objections to the Magistrate Judge's Re-
port and Recommendation have been filed herein.
The Court concurs with and adopts the findings,
conclusions, and recommendations of the Magis-
trate Judge.

IT THEREFORE IS ORDERED that (1) defend-
ant's Motion to Dismiss is denied, and (2) defend-
ant shall file an Answer within twenty (20) days.

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

ROBERT N. BLOCK, United States Magistrate
Judge.
This Report and Recommendation is submitted to
the Honorable Consuelo B. Marshall, United States
District Judge, pursuant to the provisions of 28
U.S.C. § 636 and General Order 194 of the United
States District Court for the Central District of

California.

**PROCEEDINGS**

Plaintiff, a California State prisoner, filed a pro se
civil rights Complaint pursuant to 42 U.S.C. § 1983
on November 2, 2007,[FN1] after being granted
leave to proceed *in forma pauperis.*The gravamen
of petitioner's claims is that defendant Sutley, a
prison dentist, failed to provide plaintiff with pain
medication or any other treatment (and in fact
threatened plaintiff with a disciplinary write-up for
seeking treatment) after plaintiff presented to Sut-
ley complaining that he was experiencing extreme
pain in two teeth. As a result of Sutley's failure to
provide treatment, plaintiff continued to suffer from
the extreme pain for six more days, before another
prison dentist prescribed antibiotics and pain med-
ication. Ultimately, the tooth causing the pain had
to be extracted.

> FN1. The Court notes that, for purposes of
> the statute of limitations issue raised by
> defendant, the relevant date is not the date
> on which plaintiff's Complaint actually
> was filed (i.e., November 2, 2007) or the
> date on which the Complaint was received
> by the Clerk of the Court for filing (i.e.,
> October 5, 2007), but rather the date on
> which plaintiff delivered the Complaint to
> prison authorities for mailing. *See Hous-
> ton v. Lack,* 487 U.S. 266, 108 S.Ct. 2379,
> 101 L.Ed.2d 245 (1988); *Price v. Philpot,*
> 420 F.3d 1158, 1164 (10th Cir.2005)
> (finding that the "clear consensus among
> the circuits is that the mailbox rule also ap-
> plies to inmate 42 U.S.C. § 1983 filings").
> Here, the Court is unable to discern that
> date from the proof of service attached to
> the Complaint. The only thing that can be
> determined from the face of the Complaint
> is that the relevant filing date here is no
> earlier than September 13, 2007, the signa-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                  Page 2
Not Reported in F.Supp.2d, 2008 WL 1817262 (C.D.Cal.)

ture date on the Complaint and the accompanying Declaration in Support of Request to Proceed Without Prepayment of Filing Fees.

On January 25, 2008, defendant filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ("Motion") on the grounds that: (1) plaintiff's Complaint fails to state a claim under the Eighth Amendment; (2) defendant is entitled to qualified immunity on plaintiff's claim under the Eighth Amendment; and (3) plaintiff's state law claim is time-barred pursuant to the California Torts Claim Act. Plaintiff filed opposition thereto on February 15, 2008, to which defendant filed a reply on February 21, 2008.$^{FN2}$

> FN2. In his Reply, defendant also contends that plaintiff cannot state a claim for retaliation. (*See* Reply at 3). The Court, however, does not construe plaintiff's Complaint as attempting to raise any such claim.

Thus, this matter now is ready for decision. For the reasons discussed below, the Court recommends that the Motion to Dismiss be denied and that defendant be required to file an Answer to the Complaint.

### STANDARD OF REVIEW

A complaint may be dismissed as a matter of law for failure to state a claim for two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990). Since plaintiff is appearing *pro se,* the Court must construe the allegations of the Complaint liberally and must afford plaintiff the benefit of any doubt. *See Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 623 (9th Cir.1988). Further, in determining whether the Complaint states a claim on which relief may be granted, its allegations of material fact must be taken as true

and construed in the light most favorable to plaintiff. *See Love v. United States,* 915 F.2d 1242, 1245 (9th Cir.1989). Moreover, with respect to plaintiff's pleading burden, the Supreme Court recently held that: "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do ... Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ...." *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, --- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (internal citations omitted, alteration in original).

### SUMMARY OF PLAINTIFF'S ALLEGATIONS

**\*2** On June 27, 2006, plaintiff reported to sick-call and informed defendant Sutley that "he was experiencing extreme pain in two teeth."(Complaint at 5). He further informed Sutley that the pain was affecting his ability to eat and sleep. Sutley obtained an x-ray, but said that "nothing was apparent." Sutley refused to treat plaintiff and, instead, "threatened [plaintiff] with a disciplinary write-up for seeking treatment."(*Id.*). Subsequently, plaintiff was prescribed antibiotics and pain medication by Dr. Garsh on July 3, 2006. Following a "panorex x-ray" on July 11, 2006, plaintiff's tooth was extracted by Dr. Wong on July 26, 2006. (*Id.*).

### DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

In his Reply, defendant argues that the "Court may also take judicial notice of official records and reports" and states that the "Court may also consider" the "certified copies of the California Victim Compensation and Government Claims Board's record of plaintiff's government claims."(Reply at 2). Defendant attached to his Motion copies of two declarations from Gail Cogburn, the Custodian of Re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cords, Government Claims Program, and the re-cords of two of plaintiff's administrative claims. (*See* Motion at 7, Exhs. 1, 2). Defendant did not ex-pressly seek judicial notice of these exhibits, but the Court will construe defendant's Reply as a re-quest for judicial notice pursuant to Fed.R.Evid. 201.

The Ninth Circuit has held that, "on a motion to dismiss a court may properly look beyond the com-plaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for sum-mary judgment." *Mack v. South Bay Beer Distribut-ors, Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986) ("a court may take judicial notice of records and re-ports of administrative bodies"); *see also, e.g., Transmission Agency of California v. Sierra Pac. Power,* 295 F.3d 918, 924 n. 3 (9th Cir.2002) (as amended) (taking judicial notice of administrative law judge decision in related administrative pro-ceeding), *cert. denied,* 539 U.S. 914, 123 S.Ct. 2272, 156 L.Ed.2d 129 (2003); *Nugget Hydroelec-tric, L.P. v. Pacific Gas and Elec. Co.,* 981 F.2d 429, 435 (9th Cir.1992) (taking judicial notice of State Commission decisions), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993).

Thus, to the extent that defendant is requesting that the Court take judicial notice of the fact that two of plaintiff's government tort claims were denied, de-fendant's request is granted. However, to the extent that defendant is requesting that the Court take judi-cial notice of the fact that a notice of denial was mailed to plaintiff with respect to either of those claims, or the fact that any such notice of denial was mailed to plaintiff at his current address, such request is denied. In its January 28, 2008 Minute Order, the Court noted that defendant had failed to seek judicial notice of the denial of plaintiff's ad-ministrative claims and further questioned whether the date on which a denial notice was deposited in the mail or the fact of such mailing was a proper subject for judicial notice. Inexplicably, defendant failed to address this issue in his Reply. Addition-ally, the Court noted in its January 28, 2008 Minute

Order that it was not willing to exercise the option of converting defendant's Rule 12(b)(6) Motion into a summary judgment motion since defendant had not even purported to lay an adequate foundation through a declarant with personal knowledge as to when each letter was mailed or whether each letter was properly mailed in compliance with the re-quirements of Cal. Gov't Code § 915.2. The declar-ations of Gail Cogburn, Custodian of Records, Government Claims Program, included with de-fendant's Exhibits 1 and 2 to his Motion, merely state that "the attached documents are true and cor-rect copies of the documents constituting the record of the claim of Clarence Davis" for two of his claims. (Motion, Exhs.1, 2). The attached docu-ments do not contain any information regarding the mailing of a rejection letter to plaintiff, nor do the declarations lay an adequate foundation for when the letters were mailed (or indeed an adequate foundation for whether each letter was properly mailed).[FN3]

> FN3. In this regard, there is no competent evidence before the Court establishing that each notice of denial letter was placed in a mail box, post office, sub-post office, sub-station, mail chute, or the like; no compet-ent evidence of *where* each letter sup-posedly was deposited in the mail; and no competent evidence that each letter was "in a sealed enveloped, properly addressed with postage paid." *See* Cal.Code Civ. P. § 1013(a). *See Rincon v. Burbank Unified School District,* 178 Cal.App.3d 949, 956, 224 Cal.Rptr. 88 (1986) (denying defend-ants' summary judgment motion, made on the basis that the suit was untimely, where the declarations before the court purporting to establish that the notice of denial was mailed did not show compliance with Gov't Code § 915.2 and Code Civ. P. § 1013(a)).

### DISCUSSION

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 1817262 (C.D.Cal.)

**A. *The allegations of the Complaint are sufficient to state a claim for deliberate indifference to plaintiff's serious medical needs.***

**\*3** Defendant contends that the allegations of plaintiff's Complaint fail to state a claim under the Eighth Amendment for deliberate indifference to plaintiff's serious medical needs because plaintiff's allegations support that prison officials provided him with adequate medical care. Defendant contends that Sutley's "apparent refusal to give [plaintiff] pain medication" was "well within his discretion not to prescribe plaintiff with narcotics."(Motion at 4-5). Further, defendant contends that Sutley's decision not to prescribe pain medication was merely a difference of opinion, which cannot support an Eighth Amendment claim. (Reply at 2-3).

In order to establish an Eighth Amendment claim based on inadequate medical care, plaintiff must show that the defendant was deliberately indifferent to his serious medical needs. *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 32 (1993); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other grounds, WMX Technologies v. Miller,* 104 F.3d 1133 (9th Cir.1997). Deliberate indifference to the serious medical needs of a prisoner constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *McKinney,* 509 U.S. at 32; *Gamble,* 429 U.S. at 104; *McGuckin,* 974 F.2d at 1059.

Deliberate indifference may be manifested by the intentional denial, delay or interference with the plaintiff's medical care, or by the manner in which the medical care was provided. *Gamble,* 429 U.S. at 104-05; *McGuckin,* 974 F.2d at 1059. However, the defendant must purposefully ignore or fail to respond to the plaintiff's pain or medical needs. *McGuckin,* 974 F.2d at 1060. Thus, neither an inadvertent failure to provide adequate medical care, nor mere negligence or medical malpractice, nor a mere delay in medical care (without more), nor a

difference of opinion over proper medical treatment, is sufficient to constitute an Eighth Amendment violation. *See Gamble,* 429 U.S. at 105-06; *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir.1989); *Shapley v. Nevada Bd. of State Prison Commissioners,* 766 F.2d 404, 407 (9th Cir.1984). Moreover, in addition to examining the defendant's response to the plaintiff's medical needs, the Court must examine the seriousness of the need. *McGuckin,* 974 F.2d at 1059. A "serious" medical need arises if the failure to treat the plaintiff could result in further significant injury or the "unnecessary and wanton infliction of pain." *Gamble,* 429 U.S. at 104; *McGuckin,* 974 F.2d at 1059.

In deciding the sufficiency of the allegations of the Complaint, the Court must take the allegations of material fact as true and must construe them in the light most favorable to plaintiff. *See Love,* 915 F.2d at 1245. Further, in deciding a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Hydrick v. Hunter,* 500 F.3d 978, 985 (9th Cir.2007) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Therefore, to survive a motion to dismiss, plaintiff's burden is limited to setting forth factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic,* 127 S.Ct. at 1965.

**\*4** Here, the Court finds that the allegations in plaintiff's Complaint, taken as true and in the light most favorable to plaintiff, are sufficient to state a more than speculative claim under the Eighth Amendment against defendant Sutley based on his refusal to treat plaintiff's complaint of extreme tooth pain that was adversely impacting plaintiff's ability to eat and to sleep. The fact that plaintiff ultimately received treatment from other prison dentists does not defeat his Eighth Amendment claim against defendant Sutley, or support that plaintiff and defendant Sutley merely had a difference of opinion over proper medical treatment. *See Frank-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                           Page 5
Not Reported in F.Supp.2d, 2008 WL 1817262 (C.D.Cal.)

*lin v. Oregon,* 662 F.2d 1337, 1344 (9th Cir.1981) ("A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim."). To the contrary, a reasonable inference to be drawn from the extraction of plaintiff's tooth after plaintiff presented to Dr. Garsh with the same complaints six days later is that plaintiff was suffering from a severe medical condition that did require treatment at the time that defendant Sutley refused plaintiff dental treatment and pain medication.

**B. *Defendant is not entitled to qualified immunity on plaintiff's Eighth Amendment claim.***

Defendant contends that he is entitled to qualified immunity on plaintiff's claim pursuant to the Eighth Amendment because: (1) the Complaint "is simply devoid of any allegations that would give rise to an Eighth Amendment Claim"; and (2) even if defendant's conduct "is found to somehow violate the Eighth Amendment, he respectfully submits that the unlawfulness of such conduct was not apparent to him."(Motion at 6). In his Reply, defendant contends that there is "no right for a prisoner to obtain a particular brand of pain reliever, let alone a clearly established right to obtain it."(Reply at 3).

Initially, the Court notes that the raising of a qualified immunity defense is generally disfavored on a motion to dismiss because it places the Court in the "difficult position of deciding 'far-reaching constitutional questions on a nonexistent factual record.'"*See Hydrick,* 500 F.3d. at 985 (citing *Kwai Fun Wong v. United States,* 373 F.3d 952, 957 (9th Cir.2004)). The Court is left to undertake a difficult inquiry only "based on the facts in front of [it]" presently. *See id.* at 1001.

Qualified immunity shields a public official from a suit for damages if, under the plaintiff's version of the facts, a reasonable official in the defendant's position could have believed that his or her conduct was lawful in the light of clearly established law and the information the official possessed at the time the conduct occurred. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Schwenk v. Hartford,* 204 F.3d 1187, 1195-96 (9th Cir.2000). The qualified immunity standard "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**\*5** When determining whether a public official is entitled to qualified immunity, the Court employs a two-step process. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Scott v. Harris,* --- U.S. ----, ----, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007) ( "courts are required to resolve a threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"(internal quotation marks omitted)); *Estate of Ford v. Ramirez-Palmer,* 301 F.3d 1043, 1050 (9th Cir.2002) (clarifying the qualified immunity analysis for a claim under the Eighth Amendment). If no constitutional right would have been violated if the facts were as alleged then "there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. If, however, "a violation could be made out," the next step is to determine "whether the right was clearly established."*Id.* This is "a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official have believed his conduct was lawful?" *Estate of Ford,* 301 F.3d at 1050 (quoting *Jeffers v. Gomez,* 267 F.3d 895, 910 (9th Cir.2001)). The determination of whether the law was clearly established "must be undertaken in light of the specific context of the case." *Saucier,* 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202; *see also Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (the law must provide officials with "fair warning" that their conduct was unconstitutional); *Harlow,* 547 U.S. at 818 ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").

Here, as set forth above, "[t]aken in the light most favorable to the party asserting the injury," the facts are sufficient to establish that the conduct of defendant Sutley violated plaintiff's constitutional rights under the Eighth Amendment. *Saucier,* 533 U.S. at 201. Because "a violation could be made out," the next step is to determine "whether the right was clearly established." *Id.*

Although the "clearly established" inquiry must be undertaken "in light of the specific context of the case," the fact that no case has found a constitutional violation under the *exact* facts alleged herein does not imply that the law is not clearly established. *See, e.g., Phillips v. Hust,* 477 F.3d 1070, 1079-80 (9th Cir.2007) (finding "absurd" defendant's argument that plaintiff's right of access to the courts was not clearly established because no case specifically requires that prison officials "provide comb-binding to inmates filing petitions with the Supreme Court" where "a reasonable officer would know that failing to provide access to equipment and supplies needed in order 'to prepare, serve and file' court documents would result in prisoners' claims being 'dismissed for failure to satisfy ... technical requirements' or would otherwise frustrate prisoners' litigation efforts") (alteration in original). Additionally, in determining whether the law was sufficiently "clearly established" such that a reasonable officer in defendant's position would know that his or her conduct was illegal, when there is no

"binding precedent" on the exact question, the Ninth Circuit "look[s] to all available decisional law, including the law of other circuits and district courts." *Inouye v. Kemna,* 504 F.3d 705, 714 (9th Cir.2007); *see also, Boyd v. Benton County,* 374 F.3d 773, 781 (9th Cir.2004) ("[W]e begin our inquiry by looking to binding precedent ... in the absence of binding precedent, we look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts.") (internal quotation marks and citations omitted).

**\*6** Here, at the time of defendant's alleged conduct in 2006, the law regarding a prison official's deliberate indifference to an inmate's serious need for dental care had long been clearly established. *See, e.g., McGuckin,* 974 F.2d at 1060 ("the existence of chronic and substantial pain [indicates] that a prisoner has a 'serious' need for medical treatment"); *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989) (the Ninth Circuit stated that "[d]ental care is one of the most important medical needs of inmates"). Therefore, no reasonable prison dentist could have believed that it was lawful to deny all treatment for plaintiff's complaint of extreme tooth pain.

For the foregoing reasons, the Court finds and concludes that defendant Sutley is not entitled to qualified immunity at this time.

**C. *Plaintiff's claim pursuant to Cal. Gov't Code § 845.6 is not subject to dismissal as time-barred.***

Plaintiff purports to raise his second claim pursuant to Cal. Gov't Code § 845.6 based on defendant's failure to provide medical care. (*See* Complaint at page attached after 5). Accordingly, it is subject to the provisions of California's Government Claims Act (the "Act"). *See* Cal. Gov't Code §§ 900.4 (defining "local public entity"), 905 (requiring all claims for money or damages against local public entities to be presented in accordance with the pro-

visions of the Act). Under Cal. Gov't Code § 911.2, it was incumbent upon plaintiff to present his state tort claim to defendant in accordance with Cal. Gov't.Code § 915 not later than six months after the accrual of his cause of action. Additionally, Cal. Gov't Code § 945.6 provides two alternative statutes of limitation for causes of action under the Act where a claim filed with a public entity has been rejected. If the public entity gives written notice of rejection of the claim in accordance with Cal. Gov't Code § 913, the statute of limitations is six months from the day such notice is personally delivered or deposited in the mail. If notice is not given in compliance with Cal. Gov't Code § 913, the statute of limitations is two years from the accrual of the cause of action. *See, e.g.,   Willis v. Reddin,* 418 F.3d 702, 704 (9th Cir.1969).

Here, plaintiff alleges that defendant Sutley refused to treat plaintiff's complaint of extreme pain in two teeth on June 27, 2006. (Complaint at page attached after 5). Plaintiff attached to his Complaint copies of documents pertaining to administrative claims that he presented to the California Board of Control, including: (1) a letter dated March 21, 2007, stating that claim number G561387 was rejected on March 15, 2007; (2) a letter dated October 2, 2006, stating that claim number G562404 was rejected on September 27, 2006; and (3) a letter dated November 21, 2006, stating that claim number G557432 was rejected on November 16, 2006. (*See* Complaint, Exh. A; see also Motion, Exh. 1 (certified copy of the records of claim number G562404)). The Court also takes judicial notice of the fact that plaintiff's claim number G561845 was rejected on December 14, 2006 in a letter dated December 21, 2006. (*See* Motion, Exh. 2).

*7 Defendant contends that plaintiff's second claim should be dismissed as time barred because "plaintiff had six months from the date of his claims' rejection to file the underlying lawsuit."(Motion at 7). As set forth above, however, there is no competent evidence before the Court establishing when and how notice of the denial of any

of plaintiff's claims to the California Board of Control was provided to plaintiff. Therefore, the Court finds that defendant has failed to establish for purposes of his Motion to Dismiss that plaintiff's state tort claim is subject to the six months statute of limitations, as opposed to the two year statute of limitations.

### RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation; (2) denying defendant's Motion to Dismiss; and (3) ordering defendant to file an Answer within twenty (20) days.

C.D.Cal.,2008.
Davis v. Sutley
Not Reported in F.Supp.2d, 2008 WL 1817262 (C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2008 WL 3890382 (C.D.Cal.)

▷
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
Marc Anthony Lowell ENDSLEY, Plaintiff,
v.
Octavio LUNA, Defendant.
No. CV 06-04100 DSF (SS).
Docket No. 18.

May 23, 2008.

Marc Anthony Lowell Endsley, Atascadero State
Hospital, Atascadero, CA, pro se.
Benjamin Barnouw, California Attorney General,
Los Angeles, CA, for Defendant.

## AMENDED REPORT AND RECOMMENDA-TION OF UNITED STATES MAGISTRATE JUDGE RE DEFENDANT'S MOTION TO DIS-MISS

SUZANNE H. SEGAL, United States Magistrate
Judge.

*1 This Amended <sup>FN1</sup> Report and Recommenda-
tion is submitted to the Honorable Dale S. Fischer,
United States District Judge, pursuant to 28 U.S.C.
§ 636 and General Order 05-07 of the United States
District Court for the Central District of California.

> FN1. On January 9, 2008, this Court issued
> a Report and Recommendation regarding
> Defendant's Motion to Dismiss. On Janu-
> ary 29, 2008, Defendant filed Objections to
> the Report. This Amended Report ad-
> dresses Respondent's Objections.

### PROCEEDINGS

On June 27, 2006, Plaintiff Marc Anthony Lowell
Endsley ("Plaintiff"), proceeding *pro se*, lodged a
civil rights complaint pursuant to 42 U.S.C. § 1983
(the "Complaint"). The Complaint named as de-
fendants: (1) Octavio Luna, (2) Stephen Mayberg,
(3) Joseph Malancharuvil, (4) Harold Dreibelbis,

and (5) Sharon Smith Nevins. The Complaint was
filed on July 3, 2006 after the Court granted
Plaintiff's request to proceed *in forma pauperis.*On
November 7, 2006, the Court dismissed the Com-
plaint with leave to amend because it suffered from
multiple procedural defects. Plaintiff filed a First
Amended Complaint on December 6, 2006. The
First Amended Complaint ("First Amended Com-
plaint" or "FAC") named Octavio Luna as the sole
defendant.

On August 13, 2007, Defendant Luna filed a Mo-
tion to Dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6) ("Motion" or "MTD"). Plaintiff
submitted an Opposition ("Opposition" or "Opp.")
on August 30, 2007 and Defendant Luna filed a
Reply ("Reply") on September 13, 2007. On Janu-
ary 9, 2008, the Court issued the Magistrate Judge's
Report and Recommendation ("Report and Recom-
mendation" or "R & R") recommending that the
Motion be denied. On January 29, 2008, Defendant
Luna filed Objections to the Report and Recom-
mendation ("Objections"). For the reasons stated
below, the January 9, 2008 Report and Recom-
mendation is hereby VACATED and it is recom-
mended that the Motion be GRANTED in part and
DENIED in part.

### ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

Defendant Luna is the Executive Director and
Warden of Patton State Hospital ("Patton"), a psy-
chiatric hospital facility operated by the California
Department of Mental Health. (FAC at 3-4). In
1997, after a jury found him not guilty of murder by
reason of insanity, Plaintiff was committed to Pat-
ton.(*Id.* at 4; MTD at 1).

In the First Amended Complaint, Plaintiff alleges
that Defendant Luna has denied all of his requests
to "purchase/possess a laptop computer for educa-
tional, rehabilitative, and recreational pur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                            Page 2
Not Reported in F.Supp.2d, 2008 WL 3890382 (C.D.Cal.)

poses."(FAC at 4). In Claim I, Plaintiff claims that these refusals have violated his constitutional right to due process.[FN2] (FAC at 4-5). In Claim II, he argues that the denial of his request for a personal computer has deprived him of his right to "treatment services provided in a method least restrictive of individual liberty."(FAC at 6). In Claim III, Plaintiff contends that his right to equal protection has been violated because other patients are allowed electronic devices that are capable of accessing the Internet. (FAC at 7). In addition, Plaintiff includes a sub-claim for retaliation in Claim III, alleging that Defendant Luna has only denied Plaintiff's request for a personal computer because of "Defendant Luna's feelings of animosity towards Plaintiff in response to Plaintiff's constant assertion of his civil rights in contrast to hospital policies."(*Id.*). In Claim IV, Plaintiff alleges that Defendant Luna's decision to refuse Plaintiff a personal computer violates Plaintiff's rights pursuant to *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). (See FAC at 8-9). Finally, in Claim V, Plaintiff states that his right to access the courts has been infringed upon because the hospital does not provide legal assistance to its patients. (FAC at 10).

> FN2. Although Plaintiff has numbered his claims as "Claim I, Claim II, etc.," he has included "sub-claims" within certain designated claims. The Court will address the sub-claims independently.

**\*2** Plaintiff seeks ten thousand dollars in general damages, ten thousand dollars for mental anguish or pain and suffering, and ten thousand dollars in punitive damages plus costs, attorney's fees and an unspecified amount of compensatory damages. (FAC at 11). In addition, he requests declaratory relief ordering, among other things, that he be allowed to purchase and possess a laptop computer "that meets his needs." (*Id.*). Plaintiff is suing Defendant Luna in his individual capacity.

## DISCUSSION

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (alteration in original) (citation omitted). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may seek dismissal of a complaint for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need to provide detailed factual allegations. *Twombly,* 127 S.Ct. at 1964. However, it must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 1965.In considering a motion to dismiss, the court must accept as true all the factual allegations in the complaint. *Id.*

Should this Court dismiss the Complaint, it must also decide whether to grant leave to amend. Even when a request to amend is not made, the court must grant leave unless it concludes that "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (en banc) (quoting *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995)). In determining whether amendment would be futile, a court examines whether the complaint could be amended "without contradicting any of the allegations of [the] original complaint." *Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 296 (9th Cir.1990). Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading. *Id.* at 296-97.Also, the district court's discretion to deny leave to amend is "particularly broad" where, as here, the plaintiff has previously filed an amended complaint. *Chodos v. West Publishing Co.,* 292 F.3d 992, 1003 (9th Cir.2002).

In the instant Motion, Defendant Luna argues that the First Amended Complaint is subject to dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 3890382 (C.D.Cal.)

missal on multiple grounds. First, he contends that the Complaint fails to state a claim upon which relief can be granted. (MTD at 5-17). Second, he asserts that he is entitled to qualified immunity from Plaintiff's claims. (MTD at 17-18). Third, and finally, Defendant Luna asserts that he did not personally violate any of Plaintiff's constitutional rights and, therefore, cannot be sued under 42 U.S.C. § 1983. (MTD at 18-19).

*3 In the January 9, 2008 Report and Recommendation, it was recommended that the Motion be denied. In the Objections, Defendant Luna argues, among other things, that Plaintiff has no constitutional right to have personal property in his room (Objections at 3-4), that the denial of a personal computer does not amount to "punishment" (Objections at 4-5), and that he is entitled to qualified immunity. (Objections at 8). The Court has reviewed the Objections and reconsidered Defendant Luna's Motion. For the reasons discussed below, the Court vacates the January 9, 2008 Report and Recommendation and recommends that the Motion be denied in part and granted in part.

### A. Plaintiff Has Failed To Identify A Life, Liberty, Or Property Interest That Guarantees Him The Right To Possess A Personal Computer

The Due Process Clause protects against the deprivation of "life, liberty, or property" without due process of law. *Wilkinson v. Austin,* 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). Accordingly, anyone "who seek[s] to invoke its procedural protection must establish that one of these interests is at stake."*Id.* Unless Plaintiff can show a constitutionally-protected interest, the inquiry ends and no violation of procedural due process will be found. *See Hewitt v. Grabicki,* 794 F.2d 1373, 1380 (9th Cir.1986). If, however, Plaintiff can show a protected interest, the Court must then consider the sufficiency of the procedures used to justify the deprivation of that interest. *See Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

Here, Plaintiff has failed to identify a life, liberty, or property interest that guarantees him the right to possess a personal computer. Prison officials may make legitimate polices for the "preservation of internal order and discipline, the maintenance of institutional security, and rehabilitation of prisoners." *Storseth v. Spellman,* 654 F.2d 1349, 1355 (9th Cir.1981) (citing *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974)). Generally, "the Due Process Clause does not give prisoners a right to retain unlimited personal property." *Abbott v. McCotter,* 13 F.3d 1439, 1443 (10th Cir.1994); *see also Johnson v. Galli,* 596 F.Supp. 135, 139 (D.Nev.1984) (finding that pretrial detainees have no constitutional right to have personal property in their cell).

No court has found that civilly committed persons, pretrial detainees, or prisoners have a constitutional right to have personal computers, or items that are similar to personal computers, in their cells. *See, e.g., Sands v. Lewis,* 886 F.2d 1166, 1172 (9th Cir.1989) (prisoners do not have a constitutional right to have memory typewriters in cells), *overruled on other grounds by Lewis v. Casey,* 518 U.S. 343, 350-55, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Taylor v. Coughlin,* 29 F.3d 39, 40 (2nd Cir.1994) ("If prison inmates do not enjoy a constitutional right to typewriters as implements of access to the courts, it would be illogical for us to rule that there is a constitutional right to typewriters of a specific memory capacity."); *State ex rel. Anstey v. Davis,* 203 W.Va. 538, 545, 509 S.E.2d 579 (1998) ("We are persuaded by the uniformity of opinion on this issue and therefore hold that prison inmates have no constitutional right to possess personal computers in their cells."). Because Plaintiff has failed to demonstrate that he has a constitutionally protected interest in possessing a personal computer, a procedural due process violation cannot be found. *See Hewitt,* 794 F.2d at 1380. As such, Plaintiff's procedural due process claim, as stated in Claim I, must be dismissed without leave to amend.

*4 Similarly, Plaintiff's *Turner v. Safley* claim, as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 3890382 (C.D.Cal.)

Page 4

alleged in Claim IV, also fails. To allege claim pursuant to *Turner,* a prisoner must assert that a prison regulation impinges on inmates' constitutional rights and that the regulation is not reasonably related to legitimate penological interests. *Turner,* 482 U.S. at 89. As Plaintiff has not demonstrated that he has a constitutional right to possess a personal computer, he cannot establish a claim under *Turner.* Accordingly, to the extent Claim IV challenges the institution's regulations under *Turner,* his claim lacks merit and must be dismissed without leave to amend.

**B.** *Plaintiff States A Cognizable Substantive Due Process Claim*

The substantive component of the Due Process Clause bars "certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citation omitted). Substantive due process is violated if restrictions are imposed for the purpose of punishing a civil detainee. *See Bell v. Wolfish,* 441 U.S. 520, 538, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Due process requires that the conditions of confinement for civilly committed persons bear some reasonable relation to the purpose for which such persons are committed. *Seling v. Young,* 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001). "The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Jones v. United States,* 463 U.S. 354, 368, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). Thus, the Fourteenth Amendment requires that, within the bounds of professional discretion, civilly committed persons not be subjected to conditions that amount to punishment. *Hydrick v. Hunter,* 500 F.3d 978, 997 (9th Cir.2007) (citations omitted).

"[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more,

amount to 'punishment.' " *Bell,* 441 U.S. at 539. However, a restriction is "punitive" where it is expressly intended to punish, or where it is "excessive in relation to [its non-punitive] purpose," or is "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones v. Blanas,* 393 F.3d 918, 933-34 (9th Cir.2004) (internal citations and quotation marks omitted). Officials cannot rely on general or conclusory assertions to support their policies. *Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir.1990) (to meet their burden in establishing the validity of regulations that impinge on the constitutional rights of inmates, prison authorities must "identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point."). Plaintiff's allegations in Claim I, construed liberally, state a substantive due process claim.

**\*5** Defendant Luna argues that because Patton's regulation disallowing possession of personal computers is "more than reasonably related to its legitimate interests in safety and security," the First Amended Complaint should be dismissed. (MTD at 6-16; *see also* FAC, Exh. 2).[FN3] Defendant Luna's argument, however, raises factual questions that cannot be resolved on a motion to dismiss. Whether Defendant Luna's denial of Plaintiff's request is reasonably related to the safety and security of the institution is a factual issue. As such, it is recommended that the Motion to Dismiss be denied as to Plaintiff's substantive due process claim.

> FN3. A court may consider certain materials, including documents attached to the complaint, when ruling on a Rule 12(b)(6) motion to dismiss without converting the motion to dismiss into a motion for summary judgment. *United States v. Ritchie,* 342 F.3d 903, 907-08 (9th Cir.2003).

**C.** *Plaintiff's Equal Protection Claim Is Defective*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                Page 5
Not Reported in F.Supp.2d, 2008 WL 3890382 (C.D.Cal.)

In Claim III, Plaintiff argues that Defendant Luna violated his equal protection rights. (*See* FAC at 7). "To state a claim under [Section] 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles,* 250 F.3d 668, 686 (9th Cir.2001) (citations omitted). Here, Plaintiff does not assert that he is a member of any protected class. He argues that Defendant Luna's decision to deny him possession of a personal computer is arbitrary because other patients have been allowed equipment such as video game consoles and other electronic devices. (FAC at 7). As such, Plaintiff only alleges that Defendant Luna discriminates between the types of property he will allow. Plaintiff does not allege that this discrimination is based on Plaintiff's membership in a protected class. Accordingly, Plaintiff's equal protection claim, as alleged in Claim III, is defective and must be dismissed without leave to amend.

### D. *Plaintiff's Claim That He Has Been Deprived Of Treatment Services Provided In The Least Restrictive Method Must Be Dismissed*

Plaintiff's Claim II is vague and conclusory. In Claim II, Plaintiff alleges that he has the right "to treatment services provided in a method least restrictive of individual liberty and which promotes personal independence." (FAC at 6). Plaintiff asserts that Defendant Luna's denial of Plaintiff's requests for a personal computer is "highly restrictive of his liberty and does not promote personal independence." (FAC at 6). Plaintiff, however, does not articulate how possession of a personal computer would promote individual liberty or personal independence. Moreover, Plaintiff fails to demonstrate that his treatment is somehow inhibited by the lack of a personal computer. As such, Plaintiff's claim cannot survive a motion to dismiss. *See Ivey v. Bd. of Regents of Univ. of Alaska,* 673 F.2d 266, 268 (9th Cir.1982) (even a liberal interpretation of a civil

rights complaint may not supply essential elements of a claim that were not pled). It is recommended that Claim II be dismissed without leave to amend.

### E. *Plaintiff States A Cognizable Retaliation Claim*

**\*6** Plaintiff includes a sub-claim for retaliation in Claim III. Plaintiff contends that Defendant Luna violated his First Amendment rights by retaliating against Plaintiff for filing multiple civil rights complaints. (FAC at 7). Plaintiff alleges that "[t]here is no justification whatsoever for allowing other patients to have this equipment, but not the Plaintiff, other than Defendant Luna's feelings of animosity towards Plaintiff in response to Plaintiff's constant assertion of his civil rights in contrast to hospital policies." (FAC at 7).

The Ninth Circuit has set forth the minimum pleading requirements for a § 1983 claim that prison employees have retaliated against an inmate for exercising a First Amendment right:

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson,* 408 F.3d 559, 567-68 (9th Cir.2005) (footnote omitted). These criteria reflect the requirement that the plaintiff establish a specific link between the alleged retaliation and the exercise of a constitutional right. *See Pratt v. Rowland,* 65 F.3d 802, 807-08 (9th Cir.1995).

Plaintiff alleges that Defendant Luna denied him possession of a personal computer because Plaintiff has exercised his right to file complaints regarding various hospital policies. (FAC at 7). Plaintiff also asserts that Defendant Luna's decision to deny Plaintiff possession of a personal computer has no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2008 WL 3890382 (C.D.Cal.)

legitimate goal. (FAC at 8). This Court is required to construe Plaintiff's allegations liberally. "In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 623 (9th Cir.1988) (citation omitted). In view of this lenient standard, the Court concludes that Plaintiff has alleged a claim for retaliation. Accordingly, it is recommended that Defendant Luna's Motion to Dismiss be denied as to Plaintiff's retaliation claim.

### F. *Plaintiff's Access To The Courts Claim Fails To Allege Actual Injury And Is Therefore Defective*

A plaintiff alleging a violation of his right of access to the courts must demonstrate that he has suffered "actual injury." *Lewis,* 518 U.S. at 349-50. The right to access the courts is limited to direct criminal appeals, habeas corpus proceedings, and civil rights actions challenging conditions of confinement. *Id.* at 354-55."[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* at 351.Instead, the plaintiff must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."*Id.* Plaintiff, however, fails to allege that he suffered an actual injury from an inability to access the courts. Moreover, Plaintiff has filed at least two complaints with this Court. He has adequately litigated these matters by filing amended complaints and various other pleadings. As such, Plaintiff's access to the courts claim, as asserted in Claim V, is defective and must be dismissed without leave to amend.

### G. *The Court Is Unable To Resolve Defendant Luna's Defense Of Qualified Immunity On The Current Record*

**\*7** When the defense of qualified immunity is raised, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Scott v. Harris,* --- U.S. ----, 127 S.Ct. 1769, 1774 & n. 4, 167 L.Ed.2d 686 (2007) (discussing *Saucier* ). If a violation can be made out on a favorable view of plaintiff's submissions, the next sequential step is to examine whether the right was clearly established such that a reasonable official would understand that his conduct violated that right. *Saucier,* 533 U.S. at 201-02.

The Ninth Circuit has recognized that "a motion to dismiss on qualified immunity grounds puts the court in the difficult position of deciding far-reaching constitutional questions on a non-existent factual record." *Hydrick,* 500 F.3d at 985 (internal quotations omitted). The Ninth Circuit has also noted that the court must be "cautious not to eviscerate the notice pleading standard in suits where qualified immunity is at issue." *Id.* at 985-86 & n. 5 ("[ T] he point of the Rule 12(b)(6) motion is not to evaluate the veracity of the Plaintiffs' allegations, or to speculate as to the Defendants' justifications for their actions.").

In this case, Plaintiff alleges that Defendant Luna's denial of his request to possess a personal computer violated his constitutional rights. Although the Court has concluded that Plaintiff's bare allegations are sufficient to state certain claims,[FN4] there may be factual evidence that subsequently alters the Court's resolution of whether a constitutional right was violated. Accordingly, the Court is unable to resolve the first inquiry mandated by *Saucier* on the current record. *See Saucier,* 533 U.S. at 200. Furthermore, whether Defendant Luna could have reasonably believed that his own conduct was lawful requires a greater development of the record. Thus, it is recommended that Defendant Luna's Motion to Dismiss on qualified immunity grounds be denied without prejudice to renewal of this defense at a later stage in the proceedings.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN4. *See* Discussion *supra* Parts B & E.

### H. *Plaintiff Has Adequately Pled That Defendant Luna Caused The Alleged Violations Of His Constitutional Rights*

To demonstrate a civil rights violation a plaintiff must show that the defendant's conduct caused a deprivation of the plaintiff's constitutional or statutory rights. *See* 42 U.S.C. § 1983; *Hydrick,* 500 F.3d at 987-88. Such causation is established where the defendant "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [the defendant] is legally required to do" and that act or omission results in the complained of deprivation. *Id.* at 988 (internal quotations omitted).

In the Motion, Defendant Luna states that "the regulation at issue was not created by Luna or by the Hospital. Instead, the California Administrative Code, tit. 9, section 891 forbids Plaintiff from having Internet access."(MTD at 18). The First Amended Complaint, however, challenges two distinct concerns: Defendant Luna's denial of Plaintiff's request for permission to possess a personal computer and Defendant Luna's denial of Internet access. (*See* FAC at 4; Opp. at 1).[FN5] Because Plaintiff alleges that Defendant Luna, motivated by retaliatory intent, was responsible for the denial of Plaintiff's requests to possess a personal computer, Plaintiff has sufficiently alleged that Defendant Luna caused or participated in a constitutional violation. (*See* FAC, Exh. 2). Accordingly, to the extent the Motion seeks to dismiss the First Amended Complaint on the grounds that Defendant Luna did not participate in the constitutional deprivation, it is recommended that the Motion to Dismiss be denied on this ground as well.

> FN5. Plaintiff states in his Opposition that "Plaintiff is not asking for Internet access, so there is no security concern."(Opp. at 5). However, he then proceeds to argue why limited Internet access would pose no greater concern than a confidential telephone call. (*Id.*). This statement appears to be an argument in support of granting Internet access to Patton residents. Plaintiff further notes that he has possessed a "palm pilot" while committed and could access the Internet with an attachment if "that was [P]laintiff's intent." (*Id.*). In Plaintiff's First Amended Complaint, his allegations imply that he is seeking Internet access. (FAC at 8). As the Court is required to construe a *pro se* plaintiff's allegations liberally, the Court finds that Plaintiff is seeking both possession of a personal computer and access to the Internet.

### RECOMMENDATION

**\*8** IT IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Amended Report and Recommendation; (2) **DENYING** Defendant Luna's Motion to Dismiss as it pertains to Plaintiff's substantive due process claim as alleged in Claim I (*see* Discussion *supra* Part B) and retaliation claim as alleged in Claim III (*see* Discussion *supra* Part E); (3) **GRANTING** Defendant Luna's Motion to Dismiss as it pertains to Plaintiff's procedural due process claim as alleged in Claim I (*see* Discussion *supra* Part A), *Turner v. Safley* claim (*see* Discussion *supra* Part A), equal protection claim as alleged in Claim III (*see* Discussion *supra* Part C), claim alleging deprivation of treatment services as alleged in Claim II (*see* Discussion *supra* Part D), and access to the courts claim as alleged in Claim V (*see* Discussion *supra* Part F); (4) **DISMISSING** Plaintiff's procedural due process claim, equal protection claim, deprivation of treatment services claim, and access to the courts claim without leave to amend; and (5) directing that Defendant Luna answer Plaintiff's substantive due process and retaliation claims within the time set forth in Federal Rule of Civil Procedure 12(a)(4)(A).

C.D.Cal.,2008.
Endsley v. Luna
Not Reported in F.Supp.2d, 2008 WL 3890382

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 8
Not Reported in F.Supp.2d, 2008 WL 3890382 (C.D.Cal.)

(C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2007 WL 2789561 (E.D.Cal.)

▷
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
James KEEN, Plaintiff,
v.
Amy NOBLE, et al., Defendants.
**No. CV F 04-5645 AWI WMW P.**

Sept. 20, 2007.

James Keen, Petersburg, VA, pro se.
Lynn Trinka Ernce, United States Attorney's Office, Sacramento, CA, for Defendants.

**ORDER REGARDING FINDINGS AND RE-COMMENDATIONS**

**ORDER GRANTING IN PART MOTION TO DISMISS**

**BACKGROUND**

ANTHONY W. ISHII, United States District Judge.
*1 Plaintiff is a federal inmate and is proceeding in this action against United States Bureau of Prisons ("BOP") officials for conduct that occurred while Plaintiff was housed at the United States Penitentiary at Atwater ("Atwater"). Plaintiff claims that Defendants prohibited him from the free exercise of his religious belief in violation of the First Amendment, the Land Use and Institutionalized Persons Act ("RLUIPA"), and the Religious Freedom Restoration Act ("RFRA"). Plaintiff also claims that Defendants' conduct violated his equal protection rights under the Fifth Amendment. Finally, Plaintiff claims that Defendants' actions violated the Administrative Procedure Act ("APA"). The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72-302.

On April 4, 2007, the Magistrate Judge filed Find-

ings and Recommendations that recommended Defendants' motion to dismiss the RLUIPA claim and First Amendment claim be granted on qualified immunity grounds and the motion to dismiss the Equal Protection claim be granted for failure to state a claim. Plaintiff filed objections to the Findings and Recommendations. Defendants filed a reply to the objections.

**DISCUSSION**

Plaintiff contends that Defendants violated the First Amendment, RLUIPA, and RFRA. Specifically, Defendants denied Plaintiff of personal possession of runestones (a collection of 24 stones made from wood, which have the Celtic alphabet painted on them) and permission to construct a hof (a type of wooden enclosed shelter). The Magistrate Judge found that the undisputed facts indicate Plaintiff was never denied the use of the worship area or the chapel and that Plaintiff was not denied the use of runes in the chapel area. Plaintiff was only denied the personal possession of runestones and the construction of a hof, which the Magistrate Judge found conflicted with prison security. The Magistrate Judge found that there was no clear law that any of the Defendants were aware of in 2002 that mandated the allowance of such items. The Magistrate Judge thus concluded that Defendants were entitled to qualified immunity on the First Amendment claim and RLUIPA claim. The Magistrate Judge also found the complaint fails to state a claim for an equal protection violation. Plaintiff objects to these findings. In accordance with the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Rule 73-305, this court has conducted a *de novo* review of this case.

**A. First Amendment Claim and Civil Rights Claim-Qualified Immunity**

Plaintiff objects to the Magistrate Judge's recommendation that the court find Defendants are en-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

titled to qualified immunity on Plaintiff's First Amendment claim and RLUIPA claim. Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The test to determine whether a law enforcement officer is entitled to qualified immunity involves a two-step analysis. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir.2005) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). First, the court must determine whether, taking the facts in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. *Saucier,* 533 U.S. at 201; *Moreno,* 431 F.3d at 638; *Prison Legal News v. Lehman,* 397 F.3d 692, 701 (9th Cir.2005). If the court finds that the officer violated the plaintiffs' constitutional rights, the court next determines whether that right was clearly established at the time the alleged violation occurred. *Saucier,* 533 U.S. at 201; *Moreno,* 431 F.3d at 638; *Prison Legal News,* 397 F.3d at 701. "The contours of the right must have been clear enough that a reasonable officer would have understood that what he or she was doing violated that right." *Moreno,* 431 F.3d at 638 (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 759 (1987)). The defendant bears the burden of establishing qualified immunity. *Crawford-El v. Britton,* 523 U.S. 574, 586-87, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). When evaluating a claim of qualified immunity on summary judgment or a motion to dismiss, the court must assume that the version of events offered by the nonmoving party is correct. *See Prison Legal News,* 397 F.3d at 703; *Wilkins v. City of Oakland,* 350 F.3d 949, 951 (9th Cir.2003). Thus, on this motion, the court must consider the undisputed facts and on all disputed facts assume the facts provided by Plaintiff are true.

**\*2** The first step in determining whether Defendants are entitled to qualified immunity is whether, taking Plaintiff's evidence as true, Defendants violated Plaintiff's rights. Plaintiff claims that Defendants' conduct violated both his First Amendment rights and RLUIPA rights. The First Amendment to the United States Constitution provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof ...."U.S. Const., amend. I. While prisoners "retain protections afforded by the First Amendment," including the free exercise of religion, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282, (1987) (quoting *Price v. Johnson,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948))."In order to establish a free exercise violation, [a prisoner] must show the defendants burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." *Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997). Under this standard, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). First, "there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it," and "the governmental objective must itself be a legitimate and neutral one."*Id.* A second consideration is "whether there are alternative means of exercising the right that remain open to prison inmates."*Id.* at 90 (internal quotations and citation omitted). A third consideration is "the impact accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources generally."*Id.*"Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation."*Id.*

RLUIPA also disallows burdens on a prisoner's reli-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

gious exercise unless a compelling governmental interest is at stake. RLUIPA provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1. Plaintiff bears the initial burden of demonstrating that defendants substantially burdened the exercise of his religious beliefs. *Warsoldier v. Woodford,* 418 F.3d 989, 994-95 (9th Cir.2005). If plaintiff meets his burden, defendants must demonstrate that "any substantial burden of [plaintiff's] exercise of his religious beliefs is *both* in furtherance of a compelling governmental interest *and* the least restrictive means of furthering that compelling governmental interest."*Id.* (emphasis in original)."RLUIPA is to be construed broadly in favor of protecting an inmate's right to exercise his religious beliefs."*Id.*[FN1]

> FN1. Defendants make the argument that RLUIPA does not apply to the Federal Bureau of Prisons. The court finds this argument disingenuous. Defendants cite no law for this assertion. In the leading Supreme Court case regarding RLUIPA, the Supreme Court considered the constitutionality of RLUIPA as applied to the Federal Bureau of Prisons. *See Cutter v. Wilkinson,* 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

*1. Runestones*

\*3 Both the First Amendment and RLUIPA require Plaintiff to show some interference or burden on his religion in being denied runestones. Defendants

provide evidence that their research revealed that Plaintiff's Asatru religious practice did not require his personal possession of runestones. Defendants provide evidence that possession of rune cards, along with access to runestones during ceremonies, is sufficient. Plaintiff has countered this evidence with evidence that actual possession of runestones is necessary. Thus, at this time, there is a disputed issue on the burden to Plaintiff's religion of not being allowed runestones. On this motion concerning qualified immunity, the court must assume the facts in Plaintiff's favor. Accordingly, for this motion, the court must presume that Defendants' refusal to provide Plaintiff with runestones has interfered with or burdened Plaintiff's his religion.

The next step in either a First Amendment claim or a RLUIPA claim is to ascertain the governmental interest used to justify the restriction and balance this interest with the interference on Plaintiff's religion. In a First Amendment claim, prison officials must "put forward" a legitimate governmental interest to justify their regulation, *Turner,* 482 U.S. at 89, and must provide evidence that the policy is based on legitimate penological justifications. *Swift v. Lewis,* 901 F.2d 730, 732 (9th Cir.1990). It is on this factor that Defendants' motion must be denied as to the runestones. Both Defendants' statement of undisputed facts and Defendants' evidence shows that Defendants denied Plaintiff of runestones based on PS5360.08, *Religious Beliefs and Practices* and/or their determination that possession of runestones was not required by Plaintiff's Asatru religion. Missing from Defendants' statement of undisputed facts is actual evidence, as opposed to Defendants' attorney's opinion, that the reason to deny Plaintiff runestones and/or the reason behind the regulation Defendants relied upon to deny the runestones is a penological justification. While the court can imagine that institutional safety might provide a reason to disallow inmates to have 24 hard objects in their continual possession, Defendants have provided so little information about runestones, such as their size, shape, and storage container, that the potential safety concern is not obvious. Absent

evidence of a penological purpose, the court must find both a constitutional violation and violation of RLUIPA for the purposes of a qualified immunity analysis.

If the court finds a violation of a plaintiff's constitutional rights, the court must determine whether that right was clearly established at the time the alleged violation occurred. *Saucier,* 533 U.S. at 201; *Moreno,* 431 F.3d at 638; *Prison Legal News,* 397 F.3d at 701. Here, Defendants provide evidence that Asatru is not a common religion within the BOP. In addition, during the time the events at issue in this lawsuit occurred, Atwater had recently opened, Atwater was continually inundated with new inmates, Atwater had staff supervision and programming constraints, and all worship areas had not yet been completed. The defense of qualified immunity protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curium). Given Defendants lack of knowledge about Asatru and Atwater's recent opening, the facts of this case appear at first glance to be the type in which Defendants would be entitled to qualified immunity.

*4 In deciding qualified immunity, the court must undertake its evaluation of whether a right was clearly established "in light of the specific context of the case, not as a broad general proposition ." *Saucier,* 533 U.S. at 201. In essence, the question is whether the official could have reasonably but erroneously believed that his conduct did not violate the plaintiff's rights. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001). Here, the law governing a prison of-

ficial's responsibilities toward a prisoner's First Amendment rights and RLUIPA rights was clearly established. Both required Defendants to not infringe on Plaintiff's religion absent a penological purpose. Yet, there is no competent evidence before the court that Defendants have pointed to which shows Defendants acted pursuant to a penological purpose. All evidence indicates that Defendants denied Plaintiff the runestones based on a regulation and/or their belief rune cards were sufficient. In 2002 Defendants should have known that they could not deny Plaintiff runestones without a penological purpose. Thus, Defendants are not entitled to qualified immunity regarding Plaintiff's claims about the denial of runestones.

In making the finding that there is no evidence that Defendants had a penological purpose to deny runestones, the court does recognize that the declarations of some Defendants include the broad statement that they never violated Plaintiff's rights and all of Plaintiffs' requests were denied for security reasons. These general, conclusory statements are insufficient evidence in light of the specific evidence as to the reason Defendants denied the runestones. For example, when explaining why the use of a hof was denied, Defendants set forth specific evidence that such a structure was denied for security reasons. Considering that the burden is on Defendants, the court finds general assertions that all defendants actions were done for correctional security reasons is insufficient to find a penological purpose for the denial of runestones.[FN2]

> FN2. The court makes this finding based on Defendants' failure to carry their burden on this motion because Defendants provided insufficient information. As such, this finding is for the purposes of this motion only.

## 2. Hof

The other basis for Plaintiff's First Amendment claim and RLUIPA claim is Defendants' denial of a hof On this claim, the court agrees with the reason-

ing of the Magistrate Judge. Defendants have provided evidence that the hof was denied based on the safety concern raised by an inclosed, wooden structure and that Plaintiff was given access to another worship area. Even if Defendants did not properly balance Plaintiff's religious need for the hof against safety concerns, Defendants would not have reasonably known they were violated Plaintiff's rights. Thus, the court will adopt the Magistrate Judge's recommendation on this issue, and the First Amendment claim and RLUIPA claim, to the extent they are premised on the denial of a hof, will be dismissed on qualified immunity grounds.

## B. First Amendment Claim and RLUIPA Claim-Injunctive Relief

*5 Defendants contend, and the Magistrate Judge found, that Plaintiff's claims concerning an injunction to allow runestones was moot because BOP regulations have changed and Plaintiff may now have runestones in his possession. Plaintiff claims this change in policy still does not adequately address his religious need because the new BOP policy permits only plastic runestones. Plaintiff has provided evidence that runestones must be natural.

There appears to remain a disputed issue of fact regarding whether Plaintiff's claims concerning the runestones are now moot by a change in BOP policy. This finding is bolstered by the fact that much of the argument and evidence concerning the current BOP policy and Plaintiff's current ability to have runestones is contained in the parties' briefs filed in response to the Findings and Recommendations. New evidence and arguments should not be raised in objections to Findings and Recommendations. *See Greenhow v. Secretary of HHS,* 863 F.2d 633, 638-39 (9th Cir.1988), *overruled on other grounds by United States v. Hardesty,* 977 F.2d 1347 (9th Cir.1992). Accordingly, the court declines to adopt the recommendation finding that Plaintiff's injunctive request concerning the runestones is now moot.

## C. First Amendment Claim-Supervisor Defendants

Defendants contend that they should be dismissed from the First Amendment claim because they are not adequately linked to the alleged civil rights violations. In the motion, Defendants contend that no First Amendment claim is available against Defendant Hawk Sawyer and Defendant Haro because Plaintiff's theory of liability against them is impermissibly based on respondeat superior liability. The Magistrate Judge did not address this claim because he recommended all Defendants be dismissed from the First Amendment claim based on qualified immunity.

In a civil rights claim, liability may not be established through a respondeat superior theory. *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir.2002) (1983 case against state officials); *Cameron v. Thornburgh,* 983 F.2d 253, 258 (D.C.Cir.1993) (Bivens case against federal officials). To show a supervisor's liability, the plaintiff must show (1) the supervisor's personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Jeffers v. Gomez,* 267 F.3d 895, 915 (9th Cir.2001). Supervisors can be held liable if they play an affirmative part in the alleged deprivation of constitutional rights by setting in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the constitutional injury. *Graves v. City of Coeur D'Alene,* 339 F.3d 828, 848 (9th Cir.2003) (*citations omitted* ) (quoting *Rise v. Oregon,* 59 F.3d 1556, 1563 (9th Cir.1995); *Larez v. City of LA,* 946 F.2d 630, 646 (9th Cir.1991))."Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Menotti v. City of Seattle,* 409

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.