1
2
3
4
5
6       IN THE UNITED STATES DISTRICT COURT
7
8       FOR THE NORTHERN DISTRICT OF CALIFORNIA
9    JOSE PADILLA and ESTELA LEBRON,
                                                    No. C 08-00035 JSW
10              Plaintiffs,
11       v.                                         **AMENDED ORDER DENYING IN
                                                    PART AND GRANTING IN PART
12    JOHN YOO,                                     DEFENDANT'S MOTION TO
                                                    DISMISS**
13              Defendant.
                                          /
14
15                        **INTRODUCTION**
16          Now before the Court is the motion to dismiss pursuant to Federal Rule of Civil
17   Procedure 12(b)(6) for failure to state a claim upon which relief can be granted filed by
18   Defendant John Yoo ("Yoo").  Having carefully reviewed the parties' papers and considered the
19   relevant legal authority, and having had the benefit of oral argument, and good cause appearing,
20   the Court hereby DENIES IN PART and GRANTS IN PART Yoo's motion to dismiss.
21
22          [War] will compel nations the most attached to liberty to resort for repose and
            security to institutions which have a tendency to destroy their civil and political
            rights.  To be more safe, they at length become willing to run the risk of being
23          less free.
24   The Federalist No. 8, at 44 (Alexander Hamilton) (E.H. Scott ed., 1898).
25          The issues raised by this case embody that same tension – between the requirements of
26   war and the defense of the very freedoms that war seeks to protect.  After the brutal and
27   unprecedented attacks on this nation on September 11, 2001, the United States government
28   responded to protect its citizens from further terrorist activity.  This lawsuit poses the question

**United States District Court**
For the Northern District of California

addressed by our founding fathers about how to strike the proper balance of fighting a war *against* terror, at home and abroad, and fighting a war *using* tactics of terror.  "Striking the proper constitutional balance here is of great importance to the Nation during this period of ongoing combat.  But it is equally vital that our calculus not give short shrift to the values that this country holds dear or to the privilege that is American citizenship.  It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad."  *Hamdi v. Ashcroft*, 542 U.S. 507, 532 (2004); *see also Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164-65 (1963) ("The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit government action.").

This case also raises the tension of the appropriate roles of the separate branches of government during a crisis of national proportions.  The Supreme Court has clearly held that a "state of war is not a blank check for the President when it comes to the rights of the Nation's citizens."  *Id.* at 535.  Although the courts should defer to the coordinate branches of government with respect to the "core strategic matters of warmaking ... [w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."  *Id.* at 535, 537.

**BACKGROUND**

Plaintiff Jose Padilla ("Padilla") is a United States citizen who was designated an enemy combatant during the last administration's "war on terror" and who was detained in a military brig in South Carolina for three years and eight months.  Padilla alleges that he was imprisoned without charge, without the ability to defend himself, and without the ability to challenge the conditions of his confinement.  Padilla also alleges that he has suffered gross physical and psychological abuse upon the orders of high-ranking government officials as part of a

systematic program of abusive interrogation which mirror the abuses committed at Guantanamo Bay.

For the purposes of the pending motion to dismiss, the Court accepts as true the following allegations made in the First Amended Complaint. On or about May 8, 2002, Padilla was arrested at the Chicago O'Hare International Airport pursuant to a material witness warrant issued by the United States District Court for the Southern District of New York. (First Amended Complaint ("FAC") at ¶ 35.) Padilla was transported to New York where he was held in custody in a federal detention facility. (*Id.*) On June 9, 2002, while a motion was pending to vacate the material witness warrant, President George W. Bush ("President Bush") issued an order that declared Padilla an "enemy combatant" and directed Secretary of Defense Donald Rumsfeld ("Rumsfeld") to take him into protective custody. The President found that Padilla was closely associated with al Qaeda, was engaged in conduct that constituted hostile and war-like acts, and represented a "continuing, present and grave danger to the national security of the United States, and [therefore] that detention of Mr. Padilla is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens." (*See* Letter from President Bush to Rumsfeld (June 9, 2002), *reprinted in Padilla v. Hanft*, 423 F.3d 386, 389 (4th Cir. 2005), *cert. denied*, 547 U.S. 1062 (2006)) (*"Padilla II"*); *see also* FAC, Ex. J (Executive Order dated June 9, 2002).) That same day, Padilla was taken into custody by Department of Defense officials and transported to the Consolidated Naval Brig in Charleston, South Carolina. *Padilla v. Hanft*, 389 F. Supp. 2d 678, 680 (D.S.C. 2005), *rev'd*, 423 F.3d 386 (4th Cir. 2005), *cert. denied*, 547 U.S. 1062 (2006)) (*"Padilla I"*).

Padilla was thereafter detained without being charged, was subjected to extreme isolation, including isolation from both counsel and from his family, and was interrogated under threat of torture, deportation and even death. He was placed in solitary confinement in a tiny cell in an otherwise empty wing of the military brig. Padilla alleges that he was "subjected to a systematic program of unlawful interrogation methods and conditions of confinement, which proximately and foreseeably caused [him] to suffer extreme isolation, sensory deprivation,

United States District Court

For the Northern District of California

3

severe physical pain, sleep deprivation, and profound disruption of his senses, all well beyond the physical and mental discomfort that normally accompanies incarceration." (FAC at ¶ 45.) While he was detained, government officials subjected Padilla to interrogation tactics and policies such as:

(a) extreme and prolonged isolation;

(b) deprivation of light and exposure to prolonged periods of artificial light, sometimes in excess of 24 hours;

(c) extreme and deliberate variations in the temperature of his cell;

(d) sleep adjustment;

(e) threats to subject him to physical abuse resulting in severe physical pain and suffering, or death, including threats to cut him with a knife and pour alcohol into the wounds;

(f) threats to kill him immediately;

(g) threats to transfer him to a location outside of the United States, to a foreign country or Guantanamo, where he was told he would be subjected to far worse treatment, including severe physical and mental pain and suffering;

(h) administering to him or making believe that he was being administered psychotropic drugs against his will;

(i) shackling and manacling for hours at a time;

(j) forcing him into markedly uncomfortable and painful (or "stress") positions;

(k) requiring him to wear earphones and black-out goggles during movement to, from, and within the brig;

(l) introduction into his cell of noxious fumes that caused pain to the eyes and nose;

(m) lying to him about his location and the identity of his interrogators;

(n) loud noises at all hours of the night, caused by government agents banging on the walls and bars of his cell or opening and shutting the doors to nearby empty cells;

United States District Court

For the Northern District of California

(o)     withholding of a mattress, pillow, sheet or blanket, leaving him with nothing to sleep or rest on except a cold steel slab;

(p)     forced grooming;

(q)     sudden and unexplained suspension of showers;

(r)     sudden and unexplained removal of religious items;

(s)     constant surveillance, including during the use of toilet facilities and showers;

(t)     blackening out of the interior and exterior windows of his cell;

(u)     deprivation of access to any form of information about the outside world, including radio, television, and newspapers from the time of his imprisonment in the military brig until summer 2004, at which time he was allowed very limited access to such materials;

(v)     denial of sufficient exercise and recreation and, when permitted intermittently, only in a concrete cage and often at night;

(w)    denial of any mechanism to tell time in order to ascertain the time for prayer in keeping with the Muslim practice;

(x)     denial of access to the Koran for most of his detention; and

(y)     complete deprivation or inadequate medical care for serious and potentially life-threatening ailments.

(*Id.* at ¶ 55, 63-71.)

From June 9, 2002 until March 4, 2004, government officials also denied Padilla all contact with anyone outside the military brig, including his family and legal counsel.  (*Id.* at ¶ 56.)  For ten months after Padilla's transfer to military detention, the government denied Plaintiff Estela Lebron ("Lebron"), Padilla's mother, any information about her son.  After almost a year of uncertainty, a Pentagon official brought Ms. Lebron a brief greeting card from her son letting her know that he was still alive.  (*Id.* at ¶ 58.)  Beginning on March 4, 2004, Padilla was permitted contact with his habeas attorney while his petition was pending before the U.S. Supreme Court.  The permitted contact was sporadic and subject to severe restrictions,

United States District Court

For the Northern District of California

1    including recording of conversations and review by government officials of all legal

2    correspondence.  (*Id.* at ¶ 59.)

3           Yoo currently is a professor of law.  At the time of Padilla's detention, Yoo was a

4    Deputy Attorney General in the Office of Legal Counsel ("OLC") under the administration of

5    George W. Bush and was "the *de facto* head of war-on-terrorism legal issues" and a "key

6    member of a small, secretive, and highly-influential group of senior administration officials

7    know as the 'War Council.'"  (FAC at ¶¶ 15, 19.)  As such, Yoo admittedly "shaped

8    government policy" in the "war on terrorism."  (*Id.* at ¶ 15, citing Yoo's book "War By Other

9    Means.")  Padilla alleges that Yoo personally was involved in the decision to designate him as

10   an enemy combatant and that Yoo lay the groundwork for the treatment of enemy combatants

11   under military detention.  (*Id.* at ¶ 38.)  As Yoo relates in his book, he "developed an extra-

12   judicial, *ex parte* assessment of enemy combatant status followed by indefinite military

13   detention, without notice of opportunity for a hearing of any sort ... completely preclud[ing]

14   judicial review of the designation."  (*Id.* at ¶ 36.)  Padilla also alleges that the policies Yoo

15   drafted included "the decision to employ unlawfully harsh interrogation tactics" and "pressure

16   techniques proposed by the CIA" against individuals designated as enemy combatants.  (*Id.* at

17   ¶¶ 27, 28.)  Padilla further alleges that the policy of employing harsh interrogation tactics

18   against enemy combatants "proximately and foreseeably led to the abuses suffered by Padilla."

19   (*Id.* at ¶ 46.)

20          According to Padilla, Yoo abused his position by formulating unlawful practices and

21   policies for the designation, detention and interrogation of suspected enemy combatants, and by

22   drafting memoranda designed to evade legal restraints and to immunize those who implemented

23   them.  Padilla asserts that Yoo has publicly acknowledged that he "stepped beyond his role as a

24   lawyer to participate directly in developing policy in the war on terrorism.  He shaped

25   government policy" and in his role as "the *de facto* heard of war-on-terrorism legal issues,

26   [Yoo] wrote and promulgated a series of memoranda."  (*Id.* at ¶¶ 15, 19.)  These memoranda

27   include:

28

1     (a) a memorandum dated October 23, 2001 from Yoo to White House Counsel Alberto

2   R. Gonzales ("Gonzales") and Department of Defense General Counsel William J. Haynes

3   ("Haynes") on the *Authority for Use of Military Force to Combat Terrorist Activities Within the*

4   *United States*, which concluded, among other things, that "the Fourth Amendment does *not*

5   apply to domestic military operations designed to deter and prevent further terrorist attacks,"

6   and concluded that just as "wartime destruction of property does not involve a 'taking' under

7   the Fifth Amendment, it seems safe to conclude that the Court would not apply the Fourth

8   Amendment to domestic military operations against foreign terrorists ... In any event, both

9   rights would give way before the Government's compelling interest in responding to a direct,

10   devastating attack on the United States, and in prosecuting a war successfully

11   against international terrorists – whether they are operating abroad or within the United States."

12   (Defendant Yoo's Response to Court's Order dated March 3, 2009 ("Yoo Response"), Ex. 1 at

13   25, 34) (emphasis in original);

14     (b) a memorandum dated December 21, 2001 from Yoo to Haynes on *Possible Criminal*

15   *Charges Against American Citizen Who Was a Member of the al Qaeda Terrorist Organization*

16   *of the Taliban Militia* (FAC ¶ 19(b));

17     (c) a draft memorandum dated January 9, 2002 from Yoo to Haynes on the *Application*

18   *of Treaties and Laws to al Qaeda and Taliban Detainees,* which outlines Yoo's analysis that

19   treatment of al Qaeda and Taliban members are "not governed by the bulk of the Geneva

20   Conventions, specifically those provisions concerning POWs." (*Id.*, Ex. A at 11, 16, 42.)  The

21   complaint alleges that this memo "was designed to justify the Executive's already concluded

22   policy decision to employ unlawfully harsh interrogation tactics" (*id.* at ¶ 27);

23     (d) a memorandum dated January 22, 2002 to Gonzales on the *Application of Treaties*

24   *and Laws to al Qaeda and Taliban Detainees*, signed by former Assistant Attorney General Jay

25   Bybee ("Bybee") but drafted by Yoo, which concluded that certain international treaties do not

26   protect members of the al Qaeda and Taliban organizations (*id.*, Ex. B);

27

28

1    (e) a memorandum dated February 26, 2002 to Haynes on *Potential Legal Constraints*

2    *Applicable to Interrogations of Persons Captured by U.S. Armed Forces in Afghanistan*, signed

3    by Bybee, which Padilla alleges, upon information and belief, was authored by Yoo (*id.*, Ex. C);

4    (f) an OLC memorandum drafted in or about May 2002, regarding access to counsel and

5    legal mail of detainees held at the naval brigs in Norfolk and Charleston (*Id.* at ¶ 19(f));

6    (g) a memorandum dated June 27, 2002 from Yoo to Assistant Attorney General Daniel

7    J. Bryant of the Office of Legislative Affairs on the *Applicability of 18 U.S.C. Sec. 4001(a) to*

8    *Military Detention of United States Citizens*, which specifically addressed the transfer of Padilla

9    into military detention (Yoo Response, Ex. 2);

10    (h) a memorandum dated August 1, 2002 to Gonzales on *Standards of Conduct for*

11    *Interrogation under 18 U.S.C. §§ 2340-2340A*, signed by Bybee but authored by Yoo, which

12    concluded, among other things, that "for an act to constitute torture, ... it must inflict pain that is

13    difficult to endure.  Physical pain amounting to torture must be equivalent in intensity to the

14    pain accompanying serious physical injury, such as organ failure, impairment of bodily

15    function, or even death.  For purely mental pain or suffering to amount to torture ..., it must

16    result in significant psychological harm of significant duration, e.g., lasting for months or even

17    years."  (FAC, Ex. D at 1.)  The complaint alleges that this memo "was designed to remove

18    legal restraints on interrogators so as to justify the Executive's already concluded policy

19    decision." (*Id.* at ¶ 29.)  The complaint also alleges that this memorandum was crafted "with the

20    specific intent of immunizing government officials from criminal liability for participating in

21    practices that Defendant Yoo knew to be unlawful" (*id.* at ¶ 31);

22    (i) a second memorandum written in August 2002, which addressed the legality of

23    particular interrogation techniques that the CIA wished to employ (*id.* at ¶ 19(i)); and

24    (j) an opinion dated March 14, 2003, from Yoo to Haynes on *Military Interrogation of*

25    *Alien Unlawful Combatants Held Outside the United States*, extending authority to use harsh

26    interrogation techniques against high-level prisoners held at Guantanamo Bay and other

27    facilities under Department of Defense control, and approving the use of mind-altering drugs

28    during interrogations.  (*Id.*, Ex. E.)  This memorandum indicates that Yoo "had received

1   assurances from the Criminal Division of the Justice Department that prosecutions would not be

2   brought against interrogators, reinforcing the point that even federal officials who committed

3   war crimes or torture under federal criminal statutes would escape responsibility for their

4   crimes." (*Id.* at ¶ 33.)

5         The complaint also alleges the Yoo reviewed and approved a memorandum dated

6   November 27, 2002 by Haynes which recommended that Secretary of Defense Rumsfeld

7   approve for use by the military a range of aggressive interrogation techniques not permitted by

8   the military interrogation field manual. (*Id.* at ¶ 20, Ex. F.)

9         Based on the factual contentions in the complaint, Padilla alleges that Yoo

10   proximately and foreseeably injured Mr. Padilla by violating numerous clearly
     established constitutional and statutory rights including, but not limited to, the

11   following:

12         (a)   **Denial of Access to Counsel**. Acting under color of law and
                 his authority as a federal officer, Defendant caused Mr. Padilla

13               to be deprived of his right of access to legal counsel protected
                 by the First, Fifth, and Sixth Amendments to the U.S.

14               Constitution.

15         (b)   **Denial of access to Court**. Acting under color of law and his
                 authority as a federal officer, Defendant caused Mr. Padilla to

16               be deprived of his right of access to court protected by the First
                 and Fifth Amendments to the U.S. Constitution, Article II of the

17               U.S. Constitution, and the Habeas Suspension Clause of the
                 U.S. Constitution.

18         (c)   **Unconstitutional Conditions of Confinement**. Acting under
                 color of law and his authority as a federal officer, Defendant

19               caused Mr. Padilla to be subjected to illegal conditions of
                 confinement and treatment that shocks the conscience in

20               violation of Mr. Padilla's Fifth Amendment rights to procedural
                 and substantive due process, as well as his Eighth Amendment
                 right to be free of cruel and unusual punishment, including

21               torture, outrages on personal dignity, and humiliating and
                 degrading treatment.

22         (d)   **Unconstitutional Interrogations**. Acting under color of law
                 and his authority as a federal officer, Defendant caused Mr.

23               Padilla to be subjected to coercive and involuntary illegal
                 interrogations, both directly and through unlawful conditions of

24               confinement designed to aid the interrogations, all in violation
                 of Mr. Padilla's Fifth Amendment rights to procedural due

25               process, freedom from treatment that shocks the conscience,
                 and freedom from self-incrimination, as well as his Eighth

26               Amendment right to be free from cruel and unusual
                 punishment, including torture, outrages on personal dignity, and

27               humiliating and degrading treatment.

           (e)   **Denial of Freedom of Religion**. Acting under color of law and
28               his authority as a federal officer, Defendant caused Mr. Padilla
                 to be deprived of his right to the free exercise of religion

9

United States District Court

For the Northern District of California

guaranteed under the First Amendment to the U.S. Constitution, as well as the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.

(f)     **Denial of the Right of Information**.  Acting under color of law and his authority as a federal officer, Defendant caused Mr. Padilla to be deprived of his right to information guaranteed under the First Amendment to the U.S. Constitution.

(g)     **Denial of Right to Association**.  Acting under color of law and his authority as a federal officer, Defendant caused Mr. Padilla to be deprived of his right to association with family and others guaranteed under the First Amendment to the U.S. Constitution.

(h)     **Unconstitutional Military Detention**.  Acting under color of law and his authority as a federal officer, Defendant violated Mr. Padilla's right to be free from military detention guaranteed by the Fourth Amendment to the U.S. Constitution, the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

(i)     **Denial of the Right to Be Free from Unreasonable Seizures**.  Acting under color of law and his authority as a federal officer, Defendant violated Mr. Padilla's right to be free from unreasonable seizures guaranteed by the Fourth Amendment to the U.S. Constitution.

(j)     **Denial of Due Process**.  Acting under color of law and his authority as a federal officer, Defendant violated Mr. Padilla's Fifth Amendment right not to be detained or subjected to the collateral effects of designation as an "enemy combatant" without due process of law.

(*Id.* at ¶ 82.)  The complaint also sets forth a claim on behalf of Lebron, by alleging that "Defendant, acting under color of law and his authority as a federal officer, also proximately and foreseeably injured Ms. Lebron by causing her to be denied of virtually all contact with her son in violation of her clearly established rights to association and communication under the First and Fifth Amendments of the U.S. Constitution."  (*Id.* at ¶ 83.)

The Court will address additional facts as necessary in the remainder of this Order.

## ANALYSIS

**A.     Legal Standard on Motion to Dismiss.**

Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may seek dismissal of a complaint for failure to state a claim upon which relief can be granted.  To survive a motion to

**United States District Court**
For the Northern District of California

1  dismiss, a complaint need not provide detailed factual allegations. *Id.* at 555-56. However, it

2  must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a

3  cause of action." *Id.* at 555. In considering a motion to dismiss, the Court must accept as true

4  all the factual allegations in the complaint. *Id.* "The court is not required to accept legal

5  conclusions cast in the form of factual allegations if those conclusions cannot reasonably be

6  drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th

7  Cir. 1994). A complaint must proffer "enough facts to state a claim for relief that is plausible

8  on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff

9  pleads factual content that allows the court to draw the reasonable inference that the defendant

10  is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing

11  *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability

12  requirement,' but it asks for more than a sheer possibility that a defendant has acted

13  unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a

14  defendant's liability, it 'stops short of the line between possibility and plausibility of

15  entitlement to relief.'" *Id.* (citing *Twombly,* 550 U.S. at 557 (brackets omitted)).

16       Two principles support the Supreme Court's decision in *Twombly*. First, "the tenet that

17  a court must accept as true all of the allegations contained in the complaint is inapplicable to

18  legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere

19  conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Second, "only a complaint

20  that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1949-1950 (citing

21  *Twombly*, 550 U.S. at 556.) In accordance with these principles, a court may not bestow the

22  assumption of truth on the assertion of no more than legal conclusions. "While legal

23  conclusions can provide the framework of a complaint, they must be supported by factual

24  allegations. When there are well-pleaded factual allegations, a court should assume their

25  veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*,

26  129 S. Ct. at 1950.

27       When the district court reviews the sufficiency of a complaint at the procedural stage of

28  a motion to dismiss, "before the reception of any evidence either by affidavit or admissions, its

United States District Court

For the Northern District of California

1  task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but

2  whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear

3  on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."

4  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  Therefore, to survive a motion to dismiss, a

5  plaintiff's burden is limited to setting forth factual allegations sufficient to "raise the right to

6  relief above the speculative level."  *Twombly*, 550 U.S. at 545.  A plaintiff need only plead

7  "enough facts to raise a reasonable expectation that discovery will reveal evidence."  *Twombly*,

8  550 U.S. at 556.  That is, a plaintiff must allege facts that, taken as true, are "suggestive of

9  illegal conduct."  *Id.* at 564 n.8.

10       On a motion to dismiss, "a court may properly look beyond the complaint to matters of

11  public record and doing so does not convert a Rule 12(b)(6) motion to one for summary

12  judgment."  *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).

13  The court may consider matters of public record, including pleadings, orders, and other papers

14  filed with the court.  *Id.*

15  **B.     The *Bivens* Remedy is Available Under the Circumstances Presented.**

16       **1.     Threshold Question of Federal Remedy.**

17       Padilla pleads that this Court recognize a cause of action under the circumstances

18  presented in the complaint.  The federal courts' power to grant relief not expressly authorized

19  by Congress is firmly established.  Under 28 U.S.C. § 1331, the federal courts have jurisdiction

20  to decide all cases "aris[ing] under the Constitution, laws, or treaties of the United States."

21  The "jurisdictional grant provides not only the authority to decide whether a cause of action is

22  stated by a plaintiff's claim that he has been injured by a violation of the Constitution, but also

23  the authority to choose among available judicial remedies in order to vindicate constitutional

24  rights."  *Bush v. Lucas*, 462 U.S. 367, 374 (1983).

25       The Supreme Court in *Bivens v. Six Unknown Named Agents of Federal Bureau of*

26  *Narcotics* established that victims of a constitutional violation by a federal agent have a right

27  to recover damages against the official in federal court despite the absence of a statute

28  conferring such a right.  403 U.S. 388, 396.  In *Bivens*, the Court held that it is "well settled

1    that where legal rights have been invaded, and a federal statute provides for a general right to

2    sue for such invasion, federal courts may use any available remedy to make good the wrong

3    done." *Id.* (citing *Bell v. Hood*, 327 U.S. 678, 684 (1946)).  "*Bivens* from its inception has

4    been based ... on the deterrence of individual officers who commit unconstitutional acts."

5    *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71 (2001).  The secondary purpose of

6    extending a *Bivens* remedy to a person who has been subjected to the deprivation of

7    constitutionally-guaranteed rights by an individual officer is to "provide a cause of action for a

8    plaintiff who lack[s] any alternative remedy for harms caused by an individual officer's

9    unconstitutional conduct."  *Id.* at 70.

10          However, the Supreme Court has held that "any freestanding damages remedy for a

11   claimed constitutional violation has to represent a judgment about the best way to implement a

12   constitutional guarantee, it is not an automatic entitlement no matter what other means there

13   may be to vindicate a protected interest."  *Wilkie v. Robbins*, 127 S. Ct. 2588, 2597 (2007).

14   "[O]n the assumption that a constitutionally recognized interest is adversely affected by the

15   actions of federal employees, the decision whether to recognize a *Bivens* remedy may require

16   two steps."  *Id.* at 2698.  First, "there is the question whether any alternative, existing process

17   for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain

18   from providing a new and freestanding remedy in damages."  *Id.* (citing *Bush*, 462 U.S. at

19   378); *see also Carlson v. Green*, 446 U.S. 14, 18-19 (1980) (citing *Bivens*, 403 U.S. at 397;

20   *Davis v. Passman*, 442 U.S. 228, 245-47 (1979)) (holding that courts should refrain from

21   finding a cause of action where Congress has provided an alternative remedy which it

22   explicitly declared to be a substitute for recovery directly under the Constitution and viewed as

23   equally effective).

24          Second, even in "the absence of such a congressional directive, the federal courts must

25   make the kind of remedial determination that is appropriate for a common-law tribunal, paying

26   particular heed, however, to any special factors counseling hesitation before authorizing a new

27   kind of federal litigation."  *Bush*, 462 U.S. at 378; *see also Bivens*, 403 U.S. at 396 (holding

28   that the right to such a cause of action may be defeated where there are "special factors

United States District Court

For the Northern District of California

1    counseling hesitation in the absence of affirmative action by Congress.").  The Supreme

2    Court's "prior precedents reveal a reluctance to create *Bivens* remedies where a coordinate

3    branch of government is 'in a far better position that a court' to 'decide whether ... a remedy

4    should be provided,' and if a remedy is to be provided, to decide what form this remedy should

5    take." *Arar v. Ashcroft*, 532 F.3d 157, 178 (2d Cir. 2008) (citing *Bush*, 462 U.S. at 389, 380).

6                              **a.      There Is No Alternative Remedy.**

7            The first step in making the determination whether a *Bivens* remedy should be found is

8    to ascertain whether there is an alternative remedy available.  There is no claim that Congress

9    has provided an alternative remedy in this context and the Court has found none.  The Court

10   finds that Padilla has no other means of redress for the alleged injuries he sustained as a result

11   of his detention and interrogation.  For instance, the Military Commissions Act of 2006 is only

12   applicable to alien, or non-citizen, unlawful enemy combatants.  Pub. L. No. 109-366, § 3, 120

13   Stat. 2600, 2692 (codified at 10 U.S.C. § 948r(c) (2006)).  The Detainee Treatment Act of

14   2005, by its own terms, does not "affect the rights under the United States Constitution of any

15   person in the custody ... of the United States."  Pub. L. No. 109-163, § 1402, 119 Stat. 3136,

16   3475 codified at 10 U.S.C. § 801 note (2006)); *see also Rasul v. Myers*, 563 F.3d 527, 531

17   (D.C. Cir. 2009) (distinguishing constitutional protections for American citizens abroad and

18   aliens abroad).  There is no evidence in the record proffered by either party that either

19   coordinate branch of government or alternate remedial system addresses the alleged

20   constitutional deprivations suffered by Padilla.

21           Although the Court does not rely on the state of current events to support its decision, it

22   is aware that other branches of government and professional forums have not acted to provide

23   an alternative remedy for the constitutional violations alleged in this case.  *See, e.g.,* John

24   Schwartz, *Judge Weighs Dismissing Case Involving Torture Memorandums*, N.Y. Times, Mar.

25   7, 2009, at A13 (indicating that "President Obama has shown little interest in prosecuting

26   officials of the previous administration, and it is not clear whether there will be a government-

27   sponsored investigation of Bush administration policies."); Charlie Savage, *Any Indictment of

28   Interrogation Policy Makers Would Face Several Hurdles*, N.Y. Times, Apr. 23, 2009, at A16

1   ("The release of four Bush administration memorandums approving the use of waterboarding

2   and other harsh interrogation techniques has increased momentum for an investigation into the

3   architects of the program, but the prospect of indicting any of them remains unlikely."); Josh

4   Meyer and Julian E. Barnes, *Charges Unlikely for Interrogation Memos*, Los Angeles Times,

5   May 6, 2009, at A1 ("Justice Department investigators have concluded that three Bush

6   administration lawyers who wrote controversial interrogation memos should not face criminal

7   charges, but that conduct by two of them was problematic enough to merit possible state

8   disbarment or other disciplinary action"); Andrew C. McCarthy, *The Justice Department's*

9   *Torture Hypocrisy*, National Review, May 6, 2009 (indicating that the Office of Professional

10  Responsibility "will recommend that Attorney General Eric Holder refer former Bush

11  administration lawyers to their state bar disciplinary committees over purported lapses in the

12  legal analysis those lawyers drafted to justify harsh interrogation techniques that critics –

13  including President Obama himself – have labeled "torture"); Carrie Johnson, *Experts Say*

14  *Authors of Memos May Avoid Professional Sanctions*, The Washington Post, May 7, 2009 at

15  A3 ("Efforts to impose professional sanctions on Bush administration lawyers who drafted

16  memos supporting harsh interrogations of terrorism suspects face steep hurdles.")

17          Yoo suggests that Padilla had a remedy in his pursuit of a habeas petition and argues

18  that access to habeas relief is a bar to relief in this forum.  The complaint here is against the

19  alleged architect of the government policy regarding the designation and treatment of persons

20  labeled as enemy combatants.  Padilla's habeas petition, regardless of its scope, would have

21  been filed against the military commander in charge of the brig, not against the former Deputy

22  Attorney General who allegedly scripted legal cover for the military rank and file.  Therefore, a

23  habeas proceeding would not have provided an adequate alternative remedy.

24          In addition, Yoo contends that the actual habeas petition filed by Padilla provided not

25  only a forum for alternative relief, but the Fourth Circuit's findings preclude this Court from

26  examining the constitutional violations alleged here.  Collateral estoppel, or issue preclusion,

27  bars "relitigation of issues actually litigated and necessarily decided, after a full and fair

28  opportunity for litigation, in a prior proceeding."  *Shaw v. Hahn,* 56 F.3d 1128, 1131 (9th Cir.

1995).  Although the claim of collateral estoppel usually is alleged as an affirmative defense, a court may entertain the defense on a motion to dismiss for failure to state a claim when all relevant facts are shown by the court's own record.  *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992).  A federal court decision has preclusive effect where "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008) (citation omitted).  The burden is on the party seeking to rely upon issue preclusion to prove that each of the elements have been met.  *Id.* at 1050-51.  "The party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment."  *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (citing *Offshore Sportwear, Inc. v. Vuarnet International, B.V.*, 114 F.3d 848, 858 (9th Cir. 1997)).

The Court is unconvinced that Padilla's habeas petition creates an inference of estoppel.  First, the Fourth Circuit merely reversed a grant of summary judgment and remanded to the district court for a factual hearing.  *See Padilla v. Hanft*, 423 F.3d 386, 390 n.1 (4th Cir. 2005) ("*Padilla V*").  A reversal of a grant of summary judgment does not qualify as a final judgment for collateral estoppel purposes.  *Ornellas v. Oakley*, 618 F.2d 1351, 1356 (9th Cir. 1980) (holding that a "reversed or dismissed judgment cannot serve as the basis for a disposition on the ground of res judicata or collateral estoppel").  Second, from the history of Padilla's habeas petition, it is clear that the facts presented to this Court were not actually litigated in that proceeding.  Both parties agree that the habeas appeal was taken solely on the issue of the President's authority to detain Padilla and was decided on a stipulated set of facts.  Although Yoo argues that Padilla's stipulation was voluntary and strategic, there is no indication that Padilla had an opportunity to present facts and have the matters submitted before this Court addressed in his petition for habeas corpus.  Therefore, the elements of collateral estoppel are not met:  there has not been a full and fair opportunity to litigate the

United States District Court

For the Northern District of California

16

United States District Court

For the Northern District of California

1    issues in the previous action, there is no showing that the issues were actually litigated in the

2    habeas proceedings, and there is no final judgment from the previous action.  *See Kendall*, 518

3    F.3d at 1050.

### b.    No Special Factors Counsel Hesitation.

5            Because the Court has found there is no alternative forum for seeking a remedy, the

6    Court must examine step two of the *Bivens* analysis, which requires determining whether

7    special factors counsel hesitation and "weighing reasons for and against the creation of a new

8    cause of action, the way common law judges have always done." *Wilkie*, 127 S. Ct. at 2600

9    (citing *Bush*, 462 U.S. at 378.)  Yoo contends that special factors counsel hesitation precluding

10   the Court from finding a non-statutory damages remedy in this context.

11           Special factors counseling hesitation "relate not to the merits of the particular remedy,

12   but to the question of who should decide whether such a remedy should be provided."

13   *Sanchez-Espinosa v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (quoting *Bush*, 462 U.S. at

14   380).  According to this reasoning, "courts should avoid creating a new, nonstatutory remedy

15   when doing so would be 'plainly inconsistent' with authority constitutionally reserved for the

16   political branches."  *In re Iraq and Afghanistan Detainees Litigation*,  479 F. Supp. 2d 85, 103

17   (D.C. Cir. 2007) (quoting *Chappell v. Wallace*, 462 U.S. 296, 304 (1983)).  Moreover, "even

18   when authority is not constitutionally reserved for the political branches, there nevertheless

19   might be reasons that favor allowing Congress, rather than the judiciary, to prescribe the scope

20   of relief available to the plaintiffs." *Id.* (citing *Bush*, 462 U.S. at 380-390).  Where, for

21   example, the issue involves a "host of considerations that must be weighed and appraised, its

22   resolution is more appropriately for those who write laws, rather than for those who interpret

23   them." *Id.* at 103-04 (quoting *Sanchez-Espinoza*, 770 F.2d at 208); *see also Schweiker v.

24   Chilicky*, 487 U.S. 412, 421 (1988) (holding that Supreme Court "decisions have responded

25   cautiously to suggestions that *Bivens* remedies be extended into new contexts").  Additionally,

26   the idea that special factors may counsel hesitation in the absence of affirmative action by

27   Congress also applies to compel appropriate judicial deference where congressional inaction

28   has not been inadvertent.  *Id.*; *see also Chilicky*, 487 U.S. at 423.

There have been instances in which courts have found that special factors counsel hesitation and have declined to extend a *Bivens*-type remedy.  However, the Court finds these cases readily distinguishable.  In the cases in which courts have determined to refrain from finding a cause action under *Bivens*, the presence of an alternate scheme has provided both an avenue for redress for the claimant and has evidenced an intention by an alternate branch of government to occupy the field.

In *Bush v. Lucas,* an aerospace engineer sued the director of a federal space flight center to recover for defamation and retaliatory demotion, allegedly in violation of his First Amendment rights.  463 U.S. at 367.  The Supreme Court refused to recognize a *Bivens* remedy for a violation of First Amendment rights arising out of federal personnel decisions for fear that the claim might interfere with a statutory scheme regulating the federal workplace.  463 U.S. at 389-390.  The issue, as stated by the Court, was "whether an elaborate remedial scheme that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue."  *Id.* at 389.  The Court determined, based on the existence of the elaborate civil service scheme developed over a lengthy history, that

> Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service.  Not only has Congress developed considerable familiarity with balancing governmental efficiency and the rights of employees, but it also may inform itself through factfinding procedures such as hearings that are not available to the courts.

*Id.*  The Court declined to extend *Bivens* in this context because Congress had occupied the field by creating a complex system to redress civil service grievances.

Likewise, the Court determined not to extend a *Bivens*-type remedy in *Chappell v. Wallace*, where enlisted men brought a race discrimination action against superior officers.  462 U.S. at 302.  The Supreme Court held that in the peculiar and special relationship between a soldier and his superior officer, the "training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches."  *Id.* (emphasis in original) (citing *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).  In *Chappell*, the Court held that the unique disciplinary structure of the military

18

1    establishment and Congress' activity in the field constituted "special factors" which dictated

2    that military officers cannot seek a *Bivens*-type remedy against their superior officers.  *Id.*  The

3    Court reasoned that "no military organization can function without strict discipline and

4    regulation that would be unacceptable in a civilian setting" and further, that the "inescapable

5    demands of military discipline and obedience to orders cannot be taught on battlefields; the

6    habit of immediate compliance with military procedures and orders must be virtually reflex

7    with no time for debate or reflection."  *Id.*  Lastly, the Court found that the Constitution

8    specifically contemplated that the Legislative Branch was to have "plenary power over rights,

9    duties, and responsibilities in the framework of the military establishment, including

10   regulations, procedures and remedies related to military discipline; and Congress and the court

11   have acted in conformity with that view."  *Id.* at 301.  The particular relationship between a

12   military officer and his superior is relegated to the auspices of the coordinate branches of

13   government.

14        Again, in *United States v. Stanley*, the Supreme Court declined to find a *Bivens* remedy

15   in the military context and found that the holding in *Chappell* was not restricted only to those

16   cases arising out of disputes between an officer and his superior.  483 U.S. 669, 681-84 (1987).

17   In *Stanley*, the plaintiff, a military officer, alleged that he suffered a constitutional injury as a

18   result of secret administration of LSD to him as part of an Army experiment.  The *Stanley*

19   Court held that the "special factors counseling hesitation" were "the unique disciplinary

20   structure of the Military Establishment and Congress' activity in the field" and held that such

21   factors which counsel hesitation were not limited to the adjudication within an officer-

22   subordinate relationship.  Rather, "no *Bivens* remedy is available for injuries that 'arise out of

23   or are in the course of activity incident to service.'"  *Id.* at 684 (citing *Feres v. United States*,

24   340 U.S. 135, 146 (1950)).  The Court found that the special factor counseling hesitation is the

25   specific grant of power in the Constitution to the political branches of government over

26   military discipline and behavior.  *Stanley*, 483 U.S. at 682.  The majority stated that it

27   disagreed with the dissent's characterization that all matters within congressional power are

28   exempt from *Bivens* and, instead, held merely that the Constitutional provisions and the

United States District Court

For the Northern District of California

1    specific grant of power over the militia counsels hesitation in the courts' creation of damages

2    remedies in this field.  *Id.*

3            Similarly, in *Schweiker v. Chilicky*, relying on *Bush* and *Chappell*, the Supreme Court

4    declined to create a non-statutory damages remedy against government officials alleged to

5    have wrongfully terminated the plaintiff's Social Security benefits.  The Court held that there

6    was no *Bivens* remedy for the denial of Social Security benefits because a mandatory

7    procedure already existed to challenge adverse eligibility determinations.  487 U.S. at 425-29.

8    The Court found that Congress had created "elaborate administrative remedies" for dissatisfied

9    Social Security claimants to recover benefits, thereby occupying the field.  In keeping with its

10   prior precedent, the *Schweiker* Court refused to find a *Bivens* remedy where the design of the

11   government program already provided adequate remedial mechanisms for alleged

12   constitutional violations that may occur in the course of its administration.  The Court therefore

13   found these circumstances established "special factors counseling hesitation."  *Id.* at 423.

14           In *In re Iraq and Afghanistan Detainees Litigation*, the D.C. Circuit held that, where

15   foreign citizens detained abroad sued for deprivation of their constitutional rights, the federal

16   courts should not imply a cause of action under *Bivens*.  479 F. Supp. 2d at 103.  The court

17   held that a judicially-created remedy authorizing damages against military officials engaged in

18   active war "would invite enemies to use our own federal courts to obstruct the Armed Forces'

19   ability to act decisively and without hesitation in defense of our liberty and national interests."

20   *Id.* at 105.  The discovery process alone would risk "aiding our enemies by affording them a

21   mechanism to obtain what information they could about military affairs and disrupt command

22   missions by wresting officials from the battlefield to answer compelled deposition and other

23   discovery inquiries about the military's interrogation and detention policies, practices, and

24   procedures."  *Id.*  The court held that "'[e]xecutive power over enemy aliens, undelayed and

25   unhampered by litigation, has been deemed, throughout our history, essential to wartime

26   security.'"  *Id.* at 105-06 (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 774 (1950)).

27           In contrast, the circumstances presented in this case do not dictate restraint in the

28   extension of a *Bivens*-type remedy.  The circumstances presented to this Court do not concern

20

United States District Court

For the Northern District of California

1  federal personnel decisions, military discipline or justice, the denial of social security benefits,

2  or the detention and interrogation of aliens abroad.  In the cases cited above in which a

3  constitutional injury has been alleged, the claimants have confronted a system of recourse,

4  created by an alternative branch of government, which provided an effective alternative

5  remedial structure for adjudication of their constitutional entitlements.  These are the

6  circumstances that have been found to counsel hesitation by the federal courts.  In contrast to

7  the holdings in *Stanley* and *Chappell*, here, there is no danger of intrusion upon the unique

8  disciplinary structure of the military establishment.  In those instances, servicemen were

9  provided with a "comprehensive internal system of justice to regulate military life," one that

10  "not only permits aggrieved military personnel to raise constitutional challenges in

11  administrative proceedings, it authorizes recovery of significant consequential damages."

12  *Schweiker*, 487 U.S. at 436 (citing *Chappell*, 462 U.S. at 302-03).  The holding in *In re Iraq*

13  demonstrates that the courts are not willing to extend a *Bivens* remedy to a non-citizen detained

14  abroad who engages in acts of war against this country.  479 F. Supp. 2d at 103-05.  The

15  holding in *Schweiker*, a case decided not in the military context but in the Social Security

16  benefits administrative process, demonstrates that where Congress has established an alternate

17  system of recourse, courts are not to infer a cause of action under *Bivens* for alleged

18  constitutional deprivations.  487 U.S. at 525-29.

19      Here, the Court does not find that special factors counsel hesitation where there is no

20  authority evidencing a remedial scheme for designation or treatment of an American citizen

21  residing in America as an enemy combatant.  Indeed, Yoo does not proffer an alternative

22  remedy or demonstrate that an alternative branch of government has occupied the field.

23  Therefore, the Court finds that Padilla can seek redress from his alleged constitutional injury in

24  this forum.

### c.    Substantive Areas of Law Do Not Counsel Hesitation.

25

26      Yoo also advocates that this Court should abstain from adjudication because the Court

27  should leave review of his legal memoranda and the conduct which followed to the coordinate

28  branches of government based on substantive areas of law raised by the memoranda.  The

United States District Court

For the Northern District of California

1   Court notes the irony of this position:  essentially, the allegations of the complaint are that Yoo

2   drafted legal cover to shield review of the conduct of federal officials who allegedly deprived

3   Padilla of his constitutional rights.  Now, Yoo argues that the very drafting itself should be

4   shielded from judicial review.  Padilla's allegations here are that the creation of such legal

5   cover was itself an unconstitutional exercise of power.  Thus, the question posed by the present

6   motion is whether an alternative branch of government, under the circumstances, should be

7   tasked with prescribing the scope of relief available to Padilla.

8          Yoo argues that special factors counsel hesitation due to the specific substantive areas

9   of law involved in this matter.  First, Yoo contends that the courts should not review the

10  designation of Padilla as an enemy combatant because Congress passed the Authorization for

11  Use of Military Force Joint Resolution, authorizing the President to make such a designation,

12  and thereby relegated the issue of designation specifically to the legislative and the executive

13  branches of government.  Second, Yoo contends that the Court should show the proper

14  deference to executive discretion in times of war.  Next, Yoo contends that the Court should

15  abstain from reviewing the alleged constitutional violations presented in this matter because

16  the claims necessarily would uncover government secrets, thereby threatening national

17  security.  Lastly, Yoo argues the courts should deny review of this matter because the

18  allegations involve issues relating to foreign affairs and foreign relations, matters specifically

19  designated to control by the coordinate branches of government.

20                           **i.     Effect of Congressional Joint Resolution.**

21         Just days after the terrorist attacks of September 11, 2001 in which the al Qaeda

22  terrorist network used hijacked commercial airliners to attack prominent targets in the United

23  States, Congress passed the Authorization for Use of Military Force Joint Resolution

24  ("AUMF").  The resolution authorized the President to

25         use all necessary and appropriate force against those nations, organizations, or
           persons he determines planned, authorized, committed, or aided the terrorist
26         attacks that occurred on September 11, 2001, or harbored such organizations or
           persons, in order to prevent any future acts of international terrorism against the
27         United States by such nations, organizations or persons.

28  Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001).

22

United States District Court

For the Northern District of California

1    Yoo advances the argument that Congress, in passing the AUMF, authorized the

2    President to use all necessary and appropriate force against any person he has determined aided

3    in the terrorist attacks in order to prevent any future acts of terrorism.  Yoo contends that

4    because Congress has specifically spoken and delegated discretion to the Executive, the

5    Judiciary should hesitate to interfere in the execution of the law.  However, the Court finds that

6    although Congress has granted discretion to the President to formulate the response to

7    terrorism against the United States, it has not spoken specifically or definitively regarding the

8    constitutional standards for the designation or treatment of enemy combatants.  In *Hamdi v.*

9    *Rumsfeld*, the Supreme Court found that the AUMF authorized detention in the narrow

10   circumstances presented by that case.  542 U.S at 531.  However, the Court did not refrain

11   from review in that case and rather held that all three branches of government have a role when

12   individual liberties are at stake.  *Id.* at 535-36.  There is no indication in *Hamdi* that the

13   judiciary is precluded from review of executive decisions made pursuant to the AUMF.  The

14   joint resolution does not create a remedial scheme, similar to the separate regime of military

15   justice, or the elaborate remedial schemes set out, for instance, by the Social Security Act or

16   the Civil Service Reform Act.  *See, e.g., Schweiker*, 487 U.S. at 436; *Bush*, 463 U.S. at 389.

17   The AUMF also does not set out a scheme to address potential constitutional violations

18   committed under its auspices.  *Cf. Ex Parte Quirin*, 317 U.S. 1, 28 (1942) (upholding military

19   jurisdiction based upon the express congressional authorization of the use of military tribunals

20   to try enemy belligerents who violated the law of war).  Therefore, the Court finds that the

21   Congressional determination to vest authority and discretion with the President in the

22   designation of enemy combatants under the AUMF does not constitute a special factor barring

23   judicial review of such designations.

24              **ii.     Discretion to Coordinate Branches of Government in Times**
                          **of War.**
25

26       In connection with his argument that the AUMF precludes the finding of a *Bivens*

27   remedy in this matter, Yoo contends that the Constitution explicitly delegates authority over

28   decisions related to the conduct of war to the Legislative and Executive branches of

United States District Court

For the Northern District of California

1    government.  *See* U.S. Const. Art. I, § 8 (Congress has power to provide for the common

2    defense, to organize the militia, and to declare war); U.S. Const. Art. II, § 2 (President shall be

3    commander in chief of the armed forces).  For this reason, Yoo argues, the Supreme Court

4    repeatedly has recognized that courts should refrain from interfering in the core functions of

5    the political branches, especially during wartime.  *See Hamdi*, 542 U.S. at 535 (plurality

6    opinion) ("We accord the greatest respect and consideration to the judgments of military

7    authorities in matters relating to the actual prosecution of a war, and recognize that the scope

8    of that discretion necessarily is wide.")  Undoubtedly, the "Constitution recognizes that core

9    strategic matters of warmaking belong in the hands of those who are best positioned and most

10   politically accountable for making them."  *Id.* at 531 (citing *Department of Navy v. Egan*, 484

11   U.S. 518, 530 (1988) (noting the reluctance of the courts "to intrude upon the authority of the

12   Executive in military and national security affairs") and *Youngstown Sheet & Tube Co. v.*

13   *Sawyer*, 343 U.S. 579, 587 (1952) (acknowledging "broad powers in military commanders

14   engaged in day-to-day fighting in a theater of war")).  Yoo argues that the decision to

15   designate, detain, and interrogate Padilla as an enemy combatant was a military decision made

16   pursuant to the AUMF's explicit grant of authority to the President from Congress.  On this

17   basis, Yoo argues, it follows that "courts should take great care when asked to create a cause of

18   action that would intrude upon the judgment and discretion of military authorities by targeting

19   the government attorneys to whom those authorities go for candid legal analyses or advice in

20   matters related to the prosecution of war."  (Motion at 14.)

21        Padilla was designated and detained as an enemy combatant pursuant to the authority

22   vested in the President by the AUMF.  Indeed, there is "no bar to this Nation's holding one of

23   its own citizens as an enemy combatant."  *Hamdi*, 542 U.S. at 519.  Although the AUMF does

24   not use specific language of detention, the *Hamdi* Court found that "detention to prevent a

25   combatant's return to the battlefield is a fundamental incident of war."  *Id.*  However, there is

26   no allegation in the complaint, which the Court must accept as true at this procedural stage,

27   that Padilla was detained in order to prevent his return to the battlefield.  There is no allegation

28   that Padilla was engaged in armed conflict with the United States at the time of his capture or

United States District Court

For the Northern District of California

1    that he was detained as "a simple war measure" to prevent him from actively serving the

2    enemy. *See id*. at 518 (citations omitted). There has been no adjudication as to the legality of

3    his designation, and Padilla continues to maintain that he was inappropriately designated an

4    enemy combatant and rejects the designation as failing to comport with due process. (FAC at ¶

5    43.)

6            Because a "state of war is not a blank check for the President when it comes to the

7    rights of the Nation's citizens," "[i]t does not infringe on the core role of the military for the

8    courts to exercise their own time-honored and constitutionally mandated roles of reviewing

9    and resolving claims like those presented here." *Hamdi*, 542 U.S. at 535. Courts should defer

10   to the coordinate branches of government with respect to the "core strategic matters of

11   warmaking." *Id.* However, here, Padilla's allegations concern the possible constitutional

12   trespass on a detained individual citizen's liberties where the detention was not a necessary

13   removal from the battlefield. The Court is not persuaded that such conduct constitutes a core

14   strategic warmaking power. *See id.* at 535. As the Court in *Hamdi* reaffirmed, "[w]hatever

15   power the United States Constitution envisions for the Executive in its exchanges with other

16   nations or with enemy organizations in times of conflict, it most assuredly envisions a role for

17   all three branches when individual liberties are at stake." *Id*. at 537. The war power "is a

18   power to wage war successfully, and thus it permits the harnessing of the entire energies of the

19   people in a supreme cooperative effort to preserve the nation. But even the war power does

20   not remove constitutional limitations safeguarding essential liberties." *Home Building & Loan

21   Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934).

22                          **iii.    Effect on National Security.**

23           Next, Yoo contends that failure to restrict judicial review of candid advice to the

24   Executive regarding national security issues would jeopardize national security. Essentially,

25   by his argument, Yoo contends that national security should be considered a "special factor

26   counseling hesitation" in the *Bivens* context because the discovery sought in this matter would

27   likely uncover material information potentially damaging to national security. The Court

28   disagrees. First, during the course of this case, all of the documents drafted by Yoo mentioned

in the complaint have become public record. Second, although it "exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government, ... [l]itigation [may be] be necessary to ensure that officials comply with the law." *Iqbal*, 129 S. Ct. at 1953; *see also id*. at 1961 (finding that while it is important to prevent unwarranted litigation from interfering with the proper functioning of the government, "the law provides other legal weapons designed to prevent unwarranted interference" such as beginning discovery with lower level government officials before determining whether a case can proceed to allow discovery related to higher level government officials) (Breyer, J. dissenting). Third, although impossible to assert on behalf of a non-governmental party, Yoo's argument amounts to an assertion of the state secrets privilege. Should a privilege surface on behalf of the government, the Court can and will address those concerns in due time in the management of this case.[1]

---

[1] Yoo argues that the judicial review of such claims would themselves subject the nation to breaches of national security and, even if the assertion of state secret privilege would fail, the "bar to litigation set by the special factors doctrine [] is much lower than the bar set by the state-secrets privilege." (Reply at 6.) The Court finds the parallel to the state secrets privilege to be unpersuasive, especially in light of the Ninth Circuit's recent reversal of this district's dismissal of a complaint on the basis of the state secret privilege.

In *Jeppesen*, plaintiffs, who were foreign nationals, alleged that the United States Central Intelligence Agency ("CIA"), working in concert with other government agencies and officials of foreign governments, operated an "extraordinary rendition program" to gather intelligence by apprehending foreign nationals suspected of involvement in terrorist activities and transferring them in secret to foreign countries for detention and interrogation by United States or foreign officials. *Mohamed v. Jeppesen Dataplan, Inc.*, 563 F.3d 992, 997 (9th Cir. 2009). The United States intervened and asserted that state secrets formed the subject matter of the lawsuit and argued that any suit that contains allegations, "the truth or falsity of which has been classified as secret by a government official," must be dismissed. *Id*. at 1003. The district court agreed and dismissed the case exclusively because it "involve[d] 'allegations' about [secret] conduct by the CIA." *Id*.

On appeal, the Ninth Circuit rejected this argument and reversed and remanded on the basis that the "sweeping characterization of the 'very subject matter' bar has no logical limit – it would apply equally to suits by U.S. citizens, not just foreign nationals; and to secret conduct committed on U.S. soil, not just abroad. According to the government's theory, the Judiciary should effectively cordon off all secret government actions from judicial scrutiny, immunizing the CIA and its partners from the demands and limits of the law." *Id*. The court rejected the dismissal of the action on the basis that it involved subject matter that may qualify as state secrets and the litigation may, therefore, impinge on national security. The judiciary, as always, is tasked with the difficult task of balancing the need for information in a judicial proceeding and the coordinate branches of government's prerogative in guarding state secrets, which may ultimately affect national security. *See id*. Courts must balance in each instance, recognizing that "the Executive's national security prerogatives are not the only weighty constitutional values at stake: while '[s]ecurity depends

26

United States District Court

For the Northern District of California

iv.      **Effect on Foreign Affairs and Foreign Relations.**

Lastly, Yoo argues that concerns about foreign relations should bar the creation of a *Bivens* remedy under the present circumstances, citing *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985) and *Arar v. Ashcroft*, 532 F.3d at 177-78.  The plaintiffs in *Sanchez-Espinoza* were Nicaraguans who alleged constitutional claims against federal officials for claims arising out of the United States' actions in Nicaragua in supporting forces bearing arms against the Nicaraguan government.  770 F.2d at 204.  "Just as the special needs of the armed forces require the court to leave to Congress the creation of damage remedies against military officers for allegedly unconstitutional treatment of soldiers, *see Chappell v. Wallace, supra*, so also the special needs of foreign affairs must stay our hand in the creation of damages remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad."  *Id.* at 208-09.  The court determined that "as a general matter the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist."  *Id.* at 209; *see also Rasul v. Myers*, 563 F.3d at 532 n.5 (finding that the special needs of foreign affairs must stay the court's hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad.)

Similarly, the plaintiff in *Arar* was an alien who was allegedly mistreated abroad.  Arar was a dual Syrian-Canadian citizen, alleged to be affiliated with al Qaeda, who claimed that he

upon a sophisticated intelligence apparatus,' it 'subsists, too, in fidelity to freedom's first principles [including] freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers."  *Id.* at 1003-04 (quoting *Boumediene v. Bush*, 128 S. Ct. 2229, 2277 (2008)).

The separation of powers undergirding Yoo's argument that the judiciary should refrain from review where issues of national security are present, takes on an "especially important role in the context of secret Executive conduct."  *Id.*  Yoo contends that discovery to uncover the secret nature of his advice to the President should counsel hesitation by this Court when contemplating whether to grant review.  The Ninth Circuit's pronouncement in *Jeppesen,* however, counsels against dismissal of this action merely based upon the assertion that the underlying evidence potentially to be discovered may affect national security.  The Court is, therefore, unpersuaded by Yoo's contention that the secret nature of his advice, because it may affect national security, constitutes a "special factor counseling hesitation" precluding judicial review.

1    was detained and removed to Syria so that he could be interrogated under torture by Syrian

2    authorities.  *Arar*, 532 U.S. at 181.  The Second Circuit found that the core of the suit was

3    whether Arar's removal to Syria was appropriate in light of the United States diplomatic and

4    national security concerns.  The court determined that, in order for Arar's claims to proceed,

5    "he must probe deeply into the inner workings of the national security apparatus of at least

6    three foreign countries, as well as that of the United States, in order to determine the basis for

7    his alleged designation as an Al Qaeda affiliate and his removal to Syria via Jordan despite his

8    request to be removed to Canada."  *Id.*  The court found that "litigation of Arar's claims would

9    necessarily require an exploration of the intelligence relied upon by the officials charged with

10   implementing our foreign and national security policies, the confidential communications

11   between the United States and foreign powers, and other classified or confidential aspects of

12   those policies, perhaps, whether or not such policies exist.  There can be no doubt that

13   litigation of this sort would interfere with the management of our country's relations with

14   foreign powers and affect our government's ability to ensure national security."  *Id.* at 182.[2]

15       These cases do not support the position Yoo advances.  By contrast, this case involves

16   claims about American officials' treatment of an American citizen within its own boundaries.

17   The treatment of an American citizen on American soil does not raise the same specter of

18   issues relating to foreign relations.  The Court is not persuaded by the decisions not to find a

19   *Bivens* remedy in instances in which foreign nationals are allegedly subjected to

20   unconstitutional treatment abroad.  The courts' concerns about the creation of remedies for

21   foreign nationals and the courts' intrusion into the affairs of foreign governments finds no

22   application in the particular circumstances raised by the case of allegations of unconstitutional

23   treatment of an American citizen on American soil.  *See, e.g., Rasul v. Myers*, 563 F.3d at 531.

24

25   _____

26       [2]  The panel of the Second Circuit in *Arar* was divided and approximately six weeks
     after the panel issued its decision, acting *sua sponte*, the full circuit elected to rehear the case
27   *en banc*.  Notably, the court did not say that the panel opinion had been vacated or withdrawn
     nor did it indicate which of the many issues raised in the decision had prompted the court's
28   rehearing decision.  Accordingly, the precedential status of the *Arar* decision is ambiguous.
     *See El Badrawi v. Department of Homeland Security*, 579 F. Supp. 2d 249, 263 n.15 (D.
     Conn. 2008).

Therefore, the Court finds that Padilla has stated a claim upon which relief can be granted under *Bivens*.

## C.   Qualified Immunity.

### 1.   Legal Standard for a Finding of Qualified Immunity.

Yoo also argues that he is entitled to qualified immunity on all claims.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate any clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The privilege is an immunity from suit rather than a mere defense to liability.  *Id.*  Accordingly, courts have repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*).  Because qualified immunity is an affirmative defense, the burden of proof initially lies with the official asserting the defense. *Harlow*, 457 U.S. at 812.

The Ninth Circuit has recognized that "a motion to dismiss on qualified immunity grounds puts the court in the difficult position of deciding far-reaching constitutional questions on a non-existent factual record." *Hydrick v. Hunter*, 500 F.3d 978, 985 (9th Cir. 2007) (citing *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004)).  Courts therefore must be "cautious not to eviscerate the notice pleading standard in suits where qualified immunity is at issue." *Id.* at 985-86, 986 n.5 (holding that the aim of a motion to dismiss is not to evaluate the veracity of the plaintiff's allegations or to speculate as to the defendant's justifications for their actions).

United States District Court

For the Northern District of California

In *Saucier v. Katz*, the Supreme Court stated that a court called upon to rule on the issue of qualified immunity must ask the following threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. 194, 201 (2001) (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* However, if the Court finds that the facts would show the violation of a constitutional right, the next inquiry is to determine "whether the right was clearly established." *Id.* Thus, a court "must determine whether the law governing the official's conduct was clearly established at the time the challenged conduct occurred." *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir. 1994) (citing *Hallstrom v. Garden City*, 991 F.2d 1473, 1482 (9th Cir. 1993)); *see also Blueford v. Prunty*, 108 F.3d 251, 255 (9th Cir. 1997) (holding that the issue whether an aspect of law was clearly established must be determined as of the time of the alleged conduct at issue). The Supreme Court in *Pearson v. Callahan* determined that the specific order of the qualified immunity inquiry is not required and held that "judges of the district court and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 129 S. Ct. at 818.

A constitutional right is clearly established for purposes of qualified immunity if "[t]he contours of the right [are] sufficiently clear that [at the time the alleged unlawful action is taken] a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ...; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640. However, government officials are not "charged with predicting the future course of constitutional law." *Ostlund v. Bobb*, 849 F.2d 365, 371 (9th Cir. 1988).

United States District Court

For the Northern District of California

1    A court should then address the question "whether, under that clearly established law, a

2    reasonable [official] could have believed the conduct was lawful." *Id.* This inquiry must be

3    undertaken in the light of the specific context of the case. *Saucier*, 533 U.S. at 194. In

4    deciding whether the plaintiff's rights were clearly established, "[t]he proper inquiry focuses

5    on whether 'it would be clear to a reasonable officer that his conduct was unlawful in the

6    situation he confronted' ... or whether the state of the law [at the time] gave 'fair warning' to

7    the officials that their conduct was unconstitutional." *Clement v. Gomez*, 298 F.3d 898, 906

8    (9th Cir. 2002) (quoting *Saucier*, 533 U.S. at 202). Although the inquiry is undertaken in the

9    specific context of the case, the fact that no case has found a constitutional violation under the

10   exact facts alleged does not imply that the law is not clearly established. *Phillips v. Hust*, 477

11   F.3d 1070, 1079-1080 (9th Cir. 2007). When there is no specific, binding precedent on the

12   exact question, the Ninth Circuit looks "to all available decisional law, including the law of

13   other circuits and district courts." *Inouye v. Kemna*, 504 F.3d 705, 714 (9th Cir. 2007).

14       **2.      Padilla States Claims for Violations of Constitutional Rights.**

15           **a.      Causation.**

16       Yoo argues that Padilla fails to set forth a constitutional violation on the basis that there

17   is nothing in the complaint that establishes that Yoo personally participated in or caused any

18   violation of Padilla's constitutional rights. Yoo argues that the personal participation inquiry

19   "must be individualized and focus on the duties and responsibilities of each individual

20   defendant whose acts or omissions are alleged to have caused a constitutional deprivation."

21   *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Yoo contends that the complaint fails

22   to make such allegations because: (1) the legal memoranda drafted by Yoo were merely one

23   step in a complex mechanism employed by the President in his designation and subsequent

24   treatment of Padilla as an enemy combatant; (2) the memoranda explicitly indicate that Yoo

25   was not expressing any view on the policy decisions that the President might make with

26   respect to the legal issues analyzed in the opinions; (3) the legal opinions, with the exception

27   of one specifically referring to Padilla, apply to the detention and interrogation of persons

28   captured or detained by the U.S. Armed Forces outside of the United States; and (4) with

United States District Court

For the Northern District of California

1    respect to the treatment while detained, Yoo argues that Padilla fails to point to any facts that

2    would affirmatively link Yoo to the constitutional injuries Padilla allegedly suffered.

3           At the procedural stage of a motion to dismiss, the Court must take as true all

4    allegations made in the complaint.  Like all other facts on a motion to dismiss, facts alleging

5    causation are presumed to be true.  *See Twombly*, 550 U.S. at 556.  "A person deprives another

6    of a constitutional right where that person 'does an affirmative act, participates in another's

7    affirmative acts, or omits to perform an act which [that person] is legally required to do that

8    causes the deprivation of which the complaint is made.'"  *Hydrick*, 500 F.3d at 988 (quoting

9    *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).  Indeed the "requisite causal connection

10   can be established not only by some kind of direct personal participation in the deprivation, but

11   also by setting in motion a series of acts by others which the actor knows or reasonably should

12   know would cause others to inflict the constitutional injury."  *Johnson*, 588 F.2d at 743-44; *see*

13   *also Kwai*, 373 F.3d at 966 (same).

14          Like any other government official, government lawyers are responsible for the

15   foreseeable consequences of their conduct.  For example, in *Lippoldt v. Cole*, the court found

16   an assistant city attorney liable where she researched the law and drafted a letter denying a

17   protest group's application for a parade permit based on the content of their speech.  468 F.3d

18   1204, 1210 (10th Cir. 2006).  Although senior city officials revised the letter, and others

19   approved and eventually signed the denial of the permit, the court rejected the theory that

20   intervening factors cut off causation and instead found that the drafting of a legal opinion

21   justifying unconstitutional conduct was "a substantial factor" in the decision to deny the parade

22   permits and violated plaintiffs' First Amendment rights.  *Id.* at 1220.  Similarly, in

23   *Anoushiravani v. Fishel*, the court denied a motion to dismiss against two Department of

24   Homeland Security attorneys who advised customs agents that they could constitutionally

25   refuse to release seized property.  2004 WL 1630240, *5 (D. Or. July 19, 2004).  The district

26   court held that the attorneys could be liable for their personal participation in the deprivation of

27   constitutional rights because the seizures were a foreseeable result of their legal advice.  *Id.*;

28   *see also United States Securities and Exchange Commission v. Fehn*, 97 F.3d 1276, 1281-82,

**United States District Court**
For the Northern District of California

1294 (9th Cir. 1996) (holding that a lawyer may be held liable for substantially assisting in the
violation of the law by issuing advice in violation of the law).

Here, Padilla alleges that in Yoo's highly-influential position, he participated directly
in developing policy on the war on terror. (FAC at ¶¶ 15, 19.) The complaint specifies that in
Yoo's role as an advisor in the President's War Council, he drafted legal opinions which lay
out the legal groundwork for assessing the designation of individual enemy combatants and
legitimized the unconstitutional treatment of those individuals once detained. According to the
complaint, Yoo admits that he "personally reviewed the material on Padilla to determine
whether he could qualify, legally, as an enemy combatant, and issued an opinion to that
effect." (*Id*. at ¶ 38, citing Yoo's book "War By Other Means.") According to the complaint,
Attorney General John Ashcroft relied on Yoo's opinion in recommending to the President that
Padilla be taken into military custody. (*Id*. at ¶ 39.) Again, based on Yoo's legal opinion and
Ashcroft's recommendation, the complaint alleges that President Bush issued an order dated
June 9, 2002 declaring Padilla an enemy combatant and directing Rumsfeld to take Padilla into
military custody, and the President stated that these actions were "consistent with U.S. law and
the laws of war." (*Id*. at ¶ 40.) Yoo allegedly has represented that "he had security clearance
to, and in fact did, 'read the intelligence reports' on Mr. Padilla before purporting to provide
legal authority for Mr. Padilla's designation and detention." (*Id*. at ¶ 42.) Yoo also advised
executive officials that military detention of an American citizen seized on American soil was
lawful because, he claimed, the Fourth Amendment had no application to domestic military
operations in this context. (*Id*. at ¶¶ 19(a), 21.) Following a meeting of the War Council in
July 2002 in which Yoo and fellow Council members "'discussed in great detail how to legally
justify' 'pressure techniques proposed by the CIA,' including waterboarding, mock burial, and
open-handed slapping of suspects, [Yoo] wrote his August 1, 2002 memo, which stated that
acts of interrogation would not constitute torture unless they caused pain 'equivalent in
intensity to the pain accompanying serious physical injury, such as organ failure, impairment
of bodily function, or even death.'" (*Id*. at ¶ 28.) Padilla alleges, on information and belief,
that Yoo

33

United States District Court

For the Northern District of California

1
2
3
4
5

intended or was deliberately indifferent to the fact that Mr. Padilla would be subjected to the illegal policies [Yoo] set in motion and to the substantial risk that Mr. Padilla would suffer harm as a result. [Yoo] personally recommended Mr. Padilla's unlawful military detention as a suspected enemy combatant and then wrote opinions to justify the use of unlawful interrogation methods against persons suspected of being enemy combatants. It was foreseeable that the illegal interrogation policies would be applied to Mr. Padilla, who was under the effective control of the U.S. Southern Command – the same military authority that controlled Guantanamo – and was one of only two suspected enemy combatants held at the Brig.

6

(*Id.* at ¶ 53.)

7
8
9
10
11
12
13
14

In light of these allegations, the Court finds Padilla has alleged sufficient facts to satisfy the requirement that Yoo set in motion a series of events that resulted in the deprivation of Padilla's constitutional rights. *Compare Iqbal*, 129 S. Ct. at 1951 (Court rejected that "bare assertions" in a complaint that high-ranking government officials knew about unconstitutional treatment and therefore caused it are not entitled to "the assumption of truth"). Here, in contrast, Padilla alleges with specificity that Yoo was involved in the decision to detain him and created a legal construct designed to justify the use of interrogation methods that Padilla alleges were unlawful.[3]

15

### b.    Substantive Constitutional Rights.

16
17
18
19
20
21
22
23

In addition to his contention that Padilla has failed to plead Yoo's personal participation in the alleged constitutional wrongs, Yoo argues that Padilla has failed to state a cause of action for three of the substantive constitutional claims:  (1) the right of access to courts because there was no court claim Padilla was unable to bring due to Yoo's conduct; (2) any rights under the Eighth Amendment because the Amendment does not apply unless there is a criminal conviction; and (3) the right against compelled self-incrimination under the Fifth Amendment because Padilla does not allege that he made any incriminating statements that were used against him in a criminal case.

24
25
26
27
28

---

[3]  Yoo also contends that in resolving Padilla's habeas petition, the Fourth Circuit's rejection of the petition necessarily included a determination that eight of the constitutional rights Padilla claims were violated in this case were not infracted.  (*See* Motion at 35-39.) Again, this Court finds the argument that these issues are barred by virtue of collateral estoppel to be unpersuasive.  *See supra* at B(1)(a).

### i.     Right of Access to the Court.

Prisoners have a constitutional right of access to the courts. *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977). A prisoner's right of access to the courts includes contact visitation with counsel. *Ching v. Lewis*, 895 F.2d 608, 609-610 (9th Cir. 1990); *see also Procunier v. Martinez*, 416 U.S. 396, 419-420 (1974), *rev'd in part on other grounds, Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (holding that the opportunity to communicate privately with own's attorney is an important part of meaningful access to courts). The right of access to the courts is violated not only when a plaintiff is prevented from bringing a claim, but when he is "hindered [in] his efforts to pursue a legal claim" or when a "nonfrivolous legal claim ha[s] been frustrated or [is] being impeded." *Lewis*, 518 U.S. at 351, 353. Padilla alleges he was detained incommunicado for nearly two years with no access to counsel and thereafter with very restricted and closely-monitored access. (FAC at ¶¶ 56, 59, 61.) Padilla claims that he was hindered from bringing his claims as a result of the conditions of his detention. *See Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002) (holding that an access claim may turn on a litigating opportunity yet to be gained or already lost, and is recognized in order to provide some effective vindication for a separate and distinct right to seek judicial relief for a wrong). Even an enemy combatant is entitled to access to counsel. *Hamdi*, 542 U.S. at 539. The allegation that Padilla was denied any access to counsel for nearly two years is sufficient to state a claim for violation of his right to access to courts.

### ii.     Eighth Amended Prohibition Against Cruel and Unusual Punishment.

Yoo contends that because Padilla was not convicted of a criminal offense at the time of his military detention, the Eighth Amendment prohibition against cruel and unusual punishment does not apply to him. However, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). "[C]onstitutional questions regarding the conditions and circumstances of [the] confinement [of detained persons not convicted of a crime] are properly addressed under the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment's

United States District Court
For the Northern District of California

1  protection against cruel and unusual punishment." *City of Revere v. Massachusetts General*
2  *Hospital*, 463 U.S. 239, 244 (1983).  However, "[i]n light of the Supreme Court's observation
3  that the due process rights of pretrial detainees are 'at least as great as the Eighth Amendment
4  protections available to a convicted prisoner,' we have recognized that, even though the
5  pretrial detainees' rights arise under the Due Process Clause, the guarantees of the Eighth
6  Amendment provide a *minimum standard of care* for determining their rights." *Oregon*
7  *Advocacy Center v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003) (internal citations omitted)
8  (emphasis in original).

9      Padilla alleges that while detained, he suffered prolonged shackling in painful
10  positions, relentless periods of illumination and intentional interference with sleep by means of
11  loud noises at all hours.  (FAC at ¶ 55.)  Padilla further alleges that he was subjected to
12  extreme psychological stress and impermissibly denied medical care.  (*Id.* at ¶¶ 71, 72.)
13  Lastly, Padilla asserts that these restrictions and conditions were not justified by a legitimate
14  penological interest, but rather that they were intended to intensify the coerciveness of the
15  interrogations.  (*Id.* at ¶¶ 41, 45, 55, 72.)  Padilla alleges that Yoo bears responsibility for the
16  conditions of his confinement due to his drafting opinions that purported to create legal
17  legitimacy for such treatment.  Therefore, although Padilla's claim must be analyzed under the
18  Due Process provision of the Fourteenth Amendment and not pursuant to the Eighth
19  Amendment, the Fifth Amendment sets the bar below which the treatment of detainees should
20  not fall.

21          **iii.    Fifth Amendment Right Against Self-Incrimination.**

22      Lastly, Defendant argues that Padilla cannot state a claim for violation of his Fifth
23  Amendment right against compelled self-incrimination because Padilla does not allege that he
24  made any incriminating statements.  The Fifth Amendment guarantees protection of the right
25  against self incrimination and "applies only when the accused is compelled to make a
26  Testimonial Communication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408
27  (1976).  "The privilege against self-incrimination guaranteed by the Fifth Amendment is a
28  fundamental trial right of criminal defendants.  Although conduct by law enforcement officials

prior to trial may ultimately impair that right, a constitutional violation occurs only at trial." *United States v. Verdugo-Urquidez*, 494 U.S. 259 264 (1990).  The mere use of compulsive questioning, without more, does not violate the text of the Self-Incrimination Clause.  *Chavez v. Martinez*, 538 U.S. 760, 767 (2003).  Because there is no allegation in the complaint before this Court that Padilla was ever made to be a witness against himself or that his statements were admitted as testimony against him in his criminal case, he has not stated a claim for violation of the Self-Incrimination Clause of the Fifth Amendment.  Accordingly, the sections of the First Amended Complaint making a claim for violation of the Fifth Amendment right against compelled self-incrimination are dismissed with leave to amend.  (*See* FAC at ¶¶ 5, 82(d).)

### 3. Basic Constitutional Protections Alleged Are Clearly Established.

Once the Court finds that the facts would show the violation of a constitutional right, the next inquiry is to determine "whether the right was clearly established."  *Saucier*, 533 U.S. at 202.  Yoo argues that because no federal court has afforded an enemy combatant the kind of constitutional protections Padilla seeks in this case, there was no violation of Padilla's clearly established constitutional rights.  The Court finds this argument unpersuasive.

First, the basic facts alleged in the complaint clearly violate the rights afforded to citizens held in the prison context.  The complaint alleges that military agents entered a civilian jail, seized a citizen from the civilian justice system, transported him to a military brig, detained him there indefinitely without criminal charge or conviction, deprived him of contact with anyone, including attorneys or family, removed the basic ability to practice his religion, and subjected him to a program of extreme interrogations, sensory deprivation and punishment over a period of three years and eight months.  The specific designation as an enemy combatant does not automatically eviscerate all of the constitutional protections afforded to a citizen of the United States.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Phillips*, 477 F.3d at 1079-1080 (holding that the fact that no case has found a constitutional violation under the exact facts alleged does not imply that the law is not clearly established);

United States District Court

For the Northern District of California

1    *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) (holding that a right can be clearly

2    established on the basis of common sense in the absence of precedent directly on point).

3          Second, Yoo argues that the status of enemy combatant is not itself novel, but that

4    courts have never attributed the level of constitutional rights sought in this action to this unique

5    type of detainee.  The Court finds this argument similarly unpersuasive.  The fact that a unique

6    type or designation of a detainee has come into being does not obliterate the clearly established

7    minimum protections for those held in detention.  To defeat qualified immunity, "the right

8    allegedly violated must be defined at the appropriate level of specificity before a court can

9    determine if it was clearly established."  *Wilson v. Layne*, 526 U.S. 603, 615 (1999).  But, a

10   plaintiff must not have to establish that the defendants' "behavior had been previously declared

11   unconstitutional."  *Blueford*, 108 F.3d at 254.  Rather, "if binding authority indicates that 'the

12   disputed right existed, even if no case had specifically so declared,' the Defendants would be

13   on notice of the right."  *Hydrick*, 500 F.3d at 989 (citing *Blueford*, 108 F.3d at 355).  In

14   *Hydrick*, the Ninth Circuit addressed whether there was clearly established precedent

15   governing the treatment of sexual offenders who were civilly confined in a state psychiatric

16   hospital under California's Sexually Violent Predators Act (SVP) and who challenged the

17   conditions of their confinement under 42 U.S.C. § 1983.  500 F.3d at 978.  The Ninth Circuit

18   held that even though "the law applicable to [sexual violent predators] is still evolving," "the

19   rights afforded [convicted] prisoners set a floor for those that must be afforded SVPs."  500

20   F.3d at 989.  The court stated that although

21          [i]t may not be clear exactly what due process rights are to be afforded SVPs, ...
            surely it is clear that certain actions – forcing SVPs to live in squalid conditions,
22          turning a blind eye to physical attacks against SVPs, and forcing SVPs to take
            medication as punishment or in retaliation for filing a lawsuit or for refusing to
23          speak during treatment sessions – transgress the boundary.  Surely, it would not
            require 'law train[ing]' or clairvoyance to recognize that these actions, as alleged
24          by the Plaintiffs, do not comport with due process.

25   *Id*. at 990 n.8.  The court held that the defendants could not have been "so completely unaware

26   of the standards that would apply to their conduct as it related to SVPs. ... [T]he Plaintiffs'

27   complaint alleges practices that would be unconstitutional if directed at any prisoner.

28

1   Accordingly, Defendants cannot escape liability based on a 'reasonable but mistaken' belief

2   about the constitutionality of their conduct." *Id*. at 1001.

3       Similarly, this Court finds that although the legal framework relating to the designation

4   of a citizen as an enemy combatant was developing at the time of the conduct alleged in the

5   complaint, federal officials were cognizant of the basic fundamental civil rights afforded to

6   detainees under the United States Constitution. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 103-

7   04 (1976) (holding that denial of medical attention may result in the infliction of unnecessary

8   suffering which is "inconsistent with contemporary standards of decency as manifested in

9   modern legislation codifying the common law view that '(i)t is but just that the public be

10  required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care

11  for himself.'"); *Youngberg*, 457 U.S. at 321-22 (holding that "persons who have been

12  involuntarily committed are entitled to more considerate treatment and conditions of

13  confinement than criminals whose conditions are designed to punish").[4]  The Court finds that

14  the complaint alleges conduct that would be unconstitutional if directed at any detainee, and

15  therefore finds that the rights allegedly violated were clearly established at the time of the

16  alleged conduct. *Hydrick*, 500 F.3d at 1001; *see also United States v. Lanier*, 520 U.S. 259,

---

17          [4]  Yoo argues that the *Hamdi* decision cannot be evaluated to demonstrate that enemy
18  combatants possess basic constitutional rights because the decision post-dates the conduct
    alleged in this matter.  However, Yoo relies on *Padilla II* to demonstrate that such rights
19  were not clearly established.  Although the *Hamdi* Court determined even foreign nationals
    held by the United States possess the basic constitutional right of due process, the case was
20  decided in 2007 and not clearly established precedent at the time of the conduct alleged in
    this case.  542 U.S. at 521, 531 (finding that "[c]ertainly, ... indefinite detention for the
21  purpose of interrogation is not authorized" and "reaffirm[ing] ... the fundamental nature of a
    citizen's right to be free from involuntary confinement by his own government without due
22  process of law.")  However, the Fourth Circuit's holding in *Padilla II*, 423 F.3d at 386, was
    decided in 2005, does not bear on the issue as it was decided post-conduct as well.  *See*
23  *Blueford*, 108 F.3d at 255 (holding that the issue whether an aspect of law was clearly
    established must be determined as of the time of the alleged conduct at issue).  Further, as
24  discussed, the Court finds the Fourth Circuit opinion lacks estoppel force.  Lastly, the Court
    notes that the government, in an apparent effort to avoid consideration of the Fourth Circuit's
25  decision in light of *Hamdi*, 542 U.S at 507, suddenly removed Padilla from military custody
    and criminally indicted him in Florida for offenses considerably different from and far less
26  serious than those acts upon which the President designated him as an enemy combatant.
    The government removed Padilla from military custody only two days before the
27  government's brief was due to be filed in the Supreme Court.  *See Padilla v. Hanft*, 432 F.3d
    582, 584 (4th Cir. 2005).  Although the *Padilla II* opinion is still good law, it is questionable
28  whether, should an appeal before the Supreme Court have not been mooted by Padilla's
    sudden transfer out of military custody, the decision would have been affirmed.

1   271 (1997) ("There has never been a ... case accusing welfare officials of selling foster

2   children into slavery; it does not follow that if such a case arose, the officials would be

3   immune from damages.") (internal citation and quotation marks omitted).

4       The Court finds that Padilla alleges a violation of his constitutional rights which were

5   clearly established at the time of the conduct.  Further, based on the fact that the allegations

6   involve conduct that would be unconstitutional if directed at any detainee, a reasonable federal

7   officer could not have believed the conduct was lawful.  *See Mendoza*, 27 F.3d at 1360.

8   Therefore, Yoo is not entitled to qualified immunity.

9   **D.    The Religious Freedom Reformation Act Claims.**

10      Padilla alleges that he was deprived of his right to the free exercise of religion

11  guaranteed under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.  (FAC at ¶

12  82(e).)  The Religious Freedom Restoration Act ("RFRA") "suspends generally applicable

13  federal laws that 'substantially burden a person's exercise of religion' unless the laws are 'the

14  least restrictive means of furthering [a] compelling government interest.'" *United States v.*

15  *Antoine*, 318 F.3d 919, 920 (9th Cir. 2003) (quoting 42 U.S.C. § 2000bb-1(a)-(b)).  RFRA

16  provides that the "[g]overnment shall not substantially burden a person's exercise of religion

17  even if the burden results from a rule of general applicability, except as provided in subsection

18  (b) of this section."  42 U.S.C. § 2000bb-1.  In turn, the statute defines "government" to

19  include "a branch, department, agency, instrumentality, and official (or other person acting

20  under color of law) of the United States."  42 U.S.C. § 2000bb-2(1).

21      Although Padilla alleges that he was denied his right to the free exercise of religion,

22  Yoo argues that Padilla has not stated a claim under RFRA.  First, Yoo contends that Padilla

23  fails to allege Yoo was personally involved in the acts that substantially burdened the free

24  exercise of religion.  This contention has been addressed in the causation argument attendant to

25  the civil rights claim.  (*See supra* section C(2)(a).)  Second, Yoo argues that RFRA does not

26  create a cause of action against Yoo in his individual capacity and, even if such a cause of

27  action were allowed under RFRA, Yoo would be entitled to qualified immunity because the

28  right would not be clearly established under federal law.  The Court finds that authority

United States District Court

For the Northern District of California

40

United States District Court

For the Northern District of California

1   indicates that RFRA provides for a cause of action against a federal actor in his individual

2   capacity and that this right was clearly established at the time of the conduct.

3        Yoo contends that the plain statutory text of RFRA does not provide for a cause of

4   action against a government employee in his or her individual capacity.  Yoo contends that the

5   phrase "appropriate relief against a government" indicates that Congress authorized only suits

6   against governmental entities, not individual government employees.  However, the Court

7   finds this argument unpersuasive as the statute defines "government" to include "official (or

8   other person acting under color of law) of the United States."  42 U.S.C. § 2000bb-2(1).  In

9   keeping with the analysis of the identical language in 42 U.S.C. § 1983 and the law of this

10  district, the Court finds that the phrase "person acting under color of law" permits a claim

11  against a federal officer in his individual capacity.

12       "That Congress did not waive sovereign immunity for [RFRA] damages suits does not

13  necessarily mean that [a] plaintiff may not collect damages from [] individual defendants."

14  *Lepp v. Gonzales*, 2005 WL 1867723, *8 (N.D. Cal. Aug. 2, 2005) (citing *Jama v. United*

15  *States Immigration and Naturalization Service*, 343 F. Supp. 2d 338, 373 (D.N.J. 2004)).

16  RFRA "'allows for individual capacity suits for money damages' against federal officers."

17  *Lepp*, 2005 WL 1867723 at *8 (citing *Jama*, 343 F. Supp. 2d at 374-76).  This Court adopts the

18  finding set forth in the *Jama* opinion and explicitly adopted by this district in *Lepp*.  Further,

19  there is no authority to indicate that the language in RFRA – "acting under color of law" –

20  which clearly tracks the same language in 42 U.S.C. § 1983, should not be interpreted to

21  establish individual liability for violations.  The same language as interpreted by courts under

22  42 U.S.C. § 1983 provides liability for officials in their individual capacities.  *See, e.g., Hafer*

23  *v. Melo*, 502 U.S. 21, 31 (1991) (finding that the phrase "person acting under color of law" in

24  Section 1983 includes officials in their individual capacities).  "When a legislature borrows an

25  already established individual phrase from an old statute to use it in a new statute, it is

26  presumed that the legislature intends to adopt not merely the old phrase but the judicial

27  construction of that phrase."  *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826,

28  834-35 (9th Cir. 1999) (citation omitted).  Accordingly, the "judicial interpretation of the

phrase 'acting under color of law,' as used in 42 U.S.C. § 1983, applies equally in ... RFRA action[s]." *Id*. at 835.  The Court adopts the same reasoning to find that RFRA allows for individual capacity suits for money damages against federal officers and denies the motion to dismiss the claim under RFRA.  In addition, the Court finds that the interpretation of the statute to permit individual liability is in keeping with clearly established law and, on this basis, Yoo is not entitled to qualified immunity on the RFRA cause of action.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Yoo's motion to dismiss the First Amended Complaint.  The motion is denied as to all claims with the exception of the claim for violation of Padilla's rights under the Fifth Amendment against compelled self-incrimination.  The sections of the First Amended Complaint making a claim for violation of the Fifth Amendment right against self-incrimination are dismissed with leave to amend.  (*See* FAC at ¶¶ 5, 82d.)  The remainder of the motion to dismiss is DENIED.  The Court HEREBY provides Plaintiffs leave to amend to allege a factual basis for the dismissed claim.  Plaintiffs shall file an amended complaint, if any, by July 10, 2009.  Defendant Yoo shall have twenty days thereafter to file his responsive pleading.

**IT IS SO ORDERED.**

Dated:  June 18, 2009

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California