Pages 1 - 74

United States District Court

Northern District of California

Before The Honorable Jeffrey S. White

Jose Padilla, et al.,          )
                               )
          Plaintiff,           )
                               )
  vs.                          )          No. C08-0035 JSW
                               )
John Yoo,                      )
                               )
          Defendant.           )
_____)

                               San Francisco, California
                               Friday, March 6, 2009

**Reporter's Transcript Of Proceedings**

**Appearances**:

For Plaintiff:          National Litigation Project of the
                        Allard K. Lowenstein International
                        Human Rights Clinic
                        P.O. Box 208215
                   By:  **Hope Metcalf, Esquire**
                        **Tahlia Townsend, Esquire**

For Defendant:          U.S. Department of Justice
                        Civil Division
                        P.O. Box 7146
                        Ben Franklin Station
                        Washington, DC  20044
                   By:  **Mary Hampton Mason, Esquire**
                        **Glenn Stewart Greene, Esquire**
                        **Sarah Whitman, Esquire**

(Appearances continued on next page.)

*Reported By:*          *Sahar McVickar, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

                   (Computerized Transcription By Eclipse)

```
 1   Appearances, continued:

 2   For Plaintiff:          Law Offices of Natalie L. Bridgeman
                             468 Jackson Street, 3rd Floor
 3                           San Francisco, California  94111
                       By:  Natalie Laura Bridgeman, Esquire
 4

 5

 6                           ---o0o---

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    Friday, March 6, 2009                        9:00 a.m.
2                    P R O C E E D I N G S
3              THE CLERK:  Calling case No. C-08-0035,
4    Jose Padilla, et al., versus John Yoo, et al.
5              Counsel, please state your appearances for the
6    record.
7              MS. METCALF:  Good morning, Your Honor.
8              Hope Metcalf for the plaintiffs.
9              THE COURT:  Good morning.
10             MS. TOWNSEND:  Good morning, Your Honor.
11             Tahlia Townsend for plaintiffs.
12             MS. BRIDGEMAN:  Natalie Bridgeman, local counsel for
13   the plaintiffs.
14             THE COURT:  Good morning.
15             MS. MASON:  Good morning, Your Honor.
16             Mary Hampton Mason for John Yoo.
17             THE COURT:  Good morning.
18             MR. GREENE:  Good morning, Your Honor.
19             Glenn Greene for John Yoo.
20             THE COURT:  Good morning.
21             MS. WHITFIELD:  Good morning, Your Honor.
22             Sarah Whitman for defendant, John Yoo.
23             THE COURT:  Good morning.
24             All right counsel, have you all received a copy of
25   the Court's questions?
```

1        **MS. MASON:**  Yes, Your Honor.

2        **MS. METCALF:**  Yes, Your Honor.

3        **THE COURT:**  All right, why don't counsel who are

4  going to be leading the argument come up at this point to the

5  respective lecterns.

6            And what I'd like to do is, before we get into the

7  questions, mark a comment to frame the issue, hopefully, for

8  counsel.

9            As you can see, I haven't followed my sometimes

10  practice of issuing a tentative ruling, because I don't know

11  what I'm going to do at this point, but I wanted to frame the

12  issue.  And as we all know, before the Court is the defendant's

13  motion to dismiss the complaint filed by Jose Padilla and his

14  mother.  Mr. Padilla is a United States citizen who was

15  designated an enemy combatant during the last administration's

16  war on terror and detained in a military brig in South Carolina

17  for 3 years, 8 months.

18            The complaint alleges that Mr. Padilla was detained

19  without being charged, was subjected to extreme isolation,

20  including isolation from both counsel and from his family and

21  was interrogated under threat of torture, deportation, and even

22  death.

23            Defendant John Yoo currently is a professor of law,

24  but at the time of Mr. Padilla's detention was a Deputy

25  Attorney General in the Office of Legal Counsel under the

1   administration of George W. Bush and a member of the

2   president's War Council which allegedly met regularly to,

3   according to the complaint, "develop policy on the war on

4   terrorism," unquote.

5           The complaint alleges that Professor Yoo stepped

6   beyond his role as a lawyer and abused his position by

7   formulating unlawful practices and policies for the

8   designation, detention, and interrogation of suspected enemy

9   combatants and by drafting memoranda designed to evade legal

10  restraints and to immunize those who implemented them.

11          In Federalist Paper No. 8, Hamilton wrote, "War will

12  compel nations the most attached to liberty to resort for

13  repose and security to institutions which have a tendency to

14  destroy their civil and political rights.  To be more safe,

15  they at length become willing to run the risk of being less

16  free."

17          There is no question that the matter brought before

18  the Court today embodies that same tension between the

19  requirements of war and the defense of the very freedoms that

20  war seeks to protect.  The brutal attacks on this nation on

21  September 11th, 2001, altered the way we live our lives and the

22  way the Government seeks to protect those lives.  This lawsuit

23  poses the question addressed by our Founding Fathers about how

24  to strike the proper balance of fighting a war against terror

25  at home and abroad and fighting a war using tactics of terror.

1          In deciding a motion to dismiss, the Court is

2    compelled to take as true the allegations in the complaint.

3    The Court is faced with allegations that Professor Yoo set in

4    motion the detention and interrogation techniques used against

5    a United States citizen, albeit a suspected domestic terrorist,

6    which may violate the constitutional foundation of our society.

7    By this statement, the Court does not imply any decision on the

8    merits.  The purpose of this hearing is to require the parties

9    to answer the Court's questions to help resolve the thorny

10   legal issues presented.

11          The Court instructs the parties to refrain from

12   rearguing the material covered in their extensive briefing of

13   the issues and, rather, to focus on the Court's questions.  At

14   the end of the specific questions, the parties will have an

15   opportunity to address any other issues they wish to bring to

16   the Court's attention.

17          So with that, we'll begin.  And I will typically

18   address the questions to a particular party in the first

19   instance and then give the other party a chance to respond.  I

20   believe a back and forth dialogue is the best way to proceed.

21          So starting with Question No. 1, I'll put that to

22   the defendant first.

23          **MS. MASON:**  Yes, Your Honor.

24          With respect to the question of whether this -- the

25   positions in our briefs which were drafted prior to the

 1   Administration were fully vetted, the answer to that question

 2   is, yes, Your Honor, they have been fully vetted with the new

 3   administration.

 4          With respect to any position change, as the Court

 5   knows, we did withdraw our claim -- our request for protective

 6   order.  And that is a position change; that motion is no longer

 7   before the Court, in light of the publication by the United

 8   States of a number of memorandum.

 9          I say all that with the caveat that as the Court has

10   recognized, this is a sensitive case that raises sensitive

11   issues.  I can't guarantee, as I sit here today, you know, I've

12   been at the Department for 20 years, and I'm very careful about

13   saying things I'm authorized to say and not saying things I'm

14   not authorized to say.  So I can't guarantee that every single

15   question that might come up in the course of this hearing that

16   I can have an answer to you that is fully vetted, but I will

17   try my best.  And if I don't, I will let you know that.

18          *THE COURT:*  Very well.

19          Any comments you would like to make on that

20   question?  I don't expect you to have any substantive

21   information, but do you have any reason to believe that the

22   position that counsel just spoke isn't the correct one?

23          *MS. METCALF:*  Oh, no, I certainly wouldn't question

24   Counsel's position.

25          If I might, I just would add one -- one small

1    footnote.

2              **THE COURT:**  Okay.

3              **MS. METCALF:**  Which is that to the extent that there

4    has been a shift in policies, if that was one of the questions

5    that the Court was asking as to treatment of detainees or

6    detention policy, generally, of suspected enemy combatants, it

7    would be our position that that would nonetheless have no

8    bearing on this case with respect to Mr. Padilla's individual

9    right to redress.

10             **THE COURT:**  Well, that's a fair point.  The Court's

11   question, and I think defendant's counsel has responded, is,

12   really, has the position in this lawsuit changed.  I know there

13   has been -- in some lawsuits the question has been raised about

14   whether the Government's position has changed in light of the

15   change in administration, so I have my answer to that.

16             So let's go to Question 2, which I'll address to the

17   plaintiff's, in the first instance, counsel.

18             **MS. METCALF:**  Thank you, Your Honor.

19             The Supreme Court has never recognized a

20   freestanding national security special factor under **_Bivens_**.

21   And where it has considered the same policy concerns that

22   Defendant Yoo in this case urges the courts to take into

23   account at the **_Bivens_** special factor stage, it has refused to

24   find absolute immunity.  And the case I'm referring to there is

25   **_Mitchell v. Forsythe_**, which we briefed fairly extensively in

```
 1   our briefs.

 2              But I do raise it to this Court's attention because

 3   I believe that if this Court were to refuse to recognize

 4   Mr. Padilla's claims at the outset merely on the basis of

 5   national security concerns, it would essentially be in

 6   tantamount to finding absolute immunity for Mr. Yoo.  And the

 7   Supreme Court has expressly refused to permit absolute

 8   immunity, even for the Attorney General acting in matters of

 9   national security.  And there is a good reason for that.  As

10   the Supreme Court said, and I quote, "The danger that high

11   federal officials will disregard" --

12              THE COURT:  Slow down.  Make believe you were

13   dictating for this court reporter, and I think we'll all --

14              MS. METCALF:  Terribly sorry.

15              THE COURT:  That's all right.

16              MS. METCALF:  Okay.

17              As the Supreme Court said in Mitchell v. Forsythe,

18   there is a good reason for that, namely, to treat national

19   security concerns in the realm of qualified immunity rather

20   than absolute immunity, or, in this case, it would be an

21   absolute bar to Mr. Padilla's claims.

22              And as the Supreme Court said, it is, quote "The

23   danger that high federal officials will disregard

24   constitutional rights in their zeal to protect the national

25   security is sufficiently real to counsel against affording such
```

1    officials an absolute immunity."

2            Thus, in that case the Court recognized the risk of

3    chilling even the Attorney General in his duty to protect the

4    national security.  But nonetheless, the Court felt that it,

5    was -- especially in times of crisis that the qualified

6    immunity test was the proper balance.  As this Court referred

7    to in its opening remarks, it is the balance between national

8    security and liberties that this case touches upon.  And it

9    would be our position that the qualified immunity test finds

10   that proper balance.

11           **THE COURT:**  All right.  Why don't you move on to the

12   second part of the question with respect to an alternative

13   remedy, because the defendant certainly makes a big point about

14   that in his brief.

15           **MS. METCALF:**  Certainly, Your Honor.

16           First of all, I would point to the fact of **Carlson**,

17   the Supreme Court case, **Carlson**, has already found that the

18   Federal Torts Claims Act is not a sufficient alternative remedy

19   for **Bivens**.  And again, there is good reason to the Court's

20   finding there, and that is that the -- the underlying purpose

21   of the **Bivens** remedy is individual deterrence for

22   constitutional torts.  And thus, we don't believe that, for

23   example, a tort suit would adequately address Mr. Padilla's

24   concerns in this case.

25           The other potential alternative remedy that I

1  believe that Defendant Yoo mentions in passing is the fact that

2  torture or some of the allegations that we have alleged might

3  be criminalized.  And there I would just say that to suggest

4  that the **_Bivens_** remedy should be unavailable any time that

5  Congress criminalizes action really turns the **_Bivens_** doctrine

6  on its head.

7          The **_Bivens_** doctrine is meant to be an implied right

8  of action for constitutional torts, and by that measure,

9  virtually any constitutional tort where it's criminalized would

10  be, per se, unavailable.  I'm not aware of any Supreme Court

11  precedent supporting that proposition.

12          And finally, I would just add that the bottom line,

13  as far as we are concerned, is that Mr. Padilla has never been

14  afforded the opportunity to litigate the claims at the heart of

15  this case.  He has never had a forum or any court to hear his

16  grievances with respect to his -- his mistreatment while he was

17  in military detention.

18          **_THE COURT:_**  What about the proceedings that occurred

19  in -- out in the Fourth Circuit?

20          **_MS. METCALF:_**  Certainly, Your Honor.

21          **_THE COURT:_**  They say that's collateral estoppel.

22          **_MS. METCALF:_**  Yes.  It would be our position that

23  collateral estoppel clearly does not apply in this case.  First

24  of all, there was no final judgment in that matter.

25          **_THE COURT:_**  Well, I just made that as an offhand

 1    comment.

 2            **MS. METCALF:**   Okay.

 3            **THE COURT:**   You just made a comment that he has not

 4    had a chance, the plaintiff has not had a chance to litigate

 5    his claims at all; he certainly had a chance to argue to the

 6    Fourth Circuit and the District Court out there, that his

 7    rights were being violated, correct?

 8            **MS. METCALF:**   With respect to certain rights.   And

 9    there, I would -- I would just point the Court to the fact that

10    the Fourth Circuit -- explicitly, that the holding in the

11    Fourth Circuit was very narrow.   And it went up -- the matter

12    went up solely on the question of whether or not there was

13    presidential authority to detain.   And so none of our claims,

14    except for the detention vel non claim that we have brought

15    would be covered by the Fourth Circuit opinion.

16            I would further point out that even there the Fourth

17    Circuit's opinion was predicated upon stipulated facts with the

18    understanding that the facts would have to be actually

19    litigated.   So Mr. Padilla, in fact, never did have the

20    opportunity to actually present facts, exculpatory facts with

21    respect to his alleged status as an enemy combatant.

22            **THE COURT:**   All right.

23            Lastly, before we move on and hear the response from

24    the defendant, I would like you to address the last part of the

25    Court's question regarding the authorization for use of

```
 1   military force.  Because it seems like Congress has acted in

 2   this area, and that is one of the tests that the Supreme Court

 3   seems to take into account.  So what's your response on that?

 4              MS. METCALF:  Certainly, Your Honor.

 5         I would just point to the fact that the AUMF is a

 6   resolution that is quite broad in its grant of powers; however,

 7   it's also not very specific.  And so when it -- when you

 8   compare the AUMF, for example, with other statutory regimes,

 9   such as in Schweiker v. Chalicky, which had to do with

10   remedial -- the remedial schemes available under the Social

11   Security Act; the Bush case, which covered -- the statute there

12   was the Civil Service Reform Act that, again, set out

13   particular remedies.  Or even the military cases, Stanley and

14   Chappell, where there was a very elaborate and separate

15   military judicial scheme, a separate regime of military

16   justice.

17         So if the question is, as I think it is under the

18   Bivens special factors test, is there any indication that

19   Congress' inaction has not been inadvertent, that's the test

20   that we use; here, I would say the AUMF really is not a strong

21   indication as to, certainly, the right to redress for a U.S.

22   citizen.  And because the question under Bivens special factors

23   would be whether Congress has somehow occupied the field with

24   respect to available remedies and has indicated that when an

25   individual brings a Bivens action that the Court should stay
```

1   its hand.

2           I would also point out that the Congress has taken

3   more specific actions, specifically with respect to remedies

4   available to enemy combatants regarding their treatment and

5   detention, and that was the Military Commissions Act.  And so

6   where it has seen fit to bar remedies, it specifically excluded

7   citizens from that category.  And that -- that's Military

8   Commissions Act, Section 7(e)(2).  And that applies only to

9   alien enemy combatants, not to citizens.

10          *THE COURT:*  All right.

11          Mr. Mason?

12          *MS. MASON:*  Yes, Your Honor.

13          I was a little surprised to hear that plaintiffs

14  thought that their best argument was that the Court hadn't

15  recognized a freestanding national security special factor.

16  Frankly, I thought they were going to come out and say their

17  best argument is that this case didn't present the sort of

18  prudential considerations that **_Wilkie_** has found preclusive.

19          I think it's important to remember in that context

20  that the Supreme Court has recognized two very explicit

21  categories of special factors.  The first category of special

22  factors are the **_Stanley_** and **_Chapelle_** special factors, matters

23  that are textually committed to the coordinate branches in the

24  Constitution.

25          The second set of special factors completely

1    independent of that that the Supreme Court has recognized are

2    the sort of prudential considerations.  And frankly, that's

3    most of the Supreme Court's jurisprudence *Wilkie*, *Chilicky*,

4    *Bush*, *Molesko*, all those are prudential considerations, you

5    know, should the Court use its equitable power to imply a

6    remedy here.

7             But in the context of -- well, let me say, first,

8    that the special factors inquiry is in the aggregate, so the

9    combination of factors has weight.  But in the context of

10   textually committed to the coordinate branches factors, the

11   Supreme Court has really been unwavering.  And plaintiff has to

12   rewrite a lot of Supreme Court jurisprudence in order to get to

13   the position that the sort of national security interest here,

14   specifically, the detention and interrogation of an enemy

15   combatant, are not the type of thing that are textually

16   committed to the coordinate branches.

17            And I know we have cited, and I'm not going to

18   repeat our briefs, generally, about war powers, but I think

19   it's important to look at Article 1, Section 8, where the

20   Constitution says that Congress has the power specifically to

21   make rules concerning captures on land and water.  That is a

22   highly, highly specific -- and as *Stanley* says, that is the

23   sort of power that is designated repeatedly and with insistence

24   to Congress.

25            So it's not enough in this area, in this very

1   special area of textually committed to the coordinate branches

2   cases, for the plaintiff to come forward and say it's a bad

3   idea not to imply a remedy, Congress must have intended one.

4   And, in fact, it's ironic that plaintiff uses -- brings this

5   case for the purpose of vindicating constitutional rights and

6   ignores those kind of fundamental separation of power concerns.

7   That is very clear, not only in the Constitution, but in the

8   ***Bivens*** jurisprudence.

9           We don't think this is a question of the Court's

10  competence to address these issues, but we think it's a

11  question of Congress' prerogative to identify them in the first

12  instance.

13          And there is no question that the designation of an

14  enemy combatant, decisions about interrogation, one, that

15  plaintiff affirmatively alleges these were made at the highest

16  levels of the U.S. Government; and, two, that a myriad of

17  policy considerations fall into that calculus.

18          So the question is whether one of those policy

19  considerations -- and one of those considerations should be for

20  the individual involved in a particular case, I'm not going to

21  designate you an enemy combatant, I'm not going to interrogate,

22  I might get sued.  That sort of question, that sort of

23  interference with military decision making, the concern about

24  suit is the kind of thing that the Supreme Court has said, we

25  need to wait for Congress to speak.

1          And with respect to Counsel's reference to --

2          **THE COURT:**  Are you saying that once you are -- in

3    the context that you are talking about, that the fear of being

4    sued should be paramount, and the Constitution should basically

5    be completely disregarded?

6          **MS. MASON:**  No.  Certainly --

7          **THE COURT:**  There is a comment -- there is a

8    position taken by the defendant in one of these memos, which I

9    found to be somewhat astounding, that the Fourth Amendment

10   doesn't even apply at all, it just doesn't apply.

11         And are you saying, similarly, that when you are

12   dealing with issues of military issues or national security

13   that the Constitution doesn't apply?  Because if that's the

14   position, that is a pretty scary position.

15         **MS. MASON:**  Absolutely not.  Again, the question for

16   the special factors inquiry is not does the Constitution apply,

17   it's a predicate threshold dispositive question, we believe in

18   this case, which is, should the Court imply a remedy for that

19   alleged constitutional violation.

20         So the question of whether or not the Constitution

21   applies, and I think the Court has been quite clear in **_Hamdi_**,

22   for instance, that the constitution applies in some manner and

23   in some way with respect to enemy combatant designation.  That

24   is a wholly separate question from the question of whether to

25   imply a remedy.

1           When Counsel refers to ***Mitchell versus Forsythe***,

2    which is an immunity case and suggests that that somehow

3    resolves the implication of the remedy issue, the Supreme Court

4    absolutely explicitly rejected that in ***Stanley*** at page 648

5    and -- 646 and 648.

6           So the Supreme Court said in ***Stanley*** that, in fact,

7    the special factors inquiry would run quite hollow if we were

8    to consider it as coextensive with the immunity inquiry.

9           Immunity, again, bars express causes of action.

10   That is why immunity's kick is so important.  We are talking

11   about an implied cause of action here.  And there the Court has

12   been unwavering in saying that in areas that involve policy

13   Congress must decide.

14          You asked counsel about the fact that, you know,

15   hasn't Congress looked at some of these issues, and, certainly,

16   not only in the context that plaintiff's counsel mentions, but

17   with respect to the very particular memos that they cite as

18   evidence of Professor Yoo's conduct, Congress has looked at

19   those.  My client testified in front of Congress in June of

20   '08; when the memos were released Monday, Congress has said it

21   wants to form a truth commission to examine this.  So there is

22   no question that Congress both knows about it and is

23   considering looking at it.

24          And the Court said in ***Chilicky*** that that type of

25   instance where the Congress says -- where the Court said aware

1    of the allegations and doesn't provide a right of action, that

2    ends the Court's inquiry with respect to special factors.

3         I do want to address the remedy question that the

4    Court raised.  I think the first thing is that you have to

5    divide the plaintiff's allegations into sort of two component

6    parts.  You have the designation detention allegations, and

7    then you have the interrogation treatment allegations.

8         With respect to the designation detention

9    allegations, there is simply no question that plaintiff had a

10   remedy, and that remedy was habeas.  The fact that plaintiff

11   elected to litigate the question of the president's authority

12   before litigating the facts of his case was his choice to make

13   at any point.  And the fact that ultimately his case -- his

14   habeas case doesn't proceed forward is just due to the unique

15   procedural outcome of his case.

16        But he had a remedy.  He could have, in fact,

17   elected, and was specifically given the opportunity by

18   Magistrate Judge Carr in South Carolina to litigate the facts

19   and then chose not to over the magistrate judge's very

20   strenuous assurances that that's what he wanted to do.  That is

21   the designation detention end.

22        Then there is the question of the interrogation

23   conditions of confinement end.  First of all, we have not

24   suggested that there could be no freestanding constitutional

25   claim by an enemy combatant, for instance, who might have been

 1   beaten by a guard in an isolated incident.  That doesn't -- as

 2   plaintiff does very, very specifically here in paragraphs 1,

 3   paragraph 43 and 45 and 73 really go to the heart of the

 4   policy-making authority of the United States.  So, one, there

 5   could be that sort of freestanding constitutional remedy

 6   against some other defendant not before this Court.

 7           The plaintiff might, under certain circumstances,

 8   have an FTCA remedy.  At one point, plaintiff suggested that

 9   there is some sort of intentional conduct exception, you know,

10   the FTCA quite clearly covers claim for any wrongful or

11   negligent act.  So, again, that wouldn't be the kind of claim

12   that they had against Professor Yoo.

13           But I think more fundamentally, the bottom line is

14   even on those interrogation conditions claims, if there was no

15   remedy, *Stanley* said very specifically in this area of the most

16   special of factors, those textually committed to the coordinate

17   branches, the absence of a remedy for *Stanley*, and the Court

18   says, quote/unquote "is irrelevant."  So even if push comes to

19   shove at that point, this is an area where Congress would have

20   to weigh in.

21           I would also say that with respect to *Stanley*, you

22   know the Court was dealing there with some pretty horrific

23   facts.  You know, *Stanley* alleged that he was administered, he,

24   a military soldier, was administered LSD to find out what it

25   would do to him against his will and without his knowledge.

1          So the Supreme Court has not been loathe, even in

2    cases, frankly, with much more extreme facts, in my view, than

3    those alleged here, the Supreme Court has not been loathe to

4    say this implied sort of remedy is not your remedy.

5          I would like to move on to your question about the

6    authorization of use of military force.

7          **THE COURT:**  Yes.

8          **MS. MASON:**  We agree with the plaintiff on this:

9    The authorization of use of military force is not the sort of

10   explicit Congressional declaration that the Supreme Court has

11   found necessarily bars a **_Bivens_** claim.  But it's important to

12   remember that that is a predicate question to the special

13   factors inquiry, and it is certainly one among, and by "it," I

14   mean Congress' activity in the area is certainly one among

15   multiple factors that Counsel has --

16          **THE COURT:**  Counsel, would you like to respond?

17          **MS. METCALF:**  Yes, thank you, Your Honor.

18          First of all, I think that I would just like to say

19   that it appears that we just have a fundamental disagreement

20   with opposing counsel about what is required in terms of this

21   Court looking at what Congress intends.

22          Defendant appears to suggest that Congress must

23   somehow affirmatively indicate that it wishes to provide a

24   constitution -- a remedy for constitutional torts.  And as I've

25   stated before, we believe that that is neither supported by the

 1  case law, and, in fact, it would turn **Bivens** on its head, which

 2  is an implied right of action.  In other words, Congress is

 3  legislating on the background of this implied right of action.

 4  And, as the Court has said, where it appears that Congress'

 5  failure to provide a remedy is not inadvertent, which I take to

 6  mean that Congress somehow intended not to supply a remedy,

 7  then the Congress should stay its hand.  So the question, in

 8  other words, is there evidence with respect to Mr. Padilla's

 9  claims that Congress has intended not to provide a remedy for

10  the harms alleged in his complaint.

11          The other point I would like to mention is that from

12  what we've just heard, apparently, Mr. Padilla would have,

13  potentially, claims against the line-level officers who engaged

14  in his mistreatment but not against the policy makers who, as

15  we've alleged, greenlighted policies that they knew were

16  illegal.

17          **THE COURT:**  But what about the argument that the

18  defendant's counsel makes concerning the ability, his ability

19  in South Carolina to have litigated the facts concerning his

20  designation?

21          **MS. METCALF:**  Certainly, Your Honor.

22          I would just say that the parties both stipulated as

23  to narrowing the question when it was before the magistrate

24  judge.  And the Fourth Circuit certainly did not think that he

25  was precluded from litigating the facts there.  And, really,

1    what happened is that it was when that decision by the Fourth

2    Circuit was on certiorari at the Supreme Court that he was

3    expeditiously and suddenly removed to civilian jurisdiction.

4    And so the matter was never decided, and he never had an

5    opportunity to litigate those facts.

6            **THE COURT:**  All right.

7            Anything further you want to say on that?

8            **MS. METCALF:**  I guess I would just -- I would just

9    urge the Court to consider that by Defendant Yoo's argument, it

10   seems to me that what they are urging this Court to consider is

11   a bar on constitutional torts when they would somehow involve

12   policy making by Congress.  And we would submit that virtually

13   any constitutional tort would somehow involve questions of

14   decision making and policy making.  And it's precisely the

15   reason that qualified immunity is an appropriate measure for

16   balancing the state interests and private interests that we

17   have that doctrine.

18           **THE COURT:**  All right.

19           Anything further on this question?

20           **MS. MASON:**  The only thing I would add is I agree

21   with Counsel that we have a disagreement.  To the extent that

22   she suggests that the standard is whether Congress intends not

23   to imply a remedy, I don't believe there is a single pinpoint

24   cite in the Supreme Court law that supports that as the

25   dispositive inquiry in a special factors case.

```
 1              THE COURT:  All right.

 2              Let's move on to Question 3.  Again, we are in the

 3     context of a motion to -- a 12(b)(6) motion to dismiss where

 4     the Court is required to accept as true all of the allegations

 5     in the complaint.  So what is your best argument, now that we

 6     are -- we have the Wilkie v. Robbins decision?

 7                        (Plaintiff's attorney Metcalf is seated,

 8                        Attorney Townsend takes the lecturn.)

 9              MS. MASON:  Yes, Your Honor.

10              I think that with respect to your question, first of

11     all, it's important to remember that what Wilkie discusses is a

12     workable cause of action.  And they discuss that at the

13     12(b)(6) stage.  So it's defining an action, again, that the

14     Court perceives to be workable.

15              As Your Honor points out, the plaintiff has said

16     that my client stepped outside of his role as a Government

17     lawyer and pushed too hard for particular outcomes in the

18     response to the war on terror, but in terms of a workable

19     standard in the way that Wilkie talks about it, they don't

20     suggest in any way what sort of objective criteria that role is

21     defined by, what are the considerations that would warrant a

22     finding, one way or the other, whether it's simply a question

23     of opinion.

24              And I think more fundamentally, that --

25              THE COURT:  I don't understand; what is a question
```

1   of opinion?

2         **MS. MASON:**  Whether he stepped outside his role,

3   what the role of an OLC attorney is, and whether he stepped

4   outside that role.  They cite people's opinions that he did,

5   but they cite no objective criteria, no statutory, no

6   regulatory criteria that defines that role.  So they would

7   leave the Court, in the absence of signposts by Congress, to

8   figure out what that is.

9         Also like Robbins, who is the plaintiff in *Wilkie*,

10  plaintiffs allege that Yoo's action were taken in conjunction

11  with, in the language of *Robbins*, a series of public officials

12  over a period of years for which there is no simple cause and

13  effect relationship.  That stands in sharp contrast to what the

14  plaintiff calls is the classic *Bivens* action.

15        You know, certainly, this Court has seen the classic

16  *Bivens* action coming out of, you know, Soledad or Salinas

17  County -- Salinas State Prison, that is a sort of classic

18  *Bivens* action about which there is very clear law about things

19  like respondeat superior, what the standard of liability is.

20        Here, Yoo is alleged to have taken no direct action

21  himself.  He had no supervisory authority or control over

22  Padilla or his detention.  And he is not even alleged to have

23  authority to stop anybody who did.  And that is something that

24  is very common in terms of considering the sort of chain of

25  command in *Bivens* jurisprudence.

1          The -- even the opinions that Yoo authored, or is

2    alleged to have authored, in some instances, for the most part

3    gave very general advice about very general problems.  The

4    exception to that is the enemy combatant designation memo.  And

5    again, that was a memo to the Attorney General saying that it

6    was lawful for the Attorney General to recommend to the

7    President, who ultimately decided about Padilla's designation.

8    But what it isn't is the kind of classic *Bivens* action that

9    this Court has handled in the past.

10         Moreover, I think it's important to remember that

11   you cannot divorce this case -- as I said before, *Wilkie* is one

12   type of special factor, the kind of prudential considerations,

13   but you cannot divorce this case from its national security

14   underpinnings.  And, you know, *Wilkie* was very, very clear in

15   saying that this Court should leave the difficulties about

16   whether to impose liability on federal employees to Congress.

17         And again, here, Congress is considering not only

18   this general area of detainee abuse, but, specifically, these

19   memos and this claim that the Executive Branch overreached.

20   And that's Congress' prerogative in the first instance.

21         *THE COURT:*  Is it really about the executive

22   overreaching, or is it about an individual, again, taking the

23   allegations in the complaint as true, intentionally

24   misrepresenting the state of the law in an effort to make

25   policy which the complaint alleges he himself was part of

1  making?

2         I mean, that's about as specific as you can be in

3  this context; why isn't it clear?

4         **MS. MASON:**  Well, one, the qualified immunity

5  inquiry is separate from the special factors inquiry, okay,

6  with respect to that question.

7         With respect to the special factors inquiry in that

8  question, again, plaintiff has to show that those sort of

9  decisions specifically made in the context of designating and

10 detaining enemy combatants are the sort that the Court should

11 weigh in absence of some kind of signposts from Congress.

12         So assuming those allegations to be true, they do

13 not make the sort of cause of action -- in fact, no court ever,

14 not once has recognized that type of theory as a legitimate

15 *Bivens* cause of action.

16         **THE COURT:**  But, look, I guess maybe I'm not making

17 my question clear enough.

18         The allegation -- maybe everything you say is

19 correct as a matter of law, but the allegation is that

20 Professor Yoo knew what the law was, knew that he was not

21 following the law, knew that he was not following

22 constitutional precedent, and intentionally gave incorrect

23 information to give cover to illegal activities.  I mean, it

24 sounds to the Court, that sounds like a pretty -- pretty easily

25 definable *Bivens* type of a claim.

1          It's not just he gave advice which we can all argue

2     about every day, it's he gave advice knowing that the advice

3     was incorrect, false, for the purpose of covering up or giving

4     comfort to taking illegal actions by the Executive Branch.

5          **MS. MASON:**  Again, I would say, Your Honor, you

6     know, that advice in a vacuum really means nothing.

7     Plaintiffs -- to have a case, plaintiffs have to connect that

8     advice to what happened to their client.

9          And to do that, and for the Court to define a

10    workable cause of action in that context involves inquiries

11    into the highest level of the United States Government,

12    including the President, to find out what the advice was relied

13    on, what consequences it had --

14         **THE COURT:**  Are you saying the Court can't find, at

15    this procedural stage, that the defendant put in motion a

16    series of events, by virtue of the activity that they alleged

17    occurred and his advice, when shortly after giving this advice

18    the plaintiff was treated in exactly the way or within the

19    ambit of the advice that Mr. -- that Professor Yoo gave, the

20    putting in motion --

21         **MS. MASON:**  Right.  I'm suggesting, Your Honor, that

22    the putting in motion standard and the things -- the cautionary

23    notes that **Wilkie** suggests in the context of creating a right

24    of action, that the putting in motion standard raises precisely

25    those kind of cautionary notes.  And we think for that reason

```
 1    the Court couldn't do it.
 2              Again, I can't emphasize enough that we are not
 3    saying that in the absence of the whole other body of special
 4    factor precedent that's talking about things textually
 5    committed to the coordinate branches.
 6              THE COURT:  All right -- oh, you changed counsel on
 7    me.
 8              MS. TOWNSEND:  Sorry.  We snuck in.
 9              THE COURT:  Could you restate your appearance?
10              MS. TOWNSEND:  Certainly.
11              Tahlia Townsend for the plaintiffs.
12              THE COURT:  All right, you may respond.
13              MS. TOWNSEND:  Thank you, Your Honor.
14              Your Honor, I think you have it exactly right.
15              THE COURT:  Which part?
16                        (Laughter.)
17              MS. TOWNSEND:  I'll get to that -- all of it, Your
18    Honor --
19                        (Laughter.)
20              THE COURT:  Thank you.
21              MS. TOWNSEND:  -- without even knowing what it is
22    that you think about the rest of the case.
23              We have two separate claims.  The Wilkie argument,
24    as I understand it, is that it may be difficult for the Court
25    to define a workable cause of action.  And that is the way that
```

1  you phrase it in your question.  We have two different claims

2  here.  One is that Yoo acted as a policy maker, not merely that

3  he -- that he was acting as a lawyer and also making policies,

4  but that he acted as a policy maker.  And there are many, many

5  Section 1983 and **Bivens** cases against policy makers.  That is a

6  cause of action that has already been defined, that is not

7  something new or controversial.

8          And then separately from that, we have the claim

9  that Yoo deliberately gave misleading legal information in

10  order to insulate those policies that he had participated in

11  creating.

12          And again, we don't think there is anything

13  controversial about creating a remedy on the basis of legal

14  advice.  The Court did it against Government prosecution in

15  **Burns v. Reed**.  We cited many cases in the briefs, which you

16  have already seen, in which the claim was that a lawyer caused

17  constitutional torts by giving legal advice that the action --

18  that the officer wanted to take was constitutional when it

19  wasn't.  And so those are our claims here.

20          The -- it appears that Defendant Yoo is melding

21  together two separate inquiries.  One is whether you can define

22  a workable cause of action with this question of whether the

23  set in motion standard is appropriate.  But the Ninth Circuit

24  has already determined that the set in motion standard is the

25  appropriate standard for personal participation.  And that

1    doesn't -- that doesn't at all address the prior question of

2    whether the Court should infer a remedy.  So you can't say that

3    because it would be difficult to prove causation here you

4    cannot infer a remedy, which is how I understand the latest

5    argument.

6                **THE COURT:**  Okay.

7                Anything further on this question?  Anything

8    further?

9                **MS. TOWNSEND:**  No, Your Honor.

10               **THE COURT:**  Would you like to reply briefly?

11               **MS. MASON:**  No, Your Honor.

12               **THE COURT:**  All right.

13               Well, let's move on to question No. 4, which deals

14   with something we have alluded to, already, the qualified

15   immunity issue.

16               **MS. MASON:**  Your Honor, could I make one small

17   suggestion, perhaps.

18               **THE COURT:**  You can make even a big suggestion.

19               **MS. MASON:**  My colleague, Greene, is going to

20   address to qualified immunity areas which are questions 4 and

21   5, and I'm going to address Question 6, so I'm happy to do that

22   now.

23               **THE COURT:**  It's not a long distance to travel,

24   so --

25                        **(Laughter.)**

1              **MS. MASON:**  Okay.

2              **THE COURT:**  I put together in my own mind a way of

3    proceeding, and if I break, I'm afraid that I'll miss

4    something.

5              **MS. MASON:**  I just wanted to make sure you knew that

6    I was going to pop up again.

7              **THE COURT:**  That's perfectly okay.

8              All right, so Question No. 4, obviously, we'll begin

9    with plaintiffs.

10             **MS. METCALF:**  Certainly.  Thank you, Your Honor.

11             It's our position that simply labeling a U.S.

12   citizen, particularly a U.S. citizen on U.S. soil, to label

13   that individual an enemy combatant does not strip them.

14             **THE COURT:**  Let me go back.  There is one thing I

15   want to put this a little bit in focus.

16             **MS. METCALF:**  Um-hmm.

17             **THE COURT:**  The Fourth Amendment, the Fifth

18   Amendment, the Sixth Amendment has obviously existed for a long

19   time, they are well-established.  The jurisprudence is

20   well-established, but we all know that there has been a lot of

21   constitutional litigation over the very questions that we are

22   dealing with here, designations, treatment of alleged enemy

23   combatants and the like.

24             Because 2001 -- 9/11 was unprecedented in the type

25   of war that we are fighting and have been fighting, you know,

1   is unprecedented.  And so you have the tension between, on the

2   one hand, clearly established Fourth Amendment rights of U.S.

3   citizens and on the other hand the evolving jurisprudence on

4   how do we deal with enemy combatants, alleged enemy combatants,

5   citizens and noncitizens, on the battlefield, off the

6   battlefield, with respect to designation and apprehension and

7   treatment.

8            So that's the tension that the Court feels.  And I'd

9   like you, as you are responding, to keep that in mind.

10           **MS. METCALF:**  Certainly, Your Honor.

11           I think that there is a potential tension and,

12   certainly, as the Supreme Court's case in **_Hamdi_** recognized, we

13   may not yet know the precise boundaries of certain rights.  For

14   example, that case established what the procedural due process

15   rights were.  But **_Hamdi_** also affirmed that while we may not

16   know the precise boundaries of what the rights are, we do know

17   that certain rights exist, and there is no reason to think that

18   they are extinguished simply when one is labeled an enemy

19   combatant.

20           So, for example, in the **_Hamdi_** case they said some

21   measure of procedural due process is necessary.  Our client, by

22   contrast, got no procedural due process until it was ordered to

23   do so by the Court in **_Hamdi_**.

24           I would also -- but turning, I think, as Your Honor

25   was indicating, to the claims really at the heart of this case,

1   which would be the treatment claims and interrogation claims,

2   there is simply no reason on the current precedent to expect

3   that the label of enemy combatant extinguishes one's right to

4   be free of coercive interrogation that would otherwise violate

5   the substantive due process clause and the Eighth Amendment.

6           And every time that the Supreme Court has considered

7   the rights of detained persons, it has used the Eighth

8   Amendment as an absolute floor.  And so there are quite

9   analogous cases and, I need not run through them all because

10  they are in our briefs, though I would be happy to do so here,

11  but there are analogous cases where the same treatment that was

12  inflicted even upon pre-trial detainees or those who were

13  convicted were found to be unconstitutional.

14          And as the Supreme Court recognized in ***Hamdi***,

15  detention for the purpose of interrogation is not permissible.

16  Under the military regime, detention is meant to prevent

17  someone from returning to the battlefield.  It's not a carte

18  blanche to then mistreat someone however you want because you

19  expect they might have intelligence.

20          ***THE COURT:***  Does the timing work for you, though, as

21  far as the ***Hamdi*** decision is concerned?  Because, obviously,

22  your client was alleged to have been held for a long time and

23  mistreated for a long time.  Yes, the Supreme Court ultimately

24  made those rulings, but does that make it clearly established

25  law?

1              **MS. METCALF:**  We believe that it does -- **Hamdi** does

2     not make it clearly established law; rather, it is the unbroken

3     recognition of core fundamental rights in the custodial

4     interrogation setting that makes it clearly be established.

5              And I would point this Court's attention to

6     **Hydrick v. Hunter**, in which the Ninth Circuit made very clear

7     that a new label, in that case that of a sexually violent

8     predator will not displace otherwise clearly established

9     rights.

10              And there, the Ninth Circuit observed, quote, "It

11     may not be clear exactly what due process rights are to be

12     afforded SVPs, but surely it is clear that certain actions

13     transgress the boundaries."

14              And it's our submission to this Court that because

15     the floor for the treatment of detained persons is so much

16     higher than what happened to our client.  For example, the

17     **Hope v. Pelzer** case, where someone was chained to a shackling

18     post for just seven hours, and we have alleged repeated

19     infliction of stress positions for that length of time over a

20     21-month period.  There is simply no basis to think that that

21     floor somehow fell merely because he was designated an enemy

22     combatant.

23              **THE COURT:**  All right.

24              Counsel?

25              Would you please restate your appearances since you

```
 1   are new to the argument.
 2                MR. GREENE:   Your Honor.
 3                My name is Glenn Greene, I'm also representing
 4   Professor Yoo.
 5                It's appropriate that the Court began this question
 6   with plaintiffs because it is their burden to identify clearly
 7   established law, but not just clearly established law in the
 8   abstract.  And under Saucier, and Anderson v. Creighton, they
 9   have to present clearly established law in some relevant and
10   similar factually -- factual context that supports their
11   claims, and they have not done so.
12                To the extent that plaintiffs seek to rely on rights
13   from Hamdi, as the Court pointed out, Hamdi was decided in
14   2004; that is two to three years after this case.  The opinions
15   that are the subject of this case were written.  And it's also
16   one year after Professor Yoo left the Office of Legal Counsel.
17   So we would submit that Hamdi doesn't, to the extent that
18   rights were recognized in Hamdi, it cannot be said that they
19   were clearly established at the time of John Yoo -- Professor
20   Yoo's alleged actions.
21                Turning to the question that the Court posed to
22   plaintiffs, in the absence of some clearly established law in a
23   relevant and similar context, plaintiff's only possible
24   argument is that it should have been obvious to Professor Yoo
25   in 2002, again, two years before Hamdi, that the rights they
```

1    assert in this case were clearly established.  And that cannot

2    be the case, because even in 2004 in the Supreme Court's *Hamdi*

3    decision, the Supreme Court suggested that a citizen, a U.S.

4    citizen designated as an enemy combatant, may have -- that the

5    full constitutional protections may not apply to such persons.

6         Now, *Hamdi* did recognize that a designated enemy

7    combatant, a U.S. citizen has a procedural right to challenge

8    the factual basis for the designation, but *Hamdi* also

9    recognized that the full protections that accompany such

10   challenges in the context in other settings may not be

11   applicable in --

12        **THE COURT:**  Well, the -- you might be setting up a

13   strawman here, just in reflecting on the plaintiff's arguments,

14   because it may not afford him all of the -- a citizen all of

15   the constitutional protections, but the question is, is it

16   clearly established, was it clearly established that torturing

17   a person is something that is immutable under the Eighth

18   Amendment.

19        And when you say "may not afford all," does that

20   mean by implication you are admitting that there are some

21   rights that they do have?  And counsel is suggesting that under

22   the Eighth Amendment analysis and some of these other cases,

23   dealing with detention, by analogy that the rights were clearly

24   established.  What's your response to that argument?

25        **MR. GREENE:**  Well, Your Honor, our response to that

 1   would be that, again, it's not -- it's not sufficient for

 2   plaintiffs to just identify cases involving routine pre-trial

 3   or post-trial detention, you have to identify -- plaintiffs

 4   haven't identified any case that involves considering the

 5   conditions of confinement or interrogation in the context of an

 6   enemy combatant, someone who is considered to have been -- to

 7   be a danger to the -- a threat to the nation and also to be in

 8   a position where he or she may have information that could be

 9   used in addressing a -- in stopping a terrorist attack.

10          That is not to say that there aren't rights,

11   clearly, the U.S. citizens have rights, but our position is

12   that at the time that Professor Yoo wrote these memos that are

13   at issue, no court had addressed the full -- had addressed the

14   question of what exactly these rights are, even had attempted

15   to define the floor as the Court has defined it today.

16          And as I was saying, with *Hamdi*, with the

17   procedural -- *Hamdi*'s recognition that the full panoply of

18   procedural rights may not apply in the enemy combatant setting

19   is a clear recognition that that setting is different than

20   other detention settings.

21          And although *Hamdi* did not specifically address

22   interrogation or confinement claims and the Fourth Circuit,

23   when it heard the appeal of Mr. Padilla's habeas petition, and

24   that was one year after *Hamdi*, that court said that enemy

25   combatants can be detained in order to get information.  And it

1    also said that one permissible attribute of an enemy combatant

2    designation, one consequence is that such persons -- and this

3    is a U.S. citizen -- such persons can be detained to get

4    intelligence and also be kept in isolation, or at least under

5    relatively limited communication situations, where they are --

6    do not have the full ability to communicate that someone in a

7    different detention setting might have.  And this is three

8    years after, three to four years after Professor Yoo wrote

9    these memos at issue and one year after *Hamdi*.

10          So that is another, more recent statement on the

11   rights that enemy combatants may have.  And it doesn't, again,

12   provide the type of clearly established rights.  It doesn't

13   stand for the proposition that the rights that plaintiffs

14   assert here were clearly established at the time.

15          I'd like to address quickly, plaintiffs cited Ninth

16   Circuit case of *Hydrick v. Hunter*.  Even that case, Your Honor,

17   recognizes that the rules involving -- for a new category of

18   detainees, I believe the argument that plaintiffs made was that

19   Professor Yoo was trying to say that the enemy combatant

20   designation is some new category, and therefore that is why he

21   should be entitled to qualified immunity.

22          And first of all, it's not a new category.  It was

23   recognized in *Quirin* in 1942 that someone -- that there is such

24   a thing as an enemy belligerent.  There was a definition in

25   *Quirin*, someone who enters the country for the purpose on

1    behalf of an enemy to commit a terrorist attack or some kind of

2    attack against the country.  The category has been around for a

3    long time.

4            But even their case of *Hydrick*, it recognizes that

5    where there are relevant differences that the rules involving

6    or rules applicable to old categories of detainees don't apply

7    to new categories of detainees when there are relevant

8    differences.  And clearly, there is a relevant difference

9    between someone who's detained for an immigration violation or

10   someone who is in jail because they have been convicted of you

11   know, larceny or murder versus someone who is being detained

12   because he is believed to have been a threat to the country; if

13   he is released, he would be a threat to the national security,

14   or he may have or she may have information that could be useful

15   in stopping future terrorist attacks.

16           **THE COURT:**  I understand that there has been a

17   debate among the courts, the circuit courts and the Supreme

18   Court, about rights that enemy combatants may or may not have.

19   And I have read the *Quirin* case, but is there -- are there any

20   lines to be drawn?

21           The allegation in the complaint is that

22   Professor Yoo said the Fourth Amendment doesn't apply, other

23   constitutional rights don't apply at all.  The Geneva

24   Convention doesn't apply; is there anyplace, you know, that the

25   Court can draw a line in saying that -- that when it apparently

1    leads to, in the case of Mr. Padilla, some pretty severe

2    deprivations of rights, can never be actionable or is subject

3    to qualified immunity and -- this is really a multi-part

4    question -- and was not well-established?

5            You are not arguing that the Fourth Amendment, the

6    Fifth Amendment, the Sixth Amendment doesn't apply at all to

7    Mr. Padilla; do you argue that?

8            **MR. GREENE:**  No, Your Honor, we haven't -- well,

9    with respect to -- we haven't argued specifically -- I mean, we

10   have made an argument about the -- there are several

11   components, but there is an issue of whether or not you have

12   the privilege against self-incrimination.  And we have said

13   that courts have recognized that that only applies in the

14   criminal context.  And Mr. Padilla has not alleged any

15   statement that was made.

16           So we have made some allegations about certain

17   aspects of those rights, but, generally, we are not saying that

18   the rights as a whole don't apply.  There are arguments in our

19   brief about certain discreet arguments.

20           **THE COURT:**  All right.

21           Anything further?

22           **MR. GREENE:**  I would just say that I understand the

23   Court has -- has just talked about the Fourth Amendment, that

24   is a memo that has gotten a lot of press, but we do think that

25   this is a causation issue, that the facts don't -- and the memo

 1   is before the Court, but we believe that has a matter of

 2   causation, it can't be said to be connected to --

 3           **THE COURT:**  Notwithstanding the Ninth Circuit cases,

 4   including the case that counsel recently filed in response to

 5   the Court's questions, the Ninth Circuit case involving the SEC

 6   attorney who gave -- in a proceeding before the SEC giving

 7   erroneous advice at the -- are you saying that at the 12(b)(6)

 8   procedural stage the allegation that Professor Yoo's advice

 9   caused the activity or the treatment that Mr. Padilla claims he

10   was subjected to, that that is not sufficient?

11           **MR. GREENE:**  We're saying it's not sufficient, Your

12   Honor, because as the Supreme Court recognized in **Twombly**, it's

13   not just a matter of alleging facts that set forth something

14   that is conceivable, it has to be plausible.  And as we've

15   shown in our briefs, we have argued in our briefs that the

16   chain of causation that they have set forth is not a plausible

17   one.

18           **THE COURT:**  Even the allegation that Professor Yoo

19   was part of the policy making so-called, "War Council," that's

20   not enough?

21           **MR. GREENE:**  No, Your Honor, because as the Supreme

22   Court recognized in **Twombly**, alleging factually-neutral conduct

23   is not sufficient to defeat a motion to dismiss.  There is

24   nothing, per se, unlawful about being a member of a war

25   council.  I would dare say that the United States has been in

1    several wars, and there have probably been war councils for

2    each war, so that, in and of itself, is not unlawful.

3            **THE COURT:**  Perhaps true, but being part of such a

4    policy-making body, in making policy or facilitating the making

5    of policy as to constitutional deprivations, that's more than

6    just being on the council, right?

7            **MR. GREENE:**  That is more, Your Honor, but, again,

8    there are specific allegations in the complaint, and they

9    relate to 12 specific memoranda.  And we have shown that those

10   memoranda don't match up with Mr. Padilla.

11           First of all, only two of them referred to him, one

12   was the designation memo, the other is the Nondetention Act

13   memo.  That can't possibly be the basis for any constitutional

14   claim because the Supreme Court has said that the Nondetention

15   Act doesn't bar the detention of an American citizen, and they

16   said this in 2004.

17           Even if the Supreme Court is wrong, if some

18   subsequent version of the Supreme Court overturns that, it

19   can't be said that in 2002, John Yoo was wrong.

20           **THE COURT:**  All right.

21           Counsel, response?

22           **MS. METCALF:**  Two points, Your Honor.

23           First of all, I would like to address Counsel's

24   arguments as to the clearly established line of cases.  But if

25   I might, because we started to get into causation, if I could

```
 1   draw upon my colleague, if that would be all right?
 2              THE COURT:  Sure, absolutely.
 3              MS. METCALF:  Thank you so much.
 4              So I just would like to point out that the standard
 5   for whether or not something is clearly established is a very
 6   common sense one, it's whether a defendant should have been put
 7   on notice, whether the unlawfulness must be apparent.  And for
 8   the reasons I've already stated, we believe that with respect
 9   to certain core rights, they were clearly established.
10              And I would also like to respond to Counsel's
11   reciting of the Fourth Circuit case where he suggests that that
12   case --
13              THE COURT:  Well, when you say -- let me push back.
14              MS. METCALF:  Certainly.
15              THE COURT:  You say the core rights have been
16   established; have they been established in light of Quirin and
17   some of its progeny in the so-called war-making context?
18              MS. METCALF:  Well --
19              THE COURT:  I understand the cases where somebody is
20   staked out in the sun for eight hours in Arizona, or wherever
21   it was, but I -- Counsel makes -- Professor Yoo's counsel makes
22   a point that in the military context it wasn't clearly
23   established, that we are all kind of -- we are not making this
24   up as we go along, but we are evolving, or the law is evolving.
25              MS. METCALF:  Sure.  And I would submit that perhaps
```

```
 1   one of the reasons is that it's not our typical military

 2   procedure to detain U.S. citizens.  But we know that even when

 3   they detain, you know, POWs, admitted alien enemies, there

 4   were, until Mr. Yoo's memos, very clear rules in place that the

 5   military took pride in observing, and it had observed and had

 6   been a leader in those evolving standards in the last 50 years

 7   since the Geneva Convention.

 8           And Field Manual 34-52, all of these rules were with

 9   the swipe of a pen disregarded, and that effectively left our

10   client in a legal no-man's land.

11           THE COURT:  Do those rules in the Geneva

12   Convention -- the Court raised itself; do they rise to a

13   constitutional dimension?

14           MS. METCALF:  I don't know, Your Honor, that they

15   rise to a constitutional dimension.  For example, there might

16   be additional protections in some of those rules that would not

17   be afforded under a simple substantive due process test;

18   however, I do think that they would be instructive in terms of

19   certain lines that one ought not cross.

20           And I would just emphasize that it's our position

21   that just as the Court in Hydrick rejected the idea that a new

22   category somehow deprives one of rights, there, the Ninth

23   Circuit said we do not adhere to the theory that every dog is

24   entitled to one bite.

25           And what I think the Court meant there is that it
```

1    simply can't be the case that a new category of detainee, one

2    can treat him in any which way until the first person brings a

3    lawsuit to establish the right, and then it's only then that

4    the protection will be recognized.

5            And finally, I would just point out that the Fourth

6    Circuit in the Padilla case only made statements -- it really

7    was dicta as to intelligent gathering.  And it specifically

8    only held -- it recognized that Mr. Padilla could be held to

9    prevent communications among confederates.  It said nothing

10   about incommunicado detention, such as the 21 months in which

11   we alleged he was denied all access to counsel and all access

12   to the outside world.  And it certainly said nothing as to the

13   conditions of the confinement and the interrogations used.

14           *THE COURT:*  All right.

15           Did you want to have your colleague respond as well?

16           *MS. METCALF:*  If I might.  Thank you, sir.

17           *MS. TOWNSEND:*  Sorry about the musical chairs,

18   Judge.

19           *THE COURT:*  That's all right.  Just don't call me

20   judge, I don't like that.

21           *MS. TOWNSEND:*  Sorry, Your Honor.  Bad habit from my

22   clerkship.

23           I would just like to respond to the causation

24   arguments that came up there.  As I understand it, defendant's

25   position is that our allegations are somehow implausible, that

1    our causation allegations are implausible.  With respect to the

2    policy making allegations, we have alleged that he was a member

3    of War Council and that he himself described that war council

4    as a policy-making body.  And we think that the allegation that

5    he himself described it as a policy-making body certainly

6    satisfies the *Twombly* plausibility standard and establishes a

7    causal connection between his policies, the policies that he

8    made, and the harms that flowed from those policies.

9            And we think that it's absolutely clear that that is

10   sufficient under *Hydrick*, which is a post-*Twombly* case, and in

11   which the allegation simply named a variety of people who are

12   in senior executive positions at the hospital, including a

13   psychologist.  And the Court said that because they had those

14   executive positions, it was -- the allegations were sufficient

15   to withstand a motion to dismiss.

16           Now, with respect to the causal link between the

17   memoranda and the constitutional violations, first, I believe

18   defense counsel said that we rely only on the memos that are

19   enumerated in the complaint, that is absolutely not true.  In

20   paragraph 19, we say that the memos include but were not

21   limited to the memos that we then enumerate.

22           And then in paragraph 21, we state that the memos,

23   which were defined as including others not attached and not

24   enumerated in the complaint, advised that there were no legal

25   constraints, either international or domestic, on the

1   executive's policies, with respect to the detention and

2   interrogation of suspected terrorists, and that according to

3   Defendant Yoo, neither the Fourth or Fifth Amendments placed

4   any limitations on presidential power to capture, interrogate

5   or detain terrorism suspects inside the United States or

6   outside of it.

7           So our position would be that there are other

8   memoranda out there that would directly advise of the

9   lawfulness of interrogation techniques as applied within the

10  United States.

11          **THE COURT:**  All right.

12          **MS. TOWNSEND:**  And finally, I would say that there

13  certainly is a causal connection between the October 2001 memo,

14  the one that said that the Fourth Amendment has no application

15  within the United States and Mr. Padilla, although Mr. Padilla

16  is not named in that memo, because the June 8th determination

17  of belligerency specifically describes the detention of

18  Mr. Padilla as a military operation.  And then the October memo

19  says that there are no constraints, none at all, not the Fourth

20  Amendment, not any other part of the Bill of Rights on domestic

21  military operations.

22          **THE COURT:**  You want to say anything further on that

23  point, Counsel?

24          **MR. GREENE:**  Just a couple of quick points, Your

25  Honor.

1          First --

2          **THE COURT:**   The Government is not making --

3    Mr. Yoo -- Professor Yoo is not making the argument that a

4    lawyer can never been liable for giving advice knowing the

5    advice will result in illegal activity; is that your position?

6          **MR. GREENE:**   No, Your Honor, that is not the

7    position we are arguing.  What we are arguing is that it

8    certainly wasn't clearly established at the time he gave the

9    advice that he gave or is alleged to have gave, that in this

10   particular context that a lawyer could be held liable about is

11   a lawyer who is giving advice to deal with war making and

12   national security.

13          With respect to the arguments about the Geneva

14   Convention, that's one of the issues -- again, this goes back

15   to causation, that the memos that counsel refers to, and I

16   won't go into it in detail, but those memo are about non-U.S.

17   citizens and activity that happened outside of the U.S. and

18   other than conclusory allegations about things.

19          And, moreover, the war policy allegations are also

20   about policies that were supposedly developed.  All the

21   evidence that they cite in support of those allegations relates

22   to memos that discuss things that happened to people outside

23   the U.S.  We don't dispute that it was plausible that John Yoo

24   was part of a war council, what we are disputing -- we are

25   disputing the plausibility of their allegations showing that

1  his participation in that war council led to Mr. Padilla's --

2  the claims that Mr. Padilla is making in this case.

3          And with respect to what the Fourth Circuit said or

4  did not say, the fact that the Fourth Circuit didn't address

5  certain issues about Mr. Padilla's interrogation or condition

6  of confinement just, in our view, supports the view that it

7  can't be said.  And the Fourth Circuit decision was three years

8  after Professor Yoo wrote the detention memo on enemy

9  combatants.  That memo, three years later it still couldn't be

10  said that whatever right plaintiffs are claiming were clearly

11  established.

12          **THE COURT:**  All right, let's move on to Question No.

13  5.  And the first part of the question calls for a yes or no.

14          **MS. TOWNSEND:**  And, Your Honor, I would just like to

15  clarify that I understand the question.  My understanding is --

16          **THE COURT:**  That's a good start.

17                          **(Laughter.)**

18          **THE COURT:**  Yes?

19          **MS. TOWNSEND:**  I think what you are asking was

20  whether you have to credit the allegation, because it's a

21  motion to dismiss, that Mr. Padilla is not an enemy combatant

22  or whether there is something you can take judicial notice of,

23  for example, that contradicts that allegation.

24          **THE COURT:**  Well, right.  There is no dispute about

25  what -- the designation that was made, and so for purposes of

1  this motion, isn't that dispositive?

2           **MS. TOWNSEND:**  And our answer to that question would

3  be no.

4           **THE COURT:**  All right.  And the reason?

5           **MS. TOWNSEND:**  All right, the reason that we would

6  say that is that it is our position that the president lacked

7  authority to issue the order designating Mr. Padilla as an

8  enemy combatant.  And the reason that we say that is that

9  Mr. Padilla is not within the ambit, we believe, of the ***Hamdi***

10 decision because he was not detained on a battlefield, was not

11 bearing arms.

12          And we believe that the executive -- that the

13 president did not have authority to designate a U.S. citizen

14 picked up on U.S. soil thousands of miles away from any

15 battlefield during a time when the courts were open and

16 operating as an enemy combatant.  And so we would say that that

17 order is void, and that therefore Mr. Padilla is not an enemy

18 combatant.

19          **THE COURT:**  All right.

20          **MS. TOWNSEND:**  And --

21          **THE COURT:**  Go ahead.

22          **MS. TOWNSEND:**  And just to go beyond that, Your

23 Honor, what we would say is that even if you were to conclude

24 that you don't have to credit our allegation, even if you were

25 to conclude that Mr. Padilla is, because of that order, an

1   enemy combatant for the time being, we would say that that is

2   not dispositive of any of the claims in the -- in the

3   complaint, that a U.S. citizen, even one designated as an enemy

4   combatant, has a constitutional right not to be held

5   incommunicado, denied his right to challenge that designation,

6   and subjected to brutal interrogation.

7          **THE COURT:**  All right.

8          Counsel?

9          **MR. GREENE:**  Yes, Your Honor.

10         Our answer to the question is that for purposes of

11  this motion, it is dispositive that the president declared --

12  designated Mr. Padilla an enemy combatant.  So our answer to

13  the question is yes because it was the president who had the

14  authority to do so, and it was Congressionally granted

15  authority.

16         And moreover, the president's designation, or the

17  propriety of the designation was affirmed by the Fourth Circuit

18  in the Padilla case, in the appeal of Plaintiff Padilla's

19  habeas.  And for purposes of this -- the proceeding before the

20  Court, we believe that is dispositive.

21         With respect to the argument that the Fourth

22  Circuit -- that *Hamdi* only addressed the -- someone who was

23  overseas or who is caught in a war zone carrying weapons, the

24  Fourth Circuit's decision recognizes that -- found that Padilla

25  met the enemy combatant definition -- the definition for enemy

1   combatant in *Hamdi*, but it also found that he also met the

2   definition of enemy combatant set forth in *Quirin*, which is

3   someone who enters the United States on behalf of an enemy with

4   the goal of committing some type of terrorist attack here.  So

5   the Fourth Circuit recognized both bases.  And again, that is

6   three years after Professor Yoo's opinion.

7           So it can -- whether the Fourth Circuit was right or

8   wrong, it cannot be said that three years earlier Professor Yoo

9   was clearly wrong.

10          **THE COURT:**  Counsel, is that what the Fourth Circuit

11  held?

12          **MS. TOWNSEND:**  No, Your Honor.  What I would say is

13  that in the Fourth Circuit the facts are stipulated, so the

14  facts that were before the Court involved an allegation that

15  Mr. Padilla had, in fact, been in a zone of combat before

16  coming to the United States.

17          Those were not the allegations in the Mobbs

18  declaration, which purports to contain the information that was

19  presented to the president.  That piece of information came out

20  much later.  And so we would say that the order was based on

21  allegations that Mr. Padilla came from Pakistan, which is not a

22  zone of combat, to the United States, and that therefore he

23  doesn't fall within the definition under *Hamdi*.

24          I would also say that he doesn't fall within the

25  definition of enemy combatant under *Quirin* either, because he

1    was not a soldier of any recognized Government who came to the

2    United States removing his uniform, as I believe Justice Scalia

3    pointed out in **_Hamdi_**.  There was no dispute in that case, but

4    that Haupt, the U.S. citizen in that case, had been a member of

5    an armed forces in a enemy nation.

6           **_THE COURT:_**  So what is the process by which the

7    Court resolves the answer to the question?  The Court, from the

8    plaintiff's perspective, would look behind the designation and

9    make a determination about whether that order in the first

10   instance was, as a matter of law, not as a matter of pleading

11   or as a matter of discovery, was, based upon what it had before

12   it, was a lawful order; is that your argument?

13          **_MS. TOWNSEND:_**  One of the legal issues that you

14   would have to resolve in this case would be whether -- whether

15   Mr. Padilla falls within -- whether the president had authority

16   to detain Mr. Padilla as an enemy combatant.

17          But as I mentioned before, even were you to decide

18   that you wish not to reach that question or you reach that

19   question and decided against us, that wouldn't change the

20   underlying claims.  We believe that even were you to determine

21   that the order was valid and that Mr. Padilla was an enemy

22   combatant, that he would still have the right to bring a **_Bivens_**

23   action challenging his incommunicado detention and

24   interrogation and that, in fact, this is how it must be,

25   because in order for the **_Hamdi_** decision to be enforced, in

```
1    order for that right that was announced in Hamdi to have any
2    validity, the Government must not be able to do an end run
3    around the Hamdi rule of process by removing somebody from
4    their military detention before the Hamdi process is able to
5    occur.
6            You can imagine a situation in which the Government
7    designates somebody as an enemy combatant, takes them off the
8    street, interrogates them for 24 hours and releases them; that
9    person cannot possibly bring a habeas proceeding to challenge
10   the designation, yet their rights would have been violated.
11   And they must have some remedy; otherwise, the Hamdi right is a
12   nullity.
13           THE COURT:  Counsel, anything further on that point?
14           MR. GREENE:  Again, Your Honor, I would just say
15   with respect to the Hamdi rule of procedure, it's clear after
16   Hamdi was decided that Mr. Padilla had an opportunity to
17   challenge the factual basis for the enemy combatant
18   designation, and he deliberately and knowingly withdrew it.
19   And it's a matter of public record.  In fact, there is a -- the
20   Court can take judicial notice of the docket in the
21   South Carolina case; there is actually a letter from one of
22   Mr. Padilla's attorneys saying that he talked with Mr. Padilla,
23   and Mr. Padilla agreed to postpone the litigation of that part
24   of the case until --
25           THE COURT:  But by doing so, that doesn't make it
```

1  collateral estoppel, or it's really not law of the case because

2  it's a different case, right?

3          **MR. GREENE:**  No, Your Honor, but what we have said

4  is that whatever the factual -- even -- we have said that it

5  doesn't really matter, for purposes of this case, whether or

6  not there was some factual deficiency in the enemy combatant

7  designation because plaintiffs haven't alleged any facts which

8  would show that Professor Yoo was responsible for that, for the

9  facts that were gathered.

10          So even if the facts -- there was something wrong

11  with the facts, there was some underlying problem with the

12  facts, they haven't alleged any basis to hold Professor Yoo

13  liable for that response.

14          And again, our position is that it doesn't matter

15  whether the Fourth Circuit was correct or not, what matters for

16  purposes of this case --

17          **THE COURT:**  Well, it would matter.  The implication

18  of the Court's questions is that if Mr. Padilla was properly

19  designated as a combatant not based upon the advice of

20  Professor Yoo that perhaps that might cut off any chain of

21  causation.

22          Isn't that the argument?

23          **MR. GREENE:**  I'm sorry, can you repeat that again,

24  Your Honor.

25          **THE COURT:**  That if this was a lawful order, that is

1  to say, that the enemy combatant determination or designation,

2  that somehow not -- that that would essentially cut off any

3  causation between Professor Yoo's advice and some illegal

4  activity by the Executive Branch.

5         **MR. GREENE:**  Well, Your Honor, we would submit that

6  the fact that the order was made is enough, in and of itself.

7  The Court doesn't have to reach the question whether or not

8  there was a lawful order.  The fact that the designation was

9  made cuts off liability because it wasn't for -- plaintiffs

10 have not alleged anything that would show that John Yoo had

11 some causative responsibility for the -- any lawfulness or

12 unlawfulness of the order.

13        **THE COURT:**  All right, let me then go back to

14 plaintiff.

15        What is the nexus between -- because it's a slightly

16 different question than the Court asked, the nexus between the

17 designation or the presidential designation and the activity

18 of -- inappropriate activity or illegal activity by Professor

19 Yoo?

20        They are saying that, okay, taking my question as

21 true, it doesn't really matter, it may or may not be illegal or

22 an unlawful order by the president, but that doesn't impose

23 liability on Professor Yoo; what is your response?

24        **MS. TOWNSEND:**  First, I would say that if that order

25 is unlawful, then, certainly, it doesn't cut off the chain of

1   causation.  As we argued in our brief, the guidance -- the

2   correct case for your guidance there would be ***Malley v. Briggs***,

3   that if an officer seeks a warrant without probable cause and

4   the magistrate judge issues it, that doesn't relieve the

5   officer of liability.  So that is what we would say about that.

6        Now, even if the order were lawful, we would say

7   that that doesn't cut off Professor Yoo's liability for then

8   subsequently authorizing unlawful interrogation techniques,

9   incommunicado detention or writing a memo that says you don't

10  have to provide this person with access to counsel.  All of

11  those things would be completely independent of it.

12       **THE COURT:**  Or put another way, it would be an

13  interpretation of the right of the executive as a result of the

14  presidential determination being issued.  In other words, you

15  are arguing that it's the interpretation of this order that may

16  give rise to liability.

17       **MS. TOWNSEND:**  No, Your Honor, I don't -- I may not

18  be following your question.

19       **THE COURT:**  Well, the question is this, I think I'm

20  just restating what you said, which is you are saying even if

21  the order -- whether the order is lawful or not for

22  designation, if Professor Yoo gives advice and makes policy, as

23  you alleged, to the effect that now that Mr. Padilla has been

24  named an enemy combatant we can torture him --

25       **MS. TOWNSEND:**  Yes, Your Honor.

1    **THE COURT:**  That is really your argument, correct?

2    **MS. TOWNSEND:**  Yes.  So putting aside the order,

3    once Mr. Padilla was an enemy combatant, it would still have

4    been unconstitutional for Professor Yoo to offer advice that he

5    could then, by virtue of the designation, be held incommunicado

6    and tortured.  That would certainly be our position.

7    I would just add to that that I think under the

8    state created danger doctrine, Professor Yoo would also be

9    liable for having advised that he could be detained as an enemy

10   combatant.  And if he knew what would happen to him after that,

11   he would have created the risk of all of those things happening

12   to him.  And that might be another theory of liability implicit

13   in our briefs.

14   **THE COURT:**  All right.

15   Anything further on that question, Counsel?

16   **MR. GREENE:**  No, Your Honor.

17   **THE COURT:**  All right.

18   Ms. Mason, do you want to come up for Question No.

19   6?  And who is going to respond?

20   **MS. TOWNSEND:**  I will.

21   **THE COURT:**  So this is one of those questions --

22   well, I'll start with defendant's side on this, that that is

23   50 percent curiosity and 50 percent legal significance, shall

24   we say, because, putting it in context, you have the dynamic

25   where the plaintiff is making allegations concerning the

1  existence and content of certain memoranda.  Initially, the

2  Government says, well, the defendants have it wrong, we would

3  like to produce those memoranda, we'll do so under a protective

4  order.

5          And then the plaintiffs object to that; the

6  defendant said, okay, we'll post some of those memoranda, which

7  they then do, and then subsequently ask the Court to review and

8  take into account and take judicial notice of, which the Court

9  will do.  But there are other memoranda, cited and not cited,

10  including but not limited to citations; they are not before the

11  Court.

12          And there may be a very good reason, but should the

13  Court place any significance on those, the failure to produce

14  those?  And just sort of as a sideline to that, the consequence

15  of not doing so, of not producing those means, essentially,

16  that the Court is to take as true the allegations as to the

17  content of those memoranda.

18          So that's the setup for your answer, Counsel.

19          **MS. MASON:**  Gotcha, Your Honor.

20          The first thing that I would just like to make clear

21  is that my client, Professor Yoo, has no authority or legal

22  obligation to produce these memos.

23          **THE COURT:**  Well, you know, let me just stop you,

24  because when I initially wrote this question, I said, what is

25  the significance of the failure of the Government?  I made it

```
 1   more passive because I realized that that is the argument, but

 2   somehow Professor Yoo, in some fashion, shall we say, caused

 3   these memoranda to be produced.  He probably -- and it's been

 4   reported that he requested that the Government make these

 5   public.

 6           So what you are saying is technically right, the

 7   Government is not a defendant here, but that is why I put the

 8   question in the passive voice.

 9           MS. MASON:  And let me -- it may help to provide a

10   little bit of background about why we made that request that

11   those memos be produced.

12           First of all, it's been our position all along that,

13   you know, obviously, that special factors part of the case on

14   qualified immunity, it's plaintiff's burden.  So we think that

15   with respect to those allegations in the complaint, plaintiff

16   has to come forward and explain why they show clearly

17   established law.

18           In our opposition -- in our original motion to

19   dismiss, we basically said plaintiffs can't cite with no

20   discussion memorandums that they don't know the content of and

21   then make assumptions about the content of those.

22           Plaintiff then came back in their opposition and

23   they attributed some statements to three memos that we asked be

24   produced.  With respect to the three memos that were not the

25   subject of that, we had what we believed to be facially and
```

```
 1    valid reasons to say those memos can't support the causation

 2    argument the plaintiff made here by way of -- for instance, one

 3    was about CIA interrogation techniques.  We have pointed out to

 4    the Court that that memo is in redacted form on the ACLU's

 5    website.  Those interrogation techniques --

 6             THE COURT:  So you are stipulating that that is a

 7    reliable source, then, the ACLU website?

 8             MS. MASON:  Well, certainly, it's my understanding

 9    that that is where the memo is, and it's produced as redacted.

10             THE COURT:  All right.

11             MS. MASON:  So we made -- but however, we decided

12    that while we didn't agree with characterizations, plaintiff's

13    characterizations with respect to these other three memos, it

14    would be very difficult, for instance, to respond to plaintiff

15    saying Professor Yoo wrote a memo that says the Constitution,

16    the Fourth Amendment has no applicability to military action

17    inside the United States.  We think, in fact, that memo says

18    something much more narrow, and it's talking about certain uses

19    of military force, and that when you read it in context, it

20    doesn't support the sweeping proposition for which the

21    plaintiff cites it.  And moreover, that memo says, and courts

22    may disagree with me, courts may disagree with my

23    interpretation.

24             So John Yoo, through his counsel at the Justice

25    Department, asked OLC to produce those memos, and they said
```

1   that they would do it pursuant to a protective order.  What has

2   changed in this case, as the Court was aware, and the president

3   made very clear shortly after his inauguration, was that he

4   wanted -- he favored producing as much as could be produced, as

5   a general matter, in transparency.

6             So these three memos, along with, I'll say, a series

7   of other memos completely unconnected to this litigation, were

8   produced by the Government and made public.  And when I say,

9   "produced," I mean were made public by the Government.  So

10  Professor Yoo no longer needed to request this Court for an

11  order.  So that is just sort of the procedural way that we came

12  to request it and that we sort of are in the position that we

13  are in.

14            With respect to his obligation, again, the U.S.

15  isn't a party in this case.  The United States has no discovery

16  or other obligations in this case in this litigation at this

17  time, and nor, as I said, does Defendant Yoo.  And therefore,

18  the fact that not all the memos identified are fully in the

19  public record, we say makes no difference.  It makes no

20  difference, one, because special factors are a completely

21  independent basis for dismissal, and it makes no difference

22  because facially we have distinguished those three memos and

23  said why legally they are insufficient for qualified immunity

24  purposes.

25            **THE COURT:**  So, essentially, you are saying there is

1   no legal significance, is the short answer.  And there is no

2   obligation, A, because Professor Yoo doesn't have the ability

3   to force those to be produced, and, B, because the plaintiff

4   has the burden, essentially.  And the subject matter of those

5   memoranda are really not at issue in this case.

6           MS. MASON:  That is our -- our belief with respect

7   to those memos, yes.

8           THE COURT:  And I guess you would argue that it's

9   hard to prove a negative, so where paragraph 21 of the

10  complaint talks about memos inter alia, saying that there are

11  no legal restraints, domestic or international, on the

12  executive's policies with respect to detention, and

13  interrogation of suspected terrorists and these constitutional

14  amendments don't apply and that the Geneva Convention doesn't

15  apply, that the Court is then free to take those allegations --

16  for purposes of the ruling on this motion, to take those

17  allegations as true, assume those memos exist, and they say

18  exactly what the plaintiffs say they say, correct?

19          MS. MASON:  I think that to the extent plaintiff

20  makes conclusory allegations there is still -- *Twombly* requires

21  a nonconclusory allegation.

22          THE COURT:  I guess my point is, you had the

23  ability -- and again, I understand the difficulty of proving a

24  negative, and all that --

25          MS. MASON:  Right.

 1              **THE COURT:**  -- to say, okay, here are the memos they

 2    are talking about, we think, and here they are, and they don't

 3    say what they said, and therefore the Court can then take

 4    judicial notice of those, and for these purposes, the purpose

 5    of this motion, that would be dispositive, correct?

 6              **MS. MASON:**  Yes, we think so, Your Honor.

 7              **THE COURT:**  All right.

 8              Do you agree with her on all points?

 9              **MS. TOWNSEND:**  No, Your Honor, we don't.

10              **THE COURT:**  All right.

11              **MS. TOWNSEND:**  We -- we agree that the Government

12    doesn't have any obligation to produce those memos here.  The

13    legal significance, we think, is that and it shouldn't be

14    surprising because this is, after all, a motion to dismiss,

15    that the Court must, as it said, now take as true all the

16    allegations surrounding those memos, the memos that we believe

17    exist and we weren't able to enumerate, and that plaintiff --

18    and that defendants cannot, as they tried to in the reply brief

19    in Footnote 17 and 18, take issue with those allegations.  They

20    must be taken as true.

21              As I understand the argument, there is -- it's that

22    those allegations are not sufficient to cross the **_Twombly_**

23    threshold.  And in response to that, I would say that on a

24    motion to dismiss, they must be taken as true unless there is

25    something inherently implausible about those allegations, and

1   that, in fact, the content of the memoranda that have come to

2   light makes it eminently plausible that the other memoranda are

3   out there, and that, in fact, the memoranda which we did

4   enumerate do say what we say they say.

5          As to their relevance to Mr. Padilla's case, one of

6   the memos that is missing is a memoranda which we say advises

7   that there be no access to counsel for suspected enemy

8   combatants held at the brig where Mr. Padilla was being held.

9   So that is certainly, in our view, very relative to our claims.

10          Another is a memo on the possibility of criminal

11  charges against a United States citizen; we believe that that

12  memorandum address Mr. Padilla also and would be relevant

13  because it may well discuss why it is better to hold him as an

14  enemy combatant because he can be interrogated on Defendant

15  Yoo's theory rather than criminally charging him.  And so that

16  would also be relevant.

17          And the other memorandum is a memorandum about

18  permissible interrogation techniques for the CIA, and we have

19  reason to believe that the CIA was, in fact, conducting

20  interrogation at the brig, so that would also be relevant.

21          **THE COURT:**  That's in paragraph 19 of the complaint?

22          **MS. TOWNSEND:**  That is where we enumerates those

23  three memorandum, yes, Your Honor.

24          **THE COURT:**  What do you have to say about that?

25  Pretty specific allegations that seem to go right to the

     1   wheelhouse of the argument.

     2        **MS. MASON:**  I don't want to repeat what we said in

     3   our briefs, but, for instance, with respect to the memo which

     4   they purport to say exists on counsel -- on mail, on legal

     5   mail, that was a memo that was written before **_Hamdi_** and before

     6   it was clearly established what right, if any.

     7        So even assuming my client wrote a memo that said he

     8   couldn't have legal mail at the period of time when he wrote

     9   it, that can't be -- support a clearly established claim.

    10        **THE COURT:**  But what would have been the harm under

    11   the president's new transparency policy to have put that up on

    12   the website as well, all of those memos, be transparent and let

    13   us all see them?

    14        **MS. MASON:**  I have no idea.  And that is for the

    15   Administration to decide.  And I believe that the

    16   Administration is continuing to consider in all sorts of

    17   contexts what things they are going to release.  So it's not

    18   for me to say.

    19        **THE COURT:**  I understand.

    20        **MS. MASON:**  Not that it's not for me to say; I don't

    21   know the answer to that question.  But I know that the

    22   Administration made a choice to, like I said, make public not

    23   only the three memos that were subject to this order, but a

    24   number of other memos, and that that process is ongoing.

    25        **THE COURT:**  All right.

1          Anything further on this question?

2          **MS. TOWNSEND:**  I would just like to add one comment

3    about plausibility, Your Honor.

4          **THE COURT:**  About what?

5          **MS. TOWNSEND:**  About the charge that our allegations

6    with respect to memos are somehow implausible and therefore

7    fail under the plausibility standard and not be credited by

8    Your Honor.

9          We would say that is flat wrong.  And the best

10   evidence of that is that the defendant, in Footnote 17, I

11   believe, originally characterized the Fourth Amendment memo as

12   having nothing to do with this case, and therefore they didn't

13   need to put it in, because it was about domestic military

14   operations, and Mr. Padilla's detention was not a military

15   operation.

16         **THE COURT:**  I don't know that you need to argue that

17   because plausibility is really not an issue when you are

18   dealing with 12(b)(6) -- the Court is required to take all

19   allegations that are not merely conclusory as true.  So

20   although you have a point, and that may be a point you may

21   someday get to argue to some other body, fact-finding or

22   law-finding, if you will, body, that is not something that

23   really moves the Court in terms of the disposition of this

24   motion.

25         Anything further on this point?

1          **MS. TOWNSEND:**  Then thank you, Your Honor, no.

2          **THE COURT:**  So this is the opportunity which I put

3     in, always reluctantly in my questions, to ask if the parties

4     have anything further they wish to address that has not been

5     covered by the Court's questions or sufficiently covered in

6     your briefs that you would like to wrap up.

7          **MS. MASON:**  I just have one thing briefly on special

8     factors, and I think that will be it for our side, in general,

9     and that is what the Court makes clear in its special factors

10    case is, again, in this very unique textually committed to the

11    coordinate branches case and about the military that the

12    remedy, and we have talked a lot about remedy, that the remedy

13    here is principally electoral and legislative.  And the Court

14    said that very specifically in *Chilicky* and very specifically

15    in *Bush*.  The question is whether the existing remedy should be

16    augmented by an implied right of action.

17          In this case, the very remedies that the plaintiff

18    challenges and that have been put forth have been debated

19    extensively since 911 were a centerpiece of presidential

20    election, and with respect to key things, key policies, with

21    respect to this case, the Administration has changed its

22    position.  That, again, is a question of, fundamentally, policy

23    change.

24          **THE COURT:**  I don't know if the Administration has

25    changed its position.  The Administration made a very clear

1  position that what went on in the previous administration was

2  wrong, possibly illegal.  They didn't change their position,

3  they stated a position that in their view what went on and what

4  you are attempting to defend was wrong.

5         *MS. MASON:*  Well, for instance, particularly, the

6  president has used executive orders saying that the

7  interrogation techniques relied upon by the Department of

8  Defense between 9/11 and 1/20/2009, are suspended.  So the

9  Administration has specifically changed its policy.  With

10 respect to detention practices, the Administration has said

11 let's study it, and we are going to come up with our own

12 policy.

13        The point I'm making specifically with regard to the

14 case law, because it's the case law in special factors that

15 talks about this sort of electoral process, is that the

16 executive is considering it, that it's making policy choices.

17 And the Supreme Court said in **_Molesko_** that private rights of

18 action are not the place to influence entity policy.

19        And lastly, I think that I would just like to

20 address what is sort of the undercurrent of this litigation,

21 which is that nonexistence of a remedy, and if Mr. Padilla

22 cannot pursue this as a civil damage remedy in this court, that

23 somehow we, as a system condone torture.  One, we believe very

24 strongly that that is not true.  The Administration believes

25 very strongly that that is not true.  Torture is illegal as a

1    matter of federal law, it is actively prosecuted.

2            And whether or not the things in this case did or

3    did not constitute aggressive policy making or illegal conduct

4    is for the executive to decide in the first instance and for

5    Congress to decide if it needs to be supplemented by a private

6    right of action.  But again, those are for the executive and

7    the Congress in the first instance.

8            **THE COURT:**  I missed -- I understand your argument

9    on case law, I missed the last part of what you said about

10   the -- the undercurrent.

11           You are not saying that if in the course of this

12   process legislative -- legislative policy making, whatever,

13   high public officials commit illegal acts, clearly illegal

14   acts, that the -- an individual citizen who has been the

15   subject of those illegal acts has no tort remedy, in effect, or

16   no equitable remedy in this Court?

17           **MS. MASON:**  The answer to that is it depends on the

18   existence of special factors.  The Supreme Court has just been,

19   like I said, crystal clear in the case of, again, cases with

20   really bad facts.  So if special factors exist, the answer is,

21   no, that person doesn't have a tort remedy.  And if they don't

22   exist, the answer is, yes, they do.

23           **THE COURT:**  Okay.

24           Counsel, I'll give you the wrap-up.

25           **MS. METCALF:**  Just very briefly, Your Honor.  Thank

1   you.

2           We would urge this Court to reject the idea that

3   this is somehow a case about policy making at large.  This is a

4   case that, at its simplest, is about what happened to one

5   individual person, a U.S. citizen in detention, and whether or

6   not an individual defendant is accountable for his actions that

7   we believe caused the harms to our client.

8           Where a Government lawyer abuses his position of

9   public trust and participates in intentional constitutional

10  torts, there must be real consequences.  That is the very

11  nature of the rule of law and the Court's role.  Defendant Yoo

12  cannot take refuge in the legal no-man's land that he helped to

13  create.  And we allege he was instrumental in creating that

14  legal no-man's land.  And as the Supreme Court recognized in

15  *U.S. v. Lanier*, quote "There has never been a case accusing

16  welfare officials of selling foster children into slavery.  It

17  does not follow that if such a case arose the officials would

18  be immune from damages."

19          And we believe that those principles, that the Court

20  does have a role in holding individual officers accountable for

21  violation of clear constitutional rights applies.  It applies

22  in cases of national security, and it applies here.

23          The Supreme Court in recent cases involving enemy

24  combatants clearly envisions a role for all three branches in

25  setting what the rights are of enemy combatants.  And that is

1   the heart of this case.  And that is why we respectfully urge

2   the Court to grant Mr. Padilla his day in court.

3              **THE COURT:**  All right, thank you, very much,

4   Counsel.  Excellent work on both sides.

5              The matter is now submitted.

6              **MS. MASON:**  Thank you, Your Honor.

7              **(Proceedings adjourned at 10:39 a.m.)**

8

9                      **---o0o---**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

**/s/ Sahar McVickar**

**Sahar McVickar, RPR, CSR No. 12963**

**March 9, 2009**